# EXHIBIT 1

# STATEMENT OF LINDA FAIRSTEIN
## FORMER PROSECUTOR IN CHARGE OF THE SEX CRIMES UNIT
## MANHATTAN DISTRICT ATTORNEY'S OFFICE



05195

NYCLD_039825

FOR RELEASE
January 30, 2003

STATEMENT FOR THE PUBLIC SAFETY COMMITTEE
OF THE NEW YORK CITY COUNCIL
JANUARY 30, 2003

I sincerely appreciate the invitation to participate in today's hearing of the City

Council's Committee on Public Safety concerning the 1989 assaults referred to by the

media as the Central Park Jogger case. Unfortunately, the invitation came shortly before

I was scheduled to leave New York City on January 25th to commence the western

segment of what is to be a five week tour -- combining appearances which involve my

career as an author along with pro bono consulting and lectures involving victims of

sexual and domestic violence. That trip, given my commitments to organizations that

were made eight months earlier, could not be rearranged on such short notice. Today,

therefore, finds me in California on the date of this hearing. I requested the opportunity

to appear before you and testify personally upon my return, but I understand that could

not be arranged at this time. I submit this statement, and I am grateful for the generous

offer of Counsel to the Committee to read it in my stead.

I welcome today's hearings because I think that in view of all the media attention

since Matias Reyes revealed his role in the attack, and all of the misinformation that has

been disseminated about the original course of events in 1989, the beginning of a public

discussion of the facts and circumstances of both investigations is most useful. I will

make myself fully available at any mutually convenient time to assist in your effort to

arrive at a truthful determination of what occurred during the course of the original

investigation of the events of April 19, 1989.

05196

1

NYCLD_039826

When the five defendants were prosecuted more than a decade ago, the issue of the voluntariness of their confessions and the substance of their detailed admissions were scrutinized in open courtrooms throughout extensive pre-trial hearings and two jury trials. In marked contrast, the decision to vacate the resulting convictions was made on the basis of a very limited retrospective examination of a convicted murderer whose credibility has never been tested in a public forum, whose recollection is admittedly vague, and which resulted in a speculative analysis - and even more speculative conclusions - more than a decade after the events.

The factual basis for the recommendation to vacate the convictions that was filed by the Office of the District Attorney on December 5th of 2002, is replete with internal inconsistencies. It was submitted before the conclusion of what was a more thorough and still ongoing investigation undertaken by Commissioner Kelly and the NYPD. The legal and moral issues at stake here are of far too great a magnitude to be resolved in camera. A far more appropriate solution would have been to conduct hearings before the Court so as to test the credibility of Matias Reyes, and to elicit testimony from the five convicted men to determine whether *any* portions of their earlier admissions were, in fact, untrue.

At the time of the crime, I was a prosecutor in charge of the sex crimes unit of the Manhattan District Attorney's office, where I served for thirty years, before stepping down on February 8, 2002. On the morning of April 20th, 1989, I was contacted by a NYPD lieutenant who informed me of the attack on the jogger, whose body had been found several hours earlier, and of the other 'wilding' events in the park. I discussed the matter with Mr. Morgenthau and he backed my decision to assign the case to Elizabeth Lederer, one of the best prosecutors in that great office. On the evening of April 20th at

2

05197

NYCLD_039827

about 8p.m., I joined Ms. Lederer at the stationhouse, where she continued the questioning of some of the defendants who had been brought there throughout the night and day, videotaping statements of many of them – every minor in the presence of at least one parent or guardian during the entire proceeding.

Every police officer and prosecutor involved in the case knew, from the time the DNA results of the physical evidence that had been submitted for analysis in 1989 was returned to us several months later, that only a single individual out of the large group had "completed an act of intercourse" by ejaculating at the crime scene – something much of the media and even many of the lawyers involved erroneously refer to as proof there was only one rapist.   Two juries learned exactly the same fact – that one unidentified individual had not been apprehended along with the many young men rounded up within the several days after the attack.

Early last year, convicted murderer Matias Reyes disclosed to Corrections authorities that he was the previously unidentified attacker of the jogger.  The fact that his DNA was later confirmed as a match to the crime scene material was not only new evidence, but also good news.  The sixth attacker we had hoped to identify was now known.  He is a psychopath, a remorseless killer who had raped several women including his mother, and stabbed a young woman to death in the presence of her two children.  Even though the statute of limitations for the prosecution of the crime had long since passed – making it a very convenient time for Reyes to come forward – one could take comfort in knowing that his convictions for his other crimes had earned him a life sentence and that the sixth attacker we had sought was no longer at large.

05198

3

NYCLD_039828

The DNA match between the crime scene evidence involving the jogger and Matias Reyes does *not* exonerate any of the others convicted of her attack. The legal definition of rape does not require the completion of the sexual act, as many media reports have erroneously suggested. The DNA evidence alone does not speak to which offender struck the jogger with a weapon and how many of them tackled her to the ground – as all of them originally admitted doing. Nor does it exonerate those who "acted in concert" during both the physical and sexual assaults. If you and the public think you are familiar with all the facts of the original investigation, I would remind you that not only did each of these five confess to some kind of participation in the attack on the young woman to police, most of them also identified and confirmed each other's role in the sexual and physical assault on the comatose victim. What about Kharey Wise's statements to civilian witnesses? Nothing was coercive about them. The sister of a friend of Wise testified at the trial – pilloried by her own community at the time – that Wise admitted in a telephone conversation that he had held the jogger's legs while others raped her. She repeated that fact to detectives when she was re-interviewed in 2002, again corroborating Wise's guilt. I think any of you, upon hearing her, would find her more credible than Matias Reyes. Why is her critical statement treated so dismissively? In addition to that woman, the day after the rape it was Wise who encountered two friends on the street and told them he "did" the girl in the park the night before.

The dynamic of gang rapes is consistent with the evidence. More than ten young men, some of them only twelve and thirteen, surrounded the jogger after her head had been split open by one of them, and she lay on the ground. Some only watched from a distance as the five who originally confessed – and Reyes – groped at her, pinned her

4

05199

NYCLD_039829

down, and tried to get on top of her. It was clear to us that not all of them maintained

erections or penetrated. It was obvious that some were guilty of rape because they "acted

in concert" by striking her on the head or by holding down her flailing arms and legs.

We now have the benefit of hindsight and know that when the group of forty rioters ran

into the Park, Reyes was the only accomplished rapist among them. It is no surprise then

that he stayed longer with the unconscious victim, dragged her further from the place on

the roadway where she was attacked, and completed the sexual act – probably as the

others ran on to find more innocent citizens to beat up and rob. Should these men be

exonerated solely on the allegation of a convicted psychopath who, by saying he acted

alone, may be engaged in facilitating the lawsuit against the City of New York that the

lawyers have assured us will follow?

The second piece of new evidence in this matter is more complicated than the DNA

match. It is the statement that Reyes made when he came forward and identified himself

as the rapist. He told investigators that he had acted alone on April 19th.

Counsel for the five men maintain that Reyes' claim exonerates their clients of the

attack on the jogger. They also go further than Reyes, to assert that their clients were

innocent of the other crimes in the park that occurred the same night. Who determines

the credibility of such statements without a court proceeding? At least one of the

perpetrators, Raymond Santana, admitted in 2001 that he did in fact commit the other

assaults in the park. Do you believe him, or his lawyer?

It shocks me to think that Reyes' claim has not been tested in any legal forum. He has

never been subjected to cross-examination about the details of his "confession." In fact,

he has actually given several different accounts of his actions which vary from each other

05206

5

NYCLD_039830

in significant measure. Why hasn't the public been allowed to learn every version of his story as it evolved and changed? Why can't we see the videotapes and audio tapes of his confession, and examine the details of his various interviews? Why haven't any of the five convicted offenders been examined in open court as to their contacts with Reyes either directly or through intermediaries?

The prosecutorial recommendation to vacate the convictions omits all details of Reyes' extensive psychiatric history of manipulation and fabrication. While the report criticizes inconsistencies and inaccuracies in the 1989 videotapes of the five other defendants, it declares Reyes candid and forthright. Yet in the very same response, the absurdity of that declaration is self-evident, as some of the following statements appear here, from the prosecutor's affidavit, in quotes: "Reyes does not know exactly where or how he hit the jogger;" "Reyes does not know how he dragged her;" his account of what took place is "fragmentary," and "he cannot specify what other things he used" to strike the jogger." With that kind of shocking lack of specificity and detail, a prosecutor accepts Reyes account as reliable? I expect the intelligent public would not.

In August, 2002, Reyes swore before a notary to the statement he gave defense investigators about the crime. In contrast to the detailed video interrogations of the five men in 1989, some of them almost an hour in length, Reyes wrote twelve short sentences. When he was interviewed by a television correspondent, the facts he provided changed again. What else was said in those interviews? Defense counsel make scathing attacks on detectives and prosecutors when television researchers and reporters have audio and video tapes of conversations with Reyes that the public has not been allowed to hear and

6

05201

NYCLD_039831

see?  And when the D.A.'s report was filed in December, 2002, the details provide yet a third – different – version of Reyes' actions.

How can any one seriously oppose a hearing in a courtroom before a judge to test the credibility of Matias Reyes?  Why has all of this been decided behind closed doors, with no opportunity for the self-proclaimed attacker, who suffers no penalty as a result of his confession, to be cross-examined in a public forum?

Let me go back to 1989.  I have seen very few investigations in my professional life that were as brilliant as the one mounted by the NYPD in the hours after the rioting ceased in Central Park.  Do all of you remember where the first suspects were caught? Not coming out of church or dragged out of their beds while sleeping.  Rather, they were taken into custody on Central Park West, just minutes after having completed the last assaults on the two male joggers.  The detectives could not possibly have told them the names of the forty other participants who had scattered to their homes, and who had not yet been identified.  It was upon being stopped that each of the young men began to regurgitate the story, naming the other assailants who had also been attackers. It was Raymond Santana who listed more than fifteen of his cohorts to the police.  Kharey Wise did the same.  How could they have given such detail to the police if they had not been in the park, participating in the wilding and attacks?

Scores and scores of police officers were working on the investigation within hours of the riot.  Detectives were assigned from more than five different commands – Homicide, Central Park, and the 20th, 24th, and 26th precincts among others.  Many had never known each other before.  They were deployed out into the field, trying to find more than forty young men from the barest of descriptions – often with no more than a nickname or a

7

05202

NYCLD_039832

hang-out location to go on. The officers were white, African-American and Hispanic. They had no other agenda then to identify the offenders and try to reconstruct the events of the preceding evening.

More than one of the defense counsels has alleged that I was the "architect" of what they claim was a miscarriage of justice. By the time Lederer and I were invited to the precinct — twenty-one hours after the first arrests - most of the suspects had already made oral and written admissions. Lederer then did an absolutely stunning job of questioning the attackers again, on videotape, with parents cooperating fully and sitting in on the process with their sons. When I first got to the station house, I took note of how careful the police had been to bend over backwards to accommodate the special circumstances of so many juvenile suspects. Each youth was sitting in an open space in the detective squad, parents and guardians beside them. No one was handcuffed. The venue was moved to a larger precinct as the number of assailants grew, and moved again to establish a setting with a so-called "designated youth room" to meet all the standards of procedures mandated by law. None of these youths were promised that if they confessed to felony crimes they could go home. Many young men — more than fifteen — did in fact go home: those who admitted only to watching the group (not a single individual — but a group) attack the jogger and those who were present but committed no crime. They were certainly allowed to go home. After the most violent offenders admitted their participation in this or the other most serious attacks, they were put in a cell — where each of the others and their families could see that they were not free to leave. And still, their laughter, their recounting of their rioting to each other, their cat-calling at women police

05203

8

NYCLD_039833

officers – still all that casual mocking of the attacks went on by these five and several others throughout the long hours of the night and following day.

The criminal justice system is entitled to rely on uncoerced confessions. People attacking the admissions seem to ignore the fact that a pre-trial hearing to determine the propriety of the police conduct and the voluntariness of the admissions was held in open court in 1990, with each of the defendants represented by counsel. Then and throughout two trials, there was months of testimony about the manner in which the confessions were obtained. One judge and two trial juries found the process reliable and the statements credible. An appeals court reviewed the evidence and upheld the validity of the confessions. While there are some inconsistencies in some of the statements made by the five men, their admissions contain far many more *consistent* facts, far many more accurate details than anything Reyes has had thirteen years to concoct. I would be happy, should you so request, to document for you a list of the consistencies – in each statement and between and among the original defendants – and show you how they overwhelm the inconsistencies. Yusef Salaam's statement was perhaps the shortest, since he refused to go on videotape. In his oral remarks to a detective, he admitted striking the jogger with a pipe he brought into the Park. Salaam actually took the stand in his own defense at the trial – not coerced, of course, but advised to do so by counsel of his choice. He admitted being present in the park and carrying a metal pipe there with him. What was false about his statement? What was coerced? Why not a hearing to let him tell us what he saw and did in the park that night, and whether the use of the pipe he described was consistent with the one that fractured the jogger's skull?

05204

9

Perhaps today, defense counsel will offer in support of their criticism the opinion of a college professor who appeared on ABC's Prime Time last fall, and later wrote an Op Ed page piece for the New York Times. This expert on confessions attacked their validity, and I assume many viewers and readers believed he offered an independent decision. To the contrary, although not revealed in either of his statements is the fact that it was one of the defense lawyers in this case who asked the network to use him, brought him to the studio and stood next to him, out of camera range, during the filming in which he was presented as an impartial expert. Aren't we entitled to judicial process rather than hired guns who present themselves as uninterested parties to make determinations about the propriety of the police procedures? As an aside, and to give you an idea of how some of the media coverage of this case has enhanced the false perception of the confession proceeding, after I learned that this expert's op ed page piece in the New York Times was a result of his participation with the defense team, I submitted a piece about the case to the same page. I was told they would print it if I wrote about the case without mentioning the rape—just the other assaults that occurred that night. I declined, telling them it was like allowing me to write about World War II but telling me not to mention Hitler.

Some critics have questioned the timeline in the case, talking about exoneration as something to be determined by discrepancies of two or three minutes. This was a *rampage* inside the park – it was mob violence, moving in the erratic and uneven way that a deadly pack does, under cover of darkness. It was not a carefully sequenced and orchestrated event. It did not remain a consistent group of the more than forty individuals who ran into the park together at the outset. Rather, the attackers kept splitting and

05205

NYCLD_039835

regrouping in different random configurations as they were interrupted by police cars responding to the earliest complaints of wilding, before the jogger was attacked. None of the victims who testified was looking at a watch when he or she was assaulted, nor did the jogger have any memory of the exact time she left her apartment. And the rioters didn't punch time cards as they took off across roadways and ball fields looking for more blood to spill.

For some reason I have yet to understand, the assistant district attorneys re-investigating the case in 2002 never even attempted to interview the overwhelming number of police officers and detectives who worked on the case in 1989 – including the original crime scene analyst who first responded. Street crime officers, crime scene investigators, some of the smartest and most decent squad and homicide detectives who gave their best to this matter – trying to be fair, knowing every action they took would be examined microscopically in the courtroom - were never even offered the courtesy of a meeting to describe and detail what their actions had been and what had occurred. Neither was I.

Commissioner Kelly made a commitment to determine whether the men and women of his department had acted honorably in 1989. He not only has my profound respect for the thoroughness with which he has undertaken to do that, he also has my assurance that the integrity and professionalism of their actions at that difficult time was witnessed by many of us. Although some of the Commissioner's most valued officers have questioned me about past events in these last six months, and I have tried to provide them with facts and information, I do not know the status of their investigation, nor the information they have gathered to date. I assume they will report some of that today.

11

05206

NYCLD_039836

I would certainly urge this Committee to continue to press for an avenue to establish the true facts of the 1989 investigation. Many of us who were involved originally could provide a "punch list," if you will, of people to contact and information to evaluate. For example, did the District Attorney's Office unseal family court records of other juveniles charged with lesser offense in the park that night? We have the names of some who admitted watching the attack on the jogger – and among those were young men who talked of multiple assailants, not a lone rapist. There are other youths who were in the park, who saw three of these very defendants in question running from the scene of the rape, one of whom admitted that he participated. Medical evidence and many of the physicians and nurses who treated the jogger can explain why they believe there were multiple attackers. Police officers and a third prosecutor present can describe their participation and recollections. Many of us have notes and records of those events. ABC has "outtakes" of the Reyes interview of September, 2002, which the police should be allowed to examine for consistent or inconsistent statements. Phone conversations between Reyes and ABC reporters as well as between Reyes and the prosecutor must have been taped in 2002 as part of Correction Department policy, if not by ABC reporters themselves. People at ABC told me that every time they called Reyes, for months throughout the spring and summer of 2002, to try to convince him to go on air with them, that call was followed by one from the prosecutor, who told Reyes – they say – to wait for the DA's report to be issued, because she believed him and the convictions would be vacated. What promises were made to Reyes before September of 2002, and when can we hear those tapes? All of the above items are forms of evidence that are not referenced

05207

12

NYCLD_039837

in the December 5th court document and have not been subject to examination in an official forum.

The public is entitled to an open and honest examination of every fact and circumstance in this case, from those in the original investigation to the new, untested claims of Matias Reyes. The verdicts against the five men were reached after intense scrutiny of the police conduct and prosecutorial techniques, the physical evidence and the lack of evidence, in a public forum. That is exactly how the Reyes' statement – with all its inconsistencies, brushed off with what the prosecutor has called 'a fantastic evolution of memory' – should be reviewed and analyzed – not by the media, nor by a committee of prosecutors who have chosen to ignore witnesses and facts that were completely available to them. That is also how the detailed admissions of the five men should be examined, against their current claims that only portions of their statements are true. Let them tell us which portions those are, and let them tell us exactly which crimes they did commit on that tragic night.

I welcome the scrutiny that I hope will expose all this to the public. I repeat my offer to assist you or any designated body to suggest witnesses and evidence that should be reexamined in an open forum, and I thank you for your willingness to give a fair hearing to all the participants in these events.

Respectfully submitted,

Linda Fairstein

05208

13

NYCLD_039838