# EXHIBIT 5

RS W.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK -- PART 58
------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK    :

         -against-    :

KHAREY WISE, KEVIN RICHARDSON,    :
ANTRON MCCRAY, YUSEF SALAAM, and    :
RAYMOND SANTANA,    :

                       Defendants.    :
------------------------------------x

**AFFIRMATION IN RESPONSE
TO MOTION TO VACATE
JUDGMENT OF CONVICTION**

**INDICTMENT NO. 4762/89**

    NANCY E. RYAN, an attorney duly admitted to practice in the
State of New York and an Assistant District Attorney in and for the
County of New York, hereby affirms under penalty of perjury that:

    1.  I am the Assistant District Attorney in charge of the
above-captioned case, and as such I am fully familiar with the
facts and circumstances herein.

    2.  This affirmation is based upon information and belief, the
sources of said information and belief being transcripts of prior
proceedings held in connection with the above-captioned indictment;
files, records, briefs, notes, and videotapes maintained by the New
York County District Attorney's Office, the New York City Police
Department, the Federal Bureau of Investigation, and the City and
State Departments of Corrections;   interviews with police,
civilian, and expert witnesses;  and conversations with Assistant
District Attorneys.

    3.  I make this affirmation in response to motions submitted
by the defendants Kevin Richardson, Antron McCray, Raymond Santana,
Yusef Salaam, and Kharey Wise, all of whom were convicted after
trial of various charges contained in New York County Supreme Court
Indictment Number 4762/89. The motions have been made pursuant to
Criminal Procedure Law Section 440.10(1)(g).  Each motion requests
that guilty verdicts rendered against the defendants in connection
with the above-captioned indictment be vacated and set aside based
upon newly discovered evidence, and that the court grant whatever
further relief may be just and proper.

    4.  The defendants were all convicted of charges relating to
the April 19, 1989, assault and rape of a female jogger.
Additionally, defendants Richardson, McCray, Salaam, and Santana
were convicted of charges relating to the assault and robbery of a
second, male jogger on the same date. Finally, defendant Wise was
convicted of a riot charge in connection with a series of events
that encompassed both those criminal incidents.  The newly
discovered evidence relied upon by all the defendants consists of

PAGE 1 of 34

an affidavit by Matias Reyes, in which he swears that he alone committed the attack on the female jogger of which each stands convicted.

5.   Based on the facts and for the reasons set forth below, the People consent to the defendants' motions to set aside the verdicts on all the charges of which they were convicted.

6.   This affirmation does not describe the full scope of the review, reinvestigation, and reevaluation of the evidence undertaken by the Office of the District Attorney in connection with this matter.  It outlines the principal issues considered by the People in responding to the defendants' legal motions, summarizes some of the facts relevant to those issues, and explains the analysis undertaken to resolve them.  In short, it deals with the specific legal issue presented by the defendants' motions: whether the newly discovered evidence in this matter creates a probability that, if the evidence had been received at trial, it would have resulted in a verdict more favorable to the defendants on one or more charges.

## HISTORY OF THE PROSECUTION

7.   On the night of April 19, 1989, a series of violent incidents occurred in Central Park, involving members of a group of more than 30 teenagers.  The incidents resulted in the arrests and convictions of ten young men, including the above-named defendants. At approximately 9:05 p.m. Michael Vigna, a racing biker, was accosted by a band of youths on the East Drive, just north of the 102nd Street transverse.  A few minutes later, Antonio Diaz was assaulted and robbed, also on the East Drive, at about the level of 102nd Street.  He was left unconscious.  At roughly 9:12 to 9:15 p.m., a couple on a tandem bicycle was menaced on the drive just south of the 102nd Street entrance to the park.  Moments later, slightly south of that, a taxi driver had rocks hurled at his cab, and was threatened by a group of teenagers when he got out of the car to investigate.  And, beginning at about 9:24 p.m. and continuing until roughly 9:45, a series of four male joggers were set upon on the jogging path at the northern end of the Central Park Reservoir.  Two of the male joggers escaped essentially unharmed, but two, Robert Garner and John Loughlin, were assaulted. Garner was not seriously hurt.  Loughlin, however, was knocked to the ground, kicked, punched, and beaten with a pipe and stick.  He was knocked unconscious, and sustained significant but not life-threatening injuries.

8.   At approximately 1:30 a.m., an unconscious woman was found by two men walking on a footpath through Central Park.  She lay at the edge of a wooded area, roughly 300 feet north of the 102nd Street transverse road, which runs in an "s"-shaped curve connecting the East and West Drives of the park.  Police and medical personnel were summoned.  The victim, a twenty-nine year

NYCLD_030682

old white woman who came to be known as the "Central Park jogger," was removed to the hospital.  She had been badly beaten about the head, and suffered numerous bruises, scratches, and abrasions elsewhere on her body. Her t-shirt had been rolled into a ligature and used to tie her in a distinctive fashion.*  Subsequent investigation revealed that she had left her apartment on East 83rd Street at roughly 8:55 p.m. to go jogging in the park, and that her expected route would have taken her across the transverse road. The investigation also revealed that she had been raped, and that her radio headset and keys were missing.

9.  Raymond Santana and Kevin Richardson, as well as a number of other youths, were apprehended at approximately 10:15 p.m. on April 19, after police officers responding to reports concerning some of the incidents spotted them on the western outskirts of the park. Antron McCray, Yusef Salaam, and Kharey Wise were brought in for questioning on April 20, 1989, after they had been identified by other youths as having been present at or participants in some of the events in the park.

10.  Each of the defendants was questioned by detectives and made one or more statements.  All five of the defendants implicated themselves in a number of the crimes which had occurred in the park.  None of them admitted actually raping the Central Park jogger, but each gave an account of events in which he made himself an accomplice to the crime.  Kharey Wise was 16 years old at the time;    Yusef Salaam and Antron McCray were 15;    and Kevin Richardson and Raymond Santana were 14.

11.  On May 4, 1989, Indictment Number 4762/1989 was filed charging each of the defendants with Attempted Murder in the Second Degree (Penal Law Section 110/125.25(1)), Rape in the First Degree (Penal Law Section 130.35(1)), Sodomy in the First Degree (Penal Law Section 130.50(1)), Sexual Abuse in the First Degree (Penal Law Section 130.65(1)), and two counts of Assault in the First Degree (Penal Law Sections 120.10(1) and (3)), with respect to the Central Park jogger. In addition, the indictment charged each of them with Robbery in the First Degree (Penal Law Section 160.15(3)), two counts of Robbery in the Second Degree (Penal Law Sections 160.10(1) and (2)(a)), and two counts of Assault in the Second Degree (Penal Law Sections 120.05(2) and (6)) in connection with the attack on John Loughlin, and with Assault in the Second Degree (Penal Law Section 120.05(6)) with respect to jogger David Lewis. All of the defendants were also charged with Riot in the First Degree (Penal Law Section 240.06).

---

*The shirt was placed behind her head, crisscrossed over and through her mouth, and then used to tie her hands and wrists up in front of her face.

PAGE 3 of 34

NYCLD_030683

12.   Steven Lopez, 15, was also indicted in connection with
the attack on the jogger.  Lopez was named by Kevin Richardson,
Raymond Santana, and Kharey Wise as having participated in the
crime, although they varied greatly in their descriptions of his
conduct.  Lopez was interviewed and made a videotaped statement
following his arrest on April 19, and denied any knowledge of an
incident involving a female jogger.  However, in subsequent
forensic testing, a single hair taken from his clothing was found
to be "consistent with" the jogger's hair, based upon a microscopic
analysis.  Lopez was charged in the same indictment as the five
other defendants.  On January 30, 1991, he pled guilty to Robbery
in the First Degree in connection with the assault on John
Loughlin, and on March 13, 1991, he received a sentence of one and
one-half to four and one-half years.

13.   Charges were also filed against five other defendants who
were involved in the incidents which took place on April 19.

14.   Michael Briscoe, 17, was named by Kevin Richardson as a
participant in the assault on the female jogger; he was also named
by Kharey Wise, in one of two videotaped statements Wise made.
None of the other defendants mentioned him, at least by name.  He
was interviewed by investigators and made a videotaped statement.
He denied knowledge of or culpability in the incident.  Briscoe was
initially charged in connection with the crime in a Criminal Court
complaint, but was never indicted on those charges.  On May 4,
1989, he was indicted for Riot in the First Degree (Penal Law
Section 240.06) and Assault in the Second Degree (Penal Law Section
120.05(6)), in connection with the attack on jogger David Lewis.
Briscoe pled guilty to the assault charge on May 31, 1991, and
received a sentence of one year to run concurrently with a sentence
imposed on an unrelated case.

15.   Jermaine R████████, 15, was also indicted on May 4, 1989,
charged with Robbery in the First Degree (Penal Law Section
160.15(3), two counts of Robbery in the Second Degree (Penal Law
Section (2)(a) and (1)), three counts of Assault in the Second
Degree (Penal Law Section 120.05(2) and (6)), and Riot in the First
Degree (Penal Law Section 240.06).  The charges pertained to the
assaults on John Loughlin and David Lewis.  R████ had not been
identified by any of the defendants as a participant in the attack
on the female jogger, and he denied knowing anything about such an
attack in his interviews.  On October 5, 1989, R████ pled guilty
to Robbery in the First Degree in connection with the incident
involving John Loughlin.  He also entered into a plea agreement
that required him to testify for the prosecution if called upon to
do so.  R████ was not called as a witness in the subsequent
trials of the defendants, and he was sentenced to one year on April
4, 1991, and granted Youthful Offender treatment.

16.   On January 10, 1990, Antonio Montalvo, 18, was charged
under Indictment Number 0009/90 with two counts of Robbery in the

PAGE 4 of 34

NYCLD_030684

Second Degree (Penal Law Section 160.10(2)(a) and (1)), one count of Assault in the Second Degree (Penal Law Section 120.05(2)), and Riot in the First Degree (Penal Law Section 240.06), in connection with the assault on Antonio Diaz. Montalvo, known as "Tony", had been named as a participant, though not a rapist, in Antron McCray's statement about the jogger attack.* None of the other defendants had named him. Montalvo was interviewed by investigators about the events in the park, and made a videotaped statement to an Assistant District Attorney. He denied any knowledge of an attack on a female jogger, and was never charged in connection with the crime. On January 29, 1991, he pled guilty to Robbery in the Second Degree. He received a sentence of one year.

17. Orlando Escobar, 16, was also indicted on January 10 of 1990, for Robbery in the First Degree (Penal Law Section 160.15(3)), two counts of Robbery in the Second Degree (Penal Law Sections 160.10(2)(a) and (1)), two counts of Assault in the Second Degree (Penal Law Sections 120.05(2) and (6)), and Riot in the First Degree (Penal Law Section 240.06). The charges pertained to the assault on John Loughlin. Antron McCray had stated that a "Puerto Rican kid with a hoodie" had raped the jogger, and Escobar may have been the person he was referring to.** None of the other defendants mentioned him in their statements. Escobar was interviewed, denied any knowledge of the attack, and was never charged in connection with it. On March 14, 1991, he pled guilty

---

*Montalvo's identity as the person McCray was referring to is firmly established by analyzing McCray's statement and a number of others made during the 1989 investigation. McCray identified "Tony" as a participant in the assault on Antonio Diaz, and the person who took his food and ate some of it. Four others said the same thing. Raymond Santana stated that Montalvo admitted to him that he was the person who had taken and eaten the food. In statements made to the police at the time, Montalvo acknowledged having done so. Finally, Kevin Richardson stated that a person named "Tony" participated in the assault on Diaz, and said that he lived in the Lehman Projects. That was Montalvo's residence at the time.

**That conclusion is based upon an analysis of the contents of McCray's statement and others. In the course of his videotaped statement, McCray mentioned ultimately leaving the park with another youngster. He did not know the person well, and could not immediately recall his name. Later in the statement, he remembered that his name was Orlando. In Escobar's own statements, he made it clear that he had played a role in the incidents involving Diaz, the tandem bicyclists, and the joggers at the reservoir, but that he was not well known to the others in the group. In an interview with another individual conducted in 1989, that individual said that he saw McCray and Orlando Escobar when they returned to their apartment complex, and that both were wearing black hoods.

PAGE 5 of 34

NYCLD_030685

to Attempted Robbery in the Second Degree. He was sentenced to six months incarceration and four and one-half years probation.

18. On April 21, 1989, Clarence ████ 14, was charged in a Criminal Court complaint with Rape in the First Degree (Penal Law Section 130.35(1)), Attempted Murder in the Second Degree (Penal Law Section 110/125.25(1)), and Assault in the First Degree (Penal Law Section 120.10(1) in connection with the attack on the Central Park jogger. Antron McCray had named T████ as one of the people who actually raped the jogger; police notes reflect that Kevin Richardson had also placed him at the scene, though Richardson did not repeat the allegation in his written or recorded statements. None of the other defendants named him. T████ was interviewed and made a videotaped statement. He denied that he played any part in an attack on a female jogger. Subsequently, additional charges were filed against him in Criminal Court in connection with the attacks on Loughlin and other joggers at the reservoir. T████ was never indicted, and all charges against him were dismissed on October 31, 1989.

19. Pursuant to motions to suppress their statements filed by each defendant, a joint Huntley hearing was held before Justice Thomas Galligan from October 10 to November 29, 1989. On February 23, 1990, the court issued an opinion denying the defendants' motions, with the exception of a single oral statement made by Raymond Santana.

20. On June 25, 1990, Antron McCray, Yusef Salaam, and Raymond Santana proceeded to a joint trial before the Honorable Thomas Galligan. On August 18, 1990, after ten days of deliberations, the jury convicted each defendant of one count of Assault in the First Degree and Rape in the First Degree for the attack on the Central Park jogger; Robbery in the First Degree and three assault charges for the attack on John Loughlin; Assault in the Second Degree for the attack on David Lewis; and Riot in the First Degree. It acquitted each defendant of Attempted Murder and Sodomy as to the female jogger, and was instructed by the judge not to consider the other, lesser included counts. Since each was under 16 years of age, the court, on September 11, 1990, set aside all their convictions except those for First Degree Robbery and Rape, and then sentenced each of them, as juveniles, to consecutive prison terms of from three and one-third to ten years on each count. This resulted in an aggregate term of from five to ten years pursuant to Penal Law Section 70.30(1)(d).

21. Kevin Richardson and Kharey Wise were tried jointly, also before Judge Galligan, from October 22, 1990, to December 11, 1990. The jury deliberated for eleven days before reaching a verdict. Richardson was found guilty of each count of the indictment. Wise was convicted of Assault in the First Degree and Sexual Abuse in the First Degree with respect to the attack on the Central Park jogger, and of Riot in the First Degree. He was acquitted of the

PAGE 6 of 34

remaining charges.   Because of Richardson's age, Justice Galligan
set aside all of Richardson's convictions except for those for
Attempted Murder in the Second Degree and First Degree Robbery,
Rape, and Sodomy.  The court sentenced Richardson, as a juvenile,
to consecutive prison terms of from three and one-third to ten
years on each count, resulting in an aggregate term of from five to
ten years.  Wise was sentenced to terms of imprisonment of five to
fifteen years for Assault in the First Degree, two and one-third to
seven years for Sexual Abuse in the First Degree, and one to three
years for Riot.  The sentences were imposed concurrently, for an
aggregate term of five to fifteen years.

     22.  Yusef Salaam's conviction was affirmed by the Appellate
Division (187 A.D.2d 363) and by the Court of Appeals (83 N.Y. 2d
51).  Antron McCray's conviction was also affirmed by the Appellate
Division (198 A.D.2d 200), and the Court of Appeals denied leave to
appeal.   The same is true of the conviction of Kharey Wise (204
A.D.2d 133).  Kevin Richardson's conviction was affirmed by the
Appellate Division (202 A.D.2d 207).   Raymond Santana never
perfected an appeal.

**EVIDENCE AGAINST THE DEFENDANTS AT TRIAL**

     23.  A thorough and extensive investigation was undertaken at
the time of the original proceedings in an effort to develop
additional evidence.   Nevertheless, the People's case at both
trials rested almost entirely on the statements made by the
defendants.[*]

     24.  In addition to the defendants themselves, twenty-four
young men who were in Central Park on the night of April 19 were
interviewed, some repeatedly, as were a number of the defendants'
other associates.  However, only one associate of one defendant,
Kharey Wise, testified at trial.  Her testimony related to a single
inculpatory statement she said Wise had made to her, after he had
been indicted.[**]

---

[*]Kevin Richardson and Antron McCray each made one written and
one videotaped statement.   Raymond Santana made two written
statements, with a supplement to one of them, and a videotaped
statement.   Yusef Salaam made one oral, unrecorded, unsigned
statement.   Kharey Wise made two written and two videotaped
statements.

[**]That witness was Melody Jackson.  Her brother, much younger
than she, was a friend of Wise, and she herself had known Wise for
years.   She testified that on one occasion when she was in the
family apartment where her brother lived, Wise had telephoned from
jail.  He called to speak with members of the family, as he often
did.  She testified that when she got on the telephone, she told
                                            (continued...)

NYCLD_030687

25. The crime scene, the victim, the defendants, and their personal effects were all examined for forensic evidence. Those examinations resulted in the collection of blood, semen, and hair evidence which was tested using the technologies in existence at the time.

26. The crime scene covered a wide area, and comprised five separate sites at which relevant evidence was recovered. All of the sites were on or north of the 102nd Street transverse. Two substantial bloodstains, each roughly two inches in diameter, were located on the transverse road itself, just north of the midline. Beginning at the edge of the roadway was a visible path of flattened vegetation, measuring from sixteen to eighteen inches wide, which extended to the treeline that began forty feet to the north. Within the wooded area where that vegetation ended, a trail continued to be visible for some distance in the dead leaves and other matter covering the ground.

27. Inside the treeline, approximately seventy-eight feet from the roadway, more bloodstains were discovered at a location where the ground -- bare earth covered by leaves and twigs -- appeared to have been disturbed. Blood samples were taken from leaves in the area, and a rock which appeared to have blood and several hairs on it was removed for testing. Approximately two hundred twenty-five feet beyond that, farther into the wooded area and down a slope, was another, larger area of disturbed ground with a considerably greater quantity of visible blood and a single hair. A trail of apparent blood spots was observed between the two sites. A white sock and the insole of a jogging shoe were found a short distance away from that second site, and a fragment of brick was also recovered. A second sock was found about forty feet away.

28. The jogger herself had been found at the bottom of the slope, near an unpaved path, forty-seven feet from the location of the disturbance above. On the opposite side of the path, scattered approximately thirty-two feet from where she lay, investigators recovered a pair of black jogging tights and two jogging shoes. One of the jogging shoes was untied, and the insole had been removed; the other shoe was tied.

29. Numerous items of physical evidence found at each of these locations were removed and tested for forensic evidence. For

---

** (...continued)
him she could not believe what she was hearing about his having sex with "that woman." According to Jackson's testimony, Wise replied that he had not had sex with her, but had only held and fondled the victim's leg. Jackson never mentioned Wise's statement to anyone, including members of her own family, until the eve of trial, when her brother was being questioned about Wise by the police, and Jackson interjected with the information.

PAGE 8 of 34

NYCLD_030688

purposes of this motion, only two of the specific test results need be delineated.

30.  The rock recovered from the disturbed site closest to the road was found to have human blood on it.  The rock was sent to the F.B.I. for DNA testing, but no DNA profile could be created.  It was, however, typed according to the far less discriminating ABO system, and certain proteins or antigens identified.  The test results indicated that it was consistent with the jogger's blood type.  The hair fragments found on the rock were also examined by the only means then available, a visual, microscopic comparison with samples taken from the jogger.  The comparison yielded the conclusion that the hair on the rock was consistent with the jogger's -- meaning that it had characteristics similar to her hair, and could have come from her.

31.  Utilizing those results, testimony about the rock and the hairs that had been found on it was elicited at both trials.  The microscopic analyst who had examined the hairs testified in the trial of Salaam, McCray, and Santana that the hair fragments on the rock were fragments of crushed and broken head hairs from the temporal area of the head.  He further stated that in his opinion, they had been crushed and broken due to force from the rock.  The expert went on to state that it was his belief that the rock could have been used to strike the head of the victim.  In the trial of Richardson and Wise, he stated it as his opinion, to a reasonable degree of scientific certainty, that the victim had probably been struck on the side of the head with the rock.

32.  DNA evidence was extracted from semen deposited on the jogger's sock, found near her at the crime scene.  It did not match any of the defendants, or any other known sample.*  The same was true of DNA evidence extracted from a cervical swab;  it did not match the defendants or any other known sample.  Expert testimony at trial, however, established that the DNA from both the victim and the sock appeared to have come from the same source.  Testimony also established that the DNA was not a mixture;  it was from a single source, meaning that only one individual had ejaculated.  A pubic hair found on the sock was also examined microscopically.  It was likewise found to be inconsistent with the defendants and every other known source.  The known samples included samples from all of the individuals whom the defendants had specifically named as rapists.

--------

*In addition to samples taken from the defendants, the jogger, John Loughlin, Antonio Diaz, and the jogger's boyfriend, samples were also secured from Steven Lopez, Michael Briscoe, Antonio Montalvo, Jermaine Robinson, Clarence Thomas, and Lamont McCall, all of whom had been with the defendants in Central Park that night.

NYCLD_030689

33.  The People offered testimonial and photographic evidence about the nature and extent of the injuries sustained by the jogger.  All of the relevant medical personnel were interviewed, and a number were called to testify, including an expert witness from the Medical Examiner's Office who described each of the jogger's injuries for the juries.  The People were unable to offer medical testimony to the effect that the injuries the jogger had sustained could only have been inflicted by multiple perpetrators.[*]

34.  Ultimately, there proved to be no physical or forensic evidence recovered at the scene or from the person or effects of the victim which connected the defendants to the attack on the jogger, or could establish how many perpetrators participated.

35.  The only forensic evidence recovered which in any way connected the defendants to the crime consisted of three hairs found on Kevin Richardson's clothing and one hair found on Steven Lopez's clothing.[**]  Richardson's clothing yielded nine human hairs, all of which were examined microscopically.  Six were not consistent with the jogger.  Three others, one from his underwear, one from his t-shirt, and one from his blue jeans, were found by the examiner to be consistent with the jogger's hair.  A similar conclusion was reached with respect to one out of the twelve hairs recovered from Steven Lopez's clothing; that hair was found on his shirt.  The examiner's report of his findings with respect to the hairs on Richardson and Lopez, as well as the hair fragments recovered from the crime scene, stated that they "could have originated" from the jogger.[***]

36.  Testimony concerning the hairs found on Richardson was introduced at both trials.  Testimony concerning the hair found on Lopez was introduced only at the trial of defendants Richardson and Wise.

---

[*]As part of the 2002 reexamination of the case, Dr. Charles Hirsch, Chief Medical Examiner of the City of New York, reviewed the jogger's medical records and photographs.  He has stated as his opinion that "Nothing about the distribution or severity of ... [the victim's] injuries indicates or reveals the number of assailants, which could have been one or more."

[**]The value of the hairs found on Richardson's clothing was compromised by the fact that the clothing was spread on the precinct floor to be photographed before the hairs were removed.  There was, therefore, a possibility of contamination.

[***]Two hairs were also removed from the clothing of Antron McCray, and ten from the clothing of Raymond Santana;  they were not consistent with the jogger's hair.  Kharey Wise's clothing was not taken because it had been laundered.  Yusef Salaam's jacket was taken;  no hairs were recovered.

PAGE 10 of 34

## NEWLY DISCOVERED EVIDENCE

### The Evidence Provided by Matias Reyes

37.  In early February of 2002, the District Attorney's Office was notified that an inmate had come forward with a claim that he had attacked and raped the Central Park jogger, and that he had committed the crime alone.  The inmate, Matias Reyes, had informed a Corrections Officer of his claim.  He had then been formally interviewed, on January 17, by an investigative supervisor from the Inspector General's Office.  Following that, information about his contentions was forwarded to the District Attorney's Office.

38.  Reyes, now 31, is serving sentences totalling thirty-three and one-third years to life imprisonment for three rape/robberies, one rape/murder, and one robbery* that he committed between June 11 and August 5, 1989.  The sentences were imposed on November 1, 1991, after Reyes admitted his guilt and entered pleas of guilty to the top counts in each case.

39.  Reyes' 1991 prosecutions had rested in part on DNA evidence taken from his victims and from the scenes of his crimes, which matched the DNA in a sample taken from him.  That evidence had been tested using the technology then in existence, RFLP, as were the samples in the Central Park jogger case.  Immediately upon learning of Reyes' claims, efforts were undertaken to locate the evidence from both cases, and the FBI laboratories were asked to make a comparison.  On May 8, 2002, the District Attorney's Office was notified that Reyes' DNA matched the DNA taken from the sock that had been found at the Central Park crime scene.

40.  As soon as notification of the initial comparison was received from the FBI, steps were taken to bring Reyes to the District Attorney's Office for a further investigation of his account.  Reyes was interviewed for the first time on May 23.  He was interviewed again on May 28, when he was brought to Central Park, and on May 30.  He has subsequently been questioned on a number of occasions.  Reyes has also provided samples of his blood, head, and pubic hair, and signed consent forms allowing investigators access to his complete prison file and all of his mail.  He has been interviewed extensively about the Central Park jogger case, about his criminal and personal history, about his motives in coming forward, and about his associations.

41.  The information Reyes provided in each of those areas has been extensively investigated with a view toward either

------

*According to Reyes' 2002 statements, he intended to rape the victim, but was interrupted by neighbors before he could force her into her apartment from the hallway where he accosted her.

NYCLD_030691

corroborating or refuting his statements. The investigation has
included interviews with police officers, Corrections personnel,
inmates, and civilians, as well as a review of all relevant records
pertaining to Reyes' personal, criminal, and psychological history
and the original investigation and prosecution of the attack on the
Central Park jogger.

42.   That investigation has led to the conclusion that Reyes'
account of the attack and rape is corroborated by, consistent with,
or explanatory of objective, independent evidence in a number of
important respects.   Further, investigators have been unable to
find any evidence that, as of 1989, Reyes knew or associated with
the defendants or any of the individuals known to have been in the
park with them on the night of April 19.   In any event, in their
statements, several of the defendants themselves named or otherwise
identified the individuals they claimed raped the Central Park
jogger;  the evidence indicates that none of those individuals is
Matias Reyes.   In addition, Reyes has proven to be candid and
accurate about other aspects of his life, associations, and
history, both personal and criminal.   A full review and
investigation of that criminal history has revealed significant
parallels with the jogger attack, and also resulted in the
discovery of important additional evidence.

43.   Reyes states that his decision to come forward with his
confession was prompted by a chance encounter with Kharey Wise in
Auburn Correctional Facility, and the resultant realization that
Wise was still incarcerated in connection with the attack on the
Central Park jogger.   Reyes says that he feared Wise's reaction,
and therefore disclosed nothing to him about his own culpability.
However, he began seeking advice from different individuals in the
prison system, telling them that he had committed a crime for which
someone else had been convicted, and wanting to know how he could
bring his information to the attention of appropriate authorities.

44.   Corrections records reflect that Wise and Reyes were both
imprisoned at Auburn during the relevant time period,* and
interviews with prison officials have established that the
encounter Reyes described could have taken place.   Interviews with
a number of Corrections employees, volunteers, and inmates have
confirmed Reyes' assertion that he began seeking help with a
problem in late 2001.  He specifically told some of them that he
had committed a crime for which another person had been convicted,
and that he wanted to rectify the situation.   Ultimately a
Corrections Officer, observing that Reyes seemed very troubled,
induced him to explain what was bothering him and set in motion the
process by which he came to the District Attorney's Office.

---

*Wise and Reyes had last been incarcerated in the same
institution from February to June of 1990, when both were in the
Adolescent Reception and Detention Center at Riker's Island.

NYCLD_030692

45. Reyes does not attribute his decision to come forward to having "found God," although he has stated that he has found religious services to be helpful. He has consistently explained himself in terms of his positive experiences in prison, the fact that people have treated him decently despite the nature of his criminal history, and his guilty reaction to seeing Wise.

46. Reyes' motives cannot be objectively proven or disproven. However, an extensive investigation has revealed no evidence that the defendants themselves induced him to come forward. There is no evidence of any connection between the defendants and Reyes prior to their incarceration in 1989. Except for a brief period in 1990 when he and Kharey Wise were in the same jail, he has not been imprisoned with any of them.* Moreover, none of them appeared to know of Reyes' claim until many months after he first spoke with Corrections officials. In fact, Kharey Wise was still incarcerated when Reyes made his claim, and did not apply for conditional release until July 26, 2002. Further, the one assurance Reyes sought when he first spoke with a Corrections Officer was that he would receive protection. He stated that he feared what Wise might do when he learned that it was Reyes who committed the crime he was imprisoned for.

47. More important, information Reyes has provided about himself and his history has consistently proven to be reliable and accurate, both about matters related to the case and matters with no direct connection to it. Reyes has also been candid, even with respect to aspects of his history that might cast doubt on his credibility.

48. For example, Reyes volunteered that he used to commit robberies and larcenies on a regular basis, stealing jewelry, money, and Walkmans. He frequently committed such crimes in Central Park, often by the reservoir. He was able to recall the details of several of his larcenies, and described the patterns he followed with respect to robberies. Those activities were not reflected in his records. Reyes also said that he had been arrested on one occasion, for a robbery he committed with several acquaintances in 1988, but that the case never went to court.

49. This information proved to be accurate. Investigators were able to retrieve records reflecting the arrest Reyes spoke

---

*Reyes himself picked a photograph of Michael Briscoe and stated that he thought they might have been in the same jail early in his incarceration. As noted above, Briscoe was one of the individuals charged in connection with the incidents in the park. Reyes' information was correct: the two were in the Adolescent Reception and Detention Center at Riker's Island from March 5, 1990 to May 31, 1990, although at that point, Briscoe was there for an unrelated arrest.

PAGE 13 of 34

NYCLD_030693

about.  They were also able to identify and locate individuals who knew Reyes in the late 1980's, and who confirmed the truth of his admissions.  A number of people observed him with stolen property, including both jewelry and Walkmans.

50.   The investigation has uncovered no evidence that Reyes knew any of the defendants or the others who were with them in Central Park on the night of April 19.   That fact has been established by proof coming from two directions -- on the one hand, from interviews with people who knew Reyes;  and on the other hand, from current and past interviews with the defendants and their associates.

51.   In 1989, Reyes was living on his own, working on an informal basis in a bodega on 102nd Street, across from the 23rd Precinct.  Much of the time, he slept in a van belonging to the bodega's owner;  occasionally he stayed with a neighborhood family who felt badly for him.  Investigators from the District Attorney's Office interviewed fourteen people who knew Reyes in 1989.  A number of them saw him on a daily basis.

52.  Many of those people describe Reyes as having been a loner, whom they never saw in association with any young people other than the two teenage sons of the family which occasionally helped him.  However, Reyes himself said in interviews that he used to commit petty crimes, such as shoplifting, with some neighborhood acquaintances.  A number of those acquaintances were located.  All were from the 102nd Street area -- in their own minds, a neighborhood distinct from the defendants'.*   None knew the defendants or their associates, and none ever saw Reyes with the defendants or their associates.  Two detectives from the 23rd Precinct who knew Reyes from the bodega where he worked and saw him regularly state that he appeared to be a "loner", and that they never saw him with anyone other than those who frequented the bodega.

53.  In the defendants' own 1989 statements, they listed those they knew who were in Central Park with them.  None named Reyes, by his real name or a nickname.**  The same is true of the twenty-four other individuals from the park who were interviewed at the time.

---

*The defendants and their companions were from housing complexes located somewhat farther north.

**At the time of his arrest in 1989, Reyes told police that he liked to call himself "Tony."  However, in interviews with a dozen people who knew him in 1989, all said that they knew his nickname to be "Checo," and that they never knew him to be called "Tony." In his 2002 interviews, Reyes said that "Tony" was an older boy he admired when he was younger.  He liked the name, and occasionally called himself that.

PAGE 14 of 34

NYCLD_030694

Raymond Santana, Kevin Richardson, and Michael Briscoe were interviewed in 2002, before news had broken of Reyes' information. They were shown photographs which included a picture of Reyes, and evinced no recognition at all. The same is true of a number of other individuals, present in the park in 1989, who were reinterviewed in 2002.

54. In any event, in their 1989 statements about the crime, three of the five defendants named or otherwise identified everyone they said raped the jogger. Based upon the evidence, it is a fair conclusion that none of the people they identified is Reyes.*

55. Reyes' convictions arose from crimes he committed on June 11, June 14, July 19, July 27, and August 5, 1989. The basic facts of those crimes are as follows:

(1) On June 11, 1989, Reyes stalked, raped, robbed, stabbed, and beat a twenty-four year old white woman in her apartment on 116th Street, between Park and Lexington Avenues. He used a knife he got from the victim's kitchen, and he stole, among other things, the victim's Walkman. The victim suffered a fractured nose, two black eyes, and multiple areas of bruising, some of them large, on her knees, her legs, her neck, and her flank. In addition, the victim had two superficial stab wounds on her thigh, one in her side, one on a finger, one near her left eyebrow, and one under each eye.

(2) On June 14, 1989, Reyes raped, robbed, and stabbed to death a twenty-four year old, light-skinned, blonde Hispanic woman in an apartment on 97th Street, between Madison and Park Avenues. Again, Reyes used a knife he procured from the victim's kitchen.

(3) On July 19, 1989, Reyes stalked, raped, robbed, and cut a twenty year old white woman inside an apartment on Madison Avenue, between 95th and 96th Streets. Reyes brought a knife with him. In addition to other property, Reyes took his victim's ATM card and PIN number. He then tied her with extension cords in a fashion which parallels the way the Central Park jogger was tied,** so that he could go to the bank and withdraw money. Because he had bound his victim, Reyes called 911 to summon help for her. The

---

*Raymond Santana claimed that he left the scene after Kevin Richardson had raped the jogger, while the crime was still ongoing. Yusef Salaam's statement was incomplete, and he spoke of two unidentified individuals having raped her.

**Reyes used extension cords to tie his victim. He bound her feet with one cord, used another to tie her hands, and a third to gag her by wrapping a cord around her head and crisscrossing it through her mouth. The cords were attached so that her hands were raised in front of her face.

PAGE 15 of 34

NYCLD_030695

victim suffered small, superficial cuts over one eye and under the other.

(4)   On July 27, 1989, Reyes stalked, robbed, and punched a twenty-eight year old white woman in the hallway of her apartment building on Lexington Avenue, at the corner of 95th Street. Reyes was unarmed. The crime was interrupted by neighbors. In his 2002 interviews, Reyes stated that he intended to rape the woman.

(5)   On August 5, 1989, Reyes stalked, raped, and robbed a twenty-four year old white woman in her apartment on East 91st Street, between Lexington and Third Avenues. Reyes was unarmed. He took the victim's bank card, and forced her to give him her PIN number. He intended to tie his victim, but she escaped before he could carry his plan out.

56.   In the course of his interviews, Reyes volunteered information about other sex crimes he had committed, for which he had never been arrested. One of the crimes he discussed was a sexual assault which he said he had committed in Central Park. His memory of the event was limited. He accurately recalled the exact location of the incident, and thought it had occurred in the daytime, but beyond that, he essentially knew only that he had accosted a woman with the intention of raping her, and that the crime had been interrupted by bystanders. He did not know when the crime had taken place, although he believed it occurred in 1989.

57.   The crime Reyes was describing was eventually identified, and the victim and witness located. Reyes had told the truth when he said that he committed the crime. He had in fact attacked, beaten, raped, and robbed a twenty-six year old white woman who had been exercising in the park near Lasker rink and pool, at roughly the level of 107th Street. Reyes was unarmed. A bystander intervened as the attack was ongoing, and Reyes left the park, calmly, taking the victim's property with him.

58.   Substantial circumstantial evidence establishes Reyes' identity as the perpetrator. Reyes knew, and in fact drew, the precise location where the crime occurred. There are no records of any other attack occurring there during the relevant time period. The victim stated that the attacker identified himself as "Tony." The victim and witness gave descriptions which are similar to Reyes as he appeared at the time. The victim picked a photograph resembling Reyes as a look alike in 1989. The witness recently identified a 1989 photograph of Reyes as looking "most like" the attacker. The victim described the attacker as having fresh stitches in a cut on the right side of his chin, and medical records reflect that Reyes had received stitches in that location the day before the incident. Reyes is not clear about whether the incident he remembered was an attempted or completed rape, but that may be explained by the fact that, according to the victim, he apparently did not ejaculate.

PAGE 16 of 34

L

59.    The incident occurred on April 17, 1989, in mid-afternoon, two days before the attack on the Central Park jogger. The victim was badly beaten about the head.   She had a large hematoma on her forehead, abrasions to both knees, bite marks on her left upper arm and neck, scratches over her neck, face, knees, and back, and multiple bruises.   In addition, her right ear was bruised and swollen, and her right eye was bruised and showed subconjunctival hemorrhages.   She recalls that at some point her attacker had his foot on her head.   The victim was treated and released, and the case was marked closed after initial efforts to contact the victim were unsuccessful. 

60.  Reyes disclosed information about a second sexual assault which he said occurred in a church located at Fifth Avenue and 90th Street.  Reyes remembered and described the scene accurately and in detail, but again, could remember little about the incident itself. In summary, he knew that he had accosted a woman inside the church, dragged her down a staircase with the intention of raping her, and then abandoned the sexual attack when she claimed to have some sort of disease.  He took money and jewelry from the victim, and left. He did not know when the crime was committed, nor did he remember any other particulars of the attack itself.

61.    That incident, also, was eventually identified.    It occurred in the Church of the Heavenly Rest, across from Central Park, on September 21, 1988.  Again, Reyes' admission that he committed the crime proved to be truthful.  Reyes attacked, choked, struck, robbed and intended to rape a twenty-seven year old white woman.  He was armed with a small knife, and he forced the victim to disrobe, but was dissuaded from raping her when she told him she had an infection.   The victim suffered multiple superficial scratches and bruises.*  The complainant viewed photographs on file with the Police Department, and picked no one;  Reyes' photograph was not on file.  The case was then marked closed.

62.  Reyes was also questioned about some of the other crimes for which he was convicted.   The degree of detail with which he could describe them varied:   in some instances his recollections were extraordinarily complete, particularly with respect to the events leading up to and following his crimes, and the concrete details of locations, pathways, and proceeds;   in others, his memories were more sketchy.

63.  The following summarizes the essentials of Reyes' account of his attack on the jogger:

---

*The victim in the case was interviewed in 2002, but this description of the crime is based on her 1989 account of what occurred.

NYCLD_030697

(1)  Reyes states that he left the bodega where he worked and headed for Central Park.  It was likely he would commit some kind of crime, but not necessarily a rape.  He entered the park at 102nd Street, and he first saw the jogger as she proceeded north on the East Drive, just south of the 102nd Street entrance to the park. She was running in the jogging lane on the east side of the road, wearing long black or navy blue jogging tights.  They were tight, and Reyes says he was attracted to her partly because he could see her "butt."

(2)  Reyes moved to the other side of the East Drive and began to follow the jogger, with the intention of raping her.  He did not want her to sense or see him directly behind her, so he began "zig-zagging" on the side of the road.  He was waiting to see whether she would take the long route around the park, heading north until the road looped around, or the short route, cutting across the 102nd Street transverse.  She took the short route, moving to the north side of the transverse road and heading west.  He crossed to the north side as well, still following her.

(3)  Reyes states that he caught sight of a "stick" or branch lying on the ground to the north side of the road.  (In diagrams and in a visit to the park Reyes has indicated the area he is talking about.)  He picked up the stick.  The stick was substantial;  it required two hands to hold.  Reyes then accelerated to catch up to his victim.

(4)  The jogger was wearing a headset, and she seemed to be playing it loudly, as she did not hear his approach.  Reyes came up behind her and struck a heavy blow to the back of her head.  Reyes does not know exactly where or how he hit her.  He is left-handed, but says he may well have struck her overhand, or from some other angle.  The jogger fell forward.  Her Walkman fell to the roadway. Reyes has diagrammed and shown investigators the approximate point on the road where he says he struck her.

(5)  Reyes says the jogger was conscious but clearly stunned and incapable of fighting, and that he then dragged her off the road.  Initially, he dragged her over ground that was grassy, with some grass "higher," and some grass "lower", into a "bushy" area. He explains that by a "bushy" area, he means an area among the trees, covered with dead leaves and sticks, which becomes more overgrown in the summer;  it was not overgrown at the time of the incident.  The area he dragged her into is to the north of the roadway.

(6)  Reyes does not know how he dragged the jogger.  He stopped when he reached a reasonably secluded spot.  At that point, she appeared to be recuperating from the original blow to her head, because she was talking and protesting.  He has repeatedly described her as holding her hand up to the right rear of her head,

PAGE 18 of 34

NYCLD_030698

saying that she was bleeding.  He states that he saw blood on the right shoulder of her t-shirt.

(7)  Reyes' account of what then took place inside the wooded area is more fragmentary.  He says that he cannot remember all the details of what took place, and therefore cannot give a complete narrative, but is positive about certain facts.

(8)  Reyes states that he knows that he pulled off the jogger's tights and shoes, and raped her.  At some point, which he believes was after he raped her, she broke away from him and ran; he says that he has an image of her running while naked from the waist down.  Somehow he brought her down, possibly by pulling her shirt up over her head.  Reyes had already beaten her in the spot they were in originally, but at that point the violence escalated. Reyes knows that he struck her in the face and head with a rock and other things.  He cannot specify what other things he used.  At some point in the course of the incident, he also used his hands on her.  He does not know how many times he hit her with the rock, but knows that it was "more than a couple."

(9)  Reyes says that he also knows that at some point, he found the jogger's keys;  he believes she had two, and he knows they were in a black key case which zipped around and had Velcro on it.  He describes the case as being the sort that can be attached to a belt, but says he does not recall where she wore it since she had no belt.  Reyes says he is particularly clear about the keys because after he found them, he began demanding that the jogger tell him her address.  His intention was to burglarize her apartment.  She refused to give him the information.  That, he says, angered him, and caused him to escalate the level of violence.  He knows that the jogger had no money on her, although he does not specifically remember searching for money.

(10)  Reyes states that he threw her clothes somewhere. However, he cannot remember what happened to her t-shirt.  He says that he recalls there being "something on her face" when he left, and thinks somehow her t-shirt might have been over her head.  He does not have any memory of tying or gagging her.  At various times, Reyes has also said that he may have moved her, or may have turned her over.

(11)  Reyes says that when he left the jogger, she was bloody and unconscious, but still alive.  He could hear her breathing, making some kind of hard sound in her throat, as though something had been broken.

(12)  Reyes says that he tossed the rock he used somewhere, but does not know where, or even whether it was in the immediate area.  He then made his way out of the wooded area in the same way he had come in.  When he reached the roadway, he saw that the stick he had used on the jogger was still there;  he picked it up and

PAGE 19 of 34

NYCLD_030699

threw it off to one side of the road or the other.  He also saw the
jogger's headset, still lying where it had fallen.  He put it on,
walked up onto the baseball fields to the south of the road, and
headed out of the park.  At some point he tossed the keys and case
away.  He is not sure when or where;  it may have occurred as he
was leaving the park, but could have happened earlier.

(13)  Reyes came out at the 102nd Street entrance to the park,
which intersects with the East Drive at a point south of the
transverse road.  There, he saw a detective he knew from the 23rd
Precinct named "Blondie," who was just entering the park. "Blondie"
was in a yellow cab with a partner whom Reyes did not know.
"Blondie" questioned him briefly about a commotion in the park, and
let him go on his way.

64.   Reyes' version of events regarding the attack on the
jogger is corroborated by, consistent with, or explanatory of
objective, verifiable evidence in a number of important respects.
The following sets forth some of the more significant points, in
summary form:

(1)   Reyes is accurate about the direction the jogger was
coming from and the direction she was travelling in, and he
correctly describes her jogging tights, which were tight, black,
and ankle-length.  He has also indicated that she may have been
wearing a white t-shirt, which she was.

(2)  Reyes' assertion that he began his attack by striking the
jogger in the back of the head with a heavy branch is consistent
with and explanatory of medical and crime scene evidence.  The same
is true of his description of the jogger's mental status after the
attack, of his recollection of her holding her hand to the right
rear of her head, and of his observation of blood on her right
shoulder.  The jogger had a depressed skull fracture, with a large,
overlying laceration, in the right parietal/occipital region of her
head -- in other words, in the upper right rear of her head.
According to Dr. Hirsch, that injury is fully consistent with a
blow from a heavy branch, and with the rest of Reyes' observations.

(3)  Reyes maintains that the jogger was wearing a Sony AM/FM
headset, with colors on the dial.  The jogger was in fact wearing
a headset when she was attacked.  The Walkman disappeared, and
despite an extensive search, was never found.  She does not recall
the make, but believes it may have had colors on the dial.

(4)  Reyes is accurate in his description of the location
where the attack occurred, and of the terrain he covered in
dragging the jogger into the woods.  Crime scene photographs show
a distinct path of flattened groundcover in vegetation that is a
mixture of grasses and weeds of varying heights.  The pathway is
sixteen to eighteen inches wide, and appears to be more consistent
with a single attacker dragging an inert form than with a group.

PAGE 20 of 34

NYCLD_030700

Vegetation to the side of the flattened path shows some sign of being disturbed, but trial testimony established that that was the result of crime scene personnel walking there. There are no other indications of trampling in the immediate area.

(5) Reyes says that he took the jogger's keys, which he found in a small, black case that zipped around and had Velcro on it. He believes there were two keys. It was known in April of 1989 that the jogger's keys were gone; their disappearance was unexplained. At the time, nothing was known about a case. In 2002, the jogger was asked about the possibility that she had a case. She stated that she was inclined to say that she carried her keys on a ring, but that she did own a dark green or black case with Velcro on it. She does not think that it had a zipper. It was the type of case that can be attached to a shoe. One of the jogger's shoes, found at the scene, was untied, as it would have been had a case been removed from it. The other shoe was still tied, as would be expected if it were pulled off in the course of a violent attack. The jogger also believes that she carried two keys.

(6) Reyes' recollection that he threw the jogger's clothes is consistent with the crime scene evidence. The location of her tights, shoes, and one sock indicate that they were in fact thrown.

(7) Reyes says that he beat the jogger in the head repeatedly with a rock. According to Dr. Hirsch, the medical evidence shows five lacerations and a skull fracture in the left temporal forehead area, all caused by blunt force trauma. He also states that when he left her, she was unconscious but not dead. He could hear her making a hard sound in her throat as she breathed. His description of her condition is consistent with the nature and extent of her injuries. The first officer on the scene testified that when he arrived at the scene, he could hear gurgling sounds coming from deep in her throat.

(8) Reyes maintains that he ran into "Blondie" on his way out of the park, and had a brief conversation with him. "Blondie" is a detective from the 23rd Precinct who knew Reyes. He used to see him regularly at the bodega where he worked. He does not remember whether he saw and spoke with Reyes in the park that night or not. Circumstantially, however, it is clear that Reyes did at least see "Blondie" on the night of the 19th. "Blondie" confirms that he did in fact enter the park, and that he did so at 102nd Street, in response to reports about criminal activities in the park. "Blondie" also confirms that he was in fact in a cab and was with someone who was not his regular partner. To the detective, Reyes was a harmless teenager. As he candidly reports, if he had seen Reyes and spoken to him, he would not have suspected him of criminal activity, and would have let him go. The fact that Reyes did see "Blondie" tends to confirm that he was not with the defendants. Given the nature of the criminal activities being

PAGE 21 of 34

reported, it seems likely that "Blondie" would have stopped a group of teenagers.

65. Reyes account of events is the first that has suggested an explanation for the existence of two areas of the crime scene where it appeared that attacks took place. His specific recollection that the jogger broke away only after he had raped her is, however, probably not correct. The jogger's clothing was found below the second site where an attack appeared to have occurred. That pattern of evidence indicates that her jogging tights were undoubtedly not pulled off her until she was at that second location. A more plausible scenario than the one Reyes recounts is that she broke and ran from him before the rape. However, the inaccuracy of Reyes' account in that regard should be evaluated in light of the passage of thirteen years.

66. Moreover, in evaluating the weight a jury would be likely to place upon his testimony, his failure to recall all the details of the incident must be placed in the context of his memories of other events. It was Reyes who freely disclosed that he had committed other sexual assaults, and the investigation revealed that he was telling the truth in that regard. Yet when the facts of those cases were uncovered, his memories of those particular events proved to be incomplete.

67. Corroboration of Reyes' account of the crime is found both in the pattern of his other sexual attacks and in some of their specific facts. He consistently targeted and stalked Caucasian women, or women who appeared to be Caucasian. His crimes all involved conversation with his victims, either as a way of making initial contact or as a way of acquiring information that would enable him to steal more property.* Frequently, conversation or a search for property alternated with outbursts of physical or sexual violence. All of his rapes or attempted rapes also involved robbery. In particular, where a Walkman was available, he took it. His beatings often focused on the head. His claim that he demanded the jogger's address echoes the cases in which he forced his victims to give him their PIN numbers. And although he cannot remember doing it, it is clear that Reyes is the person who tied the jogger with her own t-shirt. The manner in which she was tied -- behind the head, through the mouth, with the hands in front -- is strikingly similar to the way he tied another of his victims.

68. One additional piece of physical evidence may also corroborate Reyes' account. The victim had an oddly shaped wound on her left cheek, resembling a cross, but with curved arms. Reyes owned a ring, taken from him at the time of his arrest and retained

---

*Reyes makes no claim that this incident was initiated with conversation, a fact explained by the circumstances in which he targeted his victim.

NYCLD_030702

in the District Attorney's Office, on which the figure of Christ is raised on the flat surface of a cross. Reyes, who is left-handed, states that he used to wear the ring on his left hand. The ring and photographs of the wound were examined at the Office of the Chief Medical Examiner.* The number of variables involved makes an exact comparison with the wound impossible. However, in the opinion of Dr. Hirsch, "The patterned injury over the prominence of the victim's left cheek bone is consistent with a left fist blow, striking at an acute angle, partially imprinting the image of approximately half of the prominent parts of Mr. Reyes' ring on her skin."**

## Forensic Evidence

69.   After preliminary DNA results were received from the F.B.I. in May, the District Attorney's Office retained a private laboratory to conduct additional forensic testing.

70.   The laboratory performed further tests in connection with those DNA samples which connected Reyes to the crime. The tests provide additional corroboration of Reyes' account. The private laboratory concurred with testimony given at the defendants' trials that the DNA on the sock found at the Central Park crime scene and the DNA on the cervical swab taken from the victim came from the same person. Thus, Reyes' DNA matched both.

71.   Moreover, the laboratory found additional, untested semen on the sock, which it tested using technology not in existence in 1989. That test established that Reyes was the source of the DNA to a factor of one in 6,000,000,000 people. In addition, mitochondrial DNA testing established that Reyes was also the source of the pubic hair found on the sock in Central Park.*** In short, the DNA tests showed that Matias Reyes' claim that he raped the jogger was true, and confirmed that no one else's DNA was present in the samples taken from the victim or the evidence at the scene.

72.   Efforts were also made to locate all of the physical evidence which had been gathered at the time of the original

---

*No DNA could be recovered from the ring, which Reyes wore until August 5, 1989.

**The People introduced expert testimony in the original trial to the effect that the injury could have been caused by a rock or a brick.

***More technically, mitochondrial DNA tests only establish that a sample came from a particular person or someone else in his maternal line. In this case, for all practical purposes, the test established that Reyes was the source of the pubic hair.

PAGE 23 of 34

NYCLD_030703

prosecution. Those efforts were partially successful, and every item which could be found was retested. For purposes of this motion, however, the relevant test results pertain to hairs found on Kevin Richardson and the bloody rock found at the scene of the attack, and to the blood found on that rock. The hair found on Steven Lopez could not be located.

73. The three hairs found on Kevin Richardson were reexamined following F.B.I. protocols for questioned hair samples. The hairs were first re-examined microscopically and then submitted for mitochondrial DNA testing. All had been mounted on slides for examination in 1989.

74. The microscopic analysis of the hairs was performed by Special Agent Douglas Deedrick, formerly Chief of the Hair and Fibers Unit and currently Unit Chief of the Information and Evidence section of the F.B.I. Agent Deedrick disagreed with the expert opinion offered at the original trials. His conclusion was that the hairs were not suitable for comparison, and could not be used to link Richardson to the jogger. In his opinion, they were too undifferentiated and had too few characteristics for a meaningful comparison to be possible. He also disagreed with a characterization of one of the hairs as a pubic hair. In his view, no determination could be made as to what type of hair it was.

75. DNA was extracted from all three of the hairs found on Richardson, and none of the DNA matched the victim's. However, the official finding with respect to each of the hairs is that the results are "inconclusive." The reasons differ.

(1) One hair was found to contain a mixture of DNA from two different people. The jogger's DNA sequence was inconsistent with any combination of that mixture. The opinion of the examiner is that one of the DNA sequences probably resulted from contamination at the time the hair was originally mounted on a slide. Laboratory protocols require that when a mixture of DNA is found, no conclusion will be drawn as to the source of the hair.

(2) A partial DNA sequence was extracted from a second hair and compared to the jogger's, and seven "base differences" were observed; only two base differences are required to declare an exclusion. However, laboratory protocols require that results of each test be verified in order to eliminate the possibility of contamination. The verification is accomplished by performing a second test in order to replicate the original results, before conclusively excluding a possible source of the DNA. There was insufficient DNA extracted from the second hair to permit such verification to take place.

(3) The third hair had an intact DNA sequence extracted from it, which showed one base difference from the jogger's mitochondrial DNA. Two base differences are required in order to

PAGE 24 of 34

exclude a source, because single differences have been observed in hairs taken from the same source. However, when such differences occur in hairs from the same person, they are usually seen in particular regions of the DNA known as "hot spots." The difference observed between the jogger's hair and the third hair tested did not occur in a "hot spot". Additional samples of the jogger's hair were tested in order to see if the same base difference appeared. It did not. Both those factors reduce the likelihood that the questioned hair originated with the jogger, but she cannot be excluded as a source to a reasonable degree of scientific certainty.

76. The bloody rock found at the scene was also submitted for examination, and a limited DNA profile was obtained. That profile showed that the blood was female human blood, but inconsistent with the jogger's DNA profile. However, contamination cannot be excluded as a possibility. The rock has been handled by a number of people, and has not been stored in a manner which would ensure the integrity of the original DNA. If the original DNA has degraded, the profile raised may be DNA from an unknown person deposited over the original DNA.

77. The hair fragments found on the rock were also submitted for testing. As with the hairs found on Richardson, they were first examined microscopically by Special Agent Deedrick. He found them unsuitable for comparison, describing them as fragmentary and of limited value. In any event, the original hair samples from the jogger could not be located. Because hair changes over time, samples taken thirteen years later do not provide a suitable basis for comparison, even against standards of high quality. Accordingly, no new microscopic comparison could be made between the jogger's hair and the evidence.

78. Only one of the hair fragments was suitable for testing. The other fragments were too small. The fragment tested yielded only a partial DNA sequence, with a number of differences from the jogger's DNA. However, the size of the sample once again precluded verification through an additional test, and as a consequence no conclusive result was provided.

## THE NEWLY DISCOVERED EVIDENCE CLAIM

79. Under Criminal Procedure Law 440.10(1)(g), newly discovered evidence must meet six criteria in order to justify the vacatur of a conviction: (1) it must be such that it would probably have resulted in a verdict more favorable to the defendant if it had been received at trial; (2) it must have been discovered since the trial; (3) it must be such as could not have been discovered before the trial by the exercise of due diligence; (4) it must be material to the issue; (5) it must not be cumulative to the issue; and (6) it must not merely impeach or contradict the

NYCLD_030705

former evidence.  <u>People v. Salemi</u>, 309 N.Y. 208, 216, quoting <u>People v. Priori</u>, 164 N.Y. 459, 472 (1900).

80.   The newly discovered evidence in this case consists of the account of events provided by Matias Reyes, who states that he alone attacked and raped the Central Park jogger; DNA test results which conclusively establish that <i>Reyes was the sole source of</i> semen found on a sock at the crime scene and a cervical swab taken from the victim, as well as of a pubic hair found on the same sock; the record of prior, similar attacks committed by Reyes, including an assault and rape committed in Central Park two days before the jogger attack;  and scientific test results undermining the probative value of evidence introduced in the defendants' trials. All of that evidence meets the criteria set forth in the statute.*

81.    The vacatur of a conviction, however, requires not merely that new evidence exist, but that it be ". . . of such a character as to create a probability that had such evidence been received at the trial the verdict would have been more favorable to defendant."  <u>Criminal Procedure Law</u> Section 440.10(1)(g).   In determining whether newly discovered evidence would probably change a verdict, the evidence is not evaluated in a vacuum, but in light of the evidence contained in the record on appeal.  <u>See</u> <u>People v. Salemi</u>, 309 N.Y. at 218-19;  <u>see also, People v. Maynard</u>, 183 A.D.2d 1099 (3d Dept. 1992).

82.   In other words, an assessment of the likely impact of newly discovered evidence requires an honest appraisal of the strength or weakness of the case originally presented by the People.  The defendants' statements in this case were sufficiently persuasive to result in the convictions of all five defendants on at least some of the charges against them, and, for that matter, persuasive enough to bring about those convictions before two separate juries.  However, the confessions also had serious weaknesses.

83.   Perhaps the most persuasive fact about the defendants' confessions is that they exist at all.  While all of the defendants began by denying knowledge of the attack, each ultimately made himself an accomplice in a terrible crime.

---

*As already noted, the People requested that the F.B.I. laboratory reexamine the hair evidence introduced at the defendants' trials before having it tested for mitochondrial DNA, and the F.B.I. examiner disagreed with the original technician's findings.   However, his opinion does not qualify as newly discovered evidence within the meaning of <u>C.P.L.</u> Section 440.10 since counsel could, with due diligence, have sought a second microscopic analysis at the time of the original proceedings.

84.  In that regard, it is important to note that, with the exception of the unrecorded statement made by Yusef Salaam, each of the statements cast the speaker in a relatively minor role, and none of the defendants admitted that he personally raped her. Kevin Richardson stated that he grabbed at the jogger, but equivocated about it and, at least on video, stopped short of saying that he did so to assist in an assault or rape. Antron McCray said that he kicked the jogger and lay on top of her, but did not penetrate her. Raymond Santana finally stated that he "felt her tits." And Kharey Wise eventually said that he held and fondled her leg. Yusef Salaam, in his unrecorded statement, went furthest in ascribing culpability to himself, by saying that he struck the jogger with a pipe at the inception of the incident.

85.  In and of itself, the fact that each defendant minimized his own involvement would not be startling or necessarily significant; defendants certainly lie, even when confessing. On the other hand, it arguably makes the claim that the defendants made false admissions more plausible, by adding weight to their contention that, for whatever reason, each spoke about the crime with a view toward becoming a witness rather than a defendant. In that sense, it is an aspect of the confessions to be considered here.

86.  The significant weaknesses in the defendants' statements lie in the details they provide in describing the attack on the jogger. Taking the statements individually, those details appear to give them power. But a comparison of the statements reveals troubling discrepancies. Using their videotaped statements as the point of comparison,* analysis shows that the accounts given by the five defendants differed from one another on the specific details of virtually every major aspect of the crime -- who initiated the attack, who knocked the victim down, who undressed her, who struck her, who held her, who raped her, what weapons were used in the course of the assault, and when in the sequence of events the attack took place.

87.  Thus, for example, on the issue of who actually knocked the jogger to the ground, Kevin Richardson said Antron, Raymond, and Steve did it;  Antron McCray said everyone charged her; Raymond Santana said Kevin did it;  Yusef Salaam said he did it; and Kharey Wise first named Raymond, and then named Steve.

88.  Similarly, as to who struck the jogger in the course of the attack, Kevin Richardson alleged that only Michael Briscoe hit her, and that he hit her only with his fist, in the face. Raymond Santana said that Steve smacked her, and then struck her in the face with a brick. Antron McCray stated that everyone was hitting

_____

*Since Yusef Salaam made only one, unrecorded statement, that statement is used for this analysis.

PAGE 27 of 34

NYCLD_030707

and stomping her, and that a tall, skinny, black male struck her in the ribs and head with a pipe.  Yusef Salaam said that he himself hit her with a pipe, and that someone else used a brick.  Kharey Wise first said that Steve slapped her in the face, that someone cut her legs with a knife, and that Kevin used a "handrock";  he then said that Steve slapped her, punched her in the face, and cut her legs with a knife, and that Kevin, Steve, and Raymond punched her in the face and hit her with bricks.

89.  Likewise, on the issue of who raped her, Richardson named Antron, Raymond, and Steve.  McCray identified a tall, skinny black male, a Puerto Rican with a black hoodie, Clarence, and Kevin, and said that he himself simulated having sex with her.  Santana claimed that Kevin raped her, after which Santana left the park. Salaam named Kevin, Kharey, and a couple of unknown males.  And Kharey Wise named Steven, Raymond, and Kevin.  Kevin Richardson's is the only name common to all the statements, with the exception of his own.  It was, however, Richardson who first implicated members of the group in the rape, providing a possible motive for others to accuse him.

90.  There are certainly portions of the statements made by the defendants that are consistent with the evidence presented at trial.  There was, for example, testimony to the effect that certain of the jogger's injuries could have been caused by a pipe, a brick, or a rock, weapons that were named in some of the statements.   The jogger had bruising which could have resulted from the kicking or blows some defendants described.  Antron McCray accurately stated that the jogger wore a white shirt.

91.  That said, it is nonetheless true that in many other respects the defendants' statements were not corroborated by, consistent with, or explanatory of objective, independent evidence. And some of what they said was simply contrary to established fact.

92.  None of the defendants, for example, related where the jogger was coming from, what direction she was running in, or how they happened to catch sight of her.  None offered specific or accurate descriptions of the area where she was attacked, the terrain, or the crime scene.  Yusef Salaam stated that he struck the jogger on the head with a pipe.  He did not say where on the head, but his statement could explain the bloodstains on the road and the injuries to the back of her head.  None of the others, however, gave an account which would adequately explain either. Only Kharey Wise said anything that would explain the dispersal of physical evidence and the indications that attacks occurred at more than one site, and Wise had been taken to the scene prior to his videotaped statements.  None of the defendants mentioned the jogger's Walkman, although several mentioned John Loughlin's Walkman in the statements they made about him.  None said a word about her keys.  None said anything about a search for money,

PAGE 28 of 34

NYCLD_030708

although the insole pulled out of the victim's jogging shoe certainly suggests that someone looked for it.

93. Some of what the defendants said is simply wrong. Kharey Wise, for instance, declared that the jogger's clothes had been cut off, and that her legs had been cut with a knife. Her clothes were not cut off, and there were no knife wounds on the jogger; in fact, the prosecution affirmatively elicited testimony to that effect at trial. Likewise, Kevin Richardson said that her bra was ripped off, whereas in fact it was still on her when she was found. Raymond Santana described her as being naked during the incident, and others said she was naked when they left, although she was found with her jogging bra still on and her t-shirt tied around her head.

94. Other statements the defendants made are simply not corroborated. For example, several defendants spoke of a brick being used as a weapon in the attack. But the only brick actually removed from the crime scene had no blood or other forensic evidence that would confirm its use as a weapon.

95. More importantly, the defendants' statements about the rape could not be corroborated by DNA evidence. Each defendant, in his statement, minimized his participation in the rape, and none acknowledged having had intercourse with the victim. However, all but Raymond Santana claimed to have seen multiple individuals raping her. Despite that, the DNA of only one person was found. That required the jury to believe that, in a gang of teenaged rapists, only one ejaculated.

96. Moreover, although the prosecution argued that the DNA must have been left by one of the defendants' accomplices, that argument presented difficulties of its own. For example, Kevin Richardson and Kharey Wise purported to name everyone who had raped her, and none of the people they named proved to be a DNA match.

97. Perhaps most significant, none of the defendants accurately described where the attack on the jogger took place. With the exception of Kharey Wise, who had been to the scene, statements by all of the defendants describe events in such a way as to place the attack at or near the reservoir, at varying points in the sequence of events that actually occurred there. The defendants were not similarly confused about the locations of the other crimes they described.

98. An additional issue is raised by the other incidents which took place in the park. For while the nature and locations of those incidents made it seem logical to believe that the defendants had attacked the jogger, the timing of events made it hard to understand when they could have. Shortly after their initial entry into the park, the larger group of which the defendants were a part temporarily split up. As a result, not all

PAGE 29 of 34

NYCLD_030709

of the defendants participated both in the incidents that occurred along the East Drive and in the attacks at the reservoir; but at least some of them did. Given the times when each of those events were estimated to have occurred, it is difficult to construct a scenario that would have allowed the defendants the time to interrupt their progression south, detour to the 102nd Street transverse, and commit a gang rape.

99.   All of these issues were apparent at the time of trial. Counsel had access to the same confessions, the same objective evidence, and the same timeline that the prosecution did, and were free to exploit the weaknesses in the People's case to whatever extent they were able to do so.   It could be, and it was, credibly, honestly, and persuasively argued by the prosecution that in any gang attack, discrepancies among accounts and confusion about details are not unusual.   Indeed, given the involvement of a number of people and the violence of the events at issue, some level of genuine confusion is probably inevitable.   In this case in particular, those arguments were bolstered by the fact that the crimes occurred at night, that the lighting was poor, and that the defendants were involved in a number of incidents.

100.   Nonetheless, the fact that these weaknesses in the confessions exist gives added weight to the newly discovered evidence in this matter, and increases the probability that that evidence would result in a different verdict.

101.   The probative value of the only forensic evidence that connected the defendants to the attack, the hairs found on Kevin Richardson, was, by its nature, weak to begin with.   It has been diminished further by the tests performed in 2002.   And the specific argument the prosecution made -- that a particular rock found at the scene had been used in the attack -- has also been undermined, although the most reasonable interpretation of the new blood evidence is probably contamination.

102.   The difficulties inherent in the passage of time and the small size of the hair samples in existence made it impossible to obtain definitive DNA results.   But with respect to each of those samples that was large enough to test, a jury would hear expert testimony that the DNA which could be extracted from the evidence did not match the jogger.   Those results do not exclude the jogger as a source to a reasonable degree of scientific certainty.   Their effect, however, would be to undermine the jury's confidence in the only evidence other than the defendants' statements which showed contact between the victim and her alleged rapists.

103.   Most important, the jurors who originally heard the evidence were presented with no persuasive alternative theory of the case to consider.   Certainly, no one would have thought that as the defendants and their group were making their way through Central Park, a serial rapist was also at large.   The newly

PAGE 30 of 34

NYCLD_030710

discovered evidence provides incontrovertible proof that he was.

104.    A self-confessed and convicted serial rapist -- who habitually stalked white women in their 20's; who attacked them, beat them, and raped them; who always robbed his victims, and frequently stole Walkmans; who tied one of his victims in a fashion much like the Central Park jogger; who lived on 102nd Street; who beat and raped a woman in Central Park two days before the attack on the transverse; whose DNA was the only DNA recovered inside and alongside the victim; whose narrative of events is corroborated in a number of significant ways; who had no connection to the defendants or their cohorts; and who committed all his sex crimes alone -- has come forward to say that he alone stalked, attacked, beat, raped, and robbed a white woman in her 20's, who was set upon on the 102nd Street transverse, was missing her Walkman, and was left tied in a way that has never before been explained.  Had this evidence been available, the defendants' attorneys would have had an arguably compelling alternative to the People's theory of the case.

105.    It is the People's position that, as to those verdicts which arose specifically from the attack on the Central Park jogger, the newly discovered evidence in this case meets the standard set forth in Criminal Procedure Law Section 440.10(1)(g): it "...is of such a character as to create a probability that had such evidence been received at trial the verdict would have been more favorable to defendant."

106.    The newly discovered evidence at issue here relates directly only to those charges which arose out of the attack on the jogger herself.  Factually, it has no relationship to the other crimes -- riot, robbery, and assault -- which occurred in Central Park on the night of April 19, 1989.  Nonetheless, all of the defendants use the newly discovered evidence provided by Matias Reyes as the basis for a request that the court vacate their other convictions as well.

107.    The papers submitted on behalf of Kharey Wise, Kevin Richardson, Antron McCray, and Raymond Santana do not specify a legal basis for that request.  Yusef Salaam argues that the nature and gravity of the charges involving the female jogger prejudiced the defendants' ability to receive a fair and dispassionate trial on the other charges against him.

108.    Under the extraordinary circumstances presented by this case, the People are constrained to consent to the defendants' motions with respect to the other charges of which they were convicted.

109.    The other crimes committed on April 19 were grave and inexcusable -- unprovoked attacks on strangers, apparently undertaken for the fun of it, which left some terrorized, two

NYCLD_030711

knocked into unconsciousness, and one seriously injured. Nevertheless, as the evidence was presented at trial, the attack on the female jogger was of a far greater order of seriousness. The People's theory was that she was set upon by a number of young men, gang-raped by two or more of them, kicked and pummeled by the group, and beaten about the head with a pipe, a brick, and a rock. Had she been discovered sooner, her injuries might well have been less serious in their effects; but she was not, and by the time she was found, she was close to death. The People introduced photographs depicting her injuries, called a pathologist to describe and characterize them one by one, and presented medical evidence fully describing her condition thereafter; she remained comatose for some time, endured a lengthy period of rehabilitation, and suffered permanent impairment as a result of the attack.

110. It is commonplace for defendants to be charged in a single indictment with crimes of very different levels of gravity. The law permits it, and correctly presumes that juries can and will follow instructions requiring that they weigh evidence of guilt as to different counts separately. Thus, in and of itself, the relative seriousness of the jogger attack plainly would not merit setting aside the juries' verdicts as to other charges.

111. In this case, however, other factors must also be weighed. The crimes the defendants were charged with were not widely separated by time or location, either from each other or from the attack on the jogger; all occurred within a single hour, at the northern end of Central Park. In effect, all were considered to be part of a single incident -- a rampage in the park, as is reflected in the fact that the defendants were charged with Riot in the First Degree.

112. In fact, the prosecutor argued to the jurors in the trial of Kharey Wise and Kevin Richardson that they should not lose sight of the "overall pattern of the behavior...[as] this group continued through the park for a period of approximately an hour attacking one after another after another person." This, it was fairly and convincingly argued, showed that the group acted with a joint purpose, that they were "an entire group acting together in one violent outburst of destruction, of beating, of assaulting." Similar references were made in summation in the earlier trial of McCray, Salaam, and Santana.

113. It was logical for the People to suggest that the defendants' culpability and criminal intent could be inferred from the pattern of conduct engaged in by the group of which they were a part. This would have been an inescapable inference for the jurors in any event. But the new evidence detailed above would, if credited, call into question the defendants' involvement in the most horrific crime in the pattern of incidents in the park -- and indeed, the involvement of the larger group as well. Accordingly, it would likely have had a significant bearing, in the jurors'

NYCLD_030712

minds, on the defendants' culpability for those other crimes as well.

114.   Moreover, the trial evidence as to the other charges, like the evidence as to the attack on the female jogger, consisted almost entirely of the defendants' statements.   The distinctive logo on Kevin Richardson's jacket was described by one of the tandem bikers, and he and Santana were apprehended on the outskirts of the park;  but the People's proof was limited by one fundamental fact:  none of the victims could identify any of the defendants.

115.   Just as the other incidents in the park cannot be considered separately from the rape of the jogger, neither can the defendants' statements about those events.  In the case of at least two defendants, Richardson and Salaam, the process of questioning about the rape and the process of questioning about other crimes overlapped and intertwined.  And with a single exception, all of the substantial written or recorded statements made by Richardson, McCray, Wise, and Santana concern the attack on the female jogger as well as the other crimes of that night.   That lone exception involves Santana, whose first substantial written statement deals only with other events;  but just an hour and twenty minutes after he signed it, after further, continuous questioning, an addendum described the jogger attack.

116.   Thus, the admissions concerning the other crimes were contained in the same written and recorded statements as the admissions concerning the rape, and were largely obtained as part of the same process of questioning.  As a consequence, the newly discovered evidence would probably raise questions about the reliability of those admissions similar to the questions raised about the defendants' confessions to rape.  There is some testimony that, in certain instances, admissions about other criminal incidents were made substantially before and apart from any statements about the rape.   But that testimony alone, absent independent corroboration, would not have been sufficient to allay concerns about the defendants' confessions raised by the newly discovered evidence.

117.   In sum, there was no significant evidence at trial establishing the defendants' involvement in the other crimes of which they stand convicted that would not have been substantially and fatally weakened by the newly discovered evidence in this matter.   In the original investigation, a number of individuals identified one or more of the defendants Richardson, McCray, Santana, and Salaam in connection with the attack on John Loughlin, and statements also placed Wise at the scene of earlier incidents. In interviews in 2002, both Richardson and Santana candidly acknowledged involvement in criminal incidents that occurred on April 19, while steadfastly asserting their innocence of rape.  But none of this additional evidence was before the trial juries.

PAGE 33 of 34

NYCLD_030713

Accordingly, it cannot be considered in evaluating the newly discovered evidence claim.

118.   Assessing the newly discovered evidence, as we are required to, solely in light of the proof introduced at the earlier trials, we conclude that there is a probability that the new evidence, had it been available to the juries, would have resulted in verdicts more favorable to the defendants, not only on the charges arising from the attack on the female jogger, but on the other charges as well.

119.   The final determination of this motion must, of course, be made by the Court.   Should the Court, as requested by the parties, vacate the convictions, the People will move the Court to dismiss the indictments.   Under all the circumstances, no purpose would be served by a retrial on any of the charges contained in the indictment.

WHEREFORE, for the reasons stated, the People consent to the relief requested and recommend that the Court vacate the defendants' convictions in their entirety.

DATED:   New York, New York
         December 5, 2002


NANCY E. RYAN
Assistant District Attorney
Chief of the Trial Division


PAGE 34 of 34