# EXHIBIT 6

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.

https://www.wsj.com/articles/netflixs-false-story-of-the-central-park-five-11560207823

OPINION | COMMENTARY

# Netflix's False Story of the Central Park Five

Ava DuVernay's miniseries wrongly portrays them as totally innocent—and defames me in the process.

By Linda Fairstein
June 10, 2019 7:03 pm ET

At about 9 p.m. April 19, 1989, a large group of young men gathered on the corner of 110th Street and Fifth Avenue for the purpose of robbing and beating innocent people in Central Park. There were more than 30 rioters, and the woman known as the "Central Park jogger," Trisha Meili, was not their only victim. Eight others were attacked, including two men who were beaten so savagely that they required hospitalization for head injuries.

Reporters and filmmakers have explored this story countless times from numerous perspectives, almost always focusing on five attackers and one female jogger. But each has missed the larger picture of that terrible night: a riot in the dark that resulted in the apprehension of more than 15 teenagers who set upon multiple victims. That a sociopath named Matias Reyes confessed in 2002 to the rape of Ms. Meili, and that the district attorney consequently vacated the charges against the five after they had served their sentences, has led some of these reporters and filmmakers to assume the prosecution had no basis on which to charge the five suspects in 1989. So it is with filmmaker Ava DuVernay in the Netflix miniseries "When They See Us," a series so full of distortions and falsehoods as to be an outright fabrication.

It shouldn't have been hard for Ms. DuVernay to discover the truth. The facts of the original case are documented in a 117-page decision by New York State Supreme Court Justice Thomas Galligan, in sworn testimony given in two trials and affirmed by two appellate courts, and in sworn depositions of more than 95 witnesses—including the five themselves. Instead she has

written an utterly false narrative involving an evil mastermind (me) and the falsely accused (the five).

I was one of the supervisors who oversaw the team that prosecuted the teenagers apprehended after that horrific night of violence. Ms. DuVernay's film attempts to portray me as an overzealous prosecutor and a bigot, the police as incompetent or worse, and the five suspects as innocent of all charges against them. None of this is true.

Consider the film's most egregious falsehoods. "When They See Us" repeatedly portrays the suspects as being held without food, deprived of their parents' company and advice, and not even allowed to use the bathroom. If that had been true, surely they would have brought those issues up and prevailed in pretrial hearings on the voluntariness of their statements, as well as in their lawsuit against the city. They didn't, because it never happened.

In the first episode, the film portrays me at the precinct station house before dawn on April 20, the day after the attacks, unethically engineering the police investigation and making racist remarks. In reality, I didn't arrive until 8 p.m., 22 hours after the police investigation began, did not run the investigation, and never made any of the comments the screenwriter attributes to me.

Ms. DuVernay depicts suspects Yusef Salaam and Korey Wise being arrested on the street. In fact, two detectives went to the door of the Salaam apartment on the night of the 20th because both had been named by other rioters as attackers in multiple assaults.

The film claims that when Mr. Salaam's mother arrived and told police her son was only 15—meaning they could not question him without a parent in the room—I tried to stop her, demanding to see a birth certificate. The truth is that Mr. Salaam himself claimed to be 16 and even had a forged bus pass to "prove" it. When I heard his mother say he was 15, I immediately halted his questioning. This is all supported by sworn testimony.

Ms. DuVernay would have you believe the only evidence against the suspects was their allegedly forced confessions. That is not true. There is, for example, the African-American woman who testified at the trial—and again during the 2002 re-investigation—that when Korey Wise called her brother, he told her that he had held the jogger down and felt her breasts while others attacked her. There were blood stains and dirt on clothing of some of the five. And then

there are the statements of more than a dozen of the other kids who participated in the park rampage. Although none of the others admitted joining in the rape of Trisha Meili, they admitted attacking male victims and a couple on a tandem bike, and each of them named some or all of the five as joining them.

Nor does the film note that Mr. Salaam took the stand at his trial, represented by a lawyer chosen and paid for by his mother, and testified that he had gone into the park carrying a 14-inch metal pipe—the same type of weapon that was used to bludgeon both a male schoolteacher and Ms. Meili. Mr. Reyes's confession changed none of this. He admitted being the man whose DNA had been left in the jogger's body and on her clothing, but the two juries that heard those facts knew the main assailant in the rape had not been caught. The five were charged as accomplices, as persons "acting in concert" with each other and with the then-unknown man who raped the jogger, not as those who actually performed the act. In their original confessions —later recanted—they admitted to grabbing her breasts and legs, and two of them admitted to climbing on top of her and simulating intercourse. Semen was found on the inside of their clothing, corroborating those confessions.

Mr. Reyes's confession, DNA match and claim that he acted alone required that the rape charges against the five be vacated. I agreed with that decision, and still do. But the other charges, for crimes against other victims, should not have been vacated. Nothing Mr. Reyes said exonerated these five of those attacks. And there was certainly more than enough evidence to support those convictions of first-degree assault, robbery, riot and other charges.

It is a wonderful thing that these five men have taken themselves to responsible positions and community respect. That Ms. DuVernay ignored so much of the truth about the gang of 30 and about the suffering of their victims—and that her film includes so many falsehoods—is nonetheless an outrage.

Ms. DuVernay does not define me, and her film does not speak the truth.

*Ms. Fairstein, a former sex crimes prosecutor, is a best-selling crime novelist.*

*Appeared in the June 11, 2019, print edition.*

Copyright © 2020 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.