# EXHIBIT 9



*(continued from front flap)*

time when criminal prosecution was "no place for a woman."

Over the years, Linda Fairstein has personally tried or been involved in scores of nationally prominent rape cases, including the Robert Chambers Preppy Murder Trial and the case of the Central Park Jogger. She has been called upon to comment on virtually every significant sex crimes investigation in the country. Through the story of the Midtown Rapist case and other major investigations, she shows here how the system works to protect victims and punish criminals: how evidence is gathered, how witnesses are interviewed, how indictments are produced, and, finally, the nuts and bolts of trial, verdict, and sentencing.

*Sexual Violence* is a living document of the transformation of our notion of sex crimes, an up-to-date commentary on the vital issues of stranger and date rape and the struggle to expunge the traditional stigma that has for too long been attached to victims of sexual assault.

LINDA FAIRSTEIN is an Assistant District Attorney in New York County, and the director of the Sex Crimes Prosecution Unit. She lives in Manhattan with her husband.

PHOTOGRAPH BY SARA KRULWICH

*Jacket design by Russell Gordon*

*Jacket art: Justice by Edward Emerson Simmons, courtesy of the Art Commission of the City of New York*

William Morrow & Company, Inc.
1350 Avenue of the Americas
New York, N.Y. 10019

Printed in USA

NO LONGER THE PROPERTY OF BOSTON PUBLIC LIBRARY.

Boston Public Library

COPLEY S...
GENERAL L...

KF373
.F28
A3
1993

The Date Due Card in the pocket indicates the date on or before which this book should be returned to the Library.
Please do not remove cards from this pocket.

3 9999 02034 002 0



BOSTON PUBLIC LIBRARY

WITHDRAWN

No longer the property of the Boston Public Library.
Sale of this material benefits the Library.

ISBN 0-688-06715-8

FPT $23.00

"Fairstein's *Sexual Violence* should not only be mandatory reading for every new lawyer entering a prosecutor's office, but, because it addresses the myths as well as the hard facts of dealing with the criminal justice system, it should also be available to every person who has been victimized by this crime."
—GERALDINE FERRARO

# SEXUAL VIOLENCE
## Our War Against Rape
### Linda A. Fairstein

For more than fifteen years, Linda Fairstein has directed the Sex Crimes Prosecution Unit within the Manhattan D.A.'s office. The first such organization in the country, this unit is charged with supervising every sex crimes prosecution in Manhattan. As a consequence, Linda Fairstein and her associates have been at the very center of the massive changes in sex crimes law and procedure that have occurred over the past two decades.

Emulated in most other major cities, New York's SCPU and its counterparts throughout the country have had extraordinarily high success rates in prosecuting these violent crimes. Through their efforts, a victim of rape now can expect sensitive treatment from the police, can expect to be believed and supported, and has some reasonable expectation of winning in the courtroom.

In *Sexual Violence*, Linda Fairstein shares the wisdom she has accumulated on the front lines in the war against rape, from her beginnings as a corporate law–bound female graduate of a prestigious law school to her job in the D.A.'s office at a

(continued on back flap)

## LINDA A. FAIRSTEIN

The woman who has held that position for almost ten years, Detective Maureen Spencer, is an extremely intelligent and experienced investigator who conducts victim interviews and coordinates field investigations on many of our cases with the police teams who originally catch them in the squads.

My new duties were detailed in the job description Leslie Snyder had created for LEAA's grant review. It would be my responsibility to examine every arrest report for a felony sex offense in Manhattan and then assign the screening of cases to unit members, keeping some of the caseload for myself to try. Each of us was to handle a case every step of the way, according to the "vertical" process I mentioned in Chapter 4, from the intake evaluation through trial or disposition by plea—for the primary purpose of providing the survivor with a single contact throughout the system. Our tasks included interviewing witnesses, conducting identification procedures like lineups, responding to police precinct station houses on a twenty-four-hour-call basis to take statements or admissions from defendants in custody, appearing at speaking engagements to continue to educate the public about changes in the legal system, and of course, trying felony cases to verdict. It was to be my responsibility to maintain daily contact with the Manhattan Sex Crimes and Special Victims squads to keep current on arrests and investigations, and to offer legal advice for the purpose of assuring the propriety of police procedures for their eventual use at trial (that is, for example, if a lineup is not conducted properly, the victim will not thereafter be able to tell the jury how and when she identified her attacker).

In addition, the four of us continued to assist drafting proposals for still-needed legislative reform. And to this day, as from the unit's inception, we are called upon and consulted by police and prosecutorial agencies across the country and abroad—in Alaska and Japan and Oklahoma and war-torn Bosnia—for guidance in investigating and prosecuting their difficult and unusual cases.

## SEXUAL VIOLENCE

There has rarely ever been a "slow day" in the SCPU, and we all quickly became accustomed to the heavy volume of complaints that come in on a steady basis, day and night. Unlike in the earlier days when many of the survivors were terrified during their first meetings, barely able to articulate details of their assaults and apprehensive about participating in the criminal justice system, there began to be a change in the response of many of the women we encountered. The attention directed to the crime of rape by the feminist movement, which I believe prompted *responsible* media attention (as opposed to the usual tabloid coverage) to this crime, urged survivors not to be silent about their victimization and demanded reform of the system. At last, this combination of feminist and journalistic involvement sparked the legislative efforts that succeeded throughout the next decade to eliminate corroboration for adult victims, to remove the "earnest resistance" requirement, and to impose rape shield laws.

We more frequently met survivors who were assertive and eager to fight back through the courts at their assailants, to be informed about their cases and to follow the progress closely. Many wanted to participate in the legal process and were pleased to work with the new, pioneering unit. They wanted their cases prosecuted vigorously and were willing to cooperate in whatever manner necessary.

All of us in the unit went on trying cases and teaching ourselves with every courtroom experience, often surprising ourselves as the conviction rate improved with successive court terms.

The daily tragedies we witnessed—a five-year-old incest survivor or a thirty-five-year-old patient who had been "seduced" by her therapist in the course of treatment or a foreign tourist who had been raped by a gun-wielding gang of teens in a deserted subway station when she asked for directions or a junkie who was stabbed and sodomized when her drug deal turned sour—were horrifying. We had two goals in confronting every tragedy: to convict those assailants who

## LINDA A. FAIRSTEIN

ing only a single eyewitness, lies in the very nature of the crime. It is, obviously, a *contact* crime, and it is the most intimate kind of contact that human beings can experience. The survivor has been forced to undergo contact with her assailant in ways that no other crime victim has—usually involving every one of her five senses, and for a longer time than the occurrence of most other criminal acts—and the trained sex crimes investigators skillfully probe to retrieve from her memory the information a survivor has recorded, consciously or not, during her ordeal.

In every jurisdiction of this country, people are convicted daily of crimes like muggings based on the testimony of a single witness. And in most of those cases, the crime has taken place in a matter of several minutes—a victim is confronted by a knife- or gun-wielding robber who says, "Don't scream—I've got a weapon—give me your money"—and the transaction is completed. The attacker is seen briefly if at all (since some robberies occur from behind the victim) and his voice rarely says more than his threat and his demand. Those victims look through mug shots and at lineups, identify their attackers, and testify successfully at a trial.

Rapes and other sexual assaults are not accomplished, as robberies often are, in a matter of three or four minutes. A "short" sex offense is a ten- or fifteen-minute encounter, and a victim and her attacker are rarely together for less than twenty minutes. And more frequently, when an assailant has his prey in an isolated location where they are not likely to be disturbed—her apartment, a remote rooftop, or a wooded ravine (in New York's Central Park a jogger was attacked by a series of vicious marauders without interruption)—then the attack may go on for more than an hour.

So the time factor as well distinguishes this category of crime, and as awful as it is for the victim to experience, precisely that *extended exposure* so unique to sex offenses is what we use to enforce and validate the survivor's identification. Think how much more reliable the character of the crime of sexual assault *forces* its survivors to be.

## SEXUAL VIOLENCE

What we attempt to do is to use that time *against* the greedy offender because he has given his victim more opportunity to record detail about him, and to do so through every one of her senses. She has seen him face-to-face, often before any violence occurs, for example, on a ride up in an elevator or passage in a hallway as he recognizes his opportunity and turns to act on it. Even in the cases in which a rapist covers a woman's face or blindfolds her, he has had at least some visual exposure—and in most instances it is prolonged. The victim knows not only facial features but can also give a more accurate description of his body and size. No, she may not be able to say a height and weight in inches and pounds, but she has had his body against hers, on top of or beside her, and can tell how much larger or smaller, how heavy or slight the frame, in a way that professional investigators can thereafter reconstruct his size. And she may have been able to see what victims of a bank robbery would not have a chance to notice—marks and scars and even distinctive clothing on parts of his body that would be visible only with his clothing lowered or removed, during criminal activity. Probing the victim for detail, we often learn of surgical scars on an offender's thighs or abdomen, birthmarks or growths, unusual underwear (sometimes still on him at the time of arrest), and tattoos. My easiest investigation occurred more than a decade ago when a survivor described the tattoo of a scorpion on the rapist's penis. When he was apprehended months later and identified (fully clothed) in a lineup, he pleaded guilty to the crime because the detective had photographed his unusual tattoo and his lawyer had no defense to counter that unique marking.

And every other sense can be used in identification as well. An assailant is rarely silent when he attacks. He not only threatens and demands as a robber does but talks and questions during the sexual assault. Usually he tells his victim what to do throughout the encounter and often he questions her about her experience and personal life, although he is a complete stranger. Again, by language, diction, accent, dia-