# EXHIBIT 16

## legal affairs — THE MAGAZINE AT THE INTERSECTION OF LAW AND LIFE

▶ SEARCH   ▶ DEBATE CLUB   ▶ ARCHIVES   ▶ ABOUT US

### Features

SEPTEMBER|OCTOBER 2003
**The Practitioner** By Benjamin Smith
**The Real Harm** By Gabrielle S. Friedman
**Standard bearer** By Fred Strebeigh
**A Bigger Tent** By Katharine Mieszkowski
**Profiling's Gender Gap** By Daniel Brook
**Coming Out to America** By Tyler Maroney
**The Love Charm** A Story By Eugene Volokh
**Ex Offender** By Robert J.
**In Defense Of Prostitution** By Heidi Fleiss as told to Nadya Labi
**My Gay Divorce** By Laurie Essig

▶ SEARCH LEGAL AFFAIRS
[OPTIONS ▼]
[ SEARCH ]

[PRINTER FRIENDLY]
[EMAIL THIS ARTICLE]
[LETTER TO THE EDITOR]






**THE PRACTITIONER**

**Linda Fairstein** changed the way rape is prosecuted by reconciling feminist ideals with the dirty work of investigating sex crimes. But will she be remembered for her pragmatism or her bad publicity?

By Benjamin Smith

DURING THE SUMMER AND FALL OF 1990, prosecutors from the Manhattan district attorney's office entering the state courthouse at 111 Centre Street walked a gantlet of demonstrators. The protesters were relatives and supporters of the five boys charged with raping, beating, and leaving for dead Trisha Meili, the woman who came to be known as the Central Park jogger.

One of those prosecutors was Linda Fairstein, at the time the head of Manhattan's sex crimes unit. The fury of the boys' supporters, mostly black and Hispanic men and women from the boys' Harlem neighborhood who believed that their detailed but sometimes contradictory confessions had been coerced, kept race (and religion) near the surface of the case. "It was 'Jew Bitch' day in and day out," Fairstein said, with a certain bravado.

Yet the protesters' anger with Fairstein—and her own boasting—were both misplaced. Fairstein wasn't heading to the jogger prosecution. Upon leaving the courthouse's bank of elevators, she turned right and walked away from the activists and gawkers and the four rows of reporters in the packed jogger courtroom, and entered an almost empty courtroom where she was prosecuting two men accused of raping a cocaine addict in the emergency room at Metropolitan Hospital. It was another assistant D.A. in Fairstein's unit who prosecuted the boys in the jogger case.

Still, the events of that fall threaten to tarnish Fairstein's sterling public image, one she developed over a 30-year career that made her one of the best-known prosecutors in America. She brought national attention to her sex crimes unit through its prosecution of the "preppie murderer," Robert Chambers, who left a teenager he had just met at an Upper East Side bar dead in the park; the Midtown rapist, Russell West, who stalked the city's office buildings; and the group of five boys whose alleged rampage in Central Park one night in April 1989 introduced the word "wilding" into the American vernacular.

Tall, blonde, and unflappable, Fairstein was the model for Greta Scacchi's character in the film version of *Presumed Innocent* and a candidate to become Bill Clinton's attorney general. While still a prosecutor, she took up writing detective novels about a sex crimes prosecutor

named Alexandra Cooper, a "younger, thinner, and blonder" version of herself, as she put it. When she stepped down in February 2002 to write full time—she currently has a $2 million book contract with Scribner—many in New York saw her as the heir apparent to the city's aging district attorney, Robert Morgenthau.

A year and a half later, Fairstein is an embattled figure. The convictions of those five boys—among her unit's most celebrated—were vacated last December at Morgenthau's recommendation, after a sixth man, linked to the crime by DNA but never caught, turned out to be a serial rapist serving a life sentence upstate. A lawyer for the boys quickly labeled Fairstein a "villain." Her critics have tried to link the jogger case to other failures during her tenure in an attempt to portray her as the classic over aggressive prosecutor, just on higher heels. "I would like to see Linda Fairstein held accountable for the misery she has caused in the name of blind ambition," wrote *New York Post* columnist Steve Dunleavy.

Since the convictions in the jogger case were vacated, Fairstein has been fighting back in print and television interviews. "It's completely outrageous—unbelievable—that [the D.A. is] going to overturn these convictions without a hearing," she told *The Daily News* on December 5, the day the D.A.'s office recommended that the verdicts be vacated. When the Police Department began assembling its response to the D.A.'s decision to vacate, Fairstein pulled her files out of storage and met for "many hours" with police officials to give her side of the story, much of which turned up in the report of the independent panel commissioned by the NYPD.

What threatens to be lost in the furor over the jogger case—in part because Fairstein can't seem to help herself from fueling the uproar—are the innovations she developed in the way sex crimes are investigated and prosecuted, innovations that are more evident in cases like the one from Metropolitan Hospital than in the high-profile cases which made her famous, and which she still wants credit for, even at the expense of her legacy.

FAIRSTEIN, WHO IS 56, IS AN UNLIKELY HEROINE of the 1970s revolution in sex crimes prosecution. A doctor's daughter from a Westchester suburb, she says her only feminist crusade before she became a prosecutor was protesting a planned merger between Vassar, the women's college she attended, and Yale.

Today, she lives on the 25th floor of an Upper East Side apartment tower with her husband, Justin Feldman, a prominent securities litigator 26 years her senior. On a recent Friday morning, she answered the door wearing a pale yellow leather jacket that matched the flowers on the dining room table. It was set with colorful plates with little French sayings around the rims: *"Tout est en vos mains pour de trés jolis lendemains"* ("It's in your hands to make prettier tomorrows").

Fairstein, who has the dark sense of humor that you pick up from spending a lot of time with cops, poured her coffee into a white mug decorated with a charcoal drawing of a gentle-featured, smooth-skinned black man. "It's the missing East Side rapist," she said. (The man's DNA has been linked to 15 rapes near her neighborhood.) "I would like nothing better than to see this face."

Fairstein came to the Manhattan district attorney's office in 1972 with no particular interest in rape, and her upper-middle-class background made the then-D.A., Frank Hogan, hesitate. He was a symbol of justice and probity, and he didn't hire many women. As Fairstein recalls in her 1993 book *Sexual Violence*, a combination memoir and matter-of-fact analysis of rape prosecution, Hogan asked her skeptically about her English major at Vassar and her time at the University of Virginia Law School. "Frankly, I have to tell you that I think this is no place for a woman like you." she recalls Hogan telling her. She left the meeting sure she'd never get a call, but with the help of her law school dean—an old friend of Hogan's—and perhaps the D.A.'s own sense that times were changing, he hired her.

Fairstein joined the D.A.'s office at a time when a more seasoned assistant district attorney, Leslie Crocker Snyder, was leading the fight to change the definitions of sex crimes. In 1974, Snyder formed the nation's first sex crimes unit. Unlike Fairstein, Snyder was a soldier of the women's movement. She had spearheaded the effort to change the laws in New York that made the victim's word virtually meaningless in a rape trial and that allowed her to, in the

words of activists at the time, be "raped again" when a defense lawyer dragged out her sexual history in the courtroom.

Snyder and her allies won two key victories. They convinced the New York State Legislature to drop the requirement, dating back to the 17th century, that a woman's testimony be corroborated on three key points: the attacker's identity, the sexual nature of the attack, and the use of force. And they won passage of a "rape shield" statute that in most cases barred the defense from using a woman's sexual history to suggest her consent. In 1969, more than 1,000 men had been arrested for rape in New York City and only 18 convicted. In 1980, there were 881 arrests for rape, and 154 convictions.

By all accounts, Snyder and Fairstein don't get along. Fairstein, whose book publicity describes her as "America's foremost prosecutor of crimes of sexual assault," is often given credit for the fights of the early 1970s that Snyder led and won. Fairstein didn't claim that kind of credit when I talked to her, nor has she anywhere on the record. But her three decades in office and her dominant reputation seem to have absorbed Snyder's accomplishments in the eyes of the public and even of some professionals. One of Fairstein's longtime deputies, Melissa Mourges, told me that dropping the corroboration requirement in New York was "one of the biggest changes she championed." The change went on the books before Fairstein had worked a day at the sex crimes unit.

"Let's say that all along the way some people have claimed credit for certain things they had nothing to do with—that's all I'm going to say about that," said Snyder, now a justice of the New York State Supreme Court, when asked about Fairstein.

FAIRSTEIN WASN'T AN OBVIOUS CHOICE TO SUCCEED SNYDER. She was a professional prosecutor, not a professional feminist, and she had her sights set on more glamorous crimes. While she "enjoyed having that personal relationship with the victim" that came with rape prosecutions, she hoped to make it to the top of the office ladder and prosecute homicides. "I thought, to get backed into a unit that only did one type of crime might not be interesting," she said. But Morgenthau didn't have a lot of options in choosing Snyder's replacement. "There weren't that many women in the office at that time, and not many that were interested," he told me. Morgenthau was determined to have a woman head the unit to make rape victims feel more comfortable reporting the crime. Fairstein was one of the only women in the office who had experience prosecuting rape cases.

So Fairstein was pushed into her calling, and at an opportune time. A year earlier, in 1975, Susan Brownmiller had published her groundbreaking *Against Our Will: Men, Women, and Rape*, a detailed, polemical history of sexual assault. The book challenged a lingering liberal suspicion of false rape accusations and identified sexual assault as one of the most basic feminist issues.

Fairstein hadn't come out of the feminist movement, and she never quite found a place in the bitter academic battles over the theory of rape. Her sympathies, though, were with the avid feminists who fought to raise consciousness of sexual assault, and she says she read Brownmiller over and over during her career.

But in her public appearances and her approach to victims, Fairstein also challenged feminists who wanted to broaden the definition of rape. Brownmiller had opened a front that, pursued by feminist legal theorists like Catharine MacKinnon, threatened to make the prosecution of rape harder, not easier. Rape, Brownmiller wrote, "is nothing more or less than a conscious process of intimidation by which *all men* keep *all women* in a state of fear." Fairstein's response to the broadening definition of rape was simple: "I hate it when people use the word rape to describe something that is not what the legal definition of rape is," she said. "I don't like the terms misused, because I don't think short of homicide there is anything worse you can do to another human being."

As a result, in the beginning of her career Fairstein was viewed with some suspicion by adherents of the emerging "victims' rights" movement. A key element of their agenda was that women making accusations of rape deserved unconditional trust, not institutional skepticism. Fairstein made a practice of asking victims hard questions.

The tension between the tough prosecutor and victims' advocates came to a head in August 1982. *The New York Times* published an Op-Ed piece under the title "Two Rapes" by an anonymous 30-year-old New York college professor who had been raped by a stranger in her Upper West Side apartment. She had identified a suspect, she said, only to have the district attorney's office—in particular, a falsely sympathetic female assistant district attorney—wait seven months, then refuse to file charges.

"Jane Doe" wrote that, as a result of a hostile interrogation, she "was made to feel more like the accused than the victim." She complained of sloppy police work and bias in favor of the suspect, and concluded that "the Manhattan D.A.'s office is not interested in getting an indictment unless it is 99 percent sure of a conviction."

Fairstein, never one to let a slight go unanswered, responded with a scorching letter to *The Times*, calling the article "a disservice to the public." She offered a detailed exculpation of the accused, asserting that he had been on the phone in his room five minutes before the time the victim said she was raped. "Although the outcome was emotionally unacceptable to Miss Doe, it was a truly just decision," she wrote.

THE "JANE DOE" STORY STILL ECHOES IN THE VICTIMS' RIGHTS COMMUNITY, but Fairstein now sits on many of that community's key boards, and her critics are unwilling to speak for attribution. Over the years, Fairstein made her peace with the feminists, and her critics have tended to come instead from the "rape hysteria" camp, those who accuse prosecutors bent on convictions of concocting crimes out of ambiguous encounters. It's hard to find a feminist objection to sending rapists to jail, and it became clear by the mid-1980s that Fairstein was getting tough convictions. Unlike Snyder, though, her contributions have less to do with the law books than with the courtroom and the crime scene.

The aspiring young homicide prosecutor had one basic procedural insight: Take rape as seriously as murder. Frank Hogan had long ago installed an elite unit of homicide prosecutors that rushed to the scene of a crime in the middle of the night if there were statements to be taken or witnesses to be interviewed. "When I took over sex crimes I said this is crazy not to duplicate it. This is the way it should be," Fairstein said.

She got her wish. Her first call came after midnight. She pulled on jeans and a trench coat, "trying to look like I was on the job," and headed north to a tenement in East Harlem. It was a violent assault—police weren't sure the victim would live through the night—and "the last person anyone wanted to speak to was a lawyer." But Fairstein was able to see the blood, and the rattled mother and grandmother, in the immediate, messy aftermath of the crime, and to conduct interviews before witnesses had a chance to prepare their stories. The experience convinced her of the importance of sending prosecutors into the field.

Getting involved early in cases gave Fairstein a role in rape investigations that few prosecutors had had before, and it afforded her the opportunity to come up with a series of innovations that changed how rape was investigated. She made it routine to have the victim of an acquaintance rape place a call to the accused and catch him on tape admitting the crime, or even apologizing for it. (It was a tactic, Fairstein noted, that Leslie Snyder had been the first to exploit.) "Guys would be crying on the phone, 'I promise it'll never happen again,' " said Mourges. "You would get an enormous number of admissions."

Fairstein's hands-on approach led her to become fascinated with forensics long before it was a staple of prime-time television drama. The NYPD's forensics squad, the Crime Scene Unit, had been routinely dispatched to murder scenes to gather physical evidence and take photographs before the elements washed clues away, but they were never sent to rape scenes. After years of Fairstein's badgering the police brass, they began systematically dispatching CSU to collect evidence at rape scenes as well. "I had to kick ass for a while before that happened," she said.

Fairstein also pioneered practices that made it easier for women to see a rape prosecution through to the end. She insisted that every alleged victim get an interview with a prosecutor, and, to reduce the victims' need to tell and retell a painful story to a series of prosecutors, she ensured that one assistant D.A. would follow each victim through the whole process.

These practices made cases that seemed doomed viable. The victim in the Metropolitan Hospital case, for instance, was a 40-year-old real estate agent with psychological problems who was picked up one winter afternoon by police, rambling. The accused were a security guard and a janitor. Since even the woman's doctors hadn't believed that she was raped, no gynecologist had examined her. That fact alone would have been enough to throw out the case in the early '70s. But thanks to Fairstein's work with the victim—encouraging her to speak honestly about her cocaine problem, and getting the jury to believe her story—she won convictions against both men.

Fairstein also embraced the ultimate tool in rape: the new technology of DNA matching. In 1999, she set up a "cold hit" unit, two senior prosecutors whose sole job is to prosecute suspects identified by evidence gathered from 16,000 "rape kits"—hair, semen, and stained clothes from crime scenes—that had piled up in a Queens warehouse. The move came a year before Mayor Rudolph Giuliani launched a massive project to process the kits.

FAIRSTEIN CALLS DNA "MY THREE FAVORITE LETTERS," but it is DNA evidence that has called the convictions of the five boys in the jogger case into question. When her office won those convictions, they knew that a sixth man, whose semen was found in the jogger's body, was still on the loose. But when Matias Reyes identified himself as that man last summer, he also said that he'd acted alone. Within months, Morgenthau had recommended that the court vacate the five convictions.

Fairstein moved quickly to defend the verdicts and her reputation, and she was soon at the center of a storm. A piece in *The Village Voice* linked the jogger case to two other convictions her unit had seen reversed in the 1990s. Patrick Griffin, a gastroenterologist, was convicted of oral sodomy on a sedated patient; he was acquitted on retrial when the judge permitted the defense to cross-examine the complaining witness about her alleged history of perjury. Oliver Jovanovic was convicted of kidnapping and sexually torturing a woman he'd met on the Internet; that verdict was thrown out on the grounds that the rape shield had been raised too high, excluding e-mails that showed the alleged victim was a willing sadomasochist. *The Voice* piece suggested that Fairstein and her "minions" were "either zealots or headline seekers, pursuing verdicts that would appease the outraged public." The paper repeated an insinuation made by Jovanovic that Fairstein was "making literary hay from her cases."

The clunky plots of Fairstein's whodunits do borrow liberally from her career, but she wanted the big cases for herself more than for alter ego Alexandra Cooper. And she got them, positioning herself at the center of the most important and controversial cases of her tenure. Morgenthau gave her the Chambers case to prosecute, a departure from a general rule that his top administrators don't spend much time in the courtroom. And Fairstein elbowed aside her office rival, Nancy Ryan, to bring the jogger case and its huge headlines to the sex crimes unit.

Once Fairstein's unit took on a big case, she did her best to make it even bigger. Morgenthau keeps a tight rein on most of his prosecutors, barring them from speaking to the press without his approval. But, as Fairstein said, "I had a unique relationship with Mr. Morgenthau, a personal one," and he made an exception. Fairstein developed a reputation for being quick to return reporters' calls and solicitous of their deadlines, cultivating relationships with both the stars—she counts Leslie Stahl of CBS, Diane Sawyer of ABC, and Katie Couric of NBC as friends—and the regulars, such as the *New York Post*'s veteran court reporter, with whom she had a standing lunch date on their shared birthday. ==She was often quoted in the early days of high-profile prosecutions, offering salacious details about defendants like Jovanovic, whom she alleged had a collection of materials on serial killer Jeffrey Dahmer. Even in court, Fairstein's talk seemed calculated, at times, to write headlines. Her statement at Chambers's bail hearing was a ready-made sound bite: "He is a thug and a murderer."==

The seasoned public warrior was on the defensive, however, when I contacted her in June to set up an interview. She invited me to her home and told some of her former deputies that it was all right for them to speak with me. But a few hours after I asked Melissa Mourges about the jogger case in the course of a 20-minute conversation, Fairstein sent me an e-mail and took back her invitation: "[I] am hearing that unlike the way you pitched this piece to me, it's going to be a rehash of the jogger/[J]ovanovic," she wrote. "I just don't want to . . . open my home to someone I don't know and then get bitten in the tail." That Friday, the morning I was

to meet her, she relented and let me into her home. In the end it was the jogger trial that she most wanted to talk about, the subject that made the former prosecutor lean forward.

Cases like that of the jogger present a problem for Fairstein. When we spoke, she often seemed unwilling, or perhaps unable, to distance herself from the case. But asked directly about Patrick Griffin, she surprised me with an uncharacteristic disclaimer. "I wasn't a prosecutor on that case, nor on Jovanovic, nor on the jogger," she said. In the jogger trial, "I didn't take statements. I didn't take the confessions. I didn't try the case. I'm a lightning rod."

This momentary disclaimer notwithstanding, she can't seem to let go of the big cases, to stop asking for the lightning to strike. Since the decision to reverse the jogger convictions became official, Fairstein has complained that Reyes is an unreliable witness and has suggested that the decision to vacate was related to her rivalry with Nancy Ryan. "Nancy Ryan doesn't like me—hates me—that's a mild word for it," Fairstein said. "Would she have been delighted to undo this because of me? Yes." (Ryan didn't respond to a request for comment through Morgenthau's spokeswoman, who referred to a statement from the D.A. that said the decision was his own.)

The way Fairstein sees it, Reyes, the man whose DNA was found in the woman, ran with the boys convicted by Fairstein's office. "The group hits her, assaults her, brings her down. People start pawing at her, pawing her clothing, literally tearing her clothing off, pawing over her. I think when the group was ready to run on and they did and went south, I think [Reyes] stayed, I think he took her alone down to the ravine where she was found, way off the roadway, and I think he stayed and raped her to ejaculation."

"I will write about it someday," she said of the jogger case. "Nonfiction."

*Benjamin Smith is a reporter for* The New York Sun.

[PRINTER FRIENDLY]  [EMAIL THIS ARTICLE]  [LETTER TO THE EDITOR]  [REPRINT PERMISSION]

[CONTACT]