# EXHIBIT 18

**The New York Times Magazine** | https://nyti.ms/29nPE8p

# LINDA FAIRSTEIN VS. RAPE

By Katherine Bouton

Feb. 25, 1990



See the article in its original context from
February 25, 1990, Section 6, Page 21   Buy Reprints

**VIEW ON TIMESMACHINE**

TimesMachine is an exclusive benefit for home delivery and digital subscribers.

*About the Archive*
*This is a digitized version of an article from The Times's print archive, before the start of online publication in 1996. To preserve these articles as they originally appeared, The Times does not alter, edit or update them.*

*Occasionally the digitization process introduces transcription errors or other problems; we are continuing to work to improve these archived versions.*

Linda Fairstein - suburban born, classically educated, intelligent, impeccably dressed - spends her days thinking about vile and abominable acts. The longer one knows her, the stranger the paradox becomes.

The scene this December morning is the Manhattan courtroom of Acting Justice Bernard J. Fried. On the left is a stocky Hispanic man with a drooping mustache, charged with rape and sexual abuse, and his Legal Aid lawyer. On the right is the prosecuting attorney: a tall, striking blonde in a tailored suit and noticeably high heels, an exquisite antique pin in her lapel. ''Linda Fairstein,'' she says, addressing the judge, ''for the People.''

This is Fairstein's first trial since her highly public prosecution of Robert Chambers, the so-called ''preppie murderer,'' a year and a half before, and the 34th - or 35th, she isn't sure - case she has taken to trial since joining the Manhattan District Attorney's office, in 1972. Only two resulted in aquittals.

Fairstein, 42 years old, occupies what may be a unique place in American law. As chief of the sex-crimes unit in the D.A.'s office, a position she has held since 1976, she oversees the disposition of some 500 to 700 cases a year involving rape and other sexual abuse. Between 125 and 175 of those cases are prosecuted as felonies. About 100 are plea-bargained, most of them resulting in sentences of only slightly shorter length, Fairstein says, than might have been awarded in a jury trial. The rest are tried by a jury.

In most cities today, sex crimes are prosecuted as any other crime would be. But in Manhattan, thanks to Fairstein and her boss, District Attorney Robert M. Morgenthau, their prosecution is thought to require special skills and sensitivity. Fairstein's team consists of 14 full-time assistant district attorneys, two paralegals, a secretary, and, not least, a full-time detective.

Fairstein is in court today for a pretrial hearing, to determine whether certain evidence about the victims' identification of the defendants should be admitted in the trial itself, scheduled to begin March 6. There's no jury, and the victims are not present. (Nor is one of the defendants, Reynolds Reyes, who has been delayed on a flight from Puerto Rico.) It's an unsavory case, as most of Fairstein's are. Jose Figueroa, a security guard at Metropolitan Hospital, and Reyes, an orderly at the same institution, are charged with sexually abusing one woman and raping another, after the women had been admitted to the psychiatric emergency ward.

In the first incident, Figueroa allegedly touched the victim's breasts and then put his finger in her vagina, while she was strapped down on a gurney. Four days later, he allegedly took the second victim to a bathroom and raped her; then Reyes is said to have raped her. Afterward, according to the minutes of the arraignment, they rated her on a scale of 1 to 10.

Fairstein rests one hand lightly on the jury box, gesturing subtly with the other, as she questions Detective Bruno M. Francisci, a member of the Police Department's Manhattan sex-crimes squad, who arrested the two assailants. A police badge pinned to the lapel of his neat gray suit, hair slicked back, Francisci knows the process almost as well as Fairstein herself. Every step is orchestrated, like a minuet. Neither prosecutor nor witness falters.

In a proceeding known for constant interruption - ''Objection, your Honor'' - Fairstein sails unhindered through her presentation. Her thorough preparation, cool efficiency and barely detectable moral outrage leave the defense attorney almost speechless. Figueroa fidgets in agitation as she nails down her points.

The victims will testify against their attackers. Rape victims make good witnesses, as Fairstein told a group of rape counselors in training at St. Vincent's Hospital and Medical Center one evening not long ago. The counselors looked skeptical. ''Rape is a contact crime,'' she explained. ''It can easily take an hour or more. Many victims can identify scars, birthmarks, tattoos . . . underwear.'' Don't let a victim tell you there's no point in going to the police, she advised the counselors. ''The easiest case I ever had,'' she said, ''the man had a scorpion tattooed on his penis. That's not the kind of evidence you get with someone who held up a bank.''

Identification in the Metropolitan Hospital case was easy. Figueroa was working in the emergency room during the hours the victims were there, and was wearing a uniform. He also told one victim that his name was Jose.

One can only wonder why he would have identified himself, if indeed a crime occurred. Perhaps he thought the woman wasn't mentally competent to identify him or to assess what happened to her. Perhaps if sexual contact was made, it wasn't forcible. Or perhaps, as in some cases of acquaintance rape, which makes up an ever-increasing percentage of Fairstein's work, Figueroa thought that what he was doing wasn't so bad. It wasn't long ago that rape was considered - in certain circumstances - if not exactly a man's right, an understandable weakness of character.

I Fairstein's name is now a household word, it is because of Robert E. Chambers Jr. Chambers killed Jennifer Levin in Central Park in the early morning of Aug. 26, 1986, after an evening in a ''preppie'' bar. The charge was murder in the second degree. The trial lasted 11 weeks. After nine days of jury deliberation, and increasing signs that it would end in a mistrial, Chambers pleaded guilty to the lesser charge of manslaughter in the first degree.

Fairstein's opponent in the case was Jack T. Litman, now president of the New York State Association of Criminal Defense Lawyers, who nine years earlier had defended Richard Herrin in the slaying of his Yale girlfriend, Bonnie Garland. The Chambers trial was

unusually bitter. "I couldn't live with myself if I'd done - unfairly, unwarrantedly, and unjustly - the kind of things he did to Jennifer Levin after her death," Fairstein says of Litman. "Things were said that were not the friendliest. . . ." he agrees.

What angered Fairstein most was Litman's fight to introduce as evidence what came to be known as Levin's "sex diary." The judge finally ruled the diary was irrelevant to the case, but the phrase stuck, with its blame-the-victim implications. "Of the 480 or so jurors we interviewed, several hundred said they associated the case with the 'sex diary,' " Fairstein says.

"She's so strongly moral, she so strongly wants the system to treat people equally," comments one observer of the legal scene, Burt Neuborne, a New York University law professor and former legal director of the American Civil Liberties Union. "If there were more people like her it would be an infinitely juster system."

"The general sense is that she doesn't fight dirty, but she fights hard," he continues. Nowhere was this more evident than in her questioning of Ronald N. Kornblum, Chief Medical Examiner of Los Angeles County and one of the Chambers defense's expert witnesses.

The testimony concerned a paper Dr. Kornblum had written on the effect of the choke hold. The defense argued Levin was killed accidentally and instantaneously by strangulation, as Chambers - who was behind her - put his arm across her neck and flipped her over his head, in response to her squeezing his genitals. Fairstein contended that Chambers deliberately strangled Levin - face to face - probably during an argument, and that she struggled violently and went into a convulsive seizure after he had compressed her neck for at least 20 seconds.

Whatever the scenario, the prosecution contended, Chambers was trying to kill Levin. Addressing the defense's claim, Fairstein used the defense's own witness to demonstrate that - even as Chambers described the events - his grip could have been intentionally lethal.

Fairstein: "The carotid control hold, Dr. Kornblum. You described that in your piece as well. Would you tell us please, when you used the language 'doing the chicken,' would you describe for us exactly what phenomenon you described?" The judge: "Doing the chicken?" Fairstein: "Yes, Judge." The judge: "Describe it, Doctor." Kornblum: "That's a term that the police used on the West Coast for someone who has had the carotid choke hold applied to him and he develops seizures, [and] various other uncommon maneuvers."

Fairstein: ''Well, do you specifically describe these uncommon maneuvers as victims grimacing with pain, victims flailing their arms and legs, victims going into convulsions? Is that correct?'' Kornblum: ''Yes.'' Fairstein: ''And those are the people who live; is that right?''

A few questions further on, Fairstein asks, referring to Levin: ''And if she was in a hold in which her arms were flailing, do you believe she could still have a grip'' on his genitals?

There are many objections and much discussion before Kornblum answers: ''If she was having a seizure at that time, no, she wouldn't have kept her hands on them.''

Litman feels Fairstein underplayed the key question: whether Chambers had ''reacted instinctively or did he overreact. . . What I thought was going to be the issue was the length of time it took'' for Levin to die.

''It's so like Jack,'' Fairstein says, sighing audibly, when I mention his criticism. ''My summation was four hours. I spent an enormous amount of time talking about the length of time of death, because part of my argument to the jury was that there was a lot of uncertainty about the manner of death but that what was clear was how long the death had taken. We incorporated the testimony of his own witness, Kornblum, which I think we blew out of the water.''

Who ''won'' the Chambers case is open to question. One condition of Chambers's plea of guilty to manslaughter was that he admit he had acted with the intention of harming Levin. Even so, Litman says: ''I think we did better than she did. She held out for a murder case. . . . I got him a plea. . . .'' Chambers was sentenced to 5 to 15 years. Fairstein said at the time that she would much rather have had a verdict, ''whatever it was.''

By chance, a friend had photographed Levin and her friends in the bar on the night of her murder, and the pictures are dramatic evidence of the vitality of the life that was lost. In her summation to the jury, Fairstein referred to these pictures, as she had often throughout the trial: ''that lovely face,'' she said, ''unmarked, tan, smiling with, ironically, the neck portrayed so clearly, open, the neck which just hours after was going to be transformed into a maze of abrasions and bruises. The neck that was so vulnerable to the brute force of this defendant.''

The police photographs taken just a few hours later are shocking, and even more so in comparison to the earlier pictures: Levin's battered body is brutally exposed, the clothing up around her neck, the body crumpled and broken. ''These injuries scream to you from every one of the photographs that Jennifer Levin's death was an intentional one,'' Fairstein told the jury.

Now, in her small cluttered office, many months after the trial, Fairstein's cool prosecutorial manner cracks ever so slightly as she looks at the pictures, and her voice falters - still vulnerable to the horror of what she has seen countless times before.

Fairstein's day is filled with the everyday brutality of rape. Over the months I spent with her she dealt with a number of cases whose range and variety are typical of her experience. Some of the accusations made the newspapers; most didn't. A 12-year-old girl from Harlem was raped and tortured in an attack that lasted 5 hours. A Columbia University student was raped by a handyman who came to repair her windows. A prostitute was sexually abused by a client who claimed she owed him for a previous encounter. A runaway from Pennsylvania was raped in Tompkins Square Park by a gang of toughs. A Boy Scout leader abused his Scouts. A 40-year-old mother of four was assaulted by her doctor during a routine medical examination.

Two paralegals working in Fairstein's unit - "my clones," she calls them, college graduates on their way to law school - screen cases as they come in. Maureen Spencer, a New York City detective with the sex-crimes squad assigned to Fairstein's unit, does most of the initial interviewing with police officers; she or Fairstein will then interview the victim.

Fairstein spends a great deal of time on the less dramatic but perhaps more difficult cases, the cases with contradictions, with reluctant witnesses, with suspicious facts. She is notoriously tough on witnesses in these cases - too tough, some of her critics feel. Susan Xenarios, director of the Rape Intervention/Crime Victims Assessment Program at St. Luke's-Roosevelt Hospital Center, admits she tries to "fortify my clients" before they are interviewed by the D.A.'s office, but, she says philosophically, "it's the nature of interviewing by a prosecutor; Linda is looking for vulnerabilities." Fairstein doesn't want any surprises in court.

A young, pretty waitress from Peru comes in one morning, claiming she had rebuffed many advances from her employer, including one where he barged into the bathroom (the door was open) as she was putting on her makeup and put his hand in the top of her pants and his finger in her vagina. Fairstein questions her patiently, sympathetically, then begins zeroing in on the inconsistencies in her story. Although the woman has already been interviewed by Detective Spencer, this is the first time she has mentioned the vaginal-touching incident. Why? Fairstein presses. "My boyfriend would have. . . ." she begins.

"Why would you tell Mr. Freedman, who wants your money, and not the people who are here to help you?" Fairstein asks, exasperated. Freedman is a lawyer the woman has recently met with, who wants her to file a civil suit.

"How much money would you want?" Fairstein asks her, referring to the suit.

"I really haven't thought about it." She shrugs. "I'd like to have something for me. A business. A restaurant."

"She's rather naive and greedy to think he's going to buy her a restaurant," Fairstein says later. "But we'd deep-six it altogether if I didn't believe it."

Deep-sixing a case is never done lightly. It may well infuriate a client and lead to public accusations that serve neither Fairstein nor her cause. Sometimes a case gets as far as a grand jury before it's rejected. One 1981 rape victim whose case was rejected by a grand jury decided to air her grievances on the Op-Ed page of this newspaper. Writing that it was "no accident" that her assailant was not indicted, the pseudonymous Jane Doe went on to speculate that her own identification of the rapist had been discounted because, among other things, the man she had accused was a white middle-class student. (She, too, was white and middle-class.) Fairstein's reply, published in the Letters column of The Times, was steeped in righteous indignation, calling Jane Doe's article a "disservice to the public" and a misrepresentation of the facts. The case was dismissed, she said, because "all the other evidence exonerated the man she had 'identified.' " Telephone records and eyewitnesses placed the defendant elsewhere at the time of the rape; finger and palm prints found on the sill of the window through which the assailant had entered did not match his; and seminal fluid found on the bedsheet was not his. "We are shocked by Miss Doe's assertion that she does not know why the case was dismissed," Fairstein wrote. ". . . Although the outcome was emotionally unacceptable to Miss Doe, it was a truly just decision."

Twenty years ago, Jane Doe's case would have been thrown out even if the evidence did corroborate her story, because her identification would not have been enough to bring an indictment. Until 1972, the victim of a sexual attack in New York State was not considered an independently credible witness. The law required corroboration not only of the identity of her assailant but of the nature of the attack: that it had been forcible, and that it had been sexual. "If someone walked out of my office and had her purse stolen and then was raped by the assailant," Fairstein says, the victim's testimony could convict him of the theft but not of the rape.

Because the law made it almost impossible to prosecute rape, few victims bothered to complain. In 1971, 2,415 rapes - probably a fraction of those that occurred - were reported to the police in New York City. In the first six months of that year only one person was convicted of a felony rape.

The identification law changed in 1972, the other corroboration requirements were dropped in 1974. Fairstein readily gives the credit for a more sweeping change in attitude to the Women's Movement and, in particular, to Susan Brownmiller, whose 1975 book "Against Our Will: Men, Women and Rape" put the subject on the public agenda.

Still, the perception remains that rapists are hard to put in jail. "So many victims come in and say, 'But it's only my word against his,' " Fairstein says. One of her missions is to make it known that the victim's word is good enough.

In 1975, New York State passed another piece of legislation that failed to eliminate a lingering misperception - that the victim will be put on trial. Written by Fairstein's predecessor, Leslie Crocker Snyder, who is now a State Supreme Court justice, the amendment made it improper to consider a woman's past sexual conduct as evidence in a rape case except when the accused is an acquaintance.

And just this month the New York Court of Appeals unanimously ruled that testimony about a recently recognized psychological phenomenon known as "rape trauma syndrome" is admissable as evidence. Many victims initially react to the trauma of rape with a false sense of calm, which may be misinterpreted by a jury as an indication of consent. Under the new ruling, a "very significant" one, Fairstein says, prosecutors may bring in expert witnesses to explain this behavior.

Neither Fairstein nor the law can change jury attitudes: it's harder to convict a good-looking defendant than an unprepossessing one, a family man or someone with a job than a loner or a drifter. And it's much harder to convict someone who knows his victim than someone who is a stranger.

Acquaintance rape, or "date rape," remains difficult to prove, and a grueling courtroom experience for the victim. (In many cases, Fairstein says, even the victim's family feels she's somehow at fault.) Female jurors tend to be most critical. "Give me a jury of 12 men," she says.

The first of Fairstein's big cases was the 1978 prosecution of Marvin Teicher, a Manhattan dentist who had been accused of sexually abusing female patients while they were under anesthesia. The investigation began under Leslie Snyder, who set up a hidden closed-circuit camera and sent in an undercover policewoman. Teicher had lifted the drugged woman out of the chair and was touching her breasts when detectives watching on a remote screen decided it was time to intervene. Teicher told them that the embrace was a "ventilating" technique. "She's in respiratory distress," he said.

Snyder went on to another job, and it was left to Fairstein to prove to the jury that Teicher's actions were thoroughly unprofessional. Teicher was convicted of sexual abuse in the first degree. The cases that followed featured the kind of innovative investigation and exhaustive preparation that would become Fairstein's hallmark. In 1979, Derrick O'Mara, a 15-year-old with 16 arrests and 6 major convictions in Family Court on his record, became the first youth tried as an adult under New York State's recently enacted juvenile-justice law. He had

broken into an East Side town house and raped and sodomized a 15-year-old girl. The defense questioned whether the girl had seen him clearly enough to identify him. "The question you must ask yourself," Fairstein instructed the jury, was not whether the victim remembered the defendant's face but whether there was "any way she will ever be able to forget" it.

In 1981, a jury convicted John Ashe, a clerk at the central branch of the New York Public Library, and three others of gang-raping two fellow clerks, whom they'd lured to their apartment with the promise of tickets to a rock concert - a classic "date rape."

In 1986, the "Midtown rapist," Russell West, was convicted on multiple counts of rape, sodomy, sexual abuse and robbery in attacks on four women in Midtown office buildings (18 women had identified him as their attacker), and was sentenced to 30 to 60 years.

There were some less celebrated moments as well. In 1981, the defendant in a particularly brutal sexual assault against a nun was allowed to plea-bargain, after the nun declined to go through the trauma of a trial. Supreme Court Justice Harold Rothwax sentenced Max Lindeman to 10 to 20 years on sodomy charges; his accomplice to 5-to-15 for burglary. The public was infuriated at the leniency of the sentence.

Perhaps the low point of Fairstein's career was the 1977 Michele Reisch case. Reisch's allegation of being raped by ex-con Nathan Giles, after he had broken into her apartment, was problematic. Five witnesses said they had seen the two together at a party that evening. Giles said the sex was consensual. In interviews with Fairstein, Reisch said things about herself and her attacker and their relationship that "gave us serious pause about her credibility," Fairstein says. After discussions with the judge, Giles was permitted to plea-bargain, and was released on time already served on a gun-possession charge. Six months later Giles was arrested for sexual assault and the murder of Bonnie Bush, a nurse at Mt. Sinai hospital. He was convicted and sentenced to 62 1/2 years to 2 lifetimes plus 25 years.

The rapes that don't get prosecuted, for the most part, are the rapes that don't get reported. By some estimates, these account for up to 50 percent of all rapes committed.

Fairstein is never far from the attention of the tabloids, and they serve her well. So do television and the movies. They bring in business, and once the business is in, it can often be settled.

Fairstein served as the model for Valerie Harper's "Farrell for the People," a 1982 television movie. The director Allan J. Pakula consulted her about the character of the murdered sex-crimes prosecutor in "Presumed Innocent," now in production, which is based on the book by Scott Turow. (Greta Scacchi will play her.) Kelly McGillis consulted her for her role as the

prosecutor in "The Accused." Robert Daley dedicated his 1985 novel "Hands of a Stranger" to Fairstein, and fictionalized many of her well-known cases. It too later was made into a television movie.

Fairstein says she never planned such a high-profile - or all-consuming - career. She grew up in Westchester County, where her father was a physician and her mother a nurse, "the kind of people who were always helping people."

At Vassar College, where I knew her slightly, she studied English Lit; later, she followed her brother to the University of Virginia Law School. When District Attorney Frank S. Hogan hired her, back in 1972, she agreed "with my fingers crossed" to his request for a four-year commitment. "I just knew I would be married and having kids by then," she once told a reporter. As one of only six women in an office of 200, she was at first regarded with some skepticism. Once, when a case reduced her to tears, a male colleague told her to "go throw up like a man." But four years after joining the office, she was named head of the sex-crimes unit.

Criminal law suits her."She's just got the temperament that can deal with pressure," offers her boss, District Attorney Robert M. Morgenthau. Colleagues and opponents alike praise her skills and ingenuity as an investigator, her thorough preparation, her ability to think on her feet. She has a phenomenal memory - mention a routine case from six years ago and she'll recall, if not the victim's name, the assailant's peculiar quirks. Often, watching the local news at night, she'll recognize an assailant's modus operandi. In a flash she'll be on the phone to the police.

Fairstein lives in a gracious upper East Side apartment with a panoramic view of the East River and Queens. She and her husband, Justin N. Feldman, a 70-year-old lawyer whom she married on the eve of the Chambers trial, are active in human-rights and legal organizations, and have a wide array of friends. Summer weekends they fly to their Martha's Vineyard house. Feldman hopes they'll live there full-time soon, and that Linda will write books - suspense novels.

Looking that day at the chilling photographs from the Chambers trial, I asked her, "How can you go on living your personal life?" It was clearly a question Fairstein had asked herself. "Well, for one thing it's very different," she said after a moment. "Without sounding trite, I've been blessed with certain favors. I've had a happy, well-adjusted, trauma-free life. My personal life has always been . . ." - she hesitated, thinking perhaps of the public nature of her love life in the past, the press reports of the boyfriend in France whom she had flown off to visit regularly - ". . . very rich and full."

She remains close to her family and draws strength from them. She is, in fact, effusive to the point of cloying on the subject. ''My mother is my vision of motherhood,'' she commented at one point. ''My father is the person in the world whom I loved most dearly and adored,'' she said at another. Her husband provokes a sentiment worthy of a greeting card: ''He's the most warm and loving human being imaginable, and terrifically romantic.''

If a strong and stable family life is one answer to how Linda Fairstein can do what she does, another may be that, as she says, glancing again at the Levin pictures, ''I got into this on a lesser level, before it reached this emotional pitch.''

The flash and bravado, the elegant wardrobe and ever-blonder hair, the high heels and fancy restaurants, the tough talk (''Anything between the knees and the waist goes to me'') and a good sense of humor - they too are perhaps part of coping. Her colleagues aren't fooled by the glossy exterior. ''I'm moved by how touched she still is by the victim, after all these years,'' says Elizabeth Lederer, one of her top assistants.

The emotional side may serve her well in the courtroom. Murray Kempton summed up the Chambers trial this way: ''Litman played his poor cards with the unfalteringly glacial skills of perfected professionalism. Linda Fairstein played hers with the hectic brilliance that belongs only to the passionate. . . .''

Early last December, Fairstein took the other side of the stand, appearing as a witness in pretrial hearings on the Central Park jogger case, in which six youths are accused of rape and attempted murder of a young woman. The trial is scheduled to begin in midspring.

The courtroom was packed with the defendants and their lawyers and a host of friends and supporters. The prosecutor, Elizabeth Lederer, a serious, reserved woman with cropped, tightly curled hair, betrayed the stress of this case in the clamp of her jaw and the muscles of her back.

Bringing her skills as a prosecutor to the business of testifying, Fairstein managed to give a vivid, incriminating picture of the suspects' behavior. Time and again, objections raised by the defense were overruled by the judge.

The evening after the attack, she testified, she had accompanied Lederer to the precinct police station where the suspects were being held. Her presence over the next 32 hours was, in retrospect, invaluable to the prosecution. At one point on the first night, she heard ''a commotion . . . whistling, screaming, raucous laughter, as if a party was going on.'' She heard Kharey Wise, one of the defendants, say ''Did you tell them about the guy who was jogging? 'Do you want to race?' '' - apparently referring to another of that night's victims. '' 'Yeah, it was really funny,' '' someone else answered.

At dawn the next morning, Fairstein had accompanied Lederer, the police and two of the defendants to the scene of the crime. She described a large tree surrounded by ''an astounding amount of what appeared to be dried blood.'' A detective had asked Kevin Richardson, another of the defendants, if he recognized the scene, she recalled. '' 'This is where it happened,' '' he had said. '' 'Where what happened?' '' she quoted the detective as asking. '' 'The raping,' '' Richardson had answered.

Then they called Kharey Wise over, Fairstein testified. When he saw ''the matted grass with a lot of bloody looking matter,'' he started muttering: '' 'Damn. Damn. That's a lot of blood.' '' Quoting him, Fairstein repeated the phrases three or four times. Then, '' 'I knew she was bleeding but I couldn't see how much. . . . It was at night.' '' And then, Fairstein recalled, in response to a question from the detective, he said, '' 'This is where we - they - raped her.' ''

Why sex crimes? Homicides are supposed to be the aspiration of prosecutors. Fairstein has prosecuted only one, the Chambers case. ''There are no survivors,'' as she puts it. She prefers rape - where there are victims to be vindicated, where she can turn a negative into a kind of positive.

Last December, when David Dinkins's transition team approached her with an offer to be the city's new corruption prosecutor, she turned it down. She already has an important administrative position - deputy chief of the trial division - which she carefully keeps from infringing on the time she reserves for sex crimes.

The job she would accept, she says, is Police Commissioner. And many in the profession think she'll one day be the Manhattan District Attorney.

What do you think she'll be doing 10 years from now, I asked Robert Morgenthau, who has held that job since 1975. Sitting in his ballroom-size office, wearing a torn green cardigan and smoking a big cigar (''This is a designated no smoking area,'' says a sign as you enter the executive suite), he expresses the hope that she'll be doing just what she's doing now. But, he adds: ''She's a very talented woman. She could probably do anything she sets her mind to do.'' One day at lunch at Forlini's, the power restaurant for the courthouse crowd, a young woman colleague asked Fairstein that very question: ''Would you like to be D.A.?'' Fairstein paused, as if considering the wisdom of a straight answer. ''I'd like to be appointed to something. I hate politics. I hate kissing people's asses. But yes, I'd like to be D.A.'' Then, ''I love Morgenthau and I hope he lives 20 years. Be sure you get that in,'' she says, turning to me with a laugh.