# EXHIBIT 19



AMERICAN LAWYER BOOKS/
SIMON & SCHUSTER
SIMON & SCHUSTER BUILDING
ROCKEFELLER CENTER
1230 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10020

COPYRIGHT © 1992 BY TIMOTHY SULLIVAN
ALL RIGHTS RESERVED
INCLUDING THE RIGHT OF REPRODUCTION
IN WHOLE OR IN PART IN ANY FORM.

PUBLISHED BY AMERICAN LAWYER BOOKS/SIMON & SCHUSTER INC.
AMERICAN LAWYER BOOKS ARE PUBLISHED BY
AM-LAW PUBLISHING CORPORATION.
SIMON & SCHUSTER AND COLOPHON ARE REGISTERED TRADEMARKS
OF SIMON & SCHUSTER INC.
THE AMERICAN LAWYER IS A REGISTERED TRADEMARK OF
THE AMERICAN LAWYER NEWSPAPER GROUP, INC.
DESIGNED BY CARLA WEISE/LEVAVI & LEVAVI
MAP BY DAVID KORALEK
MANUFACTURED IN THE UNITED STATES OF AMERICA

1  3  5  7  9  10  8  6  4  2

LIBRARY OF CONGRESS CATALOGING-IN-PUBLICATION DATA
SULLIVAN, TIMOTHY (TIMOTHY JOHN)
UNEQUAL VERDICTS: THE CENTRAL PARK JOGGER TRIALS /
TIMOTHY SULLIVAN.
P.   CM.
INCLUDES INDEX.
1. CENTRAL PARK JOGGER RAPE TRIAL, NEW YORK, N.Y., 1990.
2. TRIALS (RAPE)—NEW YORK (N.Y.)  3. TRIALS (ASSAULT AND BATTERY)-
-NEW YORK (N.Y.)   I. TITLE.
KF224.C435S85  1992
345.73'02532—DC20
[347.3052532]       92-1688
CIP
ISBN: 0-671-74237-X

## CHAPTER 1

# THIS IS MY FIRST RAPE

"STEVE RIPPED HER PANTS WITH HIS KNIFE. THAT'S WHAT MADE HER mad. And then, that's when she start scratchin', uh, what's-his-name? Kevin. She was yellin' pretty loud. Yusef closed her mouth, because he had bigger hands than us."

Kharey "Polo" Wise, sixteen, was talking to Elizabeth Lederer, a senior homicide and sex crimes prosecutor in the Manhattan district attorney's office. It was about 3:30 on the afternoon of Friday, April 21, 1989, thirty-nine hours after the horribly beaten body of a young woman had been found in the northern woods of Central Park, nude except for the bra pushed up above her breasts. Lederer had been interrogating suspects in front of a video camera for fourteen hours. As soon as she finished taking one statement the cops would bring her another kid with a story to tell.

This was Lederer's second video session with Wise, and she was beginning to worry about the credibility of the case. He had given detectives two contradictory written statements before Lederer had arrived at the precinct, and his story was still changing. How was a jury to know which version to believe? Lederer would have preferred a clean

case; one written confession, one video from each defendant. But this case wasn't going that way.

She knew from experience that a suspect will admit what he has to and deny what he can. But Wise was more slippery than the other teenagers Lederer had interviewed that day. He went off on tangents and created completely implausible explanations for the myriad contradictions in his tale. Yet Wise's account of the wild spree he and approximately thirty other kids had taken through Central Park two nights before was also rich in detail and highly incriminating.

"So we was lookin' at her, and I felt kinda bad," said Wise. "This is my first thing I did to any type of female in the street. This is my first rape. I never did this before, and this is gonna be my last time doin' it."

---

Linda Fairstein, an ambitious career prosecutor who enjoyed an investigation as much as a trial, got the news at about 9:00 A.M. on Thursday, April 20, from Sergeant Robert Fiston of the Manhattan Sex Crimes Squad. A nearly nude woman, bound, gagged and within an inch of death, had been found at about 1:00 A.M. in a muddy ravine below the 102nd Street Crossdrive in Central Park. She was apparently the victim of a large gang of East Harlem youths who had rampaged through the park the previous night, mugging joggers and harassing cyclists and cab drivers. The cops were questioning a group of juvenile suspects and would need a DA to come uptown later and videotape their statements. The victim was in intensive care at Metropolitan Hospital and still unidentified.

As chief of the twelve-lawyer Sex Crimes Prosecution Unit, Fairstein, forty-one, didn't try many cases herself anymore. Her last trial, the notorious Preppy Murder Case of 1988, had raised her to a level of celebrity beyond the considerable status she had achieved in criminal justice and feminist circles for championing the aggressive prosecution of hitherto hushed-up crimes. That trial had ended in disappointment when she accepted Robert Chambers's plea to manslaughter for the killing of Jennifer Levin. The jury was stuck in its ninth day of deliberating a murder charge at the time.

No media spotlight gets as hot or as bright as that which burns in New York City, and the media love nothing more than a case like *The People* v. *Robert Chambers*. Chambers, twenty, killed Levin, eighteen, behind the Metropolitan Museum of Art, in a part of the park that

serves as playground for respectable Manhattanites, from the rich and powerful of Fifth Avenue co-ops to the intellectuals of Central Park West. Regardless of who this victim turned out to be, Fairstein reasoned, a violent rape in Central Park would attract a lot of media. The case should go to somebody who could not be intimidated or rattled by the city's hypercompetitive press corps.

Two other aspects of the case influenced Fairstein's choice: the possibility that the victim would die and the fact that she had apparently been gang-raped. In any sex crime an effective prosecutor must establish a meaningful rapport with the victim, who may be unwilling or afraid to cooperate. If this victim died, however, the prosecutor would have to be able to get the same kind of cooperation from her family, in order to present the deceased to a jury as a real person. Second, the likelihood of gang-rape meant multiple defendants, which, in turn, portended a complex investigation and a team of opposing counsel. So, in addition to a good trial lawyer who could handle the media, Fairstein needed an experienced investigator whom victims and their kin would instinctively trust. She called Lederer.

Meanwhile, Nancy Ryan, deputy chief of the Trial Division, had heard about the Central Park assaults on the radio. The first thing she did when she arrived at work that morning, even before making contact with the detectives running the investigation, was assign the case to Peter Casolaro, one of the office's top homicide prosecutors. A few months earlier, Casolaro had proven his ability to overcome the distractions of the media and win a difficult circumstantial case when a jury convicted lawyer Joel Steinberg of the manslaughter of his six-year-old, illegally adopted daughter. The killing of Lisa Steinberg had shocked the public, exposing a middle-class household in which the deranged Steinberg and his battered companion, Hedda Nussbaum, had horribly mistreated the girl and a surviving, two-year-old adopted boy.

When Fairstein heard that Ryan had assigned the Central Park case as a homicide, she rushed to her colleague's office, ready for a turf war. The woman was not dead, said Fairstein, but she was very obviously the victim of a rape. Moreover, she continued, Lederer had proven time and again her ability to establish firm relationships with victims and their families, which would undoubtedly become crucial in this case. Fairstein was confident that District Attorney Robert Morgenthau would settle the argument in her favor if Ryan chose to take it that far. But Ryan did not.

The conflict downtown in Morgenthau's office was similar to a

contest that was taking shape uptown among rival detective squads, whose members also smelled printer's ink all over the case. When detectives from the Manhattan North Homicide Squad began arriving at the Central Park Precinct shortly after 9:00 A.M. to assist in the investigation, the small parking lot was already crowded with print and broadcast reporters elbowing one another for a piece of the story. And inside, the converted nineteenth-century stable was packed not only with suspects and their relatives but with Sex Crimes detectives and Central Park precinct regulars.

A team of experienced investigators from Homicide was often called in when a precinct detective squad had to solve a difficult murder or other major felony. The Sex Crimes Squad assigned teams to the appropriate cases in the same manner. Standard procedure dictated that the precinct where the crime occurred would maintain official control of the case, a fact signified by the designation of a local detective as arresting officer. That officer, in this case Detective Humberto Arroyo of the Central Park Precinct, was responsible for coordinating the paperwork and guiding the case through the NYPD's red tape.

The dispute in Morgenthau's office was settled by administrators relying on bureaucratic procedures and personal clout, whereas the rivalry among the cops was resolved by immediate performance. With dozens of potential suspects, the size of the case dictated that several teams from Homicide and Sex Crimes would assist the Central Park detectives. The cops who got the best results soonest would end up running the case. The Central Park and Sex Crimes squads had little chance, therefore, against the wizened veterans of the Manhattan North Homicide Squad, each of whom had been chosen by the unit commander, Lieutenant Jack Doyle, because of demonstrated success as an investigator.

The police finally called Lederer to say they were ready for the video crew at about 8:00 P.M. By that time the brass had moved the investigation from the tiny Central Park stationhouse to the much bigger facilities of the Twentieth Precinct on West Eighty-second Street. Lederer called Fairstein, who offered to meet her at the precinct to help out.

By the time Fairstein and Lederer arrived, the Central Park detectives and the Sex Crimes Squad had essentially been bumped by the homicide specialists. That elite crew had been more successful in convincing the families of the juvenile suspects to cooperate and had conducted a series of interrogations producing the written confessions

that would serve as prelude to Lederer's videotaped interviews. Their tactics were time-honored and unarguably effective, but would later be challenged by every defense lawyer in the case as coercive, deceptive, manipulative, improper and illegal.

The prosecutors' first order of business was to get a briefing from the cops, to learn as much as the detectives knew about what had happened in Central Park the previous evening. As Lederer listened to the police officers and read the written statements of a few suspects, the picture began to come into focus.

A group of about fifteen boys had gathered in front of Schomburg Plaza, a government-subsidized housing complex across Fifth Avenue from the northeast corner of Central Park. They were joined between 8:30 P.M. and 9:00 P.M. by another group of about fifteen boys who had come across 110th Street from the Taft Houses project on Madison Avenue. The gang went into the park, some scouting for cyclists whose bikes they could steal, some hoping to mug pedestrians and joggers for money or cassette players. They surrounded a young Latino man, but somebody in the group knew him, so they let him pass. They approached a couple with the idea of beating up the man until somebody said, "Yo, he's with his girl." Some twisted sense of chivalry prevailed and they left the couple in peace. Next the boys came upon an old Latino man, apparently drunk, carrying a bag of food and several bottles of beer. The man, whom they all later described as "the bum," was beaten and left unconscious. On the park's East Drive the boys threw rocks and bottles at taxicabs and tried unsuccessfully to dismount several cyclists, including a couple on a tandem bike. After having been dispersed by a cruising police car, the gang split up.

This was the point at which the accounts Lederer was reading began to differ significantly. Most of the boys described a series of assaults on men jogging around the large reservoir in the middle of the park. But there was disagreement about the timing of those attacks. Among the few boys who admitted participating in the rape and beating of a female jogger near 102nd Street, some said it happened after the reservoir muggings, while others claimed it was earlier.

As the prosecutors brought themselves up to speed on the sprawling investigation, the detectives continued interrogating a relentlessly growing list of suspects. The state's case against each defendant would inevitably have its share of holes, but none seemed so vulnerable in the early going as that of Yusef Salaam. The circumstances surrounding his interrogation, conducted on the third floor of the Twentieth Precinct