**IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION**

| | |
|---|---|
| LINDA FAIRSTEIN, | ) |
| | ) |
| Plaintiff, | )   Case No: 2:20-cv-180 |
| | ) |
| v. | ) |
| | ) |
| NETFLIX, INC., AVA DUVERNAY, | ) |
| and ATTICA LOCKE, | ) |
| | ) |
| Defendants. | ) |

**PLAINTIFF'S MOTION FOR LEAVE TO CONDUCT
JURISDICTIONAL DISCOVERY**

Plaintiff Linda Fairstein moves for leave to conduct limited jurisdictional discovery on the grounds that Defendants Ava DuVernay and Attica Locke have placed the question of personal jurisdiction "in dispute" by filing their Motion to Dismiss for Lack of Personal Jurisdiction on May 18, 2020 (the "Motion") [Dkt. #26], and they have "access to facts relevant to the motion." *Amerifactors Fin. Grp., LLC v. Enbridge, Inc.*, No. 6:13-cv-1446, 2013 WL 5954777, at *5 (M.D. Fla. Nov. 7, 2013) ("When the question of jurisdiction is genuinely in dispute and the movant has access to facts relevant to the motion, refusing to allow jurisdictional discovery is an abuse of discretion," citing *Eaton v. Dorchester Dev., Inc.*, 692 F.2d 727, 731 (11th Cir. 1982)).

Plaintiff recognizes that the scope of jurisdictional discovery is limited, and she plans to focus her discovery on the three reasons set forth in paragraphs 28 and 29 of her Complaint for alleging personal jurisdiction over the individual Defendants. More specifically, the proposed discovery – in the form of requests for production of documents, limited interrogatories and focused depositions, as permitted in *UnitedHealthcare of Fla., Inc. v. Am. Renal Assocs., Holdings,*

*Inc.*, No. 16-81180-CIV, 2016 WL 8794534, at *2 (S.D. Fla. Dec. 5, 2016) – will seek information pertaining to the individual Defendants' roles in:

1. "participating in, facilitating and causing the publication of defamatory content on Netflix's website, namely *When They See Us*";

2. "publishing false and defamatory posts" about Ms. Fairstein on social media, including Twitter; and

3. "conspiring with Netflix[1] . . . to portray Ms. Fairstein in a false and defamatory manner in *When They See Us*, as alleged in Count VII."

### **MEMORANDUM OF LAW AND ARGUMENT IN SUPPORT**

**A.    Introduction**

In the Eleventh Circuit, jurisdictional discovery is "highly favored" before resolving a motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2), Fed. R. Civ. P. *UnitedHealthcare of Fla., Inc.,* 2016 WL 8794534 at *2 and *Nutramedics, Inc. v. Blackstone Nutrition, Inc.*, No. 09-81458-CIV, 2009 WL 10668148, at *2 (S.D. Fla. Dec. 31, 2009) (citing, among other cases, *Eaton v. Dorchester Dev., Inc.*, 692 F.2d 727, 729 (11th Cir. 1982), *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1367 (11th Cir. 1997), and *Majd-Pour v. Georgiana Cmty. Hosp., Inc.*, 724 F.2d 901, 903 (11th Cir. 1984)).

Indeed, "[w]hen the question of jurisdiction is genuinely in dispute and the movant [for dismissal] has access to facts relevant to the motion, refusing to allow jurisdictional discovery is an abuse of discretion." *Amerifactors Fin. Grp., LLC,* 2013 WL 5954777 at *5 (citing *Eaton,* 692 F. 2d at 729-30 and *Mother Doe I v. Al Maktoum*, 632 F. Supp. 2d 1130, 1145 (S.D. Fla. 2017)). Under such circumstances, "the rules ***entitle*** a plaintiff to elicit material through discovery before

---

[1] Netflix has not challenged personal jurisdiction, as acknowledged in footnote 1 on page 2 of the Motion.

a claim may be dismissed for lack of jurisdiction." *Eaton,* 692 F.2d at 731 (emphasis added) (quoting *Blanco v. Carigulf Lines*, 632 F.2d 656, 658 (5th Cir. 1980)).[2]

In order to provide context for the information that is needed in discovery, the next sections of this Memorandum briefly summarize the key cases relating to two topics: first, "key cases relating to the analysis of jurisdiction in defamation cases," and, second, "key cases relating to the analysis of jurisdiction in conspiracy cases."

### B. Key Cases Relating to the Analysis of Jurisdiction in Defamation Cases

In *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 776 (1984), the United States Supreme Court determined that the United States District Court for the District of New Hampshire could exercise jurisdiction over Hustler Magazine, Inc., an Ohio corporation ("Hustler"), in a defamation action explaining:

> False statements of fact harm both the subject of the falsehood *and* the readers of the statement. New Hampshire may rightly employ its libel laws to discourage the deception of its citizens. There is no "constitutional value in false statements of fact."

The Court further explained that Hustler's "regular circulation of magazines in the forum state is sufficient to support an assertion of jurisdiction in a libel action based on the contents of the magazine." *Id.* at 773-74. Specifically addressing whether the requirements of due process and "minimum contacts" were satisfied, the Court explained:

> The victim of a libel, like the victim of any other tort, may choose to bring suit in any forum with which the defendant has "certain minimum contacts" … such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice". . . . ***Where, as in this case, respondent Hustler Magazine, Inc., has continuously and deliberately exploited the New Hampshire market, it must reasonably anticipate being haled into court there in a libel action based on the contents of its magazine***.

---

[2] Although *Eaton,* 692 F.2d at 731, involved a motion to dismiss for lack of subject matter (as opposed to personal) jurisdiction, the law pertaining to, and the rationale for permitting, jurisdictional discovery is the same. *See Amerifactors,* 2013 WL 5954777 at *4 and *5.

*Id.* at 780-81 (emphasis added).

Subsequently, in *Wendt v. Horowitz*, 822 So. 2d 1252 (Fla. 2002), the Supreme Court of Florida considered whether long-arm jurisdiction over a non-resident defendant could be based on an electronic communication, and the Court held as follows:

> First, in order to "commit a tortious act" in Florida, a defendant's physical presence is not required. Second, "committing a tortious act" in Florida under section 48.193(1)(b) can occur through the nonresident defendant's telephonic, electronic, or written communications into Florida. However, the cause of action must arise from the communications. This predicate finding is necessary because of the connexity requirement contained in section 48.193(1).

Eight years later, in *Internet Solutions Corp. v. Marshall*, 39 So. 3d 1201 (Fla. 2010), the Supreme Court of Florida considered the issue of jurisdiction over a defendant accused of defamation through a website, explaining:

> A nonresident defendant commits the tortious act of defamation in Florida for purposes of Florida's long-arm statute when the nonresident makes allegedly defamatory statements about a Florida resident by posting those statements on a website, provided that the website posts containing the statements are accessible in Florida and accessed in Florida.

More recently, in *Gubarev v. Buzzfeed, Inc.*, 253 F. Supp. 3d 1149 (S.D. Fla. 2017), the plaintiffs sued Buzzfeed, Inc. and its editor-in-chief, Ben Smith, for defamation. The individual defendant resided in New York, and Buzzfeed, Inc. was a non-resident "international corporation" with offices in eighteen cities around the world. Plaintiff alleged that defendants posted defamatory materials on their website and through Buzzfeed's mobile application. Following *Internet Solutions,* the District Court reached the following conclusion with regard to Florida's long-arm statute:

> Because there is no dispute that the Buzzfeed website and the Buzzfeed mobile application are accessible in Florida, the Article was accessible in Florida, and the Article was, in fact, accessed in Florida, it follows that defendants have committed a tort in Florida for purposes of the jurisdictional analysis.

*Id.* at 1156-57.

In discussing due process, the District Court in *Gubarev* observed that *Keeton v. Hustler Magazine,* "is most instructive in this case," explaining that the United States Supreme Court had held "that the publisher of a national magazine was subject to jurisdiction in every location in which it was circulated, even if 'the bulk of the harm done to petitioner occurred outside [the forum].'" *Id.* at 1161. The District Court denied the defendants' motions to dismiss for lack of jurisdiction, explaining that "Florida maintains a strong interest in preventing the publication of defamatory materials in Florida and protecting its residents." *Id*. at 1162.

### C. Key Cases Relating to the Analysis of Jurisdiction in Conspiracy Cases

In Count VII of the Complaint, Plaintiff alleges that the two individual Defendants conspired with Netflix to defame her. Significantly, Netflix is not challenging this Court's jurisdiction (as acknowledged in footnote 1 on page 2 of the Motion), and Netflix presumably could not challenge jurisdiction, in good faith, based on the cases discussed above relating to jurisdiction in defamation cases. Because Netflix is subject to this Court's jurisdiction, the individual Defendants are also subject to jurisdiction based on Plaintiff's claim that they conspired with Netflix, as explained in *Wilcox v. Stout*, 637 So. 2d 336 (Fla. 2d DCA 1994):

> We conclude that if appellant has successfully alleged a cause of action for conspiracy among appellees and Morse to commit tortious acts toward appellant, and if she has successfully alleged that any member of that conspiracy committed tortious acts in Florida in furtherance of that conspiracy, ***then all of the conspirators are subject to the jurisdiction of the state of Florida through its long-arm statute, section 48.193***.

(Emphasis added).

Subsequently, this issue was presented to the Supreme Court of Florida in *Execu-Tech Bus. Sys., Inc. v. New Oji Paper Co. Ltd.*, 752 So. 2d 582 (Fla. 2000). In that case, the Supreme Court of Florida considered whether a foreign corporation could be subject to the jurisdiction of Florida

courts based on allegations that the foreign corporation conspired with other defendants who were subject to jurisdiction in Florida. The trial court had granted the foreign corporation's motion to dismiss, and that decision had been affirmed by Florida's Fourth District Court of Appeal, which certified a conflict with *Wilcox,* 673 So. 2d at 336. The Supreme Court of Florida reversed and approved *Wilcox,* explaining that the allegations of conspiracy satisfied the requirements of both the Florida long-arm statute and due process:

> Nothing in the long-arm statute or constitution bars such an action. . . . The same 'minimum contacts' that allowed the conspirators to exploit Floridians in the marketplace may now be used by Floridians to establish a jurisdictional basis for recouping their losses in a court of law.

*See also Machtinger v. Inertial Airline Servs., Inc.*, 937 So. 2d 730, 736 (Fla. 3d DCA 2006) ("Directing a conspiracy toward Florida establishes sufficient minimum contacts to satisfy due process.").

Federal district courts have followed these cases. For example, in *AXA Equitable Life Ins. Co. v. Infinity Fin. Grp., Inc.*, 608 F. Supp. 2d 1349 (S.D. Fla. 2009), the district court denied motions to dismiss by non-residents, explaining that: "Florida courts may exercise personal jurisdiction over parties to a Florida civil conspiracy even if the alleged civil conspirator otherwise has no connection to the state."

In *Quail Cruises Ship Mgmt., Ltd.v. Agencia De Viagens CVC Tur Limitada*, No. 09-23248-CIV, 2011 WL 5057203 (S.D. Fla. Oct. 24, 2011), the district court explained that it "has previously applied a three-part test to determine the existence of personal jurisdiction over a non-resident defendant in a civil conspiracy," explaining:

> Under the test articulated in *Hasenfus* and subsequent cases, personal jurisdiction can be exercised over a non-resident defendant under the "co-conspirator theory" if: (1) jurisdiction can, under the traditional tests discussed below, be asserted over a "resident" defendant (*i.e.* one with sufficient ties to the state); (2) the plaintiff can demonstrate the existence of a conspiracy in which the non-resident defendant and the resident defendant

>participated; and (3) an overt act in furtherance of the conspiracy took place within the state.

*Id.* at *4.

In the present case, part one of the test has been satisfied because Netflix has acknowledged (by not challenging personal jurisdiction) that it has sufficient ties to allow Florida to exercise jurisdiction over it. With regard to part two of the test, Plaintiff has alleged, in great detail, the existence of a conspiracy in which the two individual Defendants participated with Netflix. (S*ee* Count VII of the Complaint, along with paragraphs 1 through 257, which are incorporated in that Count). Finally, the third part of the test is satisfied because Plaintiff has alleged that Defendants committed a tort in Florida by making defamatory statements about a Florida resident on a website that was accessible and accessed in Florida. *Internet Solutions,* 39 So. 3d at 1201.

The Eleventh Circuit has recognized and applied the "conspiracy theory of personal jurisdiction" in a case in Alabama. In *J & M Assoc., Inc. v. Romero*, 488 F. App'x. 373 (11th Cir. 2012), the Eleventh Circuit determined that personal jurisdiction existed over a defendant because "Alabama courts have adopted the conspiracy theory of personal jurisdiction," and "J & M alleged the elements of conspiracy with particularity as well as an overt act taken in furtherance of the conspiracy in Alabama." *Id.* at 376. Because Florida has also adopted the "conspiracy theory of personal jurisdiction" (see *New Oji,* 752 So. 2d at 582), and Plaintiff Fairstein has "alleged the elements of conspiracy with particularity as well as an overt act taken in furtherance of the conspiracy" in Florida, the result in this case should be the same as the result in *Romero*.

  D. <u>**Examples of Topics to be Explored in Jurisdictional Discovery**</u>

Defendants have denied the existence of the conspiracy, and they claim, on page 8 of their Motion [Dkt. #26], that "merely because DuVernay and Locke had contracts with Netflix to write and produce the series does not mean that they were in a 'conspiracy to defame' Plaintiff." Plaintiff

should be able to see those contracts to determine the responsibilities of the individuals who wrote, directed and produced *When They See Us*, as alleged in paragraphs 2 and 3 of the Complaint (and as confirmed in the declarations of Ms. DuVernay and Ms. Locke submitted to the court). In addition, Plaintiff should be able to explore the following topics relating to jurisdiction:

a. Each Defendant's role with respect to developing and creating the content of the film series, including fact-checking for accuracy of the content.

b. Each Defendant's role in marketing and promoting *When They See Us*, including: (i) marketing the film series as a true story; (ii) whether Ms. DuVernay and Ms. Locke were obligated to market and promote the film series; (iii) whether Ms. DuVernay and Ms. Locke were compensated for marketing and promoting the film series; (iv) whether Ms. DuVernay and Ms. Locke were involved in any marketing or promotion aimed at Florida.

c. Whether Ms. DuVernay or Ms. Locke gave interviews to, or communicated with, any Florida-based reporters about Ms. Fairstein or *When They See Us*.

d. The individual(s) responsible for the decision to use Linda Fairstein's actual name in the film series.

e. The individual(s) responsible for fabricating scenes portraying Linda Fairstein as an unscrupulous lawyer who violates laws, the United States Constitution and basic rules of professional responsibility.

f. Whether Ms. DuVernay and Ms. Locke were compensated, directly or indirectly, based on viewership of the film series, including with respect to Florida Netflix subscribers.

g. The number of Netflix subscribers in Florida.

h. The number of Netflix subscribers in Florida who have accessed the film series in Florida.

i. The individual Defendants' awareness of the extent of Netflix's presence in the state of Florida.

j. Whether Ms. DuVernay discussed or promoted *When They See Us* with any Florida residents when she came to Florida to campaign for her preferred candidate for governor of Florida in October 2018. (*See* Exhibit A attached).

    k. Whether the individual Defendants visited Florida while creating the film series or to market or promote the film series.

    l. Whether the individual Defendants contacted any Florida residents in connection with creating, writing, fact-checking, promoting or marketing the film series. (The "Declaration of Ava DuVernay" states that: "To the best of my recollection, I did not contact anyone in Florida in connection with the series or in my research and writing of the Series."  However, in the Complaint at paragraph 146, Plaintiff quotes Ms. DuVernay in an interview she gave to the *Daily Beast*, published on June 2, 2019, saying: "I reached out to Ms. Meili."  Ms. Meili is the jogger who was brutally raped and severely injured, as depicted in *When They See Us*, and she currently lives in Jacksonville, Florida.  (*See* Affidavit of Linda Fairstein)).

    m. The number of Twitter followers Ms. DuVernay has in Florida and whether any of those followers liked, viewed, shared or responded to the Tweets outlined in the Complaint at Paragraphs 96, 172-173, 175-178, 180-181, 183-184.

    n. The number of Instagram followers Ms. DuVernay has in Florida and whether any of those followers liked, viewed, shared or responded to any posts she made concerning Linda Fairstein or *When They See Us*.  (Compl. ¶155).

    o. The number of Twitter followers Ms. Locke has in Florida and whether any of those followers liked, viewed, shared or responded to the Tweets outlined in the Complaint at Paragraphs 153-157, 162-163, 188-195, 197.

    p. Whether the individual Defendants played any role in selecting the categories under which the film series would be classified on Netflix.

    q. Whether Netflix agreed to indemnify the individual Defendants for liability arising from the film series and, if not, the reasons why Netflix is defending them – through common representation – for tweeting or re-tweeting statements such as: "Linda Fairstein is trash, was trash, will always be trash." (Compl. ¶194); "not a single publication needs to give Linda Fairstein a chance to speak." (Compl. ¶183); "She is an unrepentant liar.  Fuck her." (Compl. ¶195).

## Conclusion

The individual Defendants chose to create, write, direct, produce and promote a false and defamatory film series in conjunction with Netflix, which has an enormous presence in Florida. They presumably knew that their film series would be viewed by thousands of residents in Florida. They also presumably knew that their false and malicious posts on social media would be viewed

in Florida. And they presumably profited – directly or indirectly – from Florida residents who viewed the film series. As stated in *Keeton,* 465 U.S. at 776:

> False statements of fact harm both the subject of the falsehood *and* the readers of the statement. New Hampshire may rightly employ its libel laws to discourage the deception of its citizens. There is no 'constitutional value in false statements of fact.'

Like New Hampshire in *Keeton*, Florida may rightly employ its libel laws "to discourage deception of its citizens." *Id.* Moreover, the facts in the present case are even more compelling than those in *Keeton*. In *Keeton*, the plaintiff did not reside in New Hampshire, but the United States Supreme Court nevertheless ruled that the state could exercise jurisdiction over a non-resident who published defamatory material to its citizens. In the present case, the Plaintiff is a resident of Florida – thus, "both the subject of the falsehood *and* the readers of the statement" are in Florida, and this Court "may rightly employ [Florida's] libel laws" to protect them.

Notwithstanding their knowledge that their false and defamatory film series would be viewed by thousands of Florida residents, the individual Defendants have chosen to place personal jurisdiction at issue. In such circumstances in this Circuit, jurisdictional discovery is "highly favored," and Plaintiff Linda Fairstein respectfully asks this Court to grant her leave to conduct such discovery.

### Local Rule 3.01(g) Certification

Pursuant to Rule 3.01(g), Local Rules, United States District Court, Middle District of Florida, Plaintiff's counsel has conferred with counsel for Defendants prior to filing this motion, and Defendants currently oppose this Motion and will likely file a brief in opposition.

Respectfully submitted,

By: /s/ EDWARD K. CHEFFY
Edward K. Cheffy
Florida Bar No. 393649
Rachael S. Loukonen
Florida Bar No. 668435
Kimberly D. Swanson
Florida Bar No. 1018219
CHEFFY PASSIDOMO, P.A
821 Fifth Avenue South, Suite 201
Naples, Florida 34102
(239) 261-9300
ekcheffy@napleslaw.com
rloukonen@napleslaw.com
kdswanson@napleslaw.com

-and-

Andrew Miltenberg (*pro hac vice*)
Kara Gorycki (*pro hac vice*)
NESENOFF & MILTENBERG, LLP
363 Seventh Avenue, Fifth Floor
New York, New York 10001
(212) 736-4500
amiltenberg@nmllplaw.com
kgorycki@nmllplaw.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 27, 2020, a true and correct copy of the foregoing was filed and served by CM/ECF on all counsel or parties of record on the service list.

/s/ EDWARD K. CHEFFY