IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

LINDA FAIRSTEIN,                          )
                                          )
                Plaintiff,                )        Case No: 2:20-cv-00180- FtM-66MRM
                                          )
        v.                                )
                                          )
NETFLIX, INC., AVA DUVERNAY,              )
and ATTICA LOCKE,                         )
                                          )
                                          )
                Defendants.               )

---

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S OPPOSITION TO
DEFENDANT NETFLIX INC.'S MOTION TO DISMISS FOR
FAILURE TO STATE A CLAIM**

---

Edward K. Cheffy                      Andrew T. Miltenberg (*pro hac vice*)
Florida Bar No. 393649                Kara L. Gorycki (*pro hac vice*)
Rachael S. Loukonen                   NESENOFF & MILTENBERG, LLP
Florida Bar No. 668435                363 Seventh Avenue, Fifth Floor
Kimberly D. Swanson                   New York, New York 10001
Florida Bar No. 1018219               (212) 736-4500
CHEFFY PASSIDOMO, P.A.                 amiltenberg@nmllplaw.com
821 Fifth Avenue South                kgorycki@nmllplaw.com
Naples, FL 34102
(239) 261-9300                        *Trial Counsel for Plaintiff Linda Fairstein*
ekcheffy@napleslaw.com
rloukonen@napleslaw.com
kdswanson@napleslaw.com

*Trial Counsel for Plaintiff Linda Fairstein*

## TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................. iii

INTRODUCTION ............................................................................................................... 1

RELEVANT FACTUAL BACKGROUND ....................................................................... 4

STANDARD OF REVIEW ................................................................................................ 8

ARGUMENT ...................................................................................................................... 9

   I.   The First Amendment Affords No Protection to Defendants ............................... 9

      A.   There is No "Invincible Shield" of First Amendment Protection for Docudramas ....... 11

      B.   The Language Used is Not Rhetorical Hyperbole ......................................... 18

      C.   Reid & Associates v. Netflix Is Not Dispositive ........................................ 22

   II.   Ms. Fairstein Has Plausibly Alleged Defamation Claims Against the Defendants .......... 24

      A.   Defendants' Portrayal of Ms. Fairstein is Not Substantially True ................. 25

         1.   Defendants' Documents Are Not Subject to Judicial Notice ................. 26

         2.   Defendants Identified No Documents Which Contradict the ................. 27

           •   DeBlasio/Carter Press Release (Defs. Ex. 20) ........................... 27

           •   Ms. Fairstein's 2013 Deposition Testimony and Exhibits .................... 28

              (a)   *Inadmissible Toobin Article* ........................................ 28

              (b)   *Irrelevant Testimony Concerning Mr. Salaam* ........................... 28

              (c)   *Irrelevant Crime Scene Testimony* ........................................ 29

              (d)   *Testimony re Ms. Fairstein's Role* ........................................ 29

              (e)   *Testimony re "Genetic Testing"* ........................................ 29

              (f)   *Ms. Fairstein's July 2002 Letter to Jim Kindler (Defs. Ex. 2)* ................. 30

              (g)   *Ms. Fairstein's January 30, 2003 Statement (Defs. Ex. 1)* ................. 30

              (h)   *Ms. Fairstein's 2010 Letter to Former DA Morgenthau (Defs. Ex. 3)* ...... 31

           •   Ryan Affirmation (Defs. Ex. 5) ........................................ 32

           •   Excerpts from Sexual Violence (Defs. Ex. 9) ........................... 32

           •   Ms. Fairstein's June 2019 Op-Ed in The Wall Street Journal (Defs. Ex. 6) .......... 33

i

- Ms. Fairstein's July 31, 2018 Response Letter to the Editor of the New York Law Journal (Defs. Ex. 7) ............................................................................ 33

    B.   The Scenes in Question Are Defamatory ........................................................ 34

CONCLUSION ............................................................................................................ 37

## **TABLE OF AUTHORITIES**

Cases

*Absolute Activist Value Master Fund Ltd. v. Devine*,
  233 F. Supp. 3d 1297, 1328 (M.D. Fla. 2017)  9, 29, 30

*Armstrong v. Shirvell*, 596 F. App'x 433, 442 (6th Cir. 2015)  23

*Chau v. Lewis*, 771 F.3d 118 (2d Cir. 2014)  16

*Chefs' Warehouse, Inc. v. Wiley*, 2019 WL 4640208,
  at *8-9 (S.D.N.Y. Sept. 24, 2019)  24

*Cockram v. Genesco, Inc.*, 680 F.3d 1046, 1054 n. 4 (8th Cir. 2012)  24

*Conejo v. Am. Fed'n of Gov't Emps.*, 377 F. Supp. 3d 16, 29 (D.D.C. 2019)  24

*Couch v. Broward Cty.*, 2012 WL 2007148, at *1 (S.D. Fla. June 5, 2012)  30

*De Havilland v. FX Networks LLC*, 230 Cal. Rptr. 3d 625 (Cal. Ct. App. 2018)  13

*Deeb v. Saati*, 778 F. App'x 683, 689 (11th Cir. 2019)  10, 11, 15, 18

*Dibble v. Avrich*, 2014 WL 5305468, at *4 (S.D. Fla. Oct. 15, 2014)  21

*Duffy v. Fox News Networks, LLC*, 2015 WL 2449576,
  at * 2 (M.D. Fla. May 21, 2015)  8, 9, 10, 20

*Five for Entm't S.A. v. Rodriguez*, 2013 WL 632977, at *4 (S.D. Fla. Feb. 20, 2013)  9

*Gottwald v. Bellamy*, 2011 WL 2446856, at *3 (M.D. Fla. June 15, 2011)  26

*Green v. Cosby*, 138 F. Supp. 3d 114, 143 (D. Mass. 2015)  27

*Greene v. Times Pub. Co.*, 130 So. 3d 724, 729 (Fla. 3d DCA 2014)  26, 38

*Head v. Cullen*, 2019 WL 4451455, at *3 (M.D. Fla. Sept. 16, 2019)  29

*John E. Reid & Assocs., Inc. v. Netflix, Inc.*, 2020 WL 1330657,
  at *8 (N.D. Ill. Mar. 23, 2020)  13

*Johnson v. Clark*, 484 F. Supp. 2d 1242, 1247-1248 (M.D. Fla. 2007)  11

*Klayman v. City Pages*, 2014 WL 12621240, at *5 (M.D. Fla. July 9, 2014)  17, 28

*Klayman v. Judicial Watch, Inc.*, 22 F. Supp. 3d 1240, 1247 (S.D. Fla. 2014)  17, 27, 29

*Klayman*, 2015 WL 1546173  27

*Liberty Lobby, Inc. v. Anderson*, 1990 WL 605337, at *2 (D.D.C. July 30, 1990)  40

*Lovingood v. Discovery Commc'ns, Inc.*, 275 F. Supp. 3d 1301, 1313 (N.D. Ala. 2017)  18

*Lovingood v. Discovery Commc'ns, Inc.*,
  800 F. App'x 840, 848 (11th Cir. 2020)  3, 9, 12, 13, 15, 16

*LRX, Inc. v. Horizon Assocs. Joint Venture*, 842 So. 2d 881, 885-886 (Fla. 4th DCA 2003)    11

*Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 696 (11th Cir. 2016)    21, 28

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18 (1990)    10, 11, 20

*Mirage Entm't, Inc. v. FEG Entretenimientos S.A.*,
    326 F. Supp. 3d 26, 39 (S.D.N.Y. 2018)    17, 23

*Monitor Patriot Co. v. Roy*, 401 U.S. 265 (1971)    10

*Nix v. ESPN, Inc.*, 2018 WL 8802885, at *6-7 (S.D. Fla. Aug. 30, 2018)    31

*Osheroff v. Humana Inc.*, 776 F.3d 805, 811 & n. 4 (11th Cir. 2015)    29

*Palin v. N.Y. Times Co.*, 940 F.3d 804, 816 (2d Cir. 2019)    15

*Partington v. Bugliosi*, 56 F.3d 1147, 1155 (9th Cir. 1995)    13

*People v. Salaam*, 83 N.Y.2d 51, 60 (1993)    30, 33

*Pope v. Big Bend Cares, Inc.*, 2014 WL 11429278, at *2 (N.D. Fla. Dec. 18, 2014)    38, 39

*Principal Bank v. First Am. Mortg., Inc.*, 2014 WL 1268546,
    at *2 (M.D. Fla. Mar. 27, 2014)    31

*Reid & Assocs.*, 2020 WL 1330657    25, 26

*Saver v. Chartier*, 813 F.3d 891 (9th Cir. 2016)    13

*Schiller v. Viacom, Inc.*, 2016 WL 9280239, at *2    14

*Scott v. Busch*, 907 So. 2d 662, 668 (Fla. 4th DCA 2005)    15

*Setai Hotel Acquisition, LLC v. Miami Beach Luxury Rentals, Inc.*,
    2017 WL 3503371, at *6 (S.D. Fla. Aug. 15, 2017)    29

*Slone v. Judd*, 2011 WL 1124618, at *3 (M.D. Fla. Mar. 25, 2011)    30

*St. Amant v. Thompson*, 390 U.S. 727, 732 (1968)    10

*Stern v. Cosby*, 645 F. Supp. 2d 258, 270-271 (S.D.N.Y. 2009)    28, 38

*Stern v. O'Quinn*, 2008 WL 11401794, at *7 (S.D. Fla. Aug, 8. 2008)    21

*Suarez v. Sch. Bd. of Hillsborough Cty.*, 2013 WL 5653435,
    at *3 (M.D. Fla. Oct. 16, 2013)    9

*Synergy Billing, LLC, v. Priority Mgmt. Grp. Inc.*, 2017 WL 4922203, at *6-7 (M.D. Fla. Oct. 31, 2017)    38

*Thoroughbred Legends, LLC v. The Walt Disney Co.*, 2008 WL 616253,
    at *13 (N.D. Ga. Feb. 12, 2008)    14

*Zambrano v. Devanesan*, 484 So. 2d 603, 608 (Fla. 4th DCA 1986)    21

Other Authorities

https://www.collinsdictionary.com/us/dictionary/english/kid-gloves                21

https://www.merriam-webster.com/dictionary/marauder                              33

Robert D. Sack, Sack on Defamation: Libel, Slander and Related Problems § 2:4.11 (1999)   10

Rules

Rule 12(b)(6)                                                                   2, 8, 37

## INTRODUCTION

*When They See Us* ("*WTSU*" or the "Series") is a Netflix, Inc. ("Netflix") original limited series, collectively developed and written by Defendants Netflix, Ava DuVernay ("Ms. DuVernay") and Attica Locke ("Ms. Locke"),[1] which addresses the arrests, trials and convictions of five young men of color—Kharey (aka Korey) Wise ("Mr. Wise"), Raymond Santana ("Mr. Santana"), Kevin Richardson ("Mr. Richardson"), Yusef Salaam ("Mr. Salaam") and Antron McCray ("Mr. McCray") (collectively "The Five"), who were accused of beating and raping female jogger, Patricia Meili ("Ms. Meili"), in addition to rioting and attacking seven other victims in New York City's Central Park (the "Park") on April 19, 1989. The case has been referred to as the Central Park jogger case. The Series further addresses the 2002 vacatur of the convictions after Matias Reyes ("Reyes") confessed to the rape. His DNA matched the DNA evidence taken from the Meili crime scene. The Series was released on May 31, 2019, and continues to stream on Netflix. Defendants marketed and promoted the Series as a true story, especially with respect to Plaintiff Linda Fairstein ("Ms. Fairstein"), even though they knew that their portrayal of her bears no relationship to Ms. Fairstein's actual role in the Central Park jogger case. Defendants further relied on the public's belief in their false portrayal to exact retribution against Ms. Fairstein for what Defendants perceive to be her "misdeeds."

Ms. Fairstein is an attorney, former prosecutor and the author of twenty-four published books, including twenty bestselling crime novels. She served as an Assistant District Attorney in the Manhattan District Attorney's Office for three decades, until 2002, and was Chief of the Sex Crimes Prosecution Unit for twenty-six years. Ms. Fairstein neither investigated nor prosecuted

---

[1] Collectively they will be referred to herein as "Defendants." While Netflix brings this motion, Ms. DuVernay and Ms. Locke will join in the motion if their joint motion to dismiss for lack of personal jurisdiction is denied. *See* ECF No. 26, at p. 2 n. 1.

the Central Park jogger case. Rather, in the days after the attacks, she was on hand at the local police precincts to serve as liaison to Manhattan District Attorney Robert Morgenthau ("DA Morgenthau") and provide assistance to Assistant District Attorney Elizabeth Lederer ("ADA Lederer" or "Ms. Lederer") who personally conducted the prosecutorial investigation of, and prosecuted, the case against The Five. Ms. Fairstein also served as a witness at a suppression hearing and at the trials of The Five. Ms. Fairstein is prominently featured in the Series, identified by her real name.

As portrayed by actress Felicity Huffman, Ms. Fairstein appears in three of the four episodes that comprise the Series, as well as a number of film trailers. The portrayal of Ms. Fairstein in the Series was deliberately calculated to create one, clear and unmistakable villain to be targeted for hatred and vilification for what happened to The Five. In order to do so, Defendants cast Ms. Fairstein as morally and legally culpable by assigning her various roles in the case that she did not play. Defendants depicted her at places she never was, making decisions she never made, supervising police officers and detectives over whom she had no control, and putting words in her mouth—outrageously offensive words—she never uttered.

The viewing audience believed Defendants' false and defamatory portrayal of Ms. Fairstein to be true and immediately launched attacks against her, including death threats and other threats of physical harm. As a direct result of the Series, Ms. Fairstein's longstanding publishing contracts were terminated and her reputation sullied, if not destroyed. Ms. Locke and Ms. DuVernay have publicly stated that a purpose of the Series was to hold Ms. Fairstein accountable and to serve as restorative justice for Ms. Fairstein's "misdeeds" because she has been "unrepentant." The views expressed in Defendants' Rule 12(b)(6) motion to dismiss align with these public statements.

Because they strongly disagree with certain of Ms. Fairstein's public statements concerning the case against The Five, Defendants are under the erroneous impression that they have free license to defame Ms. Fairstein under the guise of protected opinion. The First Amendment does not afford Defendants the protection they seek and, as the Eleventh Circuit recently held in *Lovingood v. Discovery Commc'ns, Inc.*, 800 F. App'x 840, 848 (11th Cir. 2020), there is no "invincible shield of protection" for films characterized as docudramas or historical fiction—particularly where, as here, the framework upon which the "opinion" rests is entirely false. Defendants also took affirmative steps to mislead viewers into believing that their utterly false portrayal of Ms. Fairstein is true and accurate.

Defendants' portrayal of Ms. Fairstein also cannot be justified as offering the personal viewpoint of The Five because the scenes about which Ms. Fairstein complains do not concern events or situations in which any of The Five were present. Indeed, although Defendants have directed the focus of this case towards debate over the guilt or innocence of The Five, Ms. Fairstein's lawsuit in no way concerns this issue. Nor is Ms. Fairstein attempting to retry the case against The Five, questioning the vacatur of their convictions or attempting to "silence" their narrative. This is made plain by the fact that a key scene in the Series, depicting Ms. Fairstein's interactions with Mr. Salaam's mother at a police stationhouse, was excluded from Ms. Fairstein's claims because it can be perceived as Mr. Salaam's, or his mother's, narrative.

In moving to dismiss the Complaint, Defendants waver between the position that the Series is pure fictionalization and that it is substantially true. The Series cannot be both. Regardless, the documents that Defendants have improperly submitted to the Court in support of their "substantial truth" defense do not contradict Ms. Fairstein's allegations that she was falsely depicted in the Series. Defendants are also absolutely wrong in their assertion that the false and defamatory

manner in which Ms. Fairstein is portrayed is a mere reflection of her prior public statements. Defendants' further ignore that, to the extent they republished defamatory statements about Ms. Fairstein—including from sources about which Ms. Fairstein notified them prior to the release of the Series—they can still be held liable for defamation.

One need only view *WTSU* to see that, as concerning Ms. Fairstein, the Series is defamatory *per se* because it subjects Ms. Fairstein to "hatred, distrust, ridicule, contempt and disgrace" and injures her in her profession. After all, Defendants not only falsely portray Ms. Fairstein as an unethical, unlawful and racist prosecutor who singlehandedly masterminded a plot to incarcerate The Five, without substantial evidence and without reason, but they attack Ms. Fairstein's career as an author too.[2]

Defendants offer no viable reason why Ms. Fairstein's action should be dismissed and, accordingly, their motion to dismiss should be denied.

## RELEVANT FACTUAL BACKGROUND

Ms. Fairstein is portrayed in Parts One, Three and Four of *WTSU*. Nearly every scene in the Series which depicts Ms. Fairstein is false. Compl. ¶¶ 44-130.[3] In Part One, which concerns the detention and arrest of The Five, Ms. Fairstein is falsely depicted as: i) devising a single-attacker theory of the case at the Meili crime scene (*Id*. ¶¶ 51-56); ii) questioning unaccompanied 13- and 14-year-old boys without reading them their *Miranda* rights, including questions about "wilding" with Mr. McCray (*Id*. ¶¶ 62-76); iii) manipulating the timeline of attacks in the Park,

---

[2] Months prior to the Series premiere, Ms. Locke also relied on her "research" for the Series to publicly attack Ms. Fairstein on Twitter and lodge false accusations against Ms. Fairstein, including that she was "almost singlehandedly responsible for the wrongful incarceration of the Central Park Five," (Compl. ¶ 153; P-APP002835) and the false assertion that "other members of the NYC District Attorney's Office have admitted prosecutorial misconduct on the part of those handling the case in their office" (*Id*.) with the goal of having Ms. Fairstein stripped of a prestigious award from Mystery Writers of America. *See* Compl. ¶¶ 152-164. As a result of this smear campaign, Ms. Fairstein's award was rescinded. *Id*.

[3] With her opposition briefing to the various motions, Plaintiff has submitted an appendix of documents to the Court which contains the sources referenced in the Complaint. It is cited herein as "P-APP"

when confronted about gaps and inaccuracies, in order to pin the Meili attack on The Five (*Id.* ¶¶ 77-86, 94-96); iv) directing the New York Police Department ("NYPD") to conduct a roundup of young black males in the projects in Harlem (Compl. ¶¶ 97-103); v) telling officers about to interview Mr. Richardson not to use "kid gloves" because "[t]hese are not kids" (*Id.* ¶¶ 104-107); and vi) directing an NYPD Detective to coerce a confession from Mr. Wise because, without him, there would be no case against The Five (*Id.* ¶¶ 108-116). Ms. Fairstein was not at the Park at any time on April 20, 1989, did not come up with the theory of the case, did not question any witnesses, including The Five, at any police precinct, did not create any timelines concerning the attacks in the Park, and was not in charge of any aspect of the NYPD or prosecutorial investigations or interrogations, nor did she direct any "roundups" of suspects. *Id.* ¶¶ 53-56, 64, 69-73, 78-82, 84-86, 98-103, 105-107, 109, 111, 116. *See* P-APP000025-88, 349-414, 420-606, 714-1588; 1663-2476-2598, 2608-2649.

Ms. DuVernay has publicly stated that one purpose of the Series was to "trace and track how wiling out become wilding becomes wolf pack becomes…animals…becomes…a prison sentence for these five boys." Compl. ¶¶ 75-76; P-APP000674-75. In Part One, Defendants portray Ms. Fairstein as referring to young men of color as "wilding," "thugs," and "animals." Compl. ¶¶ 65-66, 94, 97. In today's parlance, the word "thug" is understood to be a racist code word. Compl. *Id.* ¶ 103; P-APP002446-2450.

In Part Two of the Series, Ms. Fairstein, ADA Lederer and DA Morgenthau are seen discussing the lack of evidence in the case against The Five. Ms. Fairstein says "We have a sock, those little bastards shot their wad into a sock thinking we wouldn't find it but we found it." ADA Lederer then asks, "How did the NYPD miss this?" To which Ms. Fairstein says "Who cares? We have it now and the kicker is none of the defense counsel is aware yet so we can test it right before

the trial—surprise!" Compl. ¶ 118. This is another utterly false portrayal of Ms. Fairstein acting unethically in concealing evidence from defense counsel to gain an unfair advantage before trial. *Id.* ¶ 119. When the sock DNA comes back with no match to The Five, Ms. Fairstein and ADA Lederer are seen arguing about the lack of evidence in the case. Ms. Fairstein encourages ADA Lederer to "pretend the sock never existed," to which Ms. Lederer responds "this is crossing a line," and calls Ms. Fairstein "delusional." Comp. ¶¶ 121. The exchanges between Ms. Fairstein and ADA Lederer are false and defamatory and designed to impugn Ms. Fairstein's ethics and integrity. *Id.* ¶¶ 122-125. As court documents in the public record make clear, Ms. Fairstein did not discover the sock DNA and ADA Lederer immediately disclosed it. Compl. ¶ 119; P-APP002697-716.

In Parts One and Four of the Series, Defendants falsely portray Ms. Fairstein and Assistant District Attorney Nancy Ryan ("ADA Ryan" or "Ms. Ryan") fighting over the case. ADA Ryan was responsible for reinvestigating the case against The Five after the Reyes confession in 2002. Compl. ¶¶ 87-96, 126-130. While Ms. Fairstein starts manipulating the timeline of events to pin the Meili attack on "animals" on "a rampage" in the Park, ADA Ryan tells her that the attacks are merely "a dozen kids harassing bicyclists." *Id.* ¶ 90. She wishes Ms. Fairstein "good luck." *Id.* ¶ 94. In fact, ADA Ryan had no involvement in the Central Park jogger case in April 1989 and had no conversations with Ms. Fairstein about any theory of the case. *Id.* ¶¶ 92-96; P-APP001592-1659. Nor did ADA Ryan believe that the attacks in the Park were mere harassment. In 2002, she described the events in the Park as "grave and inexcusable—unprovoked attacks on strangers, apparently undertaken for the fun of it, which left some terrorized, two knocked into unconsciousness and one seriously injured." Compl. ¶ 93; P-APP001656-57.

ADA Ryan is later depicted reviewing case notes telling her colleague that she was there when Ms. Fairstein changed the theory of the case from a single attacker to a group attack. Compl. ¶¶ 126-127. In a final scene, which takes place after the convictions are vacated in 2002, ADA Ryan meets Ms. Fairstein for lunch. She tells Ms. Fairstein that she changed her theory of the case "to cover because you knew *you* coerced those boys into saying what they did Linda, we pored over *your* confession tapes." *Id.* ¶ 128 (emphasis added). Ms. Fairstein played no part in interviewing The Five or any other suspects at any police precinct. All interviews were conducted by ADA Lederer and ADA Arthur "Tim" Clements III ("ADA Clements"). *Id.* ¶¶ 82, 105-106; P-APP000977-1092, 2477-2598.

Once again, Defendants falsely attributed the theory of the case to Ms. Fairstein, as well as responsibility for any alleged coercive tactics used during the questioning of The Five. Compl. ¶ 129. Ms. DuVernay publicly stated "the arc of the Fairstein/Ryan relationship is real. Fairstein really battled Ryan for the case in 1989. Ryan really ended up getting it back after Matias Reyes confessed." *Id.* ¶ 96; P-APP001660. The viewing audience believed these scenes to be truthful as opposed to dramatization.

Defendants marketed and promoted the Series as a true story, based on public records concerning the case against The Five. Compl. ¶¶ 165-170, 172-176, 178-179, 181, 187, 192, 197, 200-223. While the Series was in development, Ms. Fairstein notified Ms. DuVernay and Netflix of a number of false and defamatory sources that should not be relied upon in creating the Series. Ms. Fairstein also provided Defendants with a list of over twenty sources, including court records and transcripts, that could be consulted when researching the Series. Compl. ¶ 131. These sources clearly provide the reader with a view of the factually accurate role that Ms. Fairstein played with

respect to the Central Park jogger case. Ms. DuVernay discounted this notice. Netflix ignored it. *Id.* ¶¶ 131-151; P-APP003210-3268.

The Series contains no prominent disclaimer which cautions viewers that it is a fictionalization of actual events. Compl. ¶¶ 224-231. Viewers have understood the Series to be a true story, as evidenced by the immediate backlash against Ms. Fairstein, including news reports (*Id.* ¶¶ 232-234), calls for her "to die a horrific and painful death…knocked out, stomped, and spit on" (*Id.* ¶ 235), #CancelLindaFairstein on social media (*Id.* ¶¶ 236-239), Ms. Fairstein's forced resignation from the boards of nonprofits that she worked with for decades (*Id.* ¶¶ 253-254), the termination of agreements with her U.S. and UK publishers (*Id.* ¶¶ 240-246), and the cancellation of her speaking engagements, book signings and consulting jobs (*Id.* ¶¶ 256-257). *See* P-APP; Fairstein Aff., ECF No. 35.

Defendants made no efforts to correct the public misperception of Ms. Fairstein's role in the Central Park jogger case. Rather they encouraged it. Compl. ¶¶ 146, 153, 155, 162-63, 172-173, 175-179, 181, 183, 187-188, 191, 195-197, 220-223. Defendants have made clear that they intended to harm Ms. Fairstein with their false and defamatory portrayal of her in the Series. Ms. DuVernay acknowledged that a purpose of the Series was to hold Ms. Fairstein "accountable." *Id.* ¶ 182. Per Ms. Locke, Ms. Fairstein "deserves all the rage and hate and consequences that are coming her way" because she is an "unrepentant liar" (Compl. ¶ 195; P-APP002987) and "I remember with zeal telling Linda Fairstein her time is up" (Compl. ¶ 188; P-APP002954-56).

## **STANDARD OF REVIEW**

To survive a Rule 12(b)(6) motion, a complaint must state a claim to relief that is plausible on its face. *Duffy v. Fox News Networks, LLC*, 2015 WL 2449576, at * 2 (M.D. Fla. May 21, 2015). In making this plausibility determination, the Court must accept all factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff. *Id.* A well-pled

complaint survives a motion to dismiss "even if it strikes a savvy judge that actual proof of these facts is improbable, and 'that a recovery is very remote and unlikely.'" *Five for Entm't S.A. v. Rodriguez*, 2013 WL 632977, at *4 (S.D. Fla. Feb. 20, 2013) (citation omitted). When analyzing a motion to dismiss, the Eleventh Circuit permits consideration of documents outside the complaint in the limited circumstance when (1) the plaintiff refers to the document in the complaint; (2) the document is central to plaintiff's claim; (3) the contents of the document are not in dispute; and (4) the defendant attaches the document to its motion to dismiss. *Duffy*, 2015 WL 2449576, at *2. Generally, the existence of an affirmative defense will not support a motion to dismiss because plaintiffs are not required to negate an affirmative defense in their complaint. *Absolute Activist Value Master Fund Ltd. v. Devine*, 233 F. Supp. 3d 1297, 1328 (M.D. Fla. 2017); *Suarez v. Sch. Bd. of Hillsborough Cty.*, 2013 WL 5653435, at *3 (M.D. Fla. Oct. 16, 2013).

## ARGUMENT

I.   ### The First Amendment Affords No Protection to Defendants

Defendants' attempt to assert blanket First Amendment protection over the entirety of *WTSU* should not be countenanced by this Court, for no such protection exists.[4] As the United States Supreme Court held in *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18 (1990), there is no "wholesale defamation exemption for anything that might be labeled 'opinion.'" *See also Lovingood*, 800 F. App'x at 847[5] (the Supreme Court has "steadfastly refused to create new exceptions in defamation law for the last fifty years") (citing *Milkovich*, 497 U.S. at 18).[6] This is

---

[4] It is questionable whether the Court's resolution of the First Amendment issues raised in Netflix's Moving Brief is even appropriate at the motion to dismiss stage. *See Duffy*, 2015 WL 2449576, at *3 (defendant's argument that statements were non-actionable, pure opinion or rhetorical hyperbole was unpersuasive at motion to dismiss stage).

[5] In *Lovingood*, the plaintiff's defamation claim made it past the motion to dismiss stage. At issue was whether there were genuine issues of fact, at the summary judgment stage, as to whether the defendants acted with actual malice.

[6] Defendants mischaracterized *Monitor Patriot Co. v. Roy*, 401 U.S. 265 (1971), (Netflix. Br. at 14) as setting forth a rule that the First Amendment protects all vile, caustic and exaggerated attacks on public figures. What the Supreme Court held in *Monitor* is that the *N.Y. Times v. Sullivan* actual malice standard should have been applied to the plaintiff's claim that reference to his past bootlegging (which was true) during a political campaign was defamatory.

particularly applicable where, as here, a defendant fabricates the ***entire narrative*** through which a character is portrayed, using the actual name of the person about whom the purported "opinion" is being expressed. Compl. ¶¶ 44-130. *See St. Amant v. Thompson*, 390 U.S. 727, 732 (1968) ("Neither lies nor false communications serve the ends of the First Amendment."). *See also* Robert D. Sack, Sack on Defamation: Libel, Slander and Related Problems § 2:4.11 (1999) ("Where the defendant invents defamatory dialogue or other defamatory details in what purports to be nonfiction [or] uses actual people as fictional characters…liability for libel may result."); Restatement (Second) of Torts § 564, cmt. d ("The fact that the…producer states that his work is exclusively one of fiction and in no sense applicable to living persons is not decisive if [viewers] actually and reasonably understand otherwise.").

The Supreme Court has "regularly acknowledged 'the important social values which underlie the law of defamation' and recognized that '[s]ociety has a pervasive and strong interest in preventing and redressing attacks upon reputation.'" *Milkovich*, 497 U.S. at 22 (citation omitted). For this reason, expressions of "opinion" still give rise to liability for defamation when they "imply an assertion of [an] objective fact." *Id.* at 18-19. As stated in *Milkovich*:

> If a speaker says, 'in my opinion John Jones is a liar,' he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching statements in terms of opinion does not dispel these implications; and the statement, 'In my opinion Jones is a liar,' can cause as much damage to reputation as the statement 'Jones is a liar….'***[I]t would be destructive of the law if a writer could escape liability for accusations of [defamatory conduct] simply by using, explicitly or implicitly, the words, 'I think.*'

*Id.* (emphasis added). *See Deeb v. Saati*, 778 F. App'x 683, 689 (11th Cir. 2019); *Johnson v. Clark*, 484 F. Supp. 2d 1242, 1247-1248 (M.D. Fla. 2007); *LRX, Inc. v. Horizon Assocs. Joint Venture*,

842 So. 2d 881, 885-886 (Fla. 4th DCA 2003).[7] Similarly, Defendants are attempting to escape liability by asserting that *WTSU* is merely the opinion of The Five about a matter of public concern as told through the creative lens of the docudrama genre using hyperbolic language. Netflix Br.[8] at 14-17. Their arguments in support thereof are meritless.

A.   <u>There is No "Invincible Shield" of First Amendment Protection for Docudramas</u>

Defendants' convenient relabeling of *WTSU* as a docudrama, after marketing and promoting it as a true story, does not absolve them of liability for defaming Ms. Fairstein.[9] When determining whether a statement constitutes opinion, courts consider "the totality of the circumstances in which the statement was made, including the medium by which the statement was disseminated, the audience to which it was published and any cautionary terms used by the publisher in qualifying the statement." *Deeb*, 778 F. App'x at 688. An evaluation of these factors demonstrates that First Amendment protection is not warranted here simply because Defendants claim entitlement to use "artistic license."

Defendants assert that viewers of *WTSU* would not take their portrayal of Ms. Fairstein as a truthful account because they would understand that the "purpose of the Series" is to offer the "personal viewpoint" of The Five and "because the film series outlines their version of what took place and their personal theories about the facts of the trials and the conduct of those involved in them." Netflix Br. at 16. Yet Part One, in which Ms. Fairstein is prominently featured, does not concern the trials, and Ms. Fairstein did not prosecute the case or conduct the trials against The Five. As detailed in the Complaint, the scenes about which Ms. Fairstein complains "do not

---

[7] As discussed in Plaintiff's memorandum of law in opposition to Netflix's Anti-SLAPP motion, which is incorporated by reference herein, Florida—not California or New York—law applies.

[8] Netflix's Rule 12(b)(6) Motion, ECF No. 28, is cited herein as Netflix Br.

[9] Defendants at once assert that they are entitled to blanket First Amendment protection because their depiction of Ms. Fairstein is entirely fabricated and then take the opposite position to argue that "in any event" the depiction is substantially true. Netflix Br. at 13-21. They cannot have it both ways.

concern events or situations in which any of The Five were present, and cannot be explained or justified as portraying their account of what happened." Compl. ¶ 231. *See also id.* at ¶¶ 44-130.

Defendants also attempt to cloak their false and defamatory depiction of Ms. Fairstein as a "docudrama," in order to invoke First Amendment protections to which they are not entitled. As the Eleventh Circuit recognized in *Lovingood*, there is no "invincible shield of protection for all works characterized as docudrama or historical fiction." 800 F. App'x at 848. *See Partington v. Bugliosi*, 56 F.3d 1147, 1155 (9th Cir. 1995) ("We do not intimate that the First Amendment shields from scrutiny…every statement made in a docudrama [and]…authors must attempt to avoid creating the impression they are asserting objective facts."); *John E. Reid & Assocs., Inc. v. Netflix, Inc.*, 2020 WL 1330657, at *8 (N.D. Ill. Mar. 23, 2020) (labeling something as "fictitious" will not insulate it from a defamation action).[10] Accordingly, Defendants cannot—as they do— baldly assert that each film scene is a "constitutionally protected dramatization of controversial events" warranting dismissal. *See* Defs. Ex. B, "Chart of Alleged Defamatory Scenes," ECF No. 28-2.

Defendants took affirmative steps to mislead viewers into believing that their knowingly false portrayal of Ms. Fairstein is true, even though it bears no relationship to Ms. Fairstein's actual role in the Central Park jogger case. Compl. ¶¶ 44-130. They used no cautionary terms that would signal to viewers of *WTSU* that their portrayal of Ms. Fairstein is a near complete fabrication. Rather, they deliberately led viewers to believe, and viewers indeed believed, that the Series is a true story. *See Thoroughbred Legends, LLC v. The Walt Disney Co.*, 2008 WL 616253, at *13

---

[10] Defendants' reliance on *De Havilland v. FX Networks LLC*, 230 Cal. Rptr. 3d 625 (Cal. Ct. App. 2018), which addressed an Anti-SLAPP motion (which is inapplicable here), is unpersuasive. The film at issue portrayed actress Olivia de Havilland as "beautiful, glamorous, self-assured and considerably ahead of her time," and the portrayal "was the most favorable of any character in the docudrama," belying the plaintiff's contention that she was portrayed as a "vulgar gossip" and "hypocrite." *Id.* at 644. Similarly, in *Saver v. Chartier*, 813 F.3d 891 (9th Cir. 2016), the plaintiff had no defamation claim because the film portrayed him as a "heroic figure." The film also depicted the plaintiff as a composite character and did not use his name. *See id.*

12

(N.D. Ga. Feb. 12, 2008) (denying motion to dismiss defamation claims because disclaimer at end of film was insufficient to alert viewers that film was a dramatization); Declaration of Kara L. Gorycki, dated July 1, 2020 ("Gorycki Decl."), Ex. 1, *Reid v. Viacom Int'l Inc.*, No. 1:14-cv-01252, ECF No. 138, Sept. 14, 2016 Order ("*Reid* Order"), at 12 n. 7 (declining to apply a "more relaxed 'docudrama' standard" at summary judgment stage where movie was billed as a true story and nothing about its context "would convince a viewer that it represented anything other than facts or events"). As alleged in the Complaint: (i) Netflix originally categorized *WTSU* as a documentary on its streaming platform (Compl. ¶168); (ii) Defendants marketed and promoted the Series as a true story ("The Story You Know" "Is The Lie They Told You") (*Id.* ¶¶ 13, 167, 173, 175, 200, 338, 358);[11] (iii) Defendants have repeatedly, publicly referred to the Series as a true story, based on documentary evidence (*Id.* ¶¶ 14, 130, 163, 166-167, 169-172, 174-181, 187, 189, 191-192, 196-197, 200-220; P-APP002888, 2891-92, 2902-904, 2908-2909, 2914, 2943, 3006-322); and (iv) *WTSU* contains **no prominent disclaimer** that would alert viewers to the fact that the majority of scenes in the Series have been dramatized, or that scenes concerning Ms. Fairstein were nearly entirely fabricated (Compl. ¶¶ 224-231).

Defendants' contention, without support, that viewers of *WTSU* would understand the Series as conveying a single, critical perspective, or a mere dramatization of events, is belied by

---

[11] Defendants incorrectly contend that "statements outside the Series cannot govern...whether the Series is protected speech." Netflix Br., 17 n. 17. At least two courts in the Eleventh Circuit, the Northern District of Georgia and Southern District of Florida, have examined a film's advertising and promotional materials when addressing the viability of defamation claims in the docudrama context. *See Schiller v. Viacom, Inc.*, 2016 WL 9280239, at *2 (S.D. Fla. Apr. 4, 2016) (examining advertising, including movie poster and movie trailer); *Thoroughbred Legends*, 2008 WL 616253, at *13 (considering DVD cover); Gorycki Decl., Ex. 1, *Reid* Order, at 12 n. 7. Defendants' reliance on *Lovingood* is inapposite. In *Lovingood*, the Eleventh Circuit did not hold that statements made as part of the marketing and promotion of a film could not be considered as evidence of what a reasonable viewer might understand. *Lovingood*, 800 F. App'x at 849. Moreover, the film at issue in *Lovingood* opened with an express statement that it was based on a book and that "some scenes have been created for dramatic purposes." *Id.* at 843. In addition, unlike the present case, the film scene about which the plaintiff complained could not have been reasonably understood by viewers as a false depiction that the plaintiff had perjured himself. *Id.* at 848.

the allegations of the Complaint, detailing the ***actual*** responses that viewers had to the Series. *See Palin v. N.Y. Times Co.*, 940 F.3d 804, 816 (2d Cir. 2019) ("The social media backlash that precipitated correction [of the article]…suggests that the Times' readers perceived the false statements as fact-based."); *Scott v. Busch*, 907 So. 2d 662, 668 (Fla. 4th DCA 2005) (when audience members approached plaintiff immediately after a board meeting it was clear that they believed the statements made at the meeting). As alleged in the Complaint, "the film series has been perceived as a true and accurate account of what happened is evidenced by the public's response to the film, attacking Ms. Fairstein on all fronts, including through death threats." Compl. ¶ 235. Some examples of viewer reactions are:

- "I never hated someone so much as I hate Linda Fairstein, ***she made innocent children go to jail***…so fuck you linda, say hi to the devil for me."

- "What ***#Linda Fairstein did to these young men*** is beyond disgusting & excruciating to watch."

- "Linda Fairstein prosecuted the five…. She shouldn't be able to make more money off ruining the lives of ***young Black people she targeted***."

- "Hope Linda Fairstein knows that nobody believes a word that comes out of her mouth. ***Saying the Netflix series isn't true***. Just like she lied and made things up about innocent kids."

- "Those she put behind bars were innocent. But Linda Fairstein is not. ***Only one set of footprints. She knew better from the outset.***" (emphasis added).[12]

- The "prosecutor that ***falsely and unfairly pushed the case forward*** against the Central Park Five."

Compl. ¶ 237 (emphasis added); P-APP003269-3286.[13] As a ***direct result*** of the Series' premiere, Ms. Fairstein was asked, or forced, to resign from boards of non-profit organizations which she

---

[12] This is a direct reference to the opening scene showing Ms. Fairstein at the Meili crime scene stating that one person was responsible for the attack on Ms. Meili. Compl. ¶¶ 51-56.

[13] Notably, Defendants contend that the public's reaction "cannot be used to establish that it is defamatory." Netflix Br. at 17 n. 18. However, in *Chau v. Lewis*, 771 F.3d 118 (2d Cir. 2014), which Defendants rely upon to make this erroneous argument, the Second Circuit expressly stated "[w]hen deciding how to construe allegedly defamatory

had been involved with for decades, her U.S. publisher (since 2009) immediately terminated their relationship, as did her literary agent with whom she had worked since 1994. Compl. ¶¶ 240-254; Fairstein Aff., ECF No. 35, ¶ 17. Ms. Fairstein's U.K. Publisher also terminated its relationship with Ms. Fairstein. Compl. ¶ 245; Fairstein Decl. ECF No. 42. It is clear that viewers of *WTSU* **did not**, as Defendants posit, "see a tough, no-nonsense prosecutor seeking justice for the female victim of a horrible crime," (Netflix Br. at 17), and Defendants intended it that way. Compl. ¶ 182 (Ms. DuVernay telling Oprah Winfrey that a goal of the film was to hold Ms. Fairstein "accountable"); *Id.* ¶ 195; P-APP002987 (Ms. Locke tweeting that Ms. Fairstein "deserves all the rage and hate and consequences that are coming her way. She is an unrepentant liar. Fuck her.");[14] Compl. ¶ 196; P-APP002995-3000 (Ms. Locke discussing the Series as a mechanism for restorative justice against Ms. Fairstein).

This is certainly not, as Defendants contend, a case where the Series is "a non-defamatory reflection on this disastrous chapter of our nation's…history" which holds a defamatory meaning only for those depicted. *See* Netflix Br. at 17 n. 18.[15] That Ms. Fairstein was previously "the subject of controversy and criticism" is also not dispositive here. *See id.* To the extent that Defendants relied on defamatory materials in creating *WTSU*, and republished any defamatory statements about Ms. Fairstein, they would still be liable for defamation. *See Lovingood*, 800 F. App'x at 845 n. 4; *Mirage Entm't, Inc. v. FEG Entretenimientos S.A.*, 326 F. Supp. 3d 26, 39 (S.D.N.Y. 2018); *Klayman v. City Pages*, 2014 WL 12621240, at *5 (M.D. Fla. July 9, 2014) ("*City Pages*");

---

words…courts must do so in the context of the publication as a whole…and do so in the same way that the reading public, acquainted with the parties and the subject would take [them]." *Id.* at 126 (alteration in original).

[14] Defendants contend, in a conclusory footnote, that the Complaint does not specify the social media posts which Plaintiff claims to be defamatory. Netflix Br. at 11 n. 11. On the contrary, the defamatory posts at issue are specified at Paragraphs 267, 274, 284, 292, 300-309, 313-314, 322-328, 333-334.

[15] Even if these viewer reactions were not considered, it is improbable that viewers would understand the Series to reflect a single, critical perspective because *WTSU* was published globally, (Compl. ¶ 184), to an "open" audience that would not be fully familiar with the events that occurred in April 1989 and thereafter. *Deeb*, 778 F. App. at 690.

*Klayman v. Judicial Watch, Inc.*, 22 F. Supp. 3d 1240, 1247 (S.D. Fla. 2014) ("*Judicial Watch*");
Restatement (Second) of Torts § 578 ("the republisher of a defamatory statement made by another
remains subject to liability"). *See also* Compl. ¶¶ 131-144, 148-151; Compl. ¶ 156 (promoting Ken
Burns' documentary); P-APP003210-3268. Even if Ms. Fairstein were the prior subject of
controversy and criticism, this would not give Defendants free license to defame her. It is further
indisputable that the public's outrage against Ms. Fairstein in response to Defendants' false and
defamatory depiction of her in *WTSU*—including the reactions of non-profit boards and her
publisher with whom she had decades-long relationships and were, arguably, aware of said
controversy and criticism—far exceeds any prior public reaction that Ms. Fairstein may have faced
in the past due to any controversy or criticism. Compl. ¶¶ 232-257; P-APP003033-3184, 3269-
3286; Fairstein Aff., ECF No. 35, ¶¶ 14-19.

When viewing the scenes at issue in this action, it is also clear that Defendants' false
depiction of Ms. Fairstein extends far beyond "condensing" the investigation of the case against
The Five or the "selective editing of real history." *See* Netflix Br. at 15-16. *See Lovingood v.
Discovery Commc'ns, Inc.*, 275 F. Supp. 3d 1301, 1313 (N.D. Ala. 2017) (distinguishing between
changing the location of a conversation or number of people involved and false reenactment of
events which damages the reputation of the individual depicted). As detailed in the Complaint:[16]

- Ms. Fairstein did not visit the crime scene, and was not even in the Park, on April 20, 1989,
  nor did she posit that there was one attacker involved in the rape of Ms. Meili. Compl. ¶¶
  51-56; P-APP000025-88;

- Ms. Fairstein was not responsible for drafting any press releases about the Central Park
  jogger case. She was not at the police precinct. She did not have any details about Ms.
  Meili at the time she is depicted urgently putting together a statement to the press. Compl.
  ¶¶ 57-61; P-APP000089-348;

---

[16] As discussed *infra* Point II.A, Defendants have submitted no documents which may be considered by the Court at
this stage of the action. Even if they could be considered, the documents neither contradict the Complaint nor
demonstrate that the complained of film scenes are substantially true.

- Ms. Fairstein never spoke with Detective Farrell. She never questioned any young men in custody. She certainly conducted no unlawful questioning of unaccompanied minors. She was unfamiliar with the term "wilding" at the time in which she is portrayed as using the term. Compl. ¶¶ 62-76; P-APP000349-713;

- Ms. Fairstein never directed any part of the NYPD investigation. She never plotted Ms. Meili's path or convened with NYPD detectives with regard to the timeline. She was not responsible for putting together any timelines, and, accordingly, did not manipulate any timelines to account for problems or discrepancies with the attacks in Central Park. Compl. ¶¶ 77-86; P-APP000714-1122;

- Ms. Fairstein did not fight with ADA Ryan over who would work on the case. Ms. Ryan was not involved in the Central Park Jogger case in April 1989. Ms. Fairstein never briefed police about the events in the Park. She and Ms. Ryan did not disagree about, or even discuss, a missing half-hour in the timeline. Nor did Ms. Ryan opine that the attacks in the Park constituted mere harassment. Compl. ¶¶ 87-96; P-APP0001589-1662;

- Ms. Fairstein did not order police to "round-up," or "go into the projects and…stop" every little "black" "thug" in Harlem. She was not involved in the NYPD investigation into Ms. Meili's attack. She gave no orders to investigating officers and detectives to pick up suspects, whether in the Park or in "the projects." Compl. ¶¶ 97-103; P-APP0001663-2476;

- Ms. Fairstein did not direct officers to violate the law with respect to any interviews that occurred, nor would she have. She was not involved in the NYPD's questioning of witnesses or suspects at any precinct, including Mr. Richardson. Nor was Ms. Fairstein motivated by any concerns about the press because she had no role in supervising the police investigation. Compl. ¶¶ 104-107; P-APP0002477-2598;

- Ms. Fairstein did not have a theory of the case during the investigation, nor did she argue with ADA Lederer about the focus of the prosecution's case. Ms. Fairstein did not view the videotaped statements with either NYPD Detective Michael Sheehan ("Detective Sheehan") or ADA Lederer. Ms. Fairstein never pressured Detective Sheehan to force a confession out of Mr. Wise, or refer to Mr. Wise as crucial to holding any theory of the case together as against The Five. Compl. ¶¶ 108-116; P-APP0002599-2649;

- Ms. Fairstein did not bring the sock with the DNA to ADA Lederer's attention. She did hide its existence from either Ms. Lederer or The Five's defense counsels. Ms. Fairstein never suggested concealing evidence from defense counsel or springing it on them on the eve of trial. Compl. ¶¶ 117-119; P-APP0002650-2716;

- Ms. Fairstein never pressured, or forced, Ms. Lederer to prosecute a case against The Five without a lack of substantial evidence. She did not tell Ms. Lederer to pretend the sock DNA "never existed." Ms. Fairstein responsible for questioning The Five or coercing any of their confessions. She was not involved in the questioning of the young men at any

police precinct. She was neither present for nor did she participate in their video statements. Compl. ¶¶ 116, 120-125; P-APP0002608-2645, 2717-2722;

- Ms. Fairstein did not "acknowledge the track marks" at the crime scene. She did not change the theory of the case, nor was ADA Ryan present when any purported theory of Ms. Fairstein's changed in 1989. Compl. ¶ 127.

- Ms. Fairstein did not "cover because [she] knew that [she] coerced those boys into saying what they did" nor could ADA Ryan have "pored over [her] confession tapes" because Ms. Fairstein did not question The Five, nor was she responsible for any alleged coercive tactics used during police questioning, or any videotaped statements. Compl. ¶¶ 116, 128-130; P-APP000349-713, 2608-2645.[17]

Assuming that the overall "opinion" expressed in *WTSU* is that Ms. Fairstein was responsible for the injustices that occurred in the investigation and trials of The Five (Defendants have not specified the precise opinion they seek to protect), this is not protected opinion because it is capable of being proven to be either true or false. *See Duffy*, 2015 WL 2449576, at *3 ("an opinion, unlike a statement of fact, is incapable of the quality of truth or falsity"). As set forth above, this purported opinion is also based on the expression of false statements of fact to the viewer and, accordingly, is not protected speech under the First Amendment. *See Milkovich*, 497 U.S. at 18-20; *Deeb*, 778 F. App'x at 688 (speaker cannot invoke a pure opinion defense if the facts underlying the opinion are false or inaccurately presented).

### B.  The Language Used is Not Rhetorical Hyperbole

Defendants' argument that certain film scenes contain protected "rhetorical hyperbole" is also unpersuasive. "Rhetorical hyperbole" is the type of "loose, figurative language that no reasonable person would believe presented facts" about an individual. *Duffy*, 2015 WL 2449576, at *1, *3 (statements in television broadcast that plaintiffs were "caught red handed" and "busted" were not rhetorical hyperbole). *See Deeb*, 778 F. App'x at 688 (statements on social media that

---

[17] Defendants' Exhibit B, "Chart of Alleged Defamatory Scenes" does not reference Paragraphs 57, 62-63, 77, 108 or 127 of the Complaint. Defendants' descriptions of the scenes at issue are also inaccurate and misleading, attempting to divorce the scenes from their context and removing the defamatory statements in question.

plaintiff was a money launderer who would be "handcuffed and *en* route to…prison" was not rhetorical hyperbole); *Dibble v. Avrich*, 2014 WL 5305468, at *4 (S.D. Fla. Oct. 15, 2014) (publications containing statements about plaintiff's intelligence, class, ancestry and "business-relevant" qualities not decisively rhetorical hyperbole at motion to dismiss stage); *Zambrano v. Devanesan*, 484 So. 2d 603, 608 (Fla. 4th DCA 1986) (statements that individual acted in unprofessional or unethical manner were not rhetorical hyperbole). In evaluating whether a statement is rhetorical hyperbole, "the court's role is not to sift through a statement to identify and isolate factual assertions. Rather, the court should "weigh the totality of circumstances to determine whether the 'reasonable [viewer] would have believed that the challenged statements were conveying facts about the libel plaintiff.'" *Michel v. NYP Holdings*, *Inc.*, 816 F.3d 686, 696 (11th Cir. 2016) (citation omitted) (applying New York law) (few instances of informal language, or use of slang terms, viewed in context entire article were not indicative of opinion). *See also Stern v. O'Quinn*, 2008 WL 11401794, at *7 (S.D. Fla. Aug, 8. 2008) (statements made within context of "tabloid television" show not decisively rhetorical hyperbole at motion to dismiss stage). No film scene cited by Defendants falls into the category of protected, rhetorical hyperbole:

(a) Defendants' depiction of Ms. Fairstein questioning unaccompanied minors, and asking one of them if he was "out wilding with Tron," is not protected speech. A viewer of the Series would understand Ms. Fairstein's use of the word "wilding" in the present-day meaning as "a word which stoked the public's fear of black men" and that Ms. Fairstein was responsible for the perpetuation and use of that word during the case against The Five, including while in the midst of unlawful questioning. (Compl. ¶¶ 62-76). By Ms. DuVernay's own account, one purpose of the film was to "trace and track how wiling out becomes wilding becomes wolf pack…becomes…animals…becomes a prison sentence for these five boys." Compl. ¶ 75; P-APP000674-675. Defendants intentionally placed these words in Ms. Fairstein's mouth to cast her as the responsible party. *Id.* ¶ 76. Defendants are incorrect that the term "wilding" is a term that Ms. Fairstein adopted as her own and "repeatedly" used. Netflix Br. at 18. In each source cited (Defs. Exs. 1, 8), Ms. Fairstein places the term in quotes, indicating that it is a defined term rather than her own. Ms. Fairstein has not alleged that she never used the term wilding subsequently. Compl. ¶ 68 ("Ms. Fairstein was unfamiliar with the term…"wilding" or any given meaning…at the time of the attacks in Central Park.")

(b)  Defendants' depiction of Ms. Fairstein briefing police in front of a map, stating "[a]nd to think we were going to release these *animals* to family court and put them back on the streets" and "what did these *animals* do between here and here (pointing to map)" is not protected speech, nor is it, as argued by Defendants, an example of the type of language that Ms. Fairstein has used to describe The Five. *Id.* ¶ 94 (emphasis added); Netflix Br. at 18. Defendants point to no evidence that Ms. Fairstein used this language. Moreover, when viewing the scene in context, the false message conveyed is that Ms. Fairstein is trying to create support among police for a weak case and, because she views children of color as inhuman, she chooses to ignore exculpatory evidence, such as a timeline gap. Once again, the use of the word "animal" is part of Ms. DuVernay's efforts to "trace and track" the dehumanizing language used against The Five, and the words are intentionally placed in Ms. Fairstein's mouth to cast her as responsible for what happened to The Five. *See* Compl. ¶¶ 75-76.

(c)  Defendants' depiction of Ms. Fairstein stating:

> *I need that whole group…I need all of them. Every young black male who was in the park last night is a suspect in the rape of that woman who is fighting for her life right now. I want units out strong. Come on, guys. What did we miss? Let's get an army of blue up in Harlem. You go into those projects and you stop every little thug you see. You bring in every kid who was in the park last night. Id. ¶ 97.*

is not protected speech. Nor, as Defendants contend, does it "stand to reason" that because "at that point in the narrative, there had been eyewitness reports of people being randomly attacked by 'young black males' … those would be the persons of interest to investigators." Netflix Br. at 19. Ms. Fairstein was not responsible for bringing in persons of interest, questioning individuals or directing the police investigation—and certainly not calling for a roundup of young men in Harlem. Compl. ¶¶ 97-103; P-APP001663-2476. In addition, at this point in the Series, viewers have seen Ms. Fairstein unlawfully questioning unaccompanied minors, referring to young men of color as "animals," fighting with ADA Ryan, who believes the young men did nothing more than harass some cyclists, and patching holes in a timeline in order to pin the Meili attack on the young men in the Park (all of these scenes being entirely false). The scene, itself, shows Ms. Fairstein telling police to get "an army" up to Harlem, to

invade the homes of people of color living in the projects and to stop "every little thug,"[18] without probable cause, because "every kid" is a suspect. Compl. ¶ 97.[19]

In context, this scene clearly depicts Ms. Fairstein pursuing a racist agenda, while acting unlawfully and unethically in pursuit of The Five. This portrayal was clearly believed to be fact, not opinion, by viewers of the Series. *Id.* ¶ 237; P-APP0003269-86. The fact that, in 2003, Ms. Fairstein may have maintained that it was proper to link the other attacks in the Park to the attack on Ms. Meili, or opined that the police did a brilliant job on the case in interviewing witnesses, does not equate to the false manner in which Ms. Fairstein is portrayed in this scene. *See* Netflix Br. at 19-20.[20] Defendants are also incorrect in their assertion that calling someone a racist is always a protected opinion. *Id.* at 20-21. *See Armstrong v. Shirvell*, 596 F. App'x 433, 442 (6th Cir. 2015) ("Courts have held that words like 'liar' and 'racist' have clear, well understood meanings which are capable of being defamatory."); *Cockram v. Genesco, Inc.*, 680 F.3d 1046, 1054 n. 4 (8th Cir. 2012) ("One certainly can suffer severe reputational harm if accused of a racist act."); *Chefs' Warehouse, Inc. v. Wiley*, 2019 WL 4640208, at *8-9 (S.D.N.Y. Sept. 24, 2019) (accusation that plaintiff had "a policy of supporting racist business practices" was an actionable statement); *Conejo v. Am. Fed'n of Gov't Emps.*, 377 F. Supp. 3d 16, 29 (D.D.C. 2019) (falsely accusing individual of being a racist was an actionable statement).

(d)  Defendants' depiction of Ms. Fairstein telling NYPD officers who are about to interview Mr. Richardson, "This is not business as usual. The press is crawling all over this. No kid gloves here. These are not kids," (Compl. ¶ 104), is not protected speech. *See* Defs. Ex. B. The use of "kid gloves" has a readily discernible, singular meaning— to be very careful in the way one deals with something or someone.[21] Here, a reasonable viewer would understand that Ms. Fairstein was directing NYPD officers to do the opposite when interviewing Mr. Richardson, a minor, or to act unlawfully with respect to the interrogation of minors in a criminal case. Whether or not this occurred is also

---

[18] Defendants' contention that today's viewing audience would not perceive the word "thug" as a racist code word because, on one occasion in 1989, Ms. Fairstein may have referred to white male Robert Chambers as a thug is unavailing because (i) as repeatedly discussed above, the audience's reaction to Defendants' portrayal of Ms. Fairstein in the Series has been clear; (ii) the global viewers of *WTSU* would not have known that Ms. Fairstein once referred to a white person as a "thug" or be familiar with the Chambers case; and (iii) in today's parlance, and as alleged in the Complaint, the word "thug" has a derogatory and hateful meaning when used in reference to people of color. Compl. ¶ 103; P-APP002446-50. In addition, the magazine article upon which Defendants rely is neither admissible, nor properly before this Court at the motion to dismiss stage. *See infra* Pt. II. The truth or falsity of whether or not the persons at issue were thugs, (Netflix Br. at 20), is not at issue here. At issue is Defendants' false depiction of Ms. Fairstein directing the NYPD to conduct a blanket search of Harlem and round up young men of color without probable cause because she was pursuing a racist agenda. *Mirage*, 326 F. Supp. 3d at 37, is inapposite. In *Mirage*, the statement at issue was whether Mariah Carey's fans "deserved better" with respect to the cancellation of her concerts. The court found that this statement expressed an "abstract desire" which could not be objectively quantified by a jury. *Id.*

[19] Defendants improperly attempt to parse this scene, rather than analyzing it in context, by asserting that "no reasonable viewer would believe the Fairstein character was literally expecting officers to arrest 'every kid' who was in Central Park." Netflix Br. at 20. This mischaracterizes the scene. Reasonable viewers could—and did—believe that Ms. Fairstein told NYPD officers to go into the projects and stop "every kid they see" because every young black male was a suspect. Compl. ¶¶ 97-103.

[20] As discussed below, Defs. Ex. 1, in which these references are contained, is not properly before the Court.

[21] Collins Dictionary, https://www.collinsdictionary.com/us/dictionary/english/kid-gloves (last visited June 25, 2020).

capable of being proven to be true or false and is, accordingly, not an opinion. This scene is yet another entirely false depiction. *Id.* ¶¶ 105-107; P-APP002477-2598.[22]

Defendants argue that "Plaintiff cannot hold Defendants liable for 'expressing their opinion of her' actions as a public official who helped lead, and to this day supports, the prosecution against the Five." Netflix Br. at 21. As detailed above, Defendants ***can*** be held liable for opinions based on false facts and cannot hide behind the shield of rhetorical hyperbole. Moreover, Defendants did not portray Ms. Fairstein as ***helping*** lead the prosecution against The Five. They falsely portrayed her as the "singular mastermind behind a racist plot to obtain convictions of The Five at any cost," (Compl. ¶ 46), who was responsible for every aspect of the case against The Five, including the prosecution. *Id.* ¶¶ 44-130. As a result of watching *WTSU*, viewers now believe this to be the case. *Id.* ¶¶ 232-257.

### C. <u>Reid & Associates v. Netflix Is Not Dispositive</u>

Defendants rely on *Reid & Assocs.*, 2020 WL 1330657, to argue that First Amendment protection is warranted here. Netflix Br. at 2, 16-17 & n. 18, 20, 26, 28-29, 32. Even though *Reid* concerned *WTSU*, and involved two of the three defendants named here, that is where the similarities between the *Reid* action and this action end. The corporate plaintiff in *Reid*, the creator of a trademarked method for interviewing criminal suspects known as the Reid Technique, claimed that the corporation was defamed by a single scene, comprised of two lines of dialogue, in Part Four of the series in which ADA Ryan and ADA Casolaro confront Detective Sheehan about coercing testimony out of The Five during the police investigation in 1989 (the scene takes place years later, after Matias Reyes confesses). *Reid & Assocs.*, 2020 WL 1330657, at *2-3. In the

---

[22] When analyzed in a vacuum, Defendants' portrayal of Ms. Fairstein telling DA Morgenthau that "those little bastards shot their wad into a sock" may simply be offensive. But what is at issue, and which Defendants do not address, is the overall context of the film, and that by the time the viewer watches this scene, Ms. Fairstein has been portrayed as acting unlawfully, unethically and using a number of racist and dehumanizing terms towards The Five. In addition, in this entirely false scene, Ms. Fairstein is mocking The Five and their defense counsel because she concealed DNA evidence from them with the intention of springing it on them as a "surprise." Compl. ¶¶ 117-119.

scene, ADA Ryan, whom the court describes as a "truth-telling hero" of the Series, tells Detective Sheehan, "You squeezed statements out of them after 42 hours of questioning and coercing, without food…withholding parental supervision. The Reid Technique has been universally rejected." To which Sheehan replies, "I don't know what the fucking Reid Technique is." *Id.*

The court found this scene to be protected opinion because the phrase "universally rejected" is neither precise nor readily understood, the conversation took place as "a barroom back-and-forth," and the Series makes clear from Detective Sheehan's dialogue that "what Sheehan did to the young men in the first episode of the series was not the Reid Technique and could not have been because Sheehan did not know what the Reid Technique was." *Id.* at \*7-10. In contrast, there is no such counterpoint with respect to the manner in which Ms. Fairstein is depicted in the Series. On the contrary, ADA Ryan emerges as a "truth-telling hero" because Ms. Fairstein is falsely depicted as stealing the case from Ms. Ryan, and then engaging in unlawful and unethical conduct in order to pin the Meili attack on The Five. Compl. ¶¶ 44-130.

Unlike *Reid*, this is not a situation where "non-verifiable hyperbole is in the mouth of a fictionalized character with an ax to grind" because, as discussed above, the scenes at issue in this case are verifiable as true or false and are not protected opinion. *Reid & Assocs.*, 2020 WL 1330657, at \*8. Moreover, the words at issue are placed in Ms. Fairstein's mouth as opposed to a character with an ax to grind. In the few instances in which the words are being said to Ms. Fairstein (*e.g.* ADA Ryan telling Ms. Fairstein that *she* "coerced those boys"), they are capable of being proven to be either true or false.

For all these reasons, the Court should deny Defendants' motion to dismiss on First Amendment grounds.

## II.    Ms. Fairstein Has Plausibly Alleged Defamation Claims Against the Defendants

As a public figure, Ms. Fairstein must plausibly allege: 1) publication; 2) falsity; 3) actual malice; 4) actual damages; and 5) the statement must be defamatory. *Gottwald v. Bellamy*, 2011 WL 2446856, at *3 (M.D. Fla. June 15, 2011)[23] (denying motion to dismiss defamation claim alleging that defendants "strongly implied" that the plaintiff engaged in a pattern of copyright infringement); *Greene v. Times Pub. Co.*, 130 So. 3d 724, 729 (Fla. 3d DCA 2014) (reversing lower court's dismissal of defamation claim concerning defendants' statements that plaintiff was a participant in criminal fraud who took part in illegal drug use and "sexcapades"). *See also Judicial Watch,* 22 F. Supp. 3d at 1240 (denying summary judgment with respect to plaintiff's defamation claim concerning false statement that he was convicted of a crime). Defendants challenge Ms. Fairstein's defamation claims on the grounds that the scenes depicted in *WTSU* are (a) "substantially true" and (b) not defamatory.[24] Netflix Br. at 18-35.

To the extent that Defendants assert that Plaintiff is "libel proof,"[25] the "incremental harm," or "libel-proof plaintiff," doctrine has not been recognized by the Florida Supreme Court and Defendants offer no arguments why it should apply here. *See Green v. Cosby*, 138 F. Supp. 3d 114, 143 (D. Mass. 2015) (neither Florida nor California recognize the libel-proof plaintiff doctrine). The Middle District of Florida has refused to recognize this doctrine. *Klayman*, 2015

---

[23] As fully addressed in Plaintiff's opposition to Plaintiff's opposition to Netflix's Anti-SLAPP motion, Florida law applies.

[24] In a footnote in Netflix's brief, Defendants make the conclusory assertion that "as an admitted public figure, the standard of fault Plaintiff must meet is actual malice…a heavy burden Plaintiff ultimately would not be able to sustain either in all events." Netflix Br. at 15, n. 15. Putting aside that this unsupported assertion should not be considered by the Court, Ms. Fairstein plausibly alleges that Defendants acted with actual malice. *See* Compl. ¶¶ 11-12, 44-130, 138-143, 148-223, 264, 281, 298, 307, 320, 344, 364. This is fully addressed in Plaintiff's opposition to Netflix's Anti-SLAPP motion.

[25] Netflix Br. at 3 ("She cannot now, for purposes of a defamation suit, claim to be made a villain by dialogue showing her using language and espousing the very theories and decisions she has so vigorously defended to this day."); 19-20 (because "Plaintiff herself has long maintained…that it was proper to link other attacks in the park to the rape…and that the work the police did …was brilliant…[d]epicting her saying as much could in no way defame her); *Id.* at 25 (Plaintiff cannot be defamed if depicted espousing theory "that has been Plaintiff's consistent belief to this day.").

24

WL 1546173, at *17 n. 18. Even if the doctrine were recognized by Florida courts, this issue should not be decided at the motion to dismiss stage.

If the Court were to apply New York law with respect to this issue, the doctrine still would not bar Ms. Fairstein's claims. The United States Court of Appeals for the Second Circuit applies the doctrine sparingly because "it is unlikely that many plaintiffs will have such tarnished reputations that their reputations cannot sustain further damage." *Stern v. Cosby*, 645 F. Supp. 2d 258, 270-271 (S.D.N.Y. 2009) (plaintiff not precluded from seeking damages for being defamed in a book merely because he had been the subject of criticism and where conduct detailed in book was fundamentally different from conduct previously criticized). Ms. Fairstein suffered significant harm as a direct result of the Series' premiere—harm which she had not previously suffered. Compl. ¶¶ 232-257; Fairstein Aff., ECF. No. 35, ¶¶ 14-19; Fairstein Decl., ECF No. 42. For example, she worked with her publisher since 2009, and it was not until June 2019, immediately after the Series premiered, that the publisher terminated her contract. Fairstein Aff. ¶ 17. As set forth below, none of Defendants' arguments support dismissal of the Complaint.[26]

### A. <u>Defendants' Portrayal of Ms. Fairstein is Not Substantially True</u>

Defendants argue for dismissal of the Complaint on the ground that the manner in which Ms. Fairstein is portrayed in the Series is substantially true. Netflix. Br. 18-21. The "actual truth or falsity of a statement seems to be quintessentially a question of fact that ***ought not*** to be determined on a motion to dismiss absent some extraordinary factor not present in this case." *Michel*, 816 F.3d at 707 (emphasis added). *See City Pages*, 2014 WL 12621240, at *6 (declining to address substantial truth at motion to dismiss stage); *Judicial Watch*, 22 F. Supp. 3d at 1254 (trier of fact must determine substantial truth). The documents Defendants submitted in support of

---

[26] Ms. Fairstein's conspiracy claim is discussed at Point III of her opposition to the Individual Defendants' motion to dismiss/transfer venue, ECF No. 41, which is incorporated herein by reference.

their substantial truth defense are not properly before the Court and any documents that, arguably, may be considered do not support dismissal of the Complaint.

### 1.   Defendants' Documents Are Not Subject to Judicial Notice

"The Eleventh Circuit has urged caution when taking judicial notice of facts because the judicial notice process 'bypasses the safeguards which are involved with the usual process of proving facts by competent evidence in district court.'" *Absolute*, 233 F. Supp. 3d at 1316 (citation omitted). Courts typically take judicial notice of "(1) scientific facts: for instance, when does the sun rise or set; (2) matters of geography: for instance, what are the boundaries of a state; or (3) matters of political history: for instance, who was President in 1958." *Id.* A court may not take judicial notice of documents for the truth of the matters asserted therein. *Osheroff v. Humana Inc.*, 776 F.3d 805, 811 & n. 4 (11th Cir. 2015); *Head v. Cullen*, 2019 WL 4451455, at *3 (M.D. Fla. Sept. 16, 2019). A party seeking to judicially notice documents should do so by motion. *Setai Hotel Acquisition, LLC v. Miami Beach Luxury Rentals, Inc.*, 2017 WL 3503371, at *6 (S.D. Fla. Aug. 15, 2017).

Defendants made no motion. Nor have Defendants met their burden of persuading the Court that the particular "facts" which they are attempting to notice are "not reasonably subject to dispute and capable of immediate and accurate determination by resort to a source whose accuracy cannot reasonably be questioned." *Couch v. Broward Cty.*, 2012 WL 2007148, at *1 (S.D. Fla. June 5, 2012). *See Absolute*, 233 F. Supp. 3d at 1316. To the contrary, the newspaper articles and book excerpts submitted by Defendants at Exhibits 10-22, are not subject to judicial notice because their accuracy can reasonably be questioned and the facts contained therein are reasonably subject to dispute. *Absolute*, 233 F. Supp. 3d at 1316-1319.[27] Likewise, Exhibits 1-9 are reasonably subject

---

[27] It is also well established that newspaper articles constitute inadmissible hearsay. *Slone v. Judd*, 2011 WL 1124618, at *3 (M.D. Fla. Mar. 25, 2011).

to dispute. *See, e.g.*, *id.* at 1317. Here, Defendants also improperly ask the Court to consider each of their appendix exhibits, and judicial opinions and news articles cited in their brief, for the truth of their contents, which the Court may not do. Netflix Br. at 7 (Defs. Exs. 4, 9, 12, 16, 18, 22), 11 (Defs. Exs. 13-15), 8 (Defs. Ex. 17 and *People v. Salaam* opinion), 9 (Defs. Exs. 5, 20), 10 (Defs. Exs. 1, 6, 7, 10, 11), 18 (Defs. Exs. 1, 6, 8-9), 19 (Defs. Ex. 16), 20 (Devine and Breitbart articles), 24 (Defs. Exs. 2, 3, 16, 19), 25 (Defs. Ex. 6), 26 (Defs. Ex. 1), and 34 (Defs. Exs. 4, 21). The Court should decline to take judicial notice of any of these documents.

### 2.   Defendants Identified No Documents Which Contradict the Complaint's Allegations

Defendants baldly assert that sources that "Plaintiff extensively relies upon" in the Complaint contradict Ms. Fairstein's allegations. Netflix Br. at 12. Yet Defendants cite only ten (10) sources that are, arguably, referenced in the Complaint—Exhibits 1-6, 9, 12, 20 and 21.[28] *See Principal Bank v. First Am. Mortg., Inc.*, 2014 WL 1268546, at *2 (M.D. Fla. Mar. 27, 2014). These sources neither contradict nor "nullify" the Complaint's allegations and certainly ***do not*** demonstrate that Defendants' portrayal of Ms. Fairstein in *WTSU* is substantially true[29] (Netflix Br. at 12):

- **DeBlasio/Carter Press Release (Defs. Ex. 20)**: Defendants highlight New York City Mayor Bill DeBlasio's statement that the settlement with The Five was "an act of justice for those five men that is long overdue" and Corporation Counsel's statement that "to the extent that the evidence suggests that these five young men were wrongfully convicted and sentenced to substantial prison terms for a crime they did not commit, that in and of itself constitutes an injustice in need of redress." These statements do not contradict the Complaint. Ms. Fairstein's lawsuit does not challenge whether an injustice was committed. Nor does Ms. Fairstein attempt to retry the case against The Five, question the vacatur of

---

[28] Consequently, Defendants concede that the numerous other sources cited in the Complaint support the allegations made therein. *Expressio unius est exclusio alterius*.

[29] Nor do they constitute admissions that Plaintiff engaged in any of the complained of conduct depicted in the Series. *See* Netflix Br. at 12. *Nix v. ESPN, Inc.*, 2018 WL 8802885, at *6-7 (S.D. Fla. Aug. 30, 2018), is inapposite because, in a separate lawsuit, the plaintiff in *Nix* admitted to selling banned substances and then alleged that he was defamed in an article which stated that the plaintiff admitted to selling banned substances. *Id.* at *7.

their convictions, or question the propriety of the City's settlement. Ms. Fairstein's case is singularly about Defendants' decision to falsely portray Ms. Fairstein as *solely responsible* for causing any injustices that may have occurred. Defendants do not dispute that the same press release states that a "review of the record suggests that the…Assistant District Attorneys involved in the case acted reasonably, given the circumstances with which they were confronted on April 19, 1989 and thereafter." Defs. Ex. 20; Compl. ¶ 6.

- **Ms. Fairstein's 2013 Deposition Testimony and Exhibits**:

    (a) *Inadmissible Toobin Article*:[30] Ms. Fairstein's testimony concerning an inadmissible magazine article written by Jeffrey Toobin, (Netflix Br. at 7; Defs. Ex. 12), says nothing about the accuracy of the reporting therein and does not demonstrate that Ms. Fairstein adopted that article as her own statement. In addition, the article *supports* the allegations of the Complaint. Ms. Fairstein is quoted as saying that on the day after the attacks in the Park she was at the 20th Precinct *while detectives and ADA Lederer interrogated suspects* as the "800 pound gorilla"—as the head of the Sex Crimes Unit to get the necessary resources to assist ADA Lederer and the NYPD (Ex. 12). *See, e.g.*, Compl. ¶ 39 (Fairstein served as liaison to DA Morgenthau and provided technical assistance to ADA Lederer); *Id.* ¶ 57 (assisted ADA Lederer as needed); P-APP000089-92. While Defendants highlight the word "prosecutor" in the article, the article does not say that Ms. Fairstein prosecuted the case. Defs. Ex. 12. That Ms. Fairstein is quoted as stating that Matias Reyes did not act alone is irrelevant because Ms. Fairstein's defamation claims are not based on any statements concerning Matias Reyes. Ms. Fairstein's expression of such an opinion also does not equate to, or justify, Defendants' false portrayal of Ms. Fairstein manipulating timelines, questioning unaccompanied minors, changing the theory of the case, encouraging detectives to bend the rules, acting unlawfully and manipulating evidence to convict innocent children of color. Compl. ¶¶ 44-130. Even if the article were considered, it does not contradict the allegations that Defendants *falsely* portrayed Ms. Fairstein as responsible for nearly every aspect of the case against The Five.

    (b) *Irrelevant Testimony Concerning Mr. Salaam*: This testimony is not central to Ms. Fairstein's claims because, as pointed out by Defendants, "the Complaint *does not* discuss the conduct of Plaintiff that was at issue in the suppression hearings" (Netflix Br. at 8; *Cf.* Compl. ¶ 86) and "the Complaint *does not mention* the scene in Episode 1…where Yusuf [*sic*] Salaam's mother challenges the Fairstein character about interrogating her minor son without her present." Netflix Br. at 32 (emphasis added).[31] Even if considered, the cited testimony, (NYCLD_039137-51, 039393-94 and 039447-48), does not contradict Ms. Fairstein's allegation that she was falsely depicted as questioning unaccompanied minors without reading them their *Miranda* rights. Compl.

---

[30] The Toobin article is not referenced in the Complaint but it was part of Ms. Fairstein's deposition testimony. Excerpts from Ms. Fairstein's deposition transcripts from the civil litigation brought by The Five are cited throughout the Complaint.

[31] Indeed, unlike the scenes cited in the Complaint, the scene in the Series depicting the exchange between Ms. Fairstein and Mr. Salaam's mother could be viewed as portraying Mr. Salaam's, or his mother's, point of view. The film scenes that are cited in the Complaint "do not concern events or situations in which any of The Five were present, and cannot be explained or justified as portraying their account of what happened." Compl. ¶ 231.

¶¶ 62-76. *See also* Netflix Br. at 32 (stating only that Plaintiff "was involved" in incident with Mr. Salaam). Ms. Fairstein's suppression hearing testimony demonstrates that she did not question Mr. Salaam and that his identification stated that he was 16, and therefore not a minor under the applicable law. Ms. Fairstein first learned that Mr. Salaam was 15 when approached by his mother. P-APP001238-1259, L. Fairstein Supp. Hrg. Test., 11/29/89, at NYCLD_0015292-15314 (Compl. ¶ 86 n. 53).[32]

(c) ***Irrelevant Crime Scene Testimony***: Ms. Fairstein's testimony concerning her notes about a visit to the crime scene with Detective Sheehan, Mr. Wise and Mr. Richardson, and being in close proximity to Mr. Wise while he was in a holding pen with a number of individuals, is neither central to Ms. Fairstein's claims nor does it contradict the Complaint.[33] *WTSU* does not address the crime scene walk, nor did Ms. Fairstein testify that she was at the crime scene on any other occasion. She was never at the Park on April 20, 1989. Compl. ¶¶ 55-56; P-APP000025-88. Ms. Fairstein's visit the crime scene with Messrs. Wise and Richardson does not support Defendants' false portrayal of Ms. Fairstein alone at the crime scene immediately after the Meili attack, asserting that a single person was responsible. Compl. ¶¶ 51-56, Compl. ¶ 237 (9/24/19 Tweet); P-APP000025-88, 3281. The fact that Ms. Fairstein took notes, while in the common area of a police precinct, about statements she overheard in the nearby holding pen does not equate to running the entire investigation, interviewing or questioning The Five, or directing others how to do so, as she is falsely depicted in the Series. Compl. ¶¶ 51-116.

(d) ***Testimony re Ms. Fairstein's Role***: Ms. Fairstein's response to certain questions about her role in the case, (Netflix Br. at 7, n. 5),[34] does not contradict the allegation that Defendants falsely portrayed her as being in charge of the case against The Five. *Cf.* Compl. ¶¶ 55-56 and P-APP000025-88; 82 and P-APP000977-1092; 116 and P-APP002608-2649; ¶ 123 and P-APP002717-2750.

(e) ***Testimony re "Genetic Testing"***: Ms. Fairstein's testimony does not contradict the Complaint. *See* Netflix Br. at 33-35; Defs. Ex. 4 at NYCLD_039456-457. Ms. Fairstein was questioned about an October 10, 1989, *New York Times* article which referred to "inconclusive" genetic testing. *See* Defs. Ex. 21. This article, and Ms. Fairstein's testimony about it, have nothing to do with the sock DNA, which was not discovered until ***March 1990***. Compl. ¶ 119. The film scene about which Ms. Fairstein complains

---

[32] With respect to this issue, Defendants improperly attempt to submit Judge Titone's dissenting opinion in *People v. Salaam* for the truth of the statements made therein. Netflix Br. at 8, 32. Should it be considered, Defendants fail to mention that the majority opinion made no reference to Ms. Fairstein. Judge Titone's opinion further states that, upon re-entering the police precinct, Mr. Salaam's mother "revealed for the first time that defendant was 15, not 16 as the authorities had previously been led to believe" and Ms. Fairstein was "[a]pparently caught off guard" when learning this information. *People v. Salaam*, 83 N.Y.2d 51, 60 (1993).

[33] Defendants cited to this testimony in Netflix's moving brief, but failed to include it in Exhibit 4. Netflix Br. at 7, n. 5. *See* Gorycki Decl., Ex. 2, L. Fairstein Dep., at NYCLD_039237-50.

[34] Defendants did not include the entirety of the testimony they cite, (NYCLD_038927-38), in Exhibit 4. They also failed to include the full line of questioning relevant to Ms. Fairstein's role, which shows that, in fact, her role was limited because she was a trial witness. *See* Gorycki Decl., Ex. 3, Fairstein Dep. Tr., at NYCLD_038920-45 (full line of questioning).

does not concern which theories were put forth, or disproven, about the DNA evidence at trial. What is alleged is that Ms. Fairstein is falsely depicted as stating "We have a sock, those little bastards shot their wad into a sock thinking we wouldn't find it but we found it…and ***the kicker is none of the defense counsel is aware*** yet so we can test it right before the trial—surprise!" Compl. ¶ 118 (emphasis added). What is further alleged is that "Ms. Fairstein did not bring the sock to ADA Lederer's attention…[t]here was never an attempt to conceal this evidence from counsel or the court, nor did Ms. Fairstein play any role in this discovery issue." *Id.* at ¶ 119. These allegations cannot be "nullified" by testimony concerning a timeframe which pre-dates the discovery of the sock. In addition, Ms. Fairstein played no role in the discovery of the sock DNA. Compl. ¶ 119; P-APP002650-662.

(f) ***Ms. Fairstein's July 2002 Letter to Jim Kindler (Defs. Ex. 2)***: Defendants cite to this letter—written 13 years after the case against The Five and used as an exhibit at her 2013 deposition—as evidence that Ms. Fairstein "was deeply involved in the case" against The Five, in part because she "conducted witness interviews." Netflix Br. at 6. Ms. Fairstein testified that she interviewed "witnesses" David Nocenti and Sharonne Salaam. Gorycki Decl., Ex. 4, Fairstein Dep. Tr., at NYCLD_039693-99. That Ms. Fairstein spoke with Mr. Nocenti and Ms. Salaam does not equate to her being in charge of every aspect of the case against The Five, as falsely depicted in *WTSU*. *See* Compl. ¶¶ 44-130. Nor does this testimony support Defendants' false depiction of Ms. Fairstein questioning unaccompanied minors about Mr. McCray. Compl. ¶¶ 62-76.

Defendants argue that this letter contradicts the Complaint because it states that "at the same time I assigned the case to [ADA Lederer], Nancy had assigned it to Peter [Casolaro]- and the Boss made the call, later in the day to let Liz keep it." Defs. Ex. 2. Netflix Br. at 24 and n. 6. But this sentence does not contradict Ms. Fairstein's allegations that she was falsely depicted "as wresting the case from…ADA Ryan…in order to make an example of The Five, over Ryan's protestations that The Five did nothing more than harass a few cyclists." Compl. ¶¶ 46(d), 87-96. Moreover, Ms. Fairstein testified that the letter incorrectly referenced ADA Ryan because John Fried was the Chief of the Trial Division at the time that ADA Lederer was assigned to the case. Gorycki Decl., Ex. 4, at NYCLD_039697-99.

(g) ***Ms. Fairstein's January 30, 2003 Statement (Defs. Ex. 1)***: Ms. Fairstein's written statement to the New York City Council was given when the filing of The Five's lawsuit against New York City was imminent. In the statement, Ms. Fairstein addressed the District Attorney's recommendation to vacate the convictions of The Five without a hearing to test Reyes' credibility. Defs. Ex. 1, at NYCLD_039828-29. At that time, Ms. Fairstein continued to question whether The Five acted in concert with Reyes in the attack on Ms. Meili and whether the vacatur of the convictions should include the other crimes for which they were convicted. *Id.* at NYCLD_039829-32. Ms. Fairstein's statements do not contradict the Complaint. What is alleged here is that Defendants falsely portrayed Ms. Fairstein as being singlehandedly responsible for the wrongful conviction of The Five, including by leading the police investigation and changing the theory of the case from a single attack to a group attack, despite a lack of substantial

evidence, to ensure that The Five were convicted of the rape. Compl. ¶¶ 44-130. Defending the prosecution or police work that was done, or positing that Reyes did not act alone, is not the equivalent of being *responsible for* the prosecution, police work or convictions.

That, over a decade after The Five's conviction, Ms. Fairstein discussed the issue of whether discrepancies in "the timeline in the case" could be a basis for vacating the convictions, does not constitute an admission that Ms. Fairstein *created* any timelines, as depicted in the Series. Defs. Ex. 1, NYCLD_039835; Netflix Br. at 25-26. In the Series, Ms. Fairstein is falsely depicted as manipulating the timeline in the early stages of the investigation in collaboration with NYPD, and then making the rape fit into a flawed timeline. Compl. ¶¶ 77-86, 94. "Ms. Fairstein was not responsible for putting together, nor did she put together, a timeline of events during the course of the interviews that took place between April 19-1989-April 21, 1989." Compl. ¶ 85.[35] Speaking about the timeline a decade later does not change these facts. Nor would proclaiming "the essential correctness" of a timeline—which Ms. Fairstein's statement does not do—equate to being responsible for its contents or any actual, or perceived, errors in that timeline. *See* Netflix Br. at 26.

With respect to the use of the term "wilding," (Netflix Br. at 18), Ms. Fairstein first introduces the term in quotes, indicating that she is not personally adopting the phrase. Defs. Ex. 1, at NYCLD_039827.[36] Ms. Fairstein has not alleged that she never used the term wilding subsequent to the case against The Five. Compl. ¶ 68. She alleged that "portraying [her] as using the term 'wilding' when questioning unaccompanied minors in violation of the law, also adds to the defamatory nature of the scenes…[i]n the present day, the term is viewed as a word which stoked the public's fear of young black men, including in the Central Park jogger case." *Id.* ¶¶ 74, 76.[37]

(h)  *Ms. Fairstein's 2010 Letter to Former DA Morgenthau (Defs. Ex. 3)*: This letter is neither central to Ms. Fairstein's claims nor does it contradict the Complaint. That, *in 2010* (over 20 years after the Central Park jogger case), Ms. Fairstein wrote a letter to former DA Morgenthau in which she expressed her disdain for ADA Ryan does not undermine the Complaint's allegations concerning the manner in which Ms. Fairstein is portrayed in *WTSU*. *See* Netflix Br. at 24 n. 26; Compl. ¶¶ 51-56, 87-96, 126-130. That Ms. Fairstein disliked Ms. Ryan, and disagreed with the manner in which she

---

[35] Defendants completely misconstrue the allegations of Paragraph 85 in order to avoid the fact that they chose to falsely depict Ms. Fairstein as responsible for a potentially faulty timeline concerning the attacks in Central Park. *See* Netflix Br. at 25. It is Defendants, rather than Ms. Fairstein, who are attempting to "dodge" responsibility.

[36] She also used the term in quotes in the 1994 Daily News article which Defendants have submitted as Exhibit 8.

[37] Defendants have not specified how Ms. Fairstein's statement "[t]his was a rampage inside the park-it was mob violence, moving in the erratic and uneven way that a deadly pack does," defeats her allegations that Defendants intentionally put racist and dehumanizing words in her mouth. *See* Netflix Br. at 18. This description is in line with ADA Ryan's description of events at the time the convictions were vacated, yet Defendants portrayed Ms. Ryan as believing that nothing more than harassment occurred in Central Park. *See* Compl. ¶¶ 90-93; Defs. Ex. 5, at NYCLD_030711-712 (¶¶ 109-113) (noting the "unprovoked attacks on strangers," and that all defendants "were considered to be part of a single incident – a rampage in the park," and "it was fairly and convincingly argued…that they were an 'an entire group acting together in one violent outburst of destruction, of beating, of assaulting'").

handled the 2002 reinvestigation of the case against The Five, does not prove that a rivalry existed between Ms. Fairstein and Ms. Ryan *in April 1989* or that Ms. Ryan was involved in the original investigation of the attacks in Central Park in any way. Compl. ¶¶ 87-96; P-APP001589-1662. Assuming *arguendo* that a rivalry did exist, this does not prove that, as falsely depicted in the Series, ADA Ryan believed that The Five engaged in mere harassment, confronted Ms. Fairstein about her doubts about the case in 1989, was there when Ms. Fairstein's "theory changed" or that Ryan "pored over [Ms. Fairstein's] confession tapes" to conclude that Ms. Fairstein coerced The Five. Compl. ¶¶ 51-56, 87-96, 126-130. *See* Defs. Ex. 5, NYCLD_030711-712, ¶¶ 109-113.

- **Ryan Affirmation (Defs. Ex. 5)**: Defendants identify no part of the affirmation which contradicts the Complaint. Rather, they reference the affirmation in conjunction with the vacatur of The Five's judgments of conviction, and to assert that Reyes was solely responsible for the rape of Ms. Meili. Netflix Br. at 8-10. *See* Compl. ¶ 41. Whether or not Reyes was solely responsible for the rape of Ms. Meili is not at issue in this case. Defendants do not dispute that ADA Ryan found that the "other crimes committed on April 19 were grave and inexcusable—unprovoked attacks on strangers, apparently undertaken for the fun of it, which left some terrorized, two knocked into unconsciousness, and one seriously injured." Compl. ¶ 93; Defs. Ex. 5, NYCLD_030711-712, ¶¶ 109-113.

- **Excerpts from Sexual Violence (Defs. Ex. 9):** The excerpts from Ms. Fairstein's book neither contradict the Complaint nor are they central to Ms. Fairstein's claims. These excerpts do not demonstrate that Ms. Fairstein took credit for the prosecution of The Five. Netflix Br. at 7. One highlighted excerpt merely states that "Fairstein has personally tried *or been involved in scores of nationally prominent rape cases, including…the case of the Central Park Jogger*." Defs. Ex. 9, Biography (emphasis added). Another excerpt generally describes what Ms. Fairstein's duties were going to be when she became the head of the Sex Crimes Unit, not what they were in reference to the case against The Five. *Id.* at p. 120.

Defendants also assert that *Sexual Violence*—which was published nearly a decade before Reyes confessed—shows that Ms. Fairstein would have used "dehumanizing" language towards The Five during the investigation. Netflix Br. at 18. In the book, Ms. Fairstein states "more frequently, when an assailant has his prey in an isolated location…a wooded ravine (in New York's Central Park a jogger was attacked by a series of vicious marauders without interruption)." *Id.* at p. 202. The term "marauders" simply means a group that "roams from place to place making attacks and raids in search of plunder."[38] ADA Ryan described the events in Central Park in precisely this manner. *See* Defs. Ex. 5, Ryan Aff. ¶¶ 109-113; Compl. ¶ 93. This does not contradict that the Series is false and defamatory because it portrays Ms. Fairstein "as dehumanizing children of color by referring to them as 'animals,' while trying to create support among police officers for a weak case." Compl. ¶ 95. *See* Compl. ¶ 76.

---

[38] Merriam Webster, https://www.merriam-webster.com/dictionary/marauder (last visited June 25, 2020).

- **Ms. Fairstein's June 2019 Op-Ed in The Wall Street Journal (Defs. Ex. 6):** Putting aside that this opinion piece post-dates the premiere of *WTSU,* and could not have been relied upon by Defendants in creating the Series, it does not contradict the Complaint. Defendants assert that this document supports their depiction of Ms. Fairstein espousing the belief that "the rape was connected to other activity in the Park that night." Netflix Br. at 10. But this fact is not at issue here. As set forth in the Complaint, Ms. Fairstein is falsely depicted as (i) originally believing that one person committed the rape and then changing the theory of the case, despite a lack of substantial evidence, to get innocent young men convicted (Compl. ¶¶ 51-56, 127, 79, 90, 92-93, 108-130), and (ii) being told that the rape could not possibly fit into the timeline (or locations) of the other crimes in the Park that night and manipulating the timeline to make them fit together (*Id.* ¶¶ 79-86, 94).

  Defendants next mischaracterize Ms. Fairstein's Op-Ed as describing The Five as acting in concert with a sociopath. Netflix Br. at 18. In the *second* paragraph, Ms. Fairstein states "a sociopath named Matias Reyes confessed in 2002 to the rape of Ms. Meili." Defs. Ex. 6. In the *tenth* paragraph of the Op-Ed, Ms. Fairstein states "[t]he five were charged as accomplices, as persons 'acting in concert' with each other and with the then-unknown man who raped the jogger, not as those who actually performed the act." *Id.* Ms. Fairstein goes on to say, "Mr. Reyes's confession, DNA match and claim that he acted alone required that the rape charges against the five be vacated. *I agreed with that decision and still do*." (emphasis added). This directly contradicts Defendants' assertion that Ms. Fairstein "continues to hold [The Five] responsible" for the rape of Ms. Meili. Netflix Br. at 10. In addition, whether or not Ms. Fairstein continues to hold them responsible for the rape is irrelevant to Defendants' intentional, utterly false portrayal of Ms. Fairstein as pursuing a clearly unsubstantiated case against The Five. Notably, Ms. Locke's false and defamatory social media posts about Ms. Fairstein, in response to the Op-Ed, demonstrate that Defendants intended to single out Ms. Fairstein in the Series. *See* Compl. ¶ 195 (stating Ms. Fairstein "deserves all the rage and hate and consequences that are coming her way. She is an unrepentant liar. Fuck her.") In response to the Op-Ed, more specifically Ms. Fairstein's statement that the Series was complete fabrication, Ms. DuVernay tweeted "I have receipts." *Id.* ¶ 181; P-APP002943. Yet Defendants have put forth no documents that contradict the Complaint.

- **Ms. Fairstein's July 31, 2018 Response Letter to the Editor of the New York Law Journal (Defs. Ex. 7):** This letter is not referenced in the Complaint. Defendants conveniently exclude from their submission a letter from Mr. Wise's attorney to the editor of *The New York Law Journal* which attacks Ms. Fairstein, and to which she responds point by point on July 31, 2018. Gorycki Decl., Ex. 5. Regardless, Ms. Fairstein's letter *supports* her allegations because Ms. Fairstein makes clear "I was not the prosecutor in the case, nor was I one of the detectives or prosecutors who took the confessions from the 5. Instead I was an eyewitness to many of the events at the police stationhouse." Defs. Ex. 7; *Cf.* Compl. ¶¶ 39-40, 73, 86, 105, 123. The letter also points out that "[t]wo juries heard that the DNA on the jogger's body was not from any of the 5." This is not in dispute. What is alleged is that Defendants falsely portrayed Ms. Fairstein as concealing the sock DNA evidence from ADA Lederer and defense counsel until the eve of trial. Compl. ¶¶ 118-119.

The remainder of the documents contained in the Defendants' Appendix, or otherwise cited by Defendants, are outside the scope of the pleading and should not be considered.[39] Because Defendants have put forth no evidence which, if it were considered, supports their substantial truth defense, their motion to dismiss the Complaint on this ground should be denied.

## B.      The Scenes in Question Are Defamatory

The Court need not dismiss Ms. Fairstein's defamation claims at this stage of the action unless the film scenes at issue "could not possibly have a defamatory or harmful effect." *Greene*, 130 So. 3d at 730. A statement is defamatory when the "gist" or "sting" of the statement is defamatory. *Id.* The gist of any statement within a broadcast is found only by reference to the entire context. *Id.* Defamation *per se* is a published statement that, when considered alone without innuendo, "tends to subject one to hatred, distrust, ridicule, contempt or disgrace," or "tends to injure one in his trade or profession." *Synergy Billing, LLC, v. Priority Mgmt. Grp. Inc.*, 2017 WL 4922203, at *6-7 (M.D. Fla. Oct. 31, 2017); *Pope v. Big Bend Cares, Inc.*, 2014 WL 11429278, at *2 (N.D. Fla. Dec. 18, 2014). *See Stern*, 645 F. Supp. 2d at 289. Thus, contrary to Defendants' assertions, they did not have to depict Ms. Fairstein as committing a crime in order to be liable for defamation *per se*. *See* Netflix Br. at 29-34.

It is undisputed that, as a direct result of the manner in which Defendants chose to portray her in the Series, Ms. Fairstein ***has been*** subjected to hatred, distrust, ridicule, contempt and disgrace ***and*** injured in her trade or profession. Compl. ¶¶ 232-257. *See also* Compl. ¶ 183; P-APP002947 (Per Ms. DuVernay, "not a single publication needs to give Linda Fairstein a chance to speak");

---

[39] These documents would not even support the conversion of Defendants' motion to dismiss to a motion for summary judgment because they constitute inadmissible hearsay. *See supra* n. 26.

Compl. ¶ 194; P-APP002986 (Per Ms. Locke, "Linda Fairstein is trash, was trash, will always be trash."). The following depictions of Ms. Fairstein are defamatory *per se*:[40]

1) originating the use of the term wilding when reading from a police report and then using the term when questioning unaccompanied young men of color—ages 13-14—without reading them their *Miranda* rights, and asking an unaccompanied minor for Mr. McCray's address. *Id.* ¶¶ 62-76. This scene is defamatory because it portrays Ms. Fairstein breaking the law to coerce information out of unaccompanied minors. The average viewer would be familiar with the reading of *Miranda* rights to persons in custody, as this an act that is routinely depicted in television and film. There is no "strained innuendo." Netflix Br. at 30-31.

2) calling for a roundup of young, black males in Harlem, stating "You go into those projects and you stop every little thug you see. You bring in every kid who was in the park last night." Compl. ¶¶ 97-103. This scene is defamatory because it depicts Ms. Fairstein giving orders to NYPD officers to conduct a blanket search of Harlem, invade people's homes and round up young men of color without probable cause because she was pursuing a racist agenda.

3) manipulating the timeline of the attacks in Central Park: i) relying on rushed interviews of unaccompanied minors to declare that all the young men were suspects (*Id.* ¶¶ 77-86); ii) coming up with a new timeline after a 45-minute discrepancy is noted and a detective makes clear that the young men in the Park could not be committing a rape and "jumping bicyclists" at the same time (*Id.*); and iii) briefing police in front of a map, referring to young men of color as "animals" and noting a missing 30 minutes in the timeline as ADA Ryan wishes Ms. Fairstein "good luck" (*Id.* ¶¶ 94-96). The defamatory nature of this scene does not lie in the "theory that the rape was connected with other criminal activity in the Park that night," (Netflix Br. at 25), but that Defendants falsely portrayed Ms. Fairstein as forcing the timeline to fit her theory of the case in order to pursue a baseless case against The Five, whom she viewed as inhuman, even though at the start of the film she attributed the rape to a single attacker.[41]

4) directing NYPD officers who are about to interview Kevin Richardson, "This is not business as usual....No kid gloves here." Compl. ¶¶ 104-107. This scene is defamatory because it portrays Ms. Fairstein as racist, unethical and ordering police to violate the law with respect to the interrogation of minors, including Mr. Richardson. The viewer would understand that Ms. Fairstein was telling police to treat the children in custody like adults to coerce information out of them.

5) using abusive and derogatory language about The Five, acknowledging to ADA Lederer that their statements do not match, and directing an NYPD detective to coerce, and beat,

---

[40] To the extent the Court might find that a particular scene is not defamatory *per se*, then Plaintiff respectfully submits that the film scene would fall within the category of defamation *per quod*. *See Pope*, 2014 WL 11429278, at *2 ("Defamation per quod includes any other published statement that tends to injure a person's reputation.").

[41] As discussed *supra*, Plaintiff did not publicly proclaim the "essential correctness" of the timeline.

testimony from Korey Wise in order to hold her theory together that The Five raped Ms. Meili (after the detective has already directed Messrs. Richardson and Santana to alter their testimony). *Id.* ¶¶ 108-116. Contrary to Defendants' assertions, these scenes do not simply depict Ms. Fairstein espousing the view that The Five all participated in the attack on Ms. Meili or taking a "more aggressive view" than ADA Lederer. Netflix Br. at 26-28. They depict Ms. Fairstein acting in an unethical and unlawful manner in order to elicit testimony that fits her theory of the case, knowing there was a lack of substantial evidence.

6) withholding a sock containing DNA evidence from The Five's defense counsel. Compl. ¶¶ 118-119. In the scene, Ms. Fairstein refers to The Five as "those little bastards" who "shot their wad into a sock thinking we wouldn't find it, but we found it." Compl. ¶ 118. She continues "We have it now and the kicker is none of the defense counsel is aware yet so we can test it right before trial—surprise!" *Id.* This scene is defamatory because it portrays Ms. Fairstein acting unethically in first concealing potentially exculpatory evidence from ADA Lederer, and then defense counsel, with the intent to spring it on defense counsel on the eve of trial. A reasonable viewer need not be fully versed in criminal procedure to view Ms. Fairstein as untrustworthy and unethical because, as portrayed, she is playing fast and loose with DNA evidence that ultimately did not match any of The Five. *See* Netflix Br. at 34-35.

Defendants contend that the scenes depicting Ms. Fairstein interacting with ADA Lederer are not defamatory because they reflect Ms. Fairstein's view that The Five participated in the attack on Ms. Meili. *Id.* at 26-27. This glosses over what the viewer is made to understand throughout the Series, based on Defendants' false portrayal of Ms. Fairstein— that she singularly held the view that there were multiple attackers (after changing her single attacker theory) despite a number of individuals questioning her ethics in pursuing this theory. Defendants further ignore that ADA Lederer and Ms. Fairstein would never have had the back and forth portrayed in the Series because ADA Lederer did not believe that Ms. Fairstein was delusional and ADA Lederer, who actually prosecuted the case, believed that The Five participated in the attack on Ms. Meili. Compl. ¶¶ 117-125. *See Liberty Lobby, Inc. v. Anderson*, 1990 WL 605337, at *2 (D.D.C. July 30, 1990) (statements which communicated to the reader that plaintiff was a "fanatic" who "borders on self-delusion" were defamatory). A viewer would certainly distrust and have contempt for an attorney who conceals evidence, ignores exculpatory evidence, and pursues the prosecution of a case for which the viewer is told there is no substantial evidence, and whose colleague refers to her as "delusional."

7) heading up the NYPD investigation at the Meili crime scene on the morning of April 20, 1989 and concluding there was a single attacker (Compl. ¶¶ 52-56); arguing with ADA Ryan over the severity of the attacks in the Park (*Id.* ¶¶ 87-96); per ADA Ryan, changing the theory of the case from a single attacker to multiple attackers (*Id.* ¶¶ 126-127); and being accused by ADA Ryan of coercing "those boys into saying what they did" (*Id.* ¶¶ 126-130).[42] These false depictions are defamatory because, from the beginning of the

---

[42] Notably, in this scene with Ms. Ryan Defendants also attack Ms. Fairstein's career as an author. Compl. ¶¶ 128, 237.

Series, the viewer is set up to question Ms. Fairstein's credibility, and ethics, in pursuing the charges against The Five because: she saw, and believed, that there was one attacker; ADA Ryan told her that the attacks were no more than "harassment" and then wished her "luck;" and, after ADA Ryan vacated the convictions, she blamed Ms. Fairstein for the coerced confessions of The Five, stating "I pored over your confession tapes." These scenes cause the viewer to conclude that Ms. Fairstein was the "wrongdoer responsible for the incarceration of innocent children of color" (*Id.* ¶ 95) and "singularly responsible for jailing innocent young men of color after changing the theory of the case" (*Id.* ¶ 126). Indeed, as one viewer tweeted, "Those she put behind bars were innocent. But Linda Fairstein is not. Only one set of footprints. She knew better from the outset." Compl. ¶ 237; P-APP003281. Referring to the meeting between ADA Ryan and Ms. Fairstein in Part Four, a viewer tweeted "this part of the film…clearly defines her as having an agenda. There's absolutely NO excuse for her behavior." *Id.*

The scenes set forth above are defamatory on their face, as they clearly subject Ms. Fairstein to hatred, distrust, ridicule, contempt and disgrace. The Series, which depicts Ms. Fairstein as an unethical, unlawful, fanatical and racist, is further injurious to Ms. Fairstein's reputation as a career prosecutor, attorney and best-selling author. *See, e.g.*, Compl. ¶ 237. Accordingly, Defendants' Rule 12(b)(6) motion should be denied.

## CONCLUSION

For all of the above stated reasons, the Court should deny Defendants' motion to dismiss the Complaint, pursuant to Federal Rule 12(b)(6), for failure to state a claim and should further award any other relief as it deems just and proper.

Dated: July 1, 2020

Respectfully Submitted,

By: /s/ Andrew T. Miltenberg
    Andrew T. Miltenberg (*pro hac vice*)
Kara L. Gorycki (*pro hac vice*)
NESENOFF & MILTENBERG, LLP
363 Seventh Avenue, Fifth Floor
New York, New York 10001
(212) 736-4500
amiltenberg@nmllplaw.com
kgorycki@nmllplaw.com

-and-

By: /s/ Edward K. Cheffy
Edward K. Cheffy
Florida Bar No. 393649
Rachael S. Loukonen
Florida Bar No. 668435
Kimberly D. Swanson
Florida Bar No. 1018219
CHEFFY PASSIDOMO, P.A.
821 Fifth Avenue South
Naples, FL 34102
(239) 261-9300
ekcheffy@napleslaw.com
rloukonen@napleslaw.com
kdswanson@napleslaw.com

*Trial Counsel for Plaintiff Linda Fairstein*

## CERTIFICATE OF SERVICE

I hereby certify that on July 1, 2020, a true and correct copy of the foregoing was filed and served by CM/ECF on all counsel or parties of record on the service list.

/s/  EDWARD K. CHEFFY