# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

| | |
|---|---|
| **LINDA FAIRSTEIN,** | **Civ. No. 2:20-cv-00180- FtM-66MRM** |
| **Plaintiff,** | |
| **vs.** | **APPENDIX IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTIONS** |
| **NETFLIX, INC., AVA DUVERNAY, and ATTICA LOCKE,** | |
| **Defendants.** | |

## SOURCES REFERENCED IN THE COMPLAINT

| COMPLAINT CITATION | SOURCE | Pages |
|---|---|---|
| **NATURE OF ACTION** | | |
| Par. 6, n.1 | 9/5/14 Statement of Mayor DeBlasio and Corporation Counsel | P-APP000001-000002 |
| Par. 6, n. 2 | *41 Million Settlement for 5 Convicted in Jogger Case is Approved*, NY Times, Sept. 6, 2014 | P-APP000003-000004 |
| Par. 13, n. 4 Par. 167, n. 120 | Film Trailer for *When They See Us* [Video provided to Court] | |
| **THE PARTIES** | | |
| Par. 23 n.5 | *Florida Man's Cocaine Odyssey Retold in Netflix Documentary*, St. Augustine Record, Apr. 1, 2019 | P-APP000005-000007 |
| Par. 23 n.6 | *Netflix's Big Mouth Will Premiere Florida Themed Episode at O Cinema South Beach*, Miami New Times, Oct. 1, 2019 | P-APP000008-000010 |
| Par. 23 n.7 | *Netflix Subscribers Drop Hints at Streaming-Service Fatigue*, Tampa Bay Times, July 18, 2019 | P-APP000011-000020 |
| Par. 24 n. 8 | About – Ava DuVernay (www.avaduvernay.com) | P-APP000021 |
| Par. 25 n. 9 | About – Attica Locke (www.atticalocke.com) | P-APP000022 |
| **II. BACKGROUND: THE 1989 "CENTRAL PARK JOGGER" CASE** | | |
| Par. 43 n. 11, 13 | *Settlement Is Approved in Central Park Jogger Case, but New York Deflects Blame*, N.Y. Times, Sept. 5, 2014 | P-APP000023-000024 |
| **III. When They See Us: The False and Defamatory Portrayal of Ms. Fairstein** | | |
| Par. 47 n. 14 | Jumaane Williams calls for reopening of Linda Fairstein Cases [Video provided to Court] | |

| A.1. The Crime Scene: Morning of April 20, 1989 | | |
|---|---|---|
| Par. 55 n. 17 | 11/13/89 Suppression Hearing Testimony of ADA L. Fairstein (NYCLD_015187, NYCLD_015197-NYCLD_015198) | P-APP000025-000034 |
| | M. Sheehan 5/9/13 Dep. Tr. (NYCLD_044145-NYCLD_044147) | |
| | W. Roe 11/22/11 Dep. Tr., (NYCLD_060899-NYCLD_060902) | |
| Par. 55 n. 18 | 10/25/89 Suppression Hearing Testimony of Det. M. Sheehan (NYCLD_018954-018956) | P-APP000035-000037 |
| Par. 56 n. 19 | 11/2/90 Testimony of Det. R. Honeyman, Richardson/Wise Trial (NYCLD_019626- NYCLD_19650) | P-APP000038-000065 |
| | 7/2/90 Testimony of PO E. Reynolds, McCray, Salaam, Santana Trial (NYCLD_023705-NYCLD_02370) | |
| Par. 56 n. 20 | 7/2/90 Testimony of PO E. Reynolds, McCray, Salaam, Santana Trial (NYCLD_023569-NYCLD_023572, NYCLD_023597-NYCLD_023607, NYCLD_023612-NYCLD_023614, NYCLD_023669) | P-APP000066-000088 |
| | 8/6/90 Testimony of ADA L. Fairstein, McCray, Salaam, Santana Trial (NYCLD_015465-NYCLD_015468) | |
| A.2. 24th Precinct: Morning of April 20, 1989 | | |
| Par. 57 n. 21 | 8/6/90 Testimony of ADA L. Fairstein, McCray, Salaam, Santana Trial (NYCLD_015465- NYCLD_015468) | P-APP000089-000092 |
| Par. 58 n. 22 | 7/2/90 Testimony of PO E. Reynolds, McCray, Salaam, Santana Trial | P-APP000093-000318 |
| Par. 58. n. 23 | 10/25/89 Suppression Hearing Testimony of Det. M. Sheehan (NYCLD_018976-NYCLD_018985) | P-APP000319-000338 |
| | 10/27/89 Suppression Hearing Testimony of Det. M. Sheehan (NYCLD_019008-NYCLD_019017) | |
| A.3. Creating A Press Narrative: April 20, 2019 | | |
| Par. 60. n. 24 | L. Fairstein 4/23/13 Dep. Tr., (NYCLD_039089-NYCLD_039094) | P-APP000339-000348 |

|  | Testimony of ADA L. Fairstein, McCray, Salaam, Santana Trial (NYCLD_015464-NYCLD_015467) |  |
|---|---|---|
| **A.4. Interrogating Unaccompanied Minors About "Wilding"** | | |
| Par. 64 n. 25 | 7/2/90 Testimony of PO E. Reynolds, McCray, Salaam, Santana Trial (NYCLD_023530-NYCLD_23541, NYCLD_23593-23596, NYCLD_023625-NYCLD_023648) | P-APP000349-000388 |
| Par. 64 n. 26 | 8/6/90 Testimony of ADA L. Fairstein, McCray, Salaam, Santana Trial (NYCLD_015433, NYCLD_015464-NYCLD_015467) | P-APP000389-000402 |
|  | 7/2/90 Testimony of PO E. Reynolds, McCray, Salaam, Santana Trial (NYCLD_023612-NYCLD_023614) |  |
|  | L. Fairstein 4/23/13 Dep. Tr. (NYCLD_039089-NYCLD_039094) |  |
| Par 64 n. 27 | 7/2/90 Testimony of PO E. Reynolds, McCray, Salaam, Santana Trial (NYCLD_023612-NYCLD_023614) | P-APP000403-000405 |
| Par. 64 n. 28 | 11/8/89 Suppression Hearing Testimony of Det. H. Arroyo, (NYCLD_017516-NYCLD_017517, NYCLD_017529-NYCLD_017531) | P-APP000406-000410 |
| Par. 64 n. 29 | 7/16/90 Testimony of Det. H. Arroyo, McCray, Salaam, Santana Trial (NYCLD_017753-NYCLD_017756) | P-APP000411-000414 |
| Par. 67 n. 31 | J. Farrell 2/22/13 Dep. Tr. (NYCLD_058208-NYCLD_058212) | P-APP000415-000419 |
| Par. 69 nn. 32, 33 | 0/16/89 Suppression Hearing Testimony of PO R. Powers, (NYCLD_024495-NYCLD_024496) | P-APP000420-000421 |
| Par. 69 n. 34 | 10/16/19 Suppression Hearing Testimony of PO R. Powers, (NYCLD_024466-NYCLD_024499, NYCLD_024546-024547) | P-APP000422-000499 |
|  | 10/13/89 Suppression Hearing Testimony of PO E. Reynolds (NYCLD_023067-023101, NYCLD_023219) |  |
|  | L. Fairstein 4/23/13 Dep. Tr. (NYCLD_039089-NYCLD_039094) |  |
| Par. 70 n. 35, 36 | 10/16/19 Suppression Hearing Testimony of PO R. Powers, (NYCLD_024498-NYCLD_024506, NYCLD_024507-NYCLD_024512) | P-APP000500-000514 |

| Par. 70 n. 37 | A. McCray 4/2/13 Dep. Tr. (NYCLD_046476-NYCLD_046507) | P-APP000515-000546 |
|---|---|---|
| Par. 70 n. 38 | 10/13/89 Suppression Hearing Testimony of PO E. Reynolds (NYCLD_023129, NYCLD023136-NYCLD_023139) | P-APP000547-000565 |
| | E. Reynolds 7/20/11 Dep. Ex. 11 | |
| | Farrell Dep. Ex. 2 (NYCLD_058344, NYCLD_058348-NYCLD_058349) | |
| | Farrell Dep. Ex. 4 (NYCLD_058353-058354) | |
| Par. 72 n. 39 | 10/13/89 Suppression Hearing Testimony of PO E. Reynolds (NYCLD_023141-023145)<br><br>E. Reynolds 7/20/11 Dep. Ex. 11 (NYCLD_057950-NYCLD_057951) | P-APP000566-000606 |
| | Farrell Dep. Ex. 4 (NYCLD_058353-NYCLD_058354) | |
| | A. McCray 4/2/13 Dep. Tr. (NYCLD_046476-NYCLD_046507) | |
| Par 74 n. 40 | *Jogger's Attackers Terrorized At Least 9 In 2 Hours*, N.Y. Times, Apr. 22, 1989 | P-APP000607-000611 |
| Par 74 n. 41 | *What is wilding; How the Central Park Five Changed the History of American Law; Ava DuVernay Focuses on the central park 5's perspective: now people know,* oxygen.com, May 31. 2019 | P-APP000612-000672 |
| Par 75 n. 42 | NPR: Ava DuVernay Focuses on the Central Park 5's Perspective Now People Know | P-APP000673-000713 |
| **A.5. Putting Together a Timeline** | | |
| Par 78 n. 43 | J. Farrell 2/22/13 Dep. Tr. (NYCLD_058208-NYCLD_058212) | P-APP000714-000718 |
| Par 78 n. 44 | 10/13/89 Suppression Hearing Testimony of PO E. Reynolds (NYCLD_023104-NYCLD_023106, NYCLD_023117-NYCLD_023129, NYCLD_023216-NYCLD_023222, NYCLD023257-NYCLD_023266, NYCLD_023268-NYCLD_23270, NYCLD-023274-NYCLD_023276) | P-APP000719-000757 |
| Par 80 n. 45 | J. Farrell 2/22/13 Dep. Tr. (NYCLD_058208-NYCLD_058212) | P-APP000758-000766 |

| | G. Whelpley 10/12/11 Dep. Tr. (NYCLD_058056-58059) | |
|---|---|---|
| Par 81 n. 46 | 10/25/89 Suppression Hearing Testimony of Det. M. Sheehan (NYCLD_018954-018959, NYCLD_018963-018964, NYCLD_018981-NYCLD_018994) | P-APP000767-000788 |
| Par 81 n. 47 | 10/25/89 Suppression Hearing Testimony of Det. M. Sheehan (NYCLD_018954-NYCLD_018994)<br>M. Sheehan 5/9/13 Dep. Tr. (NYCLD_044001-NYCLD_044147) | P-APP000789-000976 |
| Par 82 n. 48 | 8/6/90 Testimony of ADA L. Fairstein, McCray, Salaam, Santana Trial (NYCLD_015468-NYCLD_015469)<br><br>7/2/90 Testimony of PO E. Reynolds, McCray, Salaam, Santana Trial (NYCLD_023612-NYCLD_023614)<br><br>10/13/89 Suppression Hearing Testimony of PO E. Reynolds, (NYCLD_023129, NYCLD023136-NYCLD_023145)<br><br>7/20/11 E. Reynolds Dep. Ex. 11<br><br>11/8/89 Suppression Hearing Testimony of Det. H. Arroyo, (NYCLD_017528-NYCLD_17531)<br><br>7/16/90 Testimony of Det. H. Arroyo, McCray, Salaam, Santana Trial (NYCLD_017753-NYCLD_017756)<br><br>11/13/90 Testimony of Det. J. Hartigan, Richardson/Wise Trial (NYCLD_018270-NYCLD_018281, NYCLD_018334-18337, NYCLD_018356, NYCLD_018359-NYCLD_018360, NYCLD_018390-NYCLD_018392, NYCLD_018396-018397, NYCLD0018411-NYCLD0018414)<br><br>7/25/90 Testimony of Det. M. Sheehan, McCray, Salaam, Santana Trial (NYCLD_019175-019178, NYCLD_019204-NYCLD_019205)<br><br>10/25/89 Suppression Hearing Testimony of Det. M. Sheehan (NYCLD_018954-018958, NYCLD_018963-NYCLD_018964) | P-APP000977-001082 |

| | | |
|---|---|---|
| | 10/25/89 Suppression Hearing Testimony of Det. J. Taglioni (NYCLD_06915-06933)<br><br>10/24/89 Suppression Hearing Testimony of Det. H. Hildebrandt (NYCLD016983-NYCLD017000)<br><br>Farrell Dep. Ex. 4 (NYCLD_058353-058354) | |
| Par 82 n. 49 | A. Clements 4/4/13 Dep. Tr. (NYCLD_035224-NYCLD_035225, NYCLD_035230-NYCLD_035232)<br><br>L. Fairstein 4/23/13 Dep. Tr. (NYCLD_39129-NYCLD_39133) | P-APP001083-001092 |
| Par 84 n. 50 | E. Lederer 7/24/13 Dep. Tr. (NYCLD_036699-NYCLD_036723); Ex. 27 | P-APP001093-001118 |
| Par 85 n. 52 | R. Nugent 11/19/10 Dep. Tr. (NYCLD_044971-044973) Report to Police Commissioner, Ex. F, Timeline Chart (NYCLD_031921-031923) | P-APP001119-001121 |
| Par 8 n. 53 | A. Clements 4/4/13 Dep. Tr. (NYCLD_035308-NYCLD_035314)<br><br>Suppression HearingTestimony of ADA L. Fairstein<br>Trial Testimony of L. Fairstein | P-APP001122-001588 |
| **A.6. Fighting with Nancy Ryan Over Who Would Prosecute Case** | | |
| Par 89 n. 54 | 8/6/90 Testimony of ADA L. Fairstein, McCray, Salaam, Santana Trial (NYCLD_015433-15435) | P-APP001589-001591 |
| Par 92 n. 55 | L. Fairstein 4/23/13 Dep. Tr. (NYCLD_039089-NYCLD_039112)<br><br>A. Clements 4/4/13 Dep. Tr. (NYCLD_035217-NYCLD_035225) | P-APP001592-001624 |
| Par 93 n. 56 | Ex. E to Article 78 Petition For A Judgment Requiring Justice Charles Tejada To Vacate Petitioner's Judgments of Conviction, Nancy Ryan's Affirmation In Response to Motion to Vacate Judgment of Conviction, December 5, 2002. | P-APP001625-001659 |
| Par 96 n. 57 | DuVernay Tweet: "Franke played Nancy Ryan beautifully…" | P-APP001660-001662 |

| A.7. Calling for A Roundup of Young, Black "Thugs | | |
|---|---|---|
| Par 98 n. 59 | 7/2/90 Testimony of PO E. Reynolds, McCray, Salaam, Santana Trial (NYCLD_023569-NYCLD023572, NYCLD_023600, NYCLD_023602-023605, NYCLD_023612-NYCLD_023614)<br><br>10/13/89 Suppression Hearing Testimony of PO E. Reynolds (NYCLD_023129-NYCLD_023131, NYCLD023136-NYCLD_023145)<br><br>7/20/11 E. Reynolds Dep. Ex. 11<br><br>11/8/89 Suppression Hearing Testimony of Det. H. Arroyo, (NYCLD_017528-NYCLD_17531)<br><br>7/16/90 Testimony of Det. H. Arroyo, McCray, Salaam, Santana Trial (NYCLD_017753-NYCLD_017756)<br><br>11/13/90 Testimony of Det. J. Hartigan, Trial of K. Richardson and K. Wise (NYCLD_018270-NYCLD_018281, NYCLD_018334-18337, NYCLD_018356, NYCLD_018359-NYCLD_018360, NYCLD_018390-NYCLD_018392, NYCLD_018396-018397, NYCLD0018411-NYCLD0018414)<br><br>7/25/90 Testimony of Det. M. Sheehan, McCray, Salaam, Santana Trial (NYCLD_019175-019178, NYCLD_019204-NYCLD_019205)<br><br>10/25/89 Suppression Hearing Testimony of Det. Michael Sheehan (NYCLD_018954-018958, NYCLD_018963-NYCLD_018964)<br><br>10/25/89 Suppression Hearing Testimony of Det. J. Taglioni (NYCLD_06915-06933)<br>10/24/89 Suppression Hearing Testimony of Det. H. Hildebrandt (NYCLD016983-NYCLD017000)<br><br>Farrell Dep. Ex. 4 (NYCLD_058353-058354) | P-APP001663-001777 |
| Par 99 n. 61 | 10/13/89 and 10/16/89 Suppression Hearing Testimony of E. Reynolds<br><br>7/2/90 Testimony of E. Reynolds, Trial of McCray, Salaam and Santana | P-APP001778-002201 |
| Par 99 n. 62 | 7/23/90 Testimony of J. Taglioni, McCray, Salaam and Santana Trial (NYCLD_018540-NYCLD_018546, | P-APP002202-002227 |

| | NYCLD_018573)<br><br>10/25/89 Suppression Hearing Testimony of Det. J. Taglioni (NYCLD_06906-NYCLD_06918)<br><br>11/17/89 Suppression Hearing Testimony of K. Wise (NYCLD_06985-NYCLD_06989) | |
|---|---|---|
| Par 100 n 63 | E. Reynolds 7/20/11 Dep. Tr. (NYCLD_057663-NYCLD_057668)<br><br>10/13/89 Suppression Hearing Testimony of E. Reynolds (NYCLD_23070-NYCLD_23081)<br><br>7/ /90 Trial Testimony of E. Reynolds, McCray, Salaam and Santana Trial (NYCLD_023497-NYCLD_023501) | P-APP002228-002250 |
| Par 100 n 64 | E. Reynolds 7/20/11 Dep. Tr. (NYCLD_057663-NYCLD_057668) | P-APP002251-002256 |
| Par 101 n 65 | 10/13/89 Suppression Hearing Testimony of PO E. Reynolds, (NYCLD_23080-NYCLD_23106)<br><br>7/2/90 Testimony of E. Reynolds, McCray, Salaam, and Santana Trial (NYCLD_023501-NYCLD_023529)<br><br>E. Reynolds 7/20/11 Dep. Tr. (NYCLD_057669-NYCLD_057689) | P-APP002257-002333 |
| Par 101 n 66 | 10/13/89 Suppression Hearing Testimony of PO E. Reynolds, at NYCLD_023141-023145. *See also* E. Reynolds<br>Dep. Ex. 11; *See* Farrell Dep. Ex. 2 (NYCLD_058344, NYCLD_058348-NYCLD_058349)<br><br>Farrell Dep. Ex. 4<br><br>11/8/89 Suppression Hearing Testimony of Det. H. Arroyo (NYCLD_017357-017358)<br><br>10/25/89 Suppression Hearing Testimony of Det. John Taglioni (NYCLD_006906-NYCLD_006918) | P-APP002334-002367 |
| Par 101 n 67 | 10/16/89 Suppression Hearing Testimony of PO R. Powers, (NYCLD_024466-NYCLD_024499, NYCLD_024546-024547)<br>10/13/89 Suppression Hearing Testimony of PO E. Reynolds (NYCLD_023067-023101, NYCLD_023219) | P-APP002368-002445 |

| | | |
|---|---|---|
| | L. Fairstein 4/23/13 Dep. Tr. (NYCLD_039089-NYCLD_039094) | |
| Par 103 n. 68 | Article: *The Racially Charged Meaning Behind the Word "Thug,"* NPR, All Things Considered, April 30, 2015 | P-APP002446-002476 |
| **A.8. Telling Officers "No Kid Gloves Here"** | | |
| Par 105 n. 69 | 10/13/89 Suppression Hearing Testimony of E. Reynolds (NYCLD_23080-NYCLD_23116)<br><br>7/2/90 Testimony of E. Reynolds, McCray, Salaam, Santana Trial (NYCLD_023501-NYCLD_023529, NYCLD_023612-NYCLD_023614)<br><br>E. Reynolds 7/20/11 Dep. Tr. (NYCLD_057669-NYCLD_057691)<br><br>11/28/90 Testimony of J. Hartigan, Trial of K. Richardson and K. Wise (NYCLD_018270-NYCLD_018273)<br><br>11/8/89 Suppression Hearing Testimony of Det. H. Arroyo, (NYCLD_017529-NYCLD_17531)<br><br>7/16/90 Testimony of Det. H. Arroyo, McCray, Salaam, Santana Trial (NYCLD_017753-NYCLD_017756)<br><br>J. Hartigan 11/10/10 Dep. Tr. (NYCLD_037959-NYCLD_037965, NYCLD_037968-NYCLD_037978) | P-APP002477-002597 |
| Par 106 n. 72 | Video Statements of K. Richardson, 4/21/89; A. McCray, 4/21/89; R. Santana, 4/21/89; K. Wise, 4/21/89; S. Lopez, 4/21/89; L. McCall, 4/21/89; C. Thomas, 4/21/89; J. Smith, 4/21/89 (provided to the Court under separate cover) | |
| Par 106 n. 73 | Video Statement of K. Richardson, 4/21/89 (provided to the court under separate cover) | |
| Par 106 n. 74 | K. Richardson 2/1/13 Dep. Tr. (NYCLD_054900) | P-APP002598 |
| **A.9. Directing NYPD Detectives to Coerce Testimony That Fits Ms. Fairstein's Unsupported Theory of the Case** | | |
| Par 110 n. 75 | Merriam Webster's dictionary "dumpster fire" | P-APP002599-002607 |
| Par 116 n. 77 | 8/6/90 Trial Testimony of ADA L. Fairstein, McCray, Salaam, Santana Trial (NYCLD_015468-NYCLD_015469)<br><br>A. Clements 4/4/13 Dep. Tr. (NYCLD_035224, 035230-35232) | P-APP002608-002618 |

| | L.   Fairstein   4/23/13   Dep.   Tr.   (NYCLD_39129-NYCLD_39133) | |
|---|---|---|
| Par 116 n 78 | E. Lederer 7/24/13 Dep. Tr. (NYCLD_036810 NYCLD_036735-NYCLD_036753)<br><br>E.   Lederer   7/17/13   Dep.   Tr.   (NYCLD_036018-NYCLD_036023) | P-APP002619-002644 |
| Par 116 n 79 | E.   Lederer   7/24/13   Dep.   Tr.   (NYCLD_036691-NYCLD_036695) | P-APP002645-002649 |
| **B. Part Two** | | |
| Par 119 n. 80 | 11/9/90 Testimony of M. Veit, Richardson/Wise Trial, (NYCLD_022274-NYCLD_022275,   NYCLD022313-NYCLD0022318)<br><br>7/18/90 Testimony of M. Veit, McCray, Salaam, Santana Trial (NYCLD_022239-NYCLD_022243) | P-APP002650-002662 |
| Par 119 n. 81 | Letter   to   T.   Galligan   from   E.   Lederer,   3/29/90 (NYCLD_000318) | P-APP002663 |
| Par 119 n. 82 | 4/5/90   Pre-Trial   Hearing   Tr.   (NYCLD_006313-NYCLD_006314)<br><br>4/2/90 Pre-Trial Hearing Tr. (NYCLD_006642-6654) | P-APP002664-002678 |
| Par 119 n. 83 | 4/5/90   Pre-Trial   Hearing   Tr.   (NYCLD_006313-NYCLD_006314)<br><br>4/2/90 Pre-Trial Hearing Tr. (NYCLD_006642-6654) | P-APP002679-002693 |
| Par 119 n. 84 | 5/25/90 FBI Report re DNA Analysis (NYCLD_009083) | P-APP00 |
| Par 119 n. 85 | 6/5/90 Correspondence from E. Lederer to Defense Counsel, NYCLD_000330, NYCLD_000363,NYCLD_000345 | P-APP002694-002696 |
| Par 119 n. 86 | Transcript of Opening Statement for the People, 6/25/90, (NYCLD_013824-NYCLD_013825)<br><br>Transcript of Opening Statement for the People, 10/22/90, (NYCLD_013869) | P-APP002697-002699 |
| Par 119 n. 87 | 7/18/90 Testimony of M. Veit, McCray, Salaam, Santana Trial, (NYCLD_022239-NYCLD_022243)<br><br>11/9/90 Testimony of M. Veit, Richardson/Wise Trial (NYCLD_022274-NYCLD_022275, NYCLD022313-NYCLD0022318) | P-APP002700-002716 |

| | 7/13/90 Testimony of D. Adams, McCray, Salaam, Santana Trial, (NYCLD_020968-NYCLD_020969) | |
| | 11/5/90 Testimony of D. Adams, Richardson/Wise Trial, (NYCLD_021021-021022) | |
| Par 123 n. 88 | A. Clements 4/4/13 Dep. Tr. (NYCLD_035309-035314) | P-APP002717-002722 |
| Par 123 n. 89 | E. Lederer 7/24/13 Dep. Tr. (NYCLD_036691-NYCLD_036696) | P-APP002723-002728 |
| Par 123 n. 90 | E. Lederer 7/24/13 Dep. Tr. (NYCLD_036695)<br><br>E. Lederer 7/17/13 Dep. Tr. (NYCLD_036018-NYCLD_036023 NYCLD_036121-NYCLD_036125) | P-APP002729-002740 |
| Par 123 n. 91 | 8/6/90 Testimony of ADA L. Fairstein, McCray, Salaam, Santana Trial (NYCLD_015468)<br><br>A. Clements 4/4/13 Dep. Tr. (NYCLD_035224, 035230-35232)<br><br>L. Fairstein 4/23/13 Dep. Tr. (NYCLD_39129-NYCLD_39133)<br><br>Video Statements of K. Richardson, 4/21/89; A. McCray, 4/21/89; R. Santana, 4/21/89; K. Wise 4/21/89; S. Lopez 4/21/89; L. McCall 4/21/89; C. Thomas 4/21/89; J. Smith 4/21/89 (provided to the Court under separate cover) | P-APP002741-002750 |
| Par. 124 n. 92 | 7/13/90 Testimony of D. Adams, McCray, Salaam, Santana Trial (NYCLD_020968-NYCLD_020969)<br><br>11/5/90 Testimony of D. Adams, Richardson/Wise Trial (NYCLD_021021-021022) | P-APP002751-002754 |
| Par. 125 n. 93-95 | E. Lederer 7/17/13 Dep. Tr. (NYCLD_035940-NYCLD_035941) | P-APP002755-002758 |
| **2. Ms. Fairstein's Email Correspondence with Ms. DuVernay's Colleague** | | |
| Par. 137 n. 96 | Email correspondence between L. Fairstein and J. Rosenthal, June 7, 2016. | P-APP002759-002761 |
| **4. Post-Premiere Misrepresentations About Ms. Fairstein** | | |
| Par 145 n. 97 | *Central Park Five Prosecutor Wouldn't Consult on Netflix Show if Producers Spoke to Accused Men*, Variety, June 9, 2019 | P-APP002762-002801 |
| Par 146 n. 98 | Collection of News Articles Regarding *When They See Us* and Linda Fairstein | P-APP002802-002832 |
| **B. Netflix is Placed on Notice in 2017** | | |

| Par 148 n. 99 | *Ava DuVernay Bringing Central Park Five Limited Series to Netflix*, Variety, July 6, 2017 | P-APP002833-002834 |
|---|---|---|
| **V. Ms. Locke's Efforts to Strip Ms. Fairstein of Her Mystery Writers of America Award** | | |
| Par 153 n. 101-108 | Locke Twitter chain to Edgar Awards | P-APP002835 |
| Par 154 n. 109 | Locke Twitter re Prosecutor nor Investigator | P-APP002836-002838 |
| Par 155 n. 110-111 | Locke Tweet re Called out mystery writers of America Locke tweet re "actually I think good night here is the sun setting on all the years…" | P-APP002839 |
| Par 156 n. 112 | Locke tweet re "Ava's CP5 project hasn't aired yet" | P-APP002840 |
| Par 158 n. 113 | MWA 11/29/18 Press release "Mystery Writers of America Withdraws Fairstein Award | P-APP002841-002844 |
| Par 160 n. 114 | *A literary Group Recinds Award for Linda Fairstein, Amid Outcry Over Her Role in Central Park Five Case*, Bustle, Nov. 29, 2018 | P-APP002845-002849 |
| Par 161 n. 115 | Collection of Articles regarding MWA Award | P-APP002850-002887 |
| Par 162-163 n. 116-118<br>Par 301 n. 201<br>Par 323 n. 214 | Locke twitter thread re "If you think Linda Fairstein acted professionally…" | P-APP002888 |
| **VI. Defendants' Assertions That When They See Us Is a True Story** | | |
| Par 165 n. 119 | When They See Us teaser video (Video provided to court) | |
| Par 167 n. 120 | When They See Us official Trailer (Video provided to court)<br><br>*The Trailer for Ava DuVernay's Central Park Five Series When They See Us is Deeply Unsettling*, The Palm Beach Post, April 19, 2019 | P-APP002889-002890 |
| **A.  Ms. DuVernay's Statements** | | |
| Par 171 n. 121 | DuVernay Instagram post with trailer | P-APP002891 |
| Par 172 n. 122 | DuVernay Tweet re "I wish it was fiction too" | P-APP002892 |
| Par 173 n. 123 | DuVernay tweet re "The Story You know is the lie they told you" | P-APP002893 |
| Par 174 n. 124 | DuVernay Rolling Stone Interview | P-APP002894-002901 |
| Par 175 n. 125 | DuVernay tweet re "The story you know…"  [Included on Flash Drive] | P-APP002902-002903 |
| Par 176 n. 126 | DuVernay tweet re "Not Drama. 100% real…" | P-APP002904 |
| Par 177 n. 127 | DuVernay tweet re "the incredible work of @atticalocke…" | P-APP002908 |
| Par 178 n. 128 | DuVernay tweet re "Franke played Nancy Ryan beautifully.." | P-APP002909 |
| Par 179 n. 129 | DuVernay Interview with The Daily Beast | P-APP002917-002942 |

| Par 180 n. 130 | DuVernay Reese Witherspoon Retweet re "What an extraordinary telling…" | P-APP002914 |
| Par 181 n. 131 | DuVernay retweet of meme of Joan Collins | P-APP002943 |
| Par 183 n. 132 | DuVernay tweet "Its their time…" | P-APP002947 |
| Par 184 n. 133 | DuVernay tweet "Imagine believing the world doesn't care about real stories…" | P-APP002948-002949 |
| **B. Ms. Locke's Statements** | | |
| Par 187 n. 134 | Locke Instagram post re "Friday! A piece of American History gets rewritten with the truth.." | P-APP002950-00 |
| Par 188n. 135 | Article: Inside the Controversy About Linda Fairstein, Central Park 5 Prosecutor Played by Felicity Huffman | P-APP002951-002953 |
| Par 188 n. 136 | Locke tweet People Magazine Article re "Inside the Controversy About Linda Fairstein, Central Park 5 Prosecutor" | P-APP002954-002956 |
| Par 191 n. 137 | *Before, and After, the Jogger Survivors of the real 'Central Park Five' attacker speak for the first time*, The Cut, June 3, 2019 | P-APP002957-002982 |
| Par 191 n. 138<br>Par 325 n. 217 | Locke tweet re "The blood is on Linda Fairstein's hands" | P-APP002983 |
| Par 191 n. 139<br>Par 325 n. 218 | Locke tweet re "These women deserved better from NYPD" | P-APP002984 |
| Par 192 n. 140 | Locke tweet re "The Central Park Five were not involved…" | P-APP002985 |
| Par 194 n. 141 | Locke tweet re "I am generally someone…" | P-APP002986 |
| Par 195 n. 142<br>326 n. 219 | Locke tweet re "This morning she showed us exactly why.." | P-APP002987 |
| Par 196 n. 143 | Psychology Today blog, 11 Warning Signs of Gaslighting | P-APP002988-002993 |
| Par 196 n. 144<br>167 | *DuVernay Responds to Trump's Lates Central Park Five Comments*, Florida Courier, June 19, 2019 | P-APP002995-3000 |
| Par 197 n. 145 | Locke Tweet re "Just found these…" | P-APP003001 |
| **C. Netflix's Statements** | | |
| Par 200 n. 146 | Netflix tweet re "official trailer" | P-APP003007 |
| Par 201 n. 147 | Netflix tweet re "The truth is coming out" | P-APP003008 |
| Par 203 n. 149 | Netflix tweet re "Time for the truth to be told" | P-APP003009 |
| Par 204 n. 150 | Netflix tweet re "Its time for the truth" | P-APP003006 |
| Par 205 n. 151 | Netflix tweet re "Its almost time to witness the power of truth" | P-APP003010 |
| Par 206 n. 152 | Netflix tweet re "False rhetoric that is due to be overturned" | P-APP003011 |
| Par 207 n. 153 | Netflix tweet re "There's power in the truth" | P-APP003012 |
| Par 208 n. 154 | Netflix tweet re "You're in luck, we shed light on the truth May 31st" | P-APP003013 |
| Par 209 n. 155 | Netflix tweet re "We're here to speak the truth" | P-APP003014 |
| Par 210 n. 156 | Netflix tweet re "We are ready to share the truth" | P-APP003015 |
| Par 211 n. 157 | Netflix tweet re "Their truth will finally be revealed" | P-APP003016 |
| Par 213 n. 158 | Netflix tweet re "It is even more of a reason to share their truth" | P-APP003017 |

| Par 214 n. 159 | Netflix tweet re "This story is real, but please watch at your own pace" | P-APP003018 |
|---|---|---|
| Par 215 n. 160 | Netflix post re "Shedding light on the truth" | P-APP003019 |
| Par 216 n. 161 | Netflix tweet re "here's power in truth. What did you learn in watching.." | P-APP003020 |
| Par 217 n. 162 | Netflix tweet re "The true story for all to hear" | P-APP003021 |
| Par 218 n. 163 | Netflix tweet re "This might have been the greatest thing to touch Netflix' | P-APP003022 |
| Par 220 n. 164 | *When They See Us and Chernobyl Prove Truth is Stronger Than Fiction*, Vanity Fair, Aug. 28, 2019 | P-APP003023-003029 |
| **VIII. The Public's Response to When They See Us and Ms. Fairstein's Resulting Damages** | | |
| Par 232 n. 165 | *Who's the Villain in 'When They See Us'?*, Rolling Stone, June 8, 2019 | P-APP003033-003036 |
| Par 233 n. 166 | *Linda Fairstein, Once Cheered, Faces Storm After 'When They See Us'*, New York Times, June 6, 2019 | P-APP003037-003040 |
| Par 234 n. 167 | *Article DuVernay Responds to Trumps Latest Central Park Five Comments* | P-APP003056-003064 |
| **A.#CancelLindaFairstein** | | |
| Par 236 n. 169 | *Obama on Call-Out Culture: 'That's Not Activism'*, New York Times, October 31, 2019 | P-APP003065-003067 |
| Par. 237 n. 170 | Justice Round Table. Message From Ava DuVernay | P-APP003030-003032 |
| Par 238 n. 171 | *When They See Us Sparked a Boycott Against Central Park Five Prosecutor Linda Fairstein*, Esquire, June 7, 2019 | P-APP003041-003055 |
| Par 238 n. 172 | Locke tweet re "we get justice where we can" | P-APP003068 |
| Par 239 n. 173 | Locke tweet re "she also described the #CancelLindaFairstein movement." | P-APP003069-003072 |
| **1.  Ms. Fairstein's Books and Publishing Agreements** | | |
| Par 241 n. 174 | Petition to remove Ms. Fairstein's books from Amazon, Barnes and Noble, and other booksellers; platforms | P-APP003073-003089 |
| Par 242 n. 175 | Petition to remove Ms. Fairstein's books from all retailers | P-APP003090-003106 |
| | *Central Park Five film sparks call to boycott ex-prosecutor Linda Fairstein's books*, L.A. Times, June 6, 2019 | |
| Par 243 n. 176 | Petition re Color of Change.org urging Simon and Schuster to drop Ms. Fairstein | P-APP003107-003110 |
| Par 244 n. 177 | *Publisher drops Central Park Five prosecutor Linda Fairstein*, Herald Tribune, June 8, 2019 | P-APP003111-003116 |
| | *Publisher drops Central Park Five prosecutor Linda Fairstein*, AP News, June 7, 2019 | |
| Par 246 n. 178 | *Linda Fairstein Dropped By Hollywood Literary Agency Amid 'When They See Us' Backlash*, Essence, June 12, 2019 | P-APP003117-003119 |

| **2. Calls to Reopen Ms. Fairstein's Cases** | | |
|---|---|---|
| Par 247 n. 179 | Petition asking Vance to reopen all of Ms. Fairstein's cases | P-APP003120-003126 |
| Par 248 n. 180 | *Central Park Five: Decision Not to Re-Open Linda Fairstein Case Blasted as a 'Disgrace'*, Newsweek, June 18, 2019 | P-APP003127-003132 |
| Par 249 n. 181 | Color of Change petition to District Attorney Vance | P-APP003133-003135 |
| Par 249 n. 182 | News Broadcast, Jumaane Williams Calls for Reopening of Linda Fairstein Cases, WPIX 11, Video (Provided to Court Under Separate Cover) | |
| **3. Vassar College** | | |
| Par 250 n. 183 | Petition to remove Ms. Fairstein from Vassar College's Board of Trustees | P-APP003136-003153 |
| Par 252 n. 185 | Announcement, President of Vassar College | P-APP003154-003155 |
| Par 252 n. 186 | News Reports Concerning Ms. Fairstein's resignation from Vassar College's Board of Trustee's | P-APP003156-003170 |
| **D. Glamour's 1993 Woman of the Year Award** | | |
| Par 255 n. 187 | Letter From the Editor, *A Note on Linda Fairstein's 1993 Woman of the Year Award*, Glamour, June 4, 2019 | P-APP003171-003172 |
| Par 257 n. 188-189 | Articles concerning Amy Klobuchar and Elizabeth Warren | P-APP003173-003184 |
| Par 259 n. 190 | Where is Netflix Available? | P-APP003199 |
| | *Central Park 5 series will break your heard—and make you mad*, Miami Herald, June 11, 2019 | P-APP003201-3207 |
| Par 138-144, 148-151 | 7/11/17 Skadden Arps Memo | P-APP003210-003268 |
| Par 237 | Various tweets about Linda Fairstein | P-APP003269-003286 |

Skip Main Navigation

Menu

The Official Website of the City of New York

Text Size

Select Language ▼

Powered by Google Translate

Search Search   Search

# Secondary Navigation

Mayor First Lady News Officials

# Statements of Mayor de Blasio and Corporation Counsel Zachary W. Carter on Central Park Five Settlement

September 5, 2014

**NEW YORK** – Mayor de Blasio and Corporation Counsel Zachary W. Carter released the following statements on the approval by a federal judge of the $41 million settlement in the Central Park Five case:

*Statement from Mayor de Blasio:*

"This settlement is an act of justice for those five men that is long overdue. The City had a moral obligation to right this injustice—which is why, from Day One, I vowed to settle this case. I commend the Law Department, led by Corporation Counsel Zachary W. Carter, for its efforts to reach a fair resolution of this matter that takes into account all relevant legal factors. With today's approval by a federal judge, we can finally put this case behind us, and these five men and their families can begin to heal these wounds and move forward."

*Statement from Corporation Counsel Zachary W. Carter*

"More than 10 years ago, the New York District Attorney moved to vacate the convictions of the young men who came to be known as the Central Park Five, after a review of the case prompted by statements of an individual who claimed sole responsibility for the brutal rape of a female jogger that was the centerpiece of the prosecution. DNA evidence conclusively linked that individual to the rape of the jogger. There was no DNA or other scientific evidence that implicated any of the five young men ultimately convicted of the rape.

"To the extent that the evidence suggests that these five young men were wrongfully convicted and sentenced to substantial prison terms for a crime they did not commit, that in and of itself constitutes an injustice in need of redress. Toward that end, we have reached an agreement to settle this case. This agreement should not be construed as an acknowledgment that the convictions of these five plaintiffs were the result of law enforcement misconduct. On the contrary, our review of the record suggests that both the investigating detectives and the Assistant District Attorneys involved in the case acted reasonably, given the

P-APP000001

circumstances with which they were confronted on April 19, 1989 and thereafter. In the end, however, that is an issue that would ultimately be determined by a jury at trial, absent a settlement of this litigation. We have determined that a resolution of this matter is in the best interests of the City."

*pressoffice@cityhall.nyc.gov*

*(212) 788-2958*

P-APP000002

Case 2:20-cv-00189-JLB-MRM Document 46 Filed 07/01/20 Page 18 of 194 PageID 994

The New York Times | https://nyti.ms/1pxo5r5

# Settlement Is Approved in Central Park Jogger Case, but New York Deflects Blame

**By Benjamin Weiser**

Sept. 5, 2014

A $41 million settlement for five men whose convictions in the 1989 beating and rape of a female jogger in Central Park were later overturned was made final on Friday, with the deal including unusual language that sought to absolve New York City from blame.

The agreement, which awards the five black and Hispanic plaintiffs about $1 million for each year of their imprisonment, includes no admission of wrongdoing from the city; in fact, the city explicitly asserts that prosecutors and police detectives did nothing wrong at the time.

"The City of New York has denied and continues to deny that it and the individually named defendants have committed any violations of law or engaged in any wrongful acts concerning or related to any allegations that were or could have been alleged," the settlement states.

The city's corporation counsel, Zachary W. Carter, later amplified the city's stance, saying that the agreement "should not be construed as an acknowledgment that the convictions of these five plaintiffs were the result of law enforcement misconduct."

"On the contrary," he continued, "our review of the record suggests that both the investigating detectives and the assistant district attorneys involved in the case acted reasonably, given the circumstances with which they were confronted."



Raymond Santana, left, Yusef Salaam, center, and Kevin Richardson, second from right, in June. Chang W. Lee/The New York Times

P-APP000003

The agreement nonetheless brings to a conclusion a long and bitterly contested legal battle that stemmed from the men's arrests and imprisonment in the sensational crime..

The settlement, Mayor Bill de Blasio said in a statement, arose from "a moral obligation to right this injustice."

"This settlement is an act of justice for those five men that is long overdue," he added.

Four of the men — Antron McCray, Kevin Richardson, Yusef Salaam and Raymond Santana Jr. — spent about seven years in prison; each will receive $7.125 million under terms of the deal. The fifth man, Kharey Wise, who served about 13 years, will receive $12.25 million.

One of the plaintiff's lawyers, Jonathan C. Moore, said it was "wonderful this case is finally over for these young men, who maintained their innocence all along." He said the settlement was "some measure of justice, and nobody would deny that, but no amount of money could really compensate them for what they and their families suffered."

Magistrate Judge Ronald L. Ellis approved the settlement on Friday. The city typically denies liability in settling lawsuits but the language in the Central Park settlement goes further than the statements that are often used.

The attack on the jogger, a 28-year-old investment banker, led to sensational news reports and statements by politicians, and served to inflame racial tensions in the city, which was portrayed as a place of lawlessness.

The men, ages 14 to 16 at the time of their arrests, had claimed that incriminating statements they made to the authorities had been coerced. But a judge ruled that the statements were admissible, and the men were convicted in two trials in 1990.

In 2002, the convictions were vacated after the office of the Manhattan district attorney, Robert M. Morgenthau, found DNA and other evidence that the woman had been raped and beaten by another person, Matias Reyes.

The Bloomberg administration had fought the lawsuit, which was filed in 2003; after Mr. de Blasio took office, the city reversed its position. The defendants included former Police Commissioner Raymond W. Kelly and other current and former members of the Police Department and the district attorney's office.

Cyrus R. Vance Jr., the current district attorney, said, "After more than a decade in which numerous parties have investigated and litigated the case, there has been no finding of wrongdoing or unprofessional behavior by any of the prosecutors involved."

In his statement, Mr. Carter seemed to offer a rationale for the settlement while acknowledging that some issues would remain unresolved. "To the extent that the evidence suggests that these five young men were wrongfully convicted and sentenced to substantial prison terms for a crime they did not commit," he said, "that in and of itself constitutes an injustice in need of redress."

He noted that his office's review of the case suggested detectives and prosecutors had acted reasonably. "In the end, however, that is an issue that would ultimately be determined by a jury at trial, absent a settlement of this litigation," he added. "We have determined that a resolution of this matter is in the best interests of the city."

P-APP000004

Case 2:20-cv-00180-JLB-MRM Document 46 Filed 07/01/20 Page 20 of 194 PageID 996



THE ST. AUGUSTINE RECORD
staugustine.com
COVERING THE ANCIENT CITY AND ST. JOHNS COUNTY SINCE 1894

# Florida man's cocaine odyssey retold in Netflix documentary

**By Sarah Nelson | The Gainesville Sun**
Posted Apr 1, 2019 at 1:42 PM

In 2012, Alachua County experienced a crime story almost too strange to be true.

Rodney Hyden of Archer was charged with intent to distribute cocaine after embarking on a treasure hunt to uncover 70 pounds of buried "white gold" in Puerto Rico.

Yet the story behind the arrest proved just as unbelievable. So much so that the plot caught director Theo Love's eye.

And in March, the Alachua County true crime tale made its Netflix debut.

"It's a tale of a campfire story gone wrong," Love said. "It's buried treasure, with a twist."

The story depicted in "The Legend of Cocaine Island" begins in an unassuming way. For years, Hyden and friends passed beers around a campfire, just off the beaten path in Archer. After a few Mason jars of wine, the silver-haired, perpetually-barefoot Julian would repeat a familiar tale. Between 15 and 20 years ago, on the shores of the Pirates of the Caribbean-esque island Culebra, Julian stumbled upon a bale of cocaine. Not knowing what to do, he buried the stash and returned to the States to live in a trailer.

In comes Hyden, a recently riches-to-rags family man hit hard from the Great Recession. After fixating on Julian's story about the $2 million dollars worth of cocaine lying in the sand, he decided to dig it up.

The plot follows Hyden as he devises and attempts the cross-country, drug-running endeavor that resulted in the county sheriff's office busting his plan and a 60-day stint in federal prison.

The Netflix premiere comes at a time when "Florida man" crimes are swarming online meme culture. And Love said when he found this "Southern Fairytale," he couldn't pass it up.

"There was something about Rodney's story that just seemed so absurd," he said.

Love called Hyden one day and asked if he was interested in playing himself on the big screen.

According to Love, Hyden said he's been waiting for someone from Hollywood to approach him, and began to laugh over the phone.

The Los-Angeles based director had never been to Alachua County, but grew fond of the area.

"It's a unique part of America," he said. "A lot of people, when they go to Florida, head to the beach. Central Florida has a lot of interesting aspects."

As for the small town of Archer, Love said the place felt like "a different world" while driving through areas to film.

He recalled driving along a sand road one day when Hyden began to point at something through the trees.

"You see that?" Hyden asked. "That's Julian."

There, within the backdrop of Spanish-moss and branches, stood the "hippie version of Gandalf" himself, as put by Love.

Near the end of the movie, crew members asked Julian to retell his side of the story that created a firestorm.

"It's not my story," Julian said.

They asked whose it is.

"It's not mine," he said with a laugh.

P-APP000005

Case 2:20-cv-00180-JLB-MRM   Document 46   Filed 07/01/20   Page 21 of 194 PageID 997

Since serving time, Hyden has been fulfilling his community service duty at Alachua County's Habitat for Humanity.

He was not speaking to press on the day of the Netflix premiere.

P-APP000006

P-APP000007

# MIAMI New Times®



Get a sneak peek at Big Mouth's third season at O Cinema South Beach Thursday night. / **Netflix**

# Netflix's *Big Mouth* Will Premiere Florida-Themed Episode at O Cinema South Beach

**NICHOLAS OLIVERA**  |  **OCTOBER 1, 2019**  |  **8:30AM**

Netflix's *Big Mouth* is a show about growing up, so its writers regularly use childhood experiences for story material. When the show's staff writer and Miami native Victor Quinaz pitched a spring break episode set in Florida, he had some detailed ideas about how to present his home state.

"[The members of the writing staff] were very open to me speaking very truthfully about my experience there, and sort of the Florida logic and how it aligns with puberty," Quinaz tells *New Times*. "Part of me wanted to show the Florida episode to my friends and family almost as a teaching tool in how insane Florida is."

P-APP000008

Without divulging too much ahead of the episode's premiere at O Cinema South Beach Thursday night, Quinaz suggested taking the show's animated cast to spring break hot spots such as Daytona or Walt Disney World, but the characters ultimately wound up in Lakeland.

"I pitched them going down to Florida with the expectation that the state is the spring break destination of the world," Quinaz says. "Or at the very least, the East Coast."

The writer says he couldn't believe the attention to detail that went into executing the episode, from manatees to the dangers of building a housing development too close to the Everglades. There will also be a heavy metal musical number dedicated to Florida's bonkers history. Quinaz describes it as an "anthem for the Florida Man."

Quinaz reached out to O Cinema to premiere the episode because of his long-standing relationship with the independent theater company. He premiered his feature film, *Breakup at a Wedding*, at Wynwood's now-defunct O Cinema location back in 2013.

Miami's independent film scene has grown vastly since then, with theaters such as O Cinema, Coral Gables Art Cinema, Bill Cosford Cinema, and the Tower Theater rolling out unique programming on the regular. Says Quinaz, "When I was growing up in Miami, I don't even think the Bill Cosford Cinema had opened up yet. So the idea of independent cinema wasn't readily available. Knowing [O Cinema was] sort of down for odd events, I prayed they were fans of a perverted cartoon like ours."

The full third season of *Big Mouth* premieres Friday, October 4, on Netflix.

**Big Mouth.** *8:30 p.m. Thursday, October 3, at O Cinema South Beach, 1130 Washington Ave., Miami Beach; 786-471-3269. Tickets cost $11 via o-cinema.org.*

RELATED TOPICS:    ARTS        FILM AND TV

P-APP000009

Use of this website constitutes acceptance of our terms of use, our cookies policy, and our privacy policy

The Miami New Times may earn a portion of sales from products & services purchased through links on our site from our affiliate partners.

©2020 Miami New Times, LLC. All rights reserved.

CALIFORNIA RESIDENTS: California Privacy Policy | California Collection Notice | Do Not Sell My Info

P-APP000010

ADVERTISEMENT



*Tampa Bay Times*

BUSINESS

# Netflix subscribers drop hints at streaming-service fatigue

    



This Jan. 17, 2017 photo shows N            sday, July 18, 2019, Netflix said subscribers dropped unexpectedly in the U.S. during the second quarter, raising the question of how much are people willing to pay for streaming services with a host of new ones, from Disney to NBCUniversal, on the way. (AP Photo/Elise Amendola, File)

By using this site, you agree to our updated Privacy Policy and our Terms of Use.

Published Jul. 18

P-APP000011

A dramatic slowdown in worldwide growth at Netflix — including the first quarterly drop in its U.S. subscribers since 2011 — is raising questions about just how much are people willing to pay for streaming services. Especially with a host of new ones from Disney, Apple and others on their way.

**Tampa Bay Times**

A recent price increase seems to have spooked Netflix subscribers. The company lost 126,000 subscribers in the U.S., less than 1% of its 60.1 million paid U.S. subscriptions, during the April-June period. Its most popular plan rose from $11 to $13 in a U.S. price hike announced in January and rolled out for many subscribers during the second quarter. Worldwide, the service picked up 2.7 million worldwide subscribers, far below Netflix's forecast of 5 million.

"Netflix raising prices prompted people to think about whether they were getting value for money," Wedbush analyst Michael Pachter said.

While people are willing to shell out for several services to meet their streaming needs, he said, they're also willing to cancel if they're not using it enough, just as they would with a gym membership or a subscription to the New Yorker magazi

By using this site, you agree to our updated Privacy Policy and our Terms of Use.

Streaming services p

ear to be taking note.

P-APP000012

has cut prices to $6 from $8 for its main, ad-supported service. Services from Apple, due out this year, and WarnerMedia and NBCUniversal, out in 2020, don't have announced prices yet, although the NBCUniversal service will be free and ad supported for traditional cable TV subscribers.

## Tampa Bay Times

Of course, even if these individual services are cheaper than Netflix, it's not clear how many consumers will be willing to pay for.

One way to make a service appealing is not through better prices but through exclusive shows and deep libraries, including shows that Netflix will be losing. Netflix's two most popular shows, "Friends" and "The Office," will be departing in the coming months for rival services.

Group M analyst Brian Weiser said that for now, other services shouldn't be overly concerned by a weak quarter or two at Netflix. He said streaming content consumption is still growing rapidly, so the overall market has plenty of room for competitors. And the streaming arena is a growth area in the much bigger and more mature entertainment industry.

"I don't think it follows that if Netflix has an underperforming quarter that tells you about others," he said.

Some analysts also believe Netflix's trouble is temporary.

Canaccord Genuity analyst Michael Graham said the subscriber numbers will likely hit the stock in the short term — the stock was down 11% in midday trading Thursday — but overall the company's growth remains on track, particularly overseas.

By using this site, you agree to our updated Privacy Policy and our Terms of Use.

"We still see a strong                      ge numbers of international subscriptions as key strengths going forward," he wrote in a note to investors.

P-APP000013

figures.

The spring quarter is typically sluggish for the streaming service, and Netflix acknowledged a weak content slate could have been partly responsible for the drop. It expects to regain some momentum this summer, projecting that it will add 7 million subscribers from July through September. The optimism stems in part from the immense popularity of "Stranger Things," whose third season attracted record viewership after its July 4 release.

Netflix has said it welcomes competition. It ended June with 151.6 million worldwide subscribers, far more than a current crop of video streaming rivals that includes Amazon and Hulu.

BE THE FIRST TO COMMENT

## ALSO IN THIS SECTION

### Church sells downtown St. Pete lot for $6.3 million; mixed-used tower planned

4 minutes ago    • Business

Construction nears for another new tower a few blocks away.

### Dear Penny: My boyfriend won't tell me how much he owes. Can I pull his credit?

2 hours ago    • Business

By using this site, you agree to our updated Privacy Policy and our Terms of Use.

The advice columnist explains why that's probably a really bad idea.

P-APP000014

Yesterday   • Pasco

News and notes on local businesses    *Tampa Bay Times*

## A hop and a prayer — scientists cultivate key beer ingredient in Hillsborough County

Dec. 14    • Business

Researchers are trying to make a variety of hops suitable to Florida's climate.

## The Brooksville Sears will close next month

Dec. 13    • Business

The store's parent company had already announced the area's last Kmart in Pinellas also is closing.

## Tampa is among the most friendly pet-friendly cities for renters

Dec. 13    • Business

According to Homes.com's rec                        s site in Tampa are pet friendly.

By using this site, you agree to our updated Privacy Policy and our Terms of Use.

## Clearwater office center sells for $15.4 million

P-APP000015

The Meridian Concourse Center consists of three buildings,

## Tampa Bay Times

## Tech Data had other suitors besides Warren Buffett

Dec. 13    • Business

Apollo Global Management has been trying to buy Tech Data for a year and a half. Along the way, four other companies were interested, too. Two made offers.

## Citizens Property Insurance looks for ways to reduce its policy count

Dec. 13    • Business

At the request of St. Petersburg Sen. Jeff Brandes, the insurer will look for ways to shrink.

## Amazon Fresh expands grocery delivery in Tampa

Dec. 13    • Business

By using this site, you agree to our updated Privacy Policy and our Terms of Use.

The online retailer branches out beyond the Whole Foods' organic products it already offers.

P-APP000016

Netflix subscriber drop hints at streaming-service fatigue

*Tampa Bay Times*

ADVERTISEMENT

ADVERTISEMENT

**TRENDING NOW**

Ads by Revcontent

By using this site, you agree to our
updated Privacy Policy and our
Terms of Use.

**Faux Shearling Reversible**

Mango

**Seniors with No Life
Insurance May Get a $250k
Policy for $15 a Month**

**Drivers Born Before 1983
Must Do This Before 2020**

Comparisons.org

P-APP000017

### 4 Signs Your Heart Is Quietly Failing You

PhysioTru

### Man caught on video masturbating in front of child at Winter Haven

### Easy Access To Cash Loan

Lending Tree

ADVERTISEMENT



# Tampa Bay Times

© 2019 All Rights Reserved | **Tampa Bay Times**

▦ Subscriptions

✉ Newsletters

CONTACT US

JOIN US

MEDIA KIT

PLACE AN AD

By using this site, you agree to our updated Privacy Policy and our Terms of Use.

    

P-APP000018

TRY 30 DAYS FREE    SIGN IN

**NETFLIX**

**Help Center**

# Where is Netflix available?

Netflix members with a streaming-only plan can watch TV shows and movies instantly in over 190 countries. The content that is available to stream may vary by location, and will change from time to time.



> **NOTE:** Netflix is not yet available in China, though the company continues to explore options for providing the service. It also is not available in Crimea, North Korea, or Syria due to U.S. government restrictions on American companies.

---

Was this article helpful?

| YES | NO |
|-----|-----|

**P-APP000019**

P-APP000020

Case 2:20-cv-00180-JLB-MRM   Document 46   Filed 07/01/20   Page 36 of 194 PageID 1012



WORK    ABOUT    PRESS    CONTACT

# Ava DuVernay is a writer, producer, director and distributor of independent film.

Winner of the Emmy, BAFTA and Peabody Awards, Academy award nominee Ava DuVernay is a writer, director, producer and film distributor. Her directorial work includes the historical drama SELMA, the criminal justice documentary 13TH and Disney's A WRINKLE IN TIME, which made her the highest grossing black woman director in American box office history. Based on the infamous case of The Central Park Five, her next project is entitled WHEN THEY SEE US and will be released worldwide on Netflix in May 2019. Currently, she is overseeing production on her critically-acclaimed TV series QUEEN SUGAR, her new CBS limited series THE RED LINE and her upcoming OWN series CHERISH THE DAY. Winner of the 2012 Sundance Film Festival's Best Director Prize for her micro-budget film MIDDLE OF NOWHERE, DuVernay amplifies the work of people of color and women of all kinds through her non-profit film collective ARRAY, named one of Fast Company's Most Innovative Companies. DuVernay sits on the advisory board of the Academy of Television Arts and Sciences, and chairs the Prada Diversity Council. She is based in Los Angeles, California.

PRESS CONTACT:
Sharon Liggins | info@arraynow.com

P-APP000021

**HOME**   **NOVELS ▾**   **NEWS & EVENTS**   **ABOUT**   **CONTACT**



Mel Melcon, Los Angeles Times

Attica Locke's latest novel *Heaven, My Home* (September 2019) is the sequel to Edgar Award-winning *Bluebird, Bluebird*. Her third novel *Pleasantville* was the winner of the Harper Lee Prize for Legal Fiction and was also long-listed for the Bailey's Prize for Women's Fiction. *The Cutting Season* was the winner of the Ernest Gaines Award for Literary Excellence. Her first novel *Black Water Rising* was nominated for an Edgar Award, an NAACP Image Award, as well as a *Los Angeles Times* Book Prize, and was short-listed for the Women's Prize for Fiction.  A former fellow at the Sundance Institute's Feature Filmmaker's Lab, Locke works as a screenwriter as well.  Most recently, she was a writer and producer on Netflix's *When They See Us* and the also the upcoming Hulu adaptation of *Little Fires Everywhere*. A native of Houston, Texas, Attica lives in Los Angeles, California, with her husband and daughter.



Website design by **Will Amato**

P-APP000022

Case 2:20-cv-00186-JLB-MRM   Document 46   Filed 07/01/20   Page 38 of 194 PageID 1014

The New York Times | https://nyti.ms/1pxo5r5

# Settlement Is Approved in Central Park Jogger Case, but New York Deflects Blame

By Benjamin Weiser

Sept. 5, 2014

A $41 million settlement for five men whose convictions in the 1989 beating and rape of a female jogger in Central Park were later overturned was made final on Friday, with the deal including unusual language that sought to absolve New York City from blame.

The agreement, which awards the five black and Hispanic plaintiffs about $1 million for each year of their imprisonment, includes no admission of wrongdoing from the city; in fact, the city explicitly asserts that prosecutors and police detectives did nothing wrong at the time.

"The City of New York has denied and continues to deny that it and the individually named defendants have committed any violations of law or engaged in any wrongful acts concerning or related to any allegations that were or could have been alleged," the settlement states.

The city's corporation counsel, Zachary W. Carter, later amplified the city's stance, saying that the agreement "should not be construed as an acknowledgment that the convictions of these five plaintiffs were the result of law enforcement misconduct."

"On the contrary," he continued, "our review of the record suggests that both the investigating detectives and the assistant district attorneys involved in the case acted reasonably, given the circumstances with which they were confronted."



Raymond Santana, left, Yusef Salaam, center, and Kevin Richardson, second from right, in June.  Chang W. Lee/The New York Times

P-APP000023

The agreement nonetheless brings to a conclusion a long and bitterly contested legal battle that stemmed from the men's arrests and imprisonment in the sensational crime..

The settlement, Mayor Bill de Blasio said in a statement, arose from "a moral obligation to right this injustice."

"This settlement is an act of justice for those five men that is long overdue," he added.

Four of the men — Antron McCray, Kevin Richardson, Yusef Salaam and Raymond Santana Jr. — spent about seven years in prison; each will receive $7.125 million under terms of the deal. The fifth man, Kharey Wise, who served about 13 years, will receive $12.25 million.

One of the plaintiff's lawyers, Jonathan C. Moore, said it was "wonderful this case is finally over for these young men, who maintained their innocence all along." He said the settlement was "some measure of justice, and nobody would deny that, but no amount of money could really compensate them for what they and their families suffered."

Magistrate Judge Ronald L. Ellis approved the settlement on Friday. The city typically denies liability in settling lawsuits but the language in the Central Park settlement goes further than the statements that are often used.

The attack on the jogger, a 28-year-old investment banker, led to sensational news reports and statements by politicians, and served to inflame racial tensions in the city, which was portrayed as a place of lawlessness.

The men, ages 14 to 16 at the time of their arrests, had claimed that incriminating statements they made to the authorities had been coerced. But a judge ruled that the statements were admissible, and the men were convicted in two trials in 1990.

In 2002, the convictions were vacated after the office of the Manhattan district attorney, Robert M. Morgenthau, found DNA and other evidence that the woman had been raped and beaten by another person, Matias Reyes.

The Bloomberg administration had fought the lawsuit, which was filed in 2003; after Mr. de Blasio took office, the city reversed its position. The defendants included former Police Commissioner Raymond W. Kelly and other current and former members of the Police Department and the district attorney's office.

Cyrus R. Vance Jr., the current district attorney, said, "After more than a decade in which numerous parties have investigated and litigated the case, there has been no finding of wrongdoing or unprofessional behavior by any of the prosecutors involved."

In his statement, Mr. Carter seemed to offer a rationale for the settlement while acknowledging that some issues would remain unresolved. "To the extent that the evidence suggests that these five young men were wrongfully convicted and sentenced to substantial prison terms for a crime they did not commit," he said, "that in and of itself constitutes an injustice in need of redress."

He noted that his office's review of the case suggested detectives and prosecutors had acted reasonably. "In the end, however, that is an issue that would ultimately be determined by a jury at trial, absent a settlement of this litigation," he added. "We have determined that a resolution of this matter is in the best interests of the city."

P-APP000024

People — Fairstein — Direct — Lederer          3047

A.    Last week I celebrated my 17th year in the office.

Q.    Directing your attention to shortly before 7:00 a.m. on April 21st, 1989, where were you?

A.    The 21st, I was at the 24th Police Precinct Stationhouse on West 100th Street in this county.

Q.    At approximately that time, on that date, was there a decision made about going to the 102 Street Crossdrive in Central Park?

A.    Yes, there was.

Q.    Do you recall who was present in the course of making a decision with respect to that matter?

A.    I discussed that, going specifically at that time, with Detectives Michael Sheehan, and Augie Jonza of the Homicide Task Force.

Q.    Was a decision made to go to the 102 Street Crossdrive in Central Park?

MR. BURNS:   I object to the form of the question.

THE COURT:   It is leading, but I'll allow it. Maybe it will expedite it.

Go ahead.

MR. BURNS:   Are they going to allow cross-examination on this issue?

THE COURT:   What issue?  If it pertains to

Joseph T. Tierney, CSR, RPR

1        People - Fairstein - Direct - Lederer          3057

2        Q.   Was there any conversation in the car, either by

3   yourself or in your presence, with either Kevin Richardson

4   or Kharey Wise regarding anything about the investigation

5   that was under way?

6        A.   No, we, the detectives and I, did not want any

7   conversation about the case or investigation, particularly

8   with each defendant in the presence of each other.   There

9   was general small talk among the five of us that morning

10  driving to the park.

11       Q.   How long did the trip to the 102 Crossdrive take

12  from the 24th Precinct?

13       A.   Between ten to fifteen minutes.

14       Q.   What were the lighting conditions like when you

15  arrived at the 102 Street Crossdrive?

16       A.   It was light, it was daylight.

17       Q.   Would you please describe what happened when you

18  arrived at the Crossdrive that morning?

19       A.   Detective Sheehan was driving across 102nd Street,

20  he slowed down --

21            MR. MOORE:   I'm sorry, across what street?

22            THE WITNESS:   Across 102nd Street on the

23            Crossdrive or Transverse.

24       A.   He was driving slowly.   He had been to that area

25  he told me earlier that morning, but it was the first time I


                  Joseph T. Tierney, CSR, RPR

```
 1         People - Fairstein - Direct - Lederer          3058
 2   was getting to that area.  He slowed down.  Our car was
 3   approached by an officer in uniform in another car who
 4   rolled down his window and this officer and Sheehan had a
 5   conversation.  I just saw Sheehan take out a badge and
 6   identify himself to the other officer, and the officer then
 7   stopped.  Detective Sheehan and I got out of the police car
 8   and spoke for several minutes, less than three minutes, to
 9   that uniformed police officer.  That officer was -- I don't
10   know what his specific assignment was, but it was in the
11   nature of safeguarding the area of the crime scene.  And he
12   pointed out to us some areas of significance on the roadway
13   that had to do with where the jogger had been attacked.
14         Q.    After you had this conversation with the uniformed
15   officer and with Detective Sheehan, what happened next?
16         A.    At that point Detective Sheehan asked Kevin
17   Richardson to step out of the radio car, and Richardson did.
18   Sheehan asked him if anything looked familiar to him.  And
19   it was at that point that Richardson pointed to an area in
20   the roadway and said -- I have the exact words written down,
21   but I believe, "This is where" -- "this is where we took her
22   down," I have to look.
23         Q.    Do you have something -- are you sure those are
24   the words or do you have something to refresh your
25   recollection?
```

Joseph T. Tierney, CSR, RPR

NYCLD_015198

P-APP000027

Page 454

```
 1   the detectives with me on this              14:38:08
 2   investigation happened to be African        14:38:10
 3   American.                                    14:38:13
 4       Q.    You're saying that, suggest that   14:38:14
 5   no racial comments were being made because   14:38:16
 6   a detective was African American?            14:38:19
 7           MS. DAITZ:  Objection.               14:38:22
 8       A.    No, sir.  The makeup of all of     14:38:22
 9   the detectives involved in this              14:38:26
10   investigation were from every nationality    14:38:26
11   and every race.                              14:38:29
12       Q.    And you never heard anything       14:38:33
13   around niggers or spics messing with         14:38:35
14   white, raping white women?                   14:38:40
15           MS. DAITZ:  Objection.               14:38:42
16       A.    Certainly not, no, sir.            14:38:42
17       Q.    And you never said anything like   14:38:44
18   that?                                        14:38:45
19       A.    No, sir.                           14:38:45
20       Q.    Was there a point in time when     14:38:46
21   you were at the crime scene and, with ADA    14:38:53
22   Linda Fairstein?                             14:38:59
23       A.    Yes, sir.                          14:39:01
24       Q.    When was that, when was the        14:39:02
25   first time?                                  14:39:04
```

NYCLD_044145

P-APP000028

Page 455

```
1        A.      About, well, it would be fair to    14:39:04

2    say the only time, the first and only time       14:39:10

3    was a little after 7:00 a.m. on the              14:39:13

4    morning of April 21st.                           14:39:17

5        Q.      Okay.   That was approximately        14:39:19

6    three or four hours after you had been           14:39:24

7    there with Raymond Santana?                      14:39:26

8        A.      Approximately, yes.                   14:39:29

9        Q.      And what was the nature of the       14:39:30

10   interaction?                                     14:39:39

11            MR. WAREHAM:   Withdrawn.                14:39:39

12       Q.      What was ADA Fairstein doing at       14:39:40

13   the crime scene, what was she doing?             14:39:43

14            MS. DAITZ:   Objection.                  14:39:45

15       A.      ADA Fairstein and I, Detective        14:39:45

16   Jonza, certainly Sergeant O'Connor had a         14:39:52

17   meeting in the 24 Squad, and a decision          14:39:55

18   was made, a joint decision at that time to       14:40:01

19   take two of the suspects to the park.            14:40:04

20       Q.      And which two suspects were          14:40:12

21   those?                                           14:40:15

22       A.      Kevin Richardson and Kharey           14:40:15

23   Wise.                                            14:40:18

24       Q.      And do you know why it was --         14:40:18

25   this was --                                      14:40:22
```

NYCLD_044146

P-APP000029

Page 456

```
 1              MR. WAREHAM:  Withdrawn.         14:40:24
 2        Q.     Had you, during that discussion, 14:40:25
 3   had you informed ADA Fairstein that you    14:40:27
 4   had already gone to the alleged crime      14:40:32
 5   scene with Raymond Santana?                14:40:37
 6              MS. DAITZ:  Objection.           14:40:38
 7        Q.     Junior?                         14:40:40
 8        A.     I don't recall our exact        14:40:41
 9   conversation, but I probably did tell her. 14:40:43
10        Q.     And, to your knowledge, she had 14:40:47
11   not -- well, to your knowledge, had she    14:40:49
12   been to the crime scene prior to you going 14:40:53
13   there at 7:00 a.m. the morning of the      14:40:55
14   21st?                                       14:40:58
15        A.     To my personal knowledge, no.   14:40:58
16        Q.     Did she indicate in her         14:41:00
17   discussion that she had been there, in her 14:41:02
18   discussion with you, did she indicate that 14:41:04
19   she had been there?                         14:41:06
20        A.     No, she did not.                14:41:07
21        Q.     And the reasons for taking      14:41:08
22   Kharey Wise and Kevin Richardson there     14:41:17
23   were what?                                  14:41:22
24        A.     Excuse me?                       14:41:22
25        Q.     What were the reasons that you  14:41:22
```

VERITEXT REPORTING COMPANY
212-267-6868          www.veritext.com          516-608-2400

NYCLD_044147

P-APP000030

Page 89

1                    William Roe

2        Q.     Is Central Park within your zone?

3        A.     Yes, it is.  Yes, it is.

4        Q.     Do you know whether you went

5    directly to the 20th Precinct?

6        A.     No.

7        Q.     And you don't know whether you went

8    to the Central Park Precinct instead, correct?

9        A.     Correct.

10       Q.     Do you recall seeing any media in

11   the vicinity when you arrived at work?

12            MR. MYERBERG:   Objection.

13       A.     I recall seeing the media sometime

14   during that day in front of the 24th Precinct, I

15   believe.

16       Q.     What is your memory of your first

17   involvement in the investigation of the events

18   of April 19th?

19       A.     The events of April 19th, I recall

20   being in several station houses that were

21   involved.  I recall being in the Central Park

22   Precinct house, and I recall being in the 24th

23   Precinct station house, and I remember being in

24   the 20th Precinct station house where my office

25   was.

NYCLD_060899

P-APP000031

Page 90

1                    William Roe

2            I don't remember the sequence of

3    events, what times that I was in either of these

4    precincts.

5        Q.     During the period of time that you

6    were at the Central Park Precinct, do you recall

7    seeing any of the detectives from the Manhattan

8    North Homicide Unit?

9            MR. MYERBERG:  Objection.

10       A.     I don't recall.  It's possible that

11   I did, but I just don't recall.

12       Q.     Do you recall seeing at the Central

13   Park Precinct Chief Rosenthal?

14           MR. MYERBERG:  Objection.

15       A.     I recall seeing Chief Rosenthal,

16   but I don't know whether it was in the 24th

17   Precinct or Central Park Precinct.

18       Q.     Did you ever see him at the 20th

19   Precinct?

20       A.     It's possible, but I don't recall

21   exactly when or where.

22       Q.     Do you recall having seen Chief

23   Colangelo at any of the precincts?

24       A.     I don't recall, no.

25       Q.     Did you see him at all in

NYCLD_060900

P-APP000032

Page 91

1                    William Roe
2    connection with these events?
3          A.    It's possible.  I just don't recall
4    that right now.
5          Q.    How about DI Power?
6          A.    I don't recall seeing DI Power
7    there, no.
8          Q.    Not at all?
9          A.    No.
10         Q.    How about Chief Selvaggi, do you
11   remember seeing him at any of the precincts?
12         A.    Chief Selvaggi's office was in the
13   24th Precinct.  So from time to time I used to
14   see him.  On this particular day, I don't recall
15   seeing him.
16         Q.    Do you recall going to Central Park
17   at any point?
18               MR. MYERBERG:  Objection.
19         A.    Yes.
20         Q.    Did you go to the crime scene?
21         A.    Yes.
22         Q.    Do you know what time of day it was
23   when you went to the crime scene?
24         A.    No.
25         Q.    Was the crime scene unit there when

NYCLD_060901

P-APP000033

Page 92

```
 1                    William Roe
 2    you arrived?
 3         A.    Yes.
 4         Q.    Were any detectives there when you
 5    arrived?
 6         A.    I don't recall.
 7         Q.    Did you see Linda Fairstein at the
 8    crime scene?
 9              MR. MYERBERG:  Objection.
10         A.    No.
11         Q.    You know who she is?
12         A.    Yes.
13         Q.    Did you see Elizabeth Lederer at
14    the crime scene?
15              MR. MYERBERG:  Objection.
16         A.    No.
17         Q.    What was going on at the crime
18    scene when you went to Central Park?
19              MR. MYERBERG:  Objection.
20         A.    I don't recall what time it was.  I
21    was with Sergeant Klev.  I don't recall how soon
22    after I got to work I went to the crime scene.
23    When I got there, there was the obvious crime
24    scene tape covering a large portion of the woods
25    off the path, and some members of the crime
```

NYCLD_060902

P-APP000034

T7-1f

1    COLLOQUY

2          Michael Sheehan.

3    D E T.   M I C H A E L   S H E E H A N, Shield 421,

4          Manhattan North Homicide, New York City Police

5          Department, having been called as a witness by

6          the People, having been first duly sworn,

7          testified under oath as follows:

8                COURT OFFICER: Would you give us your

9          name, spell your last name, your shield

10         number and present assignment.

11               THE WITNESS:    Detective Michael

12         Sheehan, S-H-E-E-H-A-N;  Shield 421, NYPD,

13         Manhattan North Homicide Squad.

14   DIRECT EXAMINATION

15   BY MR. CLEMENTS:

16       Q          Detective, I'd like to direct your

17   attention to April 20, 1989.  Did you work on that

18   day?

19       A    Yes, sir, I did.

20       Q    And what shift did you work?

21       A    Four in the afternoon to 1:00 in the

22   morning.

23       Q    Did you receive an assignment shortly after

24   you arrived for work?

25       A    Yes, I did.

10/24/89

NYCLD_018954

P-APP000035

T7-1f

1669

SHEEHAN – PEOPLE – DIRECT – CLEMENTS

1    Q     And what was that assignment?

2    A     I left the Manhattan North office about ten

3    after one, and responded to Central Park Squad.

4    Q     Did you arrive at Central Park?

5    A     Yes, I did.

6    Q     WHen you got there, did you receive another

7    assignment?

8    A     Yes, sir, I went to Central Park to aid in

9    the investigation of an assault on a victim that was

10   likely to die.    Upon    reaching    the   Central   Park

11   Squad,  I   was   surprised of a couple of facts by my

12   immediate supervisor, Sergeant O'Connor.

13         I was then asked to accompany the uniformed

14   force on a search.   The search   was   for   a   weapon,

15   namely, a length of pipe.

16               MR. BURNS:   A what?

17               THE WITNESS:   A length of pipe.

18   Q     Where did that search take place?

19   A     The search took place in the vicinity of

20   West 97th Street and   Central   Park   West;   actually

21   inside the park walls.

22   Q     Did   you   recover   a pipe or was a pipe

23   recovered in your presence?

24   A     No, sir.

10/24/89

NYCLD_018955

P-APP000036

T7-1f

1670

SHEEHAN - PEOPLE - DIRECT - CLEMENTS

1  Q    At the conclusion of that search, what did

2

3  you do?

4  A       At the conclusion of the search, I

5  responded back to the Central Park Squad and had a

6  conversation with, again, Sergeant O'Connor and

7  Detective John Hartigan.

8  Q    What time did you return to the Central

9  Park Squad?

10  A       I returned to the Central Park Squad

11  somewhere in the vicinity of 5:30 p.m.

12              MR. BURNS:  I'm sorry, 5:30 p.m.?

13              THE WITNESS:  That's correct.

14              THE COURT:  What time was it that you

15          said you went in search of the weapon?

16              THE WITNESS:  Shortly after 4:00, your

17          Honor.  Let's say 4:30.

18              THE COURT:  Okay.

19              MR. BURNS:  Again p.m.?

20              THE WITNESS:  p.m.

21  Q    When did you speak to John Hartigan?

22  A       I spoke with John Hartigan in the Central

23  Park Precinct, there is a separate building across

24  the alleyway from the main building.  It is the

25  auxilary police building.  It also houses the Youth

10/24/89

NYCLD_018956

P-APP000037

Peo – Honeyman – Dir                    1735

1

2          THE COURT:     Take another short recess.

3     Please, don't discuss the case.

4          (Whereupon, the jury leaves the courtroom

5     for recess)

6              *     *     *     *

7          (Whereupon, after the recess, the following

8     occurs)

9          THE COURT:     Bring the jury in.

10          (Whereupon, the jury reenters the

11     courtroom)

12          COURT CLERK:     The defendants, their

13     attorneys, and assistant district attorneys,

14     and all sworn jurors are present.

15          THE COURT:     Call your next witness, please.

16          MS. LEDERER:     Detective Honeyman.

17          (Whereupon, the witness  enters the

18     courtroom)

19          COURT OFFICER:     Place your left hand on

20     the bible, raise your right hand, face the

21     clerk.

22          COURT CLERK:     Do you solemnly swear that

23     the evidence you give this court and jury will

24     be the truth, the whole truth, and nothing but

25     the truth, so help you God?

NYCLD_019626

P-APP000038

Peo – Honeyman – Dir             1736

THE WITNESS:   I do.

COURT OFFICER:   Detective, in a loud,
clear voice, for the record, give your full
name, spelling your last name, and your shield
number and present a ssignment.

THE WITNESS:   Yes.

D E T E C T I V E     R O B E R T     H O N E Y M A N,
Shield Number 53, assigned to Crime Scene Unit,
called as a Witness by the People, having been duly
sworn, tes tified as follows:

DIRECT EXAMINATION

BY MS. LEDERER:

Q     Detective, how long have you been with the
New York City police department?

A     Approximately 17 years.

Q     And, how long have you been assigned to the
Crime Scene Unit?

A     Approximately six years.

Q     Could you describe for the members of the jury
what the duties and re sponsibilities are of a detective
with the Crime Scene Unit?

A     The duties and responsibilities of a Crime Scene
detective is to respond to the different locations and
photograph the scenes; also, to gather and package

Peo — Honeyman — Dir                1737

the evidence.

Q     Were you working on the morning of April 20,
1989?

A   Yes, I was.

Q     What tour of uty did you do?

A   I did a tour of 11:15 on the 19th through 7:30 the
morning on the 20th.

Q     Did there come a time on the morning of April 20,
1989, that you received an assignment?

A   Yes, there was.

Q     And, from whom did you receive the assignment;
if you recall?

A   We received it from Night Watch.

          MR. MOORE:   Objection to "we."

          THE COURT:   You?   You got an assignment
          from Night Watch?

          THE WITNESS:   Right.

Q     As a result of that assignment, where did you
go?

A   We were told to respond to Central Park.   The exact
location is, on the 102 Cross Drive between the East and
West Drives.

Q     Did you go to that location, then?

A   Yes, I did.

Peo – Honeyman – Dir                1738

Q     About what time did you arrive at 102 Cross
Drive in Central Park?

A     Approximately 4:00 o'clock in the morning.

Q     Where did you go on the Cross Drive, if you
recall, when you first arrived there?

A     It was approximately near a light post, marked 206.

Q     When you went to Central Park on that morning,
did you go alone or with someone?

A     I went with my partner.

Q     When you arrived there, did you see anybody on
the Cross Drive in Central Park?

A     Yes.

Q     And, who did you see?

A     Night Watch detectives.

Q     Do you recall which detectives you saw, then?

A     Sergeant Duffy from the Night Watch, and, also,
Detective Gilner.

Q     Did you have a conversation with either or
both of those officers at that time?

A     Yes.  Both of them.

Q     About how long did you speak to them?

A     Approximately half hour.

Q     In the course of your speaking to them, or, as
a result of your speaking to them, where did you go?

AM009858

NYCLD_019629

P-APP000041

Peo – Honeyman – Dir                    1739

2   A    They showed me a location, approximately in the center

3   of the Cross Drive, adjacent to that light post, CO 206.

4        Q    And, when you looked at that direction, they

5   directed you to,  what, if anything, did you see?

6   A    Appeared to be two locations of blood that were on the

7   Cross Drive.

8        Q    Did you do anything with respect to the possible

9   blood that you saw on the roadway at that time?

10  A    Yes, I did.

11       Q    Will you tell the members of the jury, please,

12  what you did?

13  A    I did field tests on the blood.

14       Q    How is that performed?

15  A    Basically, the field tests consist of a test tube

16  with capsules on either side of the test tube.

17       Q    And, what did you do,at that time?

18  A    I took a cotton swab, dabbed it in the solution on

19  the Cross Drive, and placed it inside the test tube.

20  Broke both capsules, mixed it with chemicals, turned a

21  blue green, indicating it was a positive for blood.

22       Q    The field test you just described, does that

23  distinguish whether it is human or animal blood?

24  A    No, it does not.

25       Q    What, if anything, did you do after you obtained

Peo – Honeyman – Dir                    1740

the result that you just indicated?

A    They directed my attention to an area just north
of where the blood was, an area where the ground cover was
matted down.

I went from there to a location into the woods.

Q    When yoku say you saw an area where the ground
cover was matted down, what exactly did you see?

A    The area was approximately 16 to 18 inches in width.
It was apparent drag marks that went from the northern
end of the Cross Drive to a tree that I later marked
Reference Tree H-1.

Q    After you surveyed that area together with
Sergeant Duffy and Detective Gilner, where did you go?

A    They took me to a location just on the north side
of that reference tree, H-1.   They showed me a car that
was into the wood, with its headlights on.

They told me, "that's where the victim was found."

Q    Where was the car you saw?

A    The car was deep in the woods. From there, I went
back to the Cross Drive, and we got into our own vehicle
and drove through a clearing to that area.

Q    When you arrived at that location, did you see
any uniformed officers?

A    Yes, I did.

NYCLD_019631

P-APP000043

Peo - Honeyman - Dir     1741

Q     Do you know the names of any of the uniformed officers?

A     Police Officer Walsh was guarding the scene.

Q     Did you walk around the area down below where Officer Walsh was?

A     Yes, I did.

Q     And, did you have a conversation with Officer Walsh?   At that time?

A     Yes, I did.

Q     After you had been at the area where you saw Officer Walsh, where did you go?

A     Got back in the car and drove it back up to the Cross Drive.

Q     Approximately how long were you in the  area where Officer Walsh was?

A     About twenty minutes.

Q     And, when you returned  --  (withdrawn) --  When you say you drove back up, where did you go?

A     I went to the location where I originally had taken the field tests on the blood.

Q     What did you do at tha t time?

A     I then took a blood sample from that same location.

Q     Would you describe for the members of the jury how you took a blood sample?

NYCLD_019632

P-APP000044

Peo - Honeyman - Dir                    1742

A    The blood sample I took;  I took a cotton swab, dabbed

it into the possible blood.    I then put it in the filter

paper that was then folded, put it into a brown envelope,

then sealed it.

     It was given a run number.   A date.   And, my name.

     Q    Will you tell the members of the jury what is

a run number?

A    A run number is a qualification given from my office

to the number of jobs that are going out during the

course of the year.

     Q    Was a number assigned to this case, at that time?

A    Yes, there was.

     Q    And, what number was the run number assigned

to this case?

A    The run number was 89 slash, indicating year, 941.

     Q    After you packaged that sample, did you assign

a reference number to it?

A    Yes, I did.

     Q    And, how did you mark it?

A    That reference was H-1.

     Q    What did you do with it after you packaged it

the way you've described and marked it as you've described?

I put it in my pocket.

     Q    Where did you go after you had taken the sample

NYCLD_019633

P-APP000045

Peo - Honeyman - Dir                    1743

you've just described?

A    I held the scene.    Let nobody else come in or out of that location.

Q        What were the conditions like at the 102nd Cross Drive when you were there that morning?

A    That morning, the lighting conditions was poor. The area was very large. In order to do the job properly, I decided to hold the scene.

Q        Did you return to the lower roadway where you had seen Officer Walsh?

A    Yes, I did.

Q        Did you give  Officer Walsh any instructions?

A    Yes, I did.

Q        What?

A    I told him to hold the scene; not to let anyone anywhere near the area.

Q        Did you receive anything from Officer Walsh?

A    Yes, I did.

Q        What was that?

A    At that time, he handed me a plastic bag containing a piece of garment.

Q        After you received that from Officer Walsh, where did you go?

A    I then proceeded to go to Metropolitan Hospital.

NYCLD_019634

P-APP000046

1744

Peo - Honeyman - Dir

Q    When you arrived at Metropolitan Hospital, what did you do?

A    I went to the Emergency Room.    There was a vacant room right off the Emergency Room.    I decided to use that. I went inside to the examining table and took a couple pieces of wax paper off the examining table and placed it on the floor.

I then continued to open up the bag, which contained a shirt.

Q    What did you do after you removed the shirt?

A    I placed it on the wax paper and I then photographed it.

Q    What was the condition of the shirt when you took it out of the bag?

A    The shirt was blood soaked.    It was inside out.    The sleeves were twisted, and, it was in a half-knot shape.

Q    I'd ask if the witness could please be shown what's received as People's 36 in evidence.

Do you recognize what that is?

A    Yes, I do.

Q    And, what do you recognize it to be?

A    This is the blood-soaked shirt that was in the bag that I examined on the floor of the Emergency Room.

Q    You indicated that when you first took it out of

NYCLD_019635

P-APP000047

Peo - Honeyman - Dir                    1745

the bag, it was tied in some fashion.

    Would you demonstrate for the members of the jury,
as best as you can, how it was when you took it out of
the bag?

A    These sleeves were twisted in a rope-type fashion.
(demonstrating)

    Q    If you could just hold that up  so the members
of the jury can see what you've done with the shirt?

A    (indicating)

    Q    When you took it out of the bag, did you untie
that knot?

A    Yes, I did.

    Q    Did you examine the shirt?

A    Yes, I did.

    Q    If I may for a moment?

A    (handing)

    Q    Was the shirt inside out or right side out
when you received it?

A    The shirt was inside out.

    Q    And, when you examined the shirt, what, if
anything, did you notice about it?

A    The brand name on it was Skinners.   Also, the logo
on the front of the shirt, CCE, indicating Coca Cola
Enterprise.

NYCLD_019636

P-APP000048

Peo - Honeyman - Dir          1746

Q     Did you notice anything about the fabric of the shirt when you examined it?

A     The fabric was blood soaked.

Q     Was there any damage to the shirt when you looked at it?

A     Yes, there was.

Q     What did you see when you looked at the shirt?

A     Half inch hole, possible, center chest.   Possibly two smaller holes.

Q     Ask that you show the members of the jury what you're referring to?

A     (indicating)   CCO.   Logo.

Q     Thank you.

I'd ask if the witness could please be shown People's 37 in evidence?     (handing)

Detective, do you recognize what People's 37 in evidence is?

A     Yes, I do.

Q     And, what is that?

A     This is a photograph I took on the floor of the Emergency Room.

Q     Did you take that photograph on the morning of April 20, 1989?

A     Yes, I did.

NYCLD_019637

P-APP000049

Peo - Honeyman - Dir                1747

Q     And, is that a photograph of the shirt that's immediately in front of you?

A    That's correct.

Q     Is that the way the shirt looked on the morning when you took it out of the bag and unwrapped it?

A    Yes, I t was.

Q     After you finished photographing the shirt, what was the next thing that you did?

A    I packaged up the shirt.   I used the same was paper I had to roll it up twice, so it wouldn't leak through the bag.   From there on, it would be transferred over to the other police officers.

I didn't want it dripping on anybody.

              MR. MOORE:    Objection.

              THE COURT:   I'll allow it.

Q     After you packaged the shirt, what did you do?

A    I went to see the victim.

Q     Were you able to see the victim at that  time?

A    No, I wasn't.

Q     Approximately what time was it when you first arrived, just before you photographed the shirt?

A    First photographed  --

Q     At Metropolitan Hospital?

A    Probably about ten after five.

NYCLD_019638

P-APP000050

Peo – Honeyman – Dir                     1748

Q     After you attempted to see the victim but were unable to do so, what did you do?

A    I returned to the park.   Prior to my arrival at the park, I stopped at a phone.   I called radio, and requested a helicopter.

I told them I wanted them to search the northern end of the park.   Also, I wanted them, also, to take aerial photographs.

Q     Did you then return to Central Park?

A    Yes, I did.

Q     And, where did you go within Central Park?

A    I went to 102nd Cross Drive.

Q     I'd ask if you would, for a moment, step down and see what's been received as People's 2 in evidence.

(Whereupon, the witness leaves the stand)

Q     If you could just point, for a moment, and show the members of the jury where you went in Central Park on the morning of April 20th?

A    The location where I went was approximately right about here, on the Cross Drive.

Q     If I could ask, please, that People's 3 in evidence be put on the easle  --  Just for a moment, I'd ask you to just, for a moment, take a look at People's 3 in

NYCLD_019639

P-APP000051

1749

Peo - Honeyman - Dir

1    evidence; do you recognize what's depicted in People's 3

2    in evidence?

3    A    Yes, I do.

4         Q    And, what is depicted in People's 3 in evidence?

5    A    This is a more detailed area.

6              THE COURT:    Maybe you can come around

7              this side of the photo, if you can, so you

8              don't block the jurors' view.

9    A    This is a more detailed map of that same location

10   showing the 102nd Cross Drive, over here, with the West

11   Drive here.   (indicating)

12        Q    And, is that a more detailed map of the area
     surveyed
13   you ~~anasuyux~~ on the morning of April 20th and the days

14   ~~subsequent~~ thereto?

15   A    Yes; that's correct.

16        Q    If we could ask, please, to take People's 2

17   down, and replace it with People's 3?

18             COURT OFFICER:   (complying)

19        Q    Detective, what were the lighting conditions

20   like on the Cross Drive, Central Park, on the morning

21   of April 20th, when you returned from Metropolitan

22   Hospital?

23   A    They were getting better.

24        Q    And, did you take any photographs at that time?

25

NYCLD_019640

P-APP000052

Peo - Honeyman - Dir        1750

A    Approximately 6:30 I started taking photographs.

    Q    I'd ask you, if you can, take a moment and look at what has previously been marked People's 85 through 105?

            THE COURT:   What was the first number?

            MS. LEDERER:    83.

    Q    People's 83 through 105 for identification?

A    (complying)

    Q    Do you recognize People's 83 through 105 for identification?

A    Yes, I do.

    Q    Are those photographs you took on the morning of April 20th in Central Park in the area of 102nd Cross Drive and north of that area?

A    Yes.

    Q    Do those photographs fairly and accurately reflect the way that area in Central Park looked on the morning of April 20, 1989?

A    Yes.

    Q    Thank you.

            MS. LEDERER:    At this time, I offer People's 83 to 105?

            THE COURT:   Any objection, Mr. Diller?

            MR. DILLER:   No.

            THE COURT:   Counsel?

Peo — Honeyman — Dir   1751

2      MR. MOORE:   No.

3      THE COURT:   They will be marked later, in

4 evidence.

5   Q   Can I just have the photographs for a moment?

6      COURT OFFICER:   (handing)

7   Q   Detective, with the Court's permission, I would

8 ask you to please step down and approach People's 3 in

9 evidence?

10      (Whereupon, the witness leaves the

11 stand)

12   Q   Let me hand you a red pen and I would ask you

13 to mark in red ink, with two X's, where you saw the spots

14 of blood on the roadway on the morning of April 20th?

15  A   (complying)

16   Q   As you do so, if you will describe for the Court

17 and the members of the jury where you're marking?

18  A   The two areas of blood that were on the Cross Drive

19 were approximately 17 feet west of the light pole 206

20 located here and approximately   center of the Cross

21 Drive.

22   Here, and here.   (indicating)

23   Q   Detective, prior to coming to Court today, did

24 you have occasion to examine the exhibit, People's 3

25 in evidence?

Peo - Honeyman - Dir                    1752

A    Yes, I did.

Q    And, did you have occasion to also examine that exhibit with the use of a ruler?

A    Yes, I did.

Q    And, at the time that you looked at it with a ruler, did you make use of a scale, one inch is twenty feet, as marked on the bottom of People's 3?

A    Yes, I did.

Q    I'd like to direct your attention to what's been received as People's 83 in evidence?

COURT OFFICER:  (handing)

Q    Would you describe for the members of the jury what is depicted in that photograph?

A    As depicted in Photograph 83, the blood, possible blood stains, here and here.   Just south of the northern end of the Cross Drive.

This comb was placed there by me.   Indicating the blood; also another comb placed here prior to the photographs.

Q    When did you place the comb that's depicted in that photograph and the other comb that isn't shown there, as you've just described?

A    Before I took the photographs of this area, as well as the rest of the park, I would place the comb and car.

NYCLD_019643

P-APP000055

Peo – Honeyman – Dir                    1753

Q    What time on April 20th did you place the comb
in those spots?

A    Approximately 6:20.

Q    I'd ask you to please look at what's been
received as People's 84 in evidence, and describe for
the members of the jury what's depicted in People's 84?

A    As depicted in this photograph, it was a ground cover
directly on the north end of the Cross Drive.    This
light post is CO 206.

What's visible in this photograph of the drag marks
leading from the northern end of the Cross Drive to a
tree later marked, Reference Tree H-1.

Q    Drag marks depicted in People's 84?    Tell the
members of the jury where these drag marks appear?

A    These drag marks are directly here, just on the
northern end of this comb.    They were consistent, from
there to the tree.

Q    Ask you if you could also describe for the
jury what's depicted in People's 85 and 86 in evidence?

A    85 is a close up of the ground cover;  basically
standing a little bit closer to the ground cover showing
is the distance here back to Reference Tree H-1.

You can see the drag marks leading from the
ground cover to here.    And, depicted here.

NYCLD_019644

P-APP000056

Peo - Honeyman - Dir                    1754

86 is a close up of the drag marks where the scale
or ruler from one end over distance across, approximately
eighteen inches.

Q      Was that ruler there when you got there on
April 20th?

A    Yes.

Q      Who else is depicted there?

A    That was my partner putting the ruler.

Q      Ask that you approach People's 3 in evidence;
draw with that red marker where the drag marks appear?

(Whereupon, witness leaves the
stand)

A    The drag marks depicted in these photographs are
on an arch to the 102nd Cross Drive.    Just adjacent
to light post 206.

Q      Approximately how long was that distance from the
tree you've indicated as H-1 to the edge of the roadway?

A    The distance from H-1 to the northern end of the road-
way was 78 feet.

Q      If you would describe for the members of the jury
what's depicted in People's 87 in evidence?

A    Depicted in 87 is the back end of those drag marks
as depicted in Photograph 85.    It is from this area to
the tree.    You can see just at the lower end of the grass

NYCLD_019645

P-APP000057

Peo – Honeyman – Dir                    1755

or the green-grass covering, showing two tracks leading

from there to the Reference Tree H-1.

Q    You're indicating a tree in People's 87;   would

you point that out?

A   Reference Tree H-1.

Q    When you say, Reference Tree H-1, is that a number

or some identifying reference that you assigned to that

tree?

A   Yes, it is.

Q    The drag marks that are depicted in the ground

cover as shown in People's 84, approximately how long was

the mark through the grassy cover before it became the

dirt as depicted in People's 87?

A   The distance between the northern end of the Cross

Drive to approximately the end of the green grass was

approximately 40 feet.

Q    And, what's the distance where the ground cover

ended to the tree, H-1?

A   This area from the northern end of the green is

approximately 35 feet.   Depicted in 87.   Also, you can

see it a little bit better in 85, from here to the tree.

Q    Describe for the members of the jury what's

depicted in People's 88?

A   This is a photograph facing north, just on the north

Peo - Honeyman - Dir                1756

side of Reference Tree H-1.

Q    Would you indicate where that is on People's 3
in evidence?

A    That location just this side of that black dot, which
is Reference Tree H-1.

Q    What's shown in People's 89 in evidence?

A    89 is a close up of the same area, directly on the
north side of Reference Tree H-1.   These three rocks
that are visible in Number 88 are shown a little bit
more closer detail in 89.

Q    What did you observe in the area behind that tree
H-1 that's depicted in People's 89?

A    In this area, depicted in 88 -- 89, there was a
significant amount of blood directly on the north side
of the tree.

Q    I don't know if you can do it while it's still
mounted, but, detective, I'd ask you to take PEOPLE's 89,
and circle the areas where you observed blood in that
photograph?

A    The areas of blood were on the rock itself, between
a rock.   Also, on the bottom side of the rock.   Areas
up in here in the leaves.   Directly on the side over here.
(indicating)

This location.   And, down here.   (indicating)

NYCLD_019647

P-APP000059

Peo – Honeyman – Dir                    1757

Q     What is the view shown in People's 90 in evidence, as depicted in Number 90?

A    As depicted in People's 90, this is a location facing south.    This is from Reference Tree H-1 facing south towards the 102d Cross Drive.

Two combs shown here, as depicted in Number 83.

And, this light post here is 206, as depicted in 84.

Q     Detective Honeyman, I just want to ask you to try not to block the view of the jurors over there.

In People's 90 in evidence, there are some cars on the roadway down there;  do you know whose cars those are?

A    Those are Crime Scene vehicles.

Q     Also appear two original combs ~~spikes~~ on the Cross Drive;  are those the combs you described in People's 83? That you placed there on that morning?

A    Yes, I did.

Q     In the background of People's 90 on what would be the south side of the Cross Drive that's shown on People's 90?

A    What you can see on the other side, south side of the Cross Drive is the back  stop to the ball field.

Q     Where does that appear in People's 3?

A    That would be this ball field that's shown here.

1      Peo - Honeyman - Dir    1758

2  Q Detective, I'd ask you to please describe for

3 the members of the jury what is depicted in People's 91,

4 People's 92, People's 93 in evidence?

5 A As depicted in 91, this is a photograph facing north

6 to the location where she was found. This was taken

7 directly alongside of Reference Tree H-1, as depicted

8 in this map on this location.

9     MS. LEDERER: The jurors are indicating

10    they're having trouble seeing. I think there's

11    a reflection.

12    You want the lights on?

13    THE COURT: Okay. On. It takes a

14    little time for those to heat up. Just wait

15    a minute.

16  Q If you could describe, please, for the members of

17 the jury, what is depicted in 91, 92, 93? What direction

18 it's shown in?

19 A As depicted in 91, this is a photograph that was taken

20 from adjacent to Reference Tree H-1 facing north to a

21 location where she was found, barely visible,  in this

22 photograph.

23 You can see the marked radio car put there.

24  Q How did it come about that marked radio car was

25 put in that location?

NYCLD_019649

P-APP000061

Peo - Honeyman - Dir                    1759

A    I replaced the marked radio car.

Q    For what reason?

A    Prior to me taking the photograph, so it can be seen more better through the woods.

Q    Please continue.

A    This photograph is approximately midway down from Reference Tree H-1, to the low path showing the same marked radio car depicted in 91, Center.

You can also see a large rock here, and area cordonned off by the police officers first responding to the scene.

Q    Is that rock depicted in People's 3 in evidence?

A    Yes, it is.

Q    Where is that?

A    That rock is shown right here.   (indicating)

Q    And, what is shown in People's 93 in evidence? Where is that taken from, and what is shown?

A    93 is shown just south of the lower path, showing the marked radio car.   Also some fallen trees that are in this location.

These trees.   Fallen trees.   Are these ones right over here.

                    MS. LEDERER:

                              Record should reflect the

              witness is indicating to the prior Exhibit 92.

NYCLD_019650

P-APP000062

```
 1          People Reynolds Recross (Mr. Rivera)        1002

 2     Q    Do you know which detective made that decision?

 3     A    No.

 4     Q    Officer, you also indicated that you left the

 5   precinct at about 4:15 in the morning; is that correct, on

 6   April the 20th?

 7     A    Yes.

 8     Q    You went to the crime scene; is that correct?

 9     A    Yes.

10     Q    When you call it the crime scene, what were you

11   referring to?

12     A    The area where the jogger was attacked.

13     Q    That would be, where exactly did you go, Officer,

14   can you show us on the map?

15     A    Down here in this area, what is called the lot.

16   That's north of the 102nd Street crossdrive.

17     Q    Just to repeat officer, north of the 102nd Street

18   cross drive; is that correct?

19     A    Yes, right in this area.

20     Q    That would be in the center of the east and the

21   west drive; is that correct?

22     A    More or less, yes.

23     Q    You may have a seat, Officer.  Were there other

24   police officers there?

25     A    Yes.
```

                              LDI

```
 1              People Reynolds Recross (Mr. Rivera)          1003

 2        Q    How many police officers did you see there?

 3        A    It was pretty dark at that time, I couldn't tell

 4   how many were there.

 5        Q    Was it pretty crowded?

 6        A    There were a few cars there.

 7        Q    Say more than 10 police officers?

 8        A    I don't know.

 9        Q    How many cars did you see?

10        A    About 3, 3, 4.

11        Q    I'm sorry?

12        A    3, 4.

13        Q    3, 4?

14        A    3, 4.

15        Q    These are both police officers and detectives; is

16   that correct?

17        A    Yes.

18        Q    Some of the cars there belonged to the detectives;

19   is that right?

20        A    Yes.

21        Q    Would these be the automobiles belonging to

22   Detective Whelpley and the other detective?

23        A    I don't know which car was there.

24        Q    Did you see Detective Whelpley at that location?

25        A    No, I don't recall.
```

LDI

```
 1                People Reynolds Recross (Mr. Rivera)          1004

 2        Q      Do you recall the name of the detectives you saw

 3   at that location?

 4        A      Detective Rosario.

 5        Q      You saw Detective Rosario at that location?

 6        A      Yes.

 7        Q      Officer, did you discuss the case with Detective

 8   Rosario?

 9        A      Yes.

10        Q      Did he give you all the information -- withdrawn.

11        Did he discuss the case with you also, he gave you

12   information you were not privy to; is that correct?

13        A      Excuse me?

14        Q      He also discussed the case with you, he imparted

15   information to you; is that correct?

16        A      He just explained it, a woman's body had been

17   found at that point, that was all he had.  At least that's

18   all he told me.

19        Q      You testified that you spent about 40 minutes at

20   that location, is that correct?

21        A      About that.

22        Q      Then you went back to the precinct?

23        A      Yes.

24             MR. RIVERA:  I have no further questions,

25             Judge.
```

                                    LDI

NYCLD_023707

P-APP000065

1                    People Reynolds Cross (Mr. Joseph)              866

2          Q     Seeing Antron McCray at the precinct?

3          A     I did have a conversation about it.

4          Q     You tell us, I think you told Ms. Lederer, that

5     you didn't interview or question Antron McCray at that point

6     or at any later point; is that correct?

7          A     That's correct.

8          Q     You didn't have any conversation with him at that

9     point; is that correct?

10         A     That's correct.

11         Q     The observations, what you have just told us, you

12    saw; right?

13         A     Correct.

14         Q     Nothing further then that, correct?

15         A     Nothing, no.

16         Q     Would I be correct -- withdrawn.

17               You have told us on the 19th of April and into

18    April 20th, you had conversations with numerous officers,

19    police officers, detectives, concerning what was happening

20    in Central Park in the investigation you were imparting?

21         A     When was this?

22         Q     On April 19th and into April 20th?

23         A     While we were on the street, you mean?

24         Q     Yes?

25         A     I didn't have any conversations with the

                                    LDI

NYCLD_023569

P-APP000066

1              People Reynolds Cross (Mr. Joseph)              867

2   detective.

3        Q    On April 19th you didn't -- you had a conversation

4   with the sergeant; is that correct, on April 19th?

5        A    Yes.

6        Q    You had conversations with other police officers?

7        A    Yes.

8        Q    On April 20th, the morning, you did have

9   conversations with detectives as well; is that right?

10       A    Yes.

11       Q    Just so I'm understanding, that prior to arresting

12  any of the young men that you arrested, you had spoken to

13  police officers and sergeants, but no detectives?

14       A    That's correct.

15       Q    Subsequent to their arrest, then you spoke to a

16  variety of other police officers, including detectives?

17       A    Yes.

18       Q    Over a period of time you spoke to a Detective

19  Rosario; is that correct?

20       A    Yes.

21       Q    And you spoke the a Detective Farrel?

22       A    Yes.

23       Q    Detective Whelpley?

24       A    Yes.

25       Q    Were there captains also that were at the Central

LDI

NYCLD_023570

P-APP000067

```
 1            People Reynolds Cross (Mr. Joseph)          868
 2    Park Precinct, police captains?
 3         A     Yes.
 4         Q     You spoke with them as well?
 5         A     Yes.
 6         Q     Was there a Captain Gunther?
 7         A     Yes.
 8         Q     Were there also individuals who were known as
 9    chiefs, a Chief Rosenthal?
10         A     Yes.
11         Q     Was he at the Central Park Precinct in the morning
12    of the 20th?
13         A     Yes.
14         Q     Where does a chief stand in the hierarchy of the
15    Police Department?
16         A     Where?
17         Q     Yes?
18         A     Close to the top.
19         Q     I assume above a captain; is that correct?
20         A     Yes.
21         Q     Was there another, there were several chiefs that
22    came down to the Central Park Precinct that you spoke to on
23    the morning of the 20th; is that right?
24         A     I just spoke to one, I believe.
25         Q     Was there a chief Colengelo?
```

LDI

1                    People Reynolds Cross  (Mr. Joseph)              869

2         A     Yes.

3         Q     And a Chief Selvaggi; is that correct?

4         A     Yes.

5         Q     They were also at the precinct in the morning of

6    April 20th?

7         A     No.

8         Q     At any point did you speak with them?

9         A     Yes.

10        Q     So that would be in addition to Rosen, Chief

11   Rosenthal.  You spoke to Chief Colengelo and a Chief

12   Selvaggi.

13        A     Yes.

14        Q     Now, you told us that there came a time that you

15   went to Antron McCray's home?

16        A     Yes.

17        Q     When you went to the home, to his home, you went

18   with numerous other police officers and detectives; is that

19   right?

20        A     Yes.

21        Q     I think you told us there was a detective Whelpley

22   and Farrel, Rosario, Morin?

23        A     Yes.

24        Q     When you went to Antron McCray's door, how many of

25   those officers went with you to the door?

                              LDI

NYCLD_023572

P-APP000069

```
 1              People Reynolds Cross (Mr. Burns)           894

 2       Q    Now, you mentioned the presence of chiefs.    More

 3  than one chief in the Central Park Precinct that morning?

 4       A    No.

 5              (Continued on next page.)

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

LDI

NYCLD_023597

P-APP000070

14

T-3    Reynolds-Ppl-cross (Burns)                    695

2    Q    Just one chief?

3    A    That's it.

4    Q    Were there any police brass, police officers who

5  who held the rank of above captain, were there several of

6  those officers present?

7    A    Not that I saw, no.

8    Q    You didn't see them?

9    A    No.

10    Q    Incidentally, where did you do your paperwork?

11    A    The juvenile paperwork?  The packages?

12    Q    Yeah, you said that after you finished their

13  booking process, you then took them to the juvenile room and

14  you said the juvenile room is in a different building.

15    A    That's correct.

16    Q    Is that correct?

17    A    That's correct.

18    Q    All right.  You you also stated that you had spoken

19  to a Lt. Mc Inerny, but that wasn't in the same room where

20  the juvenile room or the clerical office is, isn't that

21  true?

22    A    That's true.

23    Q    You saw him in the alley between the main precinct

24  and this other building, the building, the 24th or the

25  Central Park Precinct consists of two buildings; isn't that

M. C. Davis

```
 1                T-3   Reynolds-Ppl-cross (Burns)              896

 2   correct?

 3       A    Yes.

 4       Q    All right.  So, are you saying there was no other

 5   brass there or are you saying you didn't see them where you

 6   were working?

 7                MS.  LEDERER:  Objection.

 8                THE COURT:  I'll let him answer.

 9                Do you understand the question?

10                THE WITNESS:  Yeah.

11       A    I didn't see any brass.

12       Q    Where you were working?

13       A    Well, yeah.

14       Q    I mean --

15       A    Couldn't see them anywhere else?

16       Q    Well they could have been in the other building,

17   that's what I'm asking?

18       A    No, I didn't see them.  If they were there, I

19   didn't see them.

20       Q    But you weren't' in that building, that's what I'm

21   asking.

22                MR.  BURNS:  Objection, Judge.

23                THE COURT:  Objection sustained.

24                How can he see them if he wasn't in that

25                building?  The question doesn't lend itself to an


                                    B.  C.  Davis
```

NYCLD_023599

P-APP000072

T-3    Reynolds-Ppl-cross (Burns)                    097

1

2        answer.

3        Q     Isn't it true you were in the building where the
4   juvenile room is, and you were not in the building where
5   the, where the captain of the precinct and the-- Do you
6   understand what I'm asking you?

7        A     At the time that I was doing the paperwork, the
8   captain wasn't in.

9        Q     Yeah.

10       A     The highest ranking officer that was in the
11  precinct at that time was the lieutenant, and that was it.
12  Just one lieutenant and maybe one or two sergeants.

13       Q     Okay.  Did there come a time when you did see a
14  chief?

15       A     Yes, one chief.

16       Q     One chief.  And where did you see the chief?

17       A     I saw the chief in the captain's office.

18       Q     And the captain's office, is that located in this
19  other main building?

20       A     Yes.

21       Q     And what time was it when you saw the chief?

22       A     I have to look in my notes for that.

23       Q     Please.

24       A     That was about 12:30.

25       Q     You saw the chief at 12:30?


                              H. C. Davis

NYCLD_023600

P-APP000073

T-3   Reynolds-Ppl-cross (Burns)                898

2     A     About 12:30.

3     Q     Now, getting back to your initial observation of

4     the teenagers who were proceeding north on Central Park

5     West, where was your vehicle when you first saw them?

6     A     Our vehicle was pointed west on 100th Street

7     entrance, facing towards Central Park West.  That's the

8     northeast corner.

9     Q     So, but you were still in the park?

10    A     I don't know if you could call that in the park, we

11    were past the wall.

12    Q     And on what side of Central Park West --

13          MR.  BURNS:  Withdrawn.

14    Q     Was your vehicle parked on Central Park West?

15    A     We weren't parked.

16    Q     All right.  Had you just exited the park at that

17    point?

18    A     Yes.

19    Q     And this group was still south of 100th Street?

20    I'm sorry, this group had just passed 100th Street?

21    A     They were --

22    Q     When you first saw them?

23    A     They were going, they were on the block between

24    101st and 102nd Street, on the west side of the street.

25    Q     All right.  So then you were behind them?


                         P. C. Davis


NYCLD_023601

P-APP000074

1              T-3    Reynolds-Ppl-cross (Rivera)              899

2        A    Yes.

3                  MR.   BURNS:   Thank you, officer Reynolds.

4        A    You're welcome.

5   CROSS EXAMINATION

6   BY MR. RIVERA:

7        Q    Good afternoon, officer.

8        A    Good afternoon.

9        Q    Officer, you testified earlier today that you saw

10  one member, one member of the Force that's a brass, that had

11  brass; is that correct?

12       A    Well, what rank do you consider brass?

13       Q    A chief or above?

14       A    Yes, definitely yes.

15       Q    And Mr. Joseph's examining of you, you also

16  testified that you saw a Chief Colengelo and a chief

17  Selvaggi; is that correct?

18       A    I believe that was their names.  Let me take a

19  look.

20            Yes.

21       Q    Now, could you tell us who is Chief Colengelo?

22       A    He's-- Chief Colengelo?

23       Q    Yes.

24       A    I believe he's the chief of Manhattan North.

25       Q    Okay.


                        H. C. Davis

```
1              T-3    Reynolds-Ppl-cross (Rivera)              900

2      A    The Borough.

3      Q    Would he be the chief of detectives?

4      A    Yes.   Yes, Manhattan North detectives.

5      Q    And is he the chief of detectives for the City of

6   New York?

7      A    Yes.

8      Q    And would he be classified as brass?

9      A    You could call him that.

10      Q    Okay.   And could you tell us who Chief Selvaggi?

11      A    He's the chief of the borough patrol.

12      Q    And you also testified as to see another chief; is

13   that correct?

14      A    Yes.

15      Q    And do you know, do you recall the name of that

16   chief?

17      A    Chief Rosenthal.

18      Q    Right.   And could you tell who Chief Rosenthal is?

19      A    Chief of, Manhattan chief of detectives.

20      Q    And did you see all three chiefs on either the 20th

21   or the 21st?

22      A    I believe it was the 21st.

23      Q    Okay.   Did you see Chief Rosenthal on the 20th or

24   the 1?

25      A    Chief Rosenthal I saw both days.


                              H. C. Davis
```

NYCLD_023603

P-APP000076

1     T-3 Reynolds-Ppl-cross (Rivera)   901

2  Q And the other two chiefs you saw on the 21st?

3  A Yes.

4  Q Do you know or do you recall when you were apprised

5 there was a chief, that there were chiefs in the building at

6 the Central Park Precinct?

7  A Excuse me.

8  Q When with you informed that there were chiefs at

9 the Central Park Precinct, a time?

10  A I don't recall.  There was only one chief at the

11 Central Park Precinct.

12  Q And did Chief Rosenthal ask you to come in and

13 speak to him?

14  A No.

15  Q You volunteered to go see Chief Rosenthal?

16  A Definitely not.

17  Q Well, there came a point in time where you saw

18 Chief Rosenthal at the captain's room; is that correct?

19  A Yes.

20  Q And the purpose of your visit to see Chief

21 Rosenthal was to tell him what you had observed on the night

22 of the 19th and 20th, is that correct?

23  A That's correct.

24  Q By the way, were there other individuals present

25 when you were speaking to Chief Rosenthal?

       H. C. Davis

T-3    Reynolds-Ppl-cross (Rivera)                902

1

2     A    Yes.

3     Q    How many other individuals were present?

4     A    I'd say maybe two, three others.

5     Q    And were they also, could they also be deemed

6  police brass?

7     A    The captain could be, the others weren't.

8     Q    Was there a captain in the office?

9     A    Yes.

10    Q    And the other individuals, were they captains or

11  above?

12    A    No.

13    Q    They were below the rank of captain?

14    A    Yes.

15    Q    Outside of the precinct, were there members of the

16  press?

17    A    Yes.

18    Q    And how many members of the press were present

19  outside the precinct?

20    A    I couldn't begin to count them.

21    Q    Was it a countless number, a large number?

22    A    There were a few.

23    Q    When you say a few, would you classify it was less

24  than five, more than five?

25    A    I don't know.


                    H. C. Davis

NYCLD_023605

P-APP000078

```
 1              T-3    Reynolds-Ppl-cross (Rivera)           903
 2        Q     Would it be more than fifteen or twenty people that
 3   were present, members of the press?
 4        A     I don't know.
 5        Q     Did you see them?
 6        A     I saw a couple of them.
 7        Q     Were they together?
 8        A     No, it was scattered.
 9        Q     Were they outside the precinct?
10        A     Yes.
11        Q     Okay.  And when you say a couple, that would be
12   two; is that correct?
13        A     Well, the ones that I saw, again, I saw maybe two,
14   maybe more.
15        Q     And this would be --
16              When was the first time you saw members of the
17   press at the precinct?
18        A     What time?
19        Q     Yes.
20        A     Maybe ten.
21        Q     Ten in the morning?
22        A     Maybe.
23        Q     And that would be April the 20th; is that correct?
24        A     That's correct.
25        Q     Were you informed that members of the press were
```

                              H. C. Davis

NYCLD_023606

P-APP000079

2  waiting outside before ten o'clock in the morning?

3      A    No, I just saw a truck, one of the trucks out

4  there.

5      Q    I'm sorry?

6      A    I saw one of their trucks.

7      Q    That would be a press truck; is that correct?

8      A    Yes.

9      Q    And you only saw one press truck?

10     A    Well, that's when I realized that they were there,

11 I saw one of their trucks.

12     Q    Prior to that you had no knowledge the press was

13 interested in this case; is that correct?

14     A    That's correct.

15     Q    Now, you testified earlier that you saw a group

16 walking northbound on Central Park West at about 10:30 in

17 the evening; is that correct?

18     A    Yes.

19     Q    Okay.  And that group consisted of about ten or

20 twenty people; is that correct?

21     A    That is correct.

22     Q    And you saw them on 101st Street going towards

23 102nd Street; is that correct?

24     A    That's correct.

25     Q    Now was was this group walking?

H. C. Davis

NYCLD_023607

P-APP000080

T-3   Reynolds-Ppl-cross (Rivera)                909

the Assistant District Attorneys and all sworn

jurors are present.

    THE COURT:  All right, good afternoon, ladies

and gentlemen.

    THE CLERK:  Officer Reynolds, may I remind you

you're still under oath.

    THE WITNESS:  Yes.

CONTINUING CROSS EXAMINATION

BY MR. RIVERA:

    Q    Officer, before we broke, you indicated to us that

there was some chiefs and members of the press that were

present at the Central Park Precinct; is that correct?

    A    Yes.

    Q    And is that unusual to see top brass at the Central

Park Precinct during an arrest?

    A    There is not a lot of arrests there, so, but yeah,

I would say it is.  Slight.

    Q    Under normal circumstances would it be unusual to

see a high member of the brass at any precinct when youths

are arrested?

    MS.  LEDERER:  Objection.

    THE COURT:  I'll allow it.

    A    It depends on the precinct.

    Q    Are there some precincts where this would not be

E. C. Davis

P-APP000081

1           T-3   Reynolds-Ppl-cross (Rivera)                910

2    unusual?

3                MS.  LEDERER:  Objection.

4        A    Yes.

5        Q    What about the Central Park Precinct, is this

6    unusual at the Central Park Precinct?

7        A    Slightly, yes.

8        Q    And the same applies for the members of the press?

9        A    Yes.

10       Q    Is thsi the first time you make an arrest where you

11   have that kind of brass and that kind of press present?

12       A    Yes.

13       Q    And at what point in time were you apprised that

14   there case was going to have special significance within the

15   modus operandi of the Police Department.

16                MS.  LEDERER:  Objection.

17                THE COURT:  Sustained.

18       Q    Were there any Assistant District Attorneys present

19   at any time when you were involved in this case between

20   April the 19th and April the 20th?

21                MS.  LEDERER:  Objection.

22                THE COURT:  I'll let him answer.

23       A    Yes.

24       Q    And would that about A.D.A.  Lederer?

25       A    Yes.


                            H. C. Davis

NYCLD_023613

P-APP000082

T-3   Reynolds-Ppl-cross (Rivera)                911

2   Q   And was there also an A.D.A. Fairstein?

3   A   Yes.

4   Q   Were there any other members of the District

5   Attorney, District Attorney present, paticularly any

6   Assistant District Attorney?

7   A   I don't think so.

8   Q   And when for the first time did you see an

9   Assistant District Attorney on this matter?

10   A   The night of the 20th.

11   Q   Prior to the evening of the 20th, you had not seen

12   any A.D.A.s?

13   A   Regarding this matter?

14   Q   Regarding this case.

15   A   No.

16   Q   Did you see them in the building or any other

17   buildings involved in the case?

18   A   No.

19   Q   Prior to the 20th?

20   A   No.

21   Q   Officer, you testified that you spoke to a police

22   officer Alvarez; is that correct?

23   A   Yes.

24   Q   And police officer Alvarez informed you of an

25   assault on an individual; is that correct?

W. C. Davis

NYCLD_023614

P-APP000083

```
 1                    People Reynolds Redirect                966
 2    has to be somebody that we could call.  That's when he told
 3    me the other number to his sister.
 4         Q    You were asked by Mr. Rivera, when in the course
 5    of your work on this case, was the first time that you saw
 6    someone from the District Attorney's Office?  When was that?
 7         A    That was the next night, the night of the 20th.
 8         Q    Where was that?
 9         A    That was the 20th Precinct.
10         Q    You were asked a series of questions by Mr. Rivera
11    regarding statements that Raymond Santana made to you at the
12    time that he was first detained by you and Officer Powers.
13    I believe, Mr. Rivera, was asking you about notes that you
14    made and a memo book, is that right?
15              Do you recall the exchange that I'm referring to?
16         A    Yes.
17         Q    For what reason did it strike you as significant
18    that no other information was offered by Raymond Santana at
19    that time regarding what he he said to you?
20              MR. BURNS:  Objection.
21              THE COURT:  Objection sustained.
22              MS. LEDERER:  Can we approach for a minute?
23              THE COURT:  Yes.
24              (Whereupon, a discussion was held at the
25              bench  on the record as follows:)
```

LDI

T2-SC-TS

4946

1          Fairstein - People - Cross - Burns

2   representatives   of   the   police   department   ask   for   your

3   assistance in connection with this investigation?

4                    MS. LEDERER:   Objection.

5                    THE COURT:   I'll allow it.

6   A     Yes, they did ask for our assistance.

7   Q     At what point was that?

8                    MS. LEDERER:   Objection.

9                    THE COURT:   I'll allow it.

10  A     They first --

11  Q          No.   When was the first time they asked for the

12  assistance of the District Attorney's Office   in   relation   to

13  this investigation?

14  A     When I was called at nine o'clock on the morning of

15  the 20th, I was told I would be asked later   in   the   day   for

16  assistance.

17  Q          You   were   called   by   a   police   department

18  representative?

19  A     That's right.

20  Q     And was it   a   person   who   was   in   charge   of   the

21  investigation?

22                    MS. LEDERER:   Objection.

23                    THE COURT:   I'll let her answer.

24  A     It was one of the supervising officers, yes.

25  Q     When you arrived at eight o'clock -- I'm sorry, 8:30

NYCLD_015465

P-APP000085

T2-SC-TS

4947

Fairstein — People — Cross — Burns

--

1

2

3   A    A little after 8:30.

4   Q    -- Ms. Lederer was already there, is that right?

5   A    Yes.

6   Q         And you went inside and went up to the 2nd floor

7   detective room?

8   A    Yes, I did.

9   Q    Ms. Lederer was there?

10  A    Yes, she was.

11  Q    Had any video begun?

12  A    No.

13  Q    Had any questioning or talking to people, had any of

14  that begun at the time that you arrived?

15       MS. LEDERER:  Objection.

16       THE COURT:  If she knows, I'll let her answer.

17  A    Yes, it had.

18  Q    At any time prior to your arrival, did you have

19  occasion to go to Metropolitan Hospital?

20  A    No, sir.

21  Q         And did you have an occasion to speak to the

22  officers who had -- the officers who had discovered the body

23  of the female jogger?

24       MS. LEDERER:  At what point?

25  Q         Prior to your arrival at the precinct, at

T2A-SC-TS

4948

1              Fairstein - People - Cross - Burns

2    approximately 8:30 in the evening of the 20th.

3        A     Prior to my arrival, no.

4        Q     Incidentally, the telephone call that you received

5    about nine o'clock, that was in relation to asking the

6    District Attorney's Office for assistance in connection with

7    the investigation relative to the female jogger?

8        A     In part, yes.

9        Q     You're the -- were any other units of the District

10   Attorney's Office called?

11              MS. LEDERER:  Objection.

12       Q     To your knowledge?

13              MS. LEDERER:  Objection.

14              THE COURT:  I'll allow it.

15       A     Yes.

16       Q     Well, you're the Head of the Sex Crimes Unit, right?

17       A     Yes.

18       Q     Was there any other sex crime that was being

19   investigated, in connection with Central Park?

20              MS. LEDERER:  Objection.

21              THE COURT:  Sustained.

22       Q     Your participation, as the Chief of the Sex Crimes

23   Unit, when you were called, wasn't that in connection with the

24   investigation relative to the, to the female jogger?

25       A     Yes.

NYCLD_015467

P-APP000087

T3-JM-TS

4949

Fairstein - People - Cross - Burns

1

2    Q    Now, between 8:30 and 11:30, did you participate   in

3    any questioning of any individuals?

4    A    I questioned police officers.

5    Q    Just officers.

6    A    Right.

7    Q    Now, at 11:30, you say, is the first time you --

8              MR. BURNS:  Withdrawn.

9    Q    At what point in time -- at what point in time did

10   you -- were you aware of the fact that Yusef Salaam was in the

11   20th Precinct?

12   A    I have -- I would put it in the 11  o'clock  period,

13   but it was between 11 and 11:30.

14   Q    And do you have any -- can you tell the Court who

15   told you, or how you came by that information?

16   A    I was in a room with a lot of police officers,  and,

17   as  different events unfolded that evening, because there were

18   many participants, and a lot of police activity, people  would

19   enter  the room to tell some of the supervisors what was going

20   on.

21   Q    And I believe --  and  you  were  functioning  as  a

22   supervisor?

23   A    No.  I'm talking about police supervisors.

24   Q    But you were working along with the supervisors,

25   were you not?

T2-SC-TS

4946

1          Fairstein — People — Cross — Burns

2   representatives  of  the  police  department  ask   for   your

3   assistance in connection with this investigation?

4              MS. LEDERER:  Objection.

5              THE COURT:  I'll allow it.

6   A    Yes, they did ask for our assistance.

7   Q    At what point was that?

8              MS. LEDERER:  Objection.

9              THE COURT:  I'll allow it.

10  A    They first --

11  Q         No.   When was the first time they asked for the

12  assistance of the District Attorney's Office  in  relation  to

13  this investigation?

14  A     When I was called at nine o'clock on the morning of

15  the 20th, I was told I would be asked later  in  the  day  for

16  assistance.

17  Q           You  were  called  by  a  police  department

18  representative?

19  A    That's right.

20  Q    And was it  a  person  who  was  in  charge  of  the

21  investigation?

22              MS. LEDERER:  Objection.

23              THE COURT:  I'll let her answer.

24  A    It was one of the supervising officers, yes.

25  Q    When you arrived at eight o'clock -- I'm sorry, 8:30

P-APP000089

T2-SC-TS

4947

1            Fairstein — People — Cross — Burns

2   --

3        A    A little after 8:30.

4        Q    -- Ms. Lederer was already there, is that right?

5        A    Yes.

6        Q        And you went inside and went up to the 2nd floor

7   detective room?

8        A    Yes, I did.

9        Q    Ms. Lederer was there?

10       A    Yes, she was.

11       Q    Had any video begun?

12       A    No.

13       Q    Had any questioning or talking to people, had any of

14  that begun at the time that you arrived?

15            MS. LEDERER:  Objection.

16            THE COURT:  If she knows, I'll let her answer.

17       A    Yes, it had.

18       Q    At any time prior to your arrival, did you have

19  occasion to go to Metropolitan Hospital?

20       A    No, sir.

21       Q        And did you have an occasion to speak to the

22  officers who had --- the officers who had discovered the body

23  of the female jogger?

24            MS. LEDERER:  At what point?

25       Q        Prior to your arrival at the precinct, at

NYCLD_015466

P-APP000090

T2A-SC-TS

4948

1           Fairstein - People - Cross - Burns

2   approximately 8:30 in the evening of the 20th.

3       A    Prior to my arrival, no.

4       Q    Incidentally, the telephone call that you received

5   about nine o'clock, that was in relation to asking the

6   District Attorney's Office for assistance in connection with

7   the investigation relative to the female jogger?

8       A    In part, yes.

9       Q    You're the -- were any other units of the District

10  Attorney's Office called?

11          MS. LEDERER:  Objection.

12      Q    To your knowledge?

13          MS. LEDERER:  Objection.

14          THE COURT:  I'll allow it.

15      A    Yes.

16      Q    Well, you're the Head of the Sex Crimes Unit, right?

17      A    Yes.

18      Q    Was there any other sex crime that was being

19  investigated, in connection with Central Park?

20          MS. LEDERER:  Objection.

21          THE COURT:  Sustained.

22      Q    Your participation, as the Chief of the Sex Crimes

23  Unit, when you were called, wasn't that in connection with the

24  investigation relative to the, to the female jogger?

25      A    Yes.

NYCLD_015467

P-APP000091

T3-JM-TS

4949

1           Fairstein - People - Cross - Burns

2      Q    Now, between 8:30 and 11:30, did you participate in

3  any questioning of any individuals?

4      A    I questioned police officers.

5      Q    Just officers.

6      A    Right.

7      Q    Now, at 11:30, you say, is the first time you --

8           MR. BURNS:  Withdrawn.

9      Q    At what point in time -- at what point in time did

10 you -- were you aware of the fact that Yusef Salaam was in the

11 20th Precinct?

12     A    I have -- I would put it in the 11 o'clock period,

13 but it was between 11 and 11:30.

14     Q    And do you have any -- can you tell the Court who

15 told you, or how you came by that information?

16     A    I was in a room with a lot of police officers, and,

17 as different events unfolded that evening, because there were

18 many participants, and a lot of police activity, people would

19 enter the room to tell some of the supervisors what was going

20 on.

21     Q    And I believe -- and you were functioning as a

22 supervisor?

23     A    No.  I'm talking about police supervisors.

24     Q    But you were working along with the supervisors,

25 were you not?

VOL. 10 of 18

788

SUPREME COURT   :   NEW YORK COUNTY

CRIMINAL TERM   :   PART 59

- - - - - - - - - - - - - - - - - - - - - -x

THE PEOPLE OF THE STATE OF NEW YORK,        :

                -against-                    :

ANTRON MC CRAY, YUSEF SALAAM AND             :

RAYMOND SANTANA,                             :

                        Defendants.          :

- - - - - - - - - - - - - - - - - - - - - -x

Indictment Number 4762/89

                              111 Centre Street
                              New York, New York.
                              July 2, 1990

B E F O R E :

        THE HONORABLE THOMAS B. GALLIGAN,

                                        Justice.

    (Appearances same as previously noted.)

            oOo

    THE CLERK:  Case on trial continued, People of

    State of New York versus Raymond Santana, Yusef

    Salaam, Antron Mc Cray, indictment 4762 of '89.

        THE COURT:  People ready?

New York Supreme Court Library
100 Centre Street 17th Floor
New York, New York 10013
ENTERED OCT 3 - 1995

```
 1              T-1    Reynolds-Ppl-direct                    789

 2              MS. LEDERER:  Yes.

 3              THE COURT:  Defendants ready?

 4              MR. JOSEPH:  Yes, sure.

 5              THE COURT:  Okay, bring out the jurors.

 6              THE OFFICER:  Jury entering.

 7              THE CLERK:  The defendants, their attorneys,

 8         the Assistant District Attorneys and all sworn

 9         jurors are present.

10              THE COURT:  All right, good morning, ladies

11         and gentlemen.

12              Call your next witness, please.

13              MS. LEDERER:  Police officer Eric Reynolds.

14

15    E R I C     R E Y N O L D S            , police officer,

16              shield number 17510, assigned to the 23rd

17              Precinct Robbery Unit, called as a witness by

18              the People, Having first been duly sworn,

19              testified as follows:

20              THE OFFICER:  People's witness.

21    DIRECT EXAMINATION

22    BY MS. LEDERER:

23              THE COURT:  Officer, usually we have to ask

24         the witnesses to move closer, We're going to ask

25         you to move back a little bit. okay, that's great.
```

H. C. Davis

NYCLD_023492

P-APP000094

T-1   Reynolds-Ppl-direct                    790

Q     How long have been assigned to the 23rd Precinct?

A     A year.

Q     And how long have you been with the New York City Police Department?

A     Nine years.

Q     Prior to being assigned to the 23rd Precinct, Where were you assigned?

A     Central Park Precinct Anti Crime Unit.

Q     What does it mean to be a member of the Anti Crime Unit?

A     It's a unit that works in plainclothes, and our job is to make arrests for robberies in progress on the street such as, robberies, burglaries.  Crimes such as robberies an burglaries.

Q     And where were you working on April 19th of 1989?

A     In Central Park.

Q     What was your tour of duty on that date?

A     Four o'clock to midnight.

Q     And did you have a partner?

A     Yes.

Q     Who was your partner?

A     Robert Powers.

Q     As a member of the Anti Crime Unit in Central park, were you wearing a uniform or were you in plainclothes?

H. C. Davis

NYCLD_023493

P-APP000095

T-1   Reynolds-Ppl-direct                791

A    I was in civilian clothes.

Q    On that night did you work on foot or did you have a vehicle?

A    We had a vehicle.

Q    And what were you driving on that night?

A    It was a green Parks Department van.

Q    Would you describe for the members of the jury what the Parks Department van looked like.

A    It's just a regular van that was green in color with no windows on the sides.

Q    Is there any kind of insignia or marking indicating, any writing on the outside of the van?

A    Yes, There is the Parks Department logo, a white oak leaf.

Q    On that, on that night was the Parks Department van equipped with a police radio?

A    The van itself wasn't, we had a portable radio with us.

Q    And over that radio were you able to transmit and receive police broadcasts from the Central Park area?

A    Yes.

Q    I'd like to direct your attention to approximately 9:30 p.m. on the evening of April 19th of 1989.  Did you receive a radio communication at about that date, that time

H. C. Davis

NYCLD_023494

P-APP000096

```
1                    T-1    Reynolds-Ppl-direct                 792
2    on that date?
3         A    Yes.
4         Q    What was the radio communication that you heard?
5              MR.  JOSEPH:  Objection.
6         A    There was a--
7              THE COURT:  What was the question?
8              MS.  LEDERER:  What was the transmission that
9         was heard.
10             THE COURT:  I'll allow it.
11        A    There was an assault by approximately seven to
12   eight, by seven or eight male Hispanics over on 102nd Street
13   and the East Drive.
14        Q    Did you recognize the person who was putting that
15   transmission over the radio?
16        A    Yes.
17        Q    And who did you recognize that to be?
18        A    That was police officer Ray Alvarez from the 23rd
19   Precinct.
20        Q    Did you do anything in response to that radio
21   communication?
22        A    Yes.
23        Q    What did you do?
24        A    We drove over to the, we drove to the area to start
25   looking for the, the people described in the transmission.


                         H. C. Davis
```

T-1   Reynolds-Ppl-direct                    793

1

2     Q    On that night were you or officer Powers driving

3  the van?

4     A    Officer Powers.

5     Q    What were the lighting conditions like at

6  approximately 9:30 on April 19th of 1989?

7     A    It was dark out and the roads and the walkways were

8  lit up by lamps inside the park.

9     Q    Were there any street light or lamp posts in the

10 ball field area in Central Park?

11    A    No.

12    Q    Are there any street light on the tennis courts in

13 the area in Central Park?

14    A    Along the pathways near it there are, but not in

15 the tennis court.

16    Q    What if anything did you see when you responded to

17 the area of 102nd Street and the East Drive?

18    A    Police cars.  That was it.

19    Q    What did you do after responding to that area and

20 seeing the police cars?

21    A    I had a conversation with a couple of the officers

22 there.

23    Q    Did you have a conversation with officer Alvarez?

24    A    Yeah.

25    Q    And did you see anybody with officer Alvarez?

H. C. Davis

P-APP000098

1              T-1    Reynolds-Ppl-direct                    794

2        A    Yes.

3        Q    Where did you see officer Alvarez?

4        A    I saw him at the, approximately the East Drive and

5   102nd Street.

6        Q    And was he in a car or was he outside of a car?

7        A    I believe he was in his car.

8        Q    Who did you see with officer Alvarez.

9        A    They had a male complainant in the back of the car.

10       Q    How long did you speak to officer Alvarez?

11       A    Say about two, three minutes.

12       Q    After you had that conversation with officer

13   Alvarez, what did you do?

14       A    We continued to drive around the park in search of

15   the group that committed the assault.

16       Q    And what area, generally what area did you search?

17       A    The north end of the park.

18       Q    While you were searching the north end of the park,

19   did there come a time where you heard another radio

20   transmission?

21       A    Yes.

22       Q    And what was that radio transmission?

23       A    There was, the dispatcher had given us a message

24   that there were thirty to forty males harassing people

25   inside the park.


                          H. C. Davis

NYCLD_023497

P-APP000099

1

2       Q     When you say the dispatcher, do you know who you

3  heard?

4       A     I don't know the person whose name it was, just

5  that there was, you know.

6       Q     When you say dispatcher, are you referring to

7  somebody from Central Park or is this from the 911?

8       A     From 911.

9       Q     At approximately what time did you receive that

10  radio transmission?

11      A     It was a little after the original one that officer

12  Alvarez put over.

13      Q     What did you do after you received that radio

14  transmission?

15      A     I continued to look through the park.

16      Q     Did you see any people matching the descriptions

17  that you had received?

18      A     No.

19      Q     Did you see any police cars while you were

20  canvassing?

21      A     Yes.

22      Q     And approximately how many other police cars did

23  you see?

24      A     I'd say about eight, nine cars.

25      Q     And where did you see those police cars?


                              P. C. Davis

T-1   Reynolds-Ppl-direct                    796

A     I saw them all throughout the ball fields and on the pedestrian paths and roadways throughout the park.

Q     Did there come a time where you received a third radio transmission?

A     Yes.

Q     And what was that transmission?

A     That was from Sgt. Lale (phonetic).

Q     Who is Sgt. Lale?

A     He was our supervisor in Anti Crime.

Q     And at approximately what time did you receive that radio transmission?

A     About quarter to ten.

Q     What if anything did you do --

      What was that radio transmission?

A     He, he had a group of youths over at 100th Street and Central Park West, inside the playground and he'd wanted officer Alvarez to bring over the complainant for a show up to see if they were the same people that committed the assault against him.

Q     And did you go to that playground at 100th Street?

A     Yes.

Q     Did you see officer Alvarez there?

A     Yes.

Q     Did you see a number of youths at that playground?

H. C. Davis

NYCLD_023499

P-APP000101

```
 1                    T-1    Reynolds-Ppl-direct                797
 2         A    Yes.
 3         Q    And was officer, excuse me, was the complainant
 4    with officer Alvarez, given an opportunity to see those
 5    people?
 6         A    Yes.
 7         Q    Were you present at that time?
 8         A    Yes, I was.
 9         Q    Did you actually have any conversation or interview
10    the complainant who was with officer Alvarez?
11         A    No.
12         Q    How long did you stay at that playground?
13         A    I'd say about ten minutes, fifteen minutes, maybe.
14         Q    Where did you go when you left the playground?
15         A    We continued to canvass the northern end of the
16    park.
17         Q    And did you see any young males?
18         A    No.
19         Q    Did you see any police cars?
20         A    Yes.
21         Q    And either at this time or earlier when you saw the
22    police cars, did you notice whether any of them had any dome
23    lights or turret light on as they were driving?
24         A    No, I don't recall any.
25         Q    Did they have their turret lights on or any kind of
```

H. C. Davis

NYCLD_023500

P-APP000102

```
 1                   T-1    Reynolds-Ppl-direct                    798
 2   dome light?
 3       A    On any of the police cars?
 4       Q    Yes.
 5       A    Not that I recall, no.
 6       Q    And while you were driving around, did you hear yet
 7   another radio communication?
 8       A    Yes.
 9       Q    And what was that communicate?
10       A    That was from one of the auxiliary police, he had
11   found a male jogger that was --
12                   MR.  JOSEPH:  Objection, Judge.
13                   THE COURT:  I'll allow it.
14       A    He had found a male jogger that was severely beaten
15   on the, around 96th Street and the West Drive.
16       Q    Did you hear any further information with respect
17   to the assault on that male jogger?
18       A    Yes, another police officer--
19                   MR.  JOSEPH:  Objection.
20                   THE COURT:  Yes, just a minute.  Come up for a
21             minute.
22             Step down for a second.
23             (At side bar.)
24                   THE COURT:  Okay.
25                   MR.  JOSEPH:  The basis of my objection is


                          H. C. Davis
```

T-1    Reynolds-Ppl-direct                    799

it's hearsay.

THE COURT:  Yeah, except all this stuff was brought out throughout the other witnesses by defense counsel.

MR.  JOSEPH:  It just seems that we don't, I don't know that it was brought out through defense counsel.

THE COURT:  It was brought out, all of the radio run communications were brought out through defense counsel's cross-examination of other witnesses.

MR.  JOSEPH:  But as to this witness, I think the questions call for hearsay testimony, and I'm noting my objection, number one.

Number two, it seems to me just to be, to serve no purpose than bring to bring it out through this witness.

THE COURT:  what are you asking now?  He got a communication it was a male jogger beaten?

MS.  LEDERER:  And the description that came over the air of, that male blacks that fled northbound from that scene.

The, this information is particularly relevant in light of the opening given by Mr. Rivera who

H.  C.  Davis

NYCLD_023502

P-APP000104

T-1   Reynolds-Ppl-direct                                    800

argued that Santana was arrested for no reason.

And I think the state of mind of the officers is

relevant to why that group of people were stopped.

    And we had this conversation about whether the

hearsay would be admissible just immediately

before starting testimony in this case.  The Court

indicated that it would rule as it came up.  We

did not elicit from officer Alvarez, and it was

brought out by every defense attorney throughout

cross of that officer.

    THE COURT:  I don't know if I said I would

allow hearsay to come in.

    MS.  LEDERER:  I said you didn't rule at that

time, but after we had that conversation, and even

the defense had been alerted to it, they all

brought out what the radio runs had been.

    THE COURT:  Yes.

    MS.  LEDERER:  This officer that made the

actual stop.  His state of mind is key, specially

since it's an issue raised by Mr. Rivera.

    THE COURT:  Have you people finished?

    MS.  LEDERER:  Yes.

    THE COURT:  Normally I would not permit the

District Attorney to bring out any of this


                    H. C. Davis


NYCLD_023503

P-APP000105

T-1   Reynolds-Ppl-direct                    301

information, other than the fact they had received

a radio communication, radio transmission and

responded to, and where he responded to.   However,

all of this material that has been gone into by

the defense on cross examination of earlier

witnesses, so it seems to me inappropriate to at

this point foreclose this witness from testifying.

So, for that reason I'm going to allow it.   Okay.

     MR.   JOSEPH:   Judge, I know appellate courts

don't generally look favorably on continuing

objections, I don't know if your Honor wishes to

object to each question.

     THE COURT:   I will assume, if you want that as

to other radio transmissions, the District

Attorney may bring out.   You make a continuing

objection.

     MR.   JOSEPH:   Okay.

     THE COURT:   For the same reason I indicated I

will rule the same way.   I would have, initially

had the District Attorney tried to bring that

stuff out on her direct examination of any

witness, absent cross-examination, the bringing

out of that very same material, I would sustain

the objection, but that's not the situation.   So,


                    H. C. Davis

NYCLD_023504

P-APP000106

T-1   Reynolds-Ppl-direct                   802

1    I will allow it.

2         MR.  JOSEPH:  Our objection is preserved as to

3    all of this testimony to come?

4         THE COURT:  If you're going to object to each

5    radio transmission content, yes.

6         MR.  JOSEPH:  Right.  Correct.

7         MR.  BURNS:  I'm sorry, I make the same

8    objection, the objection is on direct examination

9    when it's brought out.

10        THE COURT:  Okay.

11        MR.  BURNS:  In other words, she's calling a

12   witness and the witness is testifying in the first

13   instance on direct examination, and the District

14   Attorney is being permitted to introduce hearsay

15   on the basis of the fact, I object to that, and I

16   also have a continuing objection.

17        THE COURT:  For the same reasons, I will allow

18   it.

19        MR.  BURNS:  Okay.

20        (In the presence of the jury.)

21   Q    The radio transmission that you described receiving

22   from the auxiliary police, would you tell us what the

23   content of that transmission were.

24   A    That he had found a male jogger that was beaten,

                    H. C. Davis

T-1   Reynolds-Ppl-direct                     803

had been beaten up and was bleeding and needed an ambulance.

Q    Was there any information given as, concerning the person or persons who were responsible for that assault?

A    Yes, there was.

Q    And what was that information?

A    That they were male blacks.

Q    And was any information given about where those people went after they attacked the male jogger?

A    That they had fled west from 96th Street.

Q    What did you do after you heard that report?

A    I started to, we started to head in that direction and made our way out of the park at 100th Street and Central Park West.

Q    When you say you exited the park, would you please step down and approach People's 2 in evidence and show the members of the jury the route that you took and where you exited the park.

A    We went across the cross drive here at 102nd Street and, going west and then south on the, on the South Drive.

Q    Excuse me, your finger is next a legend there, when you say you were going south, what roadway were you traveling on?

A    On the West Drive.  And then we went west on 100th Street which took us to 100th Street and Central Park West.

H. C. Davis

```
1              T-1   Reynolds-Ppl-direct              804
2      Q     Approximately what time was it as you were exiting
3  the park?
4      A     That was approximately ten to.
5      Q     What if anything did you see when you were at 100th
6  Street an Central Park West?
7      A     We saw a large group between 101st Street and 102nd
8  Street in Central Park West, walking northbound.
9              MS.   LEDERER:   The record should reflect the
10             witness is pointing to the right side of the
11             street.
12     Q     What side of the street did you see them on?
13     A     I saw them on the west side of the street.
14     Q     You may resume the witness stand.
15           Would you describe the group you saw as you were
16  leaving Central Park on that night.
17     A     It was a large group of teenagers, Black and
18  Hispanic, and they were walking together as a group,
19  northbound.
20     Q     How many people did you see in that group?
21     A     Anywhere from ten to twenty.
22     Q     And what were they doing when you saw them?
23     A     They were walking northbound.
24     Q     Did you observe any interaction between the people
25  who comprised that group?


                         H. C. Davis
```

T-1    Reynolds-Ppl-direct                    805

A    Well, they were walking as a group, they were talking.   And as we, as we rode alongside of them, what the group did was they stopped and started pointing at our van.

Q    Let me go back for a moment.   When you described the group and you referred, you described they were walking northbound on the block on Central Park West between 101st and 102nd, how close together were the members of this group?

A    They were altogether like a pack.

MR. JOSEPH:  Objection.

THE COURT:  I'll allow it.

Q    What direction did you turn on to Central Park West?

A    We turned north.   Northbound.

Q    And what if anything happened as you were driving northbound?

A    Well, as we started to approach them, I was going to call on the radio to have other cars come so we could sort of box them in, but the group stopped and they took, at least what I thought was notice of us.

MR. BURNS:  Objection.

MR. JOSEPH:  Objection.

THE COURT:  Don't tell us what you thought they thought, just tell us what you observed.

H. C. Davis

NYCLD_023508

T-1   Reynolds-Ppl-direct                          806

MR.   BURNS:  Will that be stricken, your

Honor?

THE COURT:  Yes.

MS.   LEDERER:  Your Honor, if we could.  Is

the hole answer stricken?

THE COURT:  Just the portion where you're

telling us what you thought they thought.  We don't

want you to five us their thought process, give us

your thought process and your observations.  Okay?

THE WITNESS:  Okay.

Q    What if anything did you see the members of that

group do as you drove northbound?

A    I saw them stop and what they did was they started

to point to us and I had thought that they recognized us.

MR.   BURNS:  Objection.

MR.   JOSEPH:  Objection.

THE COURT:  That's what he thought, that was

going through his mind.

MR.   JOSEPH:  I would object to that, even if

it was going through his mind.  No, I will allow

it, that's his thought process, I will allow that.

Go ahead.

Q    Did you see whether there was anybody near the

police, the Parks Department van that you were driving at

H. C. Davis

P-APP000111

```
 1                    T-1    Reynolds-Ppl-direct                    807
 2   that time?
 3        A    Yes.
 4        Q    All right.  Would you describe who you saw near the
 5   van and how you became aware of that person's presence.
 6        A    I saw police officer Flores and she was driving,
 7   she was in uniform driving a Mark three wheel scooter.
 8        Q    Where was it you saw her?
 9        A    She had pulled up right alongside of us on my
10   righthandside and we were between her and the group.
11        Q    Prior to seeing officer Flores at the sight you
12   just described, had you seen her earlier in the evening?
13        A    Yes.
14        Q    And where had you seen her earlier in the evening?
15        A    I saw her driving around, also looking for the,
16   canvassing for the group.
17        Q    When did you first become aware of her as you were
18   driving north on Central Park West?
19        A    Right after the group stopped and started pointing.
20        Q    And at that point when you became aware of officer
21   Flores' presence, where did you see her?
22        A    She was on my righthandside, she had pulled up
23   alongside of us, that's when we realized that--
24             MR.  JOSEPH:  Objection.
25        A    That's when I realized they were going to run.


                              H. C. Davis
```

NYCLD_023510

P-APP000112

```
 1              T-1    Reynolds-Ppl-direct              808
 2              MR.   JOSEPH:   Objection.
 3              THE COURT:   That's his thought process, that's
 4         what he was thinking when he saw her pull up
 5         alongside.   I'll allow it.
 6    Q    What if anything did you and officer Powers do when
 7 you became aware that officer Flores was on your right?
 8    A    Well then we, I realized they were going to run
 9 from us because.
10              MR.   RIVERA:   Objection.
11              THE COURT:   No, overruled.
12              Go ahead.
13    A    Because they'd stopped and started to point at the
14 van, at least I thought they were pointing at the van, they
15 were really pointing at her and thought she--
16              MR.   JOSEPH:   Objection.
17              THE COURT:   Don't tell us what they thought.
18         You tell us what you thought.
19              THE WITNESS:   Okay.
20    Q    What if anything did you and officer Powers do at
21 that point?
22    A    We took the van and cut them off at 102nd Street.
23    Q    Would you step down again and approach People's 2
24 in evidence and show the members of the jury where you and
25 officer Powers went with the van and describe the position
```

H.  C.  Davis

T-1    Reynolds-Ppl-direct                    809

of the van in relation to Central Park West.

    A    Okay.  We had, at 102nd Street we pulled in
perpendicular to Central Park West into the crosswalk with
the van sitting in traffic.

    Q    Was the van pulled into 102nd Street?

    A    No.  It was on Central Park West.

    Q    And what happened when you pulled the van into that
location?

    A    We got out of the van, identified ourselves and
told them not to run.

    Q    Why don't you resume the witness stand.

         From the position that you've just described that
the Parks Department van was in, which of you were closer to
the group?

    A    Police officer Powers.

    Q    And when the van was pulled in that postion, what
if anything did you do?

    A    I got out of the van, he got out of the van and
again we identified ourselves and told them not to run.

    Q    When you got out of the van, did you go around the
front or the back of the van?

    A    I went around the front.

    Q    And whether you went around the front, how close
were the members of the group to you at that time?


                         M. C. Davis

NYCLD_023512

P-APP000114

```
 1                    T-1    Reynolds-Ppl-direct              310
 2       A    I'd say about a car length or two.
 3       Q    And what if anything did the members of the group
 4    do when you said what you just described?
 5       A    They ran.
 6       Q    And did any members of the group not run?
 7       A    Yes.
 8       Q    And who, would you describe what happened with
 9    respect to people who did not run.
10       A    Well, they didn't run, I, we told them to get
11    against the wall, gave them a quick, you know, frisk in case
12    they had any kind of weapons.
13       Q    How many people did not run when you identified
14    yourselves?
15       A    Two.
16       Q    And where were those people in relation to the
17    group?
18       A    They were with the group, they were right in the
19    front.
20       Q    And how close were you to them at the time --
21            MS.  LEDERER:  Withdrawn.
22       Q    How close were the others in the group to you in
23    relation to where these in the group were?
24       A    Excuse me, I'm sorry?
25       Q    You indicated that there were people in the group
```

H. C. Davis

T-1   Reynolds-Ppl-direct                    811

1
2   that didn't run, how many didn't run?
3       A    Two.
4       Q    And where were those people in relation to the
5   other members of the group that didn't run?
6       A    They were with the group, but they were right at
7   the front of the pack.
8       Q    Did you later learn the names of those two people?
9       A    Yes.
10      Q    And what were their names?
11      A    Steve Lopez and Raymond Santana.
12      Q    What did you do with respect to those people?
13      A    We took them, placed them against the wall and
14  patted them down real quick.
15      Q    When you say you took them, do you know which
16  person you took?
17      A    No, I don't recall.
18      Q    And would you describe how you, what you mean when
19  you say took them.
20      A    I grabbed him by his arm.
21      Q    And you indicated you put him against the wall?
22      A    Yes.
23      Q    Was his face to the wall or face to you?
24      A    Face to the wall.
25      Q    And what did you do at that point?


                          H. C. Davis

NYCLD_023514

P-APP000116

```
1                    T-1    Reynolds-Ppl-direct                    812

2         A    I patted his outside clothing down to make sure he

3    had, you know, didn't have a knife or a gun or anything.

4         Q    Did you find any kind of a weapon?

5         A    No.

6         Q    Okay.  Where was officer Powers while you were

7    doing this?

8         A    He was standing right alongside me.

9         Q    And what was he doing?

10        A    He was doing the same with the other person he had.

11        Q    Do you know which person you had taken hold of?

12        A    No, I don't recall.

13        Q    And do you know the name of the person officer

14   Powers had taken hold of?

15        A    No.

16        Q    Other than those two people, where did everybody

17   else in that group go?

18        A    The group ran south on Central Park West towards

19   101st Street and then at 101st Street they ran west.

20        Q    After you had frisked the person you had against

21   the wall, what did you do with him?

22        A    I stood there were them and while officer Powers

23   chased the rest of the group along with officer Flores.

24        Q    At the time that you and officer Powers stopped

25   Steve Lopez and Raymond Santana, did Raymond Santana make
```

H. C. Davis

```
 1              T-1   Reynolds-Ppl-direct                 813

 2   any statement to you?

 3        A    Yes, he did.

 4        Q    And would you tell us please what he said to you.

 5        A    He stated that he had just come from a girlfriend's

 6   house and that he didn't know the group and that they were

 7   about to rip them off.

 8        Q    How long did you say, excuse me, how long did

 9   officer Powers stay at that location with you after you had

10   taken these two individuals and put them against the wall?

11        A    Just long enough to pat down the person that he was

12   holding.

13        Q    And where did he go after that?

14        A    He ran after the group.

15        Q    Did you handcuff either of those two people at that

16   time?

17        A    No.

18        Q    Did you see where officer Flores went?

19        A    Officer Flores was also in pursuit of the group.

20        Q    And was she doing that on foot or on the scooter?

21        A    In the scooter.

22        Q    Where did you see her go?

23        A    I saw her in the street go south on Central Park

24   West and then west on 101st Street.

25        Q    Did you see either officer Powers or officer Flores
```

H. C. Davis

NYCLD_023516

P-APP000118

T-1    Reynolds-Ppl-direct                    314

2    again after you saw them run west on 101st Street?

3        A    Yes.

4        Q    And would you please tell us where you saw them.

5        A    They had run east on 101st Street, doubling back,

6    you know, for the kids that had run back the other way.

7        Q    And did you see them come back to 101st Street and

8    Central Park West?

9        A    Yes.

10        Q    Did you see any members of the group at that time?

11        A    Yes.

12        Q    And approximately how many members of the group did

13    you see?

14        A    It was about six or seven of them.

15        Q    What did you see them doing?

16        A    They ran across Central Park West and when they got

17    to the wall, they jumped over the wall, into the park.

18        Q    And what if anything did you see officer Powers do.

19        A    I saw him also run cross Central Park West and he

20    jumped over the wall.

21        Q    And what did you see officer Flores do?

22        A    I believe she drove her scooter around and went

23    through the, went through the 100th Street entrance.

24        Q    What did you do during this time?

25        A    During this time I stood there with the, with Lopez

H. C. Davis

T-1    Reynolds-Ppl-direct                    815

1    and Santana and I put over the air, I called for assistance

2    for other units to come and help out officer Powers with

3    the, with the perps he was chasing.

4        Q    Officer Reynolds, I ask you to look around the

5    courtroom today, do you see Raymond Santana in court today?

6        A    Yes.

7        Q    And would you please point him out.

8        A    He's sitting right there with, I believe it's a

9    blue tie, white shirt and glasses.

10            MS.  LEDERER:   The record should reflect the

11            witness has identified Raymond Santana.

12       Q    Approximately how long did you stay at that sight

13   with Steve Lopez and raped Santana?

14       A    I'd say about fifteen, twenty minutes.

15       Q    Did there come a time where a police car came to

16   the location where you were?

17       A    Yes.

18       Q    And who was in that car?

19       A    That was Sgt. Wheeler and another police officer, I

20   don't recall his name now.

21       Q    What happened --

22       A    Officer Morales.

23       Q    What happened when that police car arrived?

24       A    They, when they got there, then they were placed, I

                        H. C. Davis

NYCLD_023518

P-APP000120

<pre>
 1                T-1    Reynolds-Ppl-direct                816
</pre>

2  placed the handcuffs on them and put them in the back of the

3  car.

4       Q    And what did you do after they were placed in the

5  radio car?

6       A    I had waited for officer Powers to come back with

7  the keys for the van so we could drive back to 100th Street

8  and Central Park West.

9       Q    Did officer Powers come back on the location where

10 you were?

11      A    Yes.

12      Q    Approximately how much time went by to the time

13 Stephen Lopez an Raymond Santana were taken in the police

14 car, how much time went by from the time those two were

15 taken in the police car until officer Powers came back.

16      A    I'd say about five minutes.

17      Q    And after officer Powers came back, what if

18 anything did you do?

19      A    We drove back to 100th Street and Central Park

20 West, inside of the park.

21      Q    Who did you see when you got to 100th Street and

22 Central Park West?

23      A    I saw my supervisor, Sgt. Lale and the other

24 officers that were involved in the pursuit.

25      Q    And did you see Raymond Santana or Steve Lopez at

                         H. C. Davis

P-APP000121

```
 1                    T-1    Reynolds-Ppl-direct                817
 2   that location?
 3        A     Yes.
 4        Q     Without us where you saw them?
 5        A     I saw them in the back of Sgt. Wheeler's car.
 6                   MS.  LEDERER:  With the Court's permission.
 7        Q     If you would step down People's 2 in evidence and
 8   show the members of the jury the location where you went
 9   after officer Powers came back with the keys to the van.
10        A     We went right here, 100th Street and Central Park
11   West, inside the park.
12        Q     Okay, thank you.  You may resume the witness stand.
13                   Other than your supervisor and Raymond Santana and
14   Steve Lopez and yourself an officer Powers, who else did you
15   see at that location?
16        A     I saw the defendants.
17                   MR.  RIVERA:  Objection.
18                   THE COURT:  Objection sustained.
19        Q     Could you tell us by name who you saw at that
20   location.
21                   MR.  JOSEPH:  Objection.
22                   THE COURT:  No, I'll allow it.
23        A     Clarance Thomas, Lamont Mc Call, Kevin Richardson,
24   and Stephen Lopez and Raymond Santana.
25        Q     How long did you stay at that location?


                              H. C. Davis
```

P-APP000122

1                        T-1    Reynolds-Ppl-direct                      818

2        A    I'd say about ten, fifteen minutes.

3        Q    And during that time did you have any conference or

4   discussion with your sergeant and other police officers?

5        A    Yes.

6        Q    What did you say during that discussion with the

7   sergeant and the other police officers?

8                   MR.   JOSEPH:   Objection.

9                   THE COURT:   Come up for a minuted, please.

10                   Step down, please.

11                   (At side bar.)

12                   THE COURT:   What is he going to say?

13                   MS.   LEDERER:   All he's going to say, there

14              was a discussion whether had heed do a showup with

15              John Loughlin, and it was decided not to do it.

16                   THE COURT:   Oaky, I'll allow that.

17                   MS. JOSEPH:   That's over objection.

18                   THE COURT:   Yes.

19                   MR.   JOSEPH:   What's the relevance that it was

20              decided not to do it?

21                   MR.   BURNS:   That's my point.

22                   THE COURT:   We'll find it out shortly.

23                   MS.   LEDERER:   It explains why they went

24              there, what they did with him.   And it explains

25              what the police procedure is at the stationhouse.


                        H. C. Davis

NYCLD_023521

P-APP000123

T-1    Reynolds-Ppl-direct                    819

1
2         MR.   JOSEPH:  My objection is not just
3     relevance, it seems again we're getting into
4     hearsay, which clearly the door has not been
5     opened up to.   It was decided not to do a lineup,
6     with John Loughlin.
7         THE COURT:  A show up.
8         MR.   JOSEPH:  A show up with John Loughlin,
9     that too is a determination made by more than one
10     individual which was at least implicitly, if not
11     explicitly calls for a statement as to what was
12     discussed by other officers.
13         THE COURT:  I'll allow it.   Overruled.
14     (In the presence of the jury.)
15  Q    Was there a discussion had at that location among
16  the police officers?
17  A    Yes.
18  Q    And what was the nature of that discussion?
19         MR.   JOSEPH:  Objection.
20         THE COURT:  I'll allow it.
21  A    It was regarding the arrest of the defendants.
22  Q    Was there any discussion about what, whether there
23  would be any kind of show up?
24         MR.   RIVERA:  Objection.
25         THE COURT:  I'll allow it.


                    H. C. Davis

1          T-1    Reynolds-Ppl-direct                    820

2      A    Yes.

3      Q    And what was the nature of that discussion?

4      A    We had wanted to get the--

5           MR. JOSEPH:  Objection, Judge, as to what

6           they wanted to.

7           THE COURT:  Yeah, just tell us what were you

8           going to do about a show up.

9      A    We were going to have a show up with the

10   complainant, John Loughlin, and we had to ascertain if he

11   could identify the people that assaulted him at that time.

12     Q    Was a show up done with John Louhglin?

13     A    No.

14     Q    At that time did you know the name John Loughlin?

15          MR. JOSEPH:  Objection.

16          THE COURT:  I'll let him answer.

17     A    No.

18     Q    Did there come a time where you left the location

19   at 100th Street and Central Park West, inside the park?

20     A    Yes.

21     Q    And where did you go at that time?

22     A    We went back to Central Park Precinct.

23     Q    How did you get from that location to the Central

24   Park Precinct?

25     A    In the green Parks Department van.


                    H. C. Davis

NYCLD_023523

P-APP000125

T-1   Reynolds-Ppl-direct                    821

1

2      Q      Who did you travel with.

3      A      Police officer Powers.

4      Q      And did you have any of the people who had been

5  apprehended in the van with you?

6      A      No.

7      Q      And do you know how Raymond Santana was transported

8  to the Central Park Precinct.

9      A      He was transported I believe with the Sergeant,

10  Sgt. Wheeler.

11     Q      How long did it take to get from that location to

12  the Central Park Precinct?

13     A      About five minutes.

14     Q      And what happened when you arrived at the precinct?

15     A      We went before the desk with the, with five

16  defendants.

17     Q      When you arrived at the precinct, did you arrive

18  there first or did the People taken into custody get there

19  before you?

20     A      I believe we arrived at about, just about the the

21  same time.

22     Q      And you described of went before the desk, would

23  you explain for the members of the jury what that means.

24     A      We go before the desk to make a record of the fact

25  that I had made an arrest and who the people were that were

H. C. Davis

T-1    Reynolds-Ppl-direct                     822

arrested, and you know, their names, addresses and what they

were being arrested for.

    Q    Did you take all five of the people who had been

taken into custody before the desk?

    A    Yes.

    Q    And do you know the names and the physical

descriptions of each of the people that you took into

custody that night?

    A    Yes.

    Q    Would you please give the name of each person taken

into custody, a physical description of that person and

indicate their age.

    A    Okay.  I'll just quickly look at my notes.

        THE COURT:  If you have to.

    A    Let me see, there was Raymond Santana, who was, who

is fourteen, and he was in apparently normal condition.

        MR.  RIVERA:  Objection.

    Q    What was his race?

        THE COURT:  Don't tell us about normal

        condition, just give us the name, description of

        what they --

        Are you asking for description of their--

        MS.  LEDERER:  Physical appearance.

        MR.  RIVERA:  Objection.

        H. C. Davis

NYCLD_023525

P-APP000127

T-1   Reynolds-Ppl-direct                823

Q    Did you learn the race of Raymond--

MR. BURNS:  Did you rule on the objection?

THE COURT:  Just a minute, I'm trying to clarify the question.

MS. LEDERER:  I withdraw the prior question.

THE COURT:  They're withdrawing.

MR. JOSEPH:  She's withdrawing?  Oh.

Q    Officer, did you learn the race of Raymond Santana?

A    Yes.

Q    And what race was he?

A    He was a male Hispanic.

Q    And did you learn his address at the time he was taken into custody.

A    Yes.

Q    What was the address?

MR. RIVERA:  Objection.

THE COURT:  I'll allow it..

A    It was

Q    And with respect to the others who were taken into custody at that time?

A    Yes.

Q    Did you learn Kevin Richardson's age?

A    Yes, he was fourteen.

Q    And what was his, what was his racial make up?

N. C. Davis

NYCLD_023526

P-APP000128

```
 1              T-1   Reynolds-Ppl-direct              824

 2      A    He was Black.

 3      Q    And what was his address?

 4      A

 5      Q    Did you learn the age of Clarance Thomas?

 6      A    Yes, he was 14.

 7      Q    And did you learn his address?

 8      A    That was

 9      Q    And what was his race.

10      A    He was a male black also.

11      Q    With respect to Lamont Mc Call, did you learn his

12  age?

13      A    Yes.  He was thirteen years old.  He was a male

14  black and he lived at

15      Q    And with respect to Steven Lopez?

16      A    He was fifteen, he was a male Hispanic and he lived

17  at

18      Q    At the time that these five people were taken

19  before the desk, were they handcuffed?

20      A    Yes, they were.

21      Q    How long were you before the desk with those five

22  people?

23      A    I'd say approximately five to ten minutes.

24      Q    And during the time you were before the desk, other

25  than the address and the date of birth and the age of those
```

T-1   Reynolds-Ppl-direct                    825

1

2   people, was any other information taken from them?

3        A    Yes.

4        Q    And what information was that?

5             MR.   JOSEPH:   Objection.

6        A    Their telephone numbers.

7        Q    Who took that information from them there?

8        A    Police officer Powers.

9        Q    After you finished appearing before the desk,

10   before the desk sergeant, where did you go?

11       A    I went to the juvenile room with the defendants.

12       Q    Where was the jouvenile room located?

13       A    It was in our clerical office, which is a seperate

14   building from the precinct.

15       Q    And how is it seperate from the precinct?

16       A    It was separated by a driveway and --

17       Q    Would you tell the members of the jury what is a

18   juvenile room?

19       A    A jouvenile room is a room designated by the Family

20   Court which is suitable for questioning of juveniles for

21   their arrest or if they're lost or if you have a juvenile in

22   police custody for any reason, this is the room which you

23   take them in.

24       Q    What is a juvenile?

25       A    A juvenile is any person under the age of sixteen.

H. C. Davis

P-APP000130

T-1   Reynolds-Ppl-direct                              826

Q    What if anything did you do when you entered the
juvenile room with these five young men?

A    I brought them in the room, took off their
handcuffs and arranged seating for all of them.

Q    What did you do after you took off the handcuffs
and arranged seating for these five people?

A    Then I started to do the paperwork.

Q    What paperwork are you talking about?

A    It's the on line booking sheet, that's the
paperwork you do when someone is arrested and juvenile
arrest package.

Q    How many different sets of papers are required for
a jouvenile package for each individual?

A    There is about six or seven for each juvenile.

Q    And where was officer Powers while you were doing
the paperwork?

A    He was calling their parents.

Q    And did there come a time when he finished making
those calls?

A    Yes.

Q    And did you see him after he finished making those
calls?

A    Yes.

Q    Where did you see him?


H. C. Davis

NYCLD_023529

P-APP000131

T-1    Reynolds-Ppl-direct                    827

A    I saw him back in the juvenile room.

Q    Did there come a time after officer Powers had finished making those phone calls that someone arrived at the youth room, at the juvenile room?

A    Yes.

Q    And who was that?

A    That was Mrs. Cuffee.

Q    Who is Mrs. Cuffee.

A    That was Kevin Richardson's mother.

Q    Where did you see her at the jouvenile room?

A    She had come to the door, to the entrance and told me that, you know, who she was and she was there for her son.

Q    About how long did you have a conversation with her?  How long did she stay in the juvenile room?

A    I'd say about five minutes.

Q    And then what happened?

A    Then she went, she waited outside the room in a seperate area we have, you know, for the civilians, for civilian workers, and I continued to do the paperwork.

Q    What is the name of the room where she was waiting?

A    That was the clerical office.

Q    How close is the clerical office to the juvenile room.

H. C. Davis

NYCLD_023530

```
1              T-1    Reynolds-Ppl-direct                    828
2      A     They're right next to each other.
3      Q     Do they share a common wall?
4      A     Yes.
5      Q     After Mrs. Cuffee arrived, did other parents of the
6    people in custody begin to arrive?
7      A     Yes.
8      Q     And did there come a time where you saw Antron Mc
9    Cray at the Central Park Precinct?
10     A     Yes.
11     Q     Approximately what time was that, if you recall?
12     A     That was sometime before one, around twelve.
13     Q     Did you have any conversation with him at that
14   time?
15     A     I don't believe so.
16     Q     Do you recall seeing him at the precinct?
17     A     Yes.
18     Q     Where did you see him, if you recall?
19     A     I saw him in the juvenile room, he came to the
20   juvenile room and then he was, he went into the, to the
21   clerical office.
22     Q     And do you know who he came to the precinct with?
23     A     He came, I believe he came with his mother or one
24   of the other kids that were locked up.
25     Q     Did you personally speak to him at the precinct?


                            H. C. Davis
```

NYCLD_023531

T-1   Reynolds-Ppl-direct                          829

A     No.

Q     Did there come a time where all of the other, did
there come a time where the parents for all of the youths
had arrived?

A     No.

Q     Did there come a time where parents or family
members for four of the five youths arrived?

A     Yes.

Q     And approximately how much time went by before the
family members of four of those five people were there?

A     I'd say about an hour, an hour and a half.

Q     Which was the young man for whom no family arrived?

A     That was for Raymond Santana.

Q     What efforts were made to contact someone from
Raymond Santana's family after the initial phone call?

A     There was several efforts.  By two o'clock we
realized nobody was coming, so police officer Powers made
another call to his father's house and there was no answer.

Q     Did there come a time where you made efforts?

A     Yes.  At about quarter after two I had to convince
him to give me the name of--

          MR.  RIVERA:  Objection.

          THE COURT:  Just tell us what-- You had a

          conversation, what it was.


                         H.  C.  Davis

NYCLD_023532

P-APP000134

T-1   Reynolds-Ppl-direct                    830

1

2    A    I had a conversation with him and told him to give

3    me the name of somebody to come pick him up.

4    Q    Would you explain for the members of the jury for

5    what purpose the family members of these five individuals

6    were notified?

7    A    Because when you arrest a juvenile, when they go to

8    Family Court--

9          MR.  JOSEPH:  Objection, Judge.

10         THE COURT:  What was your question?

11         MS.  LEDERER:  For what purpose were the

12    family members of these five people contacted.

13         THE COURT:  I'll allow it.

14         MR.  JOSEPH:  Judge, I believe the officer is

15    giving us a general policy statement.

16         THE COURT:  In this case, why did you call

17    them?

18         THE WITNESS:  So that if the four, the four

19    that were already there, in order to give them an

20    appearance ticket so they could come back in the

21    future, all five defendants would have to be

22    released to their parents at the same time.  If

23    one of them weren't, then he would have to come

24    back at eight o'clock in the morning, and all the

25    rest of them would also.  So, in order to insure

                    H. C. Davis

NYCLD_023533

P-APP000135

T-1   Reynolds-Ppl-direct                           831

they could all come back in a week or two, all the
parents would have to be there.

Q    When these five people were arrested, were they
going to be taken to court the next morning or were they
going to be given something called a desk ticket, a desk
appearance ticket?

A    They were going to been given a desk appearance
ticket.

Q    Would you describe for the jury what is a desk
appearance ticket?

A    That's a ticket you give them to appear in court on
a certain date with their parents.  They're released to the
custody of either a parent or guardian or an adult member of
their family.

Q    And is that a date sometime in the future?

A    Yes.

Q    Are you permitted or would you be permitted in the
circumstances that you are referring to on April 19th of
1989 to release any of these juveniles in their own
recognizance to let them go from the precinct?

A    No.

MR.   JOSEPH:  Objection.

MR.   BURNS:  Objection.

THE COURT:  I'll allow it.


H. C. Davis

NYCLD_023534

P-APP000136

```
1                    T-1   Reynolds-Ppl-direct              832

2       A    No.

3       Q    And when you --

4                 MS.   LEDERER:   Withdrawn.

5       Q    If you could not reach a family member for one or

6    more of the young men you had in custody on that night, what

7    is required of you?

8                 MR.   JOSEPH:   Objection.

9                 MR.   RIVERA:   Objection.

10                 THE COURT:   I'll allow it.

11      A    That person would have to go to Spoffard.

12      Q    And when they go to Spoffard, how long are they

13   kept at Spoffard?

14      A    They would have to go, they would have to appear in

15   Family Court the very next morning.  As far as how long they

16   remain in Spoffard, it could be, you know, for a long time.

17      Q    With respect to your involvement in the case, the

18   person taken to Spoffard, when are you required to bring

19   them to Family Court?

20      A    The next day.

21                 MR.   JOSEPH:   Objection.

22                 THE COURT:   I'll allow it.   Overruled.

23      Q    What is Spoffard?

24                 MR.   JOSEPH:   Objection.

25                 THE COURT:   I'll allow it.


                              H.  C.  Davis
```

```
 1                   T-1   Reynolds-Ppl-direct               833
 2       A    Spoffard is a jouvenile detention center.
 3       Q    When Raymond Santana's father did not arrive at the
 4  precinct, and the other young men had family present, did
 5  you get another phone number from Raymond Santana?
 6       A    Yes, I did.
 7       Q    And what was the number that you got from him?
 8       A    I don't recall the number, but it was for his
 9  sister, for his sister in The Bronx.
10       Q    And did you phone the telephone number that he gave
11  you?
12       A    Yes.
13       Q    At the time that you asked him for another
14  telephone number, did Raymond Santana say anything to you?
15  Excuse me, in your presence?
16       A    Yes, he made a statement.
17       Q    What if anything did you see, did you hear him say
18  and to whom did you see him say it?
19            MR.  RIVERA:  Objection.
20            THE COURT:  I'll allow it.
21       A    I observed him look over to Kevin Richardson and
22  say, "Yo, we're going to Spoffard, and we're going to fuck
23  up anything that gets in out way."
24       Q    Did you phone the number that he had given you at
25  that time?
```

                        H. C. Davis

T-1   Reynolds-Ppl-direct                    834

A    Yes.

Q    And did you have a conversation with Raymond Santana's sister?

A    Yes, I did.

Q    What if anything did you say to her and what if anything did she said to you?

A    I told her that, that her brother was under arrest for assault and for unlawful assembly in the park, and that what I needed for her to do is to come down and I would release him in her custody. And you know, as long as she could insure he would go to court on a future date.

Q    Did you give her your name?

A    Yes, I did.

Q    And did you give her a telephone number for the Central Park Precinct?

A    I did.

Q    And what if anything did she she said to you?

        MR. RIVERA: Objection.

        THE COURT: Sustained.

Q    About what time did you have this phone call with the sister?

A    It was about twenty minutes after two.

Q    How long did the conversation last?

A    I'd say about ten, fifteen minutes.

                    H. C. Davis

NYCLD_023537

P-APP000139

T-1   Reynolds-Ppl-direct                835

Q    After you got off the telephone, did there come a time where Raymond Santana's sister arrived at the precinct?

A    No.

Q    Did there come a time where you made another phone call to Raymond Santana's sister.

A    Yes.

Q    At about what time did you make that second phone call?

A    About ten minutes after four.

Q    And when you made that phone call at ten minutes after four, did you reach Raymond Santana's sister?

A    Yes.

Q    Did you have a conversation with her about getting another telephone number?

A    Yes.

Q    And what telephone number did you obtain from her?

A    Her grandmother's, grandmother's phone number.

Q    What if anything did you do after you received the grandmother's telephone number?

A    I called up his grandmother and I explained the situation to her and I asked, I told her we don't even want her to to to take a bus or, you know, a cab or anything, I told her to stay where she is and we'd have a car come and pick her up.


H. C. Davis


NYCLD_023538

P-APP000140

1                    T-1   Reynolds-Ppl-direct                 836

2       Q     What time did you make that phone call?

3       A     That was, it was about a quarter after four.

4       Q     When you made that phone call, did you speak with a

5  man or a woman?

6       A     I spoke with a woman originally.

7       Q     When you say originally, did you also have a

8  conversation with a man at that time?

9       A     Yes.

10      Q     And did you speak to them at the same time or one

11 after the other?

12      A     one after the other.

13      Q     What if anything did you tell the grandmother with

14 respect to who you were and where you were?

15      A     I told her I was, I told her my name, that I worked

16 in the Central Park Precinct and I had arrested her grandson

17 for assault.

18      Q     Did you speak to her in english or in spanish?

19      A     In english.

20      Q     What did you do after you for --

21            MS.   LEDERER:   Withdrawn.

22      Q     Do you know, you indicated you spoke to a male, do

23 you know who that was?

24      A     I believe that was his father.

25      Q     And what if anything did you say to him?


                          H. C. Davis

NYCLD_023539

P-APP000141

T-1   Reynolds-Ppl-direct                    837

2   A    I just basically told him his son was under arrest
3   for the assault.

4   Q    Did there come a time where you sent a police car
5   someplace?

6   A    Yes.

7   Q    And about what time did you send a radio car?

8   A    That was about five minutes later, I'd gotten
9   police officer Gans and police officer Martello and I handed
10  them a piece of paper with the name and the address and I
11  told them get up there as quick as you can, you know, take
12  her in the radio car, bring her here to the precinct, and
13  you know, that was it.

14  Q    And to what location did you send those officers?

15  A    That was 118th Street, I believe.

16       MS.  LEDERER:  If I may have just a moment,
17       please.

18  Q    Do you know what address you sent that radio car
19  to?

20       MR.  RIVERA:  Objection.

21       THE COURT:  I'll allow it.

22       Do you have the address?

23       THE WITNESS:  If I have it, I have to look
24       through my notes.

25       THE COURT:  If there is something to refresh


                         H. C. Davis


NYCLD_023540

P-APP000142

```
 1              T-1   Reynolds-Ppl-direct                838

 2       your recollection, you may do that.

 3   A   Just it was West 118th Street.

 4              MS.   LEDERER:  I'd ask this please be marked

 5       and shown to the witness.

 6              (The reporter marked the exhibit.)

 7              MR.   RIVERA:  I would object.  May we approach

 8       for a minute?

 9              THE COURT:  Yes.

10              (At side bar.)

11              MR.   RIVERA:  The officer testified that he

12       reviewed his notes and all he had was West 118th

13       Street on his notes.  Now, apparently Ms.  Lederer

14       is trying to show the police officer a piece of

15       paper.  It's not to refresh his recollection, but

16       to impeach his credibility as a witness.

17              THE COURT:  What are you showing him?

18              MS.   LEDERER:  It's an arrest report he did

19       that night.

20              MR.   RIVERA:  It's a different address there.

21              MS.   LEDERER:  I'm going to ask if it

22       refreshes his recollection.  If it doesn't, it

23       doesn't.

24              MR.   BURNS:  He didn't say his recollection

25       needed refreshing.


                        H. C. Davis
```

AM003992

NYCLD_023541

P-APP000143

T-1    Reynolds-Ppl-direct                    839

MS.   LEDERER:  He couldn't give an address.

THE COURT:  He only gave a street.

MR.   RIVERA:  West 118th Street.

THE COURT:  That's what he said.

MS.   LEDERER:  I'm going to ask him if he looks at this, does it refresh his recollection.

MR.   BURNS:  He didn't say his recollection needed refreshing.

THE COURT:  He said 118th Street.  He didn't say he wasn't sure of the street.  He said he didn't know the street number.

MR.   RIVERA:  He looked at his note.

THE COURT:  I think you should clarify first of all, whether anything refreshes his recollection as to the street.  And ask him the house number.  He didn't say he had any problem knowing the street, he didn't know the house number.  You can show him that.

MS.   LEDERER:  All right.

(In the presence of the jury.)

Q    Do you know the house number of the address to which you sent the radio car?

A    No, that I don't recall.

MS.   LEDERER:  I'd ask the witness please be

H.  C.  Davis

P-APP000144

```
1              T-1   Reynolds-Ppl-direct              84

2         shown People's 28 for identification.

3              MR.  RIVERA:  Objection.

4              THE COURT:  I'll allow it.

5    Q    And ask if this refreshes his recollection.

6              MR.  BURNS:  Can I see it?  Can I see it?

7              (Handed to defense counsel by the court

8         officer.)

9    A    Okay.

10   Q    Does that refresh your recollection as to where the

11   police car was sent?

12             MR.  RIVERA:  Objection.

13             THE COURT:  I'll allow it.

14             THE COURT:  Do you know now?

15             THE WITNESS:  Yes.

16             THE COURT:  The question was, what was the

17        house number.  Do you know that?

18             THE WITNESS:      .

19   Q    And what was the street?

20   A

21   Q    Is that east or west?

22   A    That was      .

23   Q    Thank you.

24        Did there come a time where you had a conversation

25   with a Lt. Mc Inerny?


                   H. C. Davis
```

P-APP000145

T-1   Reynolds-Ppl-direct                341

A    Yes.

Q    And who was Lt. Mc Cray?

A    He was the desk lieutenant, he was in charge of the precinct at that time?

Q    And approximately what time was it when you had a conversation with him on that night?

A    It was about after four, about 4:15, 4:20.

Q    Is that that on the morning of April 20th of 1989?

A    Yes.

Q    Where did this conversation take place?

A    It took place outside of the building that I was in, outside the clerical office, in the driveway between the clerical office and the stationhouse itself.

Q    And about how long did you speak to him?

A    maybe two or three minutes.

Q    As a result of that conversation, what if anything happened?

A    I was, I don't understand the question.

Q    As a result of that conversation, what if anything did you do?

A    I went uptown to 102nd Street.

Q    And what if anything did you do with respect to the a people who were in custody?

A    I didn't release them.

H. C. Davis

P-APP000146

13

1                     T-1   Reynolds-Ppl-direct                    842

2        Q     Did there come a time on the morning of April 20th

3    that you saw Raymond Santana's grandmother at the Central

4    Park Precinct?

5        A     Yes.

6        Q     And about what time was that, that you saw her

7    there?

8        A     That was approximately five in the morning.

9              MR.   RIVERA:   I'm sorry, your Honor, I didn't

10             hear the answer.

11             THE COURT:   Five in the morning, I think he

12             said.

13             THE WITNESS:   Yes.

14             THE COURT:   Five in the morning.

15       Q     Did you have any conversation with any of the

16   family members or parents in the clerical room regarding

17   food?

18       A     Yes.

19       Q     And would you tell us when approximately did you

20   have that conversation?

21       A     That was about twenty after four.  I told them, I

22   explained to the whole group they could get food on the,

23   they should go to the west side of Manhattan, around

24   Columbus Avenue near 86th Street, they'd have a better

25   chance of finding a store that was open and they'd have a

                         H. C. Davis

NYCLD_023545

P-APP000147

T-1   Reynolds-Ppl-direct                                843

better, get a better variety of food also.

Q    And did you see anybody leave the Central Park
Precinct after you had that conversation?

A    Yes.

Q    Who left the precinct?

A    Several people, most of the people that were there
left.

Q    When you say several people, are you referring to
the family members who had been in the clerical room?

A    Yes.

(Transcript continued on the next page.)

H. C. Davis

1

2     Q     During this time where were the 5 people who had

3     been taken into custody?

4     A     They were still inside the youth room.

5     Q     What, if anything, were they doing in the youth

6     room?

7     A     They were sleeping.

8     Q     When you say, they were sleeping, where were they

9     sleeping?

10    A     Some were sleeping in chairs, the others were

11    sleeping on the floor.

12    Q     Approximately what time was it that you first

13    became aware of them going to sleep?

14    A     I'd say that was about 3:00 o'clock, I'd have to

15    refresh my memory here.

16    Yes, it was about 3:00 o'clock.

17    Q     Sometime after family members left from the

18    clerical room were you aware of those people coming back to

19    the Central Park Precinct?

20    A     Yes.

21    Q     Where did you see them?

22    A     I saw them back in the youth room, back in the

23    clerical office.

24    Q     Did you notice if they had anything with them when

25    they came back?

LDI

NYCLD_023547

P-APP000149

1

2      A    Yes.

3      Q    What had they brought with them?

4      A    They had food with them.

5      Q    Was any food given to the five young men in the

6   juvenile room?

7      A    Yes.

8      Q    Which of them ate at that time?

9      A    I believe all of them ate.

10      Q    Did there come a time in the early morning hours

11   of April 20th, 1989 where the young men were taken out of

12   the juvenile room?

13      A    Yes.

14      Q    Where were they taken?

15      A    They were taken to the room adjacent to the

16   juvenile room, the clerical office.

17      Q    What happened when they were brought into the

18   clerical office?

19      A    They were placed at the desk.  All of them sat

20   with their parents or the people that had come for them.

21      Q    At that time, were any of the five young men

22   handcuffed?

23      A    No.

24      Q    What, if anything, happened in the juvenile room

25   at the time these young men were brought out into the

LDI

NYCLD_023548

P-APP000150

1                    People Reynolds Direct   T-2                846

2    clerical room?

3        A    There was an interview.

4        Q    Were you present for that interview?

5        A    Yes.

6        Q    Who was present at that time?

7        A    Loman, Lacore.

8        Q    Who was present at the time of his interview?

9        A    His mother, myself, Detectives Whelpley and

10   Farrel.

11       Q    Where were Detectives Whelpley and Farrel from?

12       A    Nightwatch.

13       Q    Approximately where, what time did that interview

14   begin?

15       A    About 5:30.

16       Q    How long did that interview last?

17       A    Lasted about, about 7.

18       Q    Did you personally conduct that interview?

19       A    No.

20       Q    What happened, if anything, when that interview

21   concluded at about 7 p.m.

22       A    I issued to Lamont McCall a desk appearance to

23   appear on May 1st.

24       Q    Was he permitted to leave with his mother?

25       A    He left with his mother.

LDI

```
1                    People Reynolds Direct   T-2              847

2         Q    After that interview of concluded, did that second

3    interview begin?

4         A    Yes.

5         Q    Who was interviewed next?

6         A    Clarence Thomas.

7         Q    Who was present during that interview?

8         A    His mother.

9         Q    Were any police officers?

10        A    Yes, myself, Detective Whelpley and Farrel.

11        Q    How long did that interview last?

12        A    That was about an hour and and a half.

13        Q    After he was interviewed, what happened?

14        A    I issued him an appearance ticket also and he was

15   released to his mother and he left.

16        Q    Was that the same adjourned date on that desk

17   appearance ticket as the earlier one?

18        A    Yes.

19        Q    Was he permitted to leave the precinct at that

20   time with his mother?

21        A    Yes.

22        Q    Was that third interview conducted at that time?

23        A    Yes.

24        Q    Who was interviewed next?

25        A    Kevin Richardson.
```

LDI

NYCLD_023550

P-APP000152

```
 1                    People Reynolds Direct   T-2              848
 2      Q    Were you present during that interview?
 3      A    No.
 4      Q    I would like to go back for a moment to the time
 5    that you spent in the juvenile room with Raymond Santana.
 6    Can you describe his demeanor at the time you were in the
 7    juvenile room with him?
 8                    MR. RIVERA:  Objection.
 9                    THE COURT:  I will allow it.
10      A    He wasn't crying or --
11                    MR. RIVERA:   Objection.
12                    THE COURT:  Overruled.
13      Q    What did you see him doing?
14      A    First, he was, you know, he was there talking to
15    the other kids.  It didn't seem to matter.
16                    MR. RIVERA:  Objection.
17                    THE COURT:  Objection sustained.  Just tell
18                    us what you observed, not what you thought was
19                    going through his mind.
20      A    Okay, he was carrying on casual conversations with
21    the others.
22      Q    During the time that you were in the juvenile room
23    or at any time, did you ever raise your voice to Raymond
24    Santana?
25      A    No.
```

LDI

NYCLD_023551

P-APP000153

```
 1              People Reynolds Direct   T-2              849

 2      Q    Did you ever threaten him?

 3      A    No.

 4      Q    Did you ever see him cry?

 5      A    No.

 6      Q    Did he ever ask for his parents?

 7      A    No.

 8      Q    I would like to go to the time of approximately

 9   11:30 on the morning of April 20th.  Were you given an

10   assignment on that morning?

11      A    Yes.

12      Q    Where did you go at that time, on that date?

13      A    We went to the home of Clarence Thomas.

14      Q    When you say "we" who was with you?

15      A    Detectives Whelpley and Farrel.

16      Q    Did any other detectives accompany you?

17      A    Not to that location, no.

18      Q    What did you do when you arrived at the home of

19   Clarence Thomas?

20      A    We had conversations with him and his mother.

21      Q    Approximately how long did you stay at that

22   location?

23      A    I'd say about a half hour.

24      Q    After that half hour elapsed, where did you go?

25      A    We went to the home of Antron McCray.
```

LDI

NYCLD_023552

P-APP000154

1

2     Q     When you say "we" who went with you?

3     A     I drove in the car with Detective Whelpley and

4  Farrel and also Clarence Thomas and his mother was in the

5  car with us.  When I went upstairs to his apartment, I was

6  accompanied by Detective Rosario, Rivera and Morin.

7     Q     When you say you went to the home of Antron

8  McCray, what was the address you went to?

9     A     That was

10    Q     Did you go          at that location?

11    A     Yes.

12    Q     Who did you go with?

13    A     Detectives Rosario, Detective Rivera and Detective

14  Morin.

15    Q     What happened when you went          at that

16  location?

17    A     Well, we knocked on the door and had a

18  conversation with Antron's father.

19    Q     Did you personally speak to Antron's father?

20    A     No.

21    Q     Who did you see have a conversation with him?

22    A     Detective Rosario.

23    Q     How long were you at the apartment at that time?

24    A     I'd say about 15 minutes.

25    Q     Did there come a time when you left that

LDI

NYCLD_023553

P-APP000155

People Reynolds Direct   T-2                          851

2   apartment?

3        A    Yes.

4        Q    When you left the apartment, who left with you?

5        A    Detectives that I named before and Bobby McCray

6   and Antron McCray.

7        Q    Do you know where Antron McCray's mother was at

8   that time?

9        A    No, I don't recall.

10        Q    When you left the apartment, where did you go?

11        A    Went back to the Central Park Precinct.

12        Q    Who went with you in the car that you were

13   traveling in?

14        A    I got back in the car with Detectives Whelpley and

15   Farrel and Clarence Thomas and his mother.

16        Q    Do you recall anything about the clothing that

17   Antron McCray wore when you left the apartment with him on

18   that morning?

19        A    Yes, his clothes were entirely covered with dry

20   blood on the front of it.

21        Q    Do you recall whether Antron McCray was handcuffed

22   when you left the apartment?

23        A    No, he wasn't.

24        Q    How long did it take you to go from that location

25   to the Central Park Precinct?

LDI

NYCLD_023554

```
 1              People Reynolds Cross (Mr. Joseph)          852

 2       A    That was about a 10, 15 minute ride.

 3       Q    When you arrived at the Central Park Precinct down

 4  where Antron McCray went?

 5       A    I believe he went to the juvenile room.

 6       Q    Did you have anything to do with interviewing him

 7  at any time?

 8       A    No.

 9       Q    Did you take a written statement from him or were

10  you present when a video statement was taken?

11       A    No.

12       Q    Did you have anything to do with the interviewing

13  of Raymond Santana?

14       A    No.

15       Q    Or have anything to do with the interviewing of

16  Yusef Salaam?

17       A    No.

18            MS. LEDERER:   Thank you, very much.   I have

19            nothing further.

20  CROSS EXAMINATION

21  BY MR. JOSEPH:

22       Q    Officer Reynolds, just to take you back to

23  something Miss Lederer was discussing with you in terms of

24  the appearance ticket with the juveniles.

25       Am I correct in understanding that the problem --
```

LDI

People Reynolds Cross (Mr. Joseph)                    853

1

2    withdrawn.

3        That what your concern was in issuing appearance

4    tickets, that if one parent didn't show up, that would mean

5    all the kids would have to go to court the following

6    morning?

7        A    That's correct.

8        Q    Nothing would have presented you from giving them,

9    all those kids whose parents were there, from giving them

10   appearance tickets, but they would have still come to court

11   that following morning; is that right?

12       A    Excuse me?

13       Q    If you had given appearance tickets to those kids

14   whose parents did showup?

15       A    Aha.

16       Q    Those kids would just have to come to court the

17   following morning; is that right?

18       A    That's correct.

19       Q    You could have given them appearance tickets,

20   those kids whose parents were there and said, we will come

21   back to court in 3 hours or 5 hours or whatever?

22       A    I explained it to them.

23       Q    Just if you can answer my question.

24            THE COURT:   Could you have done that?

25       A    I could have.


                              LDI

NYCLD_023556

P-APP000158

```
 1              People Reynolds Cross (Mr. Joseph)          854

 2       Q    So the fact is, there is no rule that said you

 3   couldn't have given appearance tickets, it was just a matter

 4   of waiting to see if one other parent was arriving?

 5       A    Right.

 6       Q    Had you elected to, you could have given those to

 7   the parents who were there, appearance tickets, and told

 8   them all to come back to court?

 9       A    If they wanted to.

10       Q    Is that right?

11       A    If they wanted to, yes.

12       Q    But, that was a decision you had made; is that

13   right?

14       A    No, I asked them also.

15       Q    You were asked and discussed with Miss Lederer the

16   facts of what occurred in Central Park West when you

17   arrested Mr. Santana, Mr. Lopez and several other young boys

18   I would like to talk to you about that.  Do you know what

19   time that was?

20       A    What time what was?

21       Q    Did you tell us it was 10:30, that you arrested

22   Mr. Santana and Mr. Lopez?

23       A    No, I didn't say that.

24       Q    Do you know what time it was?

25       A    The arrest, I will have to look in my --
```

LDI

NYCLD_023557

1

2       Q    Let me ask you.  Would I be correct, Officer

3    Renolds, that on several occasions you were given different

4    times as to the time that this arrest took place at Central

5    Park?

6                    MS. LEDERER:  Objection.

7                    THE COURT:  Sustained.

8       Q    Do you know precisely what time it was?

9       A    I'd have to refresh.

10      Q    Okay, please do.

11      A    Which defendants are you talking about?

12      Q    I'm talking about -- tell me the time when you got

13   to Central Park West and you saw there was that group.

14      A    We saw the group approximately 25 after 10.

15      Q    Okay.  How much time elapsed from that moment

16   until the time when you say the boys started to run, just a

17   matters of a couple of minutes; wasn't it?

18      A    It was about 5 minutes, I would imagine, maybe

19   less, I'm not sure though.

20      Q    Did you stay in there for 5 minutes watching these

21   boys?

22      A    I didn't look at my watch, no.

23      Q    It would have been less than five minutes, would

24   that be a fair statement?

25      A    Could have been more, I really don't know.

LDI

NYCLD_023558

People Reynolds Cross (Mr. Joseph)                856

1

2       Q     I understand you weren't looking at your watch.

3   You couldn't give us a precise minute and 30 seconds or

4   something like that.  What I'm trying to get an idea is from

5   the time when you pulled on to Central Park West and you saw

6   this group, can you give us an idea, was it less than 10

7   minutes that you sat there and observed them?

8       A     It was probably less than 10 minutes.

9       Q     How long was it until you saw the other police

10  officer pull up in the scooter?

11      A     I'm not really sure of the exact time.

12      Q     Am I correct in understanding you really can't

13  give us a time period as to how long you were there

14  observing these kids, accurate time period?

15      A     No, of course not.

16      Q     In fact you can't even give us a valid

17  approximation of how long that was?

18      A     Of --

19            MS. LEDERER:  Objection, as to the word

20            "valid."

21            THE COURT:  I thought you were.

22      Q     Whatever words.

23            You can't tell us how long you were there watching

24  those kids, to any degree of certainty?

25      A     It was approximately five minutes.

LDI

NYCLD_023559

P-APP000161

1                    People Reynolds Cross (Mr. Joseph)              857

2        Q     That's when you said certain kids ran and two

3   remained behind; is that right?

4        A     That's correct.

5        Q     What time was that?

6        A     Approximately 10:30.

7        Q     You then told us that you immediately took one of

8   the two men, the young boys who remained behind and put him

9   against the wall; is that right?

10       A     That's correct.

11       Q     Your partner, Officer Powers, took the other boy

12  and put him against the wall?

13       A     Yes.

14       Q     Those boys were under arrest at that point,

15  correct?

16       A     No.

17       Q     You placed them under arrest, didn't you?

18       A     No, we just had custody of them.

19       Q     Did there come a time when you placed them under

20  arrest?

21       A     Well, when we went back to Central Park West and

22  100th Street.

23       Q     You're talking about formally going in front of --

24  withdrawn.

25            What I'm asking you is:  Did you put handcuffs on them

LDI

NYCLD_023560

```
 1              People Reynolds Cross (Mr. Joseph)          858

 2   on the street?

 3       A    When the sergeant came.

 4       Q    When the sergeant came to Central Park West,

 5   handcuffs were put on; is that right?

 6       A    Yes.

 7       Q    What time was that?

 8       A    I'd have to look at my notes again.

 9       Q    Again, while your looking at your note,

10   officers --

11              MS. LEDERER:  I object, if the witness has a

12              question before him.

13              THE COURT:   Let him look at his notes.

14       A    Approximately 20 minutes to 11:00.

15       Q    Do you recall when you were interviewed by

16   Detective Rosario about this case?

17       A    Excuse me?

18       Q    You were interviewed sometime later by a Detective

19   Rosario about the facts of this case?

20       A    Yes.

21       Q    You recall telling Officer Rosario that it was

22   10:50 that you say you observed a group of approximately 10

23   to 12 young males walking north along the westside of

24   Central Park West?

25       A    Do I recall telling him that?
```

LDI

1                People Reynolds Cross (Mr. Joseph)            859

2        Q    Yes?

3        A    I don't believe I said that to him, I think he

4   made a mistake.

5                MR. JOSEPH:    Let me have this marked for

6                identification.

7        Q    Officer, I would ask you to take a look at this.

8   See if that refreshes your recollection as to what you told

9   that detective.  I'm just asking does it refresh your

10  recollection?

11       A    Yes.

12       Q    You did tell him 10:50?

13       A    No.

14       Q    Did you make notes in some sort of book of your

15  own as to the time that you observed these young boys on

16  Central Park West?

17       A    Yes, I did.

18       Q    Subsequent -- withdrawn.  Do you keep some sort of

19  ring notebook, you know what I mean by a ring notebook?

20       A    No.

21       Q    A little pad notebook.

22       Let me have this marked, a spiral notebook is the word

23  I was looking for.  Did you keep any notes in a spiral type

24  notebook?

25       A    Yes, the one that you have the copies of.

LDI

NYCLD_023562

P-APP000164

```
 1              People Reynolds Cross (Mr. Joseph)            860

 2       Q     Do you know when you made those notes?

 3       A     Probably the next day.

 4       Q     Did there come a time subsequent to initially

 5   making those notes, that you went back and changed certain

 6   times?

 7       A     In the book?

 8       Q     Yes?

 9       A     Yes.

10       Q     When did you go back and change those times?

11       A     That was approximately as I was doing it.

12       Q     It's your recollection that you made the changes

13   on the same day that you initially made the notes in the

14   spiral note book or are you not sure?

15       A     I'm pretty sure that's what I did.

16       Q     Do you know what time you initially listed as the

17   time of seeing the young boys, referring to seeing them on

18   Central Park West?

19       A     Can you repeat the question?

20       Q     Yes.  Do you know the time you initially listed in

21   your special notebook as being the time when you saw these

22   young boys walking on Central Park West?

23       A     No, I don't recall the original time.

24       Q     You do recall that there was a time that was

25   different than that now listed in your spiral note book; is
```

LDI

NYCLD_023563

P-APP000165

```
 1              People Reynolds Cross (Mr. Joseph)          861

 2      that correct?

 3          A     Aha.

 4          Q     You do recall that you changed that time; is that

 5      correct?

 6          A     Yes.

 7          Q     Was that done after you had conversations with

 8      other police officers?

 9          A     No, it was done after pretty much looking at my

10      notes.

11          Q     Did you have any conversation --

12              MS. LEDERER:  Excuse me, if the witness is

13              asked a question, let him be allowed.

14              THE COURT:  He actually answered it, no, was

15              the basic question.

16              MR. JOSEPH:   Yes.

17          Q     Did you have conversations with other police

18      officers that caused you to conclude that you should change

19      that time in your spiral notebook?

20          A     Did I have conversations, to change it?

21          Q     No, let me make sure I'm making the question

22      clear.  I'm not asking whether you talked to other officers

23      should you make the change.  I'm asking:  Did you talk to

24      police officers concerning their recollection of the times

25      when certain events occurred?
```

                              LDI

NYCLD_023564

P-APP000166

```
1              People Reynolds Cross (Mr. Joseph)          862

2                   MS. LEDERER:  Objection.

3                   THE COURT:  I will let him answer.

4                   MS. LEDERER:  Can I ask at what point are you

5              asking that question?

6                   THE COURT:  In reference to the entries.

7         Q    In reference to the entries, that's correct.

8                   THE COURT:  Of the pad.

9         A    Not in reference to entries, in reference to what

10   happened and what time some people saw things.

11        Q    Did you have those conversations prior to going

12   back and changing that time in your spiral note book, if you

13   recall?

14        A    Can you repeat that, please?

15        Q    You just told us that, yes, you did have

16   conversations with other officers about what time certain

17   events occurred, correct?

18        A    Yes.

19        Q    Did you have those conversations prior to going

20   back into your spiral note book and changing the time as to

21   your observing what you said were 10 to 12 youths on Central

22   Park West?

23        A    I still don't understand your question.

24        Q    Can you tell us, let me rephrase it.  You told us

25   there came a time when you changed the listing you had put
```

LDI

NYCLD_023565

P-APP000167

1              People Reynolds Cross (Mr. Joseph)              863

2     of the time you observed youths on Central Park West?

3          A     Yes.

4          Q     Had you had any conversations with other police

5     officers concerning that time prior to making that change?

6          A     No.

7          Q     But you don't know for sure when you made that

8     change, do you?

9          A     Like I said, as I was doing it and as I got later

10    on in the book, I can see that certain things.  There were

11    certain things I knew happened at a certain time.  There

12    were other things that occurred that I didn't have a chance

13    the look at my watch, but as I got to the other events which

14    you knew the definite time, I realized there was a certain

15    time gap in between.  I realized that the time previous

16    couldn't have been the right time.

17         Q     I understand.  So what you did is you worked

18    backward in a certain respect from those times that you

19    knew, that you thought were correct?

20         A     Well, certain times that I --

21         Q     Is that correct?

22         A     -- that I knew the times.

23         Q     Okay.

24         A     I had some type of landmark almost.

25         Q     Other times were more of approximations; is that

                              LDI

NYCLD_023566

P-APP000168

```
1              People Reynolds Cross (Mr. Joseph)              864

2    correct?

3         A    Sure.

4         Q    Among the approximations would be the time that

5    you saw the boys on Central Park West that you don't know;

6    is a precise time?

7         A    Right.

8         Q    Now, you told us there came a time that you saw

9    Antron McCray at the Central Park Precinct; is that right?

10   Sometime, I think you said you believe it was before 1:00

11   a.m. on April 20th?

12        A    That's correct.

13        Q    As to that, you don't know the precise time; do

14   you?

15        A    No.

16        Q    You didn't make any written record of any precise

17   time, is that right?  As to when you saw Antron McCray?

18        A    There is no reason.

19             THE COURT:  The question is:  Didn't you?

20        Q    I didn't want to ask you.

21             You didn't make any?

22        A    No.

23        Q    In fact, you didn't have any discussion with

24   another Police Officer where you said something to them

25   about that specific time, did you?
```

LDI

| | | |
|---|---|---|
| 1 | | People Reynolds Cross (Mr. Joseph)                865 |

2      A      Excuse me?

3      Q      You didn't tell another police officer that you

4   saw Antron McCray at such and such a time, giving a specific

5   time?

6      A      No.

7      Q      And when you saw Antron at the precinct in the

8   early morning hours of April 20th, he was not under arrest

9   at the time?

10      A      That's correct.

11      Q      To your knowledge, he had voluntarily come to the

12   precinct?

13      A      Yes.

14      Q      I think you told us that he was there with his

15   mother, you believe?

16      A      I believe it was his mother.

17      Q      Do you know if he was there with anybody else or

18   you just didn't know?

19      A      I didn't really pay any attention.

20      Q      That really wasn't something of concern to you at

21   that point; is that correct?

22      A      That's correct.

23      Q      You didn't have any conversation with anybody

24   about that or make any notes concerning that; is that right?

25      A      Concerning what?

LDI

```
 1              People Reynolds Cross (Mr. Joseph)           866

 2       Q     Seeing Antron McCray at the precinct?

 3       A     I did have a conversation about it.

 4       Q     You tell us, I think you told Ms. Lederer, that

 5   you didn't interview or question Antron McCray at that point

 6   or at any later point; is that correct?

 7       A     That's correct.

 8       Q     You didn't have any conversation with him at that

 9   point; is that correct?

10       A     That's correct.

11       Q     The observations, what you have just told us, you

12   saw; right?

13       A     Correct.

14       Q     Nothing further then that, correct?

15       A     Nothing, no.

16       Q     Would I be correct -- withdrawn.

17             You have told us on the 19th of April and into

18   April 20th, you had conversations with numerous officers,

19   police officers, detectives, concerning what was happening

20   in Central Park in the investigation you were imparting?

21       A     When was this?

22       Q     On April 19th and into April 20th?

23       A     While we were on the street, you mean?

24       Q     Yes?

25       A     I didn't have any conversations with the
```

LDI

NYCLD_023569

P-APP000171

1               People Reynolds Cross (Mr. Joseph)              867

2    detective.

3         Q    On April 19th you didn't -- you had a conversation

4    with the sergeant; is that correct, on April 19th?

5         A    Yes.

6         Q    You had conversations with other police officers?

7         A    Yes.

8         Q    On April 20th, the morning, you did have

9    conversations with detectives as well; is that right?

10        A    Yes.

11        Q    Just so I'm understanding, that prior to arresting

12   any of the young men that you arrested, you had spoken to

13   police officers and sergeants, but no detectives?

14        A    That's correct.

15        Q    Subsequent to their arrest, then you spoke to a

16   variety of other police officers, including detectives?

17        A    Yes.

18        Q    Over a period of time you spoke to a Detective

19   Rosario; is that correct?

20        A    Yes.

21        Q    And you spoke the a Detective Farrel?

22        A    Yes.

23        Q    Detective Whelpley?

24        A    Yes.

25        Q    Were there captains also that were at the Central

LDI

NYCLD_023570

P-APP000172

```
 1              People Reynolds Cross (Mr. Joseph)            868

 2    Park Precinct, police captains?

 3         A    Yes.

 4         Q    You spoke with them as well?

 5         A    Yes.

 6         Q    Was there a Captain Gunther?

 7         A    Yes.

 8         Q    Were there also individuals who were known as

 9    chiefs, a Chief Rosenthal?

10         A    Yes.

11         Q    Was he at the Central Park Precinct in the morning

12    of the 20th?

13         A    Yes.

14         Q    Where does a chief stand in the hierarchy of the

15    Police Department?

16         A    Where?

17         Q    Yes?

18         A    Close to the top.

19         Q    I assume above a captain; is that correct?

20         A    Yes.

21         Q    Was there another, there were several chiefs that

22    came down to the Central Park Precinct that you spoke to on

23    the morning of the 20th; is that right?

24         A    I just spoke to one, I believe.

25         Q    Was there a chief Colengelo?
```

LDI

NYCLD_023571

P-APP000173

```
 1                People Reynolds Cross (Mr. Joseph)            869

 2        A    Yes.

 3        Q    And a Chief Selvaggi; is that correct?

 4        A    Yes.

 5        Q    They were also at the precinct in the morning of

 6   April 20th?

 7        A    No.

 8        Q    At any point did you speak with them?

 9        A    Yes.

10        Q    So that would be in addition to Rosen, Chief

11   Rosenthal.  You spoke to Chief Colengelo and a Chief

12   Selvaggi.

13        A    Yes.

14        Q    Now, you told us that there came a time that you

15   went to Antron McCray's home?

16        A    Yes.

17        Q    When you went to the home, to his home, you went

18   with numerous other police officers and detectives; is that

19   right?

20        A    Yes.

21        Q    I think you told us there was a detective Whelpley

22   and Farrel, Rosario, Morin?

23        A    Yes.

24        Q    When you went to Antron McCray's door, how many of

25   those officers went with you to the door?
```

LDI

NYCLD_023572

P-APP000174

1                    People Reynolds Cross (Mr. Joseph)          870

2        A    It was 3.

3        Q    That was you and who else?

4        A    Detective Rosario, Rivera and Morin.

5        Q    Again, as I understand it from what you have told

6    us, that you were not the one who was in charge at that

7    point of doing any of the talking?

8        A    No.

9        Q    It was Detective Rosario that was doing the

10   talking?

11       A    He did a bit of talking.

12       Q    Did any of the other officers talk, do you know?

13       A    Yes.

14       Q    What other officers talked?

15       A    I believe they all spoke.

16       Q    You didn't, though?

17       A    No.

18       Q    Had you called to the McCray's before going there

19   and said, you were coming?

20       A    I didn't.

21       Q    Did you know -- withdrawn.  Did you see any other

22   Officer call?

23       A    No.

24       Q    Did you hear any Officer mention that he had

25   called to the McCray's to say that he was coming?

LDI

NYCLD_023573

P-APP000175

1                    People Reynolds Cross (Mr. Joseph)            871

2          A     No.

3          Q     Or that you were coming?

4          A     No.

5          Q     There came a time when you did go to the front

6     door, knocked on the door and you say that Mr. Bobby McCray

7     answered?

8          A     Excuse me?

9          Q     You say that Antron McCray's parents answered the

10    door?

11         A     Yes.

12         Q     You say that there came a time that Antron left

13    with you and came back to the Central Park Precinct?

14         A     Yes.

15         Q     I think you described his clothing as being very

16    bloody?

17         A     Yes.

18         Q     Those were not the clothes he was wearing when the

19    door was opened?

20         A     That's correct.

21         Q     Was he directed by a police officer to wear those

22    clothes?

23                    MS. LEDERER:  Objection.

24                    THE COURT:  I will let him answer.

25         A     No.


                              LDI


NYCLD_023574

P-APP000176

```
 1                  People Reynolds Cross (Mr. Joseph)          872
 2        Q     Do you know how it came about that he put those
 3   clothes on?
 4                  MS. LEDERER:   Objection.
 5                  THE COURT:   I will let him answer.
 6        A     He was asked to.
 7        Q     That's what I'm asking.  He was asked by one of
 8   the detectives that was there?
 9        A     Yes, he asked him and his father to put the
10   clothes that he was wearing the night before back on.
11        Q     It wasn't by chance that those clothes were put
12   on, he was asked to by one of the detectives; is that right?
13        A     That's correct.
14        Q     He did that, he put those clothes on?
15        A     Yes.
16        Q     He was asked to come to the precinct, Central Park
17   Precinct; is that right?
18        A     Yes.
19        Q     And I think you told us he wasn't placed in
20   handcuffs at that point?
21        A     No, no.
22        Q     He came with you to the precinct; is that right?
23        A     Yes.
24        Q     He didn't run away out the door, out the back or
25   anything, he came with you and got in the police car or went
```

LDI

NYCLD_023575

1          People Reynolds Cross (Mr. Joseph)          873

2    to the Central Park Precinct?

3          A    That's correct.

4          Q    You have told us that you then were not involved

5    in any way with the questioning of Antron McCray at the

6    Central Park Precinct?

7          A    That's correct.

8          Q    You were not present when that occurred?

9          A    No.

10         Q    And you didn't do the questioning?

11         A    No.

12         Q    Now, finally, am I correct, that initially when

13   you were doing paper work in the Central Park Precinct you

14   were going to be the arresting officer on this case?

15         A    Yes.

16         Q    And you filled out complaint reports as to the

17   five young boys who were arrested; is that right?

18         A    That's correct.

19         Q    You were listed as the arresting officer?

20         A    Yes.

21         Q    Ultimately you were not the arresting officer,

22   were you?

23         A    Yes, I was.

24         Q    You were the arresting Officer.  Were you listed

25   on the criminal court complaint as the arresting officer; do

LDI

NYCLD_023576

P-APP000178

1

2    you know?

3         A    Not for the assault on the jogger, but for the

4    assault on John Loughlin.

5         Q    What I'm asking you, do you know if on the

6    criminal court complaint you were listed as the arresting

7    officer?

8         A    For the assault against the jogger?

9         Q    Yes?

10        A    The female jogger?

11        Q    Yes?

12        A    No.

13        Q    Do you know who was the arresting officer on that?

14        A    I believe that was Detective Arroyo.

15        Q    Do you know that or is that just --

16        A    He had the case.  I had the arrest for the male

17   jogger and subsequent to his investigation into the assault

18   on the female jogger, he took that arrest.  There were two

19   separate arrests.

20        Q    To best of your knowledge, because of his being

21   involved in that arrest, he would be the arresting officer

22   on that?

23        A    I believe so.

24        Q    Just, finally, you spoke about the five young men

25   who were arrested out on Central Park West.  Antron McCray

LDI

NYCLD_023577

P-APP000179