205

A. MCCRAY

1    A.    I don't know how many minutes passed by, but

2    Clarence Thomas mother called again.

3    Q.    And what happened when she called?

4    A.    She said Clarence -- I didn't know what she said,

5    but on my mother's end she was like, Come over.  My mother

6    told Clarence mother to come over.

7    Q.    And did Clarence Thomas' mother come over?

8    A.    Yeah, she came over.

9    Q.    And how much time had passed between the first

10   phone call and the second phone call, if you know?

11   A.    I don't know.

12   Q.    Do you know approximately what time Clarence

13   Thomas' mother came to your apartment?

14   A.    I think it's like -- it was like in the range of

15   11 o'clock, 11:30.

16   Q.    Was it past your bedtime at this time?

17   A.    No.

18   Q.    Okay.

19   A.    Because, remember, it was -- like I said, it was

20   a holiday the next day so I was able to stay up, you know.

21   I could stay up until I fall asleep.

22   Q.    Okay.  So what were you doing when Clarence

23   Thomas' mother came to your apartment?

24   A.    Sitting on the couch.

25   Q.    Okay.  Were you watching television?

NYCLD_046485

P-APP000584

A. MCCRAY

1       A.      Yes.

2       Q.      What was your mother doing?

3       A.      Just walking back and forth through the house,

4    doing whatever she was doing.

5       Q.      Was your mother angry at all?

6       A.      Yes.

7       Q.      About what?

8       A.      She wanted to know where Clarence was at, where

9    was Clarence at, because he was with me.

10      Q.      And at that point, did you tell her that you had

11   been in Central Park?

12      A.      No.

13      Q.      What happened after Clarence Thomas' mother came

14   to your apartment?

15      A.      Oh, she got to my mother's house.  She -- I heard

16   her say, Linda, I don't know where Clarence is at.  He

17   knows he's supposed to be home by now.  And then I butted

18   in and said, He might be arrested.  He might be arrested.

19      Q.      And what was your mother's reaction?

20      A.      She smacked me.

21      Q.      And what was Clarence mother's reaction?

22      A.      She said, Why?

23      Q.      And what did you say?

24      A.      I said, We was running through the park.

25      Q.      Okay.  And what happened next?

NYCLD_046486

P-APP000585

207

A. MCCRAY

1    A.    My mother said, Okay.  Let's go get him.  Let's

2    go find him.  So I got dressed.  I was already dressed.  So

3    we -- all three of us left the house and went to the

4    precinct that got -- that I had to do the lineup at.

5    Q.    Okay.

6    A.    I took them to that precinct.  And I asked the

7    officer -- no, my mother and Clarence Thomas mother asked

8    the officer about Clarence Thomas.  And they said they

9    didn't have nobody by the name of Clarence Thomas there.

10   Q.    So, just backtrack a little bit, Mr. McCray.

11         Who went to the precinct with you?

12   A.    My mother and Clarence Thomas mother.

13   Q.    Did Bobby McCray go with you?

14   A.    No, sir.

15   Q.    Where was Bobby McCray at that point when you

16   left to go to the precinct?

17   A.    He was at work.

18   Q.    Okay.  And you said that you took your mother and

19   Clarence Thomas' mother to a precinct, right?

20   A.    Yes, the one that I had -- that I got the lineup

21   done.

22   Q.    How did you know to take them to a police

23   precinct?

24   A.    Because I told my mother he might have gotten

25   locked up, so I went to that precinct.  It was on the east

DIAMOND REPORTING   (718) 624-7200   info@diamondreporting.com

NYCLD_046487

P-APP000586

A. MCCRAY

1   side.

2       Q.   Why did you pick that one?

3       A.   That's the one I knew.

4       Q.   How did you know it?

5       A.   Because there's a McDonald's over there and my

6   school was in that area.

7       Q.   Okay.  Had you ever been there before then?

8       A.   No, sir.

9       Q.   And, again, you don't know the number of that

10  precinct, right?

11      A.   No, sir.

12      Q.   So what happened after you arrived at that

13  precinct?

14      A.   Like I said, they asked for Clarence.  The police

15  officer said they didn't have nobody by the name of

16  Clarence there.  And then I told them we was in -- I told

17  the -- I told the police officer that me and Clarence was

18  Central Park.

19      Q.   Okay.

20      A.   Then he told my mother and Clarence mother to go

21  -- you might want to go to Central Park to see if he's

22  there, the precinct in Central Park.

23      Q.   Okay.  And did you tell the police officer what

24  you were doing in the Central Park?

25      A.   No, sir.

DIAMOND REPORTING   (718) 624-7200   info@diamondreporting.com

NYCLD_046488

P-APP000587

A. MCCRAY

1    Q.    Did you tell the police officer about anything

2    that had happened in Central Park?

3    A.    No, sir.

4    Q.    Do you know what that police officer looks like?

5    A.    No, sir.  No.

6    Q.    Was it a male or female?

7    A.    A male.

8    Q.    Was he -- what was his -- what was the color of

9    his skin?

10   A.    Caucasian.

11   Q.    Was he in uniform?

12   A.    Yes.

13   Q.    Do you know if it was a blue uniform or a white

14   uniform or anything else?

15   A.    I can't recall.

16   Q.    So how long were you at that precinct?

17   A.    A few minutes.

18   Q.    And what was your mother's reaction at this

19   point?

20   A.    I was kind of walking behind my mother and

21   Clarence mother so they was talking.

22   Q.    Was your mother angry at you?

23   A.    Yes.

24   Q.    And how did you feel?

25   A.    I felt bad.

DIAMOND REPORTING   (718) 624-7200   info@diamondreporting.com
209

NYCLD_046489

P-APP000588

A. MCCRAY

1    Q.    So after you left the precinct, where did you go?

2    A.    Central Park.

3    Q.    How long did it take you to get there?

4    A.    We took a cab.  It didn't take that long.

5    Q.    Okay.  And did the cab take you --

6          MR. DePAUL:  Strike that.

7    Q.    Where did the cab take you?

8    A.    To the precinct in Central Park.

9    Q.    And who paid for the cab?

10   A.    I don't know.

11   Q.    Was it a yellow cab?

12   A.    You said who paid?

13   Q.    Yes.

14   A.    I don't know, sir.

15   Q.    Was it a yellow cab?

16   A.    I don't know.

17   Q.    And where did you sit in the cab, if you

18   remember?

19   A.    Next to my mother.

20   Q.    In the back seat?

21   A.    Yes.

22   Q.    And where was Clarence Thomas' mother?

23   A.    On the other side of my mother.

24   Q.    So what happened when you got to the precinct in

25   Central Park?

DIAMOND REPORTING   (718) 624-7200   info@diamondreporting.com

210

NYCLD_046490

P-APP000589

211
A. MCCRAY

1     A.    We got there.  Clarence mother went to the desk.

2    I sat there with my mother.  Clarence mother went to the

3    desk and asked was Clarence there.

4     Q.    And did you hear how the police officer

5    responded?

6     A.    No.

7     Q.    Did you learn that Clarence was at that precinct?

8     A.    Yes.

9     Q.    And how did you learn that?

10    A.    While she was talking to him, he went through

11    some papers and said he's here.

12     Q.    Okay.  And did you see -- when you were sitting

13    down in the precinct, did you see anyone else in the

14    precinct besides your mother and Clarence Thomas' mother

15    and the police officers?

16     A.    Yes.

17     Q.    Who did you see?

18     A.    There was a door -- there was a room and the door

19    was cracked and I seen Clarence, like I could see him from

20    where I was sitting at.

21     Q.    Okay.  And did you see anyone else in that room?

22     A.    There was people in the room, but I didn't

23    recognize or I wasn't trying to recognize them at the time.

24     Q.    Did you see Kevin Richardson in that room?

25     A.    No.

NYCLD_046491

P-APP000590

212

A. MCCRAY

1     Q.     Did you see Raymond Santana in that room?

2     A.     No.

3     Q.     Did you see Steve Lopez in that room?

4     A.     No.

5     Q.     Did you recognize anyone that room?

6     A.     Just Clarence at the time.  At that point in

7     time, just Clarence.

8     Q.     Were there any police officers in that room?

9     A.     I can't recall.

10    Q.     Okay.  So what happened next?

11    A.     We stayed.  Me and my mother stayed with Clarence

12    mother.  I know my mother had to go to work.  It was like

13    -- it was getting towards the wee hours of the morning,

14    like I think 2 o'clock, and Clarence mother told my mother

15    that she could go home.

16    Q.     Did you ever learn why Clarence Thomas had been

17    picked up and taken to the precinct?

18    A.     At that time?

19    Q.     Yes.

20    A.     No.

21    Q.     Do you know if he been charged with anything?

22    A.     No.

23    Q.     Do you know if he had been arrested for anything?

24    A.     No.

25    Q.     Was Clarence in handcuffs when he was sitting in

DIAMOND REPORTING   (718) 624-7200   info@diamondreporting.com

212

NYCLD_046492

P-APP000591

213

A. MCCRAY

1    that room?

2        A.    I can't remember.

3        Q.    At any point, did you go inside that room?

4        A.    No.

5        Q.    Did you speak with anyone in that room throughout

6    the entire time you were in the precinct?

7        A.    No.

8        Q.    Okay.  Did you yourself speak with anyone while

9    you were at the Central Park precinct?

10       A.    My mother.

11       Q.    Anyone else?

12       A.    I can't remember, sir.

13       Q.    Did you speak with any police officers?

14       A.    I can't recall.

15       Q.    Did your mother tell anyone her name when she was

16   at the precinct?

17       A.    I can't recall.

18       Q.    Did your mother tell anyone your name?

19       A.    I can't recall.

20       Q.    And did you tell anyone your name while you were

21   at the precinct?

22       A.    I don't think so, sir.

23       Q.    Okay.  So you said it was around 2 a.m. when you

24   left?

25       A.    Around that time.

DIAMOND REPORTING   (718) 624-7200   info@diamondreporting.com

NYCLD_046493

P-APP000592

214

A. MCCRAY

1    Q.    Did you -- at the time that you left, did you

2    know what was going to happen to Clarence?

3    A.    No.

4    Q.    Did Clarence Thomas' mother know what was going

5    to happen to Clarence?

6         MR. WAREHAM:  Objection.

7    A.    I don't know.

8    Q.    When you left, did you have to ask anyone's

9    permission to leave?

10    A.    No.

11    Q.    What happened next?

12    A.    My mother told her, Was she going to be okay.

13    She said yes.  And my mother said, Okay.  Give me a call

14    when he gets home.

15    Q.    Okay.

16    A.    Me and my mother took a cab back home.  I said it

17    was late because I know my mother was like, I'll deal with

18    you after that.  I'm going to get some rest, but I'll deal

19    with you.

20         My mother said she will deal with me when she get

21    back home.  She going to get some rest right now.  She'll

22    deal with me after work.

23    Q.    So at this point, your mother was still angry

24    with you?

25    A.    Yes.

DIAMOND REPORTING  (718) 624-7200  info@diamondreporting.com
214

NYCLD_046494

P-APP000593

215

A. MCCRAY

1    Q.    And what time did your mother normally go to

2    work?

3    A.    7:30 in the morning.

4    Q.    And just to backtrack, Mr. McCray, you didn't

5    have to ask any police officer's permission to leave the

6    Central Park precinct, did you?

7    A.    No, sir.

8    Q.    So how long did it take you to get home in the

9    cab?

10   A.    I don't know, sir.

11   Q.    What time did you go to bed that night?

12   A.    I don't know exactly what time I went to bed.

13   Q.    And when your mother said I'll deal with you in

14   the morning, did she say that --

15   A.    She said, I'll deal with you later.

16   Q.    I'm sorry, I'll deal with you later after work,

17   did she say that to you when you were in the apartment or

18   were you in the cab?

19   A.    In the cab.

20   Q.    And did you have any other type of conversation

21   with your mother while you were in the cab?

22   A.    No, sir.

23   Q.    And did you have any conversation with your

24   mother when you arrived home?

25   A.    She told me to go straight -- straight to bed.

NYCLD_046495

P-APP000594

216

A. MCCRAY

1      Q.    And did you?

2      A.    I was in the bed, but I wasn't sleeping at the

3    time.

4      Q.    What time did you wake up on April 20th?

5      A.    Eight o'clock, 8:30.

6      Q.    Okay.  And just to be clear, you didn't have

7    school that day, right?

8      A.    I didn't have school, sir.

9      Q.    When you woke up on April 20, 1989, was anyone

10   else home?

11     A.    No, sir.

12     Q.    What did you do after you woke up?

13     A.    I got something to eat.  Made myself something to

14   eat and watched TV.

15     Q.    What did you eat?

16     A.    I don't know.

17     Q.    And what TV did you watch?

18     A.    Which TV?

19     Q.    Yeah.  What TV shows?

20     A.    I don't know.

21     Q.    Did you see anything on the news about what had

22   happened in Central Park the night before?

23     A.    No.

24     Q.    Were there any newspapers around your house on

25   the morning of April 20th?

DIAMOND REPORTING   (718) 624-7200   info@diamondreporting.com

216

NYCLD_046496

P-APP000595

A. MCCRAY

1      A.     I don't know.

2      Q.     Did any of them --

3             MR. DePAUL:  Strike that.

4      Q.     Did any newspapers talk about what happened?

5      A.     Well, I didn't go outside to get the newspaper.

6      Q.     So there was no newspaper inside your house?

7      A.     No newspaper, sir.

8      Q.     Did there come a time on the morning of April 20,

9   1989, when Bobby McCray returned home?

10     A.     Yes.

11     Q.     What time was that?

12     A.     I don't remember the time exactly.

13     Q.     And was that -- was he on the end of his shift,

14   was he taking a break, was he on a lunch break?  Do you

15   know why he came home?

16     A.     I think it was the end of his shift.

17     Q.     Okay.  And did you speak with Bobby McCray after

18   he came home?

19     A.     I just said, How you doing, Dad?

20     Q.     And did he respond?

21     A.     Yes.

22     Q.     And what did he say?

23     A.     He said, I'm doing okay.  How you doing?  I said,

24   Okay.

25     Q.     And then after that?

DIAMOND REPORTING   (718) 624-7200   info@diamondreporting.com
                              217

NYCLD_046497

P-APP000596

218

A. MCCRAY

```
 1      A.      He went in his room.

 2      Q.      What happened after that?

 3      A.      There was a knock at the door.

 4      Q.      I'm sorry, just to backtrack.

 5              What were Bobby McCray's hours at work, if you

 6      know?

 7      A.      I don't know.

 8      Q.      Did he have a regular shift?

 9      A.      I don't know because some days it'd be like I

10      didn't see him for a whole night or a whole day, like he

11      was doing doubles or something like that.  I don't know.

12      Q.      Okay.  So you said there was a knock at the door?

13      A.      Yes.

14      Q.      Who opened the door?

15      A.      I did.

16      Q.      And when you opened the door, what did you see?

17      A.      Like three Caucasian men.

18      Q.      And did those men identify themselves?

19      A.      Yes.

20      Q.      Who did they identify themselves to be?

21      A.      Police officers.

22      Q.      Were those men in uniform?

23      A.      No.

24      Q.      What were they wearing?

25      A.      Regular clothes.
```

NYCLD_046498

P-APP000597

A. MCCRAY

1      Q.      Okay.  Were they wearing suits or just regular

2  clothes?

3      A.      Suits.

4      Q.      Can you describe each of the men for me so that

5  when -- do you know what any of their ethnicities were?

6      A.      Caucasian.

7      Q.      They were all Caucasian?

8      A.      I think so.

9      Q.      And how tall were they?

10      A.      They was taller than me.  Excuse me.  They was

11  tall.

12      Q.      So other than then --

13              MR. DePAUL:  Strike that.

14      Q.      Other than identifying themselves as police

15  officers, did they say anything else?

16      A.      They asked me was my parents home.  They asked me

17  who was I.

18      Q.      Okay.  And what did you say?

19      A.      Antron.  Excuse me.  Antron.

20      Q.      And did they ask for your last name?

21      A.      I don't know.

22      Q.      And then they asked you if your parents were

23  home?

24      A.      Yes.

25      Q.      And what did you say?

NYCLD_046499

P-APP000598

220

A. MCCRAY

1    A.    I told them my father was home.

2    Q.    Okay.  And then what happened?

3    A.    They told me to go get him.

4    Q.    And did you?

5    A.    Yes, sir.

6    Q.    What happened next?

7    A.    I got my father.  He opened the door back and he

8    let them in.

9    Q.    And what was your reaction when you saw the

10   police officers at your door?

11   A.    I guess I was scared.

12   Q.    Why?

13   A.    Because I had police officers at my door.

14   Q.    Did you think that they were there for you?

15   A.    Yes, he asked me -- one of them asked me -- they

16   asked who I was, so I kind of figured they was there for

17   me.

18   Q.    Okay.  So your father invited them in?

19   A.    Yes, sir.

20   Q.    And then what happened?

21   A.    They were speaking amongst themselves.

22   Q.    Okay.

23   A.    And one of the officers -- I don't know who --

24   one of the officers told my father they need to take me

25   down to the precinct.

DIAMOND REPORTING   (718) 624-7200   info@diamondreporting.com

NYCLD_046500

P-APP000599

221

A. MCCRAY

1    Q.    Did -- I'm sorry.  Did the police officers ask

2  for you by name or did they ask you what your name was?

3    A.    What my name was.

4    Q.    Okay.  So you said that the officers were having

5  a conversation with Bobby McCray?

6    A.    Yes, sir.

7    Q.    Could you hear any part of that conversation?

8    A.    I just heard they told my father that they were

9  going to take me downtown, they wanted me and my father to

10  go downtown.

11    Q.    And what did your father say?

12    A.    He said okay.

13    Q.    Okay.  And then what happened?

14    A.    Then he said, Let me call my wife --

15    Q.    Okay.

16    A.    -- so she can meet us there or will meet us at

17  the house.

18    Q.    So your dad called your mother?

19    A.    Yes, sir.

20    Q.    And he called her at work?

21    A.    Yes, sir.

22    Q.    And could you hear what your dad was saying to

23  your mother?

24    A.    No.  I mean, I don't know.  I heard -- I can't

25  remember word for word though, but I think he said, like, I

NYCLD_046501

P-APP000600

222

A. MCCRAY

1    need you to come home because Tronny got to go to the

2    precinct.  We got to go the precinct with Tronny.

3        Q.    Okay.  And by "Tronny," he meant you?

4        A.    Yes, sir.

5        Q.    And then what happened?

6        A.    They let us wait for my mother.  My mother came

7    and then we went down.  My mother came and then one of the

8    officers asked me did I have -- the clothes that I have on,

9    did I have on last night.

10       Q.    And what did you say?

11       A.    I said, No, sir.

12       Q.    And then what happened after that?

13       A.    He asked me where was the clothes that I had on

14   last night.

15       Q.    What did you say?

16       A.    I said, In the bathroom, in the tub.

17       Q.    And the officer ask you to do anything?

18       A.    He asked me where the bathroom was.

19       Q.    Okay.  And did you say where the bathroom was?

20       A.    Yes, sir.

21       Q.    And then what happened?

22       A.    I showed him the bathroom, and he got my clothes.

23       Q.    So he took your clothes?

24       A.    Yes.

25       Q.    Can you describe that officer for me?

DIAMOND REPORTING   (718) 624-7200   info@diamondreporting.com

222

NYCLD_046502

P-APP000601

223

A. MCCRAY

1    A.    No, sir.

2    Q.    When he took your clothes, what did he do with

3    them?

4    A.    I don't remember, sir.

5    Q.    Did he put them in a bag?  Did they hold them in

6    his hands?

7    A.    He had them in his hand.

8    Q.    Okay.  And did there come a time when your mom

9    arrived at your apartment?

10    A.    Yes.

11    Q.    Okay.  And how long did it take for her to get to

12    the apartment?

13    A.    Not too long.

14    Q.    And what was your mother's demeanor when she got

15    home?

16    A.    She looked like she was scared.

17    Q.    Okay.  And what was your father's demeanor at

18    this point?

19    A.    He had -- his expression -- he was calm, like he

20    always was.

21    Q.    And how were you feeling?

22    A.    I was nervous.

23    Q.    So what happened after that?

24    A.    Me and my mother and my father went downstairs.

25    And while we was walking out the building, there was like

DIAMOND REPORTING   (718) 624-7200   info@diamondreporting.com

223

NYCLD_046503

P-APP000602

224
A. MCCRAY

1      two police cars, and Clarence Thomas was in one of them.

2      And me and my mother and my father got in the other police

3      car.

4          Q.      So you didn't get in the same car as Clarence

5      Thomas?

6          A.      No, sir.

7          Q.      Was Clarence Thomas' mother in the car with him?

8          A.      I can't recall, sir.

9          Q.      Do you know if anyone else besides police

10     officers was in the car with Clarence Thomas?

11         A.      No, sir.

12         Q.      And the police car that you got into with your

13     mother and your father, did that have police markings on

14     it?

15         A.      No, sir.

16         Q.      So it didn't have any police markings on it?

17         A.      No, sir.

18         Q.      Okay.  Do you remember what color the car was?

19         A.      No, sir.

20         Q.      Did you get in the back seat?

21         A.      Yes, sir.

22         Q.      And where were you seated in the back seat?

23         A.      I was seated I think next to my mother.

24         Q.      Were you in the middle?

25         A.      I don't think so, sir.

NYCLD_046504

P-APP000603

225

A. MCCRAY

1    Q.    Okay.  Do you remember if you were on the right

2    side or the left side?

3    A.    I don't remember.

4    Q.    Were you handcuffed in the police car?

5    A.    No, sir.

6    Q.    At any point before you got into the police car,

7    were you placed in handcuffs?

8    A.    No, sir.

9    Q.    So what happened next?

10    A.    We drove to a precinct.

11    Q.    Do you know which one?

12    A.    No.

13    Q.    Was it any of the precincts you had been to the

14    night before?

15    A.    No, sir.

16    Q.    Did anyone --

17              MR. DePAUL:  Strike that.

18    Q.    How many police officers were in the car with

19    you?

20    A.    I can't recall.

21    Q.    Was there any conversation in the car while you

22    were driving to the police precinct?

23    A.    No.

24    Q.    Did you say anything to your mother or your

25    father?

NYCLD_046505

P-APP000604

226

A. MCCRAY

1    A.    No.

2    Q.    Did they say anything to you?

3    A.    No.

4    Q.    Did the police officers speak to your parents at

5    all?

6    A.    In the car?

7    Q.    Yes.

8    A.    No, sir.

9    Q.    Did the police officer or police officer who was

10   in the car speak to you at all?

11   A.    No, sir.

12   Q.    Did you cry when you were in the car?

13   A.    Yes.

14   Q.    Why were you crying?

15   A.    I was scared.

16   Q.    And did your mother say anything to you while you

17   were crying?

18   A.    She was just wiping my face.

19   Q.    To your knowledge, had your clothes been washed

20   at all before the police officer took them from the tub?

21   A.    No, sir.

22   Q.    Had they been soaked or -- had they been soaked

23   in any way?

24   A.    No, they weren't soaked, sir.

25   Q.    So how long did it take you to get to the police

NYCLD_046506

P-APP000605

A. MCCRAY

1   precinct?

2        A.      I don't know.

3        Q.      What happened next?

4        A.      We went to the police precinct.  They put us in a

5   room, me and my mother and father.

6        Q.      And what did the room look like?

7        A.      It was a room with a desk in it.

8        Q.      A room with a desk you said?

9        A.      Yes, yes.

10       Q.      Can you remember anything else in the room?

11       A.      No, sir.

12       Q.      Was the room big or was it small?

13       A.      I don't know, sir.

14       Q.      So what happened next?

15       A.      They sat us down.  Three police officers, they

16   sat down and they asked me what happened last night.

17       Q.      So when you entered the room, did the police

18   officers enter with you?

19       A.      They opened the door and they came in behind us.

20       Q.      Okay.  So you all went in basically at the same

21   time?

22       A.      Yes.

23       Q.      Okay.  And it was three police officers in the

24   room with you?

25       A.      Three or four.  Maybe five.

NYCLD_046507

P-APP000606

Case 2:20-cv-00180-JLB-MRM    Document 46-3   Filed 07/01/20   Page 24 of 248 PageID 1598



**True Crime Buzz**

SERIAL KILLERS      MOVIES & TV      MISSING PERSONS      CRIME PODCASTS

MAY 31, 2019, 6:19 PM ET

Crime TV

# What Is 'Wilding' And What Does It Have To Do With The Central Park 5?

Debate aroun͏        ͏hrase "wilding" meant — and if it ever referred to anything at all —  cor

BY ERIC SHO͏



DIGITAL SERIES
HIP HOP BEEFS: Clout, Crime, a͏

P-APP000607

Case 2:20-cv-00180-JLB-MRM    Document 46-3    Filed 07/01/20    Page 25 of 248 PageID 1599

The controversy surrounding the so-called Central Park 5 — five teenagers wrongfully accused of attacking and raping a woman on a run in the park — has sparked endless discussion on the topics of race, policing, and criminal justice in America. Despite their exonerations and thorough DNA testing which has identified the actual perpetrator, the facts of the case remain disputed to this day. How this group of innocent kids were blamed for the crime is precisely the question behind Ava Duvarney's latest series, "When They See Us," which recently debuted on Netflix.

One of the most bizarre elements of the original conception of the crime was the accusation that some teens who assaulted several people the same night Trisha Meili was raped were "wilding" — but what exactly "wilding" is or was remains somewhat unclear to this day.

According to a New York Times article published two days after the attack on Meili, at least 9 individuals were victims of a group of "32 schoolboys" who "terrorized" the Central Park area without a motive. The squad, which had split into smaller sub-groups after spotting police cars, physically assaulted several unidentified individuals and threw rocks at passing cars. Because the cabal of kids weren't on drugs, didn't rob anyone of their belongings, and were apparently not motivated by hatred, police believed they were participating in a pastime called "wilding."

P-APP000608



Kevin Richardson, Antron Mccray, Raymond Santana Jr., Korey Wise, and Yusef Salaam attend the World Premiere of Netflix's "When They See Us" at the Apollo Theater on May 20, 2019 in New York City. Photo: Dimitrios Kambouris/Getty Images

"It's not a term that we in the police had heard before," said Chief of Detectives Robert Colangelo at the time, noting that the police were unaware of any similar incidents in the park recently. "They just said, 'We were going wilding.' In my mind at this point, it implies that they were going to go raise hell."

"It's very difficult to explain," Colangelo continued. "I think they were a group of kids who lived relatively close together, who hung out together, and I think on Wednesday night they said, 'Let's raise a little hell, go into the park and assault and harass joggers and bicyclists.'"

Reports have since indicated that the NYPD had actually misunderstood the suspects. A 2002 report from The National Review indicates that officers had overheard the teenagers singing the lyrics to Tone Loc's popular track, "Wild Thing" while they were in holding cells but couldn't understand the context, thus spawning the neologism.

P-APP000609

Case 2:20-cv-00180-JLB-MRM    Document 46-3    Filed 07/01/20    Page 27 of 248 PageID 1601

A different account of the word suggests that it had actually been in use long before the Central Park 5 incident. In her book, "The Central Park Five," writer Sarah Burns states that "wilding" had previously been used as "street slang for acting crazy, although it didn't necessarily have violent connotations."

Political analysts have since scrutinized the way the phrase was used to stoke racial fears about black and hispanic youths and may have played a factor in the trial of the five 14- to 16-year-old children accused or raping Meili.

"The cultural panic engendered by wilding measurably contributed to the verdicts," writes Stephen Mexal, an English professor at California State University, in an article titled "The Roots of 'Wildin': Black Literary Naturalism, the Language of Wilderness, and Hip Hop in the Central Park Jogger Rape."

"The Central Park Jogger rape began as a horrific crime but became a multivalent spectacle in part because of an interpretive failure on the part of the broader public: an inability to read the word wilding critically, as a part of an ironic discourse interrogating the primacy of white civilization," says Mexal.

"Wilding" has certainly since become a common colloquialism for acting crazy or excited in a playful manner, as per Nick Cannon's former MTV series "Wild N Out," postulates Mexal.

"I suspect the word 'wilding' made many people remember about actual wilderness, violent and uncontrollable," Mexal added, according to Grist, an independent news outlet. "Now, every right-thinking person knows that a 14-year old boy from New York is not a wild tiger. But for seemingly an entire city and maybe an entire country, that simple fact suddenly became very hard to remember one night in 1989."

The fear of "wilding" has since been compared to the moral panic around fabled youth trends like the so-called "knockout game," a supposed fad in 2013 which urban youths allegedly challenged each other to punch out strangers.

P-APP000610

5/8/2020 Central Park 5: What Is Wilding? A True Crime Blog

Case 2:20-cv-00180-JLB-MRM    Document 46-3    Filed 07/01/20    Page 28 of 248 PageID 1602

"You could find instances that fit either description, but in a country with tens of millions of teenagers, where you could find examples of almost any behavior, you need more than a few anecdotes to prove a trend," wrote political analyst Jamelle Bouie for The Daily Beast. "But the question isn't whether these random assaults happen. Of course they do. The question is whether this is a new dimension of urban crime, or a new name for an old phenomenon. Most of the evidence points to the latter."

"Race is an obvious element in all of this," Bouie continues. "In almost every report, the assailants are described as young black men, and many of the victims have been white. It's hard not to see the sensationalized coverage of 'knockout'—and before that, 'wilding'—as a reflection of our national fear of young black men. Indeed, in the more sinister corners of the Internet, you can find people who argue that these incidents are the opening shots in a 'race war' by 'feral black youth.'"

Death and Taxes analyst Robyn Pennacchia went as far as describing both "wilding" and the "knockout game" as media fabrications.

"There was no such real trend as 'wilding,'" Pennacchia wrote in Business Insider. "It was all made up-but easily accepted by a society conditioned to see young black men as criminals rather than people."

## ALL POSTS ABOUT

Central Park 5

Crime TV

## RELATED STORIES





P-APP000611



How Donald Trump Is Connected To The Central Park Five

Where Is Trisha Meili, The Central Park Jogger, Now?

Get all your true crime news from Oxygen. Coverage of the latest true crime stories and famous cases explained, as well as the best TV shows, movies and podcasts in the genre. And don't miss our own podcast, Martinis & Murder!

## YOU MAY ALSO LIKE...



**We Finally Know What Happened to Brandi From 'Storage Wars'**
LOOPER.COM



**This Sneaky Clue Has Fans Convinced of a Big Taylor Swift Collab**
PAGESIX.COM

P-APP000612



**Celebrities Who Still Have Never Been Found After Going Missing**

GRUNGE.COM



**Charlize Theron Shares Rare Photo of Her Transgender Daughter**

BRAVOTV.COM

## LATEST IN TRUE CRIME BUZZ



CrimeCon @ Home Brings A Free 'True Crime Party' To Your Living Room

18 hours ago



New Podcast Investigates Woody Harrelson's Hitman Dad

2 days ago



Pranksters Trick Carole Baskin With Fake Fallon Interview

2 days ago



Nicolas Cage To Play Joe Exotic In New Television Series

3 days ago



'I'll Be Gone In The Dark' Show Follows Golden State Killer Hunt

3 days ago

P-APP000614

Case 2:20-cv-00180-JLB-MRM    Document 46-3    Filed 07/01/20    Page 32 of 248 PageID 1606

See All Posts

## EDITOR'S PICKS



**BLOG**

8 Deadly Mother's Day-Themed True Crime Shows



**BLOG**

How Was New York's Zodiac Killer Caught?



**BLOG**

North Carolina Mom Kills Stepson, Husband Decades Apart

P-APP000615

5/8/2020    Oxygen Central Park 5: What Is Wilding? Oxygen Official Site True Crime Blog

Case 2:20-cv-00180-JLB-MRM    Document 46-3    Filed 07/01/20    Page 33 of 248 PageID 1607



**BLOG**

Kansas Cult Leader Guilty Of Rape, Murder, Fraud



**BLOG**

Investigator Talks 'Gruesome' 'Hollywood Ripper' Murder

# WAYS TO WATCH

Download the Oxygen app:

iPhone

Android

Apple TV

P-APP000616

Case 2:20-cv-00180-JLB-MRM   Document 46-3   Filed 07/01/20   Page 34 of 248 PageID 1608

Roku

Amazon Fire TV

Buy episodes:

# ABOUT OXYGEN

FAQ

Privacy Policy

Do Not Sell My Personal Information

Terms of Service

Closed Captioning

HTML Sitemap

Oxygen Apps & Support

# GET INVOLVED

Join Viewer's Voice

P-APP000617

Contact Us

Oxygen Careers

Corporate Info

 AdChoices

## STAY CONNECTED

     

---

©2020 Oxygen Media LLC. A Division of NBCUniversal

P-APP000618

## The New York Times

# Jogger's Attackers Terrorized at Least 9 in 2 Hours

**By David E. Pitt**

April 22, 1989



See the article in its original context from
April 22, 1989, Section 1, Page 1   Buy Reprints

**VIEW ON TIMESMACHINE**

TimesMachine is an exclusive benefit for home delivery and digital subscribers.

*About the Archive*
*This is a digitized version of an article from The Times's print archive, before the start of online publication in 1996. To preserve these articles as they originally appeared, The Times does not alter, edit or update them.*

*Occasionally the digitization process introduces transcription errors or other problems. Please send reports of such problems to archive_feedback@nytimes.com.*

The youths who raped and savagely beat a young investment banker as she jogged in Central Park Wednesday night were part of a loosely organized gang of 32 schoolboys whose random, motiveless assaults terrorized at least eight other people over nearly two hours, senior police investigators said yesterday.

Chief of Detectives Robert Colangelo, who said the attacks appeared unrelated to money, race, drugs or alcohol, said that some of the 20 youths brought in for questioning had told investigators that the crime spree was the product of a pastime called ''wilding.''

P-APP000619

''It's not a term that we in the police had heard before,'' the chief said, noting that the police were unaware of any similar incidents in the park recently. ''They just said, 'We were going wilding.' In my mind at this point, it implies that they were going to go raise hell.''

From shortly after 8:30 P.M. until sometime after 10, the youths, mostly 14- and 15-year-olds, who broke up into smaller bands, also harassed one man; attacked another, knocking him to the ground; set upon a 52-year-old jogger, punching him; tried to assault another male jogger, in his 30's, who outran them; threw rocks at a couple riding a tandem bicycle, who fled, and attacked two other joggers, one a man in his 40's who was struck with a metal pipe and seriously injured. Police said they believed the same metal pipe, wrapped with tape, was later used in the assault on the investment banker.

Seven youths were charged as adults yesterday with rape, assault and attempted murder in the attack on the 28-year-old Salomon Brothers banker, who detectives said had been beaten with fists, a rock and the pipe. Chief Colangelo said that the police had obtained statements indicating that the woman had been set upon by 12 youths. He said the police hoped other arrests would follow.

The young woman, who doctors said had lost three-quarters of the blood in her body by the time she was found, remained on the critical list at Metropolitan Hospital yesterday, although surgeons said she had shown slight neurological improvement and was regaining certain reflexes. Dr. Robert S. Kurtz, assistant chief of surgery at Metropolitan Hospital, said that these were ''very good signs,'' but that her chances of survival would not be clear for three or four days.

The woman suffered multiple skull fractures, severe head bruises, facial injuries, swelling of the brain and multiple cuts and bruises on the arms, legs and the chest.

The woman, who was attacked in the park near the 102d Street Transverse sometime after 10 P.M., was apparently dragged 200 feet into a wooded area, where she was raped by at least 4 of the 12 boys, Chief Colangelo said. The victim was identified about noon Thursday by co-workers who heard news reports and went to the police on a hunch that they knew the victim.

Three of the youths charged in the attack on the investment banker were also charged in the attack on the male jogger in his 40's. Two other youths, one 13 and one 14, were charged in the attack on the man.

The male jogger, who was taken to St. Luke's-Roosevelt Hospital Center with head injuries, was beaten on the park bridle path near West 96th Street. The police said he did not want his name released.

Although the police released the young woman's name, The New York Times does not ordinarily identify rape victims without their permission. Because of her condition, the woman has not been able to speak. No Criminal Records

All nine of the arrested youths, whom the police were required to question in the presence of their parents, could receive prison terms of three and a half to nine years on each felony count if found guilty. A 10th youth was being questioned last night.

The full dimensions of the episode in the northern reaches of the park, under a full moon on a mild spring night, did not become apparent to detectives until hours after the first assault, when the 32 youths harassed a man at 110th Street and Central Park West, the police said.

P-APP000620

Chief Colangelo said that none of the youths questioned had criminal records and that ''we don't see any drug use here.''

''It's very difficult to explain,'' the chief said. ''I think they were a group of kids who lived relatively close together, who hung out together, and I think on Wednesday night they said, 'Let's raise a little hell, go into the park and assault and harass joggers and bicyclists.' '' Split Into Smaller Bands

Chief Colangelo said that because the group of 32 youths had split up into smaller bands - apparently after seeing an approaching police radio car -it was unclear who in each of the smaller groups was responsible for the six other assaults. For that reason, the authorities said, detectives are still reviewing statements from eyewitnesses, sifting through physical evidence and awaiting forensic reports.

The seven youths charged in the attack on the investment banker, all from upper Manhattan, were identified as Raymond Santana, 14, of 115 East 119th Street, a student at Junior High School 117; Kevin Richardson, 14, of 1309 Fifth Avenue, a student at Jackie Robinson High School; Steve Lopez, 15, of 1309 Fifth Avenue, a student at Northview Technical; Antron McCray, 15, of 40-44 West 111th Street, a student at Career Academy Junior High School; Yusef Salaam, 15, of 1309 Fifth Avenue, a student at Rice High School; Kharey Wise, 16, also of 1309 Fifth Avenue, a student at Stevenson High School, and Clarence Thomas, 14, of 21 West 112th Street, a student at the Creative Learning Community.

The three also charged in the assault on the male jogger were the Santana, Lopez and Richardson youths. The names of the 13-year-old and the 14-year-old also charged in that assault were not released.

All nine arrested remained in custody awaiting arraignment.

The police normally withhold the names of minors who are accused of crimes, but officials said they made public the names of the youths charged in the attack on the woman because of the seriousness of the incident. Met at 8:30 P.M. Investigators said preparations for the crime spree apparently began about 8:30 P.M. Wednesday, when 17 youths gathered outside the Taft Houses project at 117th Street and Madison Avenue.

''This is a prearranged meeting,'' Deputy Police Commissioner Alice T. McGillion said. ''We think this is the group that decides they're going to go out 'wilding.' But as they're walking south down the street, they run into another group of 15 kids at Fifth Avenue and 110th Street. That, as far as we know, was not prearranged.''

Three of the youths charged in the attack on the investment banker, along with the 13- and 14-year-olds charged in the attack on the male jogger, were apprehended by a police anti-crime unit as they were leaving the park at 100th Street and Central Park West at about 10:40 Wednesday night. Several hundred yards away, at 1:30 A.M., the investment banker was found, unconscious and bleeding, by two passers-by.

At the time the five youths were apprehended, Commissioner McGillion said, patrol officers at the Central Park Precinct had received two telephone calls from the couple on a tandem bicycle about a roving gang of youths in the park, and had sent radio cars to 110th Street and the East Drive to look for them. But the youths had disappeared by the time officers arrived, the police said. The second call from the same couple had sent cars and anti-crime units rushing to 98th Street and the East Drive, but again, officers found nothing.

The precinct had also taken a report from the 52-year-old jogger, who went to the station house at 9:10 P.M. and said that he had been punched by some youths near the West Drive and 102d Street. No Evidence of a Leader

But it was not until the investment banker was found that officials began to realize the gravity and extent of the crime spree.

''I don't think that they had in mind to go into the park and rape someone,'' Chief Colangelo said, adding that the police had uncovered no evidence of a leader or leaders in the groups.

''We believe that there may have been other incidents in the park that night,'' Chief Colangelo said, adding that the police had established a 24-hour hotline for victims or witnesses to call. The chief said the police would respect the wishes of those wanting to remain anonymous. The number is (212) 598-0071.

''It took some time to realize that all the incidents were connected,'' the chief said. ''Some time had elapsed from the first incident to the last. And remember, this was nighttime, the park has a lot of dark, secluded areas - and some of the statements we have indicate that the youths were lying undercover, waiting for a victim.

''I'm not sure we have all the answers now. It's been a slow process to try to put all the pieces together.''

Chief Colangelo added that legal restrictions on the police in questioning minors had compounded the investigators' burdens. Those less than 16 years old who are taken into custody must be questioned only in specially designated rooms, and their parents must be present.

Asked how the arrested youths had acted after their arrest, the chief declined to offer details. ''Some of them feel the seriousness of the cases,'' he said, ''and some of them not so seriously.''

A version of this article appears in print on April 22, 1989, Section 1, Page 1 of the National edition with the headline: Jogger's Attackers Terrorized at Least 9 in 2 Hours

**THANK YOU FOR YOUR SUPPORT**

As a subscriber, you make it possible for us to tell stories that matter.

Help more readers discover our journalism - give a subscription to The Times as a gift.

Subscribers can purchase gifts at a 50% discount.

| Give The Times |
| --- |

P-APP000622

P-APP000623

5/8/2020
When They See Us Shows a Case's Impact on U.S. Policy - The Atlantic
Case 2:20-cv-00180-JLB-MRM   Document 46-3   Filed 07/01/20   Page 41 of 248 PageID 1615

## CULTURE

# How the 'Central Park Five' Changed the History of American Law

Ava DuVernay's miniseries shows why the hysteria surrounding the 1989 case caused more children to stand trial as adults than at any other time in U.S. history.

**ELIZABETH HINTON**   **JUNE 2, 2019**



*When They See Us* is primarily focused on the racist logic of the policing, court, and prison systems that cost the five defendants their childhood.  (ATSUSHI NISHIJIMA / NETFLIX)

Coverage of violent crime is a staple of American news, yet only a handful of stories capture the attention of the nation. Even fewer go on to inform the trajectory of American legal proceedings. The acclaimed filmmaker Ava DuVernay tackles one of the most significant criminal cases of the 1990s with her miniseries *When They See Us*, which premiered on Netflix on May 31. In four episodes, DuVernay provides the most complete account of the impact of the "Central Park Jogger" case on the lives of the defendants and their families.

On April 19, 1989, police found the body of a 28-year-old white woman in New York's Central Park. She was covered in blood and nearly dead after a brutal sexual

P-APP000624

Case 2:20-cv-00180-JLB-MRM Document 46-3 Filed 07/01/20 Page 42 of 248 PageID 1616

assault. Trisha Meili, the injured party, was not the only victim of the night's horrific events. So, too, were Raymond Santana, Kevin Richardson, Korey Wise, Yusef Salaam, and Antron McCray—the kids, ages 14, 15, and 16, who were wrongfully convicted of her attack. Despite no DNA evidence, fingerprints, blood, or semen linking any of the black and brown boys to the crime, all five defendants grew up in prison, each one spending between six and 13 years behind bars.

*When They See Us* is primarily focused on the racist logic of the policing, court, and prison systems that cost the five defendants their childhood. The series also profoundly illuminates some inherent problems in American criminal justice from a range of perspectives. Viewers get an intimate glimpse of mothers, fathers, and siblings fighting for the freedom of their loved ones; law-enforcement authorities classifying these same boys as "animals"; and protesters on both sides holding signs, declaring IT'S NOT OPEN SEASON ON WOMEN or THE REAL RAPIST IN COURT TODAY IS THE NEW YORK POLICE AND THE D.A.

Ultimately, the hysteria surrounding the Central Park Jogger case gave rise to new language about black-youth crime, and to new laws that caused more children to stand trial as adults than at any other time in American history. *When They See Us* gets the audience closer to understanding why juvenile and adult prison populations exploded through the 1990s, and how the United States became home to the largest incarceration system in the world.

P-APP000625

Case 2:20-cv-00180-JLB-MRM Document 46-3 Filed 07/01/20 Page 43 of 248 PageID 1617

A courtroom scene from *When They See Us* (Atsushi Nishijima / Netflix)

The series begins on the morning of April 19, introducing viewers to the five teenagers as they navigated an ordinary day in their Harlem neighborhood. McCray (played by Caleel Harris), a rising Little League star, discussed the Yankees with his father (Michael K. Williams). Richardson (Asante Blackk), a trumpet player, anticipated being named first chair as he walked home from school with his older sister. Meanwhile, Santana (Marquis Rodriguez) and Wise (Jharrel Jerome) seemed primarily occupied with impressing girls, as Salaam (Ethan Herisse) avoided a bully. By nighttime, the boys had entered Central Park together, along with 25 to 35 others—some of whom began throwing rocks at cars, harassing passersby, and beating up homeless people. When the police arrived, the crowd scattered. The officers managed to catch five boys during the chase, including Richardson and Santana, who were taken to the Central Park station for questioning.

Initially, the police prepared to charge the kids with unlawful assembly and refer them to the children's court system. But New York District Attorney Linda Fairstein (Felicity Huffman) and investigators quickly concluded that the boys instead were Meili's attackers and built a case around them, rather than conducting a full investigation. "Every young black male who was in the park last night is a suspect in the rape of that woman who is fighting for her life," Huffman's Fairstein says to NYPD officers. She called for the deployment of an "army of blue up on Harlem" and encouraged police to "stop every little thug you see."

The police, investigators, and the press dubbed the boys' actions in the park that night "wilding." Two days after the remaining three suspects had been arrested, the *New York Post* portrayed "wilding" as "packs of bloodthirsty teens from the tenements, bursting with boredom and rage, roam[ing] the streets getting kicks from an evening of ultra-violence." Soon the term became part of the national discourse, with the newscaster Tom Brokaw describing "wilding" as "rampaging in wolf packs and attacking people just for the fun of it" on *NBC Nightly News*. Peter Jennings of ABC named it "terror," plain and simple.

The concept of "wilding" and the racist assumptions behind it made it seem plausible to law-enforcement authorities and the public that black and brown boys'

P-APP000626

Case 2:20-cv-00180-JLB-MRM   Document 46-3   Filed 07/01/20   Page 44 of 248 PageID 1618

mischief could easily turn into violent rape. In *When They See Us*, viewers hear excerpts from the *New York Post* columnist Pete Hamill's April 23 account. "They were coming downtown from a world of crack, welfare, guns, knives, indifference, and ignorance," Hamill wrote, "and driven by a collective fury, brimming with the rippling energies of youth … they had only one goal: to smash, hurt, rob, stomp, rape." For Hamill, "wilding" was an expression of class and racial hatred. "The enemies were rich. The enemies were white." The implication was that "wilding" would destroy affluent, white New York if young black and brown boys and men were not severely punished. DuVernay reminds her audience that Donald Trump purchased $85,000 ads in New York City newspapers that screamed "BRING BACK THE DEATH PENALTY. BRING BACK OUR POLICE!"

*[ Read: Ava DuVernay does true crime differently in 'When They See Us' ]*

Five years later, the animalistic premise of "wilding" that *When They See Us* so vividly illuminates received academic treatment. In his definitive 1995 *Weekly Standard* essay, "The Coming of the Super-Predators," John DiLulio Jr.—then a politics and public-policy professor at Princeton—predicted that immediate demographic shifts would "unleash an army of young male predatory street criminals." These chiefly black and brown youths were, according to DiLulio, "so impulsive, so remorseless, that [they] can kill, rape, maim, without giving it a second thought." Politicians and the media seized on the "super-predator" idea, just as they had done with "wilding." Three months after the release of DiLulio's article, then–first lady Hillary Clinton famously called for authorities to bring "the kinds of kids who are called 'super-predators,' no conscience, no empathy … to heel."

Amid the "super-predator" frenzy, nearly every state passed laws that made it easier to punish children as young as 13 as adults and, in some cases, sentence them to life without the possibility of parole. In 1998 alone, roughly 200,000 youths were put through the adult court system, and the majority of them were black. Sixteen-year-old Korey Wise was the only Central Park Five defendant to be tried as an adult, and the fourth episode of *When They See Us* is mainly told from his perspective. With an exceptional performance by Jharrel Jerome—who plays Wise both as a boy and as an adult, and imbues the role with empathy—the episode exposes the horrors children experience when they are locked up with adults. In one scene, for instance, a Rikers Island guard helps two prisoners orchestrate a violent attack

P-APP000627

Case 2:20-cv-00180-JLB-MRM Document 46-3 Filed 07/01/20 Page 45 of 248 PageID 1619

against Wise. The teen then chooses to enter solitary confinement for his own protection.

These practices went even further in the mid-1990s. Though Trump's 1989 call for the execution of the Central Park Five went unfulfilled, between the release of "The Coming of the Super-Predators" in 1995 and the Supreme Court's *Roper v. Simmons* decision, which outlawed the death penalty for juveniles in 2005, 62 percent of the children placed on death row across the U.S. were black or Latino.

But by the late 1990s, it became clear that DiIulio's "super-predators" were not, in fact, coming for blood. Youth violence had <u>declined</u>—not drastically increased—and a number of prominent criminologists discredited DiIulio's data. He <u>apologized</u> in 2001 for "any unintended consequences." A year later, after DNA evidence linked a serial rapist and murderer named Matias Reyes to Meili's attack, the New York Supreme Court vacated the Central Park Five's convictions. And in 2014, the court settled a civil case with the five men for $41 million. Nonetheless, the "super-predator" myth irrevocably altered the lives of McCray, Richardson, Salaam, Santana, Wise, and tens of thousands of youths and their families, with the proliferation of misguided state and federal policies.

*Super-predator* may now be seen as a dirty word (and indeed came to haunt Clinton during her 2016 presidential-election bid), but the "wilding" concept that emerged during the Central Park Jogger case is alive and well. The most recent usage came almost 30 years to the day of Meili's rape, on April 17, 2019, after a reported 500 black youths in Chicago descended on Millennium Park, allegedly stealing from and harassing tourists. <u>The local news</u> described their actions as "wilding." An official blamed "soft on crime" policies, warning of more "wilding" to come. As DuVernay's strongest work to date, *When They See Us* should inspire people to recognize that crime-control policies and the racist ideas behind them must change. Otherwise, the history of the Central Park Five is likely to repeat itself.

*We want to hear what you think about this article. <u>Submit a letter</u> to the editor or write to letters@theatlantic.com.*

P-APP000628

P-APP000629

P-APP000630

P-APP000631



Play Live Radio



 **DONATE**

MOVIE INTERVIEWS

# Ava DuVernay Focuses On The Central Park 5's Perspective: 'Now People Know'

June 19, 2019 · 1:23 PM ET
Heard on Fresh Air

 TERRY GROSS

FRESH AIR

**35-Minute Listen**                    PLAYLIST     Download

Transcript

DuVernay's Netflix series, *When They See Us*, tells the story of how five black and brown teenagers were manipulated into confessing to a brutal rape they did not commit.

---

 MOVIE INTERVIEWS

Ava DuVernay Hopes You Hear 'The Heartbeat Of The Boys' In Central Park 5

---

 TV REVIEWS

Horrors And Humanity In Ava DuVernay's Gripping 'When They See Us'

---

TERRY GROSS, HOST:

This is FRESH AIR. I'm Terry Gross. My guest Ava DuVernay has dramatized the story of the Central Park Five in the new four-part Netflix series "When They See Us," which

P-APP000632

Case 2:20-cv-00180-JLB-MRM   Document 46-3   Filed 07/01/20   Page 50 of 248 PageID 1624

she produced, directed and co-wrote. The Central Park Five was the name given to five black and brown boys age 14 to 16, who, in 1989, were accused of brutally raping and nearly killing a woman who was jogging in Central Park. They became symbols of crime in New York City. Donald Trump took out full-page ads in the city's four newspapers, calling for the death penalty. The five were convicted based on confessions they made shortly after they were arrested; confessions they soon after said were coerced.

In 2002, the real rapist confessed, and his DNA matched the evidence found on the victim's body. He was a serial rapist, who always acted alone. And he testified that the five had nothing to do with the rape. In 2002, after the five collectively served over three decades in prison, their convictions were vacated. A year later, they filed a civil lawsuit against New York City. In 2014, they collectively received a $41 million settlement, but they couldn't get back the years of their lives they'd lost in prison. Ava DuVernay also directed the film "Selma," which dramatized a chapter of the civil rights movement, and "13th," a documentary about mass incarceration and its echoes of the eras of slavery and Jim Crow.

Ava DuVernay, welcome back to FRESH AIR. Did you know much about their story before you made this series?

AVA DUVERNAY: Only what I knew as a teenager growing up in Compton. I was on the West Coast at the same time that these boys were on the East Coast in Harlem. I was all over the place. It was big news in Los Angeles. And it, really, was something that I focused on because these were black boys who looked like me and my friends. They were around the same age. I'm the same age as Korey Wise. And so to hear of this, you know, dastardly, despicable kind of devastating crime that had taken place, you know, was what everyone was talking about at one point.

And particularly, the word wilding caught my attention because I didn't know what it was, and I wanted to know what that meant. So I called a cousin in New York, and I asked what it was. And he said, we don't know. We think they mean wiling out. And wiling out is - does not mean, you know, gang-raping women. Wiling out is hanging out, you know, kind of like being free for the night and, like, just, you know, acting, you know, carefree. And I always have trouble when I try to translate urban slang into

P-APP000633

Case 2:20-cv-00180-JLB-MRM   Document 46-3   Filed 07/01/20   Page 51 of 248 PageID 1625

(laughter) something else, but it is - it's not a wolf pack of animal-like thugs going into the park to, you know, torture and demean and assault and rape people. That's not what wiling out means. So part of what we do in our piece is try to kind of trace and track how wiling out becomes wilding becomes wolf pack becomes, you know, animals becomes, you know, a prison sentence for these five boys.

GROSS: All five were interviewed for the Ken Burns documentary, but one of them was voice only. He didn't want his face on camera. He wanted to keep his privacy. And I'm wondering how the five young - how the five men - I mean, they're in their mid-40s now - how they felt about having the story told again and having the dramatic version out there again with actors playing them because on the one hand, it's a story in which their charges were vacated. So they're - you know, they are not guilty. At the same time, they probably want to put the story behind them to some degree, if that's possible. So how did they feel about having you tell the story?

DUVERNAY: Well, they are all individuals, so they all felt differently about it. You know, you speak of Antron McCray, who did not go on camera for the Burns doc. I remember flying out to Atlanta to see him. You know, he was the one with the most hesitation about doing it, but he'll always say if my brothers are going to do it, I'll do it. And I remember talking with him and just really wanting to get a sense of who he was and how he felt about the process. And he said to me at one point, I'm probably going to have to move when it comes out. And I said, why do you think you'll have to move? And he says, I just don't want people to know. And I said, what? - like, people on your street? And he said, yeah. I said, so no one on the street that lives around you - beautiful street in Atlanta where he lives. I said, no one knows who you are? He says, they know I'm Antron Brown. And I said, so they don't know you're Antron McCray. And he says, no, I'm not Antron McCray here. And he was the first to leave New York City. And he - you know, he's been really deliberate about wanting to separate himself from that story.

When I speak with him more more recently, I think it's changed. He still is not kind of gung ho about any part of the process, but he is wanting the story to be out there. And he is wanting to share it. He's wanting to speak his truth, and he understands that although it's uncomfortable for him, it's helping other people. As far as the other men,

P-APP000634

Yusef was very, you know, forthcoming and excited about telling the story, as was Raymond and Kevin. I think the other gentleman who had a little bit of hesitation was Korey Wise.

And the hesitation was only because the process of making the film is, you know, not something that folks who don't make film really know about, so it was a lot of questions about process and how deep he was going to have to go in telling his story and who he would be telling it to. So it became important to him that it didn't feel like he was on the stand or speaking with police, that the process was very intimate and that he got to know me. And he got to know my co-writers and that he felt comfortable in sitting down with us and telling us stories. We - he did not come into a formal writers room. We created a space for him that felt like a house, so I literally rented a house and flew the men in. And they just, basically, felt like they were sitting around our house, telling us stories on the couch so that the formality of the desk and the chair and the office that felt very institutional - we broke that down, and we were able to get to stories that felt much more personal.

GROSS: I could see why after being disbelieved for so many years, that some of the five men would feel uncomfortable having to go through the process of telling their story again.

DUVERNAY: Yeah. No, definitely. That kind of - because their storytelling had happened all in an institutional framework, right? They're telling it in a precinct and not being believed. The story's being contorted and contrived and manufactured, and they're being asked to insert details. And so this coercion is then taped, and now that becomes their story. They have to tell it to lawyers and in court. You know, their story was always on pieces of legal documents and instruments of the law that felt impersonal. And so part of what we tried to do is to make sure that they felt that this was a different kind of storytelling that they were in charge of, that they could finally assert their voices and talk about whatever they wanted. I mean, this was a four-year process, so there were a lot of stories that had nothing to do with the particulars of the case, which is kind of the only story that people wanted to know, and really got into who they were as people and how the case affected them and their families to this day.

P-APP000635

GROSS: So from having talked to the five men, give us an example of one of the stories that one of them told you about why they agreed to a confession that was not true, why they agreed to implicate themselves by saying that they did things that they didn't do.

DUVERNAY: I don't know. I take issue with the word agreed. I mean, we're talking about minors. We're talking about minors who are in rooms alone with police officers who are aggressive, who have guns on their belts and badges, who were told to mind and to respect and to follow orders from.

It gets under my skin when people ask, why? Why would they do that? Why would you say something you wouldn't do? That's even Linda Fairstein - why - well, they said it. They did it. And you - it strips away the real dynamics of that room, which is what I tried to show in the piece.

You know, you know how easily a child can be manipulated. You know how easily a child, you know, can be made to be afraid. And these authority figures did that to these boys. And so, you know, the answer to the question of, how did they agree, is, you know - I don't know if there was ever an agreement. I think that it was a - no disrespect to you - but it is a - it was a manipulation.

GROSS: So point accepted. But what were some of the ways that you think the boys were manipulated by the police and prosecutors to give the false stories that they gave, to give the false confessions that they made?

DUVERNAY: Some of the ways that we show in the piece are that they were without their parents. They were not given food or water. They were asked to repeat the story, and details were inserted into the story through repetition. It's hard to explain, so that's why I wanted to show it...

GROSS: You mean they were prompted to say things that they added?

DUVERNAY: They were - the stories were repeated and repeated again and again by both parties, and details were added through repetition. And so that was one of - that's one of the ways.

P-APP000636

Case 2:20-cv-00180-JLB-MRM   Document 46-3   Filed 07/01/20   Page 54 of 248 PageID 1628

Many of the tactics that they described to us are in the piece. And it - when it comes alive - and you actually see it being done and see boys trying to kind of pick up details and also to please who was asking them the questions, all under the kind of false belief that they would be allowed to leave if they cooperated. And that, quote, unquote "cooperation" was, you know, picking up these additional details.

I mean, one of the first questions that one of the boys was asked was, what was she wearing? And he didn't know. Kevin Richardson started to describe - I don't know - whatever he thought a white woman would be wearing, running through the park. At one point, they didn't even know she was white. They get into these details of talking about trying to sit there and piece together a story and make the person in front of them happy with it. And there were a number of different techniques that were used on them that were ultimately successful.

GROSS: Let me reintroduce you. If you're just joining us, my guest is Ava DuVernay, and her new Netflix series dramatizes the story of the five men who were known as the Central Park Five. The convictions were vacated. They received a total of $41 million in a settlement from the city of New York. And she tells their story in this new Netflix series, and it's called "When They See Us." We'll be right back after we take a short break. This is FRESH AIR.

(SOUNDBITE OF MUSIC)

GROSS: This is FRESH AIR. And if you're just joining us, my guest is Ava DuVernay. She produced, directed and co-wrote the new Netflix series "When They See Us," which dramatizes the story of the five young men - who are now middle-aged men - who became known as the Central Park Five after they were accused and then, based on false and coerced confessions, convicted of raping and assaulting a woman who was jogging in Central Park. When - about 12 years later, when the convictions were vacated, they sued the city of New York and, years later, won a total of $41 million in a settlement.

They lied about each other as part of these coerced confessions. And they named the names of the other young men who were in the five. How did they realize they had lied

P-APP000637

Case 2:20-cv-00180-JLB-MRM   Document 46-3   Filed 07/01/20   Page 55 of 248 PageID 1629

about each other and had incriminated each other? - 'cause they didn't even all know each other.

DUVERNAY: Right. Only two of the five knew each other. And it wasn't until four of them were put in a cell together at the end of the interrogation period, after they'd all - or four of the five had been taped, did they find themselves in a room together. And then they began to introduce themselves to one another.

So the four boys in that room did not know each other. It was Yusef, Kevin, Antron and Raymond. And they started to talk and started to tell each other what they said and how they'd heard each other's names. And, you know, basically, the stories that they told me, all separately, we word for word recreate in the film.

You know, the part that always kind of destroys me in watching that is, these boys were made to be a wolf pack - you know, wilding gang - in the news at the very same time that they're in a room just meeting each other. And so, you know, they're - the revelation of what they had done and incriminating one another through being fed each other's names by police, you know, came to light when they were all together in a cell.

GROSS: And, you know, after making these coerced confessions, they recanted the confessions. And they never backed down from recanting, even after they were in prison and some of them were offered, you know, parole if they just, you know, took responsibility for the crimes that they committed. They said, we didn't commit those crimes.

DUVERNAY: That's right. Even Korey Wise, who - 13-some years in prison in the worst prisons in New York state - never wavered from the truth, which was that he didn't do it, and lying had gotten him to that place. He believes that lying got him into prison - you know, following the coercion, trying to please, being told that he would be allowed to leave if he said certain things.

You know, those were the regrets that he lives with as a man - you know, decisions that he made, you know, trusting authority figures as a boy, you know? So he never intended to lie again because it only got him in, you know - in what he calls death. You

P-APP000638

Case 2:20-cv-00180-JLB-MRM Document 46-3 Filed 07/01/20 Page 56 of 248 PageID 1630

know, he says that he died in that prison many times, and that this time now feels like life after death. And sometimes, he doesn't even know if he's asleep or awake because it's so surreal.

And so, yeah, you know, the - you know, they never wavered. They never lied again after they all connected. They never went back on their word.

GROSS: So Linda Fairstein, who was the head of the New York DA's sex crimes unit, is depicted in your film as, like, bending the truth in order to convict the five. And she - after your series came out, she resigned from several boards of directors, including the board of Vassar, her alma mater. She was dropped by her book publisher and dropped by her agent. Oh, and I should say Elizabeth Lederer, the lead prosecutor in the case - she resigned after your series from her position as an adjunct faculty member at Columbia University Law School.

Do you think that those repercussions were a result of new information that you uncovered, or do you think they were a result of just making what was already known more visible by dramatizing it and getting a big reaction, a big response as a result?

DUVERNAY: No. I mean, everything that's in the piece is public record and is out there. It'd been - it had been told before by journalists in books, in articles, in documentary, in podcasts. I mean, the story had been told. You know, the power of Netflix to drop it in 190 countries and put it right in people's homes and, you know, to be able to watch it through dramatization that feels very real and not like news is just the way that some people empathize more with stories like this. But there was nothing new that hadn't been said or reported previously.

GROSS: What was your reaction to Linda Fairstein having, you know - like, resigning from Vassar and being dropped by her publisher and her agent?

DUVERNAY: I don't think I had the reaction that most people thought I would have. I mean, it was just information. It didn't really elicit any kind of big emotion. I mean, I certainly feel like people should be held accountable, and she is. And, you know, I mean, that's it. My focus is so much on the men and my focus is so much on trying to illuminate the real insidious nature of the American criminal justice system that, for

P-APP000639

Case 2:20-cv-00180-JLB-MRM Document 46-3 Filed 07/01/20 Page 57 of 248 PageID 1631

me, that piece of it is - it might feel sexy and get headlines, but it's really just not my focus. So yeah, it was information. It was kind of duly noted.

GROSS: My guest is Ava DuVernay. She produced, directed and co-wrote the new Netflix series "When They See Us," which dramatizes the stories of the Central Park Five. We'll hear more after a break, and film critic Justin Chang will review "Toy Story 4." I'm Terry Gross, and this is FRESH AIR.

(SOUNDBITE OF ANTONIO SANCHEZ'S "NAR-THIS")

GROSS: This is FRESH AIR. I'm Terry Gross, back with Ava DuVernay, who produced, directed and co-wrote the new Netflix series, "When They See Us," which dramatizes the stories of the Central Park Five, the five boys, aged 14 to 16, who were accused and convicted of raping a woman who was jogging in Central Park in 1989. Their convictions were based on coerced confessions. In 2002, the real rapist confessed to the crime, and his DNA matched what was on the victim's body. After collectively serving more than three decades in prison, the five had their convictions vacated. They sued the city of New York and, in 2014, won a collective settlement of $41 million.

One of the things you did on the set was have a counselor on the set available in case, like, people got really emotional and just, like, needed to talk with someone, at least that was my understanding of it. Were people who were making the movie triggered by some of the stories that they were telling?

DUVERNAY: The counselors weren't on set; there was a hotline, a counseling hotline. We shoot at all times of the day and night, depending on what the scene is. And so at any point, if someone wanted to - in the privacy of their own home, when they went home, driving home, coming into set, while on set - wanted to speak with someone, wanted to dissect the work that they were doing or just talk and be heard, there was a 24-hour counselling hotline that was put together.

GROSS: Were people who were making the movie triggered by some of the stories that they were telling?

P-APP000640

Case 2:20-cv-00180-JLB-MRM  Document 46-3  Filed 07/01/20  Page 58 of 248 PageID 1632

DUVERNAY: A lot of people shared how they felt, shared what they were learning. The crew that's, you know, physically on set while the film is being shot during principal photography through to the colorist, you know, and the composer - people who are working with the film and the material that we shoot after the set is broken down - you know, sound designers. At different points in the process of making it, there were a lot of tears, people wanting to share their story, their story of times where they might have been biased against black men and brown men and boys and girls, times when they were the victim of bias, had run-ins with the law.

One of the actors, Josh Jackson, talks about, you know, his kind of privilege as a young white kid who went out and was wilding out or, you know, out drunk or out just being stupid, as boys do when they're young, and having the privilege of coming home every night without, you know, ever getting into any really serious trouble for that kind of, you know, adolescent behavior. And so there were a lot of stories that I heard throughout the process of making it. And you know, those have only been amplified by the stories of people - that people were sharing once they see it.

GROSS: A lot of the final episode is devoted to the story of Korey. And his story is just, like, particularly heartbreaking. He was charged only because he agreed to accompany his friend who was being picked up on - by the police on the night of the attack in Central Park. And Korey's name wasn't even on the list of people who they were rounding up. He was just - the cop said to him, why don't you come to the station house with your friend?

And so to be loyal to his friend, he came along, ends up making a false confession, ends up getting convicted and ends up being the only one of the five who's tried as an adult and is sent to adult prisons, where he's repeatedly brutalized and assaulted. And also, I think what makes hard - it harder for him is that either he can't read well or he can't read at all - I wasn't quite sure, like, if he could read at all. But that makes it harder for him to figure out what's going on sometimes.

And also, he was born - or early in childhood had a hearing impairment, so his speech is a little bit slurred. And, like, I think all of those things must have added up to make his years just especially difficult. And I'm wondering, having met all of these men

P-APP000641

when they were in their 40s, if you feel that he is still, like, suffering a lot because of all of these extra things that he was exposed to.

DUVERNAY: Oh, yeah. I mean, he's definitely suffering. He did 13 years. His childhood - his youth was stolen from him. He...

GROSS: Right, he did more years than the others.

DUVERNAY: Yeah, youth was stolen from him. And so yeah, I mean he's definitely affected by all of that. And you know, he's trying to make his way through a new life. You know, he always says, life after death, Life after death. And this is what he is trying to navigate - how to be here on the outside, in the world, having gone through, you know, a type of darkness that, you know, is really almost impossible to describe. What you see in the film is not all of what he endured.

GROSS: You mean it was even worse than you depict?

DUVERNAY: There was more. There was more.

GROSS: More beatings?

DUVERNAY: There was more damage done to him, more darkness, more trauma. And so whenever he's in front of me, I just think he's a miracle. Even when he's not in front of me, I think about him so much. We've become close. And I - and he's very - he's got a brilliance about him when you sit and talk to him. You know, most people aren't patient enough to sit there and talk to him. But when you do, you get rewards.

Like, I was speaking with a journalist the other day who had really talked to him for about an hour. And he said that, you know, she blew him away with his insights into human nature and survival and struggle and the criminal justice system. And it just - you know, it requires a patience that most people don't have. And so, you know, I tried to take all of my conversations with Korey, which was so heart-expanding for me. You know, he really teaches me a lot in my own life and has helped me a lot in my own life and to take all of that and somehow put them into the final piece of this four-part film, this series, to just explain and to share the heart of this man.

P-APP000642

Case 2:20-cv-00180-JLB-MRM   Document 46-3   Filed 07/01/20   Page 60 of 248 PageID 1634

I mean, he is a real hero, in terms of being able to look at someone and say, he has battled something greater than most of us ever will and has come out on the other side to tell the story.

GROSS: So Ken Burns' documentary was made before the city awarded $41 million to the five in the settlement of the five's lawsuit against the city. And also, when the Burns documentary was made, President Trump was not - he was just Donald Trump. He wasn't president yet.

So first, I want to ask you about Trump - what it's like to see the role that he played in being a megaphone for finding the Central Park Five guilty before they were even tried. You know, just, like, days after they were arrested and charged, he took out full-page ads in all of New York's four major newspapers, saying, bring back the death penalty; bring back our police. And this was an argument for the death penalty, basically for children. I mean, there were 14, 15 and 16 years old.

So I'm just interested in what it was like for you to see his role in the Central Park Five.

DUVERNAY: Yes, well, he played a very famous role in the case, you know, with taking out the ads. But ultimately, you know, he's not the story. And so I made the decision just to keep it very - you know, use him very sparingly and use him, you know, with his own words and his own footage. And we do it a couple of times, and there's a couple mentions.

You know, when you really research this time, he was one of many prominent voices that were out saying all kinds of crazy stuff. I mean, Pat Buchanan basically said that Korey Wise should be lynched. He should be hung in a public park. I mean, this is the climate of the time. And it was all seen as acceptable, and it was just all happening without much of a second thought - certainly not the thought about the humanity of these boys and their families.

So yeah, as we went through, just made decisions, I made decisions not to lean too much into Trump. That's one of the reasons why I wanted to change the name from Central Park Five to "When They See Us." I felt that the Central Park Five had become so kind of synonymous with him and him hashtagging it and talking about it,

P-APP000643

particularly around the documentary as he slammed Ken Burns and tweeted against him, that I just really wanted to change the perspective in which we were thinking about this case.

And so he was really one of the big reasons why I changed the title and just tried to be - really consider how much time, how much real estate within this film does he deserve, does he get. I mean, when I talked to the guys, they really don't remember him at that time, you know, that - which really surprised me during my interviews with them over the course of the years. They - their parents do - did - very much so. But to, you know, 14, 15, 16-year-old boys who are having to leave their bedrooms and their homes and go to juvenile detention or, in Korey's case, straight to Rikers, they were not thinking about, you know, the guy who had a bunch of gold buildings in New York City at the time.

So in telling the story from their point of view and being true to that, he just didn't figure in. He didn't loom large in their personal narrative until much later when he came out against them as they were released and the convictions were vacated and the documentary came out. That's when they started to lean into him. But at the time, you know, he didn't figure into their days too much.

GROSS: My guest is Ava DuVernay. She produced, directed and co-wrote the new Netflix series "When They See Us," which dramatizes the story of the Central Park Five. We recorded our interview Monday. Yesterday, when President Trump was asked about the case, he said, they admitted their guilt. He didn't acknowledge those admissions were made in coerced confessions.

We'll hear more of my interview with Ava DuVernay after a break. This is FRESH AIR.

(SOUNDBITE OF MUSIC)

GROSS: This is FRESH AIR. Let's get back to my interview with Ava DuVernay. She directed the film "Selma" and the documentary the "13th" about racial injustice in the justice system. Her new, four-part Netflix series "When They See Us" dramatizes the story of the Central Park Five.

P-APP000644

I think it was hard for the five men after they got out of prison. Four of them got out before the convictions were vacated. Korey got out after they were vacated. I think it was hard for them to find their place in the world and make a living. You know, there's a lot stacked against you when you've been - when you spent years in prison and when you were named in this notorious case, even if you're exonerated, even if the convictions are vacated.

But when the city finally awarded a settlement - a total for all of them - you know, a combined total of $41 million - did the money - was the money helpful? I know the money can't - as they've all pointed out, the money can't buy back the years of their life that were taken away. The money can't buy the - buy back the youth that they were robbed of, but it's better to have money than not. So was the money helpful?

You know, one of the things Korey did with it was contribute to an innocence project and to working on the subject of false confessions. But can you talk a little bit about the settlement and, you know, ways in which it changed their lives, if it did?

DUVERNAY: Generally, money is helpful when you don't have it. So, you know, Kevin Richardson is working the night shift as a janitor at a convalescent home, making minimum wage and unable to pay his rent. You know, Raymond Santana, you know, Antron - you know, these guys are working, you know, what people call manual labor, under-the-table jobs, you know, where the jobs that you can get when you are formerly incarcerated and people don't care that you've been formerly incarcerated - those jobs are unfortunately few and far between.

So they are doing, you know, forklift, or they're doing, you know, construction or they're doing things where they're getting kind of paid on the side, or they're working in places - on the jobs that people who have more options don't want to do.

So at any point, if anyone gives you any money, your life changes. And certainly, you know, theirs did. When you are equating - it's kind of like the idea that poverty is you with less money. That's not really what poverty is. You know, poverty is being ensnared within a system where, at every turn, you cannot move. You do not have the resources to climb out of where you live, you know, your neighborhood, where you work, your health care, your - like, this is the reality for formerly incarcerated people.

P-APP000645

And so when you put some money on that, you know, it certainly changes some things, but a lot stays the same and - you know, certainly when you're dealing with a kind of emotional trauma and the family - the violence to the family structure that was done. You know, they've all said they'd give the money back to just grow up as they were and live and become whatever they were going to be before this happened.

GROSS: Can you tell us something about their lives now?

DUVERNAY: They are great people (laughter). I love them a lot. You know, they're really - I mean, I could cry just thinking about them all. They're good, good guys.

You know, three of them live in Atlanta. It's funny because, you know, Antron McCray is the first to leave. He goes to Atlanta. He finds this beautiful black oasis in Atlanta where you - it was, you know, predominantly black town with, you know, lots of people from a lot of different parts of the country. And, you know, there's a certain, you know, prosperity that happens in some parts of the city and lots of activity and things to do.

And so he goes out there by way of Baltimore and a couple other cities that he'd stopped in and lived along the way. And he finds Atlanta. And Raymond comes to visit. Raymond is the person he's closest to. They're really best friends. And Raymond comes to visit. And Raymond's like, yo, what is this? You've got grass in front of your house?

GROSS: (Laughter).

DUVERNAY: Wait, in the back, too? Oh, no. Wait, what? And so, shortly thereafter, Raymond picks up, and he moves to Atlanta. And then a few months after that, Yusef picks up and moves to Atlanta. So three of them live in Atlanta.

And then Kevin lives in New Jersey - just got married. When I first met him, he was not married. He was dating this really wonderful woman. And I remember him thinking, maybe she's the one. And I'm like, is she the one? What's going to happen? And now he's married, and they live in New Jersey with their new daughter and his stepdaughter. And they are the cutest little family.

P-APP000646

Case 2:20-cv-00180-JLB-MRM Document 46-3 Filed 07/01/20 Page 64 of 248 PageID 1638

And then Korey is in Harlem. And he, you know, has tried to live other places and just loves Harlem. You know, when he moves out of the city, he longs for Harlem. I mean, he will drive back into Harlem just to be there. He goes to Al Sharpton's weekly meetings every Saturday in Harlem - community meetings. He's a real part of the community. I've walked the streets with Oprah before. It's similar.

GROSS: (Laughter).

DUVERNAY: It's - people love him. They respect him. They look out for him. They give him a lot of love there. And that's why he likes it. It's home.

So that's what the five of them are doing, you know, in different - in various places, you know, with their emotional reckoning. You know, but my hope has been - and I've seen it a bit - that the film is - been a therapy in some ways. They're able to talk about it.

But the main thing is, now, people know the story. Korey is really, really adamant that people know his story. He said to me early on, it's not the Central Park Five; it's four plus one. I had a different story. And he wanted people to know. And we did everything we could to tell his story. It's a very singular story, and it's different from the other guys.

And so just the fact that, now, when people walk up to him, they know him, they know his story, they respect what he went through, I think, is - I hope and I pray that it has a positive effect on him and on all of them.

GROSS: Ava DuVernay, thank you so much for talking with us.

DUVERNAY: Thank you so much. I appreciate it. Thanks for having me.

GROSS: Ava DuVernay produced, directed and co-wrote the four-part Netflix series "When They See Us."

After we take a short break, film critic Justin Chang will review "Toy Story 4." This is FRESH AIR.

P-APP000647

(SOUNDBITE OF THE ADAM PRICE GROUP'S "STORYVILLE")

*Copyright © 2019 NPR. All rights reserved. Visit our website terms of use and permissions pages at www.npr.org for further information.*

*NPR transcripts are created on a rush deadline by Verb8tm, Inc., an NPR contractor, and produced using a proprietary transcription process developed with NPR. This text may not be in its final form and may be updated or revised in the future. Accuracy and availability may vary. The authoritative record of NPR's programming is the audio record.*

# Sign Up For Breaking News Alerts

Stay on top of the latest stories and developments, sent when news breaks.

What's your email?

SUBSCRIBE

By subscribing, you agree to NPR's terms of use and privacy policy. NPR may share your name and email address with your NPR station. See Details. This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

# More Stories From NPR

P-APP000648

RACE

**What Alice Wu Wants To Say In 'The Half Of It'**

P-APP000649



P-APP000650

MOVIE INTERVIEWS
## In New Film About Gospel Pioneers The Clark Sisters, The Music Comes First

P-APP000651

MOVIE INTERVIEWS

**In 'Downhill,' Julia Louis-Dreyfus And Will Ferrell Are 'Not Here To Play It Safe'**

P-APP000652

BUSINESS
**Filmmaker Tracks Bezos' 'Rise And Reign' And How Amazon Became 'Inescapable'**

P-APP000653



MOVIE INTERVIEWS
**The Rise Of The Single-Shot Movie In A Hyper-Edited World**

P-APP000654



RACE
**When Bias Is Coded Into Our Technology**

# Popular on NPR.org

P-APP000655

GLOBAL HEALTH
**From Loss Of Smell To 'COVID Toes': What Experts Are Learning About Symptoms**

P-APP000656



EDUCATION

**A Few Schools Reopen, But Remote Learning Could Go On For Years In U.S.**

P-APP000657



P-APP000658

HEALTH

**U.S. Coronavirus Testing Still Falls Short. How's Your State Doing?**

P-APP000659

NATIONAL

**Former Georgia Police Officer And His Son Arrested In The Death Of Ahmaud Arbery**

P-APP000660

Case 2:20-cv-00180-JLB-MRM Document 46-3 Filed 07/01/20 Page 78 of 248 PageID 1652

HEALTH

**Mystery Inflammatory Syndrome In Kids And Teens Likely Linked To COVID-19**

P-APP000661

HEALTH

**Tracking The Pandemic: How Quickly Is The Coronavirus Spreading State By State?**

# NPR Editors' Picks

P-APP000662

Case 2:20-cv-00180-JLB-MRM   Document 46-3   Filed 07/01/20   Page 80 of 248 PageID 1654

NATIONAL
**More Arrests Possible In The Killing Of Ahmaud Arbery, State Investigators Say**

P-APP000663

Case 2:20-cv-00180-JLB-MRM Document 46-3 Filed 07/01/20 Page 81 of 248 PageID 1655



P-APP000664

EDUCATION
**DeVos Uses Coronavirus Relief Funds To Top Off Small College Budgets**

P-APP000665

Case 2:20-cv-00180-JLB-MRM Document 46-3 Filed 07/01/20 Page 83 of 248 PageID 1657

SCIENCE

**The Coronavirus Is Mutating. That's Normal. Does That Mean It's More Dangerous?**

P-APP000666



P-APP000667

Case 2:20-cv-00180-JLB-MRM Document 46-3 Filed 07/01/20 Page 85 of 248 PageID 1659

INVESTIGATIONS

**Relief Payments To The Dead: Lawmakers Demand Answers From Treasury**

P-APP000668

POLITICS
## Michael Flynn Pleaded Guilty. Why Is The Justice Department Dropping The Charges?

P-APP000669

Case 2:20-cv-00180-JLB-MRM Document 46-3 Filed 07/01/20 Page 87 of 248 PageID 1661



P-APP000670

Case 2:20-cv-00180-JLB-MRM   Document 46-3   Filed 07/01/20   Page 88 of 248 PageID 1662

NEW MUSIC
**Ariana Grande And Justin Bieber Team Up For Fundraising Single 'Stuck With U'**

READ & LISTEN

**Home**

**News**

**Arts & Life**

**Music**

**Podcasts**

**Programs**

ABOUT NPR

**Overview**

**Finances**

**People**

**Press**

**Public Editor**

**Corrections**

CONNECT

**Newsletters**

**Facebook**

**Twitter**

**Instagram**

**Contact**

**Help**

GET INVOLVED

**Support Public Radio**

**Sponsor NPR**

**NPR Careers**

**NPR Shop**

**NPR Events**

**Visit NPR**

P-APP000671

terms of use

privacy

your privacy choices

text only

© 2020 npr

P-APP000672

Case 2:20-cv-00180-JLB-MRM   Document 46-3   Filed 07/01/20   Page 90 of 248 PageID 1664





Play Live Radio

PLAYLIST

   DONATE

MOVIE INTERVIEWS

# Ava DuVernay Focuses On The Central Park 5's Perspective: 'Now People Know'

June 19, 2019 · 1:23 PM ET
Heard on Fresh Air

   TERRY GROSS

FRESH AIR

**35-Minute Listen**

PLAYLIST

Download

Transcript

DuVernay's Netflix series, *When They See Us*, tells the story of how five black and brown teenagers were manipulated into confessing to a brutal rape they did not commit.


**MOVIE INTERVIEWS**
Ava DuVernay Hopes You Hear 'The Heartbeat Of The Boys' In Central Park 5


**TV REVIEWS**
Horrors And Humanity In Ava DuVernay's Gripping 'When They See Us'

TERRY GROSS, HOST:

This is FRESH AIR. I'm Terry Gross. My guest Ava DuVernay has dramatized the story of the Central Park Five in the new four-part Netflix series "When They See Us," which

P-APP000673

Case 2:20-cv-00180-JLB-MRM Document 46-3 Filed 07/01/20 Page 91 of 248 PageID 1665

she produced, directed and co-wrote. The Central Park Five was the name given to five black and brown boys age 14 to 16, who, in 1989, were accused of brutally raping and nearly killing a woman who was jogging in Central Park. They became symbols of crime in New York City. Donald Trump took out full-page ads in the city's four newspapers, calling for the death penalty. The five were convicted based on confessions they made shortly after they were arrested; confessions they soon after said were coerced.

In 2002, the real rapist confessed, and his DNA matched the evidence found on the victim's body. He was a serial rapist, who always acted alone. And he testified that the five had nothing to do with the rape. In 2002, after the five collectively served over three decades in prison, their convictions were vacated. A year later, they filed a civil lawsuit against New York City. In 2014, they collectively received a $41 million settlement, but they couldn't get back the years of their lives they'd lost in prison. Ava DuVernay also directed the film "Selma," which dramatized a chapter of the civil rights movement, and "13th," a documentary about mass incarceration and its echoes of the eras of slavery and Jim Crow.

Ava DuVernay, welcome back to FRESH AIR. Did you know much about their story before you made this series?

AVA DUVERNAY: Only what I knew as a teenager growing up in Compton. I was on the West Coast at the same time that these boys were on the East Coast in Harlem. I was all over the place. It was big news in Los Angeles. And it, really, was something that I focused on because these were black boys who looked like me and my friends. They were around the same age. I'm the same age as Korey Wise. And so to hear of this, you know, dastardly, despicable kind of devastating crime that had taken place, you know, was what everyone was talking about at one point.

And particularly, the word wilding caught my attention because I didn't know what it was, and I wanted to know what that meant. So I called a cousin in New York, and I asked what it was. And he said, we don't know. We think they mean wiling out. And wiling out is - does not mean, you know, gang-raping women. Wiling out is hanging out, you know, kind of like being free for the night and, like, just, you know, acting, you know, carefree. And I always have trouble when I try to translate urban slang into

P-APP000674

(laughter) something else, but it is - it's not a wolf pack of animal-like thugs going into the park to, you know, torture and demean and assault and rape people. That's not what wiling out means. So part of what we do in our piece is try to kind of trace and track how wiling out becomes wilding becomes wolf pack becomes, you know, animals becomes, you know, a prison sentence for these five boys.

GROSS: All five were interviewed for the Ken Burns documentary, but one of them was voice only. He didn't want his face on camera. He wanted to keep his privacy. And I'm wondering how the five young - how the five men - I mean, they're in their mid-40s now - how they felt about having the story told again and having the dramatic version out there again with actors playing them because on the one hand, it's a story in which their charges were vacated. So they're - you know, they are not guilty. At the same time, they probably want to put the story behind them to some degree, if that's possible. So how did they feel about having you tell the story?

DUVERNAY: Well, they are all individuals, so they all felt differently about it. You know, you speak of Antron McCray, who did not go on camera for the Burns doc. I remember flying out to Atlanta to see him. You know, he was the one with the most hesitation about doing it, but he'll always say if my brothers are going to do it, I'll do it. And I remember talking with him and just really wanting to get a sense of who he was and how he felt about the process. And he said to me at one point, I'm probably going to have to move when it comes out. And I said, why do you think you'll have to move? And he says, I just don't want people to know. And I said, what? - like, people on your street? And he said, yeah. I said, so no one on the street that lives around you - beautiful street in Atlanta where he lives. I said, no one knows who you are? He says, they know I'm Antron Brown. And I said, so they don't know you're Antron McCray. And he says, no, I'm not Antron McCray here. And he was the first to leave New York City. And he - you know, he's been really deliberate about wanting to separate himself from that story.

When I speak with him more more recently, I think it's changed. He still is not kind of gung ho about any part of the process, but he is wanting the story to be out there. And he is wanting to share it. He's wanting to speak his truth, and he understands that although it's uncomfortable for him, it's helping other people. As far as the other men,

P-APP000675

Case 2:20-cv-00180-JLB-MRM Document 46-3 Filed 07/01/20 Page 93 of 248 PageID 1667

Yusef was very, you know, forthcoming and excited about telling the story, as was Raymond and Kevin. I think the other gentleman who had a little bit of hesitation was Korey Wise.

And the hesitation was only because the process of making the film is, you know, not something that folks who don't make film really know about, so it was a lot of questions about process and how deep he was going to have to go in telling his story and who he would be telling it to. So it became important to him that it didn't feel like he was on the stand or speaking with police, that the process was very intimate and that he got to know me. And he got to know my co-writers and that he felt comfortable in sitting down with us and telling us stories. We - he did not come into a formal writers room. We created a space for him that felt like a house, so I literally rented a house and flew the men in. And they just, basically, felt like they were sitting around our house, telling us stories on the couch so that the formality of the desk and the chair and the office that felt very institutional - we broke that down, and we were able to get to stories that felt much more personal.

GROSS: I could see why after being disbelieved for so many years, that some of the five men would feel uncomfortable having to go through the process of telling their story again.

DUVERNAY: Yeah. No, definitely. That kind of - because their storytelling had happened all in an institutional framework, right? They're telling it in a precinct and not being believed. The story's being contorted and contrived and manufactured, and they're being asked to insert details. And so this coercion is then taped, and now that becomes their story. They have to tell it to lawyers and in court. You know, their story was always on pieces of legal documents and instruments of the law that felt impersonal. And so part of what we tried to do is to make sure that they felt that this was a different kind of storytelling that they were in charge of, that they could finally assert their voices and talk about whatever they wanted. I mean, this was a four-year process, so there were a lot of stories that had nothing to do with the particulars of the case, which is kind of the only story that people wanted to know, and really got into who they were as people and how the case affected them and their families to this day.

P-APP000676

GROSS: So from having talked to the five men, give us an example of one of the stories that one of them told you about why they agreed to a confession that was not true, why they agreed to implicate themselves by saying that they did things that they didn't do.

DUVERNAY: I don't know. I take issue with the word agreed. I mean, we're talking about minors. We're talking about minors who are in rooms alone with police officers who are aggressive, who have guns on their belts and badges, who were told to mind and to respect and to follow orders from.

It gets under my skin when people ask, why? Why would they do that? Why would you say something you wouldn't do? That's even Linda Fairstein - why - well, they said it. They did it. And you - it strips away the real dynamics of that room, which is what I tried to show in the piece.

You know, you know how easily a child can be manipulated. You know how easily a child, you know, can be made to be afraid. And these authority figures did that to these boys. And so, you know, the answer to the question of, how did they agree, is, you know - I don't know if there was ever an agreement. I think that it was a - no disrespect to you - but it is a - it was a manipulation.

GROSS: So point accepted. But what were some of the ways that you think the boys were manipulated by the police and prosecutors to give the false stories that they gave, to give the false confessions that they made?

DUVERNAY: Some of the ways that we show in the piece are that they were without their parents. They were not given food or water. They were asked to repeat the story, and details were inserted into the story through repetition. It's hard to explain, so that's why I wanted to show it...

GROSS: You mean they were prompted to say things that they added?

DUVERNAY: They were - the stories were repeated and repeated again and again by both parties, and details were added through repetition. And so that was one of - that's one of the ways.

P-APP000677

Case 2:20-cv-00180-JLB-MRM   Document 46-3   Filed 07/01/20   Page 95 of 248   PageID 1669

Many of the tactics that they described to us are in the piece. And it - when it comes alive - and you actually see it being done and see boys trying to kind of pick up details and also to please who was asking them the questions, all under the kind of false belief that they would be allowed to leave if they cooperated. And that, quote, unquote "cooperation" was, you know, picking up these additional details.

I mean, one of the first questions that one of the boys was asked was, what was she wearing? And he didn't know. Kevin Richardson started to describe - I don't know - whatever he thought a white woman would be wearing, running through the park. At one point, they didn't even know she was white. They get into these details of talking about trying to sit there and piece together a story and make the person in front of them happy with it. And there were a number of different techniques that were used on them that were ultimately successful.

GROSS: Let me reintroduce you. If you're just joining us, my guest is Ava DuVernay, and her new Netflix series dramatizes the story of the five men who were known as the Central Park Five. The convictions were vacated. They received a total of $41 million in a settlement from the city of New York. And she tells their story in this new Netflix series, and it's called "When They See Us." We'll be right back after we take a short break. This is FRESH AIR.

(SOUNDBITE OF MUSIC)

GROSS: This is FRESH AIR. And if you're just joining us, my guest is Ava DuVernay. She produced, directed and co-wrote the new Netflix series "When They See Us," which dramatizes the story of the five young men - who are now middle-aged men - who became known as the Central Park Five after they were accused and then, based on false and coerced confessions, convicted of raping and assaulting a woman who was jogging in Central Park. When - about 12 years later, when the convictions were vacated, they sued the city of New York and, years later, won a total of $41 million in a settlement.

They lied about each other as part of these coerced confessions. And they named the names of the other young men who were in the five. How did they realize they had lied

P-APP000678

Case 2:20-cv-00180-JLB-MRM   Document 46-3   Filed 07/01/20   Page 96 of 248 PageID 1670

about each other and had incriminated each other? - 'cause they didn't even all know each other.

DUVERNAY: Right. Only two of the five knew each other. And it wasn't until four of them were put in a cell together at the end of the interrogation period, after they'd all - or four of the five had been taped, did they find themselves in a room together. And then they began to introduce themselves to one another.

So the four boys in that room did not know each other. It was Yusef, Kevin, Antron and Raymond. And they started to talk and started to tell each other what they said and how they'd heard each other's names. And, you know, basically, the stories that they told me, all separately, we word for word recreate in the film.

You know, the part that always kind of destroys me in watching that is, these boys were made to be a wolf pack - you know, wilding gang - in the news at the very same time that they're in a room just meeting each other. And so, you know, they're - the revelation of what they had done and incriminating one another through being fed each other's names by police, you know, came to light when they were all together in a cell.

GROSS: And, you know, after making these coerced confessions, they recanted the confessions. And they never backed down from recanting, even after they were in prison and some of them were offered, you know, parole if they just, you know, took responsibility for the crimes that they committed. They said, we didn't commit those crimes.

DUVERNAY: That's right. Even Korey Wise, who - 13-some years in prison in the worst prisons in New York state - never wavered from the truth, which was that he didn't do it, and lying had gotten him to that place. He believes that lying got him into prison - you know, following the coercion, trying to please, being told that he would be allowed to leave if he said certain things.

You know, those were the regrets that he lives with as a man - you know, decisions that he made, you know, trusting authority figures as a boy, you know? So he never intended to lie again because it only got him in, you know - in what he calls death. You

P-APP000679

Case 2:20-cv-00180-JLB-MRM Document 46-3 Filed 07/01/20 Page 97 of 248 PageID 1671

know, he says that he died in that prison many times, and that this time now feels like life after death. And sometimes, he doesn't even know if he's asleep or awake because it's so surreal.

And so, yeah, you know, the - you know, they never wavered. They never lied again after they all connected. They never went back on their word.

GROSS: So Linda Fairstein, who was the head of the New York DA's sex crimes unit, is depicted in your film as, like, bending the truth in order to convict the five. And she - after your series came out, she resigned from several boards of directors, including the board of Vassar, her alma mater. She was dropped by her book publisher and dropped by her agent. Oh, and I should say Elizabeth Lederer, the lead prosecutor in the case - she resigned after your series from her position as an adjunct faculty member at Columbia University Law School.

Do you think that those repercussions were a result of new information that you uncovered, or do you think they were a result of just making what was already known more visible by dramatizing it and getting a big reaction, a big response as a result?

DUVERNAY: No. I mean, everything that's in the piece is public record and is out there. It'd been - it had been told before by journalists in books, in articles, in documentary, in podcasts. I mean, the story had been told. You know, the power of Netflix to drop it in 190 countries and put it right in people's homes and, you know, to be able to watch it through dramatization that feels very real and not like news is just the way that some people empathize more with stories like this. But there was nothing new that hadn't been said or reported previously.

GROSS: What was your reaction to Linda Fairstein having, you know - like, resigning from Vassar and being dropped by her publisher and her agent?

DUVERNAY: I don't think I had the reaction that most people thought I would have. I mean, it was just information. It didn't really elicit any kind of big emotion. I mean, I certainly feel like people should be held accountable, and she is. And, you know, I mean, that's it. My focus is so much on the men and my focus is so much on trying to illuminate the real insidious nature of the American criminal justice system that, for

P-APP000680

me, that piece of it is - it might feel sexy and get headlines, but it's really just not my focus. So yeah, it was information. It was kind of duly noted.

GROSS: My guest is Ava DuVernay. She produced, directed and co-wrote the new Netflix series "When They See Us," which dramatizes the stories of the Central Park Five. We'll hear more after a break, and film critic Justin Chang will review "Toy Story 4." I'm Terry Gross, and this is FRESH AIR.

(SOUNDBITE OF ANTONIO SANCHEZ'S "NAR-THIS")

GROSS: This is FRESH AIR. I'm Terry Gross, back with Ava DuVernay, who produced, directed and co-wrote the new Netflix series, "When They See Us," which dramatizes the stories of the Central Park Five, the five boys, aged 14 to 16, who were accused and convicted of raping a woman who was jogging in Central Park in 1989. Their convictions were based on coerced confessions. In 2002, the real rapist confessed to the crime, and his DNA matched what was on the victim's body. After collectively serving more than three decades in prison, the five had their convictions vacated. They sued the city of New York and, in 2014, won a collective settlement of $41 million.

One of the things you did on the set was have a counselor on the set available in case, like, people got really emotional and just, like, needed to talk with someone, at least that was my understanding of it. Were people who were making the movie triggered by some of the stories that they were telling?

DUVERNAY: The counselors weren't on set; there was a hotline, a counseling hotline. We shoot at all times of the day and night, depending on what the scene is. And so at any point, if someone wanted to - in the privacy of their own home, when they went home, driving home, coming into set, while on set - wanted to speak with someone, wanted to dissect the work that they were doing or just talk and be heard, there was a 24-hour counselling hotline that was put together.

GROSS: Were people who were making the movie triggered by some of the stories that they were telling?

P-APP000681

DUVERNAY: A lot of people shared how they felt, shared what they were learning. The crew that's, you know, physically on set while the film is being shot during principal photography through to the colorist, you know, and the composer - people who are working with the film and the material that we shoot after the set is broken down - you know, sound designers. At different points in the process of making it, there were a lot of tears, people wanting to share their story, their story of times where they might have been biased against black men and brown men and boys and girls, times when they were the victim of bias, had run-ins with the law.

One of the actors, Josh Jackson, talks about, you know, his kind of privilege as a young white kid who went out and was wilding out or, you know, out drunk or out just being stupid, as boys do when they're young, and having the privilege of coming home every night without, you know, ever getting into any really serious trouble for that kind of, you know, adolescent behavior. And so there were a lot of stories that I heard throughout the process of making it. And you know, those have only been amplified by the stories of people - that people were sharing once they see it.

GROSS: A lot of the final episode is devoted to the story of Korey. And his story is just, like, particularly heartbreaking. He was charged only because he agreed to accompany his friend who was being picked up on - by the police on the night of the attack in Central Park. And Korey's name wasn't even on the list of people who they were rounding up. He was just - the cop said to him, why don't you come to the station house with your friend?

And so to be loyal to his friend, he came along, ends up making a false confession, ends up getting convicted and ends up being the only one of the five who's tried as an adult and is sent to adult prisons, where he's repeatedly brutalized and assaulted. And also, I think what makes hard - it harder for him is that either he can't read well or he can't read at all - I wasn't quite sure, like, if he could read at all. But that makes it harder for him to figure out what's going on sometimes.

And also, he was born - or early in childhood had a hearing impairment, so his speech is a little bit slurred. And, like, I think all of those things must have added up to make his years just especially difficult. And I'm wondering, having met all of these men

P-APP000682

when they were in their 40s, if you feel that he is still, like, suffering a lot because of all of these extra things that he was exposed to.

DUVERNAY: Oh, yeah. I mean, he's definitely suffering. He did 13 years. His childhood - his youth was stolen from him. He...

GROSS: Right, he did more years than the others.

DUVERNAY: Yeah, youth was stolen from him. And so yeah, I mean he's definitely affected by all of that. And you know, he's trying to make his way through a new life. You know, he always says, life after death, Life after death. And this is what he is trying to navigate - how to be here on the outside, in the world, having gone through, you know, a type of darkness that, you know, is really almost impossible to describe. What you see in the film is not all of what he endured.

GROSS: You mean it was even worse than you depict?

DUVERNAY: There was more. There was more.

GROSS: More beatings?

DUVERNAY: There was more damage done to him, more darkness, more trauma. And so whenever he's in front of me, I just think he's a miracle. Even when he's not in front of me, I think about him so much. We've become close. And I - and he's very - he's got a brilliance about him when you sit and talk to him. You know, most people aren't patient enough to sit there and talk to him. But when you do, you get rewards.

Like, I was speaking with a journalist the other day who had really talked to him for about an hour. And he said that, you know, she blew him away with his insights into human nature and survival and struggle and the criminal justice system. And it just - you know, it requires a patience that most people don't have. And so, you know, I tried to take all of my conversations with Korey, which was so heart-expanding for me. You know, he really teaches me a lot in my own life and has helped me a lot in my own life and to take all of that and somehow put them into the final piece of this four-part film, this series, to just explain and to share the heart of this man.

P-APP000683

I mean, he is a real hero, in terms of being able to look at someone and say, he has battled something greater than most of us ever will and has come out on the other side to tell the story.

GROSS: So Ken Burns' documentary was made before the city awarded $41 million to the five in the settlement of the five's lawsuit against the city. And also, when the Burns documentary was made, President Trump was not - he was just Donald Trump. He wasn't president yet.

So first, I want to ask you about Trump - what it's like to see the role that he played in being a megaphone for finding the Central Park Five guilty before they were even tried. You know, just, like, days after they were arrested and charged, he took out full-page ads in all of New York's four major newspapers, saying, bring back the death penalty; bring back our police. And this was an argument for the death penalty, basically for children. I mean, there were 14, 15 and 16 years old.

So I'm just interested in what it was like for you to see his role in the Central Park Five.

DUVERNAY: Yes, well, he played a very famous role in the case, you know, with taking out the ads. But ultimately, you know, he's not the story. And so I made the decision just to keep it very - you know, use him very sparingly and use him, you know, with his own words and his own footage. And we do it a couple of times, and there's a couple mentions.

You know, when you really research this time, he was one of many prominent voices that were out saying all kinds of crazy stuff. I mean, Pat Buchanan basically said that Korey Wise should be lynched. He should be hung in a public park. I mean, this is the climate of the time. And it was all seen as acceptable, and it was just all happening without much of a second thought - certainly not the thought about the humanity of these boys and their families.

So yeah, as we went through, just made decisions, I made decisions not to lean too much into Trump. That's one of the reasons why I wanted to change the name from Central Park Five to "When They See Us." I felt that the Central Park Five had become so kind of synonymous with him and him hashtagging it and talking about it,

P-APP000684

Case 2:20-cv-00180-JLB-MRM Document 46-3 Filed 07/01/20 Page 102 of 248 PageID 1676

particularly around the documentary as he slammed Ken Burns and tweeted against him, that I just really wanted to change the perspective in which we were thinking about this case.

And so he was really one of the big reasons why I changed the title and just tried to be - really consider how much time, how much real estate within this film does he deserve, does he get. I mean, when I talked to the guys, they really don't remember him at that time, you know, that - which really surprised me during my interviews with them over the course of the years. They - their parents do - did - very much so. But to, you know, 14, 15, 16-year-old boys who are having to leave their bedrooms and their homes and go to juvenile detention or, in Korey's case, straight to Rikers, they were not thinking about, you know, the guy who had a bunch of gold buildings in New York City at the time.

So in telling the story from their point of view and being true to that, he just didn't figure in. He didn't loom large in their personal narrative until much later when he came out against them as they were released and the convictions were vacated and the documentary came out. That's when they started to lean into him. But at the time, you know, he didn't figure into their days too much.

GROSS: My guest is Ava DuVernay. She produced, directed and co-wrote the new Netflix series "When They See Us," which dramatizes the story of the Central Park Five. We recorded our interview Monday. Yesterday, when President Trump was asked about the case, he said, they admitted their guilt. He didn't acknowledge those admissions were made in coerced confessions.

We'll hear more of my interview with Ava DuVernay after a break. This is FRESH AIR.

(SOUNDBITE OF MUSIC)

GROSS: This is FRESH AIR. Let's get back to my interview with Ava DuVernay. She directed the film "Selma" and the documentary the "13th" about racial injustice in the justice system. Her new, four-part Netflix series "When They See Us" dramatizes the story of the Central Park Five.

P-APP000685

I think it was hard for the five men after they got out of prison. Four of them got out before the convictions were vacated. Korey got out after they were vacated. I think it was hard for them to find their place in the world and make a living. You know, there's a lot stacked against you when you've been - when you spent years in prison and when you were named in this notorious case, even if you're exonerated, even if the convictions are vacated.

But when the city finally awarded a settlement - a total for all of them - you know, a combined total of $41 million - did the money - was the money helpful? I know the money can't - as they've all pointed out, the money can't buy back the years of their life that were taken away. The money can't buy the - buy back the youth that they were robbed of, but it's better to have money than not. So was the money helpful?

You know, one of the things Korey did with it was contribute to an innocence project and to working on the subject of false confessions. But can you talk a little bit about the settlement and, you know, ways in which it changed their lives, if it did?

DUVERNAY: Generally, money is helpful when you don't have it. So, you know, Kevin Richardson is working the night shift as a janitor at a convalescent home, making minimum wage and unable to pay his rent. You know, Raymond Santana, you know, Antron - you know, these guys are working, you know, what people call manual labor, under-the-table jobs, you know, where the jobs that you can get when you are formerly incarcerated and people don't care that you've been formerly incarcerated - those jobs are unfortunately few and far between.

So they are doing, you know, forklift, or they're doing, you know, construction or they're doing things where they're getting kind of paid on the side, or they're working in places - on the jobs that people who have more options don't want to do.

So at any point, if anyone gives you any money, your life changes. And certainly, you know, theirs did. When you are equating - it's kind of like the idea that poverty is you with less money. That's not really what poverty is. You know, poverty is being ensnared within a system where, at every turn, you cannot move. You do not have the resources to climb out of where you live, you know, your neighborhood, where you work, your health care, your - like, this is the reality for formerly incarcerated people.

P-APP000686

And so when you put some money on that, you know, it certainly changes some things, but a lot stays the same and - you know, certainly when you're dealing with a kind of emotional trauma and the family - the violence to the family structure that was done. You know, they've all said they'd give the money back to just grow up as they were and live and become whatever they were going to be before this happened.

GROSS: Can you tell us something about their lives now?

DUVERNAY: They are great people (laughter). I love them a lot. You know, they're really - I mean, I could cry just thinking about them all. They're good, good guys.

You know, three of them live in Atlanta. It's funny because, you know, Antron McCray is the first to leave. He goes to Atlanta. He finds this beautiful black oasis in Atlanta where you - it was, you know, predominantly black town with, you know, lots of people from a lot of different parts of the country. And, you know, there's a certain, you know, prosperity that happens in some parts of the city and lots of activity and things to do.

And so he goes out there by way of Baltimore and a couple other cities that he'd stopped in and lived along the way. And he finds Atlanta. And Raymond comes to visit. Raymond is the person he's closest to. They're really best friends. And Raymond comes to visit. And Raymond's like, yo, what is this? You've got grass in front of your house?

GROSS: (Laughter).

DUVERNAY: Wait, in the back, too? Oh, no. Wait, what? And so, shortly thereafter, Raymond picks up, and he moves to Atlanta. And then a few months after that, Yusef picks up and moves to Atlanta. So three of them live in Atlanta.

And then Kevin lives in New Jersey - just got married. When I first met him, he was not married. He was dating this really wonderful woman. And I remember him thinking, maybe she's the one. And I'm like, is she the one? What's going to happen? And now he's married, and they live in New Jersey with their new daughter and his stepdaughter. And they are the cutest little family.

P-APP000687

Case 2:20-cv-00180-JLB-MRM Document 46-3 Filed 07/01/20 Page 105 of 248 PageID 1679

And then Korey is in Harlem. And he, you know, has tried to live other places and just loves Harlem. You know, when he moves out of the city, he longs for Harlem. I mean, he will drive back into Harlem just to be there. He goes to Al Sharpton's weekly meetings every Saturday in Harlem - community meetings. He's a real part of the community. I've walked the streets with Oprah before. It's similar.

GROSS: (Laughter).

DUVERNAY: It's - people love him. They respect him. They look out for him. They give him a lot of love there. And that's why he likes it. It's home.

So that's what the five of them are doing, you know, in different - in various places, you know, with their emotional reckoning. You know, but my hope has been - and I've seen it a bit - that the film is - been a therapy in some ways. They're able to talk about it.

But the main thing is, now, people know the story. Korey is really, really adamant that people know his story. He said to me early on, it's not the Central Park Five; it's four plus one. I had a different story. And he wanted people to know. And we did everything we could to tell his story. It's a very singular story, and it's different from the other guys.

And so just the fact that, now, when people walk up to him, they know him, they know his story, they respect what he went through, I think, is - I hope and I pray that it has a positive effect on him and on all of them.

GROSS: Ava DuVernay, thank you so much for talking with us.

DUVERNAY: Thank you so much. I appreciate it. Thanks for having me.

GROSS: Ava DuVernay produced, directed and co-wrote the four-part Netflix series "When They See Us."

After we take a short break, film critic Justin Chang will review "Toy Story 4." This is FRESH AIR.

P-APP000688

(SOUNDBITE OF THE ADAM PRICE GROUP'S "STORYVILLE")

Copyright © 2019 NPR. All rights reserved. Visit our website terms of use and permissions pages at www.npr.org for further information.

NPR transcripts are created on a rush deadline by Verb8tm, Inc., an NPR contractor, and produced using a proprietary transcription process developed with NPR. This text may not be in its final form and may be updated or revised in the future. Accuracy and availability may vary. The authoritative record of NPR's programming is the audio record.

# Sign Up For Breaking News Alerts

Stay on top of the latest stories and developments, sent when news breaks.

What's your email?

SUBSCRIBE

By subscribing, you agree to NPR's terms of use and privacy policy. NPR may share your name and email address with your NPR station. See Details. This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

# More Stories From NPR

P-APP000689



RACE
**What Alice Wu Wants To Say In 'The Half Of It'**

P-APP000690



P-APP000691

MOVIE INTERVIEWS

**In New Film About Gospel Pioneers The Clark Sisters, The Music Comes First**

P-APP000692

MOVIE INTERVIEWS
**In 'Downhill,' Julia Louis-Dreyfus And Will Ferrell Are 'Not Here To Play It Safe'**

P-APP000693

BUSINESS

**Filmmaker Tracks Bezos' 'Rise And Reign' And How Amazon Became 'Inescapable'**

P-APP000694



MOVIE INTERVIEWS
**The Rise Of The Single-Shot Movie In A Hyper-Edited World**

P-APP000695

Case 2:20-cv-00180-JLB-MRM Document 46-3 Filed 07/01/20 Page 113 of 248 PageID 1687



RACE
**When Bias Is Coded Into Our Technology**

# Popular on NPR.org

P-APP000696

Case 2:20-cv-00180-JLB-MRM   Document 46-3   Filed 07/01/20   Page 114 of 248 PageID 1688

GLOBAL HEALTH

**From Loss Of Smell To 'COVID Toes': What Experts Are Learning About Symptoms**

P-APP000697



EDUCATION
**A Few Schools Reopen, But Remote Learning Could Go On For Years In U.S.**

P-APP000698



P-APP000699

HEALTH

**U.S. Coronavirus Testing Still Falls Short. How's Your State Doing?**

P-APP000700

NATIONAL

**Former Georgia Police Officer And His Son Arrested In The Death Of Ahmaud Arbery**

P-APP000701

HEALTH

**Mystery Inflammatory Syndrome In Kids And Teens Likely Linked To COVID-19**

P-APP000702

HEALTH
**Tracking The Pandemic: How Quickly Is The Coronavirus Spreading State By State?**

# NPR Editors' Picks

P-APP000703

Case 2:20-cv-00180-JLB-MRM   Document 46-3   Filed 07/01/20   Page 121 of 248 PageID 1695

**NATIONAL**

**More Arrests Possible In The Killing Of Ahmaud Arbery, State Investigators Say**

P-APP000704



P-APP000705

Case 2:20-cv-00180-JLB-MRM Document 46-3 Filed 07/01/20 Page 123 of 248 PageID 1697

EDUCATION
**DeVos Uses Coronavirus Relief Funds To Top Off Small College Budgets**

P-APP000706

SCIENCE
**The Coronavirus Is Mutating. That's Normal. Does That Mean It's More Dangerous?**

P-APP000707



P-APP000708

Case 2:20-cv-00180-JLB-MRM Document 46-3 Filed 07/01/20 Page 126 of 248 PageID 1700

INVESTIGATIONS

**Relief Payments To The Dead: Lawmakers Demand Answers From Treasury**

P-APP000709

**POLITICS**
**Michael Flynn Pleaded Guilty. Why Is The Justice Department Dropping The Charges?**

P-APP000710



P-APP000711

Case 2:20-cv-00180-JLB-MRM Document 46-3 Filed 07/01/20 Page 129 of 248 PageID 1703

NEW MUSIC
**Ariana Grande And Justin Bieber Team Up For Fundraising Single 'Stuck With U'**

**READ & LISTEN**

Home

News

Arts & Life

Music

Podcasts

Programs

**ABOUT NPR**

Overview

Finances

People

Press

Public Editor

Corrections

**CONNECT**

Newsletters

Facebook

Twitter

Instagram

Contact

Help

**GET INVOLVED**

Support Public Radio

Sponsor NPR

NPR Careers

NPR Shop

NPR Events

Visit NPR

P-APP000712

terms of use

privacy

your privacy choices

text only

© 2020 npr

P-APP000713

14

John Farrell

2  43 for almost three years.

3       A.    I can't remember the exact amount

4  of time I was in these places.  I remember being

5  in them.  The exact amount of times, you know, I

6  moved around a lot in the police department.

7       Q.    I appreciate that these events

8  happened quite a long time ago, and I'm only

9  asking you to do the best you can with whatever

10  memory you have.

11       A.    That's fine.

12       Q.    But I do want to, you know, from

13  time to time, I'll press you a little bit to see

14  if I can get a more exact memory of it.

15            Do you remember approximately what

16  year it was that you went to the Manhattan DA's

17  Squad?

18       A.    1981, approximately 1981.

19       Q.    How long were you in the Manhattan

20  DA's Squad?

21       A.    I was in the Manhattan DA's Squad

22  until 1986, I believe, and then I went to the

23  19th Detective Squad.

24       Q.    How long were you there?

25       A.    A very short time, and then I went

NYCLD_058208

P-APP000714

15

1                  John Farrell

2    to the Manhattan South Task Force, Detective

3    Task Force on Night Watch.

4          Q.     On Night Watch, all right.  So the

5    Night Watch was part of the Manhattan South Task

6    Force Detective Squad?

7          A.     Yes.

8          Q.     Approximately what year did you go

9    to Night Watch, if you can remember?

10         A.     I said I believe it was 1986.

11         Q.     '86, all right.  And is that the

12   position you were in when you retired?

13         A.     Yes.

14         Q.     During your time in the Manhattan

15   DA's Squad, which was approximately what, five

16   years, 1981 to 1986?

17         A.     Yes.

18         Q.     Were there any particular cases

19   that you were assigned to work on?

20         A.     I worked on everything, organized

21   crime, white collar crime and anything that the

22   DA's office decided to investigate.

23         Q.     Did you work on any sex crimes

24   cases?

25         A.     No, I don't believe I did, no.

NYCLD_058209

P-APP000715

16

1                          John Farrell
2          Q.      Did you work on any homicides when
3     you were in the DA's Squad?
4          A.      I don't believe I did while on the
5     DA's Squad, no.
6          Q.      During the time you were assigned
7     to the Manhattan DA's Squad, did you know Linda
8     Fairstein?
9          A.      Yes.
10         Q.      And did you work on cases with her
11    during the time you were in the Manhattan --
12         A.      District Attorney's.
13         Q.      -- DA's Squad?
14         A.      I don't recall.
15         Q.      How did you know her?
16         A.      She was a sex crimes prosecutor for
17    the DA's office.
18         Q.      During that entire period of time
19    you were there?
20         A.      I believe so.  I'm not sure if she
21    left before me or after me.  I didn't keep track
22    of her.  I don't know.
23         Q.      Do you recall whether you actually
24    worked on a case with her though?
25                 MR. MYERBERG:  Objection.

NYCLD_058210

P-APP000716

17

John Farrell

1

2     A.    I don't recall.  I know I've worked

3  on cases with other people that might have

4  worked on cases with her.  But that's the way it

5  was in the DA's Squad, they tell you to go out

6  and help someone.

7     Q.    File your report and go on to the

8  next one?

9     A.    Yes.

10     Q.    Did you know Elizabeth Lederer?

11     A.    Yes.

12     Q.    Do you recall ever working on any

13  cases with her?

14     A.    I've seen her a few times, so I

15  believe maybe I did.  I'm not sure.

16     Q.    Before April of 1989?

17     A.    I'm not really sure.

18     Q.    But you think you may have worked

19  on some matters with her before then?

20     MR. MYERBERG:  Objection.

21     A.    I'm not positive.

22     Q.    I'm not asking you to be positive.

23  But you think you might have worked on some

24  cases with her, right?

25     A.    I don't know.

NYCLD_058211

P-APP000717

18

1                        John Farrell
2        Q.      What about an Assistant District
3    Attorney named Nancy Ryan, do you know her?  Did
4    you know her when you were in the squad?
5        A.      I don't remember the name, no.
6        Q.      Is this the first time you're
7    hearing her name?
8                MR. MYERBERG:  Objection.  Are you
9           saying outside the presence of counsel?  I
10          mean, is that the question?  If it is, it's
11          privileged.
12       Q.      I'm sorry, outside of the presence
13   of any conversations you may have had with any
14   of your lawyers, have you ever heard her name
15   before?
16       A.      I don't recall hearing her name
17   before.
18       Q.      What about a District Attorney
19   named Peter Casolaro, did you ever work with
20   him?
21       A.      I never heard of him.
22       Q.      You never heard of him, all right.
23               How about a District Attorney named
24   Harlan Levy, did you ever work with him when you
25   were in the DA's Squad?

NYCLD_058212

P-APP000718

T3-1f

358

REYNOLDS — PEOPLE — DIRECT — LEDERER

1
2      before the desk?

3          A    I believe -- may I refresh my  memory  with
4      my notes?

5                  THE COURT:  If you have to.

6                  MR. MADDOX:  When he says "defendants"
7              could he refer to who he was talking about?
8              Some are not defendants.

9                  THE COURT:  Okay.

10                 If  you  can, give us the names of the
11             people you are talking about.

12                 THE WITNESS:  All right.

13         A    That was about six minutes after eleven.

14         Q    And what happened six minutes after eleven?

15         A    They were brought to the station house.

16                 THE COURT:  They being?

17                 THE WITNESS:   Clarence Thomas, Lamont
18             McCall, Kevin Richardson, Steven Lopez, and
19             Raymond Santana.

20         Q    Were they at  the  stationhouse  when  you
21     arrived,  or  did  they arrive when you were already
22     there?

23         A    I think we got there around the same  time.
24     I  don't recall exactly who got there first.  It was
25     very close in time, though.

10/13/89

NYCLD_023104

P-APP000719

T3—1f

359

REYNOLDS — PEOPLE — DIRECT — LEDERER

1
2    Q    And what happened in front -- what did you
3    do when you went in front of the desk?
4    A    What I did was gave their names, addresses
5    and ages to the desk officer so he could enter it
6    into the blotter.
7    Q    Did you have a conversation with anyone
8    when you arrived at the Central Park Precinct?
9    A    Yes, I did.
10   Q    Who did you have a conversation with?
11   A    I had a conversation with one of the
12   detectives; two of them.
13   Q    To whom did you speak?
14   A    Detective Nugent and Detective Gonzalez.
15   Q    What did you say to them and what did they
16   say to you?
17   A    I stated what happened; that I arrested
18   five youths for assaulting a jogger in the Park.
19   And that was pretty much it. We returned them to
20   the Youth Room.
21   Q    How long were they before the desk?
22   A    I'd say about ten minutes.
23   Q    Was anyone with you and with them before
24   the desk sergeant?
25   A    Yes.

10/13/89

NYCLD_023105

P-APP000720

T3-1f

360

REYNOLDS — PEOPLE — DIRECT — LEDERER

1
2    Q     Who was that?

3    A     My partner was there, Police Officer
4    Powers; Police Officer Hennigan, Sergeant Lyle and
5    the detectives might have come out also.

6    Q     After you were before the desk with those
7    five people that you have named, where did you go?

8    A     We took them, I believe, we took them to
9    the juvenile room.

10   Q     Officer Reynolds, if you would, please look
11   at what has been received in evidence as People's 1.
12   Do you recognize what that is?

13   A     Yes.

14   Q     What do you recognize that to be?

15   A     It is a layout of part of the Central Park
16   Precinct.

17   Q     What part of the precinct is depicted in
18   that diagram?

19   A     One is the Community Affairs office, and
20   the other is our muster room.

21   Q     And where is the Youth Room in People's 1?

22   A     Do you want me to point it out?

23   Q     If you would, please.

24        MR. BERMAN: The testimony was it was
25        the Juvenile Room.

10/13/89

NYCLD_023106

P-APP000721

T3-1f

371

REYNOLDS — PEOPLE — DIRECT — LEDERER

1

2    A    (Continuing) There was no time -- I don't

3 recall what time that night I saw him. It was after

4 midnight though.

5    Q    Did there come a time when Officer Powers

6 returned from making notifications?

7    A    Yes.

8    Q    And do you recall what time it was that he

9 finished and returned to the juvenile room?

10    A    That I'd have to look up to refresh my

11 memory.

12         (Witness peruses notes)

13    A    (Continuing) I believe that was

14 approximately 12:30.

15    Q    During the time that the parents were

16 arriving, did you have conversations with them?

17    A    Yes. When they all got there, yes.

18    Q    And did there come a time when everybody's

19 parents or family had arrived?

20    A    No. There was a set of parents that were

21 missing.

22    Q    Whose parents did not arrive?

23    A    Raymond Santana's.

24    Q    Would you please describe what efforts were

25 made to reach the family of Raymond Santana?

10/13/8

NYCLD_023117

P-APP000722

T3-1f

372

REYNOLDS — PEOPLE — DIRECT — LEDERER

1
2    A    Well, at first Police Officer Powers called
3    his house and spoke to his father.
4    Q    Do you recall approximately what time he
5    made that phonecall?
6    A    I'd have to refresh my memory with my
7    notes.
8            MR. RIVERA:    I object to the
9            characterization that "he spoke to his
10           father."
11           THE COURT:  I'll allow it.
12   A    It was about 20 after 12.
13   Q    And what happened after Officer Powers ——
14   withdrawn.
15           Did Officer Powers tell you that when he
16   made that phonecall he spoke with someone?
17   A    Yes.   He said he spoke with Raymond
18   Santana's father, and his father stated he was going
19   to pick him up.
20   Q    What was the next thing that happened with
21   respect to reaching the Santana family?
22   A    Well, we waited a couple of hours, and, you
23   know, he wasn't there at the stationhouse.  So I
24   asked Bobby to give him another call.
25           THE COURT:  Bobby is?

10/13/89

NYCLD_023118

P-APP000723

T3-1f

373

REYNOLDS - PEOPLE - DIRECT - LEDERER

1

2      THE   WITNESS:    I'm   sorry,   Police

3   Officer  Powers called him two hours later,

4   I believe, and there was no answer  at  the

5   house.

6   Q      Was there then a second effort or another

7   effort made to reach someone else from the family?

8   A      Well, I had to convince Raymond Santana  to

9   give me the name of another relative to call.

10      MR. RIVERA:  Objection.

11      THE COURT:  Just tell us what you did.

12      THE   WITNESS:    Okay.   I   got  his

13   sister's telephone number and called up his

14   sister.

15   Q      Did  you  have  a  conversation  with  his

16   sister?

17   A      Yes.

18   Q      Approximately what time did you call his

19   sister?

20   A      It  was approximately 2:15.

21   Q      Did you have a conversation with her?

22   A      Yes.

23   Q      What, if anything, did she say to  you  and

24   what did you say to her?

25   A      I explained to her that her brother was

10/13/89

NYCLD_023119

P-APP000724

T3-1f

374

REYNOLDS — PEOPLE — DIRECT — LEDERER

1
2   under arrest in the Central Park Precinct;  that  we
3   needed  a  parent  or  guardian  to  pick  him up to
4   release him so he could  leave  tonight.   And  she
5   stated  she  would  come  over,  but she has a young
6   child and needed someone to watch the child for her.
7   I then gave her —— I told her, you know,  take  care
8   of that.

9        I  said,  "You  can  either take a train or
10  bus."  I gave her directions for both and she stated
11  she was going to take a taxi.

12      Q    Did you give her your telephone number?

13      A    Yes.

14      Q    Did you give her your name?

15      A    Yes.

16      Q    Did you tell her  what  precinct  you  were
17  calling from?

18      A    Yes.

19      Q       Did  there  come a time when the sister
20  arrived at the stationhouse?

21      A    No.

22      Q    What was the next step, if  any,  that  was
23  taken  to  reach  someone from the family of Raymond
24  Santana?

25      A    What I did was call back the sister and she

10/13/89

NYCLD_023120

P-APP000725

T3—1f

375

REYNOLDS — PEOPLE — DIRECT — LEDERER

1  answered the phone. And she stated to me she wasn't
2
3  going to pick him up.

4      Q     What time was it that you called back the
5  sister?

6      A           That was approximately 4:00, a little
7  after; about ten after.

8      Q     And you had a conversation with the sister
9  for a second time when you called at 4:00?

10     A     Yes.

11     Q          What, if anything, did she say to you at
12  that time?

13     A     She stated she wasn't going to pick him up,
14  and further stated she couldn't get anyone to watch
15  her child for her. So I asked her, "Well, if you
16  can't come, is there anyone else that can come to
17  pick him up?"

18          She stated his grandmother could do it, and
19  she gave me her phone number.

20     Q     Did you learn the name of the grandmother?

21     A           No, I didn't. She just stated it was his
22  grandmother, and I took the phone number to call her
23  up.

24     Q     Did you then call that number?

25     A     Yes, I did.

10/13/8?

NYCLD_023121

P-APP000726

T3-1f

376

REYNOLDS — PEOPLE — DIRECT — LEDERER

1

2    Q    What time did you make that phone call?

3    A    That was about ten after four.

4    Q    Did you have a discussion with Raymond

5  Santana's grandmother at that time?

6    A    Yes, I did.

7    Q    What, if anything, did you say to her and

8  what did she say to you?

9    A    I explained to her Raymond Santana was

10 under arrest in Central Park, and that I needed a

11 parent or guardian to come pick him up. She stated,

12 you know, she stated, okay, she would come to get

13 him.    And I told her to stay put in her apartment,

14 we were going to send a police car to pick her up

15 and bring her back personally.

16   Q    When you spoke to the grandmother, did you

17 speak in English or in Spanish?

18   A    I spoke in English.

19   Q    Did she speak to you in English or in

20 Spanish?

21   A    She spoke English.

22   Q    Did you then direct a police car to go to

23 that address?

24   A    Yes.

25   Q    And -- what time was the police car told to

10/13/89

NYCLD_023122

P-APP000727

T4-fr

377

REYNOLDS — PEOPLE — DIRECT — LEDERER

1

2    go to the grandmother's address?

3        A    About 20 minutes after four.

4        Q    And were you aware when the police car

5    returned?

6        A    Yes.

7        Q    And do you know whether or not they brought

8    the grandmother of Raymond Santana with them?

9        A    They did.

10        Q    What time was that that the grandmother was

11    picked up and brought to the Central Park Precinct?

12        A    I believe it was 4:30 going on five.

13        Q    Were the parents or family members or

14    guardians or the other people taken into custody at

15    that time already in the precinct?

16        A    Yes.

17        Q    By what time, approximately, was everybody

18    else's mother, father, or guardian present in the

19    precinct?

20        A    I'd say about by five o'clock everyone was

21    there.

22        Q    Prior to the arrival of Raymond Santana's

23    grandmother, at what time would you say that the

24    families and parents and guardians of the other four

25    had all arrived?

10/13/89

T4-fr

378

REYNOLDS — PEOPLE — DIRECT — LEDERER

1
2     A     I would say about one, 1:30 everyone was
3  there.
4     Q     Did you have any conversations with those
5  parents or guardians about releasing the people you
6  had at the stationhouse?
7     A     Yes.
8     Q     What, if anything, did you tell them?
9     A     I explained to them what would happen, that
10  if none of their children had any outstanding
11  warrants from Family Court, that they could all be
12  released to them as soon as Raymond Santana's
13  parents came.  In order to give them an appearance
14  ticket to appear in Family Court, they all have to
15  go at the same time.
16     Q     When you say "they all have to go at the
17  same time," when you say "all" who are you referring
18  to?
19     A     Raymond Santana, Steven Lopez, Kevin
20  Richardson, Lamont McCall, Clarence Thomas.
21     Q     When you said that in order to be able to
22  give them desk appearance tickets or Family Court
23  summons, they all had to be there, why was that?
24     A     They all had to appear in court at the same
25  time if they're -- if it's one case.  If one of the

10/13/89

T4-fr

379

REYNOLDS - PEOPLE - DIRECT - LEDERER

1

2    children   are   --   if   one   of   the   defendants   go   to

3    Spofard   then   he   has   to   Family   Court   --

4                    MR. BERMAN:   I'm going   to   object   to

5            this testimony.   This is a legal --

6                    THE   COURT:    I'll allow it.   This is

7            what he told these people.   I'll allow   it.

8            Whether he is right or wrong is irrelevant.

9                    MR.   BERMAN:   I didn't hear him say he

10           told the People all of that.

11                   THE COURT:   He told them they all   had

12           to go together.

13                   MR. BERMAN:   Can we make clear this is

14           an explanation we are getting?

15                   THE   COURT:    I   overruled   your

16           objection.

17       A       I   explained   to   them   if   one   of   the

18   defendants   is remanded to Spotswood (sic) he has to

19   go to Family Court in the   morning   and   that   means

20   when   the   others are released, they also have to go

21   to Family Court in the morning.   However,   if   they

22   are   all   released   at   the   same   time,   if all the

23   parents come, then they can be given   an   appearance

24   ticket   for   a   week   or two weeks in the future, so

25   what we would have to do is wait for all the parents

10/13/89

NYCLD_023125

P-APP000730

T4-fr

380

REYNOLDS — PEOPLE — DIRECT — LEDERER

1
2   to come so I can arrange it that they all come  back
3   in  a few weeks and they would be able to sleep that
4   night.
5       Q     And approximately how long were you working
6   on   the   paperwork   connected   with   the   Juvenile
7   packages and the other paperwork that was related to
8   the rest of these five people?
9       A     I'd say about two or three hours.
10      Q     And were you working on the paperwork alone
11  or was someone helping you?
12      A      I had some help for a period of time, and
13  then from Police Officer Powers and then he  had  to
14  leave.
15      Q     What time, to the best of your recall, did
16  Police Officer Powers leave?
17      A      I believe he finished at 2:00,  but  stayed
18  around on his own time to about 2:30.
19      Q      Sometime in the morning on April 20th, did
20  you have a conversation with a Lieutenant  from  the
21  Central Park Precinct?
22      A     Yes.
23      Q     Who was that?
24      A     That was Lieutenant McInerney.
25      Q     And at approximately what time did you have

10/13/89

NYCLD_023126

P-APP000731

T4-fr

381

REYNOLDS — PEOPLE — DIRECT — LEDERER

1
2   a conversation with him?

3       A    I believe it was a little after four.

4       Q       Do you recall where you had that
5   conversation with him?

6       A    I had that conversation outside of the
7   Community Affairs Office. Outside of the building
8   itself.

9       Q    What, if anything, did the Lieutenant tell
10  you?

11      A       He stated that he was informed by a
12  Detective from NightWatch that a woman's body had
13  been found on 102nd Street and that they wanted me
14  to keep the defendants there for a while so that
15  they could be questioned.

16      Q       At any time during that night while the
17  people that you described and named, the five people
18  in the juvenile room and the parents were in there,
19  did you have any conversations with the parents
20  about food?

21      A    Yes.

22      Q    Would you describe what conversations you
23  had and what happened?

24      A    They stated they wanted to get something to
25  eat for themselves and their sons and they all left,

10/13/8

T4-fr

382

REYNOLDS - PEOPLE - DIRECT - LEDERER

and I explained to them if they went to the west side, they would be more stores open where they could get something to eat.

Q       Do you remember -- did everyone leave or did only some people leave; do you recall?

A       Pretty much everybody left. A couple of people stayed, but those with the people -- you know -- where they had two parents or guardians and one went to get the foot and I believe another one might have stayed.

Q       With respect to the Defendant Lopez, do you recall who it was from his family who arrived?

A       It was his father.

Q       And with respect to Kevin Richardson, do you remember -- you testified something about his mother. Did anybody else come with the mother to your knowledge?

A       I believe she was alone in the beginning.

Q       Did there come a time when the five people that you had in the Juvenile Room were taken out to the area where the parents were waiting?

A       Yes.

Q       And when was that?

A       That's when the detective from NightWatch

10/13/89

NYCLD_023128

P-APP000733

T4-fr

383

REYNOLDS — PEOPLE — DIRECT — LEDERER

1
2  came and began interviewing them one at a time.

3      Q      Approximately what time was that if you
4  recall?

5      A      I believe that's approximately 5:50 in the
6  morning.  Let me refresh my memory with that.  I'm
7  sorry, that was approximately 5:30.

8      Q      Were you aware when parents of the family
9  returned with food?

10      A      Yes.

11      Q      Were you aware whether any of that food was
12  given to any of the people you had in the Juvenile
13  room?

14      A      Yes.

15      Q      Who do you recall seeing have some food in
16  that room?

17      A      I believe all of them ate.

18      Q      And do you recall whether Raymond Santana
19  made any statement in your presence while he was in
20  that room?

21      A      Yes, he did.

22              THE COURT:   Which room?

23      Q      I'm sorry.  In the Juvenile room?

24      A      Yes.

25      Q      What, if anything, did you hear him say?

10/13/8?

NYCLD_023129

P-APP000734

470

REYNOLDS — PEOPLE — CROSS — BERMAN

Q    The approximate time.

A    Again, I'm not sure precisely when the warrant check was done.

Q    When is the outer limit?  In other words, by what point for sure you knew, what was that point?

A    Again--

Q    By three in the morning on the 20th, did you know there were no warrants against any of them?

A    Again, I don't recall specifically when we did the warrant check.

Q    How about by noon on the 20th, did you know there were no warrants against any of them?

A    By noon, sure.

Q    How about 9 a.m. on the 20th, by then for sure, did you know there were no warrants against any of them?

A    Yes.

Q    How about at six in the morning on the 20th, was it sure by then there were no warrants against any of these five?

A    Yes.

Q    Five?

A    Five, I'm not sure.

Q    And the explanation you gave us on direct

NYCLD_023216

P-APP000735

471

REYNOLDS — PEOPLE — CROSS — BERMAN

was that that was somehow or other tied in with,
Santana's parents weren't there yet, or did I
misunderstand you?

A    You're correct.

Q    If everybody had cleared warrants, why did
the other youths have to wait for Santana's parents
to be there?

A    Because if Santana's parents didn't show up,
he would have to go to Spofard and he would have had
to appear in Family Court the same day in the
morning, which would have meant all the rest of them
would have had to come back also. So, since we
weren't sure if they were coming-- every time we
called someone, they said they were coming and then
didn't show up and I said, "Yeah, the parents are on
the way." And two hours later we know they are not
coming now.

Q    That wasn't tied in with the warrants, that
was an independent reason why you couldn't let the
others go home with their parents, is that correct?

A    Ask that again.

Q    There were two things that would have kept
at least one youth overnight, is that correct? One
of them would be a warrant against that youth,

472

REYNOLDS — PEOPLE — CROSS — BERMAN

1
2  right?

3      A    Right.

4      Q    The other was if that youth's parents don't
5  show up to pick him up, right?

6      A    Right.

7      Q    Either one of those independently, if either
8  of those happened, that youth would have to go to
9  court the very next morning?

10     A    Right.

11     Q    And is it fair to say that you could have
12  told the four who could have been released to come
13  to court the very next morning?

14     A    I could have.

15     Q    So, I ask you again, what prevented you from
16  releasing those four to their parents and giving
17  them an appearance date the very next morning and
18  waiting to see what happened about Santana's
19  parents?

20     A    I explained to them if we waited, then
21  everybody involved could get a little sleep that
22  morning rather than sleeping two hours then going to
23  Family Court and having time to prepare themselves a
24  week or two from the day of the arrest.

25     Q    And you felt people could sleep more

473

REYNOLDS — PEOPLE — CROSS — BERMAN

1   comfortably  on  the  floor  of  the  precinct  than  at

2   home?

3                MS. LEDERER:  Objection.

4                THE COURT:  Sustained.

5       Q    Now,  you  told  us  on  direct  that  about  four

6   in  the  morning,  Lieutenant  McInerney  told  you  a

7   woman's  body  had  been  discovered  in  the  park?

8       A    I  believe  that's  the  approximate  time.

9                MR. BURNS:  I  didn't  hear  that  question

10              and  answer.

11               THE COURT:  Read  it  back.

12               (The  court  reporter  read  back  the

13              requested  portion  of  the  record.)

14      Q    And  Lieutenant  McInerney  told  you  to  keep

15  the  kids  for  questioning  about  that,  didn't  he?

16      A    He  stated  that  the  detectives  wanted  to

17  speak  to  them.

18      Q    And  you  understood  that  to  mean  to  keep  the

19  kids  for  questioning  about  that  woman,  right?

20      A    That's  correct.

21      Q    Now,  you  have  told  us  by  what  time  was  it

22  that  Santana's  grandmother  arrived  approximately?

23      A    Let's  see.  It  was  after  four.

24      Q    But  by  4:30  she  was  there,  right?

NYCLD_023219

P-APP000738

474

REYNOLDS — PEOPLE — CROSS — BERMAN

1

2    A    4:30, a quarter to five.

3    Q    And by 6:00 the warrants had all cleared,

4 nobody had any warrants, right?

5    A    I believe so.

6    Q    As of 6 a.m. in the morning of April 20,

7 1989, were those five youths free to leave?

8    A    No.

9    Q    Their parents were there, right?

10    A    That's correct.

11    Q    None of them had any warrants that was known

12 by 6 a.m.?

13    A    Yes.

14    Q    As to Steve Lopez, he was being charged as a

15 juvenile with a B misdemeanor and was due to be

16 given an appearance ticket for Family Court; is that

17 right?

18    A    That's correct.

19    Q    By what facts that you can tell us about

20 were you entitled to keep him any longer against his

21 will after 6 a.m. on the morning of April 20th?

22         MS. LEDERER:  Objection.

23         THE COURT:  Sustained.

24    Q    Did you tell him once he had pleaded

25 warrant, once all five youths had cleared warrants

REYNOLDS — PEOPLE — CROSS — BERMAN

1 and once there were parents or grandparents for all

2 five youths, did you tell him, "Now you're free to

3 go"?

4     A   No.

5     Q   Is it fair to say that he wasn't free to go

6 because the lieutenant said that people wanted to

7 question him?

8     A   Yes.

9     Q   Was he under arrest for any crime relating

10 to the woman victim at that point in time, 6 a.m. on

11 the morning of April 20th?

12     A   I don't believe so, no.

13     Q   As far as his arrest for the unlawful

14 assembly as of 6 a.m., was that arrest holding him

15 any longer?

16     MS. LEDERER:  Objection.

17     THE COURT:  I will let him answer.

18     A   No.  The lieutenant asked me to hold them

19 for questioning by the detectives.

20     Q   At 4 a.m. or so when the lieutenant asked

21 you to hold these five youths for questioning about

22 the woman, did you have any evidence against Steven

23 Lopez regarding that?

24     A   Regarding the woman, the woman jogger?

476

REYNOLDS – PEOPLE – CROSS – BERMAN

1

2    Q    That's right.

3    A    I had no knowledge of the crime at all other

4    than a woman was assaulted.

5    Q    Am I fair in saying you knew the woman was

6    assaulted, you had no evidence about that against

7    Steven Lopez, but nonetheless he wasn't free to go?

8    A    That's correct.

9            MR. BERMAN:  I have no further

10           questions, your Honor.

11           THE COURT:  Mr. Moore, do you have any

12           questions?

13           MR. MOORE:  Just one second, your Honor.

14   CROSS EXAMINATION

15   BY MR. MOORE:

16   Q    Officer Reynolds, you stated that on 4/19

17   you were assigned to the Anti-Crime Unit of the

18   Central Park Precinct, am I correct?

19   A    That's correct.

20   Q    How long have you been assigned to

21   Anti-Crime in that particular precinct?

22   A    From January.

23   Q    January of '89?

24   A    Yes.

25   Q    And prior to that, how long have you been

P-APP000741

511

REYNOLDS — PEOPLE — CROSS — DILLER

1

2 correct?

3     A     Yes.

4     Q     And did you prepare, for example, at that

5 point an on-line booking system arrest worksheet?

6     A     That's correct.

7     Q     And on that document did you indicate what

8 the charges against Kevin Richardson were?

9     A     I'll have to look at it, but I did indicate

10 that.

11     Q     Go ahead.

12     A     Yes, I did.

13     Q     What charges were they?

14     A     It was assault, unlawful assembly and

15 possession of a weapon.   I originally put assault

16 and unlawful assembly.

17     Q     You filled out one worksheet where you

18 indicated assault and unlawful assembly, is that

19 correct?

20     A     That's correct.

21     Q     And then you filled out a second worksheet,

22 is that correct?

23     A     Second worksheet for what?

24     Q     For the identical crime with respect to

25 Kevin Richardson?

P-APP000742

512

REYNOLDS — PEOPLE — CROSS — DILLER

1

2      A    You mean did I tear up the first and pick up

3   a second?

4      Q    No, not tear it up but make up a second?

5      A    No.

6      Q    You said the first one had assault in the

7   second degree and unlawful assembly?

8      A    At first it had assault in the second and

9   unlawful assembly.

10     Q    What did you do with that document?

11     A    I completed it and sent it downtown to

12   Central Booking in Manhattan.

13     Q    You said there was a second document that

14   had something else in it?

15     A    No, I didn't.

16     Q    Did you prepare a second document?

17     A    No, not a second arrest report, no.

18          MR. DILLER:   I would like this document

19          marked Defendant Richardson's Exhibit B for

20          identification.

21          (Document marked Defendant Richardson's

22          Exhibit B for identification.)

23     Q    Now, I show you what has been marked as

24   Defendant Richardson's Exhibit B for identification

25   and ask you to look at the top page.

513

REYNOLDS — PEOPLE — CROSS — DILLER

1

2      Have you had an opportunity?

3      A    Yes.   What part of the top?

4      Q    Listing the crimes.

5      A    Yes.

6      Q    And    after    looking    at    it,   is   your

7   recollection refreshed as to whether or not you had

8   the third crime listed on this sheet?

9      A    Yes.

10      Q    This is not the same working sheet at the

11   other working sheet, isn't that so?

12      A    Yes, it is.

13      Q    Okay.

14           MR. DILLER:   I ask that this document be

15           marked as Defendant Richardson's Exhibit C

16           for identification.

17           (Document marked Defendant Richardson's

18           Exhibit C for identification.)

19           MS.   LEDERER:   Is   this   a   one-page

20           document?   What's being marked is several

21           documents.

22           THE COURT:   Which page you marking?

23           MR. DILLER:   Just the top page.

24      Q    I ask you to look at again the crimes on

25   that list.

514

REYNOLDS — PEOPLE — CROSS — DILLER

Is your recollection refreshed as to whether-- the fact that you made two different sheets for two different crimes?

A     Yes, this is the same sheet as the first one.

Q     Is there a difference?

A     The difference is this one here was--

THE COURT:   Which one is this one?

THE WITNESS:   I'm sorry, Exhibit C. Exhibit C was photostated before it went downtown. The other one is photostated after going down to Central Booking. It's the same document, there's only one.

Q     And it has the same arrest I.D. numbers?

A     No, there's a different number on it.

Q     Can you tell us why there are two different numbers?

A     I don't know.

Q     In any event, they charged Kevin Richardson with criminal possession of a weapon. What was the weapon?

A     The weapon was the pipe.

Q     Now, when did you learn there was a pipe?

A     Excuse me?

NYCLD_023260

515

REYNOLDS — PEOPLE — CROSS — DILLER

1

2    Q    When was it that you learned that there was

3    a pipe?

4    A    At 100th Street and Central Park West.

5    Q    When you prepared the on-line booking sheet

6    arrest, isn't it true that you characterize it as a

7    blunt instrument, not a pipe?

8    A    A pipe is a blunt instrument.

9    Q    You didn't say pipe on it, isn't that so?

10   A    On which report?

11   Q    On the on-line booking sheet.

12   A    Right.

13   Q    Did you know it was a pipe at that time?

14   A    I was told it was a pipe.

15   Q    Who told you?

16   A    I was-- Police Officer Powers stated that he

17   had made a statement that they used a pipe.

18   Q    Who made the statement?

19   A    The defendant.

20   Q    Which defendant?

21   A    He didn't say specifically who it was.    It

22   was either Richardson, Lamont McCall or Clarence

23   Thomas.

24            THE COURT:    Give us names of people.

25            Some are defendants, some are not.    Just

NYCLD_023261

516

REYNOLDS — PEOPLE — CROSS — DILLER

2      give us names of people.

3      Q      Would it be fair to say, Officer Reynolds,

4  that at that point you didn't know of any statements

5  that were attributable to Kevin Richardson?

6      A      Excuse me?

7      Q      Would it be fair to say that at the time you

8  were preparing the worksheet, you knew of no

9  statement of Kevin Richardson?

10     A      I knew he made a statement, yes.

11     Q      You didn't know the content of the

12 statement?

13     A      Police Officer Powers said he made a

14 statement that he was at the scene.

15     Q      Did he make a statement that he participated

16 on the assault of the male jogger, Mr. Loughlin?

17     A      Yes.

18     Q      Did he articulate exactly what it was he

19 did?

20     A      He spoke to Officer Powers.

21     Q      Did Officer Powers tell you what Mr.

22 Richardson told him he did?

23     A      He told me he was there and acted as a

24 participant.

25     Q      But never articulated what he did as a

517

REYNOLDS — PEOPLE — CROSS — DILLER

1
2      participant, did he?

3          A    No, not that I recall.  No.

4          Q    Now, for the two hours you're doing your
5      paperwork, where's Mrs. Cuffy?

6          A    She's in the Clerical Room.

7          Q    How far is that away from the Juvenile Room
8      in terms of distance?

9          A    They're adjoining each other.

10         Q    And would it be fair to say that she-- that
11     staying in the outside room where she is, you could
12     hear if there's noise in the Juvenile Room?

13         A    Yes.

14         Q    Now, after two hours passed, approximately
15     what time was that?

16         A    Two hours from what time?

17         Q    In other words, when you finished your
18     clerical work, what time was that?

19         A    It was about three, three or four, I
20     believe.  I'm not sure specifically when I finished.
21     It wasn't entirely finished because I didn't have
22     the return date.

23         Q    Up until three or four in the morning, that
24     would have made it approximately over four hours
25     since Kevin Richardson was in custody at the station

NYCLD_023263

518

REYNOLDS - PEOPLE - CROSS - DILLER

1

2  house, isn't that so?

3      A    Yes, that's true.

4      Q    In that four-hour period, did Mrs. Cuffy

5  ever engage in a conversation with her son, Kevin?

6      A    She might have because I remember her being

7  in the room and I had a conversation with her.

8      Q    When you say "might have," did you ever

9  leave Mrs. Cuffy to speak with Kevin Richardson?

10     A    Did I leave her to speak--

11     Q    In other words, did you ever see them

12  actually engaged in conversation?

13     A    I don't recall.  She might have spoken to

14  him.  I don't remember.  I didn't place a lot of

15  significance on it.

16     Q    Now, you had just completed some of the

17  paperwork with respect to an arrest of a felony of

18  Kevin Richardson, did you not?

19     A    Yes.

20     Q    And you knew he was fourteen years of age,

21  did you not?

22     A    Yes.

23     Q    Did you ever tell Mrs. Cuffy something to

24  the effect, "Mrs. Cuffy, your son is being charged

25  with a rather serious crime, that it would be a good

NYCLD_023264

P-APP000749

519

REYNOLDS — PEOPLE — CROSS — DILLER

1
2  idea for you to get an attorney for him"?

3      A    No.

4      Q    Did you ever tell her anything about what
5  was going to happen with respect to the Family Court
6  processings that were anticipated at that time?

7      A    Yes, I believe so.

8      Q    What did you tell her?

9      A    I stated that what usually happens is he'll
10  go to Family Court.   What they'll do is they'll
11  monitor his behavior, see if he is doing well in
12  school, and if he needs psychiatric help or some
13  kind of counseling, that he would probably receive
14  it.

15      Q    Did you indicate to her that this was a
16  court?  He wasn't merely going to some sociologist,
17  that was court she was going to?

18      A    Yes, that's correct, Family Court.

19      Q    Did you tell her in court there are lawyers?

20      A    No, I didn't explain the whole workings to
21  her.

22      Q    Did you also tell her that Kevin had certain
23  rights about remaining silent?

24      A    You are asking me if I read her her rights?

25      Q    Not read her, just discussed it with her?

NYCLD_023265

P-APP000750

520

REYNOLDS — PEOPLE — CROSS — DILLER

1

2     A     I don't believe so.

3     Q     Now, it's 4:00; is that correct,

4  approximately 4:00 in the morning?

5     A     If you want it to be.

6     Q     No, no, it's not what I want it to be--

7             THE COURT:  Please, Officer.

8             Please be more specific about what time

9         you're talking about.

10    Q     I'm talking about after the clerical work

11  was concluded.

12    A     Again, the paperwork wasn't finished because

13  I still had to get the return day.  Parts of the

14  paperwork were left open.

15    Q     Up until that point, in other words, you

16  recognize there is some paperwork to be finally

17  concluded but the point about which we are now

18  speaking where you finished most of the paperwork,

19  it was about 4:00; is that so?

20    A     Yeah, about 4:00.

21    Q     Now, the room in which Mrs. Cuffy was

22  seated, could you describe that to us a little bit?

23  Were there chairs?

24    A     There were several chairs, desks with lamps.

25    Q     Was there a telephone?

522

REYNOLDS — PEOPLE — CROSS — DILLER

2  manifested, also appeared to be sickly a little bit?

3      A    No.

4      Q    Did she indicate to you, you recall that she

5  was a recent victim of a stroke?

6      A    No.

7              THE COURT:   Recent victim of a what?

8              MR. DILLER:   Of a stroke.

9              THE WITNESS:   No.

10     Q    She didn't say that?

11     A    I don't recall her telling me that, no.

12     Q    In any event, we are now down to 4:00; Kevin

13  is in one room, Mrs. Cuffy is in another room, is

14  that correct?

15     A    That's correct.

16     Q    And then a Lieutenant McInerney, I believe--

17     A    Right.

18     Q    -- presents the news that there was a very

19  serious thing that happened in the park, is that

20  right, namely, a woman was found very seriously

21  beaten, is that correct, words to that effect?

22     A    That's right.

T13/LF

24     Q    And that everyone is to be questioned by the

25  police, by detectives; is that correct?

NYCLD_023268

P-APP000752

523

REYNOLDS — PEOPLE — CROSS — DILLER

1

2      A      He  asked  me  to  hold  onto  them  until  the

3  detectives could come to question them.

4      Q      So,  at  that  point  whether  they  were

5  awaiting-- that is whether the five of them in the

6  room were awaiting the  arrival  of  other  parents  or

7  clearances on warrants, all bets are off; they had

8  to say, is that correct?

9      A      That's correct.

10      Q      And  then  detectives  of  the  Investigation

11  Unit  of  the  Central  Park  Precinct  started  to  come

12  in, is that so?

13      A      No.

14      Q      Who  came  in,  if  anybody?

15      A      Detectives  from  Night  Watch.

16      Q      Now,  what  is  Night  Watch?

17      A      Those  are  the  detectives  that  handle,  you

18  know, serious crimes during the night when the PDU's

19  are not working, when they were unavailable.

20      Q      Is  this  division-wide  or  borough-wide  or

21  city-wide?

22      A      I believe it's borough-wide.

23      Q      And did, indeed, any of them come?

24      A      Come where?

25      Q      To  the  precinct,  to  the  Juvenile  Room?

NYCLD_023269

P-APP000753

524

REYNOLDS - PEOPLE - CROSS - DILLER

1

2      A     Eventually, yes.

3      Q     When you say "eventually," what time was it?

4      A     It was around, I believe, five, six o'clock.

5      Q     Now, by five or six o'clock, did Mrs. Cuffy

6  then have the opportunity to speak to Kevin

7  Richardson?

8      A     Did she have the opportunity?

9      Q     In other words, did she-- withdrawn.

10     Did she speak to Kevin Richardson?

11     A     I don't recall if she spoke to him or not.

12     Q     Did you go to Mrs. Cuffy seated in the

13  clerical room and tell her that there was a problem

14  that had arisen and that Kevin wasn't just about

15  ready to go, and this was a serious question that

16  had to be dealt with?  Did you tell her that?

17     A     I believe so, at one point I told her they

18  would have to wait.

19     Q     Did you tell her specifically why they would

20  have to wait?

21     A     Specifically as far as the incident that

22  occurred?

23     Q     What you had known from Lieutenant

24  McInerney, did you tell it to her?

25     A     No.

528

REYNOLDS — PEOPLE — CROSS — DILLER

1

2   it.  MS carries blankets in their ambulances.

3        Q    Now, do you know where Kevin Richardson, if

4   he was sleeping on the floor?

5        A    I don't recall if he was in a chair or on

6   the floor.

7        Q    But during that six hours, is it your

8   testimony, Officer Reynolds, that no one spoke with

9   him?

10       A    Are you talking about police officers?

11       Q    Police officers, yes.

12       A    I don't recall anyone speaking with him.

13       Q    Now, did there come a time when any kind of

14  personnel, whether from the District Attorney's

15  office or from the police department, sought to have

16  a colloquy with Kevin Richardson?

17       A    You're going to have to explain that word.

18       Q    Okay.  From after 6:00 in the morning did

19  there come a time where a member of the New York

20  City Police Department or the District Attorney's

21  office had a conversation or interview with Kevin

22  Richardson?

23       A    Yes.

24       Q    When was that for the very first time?

25       A    I believe that was about 8:00.  I'm not sure

529

REYNOLDS — PEOPLE — CROSS — DILLER

1

2    of the exact time. I wasn't present for his

3    interview.

4        Q    Do you know a Captain Gunther?

5        A    Yes.

6        Q    And do you know a Chief Rosenthal?

7        A    I don't know Chief Rosenthal personally. I

8    know of him.

9        Q    Now, was he the assistant chief of

10    detectives in charge of Manhattan detectives?

11        A    Yes.

12        Q    Did you see him in the early morning hours

13    of the 20th of April, 1989?

14        A    Yes.

15        Q    And did you see him go into what we had

16    talked about, the Juvenile Room?

17        A    No.

18        Q    Did you see Captain Gunther go into the

19    Juvenile Room?

20        A    No.

21        Q    Did you see any investigative detectives go

22    into the Juvenile Room?

23        A    Yes.

24        Q    And when was it for the first time that they

25    went into the room?

NYCLD_023275

P-APP000756

530

1      REYNOLDS — PEOPLE — CROSS — DILLER

2      A    It was approximately 5:30, 5:50.

3      Q    And do you know what they did when they went

4      into the room?

5      A    They eventually started interviewing the

6      juveniles.

7      Q    Now, you assume that, you weren't there,

8      right?

9      A    I was there for two.

10     Q    Which two were you there while they were

11     interviewing?

12     A    Clarence Thomas and Lamont McCall.

13     Q    When were those interviews concluded?

14     A    Each one separately——

15     Q    Were they both done simultaneously?

16     A    No.

17     Q    When was the second interview concluded?

18     A    I'm not sure of the exact time.

19     Q    Would you say they each took at least an

20     hour?

21     A    Yes.

22     Q    So, that would take us to about 8:00 in the

23     morning; is that right?

24     A    Yes.

25     Q    Where was Mrs. Cuffy at 8:00 in the morning?

NYCLD_023276

P-APP000757

SHEEHAN - PEOPLE - DIRECT - CLEMENTS      1698

hours tops.

     Q      During the period you were conducting the interview in the youth room at the 20th Precinct did you or Detective Jonza make any promises to Raymond Santana?

     A      No, sir.

     Q      Did you or Detective Jonza make any threats to Raymond Santana?

     A      No, sir, none at all.

     Q      Did Raymond Santana stay in the youth room after the interview finished?

     A      No, sir. Raymond and his dad were escorted out of the room, back upstairs to the 20th Squad. Basically to the same area, the same desk, same seats and were asked to take a seat until we found out when the District Attorney would be ready for them.

     Q      Did there come a time that you left the 20th Precinct and went somewhere else?

     A      Yes, sir. About 2:00 in the morning.

     Q      Where did you go?

     A      Myself and Jonza escorted Mr. Santana Senior and his son Raymond from the 20th Precinct, by unmarked car, we went from 82nd Street up to 100th Street to the 24th Precinct.

     Q      Why was the investigation moved from the 20th

NYCLD_018981

P-APP000758

SHEEHAN - PEOPLE - DIRECT - CLEMENTS        1699

Precinct to the 24th Precinct?

A    Sometime after we finished this written statement there was some discussion among a variety of the supervisors at the 20th Precinct, uniform and detectives, as to whether or not the room we just finished our statement in was the actual designated youth room.  To continue the investigation there was -- there was definitely some question as to which was the correct room.  We decided to move to the 24th Precinct which had a designated youth room that everyone agreed upon and that's where we're going to video tape.

Q    Before this investigation began did you have any experience concerning the youth room at the 20th Precinct?

A    Yes, sir.  I had been assigned to Manhattan North for 21 years.  I'd been in and out of the 20th Precinct numerous times.  That's always been the youth room in my experience.

MR. JOSEPH:  Objection, your Honor.

THE COURT:  I'll allow it.

Q    The room you're speaking of is that 125, the one you indicated earlier?

A    That's correct.  It's the Youth Officer's room.  It's always been.

Q    When you went to the 24th Precinct with Raymond Santana and his father and Detective Jonza where did you go

NYCLD_018982

P-APP000759

SHEEHAN - PEOPLE - DIRECT - CLEMENTS        1700

in the precinct?

    A    Upon arriving at the 24th Precinct, which is located at 151 West 100th Street between Columbus and Amsterdam we went in passed the uniform desk and the designated youth room in the 24th is on the first floor. It's actually a part of the muster room.

    MR. CLEMENTS:  At this time, with the Court's permission, I'd like the witness to get off the stand and look at People's 5 in evidence.

    (Whereupon the witness approached People's 5 in evidence.)

    Q    Do you recognize People's 5, detective?

    A    Yes, I do.

    Q    What do you recognize it to be?

    A    It's a schematic of the 24th Precinct first floor.

    Q    When you entered the 24th Precinct with Raymond Santana and his father where did you go?

    A    This is the main uniform desk.  This is the entry. This is 100th Street.  We entered.  The desk is here.  There are some closing folding doors which were open in the open position.  This is the muster room.

    MR. CLEMENTS:  The record should reflect the witness is indicating the large room on the right-hand side of the exhibit, about the middle.

NYCLD_018983

P-APP000760

SHEEHAN - PEOPLE - DIRECT - CLEMENTS        1701

THE WITNESS:  Now straight back here --  this is a partitioned group of offices.

Q     When you say "partitioned" do the walls go up  to the ceiling?

A     No, they don't.  This area back here is designated as the youth room.

MR. CLEMENTS:  The record should reflect that the officer is pointing to a room previously marked by another witness as  room 101.

Q     Where did Raymond Santana and his father go as you entered the precinct?

A     Along the back wall here, which would be the  east wall  of the 24th Precinct.  Along the back wall is a  water fountain here, a soda machine and there is a lot of  folding metal chairs, metal desks, this is the room where roll  call is  held  so there are a lot of scattered desks.  They  sat against  the  wall  basically  waited  until  the  room  was available to do the video tape.

Q     Did there come a time when Raymond Santana made an oral statement that was recorded on video tape?

A     Yes.

Q     And where was that statement taken?

A     About 2:30 in the morning the -- now the 21st  of April, the video tape statement was taken in this room by  a

NYCLD_018984

SHEEHAN - PEOPLE - DIRECT - CLEMENTS        1702

video tape technician from the District Attorney's office. Present in the room seated at this desk on this side was Raymond Santana. Seated next to him was his father. Seated about here was myself. Next to me was Detective Bertaroyo (phon) who was the case officer from Central Park, who was in charge of the investigation. The Assistant District Attorney, Elizabeth Lederer, sat here and the video tape technician was back here and this is where the camera was set up.

        MR. CLEMENTS:  Indicating the north east corner of the room.

        THE WITNESS:  That is correct, the north east corner of the room.

        MR. CLEMENTS:  You can resume the stand again, detective.

        (Whereupon Detective Sheehan resumed the witness stand.)

        MR. CLEMENTS:  At this time I'd like to have this video tape marked People's 17 for identification.

        (Whereupon the video tape was so marked People's Exhibit 17 for identification.)

Q    Detective, do you recognize People's 17?

A    Yes, I do.

SHEEHAN - PEOPLE - DIRECT - CLEMENTS        1703

Q      How do you recognize it?

A      This is -- it's a Sony Beta tape of Mr. Santana's statement.   I viewed it earlier today and indicated with today's date 10/25/89 and with my initials in the lower right-hand corner.

Q      Were you present in room 101 in the 24th Precinct when the video tape statement was taken from Raymond Santana?

A      Yes.

Q      When did that video end, approximately?

A      It began at 2:30 and ended a little after 3:00 A.M. on the 21st.

Q      Was any other video tape done with Raymond Santana?

A      Yes.  Several minutes later, I'm not sure of exactly how many, but -- I'd have to guess at about 15 minutes or so another video was done of Raymond Santana. Raymond was asked to stand in the same room and the video tape was taken of his clothing, which he described as being the same clothes he had on during the assault.

Q      And does that second video, the video of his clothing, Raymond Santana's clothing also appear on People's 17 for identification?

A      Yes, it does.

NYCLD_018986

P-APP000763

SHEEHAN - PEOPLE - DIRECT - CLEMENTS          1704

1

2          MR. CLEMENTS: At this time I offer People's

3     17 into evidence.

4          MR. BERMAN:   I would inquire as to which

5     defendant this is being offered against?

6          THE COURT:  We have been through that.

7          MR. BERMAN:  You can rule however you want to

8     rule.

9          THE COURT:  I'm going to rule the same way.

10    You have no standing to contest this no matter who

11    it's offered against.

12         MR. MOORE:  There's insufficient foundation

13    as to the officer establishing --

14         THE COURT:  You have no standing to contest.

15    It is being offered for -- as a statement of

16    Santana.  The attorney has not objected.

17         MR. RIVERA:  I do not object for purposes of

18    the hearing.

19         THE COURT:  And it will be marked.

20         (Whereupon the video tape was so marked

21    People's Exhibit 17 in evidence.)

22         MR. CLEMENTS:  At this time with the Court's

23    permission may we play the video tape?

24         THE COURT:  Yes.

25         MR. BERMAN:  Judge, I would just ask for the

SHEEHAN - PEOPLE - DIRECT - CLEMENTS        1705

same  instruction  that  the  Court  made  or  comment

the  Court  made  before  the  McCray  tape  that  in

terms  of  ultimately  a  trial  this  is  only  against

the  person  who  made  the  statement.

THE  COURT:  This  video  is  being  offered  at  a

hearing.  What  happens  at  trial  is  something  else

again.  Any  defendant's  statement  at  trial  is  a

statement  offered  against  him.  At  hearings  this

is  something  different.

MR.  CLEMENTS:  May  I  start?

THE  COURT:  Yes.

(Whereupon  the  video  tape,  People's  Exhibit

17  in  evidence,  was  played  in  open  Court.)

Q      Detective,  following  the  video  statement,  did

there  come  a  time  when  you  left  the  precinct?

A      Yes,  sir.

Q      When  was  that?

A      At  approximately  3:45.

Q      Did  anyone  accompany  you?

A      Yes.

Q      Who  was  that?

A      Detective  August  Jonza,  myself,  Mr.  Santana,

Senior,  and  Raymond  Santana.

Q      Where  did  you  go?

NYCLD_018988

P-APP000765

SHEEHAN - PEOPLE - DIRECT - CLEMENTS        1706

A    Our original destination was the Santana residence on East 119th Street which is across the street from the 25th Precinct.

Q    Did you go to that location?

A    On our way, we stopped by the crime scene.

Q    Where was that?

A    Crime scene is actually a multiple crime scene. We went by 102nd Street and the Cross Drive which connects the East Drive of Central Park with the West Drive of Central Park.

Q    Where did you go on 102nd Street Cross Drive?

A    Approximately midway between the East and West Drive.

Q    Was anything said by anyone in the car?

A    Yes, sir. I asked Raymond Santana if we could all exit the car including his father; if he would -- if he could possibly remember and try to show us some of the pertinent sites; in particular, where the woman was grabbed and where the rape took place.

Q    Did Raymond Santana, Junior, say anything or point anywhere?

A    He pointed in the general area, an area north, north of this cross drive which is heavily wooded; and about 30, 40 feet in it, it begins to slope down into a ravine.

NYCLD_018989

P-APP000766

SHEEHAN - PEOPLE - DIRECT - CLEMENTS       1707

We walked into the woods, maybe 20, 30 feet. He said it was really -- it was too dark for him to really point out anything of any significance.

Q    Was Raymond Santana, Junior, cuffed or uncuffed?

A    He was uncuffed.

Q    Did there come a time when you left 102nd Street Cross Drive?

A    Yes, sir. I would say no more than 20 minutes later. It's a little after 4:00 in the morning.

Q    Where did you go?

A    We left the 102nd Street Cross Drive and continued to our original destination,

Q    For what purpose did you go to

A    We advised both Mr. Santana and his father that we were going to voucher his clothing, young Santana's; voucher his clothing, and that now is a good opportunity for his father to go into their residence and get him fresh clothes. He did so.

He was in the residence, I don't know, 15 minutes or so. There was some discussion between Mr. Santana and his father as to particular sneakers or a particular pair of pants that he wanted to wear and what location they were in the apartment. His father went in on his own, came out with the clothing, and he also brought a bag of food.

NYCLD_018990

P-APP000767

SHEEHAN - PEOPLE - DIRECT - CLEMENTS        1708

1    I don't recall exactly what it was. There was also
2  something to drink. There was a container of juice or soda.
3    Once we got the clothing and the food, Mr. Santana said
4  good-bye to his son, went into the apartment house, and
5  myself and Jonza and young Raymond Santana returned to the
6  24th Precinct.
7    At the 24th Precinct, I asked him to accompany me into
8  the men's room on the ground floor. I had a brown paper bag
9  I got from behind the desk of the precinct. And I asked him
10  to remove all of his clothing which he was wearing. He
11  handed it to me item by item. I put it into the bag as much
12  as I could fit. I don't think I could fit his jacket as I
13  recall. He was then given the clothing that his father had
14  provided. He put that clothing on.
15    He was then escorted from the bathroom up to the second
16  floor which is the 24th detective squad; walked into the
17  squad. There is a little waiting area. Beyond that, there
18  is a half door which is a common place in most detective
19  squads; passed that to the gate. Off to the left there is a
20  desk and some chairs, and he was seated at that desk.

21         MR. CLEMENTS: With the Court' permission,
22      I'd like you to get off the stand, and if you
23      would, look at People's 5 in evidence.

24         (Whereupon the witness complied.)

NYCLD_018991

P-APP000768

SHEEHAN - PEOPLE - DIRECT - CLEMENTS      1709

1

2    Q    Would you show the Court where you went with

3    Raymond Santana and where his clothing was removed.

4    A    All right. This is the first floor of the 24th

5    Precinct (indicating). Again, this is the muster room

6    (indicating). This is the entrance (indicating). There is

7    a men's room right here (indicating). Myself and Santana

8    went into the men's room, and this is where he changed out

9    of his clothing.

10    Q    Now, if you would look at People's 6 in evidence,

11    the second floor of the 24th Precinct. Do you recognize

12    People's 6?

13    A    Yes, I do; just want to get my bearings for a

14    second.

15    Q    All right. I'm sorry. Do you recognize People's

16    6?

17    A    Yes, I do.

18    Q    How did you bring Raymond Santana upstairs?

19    A    Up the staircase which -- when you enter the 24th

20    Precinct there's a staircase -- if you make two hard lefts

21    there's a staircase right there in the front of the

22    building. Right up those stairs to the second floor along

23    this hallway. The main entrance to the 24th squad is here.

24    This is a small waiting room. The half gate is here. Went

25    through the half gate, around these two desks and he was

NYCLD_018992

P-APP000769

SHEEHAN - PEOPLE - DIRECT - CLEMENTS        1710

seated here.

MR. CLEMENTS:  The record should reflect that the witness is pointing to the two desks just inside the swinging gate on the western end of the detective squad.

Q    Is that the detective squad that you pointed to, that large room?

A    Yes, sir, this room here, this large room here is the detective squad.  It's broken into smaller rooms for interview purposes.

MR. CLEMENTS:  Thank you.  You can resume your seat.

(Whereupon the witness, Detective Sheehan, resumed the witness stand.)

Q    What did you do with the clothing that you recovered from Raymond Santana?

A    I took that clothing down to the 20th Precinct, after Mr. Santana was seated at the desk.  I drove it down to the 20th Precinct with Jonza and went to the second floor, the two-0 squad room and handed those clothes to Detective Gonzalez from Central Park.

Q    After doing that did you return to the 24th Precinct?

A    Yes, sir.

NYCLD_018993

P-APP000770

SHEEHAN - PEOPLE - DIRECT - CLEMENTS        1711

Q    I'd like to direct your attention -- withdrawn.

Did you ever frisk or search Raymond Santana?

A    No, sir.

Q    I'd like to direct your attention to approximately 7:00 in the morning on the 21st at the 24th Precinct.   What were you doing at that time and location?

A    A few minutes before 7:00 there was a conversation among detectives.   I was present.   Jonza was present and Assistant District Attorney Linda Fairstein was present.   It was a discussion as to the feasibility of visiting the crime scene during the daylight hours.   It was just becoming daylight, about 7:00.

MR. BURNS:   I'm sorry, is this the 21st?

THE WITNESS:   It's all on the 21st.

Q    Was a decision made concerning visiting the crime scene?

A    Yes, sir.

Q    And what was done in connection with the crime scene?

A    Decision was made to go back to the crime scene and to take with us two other defendants who were being charged in this case.

Q    Who's that?

A    Kevin Richardson and Kharey Wise.

14

```
 1              John Farrell
 2   43 for almost three years.
 3       A.    I can't remember the exact amount
 4   of time I was in these places.  I remember being
 5   in them.  The exact amount of times, you know, I
 6   moved around a lot in the police department.
 7       Q.    I appreciate that these events
 8   happened quite a long time ago, and I'm only
 9   asking you to do the best you can with whatever
10   memory you have.
11       A.    That's fine.
12       Q.    But I do want to, you know, from
13   time to time, I'll press you a little bit to see
14   if I can get a more exact memory of it.
15            Do you remember approximately what
16   year it was that you went to the Manhattan DA's
17   Squad?
18       A.    1981, approximately 1981.
19       Q.    How long were you in the Manhattan
20   DA's Squad?
21       A.    I was in the Manhattan DA's Squad
22   until 1986, I believe, and then I went to the
23   19th Detective Squad.
24       Q.    How long were you there?
25       A.    A very short time, and then I went
```

NYCLD_058208

P-APP000772

15

```
 1                    John Farrell
 2    to the Manhattan South Task Force, Detective
 3    Task Force on Night Watch.
 4         Q.    On Night Watch, all right.  So the
 5    Night Watch was part of the Manhattan South Task
 6    Force Detective Squad?
 7         A.    Yes.
 8         Q.    Approximately what year did you go
 9    to Night Watch, if you can remember?
10         A.    I said I believe it was 1986.
11         Q.    '86, all right.  And is that the
12    position you were in when you retired?
13         A.    Yes.
14         Q.    During your time in the Manhattan
15    DA's Squad, which was approximately what, five
16    years, 1981 to 1986?
17         A.    Yes.
18         Q.    Were there any particular cases
19    that you were assigned to work on?
20         A.    I worked on everything, organized
21    crime, white collar crime and anything that the
22    DA's office decided to investigate.
23         Q.    Did you work on any sex crimes
24    cases?
25         A.    No, I don't believe I did, no.
```

VERITEXT REPORTING COMPANY

NYCLD_058209

P-APP000773

16

1               John Farrell
2       Q.      Did you work on any homicides when
3   you were in the DA's Squad?
4       A.      I don't believe I did while on the
5   DA's Squad, no.
6       Q.      During the time you were assigned
7   to the Manhattan DA's Squad, did you know Linda
8   Fairstein?
9       A.      Yes.
10       Q.      And did you work on cases with her
11   during the time you were in the Manhattan --
12       A.      District Attorney's.
13       Q.      -- DA's Squad?
14       A.      I don't recall.
15       Q.      How did you know her?
16       A.      She was a sex crimes prosecutor for
17   the DA's office.
18       Q.      During that entire period of time
19   you were there?
20       A.      I believe so.  I'm not sure if she
21   left before me or after me.  I didn't keep track
22   of her.  I don't know.
23       Q.      Do you recall whether you actually
24   worked on a case with her though?
25               MR. MYERBERG:  Objection.

NYCLD_058210

P-APP000774

17

                    John Farrell

1

2       A.      I don't recall.  I know I've worked

3   on cases with other people that might have

4   worked on cases with her.  But that's the way it

5   was in the DA's Squad, they tell you to go out

6   and help someone.

7       Q.      File your report and go on to the

8   next one?

9       A.      Yes.

10      Q.      Did you know Elizabeth Lederer?

11      A.      Yes.

12      Q.      Do you recall ever working on any

13  cases with her?

14      A.      I've seen her a few times, so I

15  believe maybe I did.  I'm not sure.

16      Q.      Before April of 1989?

17      A.      I'm not really sure.

18      Q.      But you think you may have worked

19  on some matters with her before then?

20              MR. MYERBERG:  Objection.

21      A.      I'm not positive.

22      Q.      I'm not asking you to be positive.

23  But you think you might have worked on some

24  cases with her, right?

25      A.      I don't know.

NYCLD_058211

P-APP000775

18

1              John Farrell
2      Q.    What about an Assistant District
3    Attorney named Nancy Ryan, do you know her?  Did
4    you know her when you were in the squad?
5      A.    I don't remember the name, no.
6      Q.    Is this the first time you're
7    hearing her name?
8              MR. MYERBERG:  Objection.  Are you
9         saying outside the presence of counsel?  I
10         mean, is that the question?  If it is, it's
11         privileged.
12      Q.    I'm sorry, outside of the presence
13    of any conversations you may have had with any
14    of your lawyers, have you ever heard her name
15    before?
16      A.    I don't recall hearing her name
17    before.
18      Q.    What about a District Attorney
19    named Peter Casolaro, did you ever work with
20    him?
21      A.    I never heard of him.
22      Q.    You never heard of him, all right.
23              How about a District Attorney named
24    Harlan Levy, did you ever work with him when you
25    were in the DA's Squad?

NYCLD_058212

P-APP000776

Page 26

1          Glen Donald Whelpley

2   in the regular course of your business

3   as a detective?

4          MR. MYERBERG:   Objection.

5      A.    Yes, sir.

6      Q.    Do you know whether you were

7   ever asked to provide the notes relative

8   to this case to anybody involved with

9   the case?

10     A.    My notes from the notebook,

11  sir?

12     Q.    Yes.

13     A.    I don't recall being asked,

14  no, sir.

15     Q.    Do you know who Assistant

16  District Attorney Linda Fairstein is?

17     A.    I've heard her name.

18     Q.    Did you know who she was back

19  in 1989 when you were working on the

20  Central Park jogger case, from whatever

21  time you were working on it?

22     A.    Did I know her?

23     Q.    Yes.

24     A.    No.

25     Q.    Did you know she was working

NYCLD_058056

P-APP000777

Page 27

1              Glen Donald Whelpley

2   on that case at the time you were

3   working on the case?

4        A.    I really didn't follow it,

5   sir.

6        Q.    Well, you did some

7   investigation including some interviews

8   of some kids in the park; correct?

9        A.    Yes.

10       Q.    And you made notes of those

11  interviews; correct?

12       A.    Yes, sir.

13       Q.    Did you give those notes to

14  anybody in the Police Department after

15  you made them, after you did your

16  interviews?

17       A.    The notes in the spiral

18  notebook?

19       Q.    Yes.

20       A.    I really don't know, sir.

21       Q.    Did you give those notes to

22  anybody in the District Attorney's

23  office?

24       A.    I don't know, sir.

25       Q.    Do you recall being asked to

NYCLD_058057

P-APP000778

Page 28

1              Glen Donald Whelpley

2      provide your notes in your spiral

3      notebook to anybody in the Police

4      Department?

5                MR. MYERBERG:   Objection.

6          A.    I don't recall being asked,

7      no, sir.

8          Q.    Do you recall being asked to

9      give your notes to anybody in the

10     District Attorney's office concerning

11     your involvement in this case?

12         A.    I don't recall being asked,

13     no, sir.

14         Q.    Do you recall ever providing

15     your DD 5s to anybody in the Police

16     Department after you prepared them?

17         A.    Well, normally I would turn my

18     DD 5s in to my supervisor.

19         Q.    Sergeant Duffy at the time;

20     right?

21         A.    Yes, sir.

22         Q.    Do you know what would happen

23     to them once you turned them in?

24         A.    I believe that they, and I'm

25     not sure of this, the exact chain of

NYCLD_058058

P-APP000779

Page 29

1              Glen Donald Whelpley

2    command or how it would go through, but

3    this would be turned over to, you know,

4    other superior officers in the Police

5    Department and would become part of the

6    case folder.

7         Q.    Other than with Mr. Myerberg

8    or Ms. Nelson or anybody else in the

9    Corp. Counsel's office, did you speak

10   with anybody else concerning this

11   deposition before today's deposition?

12        A.    Other than Mr. Myerberg?

13        Q.    Yes, other than lawyers for

14   the City.

15        A.    No, sir.

16        Q.    Did you speak with any of your

17   former colleagues in the detective

18   bureau concerning your testimony here

19   today?

20        A.    No, sir.

21        Q.    How many times did you meet

22   with the City lawyers?

23             MR. MYERBERG:   Objection.

24        A.    Six, seven times, sir.

25        Q.    How many hours in total?

NYCLD_058059

P-APP000780

T7-1f

1                              COLLOQUY                    1668

2                  Michael Sheehan.

3    D E T.   M I C H A E L   S H E E H A N, Shield 421,

4    Manhattan North Homicide, New York City Police

5    Department, having been called as a witness by

6    the People, having been first duly sworn,

7    testified under oath as follows:

8              COURT OFFICER: Would you give us your

9         name, spell your last name, your shield

10        number and present assignment.

11             THE WITNESS:      Detective Michael

12        Sheehan, S-H-E-E-H-A-N; Shield 421, NYPD,

13        Manhattan North Homicide Squad.

14   DIRECT EXAMINATION

15   BY MR. CLEMENTS:

16        Q      Detective, I'd like to direct your

17   attention to April 20, 1989. Did you work on that

18   day?

19        A    Yes, sir, I did.

20        Q    And what shift did you work?

21        A    Four in the afternoon to 1:00 in the

22   morning.

23        Q    Did you receive an assignment shortly after

24   you arrived for work?

25        A    Yes, I did.

10/24/89

NYCLD_018954

P-APP000781

T7-1f

1669

SHEEHAN - PEOPLE - DIRECT - CLEMENTS

1    Q    And what was that assignment?

2    A    I left the Manhattan North office about ten

3    after one, and responded to Central Park Squad.

4    Q    Did you arrive at Central Park?

5    A    Yes, I did.

6    Q    WHen you got there, did you receive another

7    assignment?

8    A    Yes, sir, I went to Central Park to aid in

9    the investigation of an assault on a victim that was

10   likely to die.    Upon  reaching  the  Central  Park

11   Squad,  I  was  surprised of a couple of facts by my

12   immediate supervisor, Sergeant O'Connor.

13            I was then asked to accompany the uniformed

14   force on a search.  The search  was  for  a  weapon,

15   namely, a length of pipe.

16            MR. BURNS:  A what?

17            THE WITNESS:  A length of pipe.

18   Q    Where did that search take place?

19   A    The search took place in the vicinity of

20   West 97th Street and  Central  Park  West;  actually

21   inside the park walls.

22   Q    Did  you  recover  a pipe or was a pipe

23   recovered in your presence?

24   A    No, sir.

10/24/89

NYCLD_018955

P-APP000782

T7-1f

1670

SHEEHAN — PEOPLE — DIRECT — CLEMENTS

1    Q    At the conclusion of that search, what did
2
3 you do?

4    A         At the conclusion of the search, I
5 responded back to the Central Park Squad and had a
6 conversation with, again, Sergeant O'Connor and
7 Detective John Hartigan.

8    Q    What time did you return to the Central
9 Park Squad?

10    A    I returned to the Central Park Squad
11 somewhere in the vicinity of 5:30 p.m.

12         MR. BURNS:  I'm sorry, 5:30 p.m.?

13         THE WITNESS:  That's correct.

14         THE COURT:  What time was it that you
15         said you went in search of the weapon?

16         THE WITNESS:  Shortly after 4:00, your
17         Honor.  Let's say 4:30.

18         THE COURT:  Okay.

19         MR. BURNS: Again p.m.?

20         THE WITNESS:  p.m.

21    Q    When did you speak to John Hartigan?

22    A    I spoke with John Hartigan in the Central
23 Park Precinct, there is a separate building across
24 the alleyway from the main building.  It is the
25 auxilary police building.  It also houses the Youth

10/24/89

NYCLD_018956

P-APP000783

T7-1f

1671

SHEEHAN - PEOPLE - DIRECT - CLEMENTS

1    Room.    It was in that building, in the Youth Room,

2    that I spoke with John Hartigan.

3         Q    And would you relate the nature of the

4    conversation?

5         A        Sure.    Hartigan advised me that he had

6    taken a statement from -- Raymond Santana, who was

7    seated at a desk in that room.  He had also advised

8    me that Santana wished to add certain things to the

9    statement, and that it was impossible for him to

10   continue, because there was no parents or guardian

11   present for Santana.

12        Also, during this I was advised by

13   O'Connor, Sergeant O'Connor that the entire

14   investigation was going to be moved out of the

15   Central Park Precinct to the west side of West 82nd

16   STreet into the 20th Precinct which was probably a

17   better facility to handle an investigation of this

18   size.

19        Q    You were at the Central Park Precinct,

20   would you describe the conditions around the

21   precinct at that time?

22        A    Well, Central Park Precinct is an old

23   stationhouse.  There is not a lot of room.  There is

24   not a lot of individual rooms to do interviews.

10/24/89

NYCLD_018957

P-APP000784

T7-1f

1672

1    SHEEHAN - PEOPLE - DIRECT - CLEMENTS

2    Also, in this case, there's only a small youth room.

3    It's also a bad place to conduct a confidential

4    investigation, especially in a matter of this nature

5    with the press.

6            The press had arrived. There were quite a

7    few people arriving from the media. And they began

8    to gather. There's actually an alleyway that

9    divides the two main parts of the stationhouse.

10   It's unlike any other in the City.

11       Q    After speaking to Sergeant O'Connor and to

12   Detective Hartigan, did you receive another

13   assignment in connection with this case?

14       A    Yes, I did.

15       Q    And what was that?

16       A    The assignment was to take Raymond Santana

17   in our car. I was with Detective Jonza, J-O-N-Z-A,

18   and Rudy Hall, H-A-L-L, both from the Manhattan

19   North Homicide Squad. We were to take Santana from

20   the Central Park Stationhouse to the 20th, notify

21   his father, try to make some arrangements to get his

22   father down to the 20th Precinct, and then take an

23   updated, more complete statement.

24       Q    Did there come a time when you left the

25   Central Park Precinct?

10/24/89

NYCLD_018958

P-APP000785

T8-fr

1673

1         SHEEHAN — PEOPLE — DIRECT — CLEMENTS

2     A    Yes.  I'd have to  say  it's  around  6:00.

3   Precisely  I'm  not  positive,  but  it's  around  six

4   o'clock.  I left the Central Park  Precinct  in  the

5   company  of  Jonza,  Hall,  and  Raymond  Santana, a

6   fourteen year old youth.

7     Q    Who was driving?

8     A    I was.

9     Q    Was Raymond Santana cuffed or uncuffed?

10    A    He was uncuffed.

11    Q    Where did he sit in the car?

12    A    In the back seat.

13    Q    Did any conversation take place in the car?

14    A    There was conversation among the  three  of

15  us,  the  three  detectives  about  --  you  have to

16  understand we didn't have  all  the  facts  of  this

17  case.  We had just come to work at four o'clock and

18  we realized that we hadn't done a complete search on

19  the exterior of the wall at 97th Street and  Central

20  Park  West  for  that  pipe  and  it  was during the

21  conversation I advised Santana we were going to take

22  a detour on the way to the stationhouse.

23      "I just want to look at something  at  97th

24  Street and Central Park West."

25      On  the  way to 97th and Central Park West,

10/24/89

NYCLD_018959

P-APP000786

T8-fr

1674

1          SHEEHAN — PEOPLE — DIRECT — CLEMENTS

2     Raymond Santana said, "If you're looking for a pipe,

3     the pipe isn't going to be there, because I know for

4     a fact my friend had the pipe when I left the park."

5                    MR. MADDOX:   Judge, can that last part

6               be read back?

7                    THE COURT:   Read it back.

8                    (Reporter complies)

9          Q     Detective Sheehan,  had  you  received  any

10    information  concerning this pipe prior to beginning

11    your search for it?  What significance it might have

12    had?

13         A     The only significance, the only information

14    I had received prior to this was  that  a  pipe  was

15    used in the assault.  I also knew there were several

16    assaults.   There was one in particular on a female.

17    She was likely to die.  I didn't know to what extent

18    the pipe was used on anyone else, but I did know the

19    pipe was significant to the investigation.

20         Q     You were beginning to tell us about  things

21    that  Raymond  Santana  said in the car.  Did he say

22    anything else?

23         A     Yes.  He continued to say  that  he  exited

24    the   park   with   some   friends.   Among  them,

25    phonetically, Antron, a friend of his.   Antron  had

10/24/89

NYCLD_018960

P-APP000787

T8-fr

1675

1    SHEEHAN - PEOPLE - DIRECT - CLEMENTS

2    the pipe. He said they turned across Central Park

3    West and as we arrived on the scene, he pointed in

4    the direction of Columbus Avenue which is, I guess,

5    looking west.

6        Q    Where was your car at that point?

7        A    Right at 97th STreet and Central Park West

8    at the intersection.

9        Rudy Hall got out of the car and did a fast

10   search anyway, just by the exterior of the wall.

11   Maybe a block north and a block south, just to be

12   sure. He pointed in the direction of Columbus

13   Avenue. He said that he and a group of friends,

14   including Antron, had exited the park and ran west

15   on 97th Street and the way he knew that Antron had

16   the pipe is that there were several -- there was

17   construction going on on a building on Park West

18   Village, which would consist of the north side of

19   97th Street between Columbus and Central Park West.

20       And, I guess, they were doing some brick

21   face or something, they had that overhead type of

22   construction --

23       Q    Where was that in relation to the sidewalk?

24       A    It was covering the sidewalk, and

25   underneath they had the electric lighting running

10/24/89

NYCLD_018961

P-APP000788

T8-fr

1676

SHEEHAN - PEOPLE - DIRECT - CLEMENTS

1   the length of the site and every -- just about every
2   other bulb was broken. He said that when they ran
3   through there, Antron had jumped and broke the bulbs
4   with the pipe to the point where a security guard
5   gave chase. He said that's -- he said, "I can show
6   you exactly where the pipe was dropped."
7
8             We got out and we walked, myself and Mr.
9   Santana walked the whole length of 97th Street,
10  towards Columbus Avenue he said, "Look, the pipe is
11  at 100th Street and Columbus Avenue." He said,
12  "Right next to a fence. That's where I saw Antron
13  drop the pipe."
14            We then got back in the car and we drove
15  to 100th Street and Columbus Avenue and he pointed
16  at the southeast corner. There was a fence there
17  which -- it's actually on the property of Park West
18  Village, which is a complex, building complex, and
19  he pointed the fence out and said that the pipe was
20  placed against the fence right on that corner.
21            So I got out and looked and he got out and
22  looked, Santana, and my two partners, and we looked
23  around the whole area. We didn't see the pipe. In
24  fact, about ten feet off the curb, there was an
25  excavation. I don't know if it was Con Ed,

10/24/89

T8-fr

1677

1         SHEEHAN — PEOPLE — DIRECT — CLEMENTS

2   Telephone Company, or whatever, but there was a hole

3   in the street protected by barriers.  I went to that

4   hole, jumped in myself, and examined it.  It was

5   only about two feet deep.  There was no pipe.

6      Q    After you looked for the pipe at 100th

7   Street and Central Park West, where did you go next?

8      A    We all got back in the car, that is to say

9   myself, Rudy Hall, Augie Jonza, and Raymond Santana.

10  We drove from 100th Street and Columbus Avenue south

11  to the 20th Precinct, which is located at 82nd

12  Street, West 82nd Street between Columbus and

13  Amsterdam.

14      Q    Was anything else said in the car?

15      A    On the way from that site to the 20th

16  Precinct, Mr. Santana said, "I had nothing to do

17  with the rape.  All I did is feel the woman's tits.

18  I had nothing to do with the rape."

19      Q    Did you ask him any questions in the car?

20      A    No, I didn't.

21      Q    Was there any conversation in the car?

22      A    No, there wasn't.

23      Q    When you arrived at the 20th Precinct,

24  where did you go?

25      A    Upon arrival at the 20th Precinct, went to

10/24/89

T8-fr

1678

SHEEHAN — PEOPLE — DIRECT — CLEMENTS

1  the   second   floor,   the   20th   Detective   Squad.   We

2  entered.   As you walk into the squad,   to   the   left

3  there's   a desk by a window which would be -- if you

4  were looking at it in the scheme,   it's the west wall

5  of the 20th squad.

6

7           MR.   CLEMENTS:       With     the     Court's

8           permission,   I would like the witness to get

9           off   the   stand   and   look   at   what's   been

10          received as People's 3 in evidence.

11          (Witness   approaches   People's   3   in

12          evidence.)

13  Q     Do you recognize People's 3,   Detective?

14  A     Let me get my bearings, yes, I do.

15  Q     And what do you recognize it to be?

16  A       This   is   a   schematic   drawing   of   the   second

17  floor of the 20th Precinct.   These offices here   are

18  the 20th Detective Squad.

19          MR.   CLEMENTS:       Indicating,   for the

20          record, the offices on the   lower   half   of

21          People's 3 in evidence.

22  Q       How did you get to the second floor with

23  Raymond Santana?

24  A       Came in the main entrance of the   precinct,

25  which   would   be   here,   and   up   the   staircase

10/24/89

NYCLD_018964

P-APP000791

T8-fr

1679

1        SHEEHAN — PEOPLE — DIRECT — CLEMENTS

2   immediately to your right as you enter the

3   stationhouse.

4        Q    Is that the staircase on People's 3 that's

5   just outside the entrance to the Detective Unit?

6        A    Yes, it is, right here.    Second floor,

7   through the door, which brings you into a common

8   hallway and through the main door of the 20th Squad,

9   straight through there's a half gate with a buzzer,

10  through the half gate and this is the west wall of

11  the 20th Precinct.

12       Raymond Santana was asked to take a seat at

13  this desk.

14            MR. CLEMENTS:   Indicating a desk in

15            the lower right hand corner of People's 3

16            in evidence.

17       Q    Was he cuffed or uncuffed at that point?

18       A    He was uncuffed.

19       Q    What did you do after Mr. Santana was

20  seated?

21       A    After he was seated here, I went to a soda

22  machine, which is out here, this common hallway, and

23  got him a soda.   I don't know what brand, but he

24  just wanted a soda.   Brought him a soda and I asked

25  him for his father's phone number which he gave me.

10/24/89

NYCLD_018965

P-APP000792

T8-fr

1680

SHEEHAN – PEOPLE – DIRECT – CLEMENTS

2   Q    What did you do after he gave you the phone
3   number?

4   A    I called his father, got him on the  phone,
5   and  advised  him  that  we  had his son at the 20th
6   Precinct, and we would like him to come in.

7   Q    Did you say why his son  was  at  the  20th
8   Precinct?

9   A    I said his son was involved in an incident
10  in Central Park.  He said he knew about it.  I said,
11  "We had moved the  investigation  from  the  Central
12  Park  Precinct down to the 20th Precinct.  We wanted
13  to take another  statement  from  him,  and  in  all
14  probability, he's probably going to be arrested."

15  Q    Did you say where the 20th Precinct was
16  located?

17  A    Yes, I did.  82nd Street, between Amsterdam
18  and Columbus.

19  Q    Were any directions given?

20  A    Not -- he didn't ask  for  any.   He  knew
21  where 82nd Street was.

22  Q    Did you agree on a time when Mr. Santana
23  was to arrive?

24  A    Yes.  He asked for some time, an  hour,  an
25  hour-and-a-half  or thereabouts.  I said, "That's no

10/24/89

NYCLD_018966

P-APP000793

T8-fr

1681

1    SHEEHAN — PEOPLE — DIRECT — CLEMENTS

2    problem.  It gives us a chance to grab a sandwich.

3    We're going to go eat.  If we're not back in time,"

4    I told him to wait for us.  He had my name.   I

5    spelled it for him.

6         MR. CLEMENTS:   You can resume the

7         witness stand.

8         (Witness complies)

9

10        (TRANSCRIPT CONTINUES)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

10/24/89

NYCLD_018967

P-APP000794

SHEEHAN - PEOPLE - DIRECT - CLEMENTS 1682/1685

1

2      Q      Where was the telephone that you used in

3 relationship to where Raymond Santana was seated?

4      A      The telephone was on either that desk or the desk

5 across from it.  It was in the general vicinity where

6 Raymond was seated.

7      Q      Did Raymond Santana, Junior, ask to speak to his

8 father?

9      A      No, he didn't.

10      Q      Did Mr. Santana, Senior, ask to speak to Raymond?

11      A      No, not at all.

12      Q      After the phone call, what did you do?

13      A      After the phone call, I advised the catching

14 detectives, the detectives from the 20th Squad, they weren't

15 themselves actually involved in this investigation, that

16 there would be other detectives coming into that squad.  In

17 essence, the whole investigation would be moved into that

18 squad.  Maybe they could do a favor and free up a couple

19 desks.

20      After that stuff was taken care of, I advised them

21 we're going to go out and eat.  The three of us went out;

22 myself, Hall and Jonza went out to a delicatessen and we

23 ate.

24      Q      How long did that take?

25      A      About an hour.

NYCLD_018968

P-APP000795

SHEEHAN - PEOPLE - DIRECT - CLEMENTS        1686

Q       Do you know what time you arrived at the 20th Precinct with Raymond Santana?

A       I'd have to -- 6:30 to 7:00; somewhere in that vicinity.

Q       Did there come a time when you returned to the 20th Precinct after eating?

A       Yes.

Q       Where did you go?

A       Returned to the 20th Precinct somewhere in the vicinity of 8:00; maybe a little before, maybe a little after; returned, went to the 20th Detective Squad, reported back.  By this time there was -- there were a lot more detectives there.  The investigation seemed to be in full swing.

Went in and spoke to our immediate supervisor which is again, Sergeant O'Connor; advised him that we had eaten.  We were back, and if there's anything pending, you know, what's next.  We also wanted to be briefed on the investigation.

Q       Did you see Raymond Santana?

A       Yes, I did.

Q       Where was he?

A       He was seated at the same desk that I had asked him to take a seat at earlier.

Q       Did you speak to him?

NYCLD_018969

SHEEHAN - PEOPLE - DIRECT - CLEMENTS        1687

A    Yes, I asked him if his dad had shown up yet.   He said no.   I said, "If you see your father come to the   gate, make sure you yell to him so he knows where you are and   get somebody's   attention.   Reach out for me.   I'll be   in   the briefing in back."

Q    Did you go to a briefing?

A    Yes, I did.

Q    Did there come a time when you left the briefing?

A    Yes.

Q    Under what circumstances?

A    Detective came and got me; said that Mr.   Santana had arrived, and when I exited the briefing into the general squad room, I was advised by Raymond Santana, Junior, the 14 year old, that his father had been there and just left,   but he would be right back.

I   advised   him, "Next time he comes up, make   sure   he stays.   We want to do an interview."

Q    After you spoke to Raymond Santana,   Junior,   did you return the briefing?

A    Yes, I did return to the briefing for another   15 minutes or so; 20 minutes.

Q    Did there come a time when you left the   briefing again?

A    Yes, I met with Mr. Santana.   He had now   arrived

NYCLD_018970

SHEEHAN - PEOPLE - DIRECT - CLEMENTS        1688

back at the station house. I advised him that we wanted to

take another statement from his son; that he had made a

statement already, and that he had implicated -- he wanted

to put additional information into that statement. We

didn't want to do it without his father being present.

Q     After you spoke to Mr. Santana, what did you do?

A     Shortly thereafter, we checked on the availability

of the youth room which is located on the first floor.

Q     Was it available?

A     Not at that particular time. So we had to wait

our turn which was no longer than a half hour or so. I then

escorted Mr. Santana, Senior, his son Raymond; and Detective

Jonza accompanied me from the second floor detective squad

to the first floor to the youth room.

Q     Did you enter the youth room?

A     Yes, I did.

Q     I'd like you -- with the Court's permission -- to

get off the stand and look at what's been received in

evidence as People's 2, the first floor of the 20th

Precinct.

MR. MADDOX: People's what?

MR. CLEMENTS: Two.

Q     Do you recognize People's 2, detective?

A     Yes, I do.

NYCLD_018971

SHEEHAN - PEOPLE - DIRECT - CLEMENTS        1689

1

2      Q      What do you recognize it to be?

3      A      This is a schematic of the first floor of the 20th

4   Precinct.

5      Q      Do you see the room on that diagram that you

6   referred to as the youth room?

7      A      Yes, I do.

8      Q      Would you point it out, please.

9      A      The room is right here (indicating).

10             MR. CLEMENTS:   For the record, indicating the

11             room that's been marked by another witness as room

12             125.

13             THE WITNESS:   That's correct.

14      Q      You mentioned that you entered the youth room with

15   Raymond  Santana  and his  father.  Could you show  us  where

16   everyone sat.

17      A      Sure.   These are desks (indicating).   I  sat  on

18   this  side  of  the desk; Detective Jonza sat  to  my  left;

19   Raymond Santana sat on the side of the desk, and his   father

20   beside him, maybe a foot to the rear (indicating).

21      Q      And where was Detective Jonza?

22      A      Jonza was to my left, my immediate left.

23             MR.  CLEMENTS:   You can have a  seat  again.

24             Thank you.

25             (Whereupon the witness complied.)

NYCLD_018972

P-APP000799

SHEEHAN - PEOPLE - DIRECT - CLEMENTS        1690

Q        Before the interview began, did Raymond Santana have anything to eat?

A        He was eating potato chips.

Q        At what point did you see him eating potato chips?

A        Just before we went down to the interview room.

Q        After you entered the interview room, how did the interview begin?

A        I introduced myself, which I had previously done, to Mr. Santana on the second floor. I introduced my partner, Jonza. Jonza filled out a book which was laying on the desk.

Any time you do an interview in the youth room, there is a book. It is uniform procedure. He filled it out.

I then asked Ray -- well, I read him his rights.

Q        Did you give him his rights from memory, or did you use anything to assist you?

A        I used a Police Department handout, a standard issue card.

Q        Do you have with you the card that you used to read Raymond Santana his Miranda warnings?

A        Yes, I do.

               MR. CLEMENTS: At this time I'd like to have the card which the detective just took from his wallet marked People's 15 for identification.

SHEEHAN - PEOPLE - DIRECT - CLEMENTS       1691

1

2              (Whereupon   People's   15   was   marked   for

3         identification.)

4    Q    Do you recognize People's 15?

5    A    Yes, I do.

6    Q    And how do you recognize it?

7    A    It's the card I read the Miranda warnings from.

8    Q    Have you had that card since April 20, 1989?

9    A    Yes, I have.

10   Q    Is it in substantially the same condition today as

11  it was then?

12   A    Yes, sir.

13              MR. CLEMENTS:  At this time I offer  People's

14         15.

15              MR. RIVERA:  May I see it, your Honor?

16              THE COURT:  Yes.

17         (Handing to Mr. Rivera.)

18              MR. RIVERA:  No objection, your  Honor,  for

19         the hearing.

20              THE COURT:  All right, mark it.

21              (Whereupon People's 15, heretofore marked for

22         identification, was received in evidence.)

23   Q    Would you tell the Court what rights you read  and

24  how Raymond Santana, Junior, responded?

25   A    I  read  the  rights  according  to  the  Miranda

NYCLD_018974

P-APP000801

SHEEHAN - PEOPLE - DIRECT - CLEMENTS        1692

1  warnings printed on the card.  I addressed both Raymond and

2  his father at the same time.  I advised both of them if they

3  didn't understand anything, they could stop me at any time.

4      "Number one; you have the right to remain silent and

5  refuse to answer questions.  Do you understand?"  Raymond,

6  Junior and Raymond, Senior, both acknowledged "Yes."

7      Q    Did they say "Yes," or shake their heads?

8      A    They said, "Yes."

9      "Anything you do say may be used against you in a court

10  of law.  Do you understand?"  Santana Senior and Junior

11  both responded, "Yes."

12      "You have the right to consult an attorney before

13  speaking to the police and to have an attorney present

14  during any questioning now or in the future.  Do you

15  understand?"  Both people, both Santanas answered, "Yes."

16      "Number four; if you cannot afford an attorney, one

17  will be provided for you without cost.  Do you understand?"

18  They both answered, "Yes."

19      "Number five; if you do not have an attorney available,

20  you have the right to remain silent until you have had an

21  opportunity to consult one.  Do you understand?"  They both

22  answered, "Yes."

23      "Number six; now that I have advised you of your

24  rights, are you willing to answer questions?"  They both

NYCLD_018975

P-APP000802

```
 1              SHEEHAN - PEOPLE - DIRECT - CLEMENTS       1693
 2     answered, "Yes."
 3          Q    Did either Raymond Santana or his father have  any
 4     difficulty with the English language?
 5          A    No, sir.
 6          Q    After you read Raymond Santana and his father  the
 7     Miranda warnings, did you begin an interview?
 8          A    Yes, I did.
 9          Q    Would  you  describe  for  the  Court  how  that
10     interview was conducted.
11          A    I asked Raymond Santana, Junior, to describe to me
12     what  happened the night before, April 19th. I gave  him  a
13     point  of reference, you know: "Where did you meet?  What
14     time did you meet? Who were you with? Describe to me in as
15     much  detail as you can what happened. I know you spoke  to
16     John  Hartigan.  You didn't speak to me yet. This  is  the
17     first time I am hearing it. Try not to leave anything  out.
18     Try  not  to be embarrassed. Don't  be  embarrassed  about
19     anything in front of your father."
20          Once that was all agreed to, Santana spoke for about an
21     hour  orally,  I would say, back and forth.  I  asked  some
22     questions.  Then I advised him that I was going  to  reduce
23     this to writing.
24          Q    Did Detective Jonza ask any questions?
25          A    I believe he did.
```

NYCLD_018976

P-APP000803

SHEEHAN - PEOPLE - DIRECT - CLEMENTS        1694

Q    How about Raymond's father?

A    Raymond's father didn't ask any questions, no.

Q    You mentioned that there came a time when a written statement was prepared. Would you describe how that was done.

A    The whole interview began about ten after ten. On the heading of the written statement, I put down who was present in the room. I also put, using the military time that we use in the Police Department, 22:10 hours, which is ten after ten P.M. We didn't begin writing at ten after ten.

As I said, we did an oral, more or less, discussion for about an hour. I then reduced it to writing. It is contained on five lined pages of white paper.

MR. CLEMENTS: At this time I'd like to have this five page document marked People's 16 for identification.

(Whereupon the above referred to five page document was marked collectively as People's 16 for identification.)

Q    Do you recognize People's 16?

A    Yes, I do.

Q    What do you recognize it to be?

A    This is the written statement of Raymond Santana,

SHEEHAN - PEOPLE - DIRECT - CLEMENTS        1695

April 20, 1989, which was given to me, which was written by me in the 20th Precinct youth room.

Q    Is it signed by you as well?

A    Yes, it is.

Q    Is it in substantially the same condition as it was on April 20th?

A    Yes, sir.

MR. CLEMENTS:  At this time I offer People's 16 into evidence.

MR. RIVERA:  May I see it, your Honor.

THE COURT:  Yes.

(Handing to Mr. Rivera.)

MR. RIVERA:  No objection for the purpose of the hearing, your Honor.

THE COURT:  Mark it.

(Whereupon the statement was so marked People's Exhibit 16 in evidence.)

Q    Detective, if you could look at People's 16 in evidence, do any signatures appear on People's 16?

A    Yes, sir.

Q    Where do they appear?

A    Excuse me.  Pages one, two, three and four contain the signatures of myself and Raymond Santana in the margin. Page five, which is the last page of the statement contains

SHEEHAN - PEOPLE - DIRECT - CLEMENTS        1696

the signature of Raymond Santana, my own signature and  skip

one  line below that it's witnessed by, and it contains  the

signature  of  Raymond  Santana  Senior,  the  father,  and

Detective August Jonza.

Q    Could you explain to the Court the procedure  you

used  in  writing  out  the  statement  and how  the  signatures

came to appear on the pages you just mentioned?

A     After  speaking  for roughly  an  hour,  I'm  not

positive if it was an exact hour, approximately an hour.   I

then  began  to reduce it to writing.  On page one,  when  I

finished page one, page one was given to Raymond Santana and

his  father to read, as was every other page.  Each  page  I

asked  Raymond  to  initial or to sign.  He  signed  in  the

margin and I signed it.

Q    Did he sign as each page was created?

A    That's correct.  And at the end of the statement I

read  the entire statement to them.  I then gave it to  them

to  look it over and then I asked them also to sign  at  the

end  of the statement.  Raymond signed it first and  then  I

signed it, his father signed it and Jonza signed it.

Q    Were any corrections made?

A    No, sir, I don't believe.  Just let me check.  Not

to my knowledge, if I recall.  No corrections.

Q    How did the interview end?

NYCLD_018979

P-APP000806

```
 1              SHEEHAN - PEOPLE - DIRECT - CLEMENTS        1697

 2        A     It ended at 12:00 midnight.  We used the  military

 3   time.  I used the military time, 2400 hours.  The   statement

 4   lasted  for about -- between the oral and the   written,   the

 5   total was one hour and 50 minutes.

 6                    MR. BURNS:  Fifty, five-0?

 7                    THE WITNESS:  Five-0, that's correct.

 8                    MR.  CLEMENTS:  With the  Court's  permission

 9              may the witness read the statement?

10                    MR. RIVERA:  Objection.

11                    MR. BURNS:  It speaks for itself.

12                    THE  COURT:   It's  in  evidence.   It's  not

13              necessary.

14        Q     After midnight what did you do?

15        A     When the statement was completed I then asked  Mr.

16   Santana Senior if there was any -- did he have any questions

17   about what was going to happen.  He really didn't have  that

18   many  questions except for how long he would be required  to

19   stay   at   the   precinct.   I  advised  him  that  the   --

20   representatives  from the District Attorney were present  in

21   the  building  and that at some time in the near  future  he

22   would  be required to sit with his son while he was also  --

23   while  he gave an oral statement which would be video  taped

24   for the District Attorney.  He didn't have any objections to

25   that  and  I told him it would be soon, maybe an  hour,  two
```

SHEEHAN - PEOPLE - DIRECT - CLEMENTS        1698

hours tops.

Q        During   the   period   you   were   conducting   the
interview in the youth room at the 20th Precinct did you   or
Detective Jonza make any promises to Raymond Santana?

A        No, sir.

Q        Did   you or Detective Jonza make any   threats   to
Raymond Santana?

A        No, sir, none at all.

Q        Did Raymond Santana stay in the youth room   after
the interview finished?

A        No, sir.  Raymond and his dad were escorted out of
the room, back upstairs to the 20th Squad.  Basically to the
same area, the same desk, same seats and were asked to   take
a   seat until we found out when the District Attorney   would
be ready for them.

Q        Did   there   come a time that you   left   the   20th
Precinct and went somewhere else?

A        Yes, sir.  About 2:00 in the morning.

Q        Where did you go?

A        Myself and Jonza escorted Mr. Santana Senior   and
his son Raymond from the 20th Precinct, by unmarked car,   we
went   from   82nd   Street   up to 100th   Street   to   the   24th
Precinct.

Q        Why   was the investigation moved   from   the   20th

NYCLD_018981

P-APP000808

SHEEHAN - PEOPLE - DIRECT - CLEMENTS      1699

Precinct to the 24th Precinct?

A     Sometime after we finished this written  statement
there was some discussion among a variety of the supervisors
at the 20th Precinct, uniform and detectives, as to  whether
or  not the room we just finished our statement in  was  the
actual designated youth room.  To continue the investigation
there was -- there was definitely some question as to  which
was  the  correct  room.  We decided to  move  to  the  24th
Precinct  which  had a designated youth room  that  everyone
agreed upon and that's where we're going to video tape.

Q     Before this investigation began did you have  any
experience concerning the youth room at the 20th Precinct?

A     Yes, sir.  I had been assigned to Manhattan  North
for  21  years.  I'd been in and out of  the  20th  Precinct
numerous  times.   That's always been the youth room  in  my
experience.

               MR.  JOSEPH:  Objection, your Honor.

               THE COURT:  I'll allow it.

Q     The room you're speaking of is that 125, the  one
you indicated earlier?

A     That's correct.  It's the Youth  Officer's  room.
It's always been.

Q     When you went to the 24th Precinct  with  Raymond
Santana and his father and Detective Jonza where did you  go

SHEEHAN - PEOPLE - DIRECT - CLEMENTS        1700

1  in the precinct?

2       A      Upon  arriving  at  the  24th  Precinct,  which  is

3  located  at  151  West  100th  Street  between  Columbus  and

4  Amsterdam  we  went  in  passed  the  uniform  desk  and  the

5  designated  youth  room  in  the  24th  is  on  the  first  floor.

6  It's  actually  a  part  of  the  muster  room.

7                  MR. CLEMENTS:  At  this  time,  with  the  Court's

8                  permission,  I'd  like  the  witness  to  get  off  the

9                  stand  and  look  at  People's  5  in  evidence.

10                 (Whereupon the witness approached People's  5

11                 in evidence.)

12      Q      Do  you  recognize  People's  5,  detective?

13      A      Yes,  I  do.

14      Q      What  do  you  recognize  it  to  be?

15      A      It's  a  schematic  of  the  24th  Precinct  first  floor.

16      Q      When  you  entered  the  24th  Precinct  with  Raymond

17  Santana  and  his  father  where  did  you  go?

18      A      This  is  the  main  uniform  desk.  This  is  the  entry.

19  This  is  100th  Street.  We  entered.  The  desk  is  here.  There

20  are  some  closing  folding  doors  which  were  open  in  the  open

21  position.  This  is  the  muster  room.

22                 MR. CLEMENTS:  The  record  should  reflect  the

23                 witness  is  indicating  the  large  room  on  the  right-

24                 hand  side  of  the  exhibit,  about  the  middle.

NYCLD_018983

P-APP000810

SHEEHAN - PEOPLE - DIRECT - CLEMENTS        1701

THE WITNESS:  Now straight back here -- this is a partitioned group of offices.

Q    When you say "partitioned" do the walls go up to the ceiling?

A    No, they don't.  This area back here is designated as the youth room.

MR. CLEMENTS:  The record should reflect that the officer is pointing to a room previously marked by another witness as  room 101.

Q    Where did Raymond Santana and his father go as you entered the precinct?

A    Along the back wall here, which would be the  east wall  of the 24th Precinct.  Along the back wall is a  water fountain here, a soda machine and there is a lot of  folding metal chairs, metal desks, this is the room where roll  call is  held  so there are a lot of scattered desks.  They  sat against  the  wall  basically  waited  until  the  room  was available to do the video tape.

Q    Did there come a time when Raymond Santana made an oral statement that was recorded on video tape?

A    Yes.

Q    And where was that statement taken?

A    About 2:30 in the morning the -- now the 21st  of April, the video tape statement was taken in this room by  a

SHEEHAN - PEOPLE - DIRECT - CLEMENTS          1702

1   

2  video tape technician from the District Attorney's office.

3  Present in the room seated at this desk on this side was

4  Raymond Santana. Seated next to him was his father. Seated

5  about here was myself. Next to me was Detective Bertaroyo

6  (phon) who was the case officer from Central Park, who was

7  in charge of the investigation. The Assistant District

8  Attorney, Elizabeth Lederer, sat here and the video tape

9  technician was back here and this is where the camera was

10  set up.

11          MR. CLEMENTS:  Indicating the north east

12          corner of the room.

13          THE WITNESS:  That is correct, the north east

14          corner of the room.

15          MR. CLEMENTS:  You can resume the stand

16          again, detective.

17          (Whereupon Detective Sheehan resumed the

18          witness stand.)

19          MR. CLEMENTS:  At this time I'd like to have

20          this video tape marked People's 17 for

21          identification.

22          (Whereupon the video tape was so marked

23          People's Exhibit 17 for identification.)

24  Q     Detective, do you recognize People's 17?

25  A     Yes, I do.

SHEEHAN - PEOPLE - DIRECT - CLEMENTS        1703

Q    How do you recognize it?

A    This is -- it's a Sony Beta tape of Mr. Santana's statement. I viewed it earlier today and indicated with today's date 10/25/89 and with my initials in the lower right-hand corner.

Q    Were you present in room 101 in the 24th Precinct when the video tape statement was taken from Raymond Santana?

A    Yes.

Q    When did that video end, approximately?

A    It began at 2:30 and ended a little after 3:00 A.M. on the 21st.

Q    Was any other video tape done with Raymond Santana?

A    Yes. Several minutes later, I'm not sure of exactly how many, but -- I'd have to guess at about 15 minutes or so another video was done of Raymond Santana. Raymond was asked to stand in the same room and the video tape was taken of his clothing, which he described as being the same clothes he had on during the assault.

Q    And does that second video, the video of his clothing, Raymond Santana's clothing also appear on People's 17 for identification?

A    Yes, it does.

SHEEHAN - PEOPLE - DIRECT - CLEMENTS          1704

    MR. CLEMENTS:  At this time I offer  People's 17 into evidence.

    MR. BERMAN:   I would inquire  as  to  which defendant this is being offered against?

    THE COURT:  We have been through that.

    MR. BERMAN:  You can rule however you want to rule.

    THE  COURT:  I'm going to rule the same  way. You have no standing to contest this no matter who it's offered against.

    MR.  MOORE:  There's insufficient  foundation as to the officer establishing --

    THE COURT:  You have no standing to  contest. It is being offered for -- as  a  statement  of Santana.  The attorney has not objected.

    MR. RIVERA:  I do not object for purposes of the hearing.

    THE COURT:  And it will be marked.

    (Whereupon  the  video  tape  was  so  marked People's Exhibit 17 in evidence.)

    MR. CLEMENTS:  At this time with the  Court's permission may we play the video tape?

    THE COURT:  Yes.

    MR. BERMAN:  Judge, I would just ask for  the

NYCLD_018987

P-APP000814

SHEEHAN - PEOPLE - DIRECT - CLEMENTS      1705

same instruction that the Court made or comment

the Court made before the McCray tape that in

terms of ultimately a trial this is only against

the person who made the statement.

THE COURT: This video is being offered at a

hearing. What happens at trial is something else

again. Any defendant's statement at trial is a

statement offered against him. At hearings this

is something different.

MR. CLEMENTS: May I start?

THE COURT: Yes.

(Whereupon the video tape, People's Exhibit

17 in evidence, was played in open Court.)

Q      Detective, following the video statement, did

there come a time when you left the precinct?

A      Yes, sir.

Q      When was that?

A      At approximately 3:45.

Q      Did anyone accompany you?

A      Yes.

Q      Who was that?

A      Detective August Jonza, myself, Mr. Santana,

Senior, and Raymond Santana.

Q      Where did you go?

SHEEHAN - PEOPLE - DIRECT - CLEMENTS       1706

A       Our original destination was the Santana residence on East 119th Street which is across the street from the 25th Precinct.

Q       Did you go to that location?

A       On our way, we stopped by the crime scene.

Q       Where was that?

A       Crime scene is actually a multiple crime scene. We went by 102nd Street and the Cross Drive which connects the East Drive of Central Park with the West Drive of Central Park.

Q       Where did you go on 102nd Street Cross Drive?

A       Approximately midway between the East and West Drive.

Q       Was anything said by anyone in the car?

A       Yes, sir. I asked Raymond Santana if we could all exit the car including his father; if he would -- if he could possibly remember and try to show us some of the pertinent sites; in particular, where the woman was grabbed and where the rape took place.

Q       Did Raymond Santana, Junior, say anything or point anywhere?

A       He pointed in the general area, an area north, north of this cross drive which is heavily wooded; and about 30, 40 feet in it, it begins to slope down into a ravine.

SHEEHAN - PEOPLE - DIRECT - CLEMENTS       1707

We walked into the woods, maybe 20, 30 feet. He said it was really -- it was too dark for him to really point out anything of any significance.

Q    Was Raymond Santana, Junior, cuffed or uncuffed?

A    He was uncuffed.

Q    Did there come a time when you left 102nd Street Cross Drive?

A    Yes, sir. I would say no more than 20 minutes later. It's a little after 4:00 in the morning.

Q    Where did you go?

A    We left the 102nd Street Cross Drive and continued to our original destination.

Q    For what purpose did you go to

A    We advised both Mr. Santana and his father that we were going to voucher his clothing, young Santana's; voucher his clothing, and that now is a good opportunity for his father to go into their residence and get him fresh clothes. He did so.

He was in the residence, I don't know, 15 minutes or so. There was some discussion between Mr. Santana and his father as to particular sneakers or a particular pair of pants that he wanted to wear and what location they were in the apartment. His father went in on his own, came out with the clothing, and he also brought a bag of food.

NYCLD_018990

P-APP000817

SHEEHAN - PEOPLE - DIRECT - CLEMENTS      1708

I don't recall exactly what it was. There was also something to drink. There was a container of juice or soda.

Once we got the clothing and the food, Mr. Santana said good-bye to his son, went into the apartment house, and myself and Jonza and young Raymond Santana returned to the 24th Precinct.

At the 24th Precinct, I asked him to accompany me into the men's room on the ground floor. I had a brown paper bag I got from behind the desk of the precinct. And I asked him to remove all of his clothing which he was wearing. He handed it to me item by item. I put it into the bag as much as I could fit. I don't think I could fit his jacket as I recall. He was then given the clothing that his father had provided. He put that clothing on.

He was then escorted from the bathroom up to the second floor which is the 24th detective squad; walked into the squad. There is a little waiting area. Beyond that, there is a half door which is a common place in most detective squads; passed that to the gate. Off to the left there is a desk and some chairs, and he was seated at that desk.

MR. CLEMENTS: With the Court' permission, I'd like you to get off the stand, and if you would, look at People's 5 in evidence.

(Whereupon the witness complied.)

SHEEHAN - PEOPLE - DIRECT - CLEMENTS       1709

1

2    Q     Would you show the Court where you went with

3    Raymond Santana and where his clothing was removed.

4    A     All right.  This is the first floor of the 24th

5    Precinct (indicating).  Again, this is the muster room

6    (indicating).  This is the entrance (indicating).  There is

7    a men's room right here (indicating).  Myself and Santana

8    went into the men's room, and this is where he changed out

9    of his clothing.

10    Q     Now, if you would look at People's 6 in evidence,

11    the second floor of the 24th Precinct.  Do you recognize

12    People's 6?

13    A     Yes, I do; just want to get my bearings for a

14    second.

15    Q     All right.  I'm sorry.  Do you recognize People's

16    6?

17    A     Yes, I do.

18    Q     How did you bring Raymond Santana upstairs?

19    A     Up the staircase which -- when you enter the 24th

20    Precinct there's a staircase -- if you make two hard lefts

21    there's a staircase right there in the front of the

22    building.  Right up those stairs to the second floor along

23    this hallway.  The main entrance to the 24th squad is here.

24    This is a small waiting room.  The half gate is here.  Went

25    through the half gate, around these two desks and he was

P-APP000819

SHEEHAN - PEOPLE - DIRECT - CLEMENTS        1710

seated here.

       MR. CLEMENTS:  The record should reflect that the witness is pointing to the two desks just inside the swinging gate on the western end of the detective squad.

Q    Is that the detective squad that you pointed to, that large room?

A    Yes, sir, this room here, this large room here is the detective squad.  It's broken into smaller rooms for interview purposes.

       MR. CLEMENTS:  Thank you.  You can resume your seat.

       (Whereupon the witness, Detective Sheehan, resumed the witness stand.)

Q    What did you do with the clothing that you recovered from Raymond Santana?

A    I took that clothing down to the 20th Precinct, after Mr. Santana was seated at the desk.  I drove it down to the 20th Precinct with Jonza and went to the second floor, the two-0 squad room and handed those clothes to Detective Gonzalez from Central Park.

Q    After doing that did you return to the 24th Precinct?

A    Yes, sir.

NYCLD_018993

P-APP000820

```
 1              SHEEHAN - PEOPLE - DIRECT - CLEMENTS      1711

 2      Q    I'd like to direct your attention -- withdrawn.

 3      Did you ever frisk or search Raymond Santana?

 4      A    No, sir.

 5      Q    I'd like to direct your attention to approximately

 6      7:00 in the morning on the 21st at the 24th Precinct.   What

 7      were you doing at that time and location?

 8      A    A few minutes before 7:00 there was a conversation

 9      among detectives.   I was present.  Jonza was  present   and

10      Assistant District Attorney Linda Fairstein was present.   It

11      was a discussion as to the feasibility of visiting the crime

12      scene  during  the  daylight hours.  It  was  just  becoming

13      daylight, about 7:00.

14              MR. BURNS:  I'm sorry, is this the 21st?

15              THE WITNESS:  It's all on the 21st.

16      Q    Was a decision made concerning visiting the  crime

17      scene?

18      A    Yes, sir.

19      Q    And  what was done in connection with  the  crime

20      scene?

21      A    Decision was made to go back to the  crime  scene

22      and  to  take with us two other defendants  who  were  being

23      charged in this case.

24      Q    Who's that?

25      A    Kevin Richardson and Kharey Wise.
```

NYCLD_018994

P-APP000821

T7-1f

1                          COLLOQUY                    1668

2              Michael Sheehan.

3    D E T.    M I C H A E L    S H E E H A N, Shield 421,

4    Manhattan North Homicide, New York City Police

5    Department, having been called as a witness by

6    the People, having been first duly sworn,

7    testified under oath as follows:

8              COURT OFFICER: Would you give us your

9    name, spell your last name, your shield

10   number and present assignment.

11             THE WITNESS:      Detective Michael

12   Sheehan, S-H-E-E-H-A-N; Shield 421, NYPD,

13   Manhattan North Homicide Squad.

14   DIRECT EXAMINATION

15   BY MR. CLEMENTS:

16       Q        Detective, I'd like to direct your

17   attention to April 20, 1989. Did you work on that

18   day?

19       A    Yes, sir, I did.

20       Q    And what shift did you work?

21       A    Four in the afternoon to 1:00 in the

22   morning.

23       Q    Did you receive an assignment shortly after

24   you arrived for work?

25       A    Yes, I did.

10/24/89

NYCLD_018954

P-APP000822

T7-1f

1669

SHEEHAN - PEOPLE - DIRECT - CLEMENTS

1    Q    And what was that assignment?

2    A    I left the Manhattan North office about ten

3    after one, and responded to Central Park Squad.

4    Q    Did you arrive at Central Park?

5    A    Yes, I did.

6    Q    WHen you got there, did you receive another

7    assignment?

8    A    Yes, sir, I went to Central Park to aid in

9    the investigation of an assault on a victim that was

10   likely to die.   Upon   reaching   the   Central   Park

11   Squad,   I   was   surprised of a couple of facts by my

12   immediate supervisor, Sergeant O'Connor.

13           I was then asked to accompany the uniformed

14   force on a search.   The search   was   for   a   weapon,

15   namely, a length of pipe.

16                MR. BURNS:   A what?

17                THE WITNESS:   A length of pipe.

18   Q    Where did that search take place?

19   A    The search took place in the vicinity of

20   West 97th Street and   Central   Park   West;   actually

21   inside the park walls.

22   Q    Did   you   recover   a pipe or was a pipe

23   recovered in your presence?

24   A    No, sir.

10/24/89

NYCLD_018955

P-APP000823

T7—1f

1670

1        SHEEHAN — PEOPLE — DIRECT — CLEMENTS

2        Q       At the conclusion of that search, what   did

3     you do?

4        A              At   the   conclusion   of   the   search, I

5     responded back to the Central Park Squad and   had   a

6     conversation   with,   again,   Sergeant   O'Connor   and

7     Detective John Hartigan.

8        Q       What time did you   return   to   the   Central

9     Park Squad?

10       A          I   returned   to   the Central Park Squad

11    somewhere in the vicinity of 5:30 p.m.

12                MR. BURNS:   I'm sorry, 5:30 p.m.?

13                THE WITNESS:   That's correct.

14                THE COURT:   What time was it that   you

15          said you went in search of the weapon?

16                THE WITNESS:   Shortly after 4:00, your

17          Honor.   Let's say 4:30.

18                THE COURT:   Okay.

19                MR. BURNS:  Again p.m.?

20                THE WITNESS:   p.m.

21       Q       When did you speak to John Hartigan?

22       A          I spoke with John Hartigan in the Central

23    Park Precinct, there is a separate   building   across

24    the   alleyway   from   the   main   building.   It is the

25    auxilary police building.   It also houses the   Youth

10/24/69

NYCLD_018956

P-APP000824

T7—1f

1671

1        SHEEHAN — PEOPLE — DIRECT — CLEMENTS

2  Room.     It was in that building, in the Youth Room,

3  that I spoke with John Hartigan.

4        Q     And would you relate the nature of the

5  conversation?

6        A          Sure.    Hartigan advised me that he had

7  taken a statement from –– Raymond Santana, who was

8  seated at a desk in that room.  He had also advised

9  me. that Santana wished to add certain things to the

10 statement, and that it was impossible for him to

11 continue, because there was no parents or guardian

12 present for Santana.

13        Also, during this I was advised by

14 O'Connor, Sergeant O'Connor that the entire

15 investigation was going to be moved out of the

16 Central Park Precinct to the west side of West 82nd

17 STreet into the 20th Precinct which was probably a

18 better facility to handle an investigation of this

19 size.

20        Q     You were at the Central Park Precinct,

21 would you describe the conditions around the

22 precinct at that time?

23        A     Well, Central Park Precinct is an old

24 stationhouse.  There is not a lot of room.  There is

25 not a lot of individual rooms to do interviews.

10/24/89

NYCLD_018957

P-APP000825

T7-1f

1672

1      SHEEHAN - PEOPLE - DIRECT - CLEMENTS

2   Also, in this case, there's only a small youth room.

3   It's also a bad place to conduct a confidential

4   investigation, especially in a matter of this nature

5   with the press.

6           The press had arrived. There were quite a

7   few people arriving from the media. And they began

8   to gather.   There's actually an alleyway that

9   divides the two main parts of the stationhouse.

10  It's unlike any other in the City.

11       Q    After speaking to Sergeant O'Connor and to

12  Detective Hartigan, did you receive another

13  assignment in connection with this case?

14       A    Yes, I did.

15       Q    And what was that?

16       A    The assignment was to take Raymond Santana

17  in our car.  I was with Detective Jonza, J-O-N-Z-A,

18  and Rudy Hall, H-A-L-L, both from the Manhattan

19  North Homicide Squad.  We were to take Santana from

20  the Central Park Stationhouse to the 20th, notify

21  his father, try to make some arrangements to get his

22  father down to the 20th Precinct, and then take an

23  updated, more complete statement.

24       Q    Did there come a time when you left the

25  Central Park Precinct?

10/24/89

T8-fr

1673

1    SHEEHAN — PEOPLE — DIRECT — CLEMENTS

2    A    Yes.  I'd have to say it's around 6:00.

3    Precisely I'm not positive, but it's around six

4    o'clock.  I left the Central Park Precinct in the

5    company of Jonza, Hall, and Raymond Santana, a

6    fourteen year old youth.

7    Q    Who was driving?

8    A    I was.

9    Q    Was Raymond Santana cuffed or uncuffed?

10   A    He was uncuffed.

11   Q    Where did he sit in the car?

12   A    In the back seat.

13   Q    Did any conversation take place in the car?

14   A    There was conversation among the three of

15   us, the three detectives about -- you have to

16   understand we didn't have all the facts of this

17   case.  We had just come to work at four o'clock and

18   we realized that we hadn't done a complete search on

19   the exterior of the wall at 97th Street and Central

20   Park West for that pipe and it was during the

21   conversation I advised Santana we were going to take

22   a detour on the way to the stationhouse.

23          "I just want to look at something at 97th

24   Street and Central Park West."

25          On the way to 97th and Central Park West,

10/24/89

NYCLD_018959

P-APP000827

T8-fr

1677

1     SHEEHAN — PEOPLE — DIRECT — CLEMENTS

2   Telephone Company, or whatever, but there was a hole

3   in the street protected by barriers.  I went to that

4   hole, jumped in myself, and examined it.  It was

5   only about two feet deep.  There was no pipe.

6        Q     After you looked for the pipe at 100th

7   Street and Central Park West, where did you go next?

8        A     We all got back in the car, that is to say

9   myself, Rudy Hall, Augie Jonza, and Raymond Santana.

10  We drove from 100th Street and Columbus Avenue south

11  to the 20th Precinct, which is located at 82nd

12  Street, West 82nd Street between Columbus and

13  Amsterdam.

14       Q     Was anything else said in the car?

15       A     On the way from that site to the 20th

16  Precinct, Mr. Santana said, "I had nothing to do

17  with the rape.  All I did is feel the woman's tits.

18  I had nothing to do with the rape."

19       Q     Did you ask him any questions in the car?

20       A     No, I didn't.

21       Q     Was there any conversation in the car?

22       A     No, there wasn't.

23       Q     When you arrived at the 20th Precinct,

24  where did you go?

25       A     Upon arrival at the 20th Precinct, went to

10/24/89

NYCLD_018963

P-APP000828

T8-fr

1678

SHEEHAN — PEOPLE — DIRECT — CLEMENTS

1  the  second  floor,  the  20th  Detective Squad.  We

2  entered.  As you walk into the squad,  to  the  left

3  there's  a desk by a window which would be —— if you

4  were looking at it in the scheme, it's the west wall

5  of the 20th squad.

6  MR.  CLEMENTS:  With  the  Court's

7  permission, I would like the witness to get

8  off  the  stand  and  look  at  what's been

9  received as People's 3 in evidence.

10  (Witness  approaches  People's  3  in

11  evidence.)

12  Q  Do you recognize People's 3, Detective?

13  A  Let me get my bearings, yes, I do.

14  Q  And what do you recognize it to be?

15  A  This is a schematic drawing of the second

16  floor of the 20th Precinct.  These offices here  are

17  the 20th Detective Squad.

18  MR.  CLEMENTS:  Indicating,  for the

19  record, the offices on the  lower  half  of

20  People's 3 in evidence.

21  Q  How did you get to the second floor with

22  Raymond Santana?

23  A  Came in the main entrance of the  precinct,

24  which  would  be  here,  and  up  the  staircase

10/24/89

Page 310

| | | | |
|---|---|---|---|
| 1 | Q. | Where did you park? | 09:59:06 |
| 2 | A. | In the parking lot. | 09:59:08 |
| 3 | Q. | When you arrived there, were | 09:59:09 |
| 4 | there many -- were there people outside of | 09:59:12 |
| 5 | the Central Park Precinct, civilians? | 09:59:15 |
| 6 | A. | I don't recall that, sir. | 09:59:17 |
| 7 | Q. | Was there much activity outside | 09:59:19 |
| 8 | of the precinct? | 09:59:21 |
| 9 | A. | I don't recall that. | 09:59:22 |
| 10 | Q. | Okay.  So you went into the | 09:59:23 |
| 11 | Central Park Precinct, and then what | 09:59:27 |
| 12 | happened? | 09:59:29 |
| 13 | A. | Inside the Central Park | 09:59:29 |
| 14 | Precinct, it was crowded.  It's a very | 09:59:32 |
| 15 | small place in 1989.  The detective squad | 09:59:38 |
| 16 | room is kind of very confined, so there | 09:59:48 |
| 17 | was like a spillover, so to speak, of | 09:59:50 |
| 18 | detectives out into the space in front of | 09:59:54 |
| 19 | the desk, which is the precinct desk. | 09:59:59 |
| 20 | There were a lot of, you know, guys there. | 10:00:02 |
| 21 | Q. | Was that unusual -- had you | 10:00:05 |
| 22 | reported in the Central Park Precinct | 10:00:08 |
| 23 | before during your career? | 10:00:10 |
| 24 | A. | Yes, sir. | 10:00:11 |
| 25 | Q. | Was this an unusual number of | 10:00:11 |

NYCLD_044001

P-APP000830

Page 311

1    detectives to be there at one time?          10:00:14

2             MS. DAITZ:   Objection.             10:00:17

3        A.    Yes, sir.                          10:00:18

4        Q.    And when you arrived, did you --   10:00:18

5    who did you report to?                       10:00:24

6        A.    My sergeant, Sergeant T. J.        10:00:26

7    O'Connor.                                    10:00:33

8        Q.    And when you saw the large         10:00:33

9    number of members of service there, did      10:00:41

10   you ask somebody what's happening?           10:00:43

11       A.    Yes, I believe I did.              10:00:45

12       Q.    And what were you told?            10:00:46

13       A.    I was told there was an            10:00:48

14   investigation into a group of youths who     10:00:50

15   had run through the park and assaulted       10:00:55

16   several people.  One of the victims, a       10:01:02

17   female, was in critical condition and       10:01:08

18   likely to die.                               10:01:11

19       Q.    And was there a description of     10:01:13

20   the group?  When the people said a group    10:01:17

21   of youths, was there any description of      10:01:19

22   the group of youths?                         10:01:21

23       A.    I don't recall the description     10:01:22

24   now, sir.                                    10:01:24

25       Q.    No one said black kids, Hispanic   10:01:25

NYCLD_044002

P-APP000831