Page 419

| | | |
|---|---|---|
| 1 | his statement. | 12:45:23 |
| 2 | Q. Why did you feel it necessary to | 12:45:29 |
| 3 | go to the scene of the, alleged scene of | 12:45:31 |
| 4 | the attack on the jogger after Raymond | 12:45:35 |
| 5 | Santana had already made his statement? | 12:45:38 |
| 6 | MS. DAITZ: Objection to form. | 12:45:40 |
| 7 | A. I asked Raymond and his father | 12:45:45 |
| 8 | if they could point, if Raymond could | 12:45:50 |
| 9 | point out -- if he could recall where the, | 12:45:53 |
| 10 | where the initial attack on the jogger | 12:46:00 |
| 11 | took place. | 12:46:03 |
| 12 | Q. You asked him that when, as you | 12:46:07 |
| 13 | drove through the park or before you got | 12:46:09 |
| 14 | into the park? | 12:46:12 |
| 15 | MS. DAITZ: Objection to form. | 12:46:13 |
| 16 | A. I'm not sure whether I asked him | 12:46:13 |
| 17 | that before we got in the car or whether I | 12:46:16 |
| 18 | mentioned it in the car, but certainly I | 12:46:20 |
| 19 | had that conversation. | 12:46:22 |
| 20 | Q. And what did Raymond say to you? | 12:46:23 |
| 21 | A. As we drove along the West 102nd | 12:46:31 |
| 22 | Street Drive, there were police officers | 12:46:39 |
| 23 | on the drive. | 12:46:43 |
| 24 | To the best of my recollection, | 12:46:51 |
| 25 | there were some lights set up. Raymond | 12:46:53 |

NYCLD_044110

P-APP000939

Page 420

| | | |
|---|---|---|
| 1 | told me to stop the car at a certain | 12:46:58 |
| 2 | point.  He said it happened here. | 12:47:02 |
| 3 | Q.    And so then you got out.  Did | 12:47:14 |
| 4 | you get out when he said it happened here? | 12:47:16 |
| 5 | A.    I stopped the car. | 12:47:19 |
| 6 | Q.    I'm sorry, you said you saw a | 12:47:20 |
| 7 | police car, you drove and you saw a police | 12:47:22 |
| 8 | car and you drove past it? | 12:47:25 |
| 9 | A.    I did not, I didn't say that.  I | 12:47:27 |
| 10 | said I saw police officers on that -- | 12:47:28 |
| 11 | Q.    On the drive. | 12:47:30 |
| 12 | A.    It could have been police -- | 12:47:31 |
| 13 | Q.    On the Cross Drive? | 12:47:35 |
| 14 | A.    Yes, sir.  It could have been | 12:47:36 |
| 15 | police vehicles as well, but I | 12:47:38 |
| 16 | specifically don't recall. | 12:47:40 |
| 17 | Q.    Were there any lights? | 12:47:40 |
| 18 | A.    As I testified, there were | 12:47:42 |
| 19 | lights. | 12:47:43 |
| 20 | Q.    And then Raymond said stop here? | 12:47:43 |
| 21 | A.    Yes, sir. | 12:47:47 |
| 22 | Q.    And then what did he say or then | 12:47:48 |
| 23 | what happened? | 12:47:54 |
| 24 | A.    Jonza, myself, Santana, Jr. and | 12:47:56 |
| 25 | Raymond, Sr. all got out of the car. | 12:48:02 |

NYCLD_044111

P-APP000940

Page 421

| | | |
|---|---|---|
| 1 | Q.     And? | 12:48:05 |
| 2 | A.     Following Raymond's lead, we | 12:48:06 |
| 3 | walked to the, what would be the northern | 12:48:13 |
| 4 | edge of the path that cuts from the East | 12:48:16 |
| 5 | Drive to the West Drive and vice versa. | 12:48:23 |
| 6 | Q.     And then what happened? | 12:48:25 |
| 7 | A.     Raymond said it happened here, | 12:48:27 |
| 8 | or words to that effect. | 12:48:34 |
| 9 | Q.     And then you got back in the | 12:48:35 |
| 10 | car? | 12:48:41 |
| 11 | A.     We got back in the car. | 12:48:41 |
| 12 | Q.     I'm saying, that was a question, | 12:48:43 |
| 13 | did you get back in the car, did you walk | 12:48:45 |
| 14 | anyplace else? | 12:48:48 |
| 15 | A.     To the best of my recollection, | 12:48:49 |
| 16 | I think we walked a little off the path | 12:48:51 |
| 17 | onto the grass.  But as I sit here today, | 12:48:56 |
| 18 | all these years later, I don't remember | 12:49:01 |
| 19 | that as clearly as I did back then. | 12:49:07 |
| 20 | Q.     When you say you walked into the | 12:49:10 |
| 21 | grass, the grass at the scene where the | 12:49:12 |
| 22 | attack occurred? | 12:49:16 |
| 23 | A.     According to Raymond. | 12:49:18 |
| 24 | MS. DAITZ:   Objection. | 12:49:19 |
| 25 | Q.     According to Raymond. | 12:49:20 |

NYCLD_044112

P-APP000941

Page 422

| | | |
|---|---|---|
| 1 | Subsequent to that, did you find out where | 12:49:22 |
| 2 | the scene, where the actual crime scene | 12:49:25 |
| 3 | was -- | 12:49:27 |
| 4 | MS. DAITZ: Objection. | 12:49:28 |
| 5 | Q. -- involving Ms. Meili? | 12:49:28 |
| 6 | MS. DAITZ: Objection to form. | 12:49:31 |
| 7 | A. Subsequent to? | 12:49:32 |
| 8 | Q. Subsequent to that. That was | 12:49:35 |
| 9 | your first trip to the crime scene, | 12:49:37 |
| 10 | correct? | 12:49:38 |
| 11 | A. Yes, yes, sir. | 12:49:39 |
| 12 | Q. You made other trips to the | 12:49:40 |
| 13 | crime scene after that? | 12:49:43 |
| 14 | A. Yes, sir. | 12:49:43 |
| 15 | Q. And at some point you | 12:49:44 |
| 16 | established where it actually, where the | 12:49:45 |
| 17 | attack on Ms. Meili actually occurred, | 12:49:47 |
| 18 | correct? | 12:49:51 |
| 19 | MS. DAITZ: Objection. | 12:49:51 |
| 20 | Q. At some point during the | 12:49:52 |
| 21 | investigation? | 12:49:54 |
| 22 | A. At some point during the | 12:49:55 |
| 23 | investigation, there were actually two | 12:49:56 |
| 24 | crime scenes. | 12:49:59 |
| 25 | Q. And the location where you said | 12:50:00 |

NYCLD_044113

P-APP000942

Page 423

| | | |
|---|---|---|
| 1 | Raymond told you to stop, was that the | 12:50:08 |
| 2 | first crime scene or the second crime | 12:50:10 |
| 3 | scene? | 12:50:13 |
| 4 | A.    That was, what was later on to | 12:50:13 |
| 5 | be determined, the first crime scene, yes. | 12:50:17 |
| 6 | Q.    And the first crime scene is | 12:50:20 |
| 7 | where Ms. Meili was first attacked? | 12:50:23 |
| 8 | A.    That would be correct. | 12:50:26 |
| 9 | Q.    And Raymond told you to stop the | 12:50:28 |
| 10 | car close to that scene? | 12:50:33 |
| 11 | A.    Yes, sir, it was an | 12:50:35 |
| 12 | approximation. | 12:50:39 |
| 13 | Q.    And he was the one who told you | 12:50:39 |
| 14 | where to stop? | 12:50:48 |
| 15 | A.    Yes, sir. | 12:50:49 |
| 16 | Q.    Do you remember the, looking at | 12:50:49 |
| 17 | Sheehan 34, your testimony at the | 12:51:15 |
| 18 | suppression hearing, do you remember being | 12:51:17 |
| 19 | asked these questions, I'm going to refer | 12:51:22 |
| 20 | you to the page, page 1706, through line 4 | 12:51:24 |
| 21 | on page 1707, and let me know when you're | 12:52:08 |
| 22 | finished. | 12:52:27 |
| 23 | A.    Okay. | 12:52:45 |
| 24 | Q.    Do you remember being asked | 12:52:46 |
| 25 | those questions starting on 1706, well, | 12:52:48 |

NYCLD_044114

P-APP000943

Page 424

| | | |
|---|---|---|
| 1 | actually, the question is on 170 -- I | 12:52:53 |
| 2 | don't have that page. | 12:52:58 |
| 3 | The answer is:  "Our original | 12:52:58 |
| 4 | destination was the Santana residence on | 12:53:01 |
| 5 | ███████████████ which is across the | 12:53:03 |
| 6 | street from the 25th Precinct. | 12:53:06 |
| 7 | "QUESTION:  Did you go to that | 12:53:07 |
| 8 | location? | 12:53:08 |
| 9 | "ANSWER:  On our way we stopped | 12:53:09 |
| 10 | by the crime scene. | 12:53:12 |
| 11 | "QUESTION:  Where was that? | 12:53:14 |
| 12 | "ANSWER:  The crime scene is | 12:53:15 |
| 13 | actually a multiple crime scene.  We went | 12:53:18 |
| 14 | to 102nd Street and the Cross Drive which | 12:53:21 |
| 15 | connects the East Drive on Central Park | 12:53:24 |
| 16 | with the West Drive of Central Park. | 12:53:27 |
| 17 | "QUESTION:  Where did you go on | 12:53:29 |
| 18 | 102nd Street Cross Drive? | 12:53:31 |
| 19 | "ANSWER:  Approximately midway | 12:53:32 |
| 20 | between the East and West Drive. | 12:53:34 |
| 21 | "QUESTION:  Was anything said by | 12:53:37 |
| 22 | anyone in the car? | 12:53:38 |
| 23 | "ANSWER:  Yes, sir, I asked | 12:53:39 |
| 24 | Raymond Santana if we could all exit the | 12:53:42 |
| 25 | car, including his father, if he would, if | 12:53:45 |

NYCLD_044115

P-APP000944

Page 425

| | | |
|---|---|---|
| 1 | he could possibly remember and try to show | 12:53:48 |
| 2 | us some of the pertinent sites, in | 12:53:51 |
| 3 | particular, where the woman was grabbed | 12:53:54 |
| 4 | and where the rape took place. | 12:53:55 |
| 5 | "QUESTION:  Did Raymond Santana, | 12:53:57 |
| 6 | Jr. say anything or point anywhere? | 12:54:00 |
| 7 | "ANSWER:  He pointed in the | 12:54:01 |
| 8 | general area, an area north, north of this | 12:54:04 |
| 9 | Cross Drive which is heavily wooded and | 12:54:07 |
| 10 | about 30 to 40 feet in.  It begins to | 12:54:10 |
| 11 | slope down into a ravine.  We walked into | 12:54:13 |
| 12 | the woods maybe 20 to 30 feet.  He said it | 12:54:16 |
| 13 | was really, it was really too dark for him | 12:54:20 |
| 14 | to point out anything of any | 12:54:23 |
| 15 | significance." | 12:54:27 |
| 16 | Do you remember being asked | 12:54:27 |
| 17 | those questions and giving those answers? | 12:54:29 |
| 18 | A.    I don't remember it, but if it's | 12:54:30 |
| 19 | part of my testimony -- | 12:54:34 |
| 20 | Q.    And it doesn't indicate -- | 12:54:34 |
| 21 | MS. DAITZ:  Can you just let him | 12:54:36 |
| 22 | finish his answer? | 12:54:37 |
| 23 | Q.    Okay. | 12:54:38 |
| 24 | A.    If it's part of my testimony, | 12:54:39 |
| 25 | then I would assume this is what happened. | 12:54:42 |

NYCLD_044116

P-APP000945

Page 426

| | | |
|---|---|---|
| 1 | Q.   And this deposition was on | 12:54:44 |
| 2 | October 1989 some six months -- | 12:54:48 |
| 3 | MS. DAITZ:   This hearing. | 12:54:53 |
| 4 | Q.   This hearing, I'm sorry, this | 12:54:55 |
| 5 | hearing was in October 1989 some six | 12:54:57 |
| 6 | months after the incident? | 12:55:00 |
| 7 | A.   Yes, sir. | 12:55:01 |
| 8 | Q.   when it would be fresher in your | 12:55:02 |
| 9 | mind? | 12:55:06 |
| 10 | A.   Yes. | 12:55:06 |
| 11 | Q.   And did your answer -- nowhere | 12:55:06 |
| 12 | in it does your answer indicate that | 12:55:11 |
| 13 | Raymond told you where to stop, does it? | 12:55:13 |
| 14 | A.   Nowhere in this testimony, but | 12:55:16 |
| 15 | you're asking me my independent | 12:55:19 |
| 16 | recollection? | 12:55:21 |
| 17 | Q.   Yes. | 12:55:22 |
| 18 | A.   And my independent recollection | 12:55:22 |
| 19 | is that he did tell me where to stop. | 12:55:24 |
| 20 | Q.   That's your independent | 12:55:27 |
| 21 | recollection in 2013? | 12:55:28 |
| 22 | A.   Right. | 12:55:31 |
| 23 | MS. DAITZ:   Mr. Wareham, can we | 12:55:45 |
| 24 | break for lunch?  Whenever it's convenient | 12:55:48 |
| 25 | for you. | 12:55:55 |

NYCLD_044117

P-APP000946

Page 427

| | | |
|---|---|---|
| 1 | MR. WAREHAM:  Okay, 1:30. | 12:55:55 |
| 2 | MS. DAITZ:  Sure. | 12:55:57 |
| 3 | MR. WAREHAM:  It that good for | 12:55:59 |
| 4 | you, Jane, you and the kid? | 12:56:00 |
| 5 | Q.    Do you remember Raymond making a | 12:56:03 |
| 6 | statement that you testified to that it | 12:56:11 |
| 7 | was too dark in the wooded area? | 12:56:12 |
| 8 | A.    I remember, once again, to the | 12:56:16 |
| 9 | best of my recollection, I do remember | 12:56:20 |
| 10 | Raymond saying as we walked, as I | 12:56:23 |
| 11 | testified, off the path into the grassy | 12:56:26 |
| 12 | area, I do remember him saying that it | 12:56:29 |
| 13 | was, that it was dark. | 12:56:32 |
| 14 | Q.    Too dark for him to be able to | 12:56:33 |
| 15 | -- | 12:56:37 |
| 16 | A.    I don't recall that. | 12:56:37 |
| 17 | Q.    -- to identify? | 12:56:38 |
| 18 | A.    I don't recall that exactly but | 12:56:39 |
| 19 | certainly that's in my testimony. | 12:56:41 |
| 20 | Q.    And this was at approximately | 12:56:42 |
| 21 | what time in the morning? | 12:56:46 |
| 22 | A.    Okay, let me try to get a | 12:56:49 |
| 23 | timeline again in my head. | 12:56:53 |
| 24 | Q.    Okay. | 12:56:55 |
| 25 | A.    The videotaped statement was | 12:56:56 |

Page 428

| # | | |
|---|---|---|
| 1 | sometime after two o'clock.  Then there | 12:57:00 |
| 2 | was a videotape of the clothes.  So this | 12:57:04 |
| 3 | was, to the best of my recollection, | 12:57:07 |
| 4 | sometime around three a.m. to four a.m., | 12:57:16 |
| 5 | and that's being very general. | 12:57:19 |
| 6 | Q.    It was before sunrise? | 12:57:22 |
| 7 | A.    Yes, sir. | 12:57:24 |
| 8 | Q.    And the assault on Ms. Meili | 12:57:25 |
| 9 | occurred, excuse me, in approximately nine | 12:57:41 |
| 10 | or ten p.m. on the night of the, on April | 12:57:45 |
| 11 | 19th; is that correct? | 12:57:51 |
| 12 | MS. DAITZ:  Objection. | 12:57:52 |
| 13 | A.    As I said, as I sit here today, | 12:57:52 |
| 14 | I'm not entirely certain when that | 12:57:56 |
| 15 | happened. | 12:57:59 |
| 16 | Q.    But you do know it was at night? | 12:57:59 |
| 17 | A.    I believe it was, I believe it | 12:58:01 |
| 18 | was at night, yes. | 12:58:04 |
| 19 | Q.    And -- | 12:58:07 |
| 20 | MR. WAREHAM:  Withdrawn. | 12:58:23 |
| 21 | Q.    Do you remember this, I'll now | 12:58:24 |
| 22 | refer you to 35, your testimony at the | 12:58:40 |
| 23 | McCray, Santana, Salaam trial in 1990. | 12:58:52 |
| 24 | And pages 3694, 3696, starting on 3694 at | 12:59:00 |
| 25 | line 10 or line 5, I'm sorry.  If you | 12:59:36 |

NYCLD_044119

P-APP000948

Page 429

| | | |
|---|---|---|
| 1 | would just read along with me. | 12:59:49 |
| 2 | Question, on line 4, on 3694. | 12:59:52 |
| 3 | "QUESTION:  And where did you go | 12:59:55 |
| 4 | and who went with you?  I'm sorry.  Let's | 12:59:57 |
| 5 | start at the top. | 13:00:00 |
| 6 | MS. DAITZ:  Can you tell me | 13:00:00 |
| 7 | where you are? | 13:00:02 |
| 8 | MR. WAREHAM:  3694. | 13:00:02 |
| 9 | MS. DAITZ:  All right. | 13:00:04 |
| 10 | Q.   "QUESTION:  Approximately when? | 13:00:05 |
| 11 | "ANSWER:  About 3:45 in the | 13:00:07 |
| 12 | morning. | 13:00:10 |
| 13 | "QUESTION:  And where did you go | 13:00:11 |
| 14 | and who went with you? | 13:00:12 |
| 15 | "ANSWER:  Myself and, again, | 13:00:13 |
| 16 | Detective Augie Jonza escorted Raymond | 13:00:15 |
| 17 | Santana Sr. and Raymond Santana, Jr. from | 13:00:18 |
| 18 | the 24th Precinct in a department auto to | 13:00:21 |
| 19 | the Santana residence which is on, located | 13:00:24 |
| 20 | on ███████████████ across from the 25th | 13:00:27 |
| 21 | Precinct. | 13:00:27 |
| 22 | "QUESTION:  Did you go directly | 13:00:31 |
| 23 | to the Santana residence? | 13:00:33 |
| 24 | "ANSWER:  No, we did not. | 13:00:34 |
| 25 | "QUESTION:  Where did you go? | 13:00:37 |

NYCLD_044120

P-APP000949

Page 430

1   "ANSWER:  I advised Raymond and          13:00:38
2   his father that en route to their home, I   13:00:41
3   would like to possibly take a drive by      13:00:44
4   where this incident happened with the       13:00:47
5   woman and they agreed.                       13:00:48
6        "It was done in an effort that        13:00:50
7   Santana could, Raymond, Jr. could help us   13:00:51
8   out in pointing out perhaps the exact       13:00:55
9   spot.  We drove to Central Park West and I  13:00:59
10  went into the Central Park, I went into     13:01:01
11  Central Park which was closed to vehicular  13:01:03
12  traffic, I believe, drove to the West       13:01:06
13  Drive, made a left up to 102nd Street,      13:01:08
14  which is the Cross Drive, which is usually  13:01:12
15  just open for authorized vehicles, through  13:01:14
16  the 102nd Street Cross Drive to a point     13:01:16
17  between a third and a halfway between East  13:01:20
18  and West Drive going from the west to the   13:01:22
19  East Side.  We stopped on Raymond's         13:01:24
20  advice.                                      13:01:31
21       "QUESTION:  When you say on            13:01:31
22  Raymond's advice, as you were driving east  13:01:33
23  on 102nd Street at Cross Drive what, if     13:01:35
24  anything, happened that led you to stop     13:01:38
25  the car?                                     13:01:41

NYCLD_044121

P-APP000950

Page 431

```
 1              "ANSWER:  I asked him if this      13:01:41
 2    was the particular road, and he agreed       13:01:43
 3    this was the road.  I said you tell me        13:01:45
 4    where to stop.  He said he thinks this is     13:01:47
 5    the spot, so we stopped.                      13:01:50
 6              "QUESTION:  I would ask you to      13:01:53
 7    please step down again and approach          13:02:00
 8    People's 2 in evidence.  Would you           13:02:02
 9    indicate on that map approximately where     13:02:04
10    you were when Raymond Santana told you to    13:02:06
11    stop?                                         13:02:08
12              "MR. RIVERA:  Objection, Your       13:02:10
13    Honor.                                        13:02:10
14              "THE COURT:  I'll allow him to      13:02:11
15    answer.                                       13:02:12
16              "ANSWER:  As I said, this is the    13:02:13
17    102nd Street Cross Drive, this is not        13:02:14
18    normally open to vehicular traffic,          13:02:17
19    usually just authorized vehicles.            13:02:19
20              "We entered the park here.  This    13:02:21
21    is the West Drive, made a left straight up   13:02:23
22    here, made a right, straight up to here      13:02:23
23    made a right, into the Drive, and I said a   13:02:29
24    third to halfway, which is approximately     13:02:31
25    here, approximately here.  I'm not           13:02:32
```

NYCLD_044122

P-APP000951

Page 432

| | | |
|---|---|---|
| 1 | completely certain. | 13:02:35 |
| 2 | "QUESTION:  What, if anything, | 13:02:35 |
| 3 | happened at that location, was there any | 13:02:37 |
| 4 | conversation? | 13:02:38 |
| 5 | "ANSWER:  Yes, we all got out of | 13:02:39 |
| 6 | the car, myself, Jonza, Santana, Jr., | 13:02:41 |
| 7 | Santana, Sr. | 13:02:43 |
| 8 | "QUESTION:  Where did you go | 13:02:45 |
| 9 | when you got out of the car? | 13:02:46 |
| 10 | "ANSWER:  Raymond indicated that | 13:02:48 |
| 11 | this was the area that Kevin was | 13:02:50 |
| 12 | struggling with the woman.  He then | 13:02:52 |
| 13 | pointed to a heavily wooded area, and the | 13:02:54 |
| 14 | area was sloped.  It doesn't slope | 13:02:56 |
| 15 | immediately, but it begins to slope down. | 13:02:57 |
| 16 | We walked into, inside the wood line, if | 13:02:59 |
| 17 | you know what I'm saying, like inside the | 13:03:04 |
| 18 | first group of trees about 30, 40 feet, | 13:03:05 |
| 19 | excuse me, or so. | 13:03:05 |
| 20 | "He said everything else | 13:03:09 |
| 21 | happened in this area here, but I'm not | 13:03:10 |
| 22 | sure, I can't tell you, it's too dark. | 13:03:14 |
| 23 | MS. DAITZ:  I can't tell, it's | 13:03:16 |
| 24 | too dark. | 13:03:18 |
| 25 | Q.   I'm sorry, I can't tell, it's | 13:03:19 |

NYCLD_044123

P-APP000952

Page 433

```
1    too dark.                                13:03:21

2              MR. WAREHAM:  Thank you.        13:03:22

3         Q.   Do you remember giving this     13:03:23

4    testimony?                               13:03:24

5         A.   I don't recall the exact        13:03:24

6    testimony again, but certainly if I gave  13:03:26

7    it, then it's my testimony.              13:03:29

8         Q.   Can you explain the difference  13:03:32

9    between your testimony at the hearing in  13:03:36

10   1989 where you said we stopped, and your  13:03:40

11   testimony at the trial nine months later  13:03:44

12   where you said you stopped on Kevin's     13:03:50

13   advice?                                  13:03:54

14             MS. DAITZ:  Objection.          13:03:54

15        Q.   Raymond's advice, sorry.        13:03:55

16             MS. DAITZ:  Objection to form.  13:03:58

17        A.   And your question, sir?         13:03:59

18        Q.   My question is, your testimony  13:04:00

19   in October 1989 was we stopped, no        13:04:02

20   indication that you stopped on Raymond's  13:04:06

21   advice.                                  13:04:09

22             Your testimony at the trial is  13:04:09

23   that you stopped on Raymond's advice      13:04:14

24   making him more culpable in the incident. 13:04:17

25             MS. DAITZ:  Objection to form.  13:04:28
```

NYCLD_044124

P-APP000953

Page 434

```
 1      A.     First of all, that's your          13:04:30
 2   characterization, making him more            13:04:32
 3   culpable.  If you're asking me was there a   13:04:36
 4   difference in my testimony, yes, there was   13:04:39
 5   a slight difference in my testimony.         13:04:41
 6            As to whether Raymond Santana is    13:04:44
 7   the one who said stop the car, I testified   13:04:46
 8   to that in the trial, and I'm testifying     13:04:50
 9   to that today.                               13:04:52
10      Q.     Okay, so you're saying that the    13:04:56
11   testimony you gave in October 1989 when it   13:05:02
12   was fresher in your mind is not as           13:05:06
13   accurate as the testimony you gave in July   13:05:09
14   1990 or in May 2013?                         13:05:12
15            MS. DAITZ:  Objection to form.      13:05:18
16      A.     I'm not saying that at all, sir.   13:05:18
17   I'm saying it's slightly different.  I'm     13:05:21
18   not saying it's more accurate or less        13:05:24
19   accurate, I'm saying it's slightly           13:05:26
20   different.                                   13:05:28
21      Q.     Significantly different.           13:05:29
22            MS. DAITZ:  Objection.              13:05:30
23      A.     Perhaps in your mind, not in       13:05:30
24   mine.                                        13:05:34
25      Q.     I won't argue with you, Mr.        13:05:34
```

NYCLD_044125

P-APP000954

Page 435

| | | |
|---|---|---|
| 1 | Sheehan. | 13:05:36 |
| 2 | But you're, but you are | 13:05:37 |
| 3 | consistent in that Raymond said it was too | 13:05:46 |
| 4 | dark at three, four a.m. in morning? | 13:05:50 |
| 5 | (Mr. Wise left the room.) | 13:05:53 |
| 6 | A.     Yes, sir. | 13:05:56 |
| 7 | Q.     Darker than it would have been | 13:05:57 |
| 8 | at ten p.m. that night, the night before? | 13:05:59 |
| 9 | MS. DAITZ:  Objection. | 13:06:00 |
| 10 | A.     I didn't say that.  It's just, | 13:06:01 |
| 11 | all I'm testifying here is to what I read | 13:06:03 |
| 12 | in my testimony where Raymond said that it | 13:06:05 |
| 13 | was dark, and I recall that as I sit here | 13:06:08 |
| 14 | today. | 13:06:11 |
| 15 | Q.     Isn't it, isn't it a fact that | 13:06:11 |
| 16 | when you drove to that area that Raymond | 13:06:15 |
| 17 | Santana, Jr. and you said, you said this | 13:06:18 |
| 18 | is the spot where it happened.  He said | 13:06:22 |
| 19 | no, this is not the spot, this isn't, I | 13:06:24 |
| 20 | haven't been here, it's over by the water? | 13:06:28 |
| 21 | MS. DAITZ:  Objection. | 13:06:30 |
| 22 | A.     Are you saying -- | 13:06:32 |
| 23 | Q.     I'm saying -- | 13:06:35 |
| 24 | A.     I'm a bit confused. | 13:06:36 |
| 25 | Q.     Okay, let me rephrase it. | 13:06:38 |

NYCLD_044126

P-APP000955

Page 436

| | | |
|---|---|---|
| 1 | A.     Okay. | 13:06:39 |
| 2 | Q.     Did Raymond Santana, Jr., when | 13:06:40 |
| 3 | you drove to 102nd Street Cross Drive, say | 13:06:43 |
| 4 | to you that, and you said, you said that | 13:06:46 |
| 5 | this is the spot where it occurred.  You | 13:06:49 |
| 6 | said you said that this is -- | 13:06:52 |
| 7 | MR. WAREHAM:  Withdrawn. | 13:06:54 |
| 8 | Q.     Isn't it a fact that when you | 13:06:54 |
| 9 | got to the 102nd Street Cross Drive, that | 13:06:56 |
| 10 | you told Raymond Santana this is the spot | 13:06:58 |
| 11 | where it happened, isn't it?  And he said | 13:07:01 |
| 12 | no, it happened over by the water. | 13:07:03 |
| 13 | MS. DAITZ:  Objection to form. | 13:07:07 |
| 14 | A.     No, that's not what happened. | 13:07:09 |
| 15 | Q.     And if Raymond Santana testified | 13:07:11 |
| 16 | to that under oath, you would say he was | 13:07:18 |
| 17 | lying? | 13:07:23 |
| 18 | A.     I can't say whether Raymond | 13:07:24 |
| 19 | Santana was lying. | 13:07:27 |
| 20 | Q.     Junior, that is. | 13:07:28 |
| 21 | A.     I can't say Raymond Santana, Jr. | 13:07:29 |
| 22 | was lying.  I mean, that could be his | 13:07:32 |
| 23 | version of events now.  His version of | 13:07:35 |
| 24 | events on the night when I took him there, | 13:07:40 |
| 25 | the morning that I took him there, I | 13:07:43 |

NYCLD_044127

P-APP000956

Page 437

| | | |
|---|---|---|
| 1 | recall and I testified to. | 13:07:46 |
| 2 | Q. And if -- let me show you -- did | 13:07:47 |
| 3 | you, after you testified in the Santana | 13:09:07 |
| 4 | trial in 19 -- July 1990, did you attend | 13:09:15 |
| 5 | -- did you stay to hear any of the other | 13:09:20 |
| 6 | testimony? | 13:09:23 |
| 7 | A. No, sir. | 13:09:23 |
| 8 | Q. Did you hear the testimony of | 13:09:24 |
| 9 | Raymond Santana, Sr.? | 13:09:27 |
| 10 | A. No, sir. | 13:09:29 |
| 11 | Q. Let me show you what has been | 13:09:29 |
| 12 | marked Sheehan 37 which is an excerpt from | 13:09:34 |
| 13 | the trial testimony of Raymond Santana, | 13:09:41 |
| 14 | Sr. on August 1, 1990 -- | 13:09:45 |
| 15 | A. Thanks. | 13:09:47 |
| 16 | MS. DAITZ: Thank you. | 13:09:53 |
| 17 | Q. -- at the trial of Antron | 13:09:53 |
| 18 | McCray, Raymond Santana and Yusef Salaam. | 13:09:58 |
| 19 | MS. DAITZ: 37? | 13:10:05 |
| 20 | MR. WAREHAM: 37. | 13:10:07 |
| 21 | MS. DAITZ: Are you giving a | 13:10:08 |
| 22 | page number? | 13:10:11 |
| 23 | (Mr. Wise re-entered the room.) | 13:10:13 |
| 24 | MR. WAREHAM: 4740 through 4743. | 13:10:14 |
| 25 | 4744, excuse me, I'm sorry. | 13:10:25 |

NYCLD_044128

P-APP000957

Page 438

| | | |
|---|---|---|
| 1 | A.    What pages again, sir? | 13:10:28 |
| 2 | Q.    The entire, 4740 through 4744. | 13:10:29 |
| 3 | A.    Okay. | 13:10:33 |
| 4 | Q.    And I'll read it, and then I'll | 13:10:34 |
| 5 | ask you some questions.  This is on page | 13:10:46 |
| 6 | 4740, line 4, direct examination | 13:10:48 |
| 7 | continued. | 13:10:52 |
| 8 | MS. DAITZ:  Can you just give me | 13:10:52 |
| 9 | one minute? | 13:10:54 |
| 10 | MR. WAREHAM:  Okay.  Let's go | 13:10:56 |
| 11 | off, I have to take a quick break. | 13:11:23 |
| 12 | THE VIDEOGRAPHER:  We are going | 13:11:26 |
| 13 | off the record at 1:11 p.m.  This marks | 13:11:27 |
| 14 | the end of media unit 2. | 13:11:31 |
| 15 | (A recess was taken.) | 13:11:36 |
| 16 | THE VIDEOGRAPHER:  We're back on | 13:16:32 |
| 17 | the record at 1:17 p.m. This starts the | 13:17:20 |
| 18 | beginning of media unit 3. | 13:17:24 |
| 19 | Q.    So did you have an opportunity | 13:17:26 |
| 20 | to look at that? | 13:17:29 |
| 21 | A.    Yes, I did. | 13:17:30 |
| 22 | Q.    On page 4740, line 5, direct | 13:17:31 |
| 23 | examination by Mr. Rivera of Mr. Raymond | 13:17:39 |
| 24 | Santana, Sr. | 13:17:39 |
| 25 | "QUESTION:  And you, you | 13:17:43 |

NYCLD_044129

P-APP000958

Page 439

| | | |
|---|---|---|
| 1 | indicated, Mr. Santana, that you went in a | 13:17:44 |
| 2 | police car with your son, Raymond, and | 13:17:48 |
| 3 | other police officers? | 13:17:50 |
| 4 | "ANSWER:  M-mm. | 13:17:50 |
| 5 | "QUESTION:  How many police | 13:17:53 |
| 6 | officers went into that police car? | 13:17:55 |
| 7 | "ANSWER:  It was, when we came | 13:17:56 |
| 8 | out the precinct, it was two, two police | 13:17:59 |
| 9 | cars. | 13:18:02 |
| 10 | "QUESTION:  Two police cars? | 13:18:02 |
| 11 | "ANSWER:  Yeah.  It was five | 13:18:03 |
| 12 | detectives, me and my son. | 13:18:06 |
| 13 | "QUESTION:  You and your son | 13:18:07 |
| 14 | were in one police car? | 13:18:09 |
| 15 | "ANSWER:  Yeah. | 13:18:11 |
| 16 | "QUESTION:  The same police car? | 13:18:12 |
| 17 | "ANSWER:  With two detectives. | 13:18:14 |
| 18 | "QUESTION:  There were two | 13:18:16 |
| 19 | detectives in that car? | 13:18:18 |
| 20 | "ANSWER:  Uh-huh. | 13:18:19 |
| 21 | "QUESTION:  And was there | 13:18:21 |
| 22 | another police car? | 13:18:22 |
| 23 | "ANSWER:  Yes. | 13:18:24 |
| 24 | "QUESTION:  And how many | 13:18:25 |
| 25 | detectives were in that other police car? | 13:18:26 |

NYCLD_044130

P-APP000959

Page 440

```
 1              "ANSWER:   Three.              13:18:29

 2              "QUESTION:   And where did you  13:18:31

 3    go?                                       13:18:32

 4              "ANSWER:   To the Central Park.  13:18:33

 5              "QUESTION:   And where were you  13:18:36

 6    seated?                                    13:18:37

 7              "ANSWER:   In the back with      13:18:38

 8    Raymond.                                   13:18:40

 9              "QUESTION:   And Raymond was      13:18:41

10    seated in the back?                        13:18:42

11              "ANSWER:   Yes.                  13:18:43

12              "QUESTION:   Was Raymond seated   13:18:45

13    behind the driver or behind the --         13:18:47

14              "ANSWER:   He was seated behind   13:18:49

15    the driver.                                13:18:51

16              "QUESTION:   And you were to the  13:18:52

17    right of Raymond; is that correct?         13:18:53

18              "ANSWER:   Yeah.                 13:18:55

19              "QUESTION:   And the other police 13:18:56

20    officer -- the other officers, where were  13:18:59

21    they?                                      13:19:00

22              "ANSWER:   Hm?                   13:19:02

23              "QUESTION:   There were two       13:19:04

24    police officers you indicated.             13:19:05

25              "ANSWER:   In the front.         13:19:06
```

NYCLD_044131

P-APP000960

Page 441

| | | |
|---|---|---|
| 1 | "QUESTION:   And where were they | 13:19:08 |
| 2 | seated, in the front seat? | 13:19:09 |
| 3 | "Yeah, front seat. | 13:19:13 |
| 4 | "QUESTION:   And where did you | 13:19:15 |
| 5 | go? | 13:19:16 |
| 6 | "ANSWER:   To the Central Park. | 13:19:17 |
| 7 | "QUESTION:   And do you know | 13:19:18 |
| 8 | where you went? | 13:19:19 |
| 9 | "ANSWER:   To -- when we got | 13:19:20 |
| 10 | there, it was a policeman there. | 13:19:23 |
| 11 | "QUESTION:   It was, there was a | 13:19:27 |
| 12 | policeman there? | 13:19:28 |
| 13 | "ANSWER:   Yeah. | 13:19:29 |
| 14 | "QUESTION:   And, other than the | 13:19:29 |
| 15 | a policeman there, were there any other | 13:19:31 |
| 16 | vehicles there? | 13:19:34 |
| 17 | "ANSWER:   No. | 13:19:35 |
| 18 | "QUESTION:   There were no | 13:19:36 |
| 19 | vehicles where this police officer was | 13:19:38 |
| 20 | standing? | 13:19:40 |
| 21 | "ANSWER:   No. | 13:19:41 |
| 22 | "QUESTION:   What happened there? | 13:19:42 |
| 23 | "ANSWER:   We got there.   They | 13:19:43 |
| 24 | tell us to get off the car. | 13:19:45 |
| 25 | "QUESTION:   Who said get off the | 13:19:48 |

NYCLD_044132

P-APP000961

Page 442

| | | |
|---|---|---|
| 1 | car? | 13:19:50 |
| 2 | "ANSWER:  Sheehan. | 13:19:50 |
| 3 | "QUESTION:  Did Raymond say | 13:19:52 |
| 4 | anything at that point in time? | 13:19:54 |
| 5 | "ANSWER:  No. | 13:19:56 |
| 6 | "QUESTION:  Did Raymond tell the | 13:19:58 |
| 7 | police officer, Detective Sheehan, stop | 13:19:58 |
| 8 | right here? | 13:19:59 |
| 9 | "ANSWER:  No. | 13:19:59 |
| 10 | "MS. LEDERER:  Objection as to | 13:20:01 |
| 11 | leading, Your Honor. | 13:20:02 |
| 12 | "THE COURT:  Yes, objection | 13:20:06 |
| 13 | sustained.  Let him testify. | 13:20:07 |
| 14 | "QUESTION:  What happened at | 13:20:09 |
| 15 | that location? | 13:20:10 |
| 16 | "ANSWER:  We got out of the car, | 13:20:11 |
| 17 | and we start walking on the grounds. | 13:20:12 |
| 18 | "QUESTION:  And were you walking | 13:20:12 |
| 19 | also? | 13:20:12 |
| 20 | "ANSWER:  Yes. | 13:20:12 |
| 21 | "QUESTION:  And what, did the | 13:20:14 |
| 22 | officer ask Raymond any questions? | 13:20:19 |
| 23 | "ANSWER:  Not yet. | 13:20:21 |
| 24 | "QUESTION:  What happened then? | 13:20:23 |
| 25 | "ANSWER:  Then we went downhill | 13:20:25 |

NYCLD_044133

P-APP000962

Page 443

| | | |
|---|---|---|
| 1 | like and he said, Raymond, you was here, | 13:20:27 |
| 2 | and Raymond said, no, I never been here. | 13:20:29 |
| 3 | "QUESTION:  And what happened | 13:20:32 |
| 4 | then? | 13:20:32 |
| 5 | "ANSWER:  "Raymond said he was | 13:20:34 |
| 6 | on the other side of the park. | 13:20:36 |
| 7 | "QUESTION:  Did Raymond point to | 13:20:38 |
| 8 | any area? | 13:20:40 |
| 9 | "ANSWER:  Yes. | 13:20:41 |
| 10 | "QUESTION:  To a general area? | 13:20:42 |
| 11 | "ANSWER:  Yes, the water well. | 13:20:44 |
| 12 | "QUESTION:  I'm sorry? | 13:20:46 |
| 13 | "ANSWER:  The water well. | 13:20:47 |
| 14 | "QUESTION:  And do you know, do | 13:20:49 |
| 15 | you know how, was he pointing with his | 13:20:51 |
| 16 | hand? | 13:20:53 |
| 17 | "Objection. | 13:20:53 |
| 18 | "MS. LEDERER:  Objection. | 13:20:54 |
| 19 | "THE COURT:  Let him tell what | 13:20:55 |
| 20 | was going on, let him describe. | 13:20:56 |
| 21 | "QUESTION:  Could you describe | 13:20:59 |
| 22 | what was happening? | 13:21:00 |
| 23 | "ANSWER:  Yeah, he was in a | 13:21:01 |
| 24 | downhill like, and Raymond, he and Raymond | 13:21:03 |
| 25 | said he was in the other side. | 13:21:06 |

NYCLD_044134

P-APP000963

Page 444

1        "QUESTION:  Was he pointing with    13:21:08

2   his hand?                                          13:21:10

3        "ANSWER:  Yeah.                      13:21:10

4        "THE COURT:  Mr. Rivera, let him    13:21:11

5   describe what he was doing.                        13:21:14

6        "MR. RIVERA:  Your Honor, he        13:21:16

7   pointed with his hand.                             13:21:17

8        "THE COURT:  Well, let him          13:21:18

9   describe it.  Please describe it.                  13:21:20

10       "QUESTION:  And what happened       13:21:22

11  next?                                              13:21:23

12       "ANSWER:  They didn't pay him no    13:21:24

13  mind.                                              13:21:24

14       "QUESTION:  When you say they       13:21:27

15  didn't pay him no mind, who are you                13:21:29

16  referring to?                                      13:21:29

17       "ANSWER:  Sheehan.                  13:21:32

18       "QUESTION:  Now, did Detective      13:21:33

19  Sheehan ask him any questions?                     13:21:35

20       "ANSWER:  No.                       13:21:37

21       "QUESTION:  After that, what        13:21:38

22  happened?"                                         13:21:40

23       Okay.  Is, was Mr. Santana with     13:21:40

24  you when you took him into the park or you         13:21:49

25  testified Mr. Santana was with you,                13:21:51

NYCLD_044135

P-APP000964

Page 445

| | | |
|---|---|---|
| 1 | Senior, when you went to the park? | 13:21:53 |
| 2 | A.    If you're asking me was Mr. | 13:21:55 |
| 3 | Santana, Sr. with his son Raymond, Jr. | 13:21:57 |
| 4 | when Detective Jonza and I -- | 13:22:00 |
| 5 | Q.    Yes. | 13:22:03 |
| 6 | A.    -- went into the park en route | 13:22:04 |
| 7 | to their own home, yes. | 13:22:07 |
| 8 | Q.    And you've heard Mr. | 13:22:08 |
| 9 | Santana's -- you've read Mr. Santana's | 13:22:12 |
| 10 | testimony? | 13:22:15 |
| 11 | A.    Yes. | 13:22:15 |
| 12 | Q.    Is that accurate? | 13:22:16 |
| 13 | A.    No. | 13:22:17 |
| 14 | MR. WAREHAM:   Okay, we can take | 13:22:36 |
| 15 | a break now. | 13:22:38 |
| 16 | MS. DAITZ:   Okay. | 13:22:39 |
| 17 | MR. WAREHAM:   A break for lunch. | 13:22:39 |
| 18 | THE VIDEOGRAPHER:   We're going | 13:22:41 |
| 19 | off at 1:22 p.m. | 13:22:42 |
| 20 | (Whereupon a luncheon recess was | 13:22:44 |
| 21 | taken.) | 13:22:47 |
| 22 | (Twelve documents were hereby | 13:22:47 |
| 23 | marked as Sheehan Exhibits 41-52 for | 13:22:47 |
| 24 | identification, as of this date.) | 13:22:47 |
| 25 | AFTERNOON SESSION | 14:26:34 |

NYCLD_044136

P-APP000965

Page 446

| | | |
|---|---|---|
| 1 | THE VIDEOGRAPHER: We are back | 14:26:34 |
| 2 | on the record at 2:28 p.m. | 14:28:31 |
| 3 | Q. Good afternoon, Mr. Sheehan. | 14:28:34 |
| 4 | A. Good afternoon. | 14:28:37 |
| 5 | Q. Let me ask you, going back to | 14:28:39 |
| 6 | the 20th Precinct, when, where did you | 14:28:44 |
| 7 | question Raymond Santana, Jr., where did | 14:28:54 |
| 8 | you do the interview? | 14:28:57 |
| 9 | A. His interview was done on the | 14:28:59 |
| 10 | ground floor, it was the 20th Precinct | 14:29:02 |
| 11 | youth room. | 14:29:06 |
| 12 | Q. And that was a designated youth | 14:29:08 |
| 13 | room? | 14:29:10 |
| 14 | A. It's a room that certainly I had | 14:29:11 |
| 15 | believed was the designated youth room. | 14:29:14 |
| 16 | Q. But there was a question about | 14:29:17 |
| 17 | whether it was the, whether it was | 14:29:23 |
| 18 | properly designated as a youth room? | 14:29:24 |
| 19 | A. At some point in the | 14:29:27 |
| 20 | investigation, I'm not sure exactly when, | 14:29:28 |
| 21 | there was a question, I believe the | 14:29:31 |
| 22 | question was asked of the desk officer, | 14:29:33 |
| 23 | was this, in fact, the designated youth | 14:29:36 |
| 24 | room. | 14:29:39 |
| 25 | I, from previous experience, I | 14:29:39 |

NYCLD_044137

P-APP000966

Page 447

```
 1    had known it to be the youth room.          14:29:43
 2        Q.    Was that the reason that the       14:29:45
 3    videotaping was moved from the 20th          14:29:48
 4    Precinct to the 24th Precinct?               14:29:50
 5        A.    Yes, sir.                          14:29:51
 6        Q.    Because there was a question of    14:29:52
 7    --                                           14:29:57
 8        A.    Yes, sir.                          14:29:57
 9        Q.    What were the dimensions of that   14:29:57
10    room, bearing in mind you're not good with   14:30:00
11    distances, in relation -- could you          14:30:03
12    describe it as you did in relation to this   14:30:04
13    room that we're in now, the conference       14:30:06
14    room at Beldock, Levine & Hoffman?           14:30:09
15        A.    Sure.  I would say the length of   14:30:12
16    the room was probably the same, but I        14:30:14
17    would say it's a little wider.               14:30:15
18            MS. DAITZ:  Which is wider?          14:30:18
19        A.    In other words, push this wall     14:30:20
20    back a couple of feet.  It's the room as     14:30:22
21    you come into the precinct, the 20th         14:30:24
22    Precinct, it's directly ahead.               14:30:31
23        Q.    That room is still there in        14:30:32
24    2013, it's the same room?  I mean, that      14:30:35
25    room hasn't gone anywhere?                   14:30:37
```

NYCLD_044138

P-APP000967

Page 448

| | | |
|---|---|---|
| 1 | MS. DAITZ:  Objection. | 14:30:39 |
| 2 | A.    I haven't been in the 20 in | 14:30:39 |
| 3 | awhile, but I assume that room is still | 14:30:42 |
| 4 | there, yeah. | 14:30:44 |
| 5 | Q.    When you began your interview | 14:30:45 |
| 6 | with Raymond, how would you describe his | 14:30:46 |
| 7 | demeanor? | 14:30:50 |
| 8 | A.    He seemed, he seemed relaxed. | 14:30:52 |
| 9 | Q.    He didn't seem tired? | 14:30:58 |
| 10 | A.    No. | 14:31:00 |
| 11 | Q.    He didn't seem drawn? | 14:31:00 |
| 12 | A.    No. | 14:31:03 |
| 13 | Q.    He didn't seem anxious? | 14:31:04 |
| 14 | A.    He seemed, he seemed very | 14:31:05 |
| 15 | relaxed and very coherent. | 14:31:08 |
| 16 | Q.    And you testified you didn't | 14:31:10 |
| 17 | know when he had first been put in | 14:31:17 |
| 18 | custody. | 14:31:20 |
| 19 | A.    That's correct. | 14:31:20 |
| 20 | Q.    So if I told you it was | 14:31:21 |
| 21 | approximately ten p.m. on the night of | 14:31:26 |
| 22 | April 19th, you wouldn't know whether that | 14:31:28 |
| 23 | was true or not? | 14:31:31 |
| 24 | MS. DAITZ:  Objection to form. | 14:31:32 |
| 25 | A.    That's right. | 14:31:33 |

NYCLD_044139

P-APP000968

Page 449

| | | |
|---|---|---|
| 1 | Q.    You described going to the 102nd | 14:31:34 |
| 2 | Street Cross Drive after you finished the, | 14:31:45 |
| 3 | taking the written statement, Raymond's | 14:31:49 |
| 4 | written statement, correct? | 14:31:51 |
| 5 | A.    No. | 14:31:52 |
| 6 | Q.    Okay. | 14:31:53 |
| 7 | MR. WAREHAM:   Withdrawn. | 14:31:55 |
| 8 | Q.    When you went to the 102nd | 14:31:56 |
| 9 | Street Cross Drive with Raymond Santana, | 14:32:00 |
| 10 | Jr. and his father, you said Detective | 14:32:04 |
| 11 | Jonza was with you? | 14:32:06 |
| 12 | A.    Yes. | 14:32:08 |
| 13 | Q.    Detective Hall? | 14:32:08 |
| 14 | A.    No, sir. | 14:32:09 |
| 15 | Q.    There were two or three other | 14:32:10 |
| 16 | detectives with you? | 14:32:12 |
| 17 | A.    No, sir. | 14:32:12 |
| 18 | Q.    It was just one car? | 14:32:13 |
| 19 | A.    That's correct. | 14:32:14 |
| 20 | Q.    There weren't two cars that went | 14:32:17 |
| 21 | to the 102nd Street Cross Drive when you | 14:32:24 |
| 22 | took Raymond Santana? | 14:32:27 |
| 23 | A.    No, sir. | 14:32:31 |
| 24 | Q.    So it was just you, Mr. Santana, | 14:32:32 |
| 25 | Raymond and officer, and Detective Jonza? | 14:32:41 |

NYCLD_044140

P-APP000969

Page 450

| | | |
|---|---|---|
| 1 | A.  Correct. | 14:32:45 |
| 2 | Q.  And you drove? | 14:32:46 |
| 3 | A.  I drove. | 14:32:47 |
| 4 | Q.  Okay.  When you went -- when did | 14:32:48 |
| 5 | you first -- was there a time when you -- | 14:33:07 |
| 6 | MR. WAREHAM:  Withdrawn. | 14:33:15 |
| 7 | Q.  When did you first find out the, | 14:33:15 |
| 8 | that the female jogger who had been beaten | 14:33:26 |
| 9 | and possibly raped was a white woman? | 14:33:32 |
| 10 | MS. DAITZ:  Objection to form. | 14:33:37 |
| 11 | A.  I'm not exactly sure.  It may | 14:33:38 |
| 12 | have been at the briefing at the 20th | 14:33:44 |
| 13 | Precinct.  It may have been, it would have | 14:33:47 |
| 14 | to be at the briefing at the 20th. | 14:33:49 |
| 15 | Q.  Was there a time you found out | 14:33:52 |
| 16 | the racial identity of the other victims? | 14:33:56 |
| 17 | A.  To the best of my recollection | 14:34:00 |
| 18 | as I sit here today, I think it was much | 14:34:06 |
| 19 | later in the investigation. | 14:34:08 |
| 20 | Q.  When you say "much later," | 14:34:09 |
| 21 | hours, a day? | 14:34:13 |
| 22 | A.  Possibly the next day. | 14:34:15 |
| 23 | Q.  Okay.  And when was, was there a | 14:34:15 |
| 24 | time you found out the racial identity of | 14:34:21 |
| 25 | the suspects in the attacks in the park? | 14:34:26 |

NYCLD_044141

P-APP000970

Page 451

```
1        A.     Yes.   I'm not sure exactly when.    14:34:31
2    I certainly knew that Raymond Santana was       14:34:36
3    Hispanic and, just to go back to your last      14:34:39
4    question, I certainly knew from Raymond's        14:34:45
5    own description in his statement the            14:34:48
6    various races of the victims of the             14:34:51
7    assaults.                                       14:34:54
8        Q.     And would it be fair to say that     14:34:56
9    all of the suspects were either black,          14:35:01
10   either black or Hispanic?                       14:35:04
11       A.     The suspects that I physically       14:35:07
12   saw, yes, sir.                                  14:35:10
13       Q.     And that all of the victims of       14:35:11
14   the attacks, save possibly one, were            14:35:17
15   white?                                          14:35:21
16            MS. DAITZ:   Objection.                14:35:21
17       A.     I don't recall the racial makeup     14:35:21
18   of all of the victims, but they were not        14:35:26
19   all white, no.                                  14:35:31
20       Q.     But the majority were, the vast      14:35:32
21   majority of the victims were white?             14:35:35
22            MS. DAITZ:   Objection to form.        14:35:37
23       A.     If memory serves me correct, I       14:35:38
24   would say yes, the majority.                    14:35:40
25       Q.     Did it bother you that a suspect     14:35:43
```

NYCLD_044142

P-APP000971

Page 452

| | | |
|---|---|---|
| 1 | had been accused of rape and possible | 14:35:58 |
| 2 | murder of a white woman? | 14:36:04 |
| 3 | MS. DAITZ: Objection to form. | 14:36:05 |
| 4 | A. I don't quite understand, would | 14:36:08 |
| 5 | it bother me? | 14:36:12 |
| 6 | Q. Right. What was -- | 14:36:13 |
| 7 | A. How would it bother me? | 14:36:15 |
| 8 | Q. What was your reaction to the | 14:36:17 |
| 9 | fact that the victim was a, the victim of | 14:36:18 |
| 10 | the jogger attack was a white woman, and | 14:36:22 |
| 11 | the accused were black and Hispanic? | 14:36:25 |
| 12 | MS. DAITZ: Objection to form. | 14:36:28 |
| 13 | A. Are you asking me how I was | 14:36:29 |
| 14 | affected by that? | 14:36:32 |
| 15 | Q. I'm asking you what was your | 14:36:33 |
| 16 | reaction. | 14:36:34 |
| 17 | A. My reaction that to was my | 14:36:35 |
| 18 | reaction to any other case. I've had | 14:36:38 |
| 19 | white victims, I've had, the majority of | 14:36:42 |
| 20 | my victims were black and Hispanic. I've | 14:36:46 |
| 21 | had white perpetrators, I've had black | 14:36:49 |
| 22 | perpetrators and I've had Hispanic | 14:36:53 |
| 23 | perpetrators. | 14:36:56 |
| 24 | Q. So it didn't bother you that the | 14:36:56 |
| 25 | victim was a white female and the accused | 14:36:58 |

NYCLD_044143

P-APP000972

Page 453

| | | |
|---|---|---|
| 1 | were black and Hispanic? | 14:37:01 |
| 2 | A.     No. | 14:37:03 |
| 3 | MS. DAITZ:  Objection to form. | 14:37:03 |
| 4 | Q.     Did that, did that scenario of a | 14:37:06 |
| 5 | white victim and black and Hispanic | 14:37:15 |
| 6 | accused, did you hear any of your fellow | 14:37:20 |
| 7 | officers comment about that? | 14:37:25 |
| 8 | MS. DAITZ:  Objection. | 14:37:26 |
| 9 | A.     No, sir. | 14:37:26 |
| 10 | Q.     No one made any comments about | 14:37:27 |
| 11 | that fact? | 14:37:32 |
| 12 | MS. DAITZ:  Objection. | 14:37:33 |
| 13 | A.     As I sit here today again, to | 14:37:33 |
| 14 | the best of my recollection, I didn't hear | 14:37:36 |
| 15 | any comments by anybody. | 14:37:38 |
| 16 | Q.     No one said anything about these | 14:37:39 |
| 17 | kids from Harlem, you know, trying to rape | 14:37:42 |
| 18 | or raping a white woman in Central Park? | 14:37:46 |
| 19 | A.     Nothing like that was ever said | 14:37:50 |
| 20 | in my presence, no, sir. | 14:37:52 |
| 21 | Q.     Were any comments made about | 14:37:53 |
| 22 | blacks and Hispanics raping a white woman | 14:37:57 |
| 23 | in Central Park or raping a white woman? | 14:38:03 |
| 24 | MS. DAITZ:  Objection. | 14:38:05 |
| 25 | A.     Certainly not.  I mean, one of | 14:38:06 |

NYCLD_044144

P-APP000973

Page 454

| | | |
|---|---|---|
| 1 | the detectives with me on this | 14:38:08 |
| 2 | investigation happened to be African | 14:38:10 |
| 3 | American. | 14:38:13 |
| 4 | Q. You're saying that, suggest that | 14:38:14 |
| 5 | no racial comments were being made because | 14:38:16 |
| 6 | a detective was African American? | 14:38:19 |
| 7 | MS. DAITZ: Objection. | 14:38:22 |
| 8 | A. No, sir. The makeup of all of | 14:38:22 |
| 9 | the detectives involved in this | 14:38:26 |
| 10 | investigation were from every nationality | 14:38:26 |
| 11 | and every race. | 14:38:29 |
| 12 | Q. And you never heard anything | 14:38:33 |
| 13 | around niggers or spics messing with | 14:38:35 |
| 14 | white, raping white women? | 14:38:40 |
| 15 | MS. DAITZ: Objection. | 14:38:42 |
| 16 | A. Certainly not, no, sir. | 14:38:42 |
| 17 | Q. And you never said anything like | 14:38:44 |
| 18 | that? | 14:38:45 |
| 19 | A. No, sir. | 14:38:45 |
| 20 | Q. Was there a point in time when | 14:38:46 |
| 21 | you were at the crime scene and, with ADA | 14:38:53 |
| 22 | Linda Fairstein? | 14:38:59 |
| 23 | A. Yes, sir. | 14:39:01 |
| 24 | Q. When was that, when was the | 14:39:02 |
| 25 | first time? | 14:39:04 |

NYCLD_044145

P-APP000974

Page 455

```
1      A.    About, well, it would be fair to   14:39:04
2   say the only time, the first and only time  14:39:10
3   was a little after 7:00 a.m. on the         14:39:13
4   morning of April 21st.                       14:39:17
5      Q.    Okay.  That was approximately       14:39:19
6   three or four hours after you had been      14:39:24
7   there with Raymond Santana?                  14:39:26
8      A.    Approximately, yes.                  14:39:29
9      Q.    And what was the nature of the      14:39:30
10  interaction?                                 14:39:39
11         MR. WAREHAM:  Withdrawn.             14:39:39
12     Q.    What was ADA Fairstein doing at     14:39:40
13  the crime scene, what was she doing?         14:39:43
14         MS. DAITZ:  Objection.               14:39:45
15     A.    ADA Fairstein and I, Detective     14:39:45
16  Jonza, certainly Sergeant O'Connor had a    14:39:52
17  meeting in the 24 Squad, and a decision      14:39:55
18  was made, a joint decision at that time to  14:40:01
19  take two of the suspects to the park.        14:40:04
20     Q.    And which two suspects were         14:40:12
21  those?                                       14:40:15
22     A.    Kevin Richardson and Kharey         14:40:15
23  Wise.                                        14:40:18
24     Q.    And do you know why it was --       14:40:18
25  this was --                                  14:40:22
```

NYCLD_044146

P-APP000975

Page 456

| | | |
|---|---|---|
| 1 | MR. WAREHAM:  Withdrawn. | 14:40:24 |
| 2 | Q.    Had you, during that discussion, | 14:40:25 |
| 3 | had you informed ADA Fairstein that you | 14:40:27 |
| 4 | had already gone to the alleged crime | 14:40:32 |
| 5 | scene with Raymond Santana? | 14:40:37 |
| 6 | MS. DAITZ:  Objection. | 14:40:38 |
| 7 | Q.    Junior? | 14:40:40 |
| 8 | A.    I don't recall our exact | 14:40:41 |
| 9 | conversation, but I probably did tell her. | 14:40:43 |
| 10 | Q.    And, to your knowledge, she had | 14:40:47 |
| 11 | not -- well, to your knowledge, had she | 14:40:49 |
| 12 | been to the crime scene prior to you going | 14:40:53 |
| 13 | there at 7:00 a.m. the morning of the | 14:40:55 |
| 14 | 21st? | 14:40:58 |
| 15 | A.    To my personal knowledge, no. | 14:40:58 |
| 16 | Q.    Did she indicate in her | 14:41:00 |
| 17 | discussion that she had been there, in her | 14:41:02 |
| 18 | discussion with you, did she indicate that | 14:41:04 |
| 19 | she had been there? | 14:41:06 |
| 20 | A.    No, she did not. | 14:41:07 |
| 21 | Q.    And the reasons for taking | 14:41:08 |
| 22 | Kharey Wise and Kevin Richardson there | 14:41:17 |
| 23 | were what? | 14:41:22 |
| 24 | A.    Excuse me? | 14:41:22 |
| 25 | Q.    What were the reasons that you | 14:41:22 |

NYCLD_044147

P-APP000976

T3-JM-TS

4949

1              Fairstein - People - Cross - Burns

2      Q    Now, between 8:30 and 11:30, did you participate  in

3  any questioning of any individuals?

4      A    I questioned police officers.

5      Q    Just officers.

6      A    Right.

7      Q    Now, at 11:30, you say, is the first time you --

8              MR. BURNS:  Withdrawn.

9      Q      At what point in time -- at what point in time did

10 you -- were you aware of the fact that Yusef Salaam was in the

11 20th Precinct?

12     A    I have -- I would put it in the 11  o'clock  period,

13 but it was between 11 and 11:30.

14     Q      And do you have any -- can you tell the Court who

15 told you, or how you came by that information?

16     A    I was in a room with a lot of police officers,  and,

17 as  different events unfolded that evening, because there were

18 many participants, and a lot of police activity, people  would

19 enter  the room to tell some of the supervisors what was going

20 on.

21     Q    And I believe --  and  you  were  functioning  as  a

22 supervisor?

23     A    No.  I'm talking about police supervisors.

24     Q      But you were working along with the supervisors,

25 were you not?

NYCLD_015468

P-APP000977

T3-JM-TS

4950

1                    Fairstein - People - Cross - Burns

2                    MS. LEDERER:  Objection.

3                    THE COURT:  I'll let her answer it.

4        A    I was not supervising a police investigation, no.

5        I was there to assist, and to assist Ms. Lederer,  if  I

6   could be of any use.

7        Q         Well,  in  the course of your assisting with the

8   investigation, while you were on the second floor squad  room,

9   someone came in and mentioned Yusef Salaam, is that it?

10       A    Yes.

11       Q    And was anything said about his age at that time?

12       A    No.

13       Q         At that point, you didn't have any -- you didn't

14  know how old he was?

15       A    No.

16       Q    Did you know that he was a teenager or older?    Did

17  you know that?

18       A    I didn't know anything.

19       Q    Nothing at all?

20       And  then,  at  11:30,  you  had a call, that there was a

21  lawyer downstairs?

22       A    Not a call.  Someone came in.

23       Q    And told you?

24       A    And said to me, particular.

25       Q    You don't know who that person was?

NYCLD_015469

P-APP000978

```
1              T-3   Reynolds-Ppl-cross (Rivera)           909

2          the Assistant District Attorneys and all sworn

3          jurors are present.

4              THE COURT:  All right, good afternoon, ladies

5          and gentlemen.

6              THE CLERK:  Officer Reynolds, may I remind you

7          you're still under oath.

8              THE WITNESS:  Yes.

9   CONTINUING CROSS EXAMINATION

10  BY MR. RIVERA:

11      Q    Officer, before we broke, you indicated to us that

12  there was some chiefs and members of the press that were

13  present at the Central Park Precinct; is that correct?

14      A    Yes.

15      Q    And is that unusual to see top brass at the Central

16  Park Precinct during an arrest?

17      A    There is not a lot of arrests there, so, but yeah,

18  I would say it is.  Slight.

19      Q    Under normal circumstances would it be unusual to

20  see a high member of the brass at any precinct when youths

21  are arrested?

22              MS.  LEDERER:  Objection.

23              THE COURT:  I'll allow it.

24      A    It depends on the precinct.

25      Q    Are there some precincts where this would not be


                              E. C. Davis
```

```
 1                T-3    Reynolds-Ppl-cross (Rivera)              910
 2   unusual?
 3                    MS.   LEDERER:   Objection.
 4        A    Yes.
 5        Q    What about the Central Park Precinct, is this
 6   unusual at the Central Park Precinct?
 7        A    Slightly, yes.
 8        Q    And the same applies for the members of the press?
 9        A    Yes.
10        Q    Is thsi the first time you make an arrest where you
11   have that kind of brass and that kind of press present?
12        A    Yes.
13        Q    And at what point in time were you apprised that
14   there case was going to have special significance within the
15   modus operandi of the Police Department.
16                    MS.  LEDERER:   Objection.
17                    THE COURT:  Sustained.
18        Q    Were there any Assistant District Attorneys present
19   at any time when you were involved in this case between
20   April the 19th and April the 20th?
21                    MS.  LEDERER:   Objection.
22                    THE COURT:  I'll let him answer.
23        A    Yes.
24        Q    And would that about A.D.A.  Lederer?
25        A    Yes.


                              H. C. Davis
```

NYCLD_023613

P-APP000980

```
1              T-3    Reynolds-Ppl-cross (Rivera)           911

2        Q    And was there also an A.D.A. Fairstein?

3        A    Yes.

4        Q    Were there any other members of the District

5   Attorney, District Attorney present, paticularly any

6   Assistant District Attorney?

7        A    I don't think so.

8        Q    And when for the first time did you see an

9   Assistant District Attorney on this matter?

10       A    The night of the 20th.

11       Q    Prior to the evening of the 20th, you had not seen

12  any A.D.A.s?

13       A    Regarding this matter?

14       Q    Regarding this case.

15       A    No.

16       Q    Did you see them in the building or any other

17  buildings involved in the case?

18       A    No.

19       Q    Prior to the 20th?

20       A    No.

21       Q    Officer, you testified that you spoke to a police

22  officer Alvarez; is that correct?

23       A    Yes.

24       Q    And police officer Alvarez informed you of an

25  assault on an individual; is that correct?


                        M. C. Davis
```

NYCLD_023614

P-APP000981

T4-fr

390

REYNOLDS - PEOPLE - DIRECT - LEDERER

1
2     Q    At the conclusion of the interview of
3  Lamont McCall, what, if anything, happened?
4     A       At that point he was given an appearance
5  ticket for Family Court.
6     Q    When you say he was given an appearance
7  ticket, who gave him that ticket?
8     A    I did.
9     Q       Did that appearance ticket have a return
10 date?
11    A    Yes.
12    Q    What happened with Lamont   McCall   at   that
13 time?
14    A       He was released to his mother, and given
15 the appearance ticket.
16    Q    Were you present at   another   interview   at
17 that time?
18    A    Yes, I was.
19    Q    Where was that interview conducted?
20    A    That was in the Juvenile room.
21    Q       And is that the lower rectangular room to
22 the bottom of that building on the diagram, People's
23 1?
24    A    Yes, it is.
25    Q    Who was interviewed second?

10/13/8

NYCLD_023136

P-APP000982

T4-fr

REYNOLDS - PEOPLE - DIRECT - LEDERER

1

2      A      Clarence Thomas.

3      Q      And who was present during the interview of

4   Thomas?

5      A      His mother.

6      Q      Did you conduct that interview?

7      A      No.

8      Q      If you know, who conducted that interview?

9      A      I believe that was Detective Whelpley.

10     Q      Would you please name everyone who was in

11   the Juvenile Room at the time that interview was

12   conducted?

13     A      Detective Farrell, Detective Whelpley,

14   Clarence Thomas, his mother, and myself.

15     Q      And approximately how long was that

16   interview?

17     A      It was approximately an hour, an hour and a

18   half.

19     Q      During the time that -- in substance, what

20   did Clarence Thomas say to you?

21     A      He stated that they -- the group came into

22   the park at 110th Street and they had no specific

23   plans for that evening, and they started to assault

24   -- they assaulted, I believe, a bum, and then later

25   on went up to the reservoir and assaulted a jogger

10/13/89

NYCLD_023137

P-APP000983

T4-fr

392

REYNOLDS — PEOPLE — DIRECT — LEDERER

1

up there with a pipe.

2

3    Q    And did he identify any of the people who

4  were with him that night in Central Park?

5    A    Yes, he did.

6    Q    Who did he name?

7    A    I'll have to look at my notes to refresh my

8  memory on that. He named Antron McCray and Lamont

9  McCall.

10   Q    Did he give any information about Antron

11  McCray?

12   A    Yes, he did.

13   Q    What, if any, information did he tell you

14  about Antron McCray?

15   A    I believe he stated that he had assaulted

16  the jogger.

17   Q    Did he give you any information about a

18  description of who Antron McCray was?

19   A    He described him as a male black, 14, 15

20  years old, I believe.

21   Q    Did he tell you anything about where Antron

22  McCray lived?

23   A    He stated he lives on

24   Q    What, if anything, happened at the

25  conclusion of the interview of Clarence Thomas?

10/13/89

NYCLD_023138

P-APP000984

T4-fr

393

REYNOLDS - PEOPLE - DIRECT - LEDERER

1

2   A    He was released to his mother.

3   Q    Was he given anything prior to his release?

4   A    He was given an appearance ticket for

5   Family Court.

6   Q    And was there a date on that ticket?

7   A    Yes, there was.

8   Q    And was that the same date that had been on

9   the ticket of Lamont McCall?

10  A    Yes.

11  Q    What, if anything, did you do after being

12  present for the interview of Clarence Thomas?

13  A    After that we went -- later on that

14  afternoon we went back to his house.

15  Q    When you say later on that afternoon, what

16  time was it when you --

17  A    It was about 11:30.

18  Q    Is that in the morning or the evening?

19  A    In the morning.

20  Q    On what date?

21  A    On the 20th of April.

22  Q    Who did you go with?

23  A    Detective Whelpley and Farrell.

24  Q    And where did you go?

25  A    We went to his house.

10/13/89

NYCLD_023139

P-APP000985

T4-fr

394

REYNOLDS — PEOPLE — DIRECT — LEDERER

1

2   Q   Whose house?

3   A   Clarence Thomas' house.  It's

4

5   Q   AT what time was Clarence Thomas given a

6   return ticket to come to Family Court,

7   approximately?

8   A   It was about 7:30, 8:00.

9   Q   And what, if anything, happened between

10  that time and the time you went to Clarence Thomas'

11  home?

12  A   Kevin Richardson was interviewed.

13  Q   What happened when you arrived at Clarence

14  Thomas' home with the detectives at about 11:30 on

15  the morning of the 20th?

16  A   He was informed we wanted to question him

17  further, and his rights were read to him and his

18  mother.

19  Q   And was he reinterviewed at his home?

20  A   Yes, he was.

21  Q   Approximately how long was he spoken to at

22  his home?

23  A   I'd say about 15, 20 minutes.

24  Q   Did there come a time -- did you conduct

25  that interview?

10/13/89

NYCLD_023140

P-APP000986

T4-fr

395

REYNOLDS - PEOPLE - DIRECT - LEDERER

1

2   A   No.

3   Q   Were you present for that interview?

4   A   Yes.

5   Q   After that interview was conducted, where
6 did you go?

7   A       THen went to          to Antron
8 McCray's house.

9   Q   Who did you go with?

10   A   I went with Detective Farrell and  Whelpley
11 and other detectives from Sex Crime.

12   Q   What, if anything -- withdrawn.

13       When you left Clarence Thomas' apartment,
14 did you leave alone?

15   A   No, I didn't.

16   Q   Who came with you?

17   A   Detective Whelpley, Detective Farrell,  and
18 we  met  with Detective Rosario and Detective Rivera
19 and Morin from Sex Crimes.

20   Q   Did Clarence Thomas and his mother go  with
21 you?

22   A   Yes, they did.

23   Q   Did you travel in the same car with them?

24   A   Yes, I did.

25   Q       Did you have any conversation with them

10/13/89

T4-fr

396

REYNOLDS — PEOPLE — DIRECT — LEDERER

1

2    about why they were going with you?

3        A    With him and his mother?

4        Q    Yes?

5        A    No.

6        Q    How did you know where to go when you    left

7    Clarence Thomas' apartment?

8                MR. JOSEPH: Objection.

9                MR. BERMAN:  Objection.

10               THE COURT:  I'll allow it.

11               Where were you going?

12               THE  WITNESS:  We were going to Antron

13       McCray's house.

14       Q    How did  you  know  where  Antron  McCray's

15    house was?

16       A    Clarence's mother told us where it was.

17       Q        Where did you go to find Antron McCary's

18    apartment?

19       A    To

20       Q    What happened when  you  arrived  at

21          ?

22       A        We  knocked on the door and we spoke  to

23    Antron's father, Bobby McCray.

24       Q    Did you go to the door?

25       A    I went to the door, yes.

10/13/89

P-APP000988

T4-fr

397

REYNOLDS - PEOPLE - DIRECT - LEDERER

1
2    Q    Was anyone else with you?

3    A    Yes.

4    Q    Who was that?

5    A    Detective Rosario, Detective Rivera, and
6    Detective Morin.

7    Q    Did you personally speak to the person you
8    identified as Bobby McCray?

9    A    No.

10   Q    Were you present when there was a
11   conversation with him?

12   A    Yes.

13   Q    Who had that conversation?

14   A    Detective Rosario.

15   Q    What did you hear him say and what did you
16   hear Bobby McCray respond?

17   A    He stated that he wanted to speak to Antron
18   at the Central Park Precinct and that Bobby McCray
19   would have to come with us also because Antron is a
20   juvenile.

21   Q    And what happened then?

22   A    And he agreed and told Antron to get
23   dressed.

24   Q    And did Antron McCray and his father then
25   leave with you?

10/13/89

T4-fr

398

REYNOLDS - PEOPLE - DIRECT - LEDERER

1

2      A      Yes, they did.

3      Q      Do you recall whether anyone else from    the

4  McCray family came?

5      A      His mother came also.

6      Q      And did they ride with you or did they ride

7  with someone else?

8      A        I believe they rode with the detectives

9  from Sex Crimes.

10     Q      What time did you   return   to   the   Central

11  Park Precinct, approximately?

12     A      I'd say it was after 12:00.

13     Q        When Antron McCray came with you -- and

14  left his apartment, what was he wearing?

15     A      He had on the clothes that he   was   wearing

16  the night before.  They were --

17                MR. MOORE:  Objection.

18                MR. BURNS:  Objection.

19                THE COURT:  Objection sustained.

20                Do you remember what he was wearing?

21                THE WITNESS:  No.

22     Q        Was there a conversation with anyone in

23  your presence about what Antron McCray would wear?

24     A      Yes.

25     Q        What   do   you    remember    about    that

10/13/89

T4-fr

399

REYNOLDS – PEOPLE – DIRECT – LEDERER

1
2    conversation?

3        A       Detective Rosario asked Bobby McCray, he
4    asked him if Antron could wear the same clothes he
5    wore the night before, and they agreed.

6        Q       Did you notice anything about his clothes
7    when he came out of the apartment?

8        A       Yes, they were entirely covered with dry
9    mud.

10        Q       When you returned to the Central Park
11    Precinct, did you conduct any interviews of any of
12    the suspects that you already named, that is, Kevin
13    Richardson, Steve Lopez, or Raymond Santana?

14        A       No, I didn't.

15        Q       And did you at any time conduct or were you
16    present during any interviews with Michael Brisco,
17    Kharey Wise, Antron McCray or Yusaf Salam?

18        A       No.

19        Q       Did you voucher any property in connection
20    with this case?

21        A       No.

22        Q       Did you go out and pick up any other
23    suspects in this case?

24        A       No, I didn't.

25             MS. LEDERER:   Thank you very much.

10/13/89

NYCLD_023145

P-APP000991

T4-fr

383

REYNOLDS — PEOPLE — DIRECT — LEDERER

1
2     came and began interviewing them one at a time.

3         Q     Approximately what time  was  that  if  you

4     recall?

5         A     I believe that's approximately 5:50 in the

6     morning.  Let me refresh my memory with that.     I'm

7     sorry, that was approximately 5:30.

8         Q       Were you aware when parents of the family

9     returned with food?

10        A     Yes.

11        Q     Were you aware whether any of that food was

12    given to any of the people you had in  the  Juvenile

13    room?

14        A     Yes.

15        Q       Who do you recall seeing have some food in

16    that room?

17        A     I believe all of them ate.

18        Q     And do you recall whether  Raymond  Santana

19    made  any statement in your presence while he was in

20    that room?

21        A     Yes, he did.

22              THE COURT:   Which room?

23        Q     I'm sorry.   In the Juvenile room?

24        A     Yes.

25        Q     What, if anything, did you hear him say?

10/13/8?

NYCLD_023129

P-APP000992

COMPLAINT
INFORMATIO
PD 313 081/A II

DETAILS:  COMPLAINT: VICTIM FOUND BEAT AND BOUND INSIDE CENTRAL PARK

SUBJECT: INTERVIEW OF CLARENCE THOMAS M/B/14yrs

1) On this date at 0700hrs the undersigned along with Det Whelpley did
interview  Clarence Thomas M/B/14yrs DOB ▅▅▅▅ of ▅▅▅▅
▅▅▅▅ in the presence of his mother Gloria Thomas who lives at the
address. Clarence Thomas was under arrest at this time so the under-
signed informed him and his mother of there rights from a card. Both
Clarence Thomas and his mother Gloria Thomas acknowledge each right
by stating yes and on the last right they agreed to answer questions
without an attorney present. Clarence Thomas states that he and his
friend Antron Mc Cray, who lives on ▅▅▅▅ and goes to JHS 117 (
Exact address unknown) were on E110th st and they met
approx 15 other males all about 13 to 15 yrs old. Clarence states that
he did not know all of these males but he did know a guy named Polo
who is a M/Bor H/15yrs and he hangs out on E 110th and Madison , a guy
named Ralph M/B/15yrs who lives in the Taft projects and he knows
Lamont Mc'Call ( See DD 5 Det Whelpley Re; Lemont Mc Call). Clarence
states that the group was mixed with blacks and hispanics and that they
all went into the park at E 110th and started walking into the park and
south. Clarence stated that they where just hanging out that there was
no plan on what they were going to do in the park. Clarence states that
they entered the park at approx 2010hrs and he remembers the time
because he knows that he met the group at 2000hrs and it took them
about ten minutes to talk and then walk to the park. Clarence further
states that as they walked thru the park some of the guys were throw-
ing rocks at cars but none of the cars stopped except for a cab (yellow)
that did stop but did not chase the group. Clarence also states that
as they walked thru the park ( location unknown) approx eight of the
guys saw a male white40's jogging who was wearing a sweater and blue
shorts, and these eight guys started chasing the male white but after
a few minutes five of the eight returned to the group stating that the
guy got away.                                        Continued on page two

Continued on page two

NYC022226

REYNOLDS EXH. 11

NYCLD_057950

P-APP000993

| COMPLAINT FOLLOW-UP INFORMATIONAL | | Page 2 000873 Pages | |
|---|---|---|---|
| PD313 0914 SECOND SHEET (1-80)84 | | Pct. 022 | Complaint No 281 | Date of this Report 4/20/89 |

DETAILS:          CONTINUED FROM PAGE ONE RE: ASSAULT OF UNIDENTIFIED FEMALE WHITE
                  INSIDE CENTRAL PARK: INTERVIEW OF CLARENCE THOMAS

Cont; Clarence does not know what happened to the other three guys who chased
the male white and states that they were guys he did not know by name that
they were friends of Antron Mc Cray. Clarence states that he and the rest of
the group continued south in the park and then at approx the middle of the
park around 96th St about seven of the guys went after and beat up another
jogger at the fence near the reservoir and this was a male white ( could supply
no further discription). Clarence states that he and Antron Mc Cray ran out of
the park and after awhile the other guys came out and they all started walking
north on Central Park West and as they walked a green van pulled up in the
street and pulled up to the group and one of the guys in the van said that
they were the police and that no one should run but everyone ran any way.
Clarence states that he ran to W 100th St and turned into the park and he trippe
and fell to the ground and the police caught him. Clarence further states that
the others all ran in different directions

When questioned about anyone else who the group had hit Clarence stated that
there was an old bum  who was a male white or hispanic that Lamont Mc Call
had hit with his fist in the back of the bum's head and knocked him to the
ground. Clarence further stated that the only other person he saw in the
park, outside of the three  he had mentioned was some people on a bike but
that they did not go after them. Clarence states that the Bumwas in the middle
of the park and that the Bum was wearing a dark blue coat with grayish pants.
When asked if anyone in the group had a weapon Clarence stated that there was
a M/B/ in his teens tall wearing blue jeans with patches all over them and
a beige taped trench coat and he had a pipe that was approx 14 inches long with one
end taped with black tape. Clarence states that he does not know this tall
male's name but that he saw this male take this pipe out of his pants with his
right hand when they were at the reservoir with the man who  had been beat but
he did not see if the tall male hit the male white with the pipe. Clarence
states that he was too far away from the seven guys to see who was hitting the
white male. At this time Clarence was allowed to go home with his mother and
the interview was discontinued

On this date at approx 1130hrs the undersigned along with Det Whelpley were
at the home of Clarence Thomas and spoke to Clarence's mother first and told her
that Clarence had tobe spoken to again. Mrs Thomas invited the undersigned
and Dte Whelpley into her home and then then woke up Clarence. Mrs Thomas
brought Clarence into her kitchen and he sat down asf did Mrs Thomas and at this
point the undersigned reminded both of them of there rights and again told them
they had the right to have an attorney present before speaking to the police.
Both Mrs Thomas and Clarence agreed to speak te us without an attorney present.
At this time Clarencestated that the pipe he told us about was passed
back and forth between the tall guy and Antron Mc Cray but  Clarence still state
that he did not see either of them hit the guy with the pipe. When asked about
anyone else being beat in the park by this group, Clarence stated that the Bum
Lamont hit but this time Clarence states Lamont beat the Bum with three other
guy's  and that they really beat the guy by punching and kicking him then they
draged this Bum off the road and on the the curb and left him there bleeding.
Clarence states he does not know the names of the three guys who beat the Bum
with Lamont by name but that Antron might know them. Clarence and his mother
agreed to show the undersigned where Antron lived and also agreed to come back
to the Central Park Pct with the undersigned. While in auto 8475 Mrs Thomas
directed the undersigned and Det Whelpley to ███████████ and stated
that Antron lived in this building in apartment███ Det Rosario along with
Dets Rivera and Morin from Sex Crimes went into
███and came out with the subject who was identified as Antron Mc Cary and his
mother Linda Mc Cray and his father Bobby MC Cary. Det Rosario informed the
undersigned that he requested Mr and Mrs Mc Cary and Antron to come to the
CPP and they agreed further Det Rosario asked that Antron wear the clothes he
had been wearing before he went to bed and this was also agreed to by both
parents and Antron. When Antron exited the building his clothes where covered
with dried mud and were very dirty. Mr and Mrs Mc Cray and Antron were trans-
ported to the CPP in Sex Crime auto 731 and Mrs Thomas and Clarence were trans-
ported in DBMSTF auto 8475.

INVESTIGATION CONTINUING

| Reporting Officer's Rank, Signature, Command | Name Printed | Tax Registry No. | Supervisor's Signature | C.O.'s Initials |
|---|---|---|---|---|
| Det ____ DBMSTF | J FARRELL | 864831 | Sgt. | |

NYC022227

NYCLD_057951

P-APP000994

```
 1              People - Det. Arroyo - Cross - Rivera          2963

 2      Q.    You don't recall --

 3              MR. RIVERA:  Withdrawn.

 4      Q.    You just stated that you don't recall that he said

 5 that; is that correct?

 6      A.    Yes, I don't recall that -- I don't recall that he

 7 said that.

 8      Q.    Okay.  Did Raymond tell you that he did not live

 9 with his father?

10      A.    I don't recall that either.

11      Q.    You don't recall any information relative to

12 Raymond's father; is that correct?

13      A.    No, that's incorrect.

14      Q.    You do recall Raymond saying something about his

15 father; is that correct?

16      A.    Yes.

17      Q.    What did Raymond tell you about his father?

18      A.    Told me he didn't get along with him very well.

19      Q.    I'm sorry?

20      A.    He told me he didn't get along with him very well.

21      Q.    Did he tell you he lived with Raymond?

22      A.    I don't recall.

23      Q.    Did he tell you he lived with his mother?

24      A.    Again, I don't recall.

25      Q.    And you were present during the entire questioning
```

Joseph T. Tierney, CSR, RPR

NYCLD_017528

P-APP000995

```
 1              People - Det. Arroyo - Cross - Rivera           2964
 2   of Raymond by Detective Hartigan; is that correct?
 3                   MS. LEDERER:  Objection.
 4                   THE COURT:  What was your question?
 5                   MR. RIVERA:  That he was present during the
 6              entire questioning of Raymond by Detective
 7              Hartigan.
 8        Q.    Is that correct?
 9                   MS. LEDERER:  Objection.
10                   THE COURT:  I'll let him answer if he was
11              present --
12                   Detective Hartigan was present at all times
13              when you were present?
14                   THE WITNESS:  Detective Hartigan was present
15              when I was present, yes.
16                   THE COURT:  At all times?
17                   THE WITNESS:  Except for the times that I
18              left the room, correct.
19        Q.    But from 1:40 to 4:40, you were present during the
20   entire questioning of Raymond Santana; is that correct?
21        A.    Again, except for those times that I left briefly.
22        Q.    Well, when did you leave the room between 1:40 and
23   4:40?
24        A.    Well, I left the room to get coffee.
25        Q.    Other than that.
```

Joseph T. Tierney, CSR, RPR

```
 1              People - Det. Arroyo - Cross - Rivera          2965
 2        A.    I might have also left the room to get myself a
 3   soda.  I left the room after the signing of the written
 4   statement, and that would take us beyond 4:40 p.m.
 5        Q.    Okay.  Raymond signed the statement at about 4:40;
 6   is that correct?
 7        A.    That's correct.
 8        Q.    That means that the interrogation of Raymond ended
 9   about 4:40, would that be correct?
10        A.    That's correct.
11        Q.    And did you tell Raymond that the interrogation
12   had ended of Raymond?
13        A.    No.
14        Q.    You, at no time, informed him that your
15   questioning is over; is that correct?
16        A.    No.
17        Q.    You just took the statement, left the room and
18   came back several minutes later; is that correct?
19        A.    That's correct.
20        Q.    Now, you took that statement and brought it to
21   your supervisors; is that correct?
22        A.    That's correct.
23        Q.    And who, in particular, did you bring Raymond's
24   statement to?
25              MS. LEDERER:  Objection.


                   Joseph T. Tierney, CSR, RPR
```

People - Det. Arroyo - Cross - Rivera                    2966

1
2          THE COURT:  Who did he what?
3          MR. RIVERA:  Who did he bring Raymond's
4     statement to.
5          THE COURT:  I'll let him answer.  I really
6     don't know what it has to do with this hearing.
7     A.    I brought the statement to the detective squad
8     room, where Lieutenant Doyle from Manhattan North Homicide
9     was present.
10    Q.    Was ADA Fairstein or ADA Lederer present when you
11    went to bring the statement to Lieutenant Doyle?
12         MS. LEDERER:  Objection.
13         THE COURT:  I'll let him answer that.
14    A.    No, they were not.
15    Q.    Did you discuss with Lieutenant Doyle the fact
16    that Raymond's grandmother was present and had difficulty
17    with the English language?
18         MS. LEDERER:  Objection.
19         THE COURT:  Sustained.
20    Q.    Did you ever ask Raymond to put into his own words
21    the statement that is People's 20 in evidence?
22    A.    Yes, I asked him if he wanted to write it out.
23    Q.    And what, if anything, did Raymond say?
24    A.    He said no.  I offered to write it out and he
25    agreed.


                Joseph T. Tierney, CSR, RPR

T10-SC-TS

2498

Arroyo - Cross - Rivera

1

2    Q        And that part was not in when you first made out
3  this statement, is that correct?

4    A        That's correct.    Because if he had anything
5  additional to add, it would have been added there.

6    Q        But it wasn't in when you read the statement to
7  Ramon?

8    A    That's correct.

9    Q    Now, were you the one who called the district
10 attorney's office to have him come down?

11   A    No, I was not.

12   Q    <u>Were you present when the DAs office showed up?</u>

13   A    <u>Yes.</u>

14   Q        And at about what time did representatives of the
15 DAs office show up?

16   A    I'm not sure exactly what time they showed up.    <u>I</u>
17 <u>first encountered the DAs at the 20th Precinct after I was</u>
18 <u>finished at the Central Park Precinct.</u>

19   Q    So, they weren't at the Central Park Precinct?

20   A    Well, I don't recall seeing them there.

21   Q    First time you saw them was at the 20 Precinct, 20th
22 Precinct?

23   A    That's correct.

24   Q    And was this in the morning or in the afternoon that
25 you saw them?

T10-SC-TS

2499

Arroyo - Cross - Rivera

1

2     A     This was in the evening.

3     Q     And you have no recollection at about what time you

4 saw them?

5     A     No, I don't.

6     Q     And who from the district attorney's office did you

7 see at the precinct?

8     A     I saw district attorney Linda Fairstein, district

9 attorney Liz Lederer and district attorney Tim Clements.

10    Q     Do you know who Linda Fairstein is in the hierarchy

11 of the district attorney's office?

12    A     Yes.

13    Q     And who is she?

14    A     She was the sex crimes senior trial lawyer for the

15 DAs office.

16    Q     Was she the chief of the sex crime unit for the DAs

17 office?

18    A     I'm not exactly sure what her rank was, but she held

19 some position along those lines at that time.

20    Q     She had a position within the district attorney's

21 office, a high position within the DAs office, is that

22 correct?

23    A     Well, I would assume you would call it that, yeah.

24    Q     And you saw them there on the evening of April the

25 20th, am I correct in that?

NYCLD_017754

P-APP001000

T10-SC-TS

2500

Arroyo - Cross - Rivera

1

2   A    Yes.

3   Q    And the job of a district attorney, the primary job

4  of the district attorney is to assist the police in getting a

5  statement from a defendant?

6   A    That's not correct.

7   Q    They assist the police in getting a video statement

8  from the defendant, is that correct?

9   A    They did perform video statements, yes.

10   Q    When you got the statement from Ramon Santana, you

11  didn't run out and call the DAs office and say we got a

12  statement from Defendant Santana, come on down so we can make

13  a video of it?

14   A    Absolutely not.

15   Q    You waited to get statements from all defendants

16  before you called the DAs office?

17       MR. CLEMENTS:  Objection.

18       THE COURT:  Objection sustained.

19   Q    And so -- were you present when a video statement

20  was taken of Ramon Santana?

21   A    Yes, I was.

22   Q    And who else was present in the room?

23   A    Ramon Santana, Ramon Santana, Sr., district attorney

24  Liz Lederer and detective Mike Sheehan.

25   Q    And yourself, is that correct?

NYCLD_017755

P-APP001001

T10-SC-TS

2501

1                      Arroyo - Cross - Rivera

2       A     And myself.

3       Q        And detective Sheehan is from the Manhattan North

4   Homicide?

5       A     That's correct.

6       Q     Did you escort Ramon into the video room?

7       A     I don't recall.  I don't believe I  did.     I  don't

8   recall if I did escort him.

9       Q        Did you at any point in time tell Ramon that they

10  were going to take a video statement of him?

11      A     No, I don't recall.

12      Q     When you finished questioning Ramon at 4:40  in  the

13  afternoon,  did  you say Ramon, you got to wait around because

14  we're going to take a video statement of you?

15      A     You got to what?

16      Q     You have to wait around because we're going to  take

17  a video statement of you?

18      A     No, I didn't tell him that.

19      Q        It was your testimony you went up and you gave a

20  statement that you took from Ramon  Santana  to  one  of  the

21  supervisors, is that correct, detective supervisors?

22      A     That's correct.

23      Q     Was that detective supervisor lieutenant Doyle?

24      A     That's correct.

25      Q     And this was the commanding officer of the homicide

1                          Hartigan/cross/Mr. Moore          2592

2   J O H N      H A R T I G A N, was recalled as a witness in

3   behalf of the People, having previously been duly sworn,

4   continues to testify as follows:

5              MR. MOORE:  May we approach?

6              THE COURT:  Yes.

7              (Whereupon, there was a bench conference among

8         all counsel with the court out of the hearing and

9         presence of the jury.)

10             (Pause)

11             THE CLERK:  Detective, having been previously

12        been sworn, you're still under oath.

13             THE WITNESS:  Yes, sir.

14             THE COURT:  Members of the jury, you recall Mr.

15        Hartigan was here previously, was interrupted.  And

16        we are going to resume his examination today, cross

17        examination by Mr. Moore.

18   CROSS EXAMINATION

19   BY MR. MOORE:.

20        Q     Mr. Hartigan, good morning.

21        A     Good morning, sir.

22        Q     You indicated in previous cross examination by Mr.

23   Diller that you retired from the N Y P D sometime in July of

24   1989, am I correct?

25        A     Yes, sir.

```
 1                    Hartigan/cross/Mr. Moore          2593

 2      Q     You also indicated that you were a patrolman for

 3  five years and that you were a detective for twenty years,

 4  am I correct?

 5      A     In the detective division for twenty years, yes,

 6  sir.

 7      Q     How long were you with the Manhattan North homicide

 8  detective unit?

 9      A     Three years.

10      Q     And during your tenure with Manhattan North, Mr.

11  Hartigan, how many cases, homicide cases have you

12  investigated?

13      A     It's hard to say.  It's a large number of homicides

14  that we did.  We worked on old homicides.  We worked on new

15  homicides as they came in.  We went back on old homicides.

16      Q     And what percentage of those cases have resulted in

17  arrests?

18               MS. LEDERER:  Objection.

19               THE COURT:  Objection sustained.

20      Q     Now, have those cases that you worked on, what

21  percentage of the defendants in those cases have been black

22  and Hispanic males?

23               MS. LEDERER:  Objection.

24               THE COURT:  Sustained.

25      Q     Of those cases that you have worked on, what
```

AM010249

NYCLD_018271

P-APP001004

Hartigan/cross/Mr. Moore          2594

2  percentage of those cases have been based on statements?

3          MS. LEDERER:  Objection.

4          THE COURT:  Sustained.

5      Q    Now, you've indicated, Mr. Hartigan, that you have

6  in the course of your investigation, you have dealt with

7  young people, am I correct?

8      A    Yes, sir.

9      Q    Would you say in a large percentage of your cases

10 or a small percentage of those cases?

11     A    I'd say a small percentage.

12     Q    Now, in April 20, 1989 your tour of duty was from 8

13 o'clock in the morning to 4 o'clock in the afternoon, am I

14 correct?

15     A    Yes, sir.

16     Q    And in fact, Detective Hartigan, you were fairly

17 busy on that particular day, were you not?

18     A    Pardon me?

19     Q    You were fairly busy on April 20th, were you not?

20     A    Yes, sir.

21     Q    As a matter of fact, you participated in the

22 interview of Kevin Richardson from 9:40 in the morning until

23 about 1 o'clock in the afternoon, am I not correct?

24     A    From about 10 o'clock in the morning, yes, sir.

25     Q    Until about 1 o'clock?

NYCLD_018272

P-APP001005

```
 1                    Hartigan/cross/Mr. Moore          2595

 2      A    Yes, sir.

 3      Q    And that interview resulted in a statement from

 4 Kevin Richardson, am I not correct?

 5           MS. LEDERER:  Objection as to form.

 6           THE COURT:  Objection as to form is sustained.

 7      Q    Well, after the interview Kevin Richardson did give

 8 you a statement, is that correct?

 9      A    Kevin Richardson was giving a statement at the time

10 I sat in on the interview.

11      Q    Yeah.  And he gave you a statement, a written

12 statement?

13      A    Yes, sir.

14      Q    And from 1 to 6 o'clock you participated in the

15 interview of Raymond Santana, am I correct?

16      A    Yes, sir.

17      Q    And that was from 1 to 6 o'clock?

18      A    I can't recall exactly what  --  I believe it was 1

19 --  4 to 6 o'clock.  I can not exactly recall the hour.

20      Q    And at the end of the interview Raymond Santana

21 signed a statement, isn't that correct?

22      A    Yes, sir.

23      Q    And, as a matter of fact, during your examination

24 of Raymond Santana from 1 to 4 o'clock you asked him

25 repeatedly --
```

| | |
|---|---|
| 1 | Hartigan/cross/Mr. Moore                    2596 |
| 2 | MS. LEDERER:  Objection. |
| 3 | THE COURT:  He didn't say he interviewed him |
| 4 | from 1 to 4 o'clock. |
| 5 | Q   Well, your interview of Raymond Santana was roughly |
| 6 | from 1 to 5 o'clock, is that correct? |
| 7 | A   I can't recall what time it ended, sir. |
| 8 | MS. LEDERER:  Your Honor, can I request a |
| 9 | sidebar with the line of questioning Mr. Moore is |
| 10 | about to proceed? |
| 11 | THE COURT:  Yes. |
| 12 | (Whereupon, the following occurred at |
| 13 | sidebar:). |
| 14 | MS. LEDERER:  Your Honor, I requested a sidebar |
| 15 | because Mr. Moore appears to be beginning a line of |
| 16 | questioning about questions that were put to |
| 17 | Raymond Santana.  I would ask for an offer of |
| 18 | proof. |
| 19 | MR. MOORE:  First of all, you in your direct |
| 20 | brought out the fact that he had questioned or |
| 21 | interviewed Raymond Santana. |
| 22 | MS. LEDERER:  That's right.  That was the only |
| 23 | question I asked him. |
| 24 | MR. MOORE:  Let me just finish.  You also |
| 25 | showed Raymond Santana's clothing.  I intend to |

Hartigan/cross/Mr. Moore          2597

show that this officer had a pattern of practice

not only of interviewing people, but also of

getting statements from almost all the individuals

that he interviewed.  And that certainly is

relevant to the whole --

THE COURT:  That he got statements from these

people?

MR. MOORE:  Yeah.

THE COURT:  All right.

MS. LEDERER:  I didn't object to that question.

You just asked him that.  What you were starting

to ask him, isn't it a fact that you repeatedly

asked him during that interview, and I --

THE COURT:  If you're trying to bring out the

substance of the statements  --  I thought that was

the purpose of our visit --

MR. MOORE:  No.  I'm just showing that he asked

him about his involvement in the assault on the

jogger.  I did not give him his involvement with

the assault.

THE COURT:  You can not do that.  You can ask

him if he took a statement from him, answer no.

But the contents of that statement --

MR. MOORE:  I just wanted to ask him a question

NYCLD_018275

P-APP001008

```
 1                    Hartigan/cross/Mr. Moore          2598
 2      about whether he got the statement from the female
 3      jogger when Raymond Santana --
 4           THE COURT:  Same ruling.  I will sustain the
 5      objection.
 6           MR. MOORE:  Okay.  I'll ask him about whether
 7      there was a statement.
 8           THE COURT:  Okay.
 9           MS. LEDERER:  Just while we're here, so that I
10      think the record should be clear, that line of
11      questioning would not be permitted with Steven
12      Lopez or with any of the other non-defendants in
13      this case that this detective interviewed.
14           THE COURT:  For the same reason.  They're not
15      admissible statements.  They're hearsay.
16           MR. MOORE:  I'm not bringing the statements in.
17           THE COURT:  That he took the statement, fine.
18           MS. LEDERER:  That the witness was produced,
19      fine.  But the substance of any statement by
20      another person --
21           MR. MOORE:  I understand.
22           THE COURT:  Okay.
23           (Whereupon, the following occurred in open
24      court:).
25           MR. MOORE:  Could you just read back the last
```

NYCLD_018276

P-APP001009

1                    Hartigan/cross/Mr. Moore              2599

2              question.

3                    THE COURT:  The last question was objected to.

4         Q    Officer, so that I can understand clearly, you

5    indicated that you did interview Raymond Santana sometime in

6    the afternoon from 1 to 4 or 4 to 6, is that correct?

7         A    Yes.

8         Q    After this interview, Raymond Santana signed a

9    statement, is that correct?

10        A    It was during the interview he signed the

11   statement, yes.

12        Q    And there came a time later on that evening from

13   6:30 to 9 o'clock that you also interviewed Steven Lopez, is

14   that correct?

15        A    I interviewed Steven Lopez.  But I don't recall the

16   times.

17        Q    And at the end of that interview Steven Lopez

18   signed a statement, correct?

19        A    Yes, sir.

20        Q    And that morning from 12:30 until about 3 o'clock

21   you interviewed Kharey Wise, am I correct?

22        A    Yes, sir.

23        Q    And at the end of that interview again Kharey Wise

24   signed a statement?

25        A    Yes, sir.

1                        Hartigan/cross/Mr. Moore          2600

2       Q     And from about 2:30 to 3 o'clock that very morning

3    you participated in a videotaped statement by Raymond

4    Santana, is that correct?

5       A     I can't recall if I did or not, sir.

6       Q     But you were aware of the fact that there was a

7    videotape of Raymond Santana?

8       A     I don't recall.

9       Q     And about 3 o'clock that morning you transported

10   Kevin Richardson to the 24th Precinct, am I not correct?

11      A     Either I was transported with him or with his

12   family, yes.

13      Q     And sometime about 4:50 that morning Kevin

14   Richardson participated in a videotaped statement, is that

15   correct?

16      A     Yes, sir.

17      Q     And you were present?

18      A     Yes, sir.

19      Q     And about 8 o'clock the next morning you took Kevin

20   Richardson to the crime scene, am I not correct?

21      A     Yes, sir.

22      Q     From 8 to 9 o'clock, is that correct?

23      A     I don't believe it was that  --  exactly 9 o'clock.

24   But I would say around there.

25      Q     And then about 9:30 you came back to the 24th

NYCLD_018278

P-APP001011

1                  Hartigan/cross/Mr. Moore          2601

2   Precinct and you took a second statement from Kharey Wise,

3   am I not correct?

4       A    Yes, sir.

5       Q    And then about 12:30 that day until about 1:50

6   Kharey Wise participated in a videotaped statement, am I not

7   correct?

8       A    I don't know the times.  But he did participate in

9   a statement, yes, a video statement, yes.

10      Q    And sometime during that videotaped statement you

11  came and you slipped a note to the assistant district

12  attorney Miss Lederer, am I correct?

13      A    Yes, sir.

14      Q    And then sometime at 3:15 later on that evening you

15  were present when Kharey Wise participated in a second

16  videotaped statement?

17      A    Yes, sir.

18      Q    So wouldn't you say, officer, that in those twelve

19  hours you were a very busy detective, weren't you?

20      A    We were all busy.  Yes, sir.

21      Q    I see.  You interviewed a series of young people

22  and in almost all of the cases they made statements, isn't

23  that correct?

24           MS. LEDERER:  Objection as to form.

25           THE COURT:  I'll allow it.

NYCLD_018279

P-APP001012

1                    Hartigan/cross/Mr. Moore              2602

2       A     Yes, sir.

3       Q     I see.  Now, Detective Hartigan, with respect to

4  Kevin Richardson, you indicated that you came sometime about

5  10 o'clock that morning to the Central Park Precinct?

6       A     Yes, sir.

7       Q     And you knew at that time, did you not, that a

8  female jogger had been found assaulted somewhere in Central

9  Park, isn't that correct?

10      A     Yes, sir.

11      Q     You also knew that there were a group of young

12 people who were being held for the assault on a male jogger

13 called John Loughlin around by the reservoir, isn't that

14 correct?

15      A     I didn't know the male jogger's name, no.

16      Q     Well, you were aware of the fact that they were

17 being held for the assault on a male jogger at the

18 reservoir?

19      A     I was aware that they were being held for a series

20 of assaults.

21      Q     For a series of assaults?

22      A     Yes, sir.

23      Q     Not only on the assault on the gentleman of the

24 reservoir but another assault in the park, am I correct?

25      A     I didn't know exactly what the assaults took place.

Hartigan/cross/Mr. Moore          2603

1   I didn't know.  I didn't have firsthand knowledge of what

3   assaults had taken place.

4        Q     But you were aware of a series of assaults?

5        A     That's what I understand, yes, sir.

6        Q     And you were aware, when you responded to the

7   precinct, were you not, that these young men were suspected

8   of being involved in the assault on the female jogger, isn't

9   that correct?

10       A     I would assume yes.

11       Q     And you were also aware when you went to the

12  precinct that Detective Gonzalez was interviewing Kevin

13  Richardson, am I correct?

14       A     I'm sorry?

15       Q     Detective Gonzalez was interviewing.

16       A     Was I aware of what, sir?

17       Q     That he was interviewing Kevin Richardson?

18       A     No.  I didn't learn that until I had gone into the

19  youth room.

20       Q     When you went into the youth room you saw him

21  interviewing Kevin Richardson, am I correct?

22       A     Yes.

23       Q     And he was asking Kevin Richardson questions and

24  Kevin Richardson was responding?

25       A     At that time I didn't pay attention what was going

NYCLD_018281

P-APP001014

SHEEHAN - PEOPLE - DIRECT - LEDERER          3650

minutes.

I, I then advised Raymond I was going into another room, and that when his father got back here, to please ask him to wait for me, I would out in a few minutes.

Q     Did there come a time where you were notified regarding Mr. Santana's senior presence at the precinct?

A     Yes, ma'am.

Q     Would you describe what happened?

A     After eight o'clock, again, I'm not positive on the time, but after eight, and before nine, I was at a briefing in the rear room of the 20th Squad, which would be on the east, it's the east side of the squad, and I was advised by another detective that Mr. Santana senior had arrived.

Q     Did you return to the area where Raymond Santana, Jr., the defendant, was?

A     Yes, I did.

Q     And what happened when you returned to that location?

A     His father was there with him. We shook hands. I introduced myself.

And I advised Mr. Santana, Sr. again that we were going to take a statement, and wanted him to

FMRRN TRANSCRIPT

NATIONWIDE: 1-800-255-5040

CORBY GROUP  N.J:

SHEEHAN - PEOPLE - DIRECT - LEDERER          3651

1

2    be present.

3              I also advised him at that time that there

4    were members of the District Attorney's Office who

5    probably are going to want to videotape any statement

6    that he gave, and his presence would also be required.

7        Q    Did there come a time where you took -- where

8    you interviewed Raymond Santana, Jr.?

9              Did there come a time where you conducted

10   an interview of Raymond Santana, the defendant?

11       A    Yes, ma'am.

12       Q    Approximately what time did that interview

13   begin?

14       A    Ten after 10:00 PM.

15       Q    Where was that interview conducted?

16       A    On the first floor of the 20th Precinct in

17   the Youth Room.

18       Q    Were you able to conduct that interview in

19   that room immediately upon Raymond Santana's father

20   arriving at the precinct?

21       A    No. The Youth Room was being utilized, and

22   we had to wait.

23       Q    Would you describe how it came about that

24   the interview began with Raymond Santana, and who was

25   present?

FMRRN TRANSCRIPT

NATIONWIDE: 1-800-255-5040

CORBY GROUP  NJ:

SHEEHAN - PEOPLE - DIRECT - LEDERER                    3652

1

2        A      We entered the room, it was myself, Detective

3    Jonza,   Raymond   Santana,   Sr.   and   Raymond   Santana,   Jr.

4    We all entered the room.

5               there was a desk or a table.

6               I sat your side if we were to use the prosecu-

7    tion  table,  I  sat  where  you're  sitting,  Mr.  Jonza  sat

8    where  Mr.  Clements  is  sitting.   Raymond  sat  right  over

9    here,  at  this  edge,  and  his  father  sat  to  his  left,

10   slightly to the rear.

11       Q     Prior  to  going  into  the  Youth  Room  to  conduct

12   the  interview  with  Raymond  Santana,  had  you  had  occasion

13   to  see  a  written  statement  that  had  been  prepared  and

14   signed by Raymond Santana?

15       A     Yes, I did.

16       Q     When, for the first time, did you see a written

17   statement  that  Raymond  Santana  had  made  prior  to  your

18   interview?

19       A     Shortly  before,  I  don't  know  how  long,  but

20   certainly enough time to peruse it.

21       Q     Did  Detective  Hartigen  show  you  that  statement

22   when  you  saw  Detective  Hartigen  and  Raymond  Santana

23   in the Youth Room of the Central Park Precinct?

24       A     No, he did not.

25       Q     Did  he  tell  you  the  contents  of  that  statement

FMRRN TRANSCRIPT

NATIONWIDE: 1-800-255-5040

CORBY GROUP  NJ:

FMRRN TRANSCRIPT

NATIONWIDE: 1-800-255-5040

CORBY GROUP   NJ:

SHEEHAN - PEOPLE - DIRECT - LEDERER                3653

at that time, when you saw him at the Central Park

Precinct?

    A    No, he did not.

    Q    Describe how the interview with Raymond Santana

began?

    A    Detective Jonza signed us into a logbook

that was on the desk.

        I, I introduced us once again, Jonza.

        I then advised Santana, Sr. and Santana,

Jr. that I was going to read the Miranda warnings,

which I did, from a Police Department handout.

        MS. LEDERER:   I would ask this please

        be marked as People's 179 for identification.

        (People's Exhibit 179 marked for identifica-

        tion.)

        MS. LEDERER:   I would ask if that could

        please be shown to the witness, please.

        (Handed up to and examined by the witness.)

    Q    Do you recognize People's 179 for identification?

    A    Yes, I do.

    Q    And what do you recognize that to be?

    A    This was the card that I used to read the

Miranda warning.

    Q    Are those the rights that you read to

T4-SC-TS

3679

Sheehan - People - Direct - Lederer

1

2    are you able to hear teletype machines, telephones and

3    typewriters from the 124 room?

4         A    Yes, ma'am.  Because the walls do not go all the way

5    to the ceiling.

6         Q    Are there doors or gates to any of the rooms in the

7    first floor of the 24th Precinct?

8         A    What used to be the 124 room is now the arrest

9    processing center where the uniformed force takes their

10   prisoners.  It's right behind a desk and there is a door there

11   that's been slamming forever.

12        Q    Are you able to hear the slamming of that door from

13   inside the youth room at the 24th Precinct?

14        A    Yes, you are.

15        Q    Did there come a time a video taped statement was

16   taken from Raymond Santana, Jr.?

17        A    Yes.

18        Q    Approximately what time did that happen?

19        A    Approximately 2:30 in the morning.

20        Q    Where did that happen?

21        A    That happened at the 24th Precinct, in that little

22   room I just described, the youth room.

23        Q    Who was present at the time that video taped

24   statement was taken?

25        A    Raymond Santana, Jr., Raymond Santana, Sr., myself,

NYCLD_019204

P-APP001019

T4-SC-TS

3680

Sheehan - People - Direct - Lederer

1

2  detective Burt Arroyo, a video tape technician and you were.

3      Q    Approximately how long did that interview last?

4      A         Approximately  half an hour, a couple of minutes

5  after three.

6      Q    After that interview was  concluded,  was  a  second

7  video tape done of Raymond Santana?

8      A    Yes, about fifteen minutes later there was a second

9  video tape done where Raymond was asked to stand, put  on  his

10  outer  garment, a jacket and a cap.  And that was done for the

11  purposes of recording the clothing he was wearing.

12          MS. LEDERER:  If I can ask to please have  this

13          marked as People's 181 for identification.

14          (Whereupon,   the   Reporter   marked   the

15          abovementioned exhibit, as requested.)

16     Q    Detective, were you present from the very  beginning

17  of the videotape interview to the very end of  the  interview of

18  Raymond Santana, Jr.?

19     A    Yes, I was.

20     Q         And  were  you present from the beginning of the

21  recording of the clothing that he was wearing to the very  end

22  of that recording?

23     A    Yes, I was.

24     Q     I ask you to please look at what's been marked as

25  People's 181 for identification.  Do  you  recognize  People's

NYCLD_019205

P-APP001020

```
1                    Hartigan/cross/Mr. Moore              262756
2  correct?
3      A    I can't recall what he said in the videotape.
4      Q    With respect to this case, officer, did you ever
5  ascertain what time the female jogger was attacked?
6                MS. LEDERER:  Objection.
7                THE COURT:  Sustained.
8                (Pause)
9      Q    And did you make any attempts, officer, to verify
10 the accuracy of the allegations made by Kevin Richardson?
11               MS. LEDERER:  Objection.
12               THE COURT:  Sustained.  We've been all through
13          that, counsel.
14               (Pause)
15     Q    Now, Mr. Hartigan, there came a time when you spoke
16 to Kharey Wise, am I correct?
17     A    Yes, sir.
18     Q    And what time was that?
19     A    12:30 a.m. on the 21st of April.
20     Q    Now, you interviewed him in the sex crimes room of
21 the 20th Precinct, am I not correct?
22     A    Yes, sir.
23     Q    And so from the time when you interviewed him you
24 had a suspicion, did you not, that he was somehow involved
25 in a sexual assault on a female jogger?
```

1                        Hartigan/cross/Mr. Moore            262057

2        A     Yes, sir.

3        Q     Now, do you know the name of the officer who

4   brought Kharey Wise into the precinct?

5        A     No.

6        Q     Did you ever try to find out the name of the

7   officer?

8        A     No.

9        Q     Do you know a Detective Freck, John Freck?

10       A     Yes, I do.

11       Q     Is he from Manhattan North?

12       A     Yes, he is.

13       Q     And do you not recall that it was Detective Freck

14   who brought Kharey Wise?

15       A     No, I don't.  I didn't recall it.  No.

16       Q     And were you also aware of the fact that Eddie De

17   LaPaz had been brought to the 20th Precinct?

18       A     I had no knowledge of Eddie De LaPaz being brought

19   to the 20th Precinct.

20       Q     Now, when Kharey Wise came into the 20th Precinct

21   on the morning of April 20th --

22       A     21st.

23       Q     -- 21st?

24       A     Yes, sir.

25       Q     Was he under arrest?

P-APP001022

1                    Hartigan/cross/Mr. Moore              26₤₤₤₤

2      A    I don't know.

3      Q    Were you the officer who was assigned to interview

4  him?

5      A    Yes.

6      Q    And are you telling the jury that you, the assigned

7  officer, did not know whether he was under arrest?

8               MS. LEDERER:  Objection.

9               THE COURT:  I'll let him answer.

10     A    I didn't know he was going to be placed under

11  arrest or not.  I didn't know that.

12     Q    Did you know whether at the time when you began the

13  interview of him was he under arrest?

14     A    No.  I didn't know if he was under arrest at that

15  time.  No.

16     Q    Does that mean he may have been under arrest?

17     A    If they had deemed that he was one of the

18  principals and that he was under arrest, then he would have

19  been under arrest.

20     Q    You say "they."  Who are you referring to?

21     A    I had no personal contribution as to who was being

22  placed under arrest.  It was not my job.  That was not my

23  aspect of the investigation.  I wasn't placing anybody under

24  arrest.

25     Q    You were the person who was assigned to interview

1                    Hartigan/cross/Mr. Moore              2602 59

2   him, right?

3        A    To do an interview, yes.

4        Q    So was he free to leave?

5        A    I don't know, sir.  If he was under arrest he

6   wasn't free to leave.  If he wasn't under arrest he was free

7   to leave.

8        Q    You didn't find out from your superiors whether he

9   was under arrest or not?

10       A    At that time, no.

11       Q    Now, when you first saw Kharey Wise you told him

12   about certain incidents in Central Park that night, didn't

13   you?

14       A    No.  He told me.

15       Q    Don't you recall that it was you who initiated the

16   conversation, officer?

17       A    Oh, yes, sir.

18       Q    And did you not tell him about the incidents in

19   Central Park?

20       A    I didn't tell him about any incidents in Central

21   Park.  I told him there was something that happened in

22   Central Park.

23       Q    So is it your testimony that you did not tell him

24   what incidents in Central Park that night?

25       A    I didn't mention anything, joggers, female joggers

NYCLD_018337

P-APP001024

Hartigan/cross/Mr. Moore                 2647 8

1

2    Q    I'm asking you exactly what he said as you can

3 recall.

4    A    If I recall correctly, that's exactly what he said.

5 I asked him what time were you and where were you.  And he

6 told me.

7    Q    He mentioned to you that he was with a girlfriend

8 Lisa, am I correct?

9    A    Yes, sir.

10   Q    He gave Lisa's apartment number, am I correct?

11   A    Yes.

12   Q    At any time on the 21st did you speak to Lisa?

13   A    No.

14   Q    But he indicated to you that he was with this

15 woman, am I correct?

16   A    Yes, sir.

17   Q    Then he also mentioned to you that he and a

18 gentleman called Eddie De LaPaz went into the park, am I

19 correct?

20   A    Yes.

21   Q    Now, there came a time subsequent to this, after

22 the  --  withdrawn.

23   There came a time later on the next day when you took a

24 second statement from Kharey Wise, am I correct?

25   A    Yes, sir.

NYCLD_018356

P-APP001025

Hartigan/cross/Mr. Moore                    2648 81

1

2     A     I asked him if that was true.  He acknowledged that

3   it was true.

4     Q     You asked him at the end of the statement?

5     A     Yes.

6     Q     But you didn't ask him as you went through

7   sentence-by-sentence, did you?

8     A     I believe he was doing that with me.  As I was

9   reading, I was reading each word.

10    Q     You believe.  Did he or did he not?

11              MS. LEDERER:  Objection.

12              THE COURT:  Please.  You can't both talk at the

13          same time.

14              What is your question?

15    Q     Did you ask him sentence-by-sentence whether he

16   understood what each sentence meant?

17    A     No.

18    Q     Now, there came a time when he signed the

19   statement, am I correct?

20    A     Yes, sir.

21    Q     And Detective John Hartigan and yourself also

22   signed the statement, am I correct?

23    A     I'm John Hartigan.

24    Q     I'm sorry.  Detective Robert Nugent?

25    A     Yes, sir.

P-APP001026

Hartigan/cross/Mr. Moore                    2640 82

1

2     Q     Was Robert Nugent in the room throughout the entire

3  interview?

4     A     Yes, sir.

5     Q     Now, at any time during the interview, officer, did

6  you ask Kharey Wise if he wanted anything to eat?

7     A     I can't recall if I did or not.  I don't think I

8  asked him if he wanted anything to eat, no.

9     Q     You didn't ask him if he wanted anything to drink?

10    A     I might have.

11    Q     You can't recall?

12    A     I can't recall.

13    Q     Now, after he finished the statement, what action

14  did you take or what did you do?

15    A     I went back downstairs to the 20th squad-room.

16    Q     And you left him alone?

17    A     No.  I left him upstairs in the Sex Crimes Squad.

18    Q     Did you leave him with someone?

19    A     There was police officers up there watching

20  everybody, whoever was still upstairs in that room.

21    Q     Was Detective Nugent with him when you left?

22    A     Yes.  I believe so, yes.

23    Q     Now, after you left Kharey Wise you were involved

24  in other matters, am I not correct?

25    A     After I left Kharey Wise?

NYCLD_018360

P-APP001027

Det. Hartigan / Defense / Cross (Moore)          2712

with Mr. Santana, earlier that evening?

A.   Yes.

Q.   And do you recall that there came a time --

          MS. LEDERER:  Objection.

          THE COURT:  I don't know what the question

is.

          MS. LEDERER:  May we have a side bar?

          THE COURT:  Yes.

          (The following is a sidebar conversation

          outside the hearing of the jury.)

          MS. LEDERER:  It appears to me that Mr. Moore

is trying to ask questions about whether this

detective prefers to interview young people by

themselves without the presence of a parent.

          I am aware that Raymond Santana had a

conversation with the detective out of the

presence of the father.

          If that's where Mr. Moore is going, it's

objectionable and he shouldn't be allowed to ask

the question.

          THE COURT:  I will allow the question.  You

can ask him on redirect how he came to do it.

          (Open court.)

Q.   Mr. Hartigan, do you recall earlier that evening


          Michael Frankel, Sr. Court Reporter

NYCLD_018390

P-APP001028

Det. Hartigan / Defense / Cross (Moore)         2713

that you had a conversation with Mr. Raymond Santana?

    A.    Early that day, yes.  The 20th I had a
conversation with him.

    Q.    That's correct.

          And you were asking him questions about his
involvement with the female jogger.  Do you remember that?

    A.    No, I didn't ask him any questions about the
female jogger.

          Again, he had told us what had happened.

    Q.    Okay.

          But there came a time when he gave you some
information in a statement.  Is that correct?

    A.    He gave us a statement.

    Q.    And you took down his statement.  Am I correct?

    A.    Yes.

    Q.    And in that statement he had not mentioned about
the female jogger.  Do you remember that?

    A.    Yes, sir.

    Q.    Do you remember that there came a time when his
father and his grandmother, -- I'm sorry, his father had
left the precinct?  Do you remember?  That was outside of
the precinct?

    A.    There was different times.  I believe his father
was there early in the morning and left and then again he

                Michael Frankel, Sr. Court Reporter

Det. Hartigan / Defense / Cross (Moore)          2714

left during the conversation that I was having with Santana, yes.

    Q.   That's correct.

        He left during that conversation.  And when his father had left, then you asked him questions about his involvement --

    A.   No.

    Q.   When the father left, he told you about his involvement with the female jogger.  Is that correct?

    A.   He asked his father for permission to talk to me by himself and his father granted it.

    Q.   During the time his father was not there is when he told you about his involvement with the female jogger?

    A.   Yes.

    Q.   Isn't that correct?

    A.   Yes.

    Q.   Now, with respect to Eddie De La Paz, you indicated that you wanted to take him to the precinct.  Am I correct?

    A.   I asked him if he would accompany us to the precinct, yes.

    Q.   And the purpose of taking him to the precinct, was to ask him questions.  Was it not?

    A.   To take a statement from him, yes.

Michael Frankel, Sr. Court Reporter

Det. Hartigan / Defense / Cross (Moore)                2718

1
2    A.   I don't know.

3    Q.   That was in fact Detective Kelly.  Wasn't it?

4    A.   I don't know.

5    Q.   Well, did you ever speak to the detective who was

6  assigned to speak with Al Morris?

7    A.   No.

8    Q.   So Detective Kelly didn't tell you that Al Morris

9  was with Kharey Wise?

10             MS. LEDERER:  Objection.

11             THE COURT:  Objection sustained.

12   Q.   Or is it that you didn't want to hear what

13  information Al Morris was going to tell you?

14   A.   There was just too many people.  It was just too

15  much to absorb.

16   Q.   Now, there came a time when you went back to the

17  24th Precinct.  Am I correct?

18   A.   When?

19   Q.   After you spoke to Eddie De La Paz, you went back

20  to the 24th Precinct.  Am I correct?

21   A.   Yes, sir.

22   Q.   Then you put some information in a note and you

23  handed it to Miss Lederer?

24   A.   Yes.

25   Q.   And this information said that you had spoken to

             Michael Frankel, Sr. Court Reporter

Det. Hartigan / Defense / Cross (Moore)          2719

Al Morris and Al Morris had not verified what Kharey Wise

had said?

    A.   No.  I never spoke to Al Morris.  I spoke to Eddie

De La Paz.

    Q.   I'm sorry.  My mistake.

          You indicated you spoke to Eddie De La Paz?

    A.   Yes, sir.

    Q.   And Eddie De La Paz said he wasn't with Kharey

Wise?

    A.   Yes.

    Q.   At that stage when you gave the information to the

district attorney, you remained room.  Didn't you?

    A.   No, I did not.

    Q.   And did you know that the district attorney had

told Kharey Wise what you had told him about -- I'm sorry,

Eddie De La Paz?

    A.   No.

    Q.   You didn't know that?

    A.   I didn't know if she did or not.

    Q.   Now, after that there came a time when Kharey Wise

finished his video taped statement.  Isn't that correct?

    A.   Yes, sir.

    Q.   At this time when he finished the first video

taped statement, was he under arrest?

Michael Frankel, Sr. Court Reporter

NYCLD_018397

P-APP001032

```
 1                    Hartigan/redirect/People              2733

 2     A      Justice got what it wanted.

 3                 MR. MOORE:   No further questions.

 4                 THE COURT:   Do you have anything else?

 5  REDIRECT EXAMINATION

 6  BY MS. LEDERER:.

 7     Q      Detective, if I might take you back to the

 8  interview of Kevin Richardson.  Do you recall when you were

 9  here earlier you were cross-examined by Mr. Diller?  Do you

10  recall the questions he put to you?

11     A      Yes.

12     Q      And do you recall him asking you a series of

13  questions as to whether you promised the Richardsons, Kevin

14  Richardson or anybody from his family, that Kevin Richardson

15  can go home if he made a statement?  Do you recall those

16  questions Mr. Diller put to you?

17     A      Yes.

18     Q      On the morning of April 20th during the time that

19  you were interviewing Kevin Richardson and during the time

20  that he was writing a statement, did you ever have a

21  conversation with anyone from the Richardson family about

22  Kevin Richardson?

23     A      Yes.

24     Q      And do you recall who you spoke to at that time?

25     A      Gracie Cuffee, the sister.
```

1                    Hartigan/redirect/People                2734

2       Q    Was that conversation at the Central Park Precinct?

3       A    Yes, it was.

4       Q    And did you say anything to Angela Cuffee about

5   Kevin Richardson at that time?

6       A    Yes.

7       Q    What did you say to her?

8       A    I -- generally I spoke to her that Kevin had a

9   lot going for him.  He was young.  He was  --  I had met a

10  lot of people during the course of my time in the police

11  department, a lot of young people who couldn't read or

12  write.  Kevin was intelligent.  He was articulate, could

13  read, he could write.  And that he had a lot going for him.

14      Q    Did you in that conversation with Angela Cuffee,

15  did you have any conversation about what would happen with

16  Kevin Richardson with respect to the statements he had made

17  to you?

18      A    Yes.  I told her that I didn't know what was going

19  to happen, but this wasn't the end of the world for Kevin.

20  That it wasn't up to us, the police department.  But he

21  could possibly be given youthful offender treatment by the

22  courts and that he would have no record at the age of

23  eighteen.

24      Q    In that conversation did you indicate to her that

25  this case would be going to court?

NYCLD_018412

P-APP001034

1                    Hartigan/redirect/People                 2735

2      A      I assumed that she understood that this case was

3  going to court.

4                MR. DILLER:  Objection.

5                THE COURT:  Objection sustained what she

6           understood.

7      Q      Did you use words to her telling her that this case

8  was going to court?

9      A      I don't know if I did or not.

10     Q      When you talked about youthful offender treatment,

11  what exactly did you say to Angela Cuffee?

12     A      That the court could give him youthful offender

13  treatment, and that he would have no police record after the

14  age of eighteen.

15     Q      Did you promise her that would happen in this case?

16     A      No.  I told her we had no control  --  the police

17  department had no control over it.  But this is what

18  possibly could happen.

19     Q      Did you tell her who had control over that?

20     A      The courts.

21     Q      Detective, during the 20th and 21st, and the 22nd

22  and in the course of this investigation, were other

23  detectives other than yourself conducting interviews?

24     A      Yes.

25     Q      Did you personally do an interview of Antron

NYCLD_018413

P-APP001035

```
 1                    Hartigan/redirect/People                    2736
 2  McCray?
 3      A    No.
 4      Q    Did other detectives do that interview?
 5      A    Yes.
 6      Q    Did you personally interview Yusef Salaam?
 7      A    No.
 8      Q    Did other detectives do that interview?
 9      A    Yes.
10      Q    Did you personally interview Jermaine Robinson?
11      A    No.
12      Q    Did other detectives do that interview?
13      A    Yes.
14      Q    Did you personally interview Jomo Smith?
15      A    No.
16      Q    Did other detectives do that interview?
17      A    Yes.
18      Q    Did you personally interview Alfred Morris?
19      A    No.
20      Q    Did other detectives do that interview?
21      A    Yes.
22      Q    Did you personally interview Clarence Thomas?
23      A    No.
24      Q    Did other detectives do those interviews?
25      A    Yes.
```

T7-1f

COLLOQUY

1668

1  
2          Michael Sheehan.
3   D E T.   M I C H A E L     S H E E H A N, Shield 421,
4       Manhattan North Homicide, New York City Police
5       Department, having been called as a witness by
6       the People, having been first duly sworn,
7       testified under oath as follows:
8              COURT OFFICER: Would you give us your
9          name, spell your last name, your shield
10         number and present assignment.
11             THE WITNESS: Detective Michael
12         Sheehan, S-H-E-E-H-A-N; Shield 421, NYPD,
13         Manhattan North Homicide Squad.
14  DIRECT EXAMINATION
15  BY MR. CLEMENTS:
16      Q       Detective, I'd like to direct your
17  attention to April 20, 1989. Did you work on that
18  day?
19      A    Yes, sir, I did.
20      Q    And what shift did you work?
21      A    Four in the afternoon to 1:00 in the
22  morning.
23      Q    Did you receive an assignment shortly after
24  you arrived for work?
25      A    Yes, I did.

10/24/89

NYCLD_018954

P-APP001037

T7-1f

1669

SHEEHAN - PEOPLE - DIRECT - CLEMENTS

1    Q    And what was that assignment?

2    A    I left the Manhattan North office about ten

3    after one, and responded to Central Park Squad.

4    Q    Did you arrive at Central Park?

5    A    Yes, I did.

6    Q    WHen you got there, did you receive another

7    assignment?

8    A    Yes, sir, I went to Central Park to aid in

9    the investigation of an assault on a victim that was

10   likely to die.   Upon   reaching   the   Central   Park

11   Squad,   I   was   surprised of a couple of facts by my

12   immediate supervisor, Sergeant O'Connor.

13        I was then asked to accompany the uniformed

14   force on a search.  The search   was   for   a   weapon,

15   namely, a length of pipe.

16             MR. BURNS:   A what?

17             THE WITNESS:   A length of pipe.

18   Q    Where did that search take place?

19   A    The search took place in the vicinity of

20   West 97th Street and   Central   Park   West;   actually

21   inside the park walls.

22   Q    Did   you   recover   a pipe or was a pipe

23   recovered in your presence?

24   A    No, sir.

10/24/89

NYCLD_018955

P-APP001038

T7—1f

1670

SHEEHAN — PEOPLE — DIRECT — CLEMENTS

1   Q      At the conclusion of that search, what   did

2   you do?

3   A          At the conclusion of the search, I

4   responded back to the Central Park Squad and   had   a

5   conversation with, again, Sergeant O'Connor   and

6   Detective John Hartigan.

7   Q      What time did you   return   to   the   Central

8   Park Squad?

9   A          I returned to   the Central Park Squad

10  somewhere in the vicinity of 5:30 p.m.

11              MR. BURNS:   I'm sorry, 5:30 p.m.?

12              THE WITNESS:   That's correct.

13              THE COURT:   What time was it that   you

14          said you went in search of the weapon?

15              THE WITNESS:   Shortly after 4:00, your

16          Honor.   Let's say 4:30.

17              THE COURT:   Okay.

18              MR. BURNS:  Again p.m.?

19              THE WITNESS:   p.m.

20  Q      When did you speak to John Hartigan?

21  A      I spoke with John Hartigan in the Central

22  Park Precinct, there is a separate   building   across

23  the   alleyway   from   the   main   building.   It is the

24  auxilary police building.   It also houses the   Youth

10/24/89

NYCLD_018956

P-APP001039

T7-1f

1671

SHEEHAN - PEOPLE - DIRECT - CLEMENTS

1  Room.     It was in that building, in the Youth Room,

2

3  that I spoke with John Hartigan.

4      Q     And would you relate the nature of the

5  conversation?

6      A          Sure.    Hartigan advised me that he had

7  taken a statement from -- Raymond Santana, who was

8  seated  at a desk in that room.  He had also advised

9  me. that Santana wished to add certain things to the

10  statement, and that it was  impossible  for  him  to

11  continue,  because  there was no parents or guardian

12  present for Santana.

13          Also,  during  this  I  was  advised  by

14  O'Connor,   Sergeant   O'Connor  that   the   entire

15  investigation was going  to  be  moved  out  of  the

16  Central  Park  Precinct to the west side of West 82nd

17  STreet into the 20th Precinct which was  probably  a

18  better  facility  to handle an investigation of this

19  size.

20      Q     You were  at  the  Central  Park  Precinct,

21  would  you  describe  the  conditions  around  the

22  precinct at that time?

23      A    Well,  Central  Park  Precinct  is  an  old

24  stationhouse.  There is not a lot of room.  There is

25  not  a  lot  of  individual  rooms to do interviews.

10/24/89

NYCLD_018957

P-APP001040

T7-1f

1672

1    SHEEHAN - PEOPLE - DIRECT - CLEMENTS

2    Also, in this case, there's only a small youth room.

3    It's also a bad place to conduct a confidential

4    investigation, especially in a matter of this nature

5    with the press.

6         The press had arrived. There were quite a

7    few people arriving from the media. And they began

8    to gather. There's actually an alleyway that

9    divides the two main parts of the stationhouse.

10   It's unlike any other in the City.

11        Q     After speaking to Sergeant O'Connor and to

12   Detective Hartigan, did you receive another

13   assignment in connection with this case?

14        A     Yes, I did.

15        Q     And what was that?

16        A     The assignment was to take Raymond Santana

17   in our car. I was with Detective Jonza, J-O-N-Z-A,

18   and Rudy Hall, H-A-L-L, both from the Manhattan

19   North Homicide Squad. We were to take Santana from

20   the Central Park Stationhouse to the 20th, notify

21   his father, try to make some arrangements to get his

22   father down to the 20th Precinct, and then take an

23   updated, more complete statement.

24        Q     Did there come a time when you left the

25   Central Park Precinct?

10/24/89

NYCLD_018958

P-APP001041

T8-fr

1677

1    SHEEHAN — PEOPLE — DIRECT — CLEMENTS

2  Telephone Company, or whatever, but there was a hole

3  in the street protected by barriers.  I went to that

4  hole,  jumped  in  myself,  and examined it.  It was

5  only about  two feet deep.  There was no pipe.

6        Q    After you looked  for  the  pipe  at  100th

7  Street and Central Park West, where did you go next?

8        A    We all got back in the car, that is to say

9  myself, Rudy Hall, Augie Jonza, and Raymond Santana.

10  We drove from 100th Street and Columbus Avenue south

11  to the 20th  Precinct,  which  is  located  at  82nd

12  Street,  West  82nd  Street  between  Columbus  and

13  Amsterdam.

14        Q    Was anything else said in the car?

15        A    On the way  from  that  site  to  the  20th

16  Precinct,  Mr.  Santana  said,  "I had nothing to do

17  with the rape.  All I did is feel the woman's  tits.

18  I had nothing to do with the rape."

19        Q    Did you ask him any questions in the car?

20        A    No, I didn't.

21        Q    Was there any conversation in the car?

22        A    No, there wasn't.

23        Q    When  you arrived at the 20th Precinct,

24  where did you go?

25        A    Upon arrival at the 20th Precinct, went  to

10/24/89

NYCLD_018963

T8-fr

1678

1    SHEEHAN - PEOPLE - DIRECT - CLEMENTS

2    the second floor, the 20th Detective Squad. We

3    entered. As you walk into the squad, to the left

4    there's a desk by a window which would be -- if you

5    were looking at it in the scheme, it's the west wall

6    of the 20th squad.

7    MR. CLEMENTS: With the Court's

8    permission, I would like the witness to get

9    off the stand and look at what's been

10   received as People's 3 in evidence.

11   (Witness approaches People's 3 in

12   evidence.)

13   Q    Do you recognize People's 3, Detective?

14   A    Let me get my bearings, yes, I do.

15   Q    And what do you recognize it to be?

16   A    This is a schematic drawing of the second

17   floor of the 20th Precinct. These offices here are

18   the 20th Detective Squad.

19   MR. CLEMENTS: Indicating, for the

20   record, the offices on the lower half of

21   People's 3 in evidence.

22   Q    How did you get to the second floor with

23   Raymond Santana?

24   A    Came in the main entrance of the precinct,

25   which would be here, and up the staircase

10/24/89

NYCLD_018964

P-APP001043

Page 79

1                    Arthur Clements

2   make you think that it was a bad idea?  Were you

3   worried that it's not appropriate or not a good

4   thing to take statements from kids that are that

5   young?

6              MR. MYERBERG:  Objection.

7        A.     No, I didn't have any concern about

8   that.  The statements were being taken in the

9   youth room with parents or guardians present.

10        Q.     Did it ever cross your mind that

11   these were young children, did you ever think of

12   them in that way?

13              MR. MYERBERG:  Again, up to

14        arraignment or at that time?

15              MS. FISHER-BYRIALSEN:  At that

16        time.

17              MR. MYERBERG:  Objection.

18        A.     No, I didn't have any concern.  To

19   the extent I knew their ages, I knew statements

20   were being taken by people who were less than

21   16.

22        Q.     We talked about where the case was

23   assigned earlier, and I asked you if ADA

24   Fairstein was supervising ADA Lederer and you

25   said no.  Do you know if anyone was supervising

NYCLD_035230

P-APP001044

Page 80

1                    Arthur Clements

2    her, anyone at all from the DA's office?

3              MR. MYERBERG:  Objection.

4         A.     I think I testified earlier that I

5    did not, I did not know specifically, you know,

6    what Linda Fairstein's role at the precinct was,

7    but that from my perspective, ADA Lederer was

8    assigned to the case.  So her supervisor would

9    have been our boss, John Hogan, the Chief of

10   Trial Bureau 40.

11        Q.     During your first period at the

12   24th Precinct up to the interview of or up to

13   the conclusion of the statement by Clarence

14   Thomas, did you ever see John Hogan at the

15   precinct?

16        A.     No.

17        Q.     Did you ever see any other

18   supervisors from Trial Bureau 40 at the

19   precinct?  You mentioned earlier there was one

20   other person other than John Hogan.

21             MR. MYERBERG:  Objection.

22        Q.     Dan McNulty, did you ever see him

23   at the precinct?

24             MR. MYERBERG:  Objection.

25        A.     No, I did not see Dan McNulty at

NYCLD_035231

P-APP001045

Page 81

1                      Arthur Clements

2    the precinct but I wouldn't have expected to see

3    him there.

4         Q.      Why not?

5         A.      Because Elizabeth Lederer was

6    qualified to handle homicide cases, and

7    Assistants who went to precincts on, you know,

8    homicide call typically did not have supervisors

9    with them at the precinct, they handled that on

10   their own.

11        Q.      In regards to this case at that

12   time, did you think of her as your superior?

13        A.      Who?

14        Q.      ADA Lederer.

15        A.      At that time in 1989, I thought

16   that John Hogan and Dan McNulty and another

17   deputy bureau chief, if there was one, were my

18   supervisors.

19             (Mr. Warren entered the room.)

20             MS. FISHER-BYRIALSEN:  Just for the

21        record, Michael Warren just came in.  This

22        is Mr. Clements.

23             MR. WARREN:  Yes, we met.

24             MS. FISHER-BYRIALSEN:  Just let the

25        record reflect Mr. Warren is here.

NYCLD_035232

P-APP001046

TAGLIONI — PEOPLE — DIRECT

1

2    A    Yes, I was.

3    Q    And what, if anything, did you hear Kharey

4 say?

5    A    That he would come into the station house

6 with us.

7    Q    And was Kharey Wise handcuffed at that time?

8    A    No, nobody was handcuffed.

9    Q    Where did you go when you left the

10    ?

11    A    Went down to the lobby and to our car.

12    Q    How many cars did you have?

13    A    We had two unmarked police cars.

14    Q    And did you ride in one of the cars?

15    A    Yes, I did.

16    Q    Who did you ride with?

17    A    Detective Hall and Yusaf Salaam.

18    Q    And where did Yusaf Salaam ride in the car?

19    A    In the back seat.

20    Q    Do you know where Kharey went?

21    A    Kharey went into the other unmarked vehicle

22 with Detective Bier and Detective Freck.

23    Q    Was Yusaf Salaam handcuffed when he rode in

24 the car?

25    A    No, he was not.

1599

TAGLIONI — PEOPLE — DIRECT

1    
2    Q    Did you have any conversation with Yusaf

3    Salaam on the way after you left

4    A    No, I did not.

5    Q    Did you hear any conversation between him

6    and anybody else in the car, the other detective?

7    A    I don't recall it, no.

8    Q    Where did you go?

9    A    I went to the 20th Precinct.

10   Q    And where did you go when you arrived at the

11   20th Precinct?

12   A    When we arrived at the 20th Precinct, we

13   were directed to go upstairs to the third floor to

14   the Sex Crimes office.

15   Q    Directing your attention to People's 4 in

16   evidence, the third floor of the 20th Precinct,

17   could you please step down from the witness stand

18   and approach People's 4 in evidence and indicate,

19   please, where you went with Yusaf Salaam when you

20   arrived.

21   A    Okay.  We took the stairway up to the third

22   floor.  We entered the Sex Crimes office, which is

23   over here, and I took Yusaf into this room right

24   here in the Sex Crimes office.

25             MS. LEDERER:  The record should reflect

NYCLD_006916

P-APP001048

1600

TAGLIONI — PEOPLE — DIRECT

1    the witness is indicating a small room off

2    of a longer room. It has three file

3    cabinets and something-- and one desk in

4    that room.

5         You may resume the witness stand. Thank

6    you.

7         (Witness complies.)

8    Q    Now, what did you do when you arrived in

9    that room with Yusaf Salaam?

10   A    I sat there and I waited for someone,

11   another detective to come to do the interview.

12   Q    Did you have any conversation with Yusaf

13   Salaam while you sat there in that room with him?

14   A    No, I did not.

15   Q    Was he seated or standing?

16   A    He was seated.

17   Q    And approximately how much time elapsed

18   before the arrival of a detective to conduct an

19   interview?

20   A    I'm not sure, but I'd say anywhere from

21   fifteen to twenty minutes.

22   Q    And do you know the name of the detective

23   who arrived within that fifteen to twenty minute

24   period?

NYCLD_006917

P-APP001049

TAGLIONI - PEOPLE - DIRECT

1    
2    A    Yes, I do.    Detective Thomas McKenna from

3    Manhattan North Homicide.

4    Q    Were you present when Detective McKenna came

5    into the room?

6    A    Yes, I was.

7    Q    Approximately what time was it-- withdrawn.

8    What, if anything, did he say or do when he came

9    into the room?

10    A    When he came into the room, I introduced him

11    to Yusaf, told him who he was, Detective McKenna

12    from the Homicide Squad, that he would be talking to

13    him.

14    With this Detective McKenna also introduced

15    himself to Yusaf, read him his rights, and at that

16    point I left the office.

17    Q    Were you present when the rights were read?

18    A    Yes, I was.

19    Q    And did you see whether they were read from

20    a card or were they given by memory?

21    A    No, they were read from a card.

22    Q    Were you present-- well, withdrawn.

23    When the rights were read, did Yusaf respond in

24    any way when the rights were read?

25    A    Yes, he did.

1602

1    TAGLIONI - PEOPLE - DIRECT

2    Q    What do you recall his response or responses

3    to be?

4    A    "Yes," to all the answers.

5    Q    When-- did there come a time that you left

6    the third floor?

7    A    Yes, there did.

8    Q    And where did you go when you left the third

9    floor of the 20th Precinct?

10   A    I went down to the second floor to the

11   squad, the 20th squad room.

12   Q    Did there come a time where you returned to

13   the room where you had left Yusaf and Detective

14   McKenna?

15   A    Yes, there was.

16   Q    Approximately how much time elapsed from the

17   time that Detective McKenna came into that room

18   until the time that you returned, as best as you can

19   recall?

20   Well, let me rephrase the question.  I'm sorry.

21   From the time that you left the room, not when

22   Detective McKenna came in, how much time were you

23   away from that room before you returned?

24   A    I'd-- I really-- I don't know.  I believe

25   twenty minutes, maybe more.

NYCLD_006919

P-APP001051

TAGLIONI — PEOPLE — DIRECT                    1603

1   
2       Q    And do you recall for what reason-- what did
3   you do when you returned to the room?
4       A    I asked McKenna for the pad he was writing
5   on, his notebook, his spiral book.
6                    MR. MADDOX:  May that answer be read
7           back?
8                    THE COURT:  Read it back, please.
9                    (The court reporter read back the
10          requested portion of the record.)
11      Q    And do you recall what, if anything, you did
12  with that spiral book?
13      A    Yes, I took it down to the second floor.  I
14  gave it to one of my supervisors.
15      Q    Did there come a time where you returned
16  that spiral book to Detective McKenna?
17      A    Yes.
18      Q    And approximately how much time after you
19  took it from him did you return it to him?
20      A    A few minutes.
21      Q    Sometime after you had taken Detective
22  McKenna's steno book and returned it to him did you
23  have occasion to go to the first floor of the 20th
24  Precinct?
25      A    Yes, I did.

1604

TAGLIONI – PEOPLE – DIRECT

1    Q    And how was it that you came to go to the

2

3    first floor?

4    A    I was instructed to go downstairs by one of

5    my supervisors to talk to Yusaf's mother who had

6    arrived at the station house sometime before that.

7    Q    And do you recall who told you to go

8    downstairs?

9    A    Again, it was one of my supervisors, either

10   the sergeant or the lieutenant.

11   Q    Did you then go downstairs and have a

12   conversation with Yusaf Salaam's mother?

13   A    Yes, I did.

14   Q    And what time was it, as best you recall,

15   that you had a conversation with the defendant's

16   mother?

17   A    It was sometime between twelve and one

18   o'clock in the morning.

19   Q    Do you recall where you had that

20   conversation with Yusaf Salaam's mother?

21   A    Yes, I do.

22   Q    And if you could please step down for a

23   moment and approach the easel, People's 2 in

24   evidence.

25        (Witness complies.)

NYCLD_006921

P-APP001053

1605

TAGLIONI — PEOPLE — DIRECT

1    Q    Would you indicate, please, where you had a
2  conversation with her.
3
4    A    Okay.  I had it right by the main desk,
5  standing right about over here, by the back exit.
6            MS. LEDERER:  The record should reflect
7            that the witness is indicating outside a
8            room that is marked "morgue," and near a
9            "generator room."
10   Q    How many people were present at the
11  conversation you had with Yusaf Salaam's mother?
12   A    At least four.
13   Q    And do you know the names of any of those
14  people?
15   A    No, I do not.
16   Q    Would you please tell us—— you may resume
17  the witness stand.
18            (Witness complies.)
19   Q    What, if anything, did she say to you and
20  what did you say to her in the course of that
21  conversation?
22   A    When we came down, I identified myself as
23  Detective Taglioni.  She identified herself as
24  Mrs.—— as Yusaf's mother.  I don't know her first
25  name.

NYCLD_006922

P-APP001054

1606

TAGLIONI - PEOPLE - DIRECT

1  She was concerned about her child, you know, if

2  he was being abused and I assured her (blank on

3  tape) *that he wasn't. ER.*

4  I said, "We're upstairs. They're talking to him

5  right now."

6  With that she said, "Well, you shouldn't be

7  talking to him because he's only fifteen years old."

/LF 9

10  Q   What, if anything, did you say to her when

11  she told you that her son was only fifteen years

12  old?

13  A   I had told her that he showed us proof of

14  age that he was sixteen years old and that's the

15  reason we were talking to him.

16  Q   And what did she say at that point?

17  A   Well, she said he was fifteen years old.

18  At that point I went upstairs. I told my

19  supervisors these facts, and then I went upstairs to

20  the third floor where Detective McKenna was talking

21  to him and asked him to come out of the room and

22  advised him of the fact Yusaf may, in fact, be only

23  fifteen years old and there may be an attorney.

24  An attorney was downstairs, a federal attorney.

25  Q   Let me just back up for a moment. Did you

NYCLD_006923

P-APP001055

1607

TAGLIONI - PEOPLE - DIRECT

1  ever, prior to going upstairs to Detective McKenna

2  to tell him to interrupt the interview, have a

3  conversation with anyone who identified himself as

4  an attorney?

5     A    No, I didn't have a conversation, no.

6     Q    In the conversation you referred to with

7  Mrs. Salaam or Yusaf's mother, was that the only

8  conversation you had with her up until that point?

9     A    Well, I had a conversation again with her

10 later on.

11    Q    Up until that point, was that the first

12 conversation you had with her?

13    A    Yes, it was.

14    Q    Did she tell you in that conversation there

15 was someone there, an attorney on behalf of her son?

16    A    No.  She told me she had a friend there that

17 was an attorney.  She never told me he was

18 representing her son.

19    Q    Did she tell you anything about his relation

20 to the family?

21    A    Yes, that he was a friend of the family's

22 and he was a federal attorney.

23    Q    And this conversation-- I'm sorry.  She said

24 he was what?

1608

1      TAGLIONI — PEOPLE — DIRECT

2      A    A federal attorney.

3      Q    Did she explain to you what that meant?

4      A    No, and I didn't ask her.

5      Q    The information you are just telling us

6   about hearing this person was a federal attorney who

7   was a friend of the family, when did you learn that?

8      A    When I first spoke to her the first time.

9      Q    Was that in the same conversation that she

10  told you Yusaf Salaam was fifteen years old?

11     A    Yes, it was.

12     Q    Will you tell us now when you went upstairs

13  and spoke to Detective McKenna, after this

14  conversation with her, what, if anything, did you

15  say to her?

16     A    I told Detective McKenna that we had a

17  problem, that Yusaf might be fifteen years old and

18  that there was an attorney downstairs. I didn't

19  know if the attorney was representing him or not,

20  that he stated-- that his mother stated that he was

21  a friend of the family.

22       At this point Detective McKenna said, "That's

23  it, we can't talk to him anymore."

24     Q    How much time went by from the time that you

25  had this conversation with Mrs. Salaam until you

NYCLD_006925

P-APP001057

1609

TAGLIONI — PEOPLE — DIRECT

1  went upstairs and interrupted the interview with

2  Detective McKenna?

3      A   It couldn't have been more than five minutes

4  tops.

5      Q   After you had the conversation with Mrs.

6  Salaam wherein she told you what you just described

7  to us, what was the very next thing you did?

8      A   I directly-- I went upstairs. I told my

9  supervisors and then went directly upstairs to

10  Detective McKenna.

11     Q   Did you do anything else other than tell

12  your supervisor and then go tell Detective McKenna?

13     A   No, I did not.

14     Q   After the conversation you had with

15  Detective McKenna, what was the next thing you did?

16     A   I then went back downstairs and had a

17  further conversation with Yusaf's mother, Mrs.

18  Salaam.

19     Q   And did you tell her what you had just done

20  with respect to Detective McKenna?

21             MR. MOORE:   Objection as to form.

22             THE COURT:   I will allow it.

23     A   Yes, I told her the detective that was

24  speaking to him was informed he was fifteen years

1   TAGLIONI - PEOPLE - DIRECT

2   old, and that he would not be spoken to anymore.

3        Q    And did you have a further conversation with

4   Mrs. Salaam at that point?

5        A    Yes, I did.

6        Q    Would you please tell us what you said to

7   her and what she said to you.

8        A    She asked me if she would be able to talk to

9   Yusaf.    I    told    her    I    would    confer    with    my

10  supervisors, which I did, and permission was given

11  for her to speak to him.

12       Q    Going    back    for    a    moment    to    the    first

13  conversation you had with Mrs. Salaam, about how

14  long did you speak to her at that point?

15       A    I really don't-- I'm not sure.

16       Q    The    second    conversation    that    you    were

17  describing where she asked to speak to Yusaf, do you

18  recall    approximately    how    long    that    conversation

19  lasted?

20       A    Five, ten minutes, maybe.

21       Q    And after you had that conversation-- did

22  you speak to someone about arranging for Mrs. Salaam

23  to see Yusaf?

24       A    Yes, I did.

25       Q    And do you know who it was that you spoke

1611

TAGLIONI — PEOPLE — DIRECT

to?

A    Again, it was one of my supervisors. I'm not sure if it was the sergeant or the lieutenant.

Q    What, if anything, did you do after you spoke to the sergeant or the lieutenant?

A    I went back downstairs and informed Mrs. Salaam that she would be allowed to speak to him. I then went upstairs and took Yusaf down to the first floor.

Q    Where did you find Yusaf when you went upstairs?

A    In the same room where I had put him earlier.

Q    Was anyone speaking with him at that time?

A    No.

Q    What did you do when you went upstairs and found Yusaf on the third floor?

A    I told him his mother was downstairs and would like to speak to him.

Q    What, if anything, did you do with respect to that?

A    I took Yusaf downstairs to the first floor.

Q    Was he handcuffed?

A    No, he was not.

NYCLD_006928

P-APP001060

1612

TAGLIONI — PEOPLE — DIRECT

1

2      Q    And when you took him down to the first

3   floor, could you just approach People's 2 in

4   evidence and show us where you brought him and where

5   his mother was.

6      A    Again, we were down in the main room by the

7   main desk (indicating).  His mother was still

8   standing here with the people (indicating).  His

9   mother and Yusaf went over into this corner and

10  that's where they spoke (indicating).

11     Q    And were you present at the time that they

12  spoke?

13     A    Yes, I was still standing over here

14  (indicating).

15     Q    From where you were standing were you able

16  to hear what they were saying?

17     A    No, I could not.

18          MS. LEDERER:  Thank you, you may resume

19          the witness stand.

20          (Witness complies.)

21     Q    You made reference to some other people in

22  addition to Yusaf Salaam's mother.  Was there anyone

23  else there with respect to Yusaf Salaam?

24     A    Yes.  There were a couple of women and a

25  male.

NYCLD_006929

P-APP001061

1613

TAGLIONI — PEOPLE — DIRECT

1 

2     Q   Do you know their names?

3     A   No, I do not.

4     Q   And approximately how long did Yusaf speak

5 to his mother at that point?

6     A   He spoke to her for quite awhile.  I don't

7 know the amount of time, but a couple times I had to

8 interrupt and tell her we had to bring him upstairs.

9 So it was quite awhile.

10     Q   Can you approximate the amount of time?

11     A   No, I couldn't.

12     Q   At some point did you take Yusaf someplace

13 else?

14     A   Yes.  After he was finished speaking with

15 his mother we brought him back upstairs.

16     Q   When you took him upstairs after he had

17 spoken with his mother, where did you take him?

18     A   I believe it was back up to the third floor

19 again.

20     Q   After you brought Yusaf back upstairs, did

21 you have any further conversation with the

22 defendant's mother?

23     A   Yes, I did.

24     Q   And would you tell us how much after you

25 brought him upstairs was that conversation?

1614

TAGLIONI — PEOPLE — DIRECT

1   A    Five, ten minutes; ten minutes.

2   Q    And where did that conversation take place?

3   A    Also on the third (sic) floor but at a
different location than where we had spoke to her
before.  That's-- as soon as you come into the main
entrance there is a bench against the wall.  She was
sitting there with this federal attorney who turned
out to be a family friend.

10  Q    When you say this federal attorney, did you
actually meet that person at that time?

12  A    Yes, I did.

13  Q    And was that the first time you met him that
evening?

15  A    No, it was not.

16  The first time I spoke to him?

17  Q    Yes.

18  A    It was the first time I actually spoke to
him, yes.

20  Q    Did you have a conversation with the
defendant's mother and the person you've described
as a federal attorney?

23  A    Yes, I did.

24  Q    Would you tell us, please, what they said
and what you said.

NYCLD_006931

P-APP001063

1615

TAGLIONI - PEOPLE - DIRECT

1

2    A   Mrs. Salaam stated that he was a friend of

3  the family.  I believe she used the term "a big

4  brother."

5    With that he asked me what the procedure was

6  now.  And I thought that was a little strange that

7  an attorney was asking me about--

8              MR. MOORE:  Objection.

9              THE COURT:  Yes.

10             Don't tell us what you thought.

11   A   He asked me what the criminal procedures

12 were.  I explained that Yusaf would be brought down

13 to court and he would go in front of a judge for

14 arraignment.

15   Q   And did they ask you any other questions

16 about anything, about the procedure or what would

17 happen at that point?

18   A   After I explained to him, you know, the

19 whole arrest procedure, that was the only

20 conversation I had with them.

21   Q   And about how long was that conversation, if

22 you recall?

23   A   Maybe twenty minutes, fifteen minutes,

24 twenty-five minutes.  I'm really not sure.

25   Q   What happened after you had that

NYCLD_006932

P-APP001064

TAGLIONI — PEOPLE — DIRECT                    1616

2 conversation?

3     A   I believe they left the station house and I
4 went back upstairs to the second floor.

5     Q   Did you have any further conversation with
6 Yusaf Salaam after you spoke to Detective McKenna
7 and told him not to continue the interview?

8     A   No, I did not.

9         MS. LEDERER:   If I may have just one
10        moment, please.

11    Q   At any time-- well, withdrawn.

12        MS. LEDERER:   I have nothing further.
13        Thank you very much.

14        THE COURT:   Mr. Burns.

15        MR. BURNS:   Let me have a second, Judge.

16        THE COURT:   Yes.

17        (Mr. Burns and his client confer.)

18        MR. MOORE:   Excuse me, your Honor, one
19        moment.   May I just approach?

20        (Discussion was held off the record.)

21 CROSS EXAMINATION

22 BY MR. BURNS:

23    Q   Detective Taglioni, my name is Robert Burns
24 and I represent Yusaf Salaam.

25    You and I, we have never met, have we?

TS-1f

1498

1     HILDEBRANDT — PEOPLE — DIRECT — LEDERER

2     time.   They were throwing stones at  the  cars,  and

3     they   came   across   this bum.   They let the bum pass.

4     There was an individual that went  and  knocked  him

5     down.    They   went   over and beat him.   They kicked

6     him.   They took his food and his beer.

7                Someone   had   poured   the   beer   on   him.

8     Somebody  else had taken his food.   They dragged him

9     off the side of the road and left him laying in  the

10    grass.

11               Then he stated they started roaming through

12    the  park, and then they tried to catch individuals.

13    There was a guy  and  a  girl  that  were  riding  a

14    bicycle  built  for  two.    They tried to get them.

15    They got away from them.

16               Then there  came  a  time  they  grabbed  a

17    jogger,  and they knocked him down to the ground and

18    hit him with a pipe.  And then they left  the  park,

19    that the police had come.

20               They  ran  back into the park.  They hid in

21    the park, in the mud.   And  then  he  and  another

22    individual went home to his house.

23        Q         Let  me just go back for just a moment,

24    Detective.

25               Prior to beginning this interview, did  you

10/24/89

NYCLD_016983

P-APP001066

T5-1f

HILDEBRANDT - PEOPLE - DIRECT - LEDERER    1499

2    have a conversation with Detective Gonzalez?

3         A    No, I did not.

4         Q    Prior to beginning this interview, did you

5    have a conversation with anybody from the Police

6    Department with respect to any investigation that

7    had been conducted up until that point?

8         A    No, I did not.

9         Q    Did you have any knowledge at all about

10   what happened in Central Park on the night of the

11   19th, prior to beginning the interview of Antron

12   McCray?

13        A    Other than there had been a woman that had

14   been found assaulted and raped and near death.

15        Q    And had anybody at all told you anything at

16   all about what had happened in the park that night?

17        A    No, they did not.

18        Q    In the course of taking a statement of

19   Clarence Thomas, had he made any statements about

20   what happened in Central Park?

21             MR. JOSEPH:  Objection, Judge.

22             THE COURT:  Prior to what?

23             MS. LEDERER:  In the course of taking

24             the statement of Clarence Thomas, had he

25             made any statements about what happened in

10/24/89

NYCLD_016984

P-APP001067

T5-1f

HILDEBRANDT - PEOPLE - DIRECT - LEDERER          1500

Central Park?

     THE COURT:  I will allow it.

     MR. JOSEPH:  The witness already said nobody told him about it.  The Assistant may not be happy with the answer or maybe she is.  I don't know.

     THE COURT:  I don't know either, but I will let him answer the question.

Q   Had Clarence Thomas made any statement about what happened in Central Park on the night of the 19th prior to the interview of Antron McCray?

A   Prior to conducting the interview of Antron McCray?

Q   Had Clarence Thomas made any statement about what happened in Central Park on the night of the 19th, prior to the interview of Antron McCray?

     MR. JOSEPH:  Objection.

     THE COURT:  I will allow it.

A   Yes, he did.

Q   At the time you conducted the interview of Antron McCray, was he handcuffed?

A   No, he was not.

Q   You described a moment ago a statement that Antron McCray made to you after you asked him what

10/24/89

NYCLD_016985

P-APP001068

TS-1f

1501

1       HILDEBRANDT — PEOPLE — DIRECT — LEDERER

2   had happened in Central Park on the night of April

3   19th?    In the course of his making that statement,

4   did he speak freely or did you interrupt and ask

5   questions?

6       A    In the beginning I let him talk freely.

7       Q    And during the time that he said to you

8   what you have just told us he said to you, was that

9   during the time that he was speaking freely; or was

10  that a time that you were asking him questions?

11      A    Repeat that, please.

12      Q   You have just described a statement that he

13  made when you asked him what happened in Central

14  Park, when he made that statement? Did he speak

15  freely or was this in response to questions put to

16  him?

17          MR. JOSEPH:  Objection to the form.

18          THE COURT:   I don't know about

19       "freely".

20      Q   Was he speaking without interruption or

21  were you interrupting the questions?

22      A    He was speaking without interruption.

23      Q   What, if anything, happened -- withdrawn.

24          During the time he said those things to

25  you, did either of his parents speak?

10/24/89

NYCLD_016986

P-APP001069

T5-1f

1502

HILDEBRANDT - PEOPLE - DIRECT - LEDERER

1    A    No, not at that time.

2    Q    What, if anything, happened after he made

3    the statement that you've just described to us?

4    A    I felt he was not telling us ---

5         MR. JOSEPH:  Objection.

6         THE COURT:  Objection sustained.

7         What happened after that?

8         MS. LEDERER:    May I withdraw the

9    question and ask another question?

10        THE COURT:  Yes.

11   Q    Was there anything you observed about

12   Antron McCray's behavior during the time he made

13   that statement to you?

14        MR. JOSEPH:  Objection.

15        THE COURT:  I will allow it.

16        Just describe what you saw; not your

17   mental state.

18        THE WITNESS:    I saw he was very

19   fidgety in the seat.

20        MR. JOSEPH:  Objection to that.

21        THE COURT:  I will allow it.

22   A    (Continuing)  He was -- at times he had eye

23   contact with me.  When he was speaking to me, he

24   would constantly look down at the ground.

10/24/89

NYCLD_016987

P-APP001070

TS-1f

HILDEBRANDT — PEOPLE — DIRECT — LEDERER    1503

1

2     Q        And after he made that statement to you

3  that you've already described, what happened next?

4     A        We went outside -- I went outside into the

5  hall with Detectives McCabe, Gonzalez, and Mr.

6  McCray.

7     Q     And did you have a conversation outside of

8  the hall?

9     A     Yes.

10    Q        Would you tell us who spoke and what was

11 said?

12    A     I spoke to Mr. McCray.

13    Q     What, if anything, did you say to him?

14    A     I informed him that I felt that his son was

15 not being completely truthful with us. That he was

16 holding back some vital information that might help

17 us in this case.

18    Q     Did the -- did Mr. McCray respond when you

19 said that to him?

20    A     Yes, he did.

21    Q     What, if anything, did he say to you?

22    A     He also felt that his son was not being --

23           MR. JOSEPH:  Objection.

24           THE COURT:  Tell us what he said.

25           THE WITNESS:  He said, I agree, I can

10/24/89

NYCLD_016988

P-APP001071

T6-fr

1504

1   HILDEBRANDT - PEOPLE - DIRECT - LEDERER

2          tell when my son is not telling me the

3          truth.

4      Q      Did he say anything else to you at that

5   point?

6      A    Not that I can recall.

7      Q    Approximately how long did you talk outside

8   the room?

9      A    Two or three minutes.

10     Q    And what happened after the two or three

11  minutes?

12     A      I suggested that Mr. McCray go into the

13  room and talk to his son, inform his son that we

14  felt that he was not being completely truthful with

15  us.

16     Q    And what happened at that point?

17     A    He went into the room and spoke to his son

18  and Mrs. McCray.

19     Q    And where were you at that time?

20     A    Outside the door.

21     Q    Where was Detective McCabe?

22     A    Outside the door.

23     Q    And where was Detective Gonzalez?

24     A    We were all outside.

25     Q    How long did you remain outside the door?

10/24/89

NYCLD_016989

P-APP001072

T6-fr

1505

HILDEBRANDT - PEOPLE - DIRECT - LEDERER

1

2     A     Several minutes.

3     Q     Did you hear what was being said outside

4   the room at that time?

5     A     No, we could not.

6     Q     And what happened after the several minutes

7   past?

8     A     We went back in the room.

9     Q     And what did you do when you went back in

10   the room?

11     A     We continued the interview with Antron.

12   Asked him to go over the chain of events again.

13     Q     When you say "we", who spoke?

14     A     I did.

15     Q     And when you asked Antron to go over the

16   events, what, if anything, did he say to you?

17     A     Basically he repeated the same story.

18     Q     What happened after he repeated the same

19   story?

20     A     Then I asked him if there came a time that

21   they saw a female jogger in the park and he claimed

22   that he didn't.

23     Q     And was there anything unusual about his

24   behavior when he answered your question about the

25   female jogger?

10/24/89

NYCLD_016990

P-APP001073

T6-fr

1506

HILDEBRANDT — PEOPLE — DIRECT — LEDERER

1   MR. JOSEPH:  Objection, Judge.

2   THE COURT:  Objection sustained as  to

3   whether there was anything unusual or not.

4   Q   Was there anything that you noticed about

5   his behavior when he answered the question about the

6   female jogger?

7   MR. JOSEPH:  Objection.

8   THE COURT:  I'll allow it.

9   A   He was looking at me at the time  he  asked

10  the  question  and  ask he answered the question, he

11  looked away.  Looked down at the ground.  Started to

12  move around inside the seat.

13  Q   What happened next?

14  A   At that point I suggested that  ——  to  Mr.

15  McCray  that we go out in the hall, I'd like to have

16  a conversation with him.

17  Q   And did you leave the room with Mr. McCray?

18  A   Yes, I did.

19  Q   And did anyone else leave with you?

20  A   Detective Gonzalez.

21  Q   Where did you go when you left the room?

22  A   Just outside, behind the door.

23  Q   And  what  conversation  occurred  at  that

24  time?  Who  spoke  and what, if anything, did they

10/24/89

NYCLD_016991

P-APP001074

T6-fr

1507

HILDEBRANDT - PEOPLE - DIRECT - LEDERER

2  say?

3     A     I had asked Mr. McCray if he felt that his

4  son was still holding back, and he said, "Yes," he

5  felt that he was keeping something from us. He

6  doesn't now why. He didn't raise him like that. He

7  raised him to tell the truth.

8     Q     And what happened after that conversation?

9     A          I had asked him, "Do you think that he

10  would be embarrassed -- that he is embarrassed

11  talking in there about what happened?"

12          At that time Mr. McCray said that it could

13  be, it could possibly be. He said, "Maybe it would

14  be better if my wife wasn't there, that he would

15  tell us what happened." And at that point I asked

16  him if he would want to talk to his wife. He said,

17  "Yes." I put him back in the room and Detective

18  McCabe came out and they had a conversation.

19     Q     Approximately how long -- withdrawn.

20          Detective, where was Detective Gonzalez at

21  this time?

22     A     He was in the hall.

23     Q     And where was Detective McCabe?

24     A     Inside the room.

25     Q     And did Detective McCabe leave the room?

10/24/89

NYCLD_016992

P-APP001075

T6-fr

1          HILDEBRANDT - PEOPLE - DIRECT - LEDERER

2          A      Only after Mr. McCray went back in and we

3     allowed them to speak together.

4          Q          How long were they allowed to speak

5     together?

6          A      A couple of minutes.

7          Q      Could you hear what was being said in that

8     room?

9          A      No.

10         Q          After a couple of minutes passed, what's

11    the next thing that happened?

12         A      We entered. We went back into the Youth

13    Room and I asked Mr. McCray what was decided and he

14    informed me that his wife had agreed to leave and at

15    that point Detective Gonzalez escorted her from the

16    room.

17         Q          After Mrs. McCray left the room, what was

18    the next thing that happened?

19         A      Mr. McCray informed his son -- as to why

20    the mother -- he informed the son to be truthful

21    with us and to tell us what happened, and if

22    something happened to the female jogger, to tell us

23    what happened.

24         Q          And did you then have a further

25    conversation with Antron McCray?

10/24/89

NYCLD_016993

P-APP001076

T6-fr

1509

HILDEBRANDT - PEOPLE - DIRECT - LEDERER

1    A        At that point -- just prior to that,
3  Detective Gonzalez came back into the room and when
4  he was back, I had asked Antron to tell us exactly
5  what happened with the female jogger.
6    Q    And -- did Antron McCray then tell you
7  something about what happened with the female
8  jogger?
9    A    Yes, he did.
10   Q    In substance, can you tell us, please, what
11 did he say happened with respect to the female
12 jogger?
13           MR. JOSEPH:  I object to the form, "in
14        substance."
15           THE COURT:  Give us your recollection
16        of what he said.
17           THE WITNESS:  He said the female
18        jogger was jogging along the reservoir, and
19        they came up and one of the individuals
20        grabbed her.  They knocked her to the
21        ground.  They started kicking her.  He
22        admitted to kicking her.  There came a
23        point where he was holding her down by the
24        left arm, and another individual had
25        removed her clothing.  There come a time

10/24/89

NYCLD_016994

P-APP001077

T6-fr

HILDEBRANDT - PEOPLE - DIRECT - LEDERER          1510

2      when the jogger was struck in the chest and
3      struck over the head with a pipe. He gives
4      the sequence of individuals --
5           MR. JOSEPH: Objection, Judge.
6           THE COURT: I'll allow it. Go ahead.
7           THE WITNESS: Who jumped on top of her
8      including himself. I believe he puts
9      himself as the third individual. As he was
10     on top, somebody else was holding her arm
11     down. After he was finished, he was
12     followed by one or two other individuals,
13     and when they were finished, they left that
14     area of the park.
15     Q     After Antron McCray made the statement to
16     you, did there come a time you put in writing the
17     statement that he had given you?
18     A     Yes.
19          MR. JOSEPH: I object to the question.
20          THE COURT: No, I'll allow it.
21     A     Yes, I did.
22     Q     Did you write the statement, or did you and
23     Antron McCray write the statement?
24     A     I wrote it.
25     Q     And would you please describe for the Court

10/24/89

T6-fr

1511

HILDEBRANDT - PEOPLE - DIRECT - LEDERER

1  how it came about that what he said was put on
2
3  paper?

4          Did you write the whole thing at once or
5  did you write it in pieces?  did you ask him
6  questions?  Describe to us how it came about that
7  the statement was put into writing?

8     A    After he had admitted to what happened to
9  the female jogger --

10          MR. JOSEPH:  I object, Judge.

11          THE COURT:  I'll allow it.

12          MR. JOSEPH:  That's not responsive to

13          the --

14          THE COURT:  I'll allow it.  Go ahead.

15    A    I told him I was going to write down the
16  chain of events as he relayed them to me.  I
17  repeated the chain of events and had asked him to
18  correct me if I was wrong.  And I wrote down from
19  memory, from what he originally told me.  After I
20  wrote down the statement, I read the statement to
21  him and his parents --

22    Q    Let me stop you for a moment.

23          You just said, "his parents."  Did there
24  come a time that his mother returned to the room?

25    A    Yes, there was.

10/24/89

NYCLD_016996

P-APP001079

T6-fr

HILDEBRANDT - PEOPLE - DIRECT - LEDERER  1512

1

2      Q       And would you please tell us, in relation

3  to the writing of the statement, when  was  it  that

4  his mother returned to the room?

5      A       After he admitted to what had happened to

6  the female jogger, Detective -- I  believe  it  was

7  Detective  Gonzalez  went  upstairs and brought Mrs.

8  McCray back into the room.

9      Q    Was that before or after the statement  was

10  put in writing?

11      A     Before.

12      Q       I interrupted you.  I think you said you

13  had written out the statement.  What did you do with

14  the statement after you had written it out?

15      A     After I wrote it, I read it to  Antron  and

16  his parents.

17      Q       As  you  read  it to Antron, did he say

18  anything to you when you read it back to him?

19      A    No, he did not.

20      Q    Did he make any corrections when  you  read

21  it back to him?

22      A       I believe I made a few corrections as to

23  time and --

24      Q    When you read it back, did  either  of  his

25  parents speak?

10/24/89

NYCLD_016997

P-APP001080

T6-fr

HILDEBRANDT — PEOPLE — DIRECT — LEDERER    1513

1

2    A    No, they did not.

3    Q    I ask you to please look at what's been
4    previously marked as People's 12 for identification.

5         (People's 12 handed to witness.)

6    Q    Looking at People's 12 for  identification,
7    do  you  recognize  what  that  is,  Detective
8    Hildebrandt?

9    A    Yes.

10   Q    What do you recognize that to be?

11   A    That's the  statement  that  I  wrote  down
12   after the interview of Antron.

13   Q    And is that statement signed by anyone?

14   A    Yes, it is.

15   Q    Will you please indicate who has signed
16   that statement?

17   A    Antron McCray, Linda McCray,  Bobby  McCray
18   and myself.

19   Q    And are there any initials on the end of
20   pages one or two of that three page exhibit?

21   A    Yes, there are.

22   Q    And what initials appear at the  bottom  of
23   the first page of that exhibit?

24   A    A.M., L.M. -- it looks like A.M. -- B.M., I
25   guess.  B.M.

10/24/89

NYCLD_016998

P-APP001081

T6-fr

HILDEBRANDT - PEOPLE - DIRECT - LEDERER 1514

1

2      Q        Who   initialed pages one and two at the

3  bottom?

4      A     Antron  McCray,  Linda  McCray,  and  Bobby

5  McCray.

6      Q        And   was   this   document  signed  in  your

7  presence?

8      A     Yes, it was.

9      Q     And was it initialed at the bottom of pages

10  one and two in your presence?

11      A     After I read each page.

12      Q     Are  there  any  corrections   that   appear   in

13  any of the lines of pages one, two, or three?

14      A     Yes, there are.

15      Q        Would   you please indicate on the first

16  page, is there any correction or change that appears

17  other than the text?

18      A     Yes, I wrote down on there, "about 9  p.m."

19  and I initialed it.

20      Q        And   how   did   it   come  about that that

21  addition or correction was made?

22      A     Well, as I was reading it aloud, I have  on

23  here  "Clarence  was at my house and we left," but I

24  didn't have what time he was at the house.

25      Q     When was the   correction   or   the   addition

10/24/89

NYCLD_016999

P-APP001082

T6-fr

HILDEBRANDT - PEOPLE - DIRECT - LEDERER   1515

2   made?

3      A     As I was reading it.

4      Q          And   is   that  your  handwriting  that  the

5   addition --

6      A     Yes.

7      Q     On page two are there   any   corrections   or

8   changes or additions?

9      A     Yes.

10      Q        And  would  you  please  indicate  which  change

11   or correction is there?

12      A     I added the word "down."

13      Q     Is that your handwriting?

14      A     Yes, it is.

15      Q     And was that added before the document   was

16   signed and initialed?

17      A     Yes.

18      Q          And the correction on the first page --

19   withdrawn.

20         The addition on the  first  page  where  it

21   says "around 9 p.m." was   that   added before the

22   document was signed and initialed?

23      A     Yes.

24            MS. LEDERER:  Your Honor, at this time

25            I offer People's 12 in evidence.

10/24/89

NYCLD_017000

P-APP001083

Linda Fairstein

Page 261

```
 1    meeting his father.  I saw Raymond      16:47:16
 2    Santana's father that morning, the morning  16:47:20
 3    seven to nine a.m. at the 24th Precinct.    16:47:24
 4            I believe I saw other parents.     16:47:36
 5    I know I saw other parents at hours        16:47:40
 6    throughout the day of the 21st and other   16:47:43
 7    young men.  I saw Michael Briscoe, I       16:47:48
 8    remember distinctly, and I believe family  16:47:53
 9    members of his.                            16:47:56
10        Q.    Did you know that Raymond        16:48:00
11    Santana had to be re-interviewed because a  16:48:02
12    parent was not present?                    16:48:05
13            MS. DAITZ:  Objection to form.     16:48:08
14        A.    Did I learn that Raymond Santana  16:48:14
15    had to be re-interviewed when, what day,   16:48:17
16    what time, I don't know.                   16:48:20
17        Q.    Whenever he was interviewed,      16:48:22
18    particularly on the 19th.                  16:48:25
19            MS. DAITZ:  Your personal          16:48:26
20    knowledge prior to arraignment is what     16:48:27
21    he's asking you.  At the precinct, did you  16:48:30
22    come to learn the fact as Mr. Beldock just  16:48:32
23    characterized it.                          16:48:35
24        A.    I didn't have any personal        16:48:36
25    knowledge of what happened on the 19th     16:48:39
```

NYCLD_039129

P-APP001084

Linda Fairstein

Page 262

```
 1    before -- on the 19th, no.                16:48:41
 2        Q.    Nobody gave you any information  16:48:45
 3    about what happened on the 19th?           16:48:48
 4            MS. DAITZ:   Objection to form.    16:48:49
 5    You can answer.                            16:48:50
 6        A.    The information that was being   16:48:51
 7    given was being given to Ms. Lederer who   16:48:52
 8    was the prosecutor in charge of the        16:48:55
 9    investigation.                             16:48:57
10        Q.    You didn't get that information  16:48:58
11    as well?                                   16:48:59
12        A.    I got some of the information.   16:48:59
13    She was doing her job.  It wasn't as       16:49:02
14    though she was coming to me to tell me     16:49:05
15    everything.                                16:49:08
16        Q.    So did you learn anything about  16:49:08
17    what happened on the 19th?                 16:49:11
18        A.    Anything about what happened on  16:49:12
19    the 19th, yes, I previously answered.      16:49:13
20        Q.    I'm talking about questioning of 16:49:15
21    any of the young men.                      16:49:22
22        A.    I don't recall now being told    16:49:24
23    any specifics.                             16:49:27
24        Q.    Okay.  Back on the 20th at the   16:49:29
25    20th Precinct, what were you doing for     16:49:39
```

NYCLD_039130

P-APP001085

Linda Fairstein

Page 263

| | | |
|---|---|---|
| 1 | three and a half hours that you were | 16:49:49 |
| 2 | there? | 16:49:51 |
| 3 | A.   I was trying to facilitate what | 16:49:51 |
| 4 | Ms. Lederer needed to do.  So I spent a | 16:49:59 |
| 5 | lot of time on the phone. | 16:50:03 |
| 6 | Q.   When I said three and a half | 16:50:04 |
| 7 | hours, I think it's probably more like | 16:50:06 |
| 8 | four hours, right, 8:30 to 12:30? | 16:50:09 |
| 9 | A.   8:30 to 11:30, it was three | 16:50:12 |
| 10 | hours because, as you know, at 11:30 I | 16:50:16 |
| 11 | became involved with another issue. | 16:50:19 |
| 12 | Q.   You're giving us to understand, | 16:50:21 |
| 13 | and you'll correct me if I'm wrong, that | 16:50:27 |
| 14 | you had no supervisory involvement in Ms. | 16:50:30 |
| 15 | Lederer's work at the 20th Precinct; is | 16:50:34 |
| 16 | that correct? | 16:50:38 |
| 17 | MS. DAITZ:  Objection to form. | 16:50:38 |
| 18 | A.   Those are not my words.  That's | 16:50:39 |
| 19 | not the impression I'm trying to create. | 16:50:44 |
| 20 | Q.   Were you supervising the | 16:50:47 |
| 21 | investigation? | 16:50:49 |
| 22 | A.   No, I was not doing that. | 16:50:50 |
| 23 | Q.   Were you the senior District | 16:50:52 |
| 24 | Attorney there? | 16:50:54 |
| 25 | A.   I was the Senior Assistant | 16:50:54 |

NYCLD_039131

P-APP001086

Linda Fairstein

Page 264

```
 1    District Attorney there for, as I've        16:50:58
 2    testified at the trial, administrative       16:51:02
 3    purposes.  I was not there -- I assigned     16:51:05
 4    Ms. Lederer because she did not need at      16:51:07
 5    the precinct a legal supervisor.             16:51:10
 6        Q.    Were you participating in the      16:51:13
 7    investigation?                               16:51:15
 8        A.    As of 11:30 that night, I was      16:51:18
 9    not participating in any part.               16:51:22
10        Q.    As of 8:30 that night?             16:51:24
11        A.    I'm sorry, from 8:30 to 11:30,     16:51:26
12    no.  I set Ms. Lederer up.  I began to       16:51:30
13    make phone calls to expedite her work.       16:51:33
14        Q.    The phone calls were to            16:51:36
15    Morgenthau?                                  16:51:38
16        A.    Several to Morgenthau, several     16:51:39
17    to and from John Hogan, her Bureau Chief.    16:51:41
18    I spent time on the phone with one of the    16:51:46
19    neurosurgeons at Metropolitan Hospital.  I   16:51:50
20    spent a lot of time on the telephone with    16:51:54
21    one of Ms. Meili's brothers.                 16:51:59
22        Q.    Go on.                             16:52:04
23        A.    I spent time on the phone with     16:52:11
24    the desk at the 24th Precinct inquiring      16:52:15
25    about the designated youth room there and    16:52:18
```

NYCLD_039132

P-APP001087

Linda Fairstein

Page 265

| | | |
|---|---|---|
| 1 | whether we could clear -- whether they | 16:52:20 |
| 2 | could clear for Ms. Lederer and Mr. | 16:52:23 |
| 3 | Clements the youth room, and could handle | 16:52:26 |
| 4 | the operation if we moved it to their | 16:52:30 |
| 5 | precinct. | 16:52:35 |
| 6 | Q.    Anyone else you were talking to? | 16:52:35 |
| 7 | A.    Possibly, but I don't recall. | 16:52:38 |
| 8 | Q.    Let me show you an exhibit | 16:52:40 |
| 9 | that's been premarked as 5. | 16:52:45 |
| 10 | MS. DAITZ:  Thank you. | 16:53:00 |
| 11 | Q.    Do you recognize -- | 16:53:05 |
| 12 | A.    Just a minute. | 16:53:07 |
| 13 | MS. DAITZ:  Fairstein Exhibit 5 | 16:53:11 |
| 14 | is a one-page document, NYC025732. | 16:53:14 |
| 15 | Q.    This -- | 16:53:25 |
| 16 | A.    Just a minute.  I'm having | 16:53:26 |
| 17 | trouble with the handwriting.  Just let me | 16:53:29 |
| 18 | read it and I'll answer your questions, | 16:53:31 |
| 19 | please.  Okay, yes. | 16:53:33 |
| 20 | Q.    This -- | 16:53:48 |
| 21 | MR. BELDOCK:  Withdrawn. | 16:53:50 |
| 22 | Q.    You said you spent some time | 16:53:51 |
| 23 | talking to a doctor, right? | 16:53:52 |
| 24 | A.    Yes. | 16:53:54 |
| 25 | Q.    This document is not the doctor | 16:53:55 |

NYCLD_039133

P-APP001088

COMPLAINT - FOLLOW UP
PD 313-081A (Rev. 1-86)-31

| | Pct | OCCB No. | Complaint No. | Date of This Report | PAGE 1 OF 2 PAGE |
|---|---|---|---|---|---|
| | 022 | | 281 | 4/20/89 | |

Date of Orig. Report | Date Assigned | Unit Reporting
4/20/89 | 4/20/89   67 | DBMSTF NIGHTWATCH

Complainant's Name - Last, First, M.I.
P.S.N.Y.

Victim's Name - if Different
Unidentified F/W/20-30yrs

003055

DETAILS:   COMPLAINT: VICTIM FOUND BEAT AND BOUND INSIDE CENTRAL PARK
           SUBJECT: INTERVIEW OF CLARENCE THOMAS M/B/14yrs

1) On this date at 0700hrs the undersigned along with Det Whelpley did
   interview  Clarence Thomas M/B/14yrs DOB ████████ of ███████
   ██████ in the presence of his mother Gloria Thomas who lives at the
   address. Clarence Thomas was under arrest at this time so the under-
   signed informed him and his mother of there rights from a card. Both
   Clarence Thomas and his mother Gloria Thomas acknowledge each right
   by  stating yes and on the last right they agreed to answer questions
   without an attorney present. Clarence Thomas states that he and his
   friend Antron Mc Cray who lives on ████████ and goes to JHS 117 (
   Exact address unknown) were on E110th St and Madison Ave and they met
   approx 15 other males all about 13 to 15 yrs old. Clarence states that
   he did not know all of these males but he did know a guy named Polo
   who is a M/Hsp H/14yrs and he hangs out on E 110th and Madison , a guy
   named Ralph M/B/15yrs who lives in the Taft projects and he knows
   Lamont Mc Call ( See DD 5 Det Whelpley Re; Lamont Mc Call). Clarence
   states that the group was mixed with blacks and hispanics and that they
   all went into the park at E 110th and started walking into the park and
   south. Clarence stated that they where just hanging out that there was
   no plan on what they were going to do in the park. Clarence states that
   they entered the park at approx 2010hrs and he remembers the time
   because he knows that he met the group at 2000hrs and it took them
   about ten minutes to talk and then walk to the park. Clarence further
   states that as they walked thru the park some of the guys were throw-
   ing rocks at cars but none of the cars stopped except for a cab (yellow
   that did stop but did not chase the group. Clarence also states that
   as they walked thru the park ( location unknown) approx eight of the
   guys saw a male white40's jogging,who was wearing a sweater and blue
   shorts, and these eight guys started chasing the white male but after
   a few minutes five of the eight returned to the group stating that the
   guy got away.

   Continued on page two

Reporting Officer's Rank, Signature - Command
Det ████████ DBMSTF

Name Printed
J. FARRELL

Tax Registry No.
864831

Supervisor's Signature
Sgt

Farrell Eth.
4

NYC002949

COMPLAINT FOLLOW-UP INFORMATIONAL
PD-313-081A SECOND SHEET (1-85)-24

| Page | | Pct. | Complaint No. | Date of This Report |
|---|---|---|---|---|
| 022 | | | 281 | 4/20/89 |

DETAILS:   CONTINUED FROM PAGE ONE RE: ASSAULT OF UNIDENTIFIED FEMALE WHITE
INSIDE CENTRAL PARK: INTERVIEW OF CLARENCE THOMAS      003056

) Cont; Clarence does not know what happened to the other three guys who chased the male white and states that they were guys he did not know by name that they were friends of Antron Mc Cray. Clarence states that he and the rest of the group continued south in the park and then at approx the middle of the park around 96th St. about seven of the guys went after and beat up another jogger at the fence near the reservoir and this was a male white ( Could supply no further description). Clarence states that he and Antron Mc Cray ran out of the park and after awhile the other guys came out and they all started walking north on Central Park West and as they walked a green van turned into the street and pulled up to the group and one of the guys in the van said that they were the police and that no one should run but everyone ran any way. Clarence states that he ran to W 100th St and turned into the park and he tripped and fell to the ground and the police caught him. Clarence further states that the others all ran in different directions

) When questioned about anyone else who the group had hit Clarence stated that there was an old bum who was a male white or hispanic that Lamont Mc Call had hit with his fist in the back of the bum's head and knocked him to the ground. Clarence further stated that the only other person he saw in the park, outside of the three, he had mentioned was some people on a bike but that they did not go after them. Clarence states that the Bumwas in the middle of the park and that the Bum was wearing a dark blue coat with grayish pants. When asked if anyone in the group had a weapon Clarence stated that there was a M/B/ in his teens tall wearing blue jeans with patches all over them and a beige trench coat and he had a pipe that was approx 14 inches long with one end taped with black tape. Clarence states that he does not know this tall male's name but that he saw this male take this pipe out of his pants with his right hand when they were at the reservoir with the man who had been beat but he did not see if the tall male hit the male white with the pipe. Clarence states that he was too far away from the seven guys to see who was hitting the white male. At this time Clarence was allowed to go home with his mother and the interview was discontinued

) On this date at approx 1130hrs the undersigned along with Det Whelpley were at the home of Clarence Thomas and spoke to Clarence's mother first and told her that Clarence had tobe spoken to again. Mrs Thomas invited the undersigned and Dte Whelpley into her home and then went an woke up Clarence. Mrs Thomas brought Clarence into her kitchen and he sat down asf did Mrs Thomas and at this point the undersigned reminded both of them of there rights and again told them they had the right to have an attorney present before speaking to the police. Both Mrs Thomas and Clarence agreed to speak to us without an attorney present. At this timeClarencestated that the pipe he told us about before was passed back and forth between the tall guy and Antron Mc Cray but Clarence still state that he did not see either of them hit the guy with the pipe. When asked about anyone else being beat in the park by this group, Clarence stated that the Bum Lamont hit but this time Clarence states Lamont beat the Bum with three other guy's and that they really beat the guy by punching and kicking him then they draged this Bum off the road and on the the curb and left him there bleeding. Clarence states he does not know the names of the three guys who beat the Bum with Lamont by name but that Antron might know them. Clarence and his mother agreed to show the undersigned where Antron lived and also agreed to come back to the Central Park Pct with the undersigned. While in auto 8475 Mrs Thomas directed the undersigned and Det Whelpley to ▓▓▓ and stated that Antron lived in this building in apartment ▓▓▓ Det Rosario along with Dets Rivera and Morin from Sex Crimes went into ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ and came out with the subject who was identified as Antron Mc Cary and his mother Linda Mc Cray and his father Bobby MC Cary. Det Rosario informed the undersigned that he requested Mr and Mrs Mc Cary and Antron to come to the CPP and they agreed further Det Rosario asked that Antron wear the clothes he had been wearing before he went to bed and this was also agreed to by both parents and Antron. When Antron exited the building his clothes where covered with dried mud and were very dirty. Mr and Mrs Mc Cray and Antron were transported to the CPP in Sex Crime auto 731 and Mrs Thomas and Clarence were transported in DBMSTF auto 8475.

INVESTIGATION CONTINUING

| Reporting Officer's Name/Signature/Command | Name Printed | Tax Registry No. | Supervisor's Signature | C.O.'s Initials |
|---|---|---|---|---|
| Det [sig] DBMSTF | J FARRELL | 864831 | Sgt. | |

CRIMINAL RECORDS SECTION

NYC002960

NYCLD_058354

P-APP001090

Page 73

```
 1                   Arthur Clements
 2   anyone representing you from Corporation
 3   Counsel?
 4         A.      Again, your question is about?
 5         Q.      A negative relationship or friction
 6   between Nancy Ryan and Linda Fairstein.
 7         A.      No, I had not heard that.
 8         Q.      Ultimately, prior to arraignment,
 9   this case became a case belonging to the Sex
10   Crimes Bureau; is that correct?
11                 MR. MYERBERG:   Objection.
12         A.      I don't know specifically whether
13   that is accurate or not from my perspective.   It
14   was assigned to Elizabeth Lederer.
15         Q.      And to your knowledge, was Linda
16   Fairstein supervising Elizabeth Lederer?
17                 MR. MYERBERG:   Objection.
18         A.      No.
19         Q.      What was your understanding of her
20   involvement in the case prior to the arraignment
21   of Linda Fairstein's involvement prior to the
22   arraignment?
23         A.      I don't know if I -- I think Linda
24   Fairstein was at the precinct, but that the case
25   was assigned to Elizabeth Lederer.
```

NYCLD_035224

P-APP001091

Page 74

1                      Arthur Clements

2          Q.      Did she have any other involvement

3    than simply being at the precinct on that one

4    occasion prior to the arraignment?

5                 MR. MYERBERG:   Objection.

6          A.      You're asking about Linda

7    Fairstein?

8          Q.      Yes.

9          A.      I don't know specifically what

10   Linda Fairstein's involvement was at the time I

11   arrived at the precinct.

12         Q.      Let me go back.   We've discussed so

13   far the period from April 21st around 2:00 to

14   2:30 a.m. where you arrive at the precinct and

15   the events, including the statements taken from

16   Kevin Richardson, Steve Lopez, Raymond Santana

17   up to Clarence Thomas, correct?   Those are the

18   things that happened when you were initially at

19   the 24th Precinct on April 21, 1989?

20                 MR. MYERBERG:   Objection.

21         A.      Well, I don't know that that's

22   everything that happened at the 24th Precinct.

23   But I was present on the first floor of the 24th

24   Precinct during the time that the videotaped

25   statements of Kevin Richardson, Raymond Santana,

NYCLD_035225

P-APP001092

E. LEDRER

Page 666

```
 1      A.    If this document is correct,    11:03:31
 2   then I would have been at the 20th        11:03:39
 3   Precinct from 8:45 p.m. until             11:03:41
 4   approximately 10:45 p.m.                  11:03:43
 5      Q.    And at some point you went to    11:03:48
 6   the 24th Precinct, correct, because that's  11:03:50
 7   where you then conducted the interviews,  11:03:53
 8   right?                                     11:03:54
 9      A.    I'm sorry, let me correct my     11:03:54
10   answer.  As I sit here today and as I     11:03:56
11   think about my answer, I don't believe I  11:04:00
12   traveled to the 24th Precinct with the    11:04:02
13   video technician.  I believe I stayed at  11:04:04
14   the 24th Precinct until approximately     11:04:07
15   midnight.                                  11:04:09
16      Q.    At the 20th Precinct?            11:04:10
17      A.    I believe so.                    11:04:10
18      Q.    Until midnight, okay.           11:04:11
19      A.    Approximately.  And so, if this  11:04:12
20   document is correct, then arriving at the  11:04:17
21   20th Precinct with the video technician at  11:04:20
22   8:45, I was there for a little bit over    11:04:23
23   three hours.                               11:04:26
24      Q.    Tell me how you learned, tell me  11:04:28
25   what you were doing for the three hours or  11:04:31
```

NYCLD_036699

P-APP001093

E. LEDRER

Page 667

```
 1    thereabouts that you were at the 20th        11:04:34
 2    Precinct, what were you doing there?         11:04:34
 3       A.    I don't, as I sit here today,       11:04:36
 4    have a clear recollection of what I was      11:04:41
 5    doing.  I believe I was trying to prepare    11:04:43
 6    to take a videotaped statement, and I        11:04:47
 7    don't recall, as I sit here today, which     11:04:53
 8    young man that would have been.              11:04:55
 9            But we were preparing, and I         11:04:57
10    believe trying to set up in what we          11:05:00
11    thought was the youth room at the 20th       11:05:02
12    Precinct.                                    11:05:04
13            So I was involved in preparing       11:05:04
14    for that, but I don't know what else I       11:05:09
15    might have been doing.  I don't remember     11:05:12
16    anymore.                                     11:05:13
17       Q.    Were you talking with the           11:05:14
18    detectives who were investigating the case  11:05:18
19    during this period of time before you       11:05:20
20    started the interviews?                      11:05:22
21       A.    I don't remember.  I may have       11:05:23
22    been.  I know for part of the time I was     11:05:24
23    at a briefing, but I don't know how long I   11:05:26
24    was there.                                   11:05:29
25       Q.    Who did the briefing?               11:05:29
```

NYCLD_036700

P-APP001094

E. LEDRER

Page 668

| | | |
|---|---|---|
| 1 | MS. DOLLIN:  Objection.  Asked | 11:05:31 |
| 2 | and answered. | 11:05:32 |
| 3 | A.    It was someone from the police | 11:05:32 |
| 4 | department. | 11:05:37 |
| 5 | Q.    Who? | 11:05:38 |
| 6 | MR. BELDOCK:  Can you repeat | 11:05:38 |
| 7 | that? | 11:05:39 |
| 8 | MR. MOORE:  She said it was | 11:05:40 |
| 9 | someone from the police department. | 11:05:41 |
| 10 | Q.    Who from the police department, | 11:05:42 |
| 11 | do you know? | 11:05:45 |
| 12 | A.    I don't know. | 11:05:45 |
| 13 | Q.    Was it one of the detectives who | 11:05:46 |
| 14 | were involved in the investigation? | 11:05:48 |
| 15 | MS. DOLLIN:  I'm just going to | 11:05:49 |
| 16 | object to this line of questioning as | 11:05:50 |
| 17 | having been asked last time. | 11:05:52 |
| 18 | MR. MOORE:  Well, we only | 11:05:54 |
| 19 | touched on it.  We didn't really go into | 11:05:55 |
| 20 | it.  We went off to something else, that's | 11:05:56 |
| 21 | why I'm going back to it. | 11:05:58 |
| 22 | Q.    Do you remember who it was?  Was | 11:06:00 |
| 23 | it one of the detectives or was it | 11:06:02 |
| 24 | somebody else from the police department? | 11:06:04 |
| 25 | A.    I think it was somebody else | 11:06:06 |

NYCLD_036701

P-APP001095

E. LEDRER

Page 669

| | | |
|---|---|---|
| 1 | from the police department. | 11:06:07 |
| 2 | Q.    And was the briefing about what | 11:06:08 |
| 3 | evidence they had at that point in terms | 11:06:11 |
| 4 | of who was responsible for what happened | 11:06:13 |
| 5 | in the park, was that what the briefing | 11:06:15 |
| 6 | was about? | 11:06:17 |
| 7 | MS. DOLLIN:  Objection to form. | 11:06:18 |
| 8 | A.    I don't have a clear memory of | 11:06:19 |
| 9 | what the briefing was about beyond, I | 11:06:23 |
| 10 | believe, a description of some of the | 11:06:26 |
| 11 | things that had happened in the park that | 11:06:28 |
| 12 | night.  But I'm not, I think that's what | 11:06:30 |
| 13 | it was, but I don't remember clearly. | 11:06:33 |
| 14 | Q.    When did Linda Fairstein get to | 11:06:36 |
| 15 | the precinct, do you know?  First of all, | 11:06:39 |
| 16 | was she at the 20th Precinct? | 11:06:42 |
| 17 | A.    ADA Fairstein was at the 20th | 11:06:45 |
| 18 | Precinct on the evening of April 20th. | 11:06:49 |
| 19 | Q.    Did you have conversations with | 11:06:50 |
| 20 | her about the case at the 20th Precinct on | 11:06:52 |
| 21 | April 20th? | 11:06:55 |
| 22 | A.    I believe we spoke briefly. | 11:07:00 |
| 23 | Q.    Okay.  What about? | 11:07:02 |
| 24 | A.    I would imagine.  I remember, I | 11:07:04 |
| 25 | remember her telling me that the reason | 11:07:15 |

NYCLD_036702

P-APP001096

E. LEDRER

Page 670

| | | |
|---|---|---|
| 1 | she had come to the 20th Precinct, to give | 11:07:17 |
| 2 | me whatever help I might need, was because | 11:07:23 |
| 3 | she had handled a case that happened in | 11:07:25 |
| 4 | Central Park, and that having a crime | 11:07:28 |
| 5 | scene in Central Park had unique problems. | 11:07:32 |
| 6 | And she felt that perhaps she'd be able to | 11:07:35 |
| 7 | assist me in dealing with a crime scene in | 11:07:38 |
| 8 | Central Park. | 11:07:41 |
| 9 | Q.     You had had an earlier phone | 11:07:42 |
| 10 | conversation with Linda Fairstein asking | 11:07:44 |
| 11 | you to take charge of the investigation, | 11:07:47 |
| 12 | correct? | 11:07:49 |
| 13 | MS. DOLLIN:  Objection to form. | 11:07:50 |
| 14 | A.     The phone call I had with ADA | 11:07:51 |
| 15 | Fairstein wasn't to take charge of an | 11:07:53 |
| 16 | investigation.  It was to stand by and | 11:07:55 |
| 17 | field the questions that might come from | 11:08:01 |
| 18 | whoever was working on this at the Central | 11:08:06 |
| 19 | Park Precinct. | 11:08:10 |
| 20 | Q.     So at what point did you learn | 11:08:10 |
| 21 | that a young white woman had been sexually | 11:08:17 |
| 22 | assaulted in the park?  Did you learn that | 11:08:23 |
| 23 | in your conversation with Linda Fairstein | 11:08:26 |
| 24 | or did you not learn that until you got to | 11:08:28 |
| 25 | the precinct? | 11:08:30 |

NYCLD_036703

P-APP001097

E. LEDRER

Page 671

| | | |
|---|---|---|
| 1 | A.     I may have heard it on the radio | 11:08:31 |
| 2 | before I went to work.  And I don't have a | 11:08:34 |
| 3 | clear memory of ADA Fairstein mentioning | 11:08:38 |
| 4 | it to me.  But that would have been the | 11:08:42 |
| 5 | reason that I got involved because it was | 11:08:45 |
| 6 | a sexual assault and a possible homicide. | 11:08:47 |
| 7 | Q.     And when did you learn that | 11:08:50 |
| 8 | Patricia Meili was discovered near the | 11:08:51 |
| 9 | 102nd Street Transverse? | 11:08:54 |
| 10 | A.     As I sit here today, I don't | 11:09:00 |
| 11 | have a memory of when I learned where she | 11:09:08 |
| 12 | was found.  I don't know when I learned | 11:09:11 |
| 13 | that. | 11:09:14 |
| 14 | Q.     Well, you knew that she was, you | 11:09:14 |
| 15 | knew that she had been jogging, correct, | 11:09:18 |
| 16 | and attacked while she was jogging? | 11:09:20 |
| 17 | A.     I believe I knew that at some | 11:09:22 |
| 18 | point during the day. | 11:09:24 |
| 19 | Q.     Yeah, I'm trying to pinpoint it | 11:09:24 |
| 20 | because you were familiar with the route | 11:09:27 |
| 21 | that she ran, correct? | 11:09:29 |
| 22 | MS. DOLLIN:  Objection. | 11:09:30 |
| 23 | A.     In 1989? | 11:09:31 |
| 24 | Q.     Yeah. | 11:09:33 |
| 25 | A.     Yeah. | 11:09:34 |

NYCLD_036704

P-APP001098