E. LEDRER

Page 672

| | | |
|---|---|---|
| 1 | Q. You used to run that same route, | 11:09:34 |
| 2 | right? | 11:09:37 |
| 3 | MS. DOLLIN: Objection. | 11:09:37 |
| 4 | Q. Across the 102nd Street | 11:09:38 |
| 5 | Transverse? | 11:09:41 |
| 6 | A. Sometimes. | 11:09:41 |
| 7 | Q. Before, before you left the 20th | 11:09:41 |
| 8 | Precinct, do you recall that you learned | 11:09:54 |
| 9 | the location of where she was found or did | 11:09:57 |
| 10 | you not learn that until you got to the | 11:10:00 |
| 11 | 24th? | 11:10:02 |
| 12 | A. I don't really remember when I | 11:10:03 |
| 13 | learned that. | 11:10:06 |
| 14 | Q. All right. At some point, did | 11:10:06 |
| 15 | you make an attempt to develop a timeline | 11:10:23 |
| 16 | of all these events that were taking place | 11:10:26 |
| 17 | in the park? | 11:10:29 |
| 18 | MS. DOLLIN: At what period of | 11:10:29 |
| 19 | time are you asking? | 11:10:31 |
| 20 | Q. While you were at the -- when | 11:10:31 |
| 21 | you got involved in the investigation, at | 11:10:32 |
| 22 | some point did you try to construct or ask | 11:10:34 |
| 23 | somebody to construct a timeline of the | 11:10:37 |
| 24 | events? | 11:10:39 |
| 25 | MS. DOLLIN: And again, you're | 11:10:39 |

NYCLD_036705

P-APP001099

E. LEDRER

Page 673

| | | |
|---|---|---|
| 1 | asking prior to arraignment, right? | 11:10:41 |
| 2 | MR. MOORE:  Prior to when? | 11:10:43 |
| 3 | MS. DOLLIN:  Arraignment. | 11:10:44 |
| 4 | MR. MOORE:  Yeah, I guess, sure. | 11:10:46 |
| 5 | A.    Excuse me? | 11:10:48 |
| 6 | Q.    Prior to the time, prior to the | 11:10:48 |
| 7 | time a decision was made to arrest whoever | 11:10:52 |
| 8 | you were going to arrest for the rape of | 11:10:55 |
| 9 | Patricia Meili, did you see a timeline or | 11:10:57 |
| 10 | were you involved in constructing a | 11:10:59 |
| 11 | timeline? | 11:11:01 |
| 12 | MS. DOLLIN:  Objection to form. | 11:11:01 |
| 13 | A.    When I was at the 20th Precinct | 11:11:02 |
| 14 | and the 24th Precinct, I don't remember | 11:11:06 |
| 15 | anybody specifically working on a | 11:11:13 |
| 16 | timeline. | 11:11:20 |
| 17 | Q.    Well, you knew there were a | 11:11:22 |
| 18 | series of events -- | 11:11:28 |
| 19 | MR. MOORE:  Withdraw that. | 11:11:30 |
| 20 | Q.    Were you present -- did you know | 11:11:31 |
| 21 | who Chief Rosenthal was? | 11:11:33 |
| 22 | A.    I think I'd heard his name | 11:11:35 |
| 23 | before then. | 11:11:37 |
| 24 | Q.    Were you present when he gave a | 11:11:37 |
| 25 | statement to the press concerning the | 11:11:39 |

NYCLD_036706

P-APP001100

E. LEDRER

Page 674

| | | |
|---|---|---|
| 1 | case? | 11:11:41 |
| 2 | A.    No. | 11:11:42 |
| 3 | Q.    Okay. | 11:11:42 |
| 4 | MR. MOORE:  Why don't you mark | 11:11:50 |
| 5 | this as 26. | 11:11:51 |
| 6 | (Document NYC041413 was hereby | 11:11:51 |
| 7 | marked as Lederer Exhibit 26 for | 11:11:51 |
| 8 | identification, as of this date.) | 11:12:36 |
| 9 | Q.    I'm handing you what's been | 11:12:36 |
| 10 | marked as Lederer Deposition Exhibit | 11:12:38 |
| 11 | number 26.  Have you ever seen this | 11:12:40 |
| 12 | document before? | 11:12:45 |
| 13 | A.    Let me just take a minute to | 11:12:45 |
| 14 | look at it. | 11:12:47 |
| 15 | MS. DOLLIN:  And while the | 11:12:48 |
| 16 | witness is reviewing it, it bears Bates | 11:12:49 |
| 17 | stamp number NYC041413. | 11:12:52 |
| 18 | A.    Okay, I looked at the document. | 11:14:03 |
| 19 | Q.    Have you ever seen it before? | 11:14:06 |
| 20 | MS. DOLLIN:  Outside the | 11:14:07 |
| 21 | presence of counsel. | 11:14:08 |
| 22 | MR. MOORE:  Yeah, I guess. | 11:14:09 |
| 23 | A.    I don't know whether I've seen | 11:14:13 |
| 24 | this outside the presence of counsel. | 11:14:14 |
| 25 | It's possible that I saw this at some | 11:14:16 |

NYCLD_036707

P-APP001101

E. LEDRER

Page 675

| | | |
|---|---|---|
| 1 | point, but I don't have a clear memory of | 11:14:18 |
| 2 | when that was. | 11:14:22 |
| 3 | MR. MOORE:  Why don't you mark | 11:14:23 |
| 4 | this as 27. | 11:14:26 |
| 5 | A.    I have -- | 11:14:27 |
| 6 | MS. DOLLIN:   There's no question | 11:14:28 |
| 7 | pending. | 11:14:30 |
| 8 | (Document NYC059393 was hereby | 11:15:06 |
| 9 | marked as Lederer Exhibit 27 for | 11:15:06 |
| 10 | identification, as of this date.) | 11:15:07 |
| 11 | Q.    I'm handing you what's been | 11:15:07 |
| 12 | marked as Lederer Deposition Exhibit | 11:15:09 |
| 13 | number 27, which is Bates stamp number NYC | 11:15:11 |
| 14 | 59393. | 11:15:18 |
| 15 | Is this a document that's in | 11:15:19 |
| 16 | your handwriting? | 11:15:20 |
| 17 | A.    Yes. | 11:15:23 |
| 18 | Q.    And do you know when you created | 11:15:25 |
| 19 | this document? | 11:15:29 |
| 20 | A.    I don't know when it was in | 11:15:30 |
| 21 | the -- and it was during the prosecution | 11:15:43 |
| 22 | of this case, but I don't remember when it | 11:15:45 |
| 23 | was.  But I know that it was after | 11:15:47 |
| 24 | arraignment. | 11:15:49 |
| 25 | Q.    After arraignment, why do you | 11:15:49 |

NYCLD_036708

P-APP001102

E. LEDRER

Page 676

| | | |
|---|---|---|
| 1 | say that? | 11:15:52 |
| 2 | A.    Because I know it was done after | 11:15:53 |
| 3 | arraignment. | 11:15:57 |
| 4 | Q.    And you know that based upon | 11:15:58 |
| 5 | what though? | 11:16:00 |
| 6 | A.    I know that Michael Vigne was | 11:16:01 |
| 7 | not known to us at the Central Park 20 and | 11:16:09 |
| 8 | 24th Precinct.  And I did not know the | 11:16:14 |
| 9 | name Rubin Ronan or Rohan until quite | 11:16:23 |
| 10 | sometime after arraignment. | 11:16:28 |
| 11 | I know that David Good was not, | 11:16:30 |
| 12 | I didn't know about him or speak to him | 11:16:35 |
| 13 | until after arraignment. | 11:16:38 |
| 14 | And I don't know when the name | 11:16:40 |
| 15 | or the word at the bottom with the | 11:16:49 |
| 16 | question mark came to be there.  And -- | 11:16:51 |
| 17 | Q.    The times indicated on this | 11:16:56 |
| 18 | document, are these the times when you | 11:16:57 |
| 19 | believed that these persons were assaulted | 11:17:01 |
| 20 | or attacked by the people in the park or | 11:17:04 |
| 21 | an approximation of when that occurred? | 11:17:06 |
| 22 | A.    As I recall, I don't remember | 11:17:09 |
| 23 | exactly, but I don't believe this is drawn | 11:17:18 |
| 24 | from my opinion or my thought process. | 11:17:26 |
| 25 | I believe this is taken from the | 11:17:29 |

NYCLD_036709

P-APP001103

E. LEDRER

Page 677

| | | |
|---|---|---|
| 1 | testimony of the witness or 911 calls or | 11:17:33 |
| 2 | police reports. | 11:17:38 |
| 3 | Q.    Right, but it's a timeline of | 11:17:38 |
| 4 | events that took place in the park on | 11:17:41 |
| 5 | April 19, 1989, that evening, correct? | 11:17:44 |
| 6 | MS. DOLLIN:  Objection.  You can | 11:17:47 |
| 7 | answer. | 11:17:49 |
| 8 | A.    It's a timeline of some of the | 11:17:49 |
| 9 | events that happened in the park. | 11:17:51 |
| 10 | Q.    Right.  And it's your | 11:17:53 |
| 11 | understanding that David Lewis, David | 11:17:56 |
| 12 | Good, Robert Garner and John Loughlin were | 11:17:58 |
| 13 | all attacked somewhere at or near the | 11:18:02 |
| 14 | reservoir, correct? | 11:18:05 |
| 15 | A.    That was their testimony, yes. | 11:18:08 |
| 16 | Q.    And you had no reason to doubt | 11:18:10 |
| 17 | that testimony, correct? | 11:18:12 |
| 18 | A.    I don't. | 11:18:13 |
| 19 | Q.    All right.  And was, Antonio | 11:18:14 |
| 20 | Diaz was the person who you knew, who some | 11:18:20 |
| 21 | people described as the homeless person or | 11:18:23 |
| 22 | a bum, is that who that Antonio Diaz is? | 11:18:25 |
| 23 | A.    That's the person the young men | 11:18:29 |
| 24 | referred to as the bum, yes. | 11:18:32 |
| 25 | Q.    And do you know how that time | 11:18:33 |

NYCLD_036710

P-APP001104

E. LEDRER

Page 678

1    was fixed, 9:15 to 9:20, do you know how     11:18:35

2    that came about?                             11:18:41

3          MS. DOLLIN:  Objection to form.        11:18:41

4      A.    Other than what I already            11:18:42

5    answered, I don't.                           11:18:45

6      Q.    And Malone and Dean were the two     11:18:45

7    people on the tandem bike; is that           11:18:48

8    correct?                                     11:18:51

9      A.    That's right.                        11:18:51

10     Q.    Who was Rubin Ronan?                  11:18:52

11     A.    Rubin Ronan was a taxicab            11:18:53

12   driver.                                      11:18:57

13     Q.    Who alleged that people were         11:18:57

14   throwing stuff at his car?                   11:18:59

15     A.    That's what he said.                 11:19:00

16     Q.    And that would have been at what     11:19:01

17   location?                                    11:19:04

18     A.    I don't remember as I sit here       11:19:04

19   today.                                       11:19:07

20     Q.    Well, the cab, cabs would have       11:19:07

21   only been -- were not allowed to drive on    11:19:13

22   the 102nd Street Transverse, correct?        11:19:15

23         MS. DOLLIN:   Objection.               11:19:18

24     Q.    That was not a roadway for cars,     11:19:24

25   correct?                                     11:19:27

NYCLD_036711

P-APP001105

E. LEDRER

Page 679

```
 1       A.    As far as I know, it wasn't a      11:19:27
 2   roadway for general traffic.                  11:19:31
 3       Q.    So is it your understanding that    11:19:32
 4   Ronan was on the east side of the park on     11:19:34
 5   the roadway that cars could travel up and     11:19:37
 6   down on?                                       11:19:40
 7       A.    I believe that's where he was,      11:19:42
 8   yes.                                           11:19:44
 9       Q.    And do you know approximately       11:19:44
10   where his location was when he alleged        11:19:45
11   rocks were thrown at his car?                 11:19:48
12       A.    I don't remember now.               11:19:50
13       Q.    Was it someplace near the ball      11:19:53
14   fields, does that refresh your                11:19:57
15   recollection?                                 11:19:59
16       A.    It doesn't refresh my               11:19:59
17   recollection.                                 11:20:00
18       Q.    At the time you wrote this          11:20:00
19   timeline, were you aware of the fact that     11:20:09
20   Patricia Meili had been attacked in the       11:20:13
21   park?                                         11:20:16
22           MS. DOLLIN:   Objection.              11:20:16
23       A.    Yes.                                11:20:18
24       Q.    And where in the course of this     11:20:20
25   timeline would you have placed that           11:20:23
```

NYCLD_036712

P-APP001106

E. LEDRER

Page 680

| | | |
|---|---|---|
| 1 | attack? | 11:20:26 |
| 2 | MS. DOLLIN:  Objection. | 11:20:27 |
| 3 | A.   I'm sorry, are you asking me | 11:20:27 |
| 4 | where I would place it today? | 11:20:32 |
| 5 | Q.   Yeah. | 11:20:34 |
| 6 | A.   In order to be able to answer | 11:20:36 |
| 7 | that question, I would have to review the | 11:20:40 |
| 8 | documents and exhibits from the trial. | 11:20:43 |
| 9 | Q.   You can't say, you have no -- | 11:20:46 |
| 10 | you can't say as you sit here today where | 11:20:48 |
| 11 | in the course of these events it was your | 11:20:51 |
| 12 | belief that Patricia Meili was raped and | 11:20:53 |
| 13 | assaulted? | 11:20:56 |
| 14 | A.   To be able to answer that, I | 11:20:57 |
| 15 | would have to know where these times were | 11:21:01 |
| 16 | drawn from, and I would also have to look | 11:21:04 |
| 17 | at testimony from the hearing and trial. | 11:21:06 |
| 18 | Q.   Well, you knew from your | 11:21:09 |
| 19 | involvement in the case that Patricia | 11:21:12 |
| 20 | Meili left her apartment at or around 8:55 | 11:21:15 |
| 21 | that evening, correct? | 11:21:19 |
| 22 | A.   Are you asking me whether I know | 11:21:20 |
| 23 | that today? | 11:21:22 |
| 24 | Q.   Yeah. | 11:21:23 |
| 25 | A.   I don't know that today. | 11:21:23 |

NYCLD_036713

P-APP001107

E. LEDRER

Page 681

| | | |
|---|---|---|
| 1 | Q.    You have no memory of that? | 11:21:25 |
| 2 | A.    Not the particular time she | 11:21:27 |
| 3 | left, no. | 11:21:28 |
| 4 | Q.    Do you recall that -- who was | 11:21:29 |
| 5 | Michael Vigne? | 11:21:31 |
| 6 | A.    Michael Vigne was a young man | 11:21:32 |
| 7 | who was riding a bicycle in Central Park. | 11:21:36 |
| 8 | Q.    Who was the -- do you recall | 11:21:38 |
| 9 | that there was a person who Patricia Meili | 11:21:39 |
| 10 | talked to when she left her apartment that | 11:21:42 |
| 11 | evening? | 11:21:45 |
| 12 | A.    In person or on the telephone? | 11:21:47 |
| 13 | Q.    In person, yeah, in person. | 11:21:49 |
| 14 | A.    I recall that she ran into a | 11:21:51 |
| 15 | neighbor. | 11:21:53 |
| 16 | Q.    Right.  Do you recall his name? | 11:21:54 |
| 17 | A.    I don't remember his name today, | 11:21:55 |
| 18 | I'm sorry. | 11:22:06 |
| 19 | Q.    Okay.  And do you recall that he | 11:22:06 |
| 20 | indicated that he would have talked to her | 11:22:11 |
| 21 | sometime around 8:55 or nine o'clock that | 11:22:15 |
| 22 | evening, does that ring a bell for you? | 11:22:18 |
| 23 | A.    Without looking at the | 11:22:21 |
| 24 | transcript or the record, I don't remember | 11:22:23 |
| 25 | the time he testified to, no. | 11:22:24 |

NYCLD_036714

P-APP001108

E. LEDRER

Page 682

| | | |
|---|---|---|
| 1 | Q.    Do you recall ever coming up | 11:22:26 |
| 2 | with an estimate of how long it would have | 11:22:31 |
| 3 | taken Patricia Meili, based upon her | 11:22:33 |
| 4 | ability as a runner to get from her | 11:22:36 |
| 5 | apartment to the location on the 102nd | 11:22:38 |
| 6 | Street Transverse where she was attacked? | 11:22:41 |
| 7 | Do you recall coming up with an estimate | 11:22:45 |
| 8 | of how long that would have taken her? | 11:22:47 |
| 9 | MS. DOLLIN:  Objection.  You can | 11:22:50 |
| 10 | answer the question. | 11:22:52 |
| 11 | A.    I recall trying to do an | 11:22:54 |
| 12 | approximation or a calculation of how long | 11:22:59 |
| 13 | it would take, yes. | 11:23:00 |
| 14 | Q.    What was that, 20 minutes? | 11:23:02 |
| 15 | A.    I'm sorry, but as I sit here | 11:23:04 |
| 16 | today 24 years later, I don't remember. | 11:23:07 |
| 17 | Q.    Okay.  Did you not review | 11:23:09 |
| 18 | your -- did you not indicate in the first | 11:23:14 |
| 19 | session of the deposition that you | 11:23:17 |
| 20 | reviewed the trial testimony in | 11:23:18 |
| 21 | preparation for, to help refresh your | 11:23:22 |
| 22 | recollection about the events you were | 11:23:26 |
| 23 | going to testify to in the deposition? | 11:23:28 |
| 24 | A.    I did, yes. | 11:23:30 |
| 25 | Q.    So you didn't do that 24 years | 11:23:30 |

NYCLD_036715

P-APP001109

E. LEDRER

Page 683

```
1    ago, you did that just recently, correct?    11:23:33
2         A.    I did that relatively recently,   11:23:36
3    but I didn't --                               11:23:39
4         Q.    Certainly not 24 years ago,        11:23:40
5    right?                                        11:23:42
6         A.    No. But I didn't memorize the      11:23:42
7    times and the dates and the distances.        11:23:45
8         Q.    And you don't recall that it was   11:23:46
9    estimated that to get from her apartment      11:23:52
10   running at the rate of speed she ran to       11:23:54
11   get to the 102nd Street Transverse, so        11:23:56
12   that would have taken approximately 20         11:23:59
13   minutes?                                       11:24:01
14        A.    I don't have a memory of that       11:24:02
15   today.  It's possible.  I don't remember      11:24:05
16   what the calculation showed.                  11:24:08
17        Q.    Do you recall the police ever,      11:24:11
18   the detectives or the --                       11:24:14
19              MR. MOORE:  Okay, we have five      11:24:17
20   minutes.  All right, we have to change        11:24:18
21   here.                                          11:24:19
22              MS. DOLLIN:  We'll take a break.    11:24:19
23              THE VIDEOGRAPHER:  This marks       11:24:21
24   the end of tape number 1 in the videotaped    11:24:22
25   deposition of Elizabeth Lederer.  We're       11:24:24
```

NYCLD_036716

P-APP001110

E. LEDRER

Page 684

| | | |
|---|---|---|
| 1 | going off the record.  The time is 11:24. | 11:24:27 |
| 2 | (A recess was taken.) | 11:24:30 |
| 3 | THE VIDEOGRAPHER:  This marks | 11:38:58 |
| 4 | the beginning of tape number 2 in the | 11:39:57 |
| 5 | videotaped deposition of Elizabeth | 11:40:00 |
| 6 | Lederer.  We're going on the record.  The | 11:40:02 |
| 7 | time is 11:39. | 11:40:04 |
| 8 | Q.    Ms. Lederer, do you recall the | 11:40:11 |
| 9 | distance between where the attacks on John | 11:40:17 |
| 10 | Loughlin took place near the reservoir and | 11:40:22 |
| 11 | where the attack on Patricia Meili took | 11:40:26 |
| 12 | place, what the distance is? | 11:40:29 |
| 13 | A.    I know where the attacks took | 11:40:30 |
| 14 | place, but I don't know, I can't remember | 11:40:34 |
| 15 | if there was testimony at the trial about | 11:40:39 |
| 16 | the exact measurement or feet or yards. | 11:40:43 |
| 17 | But I know the location of each. | 11:40:47 |
| 18 | Q.    Do you have an estimate as to, | 11:40:50 |
| 19 | for instance, of how many blocks that | 11:40:52 |
| 20 | would be? | 11:40:54 |
| 21 | MS. DOLLIN:  Objection. | 11:40:55 |
| 22 | A.    I don't. | 11:40:56 |
| 23 | Q.    The reservoir was south of the | 11:40:57 |
| 24 | 96th Street Transverse, correct? | 11:41:04 |
| 25 | A.    I believe that although it's | 11:41:05 |

NYCLD_036717

P-APP001111

E. LEDRER

Page 685

| | | |
|---|---|---|
| 1 | called the 96th Street Transverse, I think | 11:41:08 |
| 2 | it's at 97th Street, but it is south of | 11:41:10 |
| 3 | that. | 11:41:13 |
| 4 |    Q.   It's south of that though, | 11:41:13 |
| 5 | correct? | 11:41:15 |
| 6 |    A.   Correct. | 11:41:15 |
| 7 |    Q.   How far south, do you know? | 11:41:15 |
| 8 |    A.   I don't know. | 11:41:17 |
| 9 |    Q.   And did anybody ever estimate in | 11:41:17 |
| 10 | the course of the investigation that you | 11:41:22 |
| 11 | were involved in how long it would take | 11:41:24 |
| 12 | somebody to go from where the attack on | 11:41:26 |
| 13 | Loughlin took place to where the attack on | 11:41:30 |
| 14 | Meili took place? | 11:41:33 |
| 15 |       MS. DOLLIN:  Objection.  Calls | 11:41:33 |
| 16 | for work product.  Don't answer. | 11:41:36 |
| 17 |       MR. MOORE:  Calls for work | 11:41:38 |
| 18 | product? | 11:41:40 |
| 19 |    Q.   In the course of your | 11:41:41 |
| 20 | investigating the case, in your | 11:41:42 |
| 21 | involvement with the case, did anybody | 11:41:45 |
| 22 | ever estimate how long it would take from | 11:41:47 |
| 23 | one, from the location at the reservoir | 11:41:52 |
| 24 | from where Loughlin was attacked to where | 11:41:55 |
| 25 | Meili was attacked? | 11:41:58 |

NYCLD_036718

P-APP001112

E. LEDRER

Page 686

```
 1            MS. DOLLIN:  Prior to         11:41:59
 2    arraignment.  You can answer that      11:42:00
 3    question.                              11:42:02
 4       A.    In, on April 20th and April   11:42:03
 5    21st, I was not aware of any estimates 11:42:14
 6    about distances while I was taking the 11:42:19
 7    videotaped statements.                 11:42:22
 8       Q.    Well, you were familiar with  11:42:23
 9    that area of the park, right, you used to 11:42:25
10    run down the Transverse, correct, across 11:42:28
11    the Transverse?                        11:42:31
12       A.    I'm sorry, when you say that  11:42:31
13    area of the park, are you referring to the 11:42:33
14    Transverse?                            11:42:35
15       Q.    The 102nd Street Transverse,  11:42:36
16    right?                                 11:42:38
17       A.    From time to time, I ran that. 11:42:38
18       Q.    Did you from time to time run in 11:42:39
19    the reservoir, run the reservoir?      11:42:42
20       A.    Yes.                          11:42:42
21       Q.    Okay.  As you sit here today, 11:42:42
22    you can't tell me in a general, generally 11:42:47
23    what the distance is between where the 11:42:51
24    reservoir is and where the 102nd Street 11:42:54
25    Transverse is?                         11:42:56
```

NYCLD_036719

P-APP001113

E. LEDRER

Page 687

1      A.     As I sit here today, I can't      11:42:58
2   answer that in a meaningful way because I   11:43:02
3   never ran from the point that we believe    11:43:05
4   Patricia Meili was attacked to the point    11:43:09
5   where we believe John Loughlin was          11:43:11
6   attacked.                                    11:43:14
7      Q.     And is it fair to say that         11:43:15
8   unless you were on the roads, either on     11:43:17
9   the west side or the east side of the       11:43:19
10  park, that to get from the reservoir to     11:43:21
11  the 102nd Street Transverse, you would      11:43:25
12  have to go down an embankment and go        11:43:28
13  across the 96th or 97th Street Transverse   11:43:32
14  and up the embankment, other than if you    11:43:34
15  were on the roads?                          11:43:37
16         MS. DOLLIN:  Objection to form.      11:43:39
17  In 1989?                                     11:43:39
18         MR. MOORE:  Yeah.                     11:43:41
19     A.     That was my understanding, yes.   11:43:41
20     Q.     And in the course of your --      11:43:43
21  well, let me ask you this.  Before a        11:43:53
22  decision was made to charge any of these    11:43:55
23  kids with rape, did anybody raise a         11:43:57
24  question in the course of the               11:44:00
25  investigation about how long it would take  11:44:01

NYCLD_036720

P-APP001114

E. LEDRER

Page 688

| | | |
|---|---|---|
| 1 | to get from 102nd Street to the reservoir, | 11:44:05 |
| 2 | 102nd Street Transverse to the reservoir? | 11:44:09 |
| 3 | MS. DOLLIN:  You can answer. | 11:44:14 |
| 4 | A.   Can you repeat the question? | 11:44:15 |
| 5 | (The record was read.) | 11:44:44 |
| 6 | A.    Prearraignment, while I was | 11:44:44 |
| 7 | taking statements at the precincts, I was | 11:44:51 |
| 8 | not aware of whether anybody in the police | 11:44:53 |
| 9 | department was making any calculations, | 11:44:57 |
| 10 | not to my knowledge. | 11:44:59 |
| 11 | Q.   The question was, did anybody | 11:44:59 |
| 12 | raise that question. | 11:45:02 |
| 13 | MS. DOLLIN:  Again -- | 11:45:03 |
| 14 | Q.   Was it even brought up as | 11:45:06 |
| 15 | something to look into or discuss? | 11:45:07 |
| 16 | MS. DOLLIN:  Prearraignment. | 11:45:09 |
| 17 | A.    If the police brought it up and | 11:45:11 |
| 18 | discussed it among themselves, I don't | 11:45:15 |
| 19 | know. | 11:45:17 |
| 20 | Q.   Okay.  So you don't recall? | 11:45:17 |
| 21 | MS. DOLLIN:  Objection to form. | 11:45:19 |
| 22 | Q.    I'm asking you whether you | 11:45:20 |
| 23 | recall that ever being brought up, it's | 11:45:22 |
| 24 | really a simple yes or no question -- yes | 11:45:24 |
| 25 | or no answer. | 11:45:27 |

NYCLD_036721

P-APP001115

E. LEDRER

Page 689

| | | |
|---|---|---|
| 1 | MS. DOLLIN:  Objection. | 11:45:28 |
| 2 | Q.    Either you recall it being | 11:45:28 |
| 3 | brought up or you don't. | 11:45:30 |
| 4 | A.    I think my answer was I don't | 11:45:32 |
| 5 | know if it was brought up by the police. | 11:45:34 |
| 6 | It was not brought up to me. | 11:45:37 |
| 7 | Q.    Did anybody at the point before | 11:45:39 |
| 8 | you decided to charge anybody with the | 11:45:41 |
| 9 | rape, do you recall anybody raising any | 11:45:43 |
| 10 | questions, any detectives, any officers, | 11:45:47 |
| 11 | you, Linda Fairstein, anybody, Tim | 11:45:50 |
| 12 | Clements, anybody raising a question about | 11:45:53 |
| 13 | how long it would take somebody who had | 11:45:59 |
| 14 | assaulted somebody by the reservoir to get | 11:46:03 |
| 15 | to the location where Patricia Meili was | 11:46:06 |
| 16 | assaulted, anybody at any point before the | 11:46:08 |
| 17 | decision to arrest anybody for the rape, | 11:46:11 |
| 18 | did anybody, do you recall anybody raising | 11:46:15 |
| 19 | that question? | 11:46:17 |
| 20 | MS. DOLLIN:  Objection to form. | 11:46:18 |
| 21 | A.    Can you repeat the beginning of | 11:46:18 |
| 22 | the question, just the first phrase. | 11:46:20 |
| 23 | MR. MOORE:  Let me rephrase it. | 11:46:26 |
| 24 | Q.    At any point up until a decision | 11:46:27 |
| 25 | was made to charge any of these young boys | 11:46:35 |

NYCLD_036722

P-APP001116

E. LEDRER

Page 690

| | | |
|---|---|---|
| 1 | for rape, did anybody raise a question, | 11:46:38 |
| 2 | whether a detective, assistant DA, Linda | 11:46:40 |
| 3 | Fairstein, Tim Clements, anybody, did | 11:46:46 |
| 4 | anybody raise a question about how long it | 11:46:49 |
| 5 | would take somebody to go from the | 11:46:50 |
| 6 | location where Loughlin was assaulted to | 11:46:52 |
| 7 | the location where Meili was assaulted, | 11:46:55 |
| 8 | did anybody raise that question? | 11:46:58 |
| 9 | A.    I don't know if the police or | 11:47:01 |
| 10 | the law enforcement personnel talked about | 11:47:06 |
| 11 | it.  It was not discussed with me, and ADA | 11:47:08 |
| 12 | Fairstein, ADA Clements and I did not | 11:47:13 |
| 13 | discuss that question. | 11:47:16 |
| 14 | Q.    At what point in time was the | 11:47:17 |
| 15 | decision made to charge people for the | 11:47:24 |
| 16 | sexual assault on Patricia Meili? | 11:47:28 |
| 17 | A.    Are you asking charged in regard | 11:47:31 |
| 18 | to being arrested? | 11:47:39 |
| 19 | Q.    Formally charged.  You were | 11:47:40 |
| 20 | going to bring a rape charge against them, | 11:47:43 |
| 21 | at what point was that? | 11:47:45 |
| 22 | A.    I just want it to be clear | 11:47:47 |
| 23 | because I'm distinguishing between at the | 11:47:50 |
| 24 | Grand Jury stage or at the arrest. | 11:47:52 |
| 25 | Q.    Before, the decision to arrest | 11:47:54 |

NYCLD_036723

P-APP001117

Page 120

1          R. NUGENT

2  interview?

3       A.    At the time of this conversation, that's

4  correct.

5       Q.    Did you tell Mr. Casolaro that you

6  thought your main job was to create a timeline of

7  that day?

8             MS. COHEN:  Objection to form.

9       A.    No.

10      Q.    No, you did not tell him that?

11      A.    No.

12      Q.    Did you tell him that you had met the

13  victim's parents at the hospital?

14      A.    Yes.

15      Q.    Did you tell him that they went with

16  you to the jogger's apartment?

17      A.    No.

18      Q.    You did not tell him that?

19      A.    No.

20      Q.    Did you tell him that you found a taxi

21  receipt indicating what time the jogger arrived

22  home?

23      A.    Yes, I did.

24      Q.    Did you tell him that you didn't find a

25  Walkman in her apartment?

NYCLD_044971

P-APP001118

Page 121

1                          R. NUGENT

2         A.      I don't believe I told him that, no.

3         Q.      Did you tell him that you used the

4    receipt as a starting point to create the timeline?

5                  MS. COHEN:   Objection to form.

6         A.      I used the receipt to show what time

7    she possibly had left her apartment to go running.

8         Q.      But I'm asking you --

9         A.      Her timeline.

10        Q.      Yes.  Did you tell Casolaro you created

11   a timeline from the taxicab receipt?

12                 MS. COHEN:   Objection to form.

13    BY MS. FISHER-BYRIALSEN:

14        Q.      Patricia Miele's timeline?

15        A.      It wasn't solely based on the taxi

16   receipt.

17        Q.      But I'm asking if you told him that?

18        A.      Yes, I did.

19        Q.      Did you tell him other detectives felt

20   the timeline should have had the rape last?

21        A.      No.

22        Q.      You didn't tell him that?

23        A.      No.

24        Q.      Did you tell him that you interviewed

25   the jogger's friends and neighbors to firm up the

NYCLD_044972

P-APP001119

Page 122

```
 1                    R. NUGENT
 2   timeline?
 3        A.      Yes, I did.
 4        Q.      Did you tell him you felt she was
 5   attacked somewhere around 9:45?
 6        A.      I don't believe I give him a time.
 7        Q.      Did you tell him that you knew the park
 8   well, because you grew up around 108th Street?
 9        A.      No.
10        Q.      Did you grow up around 108th Street?
11                MS. COHEN:   Objection.
12        A.      I grew up in the area.
13        Q.      Did you tell him that you feel the area
14   where the attack happened is very dark at night?
15        A.      Yes, I did.
16        Q.      Did you tell him that you were present
17   during the videotaped statement of Mr. Wise?
18        A.      I did not tell him that, no.
19        Q.      You did not tell him that?
20        A.      No.
21        Q.      Why do you think Mr. Casolaro would
22   make up all these things?
23                MS. COHEN:   Objection.
24        A.      I can't tell you what his line of
25   thinking is.
```

Comm. Dept. of Health Services Judge Lederer

| | | |
|---|---|---|
| ① | Michael Vigne | $9^{05}$ - $9^{10}$ |
| ② | Antonio Diaz | $9^{15}$ - $9^{20}$ |
| ③ | Malone + Dean | $9^{15}$ - $9^{20}$ |
| ④ | Rubin Ronan | $9^{25}$ - $9^{30}$ |
| ⑤ | David Lewis | @ $9^{25}$ - ? $9^{30}$ |
| ⑥ | David Good | @ $9^{50}$ |
| ⑦ | Robert Garner | $9^{30}$ - $9^{35}$ |
| ⑧ | John Loughlin | @ $9^{55}$ |

Serrano →

Romano ℞

[redacted]

Lederer #27

NYC059393

Page 157

1              Arthur Clements

2    Q.     Do you recall what?

3           MR. MYERBERG:  Don't answer that, I

4    direct you not to answer that.

5           MS. FISHER-BYRIALSEN:  And he can't

6    answer the subject matter either, is your

7    opinion?

8           MR. MYERBERG:  Right.

9           MS. FISHER-BYRIALSEN:  We'll just

10   mark them all for a ruling.  We're not

11   going to spend time discussing it now.  Is

12   that okay with you?

13          MR. MYERBERG:  Yes.

14          MS. NELSON:  I'm sorry, Jane, I

15   want to make sure I understand.

16          MS. FISHER-BYRIALSEN:  I don't want

17   to have a debate about it now.

18          MS. NELSON:  I don't either.  I'm

19   just trying to understand what it is we're

20   marking for a ruling.  Is the question

21   regarding the subject matter legal

22   research?

23          MS. FISHER-BYRIALSEN:  Yes.

24          MS. NELSON:  Thank you.

25   Q.     Post arraignment, did you have any

NYCLD_035308

P-APP001122

Page 158

1                    Arthur Clements

2    meetings about this case with anyone at the

3    District Attorney's office other than ADA

4    Lederer?

5                    MR. MYERBERG:   Objection.

6         Q.      She could have been there, but with

7    more people, more people at a meeting or at a

8    discussion than just you and her.

9         A.      Yes.

10        Q.      Do you recall who was at those

11   meetings?

12                   MR. MYERBERG:   Objection.

13        A.      Yes.

14        Q.      Who?

15        A.      At one meeting I recall there were

16   other members of Trial Bureau 40.

17        Q.      What people and by name.

18        A.      John Hogan, I believe Steve Cronin

19   was there, other more senior Assistant District

20   Attorneys in Trial Bureau 40.

21        Q.      Do you recall their names?

22        A.      I don't recall specifically all the

23   people who were there.  I only recall John Hogan

24   and Steve Cronin being there.  As I think

25   further, I believe Dan McNulty was there as

NYCLD_035309

P-APP001123

1                  Arthur Clements

2    well, but I can't remember what other Assistant

3    District Attorneys from Trial Bureau 40 were

4    there.

5         Q.    Was ADA Fairstein there?

6         A.    No.

7         Q.    Did you have any meetings after the

8    arraignment in regards to this case that ADA

9    Fairstein attended?

10        A.    I don't know what you mean by

11    meeting, but I do recall there were occasions

12    where Linda Fairstein, Elizabeth Lederer and I

13    were in Elizabeth's office in connection with

14    preparing Elizabeth Lederer to testify.

15        Q.    Preparing Elizabeth Lederer to

16    testify?

17        A.    Excuse me.  I misspoke, Linda

18    Fairstein.

19        Q.    Do you recall, and I'll broaden it,

20    instead of meetings, I'll call it discussions.

21    Do you recall having any discussions where Linda

22    Fairstein was present, other than what you just

23    testified to in regards to this case?

24        A.    Well, as you know, there were

25    multiple proceedings.  There was a pretrial

NYCLD_035310

P-APP001124

Page 160

Arthur Clements

1
2    hearing and a first trial and a second trial.
3    So the witness preparation that I just described
4    for Linda Fairstein occurred before each of
5    those three events.
6              And other than that, I do not have
7    a specific recollection of Linda Fairstein or
8    being present for meetings with Linda present.
9         Q.     So you said on three separate
10   occasions you had, what I'm going to dub as
11   witness prep meetings or discussions, with Linda
12   Fairstein?
13             MR. MYERBERG:   Objection.
14        Q.     At least three?
15        A.     I mean there were at least three.
16   We may have had more than one session before
17   each of the different proceedings I just
18   described, but it was those witness prep
19   meetings, as you just termed it, that I recall.
20        Q.     How long were they, approximately?
21        A.     I don't recall how long they were.
22   But I don't, I don't believe that I was present
23   for the entirety of the meeting -- meetings,
24   because in all three of the proceedings I just
25   described, Elizabeth Lederer was the person who

NYCLD_035311

P-APP001125

Page 161

```
 1                    Arthur Clements
 2   did the direct examination on Linda Fairstein,
 3   not me.
 4        Q.      You testified that you had no
 5   specific recollection of any other discussions
 6   with Linda Fairstein.  Do you have any general
 7   recollection of having discussions with her that
 8   you just don't know the subject matter or the
 9   date and time of?
10                MR. MYERBERG:   Objection.
11        A.      I don't have any specific or
12   general recollections of meetings with Linda
13   Fairstein outside of the witness preparation
14   meetings that we've been discussing for the last
15   few minutes.
16        Q.      Just so we are on the same page, by
17   meetings, that could include just discussions in
18   your office or in her office.  It doesn't have
19   to be an official meeting.  Does that change
20   your answer?
21        A.      I'm trying to search my memory
22   here.  I do not have a recollection of any other
23   meetings.  I don't remember any other meetings
24   other than what I've testified to.  There may
25   have been, but I don't recall them.
```

NYCLD_035312

P-APP001126

1               Arthur Clements

2          Q.     After arraignment, what was Linda

3     Fairstein's role in the case?

4               MR. MYERBERG:   Objection.

5          A.     Based upon my personal knowledge,

6     her role was as a witness.

7          Q.     As a witness only?

8               MR. MYERBERG:   Objection.

9          A.     That was my understanding of her

10    role.

11         Q.     Was she, as far as you know,

12    involved in the preparation of any other

13    witnesses to testify?

14               MR. MYERBERG:   Objection.

15         A.     I don't know if she was involved in

16    the preparation of other witnesses or not, but

17    to the best of my recollection, she was not.   I

18    don't know.

19         Q.     Did she attend the trial, other

20    than when she was testifying?

21               MR. MYERBERG:   Objection.

22         Q.     I'll break it up, did she attend

23    the first trial, other than when she was

24    testifying?

25               MR. MYERBERG:   Objection.

NYCLD_035313

P-APP001127

Page 163

1                    Arthur Clements

2          A.      I know, because the law required a

3    separation of witnesses, that she was not

4    present during the proceedings unless, unless

5    she was allowed to be present for the summation.

6    I can't recall if she was in the audience for

7    the summation for either of the two trials.

8          Q.      Do you recall if she was present in

9    the Grand Jury during the Grand Jury

10   presentations of the case against the five

11   plaintiffs in this case?

12                  MR. MYERBERG:   Objection.

13         A.      Well, she was not present, to the

14   best of my recollection, in the Grand Jury in

15   her capacity as an Assistant District Attorney.

16                  I do not recall if she testified as

17   a witness in the Grand Jury, in which case she

18   would have been present in the Grand Jury.

19         Q.      I asked you before about the media

20   coverage in the case, and I think you said there

21   was.  There was media coverage, as far as you

22   know, when you got involved in the case,

23   correct?

24         A.      Yes, I believe I testified that I

25   understood that there was some media coverage of

NYCLD_035314

P-APP001128

```
 1                      Proceedings                    3020

 2   SUPREME COURT           NEW YORK COUNTY
     TRIAL TERM              PART 59
 3   ---------------------------------------x
     THE PEOPLE OF THE STATE OF NEW YORK    :
 4            -against-                      :
     RAYMOND SANTANA, KHAREY WISE,          :    INDICTMENT NO:
 5   YUSEF SALAAM, ANTHONY McCRAY,          :    4762-89
     KEVIN RICHARDSON, STEVEN LOPEZ         :
 6   and MICHAEL BRISCO,                    :
                        Defendant.          :    Continued Hearing
 7   ---------------------------------------x
                      111 Centre Street          Volume 5
 8                    New York, N.Y. 10013
                      November 13th, 1989

 9

10   BEFORE:  HON. THOMAS B. GALLIGAN,
                  JUSTICE OF THE SUPREME COURT
11
     (Appearances: Same as previously noted.)
12   _

13                         o0o

14             COURT CLERK:  Hearing is continued.  People

15        of the State of New York verses Kharey Wise, Yusef

16        Salaam, Antron McCray, Kevin Richardson, Steve

17        Lopez, Michael Brisco and Raymond Santana,

18        Indictment 4762 of '89.

19             MR. JOSEPH:  Your Honor, if I may, just

20        before we start.  There had been discussions the

21        last time we appeared as to whether I would be

22        here on time and whether Mr. Diller would stand

23        in.  Obviously, I am here and I just want the

24        record to so reflect.

25             MS. LEDERER:  Before we begin this morning, I


                    Joseph T. Tierney, CSR, RPR
```

Proceedings                                    3021

1

2       just want to state for the record, I received a

3       phone call about 9:30 this morning from Mr.

4       Maddox's office asking for certain Rosarion

5       material, which was made available to him prior to

6       coming to court.   I understand he still needs the

7       materials for Detective Cornetta and copies will

8       be made available to him before Detective Cornetta

9       testifies.

10              The second matter is I would ask the family

11      of Michael Brisco, if there be any in court, who

12      would be witnesses at this proceeding to please be

13      excused during the testimony of the next witness.

14              THE COURT:   Nobody here?   All right.   Who is

15      the next witness?

16              MS. LEDERER:   Detective Meehan.

17

18

19

20

21

22

23

24

25

Joseph T. Tierney, CSR, RPR

```
 1         People - Fairstein - Direct - Lederer        3046
 2                (A spectator leaves the courtroom.)
 3                THE COURT:  Mr. Moore, anybody here from your
 4         client?  Mr. Moore, you have anybody here?
 5                MR. MOORE:  No, your Honor.
 6                THE COURT:  Okay.
 7                MS. LEDERER:  I call Linda fair Stein.
 8  L I N D A     F A I R S T E I N , called as a witness by and
 9         on behalf of the People at the hearing, having been
10         first duly sworn, testified as follows:
11                COURT OFFICER:  Have a seat.  Give us your
12         name and spell your last name, please.
13                THE WITNESS:  My name is Linda Fairstein,
14         F A I R S T E I N.
15  DIRECT EXAMINATION
16  BY MR. LEDERER:
17         Q.   Where are you employed?
18         A.   I'm employed as an Assistant District Attorney in
19  the office of the New York County District Attorney.
20         Q.   And what is your position in the office?
21         A.   I have two positions.  I am in charge of the Sex
22  Crimes Prosecution Unit of the office and I am deputy chief
23  of the Trial Division.
24         Q.   How long have you been with the New York County
25  District Attorney's Office?
```

Joseph T. Tierney, CSR, RPR

People - Fairstein - Direct - Lederer                3047

1

2      A.   Last week I celebrated my 17th year in the office.

3      Q.   Directing your attention to shortly before 7:00

4   a.m. on April 21st, 1989, where were you?

5      A.   The 21st, I was at the 24th Police Precinct

6   Stationhouse on West 100th Street in this county.

7      Q.   At approximately that time, on that date, was

8   there a decision made about going to the 102 Street

9   Crossdrive in Central Park?

10      A.   Yes, there was.

11      Q.   Do you recall who was present in the course of

12   making a decision with respect to that matter?

13      A.   I discussed that, going specifically at that time,

14   with Detectives Michael Sheehan, and Augie Jonza of the

15   Homicide Task Force.

16      Q.   Was a decision made to go to the 102 Street

17   Crossdrive in Central Park?

18           MR. BURNS:   I object to the form of the

19           question.

20           THE COURT:   It is leading, but I'll allow it.

21           Maybe it will expedite it.

22           Go ahead.

23           MR. BURNS:   Are they going to allow cross-

24           examination on this issue?

25           THE COURT:   What issue?  If it pertains to

Joseph T. Tierney, CSR, RPR

NYCLD_015187

P-APP001132

```
1        People - Fairstein - Direct - Lederer          3048
2           your particular client, we will.
3              Go ahead.
4    Q.   Was a decision reached on that matter?
5    A.   Yes, it was.
6    Q.   And what was the decision?
7    A.   The decision was made to go to that location
8  within the park that morning and to see if any of the
9  defendants would be willing to go with us.
10             MR. MOORE:  I can't hear very well, your
11          Honor.
12             MR. MADDOX:  The witness be instructed not to
13          tail off her voice at the end of her statements?
14             MR. MOORE:  She also be instructed to speak
15          into the microphone so we can hear?
16             THE COURT:  I don't know if I have to repeat
17          all those things, but we have some difficulty
18          hearing in this courtroom from time to time.  The
19          microphone helps from time to time, but if you
20          just speak into it, maybe it will obviate some of
21          the problems.
22             THE WITNESS:  Yes, your Honor.
23    Q.   Who was it decided should go or would go to the
24  102 Street Crossdrive in Central Park?
25    A.   I was going to go with those two detectives, and
```

Joseph T. Tierney, CSR, RPR

People - Fairstein - Direct - Lederer          3049

2  our plan at that particular point in time was to ask both

3  Kevin Richardson and Kharey Wise if they would go with us.

4      Q.   As a result of that decision, did you have a

5  conversation with anyone from the Richardson family?

6      A.   Yes.

7      Q.   And who did you speak to?

8      A.   I spoke with a man whom Detective Sheehan told me

9  was the father of Kevin Richardson.

10     Q.   Where did you have the conversation with Kevin

11 Richardson's father?

12     A.   On the 2nd floor office of the 24th Police

13 Precinct.

14     Q.   Was that the Precinct Detective Squad office?

15     A.   It is the large room that is the detectives' room,

16 yes.

17     Q.   At the time that you had this conversation with

18 the father of Kevin Richardson, who else was present?

19     A.   I believe when I started it, Detective Sheehan

20 made the introduction to me.  There were a lot of people, a

21 lot of police personnel in the room and a lot of suspects

22 and family members, so I believe I started the conversation

23 directly with Sheehan and Kevin's father, but I continued

24 the conversation, which didn't last more than two minutes,

25 by myself.


                    Joseph T. Tierney, CSR, RPR

People - Fairstein - Direct - Lederer                3050

 1                 MR. MOORE:  Objection, your Honor, not

 2       responsive to the question.

 3                 THE COURT:  I'll allow it.

 4     Q.    Where was Kevin Richardson, if you recall, during

 5 the conversation you had with his father?

 6     A.    I believe my recollection was Sheehan went to talk

 7 to Kevin Richardson, they were within sight of me but..

 8     Q.    What, if anything, did you say to Mr. Richardson

 9 and what, if anything, did he say to you?

10     A.    This was after I had been informed that Richardson

11 had completed a videotaped statement, and I told his

12 father -- his father had been present for the statement and

13 knew the statement had been made.  I said we wanted to go to

14 the park.  The sun had just come up, it was daylight, and I

15 was anxious to go before crowds, whether it be public or

16 press, arrived at that location, and I said that we would

17 like to ask Kevin's consent to come with us to the park,

18 that Mr. Richardson was entitled -- Senior, was entitled to

19 come with us if he wanted.  The purpose my telling him was

20 that we would not be asking any more questions, that we were

21 not going to the scene to do an interrogation, we were going

22 to try to put statements that had been made together with

23 the location of the crime scene.

24     Q.    What, if anything, did Mr. Richardson say in

Joseph T. Tierney, CSR, RPR

NYCLD_015190

P-APP001135

People - Fairstein - Direct - Lederer                3051

response to what you told him?

A.    He said that it would be okay with him if we went
and if we took Kevin.

Q.    And did he indicate to you whether he wanted to
come along or not?

A.    He said he did not.  There were other family
members there, there were women from the family who I did
not speak with at that time, he said he would wait there,
would we bring Kevin back to the stationhouse, I said yes.

Q.    After you finished speaking with the father, did
you see whether or not Mr. Richardson had a conversation
with Kevin Richardson?

A.    I know that he then returned to where Kevin was
sitting.  I couldn't hear them talk, but they were right
next to each other.

Q.    After you had the conversation that you just
testified to with Mr. Richardson, did there come a time
where you had a conversation with Kharey Wise?

A.    Yes.

Q.    And where did you have that conversation?

A.    Kharey Wise was in that same large room, the
precinct squad room.  He was seated by himself, and I spoke
to him.  He was alone.

Q.    Would you please tell us, what, if anything, you

Joseph T. Tierney, CSR, RPR

People - Fairstein - Direct - Lederer                    3052

2   said to him and what, if anything, he said to you?

3        A.   I introduced myself to him, I told him that I was

4   an assistant district attorney.  And I told him -- I

5   explained to him that I was interested in going with the

6   detectives and with him to -- back to the park to look at

7   the area where the crime occurred.  And I then told him I

8   was going to read him his so called Miranda warnings or his

9   rights and ask him then if he would go with us, and I

10  explained our purposes purpose in going back there.

11       Q.   You said you then read him his Miranda rights, did

12  you read that from a card?

13       A.   Yes.

14       Q.   Do you have that card with you today?

15       A.   Yes.

16       Q.   May I please see it?

17            (Card handed to the prosecutor by the witness

18            through the court officer.)

19            MS. LEDERER:   I'd ask please to have this

20            marked as People's 34 for identification.

21            (So marked.)

22       Q.   Showing you People's 34 for identification, is

23  that the card from which you read Kharey Wise the Miranda

24  rights on the morning of April 21st, 1989?

25       A.   Yes, it is.


Joseph T. Tierney, CSR, RPR

People - Fairstein - Direct - Lederer                3053

1
2    Q.   Is that in substantially the same condition as it

3 was on that morning?

4    A.   Yes, it is a laminated card, in the same

5 condition.

6    Q.   Would you please --

7           MS. LEDERER:  Your Honor, at this time the

8           People would offer People's 34 in evidence.

9           (Exhibit shown to defense counsel by the

10          court officer.)

11          THE COURT:  Any objection?

12          MR. MOORE:  No, your Honor.

13          THE COURT:  All right, mark it.

14          (So marked.)

15    Q.   Would you please read each right that you read to

16 Kharey Wise and indicate what answer, if any, he gave to

17 each right as you read it to him?

18    A.   The card, the numbers are covered now, but it

19 lists five rights.  It differs from the form in police

20 memobooks in which each question is -- excuse me, in which

21 each right is followed by a question.  It is my practice in

22 using this card, which I used for a number of years, to read

23 the warning and follow it with a question not written on the

24 card.

25          THE COURT:  I just want to know what you did

Joseph T. Tierney, CSR, RPR

People - Fairstein - Direct - Lederer                3054

1    in this case.

2             THE WITNESS:  In this case that's what I did.

3    A.   It reads on the cards:

4    Number 1:  You have the right to remain silent.  I then

5    said do you understand that.  Mr. Wise said yes.

6             I said anything you say can be and will be used against

7    you in a court of law, as it is written on the card.  I then

8    said do you understand that, he said yes or yeah.

9             Number 3:  You have the right to talk to a lawyer and

10   have him present with you while you are being questioned; do

11   you understand that.  Yeah was his response.

12            4:  If you cannot afford to hire a lawyer, one will be

13   appointed to represent you before any questioning if you

14   wish; do you understand that.  Yes.

15            5:  The card says you can decide -- I read you can so

16   decide at any times to exercise these rights and not answer

17   any questions or make any statements, do you understand

18   that.  He said yes.

19            Then I turned the card over, where it says, question 1:

20   Do you understand each of these rights I have explained to

21   you.  Wise answered yes.

22            The second question says:  Having these rights in mind,

23   do you wish to talk to us now.  I did not say that exactly

24   that way, it's not my language.  I believe I paraphrased it

Joseph T. Tierney, CSR, RPR

NYCLD_015194

P-APP001139

People - Fairstein - Direct - Lederer                3055

and said having heard everything I just said to you, are you

willing to answer my questions now.  Mr. Wise said yes.

    Q.   After you read him those rights and received those

answers, did you have further conversation with Kharey Wise?

    A.   Just to explain to him in a little more detail

what our purpose was in going to the park.  He had not yet

been questioned by Miss Lederer on videotape and I explained

to him we were going to go back to the park, he would only

be asked a few questions about where he claimed he had been

when the jogger was attacked and that we would return to the

stationhouse and Miss Lederer, who was then doing other

videotapes, would question him on our return.

    Q.   When you asked him about going to the park, what,

if anything, did he say to you?

    A.   He said yeah, he would go with me.

    Q.   And did there come a time then --

            MS. LEDERER:  Withdrawn.

    Q.   Did Kharey Wise ever ask for an attorney or to

speak with his mother or another family member?

    A.   No, he did not.

    Q.   Did he ever ask you if he can make a phone call?

    A.   No, he did not.

    Q.   Did you he ever cry during the time you spoke to

him or you saw him in Central Park?

Joseph T. Tierney, CSR, RPR

```
 1              People - Fairstein - Direct - Lederer        3056

 2         A.    He never cried.  He was quite relaxed, he didn't

 3    seem to have a lot of interest in much that was going on.

 4                   MR. MOORE:  Can we strike that as not being

 5              responsive?

 6                   THE COURT:  Yes.  The only question is did he

 7              cry?

 8                   THE WITNESS:  No.

 9                   MR. MOORE:  Can you strike the rest?

10                   THE COURT:  Yes.

11         Q.    Approximately how long did you speak with Kharey

12    Wise?

13         A.    At that time, after reading --

14         Q.    Yes.

15         A.    -- reading his rights?  Less than two more

16    minutes.

17         Q.    There come a time you went to the Crossdrive at

18    102nd Street in Central Park?

19         A.    Yes.

20         Q.    How did you travel to that location?

21         A.    We went in an unmarked police car.  There were

22    five of us:  Detective Sheehan was driving, I was sitting

23    next to him in the front seat, Detective Jonza was in the

24    middle of the back seat, richardson and Wise were on either

25    side of him and were not handcuffed.
```

Joseph T. Tierney, CSR, RPR

NYCLD_015196

P-APP001141

People – Fairstein – Direct – Lederer                    3057

1

2    Q.   Was there any conversation in the car, either by

3    yourself or in your presence, with either Kevin Richardson

4    or Kharey Wise regarding anything about the investigation

5    that was under way?

6    A.   No, we, the detectives and I, did not want any

7    conversation about the case or investigation, particularly

8    with each defendant in the presence of each other.   There

9    was general small talk among the five of us that morning

10   driving to the park.

11   Q.   How long did the trip to the 102 Crossdrive take

12   from the 24th Precinct?

13   A.   Between ten to fifteen minutes.

14   Q.   What were the lighting conditions like when you

15   arrived at the 102 Street Crossdrive?

16   A.   It was light, it was daylight.

17   Q.   Would you please describe what happened when you

18   arrived at the Crossdrive that morning?

19   A.   Detective Sheehan was driving across 102nd Street,

20   he slowed down --

21             MR. MOORE:   I'm sorry, across what street?

22             THE WITNESS:   Across 102nd Street on the

23        Crossdrive or Transverse.

24   A.   He was driving slowly.   He had been to that area

25   he told me earlier that morning, but it was the first time I

Joseph T. Tierney, CSR, RPR

```
 1              People - Fairstein - Direct - Lederer           3058
 2    was getting to that area.  He slowed down.  Our car was
 3    approached by an officer in uniform in another car who
 4    rolled down his window and this officer and Sheehan had a
 5    conversation.  I just saw Sheehan take out a badge and
 6    identify himself to the other officer, and the officer then
 7    stopped.  Detective Sheehan and I got out of the police car
 8    and spoke for several minutes, less than three minutes, to
 9    that uniformed police officer.  That officer was -- I don't
10    know what his specific assignment was, but it was in the
11    nature of safeguarding the area of the crime scene.  And he
12    pointed out to us some areas of significance on the roadway
13    that had to do with where the jogger had been attacked.
14         Q.    After you had this conversation with the uniformed
15    officer and with Detective Sheehan, what happened next?
16         A.    At that point Detective Sheehan asked Kevin
17    Richardson to step out of the radio car, and Richardson did.
18    Sheehan asked him if anything looked familiar to him.  And
19    it was at that point that Richardson pointed to an area in
20    the roadway and said -- I have the exact words written down,
21    but I believe, "This is where" -- "this is where we took her
22    down," I have to look.
23         Q.    Do you have something -- are you sure those are
24    the words or do you have something to refresh your
25    recollection?
```

Joseph T. Tierney, CSR, RPR

```
 1        People - Fairstein - Direct - Lederer          3059

 2              MR. MOORE:  Objection.

 3              THE COURT:  She said she had something

 4        written down, she would have to look at to be sure

 5        those are the exact words.

 6              If you have it, I'll let you look at it.  You

 7        have it with you?

 8              THE WITNESS:  Yes.

 9        A.   Richardson at that point said, "This is where we

10   got her."

11        Q.   Was there any further conversation with Kevin

12   Richardson at that point?

13        A.   There were no other questions asked of him at that

14   point.

15        Q.   Did he say anything further?

16        A.   No.

17        Q.   What happened after he was asked that question and

18   he gave that answer?

19        A.   He got back into the car next to Detective Jonza.

20   Kharey Wise was asked to step out of the car.

21        Q.   And did Kharey Wise come to where you and

22   Detective Sheehan were?

23        A.   Yes, he did, which was just a few feet from the

24   car.

25        Q.   Was there any conversation with Kharey Wise at
```

Joseph T. Tierney, CSR, RPR

NYCLD_015199

P-APP001144

```
 1                People - Fairstein - Direct - Lederer              3060
 2  that time?
 3        A.    Sheehan said the same thing, "Does any of this
 4  look familiar to y ou?"  And Kharey Wise pointed to the
 5  roadway, he said he was trying to get his bearings by light
 6  posts, and he said, "This is where they snatched her."  And
 7  Detective Sheehan said, "Where were you," and Kharey Wise
 8  pointed south of the roadway to an area where you can see
 9  ball fields, and he said that he had been running from the
10  ball fields to 102nd Street when they snatched her.
11        Q.    Was there any further conversation with Kharey
12  Wise at that location?
13        A.    No.
14        Q.    Were any other questions put to him?
15        A.    No.
16        Q.    Did he say anything else?
17        A.    No, he did not.
18        Q.    What happened after that exchange that you just
19  testified to?
20        A.    Kharey Wise got back in the car.  The detectives,
21  Detective Sheehan and I, got back in the car.  The uniformed
22  officer then, in his car, led us off the roadway down a very
23  steep muddy incline which was north of the transverse, and
24  he lead us -- it's an area that has a lot of trees and a lot
25  of roots and stumps.  And he led us in his car around
```

Joseph T. Tierney, CSR, RPR

People - Fairstein - Direct - Lederer          3061

through an open area to the bottom of a slope, and there was

a muddy pathway at the bottom of the slope where both cars

stopped.

Q.   Was there any conversation -- what happened at the

bottom of the slope where the car stopped?

A.   Detective Sheehan and I got out of the car first.

The uniformed officer met us again and pointed out to us

where the -- the point in the mud where the young woman's

body had been found and pointed to a location where some of

her items of clothing had been found.  Detective Sheehan and

I, while the other three individuals were in the car, walked

around that area and proceeded to walk a way up the slope

back towards the paved roadway because the uniformed cop had

pointed in that direction and had said other evidence had

been found in that direction.  And we started to walk that

alone, we reached a point maybe a third of the way up --

back up that slope when we were caused to stop.

Q.   What, if anything, did you see in that location?

A.   There was a large tree, surrounded by a lot of

leaves and branches and an astounding amount of what

appeared to be dry blood.

Q.   What, if anything, happened at that location?

A.   Detective Sheehan and I stopped there and

discussed the significance of that location between

Joseph T. Tierney, CSR, RPR

People - Fairstein - Direct - Lederer          3062

1  ourselves, and he then called to Detective Jonza and asked

2  Detective Jonza to send Kevin Richardson up to us.

3      Q.    Did Kevin Richardson get out of the car at that

4  time?

5      A.    Yes.

6      Q.    And -- please continue.

7      A.    Detective Jonza and both young men got out of the

8  car at that time.  Again, nobody was handcuffed.  Detective

9  Jonza stood next to the car with Kharey Wise and Kevin

10 Richardson walked the approximately 30 to 40 feet up to the

11 position at which Sheehan and I were standing.

12     Q.    Let me just interrupt you for a moment.  Was he

13 handcuffed at that time?

14     A.    No, he was not.

15     Q.    Was he escorted that distance from the car to

16 where you were?

17     A.    No, he was not.

18     Q.    Please continue.

19     A.    Richardson came up to us and again Sheehan asked

20 him a question like do you recognize this area, does

21 anything here look familiar to you.  And Kevin Richardson

22 pointed to an area northwest of this large tree and said,

23 "This is where it happened."  And Detective Sheehan said,

24 "What happened?"  And Kevin Richardson said, "The raping."

Joseph T. Tierney, CSR, RPR

People - Fairstein - Direct - Lederer                3063

That was, I believe, the only thing he was asked at that location.

Q.   And was that the only thing he said at that location?

A.   Yes.

Q.   After that exchange, what, if anything, did Kevin Richardson do?

A.   Detective Sheehan said to Kevin, "Okay, go back to the car, you can wait at the car." And Sheehan called out to Detective Jonza, "Send Kharey up here." And the two young men actually passed each other in walking from one detective to the other.

Q.   Did Kharey Wise come to the location where you and Detective Sheehan were?

A.   Yes.

Q.   And was there any conversation with Kharey Wise at that location?

A.   Yes.

Q.   What, if anything, was said to Kharey Wise?

A.   As Kharey Wise approached us, Detective Sheehan and I were uphill from him but that is further south, actually in the park, so we were on the south side of this large area of matted grass with a lot of bloody looking matter, and before we could ask him anything, as Kharey

Joseph T. Tierney, CSR, RPR

NYCLD_015203

P-APP001148

People - Fairstein - Direct - Lederer          3064

approached us, he started muttering out loud, "Damn, damn,
that's a lot of blood.  Damn, this is really bad, that's a
lot of blood."

Q.   When he arrived at the location where you and
Detective Sheehan were, did either of you ask him a
question?

A.   I think the first thing that Detective Sheehan
said to him, as Kharey kept repeating -- and he did more
than three or four times -- how much blood there was,
Sheehan said something like, "Why does that surprise you,"
and Kharey said, "I knew she was bleeding but I didn't know
how bad she was.  It was really dark, I couldn't see how
much blood there was at night."

Sheehan then asked Kharey was that area familiar, and
he said, "This is where" -- "this is where we" -- he said
"we" and then he said "they raped her."  His story -- the
only thing I knew about Kharey Wise with regard to the story
he had told up to that point in time was that he had said at
the precinct, not to me but I believe to Detective
Sheehan --

               MR. MOORE:  Objection, your Honor.

               THE COURT:  Yes, objection sustained.  That's
          not responsive to that question.

               Go ahead.


               Joseph T. Tierney, CSR, RPR

NYCLD_015204

P-APP001149

People - Fairstein - Direct - Lederer                3065

1

2      Q.    Let me ask you this.   Did Kharey Wise say anything

3   either on his own or in response to a question about how the

4   jogger came to the location that you were at?

5      A.    Yes, he said that, "This is where they dragged her

6   down."

7      Q.    And did he say that in response to a question or

8   did he say that spontaneously?

9      A.    He said it in response to a question.

10      Q.    Do you recall what the question was that he was

11   answering?

12      A.    What happened -- I believe Detective Sheehan was

13   the one who was asking him questions.   I believe the

14   question was, "What happened here, why is there so much

15   blood here?"

16      Q.    Did he indicate in that statement who dragged her?

17      A.    He -- he started to say "we" and he caught himself

18   and he said, "they dragged her."   He did not, nor was he

19   asked specifically at that time to, name individual

20   participants in the crime.

21      Q.    Prior to coming to the scene at the 102nd Street

22   Crossdrive with Kharey Wise that morning, did you have any

23   information about what Kharey Wise had said to any other

24   detective?

25      A.    Yes.


                    Joseph T. Tierney, CSR, RPR

NYCLD_015205

P-APP001150

```
 1            People - Fairstein - Direct - Lederer          3066
 2        Q.   And would you tell us what you had been informed
 3   as to anything he might have said until that time?
 4        A.   I was told that although he admitted being present
 5   at the time that the rape had occurred, that he had been
 6   hiding behind a tree and not a participant.
 7                 MR. MOORE:  Your Honor, I'm going to object
 8            to that as hearsay unless she identifies who said
 9            what.
10                 THE COURT:  It is hearsay but hearsay is
11            admissible.
12                 MR. MOORE:  I understand that.  She has not
13            identified the author.
14                 THE COURT:  If she knows, I'll let her.
15                 THE WITNESS:  It was Sheehan who told me that
16            was Kharey Wise's statement.
17        Q.   Were any questions put to Kharey Wise at the scene
18   then based on the information you just testified to that you
19   had had prior to going there?
20        A.   Detective Sheehan asked him which tree, and he was
21   unable -- he looked around and was unable to find a tree
22   that he claimed supported the position and angle from which
23   he had seen events.
24        Q.   Did you have any further conversation with Kharey
25   Wise at that location?
```

Joseph T. Tierney, CSR, RPR

People - Fairstein - Direct - Lederer          3067

A.   No.

Q.   And approximately how long were you present at
that scene with Kharey Wise?

A.   We were there altogether from the time we got out
of the police car until we got back, again, maybe the ten to
fifteen minute range.  We were hurried up there because of
the presence of a television news team that was approaching
down the ravine and we wanted to get --

          MR. MOORE:  Objection, it is not being

          responsive.

A.   -- out of there.

          THE COURT:  I'll allow it.

Q.   When you say -- I believe you say it was ten or
fifteen minutes.  Was that from the time you first arrived
and got out up on the roadway or are you referring to only
the time down below?

A.   I would say there were three or four -- three
minutes or so on the roadway, three or four minutes driving
down to the scene, and I think the whole thing, out of the
car with both defendants, probably couldn't have taken ten
minutes.

Q.   After the conversation that you just testified to
happened with Kharey Wise, what was the next thing that you
did?

          Joseph T. Tierney, CSR, RPR

People - Fairstein - Direct - Lederer          3068

1

2    A.   We got back in the car and tried to turn around in

3    the mud and get out of the ravine.  When we got back to the

4    roadway and were leaving the park, I was aware that one of

5    the statements that had been made earlier was that on

6    leaving the park, the group of kids who left with Antron

7    McCray had gone out the west side of the park and had been

8    in a group, that Antron had a pipe at that point and had

9    been knocking light ** bulbs out of a building where there

10   was a construction site on 96th Street, that there was

11   scaffolding, that there were light bulbs hanging from the

12   scaffolding, that Antron had been running along, jumping and

13   breaking light bulbs.  And I asked Kharey if he had seen

14   that and he said yes.  And I asked him if he could show us

15   the location at which that happened, and he said yes.

16   Q.   And where did you go then?

17   A.   And he directed Detective Sheehan to 96th Street

18   and Central Park West.  On the northwest corner there was a

19   very obvious scaffolding around what looked like an

20   apartment building, and we stopped the car.  I was the

21   closest one to the sidewalk and I got out on the right side

22   and there were, in fact, every third or fourth bulb was

23   broken.  And I got back in the car, having made that

24   observation, and we then drove around up Columbus Avenue and

25   right back to the 24th Precinct.


Joseph T. Tierney, CSR, RPR


NYCLD_015208

P-APP001153

People - Fairstein - Direct - Lederer          3069

1

2   Q.   Did Kharey Wise get out of the car at that

3   location?

4   A.   No, he did not.

5   Q.   Did Kevin Richardson get out of the car at that

6   location?

7   A.   No, he did not.

8   Q.   Was Kevin Richardson asked any questions about the

9   light bulbs?

10  A.   No.

11  Q.   Did there come a time after the trip that you just

12  described to the 102 Street Crossdrive that you went to the

13  crime scene for a second time?

14  A.   Yes.

15  Q.   And at approximately what time was that?

16  A.   I'd say approximately 8:30 that morning.

17  Q.   And who was present when you went to the crime

18  scene at about 8:30 that morning?

19  A.   At that time you, yourself, were present, Mr.

20  Clements, Detective Sheehan was again the driver and Michael

21  Mannion, who is the head of our video unit.

22            MR. BURNS:  I'm sorry, what time was this?

23            THE WITNESS:  About 8:30 that Friday morning.

24  Q.   Do you recall whether any of the suspects in the

25  investigation accompanied you on that trip?


Joseph T. Tierney, CSR, RPR

Case 2:20-cv-00180-JLB-MRM   Document 46-6   Filed 07/01/20   Page 57 of 199 PageID 2146

People - Fairstein - Direct - Lederer          3070

1

2    A.    In our car they did not.  I believe that Kevin

3    Richardson went in a separate car with Detective Hartigan.

4    Q.    Did you have any conversations with Kevin

5    Richardson at the scene at that time?

6    A.    I did not.

7    Q.    I would like to please direct your attention now

8    to 10:30 p.m. on the evening of April 21st of 1989.  Were

9    you at the 24th Precinct on that time -- at that time on

10   that date?

11   A.    Yes.

12          MR. MOORE:  I'm sorry?

13   A.    At the 24th Precinct.

14   Q.    Approximately -- at that time, on that date, where

15   were Kharey Wise, Kevin Richardson, Steve Lopez, Raymond

16   Santana, Antron McCray, Clarence Thomas and Yusef Salaam?

17   A.    They were for the first time in a holding pen on

18   the 2nd floor at the rear of the squad room.

19          MR. BERMAN:  Objection to "the first time."

20          THE COURT:  Yes, objection sustained.  She

21          just asked where they were at that time.

22   A.    In a holding pen at the -- on the 2nd floor squad

23   room of the precinct in the rear of the squad room.

24   Q.    Did you hear any conversation coming from the

25   holding cell at about that time, on that date?

Joseph T. Tierney, CSR, RPR

NYCLD_015210

P-APP001155

People - Fairstein - Direct - Lederer          3071

A.   Yes.

Q.   Would you please tell us where you were at the
time that you heard conversation coming from the cell?

A.   I was less than eight feet away from the cell, I
had gone --

MR. MOORE:   I'm sorry, how many feet?

A.   Less than eight feet from the cell.  I had gone to
use a telephone book which was os a desh, the closest desk
adjacent to the cell.

Q.   With the Court's permission, I would ask you to
please step down and approach People's 6 in evidence.  If
you would please just point to where you were at the time
that you heard conversation in the cell?

A.   I was standing in an area right there.

Q.   Would you please just point where the cell is?

A.   The cell is here.

Q.   Thank you very much, you may resume your seat.  At
the time that you heard conversation, were you able to see
any people who were in the cell?

A.   Yes.

Q.   Would you please describe what conversation you
heard?

A.   I heard Kharey Wise, who was standing closest to
me, with his side to me, talking.  I don't know if it was to

Joseph T. Tierney, CSR, RPR

```
 1              People - Fairstein - Direct - Lederer        3072

 2   one person in the group or generally, but he said -- he was

 3   laughing and he said, "Did you tell them the one about the

 4   guy who was jogging and said you want to race?"  And when he

 5   said that, somebody in the cell, who's voice I can't

 6   identify and didn't see, was also laughing and said, "Yeah I

 7   told them that one too, it was really funny."  And there was

 8   a lot of laughter from the pens at that time.

 9        Q.   When you say that Kharey Wise spoke, were you able

10   to see him speaking?

11        A.   Yes.

12        Q.   And were you able to recognize his voice?

13        A.   Yes.

14        Q.   After he said, "Did you tell them about the guy

15   who said" -- or, "the jogger who said do you want to race,"

16   what answer, if any, did you hear from another voice?

17        A.   "Yeah, I told them that too."

18        Q.   Did you hear Kharey Wise say anything further

19   after the voice you could not identify said "yeah"?

20        A.   Yeah, he was laughing, he said, "Yeah, that was

21   really funny."

22        Q.   "Yeah, that was really funny" was said by whom?

23        A.   Wise.

24        Q.   Other than the conversation you just described

25   that you heard and saw Kharey Wise speaking, were you able
```

Joseph T. Tierney, CSR, RPR

```
 1              People - Fairstein - Direct - Lederer        3073
 2   to recognize any of the other voices from anybody else in
 3   the cell?
 4        A.   No.
 5        Q.   Did you see anybody else speaking during that
 6   time?
 7        A.   I -- I could hear a lot of people speaking, I
 8   could not see who was saying what.
 9              MS. LEDERER:  Thank you very much.  I have no
10              further questions.
11              MR. BURNS:  Judge, this a good time?
12              THE COURT:  Okay.  We'll take a short recess.
13
14
15                        o0o
16
17              (The Court declares a recess.  At the
18              conclusion of the recess, the following takes
19              place in open court:)
20
21
22
23
24
25
```

Joseph T. Tierney, CSR, RPR

NYCLD_015213

P-APP001158

T2-fr

3074

1        FAIRSTEIN — PEOPLE — CROSS — MOORE

2             COURT CLERK:    Hearings    continued.

3    People  of  the  State  of  New York versus

4    Kharey Wise, Yusaf Salaam,  Antron  McCray,

5    Kevin   Richardson,  Steve  Lopez,  Michael

6    Brisco, Raymond Santana.   Indictment  4762

7    of '89.

8             (Whereupon    the    witness,   Linda

9    Fairstein, resumed the witness stand.)

10   CROSS EXAMINATION

11   BY MR. MOORE:

12       Q    Good morning, Miss Fairstein.

13       A    Good morning.

14       Q    My  name  is  Collin  Moore,  and  I'm  the

15   attorney  for  Kharey  Wise.   I'm going to ask you

16   questions pertaining to Kharey Wise.

17             Now, you have testified that on April 21st,

18   at about 7 p.m. you arrived at the 24th Precinct; am

19   I correct?

20       A    No, you are not correct.  You said  that  I

21   arrived at the 24th Precinct at 7 p.m.   No.

22       Q    What time did you arrive?

23             MS. LEDERER:   Objection.

24             THE COURT:   Objection sustained.

25       Q         Did there come a time on April 21st that

11/13/89

NYCLD_015214

P-APP001159

T2-fr

3075

FAIRSTEIN — PEOPLE - CROSS — MOORE

1   you went to the 24th Precinct?

2              MS. LEDERER:  Objection.

3              THE COURT:  Yes or no?

4   A      Yes.

5   Q      And did there come  a  time  when  you  saw

6   Kharey Wise?

7   A      Yes.

8   Q      Approximately what  time  was  that?

9              MS. LEDERER:  Objection.

10             THE COURT:  No, I'll let her answer.

11  A      I don't recall seeing him much before 7:00

12  in the morning.

13  Q      You say him at about 7 a.m., am I correct?

14  A      That's correct.

15  Q      Now, prior to seeing him on the  21st,  did

16  you see him at any time prior to this?

17             MS. LEDERER: Objection.

18             THE COURT:  Sustained.

19  Q              Now,  what  was  your  role  in  this

20  investigation, Miss Fairstein?

21             MS. LEDERER:  Objection.

22             THE COURT:  I'll let her answer.

23  A      On the 20th of April,  the  case  had  been

24  assigned  to  Miss  Lederer  who  works  with me.  I

11/13/89

NYCLD_015215

P-APP001160

T2-fr

3076

FAIRSTEIN — PEOPLE — CROSS — MOORE

1

2  offered to go with her to the stationhouse to assist

3  her    if    that    became    necessary    because    the

4  investigation  had  occurred  in Central Park, and I

5  had a lot of familiarity with crime  scenes  in  the

6  park and to see if she would need any — as I called

7  it  — gopher, assistance, any help I could give her

8  while she was doing the massive amount of work, work

9  that awaited her there.

10      Q    You stated that the decision was made to go

11  into Central Park that morning.

12      A    That's right.

13      Q    Why did you find it necessary  to  go  into

14  Central Park that morning?

15      A      To  relate the statements that had been

16  given to a particular location in the Park.

17      Q    To relate the statements, you said?

18      A    Yes.

19      Q    Now, you were aware that  Kharey  Wise  had

20  made a statement prior to seeing him on the 21st?

21      A    I was aware of a statement that he made.

22      Q     Were you aware of the fact that he had, in

23  fact, made two statements?

24            MS. LEDERER:  Objection.

25            THE COURT:  I'll let  her  answer,  if

11/13/89

NYCLD_015216

P-APP001161

T2-fr

3077

1          FAIRSTEIN — PEOPLE — CROSS — MOORE

2               she's aware he made two statements.

3          A       I was aware that he had talked to the

4    police and I was aware of one part of a statement,

5    yes, sir.

6          Q       One part of one statement.  What part of

7    the statement are you referring to?

8          A       That Kharey Wise had said he had been

9    present when the female jogger was attacked, and

10   that he had been hiding behind a tree when that

11   attack occurred.

12         Q       And you were not — I'm sorry.  Which

13   officer gave you that information?

14              MS. LEDERER: Objection.

15              THE COURT:  Sustained.

16         Q    Well, did you receive that information from

17   a particular individual?

18              MS. LEDERER:  Objection.

19              THE COURT:  As compared to —

20         Q    Did you have a look at the statement that

21   Kharey Wise made?

22         A       I never looked at any written statement,

23   no.

24         Q    And where did you obtain the information

25   that he was behind a tree?

11/13/89

NYCLD_015217

P-APP001162

T2-fr

3078

FAIRSTEIN — PEOPLE — CROSS — MOORE

1

2          MS. LEDERER:  Objection.

3          THE COURT:  I'll let her answer.

4     A     A detective said to me that that's one of

5  the things Kharey Wise had said.

6     Q     Which detective told you that?

7          MS. LEDERER:  Objection.

8          THE COURT:  No, I'll allow it.

9     A     Michael Sheehan.

10    Q     And Detective Sheehan did not inform you of

11 the fact that Kharey Wise had also said before  that

12 he  was  not there and had not seen the jogger?  Did

13 Detective Sheehan tell you that?

14    A     No.

15    Q     Now, there came a time when you saw  Kharey

16 Wise in the precinct; am I correct?

17    A     Yes, sir.

18    Q     And you said he was by himself in a room?

19    A      He was by himself in a large room in which

20 a lot of other people were present.

21    Q     Right.  Do you remember where the room  was

22 located?  What part of the precinct?

23    A     Yes.

24    Q     And where was that?

25    A     On the second floor of the precinct, of the

11/13/89

T2-fr

3079

```
 1            FAIRSTEIN - PEOPLE - CROSS - MOORE
 2   room we had referred to as the Detective Squad Room.
 3        Q        Can  you indicate on the map that is up
 4   there as Exhibit 6, exactly  where  you  saw  Kharey
 5   Wise when you first observed him?
 6               (Witness  steps  from  the  stand  and
 7               approaches People's 6 in evidence.)
 8        A    I believe he was seated at -- in a  chair
 9   next to this desk.
10        Q    Indicating that large room?
11        A    Yes, he was in this large room.
12        Q    Fine.  Thank you.
13               (Witness resumes the stand.)
14        Q    Was there anyone seated next to him?
15        A    Not immediately next to him, no.
16        Q        Well,  was there anyone situated in the
17   vicinity around him?
18               MS. LEDERER:  Objection.
19               THE COURT:  I'll allow it.
20        A    There were a lot of  people  in  the  room.
21   There  was  no  one close enough for him to talk to,
22   for example, without raising his voice  and  calling
23   across the room.  He was by himself.
24        Q        Well, were there any other police officers
25   who were in the vicinity of where he was seated?
```

11/13/89

NYCLD_015219

P-APP001164

T2-fr

3080

1                FAIRSTEIN — PEOPLE — CROSS — MOORE

2        A    There were other police officers in the

3    room.  I didn't see anyone close to him.

4        Q     Now, at the time when you saw him, did you

5    know whether he was under arrest or not?

6                MS. LEDERER:  Objection.

7                THE COURT:  Objection sustained.

8        Q    At the time when you saw him, was he under

9    arrest?

10                MS. LEDERER: Objection.

11                THE COURT:  Objection sustained.

12        Q       At the time when you saw him, Miss

13    Fairstein, was he free to leave or enter the

14    precinct?

15        A    That was not up to me when I saw him.

16        Q        No, I didn't ask you that.  Do you know

17    whether he was free to leave the precinct if he so

18    desired?

19        A    I don't know the answer to that.

20        Q     Now, you stated on direct that your first

21    statement to him was that you read him the Miranda

22    rights, am I correct?

23                MS. LEDERER:  Objection.

24                THE COURT:    I'll let her answer if

25                that is the first thing.

11/13/89

NYCLD_015220

P-APP001165

T2-fr

3081

1              FAIRSTEIN — PEOPLE — CROSS — MOORE

2       A       The first thing I believe I did, I

3   testified, was I introduced myself to him and

4   explained who I was and why I was there.

5       Q       You explained to him that you are an

6   Assistant District Attorney?

7       A       That's correct.

8       Q       And that you were here to investigate the

9   Central Park rape?

10      A       I was assisting in the investigation of the

11  cases that had occurred in the park.

12      Q       And did you mention specifically the female

13  jogger?

14      A       Yes.

15      Q       Now, after you told him that what -- did he

16  say anything to you?

17      A       He said, "Yeah," and "Okay."

18      Q       And what did you say to him?

19      A       I said that I was going to read him his

20  Miranda warnings.  "I'm going to read your rights."

21      Q       So that was the second thing that you told

22  him, am I correct?

23      A       Right.

24      Q       You read him his rights.

25              Now, did you ask him, in the course of your

11/13/89

AM002380

NYCLD_015221

P-APP001166

T2-fr

3082

1              FAIRSTEIN — PEOPLE — CROSS — MOORE

2   conversation, whether he had had anything to eat  on

3   that particular night?

4        A    At that point in time, no, I believe --

5        Q    Just yes or no.

6        A    Had he --

7        Q    At that time, did you ask him, Kharey Wise,

8   did you have anything to eat or to drink, did you?

9        A    Eat or drink when, sir?

10            THE COURT:  Anytime?

11       Q    At any time prior.

12            THE    COURT:    After   you   introduced

13            yourself to him and told him you were going

14            to read his rights, did you ask him whether

15            he had had anything to eat?

16            THE WITNESS:  I did not ask him  that.

17            I served him myself a donut.

18       Q    Did you ask him if he had slept that night?

19       A       I  did not ask him if he had slept that

20   night.

21       Q    Did you ask him if he was in good health?

22       A    No.   He   appeared   to   be   in   quite   good

23   health.

24       Q    Did you ask him that?

25       A    I saw no reason to, sir.

11/13/89

NYCLD_015222

P-APP001167

T2-fr

3083

1           FAIRSTEIN — PEOPLE — CROSS — MOORE

2      Q    Did you or did you not?

3      A    I did not.

4      Q    Now, there came a time when you stated that

5  you read him the rights from a card; am I correct?

6      A    Yes.

7           MR. MOORE:    Could I have a look at

8           People's 34?

9           MS. LEDERER:  Yes.

10     Q    Is this the exact card that you read him

11 his rights from?

12     A    I believe it is.

13     Q    You believe it, but you are not sure?

14     A    I'm sure it is.  I carry one of those cards

15 in my wallet.  It is the only card like that in my

16 wallet.  I have not removed it from my wallet.     It

17 is the same card.

18     Q    You know whether this is, in fact, the most

19 recent interpretation of the Miranda warnings or

20 not?

21          MS. LEDERER: Objection.

22          THE COURT:  Sustained.

23     Q    Now, you stated on direct that you asked

24 him, "You have the right to remain silent", yes or

25 no; am I correct?

11/13/89

NYCLD_015223

P-APP001168

T2-fr

3084

1              FAIRSTEIN — PEOPLE — CROSS — MOORE

2       A     Yes.  I didn't say "yes or no".    I    said,

3    "Do you understand?"  He said, "Yes."

4       Q       And then I think you read him six or five

5    different rights; am I correct?

6       A     Correct.

7       Q       Apart from reading him the rights, did   you

8    make an attempt to explain what the rights were?

9       A     Beyond --

10      Q       Beyond reading from a piece of paper, did

11   you make any attempt to explain to him that   he   had

12   certain   rights,   and   to   explain what those rights

13   were?

14      A     That's what I just did   by   reading   it   to

15   him.

16      Q         You felt that just reading it to him was

17   enough to explain it to him?

18                MS. LEDERER:  Objection.

19                THE COURT:  Objection sustained.

20      Q     Apart from what is written   here,   did   you

21   make   any   attempt   to   explain   his   constitutional

22   rights?  Yes or no?

23      A         By   reading   them   I   did   explain   his

24   constitutional rights, yes.

25      Q         So you read him his rights and you also

11/13/89

T2-fr

3085

1                   FAIRSTEIN — PEOPLE — CROSS — MOORE

2    explained what they were?

3                   MS. LEDERER:  Objection.

4                   THE COURT:  Objection sustained.

5                   I understand what she said.

6        Q     Did you tell him, Kharey, you have a right,

7    you or your mother have a right to have an   attorney

8    in this precinct here?  Did you tell him that?

9        A     I made no reference to his mother.

10       Q        Well, you were aware of the fact that he

11   was an adolescent, weren't you?

12       A     No.

13       Q     You were aware of the fact  he  was  fairly

14   young, weren't you?

15       A     I was aware of the fact he was over the age

16   of 16.

17       Q     And that makes him an adult?

18                   MS. LEDERER:  Objection.

19                   THE COURT:  Sustained.

20       Q     You were —— were you aware of the fact that

21   he was attending high school at the time?

22       A     I was not aware of that fact.

23       Q        By the way, prior to speaking to Kharey

24   Wise, did you know how  long  he  had  been  at  the

25   precinct?

11/13/89

NYCLD_015225

P-APP001170

T2-fr

3086

FAIRSTEIN - PEOPLE - CROSS - MOORE

1

2          MS. LEDERER:  Objection.

3          THE COURT:  I'll let her answer.

4    A     I did not know then.

5    Q     Did you inquire from any of the detectives

6    how long he had been there?

7    A     No.  I had a range.  I knew he was not

8    there  when I first arrived, and that he had come in

9    at some time thereafter.  I did not inquire the

10   hour.

11   Q     Did you attempt to find out from any of the

12   officers  the  circumstances under which he had been

13   brought in?

14         MS. LEDERER:  Objection.

15         THE COURT:  I'll let her answer.

16   A     No, I did not.

17   Q     Now, there came a time when you and

18   Detective Jonza and Detective Sheehan and Kevin

19   Richardson went to the park; am I correct?

20   A     Yes.

21   Q     And you stated you took about ten or maybe

22   fifteen minutes to get to the park?

23   A     Yes.

24   Q     Well, the 24th Precinct is about four

25   blocks from Central Park; isn't it?

11/13/89

NYCLD_015226

P-APP001171

T2-fr

1                    FAIRSTEIN — PEOPLE — CROSS — MOORE

2          A       Yes.

3          Q       And did you  --  did  the  Detective  drive

4    straight to Central Park from the Precinct?

5          A       Stopping for red lights.

6          Q       And apart from stopping for red lights --

7          A       There's no direct way in at 102nd.  We had

8    to go north.  We had to go up to, I believe 110th to

9    get in and to come down  through  the  park,  and  I

10   would  say driving at average speed, with the number

11   of traffic lights and the route we had to take, that

12   it took approximately ten minutes.

13         Q       Now, you also stated you had a conversation

14   with Kharey Wise on  the  way  to  the  park,  am  I

15   correct?

16         A       There was talk -- general talk in the car.

17         Q       Could you tell us what the general talk

18   was?

19         A       The detectives and  I  were  talking  about

20   returning to the park, we had another crime scene to

21   go  to and at one point Kevin Richardson was talking

22   about his family.  Kharey was talking about the  sun

23   was  up and that it was daylight outside, and things

24   looked a lot different in daylight.

25                 I don't remember anything more  substantive

11/13/89

T2-fr

3088

1              FAIRSTEIN - PEOPLE - CROSS - MOORE
2      than that.
3          Q    Well, did you ask him any questions?
4          A    No, sir.
5          Q    Now, there came a time when you arrived at
6      the 102nd Street crossdrive, am I correct?
7          A    Yes.
8          Q    Now, you had also stated in direct that you
9      had tried to avoid having both defendants  there  at
10     the same time, am I correct?
11         A         No, sir.  Having both of them talk about
12     the event or the occurrence in front of each  other.
13     Obviously  we  had brought them together at the same
14     time.
15         Q    And they were in the car at the same time?
16         A    That's right.
17         Q    And in fact, there came  a  time  when  you
18     called first Kevin Richardson to relate what he said
19     and then you called Kharey Wise; am I correct?
20         A    Yes.
21         Q    And in fact, when you called them, both of
22     them were outside of the car, am I correct?
23         A    At first, at arriving at the transverse?
24         Q    At  any  time  after  you  arrived  at  the
25     transverse,  did  there  not  come  a time when both

11/13/89

NYCLD_015228

P-APP001173

T2-fr

3089

FAIRSTEIN — PEOPLE — CROSS — MOORE

Kevin Richardson and Kharey Wise were both outside the car?

A        I remember Kevin getting out of the car first. That they were ever out together it's possible, but I remember we asked for Kevin to come and talk to us first, and Kevin got out of the car first.

Q       And then you called Kevin over to where you were, am I correct?

A       Yes.

Q       And how far was he from where the car was parked?

A       I would say not more than 20 feet.

Q       So it was possible, was it not, for Kharey, standing outside of the car, to overhear the conversation that you were having with Kevin?

MS. LEDERER: Objection.
Misstating the testimony.
THE COURT:   I don't know.  I'll let her answer.

Q       Was it not possible, in fact, for Kharey Wise to overhear what Kevin Richardson was telling you?

A       I don't believe ——

11/13/89

NYCLD_015229

P-APP001174

T2-fr                                                                    3090

1              FAIRSTEIN — PEOPLE — CROSS — MOORE

2                   THE COURT:  How far away?

3                   THE WITNESS:  20 feet when we first

4          started talking to Kevin, and my

5          recollection is that Kharey was still

6          inside the car.

7      Q        You cannot recall testifying that there

8  came a time when you called, I think it was Kevin

9  Richardson and Kharey Wise also came out of the car?

10     A    I believe that was at -- if you look at my

11 testimony, that was at the bottom of the ravine

12     Q    That is correct.

13     A    Well, then there was more than 50 feet

14 separating us.  The detective and I were a third of

15 the way up the hill when we were talking to Kevin,

16 and that was at a distance you could not hear

17 conversation being had by two individuals at the

18 car, and the three of us standing by the tree with

19 the blood.

20     Q    Did you make an attempt to check out

21 whether in fact you could overhear conversations

22 from that distance?

23     A    Yes.

24                   MS. LEDERER:  Objection.

25                   THE COURT:  I'll let her answer.

11/13/89

T2-fr

3091

FAIRSTEIN — PEOPLE — CROSS — MOORE

A    I didn't attempt to.  Detective  Jonza  was standing  next  to the car with Kharey while Sheehan and Richardson and I were up the hill with Kevin and you could not hear conversation  between  Jonza  and Wise.

Q        Now,  there came a time when you called Kharey Wise out of the car; am I correct?

A    There were two times.

Q    Okay, the first time was when you  were  on the  hill  and  the second time was when you were in the ravine, is that correct?

A    Yes.

Q    Now, with regard  to  the  first  time  you called  him  out  of  the car, when you were on that hill, what did he say —— what did  you  say  ——  I'm sorry, withdrawn.

What did Detective Sheehan say and what did Kharey Wise respond?

A        Sheehan  asked  him if this area looked familiar to him, is the way I  recall  the  question being asked.

Q    And what did he say?

A    I can't recall exactly.  That's what I had to look at my notes for this morning.  If  you  want

11/13/89

NYCLD_015231

P-APP001176

T2-fr

3092

          FAIRSTEIN — PEOPLE — CROSS — MOORE

his  exact  language,  I  would  like  to  look  at  my

paper.

     Q    By the way, when did you make those notes?

     A    I made those notes --

          MS. LEDERER:  Your Honor,  excuse  me.

          Could I ask, Counselor, which notes are you

          referring to?

          THE  COURT:   The witness said she had

          to refer to some  notes  this  morning  I

          assume she's referring to those notes.

     Q         Can  I  have an indication of the notes

you're referring to?

     A    The note to  which  I'm  referring  is  the

piece  of paper, single piece of paper that says,"K.

Richardson, 7 a.m." The comment made on the roadway

is, "This is where we got her."

     Q    Just one second.  Could I just have a  look

at the note?

     A    Yes.

     Q         Now, with regard to these notes to which

you're referring, when did you make those notes?

     A    I believe I reduced that event  to  writing

to that piece of paper on the Monday following.

     Q         And the 21st was -- do you recall what day

11/13/89

NYCLD_015232

P-APP001177

T2-fr

3093

FAIRSTEIN — PEOPLE — CROSS — MOORE

that was, of the week?

A     Yes, the 21st was a Friday.

Q     So the notes that had to do with your
conversation with Kharey Wise, particularly, you
reduced that to writing on the following Monday; am
I correct?

A     That's correct.

Q         Now, did you take any notes as you were
speaking to Kharey Wise and Kevin Richardson?

A     At the crime scene?

Q     At the crime scene.

A     No, I did not.

Q     So that the first time you reduced it to
writing was the Monday following; am I correct?

A     Yes.

Q     And was this based upon anything that you
had written or was it based upon your recollection?

A     My recollection.

Q     Now, you stated that Detective Sheehan
asked him if he was familiar with this area, am I
correct?

A     Yes.

Q     And what did he say?

A     "This is where we got her."

11/13/89

NYCLD_015233

P-APP001178

T2-fr

3094

FAIRSTEIN – PEOPLE – CROSS – MOORE

Q    Did he ask him anything else?

A    I don't believe he did.

Q    Now --

THE COURT:  Now, are you asking  about
Wise or Richardson?

MR. MOORE:  I'm speaking of Wise.

THE WITNESS:  Wise said, "That's where
we  snatched  her."  And I believe Sheehan
asked, "Where were you?"  And  he  pointed,
Wise  pointed  south  of  the  transverse
roadway towards  the  ballfield,  and  said
that's where he had been coming from.

Q    Now, Miss Fairstein, did he say, "That's
where  we  snatched  her,"  or  "That's  where  they
snatched her"?

I'm  just  asking  you,  based  upon  your
recollection, without looking at your notes, do  you
have  an  independent recollection as you sit now of
what Kharey Wise told you on that particular day?

A    Yes, on  that  particular  day  he  several
times  used  the  expression,  "we"  and  corrected
himself, and said "they."  Some  of  the  events  he
referred  to,  he  clearly  meant  "we"  because  he
referred to events he placed himself in  the  middle

11/13/89

NYCLD_015234

P-APP001179

T2-fr

3095

FAIRSTEIN - PEOPLE - CROSS - MOORE

of.

Q        I'm not asking you your interpretation of what he said.  I'm asking you what did he exactly say the first time Detective Sheehan asked him that question?

THE COURT:   What point are you asking about?

Q        When Sheehan first asked him the question, "Are you familiar with this area," what did he say?

A        I like to look at my notes.  I believe he said, "they" at that point.

THE COURT:  Do you have your notes?

THE WITNESS:   Yes.  He said, "That's where they snatched her."

Q        A moment ago you said, "we" so that your recollection is not clear as perhaps -- well --

A        As it was when I wrote these things down?

THE COURT:  That's not a question.  It does not require an answer.

What's the question?

Q        So he indicated that they snatched her; is that correct?  Is that what he told Sheehan?

MS. LEDERER:   Objection.

THE COURT:     She just answered that

11/13/89

T2-fr

3096

FAIRSTEIN - PEOPLE - CROSS - MOORE

question.

Q       Now, after that, did he tell Sheehan anything else while you were up the roadway?

A       Anything else?  Only where he had been first.  That he said, "I saw her when we were coming across here.   When we were running across the ballfield to the road."

Q       He told that to Sheehan?

A       In my presence, yes.   Sheehan asked the question.  I was present.

Q       Is that reflected anywhere in your notes with regard to Kharey Wise?

A       I believe it is.  Yes.

Q       You indicate in your notes, do you not, that he pointed out where he was in the ballfield and where they snatched her?

A       Yes.

Q       Now, there came a time when you went into the ravine, when you drove into the ravine, am I correct?

A       Yes.

Q       And Sheehan called him again out of the car while you were --

A       Sheehan --

11/13/89

NYCLD_015236

P-APP001181

T2-fr

3097

FAIRSTEIN — PEOPLE — CROSS — MOORE

Q     Did Detective Sheehan call him out of the vehicle?

A     Yes.

Q     What did Sheehan tell him and what did he say to Sheehan?

A     When Kharey Wise was — Kevin Richardson came up to the area where we were standing first. "We" being Sheehan and myself, near the large tree, bloody area. Kevin Richardson came up first. When Kevin was finished, which was a matter of a minute or two, Detective Sheehan called out to Detective Jonza, who was standing at the car, "Send Kharey Wise up now." So Kharey Wise started to walk past Kevin on the way and before he got close enough for us to ask him any questions, he was walking up the slope where there was obvious ground discoloration, a lot of dried blood, and then Kharey Wise started talking before Sheehan asked him a question.

Q     All right. Now, at that time when Sheehan called out to Jonza to send Kharey Wise, was he in the car or outside of the car?

A     I believe — I believe he was standing outside the radio car, next to Detective Jonza.

Q     Now, a few minutes ago I had asked you the

11/13/89

NYCLD_015237

P-APP001182

T2-fr

3098

FAIRSTEIN — PEOPLE — CROSS — MOORE

question whether it was possible for Kharey Wise  to

overhear  the conversation that you were having with

Kevin Richardson; am I correct?

      MS. LEDERER:  Objection.

      THE COURT:  Yes, you did ask that

      question.

  Q   And you had indicated that no, he could not

have heard that conversation; am I correct?

  A   I said I didn't believe it was possible.

  Q       But did you not say a moment ago that

Detective Sheehan said to Jonza, "Send  Kharey  Wise

over," and Jonza heard what he said?

  A    No, I did not say it.  I said he called to

Detective Jonza, he actually had to put his hand  to

his  mouth  and  say,  "Augie,  send  Kharey Wise up

here."

  Q   And the fact is Jonza heard it, didn't he?

      MS. LEDERER:  Object to the raising of

      the voice.

      THE COURT:  I'll allow  it.   Did  he

      come over after that?

      THE WITNESS:  Yes.

  Q       So,  Jonza heard what she had said. Did

Jonza not hear?

11/13/89

NYCLD_015238

P-APP001183

T2-fr

3099

FAIRSTEIN — PEOPLE — CROSS — MOORE

MS. LEDERER: Objection.

THE COURT:  Presumably.

Q     Now, you had stated in your direct
testimony that Kharey Wise said something to the
effect about "Damn, that's a lot of blood on the
ground," am I correct?

A     Yes.

Q     And you had also stated it was obvious to
you that it was blood that was on the ground,  am  I
not correct?

A     It appeared to me to be blood.

Q     What else did he say apart from the fact
that there was blood on the ground?

A     He said, "it's a lot  of  blood," repeated
his  expression,  and  then  said, "it's really bad,
it's really bad."

He repeated that sentence,and those phrases
four or five times as he walked the area.

Q     In those phrases that he uttered, I mean he
did not say, did he, that I  cut  the  woman,  or  I
caused her to bleed, did he?

A     No, he did not.

Q     And he didn't give you the names of anyone
at that time who had caused her to bleed, did he?

11/13/89

NYCLD_015239

P-APP001184

T2-fr

3100

1                    FAIRSTEIN — PEOPLE — CROSS — MOORE

2        A        He was not asked any of those questions    at

3    that time.

4        Q         So he -- now, did he say that he knew she

5    was bleeding?  Did he ever state that?

6        A      Yes, he did state that.

7        Q         Did Detective Sheehan ask him any questions

8    after that, after he said I knew  she was bleeding?

9        A      Yes.

10       Q       What question did he ask him?

11       A        Well, he asked him  before,  what   elicited

12   that   response   was,  "Why   are you  surprised?"  And

13   Kharey said, "I knew she was bleeding.  I   knew   she

14   was  bleeding,  but  it was dark, I couldn't see how

15   bad it was last night."  And then Sheehan went on to

16   ask him what was familiar about the area,  and   that

17   is   when   he   used   the   expression,  and  corrected

18   himself  --  I  can't  editorialize  or  change  his

19   phrasing   --  "That's where we  --  I mean that's where

20   they got her."  Pointing to the area where the blood

21   was and saying, "That's where she was raped."

22       Q      Now, during this period of time when Kharey

23   Wise was saying, "She was bleeding.   That's   where

24   she  was  raped," did you or Sheehan ask him who the

25   "she" he was referring to?

11/13/89

NYCLD_015240

P-APP001185

T2-fr                                                                    3101

                    FAIRSTEIN — PEOPLE — CROSS — MOORE

1       A      By name?

2       Q      Did you ask him, are you talking about   the

3    female jogger?  Did you ever ask him that question?

4       A      I told him that's why we were going to the

5    scene.

6       Q      I did not ask you what   you   had   told   him

7    some   half-hour   before.  He was saying allegedly, I

8    knew she was bleeding, did you and Sheehan ever   say

9    is that the female jogger, did you ever ask him that

10   question?

11      A      Our entire conversation with him revolved

12   around the female jogger.

13      Q      Did you ask him that question whether   that

14   "she"   referred   to   the female jogger at the scene,

15   did you or did you not?

16      A      At the scene we   certainly   talked   in   his

17   presence   that   the   whole   conversation   —— we were

18   there for that purpose.  We said, "that's where   the

19   body   of   the   young   woman who had been jogging was

20   found."  When one of them made a   reference   to   the

21   rape,   I   said   "This   is where the girl was raped."

22   That's who we were talking about.

23      Q      You   assumed   that   that   is   what   he   was

24   referring to, didn't you?

25

11/13/89

T2-fr

3102

FAIRSTEIN — PEOPLE — CROSS — MOORE

A     No, I began my conversation with him at the stationhouse by telling him that's who we were referring to, and that's why we were going to that particular location in the park where that young woman's body had been found.

Q     You have not answered my question.

A     I think I have, sir.

Q     After he said, "she" did you ever ask him are you talking about the female jogger? Did you ask him that question, yes or no?

THE COURT:  That specific question.

A     Not after he answered the question that I knew referred to the female jogger.

Q     So the answer is no?

A     Yes, sir.

Q     Now, you stated that he said, "we" or "they" at a particular point in time; am I correct?

A     Yes.

Q     Well, did you say Kharey, is it we or is it they who dragged her down here? Did you ever ask him that question?

A     I did not.

Q     Did Sheehan ever ask him that question there?

11/13/89

T2-fr

3103

FAIRSTEIN — PEOPLE — CROSS — MOORE

1

2    A    In my presence, at the scene, he did not.

3    Q    Now, on direct you were asked  a  question,

4  "Was  this  area  familiar to you," that is, Sheehan

5  asked him, and he said, "This is where we" or  "they

6  raped her," was that your response?  Did you testify

7  to  that  on direct, that Kharey Wise said, "This is

8  where 'we' or 'they' raped her"?

9    A    Raped her or got her.

10   Q    Well, is there a difference?  What  did  he

11 say?  "This is where we or they got her?"

12   A    You want the exact reference I would like

13 to look at my notes.

14   Q    No, I'm speaking to what you  testified  on

15 direct.   Did you not recall  testifying Kharey Wise

16 said this is where we or they raped her?

17            MS. LEDERER: Objection.

18            THE COURT:  I'll allow it.

19   Q    Do you recall testifying to that?

20   A    I don't recall specifically  that  question

21 and answer.  I'm happy to have it read back.

22   Q    I'd like you to look at your notes and to

23 indicate whether in fact that is correct or not.

24            MS. LEDERER:  Objection.

25            THE COURT:  What was correct?

11/13/89

T2-fr

3104

FAIRSTEIN — PEOPLE — CROSS — MOORE

1              MR. MOORE:  That  he  in  fact  stated

2       this is where we or they raped her.

3              THE COURT:  I'll let her look.

4       Q    Is that reflected in your notes?

5       A       My notes say Kharey said, "This is where

6       the rape was.  I mean they dragged her down here."

7       Q    There is a difference ——

8              MS. LEDERER:  Objection.

9              THE COURT:  Sustained.

10      Q    There is no reference in  your  notes  that

11      say  this  is  where  we  or they raped her, is that

12      correct?

13      A    There is no reference to that in my notes.

14      Q    Now, I'm looking at one page of your notes.

15      Is  there  another  page  that  pertains  to  this

16      particular conversation with Kharey Wise?

17      A       Yes, there is a page two, the page about

18      the lightbulbs and the laughter and the  comment  in

19      the pens.

20      Q    May I just have a look at that?

21      A    Sure.

22      Q       Thank you.  Now you had also stated that

23      there was a conversation between  Sheehan  and  Wise

24      about a tree in the park, am I correct?

11/13/89

NYCLD_015244

P-APP001189

T2-fr                                                                    3105

                    FAIRSTEIN — PEOPLE — CROSS — MOORE

1

2       A       Right.

3       Q          What did Sheehan say and what did Kharey

4    Wise say?

5       A       Sheehan asked him to point out the tree

6    behind which he claimed to have been hiding, and

7    watching this and Kharey mainly looked around for

8    several minutes, and was unable to pick a tree.

9       Q       Well, would it be true to say that you were

10   skeptical about the fact that Kharey Wise was hiding

11   behind a tree?

12                    MS. LEDERER:  Objection.

13      A       At the time --

14                    THE COURT:  Objection sustained.

15      Q     Now, is that conversation reflected in your

16   notes?

17      A     No, it was negative.

18      Q          Well,  did you think it was significant

19   enough to record in your notes?

20                    MS. LEDERER:  Objection.

21                    THE  COURT:    She  didn't  apparently

22             record it.

23      Q          Now,  there was no further conversation

24   between Kharey Wise and Sheehan or between Kharey

25   Wise  and  yourself  in  the  park that morning, was

11/13/89

NYCLD_015245

P-APP001190

T2-fr

3106

1          FAIRSTEIN - PEOPLE - CROSS - MOORE

2     there?

3          A.    That's right.

4          Q    Now, there came a time when you returned to

5     the precinct, am I correct?

6          A    Yes.

7          Q    By the way, you testified  on  direct  that

8     you knew that Kharey Wise was going to be videotaped

9     that day; am I correct?

10              MS.  LEDERER:    Your Honor, object to

11              the form of that question.

12              THE COURT:  Yes,  objection  sustained

13              as to form.

14         Q     Do you know whether Kharey Wise was going

15    to be videotaped that day?

16              MS. LEDERER:  Objection.

17              THE COURT:  I'll let her answer.

18         A    I knew it would be a  combination  of  Miss

19    Lederer's  decision  to  attempt  to  take  a  video

20    statement and the defendant's consent  at  the  time

21    she was prepared to do that.

22         Q        Well,  you  knew  that if the defendant

23    consented, Miss Lederer would, in fact, video  tape

24    him that day, didn't you?

25         A    I assumed that would be the plan.

11/13/89

NYCLD_015246

P-APP001191

T2-fr

3107

FAIRSTEIN - PEOPLE - CROSS - MOORE

Q        And wouldn't it be true to say, Miss
Fairstein, that you took Kharey Wise to that park to
get him acquainted with the topography of the park
before he made the video statement?

MS. LEDERER:  Objection.

THE COURT:  I'll let her answer.

A    No, I did not.

Q    Was that your reason for taking him there?

A    No, it was not.

Q        What was really your reason for taking
Kharey Wise to the park?

A        My reason was to attempt to have
individuals involved inform us about the location at
which events had occurred.

Q    The location of which events had occurred.
I had asked you a little earlier, and maybe you
responded, and maybe I just didn't recall. Did you
see Kharey Wise's statement before you took him to
the park that morning?

MS. LEDERER: Objection.

THE COURT:    I'll let her answer the
question whether she was aware of any
statement being made.

THE WITNESS:  I didn't see any written

11/13/89

NYCLD_015247

P-APP001192

T2-fr

3108

FAIRSTEIN — PEOPLE — CROSS — MOORE

statement.    I  was  aware  he  had made  a

statement.

Q    So, without  seeing  the  written  statement,

you  were about to ask him about certain things that

he had said in  the  statement; is that correct?

A    In particular I was interested  because  he

had  placed  himself  at  the  scene  of  the sexual

assault and was  in a position to tell me where  that

had occurred.

Q      Well, when you got to the park, did you

ever ask him, show  me  where  you  were  when  this

altercation took place?

A    Detective Sheehan did, yes.

Q     And his response was so significant that

you didn't even make a mention of it in your notes?

MS. LEDERER: Objection.

THE COURT:  Sustained.

Q    Well, you stated, did you not, when he made

a statement about the tree, you didn't put that down

in your notes, did you?

A    He couldn't show us where it was.  That  is

what  was  so  significant.   He  couldn't  show us

anything about where he was except  to  remark  upon

the  actual  location  of  the  rape  and  where the

11/13/89

NYCLD_015248

P-APP001193

T2-fr

3109

         FAIRSTEIN — PEOPLE — CROSS — MOORE

jogger's body had been when she  was  attacked,  and
where she had lost her blood.

    Q    Were there trees in that area where Kharey
Wise was that morning?

    A    There were trees all around the area.

    Q    So you are saying that he could  not  point
out a specific tree?

    A    Not even a direction.

    Q    Well, did he not point out to you that he
was  coming  from  a  particular  ballfield,  am  I
correct?

    A    At the first stop on the pavement, yes.

    Q    And did he point out to you where the woman
had apparently been dragged to a particular area?

    A    Yes.

    Q    And also he had indicated to you where some
comment about blood on the leaves; am I correct?

    A    Yes.

    Q    So would that indicate to you he had some
familiarity with the area?

              MS. LEDERER: Objection.

              THE COURT:  Sustained.

    Q    In  fact, Miss  Fairstein,  you  were  not
interested  in  locations, you wanted him to impress

11/13/89

NYCLD_015249

P-APP001194

T2-fr

3110

FAIRSTEIN — PEOPLE — CROSS — MOORE

in his mind exactly what the scene was like when he
gave the video; is that correct?

    A    That is not correct.

          MS. LEDERER: Objection.

          THE COURT:  She has already answered
        the question.

    Q    You claim that also on the way back that
you drove past the area where there was scaffolding;
am I correct?

    A    Yes.

    Q    And are you sure it was Kharey Wise who
pointed out to you where the lightbulbs were
apparently broken?

    A    Yes, I am.

    Q    Are you sure of that?

        Miss Lederer, is there any indication in
Kharey Wise's statement --

    A    I appreciate the compliment, but she's Miss
Lederer.  I'm Miss Fairstein.

    Q    I'm sorry, withdraw that.

        Did you know for a fact whether there was
any indication in Kharey Wise's statement that he
saw Antron McCray or anyone breaking the lightbulbs?

          MS. LEDERER: Objection.

11/13/89

NYCLD_015250

P-APP001195

T2-fr

3111

1      FAIRSTEIN — PEOPLE — CROSS — MOORE

2         THE COURT:  Objection sustained.

3         Is this a good point for us to recess?

4         MR. MOORE:  This is fine.

5         THE COURT:  Recess for lunch.  2:15.

6         (Whereupon at 1:00 p.m.  the  luncheon

7     recess commenced.)

8            *    *    *

9    A F T E R N O O N    S E S S I O N

10        COURT  CLERK:  Hearings  continued.

11   People of the  State  of  New  York  versus

12   Kharey  Wise,  Yusaf Salaam, Antron McCray,

13   Kevin  Richardson,  Steve  Lopez,  Michael

14   Brisco,  Raymond  Santana.  Indictment 4762

15   of '89.

16        (Whereupon  the  witness,  Linda

17   Fairstein, resumed the witness stand.)

18        THE  COURT:  Miss  Fairstein, our PA

19   system is functioning about as usual.  It's

20   not working.  We will have to  ask  you  to

21   keep your voice up.

22        THE WITNESS:  Yes, sir.

23 CROSS EXAMINATION (Continuing)

24 BY MR. MOORE:

25    Q    Good afternoon, Miss Fairstein.

11/13/89

T2-fr

3112

FAIRSTEIN — PEOPLE — CROSS — MOORE

A     Good afternoon.

Q     This morning you testified that after your visit to Central Park on the 21st, there came a time when you passed by a scaffolding on Central Park West, am I correct?

A     Yes.

Q     And then I think it was Detective Sheehan or yourself asked Kharey Wise a question; is that correct?

A     Yes.

Q     Was it yourself or Detective Sheehan?

A     I believe it was Sheehan.

Q     And do you recall what he asked?

A     He said could he indicate the building where Antron had piped the bulbs.

Q     "Piped the bulbs"?

A     Hit the bulbs with a pipe.

Q     Now, prior to this, did Detective Sheehan indicate to you that Kharey Wise had stated that he saw Antron McCray breaking some bulbs?

A     Yes.

Q     Now, I'd like to show you what's been marked in evidence, People's 22 and People's 23.

MS. LEDERER:  Objection.

11/13/89

T2-fr

3113

FAIRSTEIN — PEOPLE — CROSS — MOORE

1
       MR. MOORE:  It's in evidence.

2
       MS. LEDERER:   I object to showing

3
People's 22 and 23 to the witness.

4
       THE COURT:  What is the relevance of

5
this to her testimony?

6
       MR. MOORE:  I would like to find out,

7
your Honor, the basis for the asking of

8
that question since it is not in the

9
statement.

10
       THE COURT: Objection sustained.

11
Q    Did Detective Sheehan indicate to you that

12
Kharey Wise had said he saw Antron McCray breaking

13
bulbs?

14
A    Yes.

15
Q    Did he indicate to you whether Kharey Wise

16
had made that statement during his interrogation by

17
Detective Hartigan?

18
       MS. LEDERER:  Objection.

19
       THE COURT:  I'll allow the answer.

20
A    No, he gave me no indication, nor did I ask

21
him from what period or conversation or source.  He

22
just said that that's what he believed Kharey Wise

23
said.

24
Q    And you never asked him what the basis of

25

11/13/89

T2-fr

3114

1              FAIRSTEIN — PEOPLE — CROSS — MOORE

2    his asking was?

3        A    No.

4        Q    Now there came a time when you saw Kharey

5    Wise again at 10:30 p.m., am I correct?

6        A    Yes.

7        Q    Now, in the interval between when you

8    returned to the precinct and when you saw Kharey

9    Wise at 10:30 p.m., did you ever see him at that

10   precinct anytime during that interval?

11              MS. LEDERER:  Objection.

12              THE COURT:  Sustained.

13       Q    Did you remain at the 24th Precinct for the

14   rest of the afternoon?

15              MS. LEDERER:  Objection.

16              THE COURT:  Sustained.

17       Q    Now, you had indicated you were at a desk

18   about eight feet away from the holding cell; am I

19   correct?

20       A    Yes.

21       Q    Could you indicate exactly where you were,

22   Miss Fairstein?

23       A    Get down and go to the map?

24       Q    Yes.

25       A    (Witness complies)

11/13/89

T2-fr

3115

1                 FAIRSTEIN — PEOPLE — CROSS — MOORE

2            The cell is here as it is   marked.     There

3    are   two desks back here.  They have phones on them.

4    There was a phone book in the drawer   of   this   desk

5    that   a police officer had given me to work with and

6    I was standing between the desk and the cell nearest

7    to the desk.

8        Q     You were standing with your back toward the

9    cell; is that correct?

10       A     My side.

11       Q     Your side toward the cell.  Now, was   there

12   a door at the entrance to the cell, do you recall?

13       A     No door that I'm aware of.

14       Q     Thank you.

15                 (Witness resumes the stand.)

16       Q     Now, prior to hearing those voices in the

17   cell, would it be true to say that you were   working

18   on some project at the desk?

19                 MS. LEDERER:  Objection.

20       A     No.

21       Q     Would  it  be true to say that you were

22   involved in some activity at the desk?

23                 MS. LEDERER:  Objection.

24                 THE   COURT:     Weren't   you   looking

25            through a telephone book?

11/13/89

NYCLD_015255

P-APP001200

T2-fr

3116

FAIRSTEIN — PEOPLE — CROSS — MOORE

THE WITNESS:   I was not at the desk.
I was in a different area of that room —
actually out of that room until I went
specifically there to pick up a phone book
and look for a number.

Q    Now, there came a time when you heard some voices coming from the cellblock, am I correct?

A    Two times actually.

Q    There were two times you heard some voices. Now, with regard to the first time you heard the voices, what did you do after you heard the voice — let me just withdraw that.

Did there come a time when you heard some voices?

A    Yes.

Q    And what exactly did you hear?

A    I heard Kharey Wise say, "Did you tell them about the guy that said do you want to race"?

Q    Right.  Now you heard — by the way, did you see Kharey Wise speaking at the time when you heard this?

A    I had spoken — he's one of the few in the group to whom I had spoken personally that day, and I looked up when I heard his voice as he was

11/13/89

NYCLD_015256

P-APP001201

T2-fr

3117

1              FAIRSTEIN — PEOPLE — CROSS — MOORE

2    speaking, so I could see he was the person talking.

3    Yes.

4         Q    So, are you saying then, Miss FAirstein,

5    that from the position you were, which would be

6    eight feet from the entrance of the cell block, is

7    it your testimony that you could see the individual

8    who was uttering these words?

9         A    That's correct.

10        Q    From the position where you were by the

11   desk?

12        A    Yes, sir.

13        Q    And you saw that person without even coming

14   to the entrance of the cell block, am I correct?

15        A    Oh, yes, you can see easily into the cell

16   and from the cell back, as it was proved by the

17   second series of voices.

18        Q    Now, you also testified this morning that

19   you heard a response; is that correct?

20        A    Yes.

21        Q    And what was the response that you heard?

22        A    The response was, yeah, I told them that

23   too.

24        Q    And did you see the person who was saying

25   that?

11/13/89

NYCLD_015257

P-APP001202

T2-fr

3118

FAIRSTEIN - PEOPLE - CROSS - MOORE

1

2       A    No.

3       Q    So, from the position where you were you

4  could not see the person who was making a response;

5  is that correct?

6       A    I could see a group from which the response

7  came. Mr. Wise was standing alone nearest to me.

8  There were four or five of the others seated and

9  laying on the far side of the cell.  I could not

10 pick out the person who made that response.

11      Q    Now, you stated that there came a time that

12 you heard a second statement coming from the cell

13 block.

14      A    There was a second incident with noise from

15 the cell, yes.

16      Q    What was that second statement that you

17 heard?

18      A    It's not a statement.  It was a series of

19 noises and statements.  Shortly after I returned

20 with the phone book to another room which is the

21 room on that map, directly to the right of that

22 locker room area --

23      Q    Could you just indicate on the exhibit?

24      A    Yes.  (Witness complies)

25           I was in this room, which is, I believe,

11/13/89

NYCLD_015258

P-APP001203

T2-fr

3119

FAIRSTEIN — PEOPLE — CROSS — MOORE

the Captain's office in that precinct, and I heard
from without a real commotion.

Q    When you say "commotion" what did you hear?

A        Whistling, screaming, ruckus laughter as
though a party was going on.

Q    And what happened after that?

A    I walked out, concerned, to see what the
source of the commotion was.

Q    Did you hear Kharey Wise making any remarks
at this time?

A        I heard at least five or six screaming
voices and I could not identify anyone to match to
the words that I heard.

Q        So you could not distinctly recall Kharey
Wise saying anything at that time?

A    I cannot identify who said what.

Q    Now, apart from the fact you heard Kharey
Wise stating, "Did you tell them about the guy who
said 'Do you want to race?'" so that is the only
statement you could attribute to Kharey Wise;
correct?

A    Some one answered and said, "I told them
that too," and then Kharey Wise said, "Yeah, that
was funny."

11/13/89

NYCLD_015259

P-APP001204

T2-fr

3120

FAIRSTEIN — PEOPLE — CROSS — MOORE

Q       Apart from those two statements, you didn't
know what Kharey Wise was referring to, did you?

A       At that time I did not.

Q       He could have been speaking about some race
that he had observed a year ago; as far as you   were
concerned?

                MS. LEDERER: Objection.

A               She   didn't   know,   so I suppose that's
possible.

Q       Now, Miss Lederer, going back to your first
meeting with Kharey Wise ——

A       I am Miss Fairstein.

Q       I'm sorry.

        Going back, Miss Fairstein, to   your   first
meeting   with   Kharey   Wise,   you   stated   that   you
introduced   yourself   as   the   Assistant   District
Attorney   and then you proceeded to read him certain
rights.

A       Introduced   myself.   Told   him   what   my
intention   was   that morning, if he agreed, and then
read him his rights.

Q       What did you tell him your   intention   was
that morning?

A               That I intended, if he consented, to go

11/13/89

NYCLD_015260

P-APP001205

T2-fr

3121

FAIRSTEIN — PEOPLE — CROSS — MOORE

back to Central Park. To go to Central Park, take

him back to Central Park and that I would first read

him his rights and told him that I would ask him

questions after I read him his rights.

Q     Well, you told him in effect you would like

to take him to Central Park, and then proceeded to

read the rights?

A          I told him I was going to ask him if he

would be willing to go with us after I read him his

rights.

Q     Did you ask him if he was willing to go?

A     Yes, I did.

Q          Did you tell him he was free to go if he

did not wish to go?

A     Yes, absolutely did. I told him that he

did not have to go to the park, that it was his

choice.

Q     But I don't recall you telling him that on

direct.

          MS. LEDERER: Objection.

          THE COURT:  Sustained.

Q          You stated you introduced yourself and you

began to read him his rights ——

          MS. LEDERER: Objection. That is not

11/13/89

NYCLD_015261

P-APP001206

T2-fr

3122

FAIRSTEIN — PEOPLE — CROSS — MOORE

even a question, it's a statement.

THE COURT:  Ask a question.

Q        Did you not state that you proceeded to introduce yourself and then proceeded to read him his rights, did you not state that on direct?

A        I believe on direct I stated I introduced myself and told him I would want him to go to Central Park and then read him his rights.  I told him after the reading of the rights I would ask him if he would be willing to accompany us to the park.

Q        You told us a few minutes ago you informed him of his rights?

A        And then I would inform him of his rights. I told him the reason I was reading him his rights was to ask him if he was willing to go to the park.

Q        So you asked him twice, once if he would be willing to go to the park, and then you read him his rights and then you asked him if he would be willing to go to the park?

MS. LEDERER:  Objection.

THE COURT:  Sustained.

That's not what she said.

Q     Did you tell him you wanted him to go to the park before reading him his rights?

11/13/89

NYCLD_015262

P-APP001207

T2-fr

3123

FAIRSTEIN — PEOPLE — CROSS — MOORE

A    I told him it was my intention to go to the
park that morning, and if he would like to accompany
us.   That first I would have to tell him his rights
and then perhaps begin with would he like to   go   to
the park.

Q    So you stated you would like to take him to
the park, but you did not ask him a question or ——

            MS. LEDERER: Objection.

            THE COURT:  Sustained.

Q        Did you ask him, before you read him his
rights, whether he was willing to go to Central Park
with you?

A    No, I told him I was going to ask him that.
That was the purpose for talking to him, that I  was
not   there   to   interrogate him.  I was going to ask
him if he   would   accompany   me   for   that   specific
purpose,   but   first   I   needed to advise him of his
rights.

Q    Now, I'd like you to look   at   your   notes,
Miss   Fairstein.   With regard to your questions and
answers re. Kharey Wise ——

A    Yes.

Q    —— it states there, does it not,   that   you
read him his rights at about 7 a.m.?

11/13/89

NYCLD_015263

P-APP001208

T2-fr

3124

FAIRSTEIN — PEOPLE — CROSS — MOORE

          MS. LEDERER:   Objection.

          THE COURT:   Objection sustained.

          It's not in evidence.

          MR. MOORE:   Well, your Honor, I'd like
to have this marked as Wise Exhibit —— I
think it's F.

          MS. LEDERER:   May we approach for a
moment?

          THE COURT:   Yes.

          (Discussion at sidebar, off the
record)

     Q    I'd like you to look at the statement ——
your notes rather.

          Is there anywhere in the statement —— you
indicate any where in the statement that you asked
Kharey Wise whether he was willing to go with you to
Central Park?

     A    As you know, it's not a statement ——

     Q    These are your notes, are they not?

     A    Yes.   It's not a statement.

     Q         You indicate anywhere in your notes that
you asked him this question and that he gave you a
response?

     A    No.

11/13/89

T2-fr

3125

FAIRSTEIN — PEOPLE — CROSS — MOORE

Q      Thank you.

       MR.MOORE:     I'd   like   to   have   that
marked Wise Exhibit F.

       THE COURT: It's clearly not in   there.
You   want   to put it in evidence, put it in
evidence.  She says it's not in her notes.

Q      Now, you had mentioned in your  notes   that
you had read him his rights; is that correct?

       Do   you   mention in your notes you read him
his rights?

A      That's right.

Q      You also mention in your notes, do you not,
that you read him his rights  from   your   card   from
your wallet; is that correct?

A      Correct.

Q      You also mentioned that he was not cuffed?

A      Correct.

Q      But nowhere in your notes do you mention
the fact that you asked him if he wanted to go  with
you  to  Central  Park  and  he  gave  his  consent;
correct?

A      Correct.

Q      Now, when you were asked this  morning,  by
Miss Lederer, you indicated that Kharey Wise did not

11/13/89

T2-fr

3126

                FAIRSTEIN - PEOPLE - CROSS - MOORE

1  indicate  to  you that he wanted to make a telephone

2  call, am I correct?

3       A    He never talked about  making  a  telephone

4  call to me, no.  Never asked to.

5       Q        Did you tell him that he had a right to

6  make a telephone call if he so wished?  Did you tell

7  him that?

8       A    I did not tell him that, no.

9       Q    Now,  you  stated  that  these  notes  were

10 prepared  by  you  the  following Monday, after this

11 incident; am I correct?

12      A    These particular notes, yes.

13      Q    Now, before putting the notes  in  writing,

14 before  reducing  them  to writing, did you speak to

15 Detective Sheehan?

16      A    No, I did not.

17      Q    So you  merely  based  the  notes  on  your

18 recollection am I correct?

19      A        Not  merely,  but  I  based  them on my

20 recollection.

21      Q    And you also stated that basically  it  was

22 Detective  Sheehan  who  had  asked  most  of  the

23 questions at the crime scene?

24      A    Yes.

25

11/13/89

NYCLD_015266

P-APP001211

T2-fr                                                              3127

```
 1                  FAIRSTEIN - PEOPLE - CROSS - MOORE
 2        Q      And yet you prepared your notes without
 3   consulting with Detective Sheehan, right?
 4        A         Yes.     I wanted them to be from my
 5   recollection.
 6        Q      No, just a yes or no.  Just yes or no.
 7               And you stated, you said there you were not
 8   aware on the 21st at 7 a.m. that Kharey Wise had
 9   made two different statements?
10               MS. LEDERER:  Objection.
11               THE COURT:    she's already answered
12               those questions.
13        Q      You have stated that already, did you not?
14               THE COURT:  Yes, she did.
15               MS. LEDERER: Objection.
16        Q      By the way, before you spoke to Kharey Wise
17   that morning, did you ever speak to Detective
18   Hartigan?
19               MS. LEDERER:  Objection.
20               THE COURT:  I'll let her answer.
21        A      Did I at any course of the time --
22        Q      No, before you spoke with him at 7:00 that
23   morning, did you speak to Detective Hartigan?
24        A      During what period of time?  I don't
25   understand.
```

11/13/89

T2-fr

3128

FAIRSTEIN - PEOPLE - CROSS - MOORE

Q          Prior to taking him to the crime scene, prior to taking Kharey Wise to the crime scene, did you have a conversation with Detective Hartigan about Kharey Wise's statement?

A     No.

Q     During the period of time when you were at the crime scene or at any time after, did you have a conversation with Detective Hartigan?

MS. LEDERER: Objection.

THE COURT:  As to after I will sustain the objection.

Q     During the time when you were at the crime scene, did you have a conversation with Detective Hartigan?

A     No.

MR. MOORE:  No further questions.

THE COURT:  Mr. Diller?

MR. MOORE:   Can I just have one second, your Honor?

THE COURT:  Yes.

BY MR. MOORE:

Q     Miss Fairstein, as you sit there now, can you be sure that the two people you took to the park that morning was Kharey Wise and Kevin Richardson?

11/13/89

NYCLD_015268

P-APP001213

T2-fr

3129

FAIRSTEIN — PEOPLE — CROSS — MOORE

A     I am quite certain.

Q        And are you sure that it was not in fact Raymond Santana who went to the park with Kharey Wise?

A        No.  I only spoke to Raymond Santana only once.  I can tell you what my exact contact was with these two men.

Q     And with respect to the individual who told you about the lightbulbs, are you sure that it was Kharey Wise who told you about those lightbulbs that Antron had broken and not Raymond Santana?

A        It was Detective Sheehan who told me that Kharey Wise had said that.  It was Kharey in the car who pointed out the location to me.

        MR. MOORE:  No  further  questions  of this witness.

        THE COURT:  Mr. Diller.

CROSS EXAMINATION

BY MR. DILLER:

Q     Good afternoon, Miss Fairstein.

        As  you  know,  I'm  Howard  Diller,  and I represent  Kevin  Richardson  and  other  than  some preliminary  questions,  everything  I'll  be  talking about with you will pertain, obviously, to Kevin.

11/13/89

T2-fr

3130

FAIRSTEIN — PEOPLE — CROSS — DILLER

Now, you've been in the District Attorney's office some 17 years, have you not?

A     Yes, I have.

Q     And what exactly is your present title in the office?

I just did not get it when you testified under direct examination this morning.

A     I'm in charge of a bureau called the Sex Crimes Commission Unit which investigates and prosecutes all sex offenses which occur in Manhattan.   I have another title now, Deputy Chief of the Trial Division which is a supervisory position of 250 attorneys.

Q     And it would be fair to say that keeps you pretty busy?

A     Most days it does, sir.

Q     And you have, in addition to the supervision of all these attorneys, an interest in certain of the cases that your office is prosecuting, is that correct, a special interest like this case?

MS. LEDERER: Objection.

THE COURT:  Do you have a special interest in certain cases?

11/13/89

NYCLD_015270

P-APP001215

T2-fr

3131

FAIRSTEIN — PEOPLE — CROSS — DILLER

THE WITNESS: Usually a case with which I'm on trial. Especially interesting to me.

Q    Now, Miss Fairstein, some seven months has passed now since approximately, since the 21st of April, '89. Would it be fair to say that you have been involved in one way or another with many, many cases?

A    Yes.

Q    And would it also be fair to say that prior to coming to court today you did not have the benefit of speaking to Detective Hartigan and Sheehan within the last month?

A    About this case?

Q    Yes, about this case.

A    That's correct, yes.

Q    And would it also be fair to say that you're aware that there's a transcript made each day of the testimony of the witnesses here?

A    Yes.

Q    And would it also be fair to say that you had not read the transcript of the testimony of Detective Sheehan and Hartigan?

A    That is correct.

11/13/89

NYCLD_015271

P-APP001216

T2-fr

3132

FAIRSTEIN — PEOPLE — CROSS — DILLER

Q        And furthermore, it would be fair to say
that you had no colloquy with Miss Lederer
concerning the testimony of Sheehan and Hartigan?

A     That's right.

Q        And would it be fair for me to say then
that what you are testifying about today is in
response to questions posed to you by Miss Lederer
that you recall to the best of your ability?

A     Yes.

Q     And you had some help with some of the
notes you have made the Monday following the 21st;
is that correct?

A     Some, as you are aware, I made during the
many hours we were at the stationhouse and some that
I made on the 20th.

Q     Now, I'm going to now bring you to the 24th
Precinct, on the morning of the 21st, about which
you had testified to this today.

        And you have testified there came a time
that a decision was made with respect to going to
the park, which could be also called the crime
scene, am I right?

A     Right.

Q        Now, who were the folks with whom you had

11/13/89

NYCLD_015272

P-APP001217

T2-fr

3133

                FAIRSTEIN — PEOPLE — CROSS — DILLER
colloquy concerning that decision?  I know Detective
Sheehan was one.

   Q    Detective Jonza was another.

   Q    Now, is Detective Jonza a partner  of  sort
of Detective Sheehan, do you know?

   A    I know that they work in the same unit and
they're partnership switches from case or tour,  but
they have been partners from time to time.

   Q        And who else was in on that decision, if
you could tell us?

   A    I am sure that I told at least  one  police
supervisor  what  our  plan  was,and I spoke briefly
with Miss Lederer about it.

   Q    Now, would I be correct  in  assuming  that
going to the crime scene is a good prosecutorial and
police technique?

                MS. LEDERER:  Objection.

                THE COURT: I'll allow her to answer.

   A            It  may  be.   It  depends  on  the
circumstances.

   Q    I mean with specificity, this  case.   The
question is -- withdrawn.

        In other words, what I'm asking you, it was
a  good  police technique from your vantage point on

11/13/89

NYCLD_015273

P-APP001218

T2-fr

3134

1                  FAIRSTEIN — PEOPLE — CROSS — DILLER

2     the 21st of April at 8:00 to go to the crime scene?

3          A    I don't think I would have gone if I didn't

4     think it was a good thing to do.

5          Q    And when you decided to  go  to  the  crime

6     scene,  would  it be fair to say that you were going

7     to go with two of the suspects, namely  Kharey  Wise

8     and Kevin Richardson?

9          A    If they were willing to accompany us.

10         Q         Now, you had a certain object in asking

11    them to come, had you not?

12         A    Yes.

13         Q    And would it  be  fair  to  say  that  that

14    object  was  to discuss with them concerning certain

15    matters pertaining to the park  and  to  the  female

16    jogger victim?

17         A    In part that is correct.

18         Q         And to discuss with them certain specific

19    locations, for example, where the  event  had  taken

20    place?

21         A    That is part of my purpose.

22         Q         What are some of the other purposes that

23    you had?  You said this is part of  it.    What  are

24    some of the other purposes that you had?

25         A         As you may know, I was responsible for the

11/13/89

NYCLD_015274

P-APP001219

T2-fr

3135

FAIRSTEIN — PEOPLE — CROSS — DILLER

prosecution of a murder case, Robert Chambers case
which occurred in Central Park. That was a case in
which we were plagued at trial by unfortunate
occurrences and omissions in the investigatory work
that was not done at the crime scene, and in
particular there were two crime scenes within the
park in the case which I was involved with, a
primary and secondary crime scene. One of which had
been ignored completely and it was part of my
intention, when we were beginning to discover how
enormous this crime scene in this case was, that it
started in a roadway and it ended with a body at a
great distance away with evidence in between to try
and resolve the relation of the different locations
in the park, at an early period in time.

Q    And in resolving these matters, it would be
a wonderful technique to have people who were
suspects and question them about where and how
things had taken place in the park on the 19th,
isn't that so?

A    Well, much of the questions had been done
already. Whether or not any suspects accompanied me
I intended to go in any event. Your client had
already been questioned and discussed where things

11/13/89

NYCLD_015275

P-APP001220

T2-fr

3136

1              FAIRSTEIN — PEOPLE — CROSS — DILLER

2    had happened.

3         Q    You said he had already given a video tape?

4         A    That's correct.

5         Q         But nevertheless it was your purpose to

6    question him further   or   at   least   the   detectives

7    questioning   him   further with some of the specifics

8    relating to the park itself?  Isn't that so?

9         A    We were not planning to interrogate him   or

10   question  him further at the scene other than to ask

11   the most simple questions, perhaps less   than   five,

12   to   relate   the   facts   that   he   had   already   been

13   questioned to a specific location within the several

14   locations at the park.

15        Q    After 17 years   of   experience,   would   you

16   acknowledge to us that maybe one question could be a

17   really   important   question,   a   number   not   being

18   important?

19              MS. LEDERER: Objection.

20              THE COURT: I'll allow it.

21        A    I don't understand your question.

22        Q    In other words, the fact he   was   going   to

23   ask   five   questions,   couldn't   that   have   been

24   important to you?

25              MS. LEDERER: Objection.

11/13/89

NYCLD_015276

P-APP001221

T2-fr

3137

FAIRSTEIN — PEOPLE — CROSS — DILLER

THE COURT:  I guess if she asked  the,
she would assume they would be important.

What is your question?

Q    Question withdrawn.

You certainly had planned that Kevin wasn't
going  to  be  simply  taken  in  a car ride through
Central Park; is that correct?

A    That's right.

Q    And you  certainly  planned  there  came  a
point  and  a place when you were going to ask -- at
least Detective Sheehan, if not you,  some  question
to Kevin; isn't that so?

A    Yes.

Q    With that in mind, before you now leave the
24th  Precinct,  you  have  at  the stationhouse the
presence of Mr. Richardson, Kevin's father; is  that
right?

A    Yes.

Q    To whom you had previously been introduced
by Detective Sheehan, I believe?

A    Yes.

Q    By the way, was there another member of the
family there too?

A    I believe there were two women  there.    I

11/13/89

T2-fr

3138

                    FAIRSTEIN - PEOPLE - CROSS - DILLER

later -- Many, many hours later I believe Friday
night, one introduced herself to me as the sister of
Kevin.

     Q     Angela?

     A     She had a different last name.   I believe
it was Cuffy.

     Q        Cuffy.  Now, there comes the point where
you having been introduced to Kevin's father, Paul
Richardson; is that the name?

     A     Mr. Richardson.  I don't know a first name.

     Q        And you discussed with him that you would
like Kevin's permission to go with him to the  park;
is that so?

     A     Yes.

     Q        And did you discuss with Mr. Richardson
what your object of taking Kevin into the park was?

     A     Yes.

     Q     What did you tell him?

     A     That we were going back  to  the  location,
that  --  of  course he had been present for Kevin's
statement.  He knew what Kevin had said and we  were
going  to  try and ask Kevin to put together what he
had said about the crime with where it had happened,
a specific location.

11/13/89

NYCLD_015278

P-APP001223

T2-fr

3139

FAIRSTEIN - PEOPLE - CROSS - DILLER

Q    And am I correct or did I mishear you this morning where you testified, and correct me if I'm wrong, wherein your colloquy with Mr. Richardson you said to him something to the effect, "We would not be asking any more questions," you recall so testifying this morning?

A    Yes.    Any additional questions, questions other than he had been asked, he, Kevin had been asked.

Q    Now, did you have in mind then that the questions that were going to be asked of Kevin were questions that had been asked previously by other detectives and at the video, is that what you meant?

A    Yes.

Q    In other words, there were no brand new questions that had never been asked is what you told Richardson?

A    Yes.

Q    And you knew Kevin was fourteen, did you not?

A    I knew he was not sixteen, yes.    Fourteen or fifteen, I don't remember now, but I knew he was not sixteen.

Q    And you knew it was some pretty important

11/13/89

T2-fr

3140

FAIRSTEIN — PEOPLE — CROSS — DILLER

stuff you were going to do with him, isn't that so?

A     Yes.

Q          Did it occur to you, with the background you talked about with Chambers, that it would  be  a good idea if Mr. Richardson went along for the ride, if nothing more the potted plant --

MS. LEDERER: Objection.

THE COURT:  Who is Mr. Richardson?

MR. DILLER:    Paul.

A     Yes.

Q     It occurred to you?

A     Yes.

Q          Did you tell Mr. Richardson it would be a good idea for him to go along?

A     I asked him if he wanted to go  along  with him.

MR.  BURNS:  I'm sorry, did she answer yes?

THE COURT:  She  answered  more  than that.

Q     He said what?

A     I asked him if he wanted to go with us and that he had the right to go with us.

Q     All right, that's very important.

11/13/89

NYCLD_015280

P-APP001225

T2-fr

3141

1        FAIRSTEIN — PEOPLE — CROSS — DILLER

2          Now you say that Paul Richardson, let's

3   keep his name Paul, if you don't mind, because that

4   will reflect Kevin's father. If he would like to

5   come along and he would be welcome to join you; is

6   that correct?

7       A    Yes.

8       Q    Now, when you so asked him that, where was

9   Detective Sheehan and Jonza?

10      A    I believe they were several feet away from

11  me, talking to Kevin, if I'm not mistaken.

12      Q    And are you telling me now that Sheehan,

13  Detective Sheehan wasn't right next to you when you

14  asked that question —— wasn't he part of the

15  questioning with respect to Kevin's father coming to

16  the park?

17      A    He introduced me to Kevin's father. Did he

18  stay there the entire two or three minutes that I

19  talked to his father? He was never more than a

20  couple of feet away but I can't say what part he

21  listened to, and what part he didn't listen to.

22      Q    Did you hear any colloquy between Detective

23  Sheehan and Mr. Richardson concerning his

24  willingness to take him to the park?

25      A    No.

11/13/89

NYCLD_015281

P-APP001226

T2-fr                                                                    3142

FAIRSTEIN - PEOPLE - CROSS - DILLER

Q        Did you suggest to Mr. Richardson anything further with respect to the importance of his being present in the park?

A        No.

Q        And did you ask him at that point if he would like to accompany you?

A        Yes.

Q        And what was his response?

A        No. "Would we bring Kevin back to this building?"   I said, "Yes," and he said, he and his family would wait there.

Q        This response, do I understand, was after you had said to him, "We will not be asking him any more questions?"

A        Yes.

Q        And then right after that he said he'll just wait here for Kevin to come back?

A        Yes.

Q        By the way, you had some room in your car, did you not, to take Paul Richardson?

A        Whether there was room in that car or another car would have been dispatched with us, he could have come.

Q        By the way, I'm a little confused with

11/13/89

NYCLD_015282

P-APP001227

T2-fr

3143

FAIRSTEIN — PEOPLE — CROSS — DILLER

respect to that issue of "car". Now, the New York City Police Department has detective cars, is that right, squad cars?

A    They have marked cars, unmarked cars.

Q    You were talking about an unmarked car?

A    Right.

Q    Operated by Detective Sheehan; is that correct?

A    Yes.

Q    And that car was outside the 24 Precinct, wasn't it?

A    Yes.

Q    And who went into that car operated by Detective Sheehan other than Detective Sheehan?

A    I did.   I sat in the front seat with Sheehan.   Jonza sat in the middle of the back seat. Kharey Wise was directly behind me and Kevin Richardson was behind Detective Sheehan.

Q    And you're quite positive about that?

A    Yes, I was quite positive because I was concerned because nobody was handcuffed.

Q    Do you know if there was a second detective car that was following you?

A    On the first trip?

11/13/89

NYCLD_015283

P-APP001228

T2-fr

3144

1          FAIRSTEIN — PEOPLE — CROSS — DILLER

2     Q     Yes.

3     A     To my knowledge there was not.

4     Q     And you didn't see Detective Hartigan and

5  Nugent, did you?

6     A     On the first trip to the park I did not.

7     Q     And you're quite positive that both Wise

8  and Richardson were in your car with Jonza and

9  Sheehan?

10    A     On the first trip there is no doubt of it.

11    Q     Now, when you get to the park, you see no

12 other members of your department, the District

13 Attorney's office or the Police Department other

14 than uniformed personnel; is that correct?

15    A     On the first trip back, that's correct.

16    Q     Now there comes a time when Sheehan

17 identifies himself to the uniformed personnel and

18 you're out of the car; is that right?

19    A     When we pulled up I was in the car and that

20 driver going in the other direction and Sheehan were

21 window to window. Sheehan identified himself and we

22 then pulled over and we stepped out.

23    Q     Now, there came a time when one of the

24 suspects was asked to alight from the car; is that

25 right?

11/13/89

NYCLD_015284

P-APP001229

T2-fr

3145

FAIRSTEIN — PEOPLE — CROSS — DILLER

1

2    A    Yes.

3    Q    And who was that?

4    A    My recollection is it was Kevin first.

5    Q    Are you certain about that, or is it a

6    little foggy in your mind?

7    A    It's not foggy.

8    Q    You're sure?

9    A    I'm pretty certain.  I know at the second

10   site, at the ravine it was definitely Kevin  first,

11   but  I'm  quite  sure  that  was  the  same order we

12   followed at the top.

13   Q    Now, when he came out of the car,  did  you

14   say anything to him?

15   A    No.

16   Q    Did Sheehan say anything to him?

17   A    Yes.

18   Q    And you say Sheehan asked him whether this

19   looked familiar, the site?

20   A    Yes.

21   Q    And do I recall you testified this  morning

22   something  to the effect, "This is where we took her

23   down"?

24   A    Yes.

25   Q    And you attributed that statement to  Kevin

11/13/89

T2-fr

3146

FAIRSTEIN — PEOPLE — CROSS — DILLER

Richardson?

A     Yes.

Q     Are you positive about that?

A     Yes.

Q        Who was present when that statement was supposedly uttered by Kevin Richardson?

A     Sheehan and myself.

Q     Jonza and Wise were in the other car?

A     Were at the car, I believe still inside.

Q     And you and Sheehan were in close proximity to each other at that point, were you not?

A     Yes.

Q     And Kevin did not whisper that into your ear alone, did he?

A     No.

Q     And then there were other questions asked of Kevin, were there?

A     There at that location?

Q     At any place in the park.

Q     None further there.

Q     And then you drove to a ravine and at the ravine all five of you were in the car at one point, is that right, and Sheehan leaves the car; correct?

A     Sheehan and I left the car when we got to

11/13/89

NYCLD_015286

P-APP001231

T2-fr

3147

```
 1              FAIRSTEIN - PEOPLE - CROSS - DILLER
 2    the bottom of the ravine.
 3         Q     And then you called someone out of the car?
 4         A     When we first got out of the car, Sheehan
 5    and I had a conversation with the uniformed cop who
 6    pointed some things out at the bottom of the ravine,
 7    and then Sheehan and I started walking up the  muddy
 8    slope.   We   came   back   and   we asked -- Detective
 9    Sheehan asked Kevin to get out of the car  and  come
10    with us, and we walked up.
11         Q        And  this is where Kevin said, "This is
12    where it happened, the rape"?
13         A       "This  is  where  it  happened"  period.
14    SHeehan   said,   "What   happened?"   Kevin  said,
15    "Raping."
16         Q    And at that  moment  you  were  alone  with
17    Detective Sheehan and Kevin, right?
18         A    Yes.
19         Q    And there were no further statements made?
20         A    No questions asked of him after that.
21         Q     Taking you back to the 24, before you left
22    to go to the park, this was now at approximately  --
23    between seven and eight in the morning, is it not?
24         A    Yes.
25         Q        Of an event that took place a day and a
```

11/13/89

NYCLD_015287

P-APP001232

T2-fr

3148

FAIRSTEIN - PEOPLE - CROSS - DILLER

half before?

    A    Yes, sir.

    Q    The seriousness of this matter was apparent to you, was it not?

    A    Yes.

    Q    And you had the opportunity to meet with Kevin's father, Paul; is that right, you testified to that?

    A    Yes.

    Q    Did you discuss with Paul Richardson that -- this was really a serious matter, and he may want to engage some counsel to assist his 14 year old son or under 16 year old son, did you ever say anything like that to him?

    A    I did not.

    Q    Did you discuss anything with Mr. Richardson at that point?

    A    Nothing other than what I told you about here.

    Q    You say there did come a time when you returned to the park?

    A    Yes.

    Q    And who was present in your car the second time?

11/13/89

NYCLD_015288

P-APP001233

T2-fr

3149

FAIRSTEIN — PEOPLE — CROSS — DILLER

A    Second time it was Detective Sheehan, Miss Lederer, Mr. Clements, myself and Michael Manne (ph) our video unit head.

Q    And there was a second detective's car at that scene?

A    Yes.

Q    Who was present in that car?

A    I believe Detective Hartigan and Detective Nugent and Kevin Richardson.

Q    And there were no other suspects there?

A    Not that I'm aware of.

Q    Now, did you have any colloquy with Kevin Richardson at that point?

A    I didn't speak with any of the three occupants of that car at that scene, at that time.

Q    Would it be fair to say that your appearing for a second time had nothing to do with Detective Hartigan and Kevin Richardson and whoever else was in that car, it was coincidence only that you were both there at the same time?

MS. LEDERER:   Objection.

THE COURT:   I'll allow it.

A    It had nothing to do with me.   I had no contact with them at that time.

11/13/89

NYCLD_015289

P-APP001234

T2-fr                                                                    3150

                   FAIRSTEIN - PEOPLE - CROSS - DILLER

     Q     And no plan for it to happen?

     A     Not that I remember.

                   MR. DILLER:  May I just have a moment?

                   THE COURT:  Yes.

     Q     I just want to clarify one thing, if I may,
Miss  Fairstein,  in  your decision to take Kevin to
the park, the very first time, the  morning  of  the
21st,  would  it  be fair to say that you considered
that procedure an important one for  you,  for  your
investigation?

     A     For the investigation, not for the purpose
of introducing statements at a later point in  time.
It  was  for  a  different purpose.  A statement had
been  taken.

     Q     Now, you knew, did you not,  you  had  with
you  a suspect of a serious crime, and anything that
suspect  would  say  to  you  would  be  something
ultimately could and would be used against him?

     A     Could be.

     Q     And you had foreseen that prior to leaving
the stationhouse; isn't that so?

     A     Certainly considered it.

     Q     As you reflect back in object fairness,  do
you  think  you may have mislead Mr. Richardson when

11/13/89

T2-fr

3151

1            FAIRSTEIN — PEOPLE — CROSS — DILLER

2   you told him you would not be asking any more

3   questions?

4                MS. LEDERER:  Objection.

5                THE COURT:  Sustained.

6                MR. DILLER:    Then I have no further

7        questions.

8                THE COURT:  Any other questions?

9                MS. LEDERER:  No.

10               THE COURT:  Thank you.

11               (Witness excused)

12               MS. LEDERER:  May we approach?

13               THE COURT:  Yes.

14               (Discussion at sidebar; off the

15       record.)

16

17

18

19

20

21

22

23

24

25

11/13/89

NYCLD_015291

P-APP001236

People Rebuttal - Fairstein - Direct - Lederer        4445

```
SUPREME COURT              NEW YORK COUNTY
TRIAL TERM                 PART 59
------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK    :
                -against-              :
RAYMOND SANTANA, KHAREY WISE,         :    INDICTMENT NO:
YUSEF SALAAM, ANTRON McCRAY,          :       4762-89
KEVIN RICHARDSON, STEVEN LOPEZ        :
and MICHAEL BRISCO,                   :
                Defendant.            :    Continued Hearing
------------------------------------x
```

                        111 Centre Street
                        New York, N.Y. 10013
                        November 29th, 1989


BEFORE:  HON. THOMAS B. GALLIGAN,
              JUSTICE OF THE SUPREME COURT

(Appearances: Same as previously noted.)
-----------------------------------------------------------

              COURT CLERK:  Hearing is continued, People of

        the State of New York versus Kharey Wise, Yusef

        Salaam, Antron McCray, Kevin Richardson, Steven

        Lopez, Michael Brisco, Raymond Santana, Indictment

        4762 of '89.

              THE COURT:  Good morning.

              MR. BURNS:  Good morning, your Honor.

              MR. JOSEPH:  Good morning, Judge.

              THE COURT:  Who is your next witness?

              MS. LEDERER:  The People call Linda

        Fairstein.

              (The witness resumes the witness stand.)

              COURT CLERK:  Miss Fairstein, may I remind


              Joseph T. Tierney, CSR, RPR

People Rebuttal - Fairstein - Direct - Lederer      4446

1

2              you you are still under oath.

3                   THE WITNESS:  Yes.

4                   THE COURT:  Good morning.

5                   THE WITNESS:  Good morning, your Honor.

6    DIRECT EXAMINATION

7    BY MS. LEDERER:

8         Q.    Directing your attention to approximately 11:30

9    p.m. on the evening of April 20th of 1989, were you at the

10   20th Precinct at that time?

11        A.    Yes, I was.

12        Q.    Did there come a time on that night at the 20th

13   Precinct that you became aware that someone was making

14   inquiry about Yusef Salaam?

15        A.    Yes, I did.

16        Q.    Where were you at the time that you were made

17   aware of that?

18        A.    I was on the 2nd floor of the stationhouse, in the

19   detective squad room.

20        Q.    And how was it that you became aware that there

21   was someone inquiring about Yusef Salaam?

22        A.    A detective, I don't remember which detective, the

23   detective came to me in the squad room and said that there

24   was someone, and I'm quite sure he said a lawyer, downstairs

25   for Yusef Salaam.


                    Joseph T. Tierney, CSR, RPR

People Rebuttal - Fairstein - Direct - Lederer      4447

Q.   What, if anything, did you do immediately upon receiving that information?

A.   I said that I wanted to find out where in the stationhouse Salaam was, meaning what detectives he was with, so I could find out what the nature of his partici- pation was, what he was in the stationhouse for, what he was saying before I went down to meet with --

MR. BURNS:  I'm sorry, your Honor, I'm sorry, your Honor, I'm objecting because -- is she talking about her state of mind or is this what she told the person who told her?

THE COURT:  Yes, just tell us -- I think the question was what did you do then.  You said that you were trying to find out where he was, what status was that?

THE WITNESS:  Okay, I asked one of the detectives -- again, I believe it was Sergeant Cleeve -- I said to Sergeant Cleeve that I was going downstairs to meet with the lawyer, I wanted to know what Salaam had been saying, what his participation was, could you get the detective who is working with him here immediately to talk to me.

Q.   After you -- after you said those things to

Joseph T. Tierney, CSR, RPR

People Rebuttal - Fairstein - Direct - Lederer      4448

Sergeant Cleeve, what was the next thing that happened?

  A.   Within a minute or two, Detective Taglioni
appeared where I was in the 2nd floor squad room and he said
that Detective McKenna was working -- was talking to Salaam,
and he handed me a small brown detective steno pad -- steno
pad commonly used by detectives as well as other people.  He
handed me a brown pad and said that McKenna had sent it down
to me, it had the beginnings of his notes about his
conversation with Salaam.

  Q.   Approximately what time was it, if you recall,
that you were first notified that there was someone
inquiring about Yusef Salaam?

  A.   I placed it at about 11:30 that evening.

  Q.   What did you do with the steno pad that Detective
Taglioni gave to you?

  A.   I looked at it, I read what was in it, had a brief
conversation with Taglioni and gave it back to Taglioni to
return to McKenna.

  Q.   And do you recall the substance of what you read
from that steno pad at that time?

  A.   Yes.

  Q.   Would you please tell us what -- what information
you read off of the steno pad?

  A.   The steno pad had Yusef Salaam's name, address --

Joseph T. Tierney, CSR, RPR

NYCLD_015295

P-APP001240

People Rebuttal - Fairstein - Direct - Lederer      4449

1

2      MR. BURNS:  Excuse me, your Honor, she read

3  it, she read it out loud at the time?

4      THE COURT:  I don't know.

5      MR. BURNS:  I object to that.

6      THE COURT:  Overruled.

7      MR. BURNS:  All right.

8      A.   It had Salaam's name, address, date of birth and

9  it had a description -- began with a description that he got

10  her with the pipe, that he hit her over the head with the

11  pipe, that she went down, that he hit her again with the

12  pipe and then started to describe a sexual assault by other

13  participants on the woman jogger.

14      Q.   Do you recall how many pages were -- how many

15  pages you read from the steno pad?

16      A.   At the time I read it, my recollection is of a

17  page of -- a single page of notes.

18      Q.   And what, if anything, did you do after you

19  finished reading that steno pad?

20      A.   I gave it back to Taglioni and I headed downstairs

21  to meet with the person I had been told was waiting to see

22  me.

23      Q.   When you went to the 1st floor, what did you see?

24      A.   I walked down, there was a heavy doorway, I opened

25  the doorway.  On the other side of the doorway -- I believe

Joseph T. Tierney, CSR, RPR

NYCLD_015296

P-APP001241

People Rebuttal - Fairstein - Direct - Lederer       4450

1   Sergeant Cleeve and Captain Rowe had come downstairs with

2   me.  On the other side of the doorway was a young man in a

3   business suit.  I approached him and introduced myself and

4   said that I was Linda Fairstein, I was an Assistant District

5   Attorney in Manhattan, I was one of the people here working

6   on the case, and I asked him who he was.

7   Q.    What, if anything, did he say to you?

8   A.    He said that he was David Nocenti, and that he was

9   there, in his exact words words, "on behalf of the Salaam

10  family."

11  Q.    After he said that to you, what, if anything, did

12  you say to him?

13  A.    I said, "I understand that you are a lawyer,"

14  which is what the police had told me.  He said, "Yes."  And

15  I said, "Have you been retained by the family to represent

16  Mr. Salaam," and he said, "no, I'm not here to represent

17  him."  And I said, "Why are you here," and he said, his

18  exact words were, "I'm a member of the family, I'm part of

19  the family."  And I said, "Could you tell me please how you

20  are related to Mr. Salaam?"  And he said, "Well, I'm not

21  related to him, I'm actually a friend of the family."

22  Q.    And did you have further conversation with him?

23  A.    Yes, and I went on to inquire exactly what -- I

24  said, "I don't understand, are you here as a lawyer, are you

Joseph T. Tierney, CSR, RPR

People Rebuttal - Fairstein - Direct - Lederer      4451

1   here as part -- as a friend of the family?"  He said, "Well,

2   I'm here as a friend of the family."  I said, "Are you with

3   a law firm?"  And he said, "No, I'm not, " and he said, "I'm

4   an Assistant United States Attorney."  And I was -- I

5   expressed to him my great surprise, I said, "I don't

6   understand how you can be here as an Assistant United States

7   Attorney."  I asked him if he had identification, he opened

8   his wallet and he handed me a card which did, in fact, have

9   his name on it and said something like Department of

10  Justice, Assistant U.S. Attorney, Eastern District.  And I

11  proceeded to have a very lengthy discussion with him about

12  his presence there and what I considered an ethical conflict

13  with his employment.

14            MR. BURNS:  That's paraphrasing, Judge, can

15       we have the answer to the question?

16            THE COURT:  You want the exact conversation

17       she had?

18            MR. BURNS:  Whatever is it.

19            THE COURT:  Give us the conversation.

20            THE WITNESS:  Yes, it was quite a lengthy

21       conversation.  I said, "Does anybody -- does your

22       supervisor know you are here?"  He said no, no one

23       from his office knew he was here.  I said, "Do you

24       understand you work for the government?  I don't

Joseph T. Tierney, CSR, RPR

understand how you can be here representing a suspect in a criminal inquiry." He said, "Well, I'm not doing that." I said, "Well, why are you here?" He said, "I'm here to help." I said, "Let me ask you a couple of questions," and I proceeded to tell him, in fact, a lengthy -- I don't mean an anecodote in a humorous sense, but our position in the District Attorney's office. I said, "I don't know how Mr. Maloney runs his office but in our office when our new assistants begin to work with us, there is a training program and the first panel session that we have as part of the training program which consists of the new class of applicants -- of assistant district attorneys and two or three senior district attorneys and usually one or two criminal court judges," and I said, "The very first question that -- that we instruct the assistants about is assume that you are home at night asleep in bed and the phone rings and it's your closest friend from grade school who says I'm at the local precinct and my girl friend has just been arrested for possession of drugs, what do I do. And we elicit responses from the assistants, and what we train them is that in your

role as a prosecutor for the government, it is not allowed for you to participate in that kind of process and you must say to your closest friend I'm sorry, I can't even advise you, I can't answer any questions, I can't help you and explain why because of your position." And I went on to tell him that there is a radical view in the office that there are assistants and judges who answer the questions by saying well, I think you can tell the person who has called you to get a lawyer, but everyone agrees that you cannot get up out of bed and go to the stationhouse and participate in that process." And he and I spent a good five to ten minutes discussing that situation.

He then said to me, "What if it were your mother, " and I said, "keep my mother out of this, this has nothing to do with my mother." That was the beginning of the extended conversation.

Q. Did you have any conversation with him about contacting a supervisor of his?

A. Yes, I did.

Q. And would you please tell us what conversation, if any, there was on that subject?

A. I asked him if he had Andy Maloney's home

telephone number, that I wanted to tell Mr. Maloney that he was here and ask Mr. Maloney what he thought the propriety of Mr. Nocenti's participating in this. He told me he did not have Mr. Maloney's number. I asked him who his immediate supervisor was, he said it was a man named Begliter, whose name was not familiar to me. I said, "Do you have Mr. Begliter's phone number," and he said, "well, I do have that, but you can't call him." I said, "Why can't I call him?" He said, "Because it's his holiday, it's Passover." I said, "It's my holiday too, but there are some things that transcend that in importance at the moment and this is one of them. And it is the second night of Passover, it is very close to midnight, the evening is almost over, the dinner hour is essentially over and I would like to speak to Mr. Begliter." He said, "Well, you can't do that because he's at his mother's house for Passover, so I can't even give you a number for that." That was that conversation.

MR. BURNS: I'm sorry, it's a different conversation from the first?

MS. LEDERER: Excuse me, can I ask --

THE COURT: Yes, please don't do that. We said that many times. Are you objecting?

MR. BURNS: Judge, it is not clear, that's

4

the only reason.

THE COURT: I think it is clear.

Q. After you had this conversation that you described with --

MS. LEDERER: Withdrawn.

Q. Did you learn the name of the person you were talking to?

A. Yes.

Q. What was his name?

A. David Nocenti.

Q. After you had this conversation with David Nocenti, did you go somewhere and make a phone call?

A. Yes, this -- this whole conversation which was -- which started from the time I introduced myself to him and went through these topics in the same place, in this sort of ante room of the 1st floor, the entire conversation lasted close to 15 minutes. I then walked directly across from that doorway in this lobby area of the precinct. There is a pay phone booth on the wall, and I walked to that phone booth and took a quarter out of my pocket and called my home -- called my husband at home.

Q. And did you have a conversation with -- with him with respect to your conversation with David Nocenti?

A. Yes.

People Rebuttal - Fairstein - Direct - Lederer     4456

1

2      Q.     Did you obtain any phone numbers from your

3  husband?

4      A.     I called for the purpose of getting my home phone

5  office list out of the desk drawer at home.  I awakened my

6  husband, I asked him to get the list from the drawer so that

7  I could call one of my colleagues who I know was a close

8  personal friend of Mr. Maloney's add have a phone number for

9  him.

10      Q.     At what time was it approximately that you recall

11  you called your home?

12      A.     I know because my husband told me that it was

13  close to midnight and I should not call anyone from my

14  office, that the matter I described to him could wait to the

15  next day was his advice anyway.  He gave me the number but

16  told me it was almost midnight.

17      Q.     After you made that phone call to your husband,

18  what was the next thing that happened?

19      A.     While I was talking on the phone, that's -- that

20  phone booth -- it is not a booth, but a phone on the wall.

21  It was I believe 10 or 12 feet from the front door of the

22  precinct.  While I had gone to the phone -- the front doors

23  are double glass doors, the vestibule and glass doors

24  again --  Mr. Nocenti had walked outside the front door.

25  There were a number of people, there were more than five

Joseph T. Tierney, CSR, RPR

NYCLD_015303

P-APP001248

People Rebuttal - Fairstein - Direct - Lederer      4457

people, in the area outside the front door and the sidewalk,

it was a relatively mild night.

    Q.   Let me interrupt you for a moment.  At any time

during this conversation you just told us about with David

Nocenti, did you ever tell -- did you ever ask him for

permission to speak to Yusef Salaam?

    A.   I did not.

    Q.   During that conversation, did he ever mention

anything about Yusef Salaam's age?

    A.   He never mentioned the word -- we never discussed

Yusaf's age.

    Q.   After you saw David Nocenti go outside, what was

the next thing that happened?

    A.   I believe the next thing that happened was that

somewhere from 5 to 10 minutes later, he came back inside

the precinct with several other people.

    Q.   Did you later learn the names of any of those

people?

    A.   Yes.

    Q.   And who did he come back inside with?

    A.   He came back inside and told me that this was Mrs.

Salaam, Yusaf's mother, and there was another woman and a

man -- a woman and man with them.  I did not learn their

names.

Joseph T. Tierney, CSR, RPR

NYCLD_015304

P-APP001249

People Rebuttal - Fairstein - Direct - Lederer       4458

Q.   Did you have a conversation with any of those people at that time?

A.   Yes, I introduced myself to Mrs. Salaam and I asked her to introduce me to everyone there so that I would know the people with whom I was speaking.  I was concerned about whether or not I was speaking to people who were part of her family or related to any of the other suspects or witnesses present.  She told me that she would not tell me who the other people were with her.

Q.   At the time that you had this conversation with Mrs. Salaam, who else was immediately present?

A.   The people in her group an if anyone was with me, it would have been Captain Rowe or Sergeant Cleeve, but I don't remember that they were actually present.

Q.   How long did that conversation last?

A.   I would say less than two minutes.

Q.   And if you recall, where on the 1st floor did that conversation take place?

A.   In that lobby where I'm calling the lobby area, the reception area, after you enter the precinct double glass doors and before you approach the -- the reception area that a uniform police officer sits behind.

Q.   When -- what was the next thing that happened after Mrs. Salaam refused to identify the people that she

Joseph T. Tierney, CSR, RPR

NYCLD_015305

P-APP001250

People Rebuttal - Fairstein - Direct - Lederer       4459

1   was with?

3       A.   She asked me if she could see her son.

4       Q.   And what, if anything, did you say?

5       A.   I told her that he was being questioned now by

6   detectives and that as soon as the questioning was done, she

7   could see her son.

8       Q.   Was anything else said at that time?

9       A.   No.

10      Q.   What was the next thing that happened?

11      A.   I don't remember who, whether she -- I think she

12  asked me if she could speak to Mr. Nocenti without me, I

13  said fine.  The group of four individuals walked outside the

14  stationhouse.

15      Q.   And what, if anything, did you do when they walked

16  outside the stationhouse?

17      A.   When they walked outside the stationhouse, you

18  came downstairs and had a video technician from our office

19  with you and I believe two detectives.  And --

20      Q.   Let me just interrupt you for one moment.  Do you

21  know at approximately what time that was?

22      A.   Yes, I do.  I know that it -- that it was several

23  minutes after midnight because what we proceeded to do

24  involved something that ended precisely at midnight.

25      Q.   When you say, "what we proceeded to do," could

Joseph T. Tierney, CSR, RPR

People Rebuttal - Fairstein - Direct - Lederer     4460

could you tell us specifically how you were able to place it
at several minutes after midnight?

A.    I saw you come downstairs with the video
technician and detectives and you went into a room that --
that we had been calling the youth room in the several hours
proceeding midnight that evening.  And you, I believe the
video technician as far as I could see was starting to open
cases and setting up equipment.  I know that happened before
midnight because until midnight Detective Sheehan and
Raymond Santana, Raymond Santana's father were in the room
and they were questioning Santana.  I know now that
statement ended at midnight and you did not go into the room
with the video technician until after the statement ended.
While you were in the room, I saw the sergeant come from
behind the desk, go in and talk to you, after which you came
over to me and you and the sergeant and I had a conversation
outside that youth room.

Q.    And what was the subject of that conversation?

A.    It was at that time that we learned, you a moment
before me, that the room that we were calling the youth room
had been used as a youth room, there had been a proposal
submitted to make it formally designated the youth room but
that the designation had not been finalized at that moment
and you and I discussed for the next several minutes whether

Joseph T. Tierney, CSR, RPR

People Rebuttal - Fairstein - Direct - Lederer      4461

1  the propriety would be to go ahead and work in that room

2  knowing it was to be the designated youth room, whether we

3  should actually pick up this entire operation and all of the

4  detectives and all of the suspects and try to find another

5  precinct.  We discussed we could not go to Central Park

6  because it was too small a precinct to work in and we were

7  beginning to ask the supervisor, Captain Rowe, how long it

8  would take -- how quickly we could move to find another

9  precinct close by with a designated youth room.  That

10  conversation of five or so minutes went on outside that

11  room.

12      Q.   And were you present during that conversation?

13      A.   Yes, I was participating in it with you.

14      Q.   What -- what happened at the end of that

15  conversation?

16      A.   At -- the conversation ended with one of the

17  bosses saying to you that they knew that there was a youth

18  room at the 24th Precinct and I believe you and he were

19  going to make -- go upstairs, make phone calls and arrange

20  for all of us to start moving to the 24th Precinct.

21      Q.   After that conversation ended, did you have

22  another conversation with Mrs. Salaam?

23      A.   Yes.  When you went upstairs, I was then alone in

24  that area, I would say -- I could see the front door, so I

Joseph T. Tierney, CSR, RPR

NYCLD_015308

P-APP001253

People Rebuttal - Fairstein - Direct - Lederer          4462

1  assume I was visible to the people by the front door.  And

2  Mrs. Salaam and the woman she was with entered the

3  precinct -- entered and approached me without Mr. Nocenti,

4  but with -- or actually also the gentleman who was there.

5  So it was Mrs. Salaam and the couple she was with,

6  approached me and said they wanted to ask me questions.  I

7  said that was fine, and I suggested we go into the large

8  room that's opposite the sergeant's desk where there were

9  seats where I thought it would be more comfortable and

10  private to sit in.

11      Q.   And did you proceed to those seats that you just

12  described?

13      A.   Yes.

14      Q.   Who was -- who went to those seats, if you recall?

15      A.   The four of us went to the seats.

16      Q.   Were there any detectives or police officers

17  present?

18      A.   No.

19      Q.   And was there any conversation at that location?

20      A.   Yes, I began again by asking Mrs. Salaam who was

21  present with her, my concern was because of the size of the

22  investigation and the number of families of suspects and

23  witnesses, the friends beyond family and then the press that

24  was beginning to gather, that I know to whom I was speaking

Joseph T. Tierney, CSR, RPR

1    People Rebuttal - Fairstein - Direct - Lederer    4463

2    and that I be speaking to the immediate families of -- of

3    the individuals.  So I tried to explain that to Mrs. Salaam

4    and she told me that the woman with her was her cousin.  And

5    I asked her who the gentleman was, she said it was her

6    cousin's fiancee.  And I said that I would like to do the --

7    carry on the conversation and answer her questions with

8    herself and her cousin present, I would prefer that the

9    gentleman step outside and wait.

10       Q.    And did he then leave?

11       A.    Yes.

12       Q.    And did you then have a conversation with Mrs.

13   Salaam and her cousin?

14       A.    Yes.

15       Q.    And would you tell us, please, what, if anything,

16   you said, and what, if anything, she said?

17       A.    She said she wanted to know what was going on, she

18   wanted to see her son.  I said again, "He's being

19   questioned, he's upstairs with detectives, as soon as

20   they're done, you can see him."  She then said to me, "I

21   want to see him now, he's a minor."

22       Q.    And what, if anything, did you say when she said

23   that?

24       A.    I don't remember my exact words, I believe I said

25   that he would -- he had been advised of his rights, he was

Joseph T. Tierney, CSR, RPR

NYCLD_015310

P-APP001255

People Rebuttal - Fairstein - Direct - Lederer     4464

talking to the police now and she could see him when that
was done.  By minor, minor was the expression that she used.
To me that was anyone under 21, which she at that point had
not said an age.  She then went on to say to me the second
time, "He's 15 years old, I want to see him."

Q.   What, if anything, did you do upon being told by
Mrs. Salaam that Yusef was 15?

A.   I -- I reacted with surprise because that was the
first --

          MR. BURNS:  Objection.

          THE COURT:  I'll allow it.

A.   I expressed surprise to her and said 15, that was
the first time that I had heard he was 15.

Q.   And what, if anything, did you do at that point?

A.   I asked her whether or not she had any form of
identification with her to -- to prove that he was 15.

Q.   What --

A.   I had seen the detective pads -- the detective's
pad which had just in the detective's handwriting a date of
birth that confirmed that he was 16 -- that informed me he
was 16 when he was being questioned.

Q.   Up until that point, had you seen any
identification for Yusef Salaam?

A.   I had not, no.


          Joseph T. Tierney, CSR, RPR

People Rebuttal - Fairstein - Direct - Lederer      4465

Q.    Had anyone mentioned any identification for Yusef
Salaam at that point?

A.    Specifically to me?  No, I heard that later.

Q.    And when you asked for identification for Yusef
Salaam, what, if anything, did the mother say?

A.    She said she didn't have anything with her, but
she certainly had identification at home and she could prove
that he was 15.

Q.    And what, if anything, did you do when she -- when
she told you that?

A.    I said, "Wait right here, I'll get the detectives
downstairs and we'll resolve this."  And I immediately asked
Captain Rowe to send someone upstairs to get whoever was
questioning Salaam and whoever had brought him into the
stationhouse, if that was a different person, and bring them
immediately downstairs to meet with Mrs. Salaam.

Q.    Let me go back for a moment.  When this
conversation begun that you described where Mrs. Salaam, the
cousin and the cousin's fiancee first spoke to you,
approximately what time was that?

A.    When they first walked into the station house?

Q.    No, I'm referring now to the point just before you
went to the area where you sat down.

A.    And started the conversation in the other room?

Joseph T. Tierney, CSR, RPR

NYCLD_015312

P-APP001257

People Rebuttal - Fairstein - Direct - Lederer        4466

1

2        Q.    Yes, ma'am.

3        A.    I would say it was -- could not have been earlier

4    than 12:15.

5        Q.    And after -- after you gave the instructions about

6    getting a detective, what was the next thing that happened?

7        A.    Captain Rowe or someone called or went upstairs

8    immediately within -- I would say within three minutes,

9    Detective Taglioni and Detective Rudy Hall came down to

10   the -- to the ground floor, approached us and I believe I

11   made the introduction of them to Mrs. Salaam.  And there was

12   a conversation that followed that I didn't participate in

13   because I didn't know the facts of how Salaam had been

14   brought into the stationhouse, but it was a conversation

15   between Taglioni and Mrs. Salaam.

16       Q.    And do you recall what, if anything, was said by

17   either Mrs. Salaam or Detective Taglioni?

18       A.    I remember that that's when Detective -- Mrs.

19   Salaam said that her son was 15, Detective Taglioni said

20   that he was 16, that he had identification that proved he

21   was 16.  That's when I learned there was a bus pass with the

22   date of birth that had been the date of birth transcribed

23   into McKenna's note pad.

24       Q.    And what did Mrs. Salaam say in response to what

25   Detective Taglioni said, if you recall?

                    Joseph T. Tierney, CSR, RPR

People Rebuttal - Fairstein - Direct - Lederer      4467

A.    I just recall she kept insisting he was 15.

Q.    And did Detective Taglioni then leave?

MR. BURNS:  Objection to leaving.

THE COURT:  Yes, why don't you let her tell what happened.

Q.    What was the next thing that happened?

A.    I think I said to Taglioni in the hall to stop the questioning, get someone upstairs immediately to stop the questioning.

Q.    And what, if anything, happened after you said that?

A.    They left my presence immediately to go back to what I believe was the 3rd floor.

Q.    How long did the conversation between Detective Taglioni and Detective -- and Mrs. Salaam last?

A.    Again, two minutes, maybe three?

Q.    And what, if anything, did you do after Detective Taglioni and Detective Hall went upstairs?

A.    I remained in the -- that lobby area downstairs. I was waiting -- actually, I was waiting for you to see whether we were going to move.

Q.    And where was Mrs. Salaam, if you know, after Detective Taglioni and Detective Hall left?

A.    I walked out of the room with seats, I believe she

Joseph T. Tierney, CSR, RPR

People Rebuttal - Fairstein - Direct - Lederer      4468

1   was still seated there and I don't know, I know at some

2   point she -- when I next saw her, it was minutes later and

3   she was coming back with Nocenti from outside.  So, I left

4   her in the room, at some point she left the room with seats

5   and went outside.

6   Q.    When you saw her, as you just described, coming

7   back into the stationhouse with David Nocenti, did you have

8   any further conversation with either her or David Nocenti?

9   A.    Yes, I first had a conversation with Nocenti

10  because while I was in the lobby area, family or friends of

11  another suspect whom I had seen upstairs on the 2nd floor

12  earlier came out of the doorway and went outside and were

13  stopped or engaged in conversation with Mrs. Salaam and

14  other relatives waiting outside.  Nocenti went over and was

15  talking to them.  I asked one of the detectives to go out

16  and get Nocenti, I asked him to come in.  I said, "Mr.

17  Nocenti, you are entitled to talk to anyone you want to talk

18  to, but I want to know whether you are now counseling or

19  giving legal advice to any other families as well?"  He

20  said, "I'm just answering questions they are asking."  I

21  said, "Fine, I hope you are not giving legal advice."  He

22  said -- that's when he used the expression "put yourself in

23  this situation, think of a similar hypothetical."  And  I

24  said, "I already told you what my response to that would

25

Joseph T. Tierney, CSR, RPR

People Rebuttal - Fairstein - Direct - Lederer        4469

be." Then he went back outside, and within a minute, Mrs.

Salaam came in and said to me, "We want to get a lawyer,

we're getting a lawyer for my son."

Q.   Do you know what time it was that Mrs. Salaam said

she wanted a lawyer for her son?

A.   At that time, I wrote down on a piece of paper

12:30.  That was the only contemporaneous note I made at

that point, as I did later when other requests for lawyers

were made at 12:30 that night.  It was the first time anyone

asked for a lawyer, I wrote down Mrs. Salaam said she was

getting a lawyer.

Q.   At any time --

          MS. LEDERER:  Withdrawn.

Q.   Did you have any further conversation with Mrs.

Salaam after that?

A.   No.

Q.   At any time during your conversations with Mrs.

Salaam, did you ever say anything to her about "phony ID"?

A.   I did not.

Q.   During any of your conversation with David

Nocenti, did he -- did you ever have a conversation with him

about why Yusef Salaam was at the stationhouse?

A.   Yes, I did.

Q.   And do you recall at what point you had that

          Joseph T. Tierney, CSR, RPR

NYCLD_015316

P-APP001261

People Rebuttal - Fairstein - Direct - Lederer        4470

conversation with him?

A.   Yes, it was during the lengthy fifteen, twenty
minute encounter we had when we first met and I was
distressed with his presence.

Q.   Was that before or after Mrs. Salaam had arrived?

A.   Before.

Q.   And what, if anything, did you say to David
Nocenti or did he say to you with respect to why Yusef
Salaam was at the stationhouse?

A.   I was trying to impress upon him why I thought
this was so serious and I asked him if he knew why Yusef was
in the stationhouse, and he said he had a good guess.  And I
said, "Well, what do you know?"  And he said well, he didn't
know much, he had watched the news, he had gone to sleep, he
had been awakened by Mrs. Salaam's phone call saying
something I believe there was some kind of trouble, the
police had Yusef at the stationhouse, could he meet her
there.  Because he had heard something on the news, he
guessed it was about the rape in the park.  And I said,
"You're wrong."  And I said, "Lest you think it is just a
rope, that the only thing that happened was a rape," I said,
"there is a young lady who was virtually murdered, who is at
this moment clinging to her life and not expected to live at
the hospital," and that her head been split open with a pipe

Joseph T. Tierney, CSR, RPR

NYCLD_015317

P-APP001262

People Rebuttal - Fairstein - Direct - Lederer      4471

and that she had been attacked and hit in the face with

bricks and then sexually assaulted and that what we were

talking about was not boys' play, lest he think that's what

someone meant by a rape in the park, that we were talking

about probably a murder case and a very serious one, and

that's why I thought that what was going on was so

important.

Q.   In the conversations that you had with Mrs. Salaam

that night, did she ever -- did you ever tell her that the

police were interviewing Yusef Salaam?

A.   Yes.

Q.   As you were speaking with her?

A.   Yes.

Q.   Did you ever deny to her that the police were

interviewing Yusef Salaam?

A.   No.

Q.   At any time prior to her telling you Yusef

Salaam's age --

        MS. LEDERER:   Withdrawn.

Q.   Did you tell her that the police were interviewing

Yusef Salaam prior to her telling you his age?

A.   Yes, I told her that's what they were doing,

believing he was 16.   I didn't say "believing he was 16," I

said, "Since he is 16, the police are talking to him and you

Joseph T. Tierney, CSR, RPR

NYCLD_015318

P-APP001263

People Rebuttal - Fairstein - Direct - Lederer        4472

can see him when they are finished."

Q.   At any time when you told Mrs. Salaam that they
were interviewing Yusef Salaam, did she ever say to you,
"Well, I understand from my cousin, who has had a conver-
sation with other detectives, that you can't speak to him
because he is 15 years old"?

A.   Absolutely not, I --

Q.   I'm sorry?

A.   And her cousin -- her cousin was present, her
cousin never spoke to me.

Q.   Did her cousin ever make mention to you after the
conversation she had had with detectives earlier in the
station?

A.   She did not.  I was not aware she had ever entered
the stationhouse until she first entered to meet me.

Q.   And was there ever mention at all by any of the
people there on behalf of Yusef Salaam about a conversation
that had happened on the 2nd floor with Detective Taglioni?

A.   No.

          THE COURT:  You use the word before "boys'
          play," that was a word used by anybody?

          THE WITNESS:  No, I used it because
          unfortunately, he --

          THE COURT:  That was not an expression used


          Joseph T. Tierney, CSR, RPR

NYCLD_015319

P-APP001264

People Rebuttal - Fairstein - Direct - Lederer     4473

2     by any person?

3          THE WITNESS:   No, I meant it not to minimize

4     the sexual assault as just something not serious.

5     Q.   At any time in your conversations with Sharonne

6  Salaam, did she ever mention anything about a health card?

7     A.   She did not.

8     Q.   Did any of the detectives that night or at any

9  time mention to you about a health card belonging to Yusef

10 Salaam?

11    A.   I never heard that expression at all.

12    Q.   Did you ever see any kind of a blue or purple card

13 with Yusef Salaam's name imprinted in it?

14    A.   I -- the only card I ever seen with his name on it

15 was later that morning, the bus pass that he had had.

16    Q.   Did you ever see Yusef Salaam's wallet that night?

17    A.   No, I did not know he had a wallet.

18    Q.   Did you at some time then leave the 20th Precinct

19 to go someplace?

20    A.   Yes, I did.

21    Q.   And what time did you leave?

22    A.   Say by 12:40 that evening -- between 12:30 when I

23 made that notation and within the next ten minutes left the

24 stationhouse.

25    Q.   And who did you -- where did you go?


Joseph T. Tierney, CSR, RPR

People Rebuttal - Fairstein - Direct - Lederer      4474

1   A.   I went with you, driven by some detectives, to the
2   24th Precinct on West 100th Street.
3   Q.   During the next --
4           MS. LEDERER:  Well, withdrawn.
5   Q.   Throughout -- where were you then throughout the
6   morning of April --
7           MS. LEDERER:  Withdrawn.
8   Q.   Did you ever return to the 20th Precinct after you
9   left at 12:30 or 12:40 on the morning of April 21st?
10  A.   No.
11  Q.   And to your knowledge, did I ever leave the 24th
12  Precinct to return to the 20th Precinct at any time on the
13  morning of April 21st or in the ensuing day or days?
14  A.   You were at the 24th Precinct from 12:45 Friday
15  morning till 4:00 o'clock Saturday morning, leaving only for
16  the trip that we took together to the crime scene for
17  fifteen or twenty minutes.  You did not go back to the 24th
18  Precinct --  excuse me, 20th Precinct.
19          MS. LEDERER:  May I just have one moment?
20          (There is a pause in the proceedings.)
21          MS. LEDERER:  Your Honor, may we approach
22  just one moment?
23          (There is a discussion at the bench, off the
24  record, among the Court and Counsel and out of the

Joseph T. Tierney, CSR, RPR

NYCLD_015321

P-APP001266

```
 1          People Rebuttal - Fairstein - Direct - Lederer      4475

 2                   hearing of open court.  At the conclusion of the

 3                   bench conference, the following takes place in

 4                   open court:)

 5                          (There is a pause in the proceedings.)

 6                          COURT CLERK:  Hearing is resumed.

 7                          THE COURT:  Okay, Miss Fairstein.

 8                          (The witness resumes the witness stand.)

 9                          THE COURT:  Have you finished?

10                          MS. LEDERER:  No.

11          Q.    Directing your attention again to the 20th

12    Precinct, at the time when you saw Detective Taglioni, did

13    he ever mention to you that he had had a conversation

14    earlier with any representatives of the Salaam family?

15          A.    No.

16          Q.    At any time did he ever mention that to you?

17          A.    No.

18          Q.    I'd like to please direct your attention now to

19    between 7:00 and 8:00 a.m. on the morning of April 21st when

20    you went to the 102 Street Crossdrive in Central Park.  I

21    believe you told us when you testified here earlier that you

22    went with Detective Sheehan; is that correct?

23          A.    I did.

24          Q.    And when you went to the crime scene with

25    Detective Sheehan, did there come a time where Detective
```

Joseph T. Tierney, CSR, RPR

People Rebuttal - Fairstein - Direct - Lederer     4476

Sheehan called Kharey Wise to the scene where there was some blood on the ground?

A.   Yes.

Q.   And where were you at the time he did that?

A.   I was directly next to Detective Sheehan, I was one foot away from Detective Sheehan and two feet away from Kharey Wise.

Q.   At any time was Detective Sheehan present at that location with Kharey Wise where you were any further distance away than that?

A.   He was not.

Q.   Did you ever at any time hear Detective Sheehan tell Kharey Wise to kneel down?

A.   He did not.

Q.   Did you at any time hear Detective Sheehan tell Kharey Wise to take blood and smear it on his clothing?

A.   I heard all of this conversation between them, which was very short and limited, that was never said.

MR. MOORE:  Objection, to the first part --

THE COURT:  Strike the first part.

The question was whether you ever heard him tell Kharey Wise to take blood and smear it on his clothes.

THE WITNESS:  I did not hear that.


Joseph T. Tierney, CSR, RPR

NYCLD_015323

P-APP001268

People Rebuttal - Fairstein - Direct - Lederer        4477

Q.    Again, if I could just for a moment direct your attention back to the 20th Precinct and, in fact, even at the 24th Precinct, do you recall whether you saw any black detectives working in connection with the Central Park case?

A.    Yes.

Q.    And how many black detectives did you see?

A.    The only detective who is a black man who I saw that night is Rudy Hall, who I have known for a number of years.

        MS. LEDERER:  Thank you very much.  I have nothing further.

        MR. BURNS:  I'm sorry, do I go?

        THE COURT:  Yes.

        MR. BURNS:  I was trying to establish eye contact, we generally do.

        What letter are we up to for defense exhibit? I would like to have this marked Salaam Defense Exhibit whatever the next letter is for identification.  Salaam J --

        THE COURT:  I am told it should be I.

        MR. BURNS:  It's I?

        COURT OFFICER:  Salaam I.

        MR. BURNS:  Would you show Salaam I to the witness, please?


        Joseph T. Tierney, CSR, RPR

People Rebuttal - Fairstein - Cross - Burns      4478

1

2                    (Exhibit handed to the witness by the court

3          officer.)

4      Q.    Miss Fairstein, I ask you to look at Defendant's I

5 for identification and ask you do you recognize it?

6      A.    Yes, I do.

7      Q.    And that's a copy of -- of a writing; is that

8 right?

9      A.    Yes, a hah -- yes.

10     Q.    And do you recognize it as being in your

11 handwriting?

12     A.    I certainly do.

13     Q.    Now, when did you -- when did you make the

14 notations which are contained on Defendant's I for identi-

15 fication?

16     A.    I made these during the business week after these

17 events, the events we are discussing, so the week of the

18 24th or so.

19     Q.    All right.  Would it be on the 24th?

20     A.    I don't have a date on the top of the page.

21     Q.    I know that.

22     A.    I can do no more than estimate it was the 24th or

23 '5th, the beginning of that week.

24     Q.    Do you know whether it was either the 24th or the

25 25th, Miss Fairstein?


                    Joseph T. Tierney, CSR, RPR

People Rebuttal - Fairstein - Cross - Burns          4479

A.    I do not know which date.

Q.    And do all of the notations which are contained on
Defense Exhibit I for identification, were they all made at
the same time?  In other words, is it -- are there portions
of it that were written at one time and then a day later
other portions -- do you understand my question, Miss
Fairstein?

A.    Yes.  Something appears to be made at a different
time because my handwriting is a little different.  There is
one notation, but the rest was all made at one time.

Q.    All right.  And can you tell us how much time
passed between the times you made the two separate
notations?

A.    Maybe another couple of days, but it was the same
week.

Q.    In other words -- just so I have it straight, in
other words, you made some notes a week or so thereafter the
20th of April and then two days later you completed what's
contained in Defense Exhibit I for identification; is that
correct?

          THE COURT:  Excuse me, did you say the 20th
          of April, I'm not sure?

Q.    The testimony that you gave in relation to Salaam,
that was on the evening of the 20th of April?


          Joseph T. Tierney, CSR, RPR

People Rebuttal - Fairstein - Cross - Burns      4480

THE COURT:  I thought you were talking about the notes, I'm sorry.

Q.   The notes were there written a week thereafter but the following week, but you don't know which day?

A.   I think the 24th or 25th is what my direct testimony was.

Q.   Right.  And insofar as -- it wasn't all completed at one sitting?

A.   There's just one line that I believe I added later.

Q.   Could you point out to me the one line?

A.   Yes (indicating).

Q.   And what was the -- what occasioned your writing these notes or writing the notations which are contained on Defense Exhibit I for identification when you did?

A.   I tried to --

Q.   Do you understand my question?  What brought it about that you decided to do notes to -- to make notes or make notations a week or so thereafter?

A.   I attempted the week of the 24th to write notes about as much -- well, as much, but about significant events during the 40 or so hours that Miss Lederer, Mr. Clements and I had been working at the precincts; and I made notes, as you know, other than those about some of the events.

Joseph T. Tierney, CSR, RPR

People Rebuttal - Fairstein - Cross - Burns        4481

1

2              MR. BURNS:  I move to strike that answer as

3          not being responsive.

4      Q.   asked you what brought it about that you made the

5  notes, we know you made --

6              MS. LEDERER:  Excuse me, I think she answered

7          the question.

8              THE COURT:  I think the answer is responsive.

9              He is asking you why did you make the notes

10         at that time.

11             MR. BURNS:  Yes.

12             THE COURT:  Okay.

13             THE WITNESS:  I thought I answered it.

14             THE COURT:  I thought you did too.

15     A.:  No one told me to.  It is my practice to do that

16  and I did it in this case, I brought it about.

17     Q.   And were you alone at the time that you made the

18  notes?

19     A.   Yes, I was.

20     Q.   Had you had any conversations concerning what was

21  in the notes -- what you reduced to writing, had you had any

22  conversations with anyone prior to you reducing -- making

23  these notes?

24     A.   What I don't understand about your question is

25  conversations about the events?


                    Joseph T. Tierney, CSR, RPR

NYCLD_015328

P-APP001273

People Rebuttal - Fairstein - Cross - Burns          4482

Q.   About the event of the 20th?

A.   About many events, yes.

Q.   Please excuse me, you are right, it is not clear and I'll withdraw the question.

Did you have any conversation concerning what is contained in the notes which are contained in Defendant's Exhibit I for identification before you made the notes?

A.   No.

Q.   Now, what time was it when you received word that someone was downstairs inquiring about Yusef Salaam?

A.   About 11:30 that evening.

Q.   All right.  Did you ever make a notation to the effect that you had received word at a time earlier than 11:30?

A.   Yes.

Q.   And what would that earlier time be?

MS. LEDERER:  Objection.

THE COURT:  No, I'll allow it.

A.   11:00 o'clock.

Q.   Now, is the 11:00 o'clock --

MR. BURNS:  Withdrawn.

Q.   Is there any frame of reference that you have that has convinced you that it was 11:30 rather than 11:00 o'clock?


Joseph T. Tierney, CSR, RPR

People Rebuttal - Fairstein - Cross - Burns          4483

A.   Yes, a number of things.

Q.   Was there a frame of reference that led you to believe that it was actually 11:00 o'clock rather than 11:30?

A.   No, I learned from a number of sources, including Mr. Nocenti himself, that it was 11:30.  I had my notation -- earlier notation had been about 11:00 o'clock. I later learned, as you know from the notes, that it was 11:30.

Q.   Were you aware of the fact that Mr. Nocenti had been interviewed by Miss Lederer?

A.   When was I aware of the fact?

Q.   Were you ever made aware of that?

A.   Yes, I was made aware of that.

Q.   When was the first time that you were made aware of the fact that Mr. Nocenti had been interviewed by Miss Lederer?

A.   I don't know when it occurred, it was several months after April and after he had been interviewed I believe she told me -- I know she told me he had been interviewed.

Q.   And did you also learn that notes that he had made had been turned over to Miss Lederer?

A.   Yes.


Joseph T. Tierney, CSR, RPR

People Rebuttal - Fairstein - Cross - Burns        4484

Q.   And did you have access to those notes?

A.   I had to get those notes when he --

        MR. BURNS:  No, move to strike as not
responsive.  I asked for a yes or no.

        THE COURT:  Read the question back.  Strike
it out.

        (The last question was read back.)

        MS. LEDERER:  Your Honor, I object to that
question, as to form.

        THE COURT:  I'll allow it.

        THE WITNESS:  I don't mean to be
disrespectful, my answer would be the same, I
arranged to get the notes.

        THE COURT:  That means you had access to
them?

        THE WITNESS:  Yes.

        THE COURT:  That's the question.

Q.   Were you provided with a copy of those notes?

A.   No.

Q.   And when did you examine Nocenti's notes.

        MS. LEDERER:  Objection.

        THE COURT:  I'll allow it.

A.   I read his notes once several months ago when I
obtained them.


                Joseph T. Tierney, CSR, RPR

People Rebuttal - Fairstein - Cross - Burns        4485

Q.    Were the notes given to you?

          MS. LEDERER:  Objection.

          THE COURT:  Is that the question?

          MR. BURNS:  Yes.

          THE COURT:  As against taking them?  I don't
understand.

          MR. BURNS:  I'm sorry, it is in response to
her last answer.

          THE COURT:  Objection sustained as to the
question.

          MR. BURNS:  She said, "I got those notes, I
obtained those notes."

          THE COURT:  I sustained the objection -- the
question -- the objection.

Q.    Didn't you say you obtained them when you read the
notes?

A.    Yes.

Q.    When did you obtain the notes?

          THE COURT:  That wasn't your question but
          I'll allow it, when she received it.

A.    I can't give you a date but Mr. Nocenti's
supervisor Faxed them to me.

Q.    Did Mr. Nocenti's supervisor Fax the notes to you
at your request?


                    Joseph T. Tierney, CSR, RPR

People Rebuttal - Fairstein - Cross - Burns          4486

1

2    A.   At the request of Barbara Jones, the First

3  Assistant --

4                 MR. BURNS:  No, your Honor.

5                 THE COURT:  The answer is yes or no.

6                 THE WITNESS:  Okay, no.  At my request, no.

7    Q.   But you initiated the request for the notes; is

8  that correct?

9                 MS. LEDERER:  Objection.

10                 THE COURT:  Objection sustained.

11   Q.   She mentioned a Barbara Jones --

12                 THE COURT:  Objection is sustained.

13   Q.   How did you get the notes?

14                 THE COURT:  They were Faxed to her.

15   Q.   Were they Faxed to you or Faxed to Barbara Jones?

16                 MS. LEDERER:  Objection.

17                 THE COURT:  Sustained.

18   Q.   Where are the notes that you received?

19   A.   I gave them to Miss Lederer, I did not keep a

20  copy.

21   Q.   After reviewing those notes, is that when you then

22  made the notation or changed the notation?

23   A.   No, sir.  If you have been listing, as I told you,

24  the notes I made were in April, the week of April 24th, and

25  it was several months later that Mr. Nocenti's notes arrived


                    Joseph T. Tierney, CSR, RPR

People Rebuttal - Fairstein - Cross - Burns        4487

at our office.

Q.   All right.  Well, when you first made the notes,
was it your belief that you learned that Nocenti was in the
precinct at 11:00 o'clock?

A.   When I made the notes, I was trying to reconstruct
the hours from 8:30 on the evening of the 20th through 4:00
a.m. on the morning of the 22nd and --

MR. BURNS:  I move to strike as not
responsive.

THE COURT:  No, I'll allow it.

Finish your answer.

A.   I was trying to put approximate time periods for
each event that happened within --

MR. BURNS:  Your Honor, I moved to strike --

THE COURT:  I know, I overruled it.  I'll
allow the answer.

MR. BURNS:  This is my cross-examination.

THE COURT:  Yes, but I'm the one who makes
the rulings.

Finish your answer, please.

A.   I was trying to reconstruct general periods of
time in that however many hours it is.  Seemed to be thirty
some odd hours that we were working on the events.  It would
have been impossible, nor did we try -- did I try to

Joseph T. Tierney, CSR, RPR

People Rebuttal - Fairstein - Cross - Burns     4488

     reconstruct the minute by minute account.

       MR. BURNS:  Can I get an answer to the question that I asked, your Honor?

       THE COURT:  Yes.

       The question was as to the time as far as the 11:00, 11:30 times are concerned that you made notes about, that's what he was asking you about.

       THE WITNESS:  But I --

       THE COURT:  Read the question back.

       (The last question is read back.)

A.   When I first made the notes, I had put no notation about the time, as I told you, because I didn't know what time Nocenti was there.  I later, at a separate day, estimated about 11:00 o'clock, not 11:00 o'clock, but the word "about" appears there, 11:00 o'clock.  I then later learned that it was 11:30.

Q.   The first time you wrote the notes, there was no time thereon; is that right?

A.   Correct.  That's right.

Q.   Did you have a perception as to what time it was, even though you didn't put the time?

       MS. LEDERER:  Objection.

Q.   Or was that blank to you --

       MS. LEDERER:  Objection.

       Joseph T. Tierney, CSR, RPR

People Rebuttal - Fairstein - Cross - Burns          4489

1

2                    THE COURT:  I'll allow it.

3       A.   My only --

4       Q.   Do you understand my question?

5       A.   I'm trying to.

6                    MR. BURNS:  Could you readk it back, Mr.

7            Tierney?

8                    THE COURT:  Either you do or you don't.  If

9            you don't understand it, tell him and he'll

10           restate the question.

11      A.   Would you restate the question?

12      Q.   When you first made the notation relative to being

13   informed that Nocenti or a person was downstairs who you

14   later found was Nocenti was inquiring for Salaam, did you

15   have a perception as to what time it was?

16      A.   I don't remember now if I had a perception as to

17   what time it was.

18      Q.   Okay.  But a couple of days thereafter, you did

19   have a perception that it was approximately 11:00 o'clock;

20   is that correct?

21      A.   About 11:00 o'clock is the word I used.

22      Q.   About 11:00 o'clock.  And how long did you

23   maintain that perception until you changed it again?

24      A.   I would say that within the next two weeks as I

25   further reconstructed the events.


                    Joseph T. Tierney, CSR, RPR

People Rebuttal - Fairstein - Cross - Burns        4490

1

2     Q.   So, that's two weeks thereafter that you then

3  realized it was 11:30?

4     A.   Well, within that period of time I would say it

5  came to my attention.

6     Q.   And how did it come to your attention?

7     A.   In a number of different ways.  I had a

8  conversation with Mr. Nocenti's supervisor, Mr. Roache, from

9  the U.S. Attorney's office in the Eastern District.

10     Q.   Anybody else?

11     A.   Anybody else what?

12     Q.   Did you have a conversation with anybody else is

13  what I'm asking.

14     A.   About what, Mr. Burns?

15          THE COURT:  About the time.  We're talking

16          about the 11:00, 11:30 time, that's what we're

17          talking about.

18     A.   I had conversations with some detectives and

19  supervisors who had been present about the events that --

20  that may have helped me clarify the time.

21     Q.   After receiving the information that he was

22  downstairs, you say that's when you sent -- well, you

23  reached out, found out where Salaam was and who was talking

24  to him?

25     A.   Yes.


Joseph T. Tierney, CSR, RPR

People Rebuttal - Fairstein - Cross - Burns          4491

Q.   And you say Detective Taglioni showed up and gave you that information; is that right?

A.   Yes.

Q.   And did you send Taglioni down to get the spiral pad to see how far the interview had progressed?

A.   Detective Taglioni came downstairs to me on the 2nd floor with the spiral book.  I asked someone to get -- I didn't know who the detectives were working with Salaam.  In response to my request, Taglioni appeared, he was holding --

Q.   With the --

A.   -- was holding the book and said it was Detective McKenna's book and McKenna was talking to Salaam.

Q.   And how long did you -- how long did that take?

A.   It took at most two to three minutes for someone to go one floor up and Taglioni to appear with the book.  I looked at the book, asked Taglioni a few questions about it.  That took about maybe another two to three minutes.  Then I walked the one flight down to meet Mr. Nocenti.

Q.   And would that be, according to your estimate, about 11:35?

A.   11:35, 11:36, yes.

Q.   Now, it's your testimony that the first thing David Nocenti said to you in response to when you asked him who he was and he gave you his name, he said that he was there on behalf of the family?

A.   On behalf of the Salaam family.

Q.   In behalf of the Salaam family?

A.   Yes.

Q.   Is that right?

A.   That's correct.

                    (Continued on next page)


                Joseph T. Tierney, CSR, RPR

T2-fr

4492

1            FAIRSTEIN — REBUTTAL — CROSS — BURNS

2        Q        And from that you understand he was there

3    to find out what was going on insofar as Yusaf

4    Salaam was concerned?

5        A        I didn't understand anything.  I asked him

6    what his role was.

7        Q        And did he tell you he was there to find

8    out, you know, about what was going on?

9        A        No, he repeatedly used the expression, "I'm

10   here on behalf of the family.  I'm waiting for Mrs.

11   Salaam," and then I asked specific questions I told

12   you about, whether he was a lawyer and representing

13   Yusaf.

14       Q        Is it your testimony that he didn't --

15               MS. LEDERER:  Objection as to form.

16       Q        -- say anything other than "I'm here on

17   behalf of the Salaam Family?"  In other words, what

18   I'm saying --

19               THE COURT:  Let's withdraw one.

20               MR. BURNS:  Let me withdraw that.

21       Q        Did he ever convey to you in words that he

22   was there to find out about Yusaf?

23       A        Did he ever use those words?

24       Q        No, no.  Did he convey so that you

25   understood what -- what he came there for?

11/29/89

NYCLD_015339

P-APP001284

T2-fr

4493

FAIRSTEIN — REBUTTAL — CROSS — BURNS

1                                      

2                        MS. LEDERER:  Objection.

3                        THE COURT:  I'll allow it.

4       Q       Do you remember what he said in words or

5 substance?

6       A    Yes, again I repeat, "I'm here on behalf of

7 the family," and that's why I was asking the

8 questions, because I said to him, "I can't

9 understand what your role is here. Are you here as

10 a lawyer?"  And we had this repeated series of

11 questions and he said, "No. I know I can't be here

12 as a lawyer. I know I can't represent him. I'm an

13 Assistant United States attorney."

14      Q   But he came as -- well, did you understand

15 he came as a representative of the family?

16      A    No, I repeat to you -- no, he did not come

17 as a representative of the family. He said he was

18 waiting for the mother, and he was there on behalf

19 of the family waiting for the mother.

20      Q   Well, didn't you understand from the use of

21 the words, "In behalf of the family," that he was

22 saying he was a representative, a non-lawyer

23 representative?

24                MS. LEDERER:  Objection.

25               THE COURT:  I'll allow it.

11/29/89

NYCLD_015340

P-APP001285

T2-fr

4494

```
                    FAIRSTEIN - REBUTTAL - CROSS - BURNS
1
2       A      I did not understand that.
3       Q      He never told you that he was the attorney
4    for Yusaf Salaam; isn't that true?
5       A      That's right.
6       Q      He never told you that he was there in his
7    official capacity as an Assistant U.S. Attorney,
8    isn't that true?
9       A      That's correct.
10      Q      He did say that he was a friend of the
11   family, isn't that true?
12      A      He first said, quote, "I am a member of the
13   family. I am a part of the family," and I said,
14   "Would you explain to me how you are related,"
15   well, then he said, "Well, actually I'm just a
16   friend of the family." That was the exact language.
17      Q      Well, let me ask this question. Wasn't it
18   clear to you from what he said that he was an adult
19   interested in Yusaf Salaam's welfare?
20                  MS. LEDERER:  Objection.
21                  THE COURT:  I'll let her answer.
22                  Yes or no?
23                  THE WITNESS:      I assumed he was
24                  interested in --
25      Q      That's yes or no.
```

11/29/89

T2-fr

4495

1                FAIRSTEIN - REBUTTAL - CROSS - BURNS

2                    THE COURT:  If she can answer it yes

3        or no.

4                    THE WITNESS:   I can't answer that.

5        No.

6                    THE COURT:  She said she can't answer

7        that question yes or no.

8                    THE WITNESS:  I didn't know if he was

9        there --

10                    THE COURT:  Wait a second.   If you

11        can't answer, you can't answer.

12                    THE WITNESS:  Okay.

13        Q        Do you know whether he was interested in

14    Yusaf Salaam?

15                    MS. LEDERER:  Objection.

16                    THE COURT:  Sustained.

17        Q    Didn't he tell you that he was Yusaf's big

18    brother?

19        A    He didn't tell me that until --

20        Q    That's a yes or no?

21        A    Until the last conversation we had.

22                    MR. BURNS:   Move to strike as not

23        responsive.

24                    THE COURT:  I'll allow it.  Finish the

25        answer.

11/29/89

T2-fr

4496

FAIRSTEIN — REBUTTAL — CROSS — BURNS

1

2      THE WITNESS:   One hour   later.     That

3  was  the  last  conversation  we  had.

4      MR.  BURNS:    I move  to  strike  as  not

5  responsive.

6      THE COURT:   I will allow it.

7  Q     Did he tell you he was Yusaf's big brother?

8      THE COURT:   She already   answered   the

9  question.

10     MR.  BURNS:   But not in response to my

11 question.

12     THE  COURT:     I've     overruled    the

13 objection.     I   allowed   her to answer the

14 question.  She did.  You have an answer   to

15 that question.

16     Now,  what  is  your  next  question?

17 Q     When you went downstairs to meet the person

18 who   you   later   determined   ——   learned  was  David

19 Nocente, you  understood,  did  you  not,  that   the

20 questioning of Yusaf Salaam was continuing?

21 A     Yes.

22 Q     And  incidently,  when  you  got  downstairs  to

23 the lobby of the 20th Precinct, did you see David ——

24 withdrawn.

25     Who  was  in  the  lobby?

11/29/89

NYCLD_015343

P-APP001288

T2-fr

4497

FAIRSTEIN - REBUTTAL - CROSS - BURNS

1

2   A      When I came down it was only --

3   Q      The first time you saw David Nocente?

4   A      He was alone.

5   Q      There was no one else in the lobby?

6   A      No one else.

7   Q      How many separate conversations did you

8   have with David Nocente?

9   A          I had what I called the first long

10  conversation that I estimated lasted 15 to 20

11  minutes about a variety of subjects from the

12  introduction on.

13              MR. BURNS:  Objection.

14              THE COURT:  Counsel ask you how many

15          separate conversations you had with David

16          Nocente, I believe that's the question.

17              THE WITNESS:  Okay.

18              THE COURT:  Without telling us the

19          substance of each one.

20              THE WITNESS:  Three or four.

21  Q          Did you have all of these conversations

22  prior to your first conversation with Miss Salaam?

23  A      No.

24  Q      Can you tell us how many conversations did

25  you have with David Nocente after you had spoken to

11/29/89

NYCLD_015344

P-APP001289

T2-fr
4498

FAIRSTEIN - REBUTTAL - CROSS - BURNS

1
2  Mrs. Salaam?

3      A     After I spoke to Mrs. Salaam the first time
4  or the last time?

5      Q     All right. After you had spoken to Mrs.
6  Salaam the last time, did you speak to David
7  Nocente?

8      A     Yes, briefly. I spoke to Nocente, Mrs.
9  Salaam, Nocente, and that was when I made the note,
10  12:30 she had asked for a lawyer.

11     Q     Now, the first time you spoke to Nocente,
12  you say that was before 12:00?

13     A     Yes.

14     Q     And that conversation was lengthy?

15     A     Yes.

16     Q     And during that conversation did tempers
17  rise?

18     A     My temper did.

19     Q     Did you become very agitated?

20     A     I would describe him as agitated. I was --
21  I wouldn't say agitated. I was displeased. I was
22  angry.

23     Q     Were you screaming, would you say that?

24     A     No, I wasn't screaming.

25     Q     Did your voice rise to a shrill or a shout?

11/29/89

NYCLD_015345

P-APP001290

T2-fr

4499

FAIRSTEIN — REBUTTAL — CROSS — BURNS

1

2    A        No, there was no need to shout, he was

3  right next to me.

4    Q    You accused him of acting in  an  unethical

5  manner?

6    A    Yes.

7    Q    And did a lot of the conversation deal with

8  lawyer's ethics?

9    A    We had a conversation about ethics.

10   Q    Did he question your ethics or your ethical

11 behavior?

12   A        He never said that he did.  I don't know

13 what he was thinking, but to me he never  questioned

14 it or spoke of it to me.

15   Q        Did there come a time during that

16 conversation when you said that you would make a

17 complaint against him in the Bar Association?

18   A    I started by saying --

19   Q    Is that a yes?

20   A    We got to that, yes.

21   Q    That's the first conversation?

22   A        No.  The first conversation he was near

23 tears, begging me not to call his boss.  He was very

24 near tears.

25   Q    When you started the conversation,  was  he

11/29/89

T2-fr

4500

1              FAIRSTEIN – REBUTTAL – CROSS – BURNS

2    -- was he near tears?

3         A    No.

4         Q    And during this 15 minutes of conversation,

5    he was reduced to being near tears; yes or no?

6                   MS. LEDERER:  Object as to the form.

7         A    No.

8                   THE COURT:  I'll allow it.

9         Q    Yes or no?

10        A    No.

11        Q    No?

12        A    No.

13        Q    But you said he was near tears?

14        A         Yes.   He was not reduced to being near

15   tears, Mr. Burns.

16        Q    Please, excuse me.  When you started the

17   conversation, he was not near tears or did he give

18   any indication that he was even on the brink of

19   tears;  is  that  true,  when  he  started  the

20   conversation?

21        A         That's  true,  when  we  started  with

22   introductions.

23        Q         And at the end of that 15, 20 minutes of

24   talking to him, he was near tears?

25        A    No.  In the middle of the conversation when

11/29/89

NYCLD_015347

P-APP001292

T2-fr

4501

1              FAIRSTEIN — REBUTTAL — CROSS — BURNS

2      we discussed my speaking to his supervisor he became

3      very nervous. Said that he was nervous. Said that

4      he was in a situation over his head. Appeared to

5      have tears in his eyes and literally begged me not

6      to call his boss. I said it was serious enough that

7      I thought it was a matter of ethics that I would

8      take up with the Bar Association.

9          Q      Now, was it in ten minutes he was begging

10     you not to call his boss?

11         A      Ten or 15, yes.

12         Q      And that's when he was near tears, and you

13     saw what appeared to be tears in his eyes?

14         A      That's the way it appeared to me, yes.

15     Then he regained his composure.

16         Q      After ten minutes of talking to you, he had

17     lost his composure?

18                MS. LEDERER: Objection.

19                THE COURT: Sustained.

20         Q      At what point in the conversation had he

21     lost his composure?

22                MS. LEDERER: Objection.

23                THE COURT: Sustained.

24         Q      Had he regained his composure by the time

25     that first conversation had ended?

11/29/89

NYCLD_015348

P-APP001293

T2-fr

4502

1          FAIRSTEIN — REBUTTAL — CROSS — BURNS

2                    MS. LEDERER:   Objection.

3                    THE COURT:   I'll allow it.

4      A     Yes.

5      Q     And how much -- withdrawn.

6            Had Mrs. Salaam arrived at that time?

7      A     No.

8      Q          Did you have another conversation with

9   Nocente prior to Mrs. Salaam arriving?

10     A     I don't believe we did.  At the end of that

11  conversation is when he walked outside the station

12  house and I used the phone.

13     Q          And that's when you say you called your

14  husband -- I'm sorry.  That's when you called your

15  husband?

16     A     Yes.

17     Q          And after getting off the phone with your

18  husband, that's when Mrs. Salaam came into the

19  precinct?

20     A          No, not immediately.  There were still, I

21  would say, another maybe -- almost five minutes that

22  went by.  I was in that lobby and Mr. Nocente and

23  Mrs. Salaam and a group came in.

24     Q     And what time would that be?

25     A          Could have been anywhere from ten of

11/29/89

NYCLD_015349

P-APP001294

T2-fr

4503

FAIRSTEIN — REBUTTAL — CROSS — BURNS

1
2    twelve, five of twelve, I would say.  Shortly before

3    twelve.

4        Q     There's no notation -- you  didn't  make  a

5    notation relative to that time; is that right?

6        A     That's correct.

7        Q        And there's really no objective frame of

8    reference other than your best estimate, would  that

9    be fair to say?

10       A     No.  There's the conversation I testified

11   to when -- after Mr. Nocente  left  me  and  shortly

12   before  he  reappeared with Mrs. Salaam, when I made

13   the phonecall to my husband and my husband  gave  me

14   the  phone number I wanted and said, "Don't call her

15   now.  It's almost midnight."

16       Q     Did he tell you what time it was?

17       A     No, he said, "It's almost midnight."

18       Q     He didn't say whether it was five to twelve

19   or ten to twelve?

20       A     No.

21       Q     Or even a quarter to twelve?

22       A     No.

23       Q     And it could have been  even  those  times;

24   isn't that true?

25            MS. LEDERER:   Objection.

11/29/89

T2-fr

4504

1          FAIRSTEIN - REBUTTAL - CROSS - BURNS

2                THE COURT:   Sustained.

3     Q      All you know it was before midnight, isn't

4 that true?

5     A      Shortly before midnight.

6     Q      Well, you don't know how short; isn't that

7 true?

8     A      That's true.

9     Q      And then Mrs. Salaam came into the precinct

10 accompanied by David?

11    A      Yes.

12    Q      And a female and a male; is that right?

13    A      Yes, yes.

14    Q      Now, the second conversation that you had

15 with  David  was  that  following  this  first

16 conversation that you had with Mrs. Salaam?

17    A      No.  The second conversation with David was

18 -- this moment when he came in the stationhouse with

19 Mrs. Salaam and he said to me, "This is Yusaf's

20 mother.  This is Mrs. Salaam."  So I would call that

21 my second conversation with Nocente.

22    Q      And was that the extent of that

23 conversation after he made the introductions?

24    A      Yes, that's the extent of my talking to him

25 or him to me, yes.

11/29/89

NYCLD_015351

P-APP001296

T2-fr

4505

FAIRSTEIN — REBUTTAL — CROSS — BURNS

1
2      Q      And did you say to Miss Salaam that you --
3  withdrawn.
4              Is it that time when Miss Salaam came in
5  and said that she was Mrs. Salaam and she wanted to
6  see her son; is that right?
7      A      Yes.
8      Q      And after she said that she wanted to see
9  her son, did you say or tell her that you wanted to
10 talk to her?
11     A      No, I first responded to her question, "Can
12 I see my son?  I'd like to see my son."
13     Q      And then you told her he was being seen by
14 detectives, talked to or interviewed, or questioned
15 by detectives; is that right?
16     A      Right, that is correct.
17     Q      Do you remember the words you used relative
18 to what was happening between Yusaf and the
19 detectives?
20     A      My best recollection is that I said either
21 questioned or interviewed by.
22     Q      Did you in your own mind make a distinction
23 between interviewed or being questioned?
24              MS. LEDERER:  Objection.
25              THE COURT:  Sustained.

11/29/89

NYCLD_015352

P-APP001297