COMPLAINT FOLLOW-UP INFORMATIONAL
PD313-081A SECOND EDITION (1-80)84

Page 2   000873   Pages
Pct. 022   Complaint No. 281   Date of this Report 4/20/89

DETAILS:       CONTINUED FROM PAGE ONE RE: ASSAULT OF UNIDENTIFIED FEMALE WHITE
INSIDE CENTRAL PARK: INTERVIEW OF CLARENCE THOMAS

Cont; Clarence does not know what happened to the other three guys who chased the male white and states that they were guys he did not know by name that they were friends of Antron Mc Cray. Clarence states that he and the rest of the group continued south in the park and them at approx the middle of the park around 96th St about seven of the guys went after and beat up another jogger at the fence near the reservoir and this was a male white (could supply no further discription). Clarence states that he and Antron Mc Cray ran out of the park and after awhile the other guys came out and they all started walking north on Central Park West and as they walked a green van came from the street and pulled up to the group and one of the guys in the van said that they were the police and that no one should run but everyone ran any way. Clarence states that he ran to W 100th St and turned into the park and he trippe and fell to the ground and the police caught him. Clarence further states that the others all ran in different directions

When questioned about anyone else who the group had hit Clarence stated that there was an old bum who was a male white or hispanic that Lamont Mc Call had hit with his fist in the back of the bum's head and knocked him to the ground. Clarence further stated that the only other person he saw in the park, outside of the three he had mentioned was some people on a bike but that they did not go after them. Clarence states that the Bumwas in the middle of the park and that the Bum was wearing a dark blue coat with grayish pants. When asked if anyone in the group had a weapon Clarence stated that there was a M/B/ in his teens tall wearing blue jeans with patches all over them and a beige trench coat and he had a pipe that was approx 14 inches long with one end taped with black tape. Clarence states that he does not know this tall male's name but that he saw this male take this pipe out of his pants with his right hand when they were at the reservoir with the man who had been beat but he did not see if the tall male hit the male white with the pipe. Clarence states that he was too far away from the seven guys to see who was hitting the white male. At this time Clarence was allowed to go home with his mother and the interview was discontinued

On this date at approx 1130hrs the undersigned along with Det Whelpley were at the home of Clarence Thomas and spoke to Clarence's mother first and told her that Clarence had tobe spoken to again. Mrs Thomas invited the undersigned and Dte Whelpley into her home and then went an woke up Clarence. Mrs Thomas brought Clarence into her kitchen and he sat down asf did Mrs Thomas and at this point the undersigned reminded both of them of there rights and again told them they had the right to have an attorney present before speaking to the police. Both Mrs Thomas and Clarence agreed to speak to us without an attorney present. At this time Clarence stated that the pipe he told us about was passed back and forth between the tall guy and Antron Mc Cray but Clarence still state that he did not see either of them hit the guy with the pipe. When asked about anyone else being beat in the park by this group, Clarence stated that the Bum Lamont hit but this time Clarence states Lamont beat the Bum with three other guy's and that they really beat the guy by punching and kicking him then they draged this Bum off the road and on the curb and left him there bleeding. Clarence states he does not know the names of the three guys who beat the Bum with Lamont by name but that Antron might know them. Clarence and his mother agreed to show the undersigned where Antron lived and also agreed to come back to the Central Park Pct with the undersigned. While in auto 8475 Mrs Thomas directed the undersigned and Det Whelpley to ████ and stated that Antron lived in this building in apartment ████. Det Rosario along with Dets Rivera and Morin from Sex Crimes went into ████ and came out with the subject who was identified as Antron Mc Cary and his mother Linda Mc Cray and his father Bobby MC Cary. Det Rosario informed the undersigned that he requested Mr and Mrs Mc Cary and Antron to come to the CPP and they agreed further Det Rosario asked that Antron wear the clothes he had been wearing before he went to bed and this was also agreed to by both parents and Antron. When Antron exited the building his clothes where covered with dried mud and were very dirty. Mr and Mrs Mc Cray and Antron were transported to the CPP in Sex Crime auto 731 and Mrs Thomas and Clarence were transported in DBMSTF auto 8475.

INVESTIGATION CONTINUING

Reporting Officer's Rank, Signature, Command  Det ████ DBMSTF   Name Printed J FARRELL   Tax Registry No. 864831   Supervisor's Signature Sgt.   C.O.'s Initials

NYC022227

NYCLD_057951

P-APP001705

People - Det. Arroyo - Cross - Rivera                 2963

1

2    Q.    You don't recall --

3              MR. RIVERA:  Withdrawn.

4    Q.    You just stated that you don't recall that he said

5    that; is that correct?

6    A.    Yes, I don't recall that -- I don't recall that he

7    said that.

8    Q.    Okay.  Did Raymond tell you that he did not live

9    with his father?

10   A.    I don't recall that either.

11   Q.    You don't recall any information relative to

12   Raymond's father; is that correct?

13   A.    No, that's incorrect.

14   Q.    You do recall Raymond saying something about his

15   father; is that correct?

16   A.    Yes.

17   Q.    What did Raymond tell you about his father?

18   A.    Told me he didn't get along with him very well.

19   Q.    I'm sorry?

20   A.    He told me he didn't get along with him very well.

21   Q.    Did he tell you he lived with Raymond?

22   A.    I don't recall.

23   Q.    Did he tell you he lived with his mother?

24   A.    Again, I don't recall.

25   Q.    And you were present during the entire questioning

Joseph T. Tierney, CSR, RPR

NYCLD_017528

P-APP001706

```
 1              People - Det. Arroyo - Cross - Rivera      2964
 2    of Raymond by Detective Hartigan; is that correct?
 3                    MS. LEDERER:  Objection.
 4                    THE COURT:  What was your question?
 5                    MR. RIVERA:  That he was present during the
 6              entire questioning of Raymond by Detective
 7              Hartigan.
 8         Q.   Is that correct?
 9                    MS. LEDERER:  Objection.
10                    THE COURT:  I'll let him answer if he was
11              present --
12                    Detective Hartigan was present at all times
13              when you were present?
14                    THE WITNESS:  Detective Hartigan was present
15              when I was present, yes.
16                    THE COURT:  At all times?
17                    THE WITNESS:  Except for the times that I
18              left the room, correct.
19         Q.   But from 1:40 to 4:40, you were present during the
20    entire questioning of Raymond Santana; is that correct?
21         A.   Again, except for those times that I left briefly.
22         Q.   Well, when did you leave the room between 1:40 and
23    4:40?
24         A.   Well, I left the room to get coffee.
25         Q.   Other than that.


                    Joseph T. Tierney, CSR, RPR
```

```
 1              People - Det. Arroyo - Cross - Rivera          2965

 2        A.    I might have also left the room to get myself a

 3   soda.  I left the room after the signing of the written

 4   statement, and that would take us beyond 4:40 p.m.

 5        Q.    Okay.  Raymond signed the statement at about 4:40;

 6   is that correct?

 7        A.    That's correct.

 8        Q.    That means that the interrogation of Raymond ended

 9   about 4:40, would that be correct?

10        A.    That's correct.

11        Q.    And did you tell Raymond that the interrogation

12   had ended of Raymond?

13        A.    No.

14        Q.    You, at no time, informed him that your

15   questioning is over; is that correct?

16        A.    No.

17        Q.    You just took the statement, left the room and

18   came back several minutes later; is that correct?

19        A.    That's correct.

20        Q.    Now, you took that statement and brought it to

21   your supervisors; is that correct?

22        A.    That's correct.

23        Q.    And who, in particular, did you bring Raymond's

24   statement to?

25                 MS. LEDERER:  Objection.


                 Joseph T. Tierney, CSR, RPR
```

```
1              People - Det. Arroyo - Cross - Rivera        2966

2                   THE COURT:  Who did he what?

3                   MR. RIVERA:  Who did he bring Raymond's

4            statement to.

5                   THE COURT:  I'll let him answer.  I really

6            don't know what it has to do with this hearing.

7       A.    I brought the statement to the detective squad

8  room, where Lieutenant Doyle from Manhattan North Homicide

9  was present.

10      Q.    Was ADA Fairstein or ADA Lederer present when you

11 went to bring the statement to Lieutenant Doyle?

12                  MS. LEDERER:  Objection.

13                  THE COURT:  I'll let him answer that.

14      A.    No, they were not.

15      Q.    Did you discuss with Lieutenant Doyle the fact

16 that Raymond's grandmother was present and had difficulty

17 with the English language?

18                  MS. LEDERER:  Objection.

19                  THE COURT:  Sustained.

20      Q.    Did you ever ask Raymond to put into his own words

21 the statement that is People's 20 in evidence?

22      A.    Yes, I asked him if he wanted to write it out.

23      Q.    And what, if anything, did Raymond say?

24      A.    He said no.  I offered to write it out and he

25 agreed.


                 Joseph T. Tierney, CSR, RPR
```

1                    Hartigan/cross/Mr. Moore                2656

2    correct?

3        A    I can't recall what he said in the videotape.

4        Q    With respect to this case, officer, did you ever

5    ascertain what time the female jogger was attacked?

6                    MS. LEDERER:  Objection.

7                    THE COURT:  Sustained.

8                    (Pause)

9        Q    And did you make any attempts, officer, to verify

10   the accuracy of the allegations made by Kevin Richardson?

11                   MS. LEDERER:  Objection.

12                   THE COURT:  Sustained.  We've been all through

13           that, counsel.

14                   (Pause)

15       Q    Now, Mr. Hartigan, there came a time when you spoke

16   to Kharey Wise, am I correct?

17       A    Yes, sir.

18       Q    And what time was that?

19       A    12:30 a.m. on the 21st of April.

20       Q    Now, you interviewed him in the sex crimes room of

21   the 20th Precinct, am I not correct?

22       A    Yes, sir.

23       Q    And so from the time when you interviewed him you

24   had a suspicion, did you not, that he was somehow involved

25   in a sexual assault on a female jogger?

Hartigan/cross/Mr. Moore                    26**57

1

2     A    Yes, sir.

3     Q    Now, do you know the name of the officer who

4  brought Kharey Wise into the precinct?

5     A    No.

6     Q    Did you ever try to find out the name of the

7  officer?

8     A    No.

9     Q    Do you know a Detective Freck, John Freck?

10    A    Yes, I do.

11    Q    Is he from Manhattan North?

12    A    Yes, he is.

13    Q    And do you not recall that it was Detective Freck

14  who brought Kharey Wise?

15    A    No, I don't.  I didn't recall it.  No.

16    Q    And were you also aware of the fact that Eddie De

17  LaPaz had been brought to the 20th Precinct?

18    A    I had no knowledge of Eddie De LaPaz being brought

19  to the 20th Precinct.

20    Q    Now, when Kharey Wise came into the 20th Precinct

21  on the morning of April 20th --

22    A    21st.

23    Q    -- 21st?

24    A    Yes, sir.

25    Q    Was he under arrest?

```
 1                    Hartigan/cross/Mr. Moore            26145̶9̶

 2      A    I don't know.

 3      Q    Were you the officer who was assigned to interview

 4   him?

 5      A    Yes.

 6      Q    And are you telling the jury that you, the assigned

 7   officer, did not know whether he was under arrest?

 8              MS. LEDERER:  Objection.

 9              THE COURT:  I'll let him answer.

10      A    I didn't know he was going to be placed under

11   arrest or not.  I didn't know that.

12      Q    Did you know whether at the time when you began the

13   interview of him was he under arrest?

14      A    No.  I didn't know if he was under arrest at that

15   time.  No.

16      Q    Does that mean he may have been under arrest?

17      A    If they had deemed that he was one of the

18   principals and that he was under arrest, then he would have

19   been under arrest.

20      Q    You say "they."  Who are you referring to?

21      A    I had no personal contribution as to who was being

22   placed under arrest.  It was not my job.  That was not my

23   aspect of the investigation.  I wasn't placing anybody under

24   arrest.

25      Q    You were the person who was assigned to interview
```

NYCLD_018336

P-APP001712

Hartigan/cross/Mr. Moore                    260259

1   him, right?

2        A    To do an interview, yes.

3        Q    So was he free to leave?

4        A    I don't know, sir.  If he was under arrest he

5   wasn't free to leave.  If he wasn't under arrest he was free

6   to leave.

7        Q    You didn't find out from your superiors whether he

8   was under arrest or not?

9        A    At that time, no.

10       Q    Now, when you first saw Kharey Wise you told him

11  about certain incidents in Central Park that night, didn't

12  you?

13       A    No.  He told me.

14       Q    Don't you recall that it was you who initiated the

15  conversation, officer?

16       A    Oh, yes, sir.

17       Q    And did you not tell him about the incidents in

18  Central Park?

19       A    I didn't tell him about any incidents in Central

20  Park.  I told him there was something that happened in

21  Central Park.

22       Q    So is it your testimony that you did not tell him

23  what incidents in Central Park that night?

24       A    I didn't mention anything, joggers, female joggers

NYCLD_018337

P-APP001713

Hartigan/cross/Mr. Moore                26478

1

2      Q       I'm asking you exactly what he said as you can

3   recall.

4      A       If I recall correctly, that's exactly what he said.

5    I asked him what time were you and where were you.  And he

6   told me.

7      Q       He mentioned to you that he was with a girlfriend

8   Lisa, am I correct?

9      A       Yes, sir.

10     Q       He gave Lisa's apartment number, am I correct?

11     A       Yes.

12     Q       At any time on the 21st did you speak to Lisa?

13     A       No.

14     Q       But he indicated to you that he was with this

15   woman, am I correct?

16     A       Yes, sir.

17     Q       Then he also mentioned to you that he and a

18   gentleman called Eddie De LaPaz went into the park, am I

19   correct?

20     A       Yes.

21     Q       Now, there came a time subsequent to this, after

22   the  --  withdrawn.

23     There came a time later on the next day when you took a

24   second statement from Kharey Wise, am I correct?

25     A       Yes, sir.

Hartigan/cross/Mr. Moore                 2648 81

1
2     A     I asked him if that was true.  He acknowledged that
3  it was true.
4     Q     You asked him at the end of the statement?
5     A     Yes.
6     Q     But you didn't ask him as you went through
7  sentence-by-sentence, did you?
8     A     I believe he was doing that with me.  As I was
9  reading, I was reading each word.
10    Q     You believe.  Did he or did he not?
11          MS. LEDERER:  Objection.
12          THE COURT:  Please.  You can't both talk at the
13          same time.
14          What is your question?
15    Q     Did you ask him sentence-by-sentence whether he
16  understood what each sentence meant?
17    A     No.
18    Q     Now, there came a time when he signed the
19  statement, am I correct?
20    A     Yes, sir.
21    Q     And Detective John Hartigan and yourself also
22  signed the statement, am I correct?
23    A     I'm John Hartigan.
24    Q     I'm sorry.  Detective Robert Nugent?
25    A     Yes, sir.

Hartigan/cross/Mr. Moore                  26**82

1

2    Q    Was Robert Nugent in the room throughout the entire

3    interview?

4    A    Yes, sir.

5    Q    Now, at any time during the interview, officer, did

6    you ask Kharey Wise if he wanted anything to eat?

7    A    I can't recall if I did or not.  I don't think I

8    asked him if he wanted anything to eat, no.

9    Q    You didn't ask him if he wanted anything to drink?

10   A    I might have.

11   Q    You can't recall?

12   A    I can't recall.

13   Q    Now, after he finished the statement, what action

14   did you take or what did you do?

15   A    I went back downstairs to the 20th squad-room.

16   Q    And you left him alone?

17   A    No.  I left him upstairs in the Sex Crimes Squad.

18   Q    Did you leave him with someone?

19   A    There was police officers up there watching

20   everybody, whoever was still upstairs in that room.

21   Q    Was Detective Nugent with him when you left?

22   A    Yes.  I believe so, yes.

23   Q    Now, after you left Kharey Wise you were involved

24   in other matters, am I not correct?

25   A    After I left Kharey Wise?

P-APP001716

Det. Hartigan / Defense / Cross (Moore)                    2718

1

2      A.    I don't know.

3      Q.    That was in fact Detective Kelly.  Wasn't it?

4      A.    I don't know.

5      Q.    Well, did you ever speak to the detective who was

6   assigned to speak with Al Morris?

7      A.    No.

8      Q.    So Detective Kelly didn't tell you that Al Morris

9   was with Kharey Wise?

10              MS. LEDERER:  Objection.

11              THE COURT:  Objection sustained.

12     Q.    Or is it that you didn't want to hear what

13  information Al Morris was going to tell you?

14     A.    There was just too many people.  It was just too

15  much to absorb.

16     Q.    Now, there came a time when you went back to the

17  24th Precinct.  Am I correct?

18     A.    When?

19     Q.    After you spoke to Eddie De La Paz, you went back

20  to the 24th Precinct.  Am I correct?

21     A.    Yes, sir.

22     Q.    Then you put some information in a note and you

23  handed it to Miss Lederer?

24     A.    Yes.

25     Q.    And this information said that you had spoken to

Michael Frankel, Sr. Court Reporter

NYCLD_018396

P-APP001717

Det. Hartigan / Defense / Cross (Moore)        2719

Al Morris and Al Morris had not verified what Kharey Wise
had said?

    A.   No.  I never spoke to Al Morris.  I spoke to Eddie
De La Paz.

    Q.   I'm sorry.  My mistake.

        You indicated you spoke to Eddie De La Paz?

    A.   Yes, sir.

    Q.   And Eddie De La Paz said he wasn't with Kharey
Wise?

    A.   Yes.

    Q.   At that stage when you gave the information to the
district attorney, you remained room.  Didn't you?

    A.   No, I did not.

    Q.   And did you know that the district attorney had
told Kharey Wise what you had told him about -- I'm sorry,
Eddie De La Paz?

    A.   No.

    Q.   You didn't know that?

    A.   I didn't know if she did or not.

    Q.   Now, after that there came a time when Kharey Wise
finished his video taped statement.  Isn't that correct?

    A.   Yes, sir.

    Q.   At this time when he finished the first video
taped statement, was he under arrest?

Michael Frankel, Sr. Court Reporter

NYCLD_018397

P-APP001718

```
 1          Det. Hartigan / Defense / Cross (Moore)        2712

 2   with Mr. Santana, earlier that evening?

 3        A.    Yes.

 4        Q.    And do you recall that there came a time --

 5              MS. LEDERER:  Objection.

 6              THE COURT:  I don't know what the question

 7        is.

 8              MS. LEDERER:  May we have a side bar?

 9              THE COURT:  Yes.

10              (The following is a sidebar conversation

11               outside the hearing of the jury.)

12              MS. LEDERER:  It appears to me that Mr. Moore

13        is trying to ask questions about whether this

14        detective prefers to interview young people by

15        themselves without the presence of a parent.

16              I am aware that Raymond Santana had a

17        conversation with the detective out of the

18        presence of the father.

19              If that's where Mr. Moore is going, it's

20        objectionable and he shouldn't be allowed to ask

21        the question.

22              THE COURT:  I will allow the question.  You

23        can ask him on redirect how he came to do it.

24              (Open court.)

25        Q.    Mr. Hartigan, do you recall earlier that evening


             Michael Frankel, Sr. Court Reporter
```

7

Det. Hartigan / Defense / Cross (Moore)        2713

that you had a conversation with Mr. Raymond Santana?

    A.    Early that day, yes.  The 20th I had a conversation with him.

    Q.    That's correct.

    And you were asking him questions about his involvement with the female jogger.  Do you remember that?

    A.    No, I didn't ask him any questions about the female jogger.

    Again, he had told us what had happened.

    Q.    Okay.

    But there came a time when he gave you some information in a statement.  Is that correct?

    A.    He gave us a statement.

    Q.    And you took down his statement.  Am I correct?

    A.    Yes.

    Q.    And in that statement he had not mentioned about the female jogger.  Do you remember that?

    A.    Yes, sir.

    Q.    Do you remember that there came a time when his father and his grandmother, -- I'm sorry, his father had left the precinct?  Do you remember?  That was outside of the precinct?

    A.    There was different times.  I believe his father was there early in the morning and left and then again he

Michael Frankel, Sr. Court Reporter

NYCLD_018391

P-APP001720

Det. Hartigan / Defense / Cross (Moore)                2714

1  left during the conversation that I was having with Santana,

2  yes.

3      Q.   That's correct.

4          He left during that conversation.  And when his

5  father had left, then you asked him questions about his

6  involvement --

7      A.   No.

8      Q.   When the father left, he told you about his

9  involvement with the female jogger.  Is that correct?

10     A.   He asked his father for permission to talk to me

11 by himself and his father granted it.

12     Q.   During the time his father was not there is when

13 he told you about his involvement with the female jogger?

14     A.   Yes.

15     Q.   Isn't that correct?

16     A.   Yes.

17     Q.   Now, with respect to Eddie De La Paz, you

18 indicated that you wanted to take him to the precinct.  Am I

19 correct?

20     A.   I asked him if he would accompany us to the

21 precinct, yes.

22     Q.   And the purpose of taking him to the precinct, was

23 to ask him questions.  Was it not?

24     A.   To take a statement from him, yes.

Michael Frankel, Sr. Court Reporter

1                 Hartigan/redirect/People        2733

2    A    Justice got what it wanted.

3            MR. MOORE:  No further questions.

4            THE COURT:  Do you have anything else?

5  REDIRECT EXAMINATION

6  BY MS. LEDERER:.

7    Q    Detective, if I might take you back to the

8  interview of Kevin Richardson.  Do you recall when you were

9  here earlier you were cross-examined by Mr. Diller?  Do you

10  recall the questions he put to you?

11    A    Yes.

12    Q    And do you recall him asking you a series of

13  questions as to whether you promised the Richardsons, Kevin

14  Richardson or anybody from his family, that Kevin Richardson

15  can go home if he made a statement?  Do you recall those

16  questions Mr. Diller put to you?

17    A    Yes.

18    Q    On the morning of April 20th during the time that

19  you were interviewing Kevin Richardson and during the time

20  that he was writing a statement, did you ever have a

21  conversation with anyone from the Richardson family about

22  Kevin Richardson?

23    A    Yes.

24    Q    And do you recall who you spoke to at that time?

25    A    Gracie Cuffee, the sister.

1                   Hartigan/redirect/People                2734

2        Q    Was that conversation at the Central Park Precinct?

3        A    Yes, it was.

4        Q    And did you say anything to Angela Cuffee about

5   Kevin Richardson at that time?

6        A    Yes.

7        Q    What did you say to her?

8        A    I  --  generally I spoke to her that Kevin had a

9   lot going for him.  He was young.  He was  --  I had met a

10  lot of people during the course of my time in the police

11  department, a lot of young people who couldn't read or

12  write.  Kevin was intelligent.  He was articulate, could

13  read, he could write.  And that he had a lot going for him.

14       Q    Did you in that conversation with Angela Cuffee,

15  did you have any conversation about what would happen with

16  Kevin Richardson with respect to the statements he had made

17  to you?

18       A    Yes.  I told her that I didn't know what was going

19  to happen, but this wasn't the end of the world for Kevin.

20  That it wasn't up to us, the police department.  But he

21  could possibly be given youthful offender treatment by the

22  courts and that he would have no record at the age of

23  eighteen.

24       Q    In that conversation did you indicate to her that

25  this case would be going to court?

NYCLD_018412

P-APP001723

Hartigan/redirect/People                    2735

2      A      I assumed that she understood that this case was

3  going to court.

4                  MR. DILLER:  Objection.

5                  THE COURT:  Objection sustained what she

6              understood.

7      Q      Did you use words to her telling her that this case

8  was going to court?

9      A      I don't know if I did or not.

10     Q      When you talked about youthful offender treatment,

11 what exactly did you say to Angela Cuffee?

12     A      That the court could give him youthful offender

13 treatment, and that he would have no police record after the

14 age of eighteen.

15     Q      Did you promise her that would happen in this case?

16     A      No.  I told her we had no control  --  the police

17 department had no control over it.  But this is what

18 possibly could happen.

19     Q      Did you tell her who had control over that?

20     A      The courts.

21     Q      Detective, during the 20th and 21st, and the 22nd

22 and in the course of this investigation, were other

23 detectives other than yourself conducting interviews?

24     A      Yes.

25     Q      Did you personally do an interview of Antron

NYCLD_018413

P-APP001724

```
 1                    Hartigan/redirect/People                2736
 2   McCray?
 3        A    No.
 4        Q    Did other detectives do that interview?
 5        A    Yes.
 6        Q    Did you personally interview Yusef Salaam?
 7        A    No.
 8        Q    Did other detectives do that interview?
 9        A    Yes.
10        Q    Did you personally interview Jermaine Robinson?
11        A    No.
12        Q    Did other detectives do that interview?
13        A    Yes.
14        Q    Did you personally interview Jomo Smith?
15        A    No.
16        Q    Did other detectives do that interview?
17        A    Yes.
18        Q    Did you personally interview Alfred Morris?
19        A    No.
20        Q    Did other detectives do that interview?
21        A    Yes.
22        Q    Did you personally interview Clarence Thomas?
23        A    No.
24        Q    Did other detectives do those interviews?
25        A    Yes.
```

SHEEHAN - PEOPLE - DIRECT - LEDERER                3650

minutes.

I, I then advised Raymond I was going into
another room, and that when his father got back here,
to please ask him to wait for me, I would out in a
few minutes.

Q    Did there come a time where you were notified
regarding Mr. Santana's senior presence at the precinct?

A    Yes, ma'am.

Q    Would you describe what happened?

A    After eight o'clock, again, I'm not positive
on the time, but after eight, and before nine, I was
at a briefing in the rear room of the 20th Squad, which
would be on the east, it's the east side of the squad,
and I was advised by another detective that Mr. Santana
senior had arrived.

Q    Did you return to the area where Raymond
Santana, Jr., the defendant, was?

A    Yes, I did.

Q    And what happened when you returned to that
location?

A    His father was there with him. We shook
hands.  I introduced myself.

And I advised Mr. Santana, Sr. again that
we were going to take a statement, and wanted him to

FMRRN TRANSCRIPT

NATIONWIDE: 1-800-255-5040

CORBY GROUP  NJ:

SHEEHAN - PEOPLE - DIRECT - LEDERER          3651

be present.

I also advised him at that time that there were members of the District Attorney's Office who probably are going to want to videotape any statement that he gave, and his presence would also be required.

Q    Did there come a time where you took -- where you interviewed Raymond Santana, Jr.?

Did there come a time where you conducted an interview of Raymond Santana, the defendant?

A    Yes, ma'am.

Q    Approximately what time did that interview begin?

A    Ten after 10:00 PM.

Q    Where was that interview conducted?

A    On the first floor of the 20th Precinct in the Youth Room.

Q    Were you able to conduct that interview in that room immediately upon Raymond Santana's father arriving at the precinct?

A    No.  The Youth Room was being utilized, and we had to wait.

Q    Would you describe how it came about that the interview began with Raymond Santana, and who was present?

FMRRN TRANSCRIPT

NATIONWIDE: 1-800-255-5040

CORBY GROUP  NJ:

SHEEHAN - PEOPLE - DIRECT - LEDERER          3652

1

2          A     We  entered  the  room,  it  was  myself,  Detective

3     Jonza,   Raymond   Santana,   Sr.   and   Raymond   Santana,   Jr.

4     We all entered the room.

5               there was a desk or a table.

6               I sat your side if we were to use the prosecu-

7     tion table, I sat where you're sitting, Mr. Jonza sat

8     where  Mr.  Clements  is  sitting.   Raymond  sat  right  over

9     here,   at   this   edge,   and   his   father   sat   to   his   left,

10    slightly to the rear.

11         Q     Prior  to  going  into  the  Youth  Room  to  conduct

12    the  interview  with  Raymond  Santana,  had  you  had  occasion

13    to   see   a   written   statement   that   had   been   prepared   and

14    signed by Raymond Santana?

15         A     Yes, I did.

16         Q     When,  for  the  first  time,  did  you  see  a  written

17    statement  that  Raymond  Santana  had  made  prior  to  your

18    interview?

19         A     Shortly   before,   I   don't   know   how   long,   but

20    certainly enough time to peruse it.

21         Q     Did  Detective  Hartigen  show  you  that  statement

22    when   you   saw   Detective   Hartigen   and   Raymond   Santana

23    in the Youth Room of the Central Park Precinct?

24         A     No, he did not.

25         Q     Did  he  tell  you  the  contents  of  that  statement

FMRRN TRANSCRIPT

NATIONWIDE: 1-800-255-5040

CORBY GROUP  NJ:

SHERMAN - PEOPLE - DIRECT - LEDERER                 3653

at that time, when you saw him at the Central Park

Precinct?

A    No, he did not.

Q    Describe how the interview with Raymond Santana

began?

A    Detective Jonza signed us into a logbook

that was on the desk.

I, I introduced us once again, Jonza.

I then advised Santana, Sr. and Santana,

Jr. that I was going to read the Miranda warnings,

which I did, from a Police Department handout.

MS. LEDERER:   I would ask this please

be marked as People's 179 for identification.

(People's Exhibit 179 marked for identifica-

tion.)

MS. LEDERER:   I would ask if that could

please be shown to the witness, please.

(Handed up to and examined by the witness.)

Q    Do you recognize People's 179 for identification?

A    Yes, I do.

Q    And what do you recognize that to be?

A    This was the card that I used to read the

Miranda warning.

Q    Are those the rights that you read to

FMRRN TRANSCRIPT

NATIONWIDE: 1-800-255-5040

CORBY GROUP  NJ:

T4-SC-TS

3679

1                 Sheehan - People - Direct - Lederer

2     are you able to hear teletype machines, telephones and

3     typewriters from the 124 room?

4         A    Yes, ma'am.  Because the walls do not go all the way

5     to the ceiling.

6         Q    Are there doors or gates to any of the rooms in the

7     first floor of the 24th Precinct?

8         A    What used to be the 124 room is now the arrest

9     processing center where the uniformed force takes their

10    prisoners.  It's right behind a desk and there is a door there

11    that's been slamming forever.

12        Q    Are you able to hear the slamming of that door  from

13    inside the youth room at the 24th Precinct?

14        A    Yes, you are.

15        Q    Did there come a time a video taped statement was

16    taken from Raymond Santana, Jr.?

17        A    Yes.

18        Q    Approximately what time did that happen?

19        A    Approximately 2:30 in the morning.

20        Q    Where did that happen?

21        A    That happened at the 24th Precinct, in  that  little

22    room I just described, the youth room.

23        Q    Who was present at the time that video taped

24    statement was taken?

25        A    Raymond Santana, Jr., Raymond Santana, Sr.,  myself,

T4-SC-TS

3680

                    Sheehan - People - Direct - Lederer

1

2  detective Burt Arroyo, a video tape technician and you were.

3       Q    Approximately how long did that interview last?

4       A         Approximately  half an hour, a couple of minutes

5  after three.

6       Q    After that interview was  concluded,  was  a  second

7  video tape done of Raymond Santana?

8       A    Yes, about fifteen minutes later there was a second

9  video tape done where Raymond was asked to stand, put  on  his

10  outer  garment, a jacket and a cap.  And that was done for the

11  purposes of recording the clothing he was wearing.

12            MS. LEDERER:  If I can ask to please have  this

13         marked as People's 181 for identification.

14            (Whereupon,    the    Reporter    marked    the

15         abovementioned exhibit, as requested.)

16       Q    Detective, were you present from the very  beginning

17  of the videotape interview to the very end of the interview of

18  Raymond Santana, Jr.?

19       A    Yes, I was.

20       Q         And  were  you present from the beginning of the

21  recording of the clothing that he was wearing to the very  end

22  of that recording?

23       A    Yes, I was.

24       Q     I ask you to please look at what's been marked as

25  People's 181 for identification.  Do  you  recognize  People's

T7-1f

1    COLLOQUY

2         Michael Sheehan.

3    D E T.    M I C H A E L    S H E E H A N, Shield 421,

4    Manhattan North Homicide, New York City Police

5    Department, having been called as a witness by

6    the People, having been first duly sworn,

7    testified under oath as follows:

8              COURT OFFICER: Would you give us your

9         name, spell your last name, your shield

10        number and present assignment.

11             THE WITNESS:    Detective Michael

12        Sheehan, S-H-E-E-H-A-N; Shield 421, NYPD,

13        Manhattan North Homicide Squad.

14   DIRECT EXAMINATION

15   BY MR. CLEMENTS:

16        Q         Detective, I'd like to direct your

17   attention to April 20, 1989. Did you work on that

18   day?

19        A    Yes, sir, I did.

20        Q    And what shift did you work?

21        A    Four in the afternoon to 1:00 in the

22   morning.

23        Q    Did you receive an assignment shortly after

24   you arrived for work?

25        A    Yes, I did.

10/24/89

T7-1f

1669
SHEEHAN - PEOPLE - DIRECT - CLEMENTS

1  Q   And what was that assignment?

2  A   I left the Manhattan North office about ten
3 after one, and responded to Central Park Squad.

4  Q   Did you arrive at Central Park?

5  A   Yes, I did.

6  Q   WHen you got there, did you receive another
7 assignment?

8  A   Yes, sir, I went to Central Park to aid in
9 the investigation of an assault on a victim that was
10 likely to die.   Upon  reaching  the  Central  Park
11 Squad,  I  was  surprised of a couple of facts by my
12 immediate supervisor, Sergeant O'Connor.

13      I was then asked to accompany the uniformed
14 force on a search.  The search  was  for  a  weapon,
15 namely, a length of pipe.

16      MR. BURNS:  A what?

17      THE WITNESS:  A length of pipe.

18  Q   Where did that search take place?

19  A   The search took place in the vicinity of
20 West 97th Street and  Central  Park  West;  actually
21 inside the park walls.

22  Q   Did  you  recover  a pipe or was a pipe
23 recovered in your presence?

24  A   No, sir.

10/24/89

NYCLD_018955

P-APP001733

T7—1f

1670

1          SHEEHAN — PEOPLE — DIRECT — CLEMENTS

2      Q     At the conclusion of that search, what   did

3   you do?

4      A          At   the   conclusion   of   the   search, I

5   responded back to the Central Park Squad and   had   a

6   conversation   with,   again,   Sergeant   O'Connor   and

7   Detective John Hartigan.

8      Q     What time did you   return   to   the   Central

9   Park Squad?

10     A          I   returned   to   the Central Park Squad

11  somewhere in the vicinity of 5:30 p.m.

12              MR. BURNS:   I'm sorry, 5:30 p.m.?

13              THE WITNESS:   That's correct.

14              THE COURT:   What time was it that   you

15         said you went in search of the weapon?

16              THE WITNESS:   Shortly after 4:00, your

17         Honor.   Let's say 4:30.

18              THE COURT:   Okay.

19              MR. BURNS: Again p.m.?

20              THE WITNESS:   p.m.

21     Q     When did you speak to John Hartigan?

22     A       I spoke with John Hartigan in the Central

23  Park Precinct, there is a separate   building   across

24  the   alleyway   from   the   main   building.   It is the

25  auxilary police building.   It also houses the   Youth

10/24/89

T7-1f

1671

SHEEHAN — PEOPLE — DIRECT — CLEMENTS

1   Room.     It was in that building, in the Youth Room,

2

3   that I spoke with John Hartigan.

4        Q     And would you relate the nature of the

5   conversation?

6        A          Sure.   Hartigan advised me that he had

7   taken a statement from -- Raymond Santana, who was

8   seated at a desk in that room.  He had also advised

9   me. that Santana wished to add certain things to the

10  statement, and that it was  impossible  for  him  to

11  continue,  because  there was no parents or guardian

12  present for Santana.

13            Also,  during  this  I  was  advised  by

14  O'Connor,  Sergeant  O'Connor  that  the  entire

15  investigation was going  to  be  moved  out  of  the

16  Central  Park  Precinct to the west side of West 82nd

17  STreet into the 20th Precinct which was  probably  a

18  better  facility  to handle an investigation of this

19  size.

20       Q     You were  at  the  Central  Park  Precinct,

21  would  you  describe  the  conditions  around  the

22  precinct at that time?

23       A     Well,  Central  Park  Precinct  is  an  old

24  stationhouse.  There is not a lot of room.  There is

25  not  a  lot  of  individual  rooms to do interviews.

10/24/89

NYCLD_018957

P-APP001735

T7-1f

1672

1       SHEEHAN - PEOPLE - DIRECT - CLEMENTS

2   Also, in this case, there's only a small youth room.

3   It's also a bad place to conduct a confidential

4   investigation, especially in a matter of this nature

5   with the press.

6           The press had arrived. There were quite a

7   few people arriving from the media. And they began

8   to gather. There's actually an alleyway that

9   divides the two main parts of the stationhouse.

10  It's unlike any other in the City.

11      Q      After speaking to Sergeant O'Connor and to

12  Detective Hartigan, did you receive another

13  assignment in connection with this case?

14      A      Yes, I did.

15      Q      And what was that?

16      A      The assignment was to take Raymond Santana

17  in our car.  I was with Detective Jonza, J-O-N-Z-A,

18  and Rudy Hall, H-A-L-L, both from the Manhattan

19  North Homicide Squad.  We were to take Santana from

20  the Central Park Stationhouse to the 20th, notify

21  his father, try to make some arrangements to get his

22  father down to the 20th Precinct, and then take an

23  updated, more complete statement.

24      Q      Did there come a time when you left the

25  Central Park Precinct?

10/24/89

T8-fr

1677

1    SHEEHAN — PEOPLE — DIRECT — CLEMENTS

2  Telephone Company, or whatever, but there was a hole

3  in the street protected by barriers. I went to that

4  hole, jumped in myself, and examined it. It was

5  only about two feet deep. There was no pipe.

6      Q    After you looked for the pipe at 100th

7  Street and Central Park West, where did you go next?

8      A    We all got back in the car, that is to say

9  myself, Rudy Hall, Augie Jonza, and Raymond Santana.

10  We drove from 100th Street and Columbus Avenue south

11  to the 20th Precinct, which is located at 82nd

12  Street, West 82nd Street between Columbus and

13  Amsterdam.

14      Q    Was anything else said in the car?

15      A    On the way from that site to the 20th

16  Precinct, Mr. Santana said, "I had nothing to do

17  with the rape. All I did is feel the woman's tits.

18  I had nothing to do with the rape."

19      Q    Did you ask him any questions in the car?

20      A    No, I didn't.

21      Q    Was there any conversation in the car?

22      A    No, there wasn't.

23      Q    When you arrived at the 20th Precinct,

24  where did you go?

25      A    Upon arrival at the 20th Precinct, went to

10/24/89

NYCLD_018963

P-APP001737

T8-fr

1678
1    SHEEHAN – PEOPLE – DIRECT – CLEMENTS

2    the second floor, the 20th Detective Squad. We

3    entered. As you walk into the squad, to the left

4    there's a desk by a window which would be –– if you

5    were looking at it in the scheme, it's the west wall

6    of the 20th squad.

7              MR. CLEMENTS:    With the Court's

8              permission, I would like the witness to get

9              off the stand and look at what's been

10             received as People's 3 in evidence.

11             (Witness approaches People's 3 in

12             evidence.)

13   Q    Do you recognize People's 3, Detective?

14   A    Let me get my bearings, yes, I do.

15   Q    And what do you recognize it to be?

16   A        This is a schematic drawing of the second

17   floor of the 20th Precinct. These offices here are

18   the 20th Detective Squad.

19             MR. CLEMENTS:    Indicating, for the

20             record, the offices on the lower half of

21             People's 3 in evidence.

22   Q        How did you get to the second floor with

23   Raymond Santana?

24   A        Came in the main entrance of the precinct,

25   which would be here, and up the staircase

10/24/89

1598

1    TAGLIONI — PEOPLE — DIRECT

2    A    Yes, I was.

3    Q    And what, if anything, did you hear Kharey

4    say?

5    A    That he would come into the station house

6    with us.

7    Q    And was Kharey Wise handcuffed at that time?

8    A    No, nobody was handcuffed.

9    Q    Where did you go when you left the

10   ?

11   A    Went down to the lobby and to our car.

12   Q    How many cars did you have?

13   A    We had two unmarked police cars.

14   Q    And did you ride in one of the cars?

15   A    Yes, I did.

16   Q    Who did you ride with?

17   A    Detective Hall and Yusaf Salaam.

18   Q    And where did Yusaf Salaam ride in the car?

19   A    In the back seat.

20   Q    Do you know where Kharey went?

21   A    Kharey went into the other unmarked vehicle

22   with Detective Bier and Detective Freck.

23   Q    Was Yusaf Salaam handcuffed when he rode in

24   the car?

25   A    No, he was not.

1599

TAGLIONI — PEOPLE — DIRECT

1   Q    Did you have any conversation with Yusaf

2   Salaam on the way after you left

3   A    No, I did not.

4   Q    Did you hear any conversation between him

5   and anybody else in the car, the other detective?

6   A    I don't recall it, no.

7   Q    Where did you go?

8   A    I went to the 20th Precinct.

9   Q    And where did you go when you arrived at the

10  20th Precinct?

11  A    When we arrived at the 20th Precinct, we

12  were directed to go upstairs to the third floor to

13  the Sex Crimes office.

14  Q    Directing your attention to People's 4 in

15  evidence, the third floor of the 20th Precinct,

16  could you please step down from the witness stand

17  and approach People's 4 in evidence and indicate,

18  please, where you went with Yusaf Salaam when you

19  arrived.

20  A    Okay.  We took the stairway up to the third

21  floor.  We entered the Sex Crimes office, which is

22  over here, and I took Yusaf into this room right

23  here in the Sex Crimes office.

24              MS. LEDERER:  The record should reflect

1600

TAGLIONI - PEOPLE - DIRECT

1

2      the witness is indicating a small room off

3      of a longer room. It has three file

4      cabinets and something-- and one desk in

5      that room.

6          You may resume the witness stand. Thank

7      you.

8          (Witness complies.)

9      Q   Now, what did you do when you arrived in

10   that room with Yusaf Salaam?

11     A   I sat there and I waited for someone,

12   another detective to come to do the interview.

13     Q   Did you have any conversation with Yusaf

14   Salaam while you sat there in that room with him?

15     A   No, I did not.

16     Q   Was he seated or standing?

17     A   He was seated.

18     Q   And approximately how much time elapsed

19   before the arrival of a detective to conduct an

20   interview?

21     A   I'm not sure, but I'd say anywhere from

22   fifteen to twenty minutes.

23     Q   And do you know the name of the detective

24   who arrived within that fifteen to twenty minute

25   period?

TAGLIONI — PEOPLE — DIRECT

1

2   A   Yes, I do.   Detective Thomas McKenna from

3   Manhattan North Homicide.

4   Q   Were you present when Detective McKenna came

5   into the room?

6   A   Yes, I was.

7   Q   Approximately what time was it-- withdrawn.

8   What, if anything, did he say or do when he came

9   into the room?

10   A   When he came into the room, I introduced him

11   to Yusaf, told him who he was, Detective McKenna

12   from the Homicide Squad, that he would be talking to

13   him.

14   With this Detective McKenna also introduced

15   himself to Yusaf, read him his rights, and at that

16   point I left the office.

17   Q   Were you present when the rights were read?

18   A   Yes, I was.

19   Q   And did you see whether they were read from

20   a card or were they given by memory?

21   A   No, they were read from a card.

22   Q   Were you present-- well, withdrawn.

23   When the rights were read, did Yusaf respond in

24   any way when the rights were read?

25   A   Yes, he did.

NYCLD_006918

P-APP001742

1602

TAGLIONI - PEOPLE - DIRECT

1 

2    Q    What do you recall his response or responses

3  to be?

4    A    "Yes," to all the answers.

5    Q    When-- did there come a time that you left

6  the third floor?

7    A    Yes, there did.

8    Q    And where did you go when you left the third

9  floor of the 20th Precinct?

10    A    I went down to the second floor to the

11  squad, the 20th squad room.

12    Q    Did there come a time where you returned to

13  the room where you had left Yusaf and Detective

14  McKenna?

15    A    Yes, there was.

16    Q    Approximately how much time elapsed from the

17  time that Detective McKenna came into that room

18  until the time that you returned, as best as you can

19  recall?

20    Well, let me rephrase the question.  I'm sorry.

21    From the time that you left the room, not when

22  Detective McKenna came in, how much time were you

23  away from that room before you returned?

24    A    I'd-- I really-- I don't know.  I believe

25  twenty minutes, maybe more.

1603

TAGLIONI — PEOPLE — DIRECT

1    Q    And do you recall for what reason-- what did

2  you do when you returned to the room?

3    A    I asked McKenna for the pad he was writing

4  on, his notebook, his spiral book.

5              MR. MADDOX:   May that answer be read

6              back?

7              THE COURT:   Read it back, please.

8              (The court reporter read back the

9              requested portion of the record.)

10   Q    And do you recall what, if anything, you did

11  with that spiral book?

12   A    Yes, I took it down to the second floor.  I

13  gave it to one of my supervisors.

14   Q    Did there come a time where you returned

15  that spiral book to Detective McKenna?

16   A    Yes.

17   Q    And approximately how much time after you

18  took it from him did you return it to him?

19   A    A few minutes.

20   Q    Sometime after you had taken Detective

21  McKenna's steno book and returned it to him did you

22  have occasion to go to the first floor of the 20th

23  Precinct?

24   A    Yes, I did.

NYCLD_006920

P-APP001744

TAGLIONI — PEOPLE — DIRECT                    1604

Q    And how was it that you came to go to the first floor?

A    I was instructed to go downstairs by one of my supervisors to talk to Yusaf's mother who had arrived at the station house sometime before that.

Q    And do you recall who told you to go downstairs?

A    Again, it was one of my supervisors, either the sergeant or the lieutenant.

Q    Did you then go downstairs and have a conversation with Yusaf Salaam's mother?

A    Yes, I did.

Q    And what time was it, as best you recall, that you had a conversation with the defendant's mother?

A    It was sometime between twelve and one o'clock in the morning.

Q    Do you recall where you had that conversation with Yusaf Salaam's mother?

A    Yes, I do.

Q    And if you could please step down for a moment and approach the easel, People's 2 in evidence.

        (Witness complies.)

NYCLD_006921

P-APP001745

1605

TAGLIONI — PEOPLE — DIRECT

1  Q   Would you indicate, please, where you had a

2

3  conversation with her.

4  A   Okay.  I had it right by the main desk,

5  standing right about over here, by the back exit.

6         MS. LEDERER:  The record should reflect

7            that the witness is indicating outside a

8            room that is marked "morgue," and near a

9            "generator room."

10  Q   How many people were present at the

11  conversation you had with Yusaf Salaam's mother?

12  A   At least four.

13  Q   And do you know the names of any of those

14  people?

15  A   No, I do not.

16  Q   Would you please tell us-- you may resume

17  the witness stand.

18         (Witness complies.)

19  Q   What, if anything, did she say to you and

20  what did you say to her in the course of that

21  conversation?

22  A   When we came down, I identified myself as

23  Detective Taglioni.  She identified herself as

24  Mrs.-- as Yusaf's mother.  I don't know her first

25  name.

NYCLD_006922

P-APP001746

1606

TAGLIONI — PEOPLE — DIRECT

1   She was concerned about her child, you know, if

2

3   he was being abused and I assured her (blank on

4   tape) *that he wasn't. ER.*

5   I said, "We're upstairs. They're talking to him

6   right now."

7       With that she said, "Well, you shouldn't be

8   talking to him because he's only fifteen years old."

/LF 9

10      Q   What, if anything, did you say to her when

11  she told you that her son was only fifteen years

12  old?

13      A   I had told her that he showed us proof of

14  age that he was sixteen years old and that's the

15  reason we were talking to him.

16      Q   And what did she say at that point?

17      A   Well, she said he was fifteen years old.

18      At that point I went upstairs. I told my

19  supervisors these facts, and then I went upstairs to

20  the third floor where Detective McKenna was talking

21  to him and asked him to come out of the room and

22  advised him of the fact Yusaf may, in fact, be only

23  fifteen years old and there may be an attorney.

24      An attorney was downstairs, a federal attorney.

25      Q   Let me just back up for a moment. Did you

NYCLD_006923

P-APP001747

1607

TAGLIONI - PEOPLE - DIRECT

1   ever, prior to going upstairs to Detective McKenna
2   to tell him to interrupt the interview, have a
3   conversation with anyone who identified himself as
4   an attorney?
5       A   No, I didn't have a conversation, no.
6       Q   In the conversation you referred to with
7   Mrs. Salaam or Yusaf's mother, was that the only
8   conversation you had with her up until that point?
9       A   Well, I had a conversation again with her
10  later on.
11      Q   Up until that point, was that the first
12  conversation you had with her?
13      A   Yes, it was.
14      Q   Did she tell you in that conversation there
15  was someone there, an attorney on behalf of her son?
16      A   No.   She told me she had a friend there that
17  was an attorney.   She never told me he was
18  representing her son.
19      Q   Did she tell you anything about his relation
20  to the family?
21      A   Yes, that he was a friend of the family's
22  and he was a federal attorney.
23      Q   And this conversation-- I'm sorry.   She said
24  he was what?

NYCLD_006924

P-APP001748

1    TAGLIONI — PEOPLE — DIRECT

2    A    A federal attorney.

3    Q    Did she explain to you what that meant?

4    A    No, and I didn't ask her.

5    Q    The information you are just telling us

6    about hearing this person was a federal attorney who

7    was a friend of the family, when did you learn that?

8    A    When I first spoke to her the first time.

9    Q    Was that in the same conversation that she

10   told you Yusaf Salaam was fifteen years old?

11   A    Yes, it was.

12   Q    Will you tell us now when you went upstairs

13   and spoke to Detective McKenna, after this

14   conversation with her, what, if anything, did you

15   say to her?

16   A    I told Detective McKenna that we had a

17   problem, that Yusaf might be fifteen years old and

18   that there was an attorney downstairs.   I didn't

19   know if the attorney was representing him or not,

20   that he stated-- that his mother stated that he was

21   a friend of the family.

22   At this point Detective McKenna said, "That's

23   it, we can't talk to him anymore."

24   Q    How much time went by from the time that you

25   had this conversation with Mrs. Salaam   until   you

NYCLD_006925

1609

1       TAGLIONI — PEOPLE — DIRECT

2    went upstairs and interrupted the interview with

3    Detective McKenna?

4        A    It couldn't have been more than five minutes

5    tops.

6        Q    After you had the conversation with Mrs.

7    Salaam wherein she told you what you just described

8    to us, what was the very next thing you did?

9        A    I directly-- I went upstairs. I told my

10   supervisors and then went directly upstairs to

11   Detective McKenna.

12       Q    Did you do anything else other than tell

13   your supervisor and then go tell Detective McKenna?

14       A    No, I did not.

15       Q    After the conversation you had with

16   Detective McKenna, what was the next thing you did?

17       A    I then went back downstairs and had a

18   further conversation with Yusaf's mother, Mrs.

19   Salaam.

20       Q    And did you tell her what you had just done

21   with respect to Detective McKenna?

22            MR. MOORE:   Objection as to form.

23            THE COURT:   I will allow it.

24       A    Yes, I told her the detective that was

25   speaking to him was informed he was fifteen years

NYCLD_006926

P-APP001750

1610

TAGLIONI - PEOPLE - DIRECT

1  

2 old, and that he would not be spoken to anymore.

3     Q   And did you have a further conversation with

4 Mrs. Salaam at that point?

5     A   Yes, I did.

6     Q   Would you please tell us what you said to

7 her and what she said to you.

8     A   She asked me if she would be able to talk to

9 Yusaf. I told her I would confer with my

10 supervisors, which I did, and permission was given

11 for her to speak to him.

12     Q   Going back for a moment to the first

13 conversation you had with Mrs. Salaam, about how

14 long did you speak to her at that point?

15     A   I really don't-- I'm not sure.

16     Q   The second conversation that you were

17 describing where she asked to speak to Yusaf, do you

18 recall approximately how long that conversation

19 lasted?

20     A   Five, ten minutes, maybe.

21     Q   And after you had that conversation-- did

22 you speak to someone about arranging for Mrs. Salaam

23 to see Yusaf?

24     A   Yes, I did.

25     Q   And do you know who it was that you spoke

1611

TAGLIONI - PEOPLE - DIRECT

1    
2    to?

3        A    Again, it was one of my supervisors. I'm
4    not sure if it was the sergeant or the lieutenant.

5        Q    What, if anything, did you do after you
6    spoke to the sergeant or the lieutenant?

7        A    I went back downstairs and informed Mrs.
8    Salaam that she would be allowed to speak to him. I
9    then went upstairs and took Yusaf down to the first
10   floor.

11       Q    Where did you find Yusaf when you went
12   upstairs?

13       A    In the same room where I had put him
14   earlier.

15       Q    Was anyone speaking with him at that time?

16       A    No.

17       Q    What did you do when you went upstairs and
18   found Yusaf on the third floor?

19       A    I told him his mother was downstairs and
20   would like to speak to him.

21       Q    What, if anything, did you do with respect
22   to that?

23       A    I took Yusaf downstairs to the first floor.

24       Q    Was he handcuffed?

25       A    No, he was not.

1612

TAGLIONI — PEOPLE — DIRECT

1

2    Q    And when you took him down to the first

3    floor, could you just approach People's 2 in

4    evidence and show us where you brought him and where

5    his mother was.

6    A    Again, we were down in the main room by the

7    main desk (indicating).    His mother was still

8    standing here with the people (indicating).    His

9    mother and Yusaf went over into this corner and

10   that's where they spoke (indicating).

11   Q    And were you present at the time that they

12   spoke?

13   A    Yes, I was still standing over here

14   (indicating).

15   Q    From where you were standing were you able

16   to hear what they were saying?

17   A    No, I could not.

18          MS. LEDERER:    Thank you, you may resume

19          the witness stand.

20          (Witness complies.)

21   Q    You made reference to some other people in

22   addition to Yusaf Salaam's mother.    Was there anyone

23   else there with respect to Yusaf Salaam?

24   A    Yes.    There were a couple of women and a

25   male.

NYCLD_006929

P-APP001753

1613

TAGLIONI — PEOPLE — DIRECT

1

2  Q  Do you know their names?

3  A  No, I do not.

4  Q  And approximately how long did Yusaf speak
5  to his mother at that point?

6  A  He spoke to her for quite awhile.  I don't
7  know the amount of time, but a couple times I had to
8  interrupt and tell her we had to bring him upstairs.
9  So it was quite awhile.

10  Q  Can you approximate the amount of time?

11  A  No, I couldn't.

12  Q  At some point did you take Yusaf someplace
13  else?

14  A  Yes.  After he was finished speaking with
15  his mother we brought him back upstairs.

16  Q  When you took him upstairs after he had
17  spoken with his mother, where did you take him?

18  A  I believe it was back up to the third floor
19  again.

20  Q  After you brought Yusaf back upstairs, did
21  you have any further conversation with the
22  defendant's mother?

23  A  Yes, I did.

24  Q  And would you tell us how much after you
25  brought him upstairs was that conversation?

NYCLD_006930

P-APP001754

1614

TAGLIONI — PEOPLE — DIRECT

1   A   Five, ten minutes; ten minutes.

2   Q   And where did that conversation take place?

3   A   Also on the third (sic) floor but at a
different location than where we had spoke to her
before.  That's-- as soon as you come into the main
entrance there is a bench against the wall.  She was
sitting there with this federal attorney who turned
out to be a family friend.

10   Q   When you say this federal attorney, did you
actually meet that person at that time?

12   A   Yes, I did.

13   Q   And was that the first time you met him that
evening?

15   A   No, it was not.

16   The first time I spoke to him?

17   Q   Yes.

18   A   It was the first time I actually spoke to
him, yes.

20   Q   Did you have a conversation with the
defendant's mother and the person you've described
as a federal attorney?

23   A   Yes, I did.

24   Q   Would you tell us, please, what they said
and what you said.

NYCLD_006931

P-APP001755

1615

TAGLIONI - PEOPLE - DIRECT

1
2       A   Mrs. Salaam stated that he was a friend of
3  the family.   I believe she used the term "a big
4  brother."
5       With that he asked me what the procedure was
6  now.   And I thought that was a little strange that
7  an attorney was asking me about--
8                 MR. MOORE:  Objection.
9                 THE COURT:  Yes.
10                Don't tell us what you thought.
11      A   He asked me what the criminal procedures
12 were.   I explained that Yusaf would be brought down
13 to court and he would go in front of a judge for
14 arraignment.
15      Q   And did they ask you any other questions
16 about anything, about the procedure or what would
17 happen at that point?
18      A   After I explained to him, you know, the
19 whole arrest procedure, that was the only
20 conversation I had with them.
21      Q   And about how long was that conversation, if
22 you recall?
23      A   Maybe twenty minutes, fifteen minutes,
24 twenty-five minutes.   I'm really not sure.
25      Q   What happened after you had that

TAGLIONI — PEOPLE — DIRECT                    1616

1   conversation?

2

3       A   I believe they left the station house and I

4   went back upstairs to the second floor.

5       Q   Did you have any further conversation with

6   Yusaf Salaam after you spoke to Detective McKenna

7   and told him not to continue the interview?

8       A   No, I did not.

9           MS. LEDERER:   If I may have just one

10          moment, please.

11      Q   At any time-- well, withdrawn.

12          MS. LEDERER:   I have nothing further.

13          Thank you very much.

14          THE COURT:  Mr. Burns.

15          MR. BURNS:  Let me have a second, Judge.

16          THE COURT:  Yes.

17          (Mr. Burns and his client confer.)

18          MR. MOORE:  Excuse me, your Honor, one

19          moment.  May I just approach?

20          (Discussion was held off the record.)

21  CROSS EXAMINATION

22  BY MR. BURNS:

23      Q   Detective Taglioni, my name is Robert Burns

24  and I represent Yusaf Salaam.

25      You and I, we have never met, have we?

TS-1f

1498

1   HILDEBRANDT – PEOPLE – DIRECT – LEDERER

2   time.   They were throwing stones at   the   cars,   and

3   they   came   across this bum.   They let the bum pass.

4   There was an individual that went   and   knocked   him

5   down.   They   went   over and beat him.   They kicked

6   him.   They took his food and his beer.

7            Someone   had   poured   the   beer   on   him.

8   Somebody   else had taken his food.   They dragged him

9   off the side of the road and left him laying in   the

10  grass.

11           Then he stated they started roaming through

12  the   park, and then they tried to catch individuals.

13  There was a guy   and   a   girl   that   were   riding   a

14  bicycle   built   for   two.   They tried to get them.

15  They got away from them.

16           Then there   came   a   time   they   grabbed   a

17  jogger,   and they knocked him down to the ground and

18  hit him with a pipe.   And then they left   the   park,

19  that the police had come.

20           They   ran   back into the park.   They hid in

21  the park, in the mud.   And   then   he   and   another

22  individual went home to his house.

23      Q       Let   me just go back for just a moment,

24  Detective.

25           Prior to beginning this interview, did   you

10/24/89

NYCLD_016983

P-APP001758

T5-1f

2   have a conversation with Detective Gonzalez?

3       A    No, I did not.

4       Q        Prior to beginning this interview, did you

5   have a conversation with anybody from the Police

6   Department with respect to any investigation that

7   had been conducted up until that point?

8       A    No, I did not.

9       Q    Did you have any knowledge at all about

10  what happened in Central Park on the night of the

11  19th, prior to beginning the interview of Antron

12  McCray?

13      A        Other than there had been a woman that had

14  been found assaulted and raped and near death.

15      Q    And had anybody at all told you anything at

16  all about what had happened in the park that night?

17      A    No, they did not.

18      Q    In the course of taking a statement of

19  Clarence Thomas, had he made any statements about

20  what happened in Central Park?

21              MR. JOSEPH:  Objection, Judge.

22              THE COURT:  Prior to what?

23              MS. LEDERER:  In the course of taking

24          the statement of Clarence Thomas, had he

25          made any statements about what happened in

10/24/89

T5-1f

HILDEBRANDT - PEOPLE - DIRECT - LEDERER                1500

2       Central Park?

3               THE COURT:  I will allow it.

4               MR. JOSEPH:  The witness already said

5       nobody told him about it.  The Assistant

6       may not be happy with the answer or maybe

7       she is.  I don't know.

8               THE COURT:  I don't know either, but I

9       will let him answer the question.

10      Q    Had Clarence Thomas made any statement

11  about what happened in Central Park on the night of

12  the 19th prior to the interview of Antron McCray?

13      A    Prior to conducting the interview of Antron

14  McCray?

15      Q    Had Clarence Thomas made any statement

16  about what happened in Central Park on the night of

17  the 19th, prior to the interview of Antron McCray?

18               MR. JOSEPH:  Objection.

19               THE COURT:  I will allow it.

20      A    Yes, he did.

21      Q    At the time you conducted the interview of

22  Antron McCray, was he handcuffed?

23      A    No, he was not.

24      Q    You described a moment ago a statement that

25  Antron McCray made to you after you asked him what

10/24/89

TS-1f

1      HILDEBRANDT — PEOPLE — DIRECT — LEDERER     1501

2    had happened in Central Park on the night of April

3    19th?    In the course of his making that statement,

4    did he speak freely or did you interrupt and ask

5    questions?

6        A    In the beginning I let him talk freely.

7        Q        And during the time that he said to you

8    what you have just told us he said to you, was that

9    during the time that he was speaking freely; or was

10   that a time that you were asking him questions?

11       A    Repeat that, please.

12       Q    You have just described a statement that he

13   made when you asked him what happened in Central

14   Park, when he made that statement? Did he speak

15   freely or was this in response to questions put to

16   him?

17            MR. JOSEPH:  Objection to the form.

18            THE   COURT:    I don't know about

19       "freely".

20       Q    Was he speaking without interruption or

21   were you interrupting the questions?

22       A    He was speaking without interruption.

23       Q    What, if anything, happened -- withdrawn.

24            During the time he said those things to

25   you, did either of his parents speak?

10/24/89

NYCLD_016986

P-APP001761

T5-1f

1        HILDEBRANDT - PEOPLE - DIRECT - LEDERER        1502

2        A    No, not at that time.

3        Q    What, if anything, happened after he made

4    the statement that you've just described to us?

5        A    I felt he was not telling us --

6             MR. JOSEPH:  Objection.

7             THE COURT:  Objection sustained.

8             What happened after that?

9             MS.  LEDERER:    May  I  withdraw  the

10    question and ask another question?

11            THE COURT:  Yes.

12       Q    Was  there  anything  you  observed  about

13    Antron  McCray's  behavior  during  the time he made

14    that statement to you?

15            MR. JOSEPH:  Objection.

16            THE COURT:  I will allow it.

17            Just describe what you saw; not your

18    mental state.

19            THE  WITNESS:       I  saw  he was very

20    fidgety in the seat.

21            MR. JOSEPH:  Objection to that.

22            THE COURT:  I will allow it.

23       A    (Continuing)  He was -- at times he had eye

24    contact with me.  When he was  speaking  to  me,  he

25    would constantly look down at the ground.

10/24/89

NYCLD_016987

P-APP001762

TS-1f

HILDEBRANDT — PEOPLE — DIRECT — LEDERER 1503

2   Q       And after he made that statement to you

3   that you've already described, what happened next?

4       A       We went outside -- I went outside into   the

5   hall   with   Detectives   McCabe,   Gonzalez,   and   Mr.

6   McCray.

7       Q       And did you have a conversation outside   of

8   the hall?

9       A       Yes.

10      Q       Would you tell us who spoke and what was

11  said?

12      A       I spoke to Mr. McCray.

13      Q       What, if anything, did you say to him?

14      A       I informed him that I felt that his son was

15  not being completely truthful with us.   That he   was

16  holding   back some vital information that might help

17  us in this case.

18      Q       Did the -- did Mr. McCray respond when   you

19  said that to him?

20      A       Yes, he did.

21      Q       What, if anything, did he say to you?

22      A       He also felt that his son was not being --

23              MR. JOSEPH:   Objection.

24              THE COURT:   Tell us what he said.

25              THE   WITNESS:   He said, I agree, I can

10/24/89

NYCLD_016988

P-APP001763

T6-fr

HILDEBRANDT — PEOPLE — DIRECT — LEDERER                1504

1

2          tell when my son is not telling me the

3          truth.

4     Q          Did he say anything else to you at that

5     point?

6     A     Not that I can recall.

7     Q     Approximately how long did you talk outside

8     the room?

9     A     Two or three minutes.

10    Q     And what happened after the two or three

11    minutes?

12    A          I suggested that Mr. McCray go into the

13    room and talk to his son, inform his son that we

14    felt that he was not being completely truthful with

15    us.

16    Q     And what happened at that point?

17    A     He went into the room and spoke to his son

18    and Mrs. McCray.

19    Q     And where were you at that time?

20    A     Outside the door.

21    Q     Where was Detective McCabe?

22    A     Outside the door.

23    Q     And where was Detective Gonzalez?

24    A     We were all outside.

25    Q     How long did you remain outside the door?

10/24/89

NYCLD_016989

P-APP001764

T6-fr

1505

HILDEBRANDT — PEOPLE — DIRECT — LEDERER

1  
2   A       Several minutes.

3   Q       Did you hear what was being said outside
4   the room at that time?

5   A       No, we could not.

6   Q       And what happened after the several minutes
7   past?

8   A       We went back in the room.

9   Q       And what did you do when you went back in
10  the room?

11  A       We continued the interview with Antron.
12  Asked him to go over the chain of events again.

13  Q       When you say "we", who spoke?

14  A       I did.

15  Q       And when you asked Antron to go over the
16  events, what, if anything, did he say to you?

17  A       Basically he repeated the same story.

18  Q       What happened after he repeated the same
19  story?

20  A       Then I asked him if there came a time that
21  they saw a female jogger in the park and he claimed
22  that he didn't.

23  Q       And was there anything unusual about his
24  behavior when he answered your question about the
25  female jogger?

10/24/89

NYCLD_016990

P-APP001765

T6-fr

HILDEBRANDT — PEOPLE — DIRECT — LEDERER 1506

1

2          MR. JOSEPH:  Objection, Judge.

3          THE COURT:  Objection sustained as to

4      whether there was anything unusual or not.

5      Q      Was there anything that you noticed about

6  his behavior when he answered the question about the

7  female jogger?

8          MR. JOSEPH:  Objection.

9          THE COURT:  I'll allow it.

10     A      He was looking at me at the time he asked

11  the question and ask he answered the question, he

12  looked away.  Looked down at the ground.  Started to

13  move around inside the seat.

14     Q      What happened next?

15     A      At that point I suggested that  --  to  Mr.

16  McCray  that we go out in the hall, I'd like to have

17  a conversation with him.

18     Q      And did you leave the room with Mr. McCray?

19     A      Yes, I did.

20     Q      And did anyone else leave with you?

21     A      Detective Gonzalez.

22     Q      Where did you go when you left the room?

23     A      Just outside, behind the door.

24     Q      And what conversation occurred at that

25  time?  Who spoke and what, if anything, did they

10/24/89

T6-fr

1                                                                    1507
          HILDEBRANDT - PEOPLE - DIRECT - LEDERER

2   say?

3        A    I had asked Mr. McCray if he felt that   his

4   son  was  still holding back, and he said, "Yes," he

5   felt that he was keeping  something  from  us.    He

6   doesn't now why.  He didn't raise him like that.   He

7   raised him to tell the truth.

8        Q    And what happened after that conversation?

9        A       I had asked him, "Do you think that he

10  would be  embarrassed  --  that  he  is  embarrassed

11  talking in there about what happened?"

12            At  that time Mr. McCray said that it could

13  be, it could possibly be.  He said, "Maybe it  would

14  be  better  if  my  wife wasn't there, that he would

15  tell us what happened."  And at that point  I  asked

16  him  if he would want to talk to his wife.  He said,

17  "Yes."  I put him back in  the  room  and  Detective

18  McCabe came out and they had a conversation.

19       Q    Approximately how long -- withdrawn.

20            Detective,  where was Detective Gonzalez at

21  this time?

22       A    He was in the hall.

23       Q    And where was Detective McCabe?

24       A    Inside the room.

25       Q    And did Detective McCabe leave the room?

10/24/89

NYCLD_016992

P-APP001767

T6-fr

HILDEBRANDT - PEOPLE - DIRECT - LEDERER       1508

1

2    A    Only after Mr. McCray went back in and we

3  allowed them to speak together.

4    Q    How long were they allowed to speak

5  together?

6    A    A couple of minutes.

7    Q    Could you hear what was being said in that

8  room?

9    A    No.

10   Q    After a couple of minutes passed, what's

11 the next thing that happened?

12   A    We entered. We went back into the Youth

13 Room and I asked Mr. McCray what was decided and he

14 informed me that his wife had agreed to leave and at

15 that point Detective Gonzalez escorted her from the

16 room.

17   Q    After Mrs. McCray left the room, what was

18 the next thing that happened?

19   A    Mr. McCray informed his son -- as to why

20 the mother -- he informed the son to be truthful

21 with us and to tell us what happened, and if

22 something happened to the female jogger, to tell us

23 what happened.

24   Q    And did you then have a further

25 conversation with Antron McCray?

10/24/89

T6-fr

1509
HILDEBRANDT — PEOPLE — DIRECT — LEDERER

1    A        At that point -- just prior to that,
3   Detective Gonzalez came back into the room and  when
4   he  was  back, I had asked Antron to tell us exactly
5   what happened with the female jogger.
6       Q    And -- did Antron McCray then tell you
7   something  about what happened with the female
8   jogger?
9       A    Yes, he did.
10      Q    In substance, can you tell us, please, what
11  did he say happened with respect to the female
12  jogger?
13           MR. JOSEPH:  I object to the form, "in
14           substance."
15           THE COURT:  Give us your recollection
16           of what he said.
17           THE WITNESS:  He said the female
18           jogger was jogging along the reservoir, and
19           they came up and one of the individuals
20           grabbed her.  They knocked her to the
21           ground.  They started kicking her.  He
22           admitted to kicking her.  There came a
23           point where he was holding her down by the
24           left arm, and another individual had
25           removed her clothing.  There come a time

10/24/89

NYCLD_016994

P-APP001769

T6-fr

HILDEBRANDT - PEOPLE - DIRECT - LEDERER          1510

1   

2          when the jogger was struck in the chest and

3          struck over the head with a pipe. He gives

4          the sequence of individuals --

5              MR. JOSEPH:  Objection, Judge.

6              THE COURT:  I'll allow it.  Go ahead.

7              THE WITNESS:  Who jumped on top of her

8          including himself.   I  believe  he  puts

9          himself as the third individual.  As he was

10         on  top,  somebody else was holding her arm

11         down.    After  he  was  finished,  he  was

12         followed  by  one or two other individuals,

13         and when they were finished, they left that

14         area of the park.

15      Q    After Antron McCray made the  statement  to

16  you,  did  there  come a time you put in writing the

17  statement that he had given you?

18      A    Yes.

19              MR. JOSEPH:  I object to the question.

20              THE COURT:  No, I'll allow it.

21      A    Yes, I did.

22      Q    Did you write the statement, or did you and

23  Antron McCray write the statement?

24      A    I wrote it.

25      Q    And would you please describe for the Court

10/24/89

NYCLD_016995

P-APP001770

T6-fr

HILDEBRANDT - PEOPLE - DIRECT - LEDERER                    1511

1

2    how it came about that what he said was put on

3    paper?

4            Did you write the whole thing at once or

5    did you write it in pieces?   did you ask him

6    questions?   Describe to us how it came about that

7    the statement was put into writing?

8        A    After he had admitted to what happened to

9    the female jogger --

10            MR. JOSEPH:   I object, Judge.

11            THE COURT:   I'll allow it.

12            MR. JOSEPH:   That's not responsive to

13            the --

14            THE COURT:   I'll allow it.  Go ahead.

15        A    I told him I was going to write down the

16    chain of events as he relayed them to me.  I

17    repeated the chain of events and had asked him to

18    correct me if I was wrong.  And I wrote down from

19    memory, from what he originally told me.   After I

20    wrote down the statement, I read the statement to

21    him and his parents --

22        Q    Let me stop you for a moment.

23            You just said, "his parents."   Did there

24    come a time that his mother returned to the room?

25        A    Yes, there was.

10/24/89

T6-fr

HILDEBRANDT - PEOPLE - DIRECT - LEDERER   1512

1

2     Q       And would you please tell us, in relation

3     to the writing of the statement, when was it that

4     his mother returned to the room?

5     A       After he admitted to what had happened to

6     the female jogger, Detective -- I believe it was

7     Detective Gonzalez went upstairs and brought Mrs.

8     McCray back into the room.

9     Q     Was that before or after the statement was

10    put in writing?

11    A     Before.

12    Q       I interrupted you.  I think you said you

13    had written out the statement.  What did you do with

14    the statement after you had written it out?

15    A     After I wrote it, I read it to Antron and

16    his parents.

17    Q       As you read it to Antron, did he say

18    anything to you when you read it back to him?

19    A     No, he did not.

20    Q     Did he make any corrections when you read

21    it back to him?

22    A       I believe I made a few corrections as to

23    time and --

24    Q     When you read it back, did either of his

25    parents speak?

10/24/89

NYCLD_016997

P-APP001772

T6-fr

2    A    No, they did not.

3    Q    I ask you to please look at what's been

4    previously marked as People's 12 for identification.

5         (People's 12 handed to witness.)

6    Q    Looking at People's 12 for identification,

7    do you recognize what that is, Detective

8    Hildebrandt?

9    A    Yes.

10   Q    What do you recognize that to be?

11   A    That's the statement that I wrote down

12   after the interview of Antron.

13   Q    And is that statement signed by anyone?

14   A    Yes, it is.

15   Q    Will you please indicate who has signed

16   that statement?

17   A    Antron McCray, Linda McCray, Bobby McCray

18   and myself.

19   Q    And are there any initials on the end of

20   pages one or two of that three page exhibit?

21   A    Yes, there are.

22   Q    And what initials appear at the bottom of

23   the first page of that exhibit?

24   A    A.M., L.M. -- it looks like A.M. -- B.M., I

25   guess. B.M.

10/24/89

T6-fr

1514

HILDEBRANDT — PEOPLE — DIRECT — LEDERER

1

2    Q        Who  initialed pages one and two at the

3    bottom?

4    A    Antron  McCray,  Linda  McCray,  and  Bobby

5    McCray.

6    Q        And  was  this  document signed in your

7    presence?

8    A    Yes, it was.

9    Q    And was it initialed at the bottom of pages

10   one and two in your presence?

11   A    After I read each page.

12   Q    Are there any corrections  that  appear  in

13   any of the lines of pages one, two, or three?

14   A    Yes, there are.

15   Q        Would  you please indicate on the first

16   page, is there any correction or change that appears

17   other than the text?

18   A    Yes, I wrote down on there, "about 9  p.m."

19   and I initialed it.

20   Q        And  how  did  it  come about that that

21   addition or correction was made?

22   A    Well, as I was reading it aloud, I have  on

23   here "Clarence  was at my house and we left," but I

24   didn't have what time he was at the house.

25   Q    When was the  correction  or  the  addition

10/24/89

NYCLD_016999

P-APP001774

T6-fr

HILDEBRANDT - PEOPLE - DIRECT - LEDERER       1515

2   made?

3       A       As I was reading it.

4       Q               And   is   that your handwriting that the

5   addition --

6       A       Yes.

7       Q       On page two are there   any   corrections   or

8   changes or additions?

9       A       Yes.

10      Q       And would you please indicate which change

11  or correction is there?

12      A       I added the word "down."

13      Q       Is that your handwriting?

14      A       Yes, it is.

15      Q       And was that added before the document   was

16  signed and initialed?

17      A       Yes.

18      Q               And the correction on the first page --

19  withdrawn.

20          The addition on the   first   page   where   it

21  says "around 9 p.m." was   that   added before the

22  document was signed and initialed?

23      A       Yes.

24              MS. LEDERER:   Your Honor, at this time

25          I offer People's 12 in evidence.

10/24/89

NYCLD_017000

P-APP001775

COMPLAINT - FOLLOW UP
INFORMATIONAL
PD 313-081A (Rev. 1-86)-31

| | | | | PAGE 1 OF 2 PAGE | |
|---|---|---|---|---|---|
| Jimmy | | Pct 022 | OCCB No. | Complaint No. 281 | Date of This Report 4/20/89 |

| Date of Orig. Rep. t1 4/20/89 | Case Assigned | Case No. 67 | Unit Reporting DBMSTF NIGHTWATCH | Follow-Up No. |
|---|---|---|---|---|

Complainant's Name - Last, First, M.I.
P.S.N.Y.

Victim's Name - If Different
Unidentified F/W/20-30yrs    003055

DETAILS:  COMPLAINT: VICTIM FOUND BEAT AND BOUND INSIDE CENTRAL PARK
SUBJECT: INTERVIEW OF CLARENCE THOMAS M/B/14yrs

1) On this date at 0700hrs the undersigned along with Det Whelpley did
interview  Clarence Thomas M/B/14yrs DOB        of
in the presence of his mother Gloria Thomas who lives at the
address. Clarence Thomas was under arrest at this time so the under-
signed informed him and his mother of there rights from a card. Both
Clarence Thomas and his mother Gloria Thomas acknowledge each right
by stating yes and on the last right they agreed to answer questions
without an attorney present. Clarence Thomas states that he and his
friend Antron Mc Cray who lives on        and goes to JHS 117 (
Exact address unknown) were on E110th St and Madison Ave and they met
approx 15 other males all about 13 to 15 yrs old. Clarence states that
he did not know all of these males but he did know a guy named Polo
who is a M/Ror/B/14yrs and he hangs out on E 110th and Madison , a guy
named Ralph M/B/15yrs who lives in the Taft projects and he knows
Lamont Mc Call ( See DD 5 Det Whelpley Re; Lamont Mc Call). Clarence
states that the group was mixed with blacks and hispanics and that they
all went into the park at E 110th and started walking into the park and
south. Clarence stated that they where just hanging out that there was
no plan on what they were going to do in the park. Clarence states that
they entered the park at approx 2010hrs and he remembers the time
because he knows that he met the group at 2000hrs and it took them
about ten minutes to talk and then walk to the park. Clarence further
states that as they walked thru the park some of the guys were throw-
ing rocks at cars but none of the cars stopped except for a cab (yellow
that did stop but did not chase the group. Clarence also states that
as they walked thru the park ( location unknown) approx eight of the
guys saw a male white40's jogging,who was wearing a sweater and blue
shorts, and thess eight guys started chasing the white but after
a few minutes five of the eight returned to the group stating that the
guy got away.

Continued on page two

Reporting Officer's Rank, Signature - Command
Det                DBMS TF

Name Printed
J. FARRELL

Tax Registry No.
864831

Supervisor's Signature
Sgt.

C.O.'s Initials

Farrell Exh.
4

NYCLD_058353

P-APP001776

COMPLAINT FOLLOW-UP INFORMATIONAL
PD 313-081A (SECOND SHEET) (4-65)-24

| | Pct. | Complaint No. | Date of This Report |
|---|---|---|---|
| | 022 | 281 | 4/20/89 |

DETAILS:      CONTINUED FROM PAGE ONE RE: ASSAULT OF UNIDENTIFIED FEMALE WHITE
INSIDE CENTRAL PARK; INTERVIEW OF CLARENCE THOMAS     003056

) Cont; Clarence does not know what happened to the other three guys who chased
the male white and states that they were guys he did not know by name that
they were friends of Antron Mc Cray. Clarence states that he and the rest of
the group continued south in the park and then at approx the middle of the
park around 96th St about seven of the guys went after and beat up another
jogger at the fence near the reservoir and this was a male white ( Could supply
no further description). Clarence states that he and Antron Mc Cray ran out of
the park and after awhile the other guys came out and they all started walking
north on Central Park West and as they walked a green van turned into the
street and pulled up to the group and one of the guys in the van said that
they were the police and that no one should run but everyone ran any way.
Clarence states that he ran to W 100th St and turned into the park and he tripped
and fell to the ground and the police caught him. Clarence further states that
the others all ran in different directions

) When questioned about anyone else who the group had hit Clarence stated that
there was an old bum who was a male white or hispanic that Lamont Mc Call
had hit with his fist in the back of the bum's head and knocked him to the
ground. Clarence further stated that the only other person he saw in the
park, outside of the three he had mentioned was some people on a bike but
that they did not go after them. Clarence states that the Bumwas in the middle
of the park and that the Bum was wearing a dark blue coat with grayish pants.
When asked if anyone in the group had a weapon Clarence stated that there was
a M/B/ in his teens tall wearing blue jeans with patches all over them and
a beige trench coat and he had a pipe that was approx 14 inches long with one
end taped with black tape. Clarence states that he does not know this tall
male's name but that he saw this male take this pipe out of his pants with his
right hand when they were at the reservoir with the man who had been beat but
he did not see if the tall male hit the male white with the pipe. Clarence
states that he was too far away from the seven guys to see who was hitting the
white male. At this time Clarence was allowed to go home with his mother and
the interview was discontinued

) On this date at approx 1130hrs the undersigned along with Det Whelpley were
at the home of Clarence Thomas and spoke to Clarence's mother first and told her
that Clarence had to be spoken to again. Mrs Thomas invited the undersigned
and Dte Whelpley into her home and then went an woke up Clarence. Mrs Thomas
brought Clarence into her kitchen and he sat down asf did Mrs Thomas and at this
point the undersigned reminded both of them of there rights and again told them
they had the right to have an attorney present before speaking to the police.
Both Mrs Thomas and Clarence agreed to speak to us without an attorney present.
At this timeClarencestated that the pipe he told us about before was passed
back and forth between the tall guy and Antron Mc Cray but Clarence still state
that he did not see either of them hit the guy with the pipe. When asked about
anyone else being beat in the park by this group, Clarence stated that the Bum
Lamont hit but this time Clarence states Lamont beat the Bum with three other
guy's and that they really beat the guy by punching and kicking him then they
draged this Bum off the road and on the the curb and left him there bleeding.
Clarence states he does not know the names of the three guys who beat the Bum
with Lamont by name but that Antron might know them. Clarence and his mother
agreed to show the undersigned where Antron lived and also agreed to come back
to the Central Park Pct with the undersigned. While in auto 8475 Mrs Thomas
directed the undersigned and Det Whelpley to ███████ and stated
that Antron lived in this building in apartment ███████ Det Rosario along with
Dets Rivera and Morin from Sex Crimes went into ██████████████████████
██ and came out with the subject who was identified as Antron Mc Cary and his
mother Linda Mc Cray and his father Bobby MC Cary. Det Rosario informed the
undersigned that he requested Mr and Mrs Mc Cary and Antron to come to the
CPP and they agreed further Det Rosario asked that Antron wear the clothes he
had been wearing before he went to bed and this was also agreed to by both
parents and Antron. When Antron exited the building his clothes where covered
with dried mud and were very dirty. Mr and Mrs Mc Cray and Antron were trans-
ported to the CPP in Sex Crime auto 731 and Mrs Thomas and Clarence were trans-
ported in DBMSTF auto 8475.

INVESTIGATION CONTINUING

| Reporting Officer's Rank/Signature / Command | Name Printed | Tax Registry No. | Supervisor's Signature | C.O.'s Initials |
|---|---|---|---|---|
| Det _[signature]_ DBMSTF | J FARRELL | 864831 | Sgt. | |

CRIMINAL RECORDS SECTION

NYC062950

NYCLD_058354

P-APP001777

T1-1f

321

1  SUPREME COURT OF THE STATE OF NEW YORK

2  COUNTY OF NEW YORK : CRIMINAL TERM : PART 59

3  THE PEOPLE OF THE STATE OF NEW YORK

4            -against-

5  RAYMOND SANTANA, KHAREY WISE, YUSAF SALAM,
   ANTRON McCRAY, KEVIN RICHARDSON, STEVE LOPEZ,
6  MICHAEL BRISCO,

7            Defendants.

8            October 13, 1989

9  B E F O R E:

10           HONORABLE THOMAS B. GALLIGAN, J.S.C.

11           (Appearances as heretofore noted)

12      *        *        *        *        *

13           COURT CLERK:  Indictment 4762 of 1989,

14  Kharey Wise, Yusaf Salam, Antron McCray,

15  Kevin Richardson, Steve Lopez, Michael

16  Brisco, and Raymond Santana; continued

17  hearing.

18           (Whereupon, counsel for the defendants

19  gave their appearances.)

20           THE COURT:  Are we ready to resume?

21  It is now 10:25. This matter was set down

22  for 10:00. The usual starting time is

23  9:30. I agreed to start at 10:00 for

24  counsel's convenience so they could take

25  care of other matters.  I would advise

10/13/89

P-APP001778

T 1—1 f

322

**COLLOQUY**

1
2  counsel to be here at the time scheduled,
3  10:00 in the morning.
4       Ready to proceed?
5       MS. LEDERER: Yes, your Honor.
6       Prior to calling People's next
7  witness, Officer Reynolds, there is
8  additional Rosario materials to be turned
9  over. And I have prepared a packet of the
10 pages for each attorney: one page of hand-
11 written notes for Officer Reynolds; one
12 page, hand-written copy of UF—61, the typed
13 copy having been turned over; on-line
14 booking sheet, one copy of which has been
15 turned over already. (Handing to Defense
16 Counsel)
17      MR. MOORE: Your Honor, my only
18 request is that in the future, the District
19 Attorney not release documents on an
20 installment basis, but to do it at one
21 particular time so that we may maintain the
22 flow and logic of preparation.
23      THE COURT: Okay. Who is your next
24 witness?
25      MS. LEDERER: Officer Reynolds.

10/13/89

NYCLD_023068

P-APP001779

T 1 - 1 f

1          COLLOQUY

2  P.  O.  E R I C  R E Y N O L D S,  Shield  17510,

3       Twenty-third  Precinct  Robbery  Unit, New York

4       City Police Department, called as a witness  by

5       the  People,  having  been  first  duly  sworn,

6       testified under oath as follows:

7            COURT  OFFICER:  In  a  loud,  clear

8       voice, state your full name for the record,

9       spelling  your  last  name;  your  shield

10      number, and present assignment.

11           THE  WITNESS:  Police  Officer  Eric

12      Reynolds;  R-E-Y-N-O-L-D-S;  Shield  17510,

13      23rd Precinct Robbery Unit.

14           THE COURT:  All right.

15  DIRECT EXAMINATION

16  BY MS. LEDERER:

17     Q     Officer Reynolds, on April 19, 1989,  where

18  were you assigned?

19     A     Central Park Anti-Crime Unit.

20     Q     What tour of duty were you working on that

21  day?

22     A     Four p.m. to midnight.

23     Q     And did you have  a  particular  assignment

24  within the Central Park Precinct?

25     A     Yes, Anti-Crime duties.

10/13/89

T1—1f

324

REYNOLDS — PEOPLE — DIRECT — LEDERER

1
2  Q    What are the duties of the Anti-Crime unit?
3  A         That is to make arrests for any kind of
4  crimes   in   progress   while   working   in   civilian
5  clothes.
6  Q    Does that mean you don't work in uniform?
7  A    That's correct.
8  Q    And that night of April 19, 1989, were you
9  working on foot, or were you in a vehicle?
10  A    I was in a vehicle.
11  Q    What type of vehicle were you in?
12  A    It was a green  Parks  Department  vehicle.
13  It was a van.
14        MR. MADDOX:  I can't hear.
15        THE   COURT:    Green   Parks Department
16        vehicle.
17  Q    Did you work with a partner on that date?
18  A    Yes, I did.
19  Q    Who was your partner?
20  A    Police Officer Powers.
21  Q    Did there come a time  on  the  evening  of
22  April  19, 1989 that you heard a radio communication
23  regarding activity in Central Park?
24  A    Yes.
25  Q         At  what  time  did  you  hear  such  a

10/13/8

NYCLD_023070

P-APP001781

T1-1f

325

REYNOLDS - PEOPLE - DIRECT - LEDERER

1
2   communication?
3       A      It was approximately 9:30.
4       Q      What was the radio communication that you
5   heard at that time?
6       A      Disorderly males  in  the  park,  harassing
7   people.
8       Q         WHen  you heard that communication, was
9   there a  communication  give  for  where  that  this
10  orderly group was?
11      A       It was approximately, I believe, the west
12  side of 100th Street.
13      Q      Do you recall where you were when you heard
14  that?
15      A      I believe I was on Central Park West headed
16  northbound.
17      Q      Where did  you  go  after  you  heard  that
18  communication?
19      A      The north end of the park.
20      Q      Who was driving that night?
21      A      Officer Powers.
22      Q        When you say you went to the north end of
23  the park, where did you go?
24      A      We went to the location specified.  We went
25  in that area to canvas.

10/13/89

NYCLD_023071

P-APP001782

T1—1f

326

REYNOLDS — PEOPLE — DIRECT — LEDERER

1

2      Q      What area did you go to?

3      A      The East Drive —— West Drive up on the

4 north end, around 102nd Street.

5      Q      Do you recall whether you went to the east

6 side or the west side?

7      A      I started at the west side, and went from

8 the west to the east side.

9      Q      Were you directed to go to the east side?

10      A      Yes, I believe so, yes.

11      Q      When you say you were canvassing the area,

12 what does that mean?

13      A      It means we were searching for people

14 described in the radio run.

15      Q      What route did you take to go to the

16 location of the East Drive on 102nd Street?

17      A      We went north on Central Park West and then

18 into the park.

19      Q      Where did you go into the park?

20      A      I believe it was either 90th Street or

21 100th Street.

22      Q      And when you entered the park, did you

23 drive on the roadway or any of the paths?

24      A      We did both.   We traveled along the

25 roadways, and then we went along some of the paths.

10/13/89

T1-1f

327

REYNOLDS — PEOPLE — DIRECT — LEDERER

1

2     Q          Did you arrive at the East Drive in the
3  area of 102nd Street?

4     A     Yes.

5     Q     What, if anything, did you see at that
6  location?

7     A     Really nothing in the beginning.

8     Q          Did you see anything resembling the
9  disorderly group?

10    A     No.

11    Q     Did you see any police vehicles?

12    A     Yes.

13    Q     Do you recall what you saw?

14    A     I saw a couple -- several Central Park
15  Police vehicles and vehicles from the 23rd Precinct,
16  and the Manhattan North Task Force.

17    Q     Were those marked radio cars?

18    A     Yes.

19    Q          Did you have a conversation with any of
20  those people?

21    A     I had a couple of conversations, yes.

22    Q     At that time when you first arrived, did
23  you speak to any of these people?

24    A          We might have had a passing conversation,
25  you know, just asking if anybody had seen anything.

10/13/89

NYCLD_023073

P-APP001784

T1-1f

328

REYNOLDS — PEOPLE — DIRECT — LEDERER

MR. MADDOX:   Object (inaudible).

THE   COURT:   Just   tell   us   what conversation you had.

THE   WITNESS:   I asked if anybody had seen anything.

Q   What did the people you spoke to say?

A   Nobody had seen anything at that point.

Q   The first communication you heard, did that give any kind of description in the park?

A   I believe it was seven to eight males,  the very first one.

Q   Did it give any description, race?

A   I believe it was male blacks.

Q   Are you sure?

A   I'm not quite sure.

MR. MADDOX:   Objection, your Honor.

MR. RIVERA:   Objection.

THE COURT:   I will allow it.

Are you sure?

THE WITNESS:  No, I'm not sure.

Q   Did you hear any other radio communication after that first communication?

A   Yes.

Q   What was that communication?

10/13/8?

T1—1f

329

REYNOLDS — PEOPLE — DIRECT — LEDERER

1   A    That there were approximately, I believe,

2   20 to 30 male blacks harassing and assaulting people

3   in the park.

4   Q        And do you recall at approximately what

5   time you heard that radio communication?

6   A    Do you mind if I look at my notes to

7   refresh my memory?

8           THE   COURT:   If you have to, you may.

9           Just tell us what you are using to refresh

10          your recollection.

11          THE   WITNESS:   It is a piece of paper

12          that I wrote down with the, you know, the

13          times.

14          MR.   BERMAN:   Judge, if I may, this

15          speaker, even when there's no talking,

16          makes such a loud noise we can't hear your

17          Honor talking.

18  A    It was about a quarter to ten.

19  Q    And do you recall where you were when you

20  heard that communication?

21  A    Well, I was in the north end of the park.

22  It might have been at 102nd Street and the East

23  Drive.

24  Q    How long did you stay at 102nd Street and

10/13/89

P-APP001786

T1-1f

330

REYNOLDS — PEOPLE — DIRECT — LEDERER

1   the East Drive?

2   
3   A     Not long.

4   Q         After  you  received  that  second

5   communication, where did you go?

6   A     Again, we --

7            MR. MOORE:  Objection.

8            THE COURT:  No, I'll allow it.

9            Go  ahead.   He was with somebody, he

10           already said that.

11  A     (Continuing)  We started to ride around the

12  park again to do a further canvas.

13  Q     What area of  the  park  were  you  driving

14  around in?

15  A     The north end.

16  Q         Would you indicate did you drive on the

17  road or paths?  Where did you go?

18  A     We did both.  We tried  to  concentrate  on

19  the paths because we didn't see anything.

20           THE  COURT:   You  can tell us where,

21           when you say "we" you  are  talking  about

22           driving around in the car; but tell us only

23           what  you  saw,  talking about what you saw

24           unless somebody said something.  All right.

25  Q     Did you see anything during the  time  that

10/13/89

NYCLD_023076

P-APP001787

T2-fr

331

REYNOLDS — PEOPLE — DIRECT — LEDERER

1
2          you were driving around the north end of
3          the park?
4      A   No.
5      Q   When you referred to the north end of the
6          park, from what street north were you
7          canvassing?
8      A   North of 96th Street.
9      Q   Can you describe in a general way what
10         route you took?
11     A   In canvassing?
12     Q   Yes.
13     A   We went through all the foot paths and --
14         you know, all the routes we could to go
15         through all the dark areas, and, you know,
16         part of the park that weren't visible.
17     Q   At any time did you see anybody or any
18         group that resembled what you had heard on
19         the radio?
20     A   In the beginning, no.
21     Q   And did you hear any other radio
22         communications while you were canvassing
23         the north end of the park?
24     A   Yes.
25     Q   What was the next radio communication that

10/13/89

T2-fr

332

REYNOLDS — PEOPLE — DIRECT — LEDERER

1
2          you heard?

3     A    We  got  --  I  heard  our  sergeant  -- my

4          sergeant  from  Anti-Crime  had  a  possible

5          group  over  at  100  Street  and  the  West  Drive

6          in  the  playground.

7     Q    What  is  your  sergeant's  name?

8     A    Sergeant  Lyle.

9     Q    What  did  you  do  when  you  heard  that

10         communication?

11    A    We  responded  to  the  area  where  he  was.

12    Q    Approximately  what  time  was  it  that  you

13         arrived  at  that  playground?

14    A    That  was  about  a  quarter  to  ten,  10:00.

15    Q    Did  you  have  a  conversation  with  Officer

16         Alvarez  at  that  location?

17    A    Yes,  I  did.

18    Q    Did  he  tell  you  whether  he  had  seen

19         anything  in  the  park?

20    A    Yes.

21    Q    What,  if  anything,  did  Officer  Alvarez  tell

22         you?

23    A    He  told  me  he  saw  a  group  of  youths  and

24         when  they  saw  the  radio  car,  they  all  ran.

25    Q    Did  he  describe  the  number  of  the  people  in

10/13/89

NYCLD_023078

P-APP001789

T2-fr

333

REYNOLDS — PEOPLE — DIRECT — LEDERER

1
2      the group?
3  A   He said he saw about seven to ten of them.
4  Q   Did he indicate that he had seen a larger
5      group?
6          MR. MOORE:  Objection.
7          MR. RIVERA:  Objection.
8          MR. JOSEPH:  Objection.
9          MR. BURNS:  Objection.
10         MR. DILLER:  Objection.
11         MR. BERMAN:  Objection.
12         MR. MADDOX:  Objection.
13         THE COURT:  Sustained.  Let him
14     testify.
15 Q   What else did he tell you about the people
16 he saw?
17 A       He stated they were male blacks and
18 Hispanics and they were in their teens.
19 Q   Did he tell you where he had seen the
20 group?
21 A    I believe he said he saw them on the east
22 side.
23         MR. MOORE:  Objection.
24         THE COURT:  I'll let him answer.
25 Q   Was he able to tell you whether it was in

10/13/89

T2-fr

334

REYNOLDS — PEOPLE — DIRECT — LEDERER

1
2  or out of the park?

3      A     He said it was inside the park.

4      Q         Did he tell you what time it was that he
5  had seen them?

6      A     That I don't recall.

7      Q     Did he say anything about the gender or the
8  sex of the people he had seen?

9      A     Yes, he said   they   were   male   blacks   and
10 Hispanics.

11     Q     Did you have a conversation -- withdrawn.

12         How  long did you stay at the playground at
13 100 Street?

14     A     Not long, just long enough to   --   for   the
15 show-up and to get a description from Police Officer
16 Alvarez and then we resumed canvassing.

17     Q         Where  did  you  go  when you left that
18 location?

19     A     Again we stayed in the  north  end  and  we
20 went  through  all  the  trails and the inaccessible
21 parts of the park.

22     Q     How long did you drive around in the park?

23     A     About another half-hour.

24     Q     Did you hear  another  radio  communication
25 after  you had been at the playground where Sergeant

10/13/89

NYCLD_023080

P-APP001791

T2-fr

335

REYNOLDS - PEOPLE - DIRECT - LEDERER

Lyle was?

A     Yes.

Q     What was the communication that you heard then?

A       That there was a male jogger found beaten and bleeding profusely from his head.

Q     Where was that -- was there a location with respect to where that jogger was found?

A     Yes. That was 96th Street, I believe, approximately, and the West Drive off the reservoir.

Q         Where were you when you got that communication, if you recall?

A     I believe we were at the East Drive again and 102nd Street.

Q     Did the communication given with respect to that jogger contain any information about any people?

A       He stated there was a group of male Hispanics and Blacks who had assaulted the jogger.

Q     Was there any further information about the assault?

A     Yes, that they had fled north.

Q         What, if anything, did you do after you heard that information?

10/13/8

NYCLD_023081

P-APP001792

T2-fr

336

REYNOLDS — PEOPLE — DIRECT — LEDERER

1

2    A    At that point I decided to leave the park
3  and to start the canvas outside at Central Park West
4  at 100 Street.

5    Q    Where did you leave the park?

6    A        We left at 100th Street and Central Park
7  West.

8    Q    Why did you leave the park at that time?

9    A    Because I felt that the group was no longer
10 in the park.  We had canvassed for quite a while and
11 the entire park was saturated with police vehicles.

12   Q    Did you see other vehicles in the park
13 other than those you refer to at the East Drive and
14 102nd Street?

15   A    Other than what I described earlier?

16   Q    During the time you were canvassing the
17 park, other than what you already told us at the
18 East Drive and 102nd Street, did you see any other
19 police vehicles in the park?

20   A    Just what I mentioned.

21   Q    And when you were canvassing the north end
22 of the park, did you see any sign of other police
23 vehicles?

24   A    Yes.

25   Q    What did you see?

10/13/89

NYCLD_023082

P-APP001793

T2-fr

337

REYNOLDS — PEOPLE — DIRECT — LEDERER

1

2    A       As I was going through the fields, I could

3    see further north of me the headlights of the  other

4    vehicles going back and forth also in search for the

5    group.

6            MS.  LEDERER:   With the permission of

7            the Court, I'd ask the witness  to  please

8            step   down   and   approach  People's  7  in

9            evidence.

10           (Witness complies)

11   Q    Would you please point  on  People's  7  in

12   evidence  and  describe  as you do, what area you're

13   possibly  pointing  to,  indicate  where  you  were

14   traveling  and  where you would see the other lights

15   from other vehicles?

16   A    We saw the other lights --

17           THE COURT:  Excuse me, Officer, I have

18           to remind you to speak as loud as  you  can

19           because  everybody over on this side has to

20           hear you, and it is very difficult in  this

21           courtroom.

22           THE WITNESS:  Okay.

23           I saw headlights from the other police

24           cars   going   east  and  west  across  the

25           ballfields here on the north end.   I   was

10/13/89

NYCLD_023083

P-APP001794

T2-fr

338

REYNOLDS - PEOPLE - DIRECT - LEDERER

1
2          south   of   them   and   I could see them -- I
3          could see that the ballfields in this   area
4          was   pretty well saturated with police cars
5          and there was probably no   group   in   there
6          because somebody would have seen --
7                    MR.  MADDOX:    Also describe the area
8          that he just referred to on the map.
9                    THE COURT:   Yes,  if  there  is  some
10         legend  on that map that describes the area
11         that you're in, please tell us what it   is.
12         I  see  there  is some writing on that map.
13         If you could tell us what it was, the   area
14         that you say you were driving in.
15                    THE    WITNESS:    This   is   the   north
16         meadow, and it contains   several   baseball,
17         softball,  and  a  football  field  and  we
18         again, like I  said,  I   had   seen   several
19         radio  cars  going  back and forth and they
20         pretty well had the whole area covered.   If
21         there was any group in there --
22                    MR. BURNS:  Objection.
23                    MR. MOORE:  Objection.
24                    THE COURT: Yes, don't speculate, just
25         tell us what you saw.

10/13/89

NYCLD_023084

P-APP001795

T2-fr

339

REYNOLDS — PEOPLE — DIRECT — LEDERER

1

2        THE WITNESS: I saw the police cars

3     going back and forth and they had the area

4     well covered.

5    Q   Where did you go --

6        MR. BURNS:   I'm sorry.   For the

7    record, the record should reflect the area

8    of the North Meadow.

9        THE COURT:  He covered the whole area

10    of the North Meadow.

11   Q   When you stated earlier that you decided at

12 this time to leave the park, will you point out the

13 route you took to enter the park?

14   A   We left here at 100 Street, going west

15 towards Central Park West.

16   Q   What time was it, approximately, when you

17 were leaving Central Park?

18   A   It was approximately 10:30.

19   Q   What, if anything, did you see as you left

20 Central Park at 100 Street?

21   A   Okay.  When we got to Central Park West at

22 100th Street, just north of us, between 101st Street

23 and 102nd, on the west side of the street, we saw a

24 group of about 10, 15, male blacks and hispanics.

25 They were teenagers.

10/13/89

NYCLD_023085

P-APP001796

T2-fr

340

REYNOLDS - PEOPLE - DIRECT - LEDERER

1
2      Q     What, if anything, did you do when you   saw
3   that group?
4      A       What we -- what I did was we started to
5   drive northbound towards them to get a   better   look
6   at the group.
7      Q     What side of the street were they on?
8      A     They were on the west side of the street.
9      Q     And when you were driving, what side of the
10  street were you driving on?
11     A     I was on the east side going northbound.
12     Q       What, if anything, happened as you went
13  northbound on Central   Park   West   approaching   that
14  group?
15     A       Well, we saw the group.  They were all --
16  you know, walking together.   We felt reasonably sure
17  that they didn't --
18             THE COURT:  It's not what you felt.
19             THE WITNESS:  I felt  reasonably   sure
20         they didn't know who we were.
21             MR. RIVERA:  Objection.
22             MR. BURNS:  Objection.
23             MR. MOORE:  Objection.
24             MR. JOSEPH:  Objection.
25             MR. MADDOX:  Objection.

10/13/89

NYCLD_023086

P-APP001797

T2-fr

341

REYNOLDS - PEOPLE - DIRECT - LEDERER

1

2     MR. DILLER:  Objection.

3     MR. BERMAN:  Objection.

4     THE  COURT:    I'll  allow  that.   Go

5  ahead.

6     THE  WITNESS:  At one point  the  group

7  had stopped --

8     MR.  RIVERA:    I  didn't  hear  the

9  statement he didn't feel reasonably what?

10     THE COURT:  Did not make out who  they

11  were.

12  Q     Continue.

13  A     The group at one point stopped and they all

14  started  to   look our way and started to point at us

15  in the van, and I couldn't  understand  why  because

16  nobody wouldn't really --

17     MR. MOORE:  Objection.

18     THE COURT:  Finish your answer.

19     THE  WITNESS:   Nobody generally makes

20  who we were.

21     MR. MOORE:  Objection.

22     THE COURT:  Objection sustained.

23     Don't tell us  what  people  generally

24  do.  Just tell us what happened here.

25     THE  WITNESS:  What I did was I looked

10/13/89

NYCLD_023087

P-APP001798

T2-fr

REYNOLDS – PEOPLE – DIRECT – LEDERER                342

1

2        to our right and a marked police three-

3        wheel scooter was on our right hand side

4        and that's what panicked them.

5              MR. MOORE:  Objection.

6              MR. MADDOX:  Objection.

7              THE COURT:  Sustained.  Just tell us

8        what you saw.

9    Q       When you looked and saw in your sideview

10   mirror a scooter, where was this scooter?

11   A       Right alongside the van on my side.  It was

12   on the other side of us, from the group.

13   Q       Who was on that scooter?

14   A       Police Officer Flores.

15   Q       What did you do when you became aware  that

16   Police Officer Flores was pulling up besides you?

17   A              Well, I felt -- it looked like the group

18   was going to run to me.

19              MR. MOORE:  Objection.

20              MR. JOSEPH:  Objection.

21              THE COURT:  I'll allow it,  go  ahead-

22        Finish.

23              THE WITNESS:  And I told my partner to

24        take  the  van and pull it up ahead of them

25        to cut them off so we can stop them.

10/13/89

T2-fr

343

REYNOLDS — PEOPLE — DIRECT — LEDERER

1

2    Q    And did the van pull up?

3    A    Yes.

4    Q    Where did the van go?

5    A    Okay. My partner pulled up the van to

6    102nd Street and CPW, Central Park West on the

7    southwest corner.

8    Q    WHen you say the van was pulled up on the

9    southwest corner of 102nd and Central Park West, can

10   you describe exactly what position it was in in

11   relation to the sidewalk and the street of 102nd

12   Street?

13   A    Okay. The van was facing west with the

14   headlights facing west towards the building. Then

15   my partner and myself got out of the van, we

16   identified ourselves. AT that point the group

17   started to run except for two. Those two were

18   Raymond Santana and Steve Lopez.

19              MR. MOORE:    Not responsive to the

20         question.

21              THE COURT:  I'll allow it.

22   Q    When you say you got out of the van -- let

23   me just go back for a second. The van that you were

24   describing, what color is the van?

25   A    Green.

10/13/89

T2-fr

344

REYNOLDS - PEOPLE - DIRECT - LEDERER

1

2    Q     Are there any windows in the  back  portion

3 of the van?

4    A        In the back two doors -- I'm sorry, there

5 are no windows in it.

6    Q     Are there any side panels?

7    A     I don't believe so.

8    Q     Does it have any insignia?

9    A     Yes, Parks Department emblem on the front.

10    Q     When the van pulled into the  beginning  of

11 102nd Street and Central Park West, you say you both

12 jumped out.  What exactly did you say?

13    A        We identified ourselves as police and we

14 told them not to run.

15    Q     What happened when you said, "Don't run?"

16    A     The group started to run.

17    Q     And what did you do when the group  started

18 to run?

19    A     We got out of the van and we approached the

20 two defendants that had stayed on the corner.

21    Q        And you just named the names of those two

22 people.  Did you at the time that you  stopped  them

23 know their names?

24    A     Not at that time, no.

25    Q        What,  if  anything,  happened when you

10/13/89

NYCLD_023090

P-APP001801

T2-fr

345
REYNOLDS — PEOPLE — DIRECT — LEDERER

1
2  stopped those two?

3      A    We placed them against the wall.

4              MR. MADDOX:   Objection, Judge.    He

5          didn't   stop   them.    They   were   already

6          stopped.

7              THE COURT:   Yes.   Objection sustained.

8      Q    What happened when you approached those

9  two?

10     A         We   placed   them   against   the   wall   and

11  searched them.

12     Q    Did you have your gun drawn   when   you   got

13  out of the van?

14     A    No.

15     Q      When you say you placed them against the

16  wall, what exactly did you do?

17     A    We gave them a pat down of their clothes in

18  case they had weapons on them.

19     Q    Did you find any weapons?

20     A    No.

21     Q    What was the next thing that happened?

22     A     My   partner,   Police   Officer   Powers   and

23  Police Officer Flores chased the group.

24     Q     Did the two people that you placed against

25  the wall,   Raymond   Santana   and   Steve   Lopez,   did

10/13/89

T2-fr

346

REYNOLDS — PEOPLE — DIRECT — LEDERER

1
2    either of them say anything to you?
3        A    Yes.
4        Q    What, if anything, did they say to you?
5        A      Let's see.  Raymond Santana stated he had
6    just come from his  girlfriend's  house  and  didn't
7    state where or when.
8              MR. JOSEPH:  Objection.
9              THE  COURT:   Don't  tell  us what he
10             didn't said.  Just tell us what he did say.
11             THE WITNESS:  Steven Lopez  stated  he
12             just  came  from  the  movies  with  his
13             girlfriend  and  they  watched  the    movie
14             "Leviathan".
15       Q      Did either of them say anything about the
16   rest of the group?
17       A    They stated they weren't with the group and
18   Steven Lopez stated, I quote, "The group had   talked
19   shit about ripping them off."
20             MR. MADDOX:  I can't hear.
21             THE COURT:  Who said that?
22             THE WITNESS:  Steven Lopez.
23             THE COURT:  Stated what?
24             THE  WITNESS:   They were not with the
25             group and the group had talked -- I  quote,

10/13/89

T2-fr

347

REYNOLDS — PEOPLE — DIRECT — LEDERER

1  "Talked shit about ripping them off."

2  Q    When I asked you a moment ago did either of

3  those  two  people  say anything with respect to the

4  rest of the group I believe your answer began, "They

5  said," could you tell us exactly what either one  of

6  them said indicating by name what that person said?

7  MR.  MOORE:   Objection.   Asked and

8  answered.

9  THE COURT:  I'll allow it again.

10  THE WITNESS:  They  both  stated  that

11  they weren't with the group and they didn't

12  know  any of the others that had run.   They

13  stated that they were walking ahead of them

14  and ——

15  MR. RIVERA:   Objection,  your  Honor,

16  not responsive.

17  THE COURT:  Yes, objection sustained.

18  Q    Can you tell us what Raymond Santana said

19  to you when he  was  stopped  at  102nd  Street  and

20  Central Park West?

21  A    Raymond Santana said he wasn't with the

22  group and he had just  come  from  his  girlfriend's

23  house.

24  Q    What, if anything, did Steven Lopez say at

10/13/8

NYCLD_023093

P-APP001804

T2-fr

348

REYNOLDS - PEOPLE - DIRECT - LEDERER

1

2   that time?

3       A    He stated he also was not with  the  group,

4   that  he  had just come from his -- he had just come

5   from the movies with his girlfriend and they watched

6   the picture "Leviathan" and he also  stated,  and  I

7   quote, "Talked  shit  about  ripping off -- ripping

8   them off."

9       Q    Did  you  ask  either  Defendant  Lopez  or

10  Defendant Santana any questions?

11      A    No.

12      Q    When you saw this group, could you describe

13  how  the  group was in relation to the other members

14  of the group?

15      A    The two --

16               MR. BERMAN:  Object as to form.

17               THE COURT:  What is your question?

18      Q    When you saw the group walking  on  Central

19  Park  West,  would  you describe the relation of the

20  group with one to the other?

21      A    It was a  homogenized  group.   They  were

22  altogether  and  they  were  all walking northbound.

23  They were male Blacks, teenaged and Hispanics.

24      Q    When you saw the group on the west side  of

25  the  street,  approximately how much of the block was

10/13/89

P-APP001805

T2-fr

349
REYNOLDS — PEOPLE — DIRECT — LEDERER

1
2 taken up by the members of the group?

3    A    Maybe a quarter of the block.

4    Q    And where were Defendant's Lopez and
5 Santana, if you remember, in relation to the others
6 in the group?

7    A    They were in the group because the group
8 was altogether.

9    Q    What, if anything, happened after Lopez and
10 Santana made those statements to you?

11    A    My partner, Police Officer Powers chased
12 the rest of the group with Police Officer Flores.

13    Q    Where did you see him go?

14    A    I saw him running southbound on Central
15 Park West and then west on 101st Street.

16    Q    Did you see where he went when he turned
17 onto that street?

18    A    When he turned west, I lost sight of him?

19    Q    Officer Reynolds -- I'm sorry --

20    A    And then I saw him again running back east
21 and the group was ahead of him and they ran into the
22 park, and he ran into the park after them.

23    Q    Approximately how much time elapsed between
24 the time you saw him disappear from your sight going
25 down the street until you saw the group coming back

10/13/8?

NYCLD_023095

P-APP001806

T2-fr

350

REYNOLDS — PEOPLE — DIRECT — LEDERER

1   with him, chasing?

2   A    Just seconds.

3   Q    Did you then see Officer Powers -- go  into

4   the park?

5   A    Yes, I saw him run and jump over the wall

6   into the park after the defendants.

7            MR. MADDOX:  Objection to "after  the

8        defendants."

9            THE  COURT:   Yes, Objection sustained

10       as to "after the defendants."

11  Q    Did you see how many people were running in

12  front of Officer Powers?

13  A    It looked to be about ten.

14  Q    And you said that they entered the park, do

15  you know where it was that they entered the park?

16  A    It was over the wall and  at  Central  Park

17  West and 101st Street, between 101st and 100.

18  Q    And is that where you saw Officer Powers

19  enter the park?

20  A    Yes.

21  Q    Let me just stop you for  a  moment.   The

22  area  on Central Park West, near 101st and 102nd, to

23  your knowledge are there any movie theaters in  that

24  area?

10/13/89

NYCLD_023096

P-APP001807

T2-fr

351

REYNOLDS — PEOPLE — DIRECT — LEDERER

1

2    A    No, there isn't.

3    Q        Are there any community centers in that

4  area?

5    A    No-

6            MR. MADDOX:   Judge, may I ask if he

7        could repeat the question and answer?

8            THE   COURT:   Read   the   question and

9        answer back, please.

10           (Reporter complies)

11   Q    Are there any stores on Central  Park  West

12 in that area?

13   A        No.  There's just a grocery store further

14 down, but it's very small north of where they were.

15   Q    After you lost sight of Officer Powers when

16 he went into the park, what was the next thing  that

17 happened?

18   A     I stood on the corner with Raymond Santana

19 and Steven Lopez.

20   Q    Did you handcuff them?

21   A    No.

22   Q    And where was the van?

23   A    The van was right where we left it on 102nd

24 Street and Central Park West-

25   Q    Did either of them say anything further  to

10/13/8⁹

T2-fr

352

REYNOLDS — PEOPLE — DIRECT — LEDERER

1
2    you?

3       A       They just kept stating that they were not
4    with the rest of them.

5       Q       When you say they kept saying that, who
6    kept saying that?

7       A       Steve Lopez and Raymond Santana.

8       Q       And did you ask them any questions?

9       A       No.

10      Q       Did you have your radio with you?

11      A       Yes, I did.

12      Q       Did you hear communications coming over the
13   radio?

14      A       Yes.

15      Q        Did there come a time when someone came to
16   where you were with Santana and Lopez?

17      A       Yes.

18      Q       Approximately what time was that?

19              THE WITNESS:  May I look at  my  notes
20       to refresh my memory?

21              THE COURT:  If you have to.

22              (Witness peruses notes)

23      A       It was approximately a quarter to eleven.

24              THE COURT:  And what happened at about
25       a quarter to eleven?

10/13/89

NYCLD_023098

P-APP001809

T3-1f

353

REYNOLDS - PEOPLE - DIRECT - LEDERER

1.    THE    WITNESS:    Sergeant   Wheeler and
      Police Officer Morales  pulled   over   after
      the  call  over  the  radio  for a unit  to pick
      up  the  two.

6   Q    What  happened  when  they  responded?

7   A    They  responded  over  and  we  placed  them  into
the car.

9   Q    Placed  whom  in  the  car?

10  A    Steven  Lopez  and  Raymond  Santana.

11  Q    And  what  did  you  do  at  that  point?

12  A    I  went  with  Police  Officer  Powers  into   the
van,  and  we  drove  back  to  100  Street  and  Central
Park  West  to  confer  with  our  sergeant.

15  Q    When  Raymond  Santana  and  Steve  Lopez   were
put  in  the  car  with  the  sergeant,  did  you  see  where
they  went?

18  A    They  went  to  100  Street   and   Central   Park
West.

20  Q    And  when  you  arrived  at  100  Street  and
Central  Park  West,  were  Raymond  Santana   and   Steve
Lopez  there?

23  A    Yes.

24  Q    Were  they  in  the  car  or  outside  of  the  car?

25  A    They  were  in  the  car.

10/13/89

NYCLD_023099

P-APP001810

T3-1f

354

REYNOLDS — PEOPLE — DIRECT — LEDERER

1

2      Q       And at what corner of that intersection
3    were you at?

4      A     The northeast corner.

5      Q     When you arrived at that location, who  did
6    you arrive with?

7      A     Police Officer Powers.

8      Q     And who was already at that location?

9      A       Sergeant Lyle and Police Officer Hennigan
10   and the other officers.

11     Q     And did you see anybody  in  custody  other
12   than Raymond Santana and Steve Lopez?

13     A     Yes.

14     Q     Who did you see at that time?

15     A       I saw Kevin Richardson, Lamont McCall and
16   Clarence Thomas.

17     Q     Where did you see them?

18     A     In the back of the radio car.

19     Q     Were all three in the same radio car?

20     A     I believe so.  I'm not sure.

21     Q     Was there a discussion at  100  Street  and
22   Central Park West?

23     A     Yes, there was.

24     Q     And what was the nature of the conversation
25   had there?

10/13/89

NYCLD_023100

P-APP001811

T3—1f

355

REYNOLDS — PEOPLE — DIRECT — LEDERER

1

2      A      I discussed with our sergeant -- I was told
3  that three of the defendants had made statements.

4                  MR. MOORE:  Objection.

5                  THE COURT:  I will allow it.

6      A          I   was   told   three defendants had made
7  statements placing themselves at the attack   of   Mr.
8  Loughlin at 96th Street.

9      Q      Who told you that?

10     A          I was told that by Police Officer Powers
11  and Sergeant Lyle.

12     Q      And at that time was there a discussion   at
13  100 Street and Central Park West?

14     A      Yes.

15     Q      Was there a discussion about doing a show—
16  up?

17     A      Yes.

18     Q      And   was   a   show—up   conducted   with   John
19  Loughlin at that time?

20     A      No.

21     Q          How long did you stay at 100 Street and
22  Central Park West?

23     A      I'd say about   ten   minutes;   ten,   fifteen
24  minutes.

25     Q      During that time were you out of the van or

10/13/89

T3-1f

356

REYNOLDS - PEOPLE - DIRECT - LEDERER

1  were you in the van?

2      A    I was out of the van.

3      Q       And  at any time while you were at that

4  location, were you in a car with any of  the  people

5  that had been taken into custody?

6      A    No, I wasn't.

7      Q    What was the next thing that happened?

8      A    We drove to the Central Park Precinct.

9      Q    When you say "we drove" how did you get to

10  the Central Park Precinct?

11      A    I  went  in  the  green  Parks  Department

12  vehicle.

13      Q    Did anyone ride with you?

14      A    Yes, Police Officer Powers.

15      Q    Did you see where Raymond Santana and Steve

16  Lopez  were  at  the  time you left 100th Street and

17  Central Park West?

18      A    They were in the radio car, I believe, with

19  Sergeant Wheeler.

20      Q    And the other three people  you  mentioned,

21  where were they?

22      A        I believe they were with another set of

23  officers.  I don't recall specifically who it was.

24      Q    Were any of those five people taken out  of

10/13/89

T3-1f

357

REYNOLDS — PEOPLE — DIRECT — LEDERER

1

2  the car at 100 Street and Central Park West?

3      A    I don't believe so, no.

4      Q    How long did it take you to get from 100th

5  Street and Central Park West to the Central Park

6  Precinct?

7      A    I'd say about five minutes.

8      Q    And what did you see -- withdrawn.

9           What time was it that you arrived at the

10 Central Park Precinct?

11     A    It was approximately 12:00.

12     Q    I'm sorry.

13     A    Approximately 12 midnight.

14     Q    Are you sure it was midnight when you

15 arrived?

16          (Whereupon all Defense Counsel made an

17          objection to the question by the District

18          Attorney.)

19          THE COURT:    The objection is

20          sustained.

21     Q    What did you do when you arrived at the

22 Central Park Precinct?

23     A    We brought the defendants in front of the

24 desk.

25     Q    And what time did you bring the defendants

10/13/89

T3-1f

358

REYNOLDS - PEOPLE - DIRECT - LEDERER

1
2   before the desk?

3       A       I believe -- may I refresh my  memory  with
4   my notes?

5               THE  COURT:   If you have to.

6               MR. MADDOX:   When he says "defendants"
7           could he refer to who he was talking about?
8           Some are not defendants.

9               THE  COURT:   Okay.

10              If  you  can, give us the names of the
11          people you are talking about.

12              THE  WITNESS:   All right.

13      A    That was about six minutes after eleven.

14      Q    And what happened six minutes after eleven?

15      A    They were brought to the station house.

16              THE  COURT:   They being?

17              THE  WITNESS:    Clarence Thomas, Lamont
18          McCall, Kevin Richardson, Steven Lopez, and
19          Raymond Santana.

20      Q    Were they at  the  stationhouse  when  you
21  arrived,  or  did  they arrive when you were already
22  there?

23      A    I think we got there around the same  time.
24  I don't recall exactly who got there first.  It was
25  very close in time, though.

10/13/89

T3—1f

359

REYNOLDS — PEOPLE — DIRECT — LEDERER

1

2      Q      And what happened in front -- what did  you

3   do when you went in front of the desk?

4      A      What I did was gave their names, addresses

5   and ages to the desk officer so he  could   enter   it

6   into the blotter.

7      Q         Did you have a conversation with anyone

8   when you arrived at the Central Park Precinct?

9      A      Yes, I did.

10     Q      Who did you have a conversation with?

11     A      I  had  a  conversation  with  one  of  the

12  detectives; two of them.

13     Q      To whom did you speak?

14     A      Detective Nugent and Detective Gonzalez.

15     Q      What did you say to them and what did they

16  say to you?

17     A      I stated what  happened;  that  I  arrested

18  five  youths  for  assaulting  a jogger in the Park.

19  And that was pretty much it.  We  returned   them   to

20  the Youth Room.

21     Q      How long were they before the desk?

22     A      I'd say about ten minutes.

23     Q         Was anyone with you and with them before

24  the desk sergeant?

25     A      Yes.

10/13/89

T3-1f

360

REYNOLDS — PEOPLE — DIRECT — LEDERER

1
2    Q    Who was that?

3    A       My  partner  was  there,  Police  Officer
4  Powers;  Police  Officer Hennigan, Sergeant Lyle and
5  the detectives might have come out also.

6    Q    After you were before the desk  with  those
7  five people that you have named, where did you go?

8    A       We took them, I believe, we took them to
9  the juvenile room.

10    Q    Officer Reynolds, if you would, please look
11  at what has been received in evidence as People's 1.
12  Do you recognize what that is?

13    A    Yes.

14    Q    What do you recognize that to be?

15    A    It is a layout of part of the Central  Park
16  Precinct.

17    Q       What part of the precinct is depicted in
18  that diagram?

19    A    One is the Community  Affairs  office,  and
20  the other is our muster room.

21    Q    And where is the Youth Room in People's 1?

22    A    Do you want me to point it out?

23    Q    If you would, please.

24       MR. BERMAN:  The testimony was it was
25       the Juvenile Room.

10/13/89

NYCLD_023106

P-APP001817

T3-1f

361

REYNOLDS — PEOPLE — DIRECT — LEDERER

1

2          THE COURT:  Yes, you referred to it as

3          the Juvenile Room.

4     Q    Excuse me.  Would you show us the  juvenile

5 room?

6     A    This room right here (indicating).

7     Q        Indicating a room, the lower rectangular

8 room portrayed in People's 1.

9          When you say you went into that  room,  did

10 you  go  into  that room with all of the five people

11 that had been before the desk?

12    A    Yes.

13    Q    Before resuming the stand, could you please

14 point out where everyone was inside that  room  once

15 you went in?

16    A      Okay.  I was seated at this desk here and

17 the defendants were seated at chairs  in  this  area

18 (indicating).  They were all given a chair, and they

19 were all seated over here (indicating).

20          MR.  MADDOX:    Can the record reflect

21          that is the bottom portion of the room that

22          appears on that diagram?

23          THE COURT:  Yes, it  is  the  bottom

24          right portion.

25          MS. LEDERER:  Thank you.

10/13/89

T3-1f

362

REYNOLDS — PEOPLE — DIRECT — LEDERER

1                 You may resume your seat.

2                 (Witness complies)

3      Q      Were any of those people handcuffed in that

4   room?

5      A      Their handcuffs were removed in the room.

6      Q      What did you do in that room?

7      A           In that room I started to process the

8   paperwork for that arrest.

9      Q      What does that mean?

10     A       I did the on-line booking sheets and

11  juvenile packages.

12     Q      What is a juvenile package?

13     A           That's the — that's papers that you have

14  to fill out to go to Family Court, the depositions,

15  supporting depositions, a referral intake report,

16  and the appearance tickets for the youths to appear

17  in Family Court with their parents or guardians.

18     Q           Where was Officer Powers at that time, if

19  you know?

20     A      Officer Powers was making notifications to

21  the families, to the parents of the defendants.

22     Q      Was that happening in the room you were in?

23     A           No, that was across the way in the main

24  part of the precinct.

10/13/89

T3—1f

363

REYNOLDS — PEOPLE — DIRECT — LEDERER

1  
2  Q    During this time that you were doing the
3  paperwork in the Juvenile Room, how would you
4  describe the testimony of defendants Kevin
5  Richardson, Raymond Santana, and Steven Lopez?
6  A    They really didn't seem to care.
7          MR. RIVERA:  Objection.
8          MR. DILLER:  Objection.
9          MR. BERMAN:  Objection.
10         THE COURT:  Objection sustained.
11  Q    Describe their appearance; how would you
12  describe them.  What were they doing, what was their
13  appearance?
14         MR. BERMAN:  I would object to him
15         describing it collectively.
16         THE COURT:  I will allow it.  If they
17         differed in any respect, tell us that.
18         Tell us what each one looked like and what
19         they were doing?
20         THE WITNESS:  They were sitting around
21         talking.  Their demeanors didn't seem
22         different.  They didn't seem to care.
23         MR. RIVERA:  Objection.
24         MR. DILLER:  Objection.
25         MR. BERMAN:  Objection.

10/13/8

NYCLD_023109

P-APP001820

T3-1f

364

REYNOLDS — PEOPLE — DIRECT — LEDERER

1
2          THE   COURT:     Okay.   What do you mean
3      "they didn't seem to care"?
4          THE WITNESS:   They wanted to go   home;
5      you know, they wanted to hang out.
6          MR. RIVERA:   Objection.
7          THE COURT:   I will allow it.
8      Q    Were any one of these three people crying?
9      A    No.
10     Q      When you say you observed people in that
11     room talking   to   each   other,   did   you   see   Kevin
12     Richardson talking to anyone?
13     A    Yes, I saw him talking to Raymond Santana.
14     Q    Did you see Raymond Santana and Steve Lopez
15     talking   to   each   other   or   to other people in the
16     room?
17     A    Yes.
18     Q    Who did you see them talking to and what do
19     you remember?
20     A    They seemed to be talking   to   each   other.
21     Everybody seemed to know each other very well.
22         MR. RIVERA:   Objection.
23         MR. DILLER:   Objection.
24         MR. BERMAN:   Objection.
25         THE COURT:   Objection sustained.

10/13/89

NYCLD_023110

P-APP001821

T3-1f

365

REYNOLDS - PEOPLE - DIRECT - LEDERER

1

2      Q        Did there come a time you were aware the

3   parents began to arrive?

4              MR. MOORE:   Objection as to form.

5              THE COURT:   I will allow it.

6      A     Yes.

7              MS. LEDERER:  Your   Honor,   if   I   may

8       interrupt   at   this   point   to   reinterate

9       something said yesterday.

10             I indicated to Defense Counsel that   I

11      ask   the   parents of certain defendants and

12      potential witnesses not be present   in   the

13      courtroom.   I just want to check.

14             MR.   DILLER:   No   people   from   Mr.

15      Richardson's family that will   testify   are

16      in court.

17             MS.   LEDERER:   And no other witnesses

18      that were present at the stationhouse?

19             MR. DILLER:   That's correct.

20             MR. BERMAN:   I suppose we   should   put

21      some of it on the record, because we didn't

22      do   it   the   other   day.   I   made   the

23      representation   that   I   would   have   all

24      witnesses out of the courtroom, but I asked

25      that   my   client's   parents   remain.   And I

10/13/89

NYCLD_023111

T3-1f

366

REYNOLDS — PEOPLE — DIRECT — LEDERER

offered, if they should testify at this hearing or at the trial, that the Prosecution would be free to bring out they had been present during the testimony. I forget if it was your Honor or Miss Lederer who rejected that.

With that in mind, I instructed my client's parents not to be here for this witness and the next witness.

THE COURT: And they are not here?

MR. BERMAN: Yes.

Do you recall who it was?

THE COURT: Ultimately I'm the one who made the ruling. The important thing is what I said.

MR. BERMAN: I said they would have to be excluded during the testimony of this witness.

MR. RIVERA: On behalf of Raymond Santana, he has no relatives here today.

MR. JOSEPH: The same is true on behalf of Mr. Antron McCray.

BY MS. LEDERER:

Q    Did there come a time that you became aware

10/13/89

T3-1f

367

REYNOLDS - PEOPLE - DIRECT - LEDERER

1   of   parents   or families of any of those five people

2   beginning to arrive at the Central Park Precinct?

3        A    Yes.

4        Q    To the best you can recall, what was the

5   time you first became aware of the parents arriving?

6        A    I believe it was around midnight.

7        Q         And who do you recall arriving at

8   approximately midnight?

9        A    That was Mrs. Richardson.

10        Q    How was it that you became aware that Mrs.

11   Richardson was there?

12        A    She came into the room and opened the door

13   and she stated who she was.  And that was it.

14        Q    When you say she came into the room and

15   opened the door, could you step down for a moment

16   and point out on People's 1 in evidence where she

17   was?

18        A    There is a door right here which she opened

19   and let me know she was here for Kevin Richardson

20   (indicating).

21

22                 MR. BERMAN:  For the record, he was

23                 pointing to the area on that chart where

24                 there was no door.  There is a doorway but

25                 no door.

10/13/89

T3-1f

368

REYNOLDS - PEOPLE - DIRECT - LEDERER

THE COURT:   Yes, it does appear there's no door drawn into the diagram.   Is there an actual door there?

THE WITNESS:  Yes.

MR. MADDOX:  Could the record reflect where exactly on the diagram he is pointing to?

THE COURT:   He is pointing to the upper righthand side of that room.

Q    At the time that Mrs. Richardson or the mother of Kevin Richardson arrived, was that door opened or closed?

A    It was closed.

Q    And at the time that she came to the door, where was Kevin Richardson when she opened the door?

A    He was seated in the back of the room.

Q    When you say in the back of the room, where were you referring to?

A    Shall I point it out?

Q    Yes.

A    I believe he was seated in this area here (indicating).

MS. LEDERER:  Indicating in the lower righthand corner of the Community Affairs

10/13/89

T3-1f

369

REYNOLDS — PEOPLE — DIRECT — LEDERER

Office building.

Q      Did you observe or hear any conversation exchanged between Kevin Richardson and his mother at that point?

A      No.

Q      Was Kevin Richardson awake when she arrived?

A      Yes.

Q      And when his mother arrived at the door, did she speak?

A      Yes, she stated she was, you know, his mother. I believe I got up and just asked her to have a seat. Then I finished the paperwork, and hopefully send him home that night.

Q      Where did you ask her to have a seat?

A      I asked her to have a seat in the clerical area.

Q      The clerical area is where?

A      That's on the top of the diagram (indicating).

Q      Is that the entire room?

A      Yes.

Q      In the top portion of that building?

A      Yes.

10/13/89

NYCLD_023115

P-APP001826

T3-1f

370

REYNOLDS — PEOPLE — DIRECT — LEDERER

1
2  Q    Did you become aware of any  of  the   other
3  parents arriving at that time?
4  A    Yes.
5  Q       Who was the next parent that you became
6  aware of?
7  A    I don't recall who came in next,  but   they
8  all started to come in one at a time.
9  Q       And how was it that you became aware of
10 their arrival?
11 A    Either my partner would tell me the  parent
12 was  there,  or  they  would stick their head in the
13 door and tell me they were there, looking for  their
14 son.
15 Q       During the time that the parents and the
16 families of these five  people  were  arriving,  did
17 there come a time where you saw Antron McCray?
18 A    Yes.
19 Q    Do you recall approximately when that was?
20 A       I'm not sure.  That was after midnight.
21 I'm not sure of the exact time.
22 Q    Did you have anything  that  would  refresh
23 your recollection as to the exact time?
24 A    I can take a look.  Again, I'm not sure.
25         (Witness peruses notes)

10/13/89

NYCLD_023116

P-APP001827

T3-1f

371

REYNOLDS - PEOPLE - DIRECT - LEDERER

1

2    A    (Continuing) There was no time -- I don't
3 recall what time that night I saw him.  It was after
4 midnight though.

5    Q    Did there come a time when Officer Powers
6 returned from making notifications?

7    A    Yes.

8    Q    And do you recall what time it was that he
9 finished and returned to the juvenile room?

10    A    That I'd have to look up to refresh my
11 memory.

12              (Witness peruses notes)

13    A         (Continuing)    I believe that was
14 approximately 12:30.

15    Q    During the time that the parents were
16 arriving, did you have conversations with them?

17    A    Yes.  When they all got there, yes.

18    Q    And did there come a time when everybody's
19 parents or family had arrived?

20    A    No.  There was a set of parents that were
21 missing.

22    Q    Whose parents did not arrive?

23    A    Raymond Santana's.

24    Q    Would you please describe what efforts were
25 made to reach the family of Raymond Santana?

10/13/89

T3-1f

372

REYNOLDS — PEOPLE — DIRECT — LEDERER

1

2      A      Well, at first Police Officer Powers called

3  his house and spoke to his father.

4      Q        Do you recall approximately what time he

5  made that phonecall?

6      A      I'd have to refresh my memory with my

7  notes.

8              MR.   RIVERA:      I    object  to   the

9              characterization that "he spoke to his

10             father."

11             THE COURT:  I'll allow it.

12     A      It was about 20 after 12.

13     Q        And what happened after Officer Powers ——

14 withdrawn.

15             Did Officer Powers tell you that when he

16 made that phonecall he spoke with someone?

17     A        Yes.   He said he spoke with Raymond

18 Santana's father, and his father stated he was going

19 to pick him up.

20     Q      What was the next thing that happened  with

21 respect to reaching the Santana family?

22     A      Well, we waited a couple of hours, and, you

23 know, he wasn't there at the stationhouse. So I

24 asked Bobby to give him another call.

25             THE COURT:  Bobby is?

10/13/89

T3-1f

373

REYNOLDS — PEOPLE — DIRECT — LEDERER

1
2            THE   WITNESS:    I'm   sorry,   Police
3        Officer  Powers called him  two  hours  later,
4        I  believe,  and  there  was  no  answer  at  the
5        house.
6    Q       Was  there  then  a  second  effort  or  another
7    effort  made  to  reach  someone  else  from  the  family?
8    A    Well,  I  had  to  convince  Raymond  Santana  to
9    give  me  the  name  of  another  relative  to  call.
10           MR. RIVERA:   Objection.
11           THE  COURT:   Just  tell  us  what  you  did.
12           THE    WITNESS:    Okay.    I  got  his
13        sister's  telephone  number  and  called  up  his
14        sister.
15    Q    Did  you  have  a  conversation  with  his
16    sister?
17    A    Yes.
18    Q      Approximately  what  time  did  you  call  his
19    sister?
20    A    It  was  approximately  2:15.
21    Q    Did  you  have  a  conversation  with  her?
22    A    Yes.
23    Q    What,  if  anything,  did  she  say  to  you  and
24    what  did  you  say  to  her?
25    A       I  explained  to  her  that  her  brother  was

10/13/89

NYCLD_023119

P-APP001830

T3—1f

374

REYNOLDS — PEOPLE — DIRECT — LEDERER

1
2   under arrest in the Central Park Precinct; that we
3   needed a parent or guardian to pick him up to
4   release him so he could leave tonight.   And she
5   stated she would come over, but she has a young
6   child and needed someone to watch the child for her.
7   I then gave her —— I told her, you know, take care
8   of that.

9           I said, "You can either take a train or
10  bus."  I gave her directions for both and she stated
11  she was going to take a taxi.

12      Q    Did you give her your telephone number?

13      A    Yes.

14      Q    Did you give her your name?

15      A    Yes.

16      Q    Did you tell her what precinct you were
17  calling from?

18      A    Yes.

19      Q        Did there come a time when the sister
20  arrived at the stationhouse?

21      A    No.

22      Q    What was the next step, if any, that was
23  taken to reach someone from the family of Raymond
24  Santana?

25      A    What I did was call back the sister and she

10/13/89

NYCLD_023120

P-APP001831

T3-1f

375

REYNOLDS - PEOPLE - DIRECT - LEDERER

1  answered the phone. And she stated to me she wasn't
3  going to pick him up.

4      Q    What time was it that you called back the
5  sister?

6      A         That was approximately 4:00, a little
7  after; about ten after.

8      Q    And you had a conversation with the sister
9  for a second time when you called at 4:00?

10     A    Yes.

11     Q         What, if anything, did she say to you at
12 that time?

13     A    She stated she wasn't going to pick him up,
14 and further stated she couldn't get anyone to watch
15 her child for her. So I asked her, "Well, if you
16 can't come, is there anyone else that can come to
17 pick him up?"

18         She stated his grandmother could do it, and
19 she gave me her phone number.

20     Q    Did you learn the name of the grandmother?

21     A         No, I didn't. She just stated it was his
22 grandmother, and I took the phone number to call her
23 up.

24     Q    Did you then call that number?

25     A    Yes, I did.

10/13/8?

T3-1f

376

REYNOLDS - PEOPLE - DIRECT - LEDERER

1

2    Q    What time did you make that phone call?

3    A    That was about ten after four.

4    Q    Did you have a discussion with Raymond
5 Santana's grandmother at that time?

6    A    Yes, I did.

7    Q    What, if anything, did you say to her and
8 what did she say to you?

9    A    I explained to her Raymond Santana was
10 under arrest in Central Park, and that I needed a
11 parent or guardian to come pick him up. She stated,
12 you know, she stated, okay, she would come to get
13 him.   And I told her to stay put in her apartment,
14 we were going to send a police car to pick her up
15 and bring her back personally.

16   Q    When you spoke to the grandmother, did you
17 speak in English or in Spanish?

18   A    I spoke in English.

19   Q    Did she speak to you in English or in
20 Spanish?

21   A    She spoke English.

22   Q    Did you then direct a police car to go to
23 that address?

24   A    Yes.

25   Q    And -- what time was the police car told to

10/13/89

T4-fr

377

REYNOLDS - PEOPLE - DIRECT - LEDERER

1
2   go to the grandmother's address?

3       A     About 20 minutes after four.

4       Q     And were you aware when the police car
5   returned?

6       A     Yes.

7       Q     And do you know whether or not they brought
8   the grandmother of Raymond Santana with them?

9       A     They did.

10      Q     What time was that that the grandmother was
11  picked up and brought to the Central Park Precinct?

12      A     I believe it was 4:30 going on five.

13      Q     Were the parents or family members or
14  guardians or the other people taken into custody at
15  that time already in the precinct?

16      A     Yes.

17      Q     By what time, approximately, was everybody
18  else's mother, father, or guardian present in the
19  precinct?

20      A     I'd say about by five o'clock everyone was
21  there.

22      Q     Prior to the arrival of Raymond Santana's
23  grandmother, at what time would you say that the
24  families and parents and guardians of the other four
25  had all arrived?

10/13/89

T4-fr

378

REYNOLDS - PEOPLE - DIRECT - LEDERER

1

2   A    I would say about one, 1:30 everyone was

3   there.

4   Q    Did you have any conversations with those

5   parents or guardians about releasing the people you

6   had at the stationhouse?

7   A    Yes.

8   Q    What, if anything, did you tell them?

9   A    I explained to them what would happen, that

10  if none of their children had any outstanding

11  warrants from Family Court, that they could all be

12  released to them as soon as Raymond Santana's

13  parents came. In order to give them an appearance

14  ticket to appear in Family Court, they all have to

15  go at the same time.

16  Q    When you say "they all have to go at the

17  same time," when you say "all" who are you referring

18  to?

19  A    Raymond Santana, Steven Lopez, Kevin

20  Richardson, Lamont McCall, Clarence Thomas.

21  Q    When you said that in order to be able to

22  give them desk appearance tickets or Family Court

23  summons, they all had to be there, why was that?

24  A    They all had to appear in court at the same

25  time if they're -- if it's one case. If one of the

10/13/89

T4-fr

379

REYNOLDS - PEOPLE - DIRECT - LEDERER

1
2  children are -- if one of the defendants go to
3  Spofard then he has to Family Court --
4           MR. BERMAN: I'm going to object to
5       this testimony. This is a legal --
6           THE COURT:  I'll allow it. This is
7       what he told these people. I'll allow it.
8       Whether he is right or wrong is irrelevant.
9           MR. BERMAN: I didn't hear him say he
10      told the People all of that.
11          THE COURT: He told them they all had
12      to go together.
13          MR. BERMAN: Can we make clear this is
14      an explanation we are getting?
15          THE COURT:   I overruled your
16      objection.
17  A       I explained to them if one of the
18  defendants is remanded to Spotswood (sic) he has to
19  go to Family Court in the morning and that means
20  when the others are released, they also have to go
21  to Family Court in the morning. However, if they
22  are all released at the same time, if all the
23  parents come, then they can be given an appearance
24  ticket for a week or two weeks in the future, so
25  what we would have to do is wait for all the parents

10/13/89

T4-fr

380

REYNOLDS — PEOPLE — DIRECT — LEDERER

to come so I can arrange it that they all come back in a few weeks and they would be able to sleep that night.

Q    And approximately how long were you working on the paperwork connected with the Juvenile packages and the other paperwork that was related to the rest of these five people?

A    I'd say about two or three hours.

Q    And were you working on the paperwork alone or was someone helping you?

A    I had some help for a period of time, and then from Police Officer Powers and then he had to leave.

Q    What time, to the best of your recall, did Police Officer Powers leave?

A    I believe he finished at 2:00, but stayed around on his own time to about 2:30.

Q    Sometime in the morning on April 20th, did you have a conversation with a Lieutenant from the Central Park Precinct?

A    Yes.

Q    Who was that?

A    That was Lieutenant McInerney.

Q    And at approximately what time did you have

10/13/89

T4-fr

381

REYNOLDS – PEOPLE – DIRECT – LEDERER

1
2   a conversation with him?

3       A    I believe it was a little after four.

4       Q        Do you recall where you had that

5   conversation with him?

6       A    I had that conversation outside of the

7   Community Affairs Office. Outside of the building

8   itself.

9       Q    What, if anything, did the Lieutenant  tell

10  you?

11      A        He  stated  that  he  was informed by a

12  Detective from NightWatch that a  woman's  body  had

13  been  found  on 102nd Street and that they wanted me

14  to keep the defendants there  for  a  while  so  that

15  they could be questioned.

16      Q        At any time during that night while the

17  people that you described and named, the five people

18  in the juvenile room and the parents were in  there,

19  did  you  have  any  conversations  with the parents

20  about food?

21      A    Yes.

22      Q    Would you describe what  conversations  you

23  had and what happened?

24      A    They stated they wanted to get something to

25  eat for themselves and their sons and they all left,

10/13/8?

NYCLD_023127

P-APP001838

T4-fr

382

REYNOLDS - PEOPLE - DIRECT - LEDERER

1  and I explained to them if they went to the west
2  side, they would be more stores open where they
3  could get something to eat.

4     Q     Do you remember -- did everyone leave or
5  did only some people leave; do you recall?

6     A     Pretty much everybody left.  A couple of
7  people stayed, but those with the people -- you know
8  -- where they had two parents or guardians and one
9  went to get the foot and I believe another one might
10  have stayed.

11    Q     With respect to the Defendant Lopez, do you
12  recall who it was from his family who arrived?

13    A     It was his father.

14    Q     And with respect to Kevin Richardson, do
15  you remember -- you testified something about his
16  mother.  Did anybody else come with the mother to
17  your knowledge?

18    A     I believe she was alone in the beginning.

19    Q     Did there come a time when the five people
20  that you had in the Juvenile Room were taken out to
21  the area where the parents were waiting?

22    A     Yes.

23    Q     And when was that?

24    A     That's when the detective from NightWatch

10/13/89

T4-fr

383

REYNOLDS — PEOPLE — DIRECT — LEDERER

1

2 came and began interviewing them one at a time.

3      Q     Approximately what time was that if you

4 recall?

5      A     I believe that's approximately 5:50 in the

6 morning.  Let me refresh my memory with that.     I'm

7 sorry, that was approximately 5:30.

8      Q     Were you aware when parents of the family

9 returned with food?

10      A     Yes.

11      Q     Were you aware whether any of that food was

12 given to any of the people you had in  the  Juvenile

13 room?

14      A     Yes.

15      Q     Who do you recall seeing have some food in

16 that room?

17      A     I believe all of them ate.

18      Q     And do you recall whether Raymond Santana

19 made  any statement in your presence while he was in

20 that room?

21      A     Yes, he did.

22           THE COURT:  Which room?

23      Q     I'm sorry.  In the Juvenile room?

24      A     Yes.

25      Q     What, if anything, did you hear him say?

10/13/8?

T4-fr

384

REYNOLDS - PEOPLE - DIRECT - LEDERER

1

2    A    He looked over to Kevin Richardson at the
3    point where we couldn't get anyone to come pick him
4    up and he stated that they were going to Spofard and
5    that they would all stick together, and fuck up
6    anybody who got in their way.

7    Q    When the five people were taken from the
8    Youth Room and put in the outer office where the
9    parents were waiting, were they handcuffed?

10    A    No.

11    Q    Do you recall where any of the three
12    defendants, Kevin Richardson, Steve Lopez, or
13    Raymond Santana sat when they went into that other
14    room?

15    A    Each defendant sat with their parent or
16    whoever it was that came to pick them up. I don't
17    recall specifically what desk they sat at.

18    Q    What, if anything, did you do after those
19    people were taken out of the Juvenile room?

20    A    I went back inside to -- with the
21    detectives for the interview.

22    Q    And which detective or detectives did you
23    go with if you recall?

24    A    That was Detective Farrell and Detective
25    Whelpley.

10/13/89

T4-fr

385

REYNOLDS - PEOPLE - DIRECT - LEDERER

1
2       Q     When you say you went back inside, did  you
3  go back into the Juvenile room?
4       A     Yes.
5       Q        Was  there  anybody  else there besides
6  yourself and the two detectives you just mentioned?
7       A     Yes,  the  parent  of  the  defendant,  the
8  mother.
9       Q     Which person was in the room, which of the
10 people who had been taken into custody?
11            MR. MOORE:  I can't hear the last part
12            of the question.
13            THE COURT:  Restate the question.
14      Q     When you went in to  conduct  an  interview
15 with those detectives, who was in the room?
16      A        Besides  the detectives, myself and the
17 defendant.
18      Q     Who was the defendant?
19      A     I believe the first one -- that was  Lamont
20 McCall.
21            MR. MADDOX:  Objection.  The reference
22            to  the  word  "defendant" be stricken from
23            McCall.
24            THE COURT:  Don't refer to  people  as
25            defendants.   Just give us the name of the

10/13/8?

T4-fr

386

REYNOLDS — PEOPLE — DIRECT — LEDERER

individual you are talking about.  You said
the first person that was  interviewed  was
Lamont McCall.

      THE WITNESS:  Yes.

      THE COURT:  All right.

Q    Were you present for that interview?

A    Yes.

Q    Did you personally conduct that interview?

A    No.

Q    Do you know who did?

A    That was Detective Farrell.

Q    And  approximately  what  time was that
interview conducted?

A    It started about 5:30.

Q    Were you present when rights were read?

A    Yes.

Q    And was there --

      MR. MOORE:  Objection, your Honor,  it
assumes a fact not in evidence.

      THE COURT:  Yes, objection sustained.

Q    Was anybody in the room with Lamont McCall
besides you and the two detectives?

A    Yes, his mother.

Q    What,  if  anything,  happened  when  the

10/13/89

T4-fr

387

REYNOLDS - PEOPLE - DIRECT - LEDERER

1

2    interview began?

3        A      He told the story about how the -- himself

4    and another youth got together and went into the

5    park and started to assault people.

6        Q     How long was this interview?

7        A     It was approximately an hour.

8              MS. LEDERER:   If I may have just one

9              moment, please.

10       Q     During the interview of Lamont McCall, did

11   he name any of the people that were in the group

12   with him?

13       A     Yes, he did.

14       Q     And do you recall the names of the people

15   that he mentioned as being with him during this --

16   during the night of April 19th in Central Park?

17       A     He named Clarence Thomas, another youth

18   named Mike, I believe it is, and --

19       Q             Let me stop you for a moment.  When he

20   mentioned a person named Mike, did he give the race

21   of that person?

22       A     Yes.

23       Q     What did he say?

24       A     A male Black.

25             MR. MOORE:   Your Honor, I'm going to

10/13/89

NYCLD_023133

P-APP001844

T4-fr

388

REYNOLDS — PEOPLE — DIRECT — LEDERER

1   object to the line of questioning not being

2   relevent to this hearing.

3           THE COURT:  Overruled.

4   Q      Did he give an approximate age of the

5   person named Mike?

6   A      Approximately 14 to 15 years of age.

7   Q          Did he give a location where this person

8   resides?

9   A      I believe that's the Taft Projects.

10  Q      Did he give you any information with

11  respect to anyone else who later became — was later

12  identified and charged in this case?

13          MR. MOORE:  Objection.

14          MR. JOSEPH:  Objection.

15          THE COURT:  Do you know the names of

16          the people who are defendants in this case?

17          THE WITNESS:  I'm not sure exactly if

18          everybody was indicted, but he did name

19          Easy Al.

20          MR. MADDOX:  Objection.

21          MR. MOORE:   Objection.

22          THE COURT:  I'll allow it.

23          MR. MADDOX:  Judge, may that answer

24          and question be read back because I can't

10/13/89

T4-fr

389

REYNOLDS — PEOPLE — DIRECT — LEDERER

1   hear it.

2           THE COURT:  Read it back.

3           (Reporter complies)

4           THE COURT:  I think I asked you do you

5   know who the defendants are in this case,

6   the names of the defendants in this case?

7           THE WITNESS:  That he mentioned?

8           THE COURT:  Do you know who they are,

9   the names of the defendants in this

10  particular case?

11          THE WITNESS:  yes.

12          THE COURT:  The question, I think, has

13  been asked was anything said about those

14  persons; is that your question?

15          MS. LEDERER:  I'll rephrase it.

16  BY MS. LEDERER:

17      Q   What were the names of the people that were

18  mentioned by Lamont McCall as being with him in

19  Central Park on the night of April 19th?

20      A   Joseph McCray, Clarence Thomas, Mike, and I

21  believe another one named Easy Al.

22          THE COURT:  Easy Al?

23          THE WITNESS:  Yes, that's a name that

24  was given.

10/13/89

NYCLD_023135

P-APP001846

T4-fr

390

REYNOLDS — PEOPLE — DIRECT — LEDERER

1

2    Q    At the conclusion of the interview of

3   Lamont McCall, what, if anything, happened?

4    A        At that point he was given an appearance

5   ticket for Family Court.

6    Q    When you say he was given an appearance

7   ticket, who gave him that ticket?

8    A    I did.

9    Q        Did that appearance ticket have a return

10  date?

11   A    Yes.

12   Q    What happened with Lamont  McCall  at  that

13  time?

14   A        He was released to his mother, and given

15  the appearance ticket.

16   Q    Were you present at  another  interview  at

17  that time?

18   A    Yes, I was.

19   Q    Where was that interview conducted?

20   A    That was in the Juvenile room.

21   Q        And is that the lower rectangular room to

22  the bottom of that building on the diagram, People's

23  1?

24   A    Yes, it is.

25   Q    Who was interviewed second?

10/13/8

T4-fr

391

REYNOLDS — PEOPLE — DIRECT — LEDERER

1

2     A    Clarence Thomas.

3     Q    And who was present during the interview of

4 Thomas?

5     A    His mother.

6     Q    Did you conduct that interview?

7     A    No.

8     Q    If you know, who conducted that interview?

9     A    I believe that was Detective Whelpley.

10    Q    Would you please name everyone who was in

11 the Juvenile Room at the time that interview was

12 conducted?

13    A    Detective Farrell, Detective Whelpley,

14 Clarence Thomas, his mother, and myself.

15    Q    And approximately how long was that

16 interview?

17    A    It was approximately an hour, an hour and a

18 half.

19    Q    During the time that -- in substance, what

20 did Clarence Thomas say to you?

21    A    He stated that they -- the group came into

22 the park at 110th Street and they had no specific

23 plans for that evening, and they started to assault

24 -- they assaulted, I believe, a bum, and then later

25 on went up to the reservoir and assaulted a jogger

10/13/89

NYCLD_023137

P-APP001848

T4-fr

392

REYNOLDS — PEOPLE — DIRECT — LEDERER

1

2    up there with a pipe.

3       Q    And did he identify any of the people who

4    were with him that night in Central Park?

5       A    Yes, he did.

6       Q    Who did he name?

7       A    I'll have to look at my notes to refresh my

8    memory on that. He named Antron McCray and Lamont

9    McCall.

10      Q    Did he give any information about Antron

11   McCray?

12      A    Yes, he did.

13      Q    What, if any, information did he tell you

14   about Antron McCray?

15      A    I believe he stated that he had assaulted

16   the jogger.

17      Q    Did he give you any information about a

18   description of who Antron McCray was?

19      A    He described him as a male black, 14, 15

20   years old, I believe.

21      Q    Did he tell you anything about where Antron

22   McCray lived?

23      A    He stated he lives on

24      Q    What, if anything, happened at the

25   conclusion of the interview of Clarence Thomas?

10/13/8

NYCLD_023138

P-APP001849

T4-fr

393

REYNOLDS - PEOPLE - DIRECT - LEDERER

1

2      A      He was released to his mother.

3      Q      Was he given anything prior to his release?

4      A      He was given an appearance ticket for

5  Family Court.

6      Q      And was there a date on that ticket?

7      A      Yes, there was.

8      Q      And was that the same date that had been on

9  the ticket of Lamont McCall?

10     A      Yes.

11     Q      What, if anything, did you do after being

12 present for the interview of Clarence Thomas?

13     A      After that we went -- later on that

14 afternoon we went back to his house.

15     Q      When you say later on that afternoon, what

16 time was it when you --

17     A      It was about 11:30.

18     Q      Is that in the morning or the evening?

19     A      In the morning.

20     Q      On what date?

21     A      On the 20th of April.

22     Q      Who did you go with?

23     A      Detective Whelpley and Farrell.

24     Q      And where did you go?

25     A      We went to his house.

10/13/89

NYCLD_023139

P-APP001850

T4-fr

394

REYNOLDS - PEOPLE - DIRECT - LEDERER

1

2    Q    Whose house?

3    A    Clarence Thomas' house.  It's

4

5    Q    AT what time was Clarence Thomas given a

6    return   ticket   to   come   to   Family   Court,

7    approximately?

8    A    It was about 7:30, 8:00.

9    Q    And what, if anything, happened between

10   that  time and the time you went to Clarence Thomas'

11   home?

12   A    Kevin Richardson was interviewed.

13   Q    What happened when you arrived at  Clarence

14   Thomas'  home  with the detectives at about 11:30 on

15   the morning of the 20th?

16   A    He was informed we wanted to  question  him

17   further,  and  his  rights  were read to him and his

18   mother.

19   Q    And was he reinterviewed at his home?

20   A    Yes, he was.

21   Q    Approximately how long was he spoken to  at

22   his home?

23   A    I'd say about 15, 20 minutes.

24   Q        Did there come a time -- did you conduct

25   that interview?

10/13/89

T4-fr

395

1           REYNOLDS - PEOPLE - DIRECT - LEDERER

2      A     No.

3      Q     Were you present for that interview?

4      A     Yes.

5      Q     After that interview was conducted, where
6  did you go?

7      A          THen went to          to Antron
8  McCray's house.

9      Q     Who did you go with?

10     A     I went with Detective Farrell and Whelpley
11 and other detectives from Sex Crime.

12     Q     What, if anything -- withdrawn.

13           When you left Clarence Thomas' apartment,
14 did you leave alone?

15     A     No, I didn't.

16     Q     Who came with you?

17     A     Detective Whelpley, Detective Farrell, and
18 we met with Detective Rosario and Detective Rivera
19 and Morin from Sex Crimes.

20     Q     Did Clarence Thomas and his mother go with
21 you?

22     A     Yes, they did.

23     Q     Did you travel in the same car with them?

24     A     Yes, I did.

25     Q          Did you have any conversation with them

10/13/89

NYCLD_023141

P-APP001852

T4-fr

396

REYNOLDS - PEOPLE - DIRECT - LEDERER

1

2   about why they were going with you?

3       A    With him and his mother?

4       Q    Yes?

5       A    No.

6       Q    How did you know where to go when you   left

7   Clarence Thomas' apartment?

8               MR. JOSEPH: Objection.

9               MR. BERMAN:  Objection.

10              THE COURT:  I'll allow it.

11              Where were you going?

12              THE  WITNESS:  We were going to Antron

13          McCray's house.

14      Q    How did  you  know  where  Antron  McCray's

15   house was?

16      A    Clarence's mother told us where it was.

17      Q       Where did you go to find Antron McCary's

18   apartment?

19      A    To

20      Q    What happened when  you  arrived  at

21          ?

22      A       We  knocked on the door and we spoke to

23   Antron's father, Bobby McCray.

24      Q    Did you go to the door?

25      A    I went to the door, yes.

10/13/89

T4-fr

397

1        REYNOLDS — PEOPLE — DIRECT — LEDERER

2        Q        Was anyone else with you?

3        A        Yes.

4        Q        Who was that?

5        A        Detective Rosario, Detective Rivera, and

6    Detective Morin.

7        Q        Did you personally speak to the person you

8    identified as Bobby McCray?

9        A        No.

10        Q        Were you present when there was a

11    conversation with him?

12        A        Yes.

13        Q        Who had that conversation?

14        A        Detective Rosario.

15        Q        What did you hear him say and what did you

16    hear Bobby McCray respond?

17        A        He stated that he wanted to speak to Antron

18    at the Central Park Precinct and that Bobby McCray

19    would have to come with us also because Antron is a

20    juvenile.

21        Q        And what happened then?

22        A        And he agreed and told Antron to get

23    dressed.

24        Q        And did Antron McCray and his father then

25    leave with you?

10/13/89

NYCLD_023143

P-APP001854

T4-fr

398

REYNOLDS - PEOPLE - DIRECT - LEDERER

1

2      A      Yes, they did.

3      Q      Do you recall whether anyone else from   the

4   McCray family came?

5      A      His mother came also.

6      Q      And did they ride with you or did they ride

7   with someone else?

8      A      I believe they rode with the detectives

9   from Sex Crimes.

10      Q      What time did you   return   to   the   Central

11   Park Precinct, approximately?

12      A      I'd say it was after 12:00.

13      Q      When Antron McCray came with you -- and

14   left his apartment, what was he wearing?

15      A      He had on the clothes that he   was   wearing

16   the night before.  They were --

17               MR. MOORE:  Objection.

18               MR. BURNS:  Objection.

19               THE COURT:  Objection sustained.

20               Do you remember what he was wearing?

21               THE WITNESS:  No.

22      Q      Was there a conversation with anyone in

23   your presence about what Antron McCray would wear?

24      A      Yes.

25      Q      What   do   you   remember   about   that

10/13/89

NYCLD_023144

P-APP001855

T4-fr

399

REYNOLDS - PEOPLE - DIRECT - LEDERER

1

2    conversation?

3        A        Detective Rosario asked Bobby McCray, he

4    asked him if Antron could wear the same  clothes  he

5    wore the night before, and they agreed.

6        Q        Did you notice anything about his clothes

7    when he came out of the apartment?

8        A       Yes, they were entirely  covered  with  dry

9    mud.

10       Q        When  you  returned to the Central Park

11   Precinct, did you conduct any interviews of  any  of

12   the  suspects that you already named, that is, Kevin

13   Richardson, Steve Lopez, or Raymond Santana?

14       A        No, I didn't.

15       Q        And did you at any time conduct or were you

16   present during any interviews with  Michael  Brisco,

17   Kharey Wise, Antron McCray or Yusaf Salam?

18       A        No.

19       Q        Did you voucher any property in connection

20   with this case?

21       A        No.

22       Q        Did you  go  out  and  pick  up  any  other

23   suspects in this case?

24       A        No, I didn't.

25            MS. LEDERER:  Thank you very much.

10/13/89

NYCLD_023145

P-APP001856

T5-1f

400

COLLOQUY

1
2          MR. MOORE:  Your Honor, may I approach
3    for one second?
4          THE COURT:  Yes.
5          (Discussion    at    sidebar,    off    the
6    record, between all counsel and the Court.)
7          THE COURT:  We'll take  a  ten  minute
8    recess.
9          (Whereupon, a brief recess was taken.)
10                    *       *       *
11          MS.   LEDERER:     May    I    make    an
12    application before the witness resumes?
13          THE COURT:  Yes.
14          COURT   CLERK:     Hearing    continued.
15    People  of  the  State  of New York against
16    Kharey Wise, Yusaf  Salam,  Antron  McCray,
17    Kevin   Richardson,  Steve  Lopez,  Michael
18    Brisco,  and  Raymond  Santana; Indictment
19    4762 of '89.
20          THE COURT:  Yes.
21          MS.  LEDERER:   Your Honor, during the
22    break, when I returned from  being  in  the
23    corridor,  I  returned to fine Jessie Berman
24    standing against  the  side  wall  in  this
25    courtroom  holding  some  xeroxed  pages, and

10/13/89

NYCLD_023146

P-APP001857

T5-1f

401

COLLOQUY

1
2  showing them to Pablo Guzman.  As I  looked
3  at   the   pages,   I   could   see  from  that
4  distance they were  xeroxed  pages  of  the
5  Steno  book.   I asked if I could see "what
6  you have in your hands."   He  said,   "No,
7  it's Rosario material with my notes on it."
8     There  was  a  protective order issued
9  with respect to this material.  Mr.  Berman
10  asked  that  the protective order be issued
11  by both sides.  Sharing the material turned
12  over two days ago  with  the  media  is  a
13  violation of that protective order.
14     THE   COURT:   Mr.  Berman; is  that
15  correct?
16     MR. BERMAN:  Is what correct?
17     THE COURT:  What counsel just said, is
18  that correct?
19     MR. BERMAN:  Part of  it  is  correct,
20  but  the  conversation  I had was not about
21  this case at all.
22     THE   COURT:   In  other  words,  the
23  document  you  showed  was  not a document,
24  Rosario material in this case, is that what
25  you are saying?

10/13/89

NYCLD_023147

P-APP001858

T5-1f

402

COLLOQUY

1
2
3
4
5
6

MR. BERMAN:   The document was a document of Rosario material in this case, but the conversation was not about this case, but something completely unrelated to this case.

7
8

THE COURT:   And you didn't show him this page?

9
10

MR. BERMAN: I didn't show him any of the information on the paper.

11
12
13

THE COURT:   You were holding it in your hand, and you were talking about something else?

14
15

MR. BERMAN:  I make the representation to the Court --

16
17
18

MS. LEDERER:   He was holding it up, both were looking at the page.  It was a steno book page from Officer Reynolds.

19

THE COURT:  You deny that, Mr. Berman?

20
21

MR. BERMAN:   I didn't check what it was that I was holding.

22
23

THE COURT:   YOu say you were not showing it to the press?

24
25

MR. BERMAN: Not the text of what was in it, no, no.

10/13/89

NYCLD_023148

P-APP001859

T5-1f

403

COLLOQUY

THE COURT:  That's equivocal.

MR. BERMAN:  I can tell you  in-camera
what  the  conversation  was,  it  doesn't
relate to this case.

THE COURT:  I don't want to know  what
the  conversation  was.   I want to know if
you were  showing  the  document  you  were
foreclosed from showing to the press.

MR.  BERMAN:      I   wasn't  showing
anything.

THE COURT:   Bring  the  witness  out.
Let's go.

(Whereupon the witness, Police Officer
Eric  Reynolds,  resumed  the  stand  and
continued  to   testify  under  oath  as
follows:)

COURT  CLERK:   Sir,  I would like to
remind you you are still under oath.

CROSS EXAMINATION

BY MR. BERMAN:

Q   Officer, where did you have the  defendants
lie  down  and  go  to  sleep during that night, the
people you had in custody, where did you give them a
place to sleep that night?

10/13/89

T5-1f

404

REYNOLDS — PEOPLE — CROSS — BERMAN

1

2      A    They just, just actually, they went to

3  sleep on their own. I didn't --

4      Q    I don't imagine that you helped them go to

5  sleep. I'm asking you where did you give them a

6  place to sleep?

7      A    I didn't designate any area.

8      Q    I don't know what designate means. Did you

9  give them a place to sleep?

10     A    No, they slept where they were.

11     Q    Is that sitting in the chairs that don't

12 appear on the diagram there?

13     A    A couple of them slept in the chairs. A

14 couple slept on the floor.

15     Q    They were permitted to sleep on the floor?

16     A    Yes.

17     Q    What time did Steve Lopez' father appear at

18 that precinct as far as you know?

19     A    Probably a little after two, I believe, or

20 around that area. I'm not sure.

21     Q    Was he given the same treatment you told us

22 you gave Mr. Richardson's mother, to wit, told to

23 wait outside in another room?

24     A    Yes.

25     Q    And as you understood the Family Court act

10/13/8?

NYCLD_023150

P-APP001861

T5-1f

405

REYNOLDS - PEOPLE - CROSS - BERMAN

1  and the procedures you were supposed to follow, the

2  idea was to keep defendants apart from their

3  parents?

4  MS. LEDERER: Objection.

5  THE COURT: Objection sustained.

6  Q   Well, did you speak to Mr. Lopez when he

7  arrived?

8  A   Yes.

9  Q   Did you tell him he could come into the

10 room and sit with his son and talk with his son?

11 A   No.

12 Q   You told him to get out of there, didn't

13 you?

14 A   No.

15 Q   You told him he couldn't come into the

16 room?

17 A   Yes.

18 Q   And it's your testimony that these various

19 parents were called and told over the phone

20 essentially, "Come down and pick up your kids;"

21 isn't that right?

22 A   My partner made the notifications.

23 Q   Well, the testimony you gave on direct, you

24 didn't have trouble remembering this. Didn't you

10/13/89

T5-1f

406

REYNOLDS — PEOPLE — CROSS — BERMAN

1

2  say, your parents called, you told them to come

3  down?

4             MS. LEDERER:  Objection.

5             THE COURT:  Objection sustained.

6    Q       As far as you understand it, didn't your

7  partner call the parents in essence to come down and

8  pick up their children?

9    A    Yes.

10    Q     And when they came to pick up their

11  children, they were told to keep out and wait

12  outside in another room; is that right?

13    A   Yes, I asked them to wait in another room.

14    Q    And after they waited a few hours, you told

15  them if they wanted to, they could go out and buy

16  food for their children?

17    A   Yes.

18    Q     And is it fair to say -- well, let me ask

19  you, do you know when it was that Steven Lopez'

20  father was finally able to sit down and talk with

21  Steven Lopez at that precinct that night or the next

22  day or the next day?

23    A    It was probably the time we started the

24  interviews.

25            MR. MADDOX:  Could the witness repeat

10/13/89

NYCLD_023152

P-APP001863

T5-1f

407

REYNOLDS - PEOPLE - CROSS - BERMAN

the last answer?

THE COURT:    Read  the  answer  back, please.

(Reporter complies)

Q    Well, the interview with Steven Lopez, did this begin at 9 p.m. approximately on April 20th, if you know?

A    I don't know.

Q    Did  you  ever  see  Steven  Lopez' father sitting  down talking with Steven Lopez at any point in that precinct or the next precinct  or  the  next precinct in this case?

A    I don't recall that.

Q    Not that you can recall?

A    Excuse me?

Q    Not that you can recall?

A       I  might  have  seen  it.  I just don't remember if I did or not.

Q    For what crime did you arrest Steven Lopez?

A    Unlawful assembly.

Q    And it's your understanding that  was  a  B misdemeanor; is that right?

A    I believe so.

Q       Is  it your understanding what you were

10/13/89

NYCLD_023153

P-APP001864

T5-1f

408

REYNOLDS — PEOPLE — CROSS — BERMAN

1

2    arresting him for, what facts were you arresting him

3    for?

4                    MS. LEDERER:   Objection.

5                    THE COURT:   Objection sustained.

6    Q      Well, this crime of unlawful  assembly,  is

7    that  an  unlawful assembly that occurred outside of

8    Central Park or inside Central Park?

9    A      That was Central Park.

10   Q      And at the time you arrested Steven  Lopez,

11   what  evidence  did  you  have that he had ever been

12   inside Central Park that night?

13                   MS. LEDERER:   Objection.

14                   THE COURT:   I'll let him answer.

15   A      Could you repeat the question, please?

16   Q      AT that time, the time you arrested Steven

17   Lopez,  what  evidence  did  you  have  that  he, in

18   particular, had  ever  been  in  Central  Park  that

19   night?

20   A         That  he  was  with  the group that had

21   assaulted the jogger earlier.

22   Q      And what evidence did you have that the ten

23   to fifteen people you described on the west side  of

24   Central  Park  West  were people that had assaulted a

25   jogger earlier?

10/13/89

T5-1f

409

REYNOLDS — PEOPLE — CROSS — BERMAN

1

2    A    They made statements that they were at the
3    scene of the assault.

4    Q    Those statements were after you had taken
5    Steven Lopez into custody, weren't they?

6    A    Yes.

7    Q    At the time you took Steve Lopez into
8    custody, what evidence did you have that he was part
9    of a group that had assaulted anybody that night?

10   A    What evidence did I have at that point?

11   Q    At the time you took him into custody?

12   A    That he was with the group. He was with
13   the group that had run, that we were looking for
14   that evening.

15   Q    Let's not confuse more than one group here,
16   possibly.

17            THE    COURT:    Objection sustained.
18        Let's not make observations. Just ask
19        questions.

20   Q    There were a number of youths that you saw
21   from your van, that you saw on Central Park West
22   walking north on the west side of Central Park West;
23   is that correct?

24   A    That's right.

25   Q    What time was that that you saw them?

10/13/89

P-APP001866

T5-1f

410

REYNOLDS — PEOPLE — CROSS — BERMAN

1

2     A     Approximately 10:30.

3     Q     Did you see them exit from the park?

4     A     No.

5     Q     Were they disorderly in any way when you

6 were watching them?

7     A     No.

8     Q     Were they carrying any weapons when you

9 were watching them?

10     A     Not that I could see.

11     Q     And at some point you and your partner got

12 out of your van, is that right?

13     A     Yes.

14     Q     And how were you dressed, by the way?

15     A     I was wearing dungarees, and I believe a

16 windbreaker and a sweatshirt.

17     Q     And your partner?

18     A     I don't recall. I know he was wearing

19 sneakers and dungarees.

20     Q     And is it fair to say that prior to getting

21 out of this green van, your partner had driven the

22 van in such a position as to cut off the direction

23 that the youths on the street were walking?

24     A     Yes.

25     Q     You were basically -- your partner drove

10/13/89

NYCLD_023156

P-APP001867

T5-1f

411

REYNOLDS - PEOPLE - CROSS - BERMAN

1
2      the van so as to block the sidewalk or the crosswalk
3      at the southwest corner of Central Park West and
4      102nd Street.
5          A      We didn't block where they were walking,
6      no.
7          Q      Where exactly did that van come to a stop?
8          A          The southwest corner of 102nd Street and
9      Central Park West.
10         Q      Was the van facing -- I think you said the
11     van was facing west; is that right?
12         A      Yes.
13         Q          And was any part of the van in the
14     crosswalk, that is the crosswalk if one would try to
15     cross at 102nd Street, going north on the west side
16     of Central Park West?
17         A      No.
18         Q      Was the van entirely east of that crosswalk
19     or entirely west of that crosswalk?
20         A      It was entirely east.
21         Q      In other words, out in the street?
22         A      Yes.
23         Q      In Central Park West?
24         A      Yes.
25         Q          So this parked van, it had the "Park"

10/13/89

T5-1f

412

          REYNOLDS — PEOPLE — CROSS — BERMAN

1

2   insignia on the doors?

3       A    Yes.

4       Q    And it made a left turn into the southbound

5   lane of Central Park West such as to block that

6   southbound lane?

7       A    Yes.

8       Q    And it came to a stop in the middle of the

9   street in the roadway?

10      A    Yes.

11      Q    And the two of you got out, not in Park's

12  Department Uniforms?

13      A    No, we weren't.

14      Q    And you -- did you walk south towards the

15  youths who were walking north?

16      A    Yes.

17      Q    And at that point some of them ran and some

18  of them didn't; is that right?

19      A    That's right.

20      Q    And Steve Lopez was one of the two who

21  didn't run?

22      A    Right.

23      Q    And at that point you took him into

24  custody?

25      A    Yes.

10/13/89

NYCLD_023158

P-APP001869

T5-1f

413

REYNOLDS — PEOPLE — CROSS — BERMAN

1

2     Q    And you took him into custody for the

3 misdemeanor of unlawful assembly that had occurred

4 where?

5     A    96th Street on the bridle path there by the

6 reservoir on the west side.

7     Q    Inside the park?

8     A    Yes.

9     Q    And your belief or hunch that he had been

10 part of the assault on Mr. Loughlin derived from the

11 fact that -- well, you tell me.

12     A    Excuse me?

13     Q    What was the source of your belief that

14 Steven Lopez had been part of an assault on the

15 jogger, Mr. Loughlin?

16     A    Because we received a description of the

17 group of male hispanics and blacks that were

18 teenaged, going through the park assaulting joggers.

19 That was the description I was given for the assault

20 on Mr. Loughlin. When we approached the group which

21 Steve Lopez was part of, the entire group ran with

22 the exception of himself. He then stated he wasn't

23 part of the group, and it was very obvious that he

24 was.

25     Q    He stated he wasn't part of the group.

10/13/8?

NYCLD_023159

P-APP001870

T5-1f

414

REYNOLDS - PEOPLE - CROSS - BERMAN

1
2   That was after you put him in custody with him
3   against the wall; isn't that right?
4       A    As we were doing it.
5       Q    But your decision to seize Steve Lopez was,
6   based on the fact that he had been walking along the
7   street with a dozen or so other youths, some of whom
8   ran at the sight of the uniformed men getting out of
9   a van, is that right?
10      A    Yes.
11      Q    And in your mind you felt it was probably
12  he had assaulted Mr. Loughlin?
13              MS. LEDERER:  Objection.
14              THE COURT:  I will let him answer.
15      A    Yes.
16      Q    You felt it was more likely than not he
17  personally had assaulted Mr. Loughlin?
18              MS. LEDERER:  Objection.
19              THE COURT:  Objection sustained.
20      Q    Now, what did you arrest him for, unlawful
21  assembly or assault?
22      A    For the unlawful assembly.
23      Q    Well, didn't you fill out some forms that
24  said you arrested him for assault and had crossed
25  that out and wrote in unlawful assembly?

10/13/89

NYCLD_023160

P-APP001871

T5—1f

415

REYNOLDS — PEOPLE — CROSS — BERMAN

1

2    A    Yes.

3    Q    Could you explain that to us?

4    A        What happened is when we make arrests,

5    behind our desks we have packages of the paperwork

6    that we have to do.   And in this case, it's an

7    unusual number we had.  You know, there was five,

8    and there was a lot, and we were trying to get them

9    done as quickly as possible.  We sort of do it as an

10   assembly line ——

11   Q    If I could interrupt.  When you say "we" as

12   plural ——

13        MS. LEDERER:  Objection.

14        THE COURT:  I will allow that.

15   Q    Could you indicate what you did yourself as

16   you go on?

17   A    As far as doing the paperwork?

18   Q    When you say "we tried to do it as  quickly

19   as  possible,"  are  you talking about all of you or

20   yourself?

21   A    I tried to do my paperwork  as  quickly  as

22   possible.

23   Q        Was  it  you who did all the paperwork?

24   Except for a little help from  Officer  Powers,  you

25   were the one that did the paperwork?

10/13/89

NYCLD_023161

P-APP001872

T5-1f

416

REYNOLDS — PEOPLE — CROSS — BERMAN

1

2      A       Yeah, most of it.

3      Q             And to do it as quickly as possible you

4  didn't enlist anybody else to help  you   because  it

5  was taking so many hours?

6      A       Excuse me?

7      Q        You said it took you two, two-and-a-half

8  hours to do that initial paperwork?

9      A       Yes, approximately.

10     Q      And did you ask anybody to come up and help

11  you because it was taking so long?

12     A       I had help from Officer Powers and  Officer

13  Hennigan.

14     Q         Could  you  explain  again -- could you

15  continue with your explanation,  rather,  about  how

16  you came to write one charge against Steve Lopez and

17  cross it out and write a different one?

18     A       We had three defendants under arrest for

19  assault.  In putting in the charges, I took all  the

20  arrest reports and started to write.  I guess I must

21  have  thought  it  was someone else's report without

22  looking at the name on it.  And when I  realized  it

23  was his, I probably just crossed it out.

24     Q        Do you have any recollection of how that

25  happened?

10/13/89

NYCLD_023162

P-APP001873

T5-1f

417

REYNOLDS - PEOPLE - CROSS - BERMAN

1

2      A     No, it was probably just a mistake.

3      Q     But is it your testimony that from the

4  start, you had in mind you were arresting him only

5  for the misdemeanor of unlawful assembly and not for

6  the assault on the jogger?

7      A     When you say, "from the start," --

8      Q     From the point where you took him into

9  custody.

10     A     At that point we were thinking assault.

11     Q     Could you use the singular-

12     A     I was thinking assault.  Sorry.

13     Q     You were thinking assault?

14     A     Yes.

15     Q     When did you change your thinking?

16     A     When we went back to 100 Street and Central

17  Park West.

18     Q     When would that be?

19     A     I'd say about ten minutes later.

20           MR. MADDOX:  Could he speak louder?

21           THE COURT:  Talk into the microphone.

22           THE WITNESS:  About ten minutes later.

23     Q     And what caused you to change your mind as

24  to Steve Lopez to the assault; to change your mind

25  to make it unlawful assembly?  What happened at 100

10/13/89

NYCLD_023163

P-APP001874

T5-1f

418

REYNOLDS — PEOPLE — CROSS — BERMAN

Street and Central Park West about ten minutes after you seized Steven Lopez that made you change your mind and consider him as having been arrested for unlawful assembly rather than assault?

A    What happened was Kevin Richardson, Lamont McCall  and Clarence Thomas, I was informed had made statements, placing themselves at  the  location  of the  assault on the jogger, Mr. Loughlin. He didn't make any statement to that, but it  was  obvious  he was with the group, to me.

MR.   MADDOX:     Objection   to   the characterization, "obviously."

THE COURT:  I will  allow  it,  that's his state of mind.

MR. RIVERA:    Could  I have the last statement read back?  I didn't hear it.

THE COURT:  Read it back.

(Reporter complies)

Q    It was obvious ——

MR. RIVERA:  Your Honor, did you  have that  statement  read  back?  I didn't hear it.

THE COURT:  Read it back.

(Reporter complies)

10/13/8

T6-fr

419

REYNOLDS — PEOPLE — CROSS — BERMAN

1

2    Q    It was obvious to you that he was with   the

3    group   that   you   saw   at Central Park West; is that

4    correct?

5    A    Yes.

6    Q    Did you have any evidence that he had   been

7    with the group when a group was inside the group?

8    A    No, not at that point.

9         THE   COURT:   Excuse me —— Officer, you

10        have to talk into the microphone.

11        THE WITNESS:   No, not at that point.

12   Q    And you decided to take him to the precinct

13   at that point?

14   A    Yes.

15   Q    And book   him   formally   for   the   unlawful

16   assembly?

17   A    Yes.

18   Q    But you accidently wrote down, "assault" on

19   the forms at the precinct?

20   A    That's correct.

21   Q         And then later you crossed that out and

22   wrote "unlawful assembly"?

23   A    Right.

24   Q    The complaint report that you prepared   for

25   the   unlawful   assembly   against Steve Lopez, do you

10/13/89

NYCLD_023165

P-APP001876

T6-fr

420

REYNOLDS - PEOPLE - CROSS - BERMAN

1   know what time you prepared the complaint report?

2   You can certainly look at it if you need it.

3          MS. LEDERER: There are two complaint

4          reports. One is handwritten and one is

5          typed. Can I ask which one you are

6          referring to?

7          MR. BERMAN: I have the typed one in

8          front of me. The handwritten one is the

9          one we were given in court this morning.

10         THE COURT: Is that the one you're

11         asking about?

12         MR. BERMAN: Well, why don't you get

13         both of them in front of you and then you

14         can tell me about them. Actually, do you

15         have the original of any of those?

16         THE WITNESS: No.

17         MR. BERMAN: Can I inquire if the

18         prosecutor has the original because there

19         seems to be alterations on that time.

20         THE COURT: Are the originals

21         available?

22         MS. LEDERER: I have a carbon of the

23         typed --

24         MR. BERMAN: May I show the Court what

10/13/8

T6-fr

421

REYNOLDS - PEOPLE - CROSS - BERMAN

1

2      I have?

3          THE COURT:   He  is  asking  for  the

4      handwritten original.

5          MS. LEDERER:  Yes, I do.

6          MR. BERMAN:  Can I have this marked as

7      Defendant Lopez B at this point?

8          THE COURT:  Yes.

9          (Document  so marked Deft. Lopez B for

10     identification.)

11         MR.  BERMAN:    May  I  approach  the

12     witness and share this document with him?

13         THE COURT:  Yes.

14         MR. MADDOX:  Judge, can Mr. Berman let

15     us know what documents?

16         THE COURT:  This is Lopez B.

17         MR.  BERMAN:  I imagine its clear, but

18     in case it isn't, I also want to have Lopez

19     B-1 marked which is a xerox  that  we  were

20     given the last minute this morning.

21         THE COURT:  So marked.

22         (Document  so  marked  Deft. Lopez B-1

23     for identification.)

24 BY MR. BERMAN:

25     Q    Officer, I'm putting before you and  trying

10/13/89

NYCLD_023167

P-APP001878

T6-fr

422

REYNOLDS — PEOPLE — CROSS — BERMAN

1

2 to look at it at the same time as you two documents.

3 Am I correct that Defendant Lopez Exhibit B for

4 identification is the handwritten complaint report

5 prepared by you regarding Steve Lopez; regarding the

6 unlawful assembly charge in this case?

7     A     Yes.

8     Q       And that B-1 appears to be a xerox of the

9 same?

10    A     Yes, it is.

11            MR. BERMAN:  Can I offer these two  in

12        evidence at this time, Judge.

13            THE COURT:  Any objection?

14            MS.   LEDERER:       I   object  --  no

15        foundation.

16            THE COURT:  I'll allow it.

17            All right, mark them.

18            (Deft Lopez B  and  B-1  received  and

19        marked into evidence.)

20 BY MR. BERMAN:

21    Q       Placing these documents in front of you

22 again, we can begin with that question I started  to

23 ask  about  the  time this report was prepared.  Can

24 you first tell me from your  own  recollection  when

25 this  report  was prepared, your handwritten report,

10/13/8

NYCLD_023168

P-APP001879

T6-fr

423

REYNOLDS — PEOPLE — CROSS — BERMAN

1
2     the complaint report from your own recollection?
3          A    Can I look at it?
4               THE COURT:  Why don't you  stand  over
5          here  and  he'll  look at you and he'll talk
6          into the microphone so everybody  can  hear
7          him.
8               MR. BERMAN:  Over here?
9               THE  COURT:   Do  you  have  to stand
10         beside him?
11              MR. BERMAN:  We only have one original
12         and  I  have  the  original  and  there  is
13         something --
14              THE  COURT:   I don't want to look at
15         them.
16              MR. BERMAN:  Take a look at them --
17              THE COURT:  I don't want  to  look  at
18         them now.  Show them to the witness.
19         Q         Without looking at the document, do you
20    have an  independent  recollection  about  when  you
21    prepared Defendant Lopez' Exhibit B in evidence?
22         A    No, I don't recall what time that was.
23         Q         Looking  at  it, do you recall when you
24    prepared it?
25         A    Looking at the time it appears to  be   3:00

10/13/89

NYCLD_023169

P-APP001880

T6-fr

424

REYNOLDS - PEOPLE - CROSS - BERMAN

1

2  the next day.

3      Q        Is it fair to say that somebody has put

4  some white-out on the time on this?

5      A     Yes.

6      Q     Was that you?

7      A     Probably, yes.

8      Q     And is it fair  to  say  that  through  the

9  white-out  you  could see that someone had written a

10  number and had written  another   number   on   top   of

11  that,   and then there appears to be white-out on top

12  of it, do you get the same reading as  you  look  at

13  it?

14      A     Probably yes.

15      Q     Can you explain how that happened?

16      A        I believe it was because I started it in

17  the morning, and then I put it aside and  forgot  to

18  complete it and then I completed it the next day, so

19  I put the time that I had completed it.

20      Q        And then you put white-out on top of the

21  changed time?

22      A     Yes, because a civilian typed this out  and

23  I had to make it legible, so she could see what time

24  it was.

25      Q        And  after you put the white-out on the

10/13/89

NYCLD_023170

P-APP001881

T6-fr

425

REYNOLDS — PEOPLE — CROSS — BERMAN

1  second time, you had written  --  did  you   write   a
2  number in?
3
4     A     Yes.
5     Q     And how about down here where you had "61
6  number 281" appears to be whited out?
7        Did you do that?
8     A     Yes.
9     Q     Now, looking at Defendant  Lopez  B-1,  can
10 you see the number 281 for a UF-61 number on it?
11    A     No.
12    Q     In other words,the copy that was given to
13 the Defense doesn't show what is whited out  on  the
14 side?
15    A     No, I don't see a number on it.
16    Q     One would have to rely on the honesty of
17 the Prosecutor to know that what they gave you isn't
18 what the real thing is?
19        MS. LEDERER:  Objection.
20        THE COURT:  Objection sustained.
21        MR. BERMAN: Judge, are  you  ready  to
22     look at them yet?
23        THE  COURT:    No,  I'm not.  Ask your
24     questions.  I'll  look  at  the  documents,
25     they're in evidence.  I must look at them.

10/13/89

T6-fr

426

REYNOLDS - PEOPLE - CROSS - BERMAN

1

2    Q        What time did you prepare this complaint

3    report?

4    A    Well, what time did I start?  What time did

5    I finish?

6    Q    Well, the report asks for the military time

7    and date of this report.  What's the  military  time

8    and date of this report?

9    A    I believe it's 15:00 hours.

10   Q    On what date?

11   A    4/20/1989.

12   Q        Do you see where the date has also been

13   whited out, it either says 20 or it either says  21,

14   but  it's  not  clear.    Do you see the date's been

15   altered also?

16   A    The date's changed, whether it  was  21   or

17   not, I'm not sure.

18   Q        Was it changed from 21 to 20 or 21 to 20

19   (sic)?

20   A    It could have even possibly been  the  19th

21   when I started the report.

22   Q        In terms of when it says here "military

23   time and date of this report,"  you  said  that  the

24   time of this report is 15:00.  I ask you what is the

25   date of this report?

10/13/8?

T6-fr

427

1          REYNOLDS — PEOPLE — CROSS — BERMAN

2                MS. LEDERER:  Objection.

3                THE COURT:  I'll let him answer.

4     A     The date is —— what's written on here?

5     Q           The report has a printed portion.  When
6  it's a blank report, it has a printed portion,
7  right?

8     A     That's correct.

9     Q           And it asks you, the officer, to fill in
10  the blanks, right?

11    A     Yes.

12    Q     It asks you under number 17 to give the
13  date of the report?

14    A     That's correct.

15    Q     What's your answer to number 17?

16    A     What's placed there now is 4/20/1989.

17    Q           And is it your testimony that you first
18  wrote 4/21 and later, as time went by, you changed
19  it to 4/20?

20    A     No, that's not my testimony.

21    Q     How do you account for the apparent 21 that
22  is also written in the same area?

23    A           Actually —— like I said before, I'm not
24  sure if it's the 19th or the 20th.

25    Q     Thank you.  Showing you the report again,

10/13/89

T6-fr

428

REYNOLDS - PEOPLE - CROSS - BERMAN

1

2  Defendant Lopez Exhibit B in evidence, in terms of

3  the details that appear in that large block near the

4  bottom of the report, where it calls upon you to

5  reconstruct the occurrence, including the method of

6  entry and escape, including unique and unusual

7  actions, you wrote -- why don't you read what you

8  wrote?

9      A    "At time and place of the occurrence,

10  perps, named above, in the company of ten to twenty

11  others, did engage in violent and tumultuous

12  behavior, see UF-61 number 280 and aided number

13  156."

14     Q    And what was the "violent and tumultuous

15  behavior" you were referring to?

16     A    The assault on the jogger, Mr. Loughlin.

17     Q    Specifically the assault on Mr. Loughlin,

18  is that what you're referring to?

19     A    Yes.

20     Q    And as far as you understood it, when you

21  prepared the report, what time did the assault on

22  Mr. Loughlin happen?

23     A    Excuse me?

24     Q    What time did the assault on him happen at?

25     A    That's on the other complaint report.

10/13/89

NYCLD_023174

P-APP001885

T6-fr

429

REYNOLDS - PEOPLE - CROSS - BERMAN

1

2    Q    If you want to look at it, if you have it
3 or if you know?

4         In other words, what is the time of the
5 crime that you're talking about here?

6    A    I don't have that complaint report with me.
7 I'm not sure of the time.

8         MR. BERMAN:   May I have a moment,
9         please, Judge?

10        THE COURT:   Yes.

11   Q    At the time of the report that we're
12 referring to, you entered a time for the occurrence,
13 is that right?

14   A    Yes.

15   Q    What time did you enter for the occurrence?

16   A    22:40.

17   Q    And that would be on the 19th of April?

18   A    Yes.

19   Q    That would be at 10:40 at night?

20   A    Yes.

21   Q    Now, is that when you claim that Mr.
22 Loughlin was assaulted?

23        MS. LEDERER: Objection.

24        THE COURT:   I'll allow it.

25        THE  WITNESS:  No, that's not the time

10/13/89

T6-fr

430

REYNOLDS — PEOPLE — CROSS — BERMAN

2      he was assaulted.

3      Q     All right, where it says "occurrence," Item

4   23, the time of the occurrence, you wrote "10:40   at

5   night the occurrence occurred." Is that right?

6      A     Yes, that's what I put.

7      Q     That's wrong, right?

8      A     Yes, it is.

9      Q      Mr. Loughlin was assaulted an hour earlier

10  or so, right?

11     A     Yes.

12     Q     22:40  represents  approximately  the  time

13  that you arrested Steve Lopez, isn't that right?

14     A     Yes, that's correct.

15     Q       And  when you arrested him for unlawful

16  assembly and you stated that the occurrence that you

17  were arresting him for occurred at 22:40, you   were

18  talking  about his being on Central Park West with a

19  dozen or so youths, isn't that right?

20     A     Could you repeat that?

21     Q     When you wrote  in  this  report  that  the

22  occurrence  for  which you had arrested Steve Lopez,

23  and you wrote in here the occurrence was  "unlawful

24  assembly," when you wrote it occurred at "22:40" you

25  were  talking  about  his being on Central Park West

10/13/89

T6-fr

431

REYNOLDS — PEOPLE — CROSS — BERMAN

1

2   with a dozen or so youths at 22:40; isn't that

3   right?

4       A    No, it is not.

5       Q    Where does the 22:40 come from?

6       A       That's the time we brought them back to

7   Central Park West at 100 Street.

8       Q    But the box, am I right, calls for the time

9   of occurrence, right, not the time of the arrest or

10  the time that you got there to the precinct, am I

11  right?

12      A    That's correct.

13      Q    And the complaint that reflects your arrest

14  of Steven Lopez for the unlawful assembly has you

15  saying his crime happened at 22:40, isn't that

16  right?

17      A    Yes.

18      Q    And at 22:40 he wasn't committing any

19  crime, was he?

20      A    No, he was in our custody.

21      Q       By the way, did Steve Lopez resist arrest

22  in any way?

23      A    No.

24      Q    Did you have to use any force to arrest

25  him?

10/13/89

P-APP001888

Case 2:20-cv-00180-JLB-MRM   Document 46-9   Filed 07/01/20   Page 185 of 257 PageID 2880

T6-fr

432
1        REYNOLDS — PEOPLE — CROSS — BERMAN
2     A      No.
3     Q       In   what   precinct did you arrest Steve
4  Lopez?
5     A      In   what   precinct   was   he   placed   under
6  arrest?
7     Q      Yes?
8     A      The Central Park Precinct.
9     Q      Tell me "what placed under arrest" means as
10  opposed to "arrest"?
11           MS. LEDERER:   Objection.
12           THE COURT:   I'll allow it.
13           THE   WITNESS:    I don't understand.   I
14       don't understand the question.
15           THE COURT:    What   do   you   understand
16       that   question to mean, location of arrest,
17       is   that   what   you're   asking   him?   The
18       precinct   of   arrest;   is   that what you're
19       asking him?
20           MR. BERMAN:   Yes.
21           THE COURT:    Do   you   understand   the
22       question?
23     Q       When you arrest somebody at Central Park
24  West and 102nd Street, you are arresting them in the
25  24th Precinct; is that right?

10/13/89

P-APP001889

T6-fr

433

REYNOLDS - PEOPLE - CROSS - BERMAN

1

2    A    Yes.

3    Q    When you take them down to the Central Park

4    Precinct to book them there, you are booking them in

5    the Central Park Precinct, right?

6    A    That's correct.

7    Q    What was the precinct of arrest for  Steven

8    Lopez in this case?

9    A         It was -- well, when we considered them

10   under arrest at 100th Street and Central Park  WEst.

11   That's  where  we  --  that's why we put Central Park

12   Precinct.

13   Q    Well, 100  Street  and  Central  Park  West

14   would be the 24th Precinct, wouldn't it?

15   A         No, we were inside the park, inside the

16   wall right there.   That  driveway  right  there  is

17   considered part of the park.

18   Q         But you took him into custody up on 102nd

19   Street on the west side of Central Park?

20   A    Yes.

21   Q    You are not disputing  you  took  him  into

22   custody in the 24th Precinct, right?

23   A    No.

24   Q    You agree with me on that?

25   A    Yes.

10/13/89

NYCLD_023179

P-APP001890

T6-fr

434

REYNOLDS — PEOPLE — CROSS — BERMAN

1

2   Q        Do you have your on-line booking sheet
3   arrest worksheet?

4   A    Yes.

5   Q    Do you see item five on that, "the precinct
6   of arrest"?

7   A    Yes.

8   Q    And it says, "022"?

9   A    Yes.

10  Q    That's the Central Park Precinct; is that
11  correct?

12  A    That's correct.

13  Q        So in your nomenclature, although Steven
14  Lopez was arrested in the 24th Precinct, the Central
15  Park Precinct is the precinct of his arrest?

16  A    Yes.

17  Q    And the time of his arrest, Item 20 on that
18  on-line booking system arrest worksheet is 2250?

19  A    Yes.

20  Q    Would that be when he was taken into
21  custody by you on 102nd Street, would that be when
22  you took him into the park at 100 Street or would
23  that be when you got him to the precinct at 86th
24  Street?

25  A    That was the time we started to bring him

10/13/89

T6-fr

435

REYNOLDS - PEOPLE - CROSS - BERMAN

1
2  back into the precinct.
3      Q        Under Item 33, where it says that his
4  mother was notified, is it you or your partner or
5  somebody else who notified his mother?
6      A     It was my partner.
7      Q     Does your partner speak Spanish?
8      A     I don't believe so, no.
9      Q     We're talking about Officer Powers?
10     A     That's correct.
11     Q        Did there come a time when you offered
12  Steve Lopez the opportunity to make a phone call?
13     A     No.
14     Q     Did anybody else offer him the opportunity
15  to make a phone call in your presence?
16     A     Not that I recall, no.
17     Q        To the extent that the on-line booking
18  system arrest worksheet under item 15 says, "Refused
19  telephone calls," can you account for that?
20     A     Whenever someone doesn't have a phone call
21  or doesn't make one, you can not leave it blank, you
22  have to put something in it, it's refused.
23     Q     So if they're never given a chance to make
24  a phone call, you write in "refused"?
25     A     It's not that he wasn't given a chance, he

10/13/89

NYCLD_023181

P-APP001892

T6-fr

436

REYNOLDS — PEOPLE — CROSS — BERMAN

1 didn't ask to make a phone call.   It wasn't offered.

Q        And to you, it wasn't offered means the same as refused?

A        Excuse me?

Q        To you, "wasn't  offered"  means  the  same thing as refused?

A        In the case of making phone calls, yes.

Q        Do you have the Family Court Supporting Deposition with you, the one for Steve Lopez?

A        Yes.

Q        Did you prepare that?

A        Part of it, yes.

Q        I mean, did you swear to it?

A        Yes.

Q        It's got your signature at the bottom?

A        Yes, that's it.

Q        And you swore to it on April 20th?

A        That's correct.

Q        Do you remember  what  time  you  swore  to this?

A        I don't recall.

Q        Can you say whether it was early in the day or  late  in  the  evening, any idea at all when you swore to this on April 20th?

10/13/89

NYCLD_023182

P-APP001893

T6-fr

437

REYNOLDS — PEOPLE — CROSS — BERMAN

A    I don't recall.

Q    Now, in that form — it's an affidavit basically, isn't it?

A    Yes.

Q    And in that affidavit the form asks where and when the conduct occurred; is that correct?

You see where it says "engaged in the following conduct," about a third of the way down the page?

A    Yes.

Q    And did you swear on April 20th that the criminal conduct complained of against Steven Lopez had been engaged in on April 19th at 22:50 hours?

A    Did I swear to it, is that the question?

Q    The deposition that you told us you swore to.

Q    This deposition you've already told us you swore —

THE COURT:  The question is, did you swear to it.  His question is did you swear to that?

MR. BERMAN:    I'll pose a different question.

THE COURT:  Okay.

10/13/8

NYCLD_023183

P-APP001894

T7-1f

438

REYNOLDS — PEOPLE — CROSS — BERMAN

Q       So you are clear, you swore  to  everything
that's in this deposition; isn't that right?

A       Yes.

Q        And is one of the things you swore to --
was one of the things you swore to,  was  that  the
conduct,  the  criminal conduct you were complaining
of as against Steve Lopez  had occurred after  April
19, 1989, at 22:50 hours?

A       Yes.

Q       And that was ten minutes after you arrested
him; isn't that right?

A       That is the time of the arrest.

Q        Let me go back.  Didn't we agree that the
time of the arrest on  that  other  form  was  22:40
hours?

A       What other form?

                MR.  BERMAN:  For Court purposes, it's
        Defendant Lopez Exhibit B in evidence.

Q       For  your  purposes,  it's  the  complaint
report.   You  remember  under item 23, you had the
time of occurrence being 22:40?

A       Right.

Q       Do you remember you  told  me  that  was  a
mistake;  it  wasn't  really  the  time  of  the

10/13/89

NYCLD_023184

P-APP001895

T7-1f

439

REYNOLDS — PEOPLE — CROSS — BERMAN

occurrence. The assault of Mr. Loughlin was an hour earlier. That was the time of the arrest?

A       I didn't say that.

Q       I'm sorry. Correct me. What does 22:40 represent?

A       That was the time we were at Central Park West at 100 Street.

Q       That's after you had taken him into custody, after he had been brought down to 100 Street; is that correct?

A       That's correct.

Q       The form I'm asking about now is the supporting deposition, the one you swore to there. You have the conduct occurring at 22:50 hours, ten minutes after Mr. Lopez had been taken into custody down to 100 Street. Am I correct, the 22:50 hours would be ten minutes after he was arrested?

A       Yes, that's correct.

Q       What criminal conduct were you complaining as to Steve Lopez occurring ten minutes after he was arrested?

A       Again that was a mistake as far as the time. What I was complaining about was that he was with the group that had engaged in that behavior,

10/13/89

NYCLD_023185

P-APP001896

T7-1f

440

REYNOLDS - PEOPLE - CROSS - BERMAN

including the assault on the jogger.

    Q    These series of mistakes as to time, is it fair to say you made these series of mistakes at the time because when you arrested Steve Lopez, he wasn't doing anything wrong, and you had no evidence that he had done anything before that?

    MS. LEDERER:  Objection.

    THE COURT:  I will allow it.

    A    Was it for that reason?

    Q    Yes.

    A    No.

    Q    Was it a stroke of luck you continuously substituted the approximate times of the arrest for the time of the conduct you were complaining of?

    MS. LEDERER:  Objection.

    THE COURT:  Sustained

    Q    Can we turn to the Probation Intake Referral Report, please.

    In the lefthand column, about a third of the way down the page, do you see where it says advised -- and this is in the printed portion of the form in all capitals -- "advised of Constitutional Rights by". Do you see that?

    A    Yes.

10/13/89

T7-1f

441

REYNOLDS – PEOPLE – CROSS – BERMAN

1
2
3    Q        By the way, before I go on with that, this
4    is another form that you signed down at the  bottom;
5    isn't that right?

6    A     Yes, that's correct.

7    Q              And   the   entry   for  "advised   of
     Constitutional   Rights   by"   says   "P.O."   is     that
8    correct?

9    A     That's correct.

10   Q     And that means police officer, right?

11   A     Yes.

12   Q     Does that refer to you?

13   A      Yes, it does.  When you say police officer
14   --

15   Q     I will pose the question.

16         In this instance, when it says "P.O."  were
17   you referring to yourself?

18   A     I was going to, but I didn't complete it.

19   Q     You were going to advise him of his rights,
20   but you didn't?

21   A     Right.  I was waiting for his parents.

22   Q          So you wrote the letters P.O. as to who
23   gave him his Constitutional Rights, but in fact, you
24   didn't give him his Constitutional Rights?

25   A     No, I didn't.

10/13/89

NYCLD_023187

P-APP001898

T7-1f

442

REYNOLDS - PEOPLE - CROSS - BERMAN

1

2    Q    And the next entry where it says "Parents

3   or guardian advised of Constitutional Rights by,"

4   that is blank, right?

5    A    Right.

6    Q    And the next entry where it says, "Were

7   Constitutional Rights waived by both parents and

8   respondent," neither yes nor no was checked; is that

9   correct?

10    A    That's correct.

11    Q    And where it says "Statement made by,"

12   that's blank too?

13    A    That's correct.

14    Q    And where it says, "Nature of statement,"

15   that's blank too, right?

16    A    Right.

17    Q    Now, this is dated April 20th and sworn by

18   you; am I correct?

19    A    The part that was sworn to is only the

20   bottom part.

21    Q    You don't usually sign your name on every

22   line of the form, do you?

23    A    No. But that's just for what it asked,

24   what I personally saw, where it says, "Describe

25   specifically the individual's behavior."

10/13/8

T7-1f

443

REYNOLDS - PEOPLE - CROSS - BERMAN

1

2    Q    It's your impression that is your signature

3    and    you    are    swearing    only    to    the    paragraph

4    immediately before your signature?

5    A    Yes.

6    Q    And that relates to just what you yourself

7    saw?

8    A    Yes.

9    Q    Could you read that paragraph.  But first,

10   read the instructions to the paragraph, please.

11   A    "Describe this -- "

12        MS. LEDERER:  Objection.

13        THE COURT:  Objection sustained.

14        MR. BERMAN:  Can I have the original

15        of that marked?  I don't have an original

16        on that, Judge.

17        THE COURT:  We can use a copy.  You

18        have a copy?

19        MR. BERMAN:  You don't want to look at

20        it, but see what happens --

21        THE COURT:  No, I don't want to look

22        at it.  I will look at the documents at the

23        appropriate time.

24        MR. BERMAN:  The last time the

25        original had white-out on it.

10/13/89

NYCLD_023189

P-APP001900

T7-1f

444

REYNOLDS - PEOPLE - CROSS - BERMAN

    THE COURT:  You have the original available?

    MS. LEDERER:  No.

    MR. BERMAN:  I'm sorry, I didn't hear the answer.

    THE COURT:  She said, no.

    MR. BURNS:  Has that been marked?

    THE COURT:  No, it hasn't been offered.

    MR. BERMAN:  I don't know if you can understand my reluctance to use the xerox copy here.  Can they have the original by after lunch?

    THE COURT:  Is it available?

    MS. LEDERER:  I don't have it.  I don't know where it is.  I think the originals of these go to Family Court.

    MR. BERMAN:  I will proceed with the xerox copy with the reservations I have expressed.

    THE COURT:  Do you want that marked?

    MR. BERMAN:  Mine has notes.  If the People have a blank xerox copy.

    MS. LEDERER:  I only have one copy.

10/13/89

NYCLD_023190

P-APP001901

T7-1f

445

REYNOLDS — PEOPLE — CROSS — BERMAN

1
2          MR. BERMAN:   I'll borrow one   from   my
3    brethren.
4          Can I have this marked Defendant Lopez
5    C for identification?
6          (One-page  document marked Deft. Lopez
7    C for ID)
8          MR. MADDOX:   Mr. Berman tell   what   is
9    being   marked   and   what   that   document
10   purports to be.
11         MR. BERMAN:   This   is   the   Probation
12   Intake Referral Report.
13         MR.   BURNS:        Defendant   L-C   for
14   identification.
15   BY MR. BERMAN:
16      Q    Looking at that, having replaced  Defendant
17   Lopez  Exhibit C for identification in front of you,
18   is that a purported xeroxed copy  of  the  Probation
19   Intake Referral report that you signed in this case,
20   in connection with this case as to Steven Lopez?
21      A    Yes.
22      Q     Is that one of the documents you referred
23   to on your direct testimony when you spoke about the
24   packages  or  papers  that  you  spent   that   time
25   preparing?

10/13/8?

T7-1f

446

REYNOLDS — PEOPLE — CROSS — BERMAN

1

2      A      Yes.

3             MR.  BERMAN:      I  would  offer  that,

4      Judge.

5             THE  COURT:  Any objection?

6             MS. LEDERER:  Yes.

7             THE  COURT:  I  will  have  it  received  in

8      evidence.

9             MR. BERMAN:  Thank you, Judge.

10            (Deft. Lopez C received and marked  in

11     evidence.)

12     Q      Could you read from Defendant Lopez C in

13     evidence, please, Officer, beginning where  it  says,

14     "Describe  specifically  --"  the  three  pages  of

15     instructions -- the three lines of instructions, and

16     the  three  lines  of  handwritten  entries.

17     A      "Describe  specifically  this  respondent's

18     individual  actions  and  behavior  during  the

19     delinquent act."

20     Q      Let me stop you for a second.  Is  it  fair

21     to say that the words "this" and "individual" are in

22     all  caps,  and  underlined on this, stressing words

23     this individual?

24     A      Yes.

25     Q      Continue, please.

10/13/8<sup></sup>

NYCLD_023192

P-APP001903

T7-1f

447

REYNOLDS — PEOPLE — CROSS — BERMAN

1

2  A     "Also in concert arrest, do not describe

3  group behavior.    Describe only this individual's

4  actions and behavior and whether or not the others

5  were apprehended.    Note if a weapon was used or

6  displaced.   Indicate if the respondent personally

7  possessed it."

8  Q     Is it fair to say, "individual" is again

9  uppercase and underlined, and that the word

10  "personally" is also uppercase and underlined?

11  A     Yes.

12  Q     All right.  Read your handwritten entry you

13  swore to.

14  A     "Respondent, and at the time and place of

15  occurrence, acting in concert with approximately ten

16  others, did strike complainant across the head with

17  a blunt instrument, causing serious physical

18  injury."

19  Q     Now, you see the portion where you read

20  where it said, "In concert arrests, do not describe

21  the group behavior.  Describe only this individual's

22  actions and behavior."    This is an in concert

23  complaint you are making, isn't it?

24  A     Yes.

25  Q     And you used the very words, "in concert"?

10/13/89

NYCLD_023193

P-APP001904


T7-1f

448

REYNOLDS — PEOPLE — CROSS — BERMAN

1

2     A     Yes.

3     Q          Did   you   describe   this   defendant's

4  individual actions and behavior?

5     A     As far as acting in concert, yes.

6     Q     Did you describe what you  believed  Steven

7  Lopez himself individually did?

8     A     This is what I believe he did, yes.

9     Q     You believed that he struck the complainant

10  across the head with a blunt instrument?

11     A          I believed that he was with the others,

12  with the gang that did commit  the  assault  on  the

13  jogger.

14     Q     Do you see where he says, "do not describe

15  group behavior ——"

16               THE COURT:  We've been  through  that.

17          Why  do you have to repeat it?  I heard it.

18          I understand the point you are making.  Why

19          don't you go on to something else?

20               MR. BERMAN:  Okay.

21     Q     Can you locate the Juvenile Arrest Report?

22          Have you located it?  The  one  for  Steve

23  Lopez in this case?

24     A     Yes.

25     Q          Is that part of the package of papers you

10/13/89

NYCLD_023194

P-APP001905

T7-1f

449

REYNOLDS - PEOPLE - CROSS - BERMAN

1

2  had to work up that night?

3      A    No.

4      Q    This is the time  in  the  upper  righthand

5  corner  of  that give you any indication of when you

6  signed the previous two documents?

7      A    No.

8      Q    In the  entire  time  that  you  were  with

9  Steven  Lopez  that  night -- let me ask you, when did

10 that end?  When did you stop  being  with  him  that

11 night?

12     A    It was in the morning.

13     Q    When did that happen or what time was that?

14     A    I'm not sure of the exact  time.

15     Q    When did you go off duty?

16     A    That next Saturday morning.

17     Q        You were continuously on this case from

18 Wednesday night until Saturday morning?

19     A    That's correct.

20     Q    During that time, did you ever see or  hear

21 anybody give Steven Lopez his constitutional rights?

22     A    No.

23              MR.   BERMAN:      Judge,  is  this  a

24         reasonable time to break for lunch?

25              THE COURT:  If it is for  you,  it  is

10/13/89

NYCLD_023195

P-APP001906

T7-1f

450

REYNOLDS — PEOPLE — CROSS — BERMAN

1

2          for me.

3              MR.   BERMAN:     Okay.   Do you want the

4       document now or later in   evidence   that   I

5       want to show?

6              THE COURT:   I'm sure you will refer to

7       them subsequently in your argument.

8              We'll recess now to 2:15.

9              Don't   discuss   your   testimony   with

10      anyone, Officer.

11             (Whereupon   a   luncheon   recess   was

12      taken.)

13                   *       *       *

14

15

16

17

18

19

20

21

22

23

24

25

10/13/89

NYCLD_023196

P-APP001907

451

COLLOQUY

T7B/LF

A F T E R N O O N   S E S S I O N

THE   COURT   CLERK:   Hearing   continued,
Indictment 4762 of '89, Kharey Wise, Yusaf
Salam,   Antron   McCray,   Kevin   Richardson,
Steve   Lopez,   Michael   Brisco   and   Raymond
Santana.

THE COURT:   All right.   I thought I made
it clear this morning that I wanted to start
on   time.   I   really   don't   understand   why
attorneys   are   late.   Everybody   else   was   here
on   time   after   lunch.   I   don't   see   why   you
can't be here.

MR. MOORE:   I apologize, your Honor.

THE COURT:   All right, bring the witness
in.

(Witness resumed the stand.)

THE COURT CLERK:   Officer, I remind you
you are still under oath.

MR. BERMAN:   May I proceed, Judge?

THE COURT:   Yes.

CROSS EXAMINATION (Continued)

BY MR. BERMAN:

Q   The   radio   runs   you   spoke   about   on   direct,

452

REYNOLDS — PEOPLE — CROSS — BERMAN

1
2  you spoke about four different radio runs, the
3  fourth of which dealt with the assault of Mr.
4  Loughlin, do you recall that?
5      A   Yes.
6      Q   That's what I want to focus on for a minute.
7  That radio run, is that the one that Officer-- what
8  was his name yesterday, Officer Carlson put out?
9      A   Yes.
10     Q   And the radio run that Officer Carlson put
11 out over the radio was that Mr. Loughlin had been
12 assaulted by four or five male blacks; is that
13 correct?
14     A   I believe so.
15     Q   You told us on your direct testimony that in
16 that fourth radio run, someone said that a jogger,
17 male jogger had been beaten, was found on 96th
18 Street and the West Drive; had been beaten by male
19 blacks and Hispanics.  Do you remember saying that
20 on your direct?
21     I am specifically addressing myself to Mr.
22 Loughlin having been beaten by male blacks and
23 Hispanics.
24     A   That's correct.

T8/FR  25

453

REYNOLDS - PEOPLE - CROSS - BERMAN

1

2    Q    Now, the radio run that Officer Carlson put

3    out didn't mention Hispanics, did it?

4    A    Excuse me?  You're asking me that?

5    Q    Yes.

6    A    It might not have.  He did mention male

7    blacks though.

8    Q    And when you arrested Steve Lopez, did you

9    have it in mind that he appeared to be a male black?

10   A    From when we first observed the group.

11   Q    Did his color change after awhile?

12   A    No.

13        MS. LEDERER:  Objection.

14   Q    Did he appear to be the same color

15   throughout this incident?

16        MS. LEDERER:  Objection.

17        THE COURT:  Sustained.

18   Q    What do you mean when you say he appeared to

19   be a male black when you first observed the group?

20   A    The group appeared from our vantage point to

21   be all male blacks at first.

22   Q    At the point that you took Steve Lopez into

23   custody, did he appear to be a male black?

24   A    No.

25   Q    In fact, when you filled out the on-line

P-APP001910

454

REYNOLDS - PEOPLE - CROSS - BERMAN

1

2  booking system arrest worksheet in choosing between

3  the boxes for white Hispanic and black Hispanic, you

4  checked the box for white Hispanic for Steve Lopez,

5  didn't you?

6      A    That's what's checked.    That part wasn't

7  done by me though.

8      Q    Well, did you read it at some point, at any

9  point?

10      A    Yes, I read the report.

11      Q    Did you tell whoever did that hey, that's a

12  mistake, it should be changed?

13      A    No, I didn't.

14      Q    What was it that made you think that the

15  dozen or so black and Hispanic groups out on Central

16  Park West, on the west side of Central Park West,

17  were the same people as the four or five male blacks

18  who had attacked Mr. Loughlin?

19      A    They were the same age, same sex.

20      Q    What age--

21      A    When--

22      Q    Finish your answer.

23          THE COURT:   Go ahead.

24      A    We're told it's a male black, in my mind it

25  can also be an Hispanic also, because Hispanics do

NYCLD_023200

P-APP001911

455

REYNOLDS — PEOPLE — CROSS — BERMAN

range from being white in complexion to black and sometimes complainants will make a mistake, especially if they don't hear the person talk, they will say he is black and he is black, but he is a black Hispanic.

Q   In Mr. Lopez' case, is he a black Hispanic or a light Hispanic, in your opinion?

A   He's a dark-skin Hispanic.

Q   In other words, whoever made the entry put "white Hispanic" down instead of black Hispanic, that's something you take issue with?

MS. LEDERER:   Objection.

THE COURT:   Sustained.

Q   My question is really about what was on the radio run that Officer Carlson put out about the assault on Mr. Loughlin and you said to me that the youths on the street were the same age as the people who assaulted Mr. Loughlin, but there wasn't any age in that radio run, was there?

A   I'm not sure now.

Q   And--

A   I think that there was. He did mention male blacks and I did assume that it was the same group that we were looking for the whole evening.

456

REYNOLDS — PEOPLE — CROSS — BERMAN

1

2      Q    But on his radio run, Officer Carlson said

3  four or five male blacks had assaulted Mr. Loughlin

4  and you were stopping twelve people.

5      A    That's correct.  In that part of the park,

6  because I jog there at night myself, that track is

7  lit up.  Okay.  You can see what's going on in the

8  track.  Somebody can stand ten, fifteen feet from

9  you and you wouldn't see a thing, you wouldn't see

10  him.  It's entirely possible the complainant saw

11  four or five people and there were more standing

12  nearby.

13     Q    And you would arrest people for standing

14  nearby?

15              MS. LEDERER:  Objection.

16              THE COURT:  Is that a general question?

17     Q    As a matter of practice, do you arrest

18  people for standing nearby a crime?

19              MS. LEDERER:  Objection.

20              THE COURT:  Sustained.

21     Q    In this case, did you arrest Steve Lopez

22  because maybe he was standing by when other people

23  committed a crime?

24              MS. LEDERER:  Objection.

25              THE COURT:  Overruled.

457

REYNOLDS — PEOPLE — CROSS — BERMAN

A    Not because he was standing by, no.

Q    What made you think he was one of the four or five who participated in the assault?

A    Because when he was standing-- most of the people ran and when we stopped him, he told us a story that we didn't believe.

Q    That's after you stopped him. I'm asking you when you stopped him, and you took him and put him against the wall; that's before he told you any story you didn't believe, right?

A    That's correct.

Q    Now, if you had been able to stop all twelve of those youths, would you have arrested all twelve of them for being the four or five people who assaulted Mr. Loughlin?

MS. LEDERER:   Objection.

THE COURT:   I'll let him answer.

A    Would I have arrested them? No, we would have brought them back to the scene and ascertained who committed the assault and who did what.

Q    And if they didn't want to go back to the scene, were they free to leave?

MS. LEDERER:   Objection.

THE COURT:   I'll let him answer.

NYCLD_023203

P-APP001914

458

REYNOLDS - PEOPLE - CROSS - BERMAN

1

2      A    No, they weren't free to leave.

3      Q    And when you got out of the van, you and

4  your partner got out of the van, at that point was

5  Steve Lopez free to leave?

6      A    If he could have run from us, he was.

7      Q    Would you have let him leave at that point?

8      A    Not if I could physically help it.

9      Q    I think you answered my question.   Thank

10  you.

11      When you called for a police vehicle to come and

12  pick up Mr. Lopez and Mr. Santana, they weren't free

13  to leave at that point either, were they?

14      A    No, they weren't.

15      Q    And that was at 10:45 p.m., you testified?

16      A    About that time.

17      Q    Now, it's your testimony that apart from the

18  matters that you've discussed on your direct about

19  the  girlfriend's  house  or  the  movie,  that  Mr.

20  Lopez-- and saying that they weren't part of the

21  group and the group wanted to attack them, what we

22  heard you say on direct, did Mr. Lopez say anything

23  else between the time you stopped him and the time

24  you got to the precinct?

25      MS. LEDERER:   Objection.

459

REYNOLDS — PEOPLE — CROSS — BERMAN

        THE   COURT:   As   to   the   form   of   the

question, I'll sustain it.

    Q    Apart from what you told us on direct, did

Mr. Lopez say anything else between the time you

first saw him and the time you got to the precinct?

        MS. LEDERER:   To this witness?

    Q    That you heard?

    A    He might have made other statements.   He

just-- you know, he kept saying he wasn't involved

with the group but it was along the same lines of

what I had said earlier.

    Q    All right.   By the way, whatever statement

that he made that you heard, you never recorded them

on that form that I asked you about before lunch

where there's an area for recording statements; is

that right?

    A    What form is that?

    Q    The Probation Intake Referral Report.

    A    Did I write it in there, you're asking?

    Q    That's right.

    A    No, I didn't.

    Q    Now, you said that you wrote in the letters

PO where it says advised of constitutional rights

by, and that's because he was going to be advised of

460

REYNOLDS – PEOPLE – CROSS – BERMAN

1

2   his constitutional rights by a police officer, but

3   that never happened in your presence; is that

4   correct?

5       A    That's correct.

6       Q    Do you remember when it was you wrote in PO

7   there as to who had advised him of his

8   constitutional rights?

9       A    No, I don't recall.

10      Q    Well, would it have been on the 19th of

11  April?

12              THE COURT:  Would that be on the 19th?

13              MR. BERMAN:  When he wrote that.

14              THE WITNESS:  I don't recall.  The 19th

15          or the 20th.

16      Q    Is it your testimony that as of the time you

17  swore to the bottom of the Probation Intake Referral

18  Report, Mr. Lopez had not made any statements?

19              MS. LEDERER:  Objection.

20              THE COURT:  I'll let him answer.

21              MS.    LEDERER:    In    addition    to    the

22          statement he's already said?

23              THE COURT:  What is the question you've

24          asked?

25              MR. BERMAN:  Is it his testimony that as

461

REYNOLDS - PEOPLE - CROSS - BERMAN

1
2          of the time that Officer Reynolds swore to
3          the Probation Intake Referral Report, Mr.
4          Lopez had not made any statements?
5                 THE COURT:  At the time he wrote that
6          out and swore to it, he had not heard no
7          statement from him?
8                 MR. BERMAN:  Yes.
9                 MR. MADDOX:  Judge, it's hard for us to
10         hear Mr. Berman.  He had his back toward us.
11         Can the question be read back again?
12                THE COURT:  It would simpler for him to
13         ask the question again.
14     Q     Is it your testimony that as of the time you
15  swore to and signed the Probation Intake Referral
16  Report, Mr. Lopez had not made any statements?
17     A     In--
18                MS. LEDERER:  Objection.
19                THE COURT:  I'll allow it.
20     A     In regards to swearing to this piece of
21  paper, the only thing we're swearing to is the
22  bottom part.  We don't swear to any of the
23  information on the top regarding the defendant's
24  parents name or their phone number or their address.
25  You can't swear to it.

NYCLD_023207

P-APP001918

462

REYNOLDS — PEOPLE — CROSS — BERMAN

1

2    Q   I'm just using that, the time you swore to

3  it, as a point of reference.  As of the time you

4  signed this piece of paper, had Mr. Lopez made any

5  statements?

6           MS. LEDERER:   Your Honor, is that any

7        other statement?

8           THE COURT:  Any statement to him at all.

9           THE WITNESS:  Like I said, he might have

10        made passing statements asking me when is he

11        going home or, you know, did his parents get

12        there yet, but nothing that is recorded; at

13        least not by me.

14    Q   Now, your memo book.  When did you fill out

15  the entries in your memo book that referred to the

16  19th, 20th, 21st and 22nd of April?

17    A   I don't recall when I did that.

18    Q   What is your general practice?  When do you

19  fill out the entries in your memo book?

20           MS. LEDERER:  Objection.

21           THE COURT:  Objection sustained.

22    Q   Do you wait three, four, five days sometimes

23  to fill out the entries in your memo book?

24           MS. LEDERER:  Objection.

25           THE COURT:  Sustained.

P-APP001919

463

1          REYNOLDS - PEOPLE - CROSS - BERMAN

2      Q    Do you wait until after you speak to the

3  D.A. before you put your entries in your memo book?

4               MS. LEDERER:  Objection.

5               THE COURT:  Sustained.

6      Q    Is there a rule or procedure as to when you

7  are to put the entries in your memo book?

8               MS. LEDERER:  Objection.

9               THE COURT:  I'll allow it.

10     A    I think the rule is when it is practical to

11 make such an entry, when you have time, you are to

12 do so.

13     Q    The entries in your memo book for April

14 19th, 20th, 21st and 22nd regarding this case, is it

15 fair to say that you made all of those entries on

16 Sunday, April 23rd?

17     A    No, it's not.

18     Q    Do you have your memo book there or a copy

19 of it?

20     A    I have a copy, yes.

21     Q    Can you locate for yourself the page that

22 begins-- that has on it Saturday, April 22nd, and

23 Sunday, April 23rd, please.

24     And do you find an entry for 9:05 on April 23rd

25 for memo book and Rosario material?

NYCLD_023209

P-APP001920

464

REYNOLDS — PEOPLE — CROSS — BERMAN

1

2    A    There's nothing like that for the 23rd.

3    Q    Can you locate the page on which there's a

4 reference to "memo book and Rosario material"?

5    A    Yes.

6         MR. BERMAN:  Can we mark that page,

7         please?

8         THE COURT:  Yes.

9         (Page of memo book marked Defendant

10        Lopez' Exhibit D for identification.)

11   Q    Detective, do you have that page in front of

12 you now?

13   A    Yes.

14   Q    That's the same page that indicates 34 and a

15 half hours of overtime?

16   A    Yes, that's correct.

17   Q    Now, do you see an entry for 09:05 near the

18 bottom of that page?

19   A    Yes, I do.

20   Q    Does it say "memo book and Rosario

21 material"?

22   A    Yes.

23   Q    What does that mean?

24   A    I believe at that time I was gathering-- I

25 got my memo book and Rosario material for-- I

465

REYNOLDS — PEOPLE — CROSS — BERMAN

1

2    believe it was for the-- you know, to go to court

3    and show the District Attorney.

T9/LF    4

5        Q    And do you know when you made the entries in

6    your memo book for April 29-- 19th, 20th, 21st and

7    22nd, concerning this case?

8        A    No, I don't recall exactly when.

9        Q    When you got to the desk-- I believe you

10   said at 11:06 p.m. you gave either the desk sergeant

11   or Detectives Nuggent and Gonzalez the defendants'

12   names, addresses and ages.

13       Do you remember testifying to that?

14       A    Yes.

15       Q    Who was it that you said that to?

16       A    To the desk officer.

17       Q    And how did you have defendants' names,

18   addresses and ages?

19       A    We asked them for it.

20       Q    When did you start asking the defendants

21   questions?

22       A    In front of the desk, as far as pedigree.

23       Q    The first time you asked Steve Lopez for his

24   name was in front of the desk at the Central Park

25   Precinct?

466

REYNOLDS - PEOPLE - CROSS - BERMAN

1

2      A    I might have asked on the scene, or the

3  first time might have been at the desk. I don't

4  recall when.

5      Q    Do you remember during your direct on two or

6  three occasions in response to questions by Miss

7  Lederer, you indicated you asked defendant no

8  questions at the scene?

9      A    No questions regarding, you know, the crime.

10 I might have just, while we were standing there,

11 said, "By the way, what is your name?"

12     Q    When did that happen?

13     A    Excuse me?

14     Q    When did that happen?

15     A    Again, I said I might have.  I don't recall

16 specifically what our conversation was.

17     Q    Now, you testified on direct about handcuffs

18 being removed in the-- Juvenile Room; am I right

19 about that?

20     A    Yes.

21     Q    When were the handcuffs put on?

22     A    When they were placed in the car.

23     Q    That would be where and when?

24     A    That would be on 102nd Street and Central

25 Park West.  The exact time, I believe it's around

467

REYNOLDS - PEOPLE - CROSS - BERMAN

1

2   10:40, 10:45.

3        Q    Did you see that happen as to Steve Lopez?

4        A    Yes.

5        Q    Was it you who put the handcuffs on Steve

6   Lopez?

7        A    Yes, I believe so.

8             MR. BERMAN:   May I have just a moment,

9        Judge?

10            THE COURT:   Yes.

11       Q    Do you recall testifying on direct this

12  morning that you did not handcuff Lopez and Santana?

13       A    I might have said that.

14       Q    Well, which is true, what you said this

15  morning or what you said to me now?

16       A    I'm not sure.   They were handcuffed-- again,

17  Sergeant Wheeler and Police Officer Morales came.

18  Handcuffs were placed on them.   Whether it was me or

19  the sergeant or Police Officer Morales, I'm not sure

20  which.

21       Q    Did you understand my question a minute or

22  two ago when I asked if you in particular put the

23  handcuffs on Steve Lopez?

24            MS. LEDERER:   Objection.

25            THE COURT:   I will allow it.

NYCLD_023213

P-APP001924

468

REYNOLDS — PEOPLE — CROSS — BERMAN

1

2    Q    Did you understand that question?

3    A    Yes.

4    Q    Did you have any problem answering it then?

5         MS. LEDERER:   Objection.

6         THE COURT:   Sustained.

7    Q    Now, I believe you testified this morning on

8    direct that when Officer Powers went off into a

9    different building to call the parents, the youths

10   were talking to each other and talking about how

11   they wanted to go home; do you remember saying that?

12   A    Yes.

13   Q    And you were able to hear them say they

14   wanted to go home?

15   A    Yes.

16   Q    And did you tell Steve Lopez in essence that

17   once your parents come and pick you up, you'll be

18   able to go home?

19   A    Yes-- that is-- yeah, yes.

20   Q    Now, when the parents came, you have already

21   testified they weren't allowed to be in the same

22   room with their children; isn't that right?

23   A    Right.

24   Q    And you explained that either to them or to

25   us today, because you had to do the paperwork first,

469

REYNOLDS - PEOPLE - CROSS - BERMAN

1
2 right?

3     A    That's correct.

4     Q    Did you tell the parents that?

5     A    Yes.

6     Q    And what would have prevented them being
7 with their children while you did the paperwork?

8     A    What would have prevented them?

9     Q    Yes.

10    A    I don't understand the question.

11    Q    Why were they not allowed to visit their
12 children when you were doing the paperwork?

13    A    It is a little easier if the parents sit
14 outside, because I wasn't going to ask them
15 questions at that time.

16    Q    Easier for the parents?

17    A    Easier for me.

18    Q    And then at some point you explained to the
19 parents, you said that this delay was to go on
20 because you have to check if there are warrants
21 against the children?

22    A    That's correct.

23    Q    When did you find out that there were no
24 warrants against these five?

25    A    The exact time, I'm not sure of.

NYCLD_023215

P-APP001926

470

REYNOLDS — PEOPLE — CROSS — BERMAN

1

2   Q    The approximate time.

3   A    Again, I'm not sure precisely when the

4   warrant check was done.

5   Q    When is the outer limit?  In other words, by

6   what point for sure you knew, what was that point?

7   A    Again--

8   Q    By three in the morning on the 20th, did you

9   know there were no warrants against any of them?

10  A    Again, I don't recall specifically when we

11  did the warrant check.

12  Q    How about by noon on the 20th, did you know

13  there were no warrants against any of them?

14  A    By noon, sure.

15  Q    How about 9 a.m. on the 20th, by then for

16  sure, did you know there were no warrants against

17  any of them?

18  A    Yes.

19  Q    How about at six in the morning on the 20th,

20  was it sure by then there were no warrants against

21  any of these five?

22  A    Yes.

23  Q    Five?

24  A    Five, I'm not sure.

25  Q    And the explanation you gave us on direct

471

REYNOLDS — PEOPLE — CROSS — BERMAN

1

2   was that that was somehow or other tied in with,

3   Santana's parents weren't there yet, or did I

4   misunderstand you?

5       A    You're correct.

6       Q    If everybody had cleared warrants, why did

7   the other youths have to wait for Santana's parents

8   to be there?

9       A    Because if Santana's parents didn't show up,

10  he would have to go to Spofard and he would have had

11  to appear in Family Court the same day in the

12  morning, which would have meant all the rest of them

13  would have had to come back also. So, since we

14  weren't sure if they were coming-- every time we

15  called someone, they said they were coming and then

16  didn't show up and I said, "Yeah, the parents are on

17  the way." And two hours later we know they are not

18  coming now.

19      Q    That wasn't tied in with the warrants, that

20  was an independent reason why you couldn't let the

21  others go home with their parents, is that correct?

22      A    Ask that again.

23      Q    There were two things that would have kept

24  at least one youth overnight, is that correct?  One

25  of them would be a warrant against that youth,

472

REYNOLDS — PEOPLE — CROSS — BERMAN

1
2    right?
3        A    Right.
4        Q    The other was if that youth's parents don't
5    show up to pick him up, right?
6        A    Right.
7        Q    Either one of those independently, if either
8    of those happened, that youth would have to go to
9    court the very next morning?
10       A    Right.
11       Q    And is it fair to say that you could have
12   told the four who could have been released to come
13   to court the very next morning?
14       A    I could have.
15       Q    So, I ask you again, what prevented you from
16   releasing those four to their parents and giving
17   them an appearance date the very next morning and
18   waiting to see what happened about Santana's
19   parents?
20       A    I explained to them if we waited, then
21   everybody involved could get a little sleep that
22   morning rather than sleeping two hours then going to
23   Family Court and having time to prepare themselves a
24   week or two from the day of the arrest.
25       Q    And you felt people could sleep more

473

REYNOLDS — PEOPLE — CROSS — BERMAN

1

2    comfortably  on  the  floor  of  the  precinct  than  at

3    home?

4             MS. LEDERER:   Objection.

5             THE COURT:   Sustained.

6    Q    Now,  you  told  us  on  direct  that  about  four

7    in  the  morning,  Lieutenant  McInerney  told  you  a

8    woman's  body  had  been  discovered  in  the  park?

9    A    I  believe  that's  the  approximate  time.

10             MR. BURNS:   I  didn't  hear  that  question

11        and  answer.

12             THE COURT:   Read  it  back.

13             (The  court  reporter  read  back  the

14        requested  portion  of  the  record.)

15    Q    And  Lieutenant  McInerney  told  you  to  keep

16    the  kids  for  questioning  about  that,  didn't  he?

17    A    He  stated  that  the  detectives  wanted  to

18    speak  to  them.

19    Q    And  you  understood  that  to  mean  to  keep  the

20    kids  for  questioning  about  that  woman,  right?

21    A    That's  correct.

22    Q    Now,  you  have  told  us  by  what  time  was  it

23    that  Santana's  grandmother  arrived  approximately?

24    A    Let's  see.   It  was  after  four.

25    Q    But  by  4:30  she  was  there,  right?

NYCLD_023219

P-APP001930

474

REYNOLDS - PEOPLE - CROSS - BERMAN

1

2      A    4:30, a quarter to five.

3      Q    And by 6:00 the warrants had all cleared,

4  nobody had any warrants, right?

5      A    I believe so.

6      Q    As of 6 a.m. in the morning of April 20,

7  1989, were those five youths free to leave?

8      A    No.

9      Q    Their parents were there, right?

10     A    That's correct.

11     Q    None of them had any warrants that was known

12  by 6 a.m.?

13     A    Yes.

14     Q    As to Steve Lopez, he was being charged as a

15  juvenile with a B misdemeanor and was due to be

16  given an appearance ticket for Family Court; is that

17  right?

18     A    That's correct.

19     Q    By what facts that you can tell us about

20  were you entitled to keep him any longer against his

21  will after 6 a.m. on the morning of April 20th?

22          MS. LEDERER:  Objection.

23          THE COURT:  Sustained.

24     Q    Did you tell him once he had pleaded

25  warrant, once all five youths had cleared warrants

475

REYNOLDS — PEOPLE — CROSS — BERMAN

1
2  and once there were parents or grandparents for all
3  five youths, did you tell him, "Now you're free to
4  go"?

5      A   No.

6      Q   Is it fair to say that he wasn't free to go
7  because the lieutenant said that people wanted to
8  question him?

9      A   Yes.

10     Q   Was he under arrest for any crime relating
11 to the woman victim at that point in time, 6 a.m. on
12 the morning of April 20th?

13     A   I don't believe so, no.

14     Q   As far as his arrest for the unlawful
15 assembly as of 6 a.m., was that arrest holding him
16 any longer?

17             MS. LEDERER:  Objection.

18             THE COURT:  I will let him answer.

19     A   No.  The lieutenant asked me to hold them
20 for questioning by the detectives.

21     Q   At 4 a.m. or so when the lieutenant asked
22 you to hold these five youths for questioning about
23 the woman, did you have any evidence against Steven
24 Lopez regarding that?

25     A   Regarding the woman, the woman jogger?

NYCLD_023221

P-APP001932

476

REYNOLDS — PEOPLE — CROSS — BERMAN

1

2    Q    That's right.

3    A    I had no knowledge of the crime at all other

4    than a woman was assaulted.

5    Q    Am I fair in saying you knew the woman was

6    assaulted, you had no evidence about that against

7    Steven Lopez, but nonetheless he wasn't free to go?

8    A    That's correct.

9         MR. BERMAN:  I have no further

10        questions, your Honor.

11        THE COURT:  Mr. Moore, do you have any

12        questions?

13        MR. MOORE:  Just one second, your Honor.

14   CROSS EXAMINATION

15   BY MR. MOORE:

16   Q    Officer Reynolds, you stated that on 4/19

17   you were assigned to the Anti-Crime Unit of the

18   Central Park Precinct, am I correct?

19   A    That's correct.

20   Q    How long have you been assigned to

21   Anti-Crime in that particular precinct?

22   A    From January.

23   Q    January of '89?

24   A    Yes.

25   Q    And prior to that, how long have you been

477

REYNOLDS — PEOPLE — CROSS — MOORE

1

2    assigned to Anti—Crime generally?

3        A    Throughout my time on the job?

4        Q    Before; were you with Anti—Crime before

5    January of '89?

6        A    No.

7        Q    Now, with regard to the events of 4/19, you

8    had stated, Officer, that you were with your

9    partner, Officer Powers; is that correct?

10       A    That's correct.

11       Q    And Officer Powers was the driver of the

12   vehicle, am I correct?

13       A    You're correct.

14       Q    What was your assignment?   Were you the

15   recorder or what?

16       A    Recorder.

17       Q    So you would have been operating and

18   receiving transmissions, am I correct?

19       A    That's correct.

20       Q    Now, you stated that you received the first

21   transmission at about 21:00, is that correct?

22       A    I believe I said 21:30 I heard.   I remember

23   hearing one of the first transmissions on it.

24       Q    Okay.   That's 9:30?

25       A    Yes.

NYCLD_023223

P-APP001934

478

REYNOLDS — PEOPLE — CROSS — MOORE

1

2        Q    Our time.  All right, but do you recall that

3   you had initially told, I think Detective Rosario on

4   April 20th that you heard the first transmission at

5   21:00 hours; do you recall that?

6        A    Can I look at my notes?

T10/FR  7

8        Q    Sure, go ahead.

9        A    I told him at approximately 21:00 hours the

10  reports started to come in.  I didn't say I first

11  heard it at 21:00 hours.

12       Q    Well, you stated at 21:00 hours there were

13  numerous complaints of assaults being committed, am

14  I correct?

15       A    Will you repeat that?

16       Q    Did you state that at 21:00 hours there were

17  numerous complaints of assaults being committed in

18  the park?

19       A    I informed him that I believed that at about

20  21:00 hours is when the reports started to come in.

21       Q    So that at about 9:30 you heard a particular

22  transmission, is that correct?

23       A    That's correct.

24       Q    Now, you testified the substance of this

25  transmission was disorderly mob in park harassing

NYCLD_023224

P-APP001935

REYNOLDS — PEOPLE — CROSS — MOORE

1  
2 people, am I correct; that that was the substance of  
3 the transmission your received?  
4     A    Disorderly males.  
5     Q    Disorderly males in the park harassing  
6 people, am I correct?  
7     A    Yes.  
8     Q    Did you receive a further transmission of  
9 the males in terms of their ethnic or racial origin?  
10     A    Yes.  
11     Q    Well, what did you receive with regard to  
12 that?  
13     A    They were male blacks.  
14     Q    So, it was disorderly male blacks, is that  
15 what you received?  
16     A    Yes.  
17     Q    So, this was just not disorderly males, it  
18 was disorderly male blacks?  
19     A    Yes.  
20     Q    Well, do you recall a conversation with  
21 Detective Rosario?  
22     A    Parts of it, yes.  
23     Q    And do you not recall telling him that the  
24 assaults were committed by a large group of young  
25 males?

480

REYNOLDS — PEOPLE — CROSS — MOORE

1

2    A    If that's what's in there, that's probably

3 what I told him.

4    Q    Well, isn't that what's in there?

5    A    Yes.

6         MS. LEDERER:  Objection.

7    Q    So, there's nothing in what you told

8 Detective Rosario the next day that indicated that

9 the first transmission at least spoke of male

10 blacks, am I correct?

11    A    My conversation with him didn't hinge upon

12 the first radio transmission.

13    Q    I'm not asking you what it hinged upon, I'm

14 asking you what you told him.

15    A    I explained the entire situation to him and

16 everything that I knew at that point.

17    Q    Now, you had indicated in response to

18 questions from the District Attorney that these

19 assaults were being committed basically on the west

20 side around 100th Street, am I correct?

21    A    Some of them, yes.

22    Q    And the others were committed where?

23    A    I believe there was one on the east side,

24 one or two.  We received numerous complaints and

25 they were scattered about the park.

481

REYNOLDS — PEOPLE — CROSS — MOORE

1

2     Q     Now, did this transmission give-- did this

3  transmission give you any further details about

4  these assaults?

5     A     Which one?

6     Q     The first transmission.

7     A     The first one that I remember?

8     Q     That's right.

9     A     I believe it was for male blacks that were

10  disorderly, harassing.

11    Q     Did it indicate who was being harassed?

12    A     I believe it just stated, you know,

13  civilians, passersby in the park.

14    Q     Assaulting passersby in the park?

15    A     I believe it was harassing.

16    Q     Harassing passersby in the park?

17    A     Yes.

18    Q     Are you sure that was the substance of the

19  transmission?

20    A     I'm not a hundred percent sure. This is

21  what I recall at this point.

22    Q     Don't you recall, Officer, in your

23  conversation with Detective Rosario that you told

24  him that the youths were attacking joggers, cyclists

25  and anyone walking in the area; don't you recall

482

REYNOLDS - PEOPLE - CROSS - MOORE

1
2   telling him that?

3       A    I believe I said that.

4       Q    You were fairly specific about the victims

5   who were being attacked, were you not?

6       A    Yes.

7       Q    Well, which was the correct transmission,

8   what you received that night and you recorded in

9   your memo book or what you told Detective Rosario

10  the next day?

11              MS. LEDERER:  Objection.

12              THE COURT:  Sustained.

13      Q    I would like you to look at your memo book,

14  Officer, the first page of your memo book.  Is there

15  anything on that first page of your memo book that

16  indicated the people who were attacked were joggers,

17  cyclists, et cetera?

18              MR. BURNS:  I'm sorry, was there an

19          answer?  I didn't hear it.

20              THE COURT:  You asked if there was an

21          answer and the answer to that is no.

22      A    No, there's no mention of what type of

23  complainant or what the complainants were doing on

24  the first page.

25      Q    And in your steno pad also could you just

483

REYNOLDS — PEOPLE — CROSS — MOORE

1

2   have a look at your steno pad on the first page?

3        A    There's no mention of joggers.

4        Q    All right, Officer, the second transmission

5   you received at approximately 9:45, am I correct?

6        A    I'm  not  sure  if  that  was  the  second

7   transmission.  I remember hearing a second.

8        Q    The  second  transmission  you  recall  hearing

9   was about 9:45, is that correct?

10       A    Yes.

11       Q    And that second transmission, the substance

12  of  that  second  transmission  was  twenty  to  thirty

13  male blacks; am I correct?

14       A    Yes.

15       Q    Did it indicate twenty to thirty male blacks

16  were doing something?

17       A    It  indicated  that  twenty  to  thirty  male

18  blacks  were  the  ones  that  were  harassing  and

19  assaulting people in the park.

20       Q    Again, did that second transmission indicate

21  who was being assaulted?

22       A    No.

23       Q    Did  it  indicate  where  the  assaults  were

24  taking place?

25       A    As far as a specific location?

484

REYNOLDS - PEOPLE - CROSS - MOORE

1

2     Q    Yes.

3     A    Within the park. I'm not sure what the
4  exact locations were. I'll have to look it up.

5     Q    Well, after you received the first
6  transmission, you made a canvass of an area in the
7  northern part of the park, is that correct?

8     A    Yes.

9     Q    And you did not see, in fact, any group of
10 male blacks, am I correct?

11    A    That is correct.

12    Q    Well, after you received the second
13 transmission, you also made a canvass of the
14 northern end of the park, is that correct?

15    A    Yes.

16    Q    And you also did not meet this group of male
17 blacks?

18    A    Well, we continuously canvassed the area
19 from when we got the first radio run.

20    Q    Now, there came a time, Officer-- did there
21 come a time when you responded to 96th Street and
22 the bridle path?

23    A    No.

24    Q    So you did not respond to the area where Mr.
25 Loughlin apparently was assaulted, is that correct?

NYCLD_023230

P-APP001941

485

REYNOLDS — PEOPLE — CROSS — MOORE

1

2     A     That's correct.

3     Q     So, you never had a conversation with Mr.

4   Loughlin?

5     A     That's correct.

6     Q     Now, do you recall receiving the

7   transmission concerning the assault by Mr. Loughlin?

8     A     Yes.

9     Q     And do you recall what that transmission

10  was?

11    A     Basically stated that there was a man

12  assaulted and there was bleeding profusely from his

13  head and there was a request to have an ambulance

14  rushed to the scene because of his condition.

15    Q     Do you know if an ambulance was, in fact,

16  sent?

17    A     I'm not sure.  I think he might have went by

18  radio car.

19    Q     Do you know where he was taken?

20    A     I believe it was St. Luke's Hospital.

21    Q     So, you did obtain the information that he

22  had been taken to St. Luke's Hospital, am I correct?

23    A     Later on, yes.

24    Q     Later on about what time?

25          MS. LEDERER:   Objection.

NYCLD_023231

P-APP001942

486

REYNOLDS - PEOPLE - CROSS - MOORE

1
2          THE COURT:   I'll allow it.

3     A    I don't recall specifically what time.

4     Q    But sometime that night?

5     A    Yes.

6     Q    Now,   did   that   transmission   about   Mr.
7  Loughlin,  did  it  indicate  who  were  the  alleged
8  perpetrators?

9     A    I believe they stated-- I'm sorry, I believe
10  Officer Carlson stated that it was male blacks.

11    Q    How many?

12    A    I'm  not  sure.  I  think  he  said  seven  or
13  eight.

14    Q    Seven or eight?

15    A    I think so.

16    Q    What about four or five, is it possible he
17  may have said four or five?

18    A    Sure.

19    Q    So,  you  are  not  sure  of  the  exact  number
20  that he spoke about?

21    A    That's correct.

22    Q    Now, Officer, there came a time that you  and
23  your partner left the park at about 10:30 p.m., am  I
24  correct?

25    A    That's correct.

NYCLD_023232

P-APP001943

487

REYNOLDS — PEOPLE — CROSS — MOORE

1

2    Q    And you stated that you saw a group of, I

3    think it was blacks and Hispanics, walking in a

4    northerly direction between 101st and 102nd Street?

5    A    Correct.

6    Q    Now, how many blacks and Hispanics did you

7    see walking along 101st Street?

8    A    I saw what appeared to be about ten or

9    fifteen males.

10   Q    Ten to fifteen?

11   A    Yes.

12   Q    Now, you said your partner, Officer Powers,

13   was also in the vehicle with you, am I correct?

14   A    That's correct.

15   Q    And if I was to tell you, for example, that

16   Officer Powers alleged in his report that there were

17   fifteen to twenty, would you say your estimate was

18   more accurate than his in your opinion?

19         MS. LEDERER:   Objection.

20         THE COURT:   I'll sustain the objection.

21   Q    Well, was it fifteen to twenty?

22   A    Could have been.

23   Q    Or--

24   A    Couldn't count them.

25   Q    So, it could have been anywhere between ten

488

REYNOLDS – PEOPLE – CROSS – MOORE

1

2  to twenty?

3    A    It's entirely possible.

4    Q    But in any event, it was more than four or

5  five, am I correct?

6    A    Yes.

7    Q    Now, Officer, when you saw this group of

8  male blacks and Hispanics walking in a northerly

9  direction-- let me just ask, how were they walking

10  when you first saw them?

11    A    How were they walking?

12    Q    Yes, were they walking slow or fast or were

13  they just talking among themselves?  What were they

14  doing?

15    A    They were walking-- I guess at a brisk pace.

16    Q    At a brisk pace?

17    A    I believe so.

18    Q    Were they bothering any pedestrians in the

19  street?

20    A    I don't remember seeing anybody there.

21    Q    You don't recall that?

22    A    No.

23    Q    Now, in fact, when you saw these people,

24  these blacks and Hispanics, it was you and your

25  partner who first approached them, am I correct?

489

REYNOLDS - PEOPLE - CROSS - MOORE

1

2    A    That is correct.

3    Q    And what did you say to them when you

4  approached them?

5    A    I didn't say anything to the group.

6    Q    Did you drive to where the group was?

7    A    We drove slightly ahead of them.

8    Q    And then you manipulated your vehicle in

9  such a way that you blocked the area in which they

10  were walking?

11    A    No.

12    Q    Well, wasn't it your intention to cut them

13  off?

14    A    Yes.

15    Q    Now, at this point in time when you placed

16  your vehicle at 102nd and Central Park West, what

17  happened next?

18    A    My partner stated to them-- Officer Powers

19  stated that we were police. We were-- he identified

20  himself, told them not to run and all of the group

21  except for two ran.

22    Q    When you said you said you were police, did

23  you personally display a badge?

24    A    I had my shield around my neck.

25    Q    No, did you display your shield?

NYCLD_023235

P-APP001946

490

REYNOLDS — PEOPLE — CROSS — MOORE

1

2     A    I had it displayed around my neck.

3     Q    How did you have it displayed?

4     A    On a chain around my neck.

5     Q    Did you take your shield and point it in

6  your direction and indicate that this was your

7  shield and you were a police officer?

8     A    No.

9     Q    You just had it tangling on your neck, is

10  that correct?

11    A    That is correct.

12    Q    Were you wearing a jacket?

13    A    I might have been wearing a windbreaker.

14    Q    And-- so that it's possible that-- your

15  shield may have been in the windbreaker, is that

16  possible?

17    A    It's possible, but the jacket has an emblem

18  from the precinct I used to work at, 52nd Precinct.

19    Q    What about your police I.D., were you

20  carrying your police I.D. with you?

21    A    It's in my wallet.

22    Q    Did you take out your wallet? Did you

23  display your wallet?

24    A    No.

25    Q    Now, what about your revolver, did you take

NYCLD_023236

P-APP001947

491

REYNOLDS – PEOPLE – CROSS – MOORE

1  your revolver out of the holster?

2  A   No, I didn't.

3  Q   Now, you said you were the police and you

4  stated that the individuals scattered in various

5  directions, am I right?

6  A   They all ran south on Central Park West

7  towards 101st Street.

8  Q   Now, Officer, at this point in time was it

9  your intention to apprehend anyone?

10  A   Yes.

11  Q   Was it your intention to arrest anyone?

12  A   Anyone that had committed a crime, yes.

13  Q   Well, was it your intention to arrest any

14  one of the individuals who was in that group?

15  A   If they had assaulted the jogger or anybody

16  else, yes.

17  Q   But you didn't know at this point in time,

18  did you, whether they had, in fact, assaulted

19  anyone, did you?

20  A   We had an idea that they were involved.

21  Q   You had an idea?

22  A   Yes.

23         MR. MADDOX:   I object to "we."

24         THE COURT:   Yes.  Don't tell us about

492

REYNOLDS — PEOPLE — CROSS — MOORE

1
2          anyone else.

3              THE WITNESS:   I.

4      Q    You had an idea?

5      A    Yes, I did.

6      Q    And based  on  that  idea,  you  were  going  to
7  arrest  these ten or twelve people, am I correct?

8      A    I was going  to  question  them  and  I  was  going
9  to stop them  and  if  they  were  identified  by  a  perp
10  or we had any  other  evidence  that  they  did  it,  yes,
11  they were going  to  be  placed  under  arrest.

12      Q    You  were  going  to  question  them,  am  I
13  correct?

14      A    We were going  to  ascertain  if  they  committed
15  the crime, yes.

16      Q    When you stopped Lopez  and  Santana,  did  you
17  ask them if they had committed a crime?

18      A    No.

19      Q    But you said it  was  your  intention  to  ask,
20  so did you not pursue your intention?

21      A    Well, we don't  ask  people  if  they  committed
22  a crime because they always say no.

23      Q    Well, did you ask—  so  there's  no  point  in
24  asking them any questions then, am I correct?

25      A    Not  if  they  specifically  did  it,  no.

493

REYNOLDS - PEOPLE - CROSS - MOORE

1

2      Q    You just arrest them?

3      A    No.

4      Q    Well, in that particular point in time when

5  you came out and you approached, you didn't ask any

6  questions, am I correct?

7      A    What we did was we placed them against the

8  wall and patted them down.   At that point they

9  started to state that they were not with the group

10  and that the group was going to rob them.

11     Q    They just stated that and there were no

12  questions that you asked?

13     A    No, because my partner was chasing after the

14  others.

15     Q    So, you didn't ask them are you the group?

16  You didn't ask that question?

17     A    No, it was not necessary.

18     Q    They just bared their chest to you, they

19  just told you that they were not with the group?

20     A    That's right.

21     Q    Without any questions having been asked?

22     A    That's right.

23     Q    Now, while this was happening, was Officer

24  Powers next to you?

25     A    In the beginning, yes.

NYCLD_023239

P-APP001950

494

REYNOLDS — PEOPLE — CROSS — MOORE

Q    In the beginning?

A    Yes, when we first stopped them.

Q    Don't recall Officer Powers telling one of the young me, "You shouldn't be out there beating up on people, you should be with your girlfriend"?  Did you ever hear him saying that?

A    No, but I believe that was stated in the station house.

Q    No, he said it in the station house?

A    I believe so.  I didn't hear the statement. I'm under the impression that it happened in the station house.

T11/LF

Q    Now, you had stated in response to questions from Mr. Berman that Santana and Lopez was originally charged with unlawful assembly, is that correct?

A    That's correct.

Q    And I think in the charging documents you mentioned a violation of 40.10 of the Penal Law?

A    If that's unlawful assembly, yes.

Q    Well, did you look at the elements of unlawful assembly?

MS. LEDERER:  Objection.

495

REYNOLDS — PEOPLE — CROSS — MOORE

THE COURT:  Objection sustained.

Q    Well, would you say, Officer, that at the time when you made the arrest, that they were involved in tumultuous, violent conduct likely to cause public alarm?

A    At the time of the assault they were.

Q    Now I'm asking you at the time of the arrest.

A    At the time of the arrest, no.

Q    So, at the time of the arrest they were not in violation then, they were not unlawfully assembling, am I correct?

A    I don't think so.

Q    Now, you stated that this unlawful assembly had to do with another incident in the park, am I correct?

A    Yes, with several incidents.

Q    But at the time when you arrested them, you didn't know, did you, whether they were connected with a prior incident on Mr. Loughlin; did you know that?

A    Did I know it as a fact?

Q    Yes.

A    I believed that they did.

496

REYNOLDS — PEOPLE — CROSS — MOORE

1

2    Q   And it was on that belief that they were
3 charged with unlawful assembly?

4    A   Excuse me?

5    Q   It was on this belief that they were charged
6 with unlawful assembly?

7    A   A little more than that.

8    Q   Well, when you say that Mr. Loughlin was
9 assaulted--

10    A   Yes.

11    Q   -- would you say there was blood, he was
12 bleeding profusely from the head?

13    A   That's what I was told.

14    Q   Well, so, therefore, the charge would be
15 assault, would it not be?

16    A   Yes.

17        MS. LEDERER:  Objection.

18        THE COURT:  I will allow it.

19    Q   So, why then wasn't the charge of assault
20 made instead of unlawful assembly at that point in
21 time?

22    A   Because they didn't make any statement as to
23 committing the assault.  Three other defendants did.

24    Q   So, if they made a statement then, they
25 would be charged with assault; am I correct?

497

REYNOLDS — PEOPLE — CROSS — MOORE

1

2      A    If they made a statement stating they were

3    robbed in the assault, yes.

4      Q    If they didn't make a statement, they would

5    be charged with unlawful assembly?

6      A    For being with the group that was going

7    around assaulting people, yes.

8      Q    So, if a group of individuals assault an

9    individual and do not make a statement, they would

10   not be charged with assault; am I correct?

11            MS. LEDERER:  Objection.

12            THE COURT:  Objection sustained.  I

13        don't think he said that.

14     Q    Now, Mr. Berman had made a reference to a

15   supporting deposition that was included in the

16   Family Court documents.

17     Could you just look at the supporting deposition

18   a moment.

19     A    Which one?

20     Q    These are the Family Court documents that

21   you compiled on each of the defendants.  Let's say,

22   Lopez, for example.

23     A    Lopez?

24     Q    Yes.  Is that the supporting deposition?

25     A    Yes, it is.

REYNOLDS - PEOPLE - CROSS - MOORE

Q What do you understand a supporting deposition to be?

MS. LEDERER: Objection.

THE COURT: Let me ask counsel, what does Lopez have anything to do with your client? Why is this a proffer area for you to be going over? Counsel has already gone over a lot of this.

MR. BURNS: Your Honor, is your microphone off?

THE COURT: I'm not using my mike. Do you have trouble hearing me? Come up.

(Discussion was held off the record.)

Q Let me just ask you a few more questions, Officer.

You stated that during that night several young people were charged with assault, is that correct?

A That's correct.

Q The assault on Mr. Loughlin, am I correct?

A That's correct.

Q You also knew, Officer, that Mr. Loughlin had been taken to St. Luke's Hospital, is that correct?

A Yes.

499

REYNOLDS — PEOPLE — CROSS — MOORE

1
2     Q    Did you ever take any of those young people
3  over to the hospital where Mr. Loughlin was held for
4  the purposes of a showup?
5     A    No.
6              MR. MOORE:   No further questions.
7              THE COURT:   Mr. Diller.
8  CROSS EXAMINATION
9  BY MR. DILLER:
10    Q    Good afternoon, Detective Reynolds, my name
11 is Howard Diller.   I represent Kevin Richardson.
12 All the questions that I will be asking you will be
13 with respect to Kevin Richardson.
14    Do you understand?
15    A    Yes.
16    Q    Okay.   I'm going to direct your attention
17 specifically to the evening of the 19th of April of
18 this year and ask you, when was it for the first
19 time you saw Kevin Richardson?
20    A    When I first--
21    Q    The time.
22    A    When I first saw him?
23    Q    Yes.
24    A    When I saw him in the pack, when they
25 started running.

NYCLD_023245

P-APP001956

500

1       REYNOLDS — PEOPLE — CROSS — DILLER

2    Q    Did you recognize him?

3    A    No.

4    Q    About what time was that?

5         MR. BERMAN:   I would move to strike the

6    word "pack," Judge.

7         THE COURT:   Yes, strike out the word

8    "pack."

9         Do you have another word to describe the

10   group?  Is this a group that you saw?

11        THE WITNESS:   Yes, a group.

12   Q    What time was that approximately?

13   A    It was about, when I first the group?

14   Q    Yes.

15   A    About 10:30.

16   Q    Now, did there come a time that you saw him

17   again?

18   A    Yes.

19   Q    When was that?

20   A    That was at 100th Street and Central Park

21   West.

22   Q    And at that time he was already in custody,

23   is that so?

24   A    That's correct.

25   Q    And who arrested him?

NYCLD_023246

P-APP001957

501

REYNOLDS - PEOPLE - CROSS - DILLER

1

2     A    I'm the arresting officer on all of them.

3  If you mean who apprehended him--

4     Q    Yes.

5     A    I'm not certain who it was.

6     Q    Now, when you saw you were the arresting

7  officer, you have a certain responsibility with

8  respect to the persons charged with your arrest, is

9  that so?

10    A    Yes.

11    Q    Different than, for example, your partner,

12 Police Officer Powers; is that so, in terms of your

13 responsibilities?

14    A    As far as what?

15    Q    Procedure, filling out forms and so forth.

16    A    Well, we both do as much paperwork as

17 possible.

18    Q    Now, there came a time that Kevin Richardson

19 was taken to the Central Park Precinct, is that

20 correct?

21    A    That's correct.

22    Q    Were you in the same car with him when he

23 came to the precinct?

24    A    No.

25    Q    Who drove Kevin Richardson to the precinct,

502

REYNOLDS — PEOPLE — CROSS — DILLER

1

2  do you remember?

3      A    I'm not sure specifically who it was.

4      Q    At any rate, there came a time when he was

5  taken to the station house, is that correct?

6      A    That's right.

7      Q    And there came a time that you saw him

8  there, is that right?

9      A    That's right.

10     Q    And where was he in the station house when

11 you first saw him?

12     A    He was in front of the desk.

13     Q    And he was there with some others, is that

14 correct?

15     A    That's correct.

16     Q    And at that desk was where he had given the

17 pedigree to the desk officer, is that correct?

18     A    That is correct.

19     Q    Up until that time did you have any

20 conversation with Kevin Richardson?

21     A    Up until what time?

22     Q    Up until the point where he was at the

23 desk-- was it a desk sergeant or lieutenant?

24          THE COURT:  You mean before the time he

25          saw him at the desk, had he had any

503

REYNOLDS - PEOPLE - CROSS - DILLER

2      conversation?

3      Q    Any conversation.

4      A    No.

5      Q    Now, he was at the desk but a few minutes,
6  is that correct?

7      A    That's correct.

8      Q    And then you took him somewhere, did you
9  not?

10      A    Yes.

11      Q    And where did you take him?

12      A    Across to the Juvenile Room.

13      Q    And at that point he was handcuffed, was he
14  not?

15      A    He was handcuffed from when he was
16  originally handcuffed on the street.

17      Q    And he was handcuffed in front of the desk
18  officer?

19      A    That's correct.

20      Q    And when he was taken to the Juvenile Room,
21  he was handcuffed too, was he not?

22      A    When he got in there, yes.

23      Q    And as a matter of fact, he remained
24  handcuffed for well over an hour, isn't that so?

25      A    No.

504

REYNOLDS — PEOPLE — CROSS — DILLER

1

2   Q    Are you positive about that?

3   A    Yes.  We took the handcuffs when we got
4 inside.

5   Q    And how long was he inside before you took
6 the handcuffs off?

7   A    The exact time in minutes?

8   Q    Approximately.

9   A    Fifteen minutes.

10   Q    It wasn't over an hour?

11   A    No.

12   Q    Now, when he had his handcuffs off, who was
13 in the room with him?

14   A    I was.

15   Q    And was there any other police officer?

16   A    Well, there were police officers coming back
17 and forth.

18   Q    Was at that stage he subject to any
19 questions by any officers including yourself, as far
20 as you know?

21   A    Yes.

22   Q    And did you ask him questions?

23   A    Yes.

24   Q    What did you ask him?

25   A    I asked him what his name was, his address,