505

REYNOLDS — PEOPLE — CROSS — DILLER

1   date of birth, parents' name, telephone number.

2       Q    Now, did you ask him anything about what

3   supposedly happened in the park earlier that

4   evening?

5       A    No.

6       Q    You didn't?

7       A    No.

8       Q    In your presence did anyone else ask him

9   anything with respect to what happened earlier in

10  the evening?

11      A    Now, at what time are you talking about?

12      Q    When he first got into the Juvenile Room.

13      A    No.

14      Q    Now, there came a time that you left the

15  Juvenile Room, is that correct?

16      A    I might have.

17      Q    Now, by the way, at that point when he was

18  in the Juvenile Room, had you spoken with his

19  family?

20      A    No-- you mean over the phone?

21      Q    Over the phone.

22      A    No.

23      Q    Did your partner call his family?

24      A    Yes.

506

1          REYNOLDS — PEOPLE — CROSS — DILLER

2      Q    And your partner being Police Officer
3  Powers, is that right?

4      A    That's correct.

5      Q    And do you know what time it was that he
6  called someone in the Kevin Richardson family?

7      A    No, I don't know specifically the time.

8      Q    Did you indicate to your partner the person
9  that Kevin Richardson said for him to call?

10     A    Could you repeat that?

11     Q    In other words, when your partner called the
12 Richardson family, do you know whom he had spoken
13 to?

14     A    No.

15     Q    Now, do you know Kevin Richardson's mother?
16 Did you ever meet her?

17     A    I met her that night, yes.

18     Q    Do you know her name?

19     A    Not offhand.   I   believe   it's   Mrs.
20 Richardson, I'm not sure.

21     Q    You would be guessing at that?

22     A    Yes, I would.

23     Q    If I told you it was Mrs. Cuffy, would that
24 refresh you at all?

25     A    That's possible.  I don't recall.

507

REYNOLDS — PEOPLE — CROSS — DILLER

Q    Now, when was it for the first time that you met Mrs. Cuffy?

A    I met her that night.

Q    What time was it?

A    I'm not sure of the exact time.

Q    Well, do you know what time she came to the station house?

A    No.

Q    Do you know what time Officer Powers called her?

A    It was shortly after we brought them to the station house.  Again, the exact time, I'm not-- I wasn't there.  He was across the hall.

Q    Now, where did you see Mrs. Cuffy for the first time, where was she?

A    I saw her in the doorway of the Juvenile Room.

Q    And did you say anything to her?

A    Yes.  I told her her son was under arrest and I believe I asked her if that was her son.

Q    First, did you tell her why he was under arrest?

A    I believe so.

Q    What did you tell her?

NYCLD_023253

P-APP001964

50B

REYNOLDS — PEOPLE — CROSS — DILLER

1

2   A    I believe I told her he was under arrest for

3  assaulting people in the park.

4   Q    Were you more specific about it?

5   A    I don't recall specifically what I told her.

6   Q    And did you say where he was in the station

7  house?

8   A    He was right in front of her.

9   Q    And did you say you took her-- you told her

10  she can talk to him?

11   A    No.  I asked her if she could wait outside.

12   Q    Did she ask you if she could speak with her

13  son?

14   A    I don't recall if she did or not.  If she

15  did, she would have been allowed to.

16        MR. MOORE:  Objection.

17        THE COURT:  Overruled.  I'll let counsel

18        who asks the question, if he is satisfied

19        with it?

20        MR. DILLER:  I'll pursue it.

21   Q    Am I correct, Officer Reynolds, that you

22  never invited at that juncture Mrs. Cuffy to speak

23  with her son, Kevin Richardson; is that correct?

24   A    I don't recall if she spoke with him or not.

25  If she wanted to speak with him, I would have

509

REYNOLDS — PEOPLE — CROSS — DILLER

allowed her to.  Again, I don't recall if I did or not.  If she did, it was a brief conversation and I asked her to wait outside when she was finished so I can complete my paperwork.

T12/FR

Q    Now, in the Juvenile Room, who else was present other than Kevin Richardson at that moment?

A    Raymond Santana, Steven Lopez, Lamont McCall and Clarence Thomas.

Q    So, you had five arrested persons, is that correct?

A    That's correct.

Q    And who from the department was present?

A    Again there were several officers coming in and out, you know, with the paperwork, giving me log numbers and so on.

Q    Now, if you were doing paperwork, what concern would it have been of yours that Mrs. Cuffy would have access to speak in the presence of other officers?

MS. LEDERER:  Objection.

THE COURT:  I don't know whether he said that was so.

Did he say that?

510

REYNOLDS — PEOPLE — CROSS — DILLER

1

2       Q    You said to Mrs. Cuffy that she's to wait

3  outside, is that correct?

4       A    That's correct.

5       Q    I'm asking you, would it present a problem

6  if she would have had the opportunity in the

7  presence of other officers while you were doing your

8  paperwork that she would have conferred with her

9  son?

10      A    It wouldn't have been a major problem, but

11  usually we do have-- what I usually do is have the

12  parent wait outside so I can complete the paperwork

13  in a timely fashion.

14      Q    Officer, isn't it true that you didn't want

15  Mrs. Cuffy to speak with her son at that point?

16      A    That's not true.

17      Q    Now, how long did your paperwork?

18      A    It took a couple of hours.

19      Q    A couple of hours?

20      A    Yes.

21      Q    How many papers did you prepare?

22      A    I'd say about thirty, forty.

23      Q    Did you actually do the typing?

24      A    There's only one report that's typed.

25      Q    This is the handwriting then, is that

511

REYNOLDS — PEOPLE — CROSS — DILLER

1  correct?

2  correct?

3      A    Yes.

4      Q    And did you prepare, for example, at that

5  point an on-line booking system arrest worksheet?

6      A    That's correct.

7      Q    And on that document did you indicate what

8  the charges against Kevin Richardson were?

9      A    I'll have to look at it, but I did indicate

10  that.

11      Q    Go ahead.

12      A    Yes, I did.

13      Q    What charges were they?

14      A    It was assault, unlawful assembly and

15  possession of a weapon.  I originally put assault

16  and unlawful assembly.

17      Q    You filled out one worksheet where you

18  indicated assault and unlawful assembly, is that

19  correct?

20      A    That's correct.

21      Q    And then you filled out a second worksheet,

22  is that correct?

23      A    Second worksheet for what?

24      Q    For the identical crime with respect to

25  Kevin Richardson?

NYCLD_023257

P-APP001968

512

1          REYNOLDS – PEOPLE – CROSS – DILLER

2      A    You mean did I tear up the first and pick up

3   a second?

4      Q    No, not tear it up but make up a second?

5      A    No.

6      Q    You said the first one had assault in the

7   second degree and unlawful assembly?

8      A    At first it had assault in the second and

9   unlawful assembly.

10     Q    What did you do with that document?

11     A    I completed it and sent it downtown to

12  Central Booking in Manhattan.

13     Q    You said there was a second document that

14  had something else in it?

15     A    No, I didn't.

16     Q    Did you prepare a second document?

17     A    No, not a second arrest report, no.

18         MR. DILLER:   I would like this document

19         marked Defendant Richardson's Exhibit B for

20         identification.

21         (Document marked Defendant Richardson's

22         Exhibit B for identification.)

23     Q    Now, I show you what has been marked as

24  Defendant Richardson's Exhibit B for identification

25  and ask you to look at the top page.

513

REYNOLDS — PEOPLE — CROSS — DILLER

1

2      Have you had an opportunity?

3      A    Yes.   What part of the top?

4      Q    Listing the crimes.

5      A    Yes.

6      Q    And   after   looking   at   it,   is   your

7  recollection refreshed as to whether or not you had

8  the third crime listed on this sheet?

9      A    Yes.

10     Q    This is not the same working sheet at the

11 other working sheet, isn't that so?

12     A    Yes, it is.

13     Q    Okay.

14          MR. DILLER:   I ask that this document be

15          marked as Defendant Richardson's Exhibit C

16          for identification.

17          (Document marked Defendant Richardson's

18          Exhibit C for identification.)

19          MS.   LEDERER:   Is   this   a   one-page

20          document?   What's being marked is several

21          documents.

22          THE COURT:   Which page you marking?

23          MR. DILLER:   Just the top page.

24     Q    I ask you to look at again the crimes on

25 that list.

514

REYNOLDS - PEOPLE - CROSS - DILLER

1    Is your recollection refreshed as to whether--
2
3 the fact that you made two different sheets for two
4 different crimes?

5    A   Yes, this is the same sheet as the first
6 one.

7    Q   Is there a difference?

8    A   The difference is this one here was--

9    THE COURT:  Which one is this one?

10    THE WITNESS:  I'm sorry, Exhibit C.
11 Exhibit C was photostated before it went
12 downtown.  The other one is photostated
13 after going down to Central Booking.  It's
14 the same document, there's only one.

15    Q   And it has the same arrest I.D. numbers?

16    A   No, there's a different number on it.

17    Q   Can you tell us why there are two different
18 numbers?

19    A   I don't know.

20    Q   In any event, they charged Kevin Richardson
21 with criminal possession of a weapon.  What was the
22 weapon?

23    A   The weapon was the pipe.

24    Q   Now, when did you learn there was a pipe?

25    A   Excuse me?

515

REYNOLDS — PEOPLE — CROSS — DILLER

1

2      Q     When was it that you learned that there was

3  a pipe?

4      A     At 100th Street and Central Park West.

5      Q     When you prepared the on-line booking sheet

6  arrest, isn't it true that you characterize it as a

7  blunt instrument, not a pipe?

8      A     A pipe is a blunt instrument.

9      Q     You didn't say pipe on it, isn't that so?

10     A     On which report?

11     Q     On the on-line booking sheet.

12     A     Right.

13     Q     Did you know it was a pipe at that time?

14     A     I was told it was a pipe.

15     Q     Who told you?

16     A     I was-- Police Officer Powers stated that he

17  had made a statement that they used a pipe.

18     Q     Who made the statement?

19     A     The defendant.

20     Q     Which defendant?

21     A     He didn't say specifically who it was.  It

22  was either Richardson, Lamont McCall or Clarence

23  Thomas.

24              THE COURT:  Give us names of people.

25              Some are defendants, some are not.  Just

516

REYNOLDS - PEOPLE - CROSS - DILLER

2  give us names of people.

3      Q    Would it be fair to say, Officer Reynolds,

4  that at that point you didn't know of any statements

5  that were attributable to Kevin Richardson?

6      A    Excuse me?

7      Q    Would it be fair to say that at the time you

8  were preparing the worksheet, you knew of no

9  statement of Kevin Richardson?

10     A    I knew he made a statement, yes.

11     Q    You didn't know the content of the

12  statement?

13     A    Police Officer Powers said he made a

14  statement that he was at the scene.

15     Q    Did he make a statement that he participated

16  on the assault of the male jogger, Mr. Loughlin?

17     A    Yes.

18     Q    Did he articulate exactly what it was he

19  did?

20     A    He spoke to Officer Powers.

21     Q    Did Officer Powers tell you what Mr.

22  Richardson told him he did?

23     A    He told me he was there and acted as a

24  participant.

25     Q    But never articulated what he did as a

517

REYNOLDS — PEOPLE — CROSS — DILLER

1

2   participant, did he?

3       A    No, not that I recall.  No.

4       Q    Now, for the two hours you're doing your
5   paperwork, where's Mrs. Cuffy?

6       A    She's in the Clerical Room.

7       Q    How far is that away from the Juvenile Room
8   in terms of distance?

9       A    They're adjoining each other.

10      Q    And would it be fair to say that she-- that
11  staying in the outside room where she is, you could
12  hear if there's noise in the Juvenile Room?

13      A    Yes.

14      Q    Now, after two hours passed, approximately
15  what time was that?

16      A    Two hours from what time?

17      Q    In other words, when you finished your
18  clerical work, what time was that?

19      A    It was about three, three or four, I
20  believe.  I'm not sure specifically when I finished.
21  It wasn't entirely finished because I didn't have
22  the return date.

23      Q    Up until three or four in the morning, that
24  would have made it approximately over four hours
25  since Kevin Richardson was in custody at the station

518
REYNOLDS - PEOPLE - CROSS - DILLER

1

2  house, isn't that so?

3      A    Yes, that's true.

4      Q    In that four-hour period, did Mrs. Cuffy

5  ever engage in a conversation with her son, Kevin?

6      A    She might have because I remember her being

7  in the room and I had a conversation with her.

8      Q    When you say "might have," did you ever

9  leave Mrs. Cuffy to speak with Kevin Richardson?

10     A    Did I leave her to speak--

11     Q    In other words, did you ever see them

12  actually engaged in conversation?

13     A    I don't recall.  She might have spoken to

14  him.  I don't remember.  I didn't place a lot of

15  significance on it.

16     Q    Now, you had just completed some of the

17  paperwork with respect to an arrest of a felony of

18  Kevin Richardson, did you not?

19     A    Yes.

20     Q    And you knew he was fourteen years of age,

21  did you not?

22     A    Yes.

23     Q    Did you ever tell Mrs. Cuffy something to

24  the effect, "Mrs. Cuffy, your son is being charged

25  with a rather serious crime, that it would be a good

519

REYNOLDS — PEOPLE — CROSS — DILLER

1  idea for you to get an attorney for him"?

3     A    No.

4     Q    Did you ever tell her anything about what

5  was going to happen with respect to the Family Court

6  processings that were anticipated at that time?

7     A    Yes, I believe so.

8     Q    What did you tell her?

9     A    I stated that what usually happens is he'll

10 go to Family Court.  What they'll do is they'll

11 monitor his behavior, see if he is doing well in

12 school, and if he needs psychiatric help or some

13 kind of counseling, that he would probably receive

14 it.

15    Q    Did you indicate to her that this was a

16 court?  He wasn't merely going to some sociologist,

17 that was court she was going to?

18    A    Yes, that's correct, Family Court.

19    Q    Did you tell her in court there are lawyers?

20    A    No, I didn't explain the whole workings to

21 her.

22    Q    Did you also tell her that Kevin had certain

23 rights about remaining silent?

24    A    You are asking me if I read her her rights?

25    Q    Not read her, just discussed it with her?

520

REYNOLDS — PEOPLE — CROSS — DILLER

1

2       A    I don't believe so.

3       Q    Now,   it's   4:00;   is   that   correct,

4  approximately 4:00 in the morning?

5       A    If you want it to be.

6       Q    No, no, it's not what I want it to be--

7            THE COURT:  Please, Officer.

8            Please be more specific about what time

9        you're talking about.

10      Q    I'm talking about after the clerical work

11 was concluded.

12      A    Again, the paperwork wasn't finished because

13 I still had to get the return day.  Parts of the

14 paperwork were left open.

15      Q    Up until that point, in other words, you

16 recognize there is some paperwork to be finally

17 concluded but the point about which we are now

18 speaking where you finished most of the paperwork,

19 it was about 4:00; is that so?

20      A    Yeah, about 4:00.

21      Q    Now, the room in which Mrs. Cuffy was

22 seated, could you describe that to us a little bit?

23 Were there chairs?

24      A    There were several chairs, desks with lamps.

25      Q    Was there a telephone?

NYCLD_023266

P-APP001977

521

REYNOLDS - PEOPLE - CROSS - DILLER

1

2      A     There are telephones in the room, but I

3 believe they are locked away at night.

4      Q     Is there a coffee machine or a soda machine?

5      A     Yes, there's a coffee machine sitting there.

6 I don't believe it was in use at that time.   There's

7 a soda machine next door in our muster room.

8      Q     Did you ever-- withdrawn.

9      You saw Mrs. Cuffy, did you not?

10     A     Yes.

11     Q     Would it be fair to say, Officer, that she

12 looked extremely nervous?

13     A     She was very concerned, yes.

14     Q     Did you say to Mrs. Cuffy something to the

15 effect can I get you a cup of coffee?   It's 4:00 in

16 the morning now.

17     A     No.

18     Q     Did she ask you is it possible maybe to have

19 a glass of water, do you recall that?

20     A     Did she ask me that?

21     Q     Did she ask you for the water or coffee?

22     A     There's really no place to get the water

23 there.

24     Q     Now, would you say, Officer Reynolds, that

25 Mrs. Cuffy, in addition to grave concern that she

522

REYNOLDS — PEOPLE — CROSS — DILLER

1

2  manifested, also appeared to be sickly a little bit?

3      A    No.

4      Q    Did she indicate to you, you recall that she

5  was a recent victim of a stroke?

6      A    No.

7          THE COURT:   Recent victim of a what?

8          MR. DILLER:   Of a stroke.

9          THE WITNESS:   No.

10     Q    She didn't say that?

11     A    I don't recall her telling me that, no.

12     Q    In any event, we are now down to 4:00; Kevin

13 is in one room, Mrs. Cuffy is in another room, is

14 that correct?

15     A    That's correct.

16     Q    And then a Lieutenant McInerney, I believe--

17     A    Right.

18     Q    -- presents the news that there was a very

19 serious thing that happened in the park, is that

20 right, namely, a woman was found very seriously

21 beaten, is that correct, words to that effect?

22     A    That's right.

T13/LF 23

24     Q    And that everyone is to be questioned by the

25 police, by detectives; is that correct?

523

REYNOLDS — PEOPLE — CROSS — DILLER

1

2      A      He asked me to hold onto them until the

3  detectives could come to question them.

4      Q      So, at that point whether they were

5  awaiting-- that is whether the five of them in the

6  room were awaiting the arrival of other parents or

7  clearances on warrants, all bets are off; they had

8  to say, is that correct?

9      A      That's correct.

10      Q      And then detectives of the Investigation

11  Unit of the Central Park Precinct started to come

12  in, is that so?

13      A      No.

14      Q      Who came in, if anybody?

15      A      Detectives from Night Watch.

16      Q      Now, what is Night Watch?

17      A      Those are the detectives that handle, you

18  know, serious crimes during the night when the PDU's

19  are not working, when they were unavailable.

20      Q      Is this division-wide or borough-wide or

21  city-wide?

22      A      I believe it's borough-wide.

23      Q      And did, indeed, any of them come?

24      A      Come where?

25      Q      To the precinct, to the Juvenile Room?

NYCLD_023269

P-APP001980

524

REYNOLDS — PEOPLE — CROSS — DILLER

1
2    A    Eventually, yes.

3    Q    When you say "eventually," what time was it?

4    A    It was around, I believe, five, six o'clock.

5    Q    Now, by five or six o'clock, did Mrs. Cuffy

6    then have the opportunity to speak to Kevin

7    Richardson?

8    A    Did she have the opportunity?

9    Q    In other words, did she-- withdrawn.

10   Did she speak to Kevin Richardson?

11   A    I don't recall if she spoke to him or not.

12   Q    Did you go to Mrs. Cuffy seated in the

13   clerical room and tell her that there was a problem

14   that had arisen and that Kevin wasn't just about

15   ready to go, and this was a serious question that

16   had to be dealt with?  Did you tell her that?

17   A    I believe so, at one point I told her they

18   would have to wait.

19   Q    Did you tell her specifically why they would

20   have to wait?

21   A    Specifically as far as the incident that

22   occurred?

23   Q    What you had known from Lieutenant

24   McInerney, did you tell it to her?

25   A    No.

525

REYNOLDS — PEOPLE — CROSS — DILLER

1

2    Q   Did you tell her that there appears to be a

3 question of serious charges, that at this point for

4 sure she would be well advised to have an attorney

5 for this fourteen-year-old boy?

6    A   No.

7    Q   Now, by 6:00 in the morning do you know if

8 Mrs. Cuffy had a cup of coffee?

9    A   Several of the parents left to get something

10 to eat.

11    Q   Did Mrs. Cuffy go out of that precinct house

12 between the time she had arrived-- by the way, you

13 don't know what time she had arrived, do you?

14    A   Originally?

15    Q   Yes.

16    A   She was one of the first parents there.

17    Q   Would it be fair to say it was 11:30?

18    A   No.

19    Q   Twelve?

20    A   Probably.

21    Q   From twelve to six in the morning, did she

22 leave that station house?

23    A   I don't know.

24    Q   Do you know if she had even an automobile?

25    A   No, I didn't know.

526

REYNOLDS — PEOPLE — CROSS — DILLER

1

2    Q    Do you know if anyone brought her back a cup

3  of coffee?

4    A    I don't recall anything was brought for her,

5  but people did go out to get food.   And if she

6  didn't go, more than likely some of the other

7  parents brought her something.

8    Q    And you are saying "more than likely;" you

9  have no knowledge of that, do you?

10    A    No.

11    Q    Do you know if in that six-hour plus period

12  if Kevin Richardson had anything to eat or to drink

13  in that six hours in jail?

14    A    He did eat that morning.

15    Q    No, I'm asking you from the time of his

16  arrest, he was brought into the station house

17  sometime before midnight; is that correct?

18    A    Yes.

19    Q    Until 6:00 in the morning, some six hours

20  plus, can you tell us if he had anything to eat or

21  drink?

22    A    Something was brought for them to eat.   I

23  don't recall if it was within the six-hour period or

24  not.   For a time, during the six hours, they were

25  sleeping so they wouldn't be able to eat.

NYCLD_023272

P-APP001983

527

REYNOLDS - PEOPLE - CROSS - DILLER

1

2  Q    When you say they were sleeping, were they

3  sleeping on the floor?

4  A    One or two were curled up on the floor and a

5  couple others sat in the reclining chairs against

6  the wall.

7  Q    Would it be fair to say they didn't have the

8  use of a blanket or anything?

9  A    They had their jackets.

10 Q    Do I understand this is a regular New York

11 City Police precinct in Central Park?

12 A    That's correct.

13 Q    Would it be fair to say that the precinct

14 does have for aided cases the availability of

15 something like a blanket?

16 A    No.

17 Q    Are you telling us that the entire Central

18 Park Precinct doesn't have a single blanket?

19 A    There might be blankets in our dorms, but

20 that's what we bring in for ourselves.

21 Q    In other words, if there was some kind of an

22 accident, for example, with a necessity for

23 blankets, your precinct couldn't provide them?

24 A    If somebody was injured, they wouldn't be

25 brought to the precinct.  There would be no need for

NYCLD_023273

P-APP001984

528

REYNOLDS — PEOPLE — CROSS — DILLER

1

2   it.  MS carries blankets in their ambulances.

3      Q   Now, do you know where Kevin Richardson, if

4   he was sleeping on the floor?

5      A   I don't recall if he was in a chair or on

6   the floor.

7      Q   But during that six hours, is it your

8   testimony, Officer Reynolds, that no one spoke with

9   him?

10     A   Are you talking about police officers?

11     Q   Police officers, yes.

12     A   I don't recall anyone speaking with him.

13     Q   Now, did there come a time when any kind of

14  personnel, whether from the District Attorney's

15  office or from the police department, sought to have

16  a colloquy with Kevin Richardson?

17     A   You're going to have to explain that word.

18     Q   Okay.  From after 6:00 in the morning did

19  there come a time where a member of the New York

20  City Police Department or the District Attorney's

21  office had a conversation or interview with Kevin

22  Richardson?

23     A   Yes.

24     Q   When was that for the very first time?

25     A   I believe that was about 8:00.  I'm not sure

529

REYNOLDS — PEOPLE — CROSS — DILLER

1

2   of   the   exact   time.   I   wasn't   present   for   his

3   interview.

4        Q    Do you know a Captain Gunther?

5        A    Yes.

6        Q    And do you know a Chief Rosenthal?

7        A    I don't know Chief Rosenthal personally.   I

8   know of him.

9        Q    Now,   was   he   the   assistant   chief   of

10  detectives in charge of Manhattan detectives?

11       A    Yes.

12       Q    Did you see him in the early morning hours

13  of the 20th of April, 1989?

14       A    Yes.

15       Q    And did you see him go into what we had

16  talked about, the Juvenile Room?

17       A    No.

18       Q    Did   you   see   Captain   Gunther   go   into   the

19  Juvenile Room?

20       A    No.

21       Q    Did you see any investigative detectives go

22  into the Juvenile Room?

23       A    Yes.

24       Q    And when was it for the first time that they

25  went into the room?

NYCLD_023275

P-APP001986

530

REYNOLDS — PEOPLE — CROSS — DILLER

1

2      A    It was approximately 5:30, 5:50.

3      Q    And do you know what they did when they went

4  into the room?

5      A    They eventually started interviewing the

6  juveniles.

7      Q    Now, you assume that, you weren't there,

8  right?

9      A    I was there for two.

10     Q    Which two were you there while they were

11 interviewing?

12     A    Clarence Thomas and Lamont McCall.

13     Q    When were those interviews concluded?

14     A    Each one separately--

15     Q    Were they both done simultaneously?

16     A    No.

17     Q    When was the second interview concluded?

18     A    I'm not sure of the exact time.

19     Q    Would you say they each took at least an

20 hour?

21     A    Yes.

22     Q    So, that would take us to about 8:00 in the

23 morning; is that right?

24     A    Yes.

25     Q    Where was Mrs. Cuffy at 8:00 in the morning?

NYCLD_023276

P-APP001987

531

REYNOLDS — PEOPLE — CROSS — DILLER

1

2    A    I believe she was in the clerical part of

3 the office.

4    Q    Was she asleep on the floor?

5    A    I don't think so.  She was with her son.

6    Q    You say she was with her son?

7    A    Yes.

8    Q    She was with Kevin in the clerical room?

9    A    Yes.

10    Q    And she was talking to Kevin?

11    A    I don't know if she was talking to him.  I

12 assume that she did.

13    Q    Well, did you see them in conversation?

14    A    I don't recall if they spoke or not.

15    Q    Now, at that hour of the morning, you were

16 the arresting officer; did you speak with Mrs.

17 Cuffy?

18    A    I had brief conversations with her

19 throughout the night.  If she had questions, I would

20 answer them.

21    Q    What was some of the questions she had and

22 what were some of the answers you gave to those

23 questions?

24         MR. BURNS:  At what point in time, can

25         we have that maybe?

532

REYNOLDS — PEOPLE — CROSS — DILLER

1

2      Q    Starting from the first.

3      A    I don't recall.   These were casual

4  conversations.   It wasn't anything that was recorded

5  or made, you know, a record of.

6      Q    I am not suggesting there was something

7  recorded.   There had to be a time, certainly, by

8  8:00 in the morning that the gravity of the

9  situation was apparent; wasn't that so?

10     A    Yes.

11     Q    This is eight hours plus?

12     A    Yes.

13     Q    She had to come to you because you were the

14 arresting officer, right?

15     A    That's correct.

16     Q    To ask you what's going on here, is that

17 correct?

18          MS. LEDERER:   Objection as to form.

19          THE COURT:   I'll allow it.

20     A    At what time frame are you talking about?

21     Q    The early morning hours, like seven or eight

22 o'clock.

23     A    If she had asked-- and I don't recall if she

24 asked or not, I would have told her that the

25 detectives wanted to speak to her.

P-APP001989

533

REYNOLDS – PEOPLE – CROSS – DILLER

1

2      Q    Did you tell her at this point since it

3 looks like a really serious matter it would be a

4 good idea for this lady to get an attorney for her

5 son?

6      A    No.

7      Q    Did you indicate to Mrs. Cuffy that for sure

8 her son, Kevin, wasn't going home that night?

9      A    No, because it wasn't for sure at that

10 point.

11      Q    They were awaiting questioning, isn't that

12 so?

13      A    That's correct.

14      Q    When was it that it was Kevin Richardson's

15 turn to be questioned for the very first time by

16 detectives?

17      A    He went after Lamont McCall and Clarence

18 Thomas.

19      Q    Now, what time in the morning was that?

20      A    Again, I don't recall.

21      Q    Okay, it's in the framework, however, of

22 about 8:00; is that right, give or take?

23      A    Yes.

24      Q    Now, do you know who was the first to deal

25 with questions of Kevin?

534

REYNOLDS - PEOPLE - CROSS - DILLER

1

2     A     No, I don't.

3     Q     And do you know who was-- withdrawn.

4     Where    was    Kevin    when    the    first    team    of

5     interrogators questioned him?

6     A     Excuse me?

7     Q     Where   was   Kevin   Richardson   when   the   first

8     detectives   sought   to   question   him,   was   he   in   the

9     Juvenile Room or someplace else?

10    A     When the detectives first arrived to start--

11    Q     In other words, where did they question him?

12    A     In the Juvenile Room.

13    Q     Next to where Mrs. Cuffy was?

14    A     Well, when he was being questioned, she was

15    with him.

16    Q     She was with him?

17    A     All   the   parents   were   with   their   children

18    when they were questioned.

19    Q     I didn't ask that.   When Kevin was being

20    questioned, were the other boys in the room?

21    A     No.   At   least,   with   the   first   two

22    interviews, it was parents and the child.

23    Q     I'm asking you when Kevin was questioned.

24    Are you telling us positively that Mrs. Cuffy was

25    present for the initial interrogation of Kevin?

NYCLD_023280

P-APP001991

535

REYNOLDS — PEOPLE — CROSS — DILLER

1
2      A     I told you I wasn't present for his
3  interview.
4      Q     I realize you were not present, but you
5  certainly were in the immediate proximity of
6  everything that was going on, is that correct?
7      A     I don't believe so.
8      Q     Well, Kevin was your charge at that point,
9  was he not, since you arrested him?
10      A     That's correct.
11      Q     And did you turn him over to detectives?
12      A     They stated they wanted to speak to him.
13  There is no formal procedure for that.
14      Q     Did they say, "Well, you were the arresting
15  officer, we want you to be present"?
16      A     Did they state that?
17      Q     Did they say that to you?
18      A     I don't believe so.
19      Q     Did you say, "I'd like to be present.  After
20  all, I am the arresting officer"?
21      A     Not for Kevin Richardson, no.
22      Q     And where were the other boys?
23      A     They were in the clerical office sitting
24  with their parents.
25      Q     And you don't know where Mrs. Cuffy was at

536

1          REYNOLDS - PEOPLE - CROSS - DILLER

2    that point, do you?

3            THE COURT:   Excuse me, which point?

4            MR. DILLER:   At the point when Kevin

5        Richardson was being interviewed.

6    A    I was not there.

7    Q    Now, who did the interviewing?

8    A    I was not there.  I don't know.

9    Q    Well, you know who went into the room, do

10   you not?

11   A    Who went in the room with him?

12   Q    Yes.

13   A    His mother went with him.

14   Q    You are misunderstanding me.  When the

15   detectives were questioning Kevin Richardson in the

16   Juvenile Room, I am asking you who the detectives

17   were?

18   A    Again, I was not there.  I don't know who it

19   was.

20   Q    Do you know if there were five or six

21   detectives?

22           MS. LEDERER:   Objection.

23           MR. DILLER:   If he knows who went in the

24       room.

25           THE COURT:   He said he wasn't there.  He

537

```
 1                REYNOLDS - PEOPLE - CROSS - DILLER
 2        doesn't know.
 3               Were you in the precinct?
 4               THE WITNESS:  I was next door.
 5               THE COURT:  Meaning what?
 6               THE WITNESS:  I was in the main part of
 7        the station house.
 8               THE COURT:  Is that where the other
 9        persons were with their parents?
10               THE WITNESS:  No, they weren't.
11               THE COURT:  That was not the clerical
12        room?
13               THE WITNESS:  No.
14               THE COURT:  Was that on the same floor?
15               THE WITNESS:  No, it is a separate
16        building.  You have to go across a driveway
17        to it.
18               THE COURT:  Okay.
19        Q    Did you hear any noise coming out of the
20   room where Kevin was being questioned by detectives?
21        A    What type of noise?
22        Q    Any kind of noise.
23        A    No.
24        Q    Did you hear any shouting or loud noises?
25        A    No.   Again, I was not there, I was next
```

538

REYNOLDS — PEOPLE — CROSS — DILLER

1
2  door.

3      Q    How  long  do  you  know  if  Kevin  was  being
4  questioned?

5      A    Excuse me?

6      Q    How  long  a  period  of  time  was  Kevin  being
7  questioned?

8      A    I don't know.

9      Q    Did  there  come  a  time  that  you  saw  Kevin
10  again?

11      A    Yes.

12      Q    When was that?

13      A    I saw him later on  that  night.   I  had  seen
14  him  several  times.   I  didn't—— it  wasn't  anything
15  formal.   I  might  have  went  back  into  the  room  and
16  caught a glimpse of him and went back out.

17          THE  COURT:   Officer,  did  you  say  that
18          his  mother  was  with  him  when  he  was  being
19          questioned?

20          THE  WITNESS:    Well,   it   was   my
21          understanding  that  the  parents  were  to  be
22          with all——

23          THE COURT:  But I mean, do  you  know  in
24          this case whether his mother was with him?

25          THE WITNESS:  No, I don't.

NYCLD_023284

P-APP001995

539

REYNOLDS — PEOPLE — CROSS — DILLER

1  MR. BURNS: Judge, I can't hear you.

2  THE COURT: The question was does he
3  know whether Richardson's mother was present
4  with him when he was questioned.

5  Q    When was in the early morning hours of the
6  20th the last time that you can recall seeing Mrs.
7  Cuffy, Kevin Richardson's mother? Do you know the
8  time approximate?

9  A    No.

10  Q    As the arresting officer of Kevin
11  Richardson, did you ever tell Kevin-- he was
12  fourteen, was he not?

13  A    That's what he told me, yes.

14  Q    Do you have any reason to believe he was
15  another age?

16  A    Well, he looked a little older, but he
17  stated he was fourteen and his mother stated he was
18  fourteen.

19  Q    Did you believe them?

20  A    Yes.

21  Q    And did you at any time suggest to Kevin
22  that this is a serious matter and that after all, he
23  should speak with his mother and they ought to come
24  to some kind of an understanding whether they wanted

NYCLD_023285

P-APP001996

540

REYNOLDS — PEOPLE — CROSS — DILLER

1

2    a lawyer or to talk to anyone?

3        A    No.

T14/FR 4

5        Q    Did you ever say anything to Kevin at any

6    time from the moment that he was first in custody on

7    Central  Park  West,  wherever  he  was,  for  the  days

8    that followed that he had a right to counsel?

9        A    No.

10        Q    You  never  read  him  the  so-called  Miranda

11    warnings either, did you?

12        A    That's correct.

13        Q    Were  you  present  at  any  conversation  that

14    anyone had, after  the  detective  you  described  with

15    Kevin Richardson?

16        A    Be more specific.

17        Q    Were  you  privy,  in  other  words,  were  you

18    part of  any  detective  in  the  Police  Department  of

19    the  City  of  New  York  asking  Kevin  Richardson

20    questions?

21        A    No.

22        Q    Or any District Attorney?

23        A    No.

24            MR. DILLER:  May I  have  just  one  brief

25        moment?

NYCLD_023286

P-APP001997

541

1                          COLLOQUY

2              THE COURT:  Yes.

3              MR.   DILLER:    I    have    no    further

4       questions.

5              MS. LEDERER:  Excuse me, your Honor, may

6       we approach just for a second?

7              THE COURT:  Yes.

8              (Discussion was held off the record.)

9              THE COURT:  Short recess.

10             (Recess.)

11             THE COURT:  All right, let's continue.

12             THE   CLERK:    Officer   Reynolds,   you're

13       still under oath.

14             THE COURT:  Mr. Joseph.

15             MR. JOSEPH:  Thank you, your Honor.

16  CROSS EXAMINATION

17  BY MR. JOSEPH:

18       Q    Officer Reynolds, you told us that there

19  came a time at approximately 10 p.m. at the location

20  of 102nd Street and the area of Central Park West

21  where you saw a group of young males; is that

22  correct?

23       A    That's correct.

24       Q    And would I be correct that you never made

25  any writing of the description of any of those

542

REYNOLDS — PEOPLE — CROSS — JOSEPH

1
2 particular individuals within that group, is that
3 right?
4       A    You mean during the time that we were
5 looking for them?
6       Q    No.  Subsequent to the time you saw them,
7 did you ever write down a description of any of the
8 individuals who were not seized at that location?
9       A    You'll have to be more specific.
10      Q    Okay.  What I'm asking you is, you saw a
11 group of young men, correct?
12      A    Correct.
13      Q    And then, as I understand it, there were two
14 men that were-- that did not run away and then three
15 men, according to you, that were seized sometime
16 later; is that correct?
17      A    That's correct.
18      Q    Other than those five individuals-- let me
19 rephrase that.
20      Putting those aside those five individuals, did
21 you ever report a description of the way any of the
22 other individuals appeared to you?
23      A    No.
24      Q    Now, I think you even told Mr. Diller that
25 you could not recognize any of those particular

543

REYNOLDS - PEOPLE - CROSS - JOSEPH

1

2    individuals who were not seized at that location,

3    right?

4        A    The ones that ran, right.

5        Q    Now, I'd like to ask you-- by the way, I

6    represent Antron McCray and I think you told us on

7    direct that there came a time at the precinct when

8    you saw Antron McCray at the precinct, is that

9    right?

10       A    That's right.

11       Q    And would I be correct that when you saw him

12   he-- withdrawn.

13       Do you know whether at that time Antron McCray

14   was under arrest?

15       A    You're asking me if he was under arrest when

16   he came to the precinct?

17       Q    Yes, when you saw him?

18       A    No.

19       Q    And are you aware that he had voluntarily

20   come to that precinct?

21       A    Yes.

22       Q    And are you aware that he left the precinct

23   as well voluntarily?

24       A    That's correct.

25       Q    And I think you told us that you do not know

NYCLD_023289

P-APP002000

544

REYNOLDS — PEOPLE — CROSS — JOSEPH

1   the  particular  time  when  you  saw  him  at  the
2
3   precinct?

4       A    That's correct.

5       Q    Did  you  have  any  conversation  with  Antron
6   McCray at the precinct?

7       A    I don't believe so.

8       Q    And when you say you don't believe so, am I
9   correct in understanding that as you sit there now,
10  you  don't  recall  overhearing  or  taking  part  in  a
11  conversation with Antron McCray at the precinct that
12  night?

13      A    That's correct.

14      Q    Now, you told us that you did take part in
15  a-- let me rephrase that and I withdraw it.

16      I  believe  you  testified  that  you  were  present
17  when  Clarence  Thomas  was  questioned,  is  that
18  correct?

19      A    That's correct.

20      Q    And  would  I  be  correct  that  that  was
21  approximately at 7 a.m.?  Check your records.

22      A    Which defendant was that now?

23      Q    That's Clarence Thomas.

24           THE COURT:  Not defendant, just person.

25      A    Yes, it was.

NYCLD_023290

P-APP002001

545

REYNOLDS — PEOPLE — CROSS — JOSEPH

1

2      Q     And would I be correct that in the room then

3  along with you were several detectives, isn't that

4  right?

5      A     There were two.

6      Q     Detective Farrell and Detective Whelpley?

7      A     That's correct.

8      Q     And I think you told us that during that

9  interrogation of Clarence Thomas that-- you heard

10  the name Antron McCray; is that right?

11      A     Yes.

12      Q     And would I be correct that Clarence Thomas

13  told you that he did not see Antron McCray strike

14  any individual in the park that evening?

15      A     I'd have to look at that to refresh my

16  memory.

17      Q     Please do, if you need to.

18             MR. JOSEPH:   Judge, if I may approach?

19             THE COURT:   Yes.   Why don't you do that.

20         Speed it up.

21             (Mr. Joseph approached the witness.)

22      Q     Does that refresh your recollection?

23      A     Yes.

24      Q     And what is your recollection now?

25      A     I don't recall specifically what he said,

546

REYNOLDS — PEOPLE — CROSS — JOSEPH

1
2  but if it's in there, it's probably what he told
3  Detective Farrell.

4       Q    And that would be that he did tell Detective
5  Farrell that he did not see Antron McCray actually
6  physically assault anyone; is that correct?

7            MS. LEDERER:    Objection, the witness
8            says he doesn't remember.  "If it's in the
9            document then it's probably accurate," but
10           he doesn't remember.

11           THE COURT:    Does that refresh your
12           recollection any further?

13           THE WITNESS:  Not really, no.

14      Q    You do not recall, do you, hearing Clarence
15  Thomas say the opposite, that, in fact, Antron
16  McCray was seen by Clarence Thomas assaulting the
17  jogger or any jogger; do you recall that?

18      A    I don't recall, no.

19      Q    So, you don't recall one way or the other,
20  is that correct?

21      A    That's correct.  At that point I had been up
22  all night and was having a problem paying attention
23  to it.

24      Q    Do you recall-- withdrawn.

25      Do you recall testifying on direct that you

NYCLD_023292

P-APP002003

547

REYNOLDS — PEOPLE — CROSS — JOSEPH

1

2 heard Antron-- I'm sorry, that you heard Clarence

3 Thomas say that Antron assaulted the male jogger?

4     A    Could you repeat that?

5     Q    Do you recall saying in your direct

6 testimony that Clarence Thomas made a statement

7 saying that specifically Antron was the one who

8 physically struck the jogger?

9     A    Meaning if I said that earlier?

10    Q    Yes.

11    A    I might have.

12    Q    But the correct status is that you really

13 don't recall one way or the other specifically what

14 Clarence said, is that correct?

15    A    Well, looking at this now, that's correct.

16          THE COURT:  What is correct?

17          THE WITNESS:  What you said about--

18          THE COURT:  That you now don't know if

19       he said that or not?

20          THE WITNESS:  Right.

21    Q    Do you know whether Clarence Thomas was

22 questioned about any information he might have

23 concerning the woman who was found lying in the

24 park?

25    A    The first interview?

548

REYNOLDS — PEOPLE — CROSS — JOSEPH

1

2     Q     In the first interview, yes.   We're talking

3     about the interview on April 20th at 7 a.m.

4     A     If I recall properly, he was just asked if

5     anyone else was attacked.

6     Q     All right, and did he indicate-- would I be

7     correct that he did not indicate anything concerning

8     a female in the park being assaulted?

9     A     That's correct.

10    Q     And at the time at 7 a.m. on April 20th, you

11    were aware that a woman had been found in the park,

12    were you not?

13    A     Yes.

14    Q     And to your knowledge, Detective Farrell was

15    aware of that as well; was he not?

16    A     I believe he was.

17    Q     And did Detective Farrell-- withdrawn.

18    Is it your testimony that Detective Farrell

19    didn't ask any questions specifically about that

20    woman?

21    A     No.

22    Q     He didn't ask him any?

23           THE COURT:   What does "no" mean, that he

24           didn't?

25           THE WITNESS:   That's not my testimony,

549

REYNOLDS — PEOPLE — CROSS — JOSEPH

1

2          that's not what I'm stating.

3      Q    My question is this, did Detective Farrell

4   ask Clarence Thomas at or about 7 a.m. on April 20th

5   anything concerning a female being attacked in the

6   park?

7      A    I don't-- I'm not sure.  I don't think he

8   did.  Again, I had been up all night and by that

9   time in the morning I was having a little-- you

10  know, trouble staying awake.

11     Q    Are you aware, Officer, that Detective

12  Farrell made a written record concerning this

13  interrogation of Clarence Thomas?

14     A    Yes.

15     Q    And you have that in front of you?

16     A    Yes.

17     Q    Why don't you look at that and see if that

18  refreshes your recollection as to whether he asked

19  Clarence Thomas anything at all about a woman being

20  attacked in the park.

21     A    At what time are you talking about, which

22  interview?

23     Q    I'm talking about the interview at 7 a.m.

24          THE COURT:  Whose report is this you're

25          showing him?

550

REYNOLDS — PEOPLE — CROSS — JOSEPH

1
2       MR. JOSEPH:  This  is  a  report  of  a
3   Detective J. Farrell.
4       THE COURT:  All right.
5   A   Nothing about that in the 7:00 interview, I
6   don't think.
7       THE  COURT:  The  question  is,  after
8   reading  that  does  that  refresh  your
9   recollection in any way?
10      THE WITNESS:  No.
11  Q   Are you aware that this is a report--
12      MR. JOSEPH:  Your Honor, may I have this
13  marked for identification.  Mine is  written
14  on at the end.
15      THE  COURT:  Is  there  a  problem  in
16  marking it?
17      MR. JOSEPH:  No.
18      (Document  marked  Defendant  McCray's
19  Exhibit A for identification.)

T15/LF 20

21  Q   To your knowledge, Officer, was  that  the
22  report prepared by Detective Farrell in reference to
23  the interview of Clarence Thomas?
24  A   Would you repeat that?
25  Q   Is what you're holding in your hand, what

REYNOLDS - PEOPLE - CROSS - JOSEPH

1

2   has now just been marked for identification, the

3   report that Detective Farrell made relating to the

4   interview of Clarence Thomas?

5       A    Yes.

6       Q    Have you seen that before?

7       A    Yes.

8       Q    Are you familiar with that as Detective

9   Farrell's report?

10      A    Yes.

11      Q    May I see it again?

12           (Handing.)

13      Q    You now mention a second interview with

14  Clarence Thomas, is that correct?

15      A    Yes.

16      Q    You were present at that interview as well?

17      A    Yes.

18      Q    And this is approximately 11:30, is that

19  correct?

20      A    Yes.

21      Q    And at that second interview, am I correct,

22  that Clarence Thomas again stated that he did not

23  see Antron McCray actually strike the victim in the

24  park?

25      A    Yes.

552

REYNOLDS - PEOPLE - CROSS - JOSEPH

1

2      Q      And am I correct-- withdrawn.

3      In the second interview at 11:30 on April 20th,

4      did either the detectives or you ask Clarence Thomas

5      anything whatsoever about the woman that had been

6      found in the park?

7      A      You mean in his house at 11:30?

8      Q      Yes.

9      A      I don't believe so.

10     Q      So, it's your testimony that you knew this

11     information concerning the woman, correct?

12     A      Yes.

13     Q      And am I correct that you've told us that

14     certain individuals were even being held in the

15     Youth Room to be questioned, is that correct?

16     A      Yes.

17     Q      And the reason for that was information

18     about this woman that you had received, is that

19     right?

20     A      That's correct.

21     Q      And now you are telling us that you went--

22     you went to Clarence Thomas' house at 11:30 and

23     didn't even ask him anything whatsoever about this

24     woman; is that right?

25             MS. LEDERER:   Objection, your Honor,

553

REYNOLDS — PEOPLE — CROSS — JOSEPH

1

2      this witness has testified several times he

3      has no recollection.  Every time he asks the

4      question, he reads from another report that

5      he didn't prepare.

6           THE COURT:  Anything that can help him

7      refresh his recollection is permissible.

8           MS. LEDERER:  Every time he is asked, he

9      says no, and then he reads--

10          THE COURT:  I will allow the question.

11   Q   Is that your testimony?

12   A   I believe so, yes.  Can I look at this note

13  again?

14          THE COURT:  Sure, that's what you are

15     supposed to do.  Look at it and see if it

16     refreshes your recollection.

17          Read it.  Take some time.

18          Finished?

19          THE WITNESS:  Yes.

20          THE COURT:  Okay.  Now, what is your

21     question?

22   Q   Would I be correct, Officer, that, in fact,

23  when you went to Clarence Thomas' house, that along

24  with you were officers from the Sex Crimes Unit?

25   A   Not in their apartment, no.

NYCLD_023299

P-APP002010

554

REYNOLDS — PEOPLE — CROSS — JOSEPH

1
2     Q    But they were along with you when you went
3 to question Clarence Thomas for a second time, is
4 that correct?
5     A    I believe they met us outside.
6     Q    Is that a Detective Rosario?
7     A    Yes, he is not from Sex Crimes.
8     Q    Detective Rivera and Morin, they are from
9 Sex Crimes; is that correct?
10    A    Yes.
11    Q    And Clarence Thomas then got into a vehicle
12 with you, is that correct?
13    A    That's correct.
14    Q    And while you were in this vehicle, were you
15 in the same vehicle with Clarence Thomas?
16    A    Yes.
17    Q    Did anybody ask Clarence Thomas in the
18 vehicle about the woman in the park, that was found
19 in the park?
20    A    I don't think he was being questioned in the
21 car.  I don't recall that.
22    Q    So, would I be correct that you do not
23 recall anybody at any point asking Clarence Thomas
24 about the woman that was found in the park, is that
25 right?

555

REYNOLDS — PEOPLE — CROSS — JOSEPH

1

2      A    I don't recall, that's correct.

3      Q    You do recall Clarence Thomas being asked

4  about male joggers, is that right?

5      A    That's correct.

6      Q    Isn't it a fact that Clarence Thomas talked

7  to you about when he left the park, is that right;

8  when he, Clarence Thomas, had run out of the park?

9      A    When he ran out of the park?

10     Q    Let me rephrase that.  During the time

11 Clarence Thomas was being questioned, he related to

12 you what he said had occurred in the park; is that

13 right?

14     A    He was talking to the detectives.

15     Q    And you were listening, right?

16     A    Yes.

17     Q    And you heard him talking about being in

18 Central Park, is that right?

19     A    Yes.

20     Q    And you heard him talk about leaving the

21 park, is that right?

22     A    That's correct.

23     Q    And you heard him talk about two male

24 joggers in the park, is that correct?

25     A    Yes.

NYCLD_023301

P-APP002012

556

REYNOLDS — PEOPLE — CROSS — JOSEPH

1

2    Q    And you heard him talk about running out of

3  the park, right, after the incident with the second

4  jogger; is that right?

5    A    I believe it was the second jogger.

6    Q    And you didn't hear him say anything at

7  all-- withdrawn.

8    And he told you that after he ran out of the

9  park with the incident with the second jogger,

10  that's when he saw you in the van; is that right?

11    A    No.

12        MR. JOSEPH:  If I might have one moment?

13    Q    Would it be correct that he stated that-- I

14  will withdraw that.

15    You told us that there came a time when you went

16  to Antron McCray's house, correct?

17    A    That's correct.

18    Q    And did you actually go to the door of the

19  house?

20    A    Yes.

21    Q    And present with you were how many police

22  officers or detectives?

23    A    Three other detectives.

24    Q    And which detectives were those?

25    A    Detective Rosario, Detective Rivera and

P-APP002013

557

REYNOLDS — PEOPLE — CROSS — JOSEPH

1
2      Detective Morin.

3          Q     And were there other detectives or police
4      officers remaining in the car?

5          A     Yes.

6          Q     And would I be correct that you knew that
7      you were going to Antron McCray's house to bring
8      Antron McCray into the station house?

9          A     That's correct.

10         Q     And would I be correct that you had learned
11     information about Antron McCray from Clarence
12     Thomas; is that right?

13         A     Information regarding what?

14         Q     You had heard the name from Clarence Thomas?

15         A     Yes.

16         Q     And would it be correct that when you went
17     to the house, Antron McCray was going to be
18     arrested?

19         A     I knew he was going to be questioned.  As
20     far as an arrest, I wasn't sure with the way it was
21     going to go.

22         Q     Do you recall that there was any discussion
23     that you either took part in or overheard among the
24     detectives about trying to question, bring Antron
25     McCray in for questioning?

NYCLD_023303

P-APP002014

558

REYNOLDS — PEOPLE — CROSS — JOSEPH

1
2      A    Did I hear them discuss that?

3      Q    Yes.

4      A    No.   He was just going to go over to his
5  house to talk to him and to ask him to come back to
6  the Central Park Precinct.

7      Q    And was there a discussion that if he said
8  no, he didn't want to come back, we'll just forget
9  about it?

10     A    I don't believe we discussed that.

11     Q    Did you discuss at all whether they should
12 try to obtain items of clothing from Antron McCray?

13     A    There was no discussion.

14     Q    No discussion that you were a part of,
15 right?

16     A    That's correct.

17     Q    But when you went to the house, you had
18 learned that, from the words of Clarence Thomas,
19 that Antron McCray had been in the park; is that
20 right?

21     A    Yes.

22     Q    And Clarence Thomas at that point had
23 already been-- withdrawn.

24     At that point Clarence Thomas had already been
25 charged with          , is that right?

NYCLD_023304

P-APP002015

559

REYNOLDS — PEOPLE — CROSS — JOSEPH

1

2      A     Excuse me?

3      Q     Clarence Thomas had been charged with

4            , right?

5      A                        , yes.

6      Q     And Clarence Thomas had told you that  Antron

7  McCray was there too, is that right?

8      A     Yes.

9      Q     Was  it  not  your  intention  then  to  also

10  arrest Antron McCray for that same offense?

11     A     No, it wasn't.

12     Q     Did you tell Antron McCray, "If  you  want  to

13  come down  to  the  precinct,  that  will  be  fine.   If

14  you don't want to come, that also is fine"?

15     A     No.

16     Q     What exactly was said, do you recall?

17     A     I didn't tell him anything.

18     Q     Did you overhear  anybody  speaking  to  Antron

19  or to his father?

20     A     Yes.

21     Q     Who was that?

22     A     Detective Rosario.

23     Q      And  would  I  be  correct  that  Detective

24  Rosario said that Antron  was  going  to  have  to  come

25  down  to  the  station  for  questioning?

NYCLD_023305

P-APP002016

560

REYNOLDS — PEOPLE — CROSS — JOSEPH

1
2   A     That's correct.

3   Q     And would I be correct that Sergeant Rosario

4   directed Antron to put on the same clothes that he

5   was wearing the night before?

6   A     He asked him and his father to put it on.

7   Q     Do you recall-- withdrawn.

8   Did you write down the specific words Detective

9   Rosario said?

10  A     No.

11  Q     Do you recall the exact words that he said?

12  A     No.

13  Q     Would I be correct that what Detective

14  Rosario did was to direct Antron to tell him, "Go

15  put on the same clothing you were wearing last

16  night"?

17  A     Not in those words.

18  Q     But to that effect?

19  A     Yes.

20          MS. LEDERER:   Objection.

21          THE COURT:   I will allow it.

22          Is that substantially what was said?

23          THE WITNESS:   He asked Antron and his

24          father if he could put on the same clothes

25          he had on last night.

NYCLD_023306

P-APP002017

561

REYNOLDS — PEOPLE — CROSS — JOSEPH

1

2      Q      I just want to clarify this for my mind.

3  When you say you don't remember the exact words, you

4  seem to be saying that he asked rather than he

5  directed?

6      A      That's correct.

7      Q      All right.  Is it your recollection that you

8  can recall the specific words and that those words

9  were just put in a nice way:  "Would it be all right

10  that you put on the same clothes"?

11      A      He was asked to do it.  I don't recall the

12  specific words he used, but I do remember it was a

13  question directed to him and to his father.

14      Q      Were you aware, Officer, that at that time

15  when you went into Antron McCray's house, there was

16  a large investigation already in progress  concerning

17  the woman that was found in Central Park?

18      A      That's right.

19      Q      Were you aware that the detectives, the

20  police department, were very interested, they wanted

21  to get all items of evidence that could be obtained;

22  were you aware of that?

23      A      As far as evidence, nobody discussed that

24  with me.

25      Q      So, you weren't privy, a part of any

562

REYNOLDS — PEOPLE — CROSS — JOSEPH

1
2  discussions about obtaining evidence?

3      A   Correct.

4      Q   Do you recall whether at Antron McCray's
5  house whether you or any other officer informed him
6  that he had a right to an attorney?

7      A   I don't recall when his rights were read.

8      Q   I am asking you, forget about all the
9  rights, when you went to his house, you are now
10 bringing Antron McCray down to the station house for
11 questioning.  Do you recall any officer saying to
12 him, "You know, you have a right to an attorney"?

13     A   That sort of statement is made with his
14 rights.  Either all his rights are read or a
15 statement like that wouldn't be made.

T16/FR 16

17     Q   It's your testimony that you do not recall
18 hear the rights read to him at his apartment, is
19 that right?

20     A   They might have, I don't recall.

21     Q   Do you have any records that would refresh
22 your recollection as to whether the rights were read
23 to him at that point?

24     A   No.

25     Q   By the way, were they-- were all of the

NYCLD_023308

P-APP002019

563

REYNOLDS - PEOPLE - CROSS - JOSEPH

1
2  officers there-- withdrawn.
3      Of the officers that went in the house were
4  detectives, and you were the only police officer; is
5  that correct?
6      A    That's correct.
7      Q    By the way, you made a memo book entry
8  relating to going to Antron's house, right?
9      A    That's correct.
10     Q    And would I be correct that you indicated in
11 your memo book that you went to his house to pick up
12 Antron McCray?
13     A    Yes.  Pick him up to take him to the station
14 house.
15          MR.  JOSEPH:   If I may have a moment,
16          your Honor?
17     Q    And it is clear that when you went to the
18 door, Antron McCray was not wearing the clothing
19 that he later put on to come to the precinct; is
20 that correct?
21     A    When I came to the door, he wasn't at the
22 door.
23     Q    Did you see him at all prior to seeing him
24 in the clothes that you testified were all covered
25 with mud?

NYCLD_023309

P-APP002020

564

REYNOLDS — PEOPLE — CROSS — JOSEPH

1
2   A    Yes.

3   Q    And when you saw him, what was he wearing?

4   A    I don't recall what it was.

5   Q    Would I be correct that— withdrawn.

6   Did Antron McCray ride to the station house in

7   the same vehicle you were riding in?

8   A    I believe I rode in the same car with

9   Clarence Thomas and his mother.

10  Q    So, you don't know whether there was any

11  conversation or questioning of Antron McCray on the

12  way to the precinct?

13  A    That's correct.

14  Q    Had you had any conversation with any police

15  officers concerning Antron McCray prior to going to

16  his house?

17  A    Yes.

18  Q    With who?

19  A    With my partner, Police Officer Powers.

20  Q    And had you discussed whether there was

21  sufficient evidence to pick up Antron McCray?

22          MS. LEDERER:   Objection.

23          THE COURT:   I'll let him answer.

24  A    My partner just stated to me that one of the

25  kids that were there just came in with, I believe,

565

REYNOLDS — PEOPLE — CROSS — JOSEPH

1  his mother, but we didn't place him under arrest.

2      Q    And when you say you didn't place him under

3  arrest, you're talking about, that was at the

4  station house the first time when Antron McCray came

5  in; is that correct?

6      A    That's correct.

7      Q    And would I be correct that-- withdrawn.

8      When Antron was brought to the precinct, did you

9  remain with him?

10     A    No.

11     Q    Do you know who questioned Antron McCray?

12     A    No.

13     Q    Do you know how long he remained in the

14 precinct?

15     A    No.

16     Q    Do you know how long he remained there prior

17 to being questioned?

18     A    No.

19     Q    Do you know how long he had been in the

20 precinct-- withdrawn.

21     Let me bring you back.  You say that during the

22 early hours of April 20th, you saw Antron McCray at

23 the precinct when you were sitting there with the

24 five kids; is that right?

566

REYNOLDS — PEOPLE — CROSS — JOSEPH

1

2      A     That's correct.

3      Q     Do you know how long he was at the precinct

4   during those early morning hours?

5      A     No.

6            MR.   JOSEPH:   I   have   no   further

7      questions.

8            THE   COURT:   All   right,   recess   until

9      Monday morning at 10 a.m.

10           Who is next?

11           MS. LEDERER:   Police Officer Powers.   I

12      don't think we'll finish Powers on Monday.

13           THE   COURT:   Don't   discuss   your

14      testimony, Officer, with anybody.

15           THE WITNESS:   Yes, sir.

16           (Hearing   was   adjourned   to   Monday,

17      October 16, 1989, at 10 a.m.)

18

19

20

21

22

23

24

25

NYCLD_023312

P-APP002023

567

```
 1   SUPERIOR COURT OF THE STATE OF NEW YORK
 2   COUNTY OF NEW YORK : CRIMINAL TERM : PART 59
 3   THE PEOPLE OF THE STATE OF NEW YORK
 4              - against -                    Indictment No.
                                              4762-89
 5   RAYMOND SANTANA, et. al.,
 6                       Defendants.
 7                                    October 16, 1989
 8   BEFORE:
 9              HONORABLE THOMAS B. GALLIGAN,
10                        Justice.
11         (Appearances same as previously noted.)
12              - - - - - -
13         COURT CLERK:  Number four on the calendar,
14   Indictment 4762 of 1989; Harry Wise, Yusaf
15   Salam, Antron McCray, Kevin Richardson, Steven
16   Lopez, Michael Brisco, and Raymond Santana;
17   continued hearing.
18         THE COURT:  All right, just before we
19   start, for the record, I just want to indicate
20   the copies of the transcript, daily transcript
21   have been provided to all counsel by the
22   reporters.  So the record should be clear on
23   that.
24         MR. MADDOX:  You mean for today?
25         THE COURT:  No, for the continuation of
```

568

REYNOLDS — PEOPLE — CROSS — RIVERA

the hearing.

(Whereupon, the witness, Police Officer Eric Reynolds, resumed the stand and testified further as follows:)

COURT CLERK:  Officer, I'd like to remind you you're still under oath.

THE COURT: I'd also like to remind you to talk into the microphone.

THE WITNESS:  Okay.

THE COURT: Mr. Joseph, I believe you had finished; is that correct?

MR. JOSEPH:  That's correct.

THE COURT: Mr. Burns, it is your turn.

MR. BURNS:  I have no questions of Mr. Reynolds, Officer Reynolds.

THE COURT: Mr. Rivera?

MR. RIVERA:  Thank you, your Honor.

CROSS-EXAMINATION

BY MR. RIVERA:

Q    Officer Reynolds, my name is Peter Rivera and I represent Mr. Santana.  I want to take you to People's Exhibit 1 and I ask you to take a look at the Juvenile Room of the Central Park Precinct.  Is this the way the Juvenile Room looked on the evening of April 19th?

569

REYNOLDS — PEOPLE — CROSS — RIVERA

1

2      A       Pretty much.

3      Q       And the legend indicates that there were four

4  desks, that this diagram has four desks.  Were there

5  four desks on that night in that room?

6      A       At least four.

7      Q       And this legend also indicates that there were

8  three lockers.  Were there three lockers on that date in

9  that room?

10     A       I'm not sure of the exact number.

11     Q       And also that there were four file cabinets.

12 Were there four file cabinets on that date in that room?

13     A       I don't recall that.

14     Q       Do you recall the number of chairs in that

15 room on that date?

16     A       No.

17     Q       Were there any telephones in that room on that

18 date?

19     A       There are telephones in the room, but some of

20 them get put away, so --

21     Q       What is that room used for during the day

22 time?

23     A       That's the CPOP Auxiliary Community Affairs

24 Highway Safety office.

25     Q       It's used basically as an office during the

570

```
 1              REYNOLDS - PEOPLE - CROSS - RIVERA
 2   day time; is that correct?
 3       A    That's correct.
 4       Q    Would there be a telephone on each desk?
 5       A    I'm not -- again, I'm not too sure of the
 6   exact number of phones in there.
 7       Q    When you were there, were there any telephones
 8   in the room?
 9       A    There were definitely phones in the room.
10       Q    When they put the phones away, did they put
11   them inside the drawers?
12       A    Sometimes.
13       Q    Do you have access to the drawers inside the
14   desk?
15       A    No, not to the ones --
16       Q    Are the drawers locked?
17       A    Yes.
18       Q    Okay. Now, you were the officer who arrested
19   Mr. Santana, is that correct?
20       A    That's correct.
21       Q    And when you arrested Mr. Santana, you
22   indicated on your testimony on Friday that he made a
23   statement to you, is that correct?
24       A    That's correct.
25       Q    And the statement that he made to you was that
```

571

REYNOLDS - PEOPLE - CROSS - RIVERA

2  he was coming from his girlfriend's house; is that

3  correct?

4      A    May I refresh my memory?

5      Q    Sure.

6              (Whereupon, the witness perused his

7          documents.)

8      A    Yes, that's correct.

9      Q    Did he make any other statement to you at that

10  point in time when you arrested him?

11     A    When I arrested him or when I stopped him?

12     Q    When you stopped him.

13     A    Pretty much he just stated that he didn't know

14  the others, and that he had come from his girlfriend's

15  house.

16     Q    And then there came a point in time when you

17  placed him under arrest; is that correct?

18     A    Yes.

19     Q    Did you place him under arrest on the street?

20     A    Yes.

21     Q    And did you place him under arrest at 102nd

22  Street and Central Park West?

23     A    I placed him in the Sergeant's car and brought

24  him to 100th Street and Central Park West.

25     Q    Was he handcuffed when you placed him into the

P-APP002028

572

REYNOLDS — PEOPLE — CROSS — RIVERA

1

2   Sergeant's car?

3        A    Yes, he was.

4        Q    When did you handcuff my client?  Before or

5   after the Sergeant got there.

6        A    When the Sergeant got there.

7        Q    Did the Sergeant instruct you to place the

8   handcuffs on my client?

9        A    No, he didn't.  Not that I remember.

10       Q    Was my client standing up or was he lying on

11  the floor?

12       A    He was standing up.

13       Q    And when, for the first time, did you

14  ascertain that my client was Hispanic?

15       A    I'm not really sure.  Probably at the time I

16  was speaking to him.

17       Q    When did you ask him his name?

18       A    I don't recall exactly when.

19       Q    Isn't it a fact that you asked him his name at

20  the precinct?

21       A    I did ask him at the precinct, yes.

22       Q    And you asked him for his address at the

23  precinct?

24       A    Yes, for his address also.

25       Q    And that was the first time you asked him for

NYCLD_023318

P-APP002029

573

1              REYNOLDS — PEOPLE — CROSS — RIVERA
2    his name and address; is that correct?
3         A    I can't say that is correct. Sometimes I ask
4    them their names on the street.  You know, because there
5    were so many I might have asked him several times.
6         Q    Isn't it a fact that the first time you asked
7    my client his name and address was at the precinct?
8         A    I'm not sure.
9              THE COURT:  Both of those together?
10             MR. RIVERA:  Yes.
11             THE WITNESS: I'm not sure.
12        Q    Well, let's get back to the address.  Isn't it
13   a fact that the first time you asked my client for his
14   address was at the precinct?
15        A    Again, I'm not sure if that was the first
16   time.
17        Q    You never questioned my client on the street;
18   is that correct?
19        A    That's correct.
20        Q    And when you transported my client to 100th
21   Street, you didn't question him there, is that correct?
22        A    I didn't transport him to 100th Street.
23        Q    When my client was at 100th Street and Central
24   Park West, you didn't ask him any questions there; is
25   that correct?

P-APP002030

574

REYNOLDS — PEOPLE — CROSS — RIVERA

1

2       A      Again, if I asked him anything, it might have

3   been what his first name was.  I don't recall if I asked

4   him at that point.

5       Q      But if you asked him any questions, you would

6   have asked him what his first name is; is that correct?

7       A      Yes.

8       Q      You wouldn't have asked him any other

9   questions; is that correct?

10      A      No, there was no need to.

11      Q      And he was in handcuffs; is that correct?

12      A      Not until the Sergeant got there.

13      Q      When you got to 100th Street, did you ask my

14  client or Mr. Lopez if those were the individuals who

15  they claim said some shit about robbing them?

16      A      No.

17      Q      Did you question them as to anything about the

18  statement in which Mr. Lopez indicated that these

19  individuals were about to rob them?

20      A      Which individuals?

21      Q      The other individuals that were in the other

22  car at 100th Street were about to rob them?

23      A      No.

24      Q      How many Hispanics did you see at Central Park

25  West and 102nd Street in that group?

575

REYNOLDS - PEOPLE - CROSS - RIVERA

1
2     A     Which group?

3     Q     The group of ten to fifteen individuals that
4  were walking northbound on Central Park West near 102nd
5  Street?

6     A     I don't know.

7     Q     Did you count them?

8     A     No.

9     Q     Did you specifically -- do you have any
10 specific recollection of seeing my client walking up on
11 102nd Street and Central Park West?

12    A     At what point?

13    Q     When you first saw the group of ten to fifteen
14 individuals.

15    A     Did I specifically see them?

16    Q     Do you have any specific recollection of
17 seeing Mr. Santana walking up the street on Central Park
18 West and 102nd Street?

19    A     No, there was just one group.

20    Q     You didn't specifically see my client,
21 whatever he might have been doing; is that correct?

22    A     That's correct.

23    Q     He might have been talking to other
24 individuals; is that correct?

25    A     Which other?

NYCLD_023321

P-APP002032

576

REYNOLDS — PEOPLE — CROSS — RIVERA

1

2     Q    Some of the other individuals that were

3 walking at 102nd Street and Central Park West?

4     A    You mean the group that ran?

5     Q    That's correct.

6     A    He might have been.

7     Q    And you have no specific recollection; is that

8 correct?

9     A    That's correct.

10    Q    Were there other people that were walking in

11 that area?

12    A    On that side of the street?

13    Q    On that side of the street, yes.

14    A    I don't think so.  If there were —— maybe one

15 or two.

16    Q    And at Central Park West near that area, you

17 had tenement houses on that side of the street, is that

18 correct?

19    A    I'm not sure of the exact definition of a

20 tenement.

21    Q    You have multiple dwelling residential units,

22 you know what that is?

23    A    That's correct.

24    Q    And do you know what a tenement house is?

25    A    An apartment building.

577

REYNOLDS — PEOPLE — CROSS — RIVERA

1

2      Q      There are apartment buildings; is that

3   correct?

4      A      That's correct.

5      Q      And are these four and five story structures?

6      A      I guess.   I never bothered to count them.   I

7   don't know if they're four or five or six or seven.

8      Q      They're not twenty or thirty story structures,

9   is that correct?

10     A      On which block?

11     Q      On any street between 100th and 110th Street,

12  are there any twenty and thirty story structures and any

13  four and five story structures?

14     A      Probably.

15     Q      It's basically a residential area; is that

16  correct?

17     A      That's correct.

18     Q      And the area that is there is basically a

19  mixed residential community; is that correct?

20     A      That's correct.

21     Q      You have a lot of Hispanics that live there, a

22  lot of blacks that live there and you have some whites

23  that live there; is that correct?

24     A      That's correct.

25     Q      And they — withdrawn.

P-APP002034

578

REYNOLDS - PEOPLE - CROSS - RIVERA

1

2      Now, getting back to when you stopped my client,

3  you received a radio run of an individual who you later

4  found out to be Mr. Loughlin had been assaulted at 9:30;

5  is that correct?

6      A    I'm not sure exactly of the time.

7      Q    Approximately 9:30.

8      A    Approximately 9:30?  No.

9      Q    And you stopped my client --

10     A    No, that's not right.

11     Q    What time would that have been, Officer?

12     A    It wasn't 9:30.

13     Q    Do you recall the time?

14     A    No.

15     Q    Do you have notes that would refresh your

16  recollection?

17     A    No.

18     Q    Okay.  It was earlier in the evening; is that

19  correct?

20     A    Earlier than 9:30?

21     Q    Withdrawn.  Earlier than the time you arrested

22  my client?

23     A    That's correct.

24     Q    Would that be about forty-five minutes early?

25     A    I'm not sure of the exact time.

NYCLD_023324

P-APP002035

579

1           REYNOLDS — PEOPLE — CROSS — RIVERA

2       Q       You never spoke to Mr. Loughlin, is that

3   correct?

4               THE COURT:   Spoke to who?

5               MR. RIVERA:   Mr. Loughlin.

6               THE WITNESS:   Yes.

7       Q       You did speak to him?

8       A       Yes.

9       Q       At what point in time did you speak to him?

10      A       Next day.

11      Q       But that evening you hadn't spoken to Mr.

12  Loughlin; is that correct?

13      A       That's correct.

14      Q       All you had was a radio run that you heard

15  over the air with reference to Mr. Loughlin's assault in

16  Central Park; is that correct?

17      A       We had more radio runs than that.

18      Q       You arrested my client for the unlawful

19  assembly near Mr. Loughlin; is that correct?

20      A       That was one of the incidents.

21      Q       You testified on Friday that the incident for

22  which you arrested my client was for the unlawful

23  assembly of Mr. Santana at Central Park around the time

24  that Mr. Loughlin was assaulted; is that correct?   Was

25  that your testimony on Friday?

580

REYNOLDS — PEOPLE — CROSS — RIVERA

1

2    A    That's correct. But I didn't mean to say it
3  was the only incident.

4    Q    For what other incident did you arrest my
5  client?

6    A    All the other incidents of harrassing
7  passers-by.  We considered it to be the same group.

8    Q    How many separate incidents were there?

9    A    Off-hand I don't recall.

10    Q    But you do recall it was more than one; is
11  that correct?

12    A    That's correct.

13    Q    And you didn't see my client in Central Park
14  assaulting anybody; is that correct?

15    A    That's correct.

16    Q    And did you have any witnesses when you
17  arrested my client with reference to the harrassment of
18  people in Central Park?  Did you have the names and
19  address of any witnesses at the time that you arrested
20  my client?

21         MS. LEDERER:  Objection.

22         THE COURT:  I'll allow it.

23    A    Yes, we had names of witnesses.

24    Q    Other than Mr. Loughlin, you had other names?

25    A    Yes.

NYCLD_023326

P-APP002037

581

1                  REYNOLDS — PEOPLE — CROSS — RIVERA

2        Q     Do you recall the names of the other

3   individuals?

4        A     No, I don't.

5                  MS. LEDERER: Objection.

6        Q     You didn't speak to those other individuals;

7   is that correct?

8        A     Yes,  I did.

9        Q     Had you spoken to these individuals prior to

10  arresting my client?

11       A     No.

12       Q     Now, when you arrested my client, could you

13  describe what he was wearing?

14       A     I don't recall what he was wearing.

15       Q     Is it a fact that he was wearing sneakers?

16       A     I don't recall.

17       Q     You don't recall anything about what he was

18  wearing; is that correct?

19       A     No.

20       Q     Did you ever take my client to a show-up at

21  Central Park with Mr. Loughlin?

22       A     A show-up, where?

23       Q     A show-up inside the park with Mr. Loughlin?

24       A     No.

25       Q     Officer, you prepared various reports in

NYCLD_023327

P-APP002038

582

```
 1              REYNOLDS - PEOPLE - CROSS - RIVERA
 2   reference to these arrests; is that correct?
 3        A    That's correct.
 4        Q    And the reports that you prepared on the
 5   evening of April 19th to April 20th consisted of a
 6   complaint, of an on-line booking system arrest
 7   worksheet, of a supporting deposition for the Family
 8   Court, probation intake referral report, the desk
 9   appearance ticket and the appearance ticket for Family
10   Court; is that correct?
11        A    That's correct.
12        Q    Did you prepare any other reports?
13        A    Could you repeat those reports again.
14        Q    Sure.  Do you have the reports that you
15   prepared with you, Officer?
16        A    Yes.
17        Q    And in reference to my client, Mr. Santana,
18   you prepared, again, a complaint report?
19        A    Right.
20        Q    And an on-line booking system arrest
21   worksheet?
22        A    That's correct.
23        Q    Supporting deposition?
24        A    Yes.
25        Q    A probation intake referral report?
```

583

```
 1              REYNOLDS - PEOPLE - CROSS - RIVERA
 2      A     Yes.
 3      Q     Desk appearance ticket and an appearance
 4 ticket in the Family Court?
 5      A     Yes.
 6      Q     Any other reports?
 7      A     Desk appearance ticket investigation.  That's
 8 it, I believe.
 9      Q     I'm sorry.  Desk appearance ticket
10 investigation report, right.
11      Now, you prepared the same report for each of the
12 individuals; is that correct?
13      A     That's correct.
14      Q     For each of the five individuals that you
15 arrested on the night of April 19th; is that correct?
16      A     That's correct.
17      Q     And although Officer -- although your partner
18 stopped three of the individuals, you were the one who
19 arrested all of the individuals; isn't that correct?
20      A     That's correct.
21      Q     Isn't that unusual, Officer, for an officer
22 not making the arrest of individuals that he stops?
23      A     No, it's not.
24      Q     It happens all the time; is that correct?
25      A     That's correct.
```

NYCLD_023329

P-APP002040

584

REYNOLDS — PEOPLE — CROSS — RIVERA

1

2      Q      Okay.  In fact, of the individuals that were

3  arrested, three were arrested for felonies and two were

4  arrested for misdemeanors; is that correct?

5      A      That's correct.

6      Q      How long have you been with Anti-Crime?

7      A      About six months.

8      Q      And how long have you been with the police

9  department?

10     A      Eight years.

11     Q      Okay.  And the kind of police officer who gets

12  into Anti-Crime is an active cop?

13             MS. LEDERER:  Objection.

14             THE COURT: I will allow it.

15     A      That's correct.

16     Q      It's a police officer that makes a lot of

17  arrests; is that correct?

18     A      That's correct.

19     Q      And Anti-Crime is considered a career path; is

20  that correct?

21     A      I believe so.

22     Q      From Anti-Crime, you go to Street Crime, is

23  that correct?

24     A      That's one of the options.

25     Q      Or you can go to Organized Crime; is that

585

                    REYNOLDS — PEOPLE — CROSS — RIVERA

1

2   correct?

3       A    That's correct.

4       Q    And ultimately you end up with a detective

5   shield, is that correct?

6       A    From a couple of the units you mentioned.

7       Q    Right.  And how many arrests did you make in

8   the month of April?

9               MS. LEDERER:  Objection.

10              THE COURT:  Sustained.

11      Q    Isn't it a fact, Officer, that police officers

12  who work in Street Crime are required to make five

13  misdemeanor collars and three felony collars a month?

14              MS. LEDERER:  Objection.

15              THE COURT:  I'll allow it.

16              MS. LEDERER:  He said Street Crime.

17              THE COURT:  Anti-Crime.

18      Q    Well, Anti-Crime.  Isn't it a fact that

19  officers in Anti-Crime are required to make five

20  misdemeanor collars and three felony collars a month?

21      A    No.

22      Q    Is there a requirement, a quota system?

23      A    No.

24      Q    When you arrested my client, Mr. Santana, you

25  had no statements from anyone incriminating my client

NYCLD_023331

P-APP002042

586

1                 REYNOLDS - PEOPLE - CROSS - RIVERA

2    being in the park; is that correct?

3         A    I don't believe so.

4         Q    Well, did you -- if you had any statement from

5    anyone, you would have made notes of them?

6         A    No.  What statements are you talking about?

7    Statements made to me?

8         Q    Statements made to you?

9         A    Yes.

10        Q    Would you have made notes of them?

11        A    Yes.

12        Q    You had no statements from anyone

13   incriminating my client in the park.

14        A    No statement made to me.

15        Q    Did you have statements made to you from any

16   police officers or any witnesses as to what happened in

17   Central Park before you arrested my client?

18        A    No.

19        Q    Okay.  Did you have any scientific evidence

20   that placed my client in the park, in Central Park on

21   the night of April 19th?

22        A    No.

23        Q    Did my client ever make a statement to you

24   about being in the park on the night of April 19th?

25        A    I don't believe so.

587

REYNOLDS — PEOPLE — CROSS — RIVERA

1

2      Q      Did any witness identify my client as being in

3      the park on the night of April 19th before you arrested

4      him?

5      A      No.

6      Q      Okay.  Shortly after you arrested him, or

7      between 10:30 and 12:00 midnight, did anybody come to

8      you and identify my client as being in the park on the

9      night of April 19th?

10     A      No.

11     Q      Between 9:30 and 6:00 o'clock in the morning

12     of April 20th, did anybody come to you and identify my

13     client as being in the park on April 19th?

14     A      No.

15     Q      Now, Officer, getting back to the booking

16     system arrest sheet, do you have a copy of the arrest

17     sheet before you?

18     A      Yes, I do.

19     Q      And I ask you to look at line nineteen where

20     it indicates telephone calls.  This is in reference to

21     Mr. Raymond Santana.  I'd ask you to tell the Court what

22     that notation is?

23     A      It says "refused".

24     Q      Okay.  Now, that's any telephone calls my

25     client would have made; is that correct?

NYCLD_023333

P-APP002044

588

REYNOLDS – PEOPLE – CROSS – RIVERA

1

2      A     That's correct.

3      Q     And I ask you to look at the second page of

4    that same worksheet and again, look at line nineteen.

5    Is there a notation there?

6      A     Yes.

7      Q     And what does that notation indicate?

8      A     "Refused".

9      Q     I ask you to look at the worksheets for each

10   and every defendant that you arrested on the night of

11   April 19th.  I am going to ask you to look at the

12   worksheet for Mr. Lopez, Mr. Richardson, Mr. Thomas and

13   the other individuals and ask you to look at line

14   nineteen. Could you tell the Court what each and every

15   one of these -- what each and every one of those

16   notations --

17               MR. BURNS: Are we talking about something

18          that's a piece of paper?

19               MR. RIVERA:  Yes, the on-line booking

20          system arrest worksheet.

21               MR. BURNS: Do you want to mark it?  You

22          don't care?  Okay, all right.

23      Q     What does each and every one indicate?

24      A     That they refused.

25      Q     As to the five individuals who were arrested,

P-APP002045

589

REYNOLDS - PEOPLE - CROSS - RIVERA

1

2   each and every one refused to make a telephone call; is

3   that correct?

4        A    That's -- well, for our purposes, yes.

5        Q    When you say for your purposes, what do you

6   mean for your purposes?  Did you ask them to make a

7   telephone call?

8        A    It wasn't necessary.

9        Q    it wasn't necessary for them to make telephone

10  calls?

11       A    Their parents were coming.

12       Q    When it came to my client, you had no

13  information that my client's parents were coming; is

14  that correct?

15       A    Originally, we did.  His father stated he was

16  coming in.

17       Q    Now, when it came to one o'clock in the

18  morning, did you ask my client if he wanted to make a

19  telephone call?

20       A    I'm not sure if it was at one, but we asked

21  for your client for the name of somebody we could call

22  up for him which he wouldn't do.

23       Q    My client gave you the name of anybody who

24  could be used?

25       A    We finally convinced him to give his father's

NYCLD_023335

P-APP002046

590

REYNOLDS — PEOPLE — CROSS — RIVERA

2  name.

3       Q     You said the word "convinced". Did you offer

4  my client the opportunity to make a phone call when he

5  refused to give you the name of an individual?

6       A     No.

7       Q     You never offered a telephone call to him; is

8  that correct?

9       A     No. I asked him if we could call somebody to

10  come pick him up.

11      Q     And when you called my client's father at

12  twelve midnight, that was your testimony on Friday; is

13  that correct?

14      A     No.

15      Q     What time did you call my client's father the

16  first time?

17      A     I didn't.

18      Q     Okay. Who was the first -- did my client give

19  you the telephone number of someone that could be

20  reached?

21      A     He gave me the phone number of his sister.

22      Q     Did he ever give you a telephone before

23  two-thirty in the morning of someone that could be

24  reached to come pick him up.

25      Q     Did he ever give you his father's telephone

NYCLD_023336

P-APP002047

591

1              REYNOLDS — PEOPLE — CROSS — RIVERA

2    number?

3         A     No, he gave it to my partner.

4         Q     Okay. Did your partner make a telephone call?

5         A     Yes, he did.

6         Q     What time did your partner make the telephone

7    call?

8         A     It was around the time we got into the station

9    house.

10        Q     That would be about twelve o'clock in the

11   evening?

12        A     No.  That was a little after eleven.

13        Q     That would be a little after eleven in the

14   evening; is that correct?

15        A     That's correct.

16        Q     And did your partner indicate to you that he

17   had contact with somebody?

18        A     Yes.

19        Q     And do you have that telephone number that my

20   client gave before you or in your notes?

21        A     Yes.

22        Q     Can I see it, Officer.

23              (Handing to defense counsel by the

24        witness.)

25        Q     That's the same telephone number that's listed

NYCLD_023337

P-APP002048

592

1              REYNOLDS — PEOPLE — CROSS — RIVERA

2    on the probation intake referral report; is that

3    correct?

4         A    That's correct

5         Q    And that's the telephone number where it

6    indicates father's name; is that correct?

7         A    That's correct.

8         Q    And that would be the home telephone number;

9    is that correct?

10        A    I'm assuming that it is.

11        Q    And right next to it is a business telephone

12   number; is that correct?

13        A    Yes.

14        Q    And that is the telephone number that my

15   client gave you, gave your partner on the evening of

16   April 19th; is that correct?

17        A    That's correct.

18        Q    Okay. Now, you indicated that at about

19   two-thirty you were not able to -- withdrawn.

20        You indicated that about two-thirty no one had come

21   to speak to my client; is that correct?

22        A    That's correct.

23        Q    And what time did you tell my client's father

24   to appear at the station house?

25        A    Again, I didn't speak to his father.

NYCLD_023338

P-APP002049

593

REYNOLDS — PEOPLE — CROSS — RIVERA

1

2      Q    Were the parents of each and every one of the

3 individuals at the station house at that time?

4      A    Just about all of them, I believe.

5      Q    Was anybody missing?

6      A    I don't recall.

7      Q    But you do recall speaking to my client and

8 asking him to give you another telephone number; is that

9 correct?

10     A    That's correct.

11     Q    And that would be about two-thirty; is that

12 correct?

13     A    About that time.

14     Q    And Kevin Richardson's mother had already been

15 at the precinct; is that correct?

16     A    Yes.

17     Q    And you had told her that her son would be

18 released in a short time; is that correct?

19     A    That's correct.

20     Q    And had you told these individuals they would

21 be released shortly also?

22     A    That's correct.

23     Q    You told each and every one of the individuals

24 that they would be released in a short while after their

25 parents came to pick them up; is that correct?

594

REYNOLDS — PEOPLE — CROSS — RIVERA

1

2    A    After all the parents appeared, yes.

3    Q    All you were waiting for was my client's

4    parents to show up at two-thirty; is that correct --

5    withdrawn.

6    The only thing you were waiting for was for my

7    client's parents to show up in order to release all of

8    the individuals?

9    A    That's correct.

10   Q    And my client's parents showed up at

11   four-thirty; is that correct?

12   A    His grandmother.

13   Q    When four-thirty came, you still didn't

14   release my client; is that correct?

15   A    That's correct.

16   Q    You indicated also last week that you were

17   waiting for a search on warrants; is that correct, a

18   warrant search?

19   A    That was one of the things.

20   Q    And you indicated last week that the warrant

21   search came through about six o'clock, is that correct?

22   A    I don't recall if I said a specific time.

23   Q    Well, do you recall what time the warrant

24   search came through?

25   A    I don't remember specifically the time, no.

NYCLD_023340

P-APP002051

595

REYNOLDS — PEOPLE — CROSS — RIVERA

1

2    Q    Now, a warrant search is comprised of a

3  telephone call; is that correct?

4    A    It could be.

5    Q    What do you do when  you make a warrant

6  search?

7    A    What do I do?

8    Q    Do you make a telephone call?

9    A    In some cases.

10   Q    And other than —— well, what did you do in

11 this case? Did you make a telephone call for a warrant

12 search?

13   A    I don't recall if I used our computer or I

14 called.

15   Q    You have a computer in the precinct; is that

16 correct?

17   A    That's correct.

18   Q    And most of the time you used the computer in

19 the precinct to do a warrant search; is that correct?

20   A    When it's working.

21   Q    And you have no special recollection whether

22 the computer was working on this evening; is that

23 correct?

24   A    That's correct.

25   Q    And the computer takes approximately ten or

NYCLD_023341

P-APP002052

596

REYNOLDS – PEOPLE – CROSS – RIVERA

2  fifteen minutes to answer back whether there was a

3  warrant on any of the individuals?

4      A    It varies.

5      Q    Well, what's the longest that it takes for a

6  computer to answer back as to whether or not there is or

7  is not a warrant?

8      A    I don't know.

9      Q    Assuming that the computer is working, how

10  long does it take?

11      A    On an average?

12      Q    On an average.

13      A    Maybe five, ten minutes.

14      Q    Five, ten minutes.  Did you make the search

15  for warrants on these individuals?  Did you enter the

16  information into the computer?

17      A    No.

18      Q    Did your partner do it?

19      A    Probably not.

20      Q    Do you know who did it?

21      A    No.

22      Q    Okay.  What information goes into the computer

23  to get the warrant search?  Isn't it a fact you enter

24  the name, the address and the date of birth?

25          MS. LEDERER:  Objection.  The witness

597

                    REYNOLDS - PEOPLE - CROSS - RIVERA

1

2          should be allowed to answer the question.

3              THE COURT:  I'll allow it.

4    Q    Isn't it a fact that the only information the

5    computer requires for a warrant search is the name,

6    address, and  the date of birth?

7    A    No.

8    Q    What other information is required?

9    A    You need the race.

10   Q    And those are the four items of information

11   that the computer requires to make a warrant search; is

12   that correct?

13   A    You still need more.

14   Q    What other information do you require?

15   A    To put in the operator's name.

16   Q    That's the one who's asking for the

17   information; is that correct?

18   A    That's correct.

19   Q    What else?

20   A    I believe they need a password.

21   Q    The inputting of all this information for any

22   particular individual would take about twenty, thirty

23   seconds; is that correct?

24   A    I don't know.

25   Q    It takes less than a minute; is that correct?

NYCLD_023343

P-APP002054

598

1                    REYNOLDS - PEOPLE - CROSS - RIVERA

2          A     Probably.

3          Q     And have you done this yourself, have you

4     inputted this information into the computer?

5          A     No.

6          Q     You never done this mechanical transaction?

7          A     No.

8          Q     Is somebody assigned to the precinct that

9     inputs this information into the computer?

10         A     Yes.

11         Q     Do you recall the individual who had that

12    responsibility on the night of April the 19th?

13         A     No.

14         Q     Is it a police officer or is it a civilian?

15         A     I don't know.

16         Q     Now, getting back to the probation intake

17    referral report that you made out on my client, there's

18    a notation that you advised my client of his

19    constitutional rights.  Do you see that, Officer?

20         A     Yes.

21         Q     That's incorrect, isn't it?

22         A     Yes, it is.

23         Q     That's not your testimony; is that correct?

24         A     That's correct.

25         Q     You never advised my client of his

NYCLD_023344

P-APP002055

599

```
1              REYNOLDS - PEOPLE - CROSS - RIVERA
2   constitutional rights; is that correct?
3        A       Correct.
4        Q       Looking further down there's a notation that
5   my client ran four blocks before being apprehended.
6   That's incorrect there also, isn't it?
7        A       You're right, that's for the other defendants.
8        Q       My client never ran four blocks before being
9   apprehended; is that correct?
10       A       That's correct.
11       Q       Both these notations in this report are
12  incorrect?
13       A       That's correct.
14       Q       And getting back to the desk appearance ticket
15  there's a notation that the desk appearance ticket --
16  there's a notation there that you had arrested my client
17  there for assaults.  That's incorrect also?
18       A       Right.
19       Q       Never arrested my client for assault?
20       A       That's correct.
21       Q       When you first observed my client, my client
22  was going northbound on Central Park West?
23       A       Yes.
24       Q       With a group of individuals?
25       A       Yes.
```

NYCLD_023345

P-APP002056

600

1           REYNOLDS — PEOPLE — CROSS — RIVERA

2     Q    And you were travelling southbound; is that

3 correct?

4     A    No.

5     Q    You were travelling northbound also; is that

6 correct?

7     A    When I first observed him?

8     Q    Yes.

9     A    No.

10    Q    Where were you travelling?

11    A    Travelling west.

12    Q    You were coming out of the park?

13    A    Yes.

14    Q    At 102nd Street?

15    A    No.

16    Q    Where were you coming out of?

17    A    100th Street.

18    Q    And they were approximately two blocks away;

19 is that correct?

20    A    No, they were one block.

21    Q    They were between 101st and 102nd Street, I

22 think that was your testimony?

23    A    They had just come onto —— they had just

24 crossed 101st Street onto 102nd Street.  I mean, between

25 that —— on that block.

601

                    REYNOLDS — PEOPLE — CROSS — RIVERA

1

2       Q        And you were exiting the block at 100th

3   Street; is that correct?

4       A        That's correct.

5       Q        And then you made a right-hand turn and went

6   northbound on Central Park West; is that correct?

7       A        That's correct.

8       Q        And then you passed these individuals and made

9   a U-turn; is that correct?

10      A        No.

11      Q        You passed these individuals and made a

12  left-hand turn; is that correct?

13      A        That's correct.

14      Q        And then you blocked the traffic lane at

15  Central Park West and 102nd Street; is that correct?

16      A        That's correct.

17      Q        In other words, cars that had to come down had

18  to go around your automobile in order to proceed

19  southbound; is that correct?

20      A        There was still one lane open.

21      Q        But your vehicle was perpendicular to the

22  roadway at Central Park West; is that correct?

23      A        That's correct.

24      Q        Now, you indicated there was a police scooter

25  that was next to you; is that correct?

602

REYNOLDS - PEOPLE - CROSS - RIVERA

1

2     A     Yes.

3     Q     And who was driving that police scooter?

4     A     Police Officer Flores.

5     Q     And did Police Officer Flores make any arrests

6  of any individuals on the night of April 19th?

7     A     Not that I know of.

8     Q     And did you see Police Officer Flores after

9  you made the arrest -- withdrawn.

10     Did you see Police Officer Flores at 100th Street

11  and Central Park West when you had my client there?

12     A     I don't recall. There were a lot of cops

13  there.

14     Q     Did you see Police Officer Flores at any given

15  point in time after eleven o'clock on the night of April

16  19th?

17     A     I probably did.

18     Q     But you did not see him on the street, don't

19  have any specific recollection?

20     A     I didn't see who on the street?

21     Q     Officer Flores.

22     A     At what point?

23     Q     On the street near eleven o'clock either at

24  100th Street or after the incident on 102nd Street?

25     A     You mean right before the incident or right

603

            REYNOLDS — PEOPLE — CROSS — RIVERA

1

2   after?

3       Q      After the incident you didn't see Officer

4   Flores?

5       A      I might have.  Again, I don't recall.

6       Q      Officer, do you have the complaint that was

7   made in reference to the arrest of my client?  I think

8   it's Complaint Number 282.

9       A      Yes.

10      Q      Can you take that out, Officer?  There's a

11  notation there, when it talks about victim.  I'm

12  referring to Box Number 1.  You see that on the

13  left-hand side, Officer?

14      A      On the complaint report?

15      Q      On the complaint report.

16      A      The typed complaint report, yes.

17      Q      Okay.  When it talks about "victim", who's the

18  victim there?

19      A      "People of the State of New York".

20      Q      When it talks about witness, which is a little

21  further down from that area, whose name is listed there?

22      A      It's my name.

23      Q      Is there any other witness that's listed

24  there?

25      A      Well, my name isn't listed as a witness.  If

NYCLD_023349

P-APP002060

604

REYNOLDS — PEOPLE — CROSS — RIVERA

1  you look at it closely the box reporter is typed in

2

3  because I'm the one who is making the report.

4       Q    If there had been a witness, where would you

5  have listed his name on the complaint report?

6       A    Either in the witness box or on the bottom in

7  details.

8       Q    Is there any indication on this report that

9  Mr. Loughlin is the witness on this matter?

10      A    Other than to look at the other complaint

11 report, no.

12      Q    From this complaint report there's no

13 indication that Mr. Loughln is a complainant in this

14 matter; is that correct?

15      A    Other than looking at the complaint report,

16 no.

17      Q    You could have put Mr. Loughlin's name where

18 it said, "witness", is that correct?

19      A    I could have.

20      Q    And that box specifically is either for the

21 reporter or for the witness of a crime; is that correct?

22      A    That's correct.

23      Q    And when somebody is a witness to a crime, you

24 would have put that person's name there; is that

25 correct?

NYCLD_023350

P-APP002061

605

REYNOLDS - PEOPLE - CROSS - RIVERA

1
2   A    No.

3   Q    Looking at the report with reference to the
4   assault of Mr. Loughlin, do you have those complaint
5   reports with you?

6   A    No.  I didn't prepare that report.

7   Q    Now, you arrested my client for unlawful
8   assembly which is a b-misdemeanor; is that correct?

9   A    I believe so.

10  Q    And there were no other charges at the time
11  against my client; is that correct?

12  A    No.

13  Q    And you didn't have an arrest warrant to
14  arrest my client; is that correct?

15  A    That's correct.

16  Q    Now, had this case gone to trial you would
17  have testified -- the witnesses that would have been
18  called would have been yourself; is that correct?

19        MS. LEDERER:  Objection.

20        THE COURT:  Objection sustained.

21  Q    Did you make any phone calls from the Juvenile
22  Room on the night of April 19th?

23  A    Yes.

24  Q    And you called my client's grandmother; is
25  that correct?

NYCLD_023351

P-APP002062

606

REYNOLDS - PEOPLE - CROSS - RIVERA

1
2      A     That's correct.

3      Q     You speak any Spanish?

4      A     No.

5      Q     You indicated last time that my client's
6   grandmother spoke to you in English; is that correct?

7      A     That's correct.

8      Q     You never spoke to a male individual who
9   answered the phone on that night; is that correct?

10     A     I might have.

11     Q     Well, is it your testimony that you did speak
12  to somebody on the night of April 19th?

13     A     Yes.

14     Q     A man who answered the phone on April 19th?

15     A     I don't recall.  I do recall speaking to his
16  grandmother.

17     Q     And --

18     A     It was a very brief conversation.

19     Q     And the number that you used to call the
20  grandmother, was that the same telephone number that you
21  listed on the probation intake referral report?

22     A     That I don't recall

23     Q     Did you make any specific notation of my
24  client's grandmother's telephone number?

25     A     No.

NYCLD_023352

P-APP002063

REYNOLDS - PEOPLE - CROSS - RIVERA

Q Did you make any specific notation of my client's grandmother's address?

A What I did was, I wrote it down on a small piece of paper and handed it to the officers who went to pick her up.

Q You don't have that paper with you; is that correct?

A No.

Q Other than the fact that you indicate my client's father's address on the probation intake referral report, you don't have any other notation as to what my client's father's address is; is that correct?

A I believe so.

Q And you have no notation as to my client's grandmother's telephone number; is that correct?

A No, that's correct.

Q Or my client's grandmother's address?

A That's correct.

Q Do you have any specific notation as to who my client lived with on the night of April 19th?

A Yes.

Q Who did he live with?

A It states he lives with his father.

Q Was there any indication that he lived with

608

```
                  REYNOLDS - PEOPLE - CROSS - RIVERA
 1
 2   his grandmother?
 3        A    On the --
 4        Q    On any of your reports?
 5        A    No.  I said I put -- I put down that he lived
 6   with his father.
 7        Q    Now, you testified that my client made a
 8   statement in the precinct when he was speaking to Mr.
 9   Richardson; is that correct?
10        A    That's correct.
11        Q    And the statement was in sum and substance
12   that "we'll hang out together -- we're going to
13   Spoffard's House and we'll hang out together," is that
14   right?
15        A    That's part of it.
16        Q    What else did he say?
17        A    He said they will fuck up anybody who got in
18   their way.
19        Q    Now, this was at about two-thirty in the
20   morning; is that correct?
21        A    I'd have to check.
22        Q    Check your notes.
23        A    Yeah, it's correct, about two-fifteen.
24        Q    And you testified on Friday that the reason
25   why my client said this was because he felt that he was
```

NYCLD_023354

P-APP002065

609

REYNOLDS - PEOPLE - CROSS - RIVERA

not going to be going out that night; is that correct?

A     I don't recall that's what I testified to.

Q     Well, Mr. Richardson had his mother at the precinct on that night; is that correct?

A     That's correct.

Q     And as far as Mr. Richardson knew, he was going to be going out that night; is that correct?

A     That's correct.

Q     If you had testified on Friday that the reason he said that was because Mr. Richardson and he were going to go to Spoffard that evening, that's not a true statement on your part; is that correct?

MS. LEDERER:  Objection.

THE COURT: Objection sustained.

Q     As far as the individuals that were in the -- the five individuals that you had arrested, they were under the impression that they were leaving that evening; is that correct?

MS. LEDERER:  Objection.

THE COURT:  I'll let him answer, if they said anything to them.

THE WITNESS:  Yes.

Q     They were under the impression they were leaving that evening; is that correct?

P-APP002066

610

REYNOLDS - PEOPLE - CROSS - RIVERA

1

2    A    Yes.

3            MS. LEDERER:  Object to the form.

4            THE COURT:  Yes, the form is wrong.

5    Q    You had indicated to them that they were going

6 to be leaving that evening; is that correct?

7    A    That's what I thought.

8    Q    And they had no other information other than

9 what you told them, that they would be out on that

10 evening?

11    A    I don't understand the question.

12    Q    There was no separate information that you

13 might have overheard which would indicate that they

14 would not have been going out that evening; is that

15 correct?

16    A    There came a point in time when they weren't

17 going to leave.

18    Q    Before four o'clock in the morning, the five

19 individuals that you arrested were going to be leaving

20 shortly that evening; is that correct?

21    A    If all their parents came.

22    Q    Now, when you saw these individuals -- this

23 group of ten or fifteen individuals that were walking up

24 on Central Park West, you did not happen to overhear any

25 conversations; is that correct?

NYCLD_023356

P-APP002067

611

REYNOLDS - PEOPLE - CROSS - RIVERA

1

2      A      Whose conversation?

3      Q      The conversation of the ten to fifteen

4  individuals that were walking?

5      A      No.

6      Q      The group of children that were walking

7  northbound on Central Park West?

8      A      No, I didn't hear any children.

9      Q      You didn't know where they were going; is that

10 correct?

11     A      I knew -- other than they were headed north,

12 that was it.

13     Q      And you had no information as to what time my

14 client joined that group?

15     A      That's correct.

16     Q      Before you arrested him; is that correct?

17     A      That's correct

18     Q      Officer, you had no specific information at

19 what time my client joined that group at Central Park

20 West; is that correct?

21     A      That's correct.

22            THE COURT:  Talk louder.  Just talk up.

23        Apparently we are having some mechanical

24        difficulty.

25            MR. RIVERA:  Shall we continue, your

NYCLD_023357

P-APP002068

612

REYNOLDS - PEOPLE - CROSS - RIVERA

Honor?

Q    You will have to speak louder, Officer.

And you did not see this group coming out of the park; is that correct?

A    That's correct.

Q    And all you had was a hunch that my client was in the park with this group; is that correct?

MS. LEDERER: Objection.

THE COURT: I'll let him answer.

THE WITNESS:  You repeat that question?

Q    All you had was a hunch that my client was in the park with this group; is that correct?

A    It was a little more than a hunch.

Q    Well, did you -- you didn't see my client in the park; is that correct?

A    That's correct.

Q    My client did not make any statement to you; is that correct?

A    He made statements.

Q    Well, the statement that he made did not incriminate him being in the park; is that correct?

A    That's correct.

Q    And you had no witness that put my client in the park on that evening; is that correct?

613

REYNOLDS - PEOPLE - CROSS - RIVERA

1
2      A      That evening?

3      Q      That evening; that's the evening we're talking
4   about.   Are we talking about another evening, Officer?

5                 MS. LEDERER:   Objection.

6                 THE COURT:   Just ask your question.

7      Q      That evening, Officer.

8      A      That's correct.

9      Q      And you had no scientific evidence, is that
10  correct, linking my client to the park; is that correct?

11     A      That's correct.

12     Q      And my client's clothing, could you describe
13  -- well, you couldn't describe my client's clothing, is
14  that correct?

15     A      That's correct.

16     Q      Could you describe anything about my client
17  that might have seemed unusual when you arrested him?

18     A      About his clothes?

19     Q      About anything; anything he was doing or
20  anything he said; anything that you observed about him.

21     A      His statement, what he was telling me, he told
22  me he wasn't with the group, and it was obvious that he
23  was.

24     Q      Now, you testified on Friday that there were
25  no movie theaters near 102nd Street and Central Park

NYCLD_023359

P-APP002070

614

REYNOLDS — PEOPLE — CROSS — RIVERA

West; is that correct?

1
2

A      That's correct.

3

Q      Now, my client was walking northbound; is that correct?

4
5

A      That's correct.

6

Q      And there are theaters southbound in that general vicinity; is that correct?

7
8

A      Not that I know of.

9

Q      Are there any movie theaters on Broadway, Officer?

10
11

A      Yes.

12

Q      How many movie theaters are there?

13

A      I don't know.

14

Q      And where would those movie theaters be, Officer?

15
16

A      I believe there's on on 86th Street.

17

Q      And that's southbound of 102nd Street; is that correct?

18
19

A      That's correct.

20

Q      Are there movie theaters further north of 86th Street?

21
22

A      I don't know.  I don't work in that precinct.

23

Q      Are there any movie theaters on 96th Street?

24

A      Again, I don't know.

25

615

REYNOLDS - PEOPLE - CROSS - RIVERA

Q     By the way, the boundaries of the Central Park Precinct is the park itself; is that correct?

A     That's correct.

Q     And it doesn't extend outside the park, is that correct?

A     That's correct.

Q     Is there a window in the Juvenile Room, Officer?   Is there a window in the door to the Juvenile Room?

A     In the door?

Q     Yes.

A     No.

Q     It's a solid door?

A     Yes.

Q     Is it a glass door or a metal door?

A     Metal or wood.

Q     And there came a point in time that my client's grandmother came to the precinct; is that correct?

A     That's correct.

Q     Did you speak to her?

A     Yes.

Q     And at what time were you apprised that she was in the precinct?

NYCLD_023361

P-APP002072

616

REYNOLDS — PEOPLE — CROSS — RIVERA

2    A    About four-thirty, five o'clock.

3    Q    Did she come over to you and tell you she was

4 the grandmother, or you found out from someone?

5    A    I don't recall.

6    Q    You do recall speaking to her; is that

7 correct?

8    A    Yes.

9    Q    You spoke to her in English; is that correct?

10    A    Yes.

11    Q    Was she accompanied by anybody, or was she

12 alone?

13    A    I just -- I remember speaking to her outside

14 the Community Affairs, where it says Community Affairs

15 on the map.

16    Q    Did you advise her at that point in time her

17 grandchild would be leaving soon; is that correct?

18    A    I just asked her to be patient. It would take

19 a few minutes. I don't recall my specific conversation

20 with her.

21    Q    And isn't it a fact that my client's father

22 was there also, Officer?

23    A    He might have been.

24    Q    Isn't it a fact that he was there when the

25 grandmother was there?

617

REYNOLDS — PEOPLE — CROSS — RIVERA

1

2      A      When I was speaking to her?

3      Q      Yes.

4      A      I don't think so.

5      Q      You don't -- do you recall if she was with

6    anybody there?

7      A      She was there with the other parents.

8      Q      Do you recall if she was there with a man who

9    was there who identified himself as Mr. Santana's

10   father?

11     A      Might have been.

12     Q      Did you speak to this individual, Officer?

13     A      I really don't think so.

14     Q      You don't recall speaking to an individual who

15   identified himself as my client's father; is that

16   correct?

17     A      I might have.  Again, I don't know, you know,

18   what type of conversation it was.

19     Q      Did my client speak fluid English, Officer?

20   Did my client's grandmother speak fluid English?

21     A      No, it was broken.

22     Q      And she was able -- she indicated she was able

23   to understand you; is that correct, Officer?

24     A      Well, again, I indicated what the

25   circumstances were --

NYCLD_023363

P-APP002074

618

REYNOLDS - PEOPLE - CROSS - RIVERA

Q     Did she ask you any questions, Officer?

        MS. LEDERER:  Objection, Officer.  I ask
    that the witness be allowed to finish his
    answer.

        THE COURT:  Yes, let him finish.

Q     Did she ask you any questions, Officer?

A     I'm not sure what questions she had.  Again,
the conversation was very brief.

Q     And she asked you these questions in English;
is that correct?

A     I believe so.

Q     And you answered them in the English language;
is that correct?

A     That's correct.

Q     And you testified you don't speak any Spanish
whatsoever; is that correct?

A     That's correct.

Q     Now, you finished your arrest clerical work.
You indicated Friday that it took about two hours; is
that correct?

A     Two, three hours.

Q     You started this work about eleven-thirty; is
that correct?

A     Roughly.

619

REYNOLDS — PEOPLE — CROSS — RIVERA

Q       That would put it about two-thirty that you
finished the clerical work; is that correct?

A       Two-thirty or three, roughly.  I don't recall
specifically the time.

Q       And during the time that you were doing your
arrest reports, the five individuals were with you; is
that correct?

A       That's correct.

Q       And they were together; is that correct?

A       That's correct.

Q       And they could walk around the Juvenile Room;
is that correct?

A       They could stand up, sure.

Q       Did you restrict their movement in any way,
shape or fashion?

A       Yes.

Q       How did you restrict their movement?

A       I wanted to keep them from getting to that
door.

Q       You did not want them to go near the door; is
that correct?

A       Yes.

Q       Now, there were police officers that were
coming in and out; is that correct?

NYCLD_023365

P-APP002076

620

REYNOLDS — PEOPLE — CROSS — RIVERA

1

2     A    At what time?

3     Q    During the evening of April 19th to April

4 20th?

5     A    Yes.

6     Q    Okay.  And there were other officers that were

7 with you in that room; is that correct?

8     A    On and off.

9     Q    And there were parents that were in the other

10 room; is that correct?

11    A    Yes.

12    Q    And did these individuals tell you that they

13 wanted to speak to their parents?

14    A    I don't believe so.

15    Q    Did they go towards the door to try and speak

16 to their parents?

17    A    No.  Only I think one spoke to his parents. I

18 believe only one spoke to his parents.  Again, these

19 conversations were very brief and we were trying to do

20 things as quickly as possible to expedite matters.

21    Q    But you finished the paper work about

22 two-thirty; is that correct?

23    A    Two-thirty or three.  Again, I'm not sure of

24 the specific time.

25    Q    And after three, most of the parents had

621

REYNOLDS — PEOPLE — CROSS — RIVERA

1
2  arrived at that location, at the precinct; is that
3  correct?
4       A    That's correct.
5       Q    And they were waiting outside in the Muster
6  Room; is that correct?
7       A    No.
8       Q    In the room adjacent to the Juvenile Room; is
9  that correct?
10      A    That's correct.
11      Q    And you were just waiting for Santana's
12 father, is that correct?
13      A    That's correct.
14      Q    And other than that, you weren't doing
15 anything else; is that correct?
16      A    No.
17      Q    And you still did not permit these five
18 children to speak to their parents; is that correct?
19      A    Again, they had the opportunity to speak to
20 them if they wanted to.  If a parent wanted to speak to
21 their child, that was allowable.
22      Q    Well, between twelve and two o'clock in the
23 morning is when most of the parents arrived there; is
24 that correct?
25      A    That's -- I would say that's correct.

NYCLD_023367

622

REYNOLDS — PEOPLE — CROSS — RIVERA

1
2  Q      And most of these parents came up to you and
3  asked to speak to their children; is that correct?
4  A      I don't recall specifically what they said
5  when they came in.
6  Q      But they came over to you; is that correct?
7  A      Yes.
8  Q      And they asked you about what their children
9  were being arrested for; is that correct?
10  A      They either spoke to me or they spoke to my
11  partner.
12  Q      Was your partner in that room; is that
13  correct?
14  A      He was going back and forth.
15  Q      And did they ask to speak to their children?
16  A      I don't recall.  Again, I think one or two did
17  speak to their children; like I told you before, it was
18  a very brief conversation.
19  Q      So between the hours of two-thirty, three and
20  four-thirty, there was little contact between the five
21  children who were arrested and their parents; is that
22  correct?
23  A      Yes.
24  Q      In fact, there was almost no contact —— only
25  two children spoke to their parents; is that correct?

NYCLD_023368

P-APP002079

623

REYNOLDS — PEOPLE — CROSS — RIVERA

A       That could be correct.

Q       And that was your testimony, is that not correct?

MS. LEDERER:  Objection.

THE COURT: I'll allow it.

A       Again, I said I don't recall specifically who spoke to their parents and what the substance of the conversations were.  I don't recall.  They were very brief, because while they spoke, I was trying to do the paper work, finish up with the arrest.

Q       You had finished the paper work two-thirty, three o'clock; is that correct?

A       About that time.  I didn't say specifically what time, because I don't recall what time I finished the paper work.

Q       Were you present when Mr. Santana was questioned by any police officers?

A       When he was questioned by detectives?

Q       Yes.

A       No.

Q       Were you present when Mr. Santana was questioned by anybody?

A       No.

Q       Were you present when Mr. Santana was

624

REYNOLDS — PEOPLE — CROSS — RIVERA

1

2 questioned by anybody?

3       A     Was I present?

4       Q     Were you present?

5       A     No.

6       Q     When the other individuals were being

7 questioned by police officers and you were present

8 during their questioning, I think you testified last

9 Friday -- withdrawn.

10      I think you testified last Friday there were two

11 individuals questioned by detectives in which you were

12 present; is that correct?

13      A     That's correct.

14      Q     And the names of those two individuals were?

15      A     That was Lamont McCall and Clarence Thomas.

16      Q     And this was about six o'clock in the morning;

17 is that correct?

18      A     Approximately.

19      Q     And did you surrender custody of the other

20 individuals when you were inside the questioning room --

21 inside during the questioning of these individuals?

22      A     Well, I don't know what you mean "surrendering

23 custody."  There's no formal procedures or anything --

24      Q     Did these individuals continue to remain in

25 the Juvenile Room?

625

REYNOLDS - PEOPLE - CROSS - RIVERA

THE COURT:  Excuse me one second.  You have a tendency to cut him off.  Please be patient.

MR. RIVERA:  I thought he finished.

A    (Cont.)  Like I said, there's no formal procedure when you have a prisoner in custody and someone wants to question him from another unit.  All you do is, you make sure there's someone with him at all times so he doesn't escape.

Q    Well, these two individuals questioned in another room; is that correct?

A    Which individuals?

Q    Mr. Lamont McCall and Mr. Clarence Thomas?

A    No, they were questioned in the Juvenile Room.

Q    They were questioned in the Juvenile Room?

A    Yes.  And the other defendants were with their parents.

Q    Okay.  So at that time these individuals were being questioned, the parents were speaking to the other individuals; is that correct?

A    I'm not sure what you mean by "individuals".

Q    Okay.  You testified that you were in the Juvenile Room when Mr. Clarence Thomas was being questioned; is that correct?

A    That's correct.

NYCLD_023371

P-APP002082

626

REYNOLDS – PEOPLE – CROSS – RIVERA

1

2     Q     And where were the other children?

3     A     The other defendants were in the Clerical

4  Office (indicating).   On the map it is the top room

5  with, I believe, there's four desks (indicating).

6     Q     Were the parents there?

7     A     Yes, they were.

8     Q     Was my client's parents there?

9     A     Your client's grandmother was there.   I think

10 his father was there, as I just indicated before, and

11 they all sat with their parents or whoever their legal

12 guardian was.

13    Q     So it's your testimony my client and his

14 grandmother and father were in the Clerical Room; is

15 that correct?

16    A     Well, yes.

17    Q     Did you bring anything -- did you buy any food

18 for RAymond Santana to eat that evening?

19    A     No.

20    Q     Did anybody buy any food to your knowledge for

21 Mr. Santana?

22    A     A group of parents went out to purchase food.

23    Q     What time was this, Officer?

24    A     It was about four-thirty, four-twenty.

25    Q     And my client's weren't there; is that

627

1          REYNOLDS — PEOPLE — CROSS — RIVERA

2    correct?

3          A     That's correct.

4          Q     And these parents that went out went out to by

5    food for their particular child; is that correct?

6          A     That's correct.  But I think your client did

7    eat, though.

8          Q     You did not see my client eat; is that

9    correct?

10         A     Again, I was concerned with other matters.

11   They all had food.

12         Q     You did not observe whether my client ate or

13   not; is that correct?

14         A     I observed the group eating.  Whether your

15   client specifically ate, whether he wanted to eat, I

16   don't know.

17         Q     And you don't know if anybody brought any food

18   for my client; is that correct?

19         A     That's correct.

20               MR. RIVERA:   I have no further questions,

21         your Honor.

22               THE COURT:   Mr. Maddox.

23   CROSS-EXAMINATION

24   BY MR. MADDOX:

25         Q     Officer, what time did you finish your tour of

628

REYNOLDS — PEOPLE — CROSS — MADDOX

1

2    duty on the 19th?  What time did you finish your tour of

3    duty?

4        A    I didn't.

5        Q    You mean you continued to work?  You never

6    been off that tour since the 19th of April?  Is that

7    your testimony?

8        A    'Til now?

9        Q    Yeah.

10       A    No.

11       Q    Well, when did you finish?  What time did you

12    finish?

13            THE COURT:  Please stop.  Shouting is not

14        necessary.

15       A    That tour went into the next tour.

16       Q    Well, when did you finally finish a tour of

17    duty?

18       A    That Saturday.

19       Q    Saturday, what time?

20       A    I'd have to look in my book.

21       Q    Well, check it out.

22       A    That was at 3:25.

23       Q    3:25 p.m. on Saturday; is that correct?

24       A    No.

25       Q    In the a.m., is that your testimony?

NYCLD_023374

P-APP002085

REYNOLDS — PEOPLE — CROSS — MADDOX

1

2    A     Yes, it is.

3    Q     So you're telling us that you worked non-stop

4 from Wednesday the 19th to Saturday morning at three

5 o'clock; is that correct?

6    A     Approximately.

7    Q     Is that correct?

8    A     Approximately three.

9    Q     All right.  But you're testimony is, Sir, that

10 you worked continuously from Wednesday to Saturday; is

11 that correct?

12    A     That's correct.

13    Q     And that during that time you didn't get no

14 sleep; is that correct?

15    A     That's not correct.

16    Q     So you were sleeping on the job?

17    A     No, I sat down in a chair --

18    Q     Well, did you sleep or not?

19         THE COURT:  Just a moment, just a moment.

20     Counsel, you asked a question. Wait for the

21     answer.

22         Answer the question.

23    A     When I wasn't questioned and when I wasn't

24 needed, I sat down.  My eyes closed.  I don't think it's

25 possible to go three or four days without sleeping.

P-APP002086

630

REYNOLDS - PEOPLE - CROSS - MADDOX

1
2   Q      So your testimony, Sir, is that you were
3   sleeping on the job while you were receiving a paycheck;
4   is that correct?
5   A      You might say that.
6   Q      Now, what were the times that you were
7   sleeping on the job?
8   A      I don't know.
9   Q      Do you have anything to refresh your
10  recollection of when you were sleeping on the job?
11  A      No.
12  Q      But you were getting paid during the time that
13  you were sleeping on the job; is that correct?
14  A      Yes, I did get paid.
15  Q      All right. Now, there came a time on the 19th
16  of April that you were in the vicinity or 100th Street
17  and Central Park West; is that correct?
18  A      On what date?
19  Q      On the 19th of April, '89?
20  A      Yes.
21  Q      You were in the vicinity of 100th Street and
22  Central Park West; is that correct?
23  A      Yes.
24  Q      And what time was that?
25  A      On the 19th I was there several times.

631

REYNOLDS — PEOPLE — CROSS — MADDOX

1

2    Q    Well, at the time that you proceeded north on

3  Central Park West to 102nd Street where you blocked

4  certain persons from walking up the street, what time

5  was that?

6    A    I believe that was ten-thirty, approximately.

7    Q    In the p.m.?

8    A    Yes.

9    Q    All right. Now, prior to that, you were over

10  on 102nd Street and the East Drive; is that correct?

11    A    That's correct.

12    Q    And you received a radio communication and you

13  went over to 100th Street and Central Park West; is that

14  correct?

15    A    That's correct.

16    Q    Now, what time did you receive that radio

17  communication when you were at 102nd Street and the East

18  Drive?

19    A    I don't recall specifically the time.

20    Q    Well, do you have anything to refresh your

21  recollection?

22    A    Which job are you speaking of?

23

24

25

NYCLD_023377

P-APP002088

632

REYNOLDS - PEOPLE - CROSS - MADDOX

T6/FR

Q    Sir, you indicated on your direct, and I believe you said it several times on your cross, that you received a radio communication at 102nd Street and East Drive; is that correct?

A    That's correct.

Q    And in response to that communication, you went over to the area of 100th Street and Central Park West, isn't that correct?

A    That's correct.

Q    Now, what time did you receive that communication at 102nd and the East Drive?

A    I'll have to look in my notes.

Q    Please do.

A    Okay.  I have approximately five minutes to ten, 21:55 hours.

Q    And what time did you arrive at 100th Street and Central Park West?

A    22:25 hours.

Q    So, in other words, you took thirty minutes to go from 102nd Street and East Drive to 100th Street and Central Park West, is that your testimony?

A    That's approximate times.  We have nothing

633

REYNOLDS - PEOPLE - CROSS - MADDOX

to gauge our times by.  This was-- again, we were
not looking at our watches as these happened, so the
times could be off.

Q    Are you telling us now, sir, that those are
not the times?  You want to change your testimony?

A    No.

Q    So, it took thirty minutes--

A    It's approximate time.

Q    It took you approximately thirty minutes to
get from 102nd Street and the East Drive to 100th
Street and Central Park West, is that correct?

A    It's possible, yes.

Q    No, no.  I'm asking you, sir, did it take
you thirty minutes approximately to go from 102nd
Street and the East Drive to 100th Street and
Central Park West--

          MS. LEDERER:  I object, your Honor.

Q    I'm not asking you about--

          THE COURT:  Objection sustained.

          He answered the question.

Q    You answered, "It's possible."

A    That was the answer.

Q    I'm asking you what, in fact, happened?

          MS. LEDERER:  Objection, your Honor.

1           REYNOLDS – PEOPLE – CROSS – MADDOX

2               THE   COURT:   I  don't  know  what  that

3          question means, what happened?

4      Q    Well, I'm asking you, sir, is it a fact that

5  it took you thirty minutes to go from 102nd Street

6  and the East Drive to 100th Street and Central Park

7  West?

8      A    I cannot say that is a fact because I don't

9  have the specific time.  Again, I didn't look at my

10 watch as soon as we got the radio run and then time

11 myself as we proceeded to 100th Street.

12     Q    But  you  would  agree  with  me  it's

13 approximately thirty minutes?

14     A    That's the approximate time, yes.

15     Q    Now, what time did you place Raymond Santana

16 and Lopez under arrest?

17     A    You mean what time did I put them in the

18 sergeant's car at 102nd Street or at 100th Street

19 and Central Park West?

20     Q    Yes.  Sir, didn't there come a time when you

21 put these men in a vehicle at approximately 101st

22 Street and Central Park West?

23     A    No.

24     Q    Is it your testimony, sir, that you walked

25 them from the area of 102nd Street and Central Park

635

REYNOLDS — PEOPLE — CROSS — MADDOX

2  West back to 100th Street and Central Park West; is

3  that your testimony?

4      A    No.

5      Q    How did they get to 102nd Street and Central

6  Park West to 100th Street and Central Park West?

7      A    They were driven.

8      Q    So, you put them in a van and they were

9  driven back to 100th Street, is that correct?

10     A    No.

11     Q    Well, in whose automobile were they placed?

12     A    The sergeant's car.

13     Q    At 102nd Street and Central Park West?

14     A    Yes.

15     Q    And they were driven to 100th Street and

16  Central Park West, is that correct?

17     A    That's correct.

18     Q    And is it your testimony that they remained

19  in that sergeant's car until they arrived at the

20  Central Park Precinct?

21     A    I believe they did.

22     Q    So, would it be fair to say that they were

23  placed under arrest at 102nd Street and Central Park

24  West?

25     A    According to the law, you could say it.    I

636

REYNOLDS - PEOPLE - CROSS - MADDOX

1

2  had them in custody at 102nd Street and Central Park

3  West.

4      Q    So, they were placed in police custody at

5  102nd Street and Central Park West, is that correct?

6      A    That's correct.

7      Q    Now, prior to putting them into custody, I

8  believe that you had an occasion to pat Santana and

9  Lopez down, is that correct?

10     A    That's correct.

11     Q    And the purpose of that pat down was to look

12  for weapons, is that correct?

13     A    For my safety, yes.

14     Q    Right.  Now, where are your Stop and Frisk

15  forms with respect to that pat down?

16              MS. LEDERER:  Objection.

17              THE COURT:  I'll let him answer.

18     A    I don't recall making any out.

19     Q    Oh, you didn't make any Stop and Frisk forms

20  out?

21      Well, let me ask you this.  Were search forms

22  available to police officers on the 19th of April,

23  1989?

24              MS. LEDERER:  Objection.

25              THE COURT:  I'll allow it.

NYCLD_023382

P-APP002093

1        REYNOLDS — PEOPLE — CROSS — MADDOX

2        A    Was what forms?

3        Q    Were  Stop  and  Frisk  forms  available  to

4   police officers on April 19, 1989?

5        A    I don't know.

6        Q    Well, were you familiar with such forms on

7   the 19th of April, 1989?

8        A    Was I familiar as far as making them out and

9   knowing what they were?

10       Q    Yes.

11       A    Yes.

12       Q    But it's your testimony that you did not

13  make such a form out, is that correct?

14       A    That's correct.  I said I don't recall if I

15  made one out.

16       Q    Well, is there anything to refresh your

17  recollection as to whether you made one out or not?

18       A    I'd have to go back to the station house to

19  look, but I don't think I did.

20       Q    Now, when you left-- withdrawn.

21       You're familiar with the area of 102nd Street

22  and East Drive, is that correct?

23       A    102nd Street and the East Drive?

24       Q    Right.

25       A    Am I familiar with it?

NYCLD_023383

P-APP002094

638

REYNOLDS - PEOPLE - CROSS - MADDOX

1

2   Q    Yes.

3   A    Yes, I am.

4   Q    And you are also familiar with the area of

5 100th Street and Central Park West, is that correct?

6   A    That's correct.

7   Q    Now, how far away are those two locations

8 from each other?

9   A    I never measured it.  I couldn't tell you.

10 Maybe two, three blocks-- well, it's-- it's not a

11 direct route.  There's no direct route to it, so--

12 you know, it's hard to gauge.

13   Q    All right.  Well, let's do it like this.

14 When you left 102nd Street and the East Drive, what

15 path did you travel in order to get over to 100th

16 Street and Central Park West?

17   A    I believe we went through the cross street--

18   Q    No, no, you--

19        MS. LEDERER:  Objection, your Honor.

20        THE COURT:  Well, he was with someone

21        else.  He was not alone.

22   Q    Which path did you travel?

23   A    I believe I took the 102nd Street cross

24 drive.

25   Q    And as you were-- were you traveling very

639

REYNOLDS - PEOPLE - CROSS - MADDOX

1
2   slowly on the 102nd Street cross drive?

3       A   We might have been because the van we had
4   was in very poor condition and it stalled out a lot,
5   so there was a chance it stalled.  I don't know.  I
6   don't recall.

7       Q   Well, did you see any bodies as you were
8   traveling slowly on the 102nd cross drive?

9       A   Did I see anybody going by?

10      Q   Yes, you see anybody going by?

11      A   I don't recall.

12      Q   Did you see any physical bodies lying about
13  that area?

14      A   On the roadway?

15      Q   Yes.

16      A   No.

17      Q   And then you got-- well, withdrawn.

18      The 102nd Street cross drive took you to another
19  street, is that correct?

20      A   That's correct.

21      Q   And what was that street?

22      A   That's the West Drive.

23      Q   And when you got to the West Drive, you took
24  a lefthand turn, is that correct?

25      A   We made a lefthand turn, yes.

NYCLD_023385

P-APP002096

640

REYNOLDS - PEOPLE - CROSS - MADDOX

1

2      Q    And you proceeded to 100th Street, is that

3  correct?

4      A    I believe we did, yes.

5      Q    And you made a right turn and exited on

6  100th Street, is that correct?

7      A    I believe it's correct.

8      Q    However, your radio communication informed

9  you that the person who was allegedly assaulted was

10  at 96th Street and Central Park West, is that

11  correct?

12      A    No.

13      Q    Well, when you received a radio

14  communication at 102nd Street and the East Drive,

15  isn't it a fact that you had been then informed that

16  a male jogger was bleeding at 96th Street near the

17  reservoir?

18      A    Could you repeat that question?

19      Q    Certainly can. When you received the radio

20  communication at 102nd Street and the East Drive,

21  isn't it a fact that you were informed then that a

22  male jogger who was bleeding profusely was at 96th

23  Street near the reservoir?

24      A    Well, that radio run came in several runs.

25  It first came over that he was assaulted and then

NYCLD_023386

P-APP002097

641

REYNOLDS — PEOPLE — CROSS — MADDOX

2   later on the part about him bleeding profusely came

3   over.

4       Q   Yes, but when you were at the East Drive and

5   102nd Street, isn't it a fact that at that point

6   that you were informed he had been assaulted, the

7   male jogger?

8       A   I believe we were at that location.

9       Q   And is it your testimony now that subsequent

10   to that radio communication you received another

11   communication describing the kind of injury that he

12   had sustained?

13       A   Didn't describe the injury, it described his

14   condition.

15       Q   You would agree with me, though, that when

16   you got to 100th Street, you were only four blocks

17   from where this person was; is that correct?

18       A   That's correct.

19       Q   And you never went to that location, is that

20   correct?

21       A   That's correct.

22       Q   And you saw Santana and Lopez and another

23   group at 102nd Street and Central Park West at about

24   22:40 hours?

25       A   No.

642

REYNOLDS — PEOPLE — CROSS — MADDOX

1
2    Q    What time did you see this group?
3    A    That's approximately 22:25 hours.
4    Q    When you saw this group, is that correct?
5    A    That's correct.
6    Q    Right.  Now, you saw this group, you agree
7    with me, within six blocks of where this person had
8    allegedly been assaulted; is that correct?
9    A    I'm not sure of the exact distance.
10   Q    Well, as you travel up Central Park West,
11   you would agree with me that each one of those
12   streets has a numerical designation?
13   A    Yes.
14   Q    And you would agree with me that somewhere
15   on Central Park West there's a street known as 96th
16   Street and Central Park West?
17   A    Yes.
18   Q    And would you agree with me that each street
19   thereafter has a numerical designation?
20   A    Yes.
21   Q    And the next one is 96th Street, and the
22   next one is 100th Street?
23   A    Next street after 96th Street?
24   Q    Yes.
25   A    I believe it's 97th Street.

NYCLD_023388

P-APP002099

REYNOLDS - PEOPLE - CROSS - MADDOX

1
2      Q     And then the next street is a 100th?

3      A     98th Street.

4      Q     You would agree with me in that area there's

5  no such street known as 98th Street?

6      A     Not on Central Park West.

7      Q     Would you agree there's no street known as

8  98th Street, is that correct?

9      A     Correct.

10      Q     And there's also no street known as 99th

11  Street, is that correct?

12      A     That's correct.

13      Q     But there is a street known as 100th Street,

14  is that correct?

15      A     On the Central Park West, yes.

16      Q     Essentially between 97th Street and 100th

17  Street there's actually two apartment buildings and

18  a large parking lot, is that correct?

19      A     Between 97th and 100th?

20      Q     Yes.

21      A     Yes.

22      Q     And would you agree with me that the normal

23  walking time from 96th Street up to 102nd Street is

24  approximately seven minutes?

25                MS. LEDERER:   Objection.

644

REYNOLDS — PEOPLE — CROSS — MADDOX

1
2          THE COURT:  Objection sustained.

3      Q    Are you aware of a walking time between 96th

4  Street and 102nd Street?

5          MS. LEDERER:  Objection.

6          THE COURT:  Sustained.

7      Q    Would you agree with me, sir, that you saw

8  these  men  some  thirty  minutes  after  you  first

9  received that communication, is that correct?

10     A    That's approximate, yes.

11     Q    And when you saw them, they were at least

12  six blocks away from the location where this assault

13  was supposed to have taken place, is that correct?

14     A    Yes, approximately.

15     Q    And when you saw them some thirty minutes

16  later,  six  blocks  away  from  where  this  assault

17  allegedly occurred, this group was walking and not

18  running; is that correct?

19     A    That's correct.

20     Q    Now, I believe you told Mr. Rivera that you

21  were not familiar with movie houses on Broadway, is

22  that correct?

23     A    That's correct.

24     Q    You would agree with me though that--

25  withdrawn.

NYCLD_023390

P-APP002101

645

REYNOLDS — PEOPLE — CROSS — MADDOX

1

2     Would you agree with me that when you heard the
3  statement that Lopez was coming from a movie house,
4  that this was not preposterous; is that correct?
5            MS. LEDERER:  Objection.
6            THE COURT:  Objection sustained.
7     Q     You didn't attach any significance to the
8  statement that Mr. Lopez made that he was just
9  coming from the movie house, did you?
10           MS. LEDERER:  Objection.
11           THE COURT:  No, I'll allow that.
12    A    Significant in what way?
13    Q    Well, in the sense of suspicions.  I mean,
14  that didn't create any suspicions because someone
15  was just walking from a movie house, did it?
16    A    That in itself, no.
17    Q    Well, would you agree with me that that, at
18  that time at night, roughly 10:30, that was not a
19  preposterous statement?
20           MS. LEDERER:  Objection.
21           THE COURT:  Sustained.
22    Q    When you say that that in itself, Officer,
23  what you're saying is that that did not attach any
24  significance to you; is that correct?
25           MS. LEDERER:  Objection.

646

REYNOLDS — PEOPLE — CROSS — MADDOX

THE COURT:  I don't think he said that.

Q    What significance, if any, then did that statement about the movie house play?

A    Again, not a lot of significance.

Q    Now, there came a time later on on the 20th of April that you went to the homes of a Clarence Thomas and Antron McCray, is that correct?

A    That's correct.

Q    And you were in the company of some other police officers, is that correct?

A    That's correct.

Q    Now, were you given any specific instructions before you went to the homes of Thomas and McCray?

A    Was I given specific instructions?

Q    Yes.

A    No, just to accompany the detectives that were going there.

Q    And was it your understanding that you were to bring McCray and Thomas back to the precinct?

A    I knew we were going back to question them. There was a chance we might have to bring them back.

Q    Well, when you say that there was a chance that you may have to bring them back, could you

647

REYNOLDS — PEOPLE — CROSS — MADDOX

1

2 explain that to us?

3     A    Well, I knew we were going to question them.

4 I went with them at the last minute. I was told to

5 go with them and I wasn't sure specifically what

6 they were-- I knew they were going there to speak to

7 them. I had assumed in my mind there wouldn't be

8 any-- I guess, interrogation in their house.

9     Q    Okay. So, it was your understanding that

10 any questioning that was to take place with McCray

11 and Thomas would occur in the precinct, is that

12 correct?

13     A    That's what was in my mind. That's what I

14 assumed myself.

15     Q    In fact, that is what occurred, isn't that

16 correct?

17                MS. LEDERER:   Objection, this witness

18          has not testified about McCray's statement.

19                THE COURT:   Objection sustained.

20     Q    Well, as to Thomas, isn't it a fact that

21 Thomas was, in fact, questioned at the Central Park

22 Precinct, is that correct?

23     A    Again-- you mean when he was brought back?

24     Q    Yes.

25     A    I wasn't there. He was brought in-- if he

648

REYNOLDS — PEOPLE — CROSS — MADDOX

1

2  was questioned, I can't testify to that because I

3  wasn't there.

4     Q   But you were there when the police officers

5  knocked on Thomas' door, is that correct?

6     A   Yes.

7     Q   And you were there when the police told

8  Thomas and his mother to come down to the precinct,

9  is that correct?

10    A   That's correct.

11    Q   And while you were there, you did not see

12 any questioning taking place inside of the Thomas

13 house, is that correct?

14    A   No.

15    Q   Would you agree with me or not?

16    A   I agree.   He asked him a couple of

17 questions.

18    Q   There were a couple of questions asked at

19 the house, is that your testimony?

20    A   Yes, I believe so.

21    Q   And then after those two questions, he was

22 then taken down to the Central Park Precinct?

23    A   I'm not saying it was just two questions.

24 I'm saying I think he was asked questions and then

25 we went to Antron McCray's house.

649

REYNOLDS - PEOPLE - CROSS - MADDOX

1

2   Q   But when you went to Antron McCray's house,

3 you would agree with me that you didn't leave Thomas

4 and his mother at their residence?

5   A   Yes.

6   Q   In fact, they were placed in a police car

7 and they accompanied you to McCray's residence, is

8 that correct?

9   A   That's correct.

10   Q   And then Thomas and his mother were taken to

11 the Central Park Precinct, is that correct?

12   A   That's correct.

13   Q   Now, you didn't have anything to do with

14 Brisco on the 19th of April, 1989; is that correct?

15   A   Anything to do with him in what way?

16   Q   With Brisco, not them, Brisco.

17   A   I said anything to do with him in what way?

18   Q   In any way you can tell us about.

19   A   Unless he was in the group that ran from us,

20 I don't think there is any other contact we had.

21   Q   I mean you are not accusing-- you didn't

22 accuse Mr. Brisco on the 19th of April, 1989, of

23 running from you, did you?

24   A   No, I didn't.

25   Q   So, is it your testimony, sir, that you had

NYCLD_023395

P-APP002106

650

REYNOLDS – PEOPLE – CROSS – MADDOX

nothing to do with Mr. Brisco on the 19th of April, '89?

A   I don't believe I had any contact with him, no.

Q   And would it also be fair to say that you had no contact with him on the 20th of April?

A   Yeah, that would be fair to say.

Q   Now, are you familiar with a-- withdrawn.

Do you know a Lamont McCall?

A   Do I know him?

Q   Yes.

A   I know who he is.

T7/LF

Q   Did you first become acquainted with him on the 19th of April, 1989?

A   Did I what?

Q   Did you first become acquainted with Lamont McCall on the 19th of April, 1989?

A   I first came in contact with him that night, yes.

Q   You did not, however, apprehend Lamont McCall; is that correct?

A   That's correct.

Q   But later you did take credit for

651

REYNOLDS — PEOPLE — CROSS — MADDOX

1

2     apprehending Mr. Lamont McCall, is that correct?

3          MS. LEDERER:  Objection to the form.

4          THE COURT:  I'll allow it.

5     A    He was my arrest, yes.

6     Q    Did you tell Detective Whelpley you actually

7     caught Lamont McCall?

8     A    No.

9     Q    And if Detective Whelpley said otherwise, he

10    would be lying?

11         MS. LEDERER:  Objection.

12         THE COURT:  Sustained.

13         MR. MADDOX:  No further questions.

14         THE COURT:  Do you have redirect?

15         MS. LEDERER:  Yes.

16         THE COURT:  Is it substantial?

17         MS. LEDERER:  Well——

18         THE COURT:  We'll take a short recess

19    now.

20         (Recess.)

21         THE COURT:  Do you want to come up for a

22    moment, please, counsel.

23         (Discussion was held off the record.)

24         THE COURT:  Bring out the defendants.

25         THE COURT CLERK:  Recalling calendar

652

COLLOQUY

number four, Indictment 4762 of '89; Kharey Wise, Yusaf Salam, Antron McCray, Kevin Richardson, Steven Lopez, Michael Brisco and Raymond Santana.

(Witness resumed the stand.)

THE COURT CLERK: Officer, you are reminded you are still under oath.

THE WITNESS: Yes.

THE COURT: Okay.

REDIRECT EXAMINATION

BY MS. LEDERER:

Q   Officer Reynolds, I'd like to please direct your attention to what's been received as People's 1 in evidence.

Would you please step down for a moment, with the permission of the Court, and approach the exhibit.

(Witness complies.)

Q   How many buildings comprise the Central Park Precinct?

A   Two.

Q   Would you please indicate the buildings that you were referring to.

A   Okay. This building is one and this

```
 1              REYNOLDS - PEOPLE - REDIRECT
 2   building is connected with this, with the main part
 3   (indicating).    It   is   a   giant   horseshoe-shaped
 4   structure (indicating).
 5        Q    Opposite  the  Community  Affairs  office,  is
 6   there another building?
 7        A    Yes, this is the main part of the precinct.
 8        Q    And  the  writing  that  you  are  pointing  to
 9   says, "entrance to Central Park Precinct"?
10        A    Yes.
11        Q   When you enter  through  the  door  where  that
12   arrow  is  pointing,  what  is  immediately  in   the
13   entrance?
14        A    As you go, there's stairs.  When you go down
15   the stairs, the desk is right there to your right.
16        Q    When  you  say  the  desk,  to  what  are  you
17   referring?
18        A    The  desk  where  the  sergeant  is,  where  he
19   logs in the names of prisoners, you know, takes  care
20   of all matters in the precinct.
21        Q    Is that where you took the people that were
22   taken into custody on the night of April 19th?
23        A    Yes.
24        Q    Where in relation to the desk  that  you  just
25   described  in  the  exhibit  is  the  Central  Park
```

654

REYNOLDS — PEOPLE — REDIRECT

1
2  detectives' office?

3      A    It's right opposite.  As you're going in,
4  the detectives' office is on the left (indicating).

5      Q    The building that's displayed in the lower
6  portion where it says "muster room," what is that
7  room?  What is that building?

8      A    That's where we have our roll call and our
9  muster.

10            MR. MOORE:  Objection, your Honor, I
11         don't think this area is proper redirect
12         examination.

13            THE COURT:  Well, I don't know.  I'll
14         allow it.

15      Q    What does it mean to have muster there?

16      A    That's where we receive our instructions for
17  the day, our assignments; as far as our sectors,
18  what cars we are assigned to, what areas we are
19  assigned to.  If we have any details outside the
20  precinct, we're informed of all of that there.

21      Q    How many juvenile rooms are there in the
22  Central Park Precinct?

23      A    There's one.

24      Q    Would you point it out, please.

25      A    This room right here (indicating).

655

REYNOLDS — PEOPLE — REDIRECT

1

2     Q     Indicating the room on the lower side of the

3   Community Affairs building?

4     A     That's correct.

5     Q     Are there soda machines in any of the

6   buildings of the Central Park Precinct?

7     A     Yes, there are.

8     Q     Where are they, if you recall?

9     A     They are in the muster room.  At that time

10  there was a juice machine and a soda machine.

11          MS. LEDERER:  All right, thank you.  You

12        may resume the witness stand.

13          (Witness complies.)

14    Q     How long have you been assigned to the

15  Central Park Precinct?  In April, 1989, how long had

16  you been assigned to the Central Park Precinct?

17    A     Just over two years.

18    Q     Do you recall what day of the week April

19  19th of 1989 was?

20    A     I believe that was a Wednesday.

21    Q     Was the-- when you first began to receive

22  radio runs on the night of April 19th, do you

23  remember whether it was light or dark out?

24    A     It was dark at that time.

25    Q     Do you recall whether there were any

656

REYNOLDS - PEOPLE - REDIRECT

1
2    concerts,  plays  or  entertainment  activities  in
3    Central Park on the night of April 19, 1989?
4              MR. RIVERA:  Objection.
5              THE COURT:  I will allow it.
6        A    No.  Nothing I was aware of.
7        Q    During the time that you have been assigned
8    in the Central Park Precinct, have you frequently
9    been  assigned  to  evening  assignments,  evening
10   shifts?
11       A    Yes, I do steady four to twelve's.
12       Q    Steady four to twelve's since assigned to
13   the precinct or when?
14       A    No, my assignment in Anti-Crime in January.
15       Q    In your experience in the evening in Central
16   Park, in the time of year we're discussing, either
17   April or around that time, is it frequent, is it
18   common to see a large amount of people in Central
19   Park in the evening?
20             MR. MOORE:  Objection.
21             THE COURT:  I'll allow it.
22       A    To see inside the park at that time?
23       Q    Yes.
24       A    Not really.
25       Q    Would you describe what the usual regular

657

REYNOLDS — PEOPLE — REDIRECT

1
2  population is in Central Park on a night in April.
3           (Whereupon, an objection was made by all
4        defense counsel.)
5           THE COURT:  Objection sustained.
6  Q   Can you be more specific?
7           THE COURT:  About what?
8           MS. LEDERER:  About the answer to the
9        last question.
10          (Whereupon, an objection was made by all
11       defense counsel.)
12          THE COURT:  Objection sustained.
13 Q   Approximately 9 or 9:30 in the evening on a
14 night in April in Central Park, would it be common
15 to see joggers?
16          MR. MOORE:  Objection.
17          THE COURT:  I will allow it.
18 A   Yes.
19 Q   Could you give an approximate number of the
20 people you most frequently see?
21          MR. BERMAN:  Objection as to form.
22 Q   Could you give an approximate number of the
23 people you might see on a night in April?
24          MR. BERMAN:  At 9:30 or in the course of
25       the whole night?

NYCLD_023403

P-APP002114

658

REYNOLDS — PEOPLE — REDIRECT

1

2          THE COURT:  Are you asking that specific

3      time?

4      Q    From approximately 9 to 10 p.m. on an April

5  night in Central Park.

6          THE COURT:  I'll allow it.

7      A    Sometimes people jogging alone, sometimes

8  jogging in pairs.  There are times when there are

9  large numbers, but it varies.  It's usually just

10 joggers and bicylists.

11     Q    Was it usual on a night in April between 9

12 and 10 p.m. to see pedestrians, not joggers and not

13 bicylists?

14          MR. MOORE:  Objection.

15          THE COURT:  I will allow it.

16     A    Not many.  You wouldn't see many people.

17     Q    And the time you have been assigned to

18 Central Park, is it-- how would you qualify the

19 level of activity or police work in Central Park on

20 a night in April?

21          MR. BERMAN:  Objection.

22          THE COURT:  I don't know what that

23      means.

24          MS. LEDERER:  I will rephrase the

25      question.

1        REYNOLDS — PEOPLE — REDIRECT

2      Q    Would you describe the level of police

3  work-- withdrawn.

4      Would you describe the level of activity for a

5  police officer in Central Park on a night in April--

6            MR. RIVERA:  Objection.

7            MR. MOORE:  Objection.

8            THE COURT:  Finish your question.

9      Q    -- as light or heavy?

10      A    Frequently light.

11            THE COURT:  I'll allow it.

12      Q    Is it usually quiet in Central Park at

13  night?

14      A    Yes.

15      Q    Directing your attention to the night of

16  April 19th of 1989, did you have your radio on the

17  entire time from about-- from the time you got off

18  meal through the time that the five persons were

19  taken into custody?

20      A    Yes.

21      Q    And did you hear all the communications over

22  the radio during that time?

23      A    Yes, I heard most of them, I believe.

24      Q    Did you have a radio with you when you were

25  at 102nd Street and Central Park West?

660

REYNOLDS - PEOPLE - REDIRECT

1
2     A    Yes, I did.
3     Q    Were you able to hear radio communications
4  as you stood by Raymond Santana and Steve Lopez?
5     A    Yes.
6     Q    To the best of your recollection, what do
7  you recall hearing at that time?
8     A    I recall hearing people stating that they
9  saw a couple running one way. There were
10 conversations from officer to officer stating that
11 they saw defendants running through the fields.
12    There were also conversations--
13         MR. MADDOX:  Objection to the word
14         "defendants."
15         THE COURT:  Yes.
16         Don't use "defendants," just use
17         "people."  Refer to them as individuals.
18    A    There were conversations to the Central
19 Dispatcher from other officers that they were in
20 pursuit of individuals around certain locations
21 inside the park, including the pond and the
22 ballfields.
23    Q    Prior to the time that you saw the group
24 walking north on Central Park West, as you were
25 driving through Central Park with Officer Powers,

NYCLD_023406

1                    REYNOLDS — PEOPLE — REDIRECT

2    did you have your radio on at that time?

3         A    Yes.

4         Q    And the radio communications that you heard

5    that night, were there frequent silences between the

6    radio   communications   or   were   you   hearing

7    communications pretty much non-stop?

8         A    We heard a lot of communications.   There

9    were communications from other precincts.   We're not

10   the only precinct on our frequency.

11        Q    Going back for a moment to the Central Park

12   Precinct, you testified, I believe on Friday, that

13   when the people that you brought before the desk,

14   the people you took into custody were brought before

15   the desk, when they were removed from that area they

16   were taken to the Juvenile Room?

17        A    That's correct.

18        Q    Why were they taken to the Juvenile Room?

19        A    That's the designated room—— there is a room

20   designated by the police department to bring any

21   suspects under the age of sixteen, anyone considered

22   a juvenile by the Family Court act.

23        Q    And if you take someone into custody who is

24   an adult, where is that common to take that person,

25   or where would you have taken that person?

NYCLD_023407

P-APP002118

662

REYNOLDS — PEOPLE — REDIRECT

1

2      A    To our holding cells in front of the desk.

3      Q    At the time that you approached the group

4  that you saw walking north on Central Park West,

5  would you describe exactly how the van pulled up in

6  relation to that group.

7      A    At first we were driving-- we drove parallel

8  to them.  When it became apparent to me they were

9  going to run, we pulled the van up perpendicular in

10 the intersection onto the southwest corner of 102nd

11 Street and Central Park West.

12     Q    At the time that you pulled the van up, who

13 was closer to the group, yourself or Police Officer

14 Powers?

15     A    Police Officer Powers was closer.

16     Q    And who reached the group or Raymond Santana

17 and Steve Lopez first, yourself or Police Officer

18 Powers?

19     A    Police Officer Powers.

20     Q    How long did it take you to come around the

21 front of the van-- withdrawn.

22     Did you go around the front of the van or the

23 back of the van?

24     A    I went around the front.

25     Q    How long did it take you to go around the

NYCLD_023408

663

REYNOLDS – PEOPLE – REDIRECT

2   front?

3       A   It took me a couple seconds to jump out and

4   close the door and walk up to the two.

TB/FR   5

6       Q   During that few seconds-- withdrawn.

7       What did you see Police Officer Powers doing by

8   the time you came around the front of the van?

9       A   I saw him yelling to the crowd not to run.

10  He told them we were police, "Don't run.  Stay where

11  you are.  Don't make us chase you."

12      At that point the group started to run from him.

13      Q   Was there anything unusual about the number

14  of people in this group that you saw walking north

15  on Central Park West that you described?

16              MR. JOSEPH:  Objection.

17              THE COURT:  I'll allow it.

18      A   It was unusual that it was a large group.

19  At that time there was-- again, usually when you

20  have a large group like that they are coming from a

21  movie theater or something.

22              MR. MADDOX:  Objection.

23              THE COURT:  Overruled.

24      Q   Was the group that you saw wearing any kind

25  of team uniform?

NYCLD_023409

P-APP002120

664

REYNOLDS — PEOPLE — REDIRECT

1

2   A   No, I don't recall.

3   Q   Did you notice them carrying any kind of

4  equipment like bats, balls or anything like that?

5   A   No.

6   Q   When you saw the group walking, could you

7  describe the relation of members within the group,

8  one to the other?

9   A   The group was pretty homogeneous.  It seemed

10  like they were altogether.  There were no

11  stragglers, like anybody was ahead of the group or

12  behind it.  They were together.

13   Q   Were they single file or several people

14  abreast from one another?

15   A   Several people abreast.

16   Q   Were there any other people on Central Park

17  West that you saw when you saw this group of people

18  walking north?

19   A   There were-- I believe there were one or two

20  other people.

21   Q   Did you see those people on the west side of

22  the street or on the east side of the street?

23   A   I didn't-- at the time we approached them I

24  wasn't looking on that side.  I only looked to see

25  Officer Flores.  There might have been one or two

665

REYNOLDS — PEOPLE — REDIRECT

1
2  people going into that building there.

3       Q    Going into which building?

4       A    There's a condominium-- condominium or co-op
5  complex at the southwest corner there.

6       Q    At some point Raymond Santana and Steve
7  Lopez were taken to 100th Street and Central Park
8  West.  Whose decision was it to take them to that
9  location?

10      A    I had decided to take them to that location.

11      Q    For what reason were they taken to that
12 location?

13      A    That's where the other defendants were and
14 that's where my supervisor was.

15            MR. MADDOX:  Object to "defendants."

16            THE COURT:  Other people were there.
17       Let's not talk about defendants.

18            THE WITNESS:  Individuals were.  That's
19       where other individuals were and my
20       supervisor was there and I went to confer
21       with him.

22      Q    And what matter did you intend to discuss
23 with Sergeant Laile?

24      A    On the apprehension of the other individuals
25 and as far as making the arrest.

NYCLD_023411

P-APP002122

666

REYNOLDS — PEOPLE — REDIRECT

1
2      Q    When you say "as far as making the arrest,"
3  what specifically did you want to discuss with your
4  supervisor?
5      A    What did we have against them and what the
6  situation was specifically.
7      Q    Whose decision was it finally to arrest
8  Raymond Santana and Steve Lopez, if you know?
9      A    That was myself and Sergeant Laile.
10     Q    At 100th Street and Central Park West was
11 there a decision about doing any kind of a showup or
12 identification procedure?
13     A    There was.
14     Q    What was that discussion and who had it?
15     A    That discussion was with myself and the
16 sergeant.  We had tried to see if we could do a
17 showup and we found out that we couldn't.  So, we
18 decided against it.
19     Q    At what point was it decided that Raymond
20 Santana and Steve Lopez would be arrested?
21     A    You mean at what time?
22     Q    At what location?
23     A    At 100th Street and Central Park West.
24     Q    And who made the decision?
25     A    Myself and Sergeant Laile.

667

REYNOLDS — PEOPLE — REDIRECT

1

2  Q    Directing your attention to the early

3  morning hours of April 20th of 1989, you testified,

4  I believe, that family members arrived on behalf of

5  four of the five suspects in custody at that time?

6  A    That's correct.

7  Q    To the best of your knowledge, approximately

8  how many people arrived when all of the family

9  members or guardians of those suspects arrived?

10  A    I'd say about six to eight.

11  Q    And approximately how many chairs are there

12  in the Juvenile Room?

13  A    There's at least four.    There's probably

14  more.

15  Q    And on the night of April 19th into the

16  morning of April 20th, it was your testimony that

17  you were in that room with the five suspects who had

18  been arrested; is that right?

19  A    That's right.

20  Q    And were each of those-- were those five

21  suspects seated or standing?

22  A    They originally were seated.    I had-- I

23  pulled up some chairs and had them sit on the-- on

24  this map, you'll see that's the bottom, righthand

25  portion in the Juvenile Room.

NYCLD_023413

P-APP002124

668

REYNOLDS - PEOPLE - REDIRECT

1
2    Q    And were you also in that room?
3    A    Yes, I was.
4    Q    And you were seated?
5    A    Yes.
6    Q    Were any other officers in that room?
7    A    There were other officers, but they came
8    back and forth.
9    Q    Other than yourself and the five suspects
10   you just described, was anybody else seated in that
11   Juvenile Room?
12   A    That stayed there?
13   Q    Yes.
14   A    No.
15   Q    Approximately how many chairs were remaining
16   after the chairs that you and the five suspects were
17   using?
18   A    There might have been one or two.
19   Q    Were there eight?
20   A    Eight left?
21   Q    Yes.
22   A    In the Juvenile Room?
23   Q    Yes.
24   A    After everybody was seated?
25   Q    Yes.

669

REYNOLDS — PEOPLE — REDIRECT

1

2   A   I don't think so.   I think the rest of the

3   chairs were outside where the parents were.

4   Q   You testified, I believe, that you were

5   doing your paperwork in an assembly line fashion.

6   Would you describe more specifically and describe

7   how you did the paperwork in this case.

8   A   Well, what we did was-- when you make an

9   arrest and you get the charges, you get the Penal

10  Law and what you like to do-- what I like to do is

11  get the charges and write them in on the arrest

12  reports.   You know, even before you put the names

13  on.

14  So, there does come a time where you will put a

15  charge on and you might have put it on all of the

16  arrest reports and then you realize for one or two

17  of the defendants, the charge doesn't apply and I

18  would X or line it out and just put the other charge

19  on it.

20  Q   And when you say you were doing the

21  paperwork in an assembly line fashion, how did you

22  mean?

23  A   I took them all and put all the arrest

24  reports down, did the arrest reports, the intake

25  referral sheets, I did those one at a time.   Some of

REYNOLDS - PEOPLE - REDIRECT

1

2 the captions were left out until we had gotten that

3 information that pertained to it. Some things were

4 left blank and they had to be checked constantly to

5 make sure we had everything in them.

6 Q At some point did you become aware that any

7 of these five suspects that you had at the Central

8 Park Precinct were sleeping?

9 A Yes.

10 Q And approximately what time was that?

11 A Can I-- I have to look at my notes for that.

12 That was at least 3:00. By 3:00 all except for

13 one was definitely sleeping.

14 Q When you say all except one was not

15 sleeping, who was it that was not sleeping?

16 A That was Clarence Thomas.

17 Q Is there some reason why you recall that

18 specific time and Clarence Thomas was not sleeping?

19 A Yes, because all the others were sound

20 asleep and he was sitting there and awake and I

21 looked at him and I asked him, you know, why wasn't

22 he sleepy. He told me he wasn't sleepy because he

23 was too scared. He never been in so much trouble

24 before.

25 MR. MOORE: I'm going to object to this

671

REYNOLDS — PEOPLE — REDIRECT

1

2          as not being a proper line of examination.

3               THE COURT:   I'll allow it.

4          Q    Approximately how long did you see the other

5     ones sleeping?

6          A    They slept a good part of the night from

7     3:00 on.

8          Q    At the time that Kevin Richardson's mother

9     arrived at the Central Park Precinct, you testified

10    she came to the entrance of the Juvenile Room when

11    she first arrived and then she was asked to wait

12    outside.

13          During the time that she was waiting outside and

14    you had Kevin Richardson in the Juvenile Room, did

15    he at any time ever ask you if he could speak to his

16    mother?

17          A    I don't recall if he did.   I think he did

18    have a conversation initially when she came in.   I

19    explained to her what happened and asked her to wait

20    outside.

21          Q    Other than that initial conversation that

22    Mrs. Richardson (sic) had with Kevin Richardson,

23    after she went outside, did he ever ask you if he

24    could speak to his mother?

25          A    No, I don't believe so.

672

REYNOLDS — PEOPLE — REDIRECT

1

2      Q     Did you have a conversation with Raymond
3  Santana regarding where he lives?

4      A     Yes.

5      Q     And did you ask him for his address?

6      A     Yes.

7      Q     And did you have to do that with respect to
8  preparing paperwork in this case?

9      A     Yes.

10     Q     Did you also have occasion with respect to
11 the paperwork you were preparing to ask him with
12 whom he resides?

13     A     Yes.

14     Q     And what did he tell you?

15     A     He stated he lived with his father.

16     Q     During the time that you had those five
17 suspects in the Juvenile Room and Steve Lopez'
18 father was outside, did Steve Lopez ever ask you if
19 he could speak to his father?

20     A     No.

21     Q     During the time that you had Raymond Santana
22 in the Juvenile Room did he ever ask to go outside
23 to speak to his grandmother or his father?

24     A     No, definitely not.

25         MR.   RIVERA:      Objection,    it's    a

NYCLD_023418

P-APP002129

673

REYNOLDS — PEOPLE — REDIRECT

2    characterization.

3         THE COURT:  I'll allow it.

4    Q    Until the time Detectives Whelpley and

5    Farrell arrived at the Central Park Precinct, where

6    were the five suspects who had been arrested?

7    A    They were in the Juvenile Room.

8    Q    And to the best of your knowledge, what time

9    was it when the Detectives Whelpley and Farrell

10   arrived?

11   A    It was about 5:30.

12   Q    And was it at about 5:30 that interviews

13   were begun?

14   A    Yes.

15   Q    And the first interview was with which

16   suspect?

17   A    That was with Lamont McCall.

18   Q    Where was that interview conducted?

19   A    That was conducted in the Juvenile Room.

20   Q    And at the time that that interview was

21   conducted or was begun, what, if anything, happened

22   with respect to the other four suspects who had been

23   in that room?

24   A    They were taken out of the room and placed--

25   on the map you will see it as the top part of the

P-APP002130

674

REYNOLDS — PEOPLE — REDIRECT

building; they were placed in the top part with their parents.

     Q    When you're talking about "the top part," you're talking about the portion of the building that's closer to the 86th Street transverse?

     A    That's correct.

     Q    And is that a clerical office?

     A    Yes, it is.

     Q    And when the four suspects were taken from the Juvenile Room and put in that clerical office, were they allowed to sit with their families and parents?

     A    Yes.

     Q    And were they instructed as to whether or not they could speak with their families?

     A    No.

     Q    Was there any instruction at all when the suspects were put in that room?

     A    When the suspects were placed with their parents to wait?

     Q    Yes.

     A    No.  We just asked them to sit tight with their parents.

     Q    And at that time everyone, other than Lamont

675

REYNOLDS - PEOPLE - REDIRECT

McCall, was placed in that room?

A    That's correct.

Q    Approximately far is Central Park West on the block, 101st Street to 102nd Street from 96th Street and the bridle path, if you know?

A    Could you repeat that?

Q    Approximately how far is Central Park West and 101st Street and 102nd Street from the 96th Street bridle path?

A    Maybe three or four blocks.

Q    Directing your attention to People's 7 in evidence, the area from 96th Street and the bridle path, going directly west from that area, how far is it to Central Park West in terms of a city block, if you know?

A    From the bridle path to Central Park West?

Q    Yes, from 96th Street and the bridle path to Central Park West.

A    Maybe a block.

Q    Thank you.

After Night Watch detectives arrived and began interviewing suspects in the Juvenile Room and detectives from the day shift at Central Park arrived, were you allowed to go home?

NYCLD_023421

P-APP002132

676

REYNOLDS — PEOPLE — REDIRECT

1

2       A    No.

3       Q    And who made the decision about whether you

4  could finish your tour and leave or whether you had

5  to stay?

6       A    I believe that was-- I believe that was my

7  captain.

8       Q    And did there come a time when you were

9  finally allowed to leave?

10      A    Yes.

11      Q    And when was that?

12      A    That was Saturday morning.

13      Q    And was that your request or your decision

14  or your captain's decision?

15      A    No, that was a supervisor's decision.

16      Q    Officer, if you know, the avenue, Broadway,

17  how many blocks away from Central Park West is

18  Broadway?

19           MR. BERMAN:   At which street?

20      A    It's at least two blocks.

21           MR.   BERMAN:   There's   no   point   of

22           reference.

23      Q    At Central Park West at 96th Street, if you

24  continue to go west, what is the next avenue?

25      A    Columbus.

677

REYNOLDS - PEOPLE - REDIRECT

1

2      Q     And after Columbus, what is the next avenue?

3      A     Amsterdam.

4      Q     And after Amsterdam, what is the next

5  avenue?

6      A     Then it's Broadway, I believe.

7      Q     Officer, are you familiar with the-- with a

8  form called a 250?

9      A     Yes, I am.

10     Q     And what is a 250?

11     A     That's called a Stop and Frisk Report.

12     Q     And when is it-- when are you required to

13 fill out a 250?

14     A     Usually when you stop and question somebody

15 in regards to a crime and it turns out they didn't

16 commit the crime and you let them go.  This is to

17 record the stop that you made along with the

18 description.

19     Q     And when that person is actually

20 subsequently arrested, is it still necessary to

21 prepare a 250 report?

22     A     No.

23     Q     During the time that you had Kevin

24 Richardson and Steve Lopez and Raymond Santana in

25 the Juvenile Room from approximately shortly after

678

REYNOLDS — PEOPLE — REDIRECT

1    11 p.m. until the time they went to sleep, would you

2    describe how they behaved.

3               MR. RIVERA:  Objection.

4               THE COURT:  I'll allow it.

5    A    How they behaved in the Juvenile Room?

6    Q    Yes.

7    A    They really-- it seemed to me they didn't

8    care, you know, pretty arrogant.

9               MR. DILLER:  Objection.

10              MR. RIVERA:  Objection.

11              THE COURT:  Just describe what you saw.

12         Describe what they looked like, what they

13         said and did and didn't do and I'll draw the

14         conclusion.

15   Q    Did you see any of them crying?

16   A    No.

17   Q    Did you see any of them talking?

18   A    Yes, they spoke freely to each other.

19   Q    Did you notice whether they were laughing or

20   singing or doing anything?

21   A    That night there was no singing but they

22   were    talking    and    everything,    you    know,

23   conversations.

24              MS. LEDERER:  If I may just have one

NYCLD_023424

P-APP002135

679

REYNOLDS — PEOPLE — RECROSS — BERMAN

1   moment, your Honor?

2       I have nothing further.

3       Thank you.

4   RECROSS EXAMINATION

5   BY MR. BERMAN:

6       Q   In that designated Juvenile Room, are there
any particular facilities for juveniles?

7       A   The--

8       Q   Juvenile Room that you testified about, is
there anything in that room particularly that makes
it suitable for juveniles?

9               MS. LEDERER:  Objection.

10              THE COURT:  I'll allow it.

11      A   I don't know because I don't know what the
requirements are which makes it a juvenile room.

12      Q   Is it used exclusively for the retention of
juveniles?

13      A   No.

14      Q   Is it basically used as an office during the
day?

15      A   Yes.

16      Q   And is it fair to say in that precinct you
take any juveniles into custody, you use that office
to hold the juveniles while they're at the precinct?

680

REYNOLDS — PEOPLE — RECROSS — BERMAN

1

2  A    Could you repeat that?

3  Q    Is it fair to say that in that precinct

4 juveniles that are taken into custody, that office

5 that you refer to as the Juvenile Room is the office

6 that is used to keep the juveniles in?

7  A    That's correct.

T9/LF  8

9  Q    And if they are kept overnight, they're

10 supposed to sleep in that room?

11        MS. LEDERER:  Objection.

12        THE COURT:  Well, are they supposed to

13        or is there any other facility for them to

14        sleep other than--

15        THE WITNESS:  None that I am aware of.

16  Q    The Central Park Precinct has no facilities

17 for juveniles to sleep in overnight, is that

18 correct?

19  A    It has no facilities for anyone to sleep.

20  Q    Aren't we concerned here with juveniles--

21        MS. LEDERER:  Objection.

22        THE COURT:  Answer that.  Do they have

23        dormitories or bunks for juveniles, do they?

24        THE WITNESS:  No.

25  Q    Does that precinct have dormitories or beds

681

REYNOLDS — PEOPLE — RECROSS — BERMAN

1 
2 for officers to sleep there?

3     A   There's two beds.

4     Q   On the night in question on the night of

5 April 19th to the 20th of April, do you know if

6 those two beds were being used?

7     A   I'm not aware of it, no.

8     Q   Is it fair to say when the time came for

9 these youngsters to fall asleep, they were given no

10 choice but to sleep on the floor or sleep in a

11 chair?

12     A   Right.

13     Q   Despite the fact you had at least two beds

14 that you knew of in that precinct?

15     A   If they were placed in those beds, there was

16 no way to safeguard they would stay there.

17     Q   Unless you had an officer watching them.

18     A   That's correct. The two beds are on

19 opposite ends of our locker rooms.

20     Q   In other words, you would have needed two

21 officers to watch them?

22     A   At the very least.

23     Q   And is that why none of these youths were

24 allowed to sleep in those beds?

25     A   No.

NYCLD_023427

P-APP002138

_

682

REYNOLDS – PEOPLE – RECROSS – BERMAN

1

2    Q    You testified on redirect that at some point

3    all four of the youths except for Clarence Thomas

4    fell asleep, is that right?

5    A    Yes.

6    Q    Where was Steve Lopez sleeping?

7    A    I don't recall.

8    Q    Do you know if he was on the floor?

9    A    I don't recall.

10   Q    Do you know if he was in a chair?

11   A    I don't recall.

12   Q    Do you have a mental image of him sleeping?

13   Can you sort of close your eyes and see him

14   sleeping?

15   A    I knew all of them were sleeping.

16   Q    Well, did you see that or did somebody tell

17   you that?

18   A    I saw it.

19   Q    In that visual image of Steve Lopez

20   sleeping, is he lying on the floor or sleeping in a

21   chair?

22   A    There's no visual image.  I remember it

23   because I asked Clarence Thomas why he wasn't

24   sleeping.  I asked him why he wasn't sleeping

25   because I knew the others were sleeping.

NYCLD_023428

P-APP002139

683

REYNOLDS — PEOPLE — RECROSS — BERMAN

1
2      Q    Now, when you say these four hours slept a
3  good part of the night, you said that by 3 a.m.
4  those four were alseep; is that correct?
5      A    That's the time I made-- that he made the
6  statement to me.
7      Q    And by 5:30 a.m. they were taken out of the
8  designated Juvenile Room, weren't they?
9      A    That's correct.
10     Q    Were they put in another designated juvenile
11 room?
12     A    I don't know how much of it is designated.
13 It might or might not be.
14     Q    Can you testify under oath here that the
15 room outside the Juvenile Room is a designated
16 juvenile facility?
17          MS. LEDERER:   Objection.
18          THE COURT:   I will allow it.
19     A    I couldn't testify to it.  I don't know.
20     Q    So, the requirement that juveniles be kept
21 in a designated juvenile facility, at least at the
22 Central Park Precinct, translates itself that when
23 it's suits the officers they are, and when it suits
24 the officers they aren't?
25          MS. LEDERER:   Objection.

NYCLD_023429

684

REYNOLDS — PEOPLE — RECROSS — BERMAN

1

2          THE COURT:   Objection sustained.

3     Q    What is your understanding of the rule that

4  juveniles be kept in a juvenile designated facility?

5          MS. LEDERER:   Objection.

6          THE COURT:   Sustained.

7     Q    Are you aware of a rule that juveniles are

8  supposed to be kept in a juvenile facility while at

9  the precinct?

10         MS. LEDERER:   Objection.

11         THE COURT:   I will allow it.

12    A    Yes.

13    Q    And the only designated juvenile facility

14  that you know of at the Central Park Precinct is the

15  one room that you have described, is that right?

16    A    Yes.

17    Q    And there came a time by 5:30 in the morning

18  when the four of the youths other than Lamont McCall

19  were taken or sent out of the designated juvenile

20  room, isn't that right?

21    A    That's correct.

22    Q    And they were put in a room that is not a

23  juvenile room?

24    A    Again, I'm not aware of what the

25  requirements are in the whole building is a juvenile

685

REYNOLDS — PEOPLE — RECROSS — BERMAN

room or just that room.  They were taken out of the
room where I did the paperwork.

Q    Under oath you are only prepared to say only
one room is the juvenile room, is that right?

MS. LEDERER:  Objection.

THE COURT:  Sustained.

Q    Is it your testimony maybe that is a
juvenile room too?

A    Again, I don't know.

Q    Did they sleep walk into that room?

MS. LEDERER:  Objection.

THE COURT:  Sustained.

Counsel, let's be serious.  That is not
a serious question.

Q    When you testified that they slept a good
part of the night, did they sleep past 5:30?  That's
the serious question.

THE COURT:  Well, ask only serious
questions.  This is a serious matter, and
let's ask a serious question.

Q    Did they sleep past 5:30?

A    You mean after they were placed in the other
room, when they were with their parents?  If they
were or they slept with their parents, I don't know.

686

REYNOLDS — PEOPLE — RECROSS — BERMAN

1

2     Q     When you testified on redirect that they

3  slept a good part of the night, does that mean from

4  3 to 5 a.m.?

5     A     At least three, three being a reference

6  point that I have that they were sleeping at that

7  time.

8     Q     You are prepared to testify under oath at

9  least 3 to 5:30 they slept?

10    A     At the very least.

11    Q     And in your mind two-and-a-half hours is a

12 good part of the night?

13            MS. LEDERER:  Objection.

14            THE COURT:  Sustained.

15    Q     What did you mean when you said they slept a

16 good part of the night?

17    A     I mean they had some time to sleep, more

18 time than I did.

19            MR. MOORE:  Objection to that last part.

20            THE COURT:  Yes, strike out the last

21        part.

22    Q     What do you mean by a good part of the

23 night?

24            MS. LEDERER:  Objection.

25            MR. BERMAN:  That was his testimony on

NYCLD_023432

P-APP002143

687

REYNOLDS - PEOPLE - RECROSS - BERMAN

direct.

MS. LEDERER:  Asked and answered.

THE COURT:  I will let him answer as to what time they slept.  Whether it is a good part of the night, I will decide.

Q    Now, you testified earlier that as the parents arrived, they were told to wait outside of the Juvenile Room, isn't that right?

A    That's correct.

Q    On redirect today for Miss Lederer, you testified that Steve Lopez never asked to speak to his father during the time he was in the Juvenile Room, right?

A    I don't believe he did.

Q    He certainly didn't during the time that he was asleep, isn't that right?

A    That's right.

Q    Did you ever see him conferring with his father?

A    He definitely did after 5:30.

Q    Did you ever see him conferring with his father?

A    Yes.

Q    When was that and for how long was that?

NYCLD_023433

P-APP002144

REYNOLDS - PEOPLE - RECROSS - BERMAN

A I don't know the specific time.

Q Approximately when was that?

A He might have before 5:30. I know after 5:30 he definitely did speak with his father.

Q When was that approximately? If it was after 5:30, approximately how long?

A I don't know.

Q Is it fair to say when the interview of Mr. McCall began, you were in the Juvenile Room?

A Yes.

Q And that began at about 5:30?

A About that time.

Q And you didn't come out of that room for how long?

A I don't recall specifically how long I was there.

Q And is it-- what you are saying is when Steve Lopez was woken up and sent out into the other room, you saw him greet his father?

A I know he was out there with his father.

Q And you went back into the Juvenile Room?

A Yes.

Q And you don't know whether he consulted with his father about this case, do you?

689

REYNOLDS — PEOPLE — RECROSS — BERMAN

1

2      A     No, I don't know.

3      Q     All you can say is when you woke him up and
4  sent him out of the room, he acknowedged the
5  presence of his father out there?

6      A     I believe he was with his father.

7      Q     In terms of whether he consulted with his
8  father, you're not able to testify to that, are you?

9      A     Excuse me?  Can you repeat that?

10     Q     In terms of whether Steve Lopez had any
11  discussion of any length with his father, you're not
12  able to testify to that, are you?

13     A     Oh, no.

14     Q     When the four youths were sent out into the
15  anteroom, out of the Juvenile Room--

16     A     Which room?

17     Q     Whatever you call that room that is outside
18  the Juvenile Room, what do you call that?

19     A     The clerical office.

20     Q     The clerical office; was there some officer
21  who watched them in that clerical office?

22     A     Yes.

23     Q     They were still in custody?

24     A     Yes.

25     Q     They were still not free to leave?

NYCLD_023435

690

REYNOLDS — PEOPLE — RECROSS — BERMAN

1

2      A      That's correct.

3      Q      Their paperwork was done?

4      A      Not entirely, no.

5      Q      I believe you told us last week that you

6  started the paperwork around 11, 11:30?

7      A      That's right.

8      Q      You said it took you two or three hours to

9  finish it?

10      A      I pretty much finished everything.  I did

11  say there were captions that were left open and

12  there were things that had to be done.

13      Q      Do you recall during my cross-examination

14  yesterday, I guess, saying that by 5:30 or so the

15  paperwork was done as to the unlawful assembly

16  charges; do you recall that?

17      A      Could you repeat that?

18      Q      That by 5:30 the paperwork was certainly

19  done as to the unlawful assembly charges?

20      A      Again, majority of the paperwork was done.

21  There was still things that weren't put in yet.

22      Q      Do you recall telling me on

23  cross-examination that what was holding Steve Lopez

24  after 5:30 or 6:00 was not the unlawful assembly

25  charges but the fact that your Lieutenant McInerney

691

REYNOLDS — PEOPLE — RECROSS — BERMAN

1
2  told you to keep these kids there because he wanted
3  them questioned; isn't that so?
4      A   I stated Lieutenant McInerney told me that
5  the detectives from Night Watch wanted to interview
6  the individuals that we had in custody.
7      Q   And he told you to keep them there, didn't
8  he?
9      A   He told me to hold them there so they could
10  interview them.
11     Q   Against their will?
12     A   He did not say that.
13     Q   He told you to hold them there?
14     A   Yes.
15     Q   That was what was keeping Steve Lopez there
16  at 5:30 in the morning, is that correct?
17     A   That's correct.
18     Q   Not the unlawful assembly charge?
19     A   No, I don't believe so.
20     Q   Do you know from your own recollection or a
21  review of the reports when the first police officer
22  first began to question Steve Lopez?
23            MS. LEDERER:   Objection, this witness
24         can't testify from a review of the police
25         reports.

NYCLD_023437

P-APP002148

692

REYNOLDS — PEOPLE — RECROSS — BERMAN

1

2          THE COURT:   What was your question?

3          MR. BERMAN:   If he knows, when the first

4   police   officer   ever   started   to   question

5   Steve Lopez.

6          THE   COURT:   I   will   allow   it,   if   he

7   knows.

8     A     I don't know.

9     Q     Now,  on  redirect  just  now  a  little   while

10   ago, you told Miss Lederer when you were at 102nd

11   Street   and   Central   Park   West,   your   radio   was

12   working?

13     A     Yes, it was.

14     Q     Is this one of those that clicks onto your

15   clothes?

16     A     No.

17     Q     Is this a radio that you hold in your hands?

18     A     Yes.

19     Q     And at some point when you were at 102nd and

20   Central Park West you heard other radio runs about

21   officers pursuing other individuals around the pond

22   and ballfields?

23     A     Could you repeat that?

24     Q     You said something on redirect today about

25   hearing radio runs about other officers pursuing

NYCLD_023438

P-APP002149

693

REYNOLDS — PEOPLE — RECROSS — BERMAN

1

2 other individuals around the pond and around the

3 ballfields?

4     A    That's correct.

5     Q    And this you heard after you had apprehended

6 Steve Lopez?

7     A    Right.

8     Q    This is while you were standing there with

9 him at 102nd and Central Park West?

10     A    That's correct.

11     Q    This is after you had put him up against the

12 wall?

13     A    That's correct.

14     Q    And you understood those radio runs to be

15 about individuals who had attacked Mr. Loughlin?

16     A    I understood that to be the individuals that

17 we had attempted to stop that my partner was in

18 pursuit of on foot.

19     Q    Is it fair to say that up until the moment

20 when you apprehended Steve Lopez, you had become

21 aware there were thirty or so youths running around

22 the park causing trouble?

23     A    Yes.

24     Q    And is it fair to say that at that point you

25 would have arrested anyone whom you thought was one

694

REYNOLDS — PEOPLE — RECROSS — BERMAN

of those thirty youths who were causing trouble in the park?

A   No, that is not really fair to say, no.

Q   Would you have arrested only those whom you thought you had probable cause to believe that assaulted Mr. Loughlin?

A   I would have arrested whoever I had probable cause, yes.

Q   As to the assault on Mr. Loughlin?

A   Or to the assault on anybody else or any other crimes.

Q   And as to Steve Lopez, what was the crime that you apprehended him for?

A   What did I initially stop him for, is that what your question is?

Q   Well, when you first seized him.

A   When I first stopped him, that was for the assault on Mr. Loughlin and other assaults inside the park.

Q   And you felt you had probable cause as to the assault on Mr. Loughlin, as to the assault, and Steve Lopez--

MS. LEDERER:  Objection.

THE COURT:  I'll allow it.

NYCLD_023440

P-APP002151

695

REYNOLDS — PEOPLE — RECROSS — BERMAN

1

2    A    We weren't aware if we had probable cause,

3 but our level of suspicion was arising.   We had the

4 right to stop and question him at that point.

5    Q    And you stopped him?

6    A    Yes.

7    Q    You questioned him?

8    A    No.

9    Q    Did you stop him to question him?

10    A    We stopped him to ascertain what was going

11 on.  I didn't have a chance to question him because

12 my partner was in pursuit of the others.

13    Q    Your purpose in stopping him was to question

14 him, is that correct?

15    A    That's right.

16    Q    And you yourself had him in your custody

17 until at least 5:30 in the morning?

18    A    That's correct.

19    Q    Did you ever question him from 10:30 at

20 night until 5:30 in the morning?

21    A    Other than pedigree, there was nothing to

22 question him about.

23    Q    Did you stop him to question him?

24    A    We stopped him to ascertain if he committed

25 the crime.

NYCLD_023441

P-APP002152

696

REYNOLDS — PEOPLE — RECROSS — BERMAN

1

2    Q    How would you ascertain that, by questioning

3  him?

4    A    By questioning him, if necessary, or showup

5  or whatever means available to us.

6    Q    Did you question him?

7    A    No.

8    Q    Did you do a showup?

9    A    No.

10   Q    What did you stop him for?

11   A    For the assault on Mr. Loughlin and the

12  other assaults in the park.

13   Q    Did you believe you had probable cause as to

14  the assault on Mr. Loughlin as to Steve Lopez?

15           MS. LEDERER:   Objection.

16           THE COURT:  He has already answered the

17       question.

18           MR. BERMAN:   He has answered it six

19       different ways.

20           THE COURT:   I will let him answer it

21       again.

22   A    I believe we had a right to stop him.

23   Q    To stop and question him?

24   A    We had the right to stop and question him.

25  I didn't say I questioned him, I said we had the

NYCLD_023442

P-APP002153

697

1      REYNOLDS — PEOPLE — RECROSS — BERMAN

2   right.

3      Q    You felt you could stop and frisk him?

4      A    For my safety, yes.

5      Q    And you did frisk him?

6      A    Yes.

7      Q    And you didn't find anything when you

8   frisked him?

9      A    That's correct.

10     Q    Did the absence of a weapon increase

11  probable cause in your mind?

12            MS. LEDERER:  Objection.

13            THE COURT:  Objection sustained.

14     Q    Once you stopped Steve Lopez, what was the

15  first additional thing that came to your attention

16  that gave you any evidence against him with regard

17  to the assault on Mr. Loughlin?

18            MS. LEDERER:  Objection as to form.

19            THE COURT:   If  he  understands  the

20         question, I'll let him answer it.

21     A    Repeat it, please.

22     Q    After stopping Mr. Steve Lopez, what was the

23  first bit of evidence you encountered that tended to

24  link him up to Mr. Loughlin?

25     A    The fact that he was with the group and he

698

REYNOLDS - PEOPLE - RECROSS - BERMAN

had denied being with him. He made statements that
they were going to rob him and that he was ahead of
the group when I observed him with the group, and it
was obvious he was not going to be robbed and it was
obvious that he did know them.

Q    Prior to stopping Steve Lopez, did you see
him talking to any member of the group?

A    I saw him in the group as part of the group.
He stated that he was walking ahead of the group and
he was not.

Q    Try to answer my question. Prior to
stopping Steve Lopez, did you see him talking to
anybody in the group?

A    Did I see him specifically speaking to
anybody?

Q    That's right.

A    Not that I recall. When I saw the group, I
saw them as a group. I didn't pick out individuals
in the group.

Q    Did you see Steve Lopez before those ten or
so other youths started running?

A    I don't understand what you mean.

Q    I mean, did you see Steve Lopez before the
ten or so other youths started running?

NYCLD_023444

P-APP002155

699

REYNOLDS — PEOPLE — RECROSS — BERMAN

1

2    A    Again, I saw them as a group.    I didn't see

3  individuals.   I saw a group and this is what we were

4  looking for.

5    Q    I take it your answer to my question is you

6  didn't see Steve Lopez until after the other youths

7  starting running?

8         MS. LEDERER:   Objection.

9         THE COURT:   Specifically is that what

10        you are asking?

11        MR. BERMAN:   I am asking about Steve

12        Lopez in particular.

13   A    I didn't see Steve Lopez specifically as an

14  individual.   I just saw the group he was a part of.

15   Q    And there came a time when ten or twelve of

16  them ran away and all that was left was Steve Lopez

17  and Raymond Santana?

18   A    That's correct.

19   Q    And that's when you first saw him?

20   A    That's when I first saw him as Steve Lopez

21  and I recognized him as an individual and not part

22  of the group.

23   Q    What made you decide never to question Steve

24  Lopez?

25   A    I didn't decide not to question him.   It is

700

REYNOLDS — PEOPLE — RECROSS — BERMAN

1

2    just I felt it wasn't necessary.

3        Q    You told us that your reason for stopping

4    him was to question him or to put him in a showup,

5    is that right?

6        A    Originally.

T10/FR 7

8        Q    And you didn't put him in a showup, right?

9        A    Right.

10       Q    And you didn't question him?

11       A    Right.

12       Q    Why didn't you question him?

13       A    Because I was listening to the radio, my

14   partner, and the chase in the park. I was more

15   concerned with my partner at that point than

16   questioning the two there.

17       Q    What about the six-and-a-half hours from

18   11:00 to 5:30 at the precinct, why didn't you

19   question them then?

20       A    I wanted to do the paperwork so they could

21   be released and go with their parents and they could

22   go home and I could go home.

23       Q    After 4:00 you knew from your lieutenant not

24   to let them go, is that correct?

25       A    That's correct.

NYCLD_023446

P-APP002157

701

REYNOLDS — PEOPLE — RECROSS — BERMAN

1

2     Q    So, after 4:00 the paperwork is not the

3 excuse to question Steve Lopez, was it?

4     A    That's right.

5     Q    After 4:00 the whole purpose was to question

6 Steve Lopez, is that right?

7     A    That's correct.

8     Q    But you were not questioning him?

9     A    I was not the investigator at that time.   It

10 was not my place to question him at that point.

11    Q    Let's say at four in the morning he was

12 placed under arrest for the assault on the female

13 jogger?

14    A    No.

15    Q    He was just informally there but not free to

16 leave?

17    A    No, he was formally under arrest.

18    Q    I'm talking about for the assault on the

19 female jogger.   He was not under arrest for the

20 assault on the female jogger, was he?

21    A    No.

22    Q    And basically he was being kept because the

23 lieutenant said keep him here, we want to question

24 him?

25    A    No, he stated the detectives wanted to speak

NYCLD_023447

P-APP002158

702

REYNOLDS - PEOPLE - RECROSS - BERMAN

2  to him.

3      Q    Steve  Lopez  was  being  kept  after  4:00

4  because  Lieutenant  McInerney  said  that  the

5  detectives wanted to question him?

6      A    That's correct.

7      Q    And  was  Steve  Lopez  at  4:00  woken  up  and

8  told that he's now not going to go with his parents?

9      A    No.

10      Q    Was  he  told  that  he  was  going  to  be  kept  for

11  awhile because detectives wanted to talk with him?

12      A    No.

13      Q    When  he  was  woken  up  at  5:30  and  put  in  the

14  other room, the clerical room, was he told he is not

15  going to go home with his parents?

16      A    No.

17      Q    Was  he  told  he  was  being  kept  beyond  the

18  unlawful assembly case because  detectives  wanted  to

19  question him about something else?

20      A    I don't believe so.

21      Q    When  you  suggested  to  the  parents  that  they

22  leave and go buy food for their children, is it  fair

23  to say that's because  you  knew  their  children  were

24  going to be there for a few more hours?

25      A    I never suggested that.

703

REYNOLDS - PEOPLE - RECROSS - BERMAN

1

2    Q    What was it you said to the parents that

3 they could go buy food for their children?

4    A    I only informed them where they could go get

5 food.

6    Q    And that was about what time?

7    A    About 4:30, 4:20; after four.

8    Q    And is it fair to say that you informed the

9 parents where they could go get food because you

10 knew    after    your    conversation    with    Lieutenant

11 McInerney at 4:00, you knew that these kids were not

12 going home that night?

13    A    I informed them of it because I knew they

14 were walking out to get something to eat and instead

15 of sending them to the east side where there are no

16 stores open, I directed them to the west side where

17 there is a greater variety to get something to eat

18 and that they could get it quicker and come back.

19    Q    Is it fair to say that you understood that

20 you needed at least on parent per kid before you

21 could question the kid?

22    A    Again, I was not going to question them.

23    Q    I don't mean you, the police collectively--

24         MS. LEDERER:   Objection.

25         THE COURT:   Let him ask the question.

704

REYNOLDS - PEOPLE - RECROSS - BERMAN

1

2     Q   Did you understand that with a youth under

3 the age of sixteen, he can't be questioned without a

4 parent present?

5     A   That's correct.

6     Q   And did you understand that you needed at

7 least one parent per kid before the police could

8 question these kids?

9     A   I was not-- it wasn't my concern at that

10 time.

11     Q   When you learned at 4:00 from the Lieutenant

12 McInerney that these kids weren't going home, that

13 they were being kept for the Night Watch detective

14 to come and question them, did you tell that to Mr.

15 Lopez senior, to Steve Lopez' father?

16     A   No.

17     Q   Now, as to Mr. Lopez' father, he had been

18 called down to the precinct to come and pick up his

19 son; is that correct?

20     A   That's correct.

21     Q   Do you know when the police finally told him

22 that he wasn't going to be picking up his son?

23     A   No, I don't know.

24     Q   Between 4:00 when you learned that Steve

25 Lopez wasn't going home and 5:30 when you went back

705

REYNOLDS — PEOPLE — RECROSS — BERMAN

1   into the Juvenile Room to begin the interview with

2   Lamont McCall, did you ever tell the parents that

3   these kids aren't going home?

4       A   No.

5       Q   Isn't it fair to say you continued to leave

6   them with the impression that there's just a little

7   more paperwork to be done and then they will be

8   taking their kids home?

9       A   That's fair to say.

10      Q   Now, Miss Lederer went through--

11              THE COURT:  Excuse me, will you be much

12          more?

13              MR. BERMAN:  No, a minute or two.

14      Q   You went through some questions about how

15  many chairs were in that room and I think you said

16  there were at least four chairs, is that right?

17      A   At least four chairs.

18      Q   In other words, there were enough chairs for

19  yourself and three of the five kids to sit down at

20  one time?

21      A   No, I said there was four-- looking at the

22  diagram, I see there are four desks and I know there

23  are-- there's one chair for each desk, okay.  I

24  don't know the exact number, so I stated that

706

REYNOLDS - PEOPLE - RECROSS - BERMAN

1

2    because I know there is at least that many for the

3    amount of desks we have.  We had probably more.

4        Q    At that hour at night, one, two, three, four

5    in the morning, is it your testimony that the

6    parents were left out of the room because there were

7    not enough chairs for the parents?

8        A    That's not my testimony.

9        Q    Were there folding chairs in the precinct

10   that they could have been brought in for the

11   parents?

12       A    I don't think so, no.

13       Q    There were other chairs that could have been

14   used?

15            THE COURT:  That was not the reason, the

16       absence of chairs?

17            THE WITNESS:  No.

18       Q    The idea was to keep the parents from the

19   kids, is that right?

20       A    The idea was to let me do the paperwork as

21   quickly as possible without being interrupted.

22       Q    What prevented you from letting the kids sit

23   out in the waiting area, the same thing you did at

24   5:30?  What prevented you from doing that when the

25   parents first arrived?

707

1    REYNOLDS — PEOPLE — RECROSS — BERMAN

2    A    Security reasons.

3    Q    If it was safe to let them sit with their

4    parents from 5:30 on in the clerical area, why

5    wasn't it safe to have them sit with their parents

6    from 1:00 on in the clerical area?

7    A    A police officer was made available at that

8    time in the morning.  Earlier what could I do, go to

9    the desk officer to pull someone off patrol to watch

10   these kids?  What's more important?

11   Q    Did you ask?

12   A    No.

13   Q    At 1:30 when the parents were there, did you

14   go to the desk and ask if there was a way to have

15   someone go sit with the parents and watch the kids?

16   A    No.

17   Q    Were you more concerned with getting your

18   paperwork done?

19   A    Yes.

20        MR. BERMAN:  No further questions.

21        THE COURT:  Recess until 2:15.

22        (Luncheon recess.)

T11/LF 23

24   A F T E R N O O N   S E S S I O N

25        THE COURT CLERK:  Recalling calendar

708

COLLOQUY

four, Indictment 4762 of '89, Kharey Wise, Yusaf Salam, Antron McCray, Kevin Richardson, Steve Lopez, Michael Brisco and Raymond Santana.  Hearing continued.

THE COURT:  Mr. Moore, do you have any questions.

The issue we raised before applied to you, but in the future.  I don't know what standing you have as far as this witness, but in any case, since I allowed you, and there was no objection on cross, we will allow the recross.

(Witness resumed the stand.)

THE COURT CLERK:  Officer, you're still under oath.

THE COURT:  Go ahead.

RECROSS EXAMINATION

BY MR. MOORE:

Q  Officer Reynolds, in response to questions from the District Attorney, you stated that it was unusual to see ten or twelve black or Hispanic youths in the park at that particular time, am I correct?

A  I said on the street.

NYCLD_023454

P-APP002165

709

REYNOLDS — PEOPLE — RECROSS — MOORE

1

2      Q    On the street?

3      A    Yes.

4      Q    Now, Officer, this was the 19th of April of

5  this year, am I correct?

6      A    That's correct.

7      Q    That is within the season that is familiarly

8  known as spring, am I correct?

9      A    I guess so.  I don't know when it starts or

10  ends.

11      Q    What was the temperature that night?  Was it

12  in the 50's?

13      A    I don't recall.

14      Q    You were wearing a windbreaker, am I

15  correct?

16      A    I believe so.

17      Q    You weren't wearing a winter coat?

18      A    No.

19      Q    It wasn't snowing, was it?

20      A    Excuse me?

21      Q    It was not snowing, was it?

22      A    No.

23      Q    Was it what you would call a pleasant

24  evening?

25            MS. LEDERER:  Objection.

NYCLD_023455

P-APP002166

710

REYNOLDS — PEOPLE — RECROSS — MOORE

2      THE COURT:   I'll allow it.

3      A    I don't know what you mean by pleasant.

4  Weather wise?

5      Q    Yes, weather wise.

6      A    I guess so.   I don't really recall.

7      Q    And in response to a question from Mr.

8  Rivera, you had stated that you observed certain

9  apartment buildings, I think, on the western side of

10  Central Park West; am I correct?

11      A    I told him I was aware that there were

12  buildings there.

13      Q    And you are also aware that there are blacks

14  and Hispanics who live in those buildings?

15      A    That's correct.

16      Q    So, based on those factors are you stating

17  it is unusual to see a group of blacks and Hispanics

18  walking on the street of Central Park West in the

19  spring?

20      A    Yes.   Usually you'll see a group hanging

21  out.   Usually you don't see the group, an entire

22  group that large walking around.

23      Q    Now, Officer, you did not know where that

24  group was coming from, am I correct?

25      A    No, I assumed that they were coming from the

NYCLD_023456

P-APP002167

711

REYNOLDS - PEOPLE - RECROSS - MOORE

1

2  park.

3      Q    You assumed?

4      A    That was why I stopped them.

5      Q    What was your assumption based on?

6      A    On the radio runs that we got and the

7  descriptions of the people we were looking for.

8      Q    The radio runs said four or five blacks or

9  Hispanics had attacked Mr. Loughlin, am I correct?

10      A    That was one radio run.

11      Q    That was one radio run?

12      A    Yes.

13      Q    So, therefore, this group of ten or twelve

14  people could not refer to the same group that had

15  attacked Mr. Loughlin, could it?

16          MS. LEDERER:  Objection.

17          THE COURT:  Sustained.

18      Q    You did not personally observe where the

19  group was coming from?

20      A    That's correct.

21      Q    So, the group, in fact, could have been

22  coming from, say, Broadway and 96th Street; isn't

23  that correct?

24      A    Sure.

25      Q    Now, in response to a question, I think from

NYCLD_023457

P-APP002168

712

REYNOLDS - PEOPLE - RECROSS - MOORE

Mr. Berman, you had indicated that either Lopez or Santana had told you that they had come from a cinema, am I correct?

A   They stated-- one of them stated they had come from the movies.

Q   Yes, that's right.  Now, did you ask the gentleman who gave you that answer, did you ask what movie he had seen?

A   No, he stated the name.

Q   The answer is no, am I correct?

A   That is correct.

Q   Did you ask him what movie theater he had come from, yes or no?

A   No.

Q   And one of the young men had also stated he had just come from seeing a girlfriend, am I correct?

A   That's correct.

Q   You didn't ask him the name of his girlfriend, did you?

A   No.

Q   You didn't ask him where his girlfriend was living, did you?

A   No.

713

REYNOLDS - PEOPLE - RECROSS - MOORE

1

2   Q    And you stated that just based on their

3   answer, that one individual had come from the cinema

4   and one from his girlfriend's, just based on those

5   facts you tended to disbelieve them; am I correct?

6               MS. LEDERER:  Objection.

7               THE COURT:  Objection sustained.

8               That's not what he said.

T12/FR 9

10  Q    Well, did you believe or did you have any

11  reason-- when, for example, when one of the young

12  men said he had come from the cinema, did you have

13  any basis for disbelieving him?

14  A    Yes.

15  Q    What was that basis?

16  A    The basis was the amount of radio runs we

17  got with the description of the youths that were

18  committing these crimes in the park, and the fact

19  that they were part of a group that ran upon us.

20  Q    My question is, based on the answer alone

21  did you have any reason to disbelieve that the

22  answer he was giving you was untrue?

23  A    Yes.

24  Q    And that was based on anything he had said

25  but because of some radio run that you had heard, am

NYCLD_023459

P-APP002170

714
REYNOLDS - PEOPLE - RECROSS - MOORE

1
2    I correct?
3        A    That's correct.
4        Q    Now, you had also stated, Officer, at some
5    point in time you had placed both of these young men
6    in a police vehicle and had them transported to the
7    playground, I think it was?
8        A    No.
9        Q    You had put them in a police vehicle and
10   took them somewhere, am I correct?
11       A    They were taken somewhere.
12       Q    Somewhere where I think Sergeant Laile was?
13       A    That's correct.
14       Q    At the stage that they were placed in the
15   vehicle, at this particular moment of time were they
16   under arrest or not?
17       A    Well, that's really more of a technical
18   question as far as the law goes.  I placed--
19   handcuffs were placed on them and they were placed
20   in the vehicle.  My intention was that we had them
21   in custody.  It could be argued that they were under
22   arrest.
23       Q    Well, were they under arrest in your
24   opinion?
25       A    I did not consider them under arrest at that

NYCLD_023460

P-APP002171

715

REYNOLDS — PEOPLE — RECROSS — MOORE

2  time.

3      Q    You did not?

4      A    No.

5      Q    So, they were free to go?

6      A    No.

7      Q    So, they were not free to go and yet they

8  were not under arrest?

9      A    Well, again, this is my interpretation of

10 it.

11     Q    You also stated, Officer Reynolds, that you

12 could not do a showup at the playground, am I

13 correct?

14     A    That's correct.

15     Q    And what-- why was it you weren't able to do

16 a showup at that playground?

17     A    I believe it was the injuries to the

18 complainant.  He had-- one of his eyes were badly

19 damaged as a result of the assault upon him.

20     Q    But his other eye was functioning well, was

21 it not?

22     A    I don't know.  I wasn't at the hospital.

23     Q    Oh, but you didn't see the condition of Mr.

24 Loughlin at that particular point in time?

25     A    That's correct.

NYCLD_023461

P-APP002172

716

REYNOLDS - PEOPLE - RECROSS - MOORE

1

2      Q      There came a time later, the next day, as a

3  matter of fact, that you did visit Mr. Loughlin?

4      A      No.

5      Q      You did not?

6      A      No.

7      Q      Did you visit him two days later in the

8  hospital?

9      A      No.

10     Q      By the way, Officer, did you-- I represent

11 Kharey Wise who's the young man seated there.   Do

12 you recall--

13             THE WITNESS:   Which one, the one facing

14        away?

15             THE COURT:   The one facing the other

16        way?

17             MR. MOORE:   Kharey.

18     Q      Do you recall seeing him that night in that

19 group of young men?

20     A      You're asking me do I recall?

21     Q      Yes, do you recall?

22     A      No, I don't recall.

23             MR. MOORE:   Thank you.

24             No further questions.

25             THE COURT:   Mr. Diller.

NYCLD_023462

717

REYNOLDS — PEOPLE — RECROSS — DILLER

RECROSS EXAMINATION

BY MR. DILLER:

Q     Officer Reynolds, on direct examination-- I'm sorry, on redirect examination today and each of your last appearances here, which was Friday, you had testified with respect to what you characterized as a Juvenile Room; do you recall?

A     Yes, I do.

Q     Now, am I correct in understanding that with respect to the Central Park Precinct, the Juvenile Room is a room that you so designate rather than a room that is used only for that purpose?

        MS. LEDERER:  Objection.

        THE COURT:  I'll let him answer.

A     Could you repeat that?

Q     In other words, that room is used for multi-purposes?

A     That's correct.

Q     And the precinct has designated that as a Juvenile Room only when necessary, is that right?

        MS. LEDERER:  Objection.

        THE COURT:  I'll allow it.

        You mean they used it only when they had

        juveniles in custody?

718

REYNOLDS — PEOPLE — RECROSS — DILLER

1

2          MR. DILLER:  Yes.

3          THE WITNESS:  Yes.

4     Q     And when there are no juveniles in custody,

5     that room is used for other purposes, am I correct?

6     A     Yes.

7     Q     Now, am I correct in understanding that room

8     contains persons under the age of sixteen years of

9     age when arrested, basically?

10    A     Yes.

11    Q     And is it your understanding, Officer, that

12    when you have in custody one under sixteen years of

13    age, he's to be treated differently than one over

14    sixteen; is that your basic understanding?

15    A     I don't know what you mean by treated

16    differently.

17    Q     For one thing, he stays in the Juvenile

18    Room, isn't that so?

19    A     That's correct.

20    Q     And you also go about notifying parents, is

21    that correct?

22    A     Yes.

23          MS. LEDERER:  Objection.

24    Q     Now, what is your understanding as to the

25    significance of notifying parents?

719

REYNOLDS — PEOPLE — RECROSS — DILLER

1
2    MS. LEDERER:  Objection.

3    THE COURT:  Sustained.

4    Q    Officer, you've been a police officer now

5    for some eight years in New York City, haven't you?

6    A    That's correct.

7    Q    Am I correct that you had, during that

8    eight-year period, had occasion to work in different

9    precincts in the Borough of Manhattan?

10   A    Since the arrest?

11   Q    No, no, during your career.

12   A    Yes.

13   Q    And there are at least three or four

14   different precincts that you worked in?

15   A    No.

16   Q    How many did you work in?

17   A    In Manhattan?

18   Q    Or anywhere.

19   A    I was only assigned to two precincts.

20   Q    And are you familiar with the precincts of

21   other station houses other than Central Park?

22   MS. LEDERER:  Objection.

23   THE COURT:  Objection sustained.

24   Q    Would it be fair to say that the Central

25   Park Precinct is different and unique physically

720

REYNOLDS — PEOPLE — RECROSS — DILLER

2  than the other station houses about which you are

3  familiar?

4          MS. LEDERER:  Objection.

5          THE COURT:  Sustained.

6      Q    Now, you said on redirect examination that

7  there came a time that Mrs. Cuffy, Kevin

8  Richardson's mother, came to the entrance of the

9  Juvenile Room; do you recall that?

10     A    Yes.

11     Q    Do you recall what time it was that she

12  came?

13     A    I believe it was after twelve.

14     Q    Could it have been 11:30?

15     A    Yes.

16     Q    And you said, I believe on Friday, that she

17  sat in the clerical room; is that right?

18     A    Yes.

19     Q    And that was as per your instructions, is

20  that right?

21     A    Yes.

22     Q    Now, you also said, if I recall properly,

23  that you don't recall whether Kevin Richardson asked

24  to speak to his mother?

25     A    That's correct.

P-APP002177

721

REYNOLDS — PEOPLE — RECROSS — DILLER

1

2      Q      Do you recall if Mrs. Cuffy, Kevin's mother,

3  asked to speak to Kevin?

4      A      Again, I believe they had a brief

5  conversation in the room.  I don't-- she came into

6  the room.  I believe she said something to him and I

7  had a couple of words with her and then she went

8  back outside.

9      Q      What kind of words did you have with her?

10     A      Again, I don't recall.  It was a very brief

11  conversation.  I explained initially what was going

12  on and that was about it.

13

14          (Transcript continued on following page.)

15

16

17

18

19

20

21

22

23

24

25

NYCLD_023467

P-APP002178

T13-1f

722

REYNOLDS — PEOPLE — RECROSS — DILLER

1
2      Q      And what you explained is that Kevin
3  Richardson would be going home?
4      A      Yes.
5      Q      Now, there came a time when the others,
6  other than other suspects, other than Lamont McCall
7  were asked to leave the Juvenile Room; is that
8  correct?
9      A      Can you rephrase that?
10     Q      On redirect examination you testified that
11  there came a time when Lamont McCall was interviewed
12  privately in a Juvenile room and the others were
13  asked to leave; the other five were asked to leave
14  the Juvenile Room.  Do you recall that?
15     A      Yes.
16     Q      And they went into the clerical office; is
17  that right?
18     A      That's correct.
19     Q      And it was in that very office where Mrs.
20  Cuffy was; isn't that so?
21     A      Yes.
22     Q      And there were other parents there?
23     A      Yes.
24     Q      Now, where was Kevin, if you can recall, in
25  relation to Mrs. Cuffy in that clerical office, do

10/16/89

T13-1f

723

REYNOLDS — PEOPLE — RECROSS — DILLER

1

2  you know?

3    A    He was right next to her.  I  don't  recall

4  specifically if he was in front of her or behind her

5  or on top of her.  I don't recall.

6    Q         You  were watching the suspects in that

7  room, were you not?

8    A    Yes.

9    Q    Can you tell us that you saw Mrs. Cuffy  or

10 Kevin Richardson in a conversation?

11   A    In the clerical office?

12   Q     In the clerical office.  That's where you

13 were.

14   A    Again, each child was with  their  parents.

15 He  probably  had  conversation with her.  It wasn't

16 something that I, you know, was consciously watching

17 or was looking for.

18   Q    You said  probably.  You  have  no  direct

19 recollection about that?

20   A    Right.

21   Q    And you didn't instruct Mrs. Cuffy in any

22 regard with respect to Kevin on that  occasion,  did

23 you?

24   A    Instruct her in what?

25   Q    That she had a right to a lawyer and things

10/16/89

NYCLD_023469

P-APP002180

T13-1f

724

REYNOLDS — PEOPLE — RECROSS — DILLER

1
2      of that nature.

3          A     No.

4          Q     Now, you testified a while back on redirect

5      examination   that   no one was crying with respect to

6      the suspects.

7                    THE COURT:  Excuse me.    No   one   was

8      what?

9                    MR. DILLER:  No one was crying.

10         Q     Do you remember so testifying?

11         A     Right.

12         Q      At the point at which you related no one

13     was crying, didn't you indicate to those  youngsters

14     that they were all going home?

15         A     Yes.

16         Q      And therefore there was no need to cry if

17     they were going home.

18                   MS. LEDERER:  Objection.

19                   THE COURT:  Objection sustained.

20         Q     Now, directing your attention to after 4:00

21     is when you got the call from Lieutenant  McInerney.

22     Do you recall that?

23         A     Yes.

24         Q      Did Mrs. Cuffy continue to remain in the

25     clerical office?

10/16/89

T13-1f

725

REYNOLDS - PEOPLE - RECROSS - DILLER

2  A     After I was --

3  Q     After you received the call.

4  A     Yes.

5  Q     That the female jogger had an incident; is
6  that right?

7  A     I believe so.

8  Q         And  where was Kevin Richardson at that
9  point?

10  A     He was in  the  clerical  --  I  mean,  the
11  Juvenile room.

12  Q         And at that point you had known he wasn't
13  going home; isn't that right?

14  A     No.

15  Q     Is that right?

16  A     No.

17  Q     That's not right?

18  A     No.

19  Q     When did you determine  he  was  not  going
20  home?

21  A         It  was  probably  once he had made the
22  statement to detectives that he was involved in  the
23  attack on the female jogger.

24  Q     Now, what time was that?

25  A     That was after 8:00.

10/16/89

NYCLD_023471

P-APP002182

T13-1f

726

REYNOLDS — PEOPLE — RECROSS — DILLER

1

2   Q   8:00 in the morning?

3   A   Yes.

4   Q   Where was Mrs. Cuffy during this eight-and-
5   a-half hour period?

6   A   I don't understand your question.

7   Q   In other words, we're now to 8:00 in the
8   morning.

9   A   Right.

10   Q   And where is Kevin Richardson's mother at
11   that stage?

12   A   I assume she was with him during the
13   interview.

14   Q   You say you assume. What is the basis of
15   your assumption?

16          MS. LEDERER:  Objection.

17          THE COURT:  I will allow it.

18   A   That none of the juveniles were questioned
19   without their parents.

20   Q   Did you see Mrs. Cuffy in the same room
21   with the detectives?

22   A   No, I wasn't there.

23   Q   So you're saying -- so only because you
24   assume, but you had not seen anything; is that
25   right?

10/16/89

NYCLD_023472

P-APP002183

T13-1f

727

REYNOLDS — PEOPLE — RECROSS — DILLER

1

2       A       That's right.

3               MR.    DILLER:      I    have    no    further

4       questions.

5               MR. JOSEPH:   I have no questions.

6               MR. RIVERA:   Your Honor?

7               THE COURT:   Mr. Burns?

8               MR. BURNS:   I have no questions,   your

9       Honor.

10              THE COURT:   Mr. Rivera?

11              MR. RIVERA:   I have a few questions.

12  RECROSS EXAMINATION

13  BY MR. RIVERA:

14      Q           Officer,   you   testified   on   redirect

15  examination   that   there   was   some   radio   runs   in

16  reference   to   a   playground,   -- a playground and a

17  ball field, is that correct?

18      A     In regard to what?

19      Q       That   you   had   received   radio   runs   in

20  reference   to individuals running at a ballfield and

21  at a playground; is that correct?

22      A     No.

23      Q     What was your testimony   about   individuals

24  being   spotted   at   about   12:00   in   the evening  --

25  withdrawn.

10/16/89

NYCLD_023473

P-APP002184

T13-1f

728
REYNOLDS — PEOPLE — RECROSS — RIVERA

1

2        Did you hear on the radio, radio runs about
3   individuals being spotted at a lake and at a
4   ballfield?

5        A    Could you rephrase that?

6        Q        Did you hear on your radio about 11:00 in
7   the evening of April 19th, a radio run about
8   individuals being spotted at a lake -- withdrawn --
9   at a pond and at a playground?

10       A    No.

11       Q    What did you specifically hear about at
12   that time?

13       A    At 11:00?

14       Q    Yes.

15       A        We were on our way to the stationhouse at
16   11:00.

17       Q    Did you have your radio on?

18       A    Yes, I did.

19       Q    And you didn't hear any radio runs about
20   individuals being spotted at a pond and at a
21   ballfield?

22       A    Not at 11:00.

23       Q        Didn't you hear any radio runs about
24   individuals being spotted at a pond and at a
25   ballfield?

10/16/89

NYCLD_023474

P-APP002185

T13-1f

729

REYNOLDS — PEOPLE — RECROSS — RIVERA

1

2    A    At what time?

3    Q    At about 10:30 to 11:00 that evening.

4    A    Yes, I did.

5    Q    About what time was that?

6    A    You are saying at a pond and where else?

7    Q    A ballfield.

8    A    Yes.

9    Q    What time would that have been, Officer?

10   A    That was shortly after we spotted the group
11   and they ran.

12   Q    Could you identify on this  map  where  the
13   pond and ballfield are located?

14            MS.   LEDERER:    The  record  should
15        reflect Exhibit 7.

16            THE COURT:  Yes.

17   Q    On Exhibit 7.

18   A    This right here is the pond, and  here  are
19   the  ballfields  on  which they were speaking of, in
20   this area here.  (Indicating)

21            MS.  LEDERER:    The   record   should
22        reflect where the witness is indicating.

23            THE  WITNESS:   The north meadow, that
24        is the ballfield, and the pool here is what
25        the pond was, where they were being chased.

10/16/89

NYCLD_023475

P-APP002186

T13-1f

730

REYNOLDS — PEOPLE — RECROSS — RIVERA

2      (Indicating)

3              MR. RIVERA:  Thank you.  You  may  sit

4      down.

5              (Witness resumes the stand)

6      Q         You  testified  earlier  today  that  about

7   10:30 you  saw  a  group  of  10  or  15  blacks  and

8   hispanics  walking  northbound  on  Central  Park  West;

9   is  that  correct?

10     A      That's  correct.

11     Q      Okay,  how  many  hispanics  did  you  see

12  Officer?

13     A         I  don't  recall.  I  didn't  break  down  the

14  group  into  blacks  and  hispanics.

15     Q      How  were  you  able  to  identify  any  hispanics

16  walking  in  that  group?

17     A      I  wasn't  able  to  identify  any  until  we  had

18  stopped  them  and  I  was  able  to  ——  I  saw  Raymond

19  Santana  and  Steven  Lopez.

20     Q      And  that's  when  you  were  able  to  identify

21  that  there  were  blacks  and  hispanics  in  that  group,

22  is  that  correct?

23     A      I  knew  they  were  hispanics.  I  surmised

24  that  the  rest  were  black.  They  appeared  to  be  black

25  as  they  were  running.

10/16/89

NYCLD_023476

P-APP002187

T13-1f

731

REYNOLDS — PEOPLE — RECROSS — RIVERA

1

2 Q Prior to the time that you stopped Santana

3 and Lopez, you were not aware of this amorphous

4 group as containing blacks and hispanics; is that

5 correct?

6 A I assumed they were blacks and hispanics.

7 Q But you could not identify particular

8 individuals as being hispanics prior to you stopping

9 Raymond Santana and Steven Lopez; is that correct?

10 A Well, when you say -- again, with

11 hispanics, you have black hispanics and you have

12 white hispanics. Any of the blacks that I saw could

13 have been black hispanics. It is just a matter of

14 what language they spoke.

15 Q If they were black hispanics, Officer,

16 would you have classified them as blacks or

17 hispanics?

18 A At what point?

19 Q At any point in time. In other words, if

20 you were to issue a radio run at that point in time,

21 would you identify the group as being a black group

22 or a hispanic group?

23  MS. LEDERER: Objection.

24  THE COURT: Objection sustained.

25 Q When you arrested -- withdrawn.

10/16/89

NYCLD_023477

P-APP002188

T13-1f

732

REYNOLDS - PEOPLE - RECROSS - RIVERA

1    You did not see Raymond Santana commit an

2

3    act of unlawful assembly, is that correct, Officer?

4    A    I saw him unlawfully assembled with a group

5    that had previously committed an assault and

6    harassed other people.

7    Q    So it's your testimony that when my client

8    was walking up the street of Central Park West, he

9    was committing an act of unlawful assembly?

10    A    If that's the definition of the law.

11    Q    I'm asking if that is your testimony.

12    A    I believe it is.

13    Q    Was my client acting in tumultuous conduct

14    when he was walking on Central Park West?

15    A    He was walking with the group acting in

16    violent and tumultuous behavior.

17    Q    In your presence they acted in tumultuous

18    behavior?

19    A    I did not say that.

20    Q    They did not engage in any violent

21    tumultuous behavior that you observed; is that

22    correct?

23    A    That's correct.

24    Q    Officer, you were the arresting officer for

25    Raymond Santana; is that correct?

10/16/89

T13-1f

REYNOLDS — PEOPLE — RECROSS — RIVERA

1

2   A     That's correct.

3   Q       There was a Sergeant Lailo, is that his

4   name?

5   A     Laile; L-A-I-L-E.

6   Q     There was a Sergeant Laile that responded

7   to 102nd Street and Central Park West; is that

8   correct?

9   A     No.

10   Q     There was a Sergeant Laile -- withdrawn.

11       Did Sergeant Laile respond to 102nd Street

12   and Central Park West?

13   A     No.

14   Q      Did Sergeant Laile respond to 100th Street

15   and Central Park West?

16   A     Yes.

17   Q     Was there a Sergeant that responded to

18   102nd Street and Central Park West prior to you

19   transporting my client to 100 Street and Central

20   Park West?

21   A     Yes.

22   Q     And what's the name of that Sergeant?

23   A     Sergeant Wheeler.

24   Q       And you placed Mr. Santana in Sergeant

25   Wheeler's vehicle; is that correct?

※ 10/16/89

T14-fr

734

                    REYNOLDS - PEOPLE - RECROSS - RIVERA

1
2       A       Can you repeat that?

3       Q       You placed my client, Raymond  Santana,  in

4   Sergeant Wheeler's vehicle?

5       A       Yes.

6       Q       Did you have a conversation with Sergeant

7   Wheeler prior to placing my client in his car?

8       A       I don't recall.  If I told him anything  it

9   would  be,  I  guess,  that I'd meet him back at 100

10  Street and Central Park West.

11      Q       Did Sergeant Wheeler authorize you to place

12  my client under arrest?

13              MS. LEDERER:  Objection.

14              THE COURT:  Objection sustained.

15      Q       Did Sergeant Wheeler instruct you to  place

16  my client, Raymond Santana under arrest?

17              MS. LEDERER:  Objection.

18              THE COURT:  Sustained.

19      Q       You placed Raymond Santana under arrest

20  pursuant to your own authority; is that correct?

21              MS. LEDERER:  Objection.

22              THE COURT:  He's answered that so many

23          times.

24              MR. RIVERA:  He testified on  redirect

25          that  there  was  a Sergeant that responded

10/16/89

NYCLD_023480

P-APP002191

T14-fr

735

REYNOLDS — PEOPLE — RECROSS — RIVERA

1
2          and after he spoke to the Sergeant he
3          placed my client under arrest.
4               THE COURT:  I'll let him answer.
5               THE WITNESS:  I had conferred with my
6          supervisor regarding the facts and
7          circumstances to the incident, and decided
8          to place him under arrest with my
9          supervisor.
10     Q          This was after you conferred with your
11  supervisor; is that correct?
12     A     I had it in my mind that I was going to
13  place him under arrest.
14     Q     Did you place my client under arrest prior
15  to conferring with your supervisor?
16               MS. LEDERER:  Objection.
17               THE COURT:  I'll let him answer.
18     A     If you consider custody arrest, then you
19  can say he was under arrest.  I -- as I had stated
20  before, we had him in custody.  We placed handcuffs
21  on him and we took him to 100 Street and Central
22  Park West.
23     Q     This was before you spoke to Sergeant
24  Wheeler or after you spoke to Sergeant Wheeler?
25     A     What?

10/16/89

NYCLD_023481

P-APP002192

T14-fr

736

REYNOLDS — PEOPLE — RECROSS — RIVERA

1

2      Q      That you placed the handcuffs on my client

3  and took him to 100 Street and Central Park West?

4      A      I put the handcuffs on  probably  before  I

5  spoke to Sergeant Wheeler.

6      Q          Now, you testified also on redirect that

7  there was  a  condo  located  on  approximately  100

8  Street and Central Park West; is that correct?

9      A      A condo or cooperative.

10      Q          Condo or co-op.  How tall a structure is

11  that, Officer?

12      A      I don't know.

13      Q      Is it a 20 or 30 story structure?

14      A      I don't know.

15      Q      Or is it a four or five story structure?

16      A      Again, I do not know.

17      Q      You never observed that structure; is  that

18  correct?

19              MS. LEDERER: Objection.

20              THE COURT:  I'll let him answer.

21      A          I  looked  at it, I never sat there and

22  counted the floors.

23      Q      Is it a big  structure  or  a  medium  size

24  structure?

25      A      It appears to be pretty large.

10/16/89

NYCLD_023482

P-APP002193

T14-fr

737

1          REYNOLDS - PEOPLE - RECROSS - RIVERA

2      Q          And   you   would   have   no idea how many

3   families live at that condo?

4      A      No.

5      Q      Would you know how many hispanics   live   in

6   that condo?

7      A      No.

8      Q      Would you know how many blacks live in that

9   condo?

10      A      No.

11      Q      Have you ever seen any hispanics and blacks

12   in that condo?

13      A      You mean entering and coming and going?

14      Q      That's right.

15      A      Probably.

16      Q          When you arrested my client, Mr. Santana,

17   you didn't ask him if he had   taken   any   drugs;   is

18   that right?

19                 MS. LEDERER:   Objection.

20                 THE COURT:   Objection sustained.

21      Q          You arrested my client, Mr. Santana, did

22   you observe any smell of alcohol on his breath?

23                 MS. LEDERER:   Objection.

24                 THE COURT:   Sustained.

25      Q      Now, it was   your   intention   to   take   Mr.

10/16/89

T14-fr

738
REYNOLDS - PEOPLE - RECROSS - RIVERA

1

2   Santana to a show-up in Central Park with Mr.
3   Loughlin; is that correct?
4       A    Excuse me?
5       Q    It was your intention to take Mr. Santana
6   to a show-up in Central park, is that correct, when
7   you arrested him?
8       A    Possibly to bring Mr. Loughlin to him.
9       Q    Or bring Mr. Loughlin to him; is that
10  correct?
11      A    Yes.
12      Q    That would be for the purpose of a show-up;
13  is that correct?
14      A    That's correct.
15      Q    And were you aware that a show-up had
16  occurred with Mr. Loughlin shortly before you
17  arrested Mr. Santana?
18      A    No.
19      Q    Were you aware of any show-up with Mr.
20  Loughlin?
21      A    No.
22      Q    Involving Mr. Loughlin?
23      A    No.
24      Q    And who advised you not to conduct a show-
25  up of Mr. Loughlin?

10/16/89

NYCLD_023484

P-APP002195

T14-fr

739

REYNOLDS — PEOPLE — RECROSS — RIVERA

1

2    A    I was never advised not to have a show-up.

3    Q    Okay.

4         You testified earlier that there came a

5    point in time that you were advised -- that you were

6    aware that Mr. Loughlin had one eye closed; is that

7    correct?

8    A    I said his eye was severely injured due to

9    the assault committed upon him.

10   Q    Who advised you of the severe injury to Mr.

11   Loughlin's eye?

12   A    I believe that was Sergeant Wheeler.

13   Q    And did Sergeant Wheeler advise you that he

14   had conducted a show-up at Central Park involving

15   Mr. Loughlin?

16   A    I don't believe so, no.

17   Q    So at this point in time you were not aware

18   of any show-ups involving Mr. Loughlin; is that

19   correct?

20   A    That's correct.

21   Q    Did you advise my client's grandmother that

22   my client was a juvenile and he'd be treated as a

23   juvenile, did you use words of that significance to

24   my client's grandmother?

25   A         If I did that, that would have been in

10/16/89

NYCLD_023485

P-APP002196

T14-fr

740

REYNOLDS — PEOPLE — RECROSS — RIVERA

regard to the assault on Mr. Loughlin.

Q     Did you advise my client's grandmother that my client was arrested for the assault on Mr. Loughlin?

A     I believe so.

Q     You told her that he had been arrested for the assault on Mr. Loughlin?

A     That's what he was originally arrested for.

Q     This is when you spoke to my client's grandmother at 4:30, 5:00, is that correct?

I represent Raymond Santana if that helps your recollection.

A     I believe I waited for her to come in to explain everything to her. I told her he was under arrest and he needed a parent or guardian to come down so that we could release him to that person.

Q     And at that point in time you advised the grandmother as to what the charges were on Mr. Santana; is that correct?

A     Over the phone?

Q     In the precinct; is that correct?

A     I believe so.

Q     And you did not advise her what the charges were over the phone; is that correct?

10/16/89

NYCLD_023486

P-APP002197

T14-fr

741

REYNOLDS — PEOPLE — RECROSS — RIVERA

1
2      A     I believe so, I'm not exactly sure.

3      Q     But it's not true that Mr. Santana was

4  arrested for -- was under arrest for the assault of

5  Mr. Loughlin; is that correct?

6                  MS. LEDERER:  Objection.

7                  THE COURT:  Objection sustained.

8                  We had it so many times.

9                  MR. RIVERA:  He testified now that he

10                 advised the grandmother that he was under

11                 arrest.

12                 THE COURT:  What's your question?

13     Q     The question is was Mr. Santana under

14  arrest at 4:30 in the morning for the assault on Mr.

15  Loughlin?

16                 MS. LEDERER:  Objection.

17                 THE COURT:  I'll let him answer.

18     A     Yes.

19     Q     He was under arrest at this point in time?

20     A        I'm sorry, he's under arrest for an

21  unlawful assembly.  It's my mistake.

22     Q     So let's backtrack, Officer.

23            I represent Raymond Santana.  He was

24  arrested for unlawful assembly?

25     A     Right.

10/16/89

T14-fr

742

REYNOLDS — PEOPLE — RECROSS — RIVERA

1

2          Q          The only charge you had placed under him

3    was unlawful assembly?

4          A          Correct.

5          Q          You testified earlier today that you had

6    advised his grandmother that Mr. Santana was

7    arrested for an assault on Mr. Loughlin; that's not

8    correct?

9          A          Right.

10         Q          The only charge you advised her of was that

11   he was under arrest for unlawful assembly, is that

12   correct?

13         A          That's correct.

14         Q          And you also told her that he was a

15   juvenile and he would be treated as a juvenile; is

16   that correct?

17         A          I believe I did.

18         Q          You also told her that he would be released

19   in a very short period of time?

20         A          I believe so.

21         Q          And that he would be released to her

22   custody within a very short period of time?

23         A          I believe I did.

24         Q          Did you ever tell her that the detectives

25   were coming over to question Raymond Santana?

10/16/89

NYCLD_023488

P-APP002199

T14-fr

743

REYNOLDS - PEOPLE - RECROSS - RIVERA

1

2    A     At one point I might have.   I'm   not   sure

3    what I told her.

4    Q     Did you also tell her that Raymond Santana

5    would be released in a short period of   time   after

6    the detective questioned Mr. Santana?

7    A     I might have.

8    Q     Did  you also tell her that he would be

9    going   home   after   the   detectives   questioned   Mr.

10   Santana?

11   A     I might have said that.

12   Q     Officer, what time did you go to meal on

13   that date?

14                 MS. LEDERER:   Objection.

15                 THE   COURT:   How   is   this   proper

16   recross?

17                 MR.   RIVERA:   I thought the Court was

18   giving me leeway?

19                 THE COURT:  You had an hour   of   cross

20   examination.

21                 MR.   RIVERA:   This   is   the   last

22   question, your Honor.

23                 THE COURT:  All right,  I'll  let  you

24   ask it.

25   Q     What time did you go to meal on the night

10/16/89

NYCLD_023489

P-APP002200

```
                                                              744
 1            REYNOLDS - PEOPLE - RECROSS - RIVERA
 2   f April 19th?
 3        A      I went to meal at 8:00.
 4        Q      And what time did you come back?
 5        A      Nine.
 6             MR. RIVERA:     No   further   questions,
 7   your Honor.
 8             THE COURT:  Mr. Maddox?
 9             MR. MADDOX:      Judge, I do believe I
10   have standing.
11             THE COURT:  I  don't  think  you  have
12   standing, but we didn't raise it initially.
13   I  said  I  would  let  you cross because I
14   allowed you to cross.
15             MR. MADDOX:  I just wanted you to know
16   I don't have any questions, but that's from
17   a lawyer's point of view.
18             THE COURT:  Do you have anything else?
19             MS. LEDERER:  No.
20             THE COURT:  Thank you, Officer.
21             (Witness, Police Officer Eric Reynolds
22   exits the courtroom.)
23             THE COURT:  Who's next?
24             MS. LEDERER:  Police Officer Powers.
25   P.  O.  R O B E R T   P O W E R S, having been
```

10/16/89

NYCLD_023490

P-APP002201

FMRRN TRANSCRIPT

NATIONWIDE: 1-800-255-5040

CORBY GROUP  N.J.

COLLOQUY                                      3303

2   and all sworn jurors are present.

3          THE   COURT:   Good   morning,   ladies

4   and gentlemen.

5          Call your next witness, please.

6          MS. LEDERER:  Detective Taglioni.

7          THE   COURT CLERK:   Do   you   solemnly   swear

8   the   evidence   you   will   give   the   Court   and

9   jury   shall   be   the   truth,   the   whole   truth,

10   nothing but the truth, so help you God?

11          THE WITNESS:  I do.

12          THE   COURT   OFFICER:   In   a   loud,   clear

13   voice,   state   your   name,   spelling   your   last

14   name,   give   your   shield   and   current   assignment.

15          THE   WITNESS:  Detective   John   R.   Taglioni,

16   T-A-G-L-I-O-N-I,   shield   3685.   I'm   assigned

17   to the Manhattan North Homicide.

18          THE COURT OFFICER:   People's witness.

19   DETECTIVE   J O H N   R.   T A G L I O N I,   called   as

20       a   witness   by   the   People,   having   been   duly   sworn

21       by the court clerk, testified under oath as follows:

22   DIRECT EXAMINATION

23   BY MS. LEDERER:

24       Q    Detective,   how   long   have   you   been   with   the

25   New York City Police Department?

TAGLIONI - PEOPLE - DIRECT - LEDERER          3304

1

2     A     Twenty-one years.

3     Q     And how long have you been a detective?

4     A     Seven years.

5     Q     I'd like to direct your attention, please,

6   to April 20 of 1989.

7           Were you working on that date?

8     A     Yes, I was.

9     Q     What tour of duty did you work on April 20th?

10    A     I was doing a four by one.  That's 4:00 PM

11  to 1:00AM in the morning

12    Q     Directing your attention to approximately

13  10:45PM, on the evening of April 20th, 1989.  Where

14  were you at about that time on that date?

15    A     The 20th Precinct Stationhouse.

16    Q     Were you given an assignment at that time?

17    A     Yes.

18    Q     What was the assignment you were given?

19    A     I was given an assignment to go to

20          , to try and locate a Yusef Salaam.

21    Q     Do you recall who gave you that assignment?

22    A     Yes, it was one of my supervisors, I'm not

23  sure whether it was a sergeant or lieutenant.

24    Q     And did you go to                        at that

25  time?

FMRRN TRANSCRIPT

NATIONWIDE: 1-800-255-5040

CORBY GROUP  N.J.:

FMRRN TRANSCRIPT

NATIONWIDE: 1-800-255-5040

CORBY GROUP  N.J.

TAGLIONI - PEOPLE - DIRECT - LEDERER          3305

1

2      A    Yes, I did.

3      Q    With whom did you go?

4      A    I went with Detective Jack Freck, Detective

5   Richard Bear and Detective Rudy Hall.

6      Q    At the time you were given the assignment,

7   were any other names, other than Yusef Salaam, mentioned

8   to you?

9      A    Yes, I heard the name Kharey.

10     Q    How many vehicles did the detectives take

11  when they went to                    ?

12     A    We took two.

13     Q    What did you do upon arriving at

14      ?

15     A    I went to the      floor, to apartment

16     Q    Did anyone go with you to that location,

17  to that apartment?

18     A    Yes, the same three detectives.

19     Q    And what happened when you got to apartment

20      ?

21     A    I knocked on the door and the door was answered

22  by a young lady.

23     Q    What, if anything, did you say when the door

24  was answered by a young lady?

25     A    I introduced ourselves as police officers.

TAGLIONI - PEOPLE - DIRECT - LEDERER          3306

1

2      I asked her if Yusef Salaam lived there. She replied

3      he did. I then asked if he was home. She replied he

4      wasn't. I then asked if her parents were home. And

5      she replied they were not.

6          Q    You saw there was a young lady that answered

7      the door. Approximately how old did that young lady

8      appear to you?

9          A    She was in her teens. I'm not sure of her

10     age, maybe 16, 17 years old.

11         Q    At the time you and the other detectives

12     were at the door, were you or any of the other detectives

13     in uniform?

14         A    No.

15         Q    How ere you dressed?

16         A    Approximately the same way I am now.

17         Q    Did you or any of the other detectives have

18     guns drawn at that time?

19         A    No, we did not.

20         Q    What happened after you had the conversation

21     that you just described?

22         A    While we were talking to the young lady -

23     by the way, she identified herself as Yusef's sister

24     -- three males started walking down the hallway towards

25     the apartment.

AM006417
NYCLD_018543

P-APP002205

TAGLIONI - PEOPLE - DIRECT - LEDERER          3307

Q    When   you   say   three   males,   did   you   notice anything   about   the   approximate   ages   of   the   people   that were walking towards you?

A    Yes,   they   all   appeared   to   be   in   their   late teens.

Q    What,   if   anything,   did   you   do   when   you   saw these three males walking towards you?

A    I   stepped   away   from   the   door   and   approached the   three   males.   I   stopped   them,   I   asked   them   their names.   I   asked   the   first   one   his   name.   He   gave   me his name as Yusef Salaam.

Q    You see Yusef Salaam seated here in court?

A    Yes, I do.

Q    Will you please point him out?

A    Sitting   there   with   the   dark   gray   suit   and red tie.

MS.   LEDERER:   The   record   should   reflect the witness has identified Yusef Salaam.

THE COURT:  Yes.

Q    You   indicated   that   you   asked   Yusef   Salaam his   name,   and   he   indicated   his   name.   Did   you   have   any further conversation with him at that point?

A    Yes,   I   did.   I   asked   him   his   age.   He   replied that   he   was   16   years   of   age.   I   asked   him   if   he   had

FMRN TRANSCRIPT

NATIONWIDE: 1-800-255-5040

CORBY GROUP  N.J.

TAGLIONI - PEOPLE - DIRECT - LEDERER         3308

any identification on him, and he did. He produced a plastic card, a transit card.

Q    And when you say he produced a transit card, what, if anything, did you see him do with respect to that transit card?

A    He removed it from his pocket and handed it to me.

Q    And did you have occasion to look at the transit card?

A    Yes, I did.

Q    Where were the other detectives at the time you had this conversation with Yusef Salaam?

A    I believe Detective Hall was to my right and Detective Bear and Detective Freck were to my left.

Q    And where were the other two individuals, other two males you had seen with Yusef Salaam?

A    They were to his right.

Q    What were the other --

THE COURT:  I'm sorry, his, meaning who?

Read the answer.

You want it read back?

MR. BURNS:  I heard him say his right.

THE COURT:  That's not an objection.

TAGLIONI - PEOPLE - DIRECT - LEDERER          3309

          Go ahead.

     Q    What were the other detectives doing while
you spoke to Yusef Salaam?

     A    They were speaking to the other two gentlemen.

          MS. LEDERER:  I'd ask at this time to
          have this marked as People's 174 for identifica-
          tion.

          (Marked as requested.)

     Q    At the time you had the conversation you
described with Yusef Salaam -- how old did Yusef Salaam
appear to you as you spoke to him in the hall of


          MR. BURNS:  Objection.

          THE COURT:  I'll allow it.

     A    He looked to be in his late teens.

     Q    What lead you to that impression?

     A    His facial hair, his height.

          MS. LEDERER:  I'd ask the witness please
          be shown People's 174 for identification.

          (Handing.)

     Q    Do you recognize People's 174 for identification?

     A    Yes, I do.

     Q    What do you recognize that to be?

     A    This is a pass, transit pass, student pass,

T3-JM-TS

3337

Taglioni - People - Cross - Burns

2  Q   When you say you're not sure, is that the same thing
3  as saying you don't know which one told you?

4          MS. LEDERER:  Objection.

5          THE COURT:  Objection sustained.

6  Q   Do you know which one told you?

7  A   No, I do not.

8  Q   And the same person who told you to bring Yusef into
9  the 20th Precinct, was that also the same person who told  you
10 to bring Carey to the precinct?

11 A   Yes, it was.

12 Q       And  how  was  it  determined  that you would be
13 accompanied by detective Freck, detective Bear  and  detective
14 Hall (phonetic)?

15 A   They are part of my team.

16 Q       Were they present when you were told to bring in
17 Yusef and Carey?

18 A   Yes, they were.

19 Q   Looking at People's Exhibit  174  in  Evidence,  the
20 portion which deals, which relates to the name and the address
21 and the age, that is what is printed?

22 A   That is what is hand printed, yes.

23 Q   Is there a signature there too?

24 A       I'm sorry -- you said -- the last question, I may
25 have misunderstood you there.

T-1    Reynolds-Ppl-direct                    794

1

2        A    Yes.

3        Q    Where did you see officer Alvarez?

4        A    I saw him at the, approximately the East Drive and

5    102nd Street.

6        Q    And was he in a car or was he outside of a car?

7        A    I believe he was in his car.

8        Q    Who did you see with officer Alvarez.

9        A    They had a male complainant in the back of the car.

10        Q    How long did you speak to officer Alvarez?

11        A    Say about two, three minutes.

12        Q    After you had that conversation with officer

13    Alvarez, what did you do?

14        A    We continued to drive around the park in search of

15    the group that committed the assault.

16        Q    And what area, generally what area did you search?

17        A    The north end of the park.

18        Q    While you were searching the north end of the park,

19    did there come a time where you heard another radio

20    transmission?

21        A    Yes.

22        Q    And what was that radio transmission?

23        A    There was, the dispatcher had given us a message

24    that there were thirty to forty males harassing people

25    inside the park.


                              H. C. Davis

P-APP002210

T-1    Reynolds-Ppl-direct                    795

1

2        Q    When you say the dispatcher, do you know who you

3   heard?

4        A    I don't know the person whose name it was, just

5   that there was, you know.

6        Q    When you say dispatcher, are you referring to

7   somebody from Central Park or is this from the 911?

8        A    From 911.

9        Q    At approximately what time did you receive that

10  radio transmission?

11       A    It was a little after the original one that officer

12  Alvarez put over.

13       Q    What did you do after you received that radio

14  transmission?

15       A    I continued to look through the park.

16       Q    Did you see any people matching the descriptions

17  that you had received?

18       A    No.

19       Q    Did you see any police cars while you were

20  canvassing?

21       A    Yes.

22       Q    And approximately how many other police cars did

23  you see?

24       A    I'd say about eight, nine cars.

25       Q    And where did you see those police cars?


                        P. C. Davis

```
1                    T-1   Reynolds-Ppl-direct                    796
2       A    I saw them all throughout the ball fields and on
3  the pedestrian paths and roadways throughout the park.
4       Q    Did there come a time where you received a third
5  radio transmission?
6       A    Yes.
7       Q    And what was that transmission?
8       A    That was from Sgt. Lale (phonetic).
9       Q    Who is Sgt. Lale?
10      A    He was our supervisor in Anti Crime.
11      Q    And at approximately what time did you receive that
12 radio transmission?
13      A    About quarter to ten.
14      Q    What if anything did you do --
15           What was that radio transmission?
16      A    He, he had a group of youths over at 100th Street
17 and Central Park West, inside the playground and he'd wanted
18 officer Alvarez to bring over the complainant for a show up
19 to see if they were the same people that committed the
20 assault against him.
21      Q    And did you go to that playground at 100th Street?
22      A    Yes.
23      Q    Did you see officer Alvarez there?
24      A    Yes.
25      Q    Did you see a number of youths at that playground?
```

H. C. Davis

```
1                    T-1    Reynolds-Ppl-direct                797

2         A     Yes.

3         Q     And was officer, excuse me, was the complainant

4    with officer Alvarez, given an opportunity to see those

5    people?

6         A     Yes.

7         Q     Were you present at that time?

8         A     Yes, I was.

9         Q     Did you actually have any conversation or interview

10   the complainant who was with officer Alvarez?

11        A     No.

12        Q     How long did you stay at that playground?

13        A     I'd say about ten minutes, fifteen minutes, maybe.

14        Q     Where did you go when you left the playground?

15        A     We continued to canvass the northern end of the

16   park.

17        Q     And did you see any young males?

18        A     No.

19        Q     Did you see any police cars?

20        A     Yes.

21        Q     And either at this time or earlier when you saw the

22   police cars, did you notice whether any of them had any dome

23   lights or turret light on as they were driving?

24        A     No, I don't recall any.

25        Q     Did they have their turret lights on or any kind of


                              H. C. Davis
```

NYCLD_023500

P-APP002213

```
 1              T-1   Reynolds-Ppl-direct              798
 2   dome light?
 3        A    On any of the police cars?
 4        Q    Yes.
 5        A    Not that I recall, no.
 6        Q    And while you were driving around, did you hear yet
 7   another radio communication?
 8        A    Yes.
 9        Q    And what was that communicate?
10        A    That was from one of the auxiliary police, he had
11   found a male jogger that was --
12             MR.  JOSEPH:  Objection, Judge.
13             THE COURT:  I'll allow it.
14        A    He had found a male jogger that was severely beaten
15   on the, around 96th Street and the West Drive.
16        Q    Did you hear any further information with respect
17   to the assault on that male jogger?
18        A    Yes, another police officer--
19             MR.  JOSEPH:  Objection.
20             THE COURT:  Yes, just a minute.  Come up for a
21        minute.
22             Step down for a second.
23             (At side bar.)
24             THE COURT:  Okay.
25             MR.  JOSEPH:  The basis of my objection is


                   H. C. Davis
```

TAGLIONI — PEOPLE — DIRECT

1    Q    And where did you go?

2    A    I went to

3    Q    Did someone direct you to go to that
4    location?

5    A    Yes, I was directed to go there by my
6    supervisors.

7    Q    Do you recall who it was that told you to go
8    there?

9    A    I don't recall whether it was the lieutenant
10   or the sergeant.

11   Q    What was your instruction with respect to
12   going to                          ?

13   A    I was instructed to go to find a Yusaf
14   Salaam and ask him if he would accompany us into the
15   station house for questioning.

16   Q    Did you go by yourself or did you go with
17   anyone else?

18   A    I went with three detectives; Detectives
19   Freck, Bier, Hall, all from Manhattan North Homicide
20   Squad.

21           MR. BERMAN:  Sorry, I couldn't hear the
22           names.

23           THE WITNESS:  Detectives Freck, Hall and
24           Bier, B-I-E-R.

1590

TAGLIONI - PEOPLE - DIRECT

1  
2      Q    What were your exact instructions with

3  respect to Yusaf Salaam?

4      A    To try to locate him and ask him if he would

5  come into the station house for questioning.

6      Q    Did you know for what reason it was desired

7  that he should come to the 20th Precinct for

8  questioning?

9      A    Just in connection with the Central Park.

10     Q    Did you know how it was that the supervisors

11 who asked you to get him had gotten his name?

12     A    No, I do not.

13     Q    And did you know anything about what his

14 connection to the Central Park investigation might

15 be?

16     A    No, I did not.

17     Q    Where did you go when you went to

18        ?

19     A                                    I believe.

20     Q    And what happened when you went to that

21 apartment at                  ?

22     A    I knocked on the door.  A young lady--

23 excuse me, I don't know her name-- came to the door.

24 I identified ourselves as police officers,

25 detectives.  She identified herself as Yusaf's

1591

1  TAGLIONI - PEOPLE - DIRECT

2  sister.  I don't have her name, I don't know what

3  her name is.

4      Q    Were you able to form a general impression

5  about her age?

6      A    She appeared to be in her late teens.

7      Q    And did you have a conversation with her?

8      A    Yes, I did.

9      Q    What, if anything, did you say to her?

10      A    I asked her if-- did Yusaf live there and if

11  he was home.  And she instructed me that he was not

12  at home.

13      Q    And did she tell you that was his apartment

14  where he lived?

15      A    Yes, she did.

16      Q    What happened as you spoke to this woman at

17  ?

18      A    As we were speaking to her, three males came

19  down the hallway.  The apartment is down the end of

20  the hall.  We stopped-- they were coming towards the

21  apartment.  We stopped them.  I asked them to

22  identify themselves.  They did.

23      Yusaf identified himself as Yusaf Salaam.  The

24  other gentleman, I believe he gave his name as

25  Kharey Wise.  The name Kharey had come up in the

NYCLD_006908

P-APP002217

1592

TAGLIONI - PEOPLE - DIRECT

1   station house.

2       We were also told if we came across a Kharey-- I

3   didn't know his last name-- we should ask him to

4   accompany us to the station house.

5       Q    When you say the name Kharey had come up in

6   the station house, had that been mentioned to you

7   when you were sent to                    ?

8       A    Yes, by our supervisor.

9       Q    Can you tell us what exactly was said to you

10  with respect to Kharey Wise?

11      A    If we did run across Kharey-- I didn't have

12  Wise-- we should also ask him to accompany us to the

13  station house for questioning.

14      Q    Were you given, if you recall, a residence

15  or address for the person that was identified as

16  Kharey?

17      A    I don't recall receiving an address on

18  Kharey, no.

19      Q    When you said that three males came toward

20  you, who was the third person?

21      A    I don't know the third person's name.

22      Q    At the time did you learn his name?

23      A    I know of his first name, Eddie; that's it.

24                  THE COURT:   What was that name?

1593

TAGLIONI - PEOPLE - DIRECT

1  THE WITNESS:  Eddie.

3      Q    When you said you saw these three males
4  coming down the hall toward you and you had a
5  conversation with them, how far from the doorway
6  where you were talking to the female did you have a
7  conversation with those three males?

8      A    I'd say ten, no more than fifteen, feet.

9      Q    And would you please tell us what
10  conversation, if any, did you have with Yusaf
11  Salaam?

12      A    After he gave me his name, I asked him how
13  old he was, and he told me he was sixteen years of
14  age.  I--

15      Q    Let me just stop you for a moment.

16      When you saw Yusaf Salaam, would you say how he
17  appeared to you.

18      A    He appeared to be older.

19      Q    How was it that you formed the impression
20  that he was older?

21      A    His appearance.  He looked a lot older than
22  sixteen.

23      Q    When you spoke to him, you said he gave you
24  his name.  What else did you say to him and did he
25  say to you?

1594

TAGLIONI - PEOPLE - DIRECT

1   A   Well, when he told me he was sixteen, I
2   asked if he had any proof of that, because I thought
3   he was older.

4   Q   What, if anything, did he say when you asked
5   for proof?

6   A   He said he did have proof and displayed a
7   Transit card.  I believe it was a school Transit
8   card.

9           MS. LEDERER:   I would please ask that
10          this be marked as People's 14 for
11          identification.

12          (Card marked People's Exhibit 14 for
13          identification.)

14  Q   Looking at People's 14 for identification,
15  do you recognize what that is?

16  A   Yes, I do.

17  Q   And what do you recognize that to be?

18  A   This is the card, the student card that
19  Yusaf handed to me in the hallway.

20  Q   Does that card appear to be in the same
21  condition as when it was given to you in the
22  hallway?

23  A   No, it does not.

NYCLD_006911

P-APP002220

TAGLIONI – PEOPLE – DIRECT

1    Q   How is it different?

2    A   Well, Yusaf's name is still clear, but the
3 rest of the writing on there appears to be smudged
4 and fading.

5    Q   Is the information that is written on the
6 back of People's 14 for identification the same as
7 it was when you saw it on the evening of April 20,
8 1989, when Yusaf Salaam showed it to you?

9    A   Yes, it is.

10   Q   And does People's 14 for identification,
11 does that reflect an age, a date of birth?

12   A   Yes, it does.

13   Q   What is the date of birth on People's 14 for
14 identification?

15   A   2/27/73.

16   Q   May I see People's 14 for a moment.

17       (Handing.)

18   Q   And is this the same bus pass he showed you
19 in the hallway on April 20, 1989?

20   A   Yes, it is.

21       MS. LEDERER:  At this time I offer
22       People's 14 into evidence.

23       MR. BURNS:  May I see it?

24       (Handing.)

1596

TAGLIONI — PEOPLE — DIRECT

1     MR. BURNS: For purposes of this

2  hearing, I have no objection.

3     THE COURT: All right, mark it, please.

4     (People's Exhibit 14 received in

5  evidence.)

6     Q   Other than asking his name and asking his

7  age and asking for proof of his age, did you have

8  any further conversation with Yusaf Salaam at that

9  time in the hall?

10    A   Yes, I did. I asked him if he would

11 accompany us to the station house to talk to us

12 about the Central Park incident. He stated he

13 would.

14    Q   And what happened after you had that

15 conversation with him?

16    A   I took him in the elevator downstairs and to

17 the 20th Precinct.

18    Q   Did you handcuff Yusaf Salaam?

19    A   No, I did not.

20    Q   Did you have your gun drawn at that time?

21    A   No, I did not.

22    Q   Who was with you at the time you had this

23 conversation with Yusaf Salaam?

24    A   Detectives Hall, Bier and Andy Freck.

TAGLIONI — PEOPLE — DIRECT                    1597

1

2       Q    When you left the hallway of the

3  did anyone else go with you other than the

4  detectives you just named and Yusaf Salaam?

5       A    No.  There was seven of us and I wouldn't

6  allow more than seven people to get on the elevator

7  because I'm claustrophobic.

8       Q    When you say there were seven of you, who

9  else are you referring to besides the four

10 detectives and Yusaf Salaam?

11      A    Kharey Wise and the fellow known as Eddie.

12           MR. MOORE:  I'm sorry?

13           THE WITNESS:  I don't know the other

14           fellow's last name.  All I know is Eddie.

15      Q    Were you present or did you have any

16 personal conversation with Kharey Wise in the hall

17 of                    ?

18      A    Other than asking him his name and age and

19 would he accompany us, no.

20      Q    Did you personally say that to Kharey Wise

21 or did someone else say that to him?

22      A    I believe Detective Freck asked Kharey if he

23 would accompany us.

24      Q    And were you able to hear the conversation

25 he had with Kharey?

NYCLD_006914

P-APP002223

1598

TAGLIONI — PEOPLE — DIRECT

1    A    Yes, I was.

2    Q    And what, if anything, did you hear Kharey

3    say?

4    A    That he would come into the station house

5    with us.

6    Q    And was Kharey Wise handcuffed at that time?

7    A    No, nobody was handcuffed.

8    Q    Where did you go when you left the

9    ?

10    A    Went down to the lobby and to our car.

11    Q    How many cars did you have?

12    A    We had two unmarked police cars.

13    Q    And did you ride in one of the cars?

14    A    Yes, I did.

15    Q    Who did you ride with?

16    A    Detective Hall and Yusaf Salaam.

17    Q    And where did Yusaf Salaam ride in the car?

18    A    In the back seat.

19    Q    Do you know where Kharey went?

20    A    Kharey went into the other unmarked vehicle

21    with Detective Bier and Detective Freck.

22    Q    Was Yusaf Salaam handcuffed when he rode in

23    the car?

24    A    No, he was not.

1599

TAGLIONI - PEOPLE - DIRECT

1  
2     Q     Did  you  have  any  conversation  with  Yusaf  
3  Salaam  on  the  way  after  you  left  
4     A     No,  I  did  not.  
5     Q     Did  you  hear  any  conversation  between  him  
6  and  anybody  else  in  the  car,  the  other  detective?  
7     A     I  don't  recall  it,  no.  
8     Q     Where  did  you  go?  
9     A     I  went  to  the  20th  Precinct.  
10    Q     And  where  did  you  go  when  you  arrived  at  the  
11 20th  Precinct?  
12    A     When  we  arrived  at  the  20th  Precinct,  we  
13 were  directed  to  go  upstairs  to  the  third  floor  to  
14 the  Sex  Crimes  office.  
15    Q     Directing  your  attention  to  People's  4  in  
16 evidence,  the  third  floor  of  the  20th  Precinct,  
17 could  you  please  step  down  from  the  witness  stand  
18 and  approach  People's  4  in  evidence  and  indicate,  
19 please,  where  you  went  with  Yusaf  Salaam  when  you  
20 arrived.  
21    A     Okay.   We  took  the  stairway  up  to  the  third  
22 floor.   We  entered  the  Sex  Crimes  office,  which  is  
23 over  here,  and  I  took  Yusaf  into  this  room  right  
24 here  in  the  Sex  Crimes  office.  
25               MS.  LEDERER:   The  record  should  reflect

1600

TAGLIONI - PEOPLE - DIRECT

1   the witness is indicating a small room off

2   of a longer room. It has three file

3   cabinets and something-- and one desk in

4   that room.

5          You may resume the witness stand. Thank

6   you.

7          (Witness complies.)

8   Q   Now, what did you do when you arrived in

9   that room with Yusaf Salaam?

10  A   I sat there and I waited for someone,

11  another detective to come to do the interview.

12  Q   Did you have any conversation with Yusaf

13  Salaam while you sat there in that room with him?

14  A   No, I did not.

15  Q   Was he seated or standing?

16  A   He was seated.

17  Q   And approximately how much time elapsed

18  before the arrival of a detective to conduct an

19  interview?

20  A   I'm not sure, but I'd say anywhere from

21  fifteen to twenty minutes.

22  Q   And do you know the name of the detective

23  who arrived within that fifteen to twenty minute

24  period?

1601

TAGLIONI — PEOPLE — DIRECT

1

2      A    Yes, I do.  Detective Thomas McKenna from

3  Manhattan North Homicide.

4      Q    Were you present when Detective McKenna came

5  into the room?

6      A    Yes, I was.

7      Q    Approximately what time was it— withdrawn.

8      What, if anything, did he say or do when he came

9  into the room?

10     A    When he came into the room, I introduced him

11 to Yusaf, told him who he was, Detective McKenna

12 from the Homicide Squad, that he would be talking to

13 him.

14     With this Detective McKenna also introduced

15 himself to Yusaf, read him his rights, and at that

16 point I left the office.

17     Q    Were you present when the rights were read?

18     A    Yes, I was.

19     Q    And did you see whether they were read from

20 a card or were they given by memory?

21     A    No, they were read from a card.

22     Q    Were you present— well, withdrawn.

23     When the rights were read, did Yusaf respond in

24 any way when the rights were read?

25     A    Yes, he did.

NYCLD_006918

P-APP002227