T2-fr

331

REYNOLDS — PEOPLE — DIRECT — LEDERER

1
2      you were driving around the north end of
3      the park?
4   A  No.
5   Q  When you referred to the north end of the
6      park, from what street north were you
7      canvassing?
8   A  North of 96th Street.
9   Q  Can you describe in a general way what
10     route you took?
11  A  In canvassing?
12  Q  Yes.
13  A  We went through all the foot paths and --
14     you know, all the routes we could to go
15     through all the dark areas, and, you know,
16     part of the park that weren't visible.
17  Q  At any time did you see anybody or any
18     group that resembled what you had heard on
19     the radio?
20  A  In the beginning, no.
21  Q  And did you hear any other radio
22     communications while you were canvassing
23     the north end of the park?
24  A  Yes.
25  Q  What was the next radio communication that

10/13/89

T2-fr

REYNOLDS — PEOPLE — DIRECT — LEDERER

```
 1
 2        you heard?
 3     A  We  got  --  I  heard  our  sergeant  --  my
 4        sergeant  from  Anti-Crime  had  a  possible
 5        group  over  at 100 Street  and  the  West  Drive
 6        in  the  playground.
 7     Q  What  is  your  sergeant's  name?
 8     A  Sergeant  Lyle.
 9     Q  What  did  you  do  when  you  heard  that
10        communication?
11     A  We  responded  to  the  area  where  he  was.
12     Q  Approximately  what  time  was  it  that  you
13        arrived  at  that  playground?
14     A  That  was  about  a  quarter  to  ten, 10:00.
15     Q  Did  you  have  a  conversation  with  Officer
16        Alvarez  at  that  location?
17     A  Yes, I  did.
18     Q  Did  he  tell  you  whether  he  had  seen
19        anything  in  the  park?
20     A  Yes.
21     Q  What, if  anything,  did  Officer  Alvarez  tell
22        you?
23     A  He  told  me  he  saw a  group  of  youths  and
24        when  they  saw  the  radio  car,  they  all  ran.
25     Q  Did  he  describe  the  number  of  the  people  in
```

10/13/89

T2-fr

333

1    REYNOLDS - PEOPLE - DIRECT - LEDERER

2           the group?

3    A      He said he saw about seven to ten of them.

4    Q      Did he indicate that he had seen a larger

5           group?

6               MR. MOORE:   Objection.

7               MR. RIVERA:   Objection.

8               MR. JOSEPH:   Objection.

9               MR. BURNS:   Objection.

10              MR. DILLER:   Objection.

11              MR. BERMAN:   Objection.

12              MR. MADDOX:   Objection.

13              THE   COURT:   Sustained.   Let   him

14          testify.

15   Q      What else did he tell you about the people

16   he saw?

17   A           He stated they were male blacks and

18   Hispanics and they were in their teens.

19   Q      Did he tell you where he had seen the

20   group?

21   A        I believe he said he saw them on the east

22   side.

23              MR. MOORE:   Objection.

24              THE COURT:   I'll let him answer.

25   Q      Was he able to tell you whether it was in

10/13/89

NYCLD_023079

P-APP002416

T2-fr

334

REYNOLDS — PEOPLE — DIRECT — LEDERER

1
2 or out of the park?

3      A    He said it was inside the park.

4      Q     Did he tell you what time it was that he
5 had seen them?

6      A    That I don't recall.

7      Q    Did he say anything about the gender or the
8 sex of the people he had seen?

9      A    Yes, he said they were male blacks and
10 Hispanics.

11      Q    Did you have a conversation -- withdrawn.

12      How long did you stay at the playground at
13 100 Street?

14      A    Not long, just long enough to -- for the
15 show-up and to get a description from Police Officer
16 Alvarez and then we resumed canvassing.

17      Q    Where did you go when you left that
18 location?

19      A    Again we stayed in the north end and we
20 went through all the trails and the inaccessible
21 parts of the park.

22      Q    How long did you drive around in the park?

23      A    About another half-hour.

24      Q    Did you hear another radio communication
25 after you had been at the playground where Sergeant

10/13/89

T2-fr

335

REYNOLDS - PEOPLE - DIRECT - LEDERER

Lyle was?

    A    Yes.

    Q    What was the communication that you heard then?

    A    That there was a male jogger found beaten and bleeding profusely from his head.

    Q    Where was that -- was there a location with respect to where that jogger was found?

    A    Yes. That was 96th Street, I believe, approximately, and the West Drive off the reservoir.

    Q    Where were you when you got that communication, if you recall?

    A    I believe we were at the East Drive again and 102nd Street.

    Q    Did the communication given with respect to that jogger contain any information about any people?

    A    He stated there was a group of male Hispanics and Blacks who had assaulted the jogger.

    Q    Was there any further information about the assault?

    A    Yes, that they had fled north.

    Q    What, if anything, did you do after you heard that information?

10/13/8

NYCLD_023081

P-APP002418

T2-fr

336

REYNOLDS — PEOPLE — DIRECT — LEDERER

1
2   A   At that point I decided to leave the park
3   and to start the canvas outside at Central Park West
4   at 100 Street.

5   Q   Where did you leave the park?

6   A   We left at 100th Street and Central Park
7   West.

8   Q   Why did you leave the park at that time?

9   A   Because I felt that the group was no longer
10  in the park.  We had canvassed for quite a while and
11  the entire park was saturated with police vehicles.

12  Q   Did you see other vehicles in the park
13  other than those you refer to at the East Drive and
14  102nd Street?

15  A   Other than what I described earlier?

16  Q   During the time you were canvassing the
17  park, other than what you already told us at the
18  East Drive and 102nd Street, did you see any other
19  police vehicles in the park?

20  A   Just what I mentioned.

21  Q   And when you were canvassing the north end
22  of the park, did you see any sign of other police
23  vehicles?

24  A   Yes.

25  Q   What did you see?

10/13/89

T2-fr

337

REYNOLDS — PEOPLE — DIRECT — LEDERER

1

2      A      As I was going through the fields, I could

3  see further north of me the headlights of the  other

4  vehicles going back and forth also in search for the

5  group.

6                     MS.  LEDERER:   With the permission of

7            the Court, I'd ask the  witness  to  please

8            step  down  and  approach People's  7  in

9            evidence.

10                     (Witness complies)

11     Q      Would you please point  on  People's  7  in

12  evidence  and  describe  as you do, what area you're

13  possibly  pointing  to,  indicate  where  you  were

14  traveling  and  where you would see the other lights

15  from other vehicles?

16     A      We saw the other lights —

17                     THE COURT:  Excuse me, Officer, I have

18            to remind you to speak as loud as  you  can

19            because  everybody over on this side has to

20            hear you, and it is very difficult in  this

21            courtroom.

22                     THE WITNESS:  Okay.

23            I saw headlights from the other police

24            cars  going  east  and  west  across  the

25            ballfields here on the north end.   I  was

10/13/89

T2-fr

338

REYNOLDS — PEOPLE — DIRECT — LEDERER

1
2          south   of   them   and   I  could  see  them  --  I
3          could  see  that  the  ballfields  in  this   area
4          was   pretty  well  saturated  with  police  cars
5          and  there  was  probably  no   group   in   there
6          because  somebody  would  have  seen  --
7                   MR.  MADDOX:    Also  describe  the  area
8          that  he  just  referred  to  on  the  map.
9                   THE  COURT:   Yes,  if  there  is  some
10         legend   on  that  map  that  describes  the  area
11         that  you're  in,  please  tell  us  what  it   is.
12         I   see   there   is  some  writing  on  that  map.
13         If  you  could  tell  us  what  it  was,  the   area
14         that  you  say  you  were  driving  in.
15                  THE   WITNESS:    This   is   the   north
16         meadow,  and  it  contains   several   baseball,
17         softball,  and  a  football  field  and  we
18         again,  like  I  said,  I   had   seen   several
19         radio   cars   going   back  and  forth  and  they
20         pretty  well  had  the  whole  area  covered.   If
21         there  was  any  group  in  there  --
22                  MR.  BURNS:   Objection.
23                  MR.  MOORE:   Objection.
24                  THE  COURT:  Yes,  don't  speculate,  just
25         tell  us  what  you  saw.

10/13/89

NYCLD_023084

P-APP002421

T2-fr

339

REYNOLDS — PEOPLE — DIRECT — LEDERER

1
2          THE WITNESS:  I saw  the  police  cars
3      going  back and forth and they had the area
4      well covered.
5    Q    Where did you go --
6          MR.  BURNS:    I'm  sorry.    For  the
7      record,  the record should reflect the area
8      of the North Meadow.
9          THE COURT:  He covered the whole  area
10     of the North Meadow.
11   Q    When you stated earlier that you decided at
12 this  time to leave the park, will you point out the
13 route you took to enter the park?
14   A    We left here  at  100  Street,  going  west
15 towards Central Park West.
16   Q      What time was it, approximately, when you
17 were leaving Central Park?
18   A     It was approximately 10:30.
19   Q     What, if anything, did you see as you  left
20 Central Park at 100 Street?
21   A     Okay.  When we got to Central Park West at
22 100th Street, just north of us, between 101st Street
23 and 102nd, on the west side of the street, we saw  a
24 group  of  about  10, 15, male blacks and hispanics.
25 They were teenagers.

10/13/89

T2-fr

340

REYNOLDS — PEOPLE — DIRECT — LEDERER

1
2    Q    What, if anything, did you do when you saw
3    that group?
4    A         What we —— what I did was we started to
5    drive northbound towards them to get a better look
6    at the group.
7    Q    What side of the street were they on?
8    A    They were on the west side of the street.
9    Q    And when you were driving, what side of the
10   street were you driving on?
11   A    I was on the east side going northbound.
12   Q         What, if anything, happened as you went
13   northbound on Central Park West approaching that
14   group?
15   A         Well, we saw the group.  They were all ——
16   you know, walking together.  We felt reasonably sure
17   that they didn't ——
18             THE COURT:  It's not what you felt.
19             THE WITNESS:  I felt reasonably sure
20        they didn't know who we were.
21             MR. RIVERA:  Objection.
22             MR. BURNS:  Objection.
23             MR. MOORE:  Objection.
24             MR. JOSEPH:  Objection.
25             MR. MADDOX:  Objection.

10/13/89

NYCLD_023086

P-APP002423

T2-fr

341

REYNOLDS - PEOPLE - DIRECT - LEDERER

1

2         MR. DILLER:  Objection.

3         MR. BERMAN:  Objection.

4         THE COURT:  I'll allow that.  Go

5    ahead.

6         THE WITNESS:  At one point the group

7    had stopped --

8         MR. RIVERA:  I didn't hear the

9    statement he didn't feel reasonably what?

10        THE COURT:  Did not make out who they

11   were.

12   Q    Continue.

13   A    The group at one point stopped and they all

14   started to look our way and started to point at us

15   in the van, and I couldn't understand why because

16   nobody wouldn't really --

17        MR. MOORE:  Objection.

18        THE COURT:  Finish your answer.

19        THE WITNESS:  Nobody generally makes

20   who we were.

21        MR. MOORE:  Objection.

22        THE COURT:  Objection sustained.

23        Don't tell us what people generally

24   do.  Just tell us what happened here.

25        THE WITNESS:  What I did was I looked

10/13/89

NYCLD_023087

P-APP002424

T2-fr

1
2            to our right and a marked police three-
3       wheel scooter was on our right hand side
4       and that's what panicked them.
5            MR. MOORE:  Objection.
6            MR. MADDOX:  Objection.
7            THE COURT:  Sustained.  Just tell us
8       what you saw.
9    Q       When you looked and saw in your sideview
10  mirror a scooter, where was this scooter?
11   A       Right alongside the van on my side.  It was
12  on the other side of us, from the group.
13   Q       Who was on that scooter?
14   A       Police Officer Flores.
15   Q       What did you do when you became aware  that
16  Police Officer Flores was pulling up besides you?
17   A        Well, I felt -- it looked like the group
18  was going to run to me.
19            MR. MOORE:  Objection.
20            MR. JOSEPH:  Objection.
21            THE COURT:  I'll allow it, go  ahead.
22       Finish.
23            THE WITNESS:  And I told my partner to
24       take the van and pull it up ahead of them
25       to cut them off so we can stop them.

10/13/89

NYCLD_023088

P-APP002425

T2-fr

343

REYNOLDS - PEOPLE - DIRECT - LEDERER

1
2     Q     And did the van pull up?

3     A     Yes.

4     Q     Where did the van go?

5     A     Okay. My partner pulled up the van to
6     102nd Street and CPW, Central Park West on the
7     southwest corner.

8     Q     WHen you say the van was pulled up on the
9     southwest corner of 102nd and Central Park West, can
10    you describe exactly what position it was in in
11    relation to the sidewalk and the street of 102nd
12    Street?

13    A     Okay. The van was facing west with the
14    headlights facing west towards the building. Then
15    my partner and myself got out of the van, we
16    identified ourselves. AT that point the group
17    started to run except for two. Those two were
18    Raymond Santana and Steve Lopez.

19          MR. MOORE:   Not responsive to the
20          question.

21          THE COURT:  I'll allow it.

22    Q     When you say you got out of the van -- let
23    me just go back for a second. The van that you were
24    describing, what color is the van?

25    A     Green.

10/13/8

T2-fr

344

REYNOLDS – PEOPLE – DIRECT – LEDERER

1

2      Q      Are there any windows in the  back  portion

3  of the van?

4      A        In the back two doors -- I'm sorry, there

5  are no windows in it.

6      Q      Are there any side panels?

7      A      I don't believe so.

8      Q      Does it have any insignia?

9      A      Yes, Parks Department emblem on the front.

10      Q      When the van pulled into the  beginning  of

11  102nd Street and Central Park West, you say you both

12  jumped out.  What exactly did you say?

13      A        We identified ourselves as police and we

14  told them not to run.

15      Q      What happened when you said, "Don't run?"

16      A      The group started to run.

17      Q      And what did you do when the group  started

18  to run?

19      A      We got out of the van and we approached the

20  two defendants that had stayed on the corner.

21      Q        And you just named the names of those two

22  people.  Did you at the time that you  stopped  them

23  know their names?

24      A      Not at that time, no.

25      Q        What,  if  anything,  happened when you

10/13/89

T2-fr

345

REYNOLDS - PEOPLE - DIRECT - LEDERER

1

2    stopped those two?

3        A      We placed them against the wall.

4              MR. MADDOX:   Objection, Judge.    He

5              didn't   stop   them.    They   were   already

6              stopped.

7              THE COURT:   Yes.   Objection sustained.

8        Q    What happened   when   you   approached   those

9    two?

10       A        We   placed   them   against   the wall and

11   searched them.

12       Q    Did you have your gun drawn   when   you   got

13   out of the van?

14       A    No.

15       Q      When you say you placed them against the

16   wall, what exactly did you do?

17       A    We gave them a pat down of their clothes in

18   case they had weapons on them.

19       Q    Did you find any weapons?

20       A    No.

21       Q    What was the next thing that happened?

22       A     My   partner,   Police   Officer   Powers   and

23   Police Officer Flores chased the group.

24       Q     Did the two people that you placed against

25   the wall,   Raymond   Santana   and   Steve   Lopez,   did

10/13/89

T2-fr

346

REYNOLDS — PEOPLE — DIRECT — LEDERER

1
2  either of them say anything to you?
3     A   Yes.
4     Q   What, if anything, did they say to you?
5     A       Let's see.  Raymond Santana stated he had
6  just come from his  girlfriend's  house  and  didn't
7  state where or when.
8          MR. JOSEPH:  Objection.
9          THE  COURT:   Don't  tell  us what he
10         didn't said.  Just tell us what he did say.
11         THE WITNESS:  Steven Lopez  stated  he
12         just   came   from   the  movies  with  his
13         girlfriend  and  they  watched  the   movie
14         "Leviathan".
15    Q       Did either of them say anything about the
16  rest of the group?
17    A   They stated they weren't with the group and
18  Steven Lopez stated, I quote, "The group had  talked
19  shit about ripping them off."
20          MR. MADDOX:  I can't hear.
21          THE COURT:  Who said that?
22          THE WITNESS:  Steven Lopez.
23          THE COURT:  Stated what?
24          THE  WITNESS:   They were not with the
25         group and the group had talked -- I  quote,

10/13/89

NYCLD_023092

P-APP002429

T2-fr

347

REYNOLDS — PEOPLE — DIRECT — LEDERER

"Talked shit about ripping them off."

Q    When I asked you a moment ago did either of those two people say anything with respect to the rest of the group I believe your answer began, "They said," could you tell us exactly what either one of them said indicating by name what that person said?

MR. MOORE:    Objection.    Asked and answered.

THE COURT:  I'll allow it again.

THE WITNESS:    They both stated that they weren't with the group and they didn't know any of the others that had run.    They stated that they were walking ahead of them and ——

MR. RIVERA:    Objection, your Honor, not responsive.

THE COURT:  Yes, objection sustained.

Q    Can you tell us what Raymond Santana said to you when he was stopped at 102nd Street and Central Park West?

A    Raymond Santana said he wasn't with the group and he had just come from his girlfriend's house.

Q    What, if anything, did Steven Lopez say at

10/13/89

T2-fr

348

REYNOLDS - PEOPLE - DIRECT - LEDERER

1
2    that time?

3        A    He stated he also was not with  the  group,

4    that  he  had just come from his -- he had just come

5    from the movies with his girlfriend and they watched

6    the picture "Leviathan" and he also  stated,  and  I

7    quote, "Talked  shit  about  ripping off -- ripping

8    them off."

9        Q    Did  you  ask  either  Defendant  Lopez  or

10   Defendant Santana any questions?

11       A    No.

12       Q    When you saw this group, could you describe

13   how  the  group was in relation to the other members

14   of the group?

15       A    The two --

16              MR. BERMAN:  Object as to form.

17              THE COURT:  What is your question?

18       Q    When you saw the group walking  on  Central

19   Park  West,  would  you describe the relation of the

20   group with one to the other?

21       A    It was a  homogenized  group.   They  were

22   altogether  and  they  were  all walking northbound.

23   They were male Blacks, teenaged and Hispanics.

24       Q    When you saw the group on the west side  of

25   the  street, approximately how much of the block was

10/13/89

T2-fr

349

REYNOLDS — PEOPLE — DIRECT — LEDERER

1
2    taken up by the members of the group?

3        A    Maybe a quarter of the block.

4        Q        And    where    were    Defendant's    Lopez    and

5    Santana,  if you remember, in relation to the others

6    in the group?

7        A    They were in the group  because  the  group

8    was altogether.

9        Q    What, if anything, happened after Lopez and

10   Santana made those statements to you?

11       A        My partner, Police Officer Powers chased

12   the rest of the group with Police Officer Flores.

13       Q    Where did you see him go?

14       A    I saw him  running  southbound  on  Central

15   Park West and then west on 101st Street.

16       Q        Did you see where he went when he turned

17   onto that street?

18       A    When he turned west, I lost sight of him?

19       Q    Officer Reynolds -- I'm sorry --

20       A    And then I saw him again running back  east

21   and the group was ahead of him and they ran into the

22   park, and he ran into the park after them.

23       Q    Approximately how much time elapsed between

24   the time you saw him disappear from your sight going

25   down  the street until you saw the group coming back

10/13/8

NYCLD_023095

P-APP002432

T2-fr

350

REYNOLDS - PEOPLE - DIRECT - LEDERER

1  with him, chasing?

2  A    Just seconds.

3  Q    Did you then see Officer Powers -- go   into

4  the park?

5  A      Yes, I saw him run and jump over the wall

6  into the park after the defendants.

7          MR. MADDOX:  Objection to  "after  the

8          defendants."

9          THE  COURT:  Yes, Objection sustained

10         as to "after the defendants."

11 Q    Did you see how many people were running in

12 front of Officer Powers?

13 A    It looked to be about ten.

14 Q    And you said that they entered the park, do

15 you know where it was that they entered the park?

16 A    It was over the wall and  at  Central  Park

17 West and 101st Street, between 101st and 100.

18 Q      And is that where you saw Officer Powers

19 enter the park?

20 A    Yes.

21 Q    Let me just stop you for  a   moment.    The

22 area  on Central Park West, near 101st and 102nd, to

23 your knowledge are there any movie theaters in  that

24 area?

10/13/89

T2-fr

351

REYNOLDS — PEOPLE — DIRECT — LEDERER

1

2    A    No, there isn't.

3    Q    Are there any community centers in that

4  area?

5    A    No-

6         MR. MADDOX:  Judge, may I ask if he

7    could repeat the question and answer?

8         THE COURT:  Read the question and

9    answer back, please.

10        (Reporter complies)

11   Q    Are there any stores on Central Park West

12 in that area?

13   A    No.  There's just a grocery store further

14 down, but it's very small north of where they were-

15   Q    After you lost sight of Officer Powers when

16 he went into the park, what was the next thing that

17 happened?

18   A    I stood on the corner with Raymond Santana

19 and Steven Lopez.

20   Q    Did you handcuff them?

21   A    No.

22   Q    And where was the van?

23   A    The van was right where we left it on 102nd

24 Street and Central Park West-

25   Q    Did either of them say anything further   to

10/13/89

T2-fr

352

REYNOLDS - PEOPLE - DIRECT - LEDERER

1
2   you?

3       A       They just kept stating that they were not
4   with the rest of them.

5       Q       When you say they kept saying that, who
6   kept saying that?

7       A       Steve Lopez and Raymond Santana.

8       Q       And did you ask them any questions?

9       A       No.

10      Q       Did you have your radio with you?

11      A       Yes, I did.

12      Q       Did you hear communications coming over the
13  radio?

14      A       Yes.

15      Q        Did there come a time when someone came to
16  where you were with Santana and Lopez?

17      A       Yes.

18      Q       Approximately what time was that?

19              THE WITNESS:  May I look at  my  notes
20          to refresh my memory?

21              THE COURT:  If you have to.

22              (Witness peruses notes)

23      A       It was approximately a quarter to eleven.

24              THE COURT:  And what happened at about
25          a quarter to eleven?

10/13/89

NYCLD_023098

P-APP002435

T3-1f

353

REYNOLDS — PEOPLE — DIRECT — LEDERER

1

2          THE   WITNESS:    Sergeant   Wheeler   and

3    Police  Officer  Morales   pulled   over   after

4    the   call  over  the  radio  for  a  unit  to  pick

5    up  the  two.

6    Q     What  happened  when  they  responded?

7    A     They  responded  over  and  we  placed  them  into

8    the  car.

9    Q     Placed  whom  in  the  car?

10   A     Steven  Lopez  and  Raymond  Santana.

11   Q     And  what  did  you  do  at  that  point?

12   A     I  went  with  Police  Officer  Powers  into   the

13   van,   and   we   drove   back  to  100  Street  and  Central

14   Park  West  to  confer  with  our  sergeant.

15   Q     When  Raymond  Santana  and  Steve   Lopez   were

16   put  in  the  car  with  the  sergeant,  did  you  see  where

17   they  went?

18   A     They  went  to  100  Street   and   Central   Park

19   West.

20   Q       And  when  you  arrived  at  100  Street  and

21   Central  Park  West,  were  Raymond   Santana   and   Steve

22   Lopez  there?

23   A     Yes.

24   Q     Were  they  in  the  car  or  outside  of  the  car?

25   A     They  were  in  the  car.

10/13/89

NYCLD_023099

P-APP002436

T3-1f

354

REYNOLDS — PEOPLE — DIRECT — LEDERER

1

2     Q        And at what corner of that intersection
3 were you at?

4     A     The northeast corner.

5     Q     When you arrived at that location, who  did
6 you arrive with?

7     A     Police Officer Powers.

8     Q     And who was already at that location?

9     A       Sergeant Lyle and Police Officer Hennigan
10 and the other officers.

11     Q     And did you see anybody  in   custody   other
12 than Raymond Santana and Steve Lopez?

13     A     Yes.

14     Q     Who did you see at that time?

15     A       I saw Kevin Richardson, Lamont McCall and
16 Clarence Thomas.

17     Q     Where did you see them?

18     A     In the back of the radio car.

19     Q     Were all three in the same radio car?

20     A     I believe so.  I'm not sure.

21     Q     Was there a discussion at  100  Street  and
22 Central Park West?

23     A     Yes, there was.

24     Q     And what was the nature of the conversation
25 had there?

10/13/89

T3-1f

355

REYNOLDS - PEOPLE - DIRECT - LEDERER

1

2  A    I discussed with our sergeant -- I was told
3  that three of the defendants had made statements.

4          MR. MOORE:   Objection.

5          THE COURT:   I will allow it.

6  A        I  was  told  three defendants had made
7  statements placing themselves at the attack  of  Mr.
8  Loughlin at 96th Street.

9  Q    Who told you that?

10  A      I was told that by Police Officer Powers
11  and Sergeant Lyle.

12  Q    And at that time was there a discussion  at
13  100 Street and Central Park West?

14  A    Yes.

15  Q    Was there a discussion about doing a show-
16  up?

17  A    Yes.

18  Q    And was a show-up conducted with John
19  Loughlin at that time?

20  A    No.

21  Q      How long did you stay at 100 Street and
22  Central Park West?

23  A    I'd say about ten minutes; ten, fifteen
24  minutes.

25  Q    During that time were you out of the van or

10/13/89

NYCLD_023101

P-APP002438

473

REYNOLDS — PEOPLE — CROSS — BERMAN

1

2  comfortably   on   the   floor   of   the   precinct   than   at

3  home?

4          MS. LEDERER:   Objection.

5          THE COURT:   Sustained.

6      Q    Now,  you told us   on   direct   that   about   four

7  in  the  morning,   Lieutenant   McInerney   told   you   a

8  woman's  body  had  been  discovered  in  the  park?

9      A    I believe that's the approximate time.

10         MR. BURNS:   I didn't   hear   that   question

11         and answer.

12         THE COURT:   Read it back.

13         (The   court   reporter   read   back   the

14         requested  portion  of  the  record.)

15     Q    And  Lieutenant  McInerney  told  you  to  keep

16  the kids for  questioning  about  that,  didn't  he?

17     A    He  stated  that   the   detectives   wanted   to

18  speak to them.

19     Q    And you understood that to mean  to  keep  the

20  kids for questioning  about  that  woman,  right?

21     A    That's correct.

22     Q    Now,  you  have  told  us  by  what  time  was  it

23  that Santana's grandmother  arrived  approximately?

24     A    Let's see.   It was after four.

25     Q    But by 4:30 she was there, right?

P-APP002439

Linda Fairstein

Page 221

| | | |
|---|---|---|
| 1 | at two precincts. | 15:45:53 |
| 2 | Q.    Others were concerned about what | 15:45:56 |
| 3 | else? | 15:45:59 |
| 4 | A.    Other officers I didn't know who | 15:45:59 |
| 5 | were in a similar position, who were not | 15:46:06 |
| 6 | being interviewed and expressed to my | 15:46:09 |
| 7 | former colleagues that they had | 15:46:14 |
| 8 | information they wanted to give to her, | 15:46:17 |
| 9 | her being Ms. Ryan. | 15:46:20 |
| 10 | Q.    Do you know what officers | 15:46:22 |
| 11 | communicated with your former colleagues | 15:46:24 |
| 12 | to express that opinion or those opinions? | 15:46:26 |
| 13 | A.    As I sit here today, I don't | 15:46:29 |
| 14 | know.  I knew in 19 -- I'm sorry, I knew | 15:46:31 |
| 15 | some of the names in 2002. | 15:46:36 |
| 16 | Q.    Did you take notes when you were | 15:46:38 |
| 17 | having these conversations with people in | 15:46:40 |
| 18 | the District Attorney's office who were | 15:46:42 |
| 19 | expressing their concern? | 15:46:43 |
| 20 | A.    Not that I can think of. | 15:46:46 |
| 21 | Q.    I guess we can go to April 20th | 15:46:49 |
| 22 | now for awhile.  Fiston called you what | 15:47:15 |
| 23 | time in the morning? | 15:47:22 |
| 24 | A.    As I recall, between 8:30 and | 15:47:24 |
| 25 | nine o'clock in the morning. | 15:47:27 |

NYCLD_039089

P-APP002440

Linda Fairstein

Page 222

```
 1        Q.    At that time, did you know          15:47:29
 2   anything about the events in Central Park      15:47:32
 3   on April 19th?                                 15:47:35
 4        A.    I don't believe that I did.         15:47:36
 5        Q.    You saw nothing on television,      15:47:38
 6   you heard nothing from other sources?          15:47:41
 7        A.    I didn't see anything on            15:47:44
 8   television the night of the 19th.  I may       15:47:46
 9   have heard a news, radio news report in        15:47:50
10   the morning, not about a rape, but about a     15:47:53
11   riot.                                          15:47:58
12        Q.    Do you know why Fiston called?      15:47:59
13        A.    Yes, I do.                          15:48:05
14        Q.    Why?                                15:48:06
15        A.    He called me shortly before nine    15:48:07
16   to tell me that a woman had been found         15:48:10
17   beaten, and presumably because of her          15:48:22
18   state of undress, sexually assaulted in        15:48:24
19   the ravine, and he had been called in          15:48:28
20   because there had been no sexual assault       15:48:34
21   allegation until that woman reached the        15:48:38
22   hospital.                                      15:48:40
23        Q.    What else did he tell you?          15:48:41
24        A.    He told me that the woman was as    15:48:47
25   yet unidentified, and he asked me in the       15:48:52
```

NYCLD_039090

P-APP002441

Linda Fairstein

Page 223

| 1  | usual course of prosecutorial business if | 15:48:57 |
| 2  | I would assign a prosecutor to work on the | 15:49:00 |
| 3  | prosecutorial events that might happen | 15:49:06 |
| 4  | later in the day because there were | 15:49:14 |
| 5  | already were suspects being questioned. | 15:49:16 |
| 6  | Q.    Did you make any notes about | 15:49:22 |
| 7  | this conversation? | 15:49:24 |
| 8  | A.    No. | 15:49:25 |
| 9  | Q.    Did you create any memorandum | 15:49:25 |
| 10 | afterwards about this conversation? | 15:49:29 |
| 11 | A.    Not that I recall. | 15:49:30 |
| 12 | Q.    Did he tell you anything else? | 15:49:31 |
| 13 | A.    At that time, only that we | 15:49:35 |
| 14 | discussed that I would get back to him | 15:49:39 |
| 15 | with the name and number of the Assistant | 15:49:41 |
| 16 | DA, and that I would tell the District | 15:49:44 |
| 17 | Attorney. | 15:49:46 |
| 18 | Q.    Did you understand that Fiston | 15:49:46 |
| 19 | was calling you in line with the | 15:49:48 |
| 20 | arrangement that you and Morgenthau had | 15:49:50 |
| 21 | made, that whenever there was a rape in | 15:49:53 |
| 22 | New York City, you should be contacted? | 15:49:55 |
| 23 | A.    Not exactly. | 15:49:57 |
| 24 | Q.    Why do you say that? | 15:49:58 |
| 25 | A.    Because it was not just a call | 15:50:00 |

NYCLD_039091

P-APP002442

Linda Fairstein

Page 224

| | | |
|---|---|---|
| 1 | to give me information.  It was a call in | 15:50:04 |
| 2 | which he was asking for the help that we | 15:50:07 |
| 3 | provide in the instant moment. | 15:50:12 |
| 4 | Q.    Fiston was calling you, right, | 15:50:14 |
| 5 | right? | 15:50:17 |
| 6 | A.    Fiston did call me. | 15:50:17 |
| 7 | Q.    Right? | 15:50:19 |
| 8 | A.    Yes, sir. | 15:50:21 |
| 9 | Q.    And the reason Fiston called you | 15:50:21 |
| 10 | about a rape was the arrangement you and | 15:50:24 |
| 11 | Morgenthau had made with Fiston that you | 15:50:27 |
| 12 | should be called about every rape; is that | 15:50:29 |
| 13 | correct? | 15:50:32 |
| 14 | MS. DAITZ:  Objection. | 15:50:32 |
| 15 | A.    No, sir. | 15:50:32 |
| 16 | Q.    Why is that not correct? | 15:50:33 |
| 17 | MS. DAITZ:  Let her answer the | 15:50:35 |
| 18 | question this time. | 15:50:37 |
| 19 | Q.    Why is that not correct? | 15:50:37 |
| 20 | A.    Because the practice that | 15:50:39 |
| 21 | Morgenthau and I had requested to have | 15:50:41 |
| 22 | with Mr. Fiston and other officers was for | 15:50:45 |
| 23 | the information of a case. | 15:50:49 |
| 24 | So if a rape had happened on | 15:50:50 |
| 25 | 4/15 on East 30th Street and it wasn't | 15:50:51 |

NYCLD_039092

P-APP002443

Linda Fairstein

Page 225

| | | |
|---|---|---|
| 1 | solved, we'd know and have it under our | 15:50:55 |
| 2 | roof as well. | 15:51:00 |
| 3 | On this morning when he called | 15:51:01 |
| 4 | me, he was calling to ask me to assign a | 15:51:03 |
| 5 | prosecutor now for the purpose, as we ride | 15:51:06 |
| 6 | homicides and sex crimes as the expression | 15:51:13 |
| 7 | is called, to have a prosecutor to be | 15:51:15 |
| 8 | available to him within hours to help with | 15:51:19 |
| 9 | the prosecutorial steps that would be | 15:51:21 |
| 10 | taken at the station house. | 15:51:24 |
| 11 | Q.    So it's your answer that the | 15:51:26 |
| 12 | call that Fiston made to you had no | 15:51:29 |
| 13 | connection with the arrangements that you | 15:51:32 |
| 14 | and Morgenthau had made with Fiston to | 15:51:33 |
| 15 | call and advise you about a rape, whether | 15:51:37 |
| 16 | or not a person had been arrested? | 15:51:39 |
| 17 | MS. DAITZ:  Objection.  You can | 15:51:41 |
| 18 | answer. | 15:51:43 |
| 19 | A.    Those are not my words, sir.  I | 15:51:43 |
| 20 | didn't say they had no connection.  I said | 15:51:46 |
| 21 | this was for a much more urgent purpose. | 15:51:48 |
| 22 | It might also have served that use, hello, | 15:51:51 |
| 23 | this is the event that happened this | 15:51:55 |
| 24 | morning. | 15:51:57 |
| 25 | On top of that, there was a much | 15:51:58 |

NYCLD_039093

P-APP002444

Linda Fairstein

Page 226

| | | |
|---|---|---|
| 1 | more urgent need.  He wanted a prosecutor | 15:52:00 |
| 2 | assigned, that was the main purpose of the | 15:52:04 |
| 3 | call. | 15:52:06 |
| 4 | Q.    Did he tell you that it appeared | 15:52:06 |
| 5 | that a homicide was involved? | 15:52:08 |
| 6 | A.    No, he didn't tell me that.  He | 15:52:09 |
| 7 | told me that the victim was in very grave | 15:52:12 |
| 8 | condition. | 15:52:18 |
| 9 | Q.    The question I think I forgot to | 15:52:19 |
| 10 | ask you earlier when you spoke of one | 15:52:21 |
| 11 | person who had knowledge about the | 15:52:23 |
| 12 | investigation from Ryan, who was that? | 15:52:26 |
| 13 | A.    Lisa Friel. | 15:52:30 |
| 14 | Q.    Did you know what she had | 15:52:31 |
| 15 | learned from Ryan and how she knew about | 15:52:36 |
| 16 | it? | 15:52:38 |
| 17 | A.    I knew some of the things she | 15:52:39 |
| 18 | learned from Ryan. | 15:52:42 |
| 19 | Q.    What did you learn from Friel? | 15:52:43 |
| 20 | A.    I knew from Friel the point at | 15:52:45 |
| 21 | which Ryan no longer wanted Mooney | 15:52:55 |
| 22 | involved in the investigation. | 15:52:59 |
| 23 | I knew from Friel that she, that | 15:53:00 |
| 24 | on a day, I came to know from Friel that | 15:53:03 |
| 25 | on a date that Ryan arranged with Mooney | 15:53:08 |

NYCLD_039094

P-APP002445



Play Live Radio



**n p r**    DONATE

OPINION

# The Racially Charged Meaning Behind The Word 'Thug'

April 30, 2015 · 5:25 PM ET
Heard on All Things Considered

**6-Minute Listen**                                    PLAYLIST    Download

Transcript

NPR's Melissa Block speaks to John McWhorter, associate professor of English and comparative literature at Columbia University, about the use of the word "thug" to describe Baltimore rioters.

MELISSA BLOCK, HOST:

A certain five-letter word has been used repeatedly over the last few days.

(SOUNDBITE OF ARCHIVED RECORDING)

MAYOR STEPHANIE RAWLINGS-BLAKE: ...The thugs who only want to incite violence...

(SOUNDBITE OF ARCHIVED RECORDING)

GOVERNOR LARRY HOGAN: ...Our city of Baltimore to be taken over by thugs...

(SOUNDBITE OF ARCHIVED RECORDING)

PRESIDENT BARACK OBAMA: ...And thugs who tore up the place.

P-APP002446

Case 2:20-cv-00180-JLB-MRM   Document 46-12   Filed 07/01/20   Page 34 of 219 PageID 3438

BLOCK: Thugs, the word chosen by President Obama, Maryland's governor, Baltimore's mayor and others to describe those who looted and burned stores in Baltimore and in some cases that were later retracted with an apology. So why is thug so charged? John McWhorter has been thinking about this. He teaches linguistics at Columbia University and often writes about language and race. Welcome back to the program.

JOHN MCWHORTER: Thank you, Melissa.

BLOCK: John, I've been looking at the Merriam-Webster definition of thug, and it describes it as a brutal ruffian or assassin. What's the origin of this word?

MCWHORTER: Well, the word originates in India as a word for roughly that. And because the British ran India for a good long time, the word jumped the rails from Indian languages to English, and that's the reason that we in America have used the word for a very long time. And until rather recently, it did mean what you might call a ruffian, but of course, things have changed.

BLOCK: Well, how have they changed?

MCWHORTER: Well, the truth is that thug today is a nominally polite way of using the N-word. Many people suspect it, and they are correct. When somebody talks about thugs ruining a place, it is almost impossible today that they are referring to somebody with blond hair. It is a sly way of saying there go those black people ruining things again. And so anybody who wonders whether thug is becoming the new N-word doesn't need to. It's most certainly is.

BLOCK: Although, if you think about it, I mean, in two of the pieces of tape that we played, we heard from an African-American mayor of Baltimore and an African-American president of the United States using that word.

MCWHORTER: Yep, and that is because just like the N-word, we have another one of these strangely bifurcated words. Thug in the black community, for about the past 25 to 30 years, has also meant ruffian, but there is a tinge of affection. A thug in black people's speech is somebody who is a ruffian but in being a ruffian is displaying a

P-APP002447

The Racially Charged Meaning Behind The Word 'Thug'

healthy sort of countercultural initiative, displaying a kind of resilience in the face of racism etc. Of course nobody puts it that way, but that's the feeling. And so when black people say it, they don't mean what white people mean, and that's why I think Stephanie Rawlings-Blake and Barack Obama saying it means something different from the white housewife wherever who says it.

BLOCK: You're saying that African-American, in this case, politicians, who use the word thug should be given a pass because they understand it in a different way? I mean, the mayor certainly walked back her use of the word. She didn't want to be associated with it. She said, you know, I spoke out of frustration. They're really misguided young people.

MCWHORTER: No because I think that if an African-American woman uses the word thug today, we're not always conscious of all of these overtones in the words that we use. But I think that when she said that, she didn't mean it the same way as her white equivalent would. The word means two things, just like the N-word. And I think all of us are sophisticated enough to wrap our heads around that.

BLOCK: When do you see a turning point in how the word thug is used in our culture?

MCWHORTER: Well, it seems to have made a major change with the rise in popularity and cultural influence of rap music and the iconography connected with that. I would say that the word thug in the black community had a very different meaning by 1990 than it had had in 1980. But that thug image has never been a purely negative model. It's always been part ruffian and part hero.

BLOCK: I'm thinking of Tupac Shakur who had thug life tattooed across his stomach, I think.

MCWHORTER: Exactly, and Tupac Shakur is thought of as a god by many people. If he was a thug, then clearly if a black person says thugs were messing up the neighborhood, then they mean something other than reprehensible, shall we say, N-word. We have different races in this country, and different races have different ways of using language. Thug ends up straddling different subcultures.

P-APP002448

Case 2:20-cv-00180-JLB-MRM    Document 46-12    Filed 07/01/20    Page 36 of 219 PageID 3440

BLOCK: The word thug also - I can think of a number of other applications. I mean, folks on the far right might talk about jackbooted government thugs coming to take over our communities

MCWHORTER: That was the original meaning. It changed though. One of the things that Americans have a whole lot of trouble with - actually, that people in developed societies with written languages have trouble with - is that words never keep their meanings over time. A word is a thing on the move. A word is a process. And that's what's so confusing about the N-word. And that's what's so confusing now about this word, thug. Any discussion where we pretend that it only means one thing is just going to lead to dissension and confusion.

BLOCK: There are a lot of people now, John, who are saying, you know, why - and probably listening to this conversation saying, why are you talking about the meaning of this word, thug? That is really the wrong question to be asking and the wrong thing to be focusing on right now.

MCWHORTER: (Laughter). Well, to tell you the truth, my interest in all of these events is what made these whatever-you-want-to-call-thems rise up the way they did. And as far as I'm concerned, I feel that although the rioters were not articulate - they were not performing anything that I would call an exactly coherent action, the fact that this has happened is symptomatic of severe problems in Baltimore and similar cities. And the problem is the relationship between the police and young black men. Now, is it justified to tear up your own neighborhood to protest against it? I would say not. But the fact that it's happened is something that I think we can use as a possible turning point because I really believe that if a generation of young black men grew up in this country without thinking of the cops as the enemy, then America would really start turning a corner on race.

But nevertheless, thug is an interesting word, and to the extent that we need to be able to hear it as more than some antique, static, dictionary definition, then I think that that's part of the process of healing as well. Black people saying thug is not like white people saying thug.

BLOCK: John McWhorter, thanks for talking to us.

P-APP002449

Case 2:20-cv-00180-JLB-MRM    Document 46-12    Filed 07/01/20    Page 37 of 219 PageID 3441

MCWHORTER: Thank you.

BLOCK: John McWhorter teaches linguistics, American studies and music at Columbia University. His latest book is "The Language Hoax."

*Copyright © 2015 NPR. All rights reserved. Visit our website terms of use and permissions pages at www.npr.org for further information.*

*NPR transcripts are created on a rush deadline by Verb8tm, Inc., an NPR contractor, and produced using a proprietary transcription process developed with NPR. This text may not be in its final form and may be updated or revised in the future. Accuracy and availability may vary. The authoritative record of NPR's programming is the audio record.*

# Sign Up For The NPR Daily Newsletter

Catch up on the latest headlines and unique NPR stories, sent every weekday.

What's your email?

SUBSCRIBE

By subscribing, you agree to NPR's terms of use and privacy policy. NPR may share your name and email address with your NPR station. See Details. This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

# More Stories From NPR

P-APP002450

OPINION
**NPR Was Too Slow On Tara Reade's Story**

P-APP002451



OPINION
## Opinion: Why Is Support For Media Crackdowns Rising In Africa?

P-APP002452

Case 2:20-cv-00180-JLB-MRM   Document 46-12   Filed 07/01/20   Page 40 of 219 PageID 3444



P-APP002453

Case 2:20-cv-00180-JLB-MRM   Document 46-12   Filed 07/01/20   Page 41 of 219 PageID 3445

OPINION
# Opinion: NFL Fashion Masks But Still Not Enough Protective Masks

P-APP002454

HEALTH
**Opinion: Always The Bridesmaid, Public Health Rarely Spotlighted Until It's Too Late**

P-APP002455

OPINION

**Interview With A Coffee Shop Owner Upset Liberals: Here's What Really Happened**

P-APP002456

Case 2:20-cv-00180-JLB-MRM    Document 46-12    Filed 07/01/20    Page 44 of 219 PageID 3448



OPINION
**Opinion: What Our Children Will Remember**

# Popular on NPR.org

P-APP002457

Case 2:20-cv-00180-JLB-MRM   Document 46-12   Filed 07/01/20   Page 45 of 219 PageID 3449

GLOBAL HEALTH
**From Loss Of Smell To 'COVID Toes': What Experts Are Learning About Symptoms**

P-APP002458



P-APP002459

EDUCATION
**A Few Schools Reopen, But Remote Learning Could Go On For Years In U.S.**

P-APP002460

Case 2:20-cv-00180-JLB-MRM    Document 46-12    Filed 07/01/20    Page 48 of 219 PageID 3452



HEALTH
**U.S. Coronavirus Testing Still Falls Short. How's Your State Doing?**

P-APP002461



P-APP002462

Case 2:20-cv-00180-JLB-MRM    Document 46-12    Filed 07/01/20    Page 50 of 219 PageID 3454

NATIONAL

**Former Georgia Police Officer And His Son Arrested In The Death Of Ahmaud Arbery**

P-APP002463

The Racially Charged Meaning Behind The Word 'Thug' : NPR



HEALTH
**Mystery Inflammatory Syndrome In Kids And Teens Likely Linked To COVID-19**

P-APP002464

Case 2:20-cv-00180-JLB-MRM    Document 46-12    Filed 07/01/20    Page 52 of 219 PageID 3456



P-APP002465

HEALTH

**Tracking The Pandemic: How Quickly Is The Coronavirus Spreading State By State?**

# NPR Editors' Picks

P-APP002466

NATIONAL
**More Arrests Possible In The Killing Of Ahmaud Arbery, State Investigators Say**

P-APP002467



P-APP002468

Case 2:20-cv-00180-JLB-MRM Document 46-12 Filed 07/01/20 Page 56 of 219 PageID 3460

EDUCATION
**DeVos Uses Coronavirus Relief Funds To Top Off Small College Budgets**

P-APP002469

SCIENCE
**The Coronavirus Is Mutating. That's Normal. Does That Mean It's More Dangerous?**

P-APP002470



P-APP002471



INVESTIGATIONS
**Relief Payments To The Dead: Lawmakers Demand Answers From Treasury**

P-APP002472



POLITICS

**Michael Flynn Pleaded Guilty. Why Is The Justice Department Dropping The Charges?**

P-APP002473

Case 2:20-cv-00180-JLB-MRM    Document 46-12    Filed 07/01/20    Page 61 of 219 PageID 3465



P-APP002474

Case 2:20-cv-00180-JLB-MRM   Document 46-12   Filed 07/01/20   Page 62 of 219 PageID 3466

NEW MUSIC

**Ariana Grande And Justin Bieber Team Up For Fundraising Single 'Stuck With U'**

**READ & LISTEN**

Home

News

Arts & Life

Music

Podcasts

Programs

**CONNECT**

Newsletters

Facebook

Twitter

Instagram

Contact

Help

**ABOUT NPR**

Overview

Finances

People

Press

Public Editor

**GET INVOLVED**

Support Public Radio

Sponsor NPR

NPR Careers

NPR Shop

NPR Events

P-APP002475

Case 2:20-cv-00180-JLB-MRM    Document 46-12    Filed 07/01/20    Page 63 of 219 PageID 3467

**Corrections**                                     **Visit NPR**

terms of use

privacy

your privacy choices

text only

© 2020 npr

P-APP002476

T2-fr

334

REYNOLDS — PEOPLE — DIRECT — LEDERER

1

2   or out of the park?

3       A    He said it was inside the park.

4       Q        Did he tell you what time it was that he

5   had seen them?

6       A    That I don't recall.

7       Q    Did he say anything about the gender or the

8   sex of the people he had seen?

9       A    Yes, he said they were male blacks and

10  Hispanics.

11      Q    Did you have a conversation -- withdrawn.

12           How long did you stay at the playground at

13  100 Street?

14      A    Not long, just long enough to  --  for  the

15  show-up and to get a description from Police Officer

16  Alvarez and then we resumed canvassing.

17      Q        Where did you go when you left that

18  location?

19      A    Again we stayed in the north end and we

20  went  through  all  the  trails and the inaccessible

21  parts of the park.

22      Q    How long did you drive around in the park?

23      A    About another half-hour.

24      Q    Did you hear another radio communication

25  after you had been at the playground where Sergeant

10/13/89

T2-fr

1
2                                                                    335
                    REYNOLDS - PEOPLE - DIRECT - LEDERER
3
Lyle was?
4
        A     Yes.
5
        Q     What was the communication that you heard
6
then?
7
        A       That there was a male jogger found beaten
8
and bleeding profusely from his head.
9
        Q     Where was that -- was there a location with
10
respect to where that jogger was found?
11
        A     Yes.  That was 96th Street, I believe,
12
approximately, and the West Drive off the reservoir.
13
        Q              Where were you when you got that
14
communication, if you recall?
15
        A     I believe we were at the East Drive again
16
and 102nd Street.
17
        Q     Did the communication given with respect to
18
that jogger contain any information about any
19
people?
20
        A       He stated there was a group of male
21
Hispanics and Blacks who had assaulted the jogger.
22
        Q     Was there any further information about the
23
assault?
24
        A     Yes, that they had fled north.
25
        Q             What, if anything, did you do after you
heard that information?

10/13/89

NYCLD_023081

P-APP002478

T2-fr

336

REYNOLDS — PEOPLE — DIRECT — LEDERER

1

2      A      At that point I decided to leave the park

3  and to start the canvas outside at Central Park West

4  at 100 Street.

5      Q      Where did you leave the park?

6      A          We left at 100th Street and Central Park

7  West.

8      Q      Why did you leave the park at that time?

9      A      Because I felt that the group was no longer

10 in the park.  We had canvassed for quite a while and

11 the entire park was saturated with police vehicles.

12     Q      Did you see other vehicles in the park

13 other than those you refer to at the East Drive and

14 102nd Street?

15     A      Other than what I described earlier?

16     Q      During the time you were canvassing the

17 park, other than what you already told us at the

18 East Drive and 102nd Street, did you see any other

19 police vehicles in the park?

20     A      Just what I mentioned.

21     Q      And when you were canvassing the north end

22 of the park, did you see any sign of other police

23 vehicles?

24     A      Yes.

25     Q      What did you see?

10/13/89

NYCLD_023082

P-APP002479

T2-fr

337

REYNOLDS — PEOPLE — DIRECT — LEDERER

1

2    A     As I was going through the fields, I could

3 see further north of me the headlights of the other

4 vehicles going back and forth also in search for the

5 group.

6             MS. LEDERER:   With the permission of

7            the Court, I'd ask the witness to please

8            step down and approach People's 7 in

9            evidence.

10           (Witness complies)

11    Q    Would you please point on People's 7 in

12 evidence and describe as you do, what area you're

13 possibly pointing to, indicate where you were

14 traveling and where you would see the other lights

15 from other vehicles?

16    A    We saw the other lights ——

17            THE COURT:  Excuse me, Officer, I have

18            to remind you to speak as loud as you can

19            because everybody over on this side has to

20            hear you, and it is very difficult in this

21            courtroom.

22            THE WITNESS:  Okay.

23            I saw headlights from the other police

24            cars going east and west across the

25            ballfields here on the north end.   I was

10/13/89

NYCLD_023083

P-APP002480

T2-fr

338

REYNOLDS - PEOPLE - DIRECT - LEDERER

1
2      south   of   them   and   I  could  see  them  --  I
3      could  see  that  the  ballfields  in  this   area
4      was   pretty  well  saturated  with  police  cars
5      and  there  was  probably  no   group   in   there
6      because  somebody  would  have  seen  --
7              MR.  MADDOX:   Also  describe  the  area
8      that  he  just  referred  to  on  the  map.
9              THE  COURT:   Yes,  if  there  is  some
10     legend   on  that  map  that  describes  the  area
11     that  you're  in,  please  tell  us  what  it   is.
12     I   see  there  is  some  writing  on  that  map.
13     If  you  could  tell  us  what  it  was,  the   area
14     that  you  say  you  were  driving  in.
15             THE   WITNESS:   This  is  the  north
16     meadow,  and  it  contains   several   baseball,
17     softball,  and  a  football  field  and  we
18     again,  like  I  said,  I  had  seen  several
19     radio  cars  going  back  and  forth  and  they
20     pretty  well  had  the  whole  area  covered.   If
21     there  was  any  group  in  there  --
22             MR.  BURNS:   Objection.
23             MR.  MOORE:   Objection.
24             THE  COURT:   Yes,  don't  speculate,  just
25     tell  us  what  you  saw.

10/13/89

NYCLD_023084

P-APP002481

T2-fr

339

REYNOLDS — PEOPLE — DIRECT — LEDERER

1
2          THE WITNESS:  I saw the police cars
3      going back and forth and they had the area
4      well covered.
5   Q    Where did you go --
6          MR. BURNS:   I'm sorry.   For the
7      record, the record should reflect the area
8      of the North Meadow.
9          THE COURT:  He covered the whole area
10     of the North Meadow.
11  Q    When you stated earlier that you decided at
12  this time to leave the park, will you point out the
13  route you took to enter the park?
14  A    We left here at 100 Street, going west
15  towards Central Park West.
16  Q    What time was it, approximately, when you
17  were leaving Central Park?
18  A    It was approximately 10:30.
19  Q    What, if anything, did you see as you left
20  Central Park at 100 Street?
21  A    Okay. When we got to Central Park West at
22  100th Street, just north of us, between 101st Street
23  and 102nd, on the west side of the street, we saw a
24  group of about 10, 15, male blacks and hispanics.
25  They were teenagers.

10/13/89

T2-fr

340

REYNOLDS - PEOPLE - DIRECT - LEDERER

1
2       Q      What, if anything, did you do when you   saw
3   that group?
4       A        What we -- what I did was we started to
5   drive northbound towards them to get a   better   look
6   at the group.
7       Q      What side of the street were they on?
8       A      They were on the west side of the street.
9       Q      And when you were driving, what side of the
10  street were you driving on?
11      A      I was on the east side going northbound.
12      Q        What, if anything, happened as you went
13  northbound on Central Park   West   approaching   that
14  group?
15      A        Well, we saw the group.  They were all --
16  you know, walking together.  We felt reasonably sure
17  that they didn't --
18              THE COURT:  It's not what you felt.
19              THE WITNESS:  I felt  reasonably  sure
20          they didn't know who we were.
21              MR. RIVERA:  Objection.
22              MR. BURNS:  Objection.
23              MR. MOORE:  Objection.
24              MR. JOSEPH:  Objection.
25              MR. MADDOX:  Objection.

10/13/8?

NYCLD_023086

P-APP002483

T2-fr

341

REYNOLDS - PEOPLE - DIRECT - LEDERER

1

2          MR. DILLER:  Objection.

3          MR. BERMAN:  Objection.

4          THE COURT:  I'll allow that.  Go

5     ahead.

6          THE WITNESS:  At one point the group

7     had stopped --

8          MR. RIVERA:  I didn't hear the

9     statement he didn't feel reasonably what?

10         THE COURT:  Did not make out who they

11    were.

12    Q     Continue.

13    A     The group at one point stopped and they all

14    started to look our way and started to point at us

15    in the van, and I couldn't understand why because

16    nobody wouldn't really --

17         MR. MOORE:  Objection.

18         THE COURT:  Finish your answer.

19         THE WITNESS:  Nobody generally makes

20    who we were.

21         MR. MOORE:  Objection.

22         THE COURT:  Objection sustained.

23         Don't tell us what people generally

24    do.  Just tell us what happened here.

25         THE WITNESS:  What I did was I looked

10/13/89

T2-fr

REYNOLDS - PEOPLE - DIRECT - LEDERER                    342

1
2      to our right and a marked police three-
3      wheel scooter was on our right hand side
4      and that's what panicked them.
5           MR. MOORE:  Objection.
6           MR. MADDOX:  Objection.
7           THE COURT:  Sustained.  Just tell us
8      what you saw.
9      Q      When you looked and saw in your sideview
10     mirror a scooter, where was this scooter?
11     A      Right alongside the van on my side.  It was
12     on the other side of us, from the group.
13     Q      Who was on that scooter?
14     A      Police Officer Flores.
15     Q      What did you do when you became aware that
16     Police Officer Flores was pulling up besides you?
17     A      Well, I felt -- it looked like the group
18     was going to run to me.
19          MR. MOORE:  Objection.
20          MR. JOSEPH:  Objection.
21          THE COURT:  I'll allow it, go ahead.
22     Finish.
23          THE WITNESS:  And I told my partner to
24     take the van and pull it up ahead of them
25     to cut them off so we can stop them.

10/13/89

T2-fr

343

REYNOLDS - PEOPLE - DIRECT - LEDERER

1

2    Q    And did the van pull up?

3    A    Yes.

4    Q    Where did the van go?

5    A    Okay. My partner pulled up the van to

6    102nd Street and CPW, Central Park West on the

7    southwest corner.

8    Q    WHen you say the van was pulled up on the

9    southwest corner of 102nd and Central Park West, can

10   you describe exactly what position it was in in

11   relation to the sidewalk and the street of 102nd

12   Street?

13   A    Okay. The van was facing west with the

14   headlights facing west towards the building.   Then

15   my partner and myself got out of the van, we

16   identified ourselves.   AT that point the group

17   started to run except for two.   Those two were

18   Raymond Santana and Steve Lopez.

19          MR. MOORE:   Not responsive to the

20          question.

21          THE COURT:  I'll allow it.

22   Q    When you say you got out of the van -- let

23   me just go back for a second.  The van that you were

24   describing, what color is the van?

25   A    Green.

10/13/8

NYCLD_023089

P-APP002486

T2-fr

344

REYNOLDS - PEOPLE - DIRECT - LEDERER

1

2       Q       Are there any windows in the   back   portion

3  of the van?

4       A        In the back two doors -- I'm sorry, there

5  are no windows in it.

6       Q       Are there any side panels?

7       A       I don't believe so.

8       Q       Does it have any insignia?

9       A       Yes, Parks Department emblem on the front.

10       Q       When the van pulled into the   beginning   of

11  102nd Street and Central Park West, you say you both

12  jumped out.  What exactly did you say?

13       A        We identified ourselves as police and we

14  told them not to run.

15       Q       What happened when you said, "Don't run?"

16       A       The group started to run.

17       Q       And what did you do when the group   started

18  to run?

19       A       We got out of the van and we approached the

20  two defendants that had stayed on the corner.

21       Q        And you just named the names of those two

22  people.  Did you at the time that you   stopped   them

23  know their names?

24       A       Not at that time, no.

25       Q        What,  if  anything,  happened when you

10/13/89

NYCLD_023090

P-APP002487

T2-fr

345

REYNOLDS — PEOPLE — DIRECT — LEDERER

1
2   stopped those two?

3       A    We placed them against the wall.

4               MR. MADDOX:   Objection, Judge.   He

5           didn't   stop   them.   They   were   already

6           stopped.

7               THE COURT:   Yes.   Objection sustained.

8       Q    What happened when you approached those

9   two?

10      A        We placed them against the wall and

11  searched them.

12      Q    Did you have your gun drawn when you got

13  out of the van?

14      A    No.

15      Q        When you say you placed them against the

16  wall, what exactly did you do?

17      A    We gave them a pat down of their clothes in

18  case they had weapons on them.

19      Q    Did you find any weapons?

20      A    No.

21      Q    What was the next thing that happened?

22      A    My   partner,   Police   Officer   Powers   and

23  Police Officer Flores chased the group.

24      Q    Did the two people that you placed against

25  the wall, Raymond Santana and Steve Lopez, did

10/13/8◌

T2-fr

346

REYNOLDS — PEOPLE — DIRECT — LEDERER

1
2  either of them say anything to you?

3      A    Yes.

4      Q    What, if anything, did they say to you?

5      A       Let's see.  Raymond Santana stated he had

6  just come from his  girlfriend's  house  and  didn't

7  state where or when.

8              MR. JOSEPH:  Objection.

9              THE  COURT:   Don't  tell  us what he

10             didn't said.  Just tell us what he did say.

11             THE WITNESS:  Steven Lopez  stated  he

12             just  came   from   the  movies  with  his

13             girlfriend  and  they  watched  the  movie

14             "Leviathan".

15     Q       Did either of them say anything about the

16 rest of the group?

17     A    They stated they weren't with the group and

18 Steven Lopez stated, I quote, "The group had  talked

19 shit about ripping them off."

20             MR. MADDOX:  I can't hear.

21             THE COURT:  Who said that?

22             THE WITNESS:  Steven Lopez.

23             THE COURT:  Stated what?

24             THE  WITNESS:   They were not with the

25             group and the group had talked -- I  quote,

10/13/89

NYCLD_023092

P-APP002489

T2-fr

347

REYNOLDS - PEOPLE - DIRECT - LEDERER

1

2         "Talked shit about ripping them off."

3    Q    When I asked you a moment ago did either of

4    those two people say anything with respect to the

5    rest of the group I believe your answer began, "They

6    said," could you tell us exactly what either one  of

7    them said indicating by name what that person said?

8              MR. MOORE:    Objection.    Asked and

9         answered.

10             THE COURT:  I'll allow it again.

11             THE WITNESS:  They  both  stated  that

12        they weren't with the group and they didn't

13        know  any of the others that had run.  They

14        stated that they were walking ahead of them

15        and --

16             MR. RIVERA:   Objection,  your  Honor,

17        not responsive.

18             THE COURT:  Yes, objection sustained.

19   Q     Can you tell us what Raymond Santana said

20   to you when he  was  stopped  at  102nd  Street  and

21   Central Park West?

22   A        Raymond Santana said he wasn't with the

23   group and he had just  come  from  his  girlfriend's

24   house.

25   Q      What, if anything, did Steven Lopez say at

10/13/8

T2-fr

348

REYNOLDS - PEOPLE - DIRECT - LEDERER

1
2   that time?

3       A    He stated he also was not with  the  group,

4   that  he  had just come from his -- he had just come

5   from the movies with his girlfriend and they watched

6   the picture "Leviathan" and he also  stated,  and  I

7   quote, "Talked  shit  about  ripping off -- ripping

8   them off."

9       Q    Did  you  ask  either  Defendant  Lopez  or

10  Defendant Santana any questions?

11      A    No.

12      Q    When you saw this group, could you describe

13  how  the  group was in relation to the other members

14  of the group?

15      A    The two --

16              MR. BERMAN:  Object as to form.

17              THE COURT:  What is your question?

18      Q    When you saw the group walking  on  Central

19  Park  West,  would  you describe the relation of the

20  group with one to the other?

21      A    It was a  homogenized  group.   They  were

22  altogether  and  they  were  all walking northbound.

23  They were male Blacks, teenaged and Hispanics.

24      Q    When you saw the group on the west side  of

25  the  street, approximately how much of the block was

10/13/89

NYCLD_023094

P-APP002491

T2-fr

349

REYNOLDS — PEOPLE — DIRECT — LEDERER

1   taken up by the members of the group?

2      A    Maybe a quarter of the block.

3      Q      And where were Defendant's Lopez and

4   Santana, if you remember, in relation to the others

5   in the group?

6      A    They were in the group because the group

7   was altogether.

8      Q    What, if anything, happened after Lopez and

9   Santana made those statements to you?

10     A      My partner, Police Officer Powers chased

11  the rest of the group with Police Officer Flores.

12     Q    Where did you see him go?

13     A    I saw him running southbound on Central

14  Park West and then west on 101st Street.

15     Q      Did you see where he went when he turned

16  onto that street?

17     A    When he turned west, I lost sight of him?

18     Q    Officer Reynolds -- I'm sorry --

19     A    And then I saw him again running back east

20  and the group was ahead of him and they ran into the

21  park, and he ran into the park after them.

22     Q    Approximately how much time elapsed between

23  the time you saw him disappear from your sight going

24  down the street until you saw the group coming back

10/13/8?

T2-fr

350

REYNOLDS - PEOPLE - DIRECT - LEDERER

1
2  with him, chasing?

3      A     Just seconds.

4      Q     Did you then see Officer Powers -- go  into
5  the park?

6      A      Yes, I saw him run and jump over the wall
7  into the park after the defendants.

8              MR. MADDOX:  Objection to "after  the
9          defendants."

10             THE  COURT:   Yes, Objection sustained
11         as to "after the defendants."

12     Q    Did you see how many people were running in
13 front of Officer Powers?

14     A     It looked to be about ten.

15     Q    And you said that they entered the park, do
16 you know where it was that they entered the park?

17     A     It was over the wall and  at  Central  Park
18 West and 101st Street, between 101st and 100.

19     Q      And is that where you saw Officer Powers
20 enter the park?

21     A     Yes.

22     Q    Let me just stop you for  a  moment.   The
23 area  on Central Park West, near 101st and 102nd, to
24 your knowledge are there any movie theaters in  that
25 area?

10/13/89

NYCLD_023096

P-APP002493

T2-fr

351

REYNOLDS — PEOPLE — DIRECT — LEDERER

1
2      A      No, there isn't.

3      Q          Are there any community centers in that

4  area?

5      A      No-

6              MR. MADDOX:   Judge, may I   ask   if   he

7          could repeat the question and answer?

8              THE   COURT:    Read   the   question and

9          answer back, please.

10             (Reporter complies)

11     Q      Are there any stores on Central   Park   West

12  in that area?

13     A          No.   There's just a grocery store further

14  down, but it's very small north of where they were.

15     Q      After you lost sight of Officer Powers when

16  he went into the park, what was the next thing   that

17  happened?

18     A       I stood on the corner with Raymond Santana

19  and Steven Lopez.

20     Q      Did you handcuff them?

21     A      No.

22     Q      And where was the van?

23     A      The van was right where we left it on 102nd

24  Street and Central Park West-

25     Q      Did either of them say anything further   to

10/13/89

T2-fr

352

REYNOLDS — PEOPLE — DIRECT — LEDERER

1
2  you?

3      A      They just kept stating that they were not
4  with the rest of them.

5      Q      When you say they kept saying that, who
6  kept saying that?

7      A      Steve Lopez and Raymond Santana.

8      Q      And did you ask them any questions?

9      A      No.

10     Q      Did you have your radio with you?

11     A      Yes, I did.

12     Q      Did you hear communications coming over the
13  radio?

14     A      Yes.

15     Q      Did there come a time when someone came to
16  where you were with Santana and Lopez?

17     A      Yes.

18     Q      Approximately what time was that?

19            THE WITNESS:  May I look at  my  notes
20        to refresh my memory?

21            THE COURT:  If you have to.

22            (Witness peruses notes)

23     A      It was approximately a quarter to eleven.

24            THE COURT:  And what happened at about
25        a quarter to eleven?

10/13/89

NYCLD_023098

P-APP002495

T3-1f

353

REYNOLDS - PEOPLE - DIRECT - LEDERER

1
2          THE   WITNESS:    Sergeant   Wheeler   and
3      Police  Officer  Morales   pulled   over   after
4      the   call  over  the  radio  for  a  unit  to  pick
5      up  the  two.
6     Q     What  happened  when  they  responded?
7     A     They  responded  over  and  we  placed  them  into
8  the  car.
9     Q     Placed  whom  in  the  car?
10    A     Steven  Lopez  and  Raymond  Santana.
11    Q     And  what  did  you  do  at  that  point?
12    A     I  went  with  Police  Officer  Powers  into   the
13  van,   and   we   drove   back  to  100  Street  and  Central
14  Park  West  to  confer  with  our  sergeant.
15    Q     When  Raymond  Santana  and  Steve   Lopez   were
16  put   in  the  car  with  the  sergeant,  did  you  see  where
17  they  went?
18    A     They  went  to  100  Street   and   Central   Park
19  West.
20    Q          And   when  you  arrived  at  100  Street  and
21  Central  Park  West,  were  Raymond   Santana   and   Steve
22  Lopez  there?
23    A     Yes.
24    Q     Were  they  in  the  car  or  outside  of  the  car?
25    A     They  were  in  the  car.

10/13/89

NYCLD_023099

P-APP002496

T3-1f

354

REYNOLDS — PEOPLE — DIRECT — LEDERER

1

2      Q        And at what corner of that intersection
3  were you at?

4      A    The northeast corner.

5      Q    When you arrived at that location, who  did
6  you arrive with?

7      A    Police Officer Powers.

8      Q    And who was already at that location?

9      A      Sergeant Lyle and Police Officer Hennigan
10  and the other officers.

11      Q    And did you see anybody  in  custody  other
12  than Raymond Santana and Steve Lopez?

13      A    Yes.

14      Q    Who did you see at that time?

15      A      I saw Kevin Richardson, Lamont McCall and
16  Clarence Thomas.

17      Q    Where did you see them?

18      A    In the back of the radio car.

19      Q    Were all three in the same radio car?

20      A    I believe so.  I'm not sure.

21      Q    Was there a discussion at  100   Street  and
22  Central Park West?

23      A    Yes, there was.

24      Q    And what was the nature of the conversation
25  had there?

10/13/89

NYCLD_023100

P-APP002497

T3-1f

355

REYNOLDS — PEOPLE — DIRECT — LEDERER

1
2    A    I discussed with our sergeant -- I was told
3  that three of the defendants had made statements.
4              MR. MOORE:  Objection.
5              THE COURT:  I will allow it.
6    A        I was told three defendants had made
7  statements placing themselves at the attack of Mr.
8  Loughlin at 96th Street.
9    Q    Who told you that?
10   A      I was told that by Police Officer Powers
11 and Sergeant Lyle.
12   Q    And at that time was there a discussion at
13 100 Street and Central Park West?
14   A    Yes.
15   Q    Was there a discussion about doing a show-
16 up?
17   A    Yes.
18   Q    And was a show-up conducted with John
19 Loughlin at that time?
20   A    No.
21   Q        How long did you stay at 100 Street and
22 Central Park West?
23   A    I'd say about ten minutes; ten, fifteen
24 minutes.
25   Q    During that time were you out of the van or

10/13/8

T3-1f

356

REYNOLDS - PEOPLE - DIRECT - LEDERER

1
2   were you in the van?

3       A    I was out of the van.

4       Q          And  at any time while you were at that
5   location, were you in a car with any of  the  people
6   that had been taken into custody?

7       A    No, I wasn't.

8       Q    What was the next thing that happened?

9       A    We drove to the Central Park Precinct.

10      Q    When you say "we drove" how did you get to
11  the Central Park Precinct?

12      A    I  went  in  the  green  Parks  Department
13  vehicle.

14      Q    Did anyone ride with you?

15      A    Yes, Police Officer Powers.

16      Q    Did you see where Raymond Santana and Steve
17  Lopez  were  at  the  time you left 100th Street and
18  Central Park West?

19      A    They were in the radio car, I believe, with
20  Sergeant Wheeler.

21      Q    And the other three people  you  mentioned,
22  where were they?

23      A         I believe they were with another set of
24  officers.  I don't recall specifically who it was.

25      Q    Were any of those five people taken out  of

10/13/89

NYCLD_023102

P-APP002499

T3-1f

357

REYNOLDS — PEOPLE — DIRECT — LEDERER

1  the car at 100 Street and Central Park West?

2

3  A    I don't believe so, no.

4  Q    How long did it take you to get from 100th

5  Street and Central Park West to the Central Park

6  Precinct?

7  A    I'd say about five minutes.

8  Q    And what did you see -- withdrawn.

9  What time was it that you arrived at the

10  Central Park Precinct?

11  A    It was approximately 12:00.

12  Q    I'm sorry.

13  A    Approximately 12 midnight.

14  Q    Are you sure it was midnight when you

15  arrived?

16  (Whereupon all Defense Counsel made an

17  objection to the question by the District

18  Attorney.)

19  THE COURT:    The objection is

20  sustained.

21  Q    What did you do when you arrived at the

22  Central Park Precinct?

23  A    We brought the defendants in front of the

24  desk.

25  Q    And what time did you bring the defendants

10/13/89

T3-1f

358

REYNOLDS — PEOPLE — DIRECT — LEDERER

1
2     before the desk?

3         A     I believe -- may I refresh my  memory  with
4     my notes?

5                     THE COURT:  If you have to.

6                     MR. MADDOX:  When he says "defendants"
7                could he refer to who he was talking about?
8                Some are not defendants.

9                     THE COURT:  Okay.

10                    If  you  can, give us the names of the
11               people you are talking about.

12                    THE WITNESS:  All right.

13        A     That was about six minutes after eleven.

14        Q     And what happened six minutes after eleven?

15        A     They were brought to the station house.

16                    THE COURT:  They being?

17                    THE WITNESS:   Clarence Thomas, Lamont
18               McCall, Kevin Richardson, Steven Lopez, and
19               Raymond Santana.

20        Q     Were they at  the  stationhouse  when  you
21     arrived,  or  did  they arrive when you were already
22     there?

23        A     I think we got there around the same  time.
24     I  don't recall exactly who got there first.  It was
25     very close in time, though.

10/13/89

NYCLD_023104

P-APP002501

T3-1f

359

REYNOLDS - PEOPLE - DIRECT - LEDERER

1

2     Q     And what happened in front -- what did you

3  do when you went in front of the desk?

4     A     What I did was gave their names, addresses

5  and ages to the desk officer so he could enter it

6  into the blotter.

7     Q        Did you have a conversation with anyone

8  when you arrived at the Central Park Precinct?

9     A     Yes, I did.

10    Q     Who did you have a conversation with?

11    A     I had a conversation with one of the

12  detectives; two of them.

13    Q     To whom did you speak?

14    A     Detective Nugent and Detective Gonzalez.

15    Q     What did you say to them and what did they

16  say to you?

17    A     I stated what happened; that I arrested

18  five youths for assaulting a jogger in the Park.

19  And that was pretty much it. We returned them to

20  the Youth Room.

21    Q     How long were they before the desk?

22    A     I'd say about ten minutes.

23    Q        Was anyone with you and with them before

24  the desk sergeant?

25    A     Yes.

10/13/89

T3-1f

360

REYNOLDS — PEOPLE — DIRECT — LEDERER

1

2    Q     Who was that?

3    A        My   partner   was   there,   Police   Officer

4  Powers;  Police  Officer  Hennigan,  Sergeant  Lyle  and

5  the  detectives  might  have  come  out  also.

6    Q     After  you  were  before  the  desk  with  those

7  five  people  that  you  have  named,  where  did  you  go?

8    A        We  took  them,  I  believe,  we  took  them  to

9  the  juvenile  room.

10   Q     Officer  Reynolds,  if  you  would,  please  look

11 at  what  has  been  received  in  evidence  as  People's  1.

12 Do  you  recognize  what  that  is?

13   A     Yes.

14   Q     What  do  you  recognize  that  to  be?

15   A     It  is  a  layout  of  part  of  the  Central   Park

16 Precinct.

17   Q       What  part  of  the  precinct  is  depicted  in

18 that  diagram?

19   A     One  is  the  Community   Affairs   office,   and

20 the  other  is  our  muster  room.

21   Q     And  where  is  the  Youth  Room  in  People's  1?

22   A     Do  you  want  me  to  point  it  out?

23   Q     If  you  would,  please.

24       MR.  BERMAN:  The  testimony  was  it  was

25       the  Juvenile  Room.

10/13/89

NYCLD_023106

P-APP002503

T3-1f

361

REYNOLDS - PEOPLE - DIRECT - LEDERER

THE COURT:  Yes, you referred to it as the Juvenile Room.

Q      Excuse me.  Would you show us the juvenile room?

A      This room right here (indicating).

Q      Indicating a room, the lower rectangular room portrayed in People's 1.

When you say you went into that room, did you go into that room with all of the five people that had been before the desk?

A      Yes.

Q      Before resuming the stand, could you please point out where everyone was inside that room once you went in?

A      Okay.  I was seated at this desk here and the defendants were seated at chairs in this area (indicating).  They were all given a chair, and they were all seated over here (indicating).

MR. MADDOX:  Can the record reflect that is the bottom portion of the room that appears on that diagram?

THE COURT:  Yes, it is the bottom right portion.

MS. LEDERER:  Thank you.

10/13/89

T3-1f

362

REYNOLDS — PEOPLE — DIRECT — LEDERER

You may resume your seat.

(Witness complies)

Q        Were any of those people handcuffed in that room?

A        Their handcuffs were removed in the room.

Q        What did you do in that room?

A        In that room I started to process the paperwork for that arrest.

Q        What does that mean?

A        I did the on-line booking sheets and juvenile packages.

Q        What is a juvenile package?

A        That's the -- that's papers that you have to fill out to go to Family Court, the depositions, supporting depositions, a referral intake report, and the appearance tickets for the youths to appear in Family Court with their parents or guardians.

Q        Where was Officer Powers at that time, if you know?

A        Officer Powers was making notifications to the families, to the parents of the defendants.

Q        Was that happening in the room you were in?

A        No, that was across the way in the main part of the precinct.

10/13/89

NYCLD_023108

P-APP002505

T3-1f

363

REYNOLDS — PEOPLE — DIRECT — LEDERER

1

2       Q       During this time that you were doing the

3  paperwork in the Juvenile Room, how would you

4  describe the testimony of defendants Kevin

5  Richardson, Raymond Santana, and Steven Lopez?

6       A       They really didn't seem to care.

7               MR. RIVERA:   Objection.

8               MR. DILLER:   Objection.

9               MR. BERMAN:   Objection.

10              THE COURT:   Objection sustained.

11      Q       Describe their appearance; how would you

12  describe them.   What were they doing, what was their

13  appearance?

14              MR. BERMAN:   I would object to him

15              describing it collectively.

16              THE COURT:   I will allow it.   If they

17              differed in any respect, tell us that.

18              Tell us what each one looked like and what

19              they were doing?

20              THE WITNESS:   They were sitting around

21              talking.   Their demeanors didn't seem

22              different.   They didn't seem to care.

23              MR. RIVERA:   Objection.

24              MR. DILLER:   Objection.

25              MR. BERMAN:   Objection.

10/13/8

NYCLD_023109

P-APP002506

T3-1f

364

REYNOLDS - PEOPLE - DIRECT - LEDERER

1
2          THE   COURT:     Okay.   What do you mean
3     "they didn't seem to care"?
4          THE WITNESS:   They wanted to go  home;
5     you know, they wanted to hang out.
6          MR. RIVERA:   Objection.
7          THE COURT:   I will allow it.
8     Q     Were any one of these three people crying?
9     A     No.
10    Q       When you say you observed people in that
11    room talking  to  each  other,  did  you  see  Kevin
12    Richardson talking to anyone?
13    A     Yes, I saw him talking to Raymond Santana.
14    Q     Did you see Raymond Santana and Steve Lopez
15    talking  to  each  other  or  to other people in the
16    room?
17    A     Yes.
18    Q     Who did you see them talking to and what do
19    you remember?
20    A     They seemed to be talking  to  each  other.
21    Everybody seemed to know each other very well.
22         MR. RIVERA:   Objection.
23         MR. DILLER:   Objection.
24         MR. BERMAN:   Objection.
25         THE COURT:   Objection sustained.

10/13/89

NYCLD_023110

P-APP002507

T3-1f

365

REYNOLDS — PEOPLE — DIRECT — LEDERER

1
2       Q        Did there come a time you were aware the
3   parents began to arrive?

4               MR. MOORE:    Objection as to form.

5               THE COURT:   I will allow it.

6       A    Yes.

7               MS. LEDERER: Your   Honor,   if   I   may
8       interrupt   at   this   point   to   reinterate
9       something said yesterday.

10              I indicated to Defense Counsel that   I
11      ask   the   parents of certain defendants and
12      potential witnesses not be present   in   the
13      courtroom.   I just want to check.

14              MR.   DILLER:    No   people   from   Mr.
15      Richardson's family that will   testify   are
16      in court.

17              MS.   LEDERER:   And no other witnesses
18      that were present at the stationhouse?

19              MR. DILLER:   That's correct.

20              MR. BERMAN:   I suppose we   should   put
21      some of it on the record, because we didn't
22      do   it   the   other   day.   I   made   the
23      representation   that   I   would   have   all
24      witnesses out of the courtroom, but I asked
25      that   my   client's   parents   remain.   And I

10/13/89

T3-1f

366

1    REYNOLDS — PEOPLE — DIRECT — LEDERER
2         offered, if they  should   testify   at   this
3         hearing    or    at    the    trial,   that   the
4         Prosecution would be free to bring out they
5         had been present during the testimony.    I
6         forget if it was your Honor or Miss Lederer
7         who rejected that.
8              With   that   in   mind,   I instructed my
9         client's parents not to be  here  for  this
10        witness and the next witness.
11             THE COURT:  And they are not here?
12             MR. BERMAN:  Yes.
13             Do you recall who it was?
14             THE COURT:  Ultimately I'm the one who
15        made   the   ruling.   The important thing is
16        what I said.
17             MR. BERMAN:  I said they would have to
18        be excluded during the  testimony  of  this
19        witness.
20             MR.  RIVERA:     On   behalf   of Raymond
21        Santana, he has no relatives here today.
22             MR. JOSEPH:    The   same   is   true   on
23        behalf of Mr. Antron McCray.
24   BY MS. LEDERER:
25        Q     Did there come a time that you became aware

10/13/89

T3-1f

367

REYNOLDS - PEOPLE - DIRECT - LEDERER

1
2     of parents or families of any of those five people
3     beginning to arrive at the Central Park Precinct?
4         A     Yes.
5         Q     To the best you can recall, what was the
6     time you first became aware of the parents arriving?
7         A     I believe it was around midnight.
8         Q         And who do you recall arriving at
9     approximately midnight?
10        A     That was Mrs. Richardson.
11        Q     How was it that you became aware that Mrs.
12    Richardson was there?
13        A     She came into the room and opened the door
14    and she stated who she was.  And that was it.
15        Q     When you say she came into the room and
16    opened the door, could you step down for a moment
17    and point out on People's 1 in evidence where she
18    was?
19        A     There is a door right here which she opened
20    and let me know she was here for Kevin Richardson
21    (indicating).
22              MR. BERMAN:  For the record, he was
23              pointing to the area on that chart where
24              there was no door.  There is a doorway but
25              no door.

10/13/89

P-APP002510

T3-1f

368

REYNOLDS — PEOPLE — DIRECT — LEDERER

1
2          THE      COURT:     Yes,   it   does   appear
3      there's  no  door  drawn  into  the  diagram.   Is
4      there  an  actual  door  there?
5          THE  WITNESS:   Yes.
6          MR. MADDOX:  Could  the  record   reflect
7      where  exactly  on  the  diagram  he  is  pointing
8      to?
9          THE   COURT:    He   is   pointing  to  the
10     upper  righthand  side  of  that  room.
11     Q    At  the  time  that  Mrs.  Richardson  or  the
12 mother  of  Kevin  Richardson  arrived,  was  that  door
13 opened  or  closed?
14     A    It  was  closed.
15     Q    And  at  the  time  that  she  came  to  the  door,
16 where  was  Kevin  Richardson  when  she  opened  the  door?
17     A    He  was  seated  in  the  back  of  the  room.
18     Q    When  you  say  in  the  back  of  the  room,  where
19 were  you  referring  to?
20     A    Shall  I  point  it  out?
21     Q    Yes.
22     A     I  believe  he  was  seated  in  this  area  here
23 (indicating).
24          MS. LEDERER:  Indicating  in  the   lower
25     righthand   corner   of  the  Community  Affairs

10/13/89

T3—1f

369

REYNOLDS — PEOPLE — DIRECT — LEDERER

2    Office building.

3    Q    Did you observe or hear any conversation

4 exchanged between Kevin Richardson and his mother at

5 that point?

6    A    No.

7    Q    Was Kevin Richardson awake when she

8 arrived?

9    A    Yes.

10    Q    And when his mother arrived at the door,

11 did she speak?

12    A    Yes, she stated she was, you know, his

13 mother. I believe I got up and just asked her to

14 have a seat. Then I finished the paperwork, and

15 hopefully send him home that night.

16    Q    Where did you ask her to have a seat?

17    A    I asked her to have a seat in the clerical

18 area.

19    Q    The clerical area is where?

20    A    That's on the top of the diagram

21 (indicating).

22    Q    Is that the entire room?

23    A    Yes.

24    Q    In the top portion of that building?

25    A    Yes.

10/13/89

NYCLD_023115

P-APP002512

T3-1f

370

REYNOLDS — PEOPLE — DIRECT — LEDERER

1
2      Q     Did you become aware of any  of  the   other
3   parents arriving at that time?
4      A     Yes.
5      Q          Who was the next parent that you became
6   aware of?
7      A     I don't recall who came in next,  but   they
8   all started to come in one at a time.
9      Q          And how was it that you became aware of
10  their arrival?
11     A     Either my partner would tell me the  parent
12  was  there,  or  they  would stick their head in the
13  door and tell me they were there, looking for  their
14  son.
15     Q          During the time that the parents and the
16  families of these five  people  were   arriving,  did
17  there come a time where you saw Antron McCray?
18     A     Yes.
19     Q     Do you recall approximately when that was?
20     A          I'm not sure.  That was after midnight.
21  I'm not sure of the exact time.
22     Q     Did you have anything  that  would  refresh
23  your recollection as to the exact time?
24     A     I can take a look.  Again, I'm not sure.
25                (Witness peruses notes)

10/13/89

```
 1              People - Det. Arroyo - Cross - Rivera        2964

 2    of Raymond by Detective Hartigan; is that correct?

 3                   MS. LEDERER:  Objection.

 4                   THE COURT:  What was your question?

 5                   MR. RIVERA:  That he was present during the

 6               entire questioning of Raymond by Detective

 7               Hartigan.

 8        Q.     Is that correct?

 9                   MS. LEDERER:  Objection.

10                   THE COURT:  I'll let him answer if he was

11               present --

12                   Detective Hartigan was present at all times

13               when you were present?

14                   THE WITNESS:  Detective Hartigan was present

15               when I was present, yes.

16                   THE COURT:  At all times?

17                   THE WITNESS:  Except for the times that I

18               left the room, correct.

19        Q.     But from 1:40 to 4:40, you were present during the

20    entire questioning of Raymond Santana; is that correct?

21        A.     Again, except for those times that I left briefly.

22        Q.     Well, when did you leave the room between 1:40 and

23    4:40?

24        A.     Well, I left the room to get coffee.

25        Q.     Other than that.


                   Joseph T. Tierney, CSR, RPR
```

1          People - Det. Arroyo - Cross - Rivera          2965

2          A.   I might have also left the room to get myself a

3   soda.  I left the room after the signing of the written

4   statement, and that would take us beyond 4:40 p.m.

5          Q.   Okay.  Raymond signed the statement at about 4:40;

6   is that correct?

7          A.   That's correct.

8          Q.   That means that the interrogation of Raymond ended

9   about 4:40, would that be correct?

10         A.   That's correct.

11         Q.   And did you tell Raymond that the interrogation

12  had ended of Raymond?

13         A.   No.

14         Q.   You, at no time, informed him that your

15  questioning is over; is that correct?

16         A.   No.

17         Q.   You just took the statement, left the room and

18  came back several minutes later; is that correct?

19         A.   That's correct.

20         Q.   Now, you took that statement and brought it to

21  your supervisors; is that correct?

22         A.   That's correct.

23         Q.   And who, in particular, did you bring Raymond's

24  statement to?

25               MS. LEDERER:  Objection.


                Joseph T. Tierney, CSR, RPR

```
 1          People - Det. Arroyo - Cross - Rivera          2966
 2               THE COURT:  Who did he what?
 3               MR. RIVERA:  Who did he bring Raymond's
 4          statement to.
 5               THE COURT:  I'll let him answer.  I really
 6          don't know what it has to do with this hearing.
 7     A.   I brought the statement to the detective squad
 8 room, where Lieutenant Doyle from Manhattan North Homicide
 9 was present.
10     Q.   Was ADA Fairstein or ADA Lederer present when you
11 went to bring the statement to Lieutenant Doyle?
12               MS. LEDERER:  Objection.
13               THE COURT:  I'll let him answer that.
14     A.   No, they were not.
15     Q.   Did you discuss with Lieutenant Doyle the fact
16 that Raymond's grandmother was present and had difficulty
17 with the English language?
18               MS. LEDERER:  Objection.
19               THE COURT:  Sustained.
20     Q.   Did you ever ask Raymond to put into his own words
21 the statement that is People's 20 in evidence?
22     A.   Yes, I asked him if he wanted to write it out.
23     Q.   And what, if anything, did Raymond say?
24     A.   He said no.  I offered to write it out and he
25 agreed.
```

Joseph T. Tierney, CSR, RPR

NYCLD_017531

P-APP002516

```
1                    T-1    Reynolds-Ppl-direct                  798
2   dome light?
3        A    On any of the police cars?
4        Q    Yes.
5        A    Not that I recall, no.
6        Q    And while you were driving around, did you hear yet
7   another radio communication?
8        A    Yes.
9        Q    And what was that communicate?
10       A    That was from one of the auxiliary police, he had
11   found a male jogger that was --
12              MR.  JOSEPH:  Objection, Judge.
13              THE COURT:  I'll allow it.
14       A    He had found a male jogger that was severely beaten
15   on the, around 96th Street and the West Drive.
16       Q    Did you hear any further information with respect
17   to the assault on that male jogger?
18       A    Yes, another police officer--
19              MR.  JOSEPH:  Objection.
20              THE COURT:  Yes, just a minute.  Come up for a
21          minute.
22              Step down for a second.
23              (At side bar.)
24              THE COURT:  Okay.
25              MR.  JOSEPH:  The basis of my objection is


                          H. C. Davis
```

```
 1                    T-1    Reynolds-Ppl-direct                    799

 2      it's hearsay.

 3           THE COURT:  Yeah, except all this stuff was

 4      brought out throughout the other witnesses by

 5      defense counsel.

 6           MR.  JOSEPH:  It just seems that we don't, I

 7      don't know that it was brought out through defense

 8      counsel.

 9           THE COURT:  It was brought out, all of the

10      radio run communications were brought out through

11      defense counsel's cross-examination of other

12      witnesses.

13           MR.  JOSEPH:  But as to this witness, I think

14      the questions call for hearsay testimony, and I'm

15      noting my objection, number one.

16           Number two, it seems to me just to be, to

17      serve no purpose than bring to bring it out

18      through this witness.

19           THE COURT:  what are you asking now?  He got a

20      communication it was a male jogger beaten?

21           MS.  LEDERER:  And the description that came

22      over the air of, that male blacks that fled

23      northbound from that scene.

24           The, this information is particularly relevant

25      in light of the opening given by Mr. Rivera who
```

                              H.  C.  Davis

```
1          T-1   Reynolds-Ppl-direct                    800

2    argued that Santana was arrested for no reason.

3    And I think the state of mind of the officers is

4    relevant to why that group of people were stopped.

5        And we had this conversation about whether the

6    hearsay would be admissible just immediately

7    before starting testimony in this case.  The Court

8    indicated that it would rule as it came up.  We

9    did not elicit from officer Alvarez, and it was

10   brought out by every defense attorney throughout

11   cross of that officer.

12       THE COURT:  I don't know if I said I would

13   allow hearsay to come in.

14       MS.  LEDERER:  I said you didn't rule at that

15   time, but after we had that conversation, and even

16   the defense had been alerted to it, they all

17   brought out what the radio runs had been.

18       THE COURT:  Yes.

19       MS.  LEDERER:  This officer that made the

20   actual stop.  His state of mind is key, specially

21   since it's an issue raised by Mr. Rivera.

22       THE COURT:  Have you people finished?

23       MS.  LEDERER:  Yes.

24       THE COURT:  Normally I would not permit the

25   District Attorney to bring out any of this


                   H. C. Davis
```

NYCLD_023503

P-APP002519

T-1   Reynolds-Ppl-direct                    301

information, other than the fact they had received

a radio communication, radio transmission and

responded to, and where he responded to.  However,

all of this material that has been gone into by

the defense on cross examination of earlier

witnesses, so it seems to me inappropriate to at

this point foreclose this witness from testifying.

So, for that reason I'm going to allow it.  Okay.

    MR.   JOSEPH:  Judge, I know appellate courts

don't generally look favorably on continuing

objections, I don't know if your Honor wishes to

object to each question.

    THE COURT:  I will assume, if you want that as

to other radio transmissions, the District

Attorney may bring out.  You make a continuing

objection.

    MR.   JOSEPH:  Okay.

    THE COURT:  For the same reason I indicated I

will rule the same way.  I would have, initially

had the District Attorney tried to bring that

stuff out on her direct examination of any

witness, absent cross-examination, the bringing

out of that very same material, I would sustain

the objection, but that's not the situation.  So,


                    H. C. Davis


NYCLD_023504

P-APP002520

T-1   Reynolds-Ppl-direct                 802

1

2    I will allow it.

3         MR.  JOSEPH:  Our objection is preserved as to

4    all of this testimony to come?

5         THE COURT:  If you're going to object to each

6    radio transmission content, yes.

7         MR.  JOSEPH:  Right.  Correct.

8         MR.  BURNS:  I'm sorry, I make the same

9    objection, the objection is on direct examination

10   when it's brought out.

11        THE COURT:  Okay.

12        MR.  BURNS:  In other words, she's calling a

13   witness and the witness is testifying in the first

14   instance on direct examination, and the District

15   Attorney is being permitted to introduce hearsay

16   on the basis of the fact, I object to that, and I

17   also have a continuing objection.

18        THE COURT:  For the same reasons, I will allow

19   it.

20        MR.  BURNS:  Okay.

21        (In the presence of the jury.)

22   Q    The radio transmission that you described receiving

23   from the auxiliary police, would you tell us what the

24   content of that transmission were.

25   A    That he had found a male jogger that was beaten,


                    H. C. Davis

NYCLD_023505

P-APP002521

1
2  had been beaten up and was bleeding and needed an ambulance.
3      Q    Was there any information given as, concerning the
4  person or persons who were responsible for that assault?
5      A    Yes, there was.
6      Q    And what was that information?
7      A    That they were male blacks.
8      Q    And was any information given about where those
9  people went after they attacked the male jogger?
10     A    That they had fled west from 96th Street.
11     Q    What did you do after you heard that report?
12     A    I started to, we started to head in that direction
13  and made our way out of the park at 100th Street and Central
14  Park West.
15     Q    When you say you exited the park, would you please
16  step down and approach People's 2 in evidence and show the
17  members of the jury the route that you took and where you
18  exited the park.
19     A    We went across the cross drive here at 102nd Street
20  and, going west and then south on the, on the South Drive.
21     Q    Excuse me, your finger is next a legend there, when
22  you say you were going south, what roadway were you
23  traveling on?
24     A    On the West Drive.  And then we went west on 100th
25  Street which took us to 100th Street and Central Park West.

H. C. Davis

1                    T-1    Reynolds-Ppl-direct                    804

2          Q     Approximately what time was it as you were exiting

3    the park?

4          A     That was approximately ten to.

5          Q     What if anything did you see when you were at 100th

6    Street an Central Park West?

7          A     We saw a large group between 101st Street and 102nd

8    Street in Central Park West, walking northbound.

9                    MS.   LEDERER:  The record should reflect the

10                  witness is pointing to the right side of the

11                  street.

12         Q     What side of the street did you see them on?

13         A     I saw them on the west side of the street.

14         Q     You may resume the witness stand.

15               Would you describe the group you saw as you were

16   leaving Central Park on that night.

17         A     It was a large group of teenagers, Black and

18   Hispanic, and they were walking together as a group,

19   northbound.

20         Q     How many people did you see in that group?

21         A     Anywhere from ten to twenty.

22         Q     And what were they doing when you saw them?

23         A     They were walking northbound.

24         Q     Did you observe any interaction between the people

25   who comprised that group?


                                H. C. Davis

NYCLD_023507

P-APP002523

```
 1                    T-1    Reynolds-Fpl-direct                  805
 2        A    Well, they were walking as a group, they were
 3   talking.   And as we, as we rode alongside of them, what the
 4   group did was they stopped and started pointing at our van.
 5        Q    Let me go back for a moment.   When you described
 6   the group and you referred, you described they were walking
 7   northbound on the block on Central Park West between 101st
 8   and 102nd, how close together were the members of this
 9   group?
10        A    They were altogether like a pack.
11                  MR. JOSEPH:  Objection.
12                  THE COURT:  I'll allow it.
13        Q    What direction did you turn on to Central Park
14   West?
15        A    We turned north.   Northbound.
16        Q    And what if anything happened as you were driving
17   northbound?
18        A    Well, as we started to approach them, I was going
19   to call on the radio to have other cars come so we could
20   sort of box them in, but the group stopped and they took, at
21   least what I thought was notice of us.
22                  MR. BURNS:  Objection.
23                  MR. JOSEPH:  Objection.
24                  THE COURT:  Don't tell us what you thought
25            they thought, just tell us what you observed.


                          H. C. Davis
```

NYCLD_023508

P-APP002524

```
 1                 T-1   Reynolds-Ppl-direct              806

 2               MR.   BURNS:  Will that be stricken, your

 3          Honor?

 4               THE COURT:  Yes.

 5               MS.  LEDERER:  Your Honor, if we could.  Is

 6          the hole answer stricken?

 7               THE COURT:  Just the portion where you're

 8          telling us what you thought they thought.  We don't

 9          want you to five us their thought process, give us

10          your thought process and your observations.  Okay?

11               THE WITNESS:  Okay.

12     Q    What if anything did you see the members of that

13   group do as you drove northbound?

14     A    I saw them stop and what they did was they started

15   to point to us and I had thought that they recognized us.

16               MR.   BURNS:  Objection.

17               MR.   JOSEPH:  Objection.

18               THE COURT:  That's what he thought, that was

19          going through his mind.

20               MR.   JOSEPH:  I would object to that, even if

21          it was going through his mind.  No, I will allow

22          it, that's his thought process, I will allow that.

23               Go ahead.

24     Q    Did you see whether there was anybody near the

25   police, the Parks Department van that you were driving at
```

H. C. Davis

NYCLD_023509

P-APP002525

```
1                    T-1   Reynolds-Ppl-direct                    807
2    that time?
3         A    Yes.
4         Q    All right.  Would you describe who you saw near the
5    van and how you became aware of that person's presence.
6         A    I saw police officer Flores and she was driving,
7    she was in uniform driving a Mark three wheel scooter.
8         Q    Where was it you saw her?
9         A    She had pulled up right alongside of us on my
10   righthandside and we were between her and the group.
11        Q    Prior to seeing officer Flores at the sight you
12   just described, had you seen her earlier in the evening?
13        A    Yes.
14        Q    And where had you seen her earlier in the evening?
15        A    I saw her driving around, also looking for the,
16   canvassing for the group.
17        Q    When did you first become aware of her as you were
18   driving north on Central Park West?
19        A    Right after the group stopped and started pointing.
20        Q    And at that point when you became aware of officer
21   Flores' presence, where did you see her?
22        A    She was on my righthandside, she had pulled up
23   alongside of us, that's when we realized that--
24             MR.  JOSEPH:  Objection.
25        A    That's when I realized they were going to run.


                          H. C. Davis
```

NYCLD_023510

P-APP002526

```
 1                     T-1   Reynolds-Ppl-direct              808

 2                 MR.   JOSEPH:  Objection.

 3                 THE COURT:  That's his thought process, that's

 4          what he was thinking when he saw her pull up

 5          alongside.  I'll allow it.

 6     Q    What if anything did you and officer Powers do when

 7   you became aware that officer Flores was on your right?

 8     A    Well then we, I realized they were going to run

 9   from us because.

10                 MR.   RIVERA:  Objection.

11                 THE COURT:  No, overruled.

12                 Go ahead.

13     A    Because they'd stopped and started to point at the

14   van, at least I thought they were pointing at the van, they

15   were really pointing at her and thought she--

16                 MR.   JOSEPH:  Objection.

17                 THE COURT:  Don't tell us what they thought.

18          You tell us what you thought.

19                 THE WITNESS:  Okay.

20     Q    What if anything did you and officer Powers do at

21   that point?

22     A    We took the van and cut them off at 102nd Street.

23     Q    Would you step down again and approach People's 2

24   in evidence and show the members of the jury where you and

25   officer Powers went with the van and describe the position
```

                                   H. C. Davis

```
 1                    T-1    Reynolds-Ppl-direct              809
 2    of the van in relation to Central Park West.
 3         A    Okay.  We had, at 102nd Street we pulled in
 4    perpendicular to Central Park West into the crosswalk with
 5    the van sitting in traffic.
 6         Q    Was the van pulled into 102nd Street?
 7         A    No.  It was on Central Park West.
 8         Q    And what happened when you pulled the van into that
 9    location?
10         A    We got out of the van, identified ourselves and
11    told them not to run.
12         Q    Why don't you resume the witness stand.
13              From the position that you've just described that
14    the Parks Department van was in, which of you were closer to
15    the group?
16         A    Police officer Powers.
17         Q    And when the van was pulled in that postion, what
18    if anything did you do?
19         A    I got out of the van, he got out of the van and
20    again we identified ourselves and told them not to run.
21         Q    When you got out of the van, did you go around the
22    front or the back of the van?
23         A    I went around the front.
24         Q    And whether you went around the front, how close
25    were the members of the group to you at that time?


                            N. C. Davis
```

NYCLD_023512

P-APP002528

T-1    Reynolds-Ppl-direct                    210

2    A    I'd say about a car length or two.

3    Q    And what if anything did the members of the group

4    do when you said what you just described?

5    A    They ran.

6    Q    And did any members of the group not run?

7    A    Yes.

8    Q    And who, would you describe what happened with

9    respect to people who did not run.

10   A    Well, they didn't run, I, we told them to get

11   against the wall, gave them a quick, you know, frisk in case

12   they had any kind of weapons.

13   Q    How many people did not run when you identified

14   yourselves?

15   A    Two.

16   Q    And where were those people in relation to the

17   group?

18   A    They were with the group, they were right in the

19   front.

20   Q    And how close were you to them at the time --

21        MS. LEDERER:  Withdrawn.

22   Q    How close were the others in the group to you in

23   relation to where these in the group were?

24   A    Excuse me, I'm sorry?

25   Q    You indicated that there were people in the group

H. C. Davis

1                    T-1   Reynolds-Ppl-direct                    811

2    that didn't run, how many didn't run?

3         A    Two.

4         Q    And where were those people in relation to the

5    other members of the group that didn't run?

6         A    They were with the group, but they were right at

7    the front of the pack.

8         Q    Did you later learn the names of those two people?

9         A    Yes.

10        Q    And what were their names?

11        A    Steve Lopez and Raymond Santana.

12        Q    What did you do with respect to those people?

13        A    We took them, placed them against the wall and

14   patted them down real quick.

15        Q    When you say you took them, do you know which

16   person you took?

17        A    No, I don't recall.

18        Q    And would you describe how you, what you mean when

19   you say took them.

20        A    I grabbed him by his arm.

21        Q    And you indicated you put him against the wall?

22        A    Yes.

23        Q    Was his face to the wall or face to you?

24        A    Face to the wall.

25        Q    And what did you do at that point?


                              H. C. Davis


NYCLD_023514

P-APP002530

 1
 2     A    I patted his outside clothing down to make sure he
 3 had, you know, didn't have a knife or a gun or anything.
 4     Q    Did you find any kind of a weapon?
 5     A    No.
 6     Q    Okay.  Where was officer Powers while you were
 7 doing this?
 8     A    He was standing right alongside me.
 9     Q    And what was he doing?
10     A    He was doing the same with the other person he had.
11     Q    Do you know which person you had taken hold of?
12     A    No, I don't recall.
13     Q    And do you know the name of the person officer
14 Powers had taken hold of?
15     A    No.
16     Q    Other than those two people, where did everybody
17 else in that group go?
18     A    The group ran south on Central Park West towards
19 101st Street and then at 101st Street they ran west.
20     Q    After you had frisked the person you had against
21 the wall, what did you do with him?
22     A    I stood there were them and while officer Powers
23 chased the rest of the group along with officer Flores.
24     Q    At the time that you and officer Powers stopped
25 Steve Lopez and Raymond Santana, did Raymond Santana make

                          H. C. Davis

```
1                 T-1    Reynolds-Ppl-direct                  813
2   any statement to you?
3        A    Yes, he did.
4        Q    And would you tell us please what he said to you.
5        A    He stated that he had just come from a girlfriend's
6   house and that he didn't know the group and that they were
7   about to rip them off.
8        Q    How long did you say, excuse me, how long did
9   officer Powers stay at that location with you after you had
10  taken these two individuals and put them against the wall?
11       A    Just long enough to pat down the person that he was
12  holding.
13       Q    And where did he go after that?
14       A    He ran after the group.
15       Q    Did you handcuff either of those two people at that
16  time?
17       A    No.
18       Q    Did you see where officer Flores went?
19       A    Officer Flores was also in pursuit of the group.
20       Q    And was she doing that on foot or on the scooter?
21       A    In the scooter.
22       Q    Where did you see her go?
23       A    I saw her in the street go south on Central Park
24  West and then west on 101st Street.
25       Q    Did you see either officer Powers or officer Flores
```

                            H. C. Davis

T-1   Reynolds-Ppl-direct                                314

2   again after you saw them run west on 101st Street?

3       A    Yes.

4       Q    And would you please tell us where you saw them.

5       A    They had run east on 101st Street, doubling back,

6   you know, for the kids that had run back the other way.

7       Q    And did you see them come back to 101st Street and

8   Central Park West?

9       A    Yes.

10      Q    Did you see any members of the group at that time?

11      A    Yes.

12      Q    And approximately how many members of the group did

13  you see?

14      A    It was about six or seven of them.

15      Q    What did you see them doing?

16      A    They ran across Central Park West and when they got

17  to the wall, they jumped over the wall, into the park.

18      Q    And what if anything did you see officer Powers do.

19      A    I saw him also run cross Central Park West and he

20  jumped over the wall.

21      Q    And what did you see officer Flores do?

22      A    I believe she drove her scooter around and went

23  through the, went through the 100th Street entrance.

24      Q    What did you do during this time?

25      A    During this time I stood there with the, with Lopez


H. C. Davis

P-APP002533

```
 1                   T-1    Reynolds-Ppl-direct              815
 2   and Santana and I put over the air, I called for assistance
 3   for other units to come and help out officer Powers with
 4   the, with the perps he was chasing.
 5        Q    Officer Reynolds, I ask you to look around the
 6   courtroom today, do you see Raymond Santana in court today?
 7        A    Yes.
 8        Q    And would you please point him out.
 9        A    He's sitting right there with, I believe it's a
10   blue tie, white shirt and glasses.
11                   MS.  LEDERER:   The record should reflect the
12             witness has identified Raymond Santana.
13        Q    Approximately how long did you stay at that sight
14   with Steve Lopez and raped Santana?
15        A    I'd say about fifteen, twenty minutes.
16        Q    Did there come a time where a police car came to
17   the location where you were?
18        A    Yes.
19        Q    And who was in that car?
20        A    That was Sgt. Wheeler and another police officer, I
21   don't recall his name now.
22        Q    What happened --
23        A    Officer Morales.
24        Q    What happened when that police car arrived?
25        A    They, when they got there, then they were placed, I
```

H.  C.  Davis

NYCLD_023518

P-APP002534

T-1   Reynolds-Ppl-direct                                816

placed the handcuffs on them and put them in the back of the car.

Q    And what did you do after they were placed in the radio car?

A    I had waited for officer Powers to come back with the keys for the van so we could drive back to 100th Street and Central Park West.

Q    Did officer Powers come back on the location where you were?

A    Yes.

Q    Approximately how much time went by to the time Stephen Lopez an Raymond Santana were taken in the police car, how much time went by from the time those two were taken in the police car until officer Powers came back.

A    I'd say about five minutes.

Q    And after officer Powers came back, what if anything did you do?

A    We drove back to 100th Street and Central Park West, inside of the park.

Q    Who did you see when you got to 100th Street and Central Park West?

A    I saw my supervisor, Sgt. Lale and the other officers that were involved in the pursuit.

Q    And did you see Raymond Santana or Steve Lopez at

H. C. Davis

P-APP002535

T-1    Reynolds-Ppl-direct                    817

that location?

    A    Yes.

    Q    Without us where you saw them?

    A    I saw them in the back of Sgt. Wheeler's car.

           MS. LEDERER:  With the Court's permission.

    Q    If you would step down People's 2 in evidence and
show the members of the jury the location where you went
after officer Powers came back with the keys to the van.

    A    We went right here, 100th Street and Central Park
West, inside the park.

    Q    Okay, thank you.  You may resume the witness stand.

           Other than your supervisor and Raymond Santana and
Steve Lopez and yourself an officer Powers, who else did you
see at that location?

    A    I saw the defendants.

           MR. RIVERA:  Objection.

           THE COURT:  Objection sustained.

    Q    Could you tell us by name who you saw at that
location.

           MR. JOSEPH:  Objection.

           THE COURT:  No, I'll allow it.

    A    Clarance Thomas, Lamont Mc Call, Kevin Richardson,
and Stephen Lopez and Raymond Santana.

    Q    How long did you stay at that location?

               N. C. Davis

NYCLD_023520

P-APP002536

1              T-1    Reynolds-Ppl-direct                      818

2       A    I'd say about ten, fifteen minutes.

3       Q    Add during that time did you have any conference or

4  discussion with your sergeant and other police officers?

5       A    Yes.

6       Q    What did you say during that discussion with the

7  sergeant and the other police officers?

8                 MR.  JOSEPH:  Objection.

9                 THE COURT:  Come up for a minuted, please.

10                 Step down, please.

11                 (At side bar.)

12                 THE COURT:  What is he going to say?

13                 MS.  LEDERER:  All he's going to say, there

14            was a discussion whether had heed do a showup with

15            John Loughlin, and it was decided not to do it.

16                 THE COURT:  Oaky, I'll allow that.

17                 MS. JOSEPH:  That's over objection.

18                 THE COURT:  Yes.

19                 MR.  JOSEPH:  What's the relevance that it was

20            decided not to do it?

21                 MR.  BURNS:  That's my point.

22                 THE COURT:  We'll find it out shortly.

23                 MS.  LEDERER:  It explains why they went

24            there, what they did with him.  And it explains

25            what the police procedure is at the stationhouse.


                         H.  C.  Davis

NYCLD_023521

P-APP002537

T-1   Reynolds-Ppl-direct                                819

MR.   JOSEPH:  My objection is not just

relevance, it seems again we're getting into

hearsay, which clearly the door has not been

opened up to.  It was decided not to do a lineup,

with John Loughlin.

THE COURT:  A show up.

MR.   JOSEPH:  A show up with John Loughlin,

that too is a determination made by more than one

individual which was at least implicitly, if not

explicitly calls for a statement as to what was

discussed by other officers.

THE COURT:  I'll allow it.  Overruled.

(In the presence of the jury.)

Q    Was there a discussion had at that location among
the police officers?

A    Yes.

Q    And what was the nature of that discussion?

MR.   JOSEPH:  Objection.

THE COURT:  I'll allow it.

A    It was regarding the arrest of the defendants.

Q    Was there any discussion about what, whether there
would be any kind of show up?

MR.   RIVERA:  Objection.

THE COURT:  I'll allow it.


H. C. Davis

P-APP002538

```
 1              T-1   Reynolds-Ppl-direct                820
 2      A    Yes.
 3      Q    And what was the nature of that discussion?
 4      A    We had wanted to get the--
 5              MR.  JOSEPH:  Objection, Judge, as to what
 6           they wanted to.
 7              THE COURT:  Yeah, just tell us what were you
 8           going to do about a show up.
 9      A    We were going to have a show up with the
10   complainant, John Loughlin, and we had to ascertain if he
11   could identify the people that assaulted him at that time.
12      Q    Was a show up done with John Louhglin?
13      A    No.
14      Q    At that time did you know the name John Loughlin?
15              MR.  JOSEPH:  Objection.
16              THE COURT:  I'll let him answer.
17      A    No.
18      Q    Did there come a time where you left the location
19   at 100th Street and Central Park West, inside the park?
20      A    Yes.
21      Q    And where did you go at that time?
22      A    We went back to Central Park Precinct.
23      Q    How did you get from that location to the Central
24   Park Precinct?
25      A    In the green Parks Department van.


                         H. C. Davis
```

P-APP002539

T-1   Reynolds-Ppl-direct                    821

1

2      Q      Who did you travel with.

3      A      Police officer Powers.

4      Q      And did you have any of the people who had been

5      apprehended in the van with you?

6      A      No.

7      Q      And do you know how Raymond Santana was transported

8      to the Central Park Precinct.

9      A      He was transported I believe with the Sergeant,

10     Sgt. Wheeler.

11     Q      How long did it take to get from that location to

12     the Central Park Precinct?

13     A      About five minutes.

14     Q      And what happened when you arrived at the precinct?

15     A      We went before the desk with the, with five

16     defendants.

17     Q      When you arrived at the precinct, did you arrive

18     there first or did the People taken into custody get there

19     before you?

20     A      I believe we arrived at about, just about the the

21     same time.

22     Q      And you described of went before the desk, would

23     you explain for the members of the jury what that means.

24     A      We go before the desk to make a record of the fact

25     that I had made an arrest and who the people were that were

                           H. C. Davis

T-1   Reynolds-Ppl-direct                    822

1

2  arrested, and you know, their names, addresses and what they

3  were being arrested for.

4      Q    Did you take all five of the people who had been

5  taken into custody before the desk?

6      A    Yes.

7      Q    And do you know the names and the physical

8  descriptions of each of the people that you took into

9  custody that night?

10     A    Yes.

11     Q    Would you please give the name of each person taken

12 into custody, a physical description of that person and

13 indicate their age.

14     A    Okay.  I'll just quickly look at my notes.

15          THE COURT:  If you have to.

16     A    Let me see, there was Raymond Santana, who was, who

17 is fourteen, and he was in apparently normal condition.

18          MR.  RIVERA:  Objection.

19     Q    What was his race?

20          THE COURT:  Don't tell us about normal

21          condition, just give us the name, description of

22          what they --

23          Are you asking for description of their--

24          MS.  LEDERER:  Physical appearance.

25          MR.  RIVERA:  Objection.


                        H. C. Davis

NYCLD_023525

P-APP002541

```
 1                    T-1   Reynolds-Ppl-direct              823
 2        Q     Did you learn the race of Raymond--
 3                    MR.  BURNS:  Did you rule on the objection?
 4                    THE COURT:  Just a minute, I'm trying to
 5           clarify the question.
 6                    MS.  LEDERER:  I withdraw the prior question.
 7                    THE COURT:  They're withdrawing.
 8                    MR.  JOSEPH:  She's withdrawing?  Oh.
 9        Q     Officer, did you learn the race of Raymond Santana?
10        A     Yes.
11        Q     And what race was he?
12        A     He was a male Hispanic.
13        Q     And did you learn his address at the time he was
14           taken into custody.
15        A     Yes.
16        Q     What was the address?
17                    MR.  RIVERA:  Objection.
18                    THE COURT:  I'll allow it..
19        A     It was
20        Q     And with respect to the others who were taken into
21           custody at that time?
22        A     Yes.
23        Q     Did you learn Kevin Richardson's age?
24        A     Yes, he was fourteen.
25        Q     And what was his, what was his racial make up?


                              N.  C.  Davis
```

T-1   Reynolds-Ppl-direct                          824

2    A    He was Black.

3    Q    And what was his address?

4    A

5    Q    Did you learn the age of Clarance Thomas?

6    A    Yes, he was 14.

7    Q    And did you learn his address?

8    A    That was

9    Q    And what was his race.

10    A    He was a male black also.

11    Q    With respect to Lamont Mc Call, did you learn his

12 age?

13    A    Yes.  He was thirteen years old.  He was a male

14 black and he lived at

15    Q    And with respect to Steven Lopez?

16    A    He was fifteen, he was a male Hispanic and he lived

17 at

18    Q    At the time that these five people were taken

19 before the desk, were they handcuffed?

20    A    Yes, they were.

21    Q    How long were you before the desk with those five

22 people?

23    A    I'd say approximately five to ten minutes.

24    Q    And during the time you were before the desk, other

25 than the address and the date of birth and the age of those

H. C. Davis

```
 1                    T-1    Reynolds-Ppl-direct                    825

 2    people, was any other information taken from them?

 3         A    Yes.

 4         Q    And what information was that?

 5              MR.  JOSEPH:  Objection.

 6         A    Their telephone numbers.

 7         Q    Who took that information from them there?

 8         A    Police officer Powers.

 9         Q    After you finished appearing before the desk,

10    before the desk sergeant, where did you go?

11         A    I went to the juvenile room with the defendants.

12         Q    Where was the jouvenile room located?

13         A    It was in our clerical office, which is a seperate

14    building from the precinct.

15         Q    And how is it seperate from the precinct?

16         A    It was separated by a driveway and --

17         Q    Would you tell the members of the jury what is a

18    juvenile room?

19         A    A jouvenile room is a room designated by the Family

20    Court which is suitable for questioning of juveniles for

21    their arrest or if they're lost or if you have a juvenile in

22    police custody for any reason, this is the room which you

23    take them in.

24         Q    What is a juvenile?

25         A    A juvenile is any person under the age of sixteen.


                         H. C. Davis
```

P-APP002544

T-1   Reynolds-Ppl-direct                    826

2   Q    What if anything did you do when you entered the

3   juvenile room with these five young men?

4   A    I brought them in the room, took off their

5   handcuffs and arranged seating for all of them.

6   Q    What did you do after you took off the handcuffs

7   and arranged seating for these five people?

8   A    Then I started to do the paperwork.

9   Q    What paperwork are you talking about?

10  A    It's the on line booking sheet, that's the

11  paperwork you do when someone is arrested and juvenile

12  arrest package.

13  Q    How many different sets of papers are required for

14  a jouvenile package for each individual?

15  A    There is about six or seven for each juvenile.

16  Q    And where was officer Powers while you were doing

17  the paperwork?

18  A    He was calling their parents.

19  Q    And did there come a time when he finished making

20  those calls?

21  A    Yes.

22  Q    And did you see him after he finished making those

23  calls?

24  A    Yes.

25  Q    Where did you see him?


                              H. C. Davis

T-3   Reynolds-Ppl-cross (Rivera)                    909

the Assistant District Attorneys and all sworn

jurors are present.

    THE COURT:  All right, good afternoon, ladies

and gentlemen.

    THE CLERK:  Officer Reynolds, may I remind you

you're still under oath.

    THE WITNESS:  Yes.

CONTINUING CROSS EXAMINATION

BY MR. RIVERA:

    Q    Officer, before we broke, you indicated to us that

there was some chiefs and members of the press that were

present at the Central Park Precinct; is that correct?

    A    Yes.

    Q    And is that unusual to see top brass at the Central

Park Precinct during an arrest?

    A    There is not a lot of arrests there, so, but yeah,

I would say it is.  Slight.

    Q    Under normal circumstances would it be unusual to

see a high member of the brass at any precinct when youths

are arrested?

    MS. LEDERER:  Objection.

    THE COURT:  I'll allow it.

    A    It depends on the precinct.

    Q    Are there some precincts where this would not be

E. C. Davis

```
 1              T-3    Reynolds-Ppl-cross (Rivera)           910
 2   unusual?
 3                    MS.   LEDERER:   Objection.
 4        A    Yes.
 5        Q    What about the Central Park Precinct, is this
 6   unusual at the Central Park Precinct?
 7        A    Slightly, yes.
 8        Q    And the same applies for the members of the press?
 9        A    Yes.
10        Q    Is thsi the first time you make an arrest where you
11   have that kind of brass and that kind of press present?
12        A    Yes.
13        Q    And at what point in time were you apprised that
14   there case was going to have special significance within the
15   modus operandi of the Police Department.
16                    MS.  LEDERER:   Objection.
17                    THE COURT:  Sustained.
18        Q    Were there any Assistant District Attorneys present
19   at any time when you were involved in this case between
20   April the 19th and April the 20th?
21                    MS.  LEDERER:   Objection.
22                    THE COURT:  I'll let him answer.
23        A    Yes.
24        Q    And would that about A.D.A.  Lederer?
25        A    Yes.


                              H. C. Davis
```

NYCLD_023613

P-APP002547

T-3   Reynolds-Ppl-cross (Rivera)                911

2   Q   And was there also an A.D.A. Fairstein?

3   A   Yes.

4   Q   Were there any other members of the District

5   Attorney, District Attorney present, paticularly any

6   Assistant District Attorney?

7   A   I don't think so.

8   Q   And when for the first time did you see an

9   Assistant District Attorney on this matter?

10   A   The night of the 20th.

11   Q   Prior to the evening of the 20th, you had not seen

12   any A.D.A.s?

13   A   Regarding this matter?

14   Q   Regarding this case.

15   A   No.

16   Q   Did you see them in the building or any other

17   buildings involved in the case?

18   A   No.

19   Q   Prior to the 20th?

20   A   No.

21   Q   Officer, you testified that you spoke to a police

22   officer Alvarez; is that correct?

23   A   Yes.

24   Q   And police officer Alvarez informed you of an

25   assault on an individual; is that correct?

W. C. Davis

T10-SC-TS

2498

Arroyo - Cross - Rivera

1

2       Q        And that part was not in when you first made out
3   this statement, is that correct?
4       A        That's correct.   Because if he had anything
5   additional to add, it would have been added there.
6       Q        But   it wasn't in when you read the statement to
7   Ramon?
8       A     That's correct.
9       Q     Now, were you the one who called the district
10  attorney's office to have him come down?
11      A     No, I was not.
12      Q     Were you present when the DAs office showed up?
13      A     Yes.
14      Q        And at about what time did representatives of the
15  DAs office show up?
16      A     I'm not sure exactly what time they showed  up.     I
17  first  encountered  the  DAs  at the 20th Precinct after I was
18  finished at the Central Park Precinct.
19      Q     So, they weren't at the Central Park Precinct?
20      A     Well, I don't recall seeing them there.
21      Q     First time you saw them was at the 20 Precinct, 20th
22  Precinct?
23      A     That's correct.
24      Q     And was this in the morning or in the afternoon that
25  you saw them?

T10-SC-TS

2499

Arroyo - Cross - Rivera

1

2    A    This was in the evening.

3    Q    And you have no recollection at about what time you

4 saw them?

5    A    No, I don't.

6    Q    And who from the district attorney's office did you

7 see at the precinct?

8    A    I saw district attorney Linda Fairstein, district

9 attorney Liz Lederer and district attorney Tim Clements.

10   Q    Do you know who Linda Fairstein is in the hierarchy

11 of the district attorney's office?

12   A    Yes.

13   Q    And who is she?

14   A    She was the sex crimes senior trial lawyer for the

15 DAs office.

16   Q    Was she the chief of the sex crime unit for the DAs

17 office?

18   A    I'm not exactly sure what her rank was, but she held

19 some position along those lines at that time.

20   Q    She had a position within the district attorney's

21 office, a high position within the DAs office, is that

22 correct?

23   A    Well, I would assume you would call it that, yeah.

24   Q    And you saw them there on the evening of April the

25 20th, am I correct in that?

T10-SC-TS

2500

1                     Arroyo - Cross - Rivera

2     A     Yes.

3     Q     And the job of a district attorney, the primary job

4  of the district attorney is to assist the police in getting a

5  statement from a defendant?

6     A     That's not correct.

7     Q     They assist the police in getting a video statement

8  from the defendant, is that correct?

9     A     They did perform video statements, yes.

10    Q     When you got the statement from Ramon Santana, you

11  didn't run out and call the DAs office and say we got a

12  statement from Defendant Santana, come on down so we can make

13  a video of it?

14    A     Absolutely not.

15    Q         You waited to get statements from all defendants

16  before you called the DAs office?

17            MR. CLEMENTS:  Objection.

18            THE COURT:  Objection sustained.

19    Q     And so -- were you present when a video statement

20  was taken of Ramon Santana?

21    A     Yes, I was.

22    Q     And who else was present in the room?

23    A     Ramon Santana, Ramon Santana, Sr., district attorney

24  Liz Lederer and detective Mike Sheehan.

25    Q     And yourself, is that correct?

T10-SC-TS

2501

1                    Arroyo - Cross - Rivera
2        A    And myself.
3        Q        And detective Sheehan is from the Manhattan North
4   Homicide?
5        A    That's correct.
6        Q    Did you escort Ramon into the video room?
7        A    I don't recall.  I don't believe I  did.    I   don't
8   recall if I did escort him.
9        Q        Did you at any point in time tell Ramon that they
10  were going to take a video statement of him?
11       A    No, I don't recall.
12       Q    When you finished questioning Ramon at 4:40  in  the
13  afternoon,  did  you say Ramon, you got to wait around because
14  we're going to take a video statement of you?
15       A    You got to what?
16       Q    You have to wait around because we're going to  take
17  a video statement of you?
18       A    No, I didn't tell him that.
19       Q        It was your testimony you went up and you gave a
20  statement that you took from Ramon  Santana  to  one  of  the
21  supervisors, is that correct, detective supervisors?
22       A    That's correct.
23       Q    Was that detective supervisor lieutenant Doyle?
24       A    That's correct.
25       Q    And this was the commanding officer of the homicide

Page 64

1                    Eric Reynolds

2    in the playground before you left?

3         A.    I don't recall the exact time.  It

4    wasn't long.

5         Q.    It wasn't long?

6         A.    No.

7         Q.    Could it have been five minutes,

8    ten minutes?

9         A.    It could have been.

10        Q.    After you left, where did you and

11   Officer Powers go, what did you do?

12        A.    We continued to canvas.

13        Q.    You continued to canvas the park

14   area, the northern end of the park, correct?

15        A.    Yes.

16        Q.    How long did you canvas the

17   northern end of the park inside the park?

18        A.    Well, I don't recall the exact

19   time.

20        Q.    Could it have been another 15

21   minutes, a half an hour, what?

22        A.    Again, I don't recall the exact

23   time.

24        Q.    What did you do after that, where

25   did you go after you completed your canvas of

NYCLD_057669

P-APP002553

Page 65

```
1                    Eric Reynolds
2    the park?
3           A.     We continued to canvas.
4           Q.     You continued to canvas, okay,
5    inside the park?
6           A.     Yes.
7           Q.     How long did you canvas inside the
8    park?
9                  MR. MYERBERG:  Objection.
10          A.     Again, I don't recall.
11          Q.     Do you remember what you did?  Did
12   there come a time that you ever left the park?
13          A.     Yes.
14          Q.     And do you remember approximately
15   what time you left the park?
16          A.     I think it was, I believe it was
17   10:50.
18          Q.     About 10:50, okay.
19          A.     10:45.  I'm not sure of the exact
20   time.
21          Q.     That's okay.  And so you left the
22   park, you and Officer Powers.  Why did you leave
23   the park?  I'm curious, why did you stop the
24   canvassing inside the park?
25          A.     Because I didn't believe that the
```

NYCLD_057670

P-APP002554

Page 66

```
 1                    Eric Reynolds
 2   group was in the park anymore.
 3        Q.    So is it fair to say from about
 4   9:15 until the time that you left at about 10:45
 5   thereafter, you never ever saw any black males
 6   in the park; is that correct, in the northern
 7   end of the park?
 8              MR. MYERBERG:  Objection.
 9        A.    No.
10        Q.    You can answer.
11        A.    No, it's not fair to say.
12        Q.    Other than the ones who were on the
13   playground; is that correct?
14        A.    No.
15        Q.    You never saw any group of black
16   males together inside the park in the northern
17   end at any time between 9:15 and the time you
18   left; is that correct?
19              MR. MYERBERG:  Objection.
20        A.    I don't believe --
21              MR. MYERBERG:  You can answer.
22        A.    I don't believe so.
23        Q.    Right.  And as a matter of fact,
24   isn't that why you decided to leave and go over
25   to, was it Central Park West that you went to?
```

NYCLD_057671

P-APP002555

Page 67

1                    Eric Reynolds

2           A.      Yes.

3           Q.      And you went over to Central Park

4    West.   When you exited the park on Central Park

5    West, what street did you exit on?

6           A.      100th Street.

7           Q.      100th Street, okay.

8           A.      Yes.

9           Q.      And when you got to Central Park

10   West going out the 100th Street exit, which way

11   did you go from there, a left or a right?

12          A.      We made a right.

13          Q.      Is there any special reason you

14   made a right?

15          A.      Because we saw a large group of

16   male blacks and Hispanic teenagers.

17          Q.      When you first saw them, where did

18   you see them on Central Park West?

19          A.      They were between 101st and 102nd

20   Street.

21          Q.      So they were walking -- correct me

22   if I'm wrong, Detective -- they were walking in

23   a northerly direction; is that correct?

24          A.      Yes.

25          Q.      So is it fair to say they were

NYCLD_057672

P-APP002556

Page 68

1                    Eric Reynolds
2    walking in a northerly direction, they were
3    coming from a southerly direction?
4          A.     Yes.
5          Q.     On Central Park West?
6          A.     Yes.
7          Q.     So they were walking in the
8    direction of 102nd Street, correct?
9          A.     I'm sorry?
10         Q.     They were walking in a northerly
11   direction.  You say you saw them at about 101st.
12   They were walking in a northerly direction
13   toward 102nd Street; is that correct?
14         A.     That's correct, yes.
15         Q.     When you saw them, what did you and
16   Officer Powers do?
17              MR. WARREN:  Withdrawn.
18         Q.     Let me ask you a question before
19   that.  When you saw them, they were just
20   walking; is that correct?
21         A.     They were walking, talking with
22   each other.
23         Q.     Right, when you saw them, at no
24   time did you see them harassing anybody, beating
25   anybody, you didn't see any of that?

NYCLD_057673

P-APP002557

Page 69

1                    Eric Reynolds

2        A.        There was no one else on the street

3   but them.

4        Q.        So they were just walking and

5   talking together; is that correct?

6        A.        That's correct.

7        Q.        Approximately how many of them were

8   there, sir?

9        A.        There was a lot.  I had estimated

10  between, you know, ten, 15.  There might have

11  been more.  I don't recall though.

12       Q.        And were they all black males?

13       A.        They were male black and Hispanics.

14       Q.        And Hispanics?

15       A.        Yes.

16       Q.        So after you saw them walking from

17  a southerly direction north in the direction of

18  102nd Street, what happened after that, what did

19  you all do?

20       A.        I was going to take my radio, and

21  first we were observing them, and I was going to

22  take my radio and ask for additional units to

23  respond so that we could stop the group.

24       Q.        Go ahead, sir.  I'm sorry, go

25  ahead.

NYCLD_057674

P-APP002558

Page 70

1           Eric Reynolds
2      A.      That's it.
3      Q.      Okay, why were you going to be
4  asking for additional units if they were just
5  walking and talking to each other?  I'm just
6  trying to get this etched deeply in my mind in
7  understanding it.  Why would you call for
8  additional units?
9      A.      Because there was a large number of
10  them.
11      Q.      But they were just walking and
12  talking, right?
13      A.      Yes.
14      Q.      And that was it, no crimes being
15  committed, correct?
16              MR. MYERBERG:  Objection.
17      A.      We wanted additional units so that
18  we could stop all of them in case they decided
19  to run.
20      Q.      What happened after that, after you
21  made the call for additional units?
22      A.      I didn't get to make the call.
23      Q.      Why not?
24      A.      Because the group stopped and
25  started pointing at us, and then some of the

NYCLD_057675

P-APP002559

Page 71

```
1                    Eric Reynolds
2    males towards the rear started to walk off.  But
3    they were, appeared to have been alarmed by our
4    presence.  I thought it was our presence.
5         Q.      What happened after that?
6         A.        There was a rap on my window and it
7    was, turned out that there was a cop in uniform
8    on a scooter, and that officer was Officer
9    Flores had pulled up to us to tell us she
10   thought that might have been the group, and we
11   explained to her that's why we were there.
12        Q.      She explained that might have been
13   the group, what did she mean?
14        A.      The group we were looking for.
15        Q.      But you never.
16                Saw anybody inside the northern end
17   of the park while you were in the park; is that
18   correct?
19        A.      Sorry?
20        Q.      You never saw any black males
21   inside the park --
22                MR. MYERBERG:  Objection.
23        Q.      -- while you were canvassing; is
24   that correct?
25        A.      No, I didn't say that.
```

NYCLD_057676

P-APP002560

Page 72

1                    Eric Reynolds

2          Q.      So are you saying when she said it

3    might have been the group, what group are you

4    referring to?

5          A.      The group that was harassing and

6    assaulting people.

7          Q.      So after you saw Officer Flores --

8    is it Officer Flores?

9          A.      Yes.

10         Q.      Then what happened after that?

11         A.      Because the group, some of them

12   started, some of them in the rear started to

13   walk away in the opposite direction, we decided

14   to pull the van into the intersection of 102nd

15   and Central Park West --

16         Q.      Yes.

17         A.      -- to block the group and stop them

18   so we could, so we could, you know, show up.

19         Q.      Did you stop them or what?

20         A.      We tried to stop them.

21         Q.      What did you do after that?

22         A.      We pulled the van up into the

23   intersection.  I got out of the van.  Officer

24   Powers got out also.

25         Q.      Yes.

NYCLD_057677

P-APP002561

Page 73

```
 1                     Eric Reynolds
 2          A.        We identified ourselves as police
 3     officers and told them not to run and the group
 4     started running.
 5          Q.        In which direction did the group
 6     run?
 7          A.        They ran south.
 8          Q.        They ran south?
 9          A.        Yes.
10          Q.        On Central Park West?
11          A.        Yes.
12          Q.        All of them?
13          A.        No.
14          Q.        And what happened after that, what
15     did you do?
16          A.        I approached Raymond Santana and
17     Steven Lopez along with my partner, and we put
18     them against the wall and frisked them for
19     weapons.
20          Q.        Where did you approach Raymond
21     Santana and Seven Lopez?
22          A.        On the sidewalk between 101st and
23     102nd Street on Central Park West.
24          Q.        Is there any particular reason why
25     you approached Raymond Santana and Steven Lopez,
```

NYCLD_057678

P-APP002562

Page 74

```
 1                  Eric Reynolds
 2    other than the fact that you thought that they
 3    might have been a part of the group?
 4         A.      Because they were part of the
 5    group.
 6         Q.      But other than the fact that --
 7    part of what group, the group that was walking
 8    up Central Park West?
 9         A.      Yes.
10         Q.      But other than that, is there any
11    reason why you stopped those particular two?
12         A.      Well, again, they were part of the
13    group.
14         Q.      That was walking up Central Park
15    West?
16         A.      Yes.
17         Q.      But that's the only reason why you
18    stopped those two; is that correct?
19                 MR. MYERBERG:  Objection.
20         A.      No.
21         Q.      I'm sorry?
22         A.      No.
23         Q.      What was the other reason?
24         A.      They fit the description of the
25    males we were looking for.
```

NYCLD_057679

P-APP002563

Page 75

1                    Eric Reynolds

2          Q.       When you say they fit the

3    description of the males you were looking for,

4    when you heard the radio transmissions, was

5    there a clothing description given of the males?

6          A.       I don't recall.

7          Q.       Was there a color description given

8    of the males?

9                    MR. MYERBERG:   Objection.

10         A.       We were given a description of

11   teenage males, black and Hispanics.

12         Q.       Right, that was the only

13   description you were given; is that correct?

14         A.       As far as I can recall, yes.

15         Q.       What happened after that, after you

16   approached Lopez and Santana?

17         A.       They stated that they weren't with

18   the group, that the group was about to rob them.

19         Q.       Were there any other members of the

20   group that were stopped or brought back?

21         A.       You mean -- if you can rephrase

22   that.

23         Q.       Yes.  I mean after you stopped

24   Lopez and Santana, of the group that you said

25   you saw, were there any other young men, young

NYCLD_057680

P-APP002564

Page 76

1                    Eric Reynolds
2    boys who were arrested?
3         A.      Yes.
4                 MR. MYERBERG:   Objection.
5         Q.      And how many others and what are
6    their names?
7         A.      There were three others.
8         Q.      Who were they?
9         A.      Lamont McCall, Clarence Thomas and
10   Lamont McCall, Clarence Thomas, and I forgot the
11   third.   The last name was Richardson.
12        Q.      Kevin Richardson?
13        A.      Kevin Richardson.
14        Q.      So there were five in all arrested
15   from this group; is that correct?
16        A.      Yes.
17        Q.      And after these young boys were
18   arrested, what happened after that?
19                MR. MYERBERG:   Objection.
20        Q.      Go ahead, you can answer.
21        A.      Which young boys?
22        Q.      The five that you just mentioned,
23   Steven Lopez, Raymond Santana, Lamont McCall,
24   Clarence Thomas and Kevin Richardson.
25        A.      We brought them to 100th Street and

NYCLD_057681

P-APP002565

Page 77

```
 1                  Eric Reynolds
 2   Central Park West.
 3          Q.    When you say "we," was it in your
 4   vehicle?
 5          A.    No.
 6          Q.    Who transported these five young
 7   boys?
 8                MR. MYERBERG:   Objection.
 9          A.    They weren't transported together
10   in one car.
11          Q.    That's fine.  Who did the
12   transport?
13          A.    Sergeant Wheeler and I don't recall
14   who his partner was, and then I believe Sergeant
15   Lail and Officer Hennigan.
16          Q.    Who did Sergeant Wheeler transport?
17          A.    Lopez and Santana.
18          Q.    And the others were transported by
19   Sergeant Lail?
20          A.    I believe so.
21          Q.    And was there a discussion at all
22   after these boys were stopped and before they
23   were transported about doing a showup
24   identification with Mr. Loughlin?
25          A.    Yes.
```

NYCLD_057682

P-APP002566

Page 78

```
 1                    Eric Reynolds
 2          Q.      And was a showup identification
 3    conducted?
 4          A.      No.
 5          Q.      Why not?
 6          A.      Mr. Loughlin's injuries were too
 7    extensive.  He wasn't able to ID.
 8          Q.      Where was Mr. Loughlin at that
 9    time?
10          A.      He was in the hospital.
11          Q.      And when you say -- what hospital
12    was he in?
13          A.      I don't recall that.
14          Q.      Would it refresh your recollection
15    if I told you that he was in St. Luke's
16    Hospital?
17          A.      It sounds right.
18          Q.      How did you find out his injuries
19    were such that he would not be able to
20    participate in a showup identification?
21          A.      I was informed of that by another
22    officer.
23          Q.      By who?
24          A.      I don't recall who said that.
25          Q.      You don't recall?
```

NYCLD_057683

P-APP002567

Page 79

1                          Eric Reynolds

2          A.      No.

3          Q.      How soon after the arrest of these

4     five boys were you informed that Mr. Loughlin

5     was in such a condition that you could not

6     conduct a showup?

7          A.      It was maybe ten, 15 minutes.  I

8     don't recall.

9          Q.      Ten or 15 minutes?

10         A.      It could have been.  I don't recall

11    what the time frame was.

12         Q.      Were these young boys, were they at

13    the precinct when you found out what you

14    described as his condition, or were you still

15    out in the street?

16         A.      We were still in the street.

17         Q.      What were the nature of his

18    injuries?

19                 MR. MYERBERG:  Objection.

20         A.      He was beaten with a pipe, I

21    believe.

22         Q.      But why couldn't he participate in

23    the showup?

24                 MR. MYERBERG:  Objection.

25         A.      My understanding was both of his

NYCLD_057684

P-APP002568

Page 80

1                    Eric Reynolds

2    eyes were swollen shut.

3                    MR. WARREN:  I'd like to get this

4         marked as Reynolds 3.

5                    [Page 715 of a transcript was

6         hereby marked as Reynolds Exhibit 3 for

7         identification, as of this date.]

8         Q.       Let me know when you're finished

9    reading.  Have you read that document?

10        A.       Yes.

11        Q.       Having read that, this is your

12   testimony in a prior proceeding.  Does that

13   refresh your recollection that you've testified

14   previously that only one of his eyes was badly

15   damaged?

16                  MR. MYERBERG:  Objection.  That's

17        not the testimony here.

18        Q.       Were both of his eyes shut or just

19   one of his eyes?

20        A.       Again, my understanding was that

21   both of his eyes were swollen shut.  My

22   testimony here is that at least one of his eyes

23   was badly damaged.

24        Q.       Well, that at least he had one of

25   his eyes was badly damaged, is that what it

NYCLD_057685

P-APP002569

Page 81

```
 1                    Eric Reynolds
 2   says?
 3        A.      Yes.
 4        Q.      It doesn't say both of his eyes?
 5        A.      I'm sorry, that wasn't my testimony
 6   earlier.  I just said both were swollen shut.
 7        Q.      I see, thank you.
 8               MR. MYERBERG:  Just for the record,
 9        this is page 715 in the top right corner,
10        Reynolds People Recross Colleen Moore.
11               MR. WARREN:  That's correct,
12        starting with line 11 going through 19.
13        Q.      Now, what time did you arrive at
14   the precinct, sir?
15        A.      I believe it was around 11.
16        Q.      Eleven o'clock?
17        A.      Yes.
18        Q.      When you arrived at the precinct,
19   what did you observe?
20        A.      I believe the defendants had gotten
21   there just before me and were standing in front
22   of the desk.
23        Q.      And who else was present at that
24   time that you recall?
25        A.      Sergeant Lail, Officer Hennigan,
```

NYCLD_057686

P-APP002570

Page 82

1                    Eric Reynolds
2    Sergeant Wheeler may have been there also, I
3    believe.  I'm not 100 percent sure.
4          Q.    And what did you do after arriving
5    at the precinct?
6          A.    Went to the desk officer and
7    informed him of what I had.
8          Q.    Who was the desk officer at that
9    time?
10         A.    I don't recall.
11         Q.    Would that have been a sergeant or
12   a lieutenant?
13         A.    It could have been either.
14         Q.    Do you know a Lieutenant McInerney?
15         A.    I know who he is.
16         Q.    Was he at the desk that night when
17   you arrived?
18         A.    I don't think so.
19         Q.    After you arrived and you saw a
20   desk officer, then what did you do?
21         A.    I explained to him what I had.
22         Q.    Then what happened?
23         A.    I gave him the names and pedigree
24   information of each of the defendants.
25         Q.    Did you actually take down the

NYCLD_057687

P-APP002571

Page 83

1              Eric Reynolds

2    pedigree information?

3         A.     From each defendant?

4         Q.     Yes.

5         A.     Well, at that point it would have

6    been the desk officer.

7         Q.     The desk officer?

8         A.     Yes.

9         Q.     And what did you do after you

10   arrived and after you saw the desk officer, what

11   did you do thereafter?

12        A.     I brought the defendants to the

13   juvenile room.

14        Q.     And what floor of the precinct was

15   that in?

16        A.     That's on the first floor.

17        Q.     The first floor?

18        A.     Yes.

19        Q.     And what did you do after that,

20   sir?

21        A.     I started to process the arrest.

22        Q.     When you started to process the

23   arrest, can you describe a little further what

24   you mean by that?

25        A.     I started to do the paperwork.

NYCLD_057688

P-APP002572

Page 84

1                    Eric Reynolds

2        Q.      Okay.  On each of the young boys;

3   is that correct?

4        A.      Yes.

5        Q.      And how long did that process last,

6   doing the paperwork on each of these five young

7   boys?

8        A.      I don't recall.

9        Q.      Would it have been several hours?

10       A.      Again, I don't recall how long each

11  one took.

12       Q.      Did you do the paperwork on each

13  one of them?

14       A.      Yes.

15       Q.      And did there come a time that any

16  of their parents arrived?

17       A.      Yes.

18       Q.      Who was the first parent to arrive?

19       A.      Kevin Richardson's mother.

20       Q.      Mrs. Cuffee?

21       A.      Yes.

22       Q.      And approximately what time did Ms.

23  Cuffee arrive at the precinct?

24       A.      I believe it was around 12 o'clock

25  at night.

NYCLD_057689

P-APP002573

Page 85

```
 1                    Eric Reynolds
 2        Q.      Was she alone at that time?
 3        A.      I believe so.
 4        Q.      When she arrived, can you tell us
 5   what took place?
 6        A.      I explained to her that her son was
 7   under arrest with the others.
 8        Q.      What was her son under arrest for?
 9        A.      Unlawful assembly, and I believe
10   the assault on Mr. Loughlin.
11        Q.      The assault on Mr. Loughlin?
12        A.      I believe so.
13        Q.      Had there been an identification at
14   that point by Mr. Loughlin of her son?
15        A.      No.
16        Q.      Nevertheless, he was arrested for
17   unlawful assembly and assault on Mr. Loughlin?
18               MR. MYERBERG:  Objection.
19        Q.      You can answer.
20        A.      I know he was arrested for the
21   unlawful assembly.  I'm not sure if the assault
22   charge was included.
23        Q.      He was arrested for unlawful
24   assembly where?
25        A.      In Central Park.
```

NYCLD_057690

P-APP002574

Page 86

```
 1                    Eric Reynolds
 2        Q.      In Central Park?
 3        A.      Yes.
 4        Q.      Is there anyone who identified him
 5   as being in Central Park that night?
 6             MR. MYERBERG:  Objection.
 7        A.      Nobody as far as --
 8        Q.      Yes.
 9        A.      -- civilian witnesses?
10        Q.      Yes.
11        A.      No.
12        Q.      What about the others?
13             MR. WARREN:  Withdrawn.
14             MR. MYERBERG:  The witness has just
15        asked to take a bathroom break.  Is that
16        possible?
17             MR. WARREN:  Oh, sure.  We'll take
18        a five-minute break.
19             MR. MYERBERG:  Ten minutes.
20             MR. WARREN:  Ten minutes, fine.
21             (A recess was taken.)
22             MR. MYERBERG:  Mr. Warren, let me
23        put one thing on the record for the interns
24        that are working for your firm.  Everyone
25        signed Exhibit A; is that correct?  And the
```

NYCLD_057691

P-APP002575

1                    Hartigan/cross/Mr. Moore          2592

2    J O H N      H A R T I G A N, was recalled as a witness in

3    behalf of the People, having previously been duly sworn,

4    continues to testify as follows:

5              MR. MOORE:  May we approach?

6              THE COURT:  Yes.

7              (Whereupon, there was a bench conference among

8         all counsel with the court out of the hearing and

9         presence of the jury.)

10             (Pause)

11             THE CLERK:  Detective, having been previously

12        been sworn, you're still under oath.

13             THE WITNESS:  Yes, sir.

14             THE COURT:  Members of the jury, you recall Mr.

15        Hartigan was here previously, was interrupted.  And

16        we are going to resume his examination today, cross

17        examination by Mr. Moore.

18   CROSS EXAMINATION

19   BY MR. MOORE:.

20        Q    Mr. Hartigan, good morning.

21        A    Good morning, sir.

22        Q    You indicated in previous cross examination by Mr.

23   Diller that you retired from the N Y P D sometime in July of

24   1989, am I correct?

25        A    Yes, sir.

1                    Hartigan/cross/Mr. Moore          2593

2        Q      You also indicated that you were a patrolman for

3   five years and that you were a detective for twenty years,

4   am I correct?

5        A      In the detective division for twenty years, yes,

6   sir.

7        Q      How long were you with the Manhattan North homicide

8   detective unit?

9        A      Three years.

10        Q      And during your tenure with Manhattan North, Mr.

11   Hartigan, how many cases, homicide cases have you

12   investigated?

13        A      It's hard to say.  It's a large number of homicides

14   that we did.  We worked on old homicides.  We worked on new

15   homicides as they came in.  We went back on old homicides.

16        Q      And what percentage of those cases have resulted in

17   arrests?

18                    MS. LEDERER:  Objection.

19                    THE COURT:  Objection sustained.

20        Q      Now, have those cases that you worked on, what

21   percentage of the defendants in those cases have been black

22   and Hispanic males?

23                    MS. LEDERER:  Objection.

24                    THE COURT:  Sustained.

25        Q      Of those cases that you have worked on, what

AM010249

NYCLD_018271

P-APP002577

```
 1                    Hartigan/cross/Mr. Moore          2594
 2  percentage of those cases have been based on statements?
 3                    MS. LEDERER:  Objection.
 4                    THE COURT:  Sustained.
 5       Q    Now, you've indicated, Mr. Hartigan, that you have
 6  in the course of your investigation, you have dealt with
 7  young people, am I correct?
 8       A    Yes, sir.
 9       Q    Would you say in a large percentage of your cases
10  or a small percentage of those cases?
11       A    I'd say a small percentage.
12       Q    Now, in April 20, 1989 your tour of duty was from 8
13  o'clock in the morning to 4 o'clock in the afternoon, am I
14  correct?
15       A    Yes, sir.
16       Q    And in fact, Detective Hartigan, you were fairly
17  busy on that particular day, were you not?
18       A    Pardon me?
19       Q    You were fairly busy on April 20th, were you not?
20       A    Yes, sir.
21       Q    As a matter of fact, you participated in the
22  interview of Kevin Richardson from 9:40 in the morning until
23  about 1 o'clock in the afternoon, am I not correct?
24       A    From about 10 o'clock in the morning, yes, sir.
25       Q    Until about 1 o'clock?
```

1                    Hartigan/cross/Mr. Moore          2595

2      A    Yes, sir.

3      Q    And that interview resulted in a statement from

4 Kevin Richardson, am I not correct?

5              MS. LEDERER:  Objection as to form.

6              THE COURT:  Objection as to form is sustained.

7      Q    Well, after the interview Kevin Richardson did give

8 you a statement, is that correct?

9      A    Kevin Richardson was giving a statement at the time

10 I sat in on the interview.

11     Q    Yeah.  And he gave you a statement, a written

12 statement?

13     A    Yes, sir.

14     Q    And from 1 to 6 o'clock you participated in the

15 interview of Raymond Santana, am I correct?

16     A    Yes, sir.

17     Q    And that was from 1 to 6 o'clock?

18     A    I can't recall exactly what  --  I believe it was 1

19 --  4 to 6 o'clock.  I can not exactly recall the hour.

20     Q    And at the end of the interview Raymond Santana

21 signed a statement, isn't that correct?

22     A    Yes, sir.

23     Q    And, as a matter of fact, during your examination

24 of Raymond Santana from 1 to 4 o'clock you asked him

25 repeatedly --

Page 96

1              J. HARTIGAN

2      A.    No.

3      Q.    Detective Inspector Powell, did

4  you know what he looked like?

5      A.    Yes.

6      Q.    Did you see him either in the

7  building or on the grounds of the Central

8  Park Precinct?

9      A.    I don't recall seeing him.

10     Q.    You don't recall seeing him,

11  either?

12     A.    No, sir.

13     Q.    You knew ADA Fairstein at that

14  time, correct?

15          MS. DOLAN:  Objection to form.

16  BY MR. WARREN:

17     Q.    You can answer.

18     A.    Yes.

19     Q.    Do you recall seeing her on the

20  grounds at that time?

21     A.    No.  I don't recall seeing her.

22  I don't believe I saw here there.  When I

23  arrived at ten o'clock in the morning?

24     Q.    Yes, sir.

25     A.    No, I don't recall.

NYCLD_037959

P-APP002580

Page 97

1           J. HARTIGAN

2      Q.      Did you ever see her there at

3   the Central Park Precinct?

4      A.      I don't recall ever seeing her

5   at Central Park.

6      Q.      You don't recall seeing her at

7   the Central Park Precinct during the time

8   you were there?

9      A.      That's correct.

10      Q.      How about ADA Lederer?

11      A.      I don't recall seeing her in

12   Central Park.

13      Q.      So are you saying you didn't

14   see them?

15      A.      I don't recall.  I have no

16   recollection of seeing them in Central

17   Park.

18      Q.      You're saying when you first

19   arrived at Central Park, you went into a

20   building and spoke to a desk officer; is

21   that correct?

22      A.      That's correct.

23      Q.      Were there any other officers

24   or personnel in that first building that

25   you walked into?

NYCLD_037960

P-APP002581

Page 98

1           J. HARTIGAN

2      A.    I don't remember.  There must

3  have been other police officers.  There's

4  always police officers within the

5  confines of the precinct or the

6  stationhouse.

7      Q.    Did you see any officers that

8  you recognized in that first building?

9      A.    No, sir, I did not.  I don't

10  remember seeing anybody.

11      Q.    What happened after you walked

12  into that first building?

13      A.    The desk officer informed us

14  that the investigation was being

15  conducted in the youth room and I believe

16  he directed us where to go to the youth

17  room.

18      Q.    At that time, what was the

19  purpose that you had in your mind for

20  going to the youth room?

21          MS. DOLAN:  Objection to form.

22      You can answer.

23      A.    To assist in any way that we

24  could.

25      Q.    Assist in any way that you

NYCLD_037961

P-APP002582

Page 99

1                    J. HARTIGAN

2    could?

3         A.    Yes, sir.

4         Q.    When you got the call to go to

5    the Central Park Precinct that you had

6    referred to earlier, was there a

7    discussion by whoever called you that you

8    should at some point go to the youth room

9    once you arrived?

10        A.    I don't believe the youth room

11   was mentioned.  I have no idea.  I don't

12   know if the youth room was mentioned

13   prior to that or when I went in to see

14   the desk officer.

15        Q.    When you say you don't

16   remember, you're saying the youth room

17   could have been mentioned during that

18   initial call instructing you to go to the

19   Central Park Precinct?

20             MS. DOLAN:  Objection to form.

21        A.    I don't believe it was.

22        Q.    You don't believe it was?

23        A.    Yes, sir.

24        Q.    Okay.  When you arrived in that

25   first building -- by the way, who were

NYCLD_037962

P-APP002583

1                    J.  HARTIGAN

2      you  working  with  on  that  day?

3           A.      Detective  Scott  Jaffer.

4           Q.      J-A-F-F-E-R?

5           A.      Yes,  sir.

6           Q.      Prior  to  that  date,  how  long

7      had  you  worked  with  Detective  Jaffer?

8           A.      We  had  come  into  the  Manhattan

9      North  Homicide  Division  together.

10          Q.      So  three  years?

11          A.      Approximately  three  years.

12          Q.      Was  he  your  steady  partner  at

13     that  time?

14          A.      Yes.

15          Q.      When  you  went  into  that  first

16     building,  were  you  the  one  who  was

17     involved  with  the  discussion  with  the

18     desk  officer  or  was  it  Detective  Jaffer

19     or  were  you  doing  it  interchangeably?

20          A.      I  don't  remember  who  it  was.

21     It  could  have  been  me  or  Detective

22     Jaffer,  I  don't  remember.

23          Q.      At  that  point,  can  you  tell  me

24     what  your  expectations  were  in  terms  of

25     the  type  of  assistance  that  you  would

NYCLD_037963

P-APP002584

Page 101

1                    J. HARTIGAN

2    render in the investigation when you were

3    talking to the desk officer?

4         A.    I don't believe the desk

5    officer knew anything in regard to the

6    investigation.  He was just directing us

7    where to go.

8         Q.    No, I'm asking you in your

9    mind, what were your expectations in

10   terms of the type of assistance that you

11   would offer investigation-wise with

12   respect to that case?

13        A.    Any type of assistance that the

14   superior officer that was assigned to the

15   case would want or the detective who was

16   assigned to the case would need.

17        Q.    Who were those superior

18   officers?

19        A.    I don't remember if Lieutenant

20   Doyle was there.

21        Q.    I'm sorry?

22        A.    I don't remember if Lieutenant

23   Doyle was there.

24        Q.    Could he have been there?

25        A.    He might have.  He could

NYCLD_037964

P-APP002585

Page 102

1                    J. HARTIGAN
2     possibly have been there, yes.
3          Q.    What was his title?
4          A.    Lieutenant of the Manhattan
5     North Homicide Squad.  Commanding officer
6     of the Manhattan North Homicide Squad.
7          Q.    So you were under his command;
8     is that correct?
9          A.    Yes, sir.
10         Q.    And Detective Jaffer was under
11    his command; is that correct?
12         A.    Yes, sir.
13         Q.    And would you agree, sir, that
14    the Central Park case received enormous
15    publicity?
16              MS. DOLAN:  Objection.
17    BY MR. WARREN:
18         Q.    You can answer.
19         A.    At what time, sir?
20         Q.    At that time?
21         A.    I don't believe so.  I don't
22    remember seeing or hearing anything about
23    it at the time I got to Central Park.
24         Q.    But would the lieutenant have
25    been your immediate supervisor if he was

Page 105

1                   J. HARTIGAN

2        A.      I don't remember.

3        Q.      Okay.  So when you left that

4    first building, what did you do and where

5    did you go?

6        A.      To the youth room.

7        Q.      To the youth room.  That was in

8    an entirely different building; is that

9    correct?

10       A.      Yes, sir.

11       Q.      Once you got to the youth room,

12   did you see any white shirts, any

13   supervisors?

14       A.      No, sir, I don't believe so.

15       Q.      Okay.  When you got to the

16   building housing the youth room, what did

17   you do?

18       A.      We entered into the youth room

19   and I -- Sergeant Fiston was there.  We

20   identified ourselves to Sergeant Fiston

21   and told him we were extra manpower.  If

22   he needed anything, we were there to

23   assist him.

24       Q.      Had you ever interacted with

25   Sergeant Fiston before, prior to that?

NYCLD_037968

P-APP002587

```
1              J. HARTIGAN
2       A.    I don't remember.
3       Q.    To your knowledge, what role
4   did Sergeant Fiston have with the
5   investigation at that point?
6       A.    I don't know.  All I know is
7   that he was a sergeant.
8       Q.    He was in the room when you
9   arrived?
10      A.    Yes.
11      Q.    Did Detective Jaffer accompany
12  you in the room?
13      A.    Yes.
14      Q.    Who else was in the room?
15      A.    Detective Gonzalez.
16      Q.    Detective Gonzalez?
17      A.    Yes.
18      Q.    And who else?
19      A.    Kevin Richardson, a person I
20  subsequently learned was Kevin
21  Richardson, and his mother.
22      Q.    What took place when you came
23  into the room?  What happened?
24      A.    I informed Sergeant Fiston that
25  we were from the Homicide Squad and we
```

NYCLD_037969

P-APP002588

Page 107

1              J. HARTIGAN
2    were there to assist him in any way he
3    needed it.
4         Q.    What was Sergeant Fiston doing
5    at that time when you first walked in?
6         A.    As far as I remember, he was
7    just standing there.
8         Q.    He was just standing there?
9    Was he talking to anybody?
10        A.    I don't recall his talking to
11   anybody.
12        Q.    And you said that Detective
13   Gonzalez was in the room, as well?
14        A.    Yes, sir.
15        Q.    What was he doing when you and
16   Detective Jaffer first walked in?
17        A.    He was sitting down.
18        Q.    He was sitting down?
19        A.    Yes, sir.
20        Q.    And what was he doing while he
21   was sitting down?
22        A.    He was talking to Mr. Richardson.
23        Q.    He was talking to Mr. Richardson?
24        A.    Yes, sir.
25        Q.    When you say talking, did it

NYCLD_037970

P-APP002589

```
 1              J. HARTIGAN
 2   appear to be an interview?
 3        A.    I believe so, yes.
 4        Q.    So is it fair to say that when
 5   you walked in, an interview was in
 6   progress?
 7             MS. DOLAN:  Objection to form.
 8        You can answer.
 9        A.    It appeared to be, yes.
10        Q.    And that was Kevin Richardson
11   being interviewed by Detective Gonzalez;
12   is that correct?
13        A.    Yes, sir.
14        Q.    What time was that when you
15   walked in, approximately?
16        A.    Somewhere around ten o'clock.
17        Q.    Somewhere around ten o'clock?
18        A.    Yes.
19        Q.    After you walked in, Detective,
20   what did you do immediately thereafter?
21        A.    Again, I spoke to Sergeant
22   Fiston.
23        Q.    What did you speak to Sergeant
24   Fiston about?
25        A.    That we were from the Homicide
```

NYCLD_037971

P-APP002590

Page 109

1              J. HARTIGAN
2    Squad and we were extra manpower if he
3    needed us.
4         Q.    When you were speaking with
5    him, was the interview still going on
6    with Kevin Richardson and Gonzalez?
7         A.    I don't remember if the
8    interview was still going on.
9         Q.    And when you told him that,
10   what, if anything at all, did he say?
11        A.    I don't remember.
12        Q.    What happened after that?
13        A.    Myself and Detective Jaffer
14   left the youth room.
15        Q.    How long were you in the youth
16   room before you left?
17        A.    I don't believe we were there
18   very long; maybe five minutes.  Maybe
19   five minutes.
20        Q.    So you came in, you spoke with
21   Sergeant Fiston.  He was the only one you
22   spoke with at that time and you left,
23   correct?
24        A.    Yes, sir.
25        Q.    Other than Sergeant Fiston and

NYCLD_037972

P-APP002591

Page 110

1                    J. HARTIGAN

2    Detective Gonzalez and Mr. Richardson,

3    was there anyone else in the room when

4    you and Detective Jaffer first arrived?

5        A.    I believe there was another

6    person in the room, yes, at that time.

7        Q.    Another person?  Would that

8    have been a detective or a police

9    officer?

10       A.    A detective or a policer

11   officer.

12       Q.    What was that person doing?

13       A.    He was just sitting there.

14       Q.    Where was Detective Gonzalez

15   seated in relation to Mr. Richardson when

16   you came into the room?

17       A.    If I remember correctly, as we

18   entered the room, Detective Gonzalez was

19   on my left seated at a desk on my left.

20   Mr. Richardson was sitting in front of

21   him and Sergeant Fiston was standing over

22   here (indicated), which would be on my

23   right-hand side.

24       Q.    On your right-hand side?

25       A.    Yes.

NYCLD_037973

P-APP002592

Page 111

1                    J. HARTIGAN

2        Q.      And do you recall observing

3    Detective Gonzalez taking any notes while

4    he was having a discussion with Kevin

5    Richardson?

6        A.      I don't recall that.

7        Q.      You don't recall that?

8        A.      I don't remember, no, sir.

9        Q.      In other words, he could have,

10   you just don't remember?

11       A.      I don't remember there were any

12   conversations while we were there.   I

13   don't remember him speaking while we

14   there.

15       Q.      You don't remember who

16   speaking?

17       A.      Detective Gonzalez.

18       Q.      What was he doing?

19       A.      I guess we had interjected

20   ourselves into the interrogation and he

21   had just -- I believe he had stopped.   I

22   believe he had stopped.

23       Q.      When you say you had

24   interjected yourselves in the

25   interrogation, what do you mean?

NYCLD_037974

P-APP002593

Page 112

1                   J. HARTIGAN
2        A.      Into the interrogation room.
3    Into the youth room; when we came in.
4        Q.      Okay.
5        A.      I think -- I seem to remember
6    Detective Gonzalez stopping and as we
7    talked to Sergeant Fiston.
8        Q.      What did you say to Detective
9    Gonzalez when he stopped?
10       A.      I didn't say anything to him.
11       Q.      And what did you say to -- did
12   you have a discussion with Ms. Richardson
13   at that time?
14       A.      With who, sir?
15       Q.      Ms. Richardson, at that time.
16              MS. DOLAN:  I'm sorry, Ms. or
17       Mr.?
18              MR. WARREN:  Miss.
19              THE WITNESS:  Miss?  M-I-S-S.
20              MR. WARREN:  Yes.
21              THE WITNESS:  You said a
22       Ms. Richardson --
23              MS. DOLAN:  Objection to form.
24   BY MR. WARREN:
25       Q.      Did you have discussions with

NYCLD_037975

P-APP002594

Page 113

1              J. HARTIGAN

2    anyone else?

3         A.     I had no discussions with

4    anybody.

5         Q.     Then there came a time that you

6    left the room; is that correct?

7         A.     Yes, sir.

8         Q.     How long were you and Detective

9    Jaffer in the room before you left?

10        A.     I believe I already answered

11   that.  About five minutes.

12        Q.     Five minutes?

13        A.     Yes, sir.

14        Q.     For what reason did you leave?

15        A.     We went outside, waiting any

16   instructions that -- whatever they needed

17   us to do.  We had to enter back out into

18   the roadway awaiting any instructions.

19        Q.     I'm trying to piece this

20   together in my mind.  For what reason did

21   you leave the room after speaking with

22   Sergeant Fiston?  Why didn't you stay in

23   the room?

24        A.     Because we weren't part of what

25   was going on.  We went outside waiting

Page 114

J. HARTIGAN

1    for instructions as to what they needed

2    done.

3        Q.    Did Sergeant Fiston tell you to

4    go outside or what?

5        A.    I don't remember, sir.

6        Q.    But you went outside how long

7    after you spoke with him?

8        A.    Approximately five minutes.

9    Maybe even less than five minutes.

10        Q.    Maybe less than five minutes?

11        A.    Yes, sir.

12        Q.    So it was as a result of a

13    discussion that you had with Sergeant

14    Fiston that you and Detective Jaffer went

15    outside?

16            MS. DOLAN:   Objection to form.

17    BY MR. WARREN:

18        Q.    Is that correct?

19        A.    I don't know if Sergeant Fiston

20    directed us to go outside or we just went

21    outside.  I have no recollection of what

22    happened.

23        Q.    Was he in your mind a

24    supervisory officer of the investigation

NYCLD_037977

P-APP002596

1              J. HARTIGAN

2    at that time?

3         A.     He was the supervisor that I

4    saw.  He was the only supervisor I saw,

5    if I remember correctly.

6         Q.     Would he have had the authority

7    to instruct both you and Detective Jaffer

8    to go outside if that's what his desire

9    was?

10             MS. DOLAN:  Objection to form.

11        A.     Yes.  I imagine so, yes.

12        Q.     So after speaking with him, you

13   and Detective Jaffer went outside.

14        A.     Yes, sir.

15        Q.     When you say you went outside,

16   where did you go when you went outside?

17        A.     There's a roadway outside

18   between the buildings.

19        Q.     So when you went outside,

20   you're saying that you left that building

21   all together; is that correct?

22        A.     The youth room, yes.

23        Q.     The youth room is in a

24   building; is that correct?

25        A.     I think the youth room is part

NYCLD_037978

P-APP002597

409

KEVIN RICHARDSON

1           MR. MYERBERG:  I think I'm entitled to ask
2       the question.
3           MR. MOORE:  Well --
4           MR. MYERBERG:  So, if you have an objection,
5       you can make the objection, but I'm entitled to
6       ask the question.
7           MR. MOORE:  Note my objection.
8      Q.    Did you have any semen on any of your clothing
9  that you had been wearing that night?
10     A.    I don't know.  I didn't have nothing.
11     Q.    Sorry?
12     A.    No.
13     Q.    Now, at any time, apart from during the
14  videotaped statement, and during the visit to Central Park,
15  did you see ADA Elizabeth Lederer?
16     A.    Repeat that, I'm sorry.
17     Q.    At any time, other than the videotaped statement
18  and the time that you went to Central Park, sometime after
19  the -- April 19th, did you ever see ADA Lederer again at
20  any of the precincts that you were at?
21     A.    I don't remember seeing her.
22     Q.    And at any point, apart from when you went to
23  Central Park, did you see ADA Fairstein at any of the
24  precincts that you had been at?
25     A.    I don't remember seeing her.

NYCLD_054900

P-APP002598



SINCE 1828

- [GAMES](#)
- [BROWSE THESAURUS](#)
- [WORD OF THE DAY](#)
- [WORDS AT PLAY](#)

- [LOG IN](#)
- [REGISTER](#)
- ⌄
  [settings](#)
- [SAVED WORDS](#)

dumpster fire

✕



dictionary  thesaurus    view recents

[Login](#) or [Register](#)
Hello,

- [GAMES](#)
- [BROWSE THESAURUS](#)
- [WORD OF THE DAY](#)
- [WORDS AT PLAY](#)
- [SETTINGS](#)
- 

- [SAVED WORDS](#)    view recents

---

# dumpster fire

[noun](#)
 Save Word

P-APP002599

To save this word, you'll need to log in.

Log In

variants: or less commonly Dumpster fire

## Definition of *dumpster fire*

US, informal

**:** an utterly calamitous or mismanaged situation or occurrence **:** disaster Reese and McAdoo take the fall for what has been a dumpster fire of a season, one which has them at 2-10 on the season, and in line for one of the top two picks in the 2018 NFL Draft.— James Kratch So while 2017 has been, by many measures, a complete dumpster fire of a year, New Yorkers can at the very least take refuge in the fact that their city is becoming an even safer place to live.— Clayton Guse

## First Known Use of *dumpster fire*

2006, in the meaning defined above

Keep scrolling for more

## Learn More about *dumpster fire*

Share *dumpster fire*

Post the Definition of dumpster fire to Facebook  Share the Definition of dumpster fire on Twitter 

Time Traveler for *dumpster fire*



## The first known use of *dumpster fire* was in 2006

See more words from the same year

P-APP002600

Case 2:20-cv-00180-JLB-MRM    Document 46-12    Filed 07/01/20    Page 188 of 219 PageID 3592

# Dictionary Entries near *dumpster fire*

dump shot

dumpster

dumpster diving

dumpster fire

dump trailer

dump truck

dump valve

See More Nearby Entries

# Statistics for *dumpster fire*

Look-up Popularity

Bottom 10% of words

Cite this Entry

"Dumpster fire." *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/dumpster%20fire. Accessed 12 May. 2020.

| **Style:** MLA | ▼ |
|---|---|

Comments on *dumpster fire*

What made you want to look up *dumpster fire*? Please tell us where you read or heard it (including the quote, if possible).

**SHOW COMMENTS** ⊕

P-APP002601

Case 2:20-cv-00180-JLB-MRM   Document 46-12   Filed 07/01/20   Page 189 of 219 PageID 3593

**WORD OF THE DAY**

# flotsam 

See Definitions and Examples »

Get Word of the Day daily email!

Your email address          SUBSCRIBE

**Test Your Vocabulary**

Name More Food!

P-APP002602

Case 2:20-cv-00180-JLB-MRM    Document 46-12    Filed 07/01/20    Page 190 of 219 PageID 3594

- - Name that Fruit!

| jackfruit | pomelo |
|---|---|
| lingonberry | pomegranate |

Can you spell these 10 commonly misspelled words?

TAKE THE QUIZ

**Test Your Knowledge** - and learn some interesting things along the way.

TAKE THE QUIZ

## Love words? Need even more definitions?

Subscribe to America's largest dictionary and get thousands more definitions and advanced search—ad free!

MERRIAM-WEBSTER UNABRIDGED

WORDS AT PLAY

- ## A Word on 'Descriptive' and 'Prescriptive' Defining

P-APP002603

When it comes to words, we're
descriptive.

●

## The Words of the Week -
## 5/8/20

Words from the week of 5/8/2020

●

## One-Word Oxymorons:
## Bittersweet, Spendthrift, and
## More

When a single word contains two
conflicting ideas.

●

## 'Mano a Mano': A Hands-On
## Approach

Notes on a confusing borrowing

**ASK THE EDITORS**

●

## How to Remember the
## Spelling of 'Definitely'

A definitive answer.

P-APP002604

Case 2:20-cv-00180-JLB-MRM   Document 46-12   Filed 07/01/20   Page 192 of 219 PageID 3596

- ## Video: Why Is There a 'C' in 'Indict'?

  And who put it there, anyway?

- ## Literally

  How to use a word that (literally) drives some people nuts.

- ## Is Singular 'They' a Better Choice?

  The awkward case of 'his or her'

### WORD GAMES

- ## Name More Food!

  Test your knowledge of food vocabulary!

  **TAKE THE QUIZ**

- ## April 2020 Words of the Day Quiz

P-APP002605

Reminding you that time is, indeed,
passing.

**TAKE THE QUIZ**

●

## Spell It

Can you spell these 10 commonly
misspelled words?

**TAKE THE QUIZ**

●

## Add Diction

Build a chain of words by adding one
letter at a time.

**PLAY THE GAME**

---

Learn a new word every day. Delivered to your inbox!

Your email address

OTHER MERRIAM-WEBSTER DICTIONARIES

● SPANISH CENTRAL

● LEARNER'S ESL DICTIONARY

● WORDCENTRAL FOR KIDS

● VISUAL DICTIONARY

P-APP002606

Case 2:20-cv-00180-JLB-MRM   Document 46-12   Filed 07/01/20   Page 194 of 219 PageID 3598

- SCRABBLE® WORD FINDER
- MERRIAM-WEBSTER'S UNABRIDGED DICTIONARY
- BRITANNICA ENGLISH - ARABIC TRANSLATION
- NGLISH - SPANISH-ENGLISH TRANSLATION

**FOLLOW US**

Browse the Dictionary: A B C D E F G H I J K L M N O P Q R S T U V W X Y Z
0-9

Home | Help | Apps | About Us | Shop | Advertising Info | Dictionary API |
Contact Us | Join MWU | Video | Word of the Year | Puku | Vocabulary Resources |
Law Dictionary | Medical Dictionary | Privacy Policy | Terms of Use |
Do Not Sell My Info

Browse the Thesaurus | Browse the Medical Dictionary | Browse the Legal Dictionary |
Browse the Spanish-English Dictionary

© 2020 Merriam-Webster, Incorporated

✕

# You have been logged out.

To access your account, please log back in or contact us at customerservice@m-w.com to report this issue

P-APP002607

T3-JM-TS

4949

Fairstein - People - Cross - Burns

Q    Now, between 8:30 and 11:30, did you participate   in
any questioning of any individuals?

A    I questioned police officers.

Q    Just officers.

A    Right.

Q    Now, at 11:30, you say, is the first time you --

        MR. BURNS:  Withdrawn.

Q    At what point in time -- at what point in time did
you -- were you aware of the fact that Yusef Salaam was in the
20th Precinct?

A    I have -- I would put it in the 11  o'clock  period,
but it was between 11 and 11:30.

Q    And do you have any -- can you tell the Court who
told you, or how you came by that information?

A    I was in a room with a lot of police officers,  and,
as  different events unfolded that evening, because there were
many participants, and a lot of police activity, people  would
enter  the room to tell some of the supervisors what was going
on.

Q    And I believe --  and  you  were  functioning  as  a
supervisor?

A    No.  I'm talking about police supervisors.

Q    But you were working along with the supervisors,
were you not?

T3-JM-TS

4950

1              Fairstein - People - Cross - Burns

2              MS. LEDERER:  Objection.

3              THE COURT:  I'll let her answer it.

4      A    I was not supervising a police investigation, no.

5      I was there to assist, and to assist Ms.  Lederer,  if  I

6      could be of any use.

7      Q         Well,  in  the course of your assisting with the

8      investigation, while you were on the second floor squad  room,

9      someone came in and mentioned Yusef Salaam, is that it?

10     A    Yes.

11     Q    And was anything said about his age at that time?

12     A    No.

13     Q         At that point, you didn't have any -- you didn't

14     know how old he was?

15     A    No.

16     Q    Did you know that he was a teenager or older?   Did

17     you know that?

18     A    I didn't know anything.

19     Q    Nothing at all?

20     And  then,  at  11:30,  you  had a call, that there was a

21     lawyer downstairs?

22     A    Not a call.  Someone came in.

23     Q    And told you?

24     A    And said to me, particular.

25     Q    You don't know who that person was?

NYCLD_015469

P-APP002609

Page 73

```
 1                Arthur Clements

 2   anyone representing you from Corporation

 3   Counsel?

 4        A.    Again, your question is about?

 5        Q.    A negative relationship or friction

 6   between Nancy Ryan and Linda Fairstein.

 7        A.    No, I had not heard that.

 8        Q.    Ultimately, prior to arraignment,

 9   this case became a case belonging to the Sex

10   Crimes Bureau; is that correct?

11             MR. MYERBERG:  Objection.

12        A.    I don't know specifically whether

13   that is accurate or not from my perspective.  It

14   was assigned to Elizabeth Lederer.

15        Q.    And to your knowledge, was Linda

16   Fairstein supervising Elizabeth Lederer?

17             MR. MYERBERG:  Objection.

18        A.    No.

19        Q.    What was your understanding of her

20   involvement in the case prior to the arraignment

21   of Linda Fairstein's involvement prior to the

22   arraignment?

23        A.    I don't know if I -- I think Linda

24   Fairstein was at the precinct, but that the case

25   was assigned to Elizabeth Lederer.
```

NYCLD_035224

P-APP002610

Page 79

1                    Arthur Clements

2   make you think that it was a bad idea?  Were you

3   worried that it's not appropriate or not a good

4   thing to take statements from kids that are that

5   young?

6                MR. MYERBERG:  Objection.

7        A.    No, I didn't have any concern about

8   that.  The statements were being taken in the

9   youth room with parents or guardians present.

10       Q.    Did it ever cross your mind that

11  these were young children, did you ever think of

12  them in that way?

13               MR. MYERBERG:  Again, up to

14       arraignment or at that time?

15               MS. FISHER-BYRIALSEN:  At that

16       time.

17               MR. MYERBERG:  Objection.

18       A.    No, I didn't have any concern.  To

19  the extent I knew their ages, I knew statements

20  were being taken by people who were less than

21  16.

22       Q.    We talked about where the case was

23  assigned earlier, and I asked you if ADA

24  Fairstein was supervising ADA Lederer and you

25  said no.  Do you know if anyone was supervising

NYCLD_035230

P-APP002611

1                    Arthur Clements

2    her, anyone at all from the DA's office?

3              MR. MYERBERG:   Objection.

4         A.     I think I testified earlier that I

5    did not, I did not know specifically, you know,

6    what Linda Fairstein's role at the precinct was,

7    but that from my perspective, ADA Lederer was

8    assigned to the case.  So her supervisor would

9    have been our boss, John Hogan, the Chief of

10   Trial Bureau 40.

11        Q.     During your first period at the

12   24th Precinct up to the interview of or up to

13   the conclusion of the statement by Clarence

14   Thomas, did you ever see John Hogan at the

15   precinct?

16        A.     No.

17        Q.     Did you ever see any other

18   supervisors from Trial Bureau 40 at the

19   precinct?  You mentioned earlier there was one

20   other person other than John Hogan.

21             MR. MYERBERG:   Objection.

22        Q.     Dan McNulty, did you ever see him

23   at the precinct?

24             MR. MYERBERG:   Objection.

25        A.     No, I did not see Dan McNulty at

NYCLD_035231

P-APP002612

Page 81

1                    Arthur Clements

2   the precinct but I wouldn't have expected to see

3   him there.

4        Q.      Why not?

5        A.       Because Elizabeth Lederer was

6   qualified to handle homicide cases, and

7   Assistants who went to precincts on, you know,

8   homicide call typically did not have supervisors

9   with them at the precinct, they handled that on

10  their own.

11       Q.       In regards to this case at that

12  time, did you think of her as your superior?

13       A.       Who?

14       Q.       ADA Lederer.

15       A.       At that time in 1989, I thought

16  that John Hogan and Dan McNulty and another

17  deputy bureau chief, if there was one, were my

18  supervisors.

19              (Mr. Warren entered the room.)

20           MS. FISHER-BYRIALSEN:  Just for the

21       record, Michael Warren just came in.  This

22       is Mr. Clements.

23           MR. WARREN:  Yes, we met.

24           MS. FISHER-BYRIALSEN:  Just let the

25       record reflect Mr. Warren is here.

NYCLD_035232

P-APP002613

E. LEDRER

Page 777

| | | |
|---|---|---|
| 1 | Yusef was in the group, and Raymond said | 13:37:41 |
| 2 | Kevin.  To me, saying everybody charged | 13:37:46 |
| 3 | her and identifying names, Steve, Raymond | 13:37:50 |
| 4 | and Kevin is not a troubling discrepancy. | 13:37:54 |
| 5 | They're saying everybody did it. | 13:38:04 |
| 6 | Q.    When you say not a troubling | 13:38:06 |
| 7 | discrepancy, would you agree that there | 13:38:09 |
| 8 | was a discrepancy in the accounts? | 13:38:11 |
| 9 | MS. DOLLIN:  Objection to form. | 13:38:16 |
| 10 | A.    I think I already said that | 13:38:17 |
| 11 | there were differences between one | 13:38:19 |
| 12 | statement and the next, and I'm happy to | 13:38:20 |
| 13 | explain why those were not significant to | 13:38:22 |
| 14 | me at the time or today if you want me to. | 13:38:26 |
| 15 | Q.    So, so do you then agree that | 13:38:30 |
| 16 | with respect to all the aspects of the | 13:38:47 |
| 17 | crime mentioned in paragraph 86, that | 13:38:52 |
| 18 | there were, that the statements by the | 13:38:54 |
| 19 | five defendants give different accounts | 13:38:58 |
| 20 | with respect to each of those five, | 13:39:01 |
| 21 | whether you regard them as significant or, | 13:39:06 |
| 22 | you know, troubling or whatever. | 13:39:08 |
| 23 | I'm just asking whether you | 13:39:09 |
| 24 | agree that with respect to who initiated | 13:39:11 |
| 25 | the attack, who knocked the victim down, | 13:39:14 |

NYCLD_036810

P-APP002614

Linda Fairstein

Page 261

```
 1    meeting his father.  I saw Raymond        16:47:16
 2    Santana's father that morning, the morning 16:47:20
 3    seven to nine a.m. at the 24th Precinct.   16:47:24
 4            I believe I saw other parents.     16:47:36
 5    I know I saw other parents at hours        16:47:40
 6    throughout the day of the 21st and other   16:47:43
 7    young men.  I saw Michael Briscoe, I       16:47:48
 8    remember distinctly, and I believe family  16:47:53
 9    members of his.                            16:47:56
10       Q.    Did you know that Raymond         16:48:00
11    Santana had to be re-interviewed because a 16:48:02
12    parent was not present?                    16:48:05
13            MS. DAITZ:  Objection to form.     16:48:08
14       A.    Did I learn that Raymond Santana  16:48:14
15    had to be re-interviewed when, what day,   16:48:17
16    what time, I don't know.                   16:48:20
17       Q.    Whenever he was interviewed,      16:48:22
18    particularly on the 19th.                  16:48:25
19            MS. DAITZ:  Your personal          16:48:26
20    knowledge prior to arraignment is what     16:48:27
21    he's asking you.  At the precinct, did you 16:48:30
22    come to learn the fact as Mr. Beldock just 16:48:32
23    characterized it.                          16:48:35
24       A.    I didn't have any personal        16:48:36
25    knowledge of what happened on the 19th     16:48:39
```

VERITEXT REPORTING COMPANY
www.veritext.com
212-267-6868                                      516-608-2400

Linda Fairstein

Page 262

| 1 | before -- on the 19th, no. | 16:48:41 |
| 2 | Q.    Nobody gave you any information | 16:48:45 |
| 3 | about what happened on the 19th? | 16:48:48 |
| 4 |     MS. DAITZ:   Objection to form. | 16:48:49 |
| 5 | You can answer. | 16:48:50 |
| 6 | A.    The information that was being | 16:48:51 |
| 7 | given was being given to Ms. Lederer who | 16:48:52 |
| 8 | was the prosecutor in charge of the | 16:48:55 |
| 9 | investigation. | 16:48:57 |
| 10 | Q.    You didn't get that information | 16:48:58 |
| 11 | as well? | 16:48:59 |
| 12 | A.    I got some of the information. | 16:48:59 |
| 13 | She was doing her job.  It wasn't as | 16:49:02 |
| 14 | though she was coming to me to tell me | 16:49:05 |
| 15 | everything. | 16:49:08 |
| 16 | Q.    So did you learn anything about | 16:49:08 |
| 17 | what happened on the 19th? | 16:49:11 |
| 18 | A.    Anything about what happened on | 16:49:12 |
| 19 | the 19th, yes, I previously answered. | 16:49:13 |
| 20 | Q.    I'm talking about questioning of | 16:49:15 |
| 21 | any of the young men. | 16:49:22 |
| 22 | A.    I don't recall now being told | 16:49:24 |
| 23 | any specifics. | 16:49:27 |
| 24 | Q.    Okay.  Back on the 20th at the | 16:49:29 |
| 25 | 20th Precinct, what were you doing for | 16:49:39 |

NYCLD_039130

P-APP002616

Linda Fairstein

Page 263

| | |
|---|---|
| 1 | three and a half hours that you were | 16:49:49 |
| 2 | there? | 16:49:51 |
| 3 | A.   I was trying to facilitate what | 16:49:51 |
| 4 | Ms. Lederer needed to do.  So I spent a | 16:49:59 |
| 5 | lot of time on the phone. | 16:50:03 |
| 6 | Q.   When I said three and a half | 16:50:04 |
| 7 | hours, I think it's probably more like | 16:50:06 |
| 8 | four hours, right, 8:30 to 12:30? | 16:50:09 |
| 9 | A.   8:30 to 11:30, it was three | 16:50:12 |
| 10 | hours because, as you know, at 11:30 I | 16:50:16 |
| 11 | became involved with another issue. | 16:50:19 |
| 12 | Q.   You're giving us to understand, | 16:50:21 |
| 13 | and you'll correct me if I'm wrong, that | 16:50:27 |
| 14 | you had no supervisory involvement in Ms. | 16:50:30 |
| 15 | Lederer's work at the 20th Precinct; is | 16:50:34 |
| 16 | that correct? | 16:50:38 |
| 17 | MS. DAITZ:  Objection to form. | 16:50:38 |
| 18 | A.   Those are not my words.  That's | 16:50:39 |
| 19 | not the impression I'm trying to create. | 16:50:44 |
| 20 | Q.   Were you supervising the | 16:50:47 |
| 21 | investigation? | 16:50:49 |
| 22 | A.   No, I was not doing that. | 16:50:50 |
| 23 | Q.   Were you the senior District | 16:50:52 |
| 24 | Attorney there? | 16:50:54 |
| 25 | A.   I was the Senior Assistant | 16:50:54 |

NYCLD_039131

P-APP002617

Linda Fairstein

Page 264

| | | |
|---|---|---|
| 1 | District Attorney there for, as I've | 16:50:58 |
| 2 | testified at the trial, administrative | 16:51:02 |
| 3 | purposes.  I was not there -- I assigned | 16:51:05 |
| 4 | Ms. Lederer because she did not need at | 16:51:07 |
| 5 | the precinct a legal supervisor. | 16:51:10 |
| 6 | Q.    Were you participating in the | 16:51:13 |
| 7 | investigation? | 16:51:15 |
| 8 | A.    As of 11:30 that night, I was | 16:51:18 |
| 9 | not participating in any part. | 16:51:22 |
| 10 | Q.    As of 8:30 that night? | 16:51:24 |
| 11 | A.    I'm sorry, from 8:30 to 11:30, | 16:51:26 |
| 12 | no.  I set Ms. Lederer up.  I began to | 16:51:30 |
| 13 | make phone calls to expedite her work. | 16:51:33 |
| 14 | Q.    The phone calls were to | 16:51:36 |
| 15 | Morgenthau? | 16:51:38 |
| 16 | A.    Several to Morgenthau, several | 16:51:39 |
| 17 | to and from John Hogan, her Bureau Chief. | 16:51:41 |
| 18 | I spent time on the phone with one of the | 16:51:46 |
| 19 | neurosurgeons at Metropolitan Hospital.  I | 16:51:50 |
| 20 | spent a lot of time on the telephone with | 16:51:54 |
| 21 | one of Ms. Meili's brothers. | 16:51:59 |
| 22 | Q.    Go on. | 16:52:04 |
| 23 | A.    I spent time on the phone with | 16:52:11 |
| 24 | the desk at the 24th Precinct inquiring | 16:52:15 |
| 25 | about the designated youth room there and | 16:52:18 |

NYCLD_039132

P-APP002618

Linda Fairstein

Page 265

| | | |
|---|---|---|
| 1 | whether we could clear -- whether they | 16:52:20 |
| 2 | could clear for Ms. Lederer and Mr. | 16:52:23 |
| 3 | Clements the youth room, and could handle | 16:52:26 |
| 4 | the operation if we moved it to their | 16:52:30 |
| 5 | precinct. | 16:52:35 |
| 6 | Q.    Anyone else you were talking to? | 16:52:35 |
| 7 | A.    Possibly, but I don't recall. | 16:52:38 |
| 8 | Q.    Let me show you an exhibit | 16:52:40 |
| 9 | that's been premarked as 5. | 16:52:45 |
| 10 | MS. DAITZ:  Thank you. | 16:53:00 |
| 11 | Q.    Do you recognize -- | 16:53:05 |
| 12 | A.    Just a minute. | 16:53:07 |
| 13 | MS. DAITZ:  Fairstein Exhibit 5 | 16:53:11 |
| 14 | is a one-page document, NYC025732. | 16:53:14 |
| 15 | Q.    This -- | 16:53:25 |
| 16 | A.    Just a minute.  I'm having | 16:53:26 |
| 17 | trouble with the handwriting.  Just let me | 16:53:29 |
| 18 | read it and I'll answer your questions, | 16:53:31 |
| 19 | please.  Okay, yes. | 16:53:33 |
| 20 | Q.    This -- | 16:53:48 |
| 21 | MR. BELDOCK:  Withdrawn. | 16:53:50 |
| 22 | Q.    You said you spent some time | 16:53:51 |
| 23 | talking to a doctor, right? | 16:53:52 |
| 24 | A.    Yes. | 16:53:54 |
| 25 | Q.    This document is not the doctor | 16:53:55 |

NYCLD_039133

P-APP002619

E. LEDRER

Page 702

| | | |
|---|---|---|
| 1 | Monday, I think. | 12:00:03 |
| 2 | A.    I remember going that morning. | 12:00:06 |
| 3 | I don't, as I sit here, know whether I | 12:00:12 |
| 4 | went another time or not.  But I don't | 12:00:17 |
| 5 | believe I went a second time before | 12:00:20 |
| 6 | concluding the videotaped statements. | 12:00:23 |
| 7 | Q.    Right.  Your going to the crime | 12:00:28 |
| 8 | scene occurred in the course of you taking | 12:00:32 |
| 9 | these videotaped statements, correct? | 12:00:35 |
| 10 | MS. DOLLIN:  Objection. | 12:00:38 |
| 11 | Q.    In other words, you took some | 12:00:38 |
| 12 | before you went to the crime scene and you | 12:00:41 |
| 13 | took some after you went to the crime | 12:00:43 |
| 14 | scene, correct? | 12:00:45 |
| 15 | A.    That's correct. | 12:00:46 |
| 16 | Q.    What was your purpose in going | 12:00:46 |
| 17 | to the crime scene? | 12:00:48 |
| 18 | A.    I went to the crime scene to | 12:00:50 |
| 19 | familiarize myself with the location where | 12:01:01 |
| 20 | the crime occurred. | 12:01:07 |
| 21 | Q.    Are you finished? | 12:01:15 |
| 22 | A.    I think so. | 12:01:16 |
| 23 | Q.    At the point you went to the | 12:01:16 |
| 24 | crime scene, you had heard from -- you had | 12:01:18 |
| 25 | interviewed several of the young boys, and | 12:01:21 |

NYCLD_036735

P-APP002620

E. LEDRER

Page 703

| | | |
|---|---|---|
| 1 | at least some of them had told you that | 12:01:25 |
| 2 | the, had placed the attack on the jogger | 12:01:29 |
| 3 | at the reservoir, correct? | 12:01:33 |
| 4 | MS. DOLLIN:  Objection to form. | 12:01:35 |
| 5 | A.    I don't believe that any | 12:01:37 |
| 6 | statement, and without looking at the | 12:01:47 |
| 7 | transcripts or the statements, I can't say | 12:01:50 |
| 8 | for sure, but I don't think that any of | 12:01:53 |
| 9 | the statements made by the young men say | 12:01:56 |
| 10 | this happened at the reservoir.  I believe | 12:01:59 |
| 11 | that in the Q and A, there are several | 12:02:02 |
| 12 | questions and several answers about the | 12:02:09 |
| 13 | location. | 12:02:11 |
| 14 | And I think that that's true in | 12:02:12 |
| 15 | almost all of the videotaped statements, | 12:02:14 |
| 16 | that it's not a one-word answer, there's | 12:02:17 |
| 17 | some description. | 12:02:20 |
| 18 | And as I sit here today, I don't | 12:02:21 |
| 19 | believe anybody simply said at the | 12:02:25 |
| 20 | reservoir. | 12:02:27 |
| 21 | Q.    Is it your understanding that | 12:02:28 |
| 22 | Antron McCray allegedly placed the | 12:02:30 |
| 23 | location of the assault on Patricia Meili | 12:02:34 |
| 24 | at the reservoir? | 12:02:36 |
| 25 | A.    As I said before, I would have | 12:02:39 |

VERITEXT REPORTING COMPANY
212-267-6868            www.veritext.com            516-608-2400

NYCLD_036736

P-APP002621

E. LEDRER

Page 704

| | | |
|---|---|---|
| 1 | to look at the statements again.  I don't | 12:02:42 |
| 2 | believe the answer given by Antron McCray | 12:02:45 |
| 3 | about the location of the attack on | 12:02:49 |
| 4 | Patricia Meili was simply the words that | 12:02:50 |
| 5 | it was at the reservoir. | 12:02:53 |
| 6 | I believe in the videotaped | 12:02:55 |
| 7 | statement that I took, I think that I had | 12:03:00 |
| 8 | asked him more questions about the | 12:03:02 |
| 9 | location. | 12:03:04 |
| 10 | Q.    What about Raymond Santana, did | 12:03:06 |
| 11 | he place the, allegedly place the location | 12:03:08 |
| 12 | of the assault of Patricia Meili at the | 12:03:12 |
| 13 | reservoir, do you recall that? | 12:03:15 |
| 14 | MS. DOLLIN:  Objection to form. | 12:03:17 |
| 15 | A.    As I sit here today, I don't | 12:03:18 |
| 16 | remember where Raymond Santana put it. | 12:03:24 |
| 17 | Q.    The location of this crime, | 12:03:26 |
| 18 | where somebody put the location of the | 12:03:28 |
| 19 | crime would be a pretty important fact in | 12:03:30 |
| 20 | the course of the investigation, right? | 12:03:33 |
| 21 | MS. DOLLIN:  Objection. | 12:03:34 |
| 22 | A.    I'm sorry, can you repeat the | 12:03:35 |
| 23 | question? | 12:03:40 |
| 24 | Q.    Right.  In the course of | 12:03:40 |
| 25 | interviewing numerous suspects about a | 12:03:42 |

NYCLD_036737

P-APP002622

E. LEDRER

Page 705

| | | |
|---|---|---|
| 1 | crime, the location of that crime would be | 12:03:46 |
| 2 | an important fact to establish, correct? | 12:03:49 |
| 3 | A.   It would be one of many facts to | 12:03:52 |
| 4 | establish, yes. | 12:03:56 |
| 5 | Q.   It would be one of the important | 12:03:57 |
| 6 | facts, the location of the crime, correct? | 12:03:59 |
| 7 | MS. DOLLIN:  Objection to form. | 12:04:00 |
| 8 | A.   I could imagine that in some | 12:04:01 |
| 9 | cases the location might not be important. | 12:04:04 |
| 10 | Q.   You don't believe the location | 12:04:06 |
| 11 | in this case would have been an important | 12:04:08 |
| 12 | fact? | 12:04:11 |
| 13 | MS. DOLLIN:  Objection to form. | 12:04:11 |
| 14 | A.   In this case, I believe it was | 12:04:13 |
| 15 | one of the important facts. | 12:04:17 |
| 16 | Q.   Right.  And you knew, you knew, | 12:04:18 |
| 17 | did you not, before a decision was made to | 12:04:21 |
| 18 | charge these young men for rape that there | 12:04:25 |
| 19 | had been varying accounts as to where, as | 12:04:28 |
| 20 | to the location where the attack on | 12:04:30 |
| 21 | Patricia Meili took place, you knew that, | 12:04:33 |
| 22 | did you not? | 12:04:36 |
| 23 | A.   When I took the videotaped | 12:04:37 |
| 24 | statements, the descriptions of the | 12:04:46 |
| 25 | locations of that crime and other crimes | 12:04:52 |

NYCLD_036738

P-APP002623

E. LEDRER

Page 706

| | | |
|---|---|---|
| 1 | were described in terms of roadways and | 12:04:56 |
| 2 | pathways, and it was often confusing to | 12:04:59 |
| 3 | understand -- | 12:05:05 |
| 4 | Q.    Nobody used the term reservoir? | 12:05:06 |
| 5 | MS. DOLLIN:  Objection.  Asked | 12:05:08 |
| 6 | and answered. | 12:05:09 |
| 7 | A.    Can I finish my answer? | 12:05:10 |
| 8 | Q.    I'm asking, I want to know | 12:05:11 |
| 9 | whether anybody used the term reservoir, | 12:05:13 |
| 10 | any of the young boys when they indicated | 12:05:16 |
| 11 | the location of the attack on Patricia | 12:05:20 |
| 12 | Meili, do you recall that? | 12:05:22 |
| 13 | MS. DOLLIN:  Objection. | 12:05:24 |
| 14 | A.    I didn't finish the answer to | 12:05:24 |
| 15 | the last question. | 12:05:26 |
| 16 | Q.    All right. | 12:05:27 |
| 17 | THE WITNESS:  Can you read that | 12:05:28 |
| 18 | back, please? | 12:05:29 |
| 19 | MR. MOORE:  Actually, I'm going | 12:05:36 |
| 20 | to withdraw that question. | 12:05:37 |
| 21 | Q.    Let me ask you this question. | 12:05:38 |
| 22 | Was there confusion in your mind, after | 12:05:41 |
| 23 | having done several of the interviews, as | 12:05:43 |
| 24 | to the location of where the attack on | 12:05:46 |
| 25 | Patricia Meili took place, was there any | 12:05:48 |

NYCLD_036739

P-APP002624

E. LEDRER

Page 707

| | | |
|---|---|---|
| 1 | confusion in your mind at the time? | 12:05:50 |
| 2 | A.    Well, I'm not sure how to answer | 12:05:52 |
| 3 | that.  The attack covered close to 300 | 12:05:57 |
| 4 | feet of ground, and some of the | 12:06:04 |
| 5 | statements, like the statement of Kharey | 12:06:08 |
| 6 | Wise describing the waterfall and the fire | 12:06:11 |
| 7 | reflect exactly where the body was found. | 12:06:16 |
| 8 | Some of the statements describe | 12:06:20 |
| 9 | the young men coming over the ball fields | 12:06:23 |
| 10 | onto the 102nd Street Cross Drive, which | 12:06:25 |
| 11 | is right north of the Cross Drive.  And | 12:06:29 |
| 12 | some used points of reference as roadways. | 12:06:32 |
| 13 | There was obvious confusion when | 12:06:37 |
| 14 | we were trying to determine when someone | 12:06:40 |
| 15 | said a roadway whether it was the roadway | 12:06:42 |
| 16 | where the cars, meaning the 96th or 97th | 12:06:45 |
| 17 | Street Transverse or whether it was the | 12:06:49 |
| 18 | West Drive or the East Drive -- | 12:06:51 |
| 19 | Q.    Are you finished? | 12:06:53 |
| 20 | A.    No. | 12:06:54 |
| 21 | Q.    All right.  I really wish you | 12:06:55 |
| 22 | would just try to answer the question as | 12:06:56 |
| 23 | succinctly as you can, because you just go | 12:06:58 |
| 24 | on and on and on. | 12:07:01 |
| 25 | MS. DOLLIN:  Mr. Moore, would | 12:07:02 |

NYCLD_036740

P-APP002625

E. LEDRER

Page 708

| 1 | you just allow my client to answer. | 12:07:04 |
| 2 | Q.   And we don't have a lot of time, | 12:07:05 |
| 3 | we don't have unlimited time.  Let me just | 12:07:06 |
| 4 | -- | 12:07:08 |
| 5 | A.   Can I just finish just the rest | 12:07:08 |
| 6 | of the sentence? | 12:07:09 |
| 7 | Q.   Can you tell me whether there | 12:07:10 |
| 8 | was any confusion in your mind as to | 12:07:11 |
| 9 | whether the rape took place near the | 12:07:13 |
| 10 | reservoir or near, north of the 102nd | 12:07:16 |
| 11 | Street Transverse, was there any confusion | 12:07:19 |
| 12 | in your mind at any point before the | 12:07:20 |
| 13 | decision was made to charge, to arrest any | 12:07:22 |
| 14 | of these young boys for rape? | 12:07:24 |
| 15 | MS. DOLLIN:  You can finish your | 12:07:26 |
| 16 | answer. | 12:07:28 |
| 17 | A.   There was -- I don't think that | 12:07:28 |
| 18 | I knew enough of the evidence to know | 12:07:36 |
| 19 | where the attack had happened while I was | 12:07:41 |
| 20 | at the precinct. | 12:07:43 |
| 21 | Q.   So your answer is that there was | 12:07:44 |
| 22 | no confusion in your mind, correct? | 12:07:46 |
| 23 | MS. DOLLIN:  Objection to the | 12:07:48 |
| 24 | form. | 12:07:49 |
| 25 | A.   That's not my answer. | 12:07:49 |

NYCLD_036741

P-APP002626

E. LEDRER

Page 709

| | | |
|---|---|---|
| 1 | Q. Well, that was the question. | 12:07:51 |
| 2 | Can you answer that question, was there | 12:07:52 |
| 3 | any confusion in your mind, did you have | 12:07:53 |
| 4 | any doubt in your mind at any point until | 12:07:56 |
| 5 | these young boys were arrested for rape as | 12:07:58 |
| 6 | to whether the rape took place near the | 12:08:01 |
| 7 | reservoir or north of 102nd Street | 12:08:04 |
| 8 | Transverse? | 12:08:07 |
| 9 | MS. DOLLIN: Objection. You can | 12:08:07 |
| 10 | answer. | 12:08:09 |
| 11 | A. While I was taking the | 12:08:09 |
| 12 | videotaped statements, the important | 12:08:13 |
| 13 | information for me was whether or not each | 12:08:16 |
| 14 | of the young men admitted participating in | 12:08:19 |
| 15 | the attack on Patricia Meili. | 12:08:21 |
| 16 | That was paramount in my mind at | 12:08:23 |
| 17 | the time we were at the precincts. The | 12:08:27 |
| 18 | location of the attack was less | 12:08:29 |
| 19 | significant than the criminal acts | 12:08:31 |
| 20 | themselves. | 12:08:35 |
| 21 | Q. That doesn't answer the | 12:08:35 |
| 22 | question. The question was, was there | 12:08:37 |
| 23 | some confusion in your mind as to whether | 12:08:38 |
| 24 | some kids were saying it happened at the | 12:08:41 |
| 25 | reservoir or some said it happened north | 12:08:44 |

NYCLD_036742

P-APP002627

E. LEDRER

Page 710

| 1 | of the 102nd Street Transverse before the | 12:08:46 |
| 2 | decision was made to arrest these, anybody | 12:08:48 |
| 3 | for rape of Patricia Meili. | 12:08:50 |
| 4 | It's a very simple question. | 12:08:53 |
| 5 | Did you have different -- were the boys | 12:08:55 |
| 6 | saying different things as to the location | 12:09:01 |
| 7 | of the assault on Patricia Meili? | 12:09:04 |
| 8 | MS. DOLLIN: Objection. That | 12:09:06 |
| 9 | was asked and answered. Go ahead. | 12:09:07 |
| 10 | A. Are you asking me in 1989 when I | 12:09:09 |
| 11 | was at the 20 and 24 whether there was any | 12:09:12 |
| 12 | confusion in my mind at that time? | 12:09:17 |
| 13 | Q. Yes. | 12:09:19 |
| 14 | A. And the answer is, I wasn't | 12:09:20 |
| 15 | focussing on that. I was focussing on | 12:09:22 |
| 16 | criminal responsibility for the attack | 12:09:25 |
| 17 | which came in the form of their admissions | 12:09:26 |
| 18 | of what they themselves had done. That | 12:09:29 |
| 19 | was the focus at that time. | 12:09:32 |
| 20 | Q. So the answer is there was no | 12:09:34 |
| 21 | confusion in your mind about the location? | 12:09:36 |
| 22 | MS. DOLLIN: Objection. | 12:09:39 |
| 23 | A. I don't think that's a fair | 12:09:40 |
| 24 | statement of what I'm telling you. | 12:09:41 |
| 25 | Q. That was the question. If you | 12:09:42 |

NYCLD_036743

P-APP002628

E. LEDRER

Page 711

```
 1    can't answer it, you can't answer it.        12:09:44
 2            Either you had some confusion in      12:09:47
 3    your mind --                                  12:09:50
 4            MR. MOORE:   Let me withdraw it.      12:09:50
 5    Let me ask it this way.                       12:09:52
 6       Q.    Did you receive information that     12:09:55
 7    contradicted the information you had in       12:09:56
 8    terms of where the location of the rape       12:09:59
 9    took place, did you receive information       12:10:02
10    that was contradictory?                       12:10:05
11            In other words, did some people       12:10:08
12    say it took place near the reservoir and      12:10:09
13    some boys said it took place north of the     12:10:12
14    102nd Street Transverse prior to the          12:10:15
15    decision to charge, to arrest anybody for     12:10:17
16    rape?                                          12:10:19
17            MS. DOLLIN:   Objection.   That       12:10:21
18    question was asked and answered, but you      12:10:22
19    can answer it again.                          12:10:25
20       A.    The videotaped statements that I     12:10:26
21    took gave different descriptions of where     12:10:28
22    the crime happened.   But you're asking me    12:10:36
23    if I was confused at the time, and I can      12:10:40
24    say I wasn't focussing on that so I can't     12:10:42
25    say yes, I was confused or no, I wasn't.      12:10:45
```

NYCLD_036744

P-APP002629

E. LEDRER

Page 712

```
1    It was not the primary focus of, it was      12:10:48
2    not my primary focus.                         12:10:54
3         Q.    Well, if you have two people who   12:10:57
4    are being investigated for the same crime     12:11:00
5    and one says it happened at one location      12:11:04
6    and one says it happened at another           12:11:05
7    location, doesn't that raise, wouldn't        12:11:07
8    that raise some concern for you about          12:11:09
9    whether you're getting an accurate            12:11:11
10   statement about somebody's participation?     12:11:14
11        A.    At what point?                      12:11:19
12        Q.    At the point you get involved       12:11:20
13   and you're looking at it, you're taking       12:11:22
14   statements.                                    12:11:25
15        A.    If two people experience an         12:11:26
16   event, they often describe it differently     12:11:28
17   because different things catch their          12:11:31
18   attention.  They remember different           12:11:34
19   things, and the way they describe it in       12:11:36
20   recalling it is different.                     12:11:38
21            As I think I testified earlier,       12:11:39
22   the crime scene in Central Park was           12:11:44
23   particularly difficult because --             12:11:49
24        Q.    Right.                              12:11:51
25        A.    -- it's trees --                    12:11:52
```

NYCLD_036745

P-APP002630

E. LEDRER

Page 713

```
 1        Q.    I'm going to have to interrupt    12:11:54
 2   you at this point.  All right, let me ask    12:11:56
 3   it this way because you're going to go on    12:11:58
 4   and on and on.                               12:12:01
 5           If somebody said a crime             12:12:02
 6   occurred at 42nd Street and someone said     12:12:04
 7   the crime occurred at 34th Street, would     12:12:07
 8   that raise any -- and both were alleged to   12:12:10
 9   be involved in the same crime, would that,   12:12:11
10   would that, as a prosecutor, would that      12:12:14
11   give you any concern as to whether the       12:12:16
12   statements that are being made are           12:12:18
13   truthful?                                    12:12:20
14           MS. DOLLIN:  Objection.              12:12:21
15        A.    I think part of the trouble for   12:12:21
16   me is if each of those two people admitted   12:12:24
17   killing the same person, and one person      12:12:29
18   said it happened at 42nd Street and one      12:12:31
19   person said it happened at 34th Street, at   12:12:33
20   the point of arrest, that would be a less    12:12:36
21   significant contradiction than the fact      12:12:38
22   that they admitted together killing him.     12:12:41
23        Q.    So the location, what they're     12:12:45
24   admitting to as the location wouldn't be a   12:12:47
25   significant fact for you?                    12:12:49
```

NYCLD_036746

P-APP002631

E. LEDRER

Page 714

```
 1              MS. DOLLIN:  Objection to form.   12:12:50
 2       A.     At the time that I was at the    12:12:51
 3   station, and at the time that the decision  12:12:53
 4   was being made to arrest these young men,   12:12:55
 5   the location was not as significant as the  12:12:58
 6   admissions they were making.                12:13:04
 7       Q.     So all you were concerned about  12:13:06
 8   was the fact that they had admitted their   12:13:08
 9   involvement in the rape.  It didn't matter  12:13:12
10   what the location was.  It didn't matter    12:13:15
11   if there were inconsistencies in terms of   12:13:18
12   who assaulted her.  It didn't matter if     12:13:19
13   there were inconsistencies in terms of      12:13:22
14   what was used to assault her.  It didn't    12:13:24
15   matter if there were inconsistencies with   12:13:27
16   regard to what she was wearing or not       12:13:29
17   wearing, any of those facts.                12:13:31
18              All you were concerned about was 12:13:32
19   that they had made admissions to a rape     12:13:33
20   and that was enough for you?                12:13:38
21              MS. DOLLIN:  Objection to form.  12:13:40
22       A.     In my prosecution of this case,  12:13:41
23   in the days and weeks after arraignment, a  12:13:44
24   lot of work was done.  And I believe        12:13:46
25   you're asking me about what was done prior  12:13:50
```

NYCLD_036747

P-APP002632