

Mari Robles

1 year ago

**More updates**

## Reasons for signing

P-APP003140



**Arianna Morales**·1 year ago

As a Vassar alum, one of the things I've been most proud of is Vassar's effort to increase socioeconomic and racial diversity in it's student body. But such efforts cannot be done in a vacuum. Absent of a full demonstration of values that show that Black Lives Matter and that the college is dedicated to support writing history that denounces the traumatization of marginalized people, div... Read more

33·

Report



P-APP003141



**Hannah Hildebolt**·1 year ago

Vassar is often hailed as a school with values centered around radical social justice and change. But how can this be the case when, time and time again, Vassar's disregard for the welfare of its Black and Latinx students rears its ugly head? Having Linda Fairstein on Vassar's board is utterly despicable. She destroyed the lives of the innocent men involved in the Central Park j... Read more

23·

Report

**View all reasons for signing**

Report a policy violation

## Complete your signature

| |
|---|
| First name |
| Last name |
| Email |

New York, 10010
    United States

☑ Display my name and comment on this petition

Sign this petition

By signing, you accept Change.org's Terms of Service and Privacy Policy, and agree to receive occasional emails about campaigns on Change.org. You can unsubscribe at any time.

---

## Today: Mari is counting on you

P-APP003142

Mari Robles needs your help with "**Remove Linda Fairstein From Vassar College Board of Trustees**". Join Mari and 57,189 supporters today.

Sign this petition

___

Sign this petition

___

## Petitions promoted by other Change.org users

**Promoted by 2,338 supporters**

**Julius Jones is innocent. Don't let him be executed by the state of Oklahoma.**

When Julius Jones was 19-years-old, he was convicted of a murder he says he did not commit. I need your help to save his life. Julius has lived on death row for almost 20 years, and is held in solitary confinement for 23 hours a day. He is allowed one hour of sunlight a day, and three showers a week. Every minute we wait to take action, Julius is suffering. Every second that goes by brings Julius closer to being executed for a crime he… Read more

Sign the petition

**Promoted by 37 supporters**

P-APP003143

## Fishback v. Commonwealth WE DEMAND Remedy

In 1995 Virginia abolished parole and implemented the then new and popular trend of "Truth in Sentencing" laws. However, with the change in law few saw the collateral damage that would occur. For 5 years jurors were never told about parole being abolished, in fact, judges were instructed not to inform jurors of the change, even if they specifically asked about it. By not telling the jurors such critical information Virginia courts … Read more

Sign the petition

**Promoted by 231 supporters**

P-APP003144

Case 2:20-cv-00180-JLB-MRM Document 46-22 Filed 07/01/20 Page 6 of 92 PageID 4135

## FREE ADNAN SYED

We, the signers of this petition urge the State of Maryland and the governor, Larry Hogan, to pardon Adnan Syed, as he is not guilty of the murder of Hae Min Lee. Innocent people every day are charged with crimes they never committed and forced to live the rest of their lives confined in a jail cell. This is exactly the story of Adnan Syed. Adnan Syed is a Pakistani-American Muslim who attended Woodlawn High School in ... Read more

Sign the petition

**Promoted by 8,099 supporters**

## Recall California Governor Gavin Newsom! Make California Great Again.

Governor Gavin Newsom in addition to Governor Jerry Brown have declared California a Sanctuary State, importing illegal immigrants to replace the people of California, and give them California's tax payer funded goods and services in order to alter the voting demographics against Americans, and in favor of Democrats. Recently, in 2019 within months of taking office, Governor Gavin Newsom pulled troops off the sout... Read more

Sign the petition

**Promoted by 181 supporters**

P-APP003145

## Re-Opening the Equestrian Industry

The horse world is a large but small community, and many are suffering through this pandemic and crisis. We have come up with many solutions and suggestions to get barns reopened and trainers teaching again all with safety and health in mind. Horse barn owners and trainers have found that they are not eligible for unemployment, SBA loans and the payment protection program yet their bills also piling up. Thes... Read more

Sign the petition

**Promoted by 212 supporters**

P-APP003146

## RE-OPEN SPOKANE PETITION

Great job, Spokane. Thank you, First Responders! We did it ----AND the Hospitals are nearly empty! We need to ask the elderly and compromised to stay home. We need to continue to social distance at work if possible; wear masks, wash hands, use hand sanitizer, stay 6ft apart. PLEASE take responsibility for your own safety. 1) WE ARE NOT SEATTLE. We have different statistics. 2) Our economy is tanking &amp; businesse... Read more

Sign the petition

**Promoted by 98 supporters**

## Preserve the mountain biking skills and progression area at Graham Hills Park

Graham Hills Park has a mountain bike skills and progression area near the Marble Avenue exit on the Saw Mill Parkway, and many of the features have been there for almost 20 years. It has come to our attention that the features in this area are scheduled to be knocked down with a bulldozer by the Parks Department ... Read more

Sign the petition

P-APP003147

**Promoted by 217 supporters**

## Give Minnesota Graduating Seniors a Commencement Ceremony

On Friday, May 8th, the Minnesota Department of Health, Office of High Education, and the Minnesota Department of Education set out new recommendations for graduation ceremonies amid the COVID-19 pandemic. These guidelines included recommending "virtual commencement ceremonies where possible, ensuring that graduates and their families do not have to leave their homes" (Kare 11). Indoor com... Read more

Sign the petition

**Promoted by 51 supporters**

P-APP003148

## Reduce the current mandatory sentencing serving time from 85 % to 65% retroactive for all

Hi,  I am the wife of an Oklahoma Inmate. My husband Robert Long was sentenced to 18 years in prison.. That's almost 2 decades on a Robbery / conspiracy charge. His first offense.. No prior contact with the Tulsa police dept. He has currently served 12 of those years. His commutation was recently denied March 202… Read more

Sign the petition

**Promoted by 15 supporters**

## Defer Approval of the Green Line North #GreenLineDoneRight

We can make a bold statement if we get 1000+ supporters! Sign this petition by May 24th and share it with everyone. There's no doubt that this is not a great time to have our heads wrapped up with the Green Line. Given that we're in the middle of a pandemic, we have a lot of other things that are far more important - most importantly the safety and health of our family, friends, and neighbours. But the Green Line proces… Read more

Sign the petition

P-APP003149

Case 2:20-cv-00180-JLB-NRM Document 46-23 Filed 07/01/20 Page 11 of 92 PageID 4140

**Promoted by 204 supporters**

## Bitcoin Black (BCB) on Binance

Vote for Bitcoin Black (BCB) to be listed on Binance exchange.

Sign the petition

**Promoted by 13,295 supporters**

P-APP003150

## Shut Down Pornhub and Hold Its Executives Accountable for Aiding Trafficking

To directly fund this Traffickinghub campaign give at Traffickinghub.com, instead of donating on change.org. To get up to the minute updates on the progress of this initiative follow Laila Mickelwait on Twitter.   In the last few months, there have been several shocking cases of sex trafficking and child rape films that we... Read more

Sign the petition

**Promoted by 375 supporters**

## Cancellation of "Comedian" Kurt Metzger's (Public, Digital, and Social Media) Appearances

During a public, virtual interview with 3 other comedians, comedian Kurt Metzger vehemently expressed that the Armenian Genocide of 1915 was a good thing and he is glad that it happened. The world community, the Armenian community of the United States, and human rights advocates across the country are cal... Read more

P-APP003151

Sign the petition

**Promoted by 10 supporters**

## Reopen Victoria, MN

Reopen Victoria is a group of residents concerned about the impact of the local shutdown and closures in response to Covid-19. We acknowledge the situation caused by Covid-19 and recognize that it is a public health concern. However, the economic, social, emotional and religious disruption caused by the shutdown will cause far greater harm in the form of economic hardship, loss of livelihood, and mental health prob... Read more

Sign the petition

**Promoted by 22 supporters**

P-APP003152

Case 2:20-cv-00180-JLB-MRM   Document 46-23   Filed 07/01/20   Page 14 of 92 PageID 4143

## SAVE LAKE GLORIA as a Public Park

PRESERVE A FAMILY TRADITION - Generations of Colerain families have enjoyed Lake Gloria over a course of decades.  It is a unique feature that we should preserve.  Citizens have asked the township to preserve the southern bank and club house at Lake Gloria for public fishing, relaxation and public benefit for decades. "PUBLIC BENEFIT" - Currently, a developer seeks to build on the northern bank of the lake, but wa... Read more

Sign the petition

**COMPANY**

About

Impact

Careers

Team

**SUPPORT**

Help

Guides

Privacy

Policies

**COMMUNITY**

Blog

Press

**CONNECT**

Twitter

Facebook

| English (United States)                                                                    ▾ |
| --- |

© **2020, Change.org, PBC**  Certified B Corporation

This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

P-APP003153

Please visit our **COVID-19 (novel coronavirus) Updates page** for all developments.

OFFICE OF THE PRESIDENT
# ELIZABETH BRADLEY

# Announcement Regarding Trustee Resignation

Dear All,

I am writing to update the Vassar community. I have just learned from the Chair of the Board of Trustees that Linda Fairstein has resigned from the Board, as of today. I am told that Ms. Fairstein felt that, given the recent widespread debate over her role in the Central Park case, she believed that her continuing as a Board member would be harmful to Vassar.

The events of the last few days have underscored how the history of racial and ethnic tensions in this country continue to deeply influence us today, and in ways that change over time. As I have received many emails and phone calls from people who have expressed a broad range of views on this issue, I am reminded of William Faulkner's quote: *"The past is never dead. It's not even past."*

We come to the present with our individual and intersecting histories. Even with much discussion, we may not reach agreement about important issues. My hope is that our continued debate and discord fosters a community of profound learning and humanity.

Elizabeth H. Bradley, President

Vassar College
Poughkeepsie, NY 12604
@EHBVassar

P-APP003154



Social Media Directory

## OFFICE OF THE PRESIDENT AT VASSAR COLLEGE

124 Raymond Avenue, Box 1, Poughkeepsie, New York 12604-0001

Main Building, second floor

(845) 437-7200

Contact

Admission

©Vassar College

P-APP003155



Fourth of July Sale Is On.

SUBSCRIBE NOW
$3 for 3 months. Save 90%.

News    Space    Sports    Entertainment    Restaurants    Nation / World    Obituaries    E-Edition

Subscribe

Sign In

NATION

# Ex-prosecutor Linda Fairstein, under fire after 'When They See Us,' resigns as Vassar trustee

**A.J. Martelli**  **Ryan Santistevan**  Poughkeepsie Journal**and**

Published 7:53 p.m. ET Jun. 4, 2019 | **Updated 8:57 p.m. ET Jun. 4, 2019**

POUGHKEEPSIE, N.Y. – A Vassar College trustee who had come under fire for her involvement in the infamous Central Park Five case 30 years ago has resigned.

Linda Fairstein, a prosecutor in the case, resigned Tuesday, Vassar College President Elizabeth Bradley said in a letter posted to the college's website.

The case involved five African American and Latino teenagers arrested in 1989 in connection with the rape of a jogger in New York. They were convicted for multiple charges, including assault, attempted murder and rape. All five were exonerated in 2002 after serial rapist Matias Reyes confessed he was the  sole attacker.

**This article is FREE to your community.**

P-APP003156



NEW YORK, NY - MARCH 26, 2014: Portrait of author, Linda Fairstein in her home. CREDIT: Katherine Marks    *Katherine Brabyn*

Students had <u>called for Fairstein to be removed from the board</u> following the release Friday of "When They See Us," a four-part series on Netflix, that dramatizes the events before and after the headline-making trial. The series shows how detectives and prosecutors manipulated and coerced the young men into confessing. Fairstein observed the suspects' 1989 interrogation, conducted by another prosecutor and police. She didn't personally try the case.

**Central Park Five:** <u>Ava DuVernay's Netflix drama brings 'nuance' to case</u>

**'When They See Us':** <u>Ava DuVernay lets Trump 'speak for himself' in Central Park Five series</u>

Mari Robles, an international studies junior at Vassar, published a petition Sunday morning calling for Fairstein's removal. As of 5:30 p.m. Tuesday, more than 13,000 people had signed the petition on change.org.

In her letter, Bradley said Fairstein "felt that, given the recent widespread debate over her role ... she believed that her continuing as a Board member would be harmful to Vassar."

Though she said she was happy with the outcome, Robles said some of her classmates were unhappy Vassar didn't take action.

"I think my initial reaction (to the resignation) was 'mission accomplished.' She's off the board," Robles said. "There were other students (who) expressed dissatisfaction that she resigned. But this is something we can have a greater discussion about."

Vassar officials have declined to answer questions beyond Bradley's letter. Officials have not said if the school was aware of Fairstein's involvement in the case prior to this past weekend.

However, this was not the first time Fairstein was in the news because of it. An author who has written more than 20 crime and mystery novels, Fairstein was to receive a lifetime achievement award from the Mystery Writers of America last November. The organization rescinded the honor two days after announcing it

P-APP003158

amid concern from its membership.

Some online, including Santana, have also called for a boycott of her books.



Elizabeth Howe Bradley. *Courtesy Photo*

Bradley previously had said the school would review the status of Fairstein's place on the board.

The president in her letter Tuesday said she has received "many emails and phone calls" reflecting "a broad range of views" regarding Fairstein.

"The events of the last few days have underscored how the history of racial and ethnic tensions in this country continue to deeply influence us today, and in ways that change over time," she wrote.

Fairstein, one of 34 members of the board of trustees, is a 1969 Vassar graduate. She served in the office of the New York County District Attorney office from 1972 until 2002, spending 26 years in charge of the sex crimes prosecution unit, according to Vassar's website. The school has not made clear how long she served as a trustee.

Some involved with Vassar have come to Fairstein's defense.

Gary Heavner, a 1987 Vassar graduate and prosecutor, expressed skepticism over the case itself, and whether Fairstein did anything wrong during it.

"To blame one person because they're an easy target is lazy and improper," Heavner said. "I haven't seen enough proof to see (the Central Park Five) are guilty of rape. But I also haven't see enough proof that Linda Fairstein did anything wrong. It should be the same standard."

P-APP003159

After Reyes' admission, prosecutors stopped short of declaring the five men innocent but withdrew all charges. The legal clock had run out for charging Reyes, who was already serving life in prison on other convictions.

Since 2002, Fairstein has denied the teens were coerced and has defended authorities' conduct in the case. The city reached a roughly $41 million settlement with the five, while not admitting any wrongdoing.

Dennis Slade Jr., a 1991 graduate and co-chair of African American Alumnae/i of Vassar College, said in the organization's public Facebook group Monday that the college administration reached out to him and co-chair Tracy Elise Poole to gauge "'the temperature' of black alums." In the post he said the call to remove Fairstein has "been strong," and said he has communicated as much to the administration.

"It is important to note that Linda Fairstein has been a Trustee since at least 2010, if not earlier," Slade said. "Multiple alums (some super-liberal, some famous, some black) have served on the Board alongside her in this time and none of them, in my one year of being AAAVC co-chair, have approached me about Fairstein – or any other specific trustee, actually."

"When They See Us," is directed by Ava DuVernay, who has created such Oscar-nominated films as "Selma" and "13th," which have also explored racial injustice. The cast includes Niecy Nash, Michael K. Williams and Famke Janssen. Fairstein is portrayed by Felicity Huffman, who recently plead guilty to charges in a college admissions scandal.

**DIG DEEPER**

'All-white company' wrongly accused immigrant author of racism, $13M lawsuit claims Chris Pratt marries Katherine Schwarzenegger in California ceremony, according to reports Tony Rodham, Hillary Clinton's youngest brother, dies AC company convinced 103-year-old WWII vet to pay $24K, son says Like what you see? Download the

Case 2:20-cv-00180-JLB-MRM Document 46-28 Filed 07/01/20 Page 22 of 92 PageID 4151

 US

● **LIVE TV**

# Central Park Five prosecutor Linda Fairstein resigns from board of alma mater Vassar College

By Jason Hanna and Lisa Respers France, CNN

🕑 Updated 7:04 PM ET, Sat June 8, 2019

**(CNN) —** Author and former prosecutor Linda Fairstein -- facing a swarm of controversy over a Netflix series that examines a wrongful conviction in a high-profile rape case -- has resigned as a trustee of her alma mater.

Fairstein resigned as a member of the board of trustees of Vassar College, from which she graduated in 1969, the college in Poughkeepsie, New York, said Tuesday.

The Netflix limited series "When They See Us" dramatizes the story of five teenage boys of color who were wrongfully convicted in a jogger's 1989 rape.

Fairstein was a prosecutor in the case. There were complaints that the confessions of the Central Park Five, as they came to be known, were coerced, and their convictions were overturned in 2002 after Matias Reyes, a convicted serial rapist, confessed to the rape.

Emotions stirred by the Netflix series led to a petition calling for Fairstein's removal from Vassar's board as well other ones seeking a boycott of her books and a #CancelLindaFairstein movement on social media.

Linda Fairstein has defended the handling of the Central Park Five case.

"I am told that Ms. Fairstein felt that, given the recent widespread debate over her role in the Central Park case, she believed that her continuing as a board member would be harmful to Vassar," Vassar College President Elizabeth H. Bradley wrote in an online message Tuesday.

The city of New York settled with the five wrongfully convicted men in 2014, and they were awarded $41 million.

Fairstein is portrayed in the Netflix series by actress Felicity Huffman.

'When They See Us' makes a powerful case to be seen

Fairstein headed up the sex crimes unit at the Manhattan district attorney's office from 1976 to 2002 and went on to become a successful mystery writer.

The author recently deleted her Twitter account after days of sparring with some Twitter users.

In July, Fairstein defended the handling of the case in a letter to the editor of the New York Law Journal.

"The confessions were not coerced," she wrote. "The questioning was respectful, dignified, carried out according to the letter of the law and with sensitivity to the young age of the men."

'When They See Us' transformed those who worked on it

CNN has reached out to Fairstein and her publisher for comment.

*CNN's Madeleine Thompson contributed to this report.*

P-APP003161

 

US

US

World

Politics

Business

Opinion

Health

Entertainment

Tech

Style

Travel

Sports

Videos

Coupons

More

Weather

 US

FOLLOW CNN

  

Terms of Use    Privacy Policy    Do Not Sell My Personal Information    AdChoices    About Us    CNN Studio Tours

CNN Store    Newsletters    Transcripts    License Footage    CNN Newsource    Sitemap

© 2020 Cable News Network.  Turner Broadcasting System, Inc.  All Rights Reserved.

P-APP003162



US

● **LIVE TV**  

P-APP003163

Jun 5, 2019 10:41am PT

# Central Park Five Prosecutor Resigns From Vassar Board Amid 'When They See Us' Criticism

By Elaine Low



"Central Park Five" prosecutor Linda Fairstein has resigned from the board of Vassar College as well as the board of victim assistance organization Safe Horizon after Ava DuVernay's "When They See Us" spurred renewed focus on Fairstein's role in the 1989 case.

"I am told that Ms. Fairstein felt that, given the recent widespread debate over her role in the Central Park case, she believed that her continuing as a Board member would be harmful to Vassar," wrote Vassar College president Elizabeth Bradley in a statement regarding the resignation.

The Netflix dramatization tells the story of the wrongful arrest and conviction of five teenagers in the wake of a rape of a Central Park jogger, as well as the lifelong consequences that follow. Depicted by Felicity Huffman, the on-screen Fairstein repeatedly refers to the teens as "animals."

Safe Horizon confirmed to *Variety* that Fairstein had stepped down from its board, and issued a statement thanking her for her work and reiterating that its "top priority has been empowering victims and survivors."

P-APP003164

The hashtag #CancelLindaFairstein has gained traction on Twitter, and over 87,000 people have signed an online Change.org petition calling for retailers to stop selling Fairstein's books. A separate petition, started several days ago, called for Fairstein's resignation from the Vassar board.

"The events of the last few days have underscored how the history of racial and ethnic tensions in this country continue to deeply influence us today, and in ways that change over time," Bradley said. "As I have received many emails and phone calls from people who have expressed a broad range of views on this issue, I am reminded of William Faulkner's quote: 'The past is never dead. It's not even past.'"

P-APP003165



**FREE TRIAL**

**U.S.**

# Central Park Five Prosecutor Linda Fairstein Resigns From Vassar College Board of Trustees After Petition

BY **JENNI FINK** ON 6/4/19 AT 5:12 PM EDT





**You have 4 free articles remaining this month**

Sign-up to our daily newsletter for more articles like this + access to 5 extra articles

P-APP003166



**SHARE**

**U.S.**    CENTRAL PARK FIVE

Former prosecutor Linda Fairstein resigned from the Vassar College Board of Trustees after an online petition called for her removal because of how she handled the Central Park Five case.

The petition's creation followed the Friday release of *When They See Us,* a Netflix series based on the true story of five teenagers who were wrongfully convicted of raping a woman in 1989. Fairstein was head of the sex crimes unit at the Manhattan District Attorney's office at the time and oversaw the interrogation of the group, dubbed "The Central Park Five."

All five teenagers were convicted after confessing to the crime, which their lawyers argued were coerced. After serving between six and 13 years in prison, they had their convictions vacated when a serial rapist, whose DNA matched the attack, confessed to the crime.

ADVERTISEMENT

"I am told that Ms. Fairstein felt that, given the recent widespread debate over her role in the Central Park case, she believed that her continuing as a Board member would be harmful to Vassar," Vassar College President Elizabeth Bradley said in a statement to the community.

Author Linda Fairstein attends the Twelfth Annual Authors In Kind Literary Luncheon benefitting God's Love We Deliver at The Metropolitan Club on April 14, 2015, in New York City. On Sunday, a Vassar College student started an online petition calling for her to be removed from the board of trustees.
GETTY/STEPHEN LOVEKIN



After being created on Sunday, the Change.org petition had nearly 12,300 signatures as of Tuesday afternoon.

ADVERTISEMENT

"As a member of the Vassar community, I do not wish for the college to be formally associated with her," the petition's creator Mari Robles wrote. "The boys she wrongfully helped imprison are our neighbors, brothers, sons. They are now men that have been robbed of a life."

Robles said she was emboldened by the words of CNN host Van Jones' commencement address in May and her professors and classmates who taught her

P-APP003168

to "fight for injustice."

"I call on Vassar alums and current students to demand that she be taken off the board of trustees," Robles wrote.

Four of the teenagers, Antron McCray, Kevin Richardson, Yusef Salaam and Raymond Santana, were sentenced to five to 10 years in a juvenile detention facility. Korey Wise, the only one of the five teenagers who was tried as an adult, was sentenced to five to 15 years in prison.

After their convictions were vacated in 2002, the five men sued the city of New York. In 2014, the city of New York settled for $41 million, which CBS *Sunday Morning* noted was equivalent to about $1 million for each year they served in prison.

---

**RELATED STORIES**

- Niecy Nash Hopes 'When They See Us' Will Get People to Learn Their Rights
- Who Is Matias Reyes? Serial Rapist and Murderer in 'When They See Us'
- Who Is Linda Fairstein? Prosecutor in NewNetflix Series 'When They See Us'

---

Fairstein, a Vassar graduate, repeatedly defended her handling of the investigation. While the men's lawyer disputed Fairstein's account of the interrogations, she told the *The New Yorker* in 2002, that no one under 16 was talked to until a parent or guardian arrived.

"We had to use special 'youth rooms,'" she said. "It was a much more friendly atmosphere, not the bare interrogation rooms ... This was not an Alabama jail where two guys who have been partners for years put a guy in a back room and he doesn't see the light of day for three days."

ADVERTISEMENT

In 2018, she wrote in a letter to the New York Law Journal that the confessions weren't coerced and the questioning was "respectful, dignified" and "carried out according to the letter of the law."

The former prosecutor called *When They See Us* a "basket of lies" during an interview with The Daily Beast.

After she left the Manhattan D.A's office in 2002, she became a best-selling author. Along with a petition requesting for her removal from the Vassar College Board of Trustees, a Change.org petition also called for publishers to stop printing her books and retailers to stop selling them.

ADVERTISEMENT

"As I have received many emails and phone calls from people who have expressed a broad range of views on this issue, I am reminded of William Faulkner's quote: 'The past is never dead. It's not even past,'" Bradley said.

REQUEST REPRINT & LICENSING, SUBMIT CORRECTION OR VIEW EDITORIAL GUIDELINES

**THE DEBATE**

**Letter From the Editor**

# A Note on Linda Fairstein's 1993 Woman of the Year Award

To our readers: The lens of history has shown us that we got it wrong.

By **Samantha Barry**

June 4, 2019



Hi all,

P-APP003171

Case 2:20-cv-00180-JLB-MRM    Document 46-23    Filed 07/01/20    Page 33 of 92 PageID 4162

We've heard from some of you in recent days as we, and the world, have been remembering the injustice of the prosecution of Antron McCray, Kevin Richardson, Yusef Salaam, Raymond Santana, and Korey Wise. *Glamour* has covered the new limited series centered on their story, *When They See Us,* through interviews with some of its actors and with director Ava DuVernay.

Many of you have contacted us on social media to ask about the *Glamour* Woman of the Year award that the prosecutor in the case, Linda Fairstein, received a quarter century ago.

Unequivocally, *Glamour* would not bestow this honor on her today. She received the award in 1993, before the full injustices in this case were brought to light. Though the convictions were later vacated and the men received a settlement from the City of New York, the damage caused is immeasurable.

*Glamour*'s Women of the Year awards should reflect our culture, the values of our brand, and our audience. We remain committed to being thoughtful and purposeful about whom we choose to celebrate, and in this case, the lens of history has shown us that we got it wrong.

It's important to hold institutions accountable, and we appreciate the commitment to this issue that so many of you have demonstrated. *Glamour* is, and will always be, a platform that celebrates outspoken women. So to those of you who raised this issue, thank you. We want you to know that we hear you, and we assure you that while we can't erase the past, we will continue to learn from it.

Samantha Barry
Editor in Chief

---

**Topics    letter from the editor**

---

P-APP003172

Case 2:20-cv-00180-JLB-MRM Document 46-23 Filed 07/01/20 Page 34 of 92 PageID 4163

 

● **LIVE TV**

# Klobuchar campaign will return money to former Central Park Five prosecutor, spokesperson says

By Jasmine Wright and Kyung Lah, CNN

Updated 10:17 PM ET, Fri January 3, 2020

**Officer disputes Netflix portrayal of Central Park Five case** 04:19

**(CNN)** — Sen. Amy Klobuchar's presidential campaign said Friday that it was returning money donated by a former prosecutor who has faced sharp public criticism for her role in the Central Park Five rape case, according to a campaign spokesperson.

"The campaign shouldn't have accepted this contribution and we're returning it," the spokesperson told CNN.

First reported by The Guardian, Federal Election Commission records show that Linda Fairstein contributed $1,000 to Klobuchar's presidential campaign in March 2019. Fairstein's role in the case drew fresh scrutiny last June after the release of Netflix's limited series "When They See Us." The miniseries depicted the story of the wrongful convictions of five black and Latino teenagers who had been accused of raping and beating a white female jogger in Central Park in 1989. The men were then exonerated in 2002.

After the series debuted, Fairstein stepped down from Vassar College's Board of Trustees, among other positions, due to the resulting public backlash, according to a letter from the college's president.

The news of Fairstein's contribution to Klobuchar's campaign comes as the Minnesota Democrat more than doubled her fourth-quarter fundraising total from the previous quarter but lags significantly in support from nonwhite voters. The senator was the top choice of 0% of black people in South Carolina in a Quinnipiac University poll released in mid-November, a survey that covered 18 candidates who were then running for president, and 1% of nonwhite voters in Nevada in a CNN poll released in late September.

P-APP003173



Case 2:20-cv-00180-JLB-MRM   Document 46-23   Filed 07/01/20   Page 35 of 92 PageID 4164




● LIVE TV

over what critics have called "tough on crime" policies.

In March, The Washington Post reported on Klobuchar's unwillingness to prosecute police involved in killings of black men during her tenure. Around the same time, American Public Media reported that Klobuchar frequently sided with the police over misconduct charges. Of her tenure, she was quoted as telling The Washington Post that "kids that were killed by gangsters" were the kinds of cases she focused on, and telling American Public Media that "in that job I tried to put myself in other people's shoes to try to do the right thing."

That same month, the senator said on CNN's "State of the Union" that she had worked against racial disparities during her time in office, after being asked about a Minnesota Public Radio report from her time as county attorney. The report found inequality in law enforcement, particularly against African Americans.

Sen. Elizabeth Warren of Massachusetts has also been the recipient of some form of help from Fairstein. The former prosecutor hosted a Warren fundraiser in New York during her 2012 Senate run, according to The Guardian.

CNN reached out to the Warren campaign for comment on Fairstein's exact role in the fundraiser, but has not yet received a reply.

In response to the controversy last year, Warren's presidential campaign disavowed Fairstein's support.

"This was in 2012 but it was wrong. Linda's record is troubling and highlights how the criminal justice system has caused irrevocable harm to Black communities. Part of deciding to run our presidential campaign the way we are is the decision to say Elizabeth is not going to give special access to high-dollar donors through closed-door fundraisers," Warren spokeswoman Gabrielle Farrell said in a statement to CNN.

Search CNN...

US

World

Politics

Business

Opinion

Health

Entertainment

Tech

Style

Travel

P-APP003174

Case 2:20-cv-00180-JLB-MRM   Document 46-23   Filed 07/01/20   Page 36 of 92 PageID 4165



LIVE TV

Videos

Coupons

More

Weather



**FOLLOW CNN POLITICS**

   

Terms of Use    Privacy Policy    Do Not Sell My Personal Information    AdChoices    About Us    CNN Studio Tours

CNN Store    Newsletters    Transcripts    License Footage    CNN Newsource    Sitemap

© 2020 Cable News Network.   Turner Broadcasting System, Inc.   All Rights Reserved.
CNN Sans ™ & © 2016 Cable News Network.

P-APP003175



**FREE TRIAL**

**U.S.**

# Amy Klobuchar Returns Donation from Central Park Five Prosecutor Linda Fairstein

BY **ASHER STOCKLER** ON 1/4/20 AT 11:41 AM EST



When They See Us- Official Trailer

**SHARE**      

| U.S. | CENTRAL PARK FIVE | AMY KLOBUCHAR | NEW YORK CITY | SEX CRIMES |
| --- | --- | --- | --- | --- |



Democratic presidential candidate Sen. Amy Klobuchar (D-MN) speaks during a campaign stop at Miller's Sports Bar and Restaurant on December 27, 2019 in Algona, Iowa.

JOE RAEDLE/GETTY

Senator Amy Klobuchar, a former prosecutor running for the Democratic Party's presidential nomination, is returning a campaign donation from Linda Fairstein, the former New York State attorney who oversaw the prosecution of the Central Park Five.

Federal Election Commission records show that Fairstein donated $1,000 to Klobuchar's campaign committee in March 2019, her only contribution in the 2020 primary race to date.

ADVERTISEMENT

**RELATED STORIES**

- Robert Morgenthau Dies: Manhattan DA Who Oversaw Central Park Five Case
- How Much Was The Central Park Five Settlement?
- Trump Casts Doubt, Without Any Evidence, on Innocence of Central Park Five

In response to a request for comment about the donation, a campaign spokesperson provided *Newsweek* the following statement:

"The campaign shouldn't have accepted this contribution and we're returning it."

ADVERTISEMENT

The Guardian first reported the contribution.

Fairstein has drawn renewed scrutiny for her role in the prosecution of five teenagers —four African American and one Hispanic—for the brutal rape of a Central Park jogger in 1989. The case relied in part on false confessions extracted from each of the boys during lengthy interrogation sessions without the presence of counsel.

ADVERTISEMENT



Director Ava DuVernay's adaptation of the events into a limited-run series for Netflix has been credited with catalyzing the most recent examination of Fairstein's record.

In 2002, a New York State judge vacated the young men's convictions after a serial rapist, Matias Reyes, confessed to the crime. He had already been serving a life sentence on unrelated charges.

After DuVernay's miniseries began to garner acclaim and stir latent outrage about the handling of the case, Fairstein penned an op-ed for the *Wall Street Journal* in June calling the adaptation "so full of distortions and falsehoods as to be an outright fabrication."

"Ms. DuVernay's film attempts to portray me as an overzealous prosecutor and a bigot, the police as incompetent or worse, and the five suspects as innocent of all charges against them," Fairstein wrote. "None of this is true."

Fairstein did not respond to a request for comment about the return of her donation to the Klobuchar campaign.

ADVERTISEMENT

During the de Blasio administration, the Central Park Five settled with New York City for $41 million relating to claims stemming from their wrongful convictions, although the city did not admit to misconduct.

As part of the fallout from DuVernay's miniseries, *Glamour* magazine all-but-rescinded its 1993 christening of Fairstein as its woman of the year. Fairstein, a novelist, was also dropped by her publisher.

While the Klobuchar donation is her only attempted contribution to the 2020 race thus far, Fairstein has a history of donating to Democratic candidates. In recent years she has donated thousands to Virginia Senator Mark Warner's Senate campaign, Hillary Clinton's presidential run and the Democratic National Committee.

ADVERTISEMENT

In 2014, Fairstein also made a contribution to the reelection campaign of Maine Senator Susan Collins.

**REQUEST REPRINT & LICENSING**, **SUBMIT CORRECTION** OR **VIEW EDITORIAL GUIDELINES**

 politics                                                    ● LIVE TV    👤  ☰

# Klobuchar campaign will return money to former Central Park Five prosecutor, spokesperson says

By Jasmine Wright and Kyung Lah, CNN

Updated 10:17 PM ET, Fri January 3, 2020

Officer disputes Netflix portrayal of Central Park Five case 04:19

**(CNN) —** Sen. Amy Klobuchar's presidential campaign said Friday that it was returning money donated by a former prosecutor who has faced sharp public criticism for her role in the Central Park Five rape case, according to a campaign spokesperson.

"The campaign shouldn't have accepted this contribution and we're returning it," the spokesperson told CNN.

First reported by The Guardian, Federal Election Commission records show that Linda Fairstein contributed $1,000 to Klobuchar's presidential campaign in March 2019. Fairstein's role in the case drew fresh scrutiny last June after the release of Netflix's limited series "When They See Us." The miniseries depicted the story of the wrongful convictions of five black and Latino teenagers who had been accused of raping and beating a white female jogger in Central Park in 1989. The men were then exonerated in 2002.

After the series debuted, Fairstein stepped down from Vassar College's Board of Trustees, among other positions, due to the resulting public backlash, according to a letter from the college's president.

The news of Fairstein's contribution to Klobuchar's campaign comes as the Minnesota Democrat more than doubled her fourth-quarter fundraising total from the previous quarter but lags significantly in support from nonwhite voters. The senator was the top choice of 0% of black people in South Carolina in a Quinnipiac University poll released in mid-November, a survey that covered 18 candidates who were then running for president, and 1% of nonwhite voters in Nevada in a CNN poll released in late September.

P-APP003182

 

● LIVE TV

over what critics have called "tough on crime" policies.

In March, The Washington Post reported on Klobuchar's unwillingness to prosecute police involved in killings of black men during her tenure. Around the same time, American Public Media reported that Klobuchar frequently sided with the police over misconduct charges. Of her tenure, she was quoted as telling The Washington Post that "kids that were killed by gangsters" were the kinds of cases she focused on, and telling American Public Media that "in that job I tried to put myself in other people's shoes to try to do the right thing."

That same month, the senator said on CNN's "State of the Union" that she had worked against racial disparities during her time in office, after being asked about a Minnesota Public Radio report from her time as county attorney. The report found inequality in law enforcement, particularly against African Americans.

Sen. Elizabeth Warren of Massachusetts has also been the recipient of some form of help from Fairstein. The former prosecutor hosted a Warren fundraiser in New York during her 2012 Senate run, according to The Guardian.

CNN reached out to the Warren campaign for comment on Fairstein's exact role in the fundraiser, but has not yet received a reply.

In response to the controversy last year, Warren's presidential campaign disavowed Fairstein's support.

"This was in 2012 but it was wrong. Linda's record is troubling and highlights how the criminal justice system has caused irrevocable harm to Black communities. Part of deciding to run our presidential campaign the way we are is the decision to say Elizabeth is not going to give special access to high-dollar donors through closed-door fundraisers," Warren spokeswoman Gabrielle Farrell said in a statement to CNN.

| Search CNN... | 🔍 |
| --- | --- |

US

World

Politics

Business

Opinion

Health

Entertainment

Tech

Style

Travel

P-APP003183



LIVE TV

Videos

Coupons

More

Weather



**FOLLOW CNN POLITICS**

   

Terms of Use    Privacy Policy    Do Not Sell My Personal Information    AdChoices    About Us    CNN Studio Tours

CNN Store    Newsletters    Transcripts    License Footage    CNN Newsource    Sitemap

© 2020 Cable News Network.  Turner Broadcasting System, Inc.  All Rights Reserved.
CNN Sans ™ & © 2016 Cable News Network.

P-APP003184



TRY 30 DAYS FREE | SIGN IN

**Help Center**

# Where is Netflix available?

Netflix members with a streaming-only plan can watch TV shows and movies instantly in over 190 countries. The content that is available to stream may vary by location, and will change from time to time.



> **NOTE:** Netflix is not yet available in China, though the company continues to explore options for providing the service. It also is not available in Crimea, North Korea, or Syria due to U.S. government restrictions on American companies.

---

Was this article helpful?

| YES | NO |

P-APP003185

Case 2:20-cv-00180-JLB-MRM   Document 46-23   Filed 07/01/20   Page 47 of 92 PageID 4176

P-APP003186



# 𝕸𝖎𝖆𝖒𝖎 𝕳𝖊𝖗𝖆𝖑𝖉

LEONARD PITTS JR

# Central Park 5 series will break your heart — and make you mad

**BY LEONARD PITTS JR.**

JUNE 08, 2019 04:28 PM , UPDATED JUNE 11, 2019 11:20 AM



DONALD TRAILL *DONALD TRAILL/INVISION/AP*



### Listen to this article now

02:29          Powered by   **Trinity Audio**

We may use cookies, beacons (also known as pixels), and other
similar technologies (together "cookies") to offer you a better
experience, serve you more relevant ads, and analyze usage. By
continuing to use this application, you consent to the use of
cookies in accordance with our Privacy Policy.

**ACCEPT
COOKIES**

P-APP003187

were convicted of the brutal 1989 rape and assault of a white woman jogger. It is an unsparing re-creation of an ugly time.

**TOP ARTICLES**



AD

SKIP AD

Halting and confused, the boys struggle to describe a crime they did not commit in order to stop police officers from yelling at them and smacking them around. The concocted tales make no sense, but prosecutor Linda Fairstein is satisfied. Having decided that these are her perpetrators, she will not swerve from that, even as the facts scream otherwise.

We may use cookies, beacons (also known as pixels), and other similar technologies (together "cookies") to offer you a better experience, serve you more relevant ads, and analyze usage. By continuing to use this application, you consent to the use of cookies in accordance with our Privacy Policy.

**ACCEPT COOKIES**

P-APP003188



FILE — Linda Fairstein, chief of the Manhattan district attorney's sex crimes unit, left, enters court with Elizabeth Lederer, the prosecutor who handled the Central Park jogger case, in August 1990. "When They See Us," Ava DuVernay's Netflix series about the Central Park jogger case, has undercut the public perception of Feinstein as a law enforcement hero. (Chester Higgins, Jr./The New York Times) CHESTER HIGGINS JR. *NYT*

We may use cookies, beacons (also known as pixels), and other similar technologies (together "cookies") to offer you a better experience, serve you more relevant ads, and analyze usage. By continuing to use this application, you consent to the use of cookies in accordance with our Privacy Policy.

**ACCEPT COOKIES**

P-APP003189

branded as "thugs," "monsters," "animals." In the movie, as in life, Trump says they should die. "I want to hate these murderers," he wrote, "and I always will."

So in the absence of any forensic evidence, based only on "confessions" they said were slapped, lied and bullied out of them by police, Raymond Santana, Yusef Salaam, Antron McCray, Korey Wise and Kevin Richardson are convicted. It doesn't seem to matter to anyone that they are only boys, 14 to 16 years of age. It doesn't seem to matter that they are innocent.

Yet for as much as this is the story of a particular crime, the movie is also the story of an ongoing crime. Meaning America's long history of using dark-skinned men as its all purpose "other," the rapacious beast lurking at every dark corner, hiding in every dark heart. If he is real, maybe America is not so bad.

But without him, how do you justify slavery? Or lynching? Or mass incarceration? How do you justify Trayvon and Tamir? Without him, how do you go on thinking of yourself as a people righteous and good?

So the beast is necessary. And if a given black man chooses not to play that role, insists on trying to live as a good person in a free country, it may not matter. The role may be imposed on him anyway. And there'll be nothing he can do about it.

That's the deeper story DuVerrnay tells. She makes us watch, breaks our hearts, as the boys discover this part they've been tapped to play. With moist, frightened eyes, they look to their parents for answers, because when you're a kid, you trust mom or dad to make the wrong thing right.

But one by one, in a shifting of eyes or a pursing of lips, moms and dads are forced to stand impotent before children, to confess that for this, they have no answers.

And one by one, you see something go out of those boys.

Their convictions were vacated in 2002 when a serial rapist, supported by DNA evidence, confessed to the crime. Neither Fairstein, who went on to become a successful novelist, nor Trump, who became president, has ever acknowledged they were wrong. In agreeing to a $41 million settlement in 2014, New York City also refused to admit being wrong.

We may use cookies, beacons (also known as pixels), and other similar technologies (together "cookies") to offer you a better experience, serve you more relevant ads, and analyze usage. By continuing to use this application, you consent to the use of cookies in accordance with our Privacy Policy.

**ACCEPT COOKIES**

P-APP003190

But they were all wrong. As were many of us.

That's why this mini-series needs to be seen and internalized.

It's not just a story of justice denied. It is also the story of a harsh truth most dark-skinned people are forced to learn at some point. Namely that, "When They See Us," they very often see only something the size, shape — and color — of their fears.

When they see us, they often don't see us at all.

We may use cookies, beacons (also known as pixels), and other similar technologies (together "cookies") to offer you a better experience, serve you more relevant ads, and analyze usage. By continuing to use this application, you consent to the use of cookies in accordance with our Privacy Policy.

**ACCEPT COOKIES**

P-APP003191



**COMMENTS** ▾



VIDEOS

We may use cookies, beacons (also known as pixels), and other similar technologies (together "cookies") to offer you a better experience, serve you more relevant ads, and analyze usage. By continuing to use this application, you consent to the use of cookies in accordance with our Privacy Policy.

**ACCEPT COOKIES**

P-APP003192



Leonard Pitts on President Trump

**VIEW MORE VIDEO →**

## About Leonard Pitts Jr

@LeonardPittsJr1

Follow

Leonard Pitts Jr. **won the Pulitzer Prize for commentary in 2004**. He is the author of the novels, *Grant Park*, *Freeman*, and *Before I Forget*. His column runs every Sunday and Wednesday. *Forward From This Moment*, a collection of his columns, was released in 2009.

On Sept. 11, 2001, he wrote a column on the terrorist attacks that received a huge response from readers who deluged him with more than 26,000 e-mails. It was posted on the Internet, chain-letter style. **Read the column** and others on the topic of September 11.

You can also read Pitts' series, **What Works?**, a series of columns about programs anywhere in the country that show results in improving the lives of black children.

We may use cookies, beacons (also known as pixels), and other similar technologies (together "cookies") to offer you a better experience, serve you more relevant ads, and analyze usage. By continuing to use this application, you consent to the use of cookies in accordance with our Privacy Policy.

**ACCEPT COOKIES**

P-APP003193

I am often asked by readers interested in gaining a better basic understanding of racial issues and/or African-American history if I will compile a reading list for them. These 16 books represent my best effort to do so.

Read the list

## Herald Books



SPONSORED CONTENT

FDA-Approved Keto Pill That Melts 17LBS Belly Fat Each Week! ⬈

BY HEALTH NEWS HOME



READ NEXT

We may use cookies, beacons (also known as pixels), and other similar technologies (together "cookies") to offer you a better experience, serve you more relevant ads, and analyze usage. By continuing to use this application, you consent to the use of cookies in accordance with our Privacy Policy.

**ACCEPT COOKIES**

P-APP003194



LEONARD PITTS JR

# Angry white men refuse to be governed like the rest of us | Opinion

**BY LEONARD PITTS JR.**

MAY 12, 2020 05:03 PM

   

The mob of armed whites who showed up at Dameon Shepard's home in North Carolina were only the latest example of white extremism run amok, an anti-government stance started by Ronald Reagan.

KEEP READING →

# Local news has

We may use cookies, beacons (also known as pixels), and other similar technologies (together "cookies") to offer you a better experience, serve you more relevant ads, and analyze usage. By continuing to use this application, you consent to the use of cookies in accordance with our Privacy Policy.

**ACCEPT COOKIES**

P-APP003195

5/13/2020    Correctol, And Do we really need Netflix journalists, Then They See Us, but in the Critical People will Deserve your Heart | Miami Herald

Case 2:20-cv-00180-JLB-MRM Document 46-23 Filed 07/01/20 Page 57 of 92 PageID 4186

## MORE LEONARD PITTS JR



LEONARD PITTS JR

If 'good' white people don't decry Arbery's death, then, maybe, you're not that good | Opinion

UPDATED MAY 08, 2020 05:00 PM



LEONARD PITTS JR

Don't buy the lie. We're not 'all in this thing together.' Never were | Opinion

UPDATED MAY 07, 2020 05:24 PM



LEONARD PITTS JR

Control what you can in this time of madness, and don't forget — breathe | Opinion

MAY 01, 2020 6:03 PM



LEONARD PITTS JR

Trump could be a stand-up comic, but his punchlines still need a little work | Opinion

UPDATED APRIL 28, 2020 05:33 PM

We may use cookies, beacons (also known as pixels), and other similar technologies (together "cookies") to offer you a better experience, serve you more relevant ads, and analyze usage. By continuing to use this application, you consent to the use of cookies in accordance with our Privacy Policy.

**ACCEPT COOKIES**

P-APP003196

Case 2:20-cv-00180-JLB-MRM Document 46-23 Filed 07/01/20 Page 58 of 92 PageID 4187



LEONARD PITTS JR

We're suffering from two pandemics: the coronavirus and senselessness | Opinion

APRIL 24, 2020 3:35 PM



SPONSORED CONTENT

If Your Paycheck is Over $1,500, Make These 6 Moves Before Payday ⬈

BY THE PENNY HOARDER

## Take Us With You

Real-time updates and all local stories you want right in the palm of your hand.

 **MIAMI HERALD APP** →

**VIEW NEWSLETTERS** →

## SUBSCRIPTIONS

Start a Subscription

Customer Service

eEdition

Vacation Hold

Pay Your Bill

We may use cookies, beacons (also known as pixels), and other similar technologies (together "cookies") to offer you a better experience, serve you more relevant ads, and analyze usage. By continuing to use this application, you consent to the use of cookies in accordance with our Privacy Policy.

**ACCEPT COOKIES**

P-APP003197

Reader Panel

Archives

ADVERTISING

Place a Classified

Media Kit

Public Notices

**COPYRIGHT**

**COMMENTING POLICY**

**PRIVACY POLICY**

**TERMS OF SERVICE**

We may use cookies, beacons (also known as pixels), and other similar technologies (together "cookies") to offer you a better experience, serve you more relevant ads, and analyze usage. By continuing to use this application, you consent to the use of cookies in accordance with our Privacy Policy.

**ACCEPT COOKIES**

P-APP003198



Where is Netflix available?

TRY 30 DAYS FREE     SIGN IN

**Help Center**

# Where is Netflix available?

Netflix members with a streaming-only plan can watch TV shows and movies instantly in over 190 countries. The content that is available to stream may vary by location, and will change from time to time.



> **NOTE:** Netflix is not yet available in China, though the company continues to explore options for providing the service. It also is not available in Crimea, North Korea, or Syria due to U.S. government restrictions on American companies.

Was this article helpful?

YES     NO

P-APP003199

Where is Netflix available?

P-APP003200

Central Park 5 director Ava DuVernay's Netflix miniseries, 'When They See Us,' about the Central Park 5 will lacerate your heart | Miami Herald



 IMPACT2020

☰                        *Miami Herald*                         ▾

LEONARD PITTS JR

# Central Park 5 series will break your heart — and make you mad

**BY LEONARD PITTS JR.**

JUNE 08, 2019 04:28 PM , UPDATED JUNE 11, 2019 11:20 AM

🐦    f    ✉    ↗



DONALD TRAILL *DONALD TRAILL/INVISION/AP*

 **Listen to this article now**
02:29            Powered by    **Trinity Audio**

It's a story that will lacerate your heart.

Indeed, you'll watch "When They See Us," director Ava DuVernay's new Netflix miniseries, in appalled disbelief and open-mouthed horror. That may sound like a warning. It's actually a recommendation.

DuVernay tells the story of the so-called Central Park 5, four of them black, one Hispanic, who were convicted of the brutal 1989 rape and assault of a white woman jogger. It is an unsparing re-creation of an ugly time.

We may use cookies, beacons (also known as pixels), and other similar technologies (together "cookies") to offer you a better experience, serve you more relevant ads, and analyze usage. By continuing to use this application, you consent to the use of cookies in accordance with our Privacy Policy.                    ACCEPT COOKIES

P-APP003201

Case 2:20-cv-00180-JLB-MRM Document 46-23 Filed 07/01/20 Page 63 of 92 PageID 4193



System near Bahamas has 70 percent chance of becoming storm. But it's likely to stay out to sea

Halting and confused, the boys struggle to describe a crime they did not commit in order to stop police officers from yelling at them and smacking them around. The concocted tales make no sense, but prosecutor Linda Fairstein is satisfied. Having decided that these are her perpetrators, she will not swerve from that, even as the facts scream otherwise.

## Local news has never been more important

Subscribe for unlimited digital access to the news that matters to your community.

#READLOCAL

We may use cookies, beacons (also known as pixels), and other similar technologies (together "cookies") to offer you a better experience, serve you more relevant ads, and analyze usage. By continuing to use this application, you consent to the use of cookies in accordance with our Privacy Policy.

**ACCEPT COOKIES**

P-APP003202



FILE — Linda Fairstein, chief of the Manhattan district attorney's sex crimes unit, left, enters court with Elizabeth Lederer, the prosecutor who handled the Central Park jogger case, in August 1990. "When They See Us," Ava DuVernay's Netflix series about the Central Park jogger case, has undercut the public perception of Feinstein as a law enforcement hero. (Chester Higgins, Jr./The New York Times) CHESTER HIGGINS JR. *NYT*

Nor will the news media, egged on by an angry public and by public figures like Donald Trump. The boys are convicted in the court of public opinion before they ever enter a court of law, branded as "thugs," "monsters," "animals." In the movie, as in life, Trump says they should die. "I want to hate these murderers," he wrote, "and I always will."

So in the absence of any forensic evidence, based only on "confessions" they said were slapped, lied and bullied out of them by police, Raymond Santana, Yusef Salaam, Antron McCray, Korey Wise and Kevin Richardson are convicted. It doesn't seem to matter to anyone that they are only boys, 14 to 16 years of age. It doesn't seem to matter that they are innocent.

Yet for as much as this is the story of a particular crime, the movie is also the story of an ongoing crime. Meaning America's long history of using dark-skinned men as its all purpose "other," the rapacious beast lurking at every dark corner, hiding in every dark heart. If he is real, maybe America is not so bad.

But without him, how do you justify slavery? Or lynching? Or mass incarceration? How do you justify Trayvon and Tamir? Without him, how do you go on thinking of yourself as a people righteous and good?

So the beast is necessary. And if a given black man chooses not to play that role, insists on trying to live as a good person in a free country, it may not matter. The role may be imposed on him anyway. And there'll be nothing he can do about it.

We may use cookies, beacons (also known as pixels), and other similar technologies (together "cookies") to offer you a better experience, serve you more relevant ads, and analyze usage. By continuing to use this application, you consent to the use of cookies in accordance with our Privacy Policy.

ACCEPT COOKIES

P-APP003203

parents for answers, because when you're a kid, you trust mom or dad to make the wrong thing right.

But one by one, in a shifting of eyes or a pursing of lips, moms and dads are forced to stand impotent before children, to confess that for this, they have no answers.

And one by one, you see something go out of those boys.

Their convictions were vacated in 2002 when a serial rapist, supported by DNA evidence, confessed to the crime. Neither Fairstein, who went on to become a successful novelist, nor Trump, who became president, has ever acknowledged they were wrong. In agreeing to a $41 million settlement in 2014, New York City also refused to admit being wrong.

But they were all wrong. As were many of us.

That's why this mini-series needs to be seen and internalized.

It's not just a story of justice denied. It is also the story of a harsh truth most dark-skinned people are forced to learn at some point. Namely that, "When They See Us," they very often see only something the size, shape — and color — of their fears.

When they see us, they often don't see us at all.



COMMENTS ▾



We may use cookies, beacons (also known as pixels), and other similar technologies (together "cookies") to offer you a better experience, serve you more relevant ads, and analyze usage. By continuing to use this application, you consent to the use of cookies in accordance with our Privacy Policy.

ACCEPT COOKIES

P-APP003204



Trump getting reelected



Leonard Pitts on President Trump

**VIEW MORE VIDEO →**

### About Leonard Pitts Jr

**@LeonardPittsJr1**

Follow

Leonard Pitts Jr. **won the Pulitzer Prize for commentary in 2004**. He is the author of the novels, *Grant Park*, *Freeman*, and *Before I Forget*. His column runs every Sunday and Wednesday. *Forward From This Moment*, a collection of his columns, was released in 2009.

On Sept. 11, 2001, he wrote a column on the terrorist attacks that received a huge response from readers who deluged him with more than 26,000 e-mails. It was posted on the Internet, chain-letter style. **Read the column** and others on the topic of September 11.

You can also read Pitts' series, **What Works?**, a series of columns about programs anywhere in the country that show results in improving the lives of black children.

Leonard also wrote the 2008 series **I Am A Man**, commemorating the 40th anniversary of Dr. Martin Luther King's assassination.

Email Leonard at **lpitts@MiamiHerald.com** or visit his website at **www.leonardpittsjr.com**

### Leonard's Reading list

The Black List: Suggested Readings in African-American History

I am often asked by readers interested in gaining a better basic understanding of racial issues and/or African-American history if I will compile a reading list for them. These 16 books represent my best effort to do so.

Read the list

We may use cookies, beacons (also known as pixels), and other similar technologies (together "cookies") to offer you a better experience, serve you more relevant ads, and analyze usage. By continuing to use this application, you consent to the use of cookies in accordance with our Privacy Policy.

ACCEPT COOKIES

P-APP003205



SPONSORED CONTENT

THIS DAY IN HISTORY

READ NEXT



We may use cookies, beacons (also known as pixels), and other similar technologies (together "cookies") to offer you a better experience, serve you more relevant ads, and analyze usage. By continuing to use this application, you consent to the use of cookies in accordance with our Privacy Policy.

ACCEPT COOKIES

P-APP003206

## Angry white men refuse to be governed like the rest of us | Opinion

BY LEONARD PITTS JR.

MAY 12, 2020 05:03 PM

  

The mob of armed whites who showed up at Dameon Shepard's home in North Carolina were only the latest example of white extremism run amok, an anti-government stance started by Ronald Reagan.

**KEEP READING →**

---

## Local news has never been more important

#ReadLocal

Subscribe for unlimited digital access to the news that matters to your community.

**#READLOCAL**

---

**MORE LEONARD PITTS JR**



LEONARD PITTS JR

If 'good' white people don't decry Arbery's death, then, maybe, you're not that good | Opinion

UPDATED MAY 08, 2020 05:00 PM



LEONARD PITTS JR

Don't buy the lie. We're not 'all in this thing together.' Never were | Opinion

UPDATED MAY 07, 2020 05:24 PM



LEONARD PITTS JR

Control what you can in this time of madness, and don't forget — breathe | Opinion

MAY 01, 2020 6:03 PM



LEONARD PITTS JR

Trump could be a stand-up comic, but his punchlines still need a little work | Opinion



LEONARD PITTS JR

We're suffering from two pandemics: the coronavirus and senselessness | Opinion



SPONSORED CONTENT

If Your Paycheck is Over $1,500, Make These 6 Moves Before Payday ⌐

We may use cookies, beacons (also known as pixels), and other similar technologies (together "cookies") to offer you a better experience, serve you more relevant ads, and analyze usage. By continuing to use this application, you consent to the use of cookies in accordance with our Privacy Policy.

**ACCEPT COOKIES**

P-APP003207

Case 2:20-cv-00180-JLB-MRM Document 46-23 Filed 07/01/20 Page 69 of 92 PageID 4198

## Take Us With You

Real-time updates and all local stories you want right in
the palm of your hand.



MIAMI HERALD APP →

VIEW NEWSLETTERS →

### SUBSCRIPTIONS

Start a Subscription

Customer Service

eEdition

Vacation Hold

Pay Your Bill

### LEARN MORE

About Us

Contact Us

Newsletters

News in Education

Public Insight Network

Reader Panel

Archives

### ADVERTISING

Place a Classified

Media Kit

Public Notices

**COPYRIGHT**

**COMMENTING POLICY**

**PRIVACY POLICY**

**TERMS OF SERVICE**

We may use beacons, beacons (also known as pixels), and other similar technologies (together "cookies") to
offer you a better experience, serve you more relevant ads, and analyze usage. By continuing to use this
application, you consent to the use of cookies in accordance with our Privacy Policy.

**ACCEPT COOKIES**

P-APP003208

**Instagram**

🔍 Search

**Hollywood Reporter** ✓
**@THR**

Linda Fairstein #CentralPark5
prosecutor dropped by publisher after
@Netflix series outcry
#WhenTheySeeUs thr.cm/6gR1o8



atticalocke ✓ • Follow

atticalocke ✓ "...good night indeed"
19w

heartbb.alea I'm sorry, I just
started watching @whentheyseeus
like 30 min ago, still on my first
episode. I don't understand this,
could someone explain?
19w    2 likes    Reply
— View replies (1)

geez.spammm It's what she
deserves 😌 💅
19w    17 likes    Reply

**1,145 likes**
JUNE 8

Add a comment...                    Post

ABOUT US    SUPPORT    PRESS    API    JOBS    PRIVACY    TERMS    DIRECTORY    PROFILES    HASHTAGS    LANGUAGE        © 2019 INSTAGRAM

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

FOUR TIMES SQUARE
NEW YORK 10036-6522
———
TEL: (212) 735-3000
FAX: (212) 735-2000
www.skadden.com

DIRECT DIAL
212-735-2520
DIRECT FAX
917-777-2520

FIRM/AFFILIATE OFFICES
BOSTON
CHICAGO
HOUSTON
LOS ANGELES
PALO ALTO
WASHINGTON, D.C.
WILMINGTON
———
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
MUNICH
PARIS
SÃO PAULO
SEOUL
SHANGHAI
SINGAPORE
SYDNEY
TOKYO
TORONTO

July 11, 2017

David Hyman, Esq.
General Counsel
Netflix, Inc.
100 Winchester Circle
Los Gatos, CA 95032

Dear Mr. Hyman:

      I write on behalf of this firm's clients, Elizabeth Lederer and Linda Fairstein, in connection with recent press reports describing Netflix' planned collaboration with Ava DuVernay, Tribeca Films and Jane Rosenthal. In particular, I want to make sure that Netflix is fully cognizant of the concerns of our clients as expressed last year in correspondence with those parties.

      As you will see, our clients have a justifiable and abiding concern that they will be treated in a false and defamatory manner in dramatizations of the Central Park Jogger case. We hope that the statement attributed to Ms. DuVernay in the press accounts of your planned collaboration, that the Central Park Five experienced "injustice at every turn" was a bit of hyperbole and not intended to characterize their intersections, such as they were, with our clients.

      Please carefully review the correspondence we had with Ms. DuVernay and her counsel which I am enclosing, including the sources of information identified in our letter of June 9, 2016.

      In addition, as we have earlier requested of Ms. DuVernay, et al., because of our concern about potentially actionable defamatory statements, portrayals, and

David Hyman, Esq.
July 11, 2017
Page 2


implications, you are requested (and required[*]) to take all steps as are necessary to
retain and preserve all records and communications, whether in hard-copy or
electronic form, that have already come into your possession relating to this project,
and that come in to your possession at any point going forward.

      This letter is sent with a full reservation of rights.


                    Very truly yours,

                    Robert E. Zimet

---

[*] See Section 215.40 of the New York Penal Law which prohibits the suppression, alteration and
destruction of evidence believed about to be produced or used in a judicial proceeding.  See also
West v. Goodyear Tire and Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999); Zubulake v. UBS
Warburg LLC.; 220 F.R.D. 212, 216 (S.D.N.Y. 2003).

P-APP003211

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

FOUR TIMES SQUARE

NEW YORK 10036-6522

————

TEL: (212) 735-3000

FAX: (212) 735-2000

www.skadden.com

DIRECT DIAL
212-735-2520
DIRECT FAX
917-777-2520
EMAIL ADDRESS
ROBERT.ZIMET@SKADDEN.COM

FIRM/AFFILIATE OFFICES
BOSTON
CHICAGO
HOUSTON
LOS ANGELES
PALO ALTO
SAN FRANCISCO
WASHINGTON, D.C.
WILMINGTON
————
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
MUNICH
PARIS
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

June 9, 2016

Jane Rosenthal
375 Greenwich Street
New York, NY 10013

Ava DuVernay
c/o Jane Rosenthal
375 Greenwich Street
New York, NY 10013

Tribeca Film
375 Greenwich Street
New York, NY 10013

  We are writing on behalf of this firm's clients, Linda Fairstein and

Elizabeth Lederer.  We understand that you are in the initial stages of a motion

picture project centered on a brutal rape and a series of assaults that were perpetrated

in Central Park on April 19, 1989 and which have come to be referred to as the

Central Park Jogger case.

P-APP003212

Jane Rosenthal
Ava DuVernay
Tribeca Film
June 9, 2016
Page 2

Based on past, unfair treatment of Ms. Fairstein and Ms. Lederer in the media in connection with the Central Park Jogger case, my clients are, quite justifiably, profoundly concerned that your project might also fail to portray them accurately and fairly. To that end, we want to make clear to you that factual matter critical to understanding what our clients did and did not do was ignored in many accounts of the events of April 1989, and intentionally misrepresented in others, including in speeches and social media publications by the five individuals who later sued the city. In addition, we want to identify for you: 1) erroneous or misleading impressions and factual assertions which have been in the public domain and which you should not republish; 2) unreliable and biased sources of information on which you should not uncritically or solely rely; and 3) processes and procedures which we believe are required in these circumstances.

This letter is sent with a full reservation of rights. That Ms. Fairstein and Ms. Lederer did not sue for previous misrepresentations during the pendency of the lawsuit against the City of New York does not license malicious, intentional or reckless defamation of them.

1. Mischaracterizations of Ms. Fairstein and Ms. Lederer's Roles and Involvement

Of particular concern to our clients is that more recent public accounts (2003 and thereafter) of their roles in the underlying events were grossly inaccurate and defamatory. These have prompted a series of death threats and other threats of physical violence (which often specifically reference the depictions of them in a

Jane Rosenthal
Ava DuVernay
Tribeca Film
June 9, 2016
Page 3

particular book, film and other speeches), have given rise to other reasons for concern for their personal safety and have prompted other serious, unwarranted retributive conduct against them.

Among other things both Ms. Fairstein and Ms. Lederer have been wrongly accused of being racist, of having participated in an unlawful conspiracy to violate the then-defendants' civil rights, and otherwise engaging in inappropriate and unprofessional conduct  and groundless attempts were made to seek to curtail their employment.  All this despite Ms. Fairstein having earned a well-deserved reputation as a prosecutor committed to effectively vindicating the interests of victims of sexual assault during her thirty-year tenure in the Manhattan District Attorney's Office.  At the same time, when the facts warranted, Ms. Fairstein declined to prosecute and exonerated hundreds of individuals who were wrongly accused of rape on numerous occasions.  Likewise Ms. Lederer is also known for her thorough investigations and the exoneration of individuals in a variety of cases, including one high-profile homicide.  In that light, the foregoing inaccuracies are particularly unwarranted and damaging.

2.  Unreliable Sources of Information

Certain past treatments of this subject matter appear to have been pursued in order to achieve a predetermined objective and not to represent truthfully what the facts demanded, including a book published by Sarah Burns in 2011 and a film purporting to be a documentary released in 2012 by Sarah, her father Ken

P-APP003214

Jane Rosenthal
Ava DuVernay
Tribeca Film
June 9, 2016
Page 4

Burns, and her husband David McMahon.  Presumably you are aware that Sarah

Burns was a college student intern hired by Jonathan Moore, who was acting as

contingency fee counsel for Anton McCray and Khorey Wise in their lawsuit against

the City of New York, which resulted in her developing a relationship with the five

plaintiffs in the civil case and their families.  Likewise, you are also likely aware that

Ken Burns has said in multiple news accounts that he hoped his film would push the

City of New York to settle the civil suit brought by those charged with the rape.

Accordingly, it would be reckless at best for you to accept or rely uncritically on

these sources.


   3.  <u>Actions Required</u>

     We believe the following sources, among others, need to be carefully
consulted as part of any honest fact-finding effort:

- The circumstances surrounding the arrests of each of the five
  individuals, including how they were named and how they were
  identified by other participants (numbering more than thirty) and how
  they identified and named each other;

- The video recorded and written statements of four of the five
  individuals, and the statements made to a detective by the fifth (one of
  the young men who testified under oath at his trial);

P-APP003215

Jane Rosenthal
Ava DuVernay
Tribeca Film
June 9, 2016
Page 5

- The transcripts of the Huntley hearing and the decision by Justice Galligan concerning the voluntariness of their statements;

- The more than 1,000 police reports related to the incidents;

- The video recorded and written statements of other individuals who were present in Central Park on April 19, 1989 including those not arrested or charged;

- The statements by the other victims of the criminal behavior that occurred in Central Park on April 19, 1989;

- Medical reports describing the rape victim's injuries and what caused them;

- Re-enactment of the attack using a female police officer matching the victim's size and speed, which proved the impossibility of essential elements of the Reyes story;

- The transcripts of the two trials;

- Statements made during Parole Board Hearings by the five;

- The video recording of Matias Reyes made by Nancy Ryan in 2002;

- Mr. Reyes's deposition;

- More than 100 depositions, including those of the five, their family members, the three prosecutors and scores of police officers;

Jane Rosenthal
Ava DuVernay
Tribeca Film
June 9, 2016
Page 6

- All other recordings of Mr. Reyes' statements concerning the relevant events, including those with Nancy Ryan and with ABC 20/20 staff in preparation for his television appearance;

- The role of the two African-American police officers who were not named as defendants in the civil suit;

- The 2002 Armstrong Report, which re-examined the underlying facts and investigatory record and took into account more than 100 witness statements and depositions;

- The briefing memoranda of April 11, 2014, prepared by the NYC Corporation Counsel staff addressed to Mayor de Blasio's newly appointed counsel, Zachary Carter;

- The statement by Antron McCray's court-appointed psychiatrist who says McCray never claimed his confession was coerced;

- The fact that the weapon described by Matias Reyes was never found at the crime scene, yet the weapon described by three of the 5 young men as belonging to one of them and carried in the park by two others is consistent with the injuries to the jogger and to another male victim who suffered a similar blow to the head;

- The statement of Melanie Jackson about her conversation with Khorey Wise, while he was in jail, in which he admitted his involvement with the jogger; and

P-APP003217

Jane Rosenthal
Ava DuVernay
Tribeca Film
June 9, 2016
Page 7

- The fact that NYPD detectives interviewed more than 30 young men who rampaged in the Park on April 19, 1989 and were not accused of coercing any of the others, who made admissions about their involvement in the attacks.

The foregoing list is of course, not exhaustive but it is a minimal starting point if the objective is to honestly appreciate what happened on April 19, 1989 and in its aftermath.  I note that you have requested a meeting with Ms. Fairstein and Ms. Lederer for their "perspectives."  As you should understand, in light of their experience to date they are unwilling to participate in a project which is not committed to scrupulous fairness and rigorous and thorough factual research and accuracy.  Therefore, in order for my clients to consider your request, please seek their participation only when you can confirm that you have examined the above sources and provide a list of the topics you wish to review with them.

Further, you should be aware when the civil lawsuit was settled in 2014 – *after* the Burns' book and movie were produced – the settlement language approved by both sides explicitly asserted that policed and prosecutors did nothing wrong.  The City's corporation counsel, Zachary Carter, amplified that statement, after more than a decade of discovery by plaintiffs, that "our review of the record suggests that both the investigating detectives and the assistant district attorneys involved in the case acted reasonably, given the circumstances with which they were confronted.....There was no law enforcement misconduct."

Jane Rosenthal
Ava DuVernay
Tribeca Film
June 9, 2016
Page 8

To provide an initial perspective on the underlying facts and as a useful starting point we enclose a copy of the Armstrong Report prepared by an independent commission after Mr. Reyes claimed sole responsibility.

In addition, because of our concern about potentially actionable defamatory statements, portrayals, and implications, you are requested (and required[*]) to take all steps as are necessary to retain and preserve all records and communications, whether in hard-copy or electronic form, that have already come into your possession relating to this project, and that come in to your possession at any point going forward.

Please forward a copy of this communication to your legal counsel.

Very truly yours,

Robert E. Zimet

cc:    Linda Fairstein
       Elizabeth Lederer

---

[*] See Section 215.40 of the New York Penal Law which prohibits the suppression, alteration and destruction of evidence believed about to be produced or used in a judicial proceeding. See also West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999); Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 216 (S.D.N.Y. 2003).

P-APP003219



PROVIDED BY
FindLaw
WWW.FINDLAW.COM

## EXECUTIVE SUMMARY

To determine whether police policy or procedures needed to be changed as a result of the Central Park jogger case, the Police Commissioner asked our panel to review the events of April 19, 1989, and thereafter, that resulted in the convictions of Kharey Wise, Kevin Richardson, Antron McCray, Yusef Salaam and Raymond Santana (the "defendants"), for assault, robbery and riot in the course of attacks on various individuals, and for the rape and sexual abuse of a female jogger. Defendants moved to vacate and dismiss all of their convictions on the basis of a claim by an imprisoned serial rapist/killer named Matias Reyes that he raped the jogger that night, and that he committed the crime alone. New York County District Attorney Robert Morgenthau consented to the defendants' motions and, on December 19, 2002, the convictions were vacated and dismissed by Justice Charles Tejada.

Our task was to provide an overview for the investigation of these events, determine whether the new evidence indicated that police supervisors or officers acted improperly or incorrectly, identify any possible weaknesses in Police Department procedures and make recommendations to address any failures or weaknesses. The panel relied heavily upon police personnel assigned to assist in the review of this matter.

SUMMARY OF EVENTS OF APRIL 19, 1989

On the evening of April 19, 1989, shortly after 9:00 PM, approximately 40 African-American and Hispanic teenagers, mostly between the ages of 14 and 16, entered Central Park at 110th Street and 5th Avenue for the purpose, according to many of them, of assaulting and robbing people. Not all of the individuals in this group knew everyone else. Not every individual was present at each of the events that followed. They proceeded, at times together and at other times splitting up into smaller groups, to terrorize people through a large section of the park for almost an hour. The attacks by the group included:

- Accosting Michael Vigna, a racing biker, who escaped without physical injury;
- Assaulting and robbing Antonio Diaz, who was left on the side of a roadway unconscious;
- Menacing a couple on a tandem bicycle;
- Hurling rocks at and threatening a taxi driver;
- Threatening a male jogger, David Goode, who escaped without physical injury;
- Threatening a male jogger, Robert Garner, who escaped without physical injury;

1

- Assaulting a male jogger, David Lewis, who sustained physical injuries; and
- Assaulting a male jogger, John Loughlin, who sustained serious injuries from being knocked to the ground, kicked, punched, and beaten with a pipe and a stick.

The most significant event that occurred that evening was the brutal beating and rape of a 29 year old female jogger, whose bloody and almost lifeless body was found at about 1:30 AM on April 20, 1989. Later investigation showed that she had apparently been accosted and knocked down on a transverse road in the park at about 102nd Street, dragged into the woods where she was assaulted, and then dragged further into the woods, where the major attack upon her occurred. She was found about 200 feet further into the park, near a footpath. Although she survived, the jogger had no memory of any of the events that occurred that evening. This attack was the basis for the most serious charges against the defendants.

Police responded immediately to several 911 calls for help that resulted from the various attacks. Two of the defendants, Raymond Santana and Kevin Richardson, were arrested on the evening of April 19th in the vicinity of Central Park shortly after the attacks. Without being contacted by the police, Antron McCray voluntarily appeared at the precinct, in the company of his mother, and was not held. Because of statements made by the defendants and others implicating them, Kharey Wise and Yusef Salaam, as well as McCray, were contacted by the police the next day, and came to the precinct voluntarily.

Out of the approximately forty teenagers who entered Central Park that night, thirty-seven were interviewed. Ten were arrested and ultimately convicted of charges resulting from their activities. Five of these ten (the defendants) were charged with the assault and rape of the female jogger, the assault of John Loughlin, the assault on David Lewis, and a riot charge. All but Wise were convicted of assault, riot, robbery and rape. Wise was convicted of assault, riot and sexual abuse.

The other individuals who were arrested pled guilty to the assaults on Diaz, Loughlin or Lewis, but not to the assault of the female jogger. The defendants had implicated these other individuals in the assaults on the victims other than the female jogger.

Matias Reyes, then 18 years of age, was also in the park on the night of April 19, 1989. In 2002, he came forward to reveal that he had raped the female jogger and to claim that he did so alone.

## FINDINGS REGARDING POLICE CONDUCT

Based on our review of the material related to this case and conversations with various

2

witnesses and interested individuals, we conclude that there was no misconduct on the part of the New York City Police Department in the arrests and interrogations of the defendants. The police officers followed carefully the special statutory rules relating to the questioning of individuals less than 16 years of age, in particular rules pertaining to the participation of parents or guardians in such interviews. The New York County District Attorney and his senior staff have stated to us that they have found no evidence of coercion in the questioning of the defendants or others involved in the events of April 19, 1989, and they have no criticism of the interrogation or arrest techniques employed by the police. Our conclusion is also strongly supported by the opinion of Justice Thomas B. Galligan regarding the defendants' original motions to suppress their statements.

Justice Galligan's Opinion

In 1989, the defendants challenged the validity of their initial arrests by police, and the admissibility of the statements they made, including: allegations of failure to notify parents and have them present during questioning; improper trickery and/or deception; the use or threat of physical force; and deprivation of food and sleep. Following a six week pre-trial hearing into the admissibility of defendants' statements and other evidence, Justice Galligan carefully analyzed each claim raised by each defendant and found, with one exception,[1] that there was no constitutional or statutory violation by any of the officers or prosecutors involved and thus, no basis to suppress any of the statements or evidence made by or taken from the defendants.

In the course of considering the new evidence of Reyes's involvement in the attack on the jogger, some have focused anew on the defendants' statements. It should be noted that the inconsistencies and weaknesses of the defendants' statements were fully explored at the time of the defendants' pre-trial hearing and the Court's decision. The same inconsistencies and weaknesses were vigorously but unsuccessfully raised again at defendants' trials. It would seem that consistency would be a feature of planted rather than spontaneous information. We believe the inconsistencies contained in the various statements were not such as to destroy their reliability. All of the defendants were obviously attempting to minimize their own involvement and the stories they told necessarily included fabrications. On the other hand, there was a general consistency that ran through the defendants' descriptions of the attack on the female jogger. She was jogging; she was knocked down on the road; dragged into the woods; hit and molested by several assailants; sexually abused by some while others held her arms and legs; and left semi-conscious in a state of undress, after an assault that covered a relatively short period of time. This general description was common to all or most of the defendants' statements, despite some differences in specifics.

[1] The only statement that was suppressed was made by Santana at the beginning stages of the booking process. A police officer made a remark to the defendants to the effect that they shouldn't be out beating people, but "should be out with your girlfriends." Santana then looked at a co-defendant, smiled and said, "I already got mines," and they both laughed. The Court suppressed this statement on the grounds that the officer's remarks were the equivalent of interrogation and should have been preceded by a waiver of Miranda rights.

P-APP003222

It has been suggested that the police improperly coached or otherwise provided the defendants with facts which they later regurgitated in their confessions. However, although the defendants have complained of being "coerced" and have claimed that the police officers pressed them to confess, only one of them purported to explain how they got the factual details they gave in their statements. Defendant Wise was the only defendant to claim he had been "fed" answers. This contention was rejected in Justice Galligan's exhaustive opinion. The parents or family members of Santana, McCray and Richardson were present during all of their interrogations and the giving of written and video statements. In addition, Santana acknowledged both at a parole hearing in 1994 and when reinterviewed in 2002, that he assaulted a man but made up the story regarding the rape; he did not say the police gave him a story for him to adopt as his own.

**Reyes's Claim That He Acted Alone**

Because of Reyes's claim that he acted alone, some have analyzed the case as if there were only two possible scenarios – either Reyes acted alone or the defendants did. Another possibility that must be considered is that both Reyes and the defendants participated, to some degree, in attacking the jogger. At defendants' trials, the juries accepted the prosecution's theory that the defendants, together with an unknown attacker, committed the rape. We believe, however, that it is necessary, for the purposes of our inquiry, to complete the record by considering other scenarios that a jury might also accept. Our examination of the facts leads us to suggest that there is an alternative theory of the attack upon the jogger – that both the defendants and Reyes assaulted her, perhaps successively.

It may have been, as a former inmate-acquaintance claimed Reyes told him, that the attack on the jogger was already in progress when Reyes joined, attracted to the scene by the jogger's screams. Or, the defendants might have abandoned the jogger after mauling her in the hit-and-run style typical of their rampage and Reyes could then have come upon her and perpetrated a new attack, but in a much more brutal fashion. In either scenario, it would have been likely that Reyes, not the defendants, was guilty of the more vicious outrages inflicted upon the jogger, which would have been more characteristic of Reyes than of the behavior exhibited by the defendants. The defendants' lesser role would in fact be consistent with their confessions.

There is no corroboration for Reyes's claim that he acted alone. The only evidence to support the view that he acted by himself remains his own statement that he did so. This makes Reyes's general credibility a matter of considerable importance. Reyes's former attorney and defense psychologist have attested to his instability and lack of credibility. Even Justice Galligan, who also presided over Reyes's murder/rape trial in 1991, was quoted in the press as stating that "[I]f Reyes is a credible witness, then credibility has a new meaning." Reyes has been interviewed extensively by the staff of the District Attorney's office, for the most part without the direct participation of the

4

P-APP003223

Police Department, who were permitted to view one videotaped interview and one brief audio recording of an interview.  No hearing was held with respect to defendants' motions to vacate their convictions, thus no opportunity was given to cross-examine Reyes in public under oath.  We understand that he has not been subjected to a polygraph examination, perhaps because he is thought to be too unstable to allow for a meaningful test.

Central to a consideration of the truth of Reyes's claim that he raped the jogger by himself is an assessment of his motive for coming forward to make the claim.  Was he simply moved to do the right thing by feelings of guilt and the "positive experiences" that he has had in prison? The District Attorney's office accepts Reyes's statement that his decision to come forward was motivated by a chance encounter with Wise in Auburn Correctional Facility, and the resultant realization that Wise was still incarcerated in connection with the attack on the jogger.  There is however evidence to suggest that he came forward in response to threats, delivered through the underground prison communications system, and/or that he acted in order to get a desired change in prison assignment.

From the various accounts that Reyes has given in different interviews that we have been able to review, there have been significant problems or inconsistencies in his description of the details of the attack and subsequent events.  In addition, several statements were made by witnesses to officers investigating the incident and by the defendants, speaking outside the formal interrogation process, which directly contradict Reyes's claim that he acted alone, and evidence the participation of the defendants. They include inculpatory statements by defendants Wise, Richardson and Santana both to police officers and to civilian witnesses who reported the statements to police. Santana and Richardson separately pointed out the location of the rape when brought to Central Park.  When Wise was questioned, he made reference to a man named "Rudy" who took the jogger's Walkman; the description of the jogger's "Walkman pouch" was similar to Reyes's description of a "fanny pack."  At the time of this interview, the police had no way of knowing that the jogger had a Walkman or that she carried it in a pouch.  Wise also commented on the amount of blood at the spot where the rape occurred.  When asked why he was so surprised by the amount of blood, he answered, "I knew she was bleeding but I didn't know how bad she was.  It was really dark.  I couldn't see how much blood there was at night."

Elaborate analyses of proposed timelines covering the various events on the evening the jogger was attacked have been proposed, with the conclusion that the defendants did not have the time to participate in the attack upon the jogger because they were busy, at specific times, with other assaults. This reasoning depends upon a selective analysis of the evidence from which various events are timed.  In fact, no accurate timeline can be constructed because the evidence regarding the timing of the various events and the individuals who participated in them is not sufficiently precise to allow any exact conclusion.  For example, a key time necessary to calculate when the defendants might have had the opportunity to rape the female jogger is the time of the attack upon jogger David Lewis.  However, estimates of that time vary from 9:24 PM to

5

P-APP003224

9:42 PM.  Not even the time during which the jogger is assumed to have been attacked, between 9:15 PM and 9:30 PM, is free from doubt.  We believe that no accurate timeline exists and none can be reliably constructed.

Finally, relevant forensic evidence concerning the presence of hair, blood and semen on some of the defendants' clothing was presented at trial and has not been refuted.  In particular, hair "consistent" with the female jogger's hair was found on the clothing of Richardson and co-defendant Steven Lopez; blood stains were found on Santana's right sneaker, Salaam's jacket and on co-defendant Lopez's underwear, and semen stains were found on the underwear of McCray and Richardson, and on Santana's sweatshirt. This evidence is by no means dispositive, but it contradicts various reports that no blood was found on any of the defendants.

## ASSAULTS ON OTHERS

In addition to their convictions for the rape and assault on the female jogger, the defendants were also convicted of crimes with respect to other attacks occurring that evening.   Justice Tejada ruled, as the District Attorney recommended, that the convictions on these charges against the defendants, as well as those involving the female jogger, should be vacated, although the newly discovered evidence of Matias Reyes's rape of the female jogger related only to that event.  We understand the legal position underlying Justice Tejada's ruling, that the existence of new evidence regarding the most significant charge against the defendants may have affected the juries' ability to consider evidence regarding the other charges.  However, we believe that there is no reason, on the merits, to think that a jury fairly presented with the evidence against the defendants would come to a different conclusion than was reached before.

Some of the defendants have repeated their admissions of guilt.  Santana testified at a parole hearing in 1994 and he was questioned about the crimes he committed on April 19th, 1989.  He admitted that he and his friends planned to go to the park that night to rob and assault people.  He stated that about seven or eight friends devised the plan. They were prepared to attack whoever they encountered that night in the park.  Santana reiterated that they had let one, a couple, go because the man was with his girlfriend. Santana also admitted to beating a man.  He denied only the rape.

When McCray went before the parole board in November 1994, he admitted all of his crimes except for the rape of the female jogger.   Two of the defendants, Raymond Santana and Kevin Richardson, during interviews conducted by detectives in 2002, admitted their participation in the assaults that did not involve the jogger.

In the first major event, the assault on Antonio Diaz, a total of 23 people were named as participants or as being present.  All five defendants were implicated by accomplices and two admitted participation.  The second major event was harassment of a couple on a tandem bike.  A total of 13 people were named participants or as being present; four of the defendants were implicated by accomplices and admitted participation.  The third

P-APP003225

major event was crossing the 96th Street Transverse road to the reservoir. A total of 17 people were identified as having gone south towards the reservoir. All five defendants were implicated by accomplices and admitted going. The fourth major event was the assault on jogger David Lewis. A total of 11 people were identified as participants or as being present. Four of the defendants were implicated by accomplices and one admitted participation. The fifth major event was the assault on jogger John Loughlin, who was very badly beaten. A total of 19 people were identified as participants or as being present. All five defendants were implicated by accomplices and three admitted participation. Whatever conclusions may be reached regarding Matias Reyes's claim that he raped the female jogger alone, there seems to be no reason to believe that the defendants were innocent of the other crimes for which they were convicted.

CONCLUSION

The only new evidence that exists regarding the events in Central Park on the night of April 19, 1989 is the statement by serial rapist/killer Matias Reyes that he alone assaulted and raped the female jogger. DNA confirms that Reyes raped the jogger but we have nothing but his uncorroborated word that he did so alone. If Reyes's claim that he attacked the jogger by himself is true, it necessarily follows that the statements of the five defendants who were convicted of the crime, as well as those of the other witnesses who described it, were erroneous.

In that event, the question arises whether the statements were coerced or "suggested" by the interrogating officers. That question is, of course, central to our task of analyzing police behavior with respect to these events.

We believe that the issue of coercion was laid to rest authoritatively by the exhaustive opinion of Judge Galligan, following a lengthy Huntley hearing. Whether the defendants' statements were accurate or not, the methods used in obtaining them were examined by Judge Galligan with utmost care. We have not seen any evidence to suggest that Judge Galligan was in error and our review of available information confirms that police interrogations were conducted professionally and in accordance with applicable rules.

Affirming that neither the police nor the prosecutors engaged in outright coercion, the District Attorney has theorized that facts may have inadvertently been suggested to defendants and witnesses, enabling them to describe the attack on the jogger with sufficient particularity to make their statements credible. To determine whether this sort of thing went on, it is necessary to analyze the consistencies and inconsistencies in the various statements. The considerations are similar to those relevant to the basic question of whether Reyes is to be believed when he says he attacked the jogger alone. Those who believe Reyes emphasize the inconsistencies in the defendants' statements and those who do not believe him point to the statements' consistencies and to other supporting evidence.

7

The District Attorney, in responding to defendants' motions to dismiss the charges against them, laid out, in considerable detail, the arguments supporting the contention that Reyes was the sole attacker. Since the District Attorney had no reason to explore counter-arguments, we have done so.

We conclude that the various inconsistencies in defendants' statements, and the other recently revealed weaknesses in the evidence presented at trial, when viewed in light of Reyes's claim that he alone attacked the jogger, could afford a reasonable basis for maintaining that Reyes did, indeed, commit an attack on the jogger by himself.

However, the consistencies found in the defendants' statements, the informal remarks made by the defendants at various times, the corroborative testimony of other witnesses, the absence of a convincing motive for Reyes and suspicion of his general credibility, lead us to conclude that it is more likely than not that the defendants participated in an attack upon the jogger.

We adopt the view that the most likely scenario for the events of April 19, 1989 was that the defendants came upon the jogger and subjected her to the same kind of attack, albeit with sexual overtones, that they inflicted upon other victims in the park that night. Perhaps attracted to the scene by the jogger's screams, Reyes either joined in the attack as it was ending or waited until the defendants had moved on to their next victims before descending upon her himself, raping her and inflicting upon her the brutal injuries that almost caused her death.

On this theory of the facts, there is no reason to believe that the defendants were prompted into making erroneous statements.

With respect to the other crimes for which the defendants were convicted, we are aware of no new evidence or reason to review the old evidence regarding those crimes. Two of the defendants reaffirmed their guilt for these crimes at parole hearings and one of these, together with a third, did so in 2002, after Reyes came forward to make his confession. Moreover, four other individuals who had pleaded guilty to the assaults, implicated the defendants in these crimes in their interrogations or recorded statements. We understand the technical legal position espoused by the District Attorney and adopted by the Court, vacating these convictions. However, we firmly believe that this legal ruling affords no basis for maintaining that the defendants were not involved in the other crimes for which they were convicted.

OBSERVATIONS AND LESSONS LEARNED

In addition to our factual conclusions, we offer the following observations:

- Early assignment of a senior commander
  Some early confusion in this complex case could have been avoided if

P-APP003227

procedures which would likely be used today in a similarly complex investigation were in effect then, namely: the establishment of 12-hour tours for the senior commanders overseeing the investigation; the establishment of a command center where all information related to the investigation could be received and correlated; and the establishment of regular briefings so that all personnel assigned to the case could be kept informed.

- Establishment of a Management Team
  A management team should have been established on the evening of April 19, 1989, for the purpose of overseeing all investigative steps and facilitating information-sharing among all investigative personnel. Had this occurred, factual accounts provided by the suspects that lacked clarity or needed additional exploration could have been identified and resolved prior to videotaping.

- Allocation of adequate space to conduct interview of minors
  There was inadequate space to conduct interviews of minors. This problem has only become worse with the passage of time.  The Department should consider rehabilitating or constructing new precinct space to accommodate interviews of minors.

- Evidence accountability and control
  The then Manhattan Chief of Detectives brought home with him the only available copies of some Polaroid photos of the female jogger that had been taken by investigators, making them unavailable for use by the prosecutor during the videotaped questioning of the suspects. The Polaroid photos were eventually made available to the prosecutor but only during Kharey Wise's videotaped interrogation.  This action could have exacerbated problems associated with the interrogations. It was obviously wrong for this to have occurred, but it does not appear to be a systemic problem and is unlikely to recur.

- Forensic management
  During the photographing of the pants of one of the defendants, the pants were placed on the precinct floor, creating a risk of potential evidence contamination and compromise of any trace evidence taken from them. Again, this error is unlikely to recur because of reforms implemented after the Department's crime scene unit was reorganized and its procedures were reviewed and modified in 1995.

- Case review and coordination
  It is now known that among the series of violent crimes that he committed, Matias Reyes also raped a woman in Central Park on April 17, 1989, just two days before the jogger attack.   There has been some criticism directed at the Department for the failure to connect the April 17, 1989 rape to the April 19, 1989 attack on the jogger.  Reyes was identified as a possible suspect in the April 17, 1989 rape, and was later arrested, in August, 1989, for another rape and murder

P-APP003228

to which he ultimately pleaded guilty.  If, at the time, it had occurred to either the police or the prosecutors that the April 19th rape might have been committed by the same individual that had raped someone on April 17th, it would have been simple to compare the DNA recovered from the jogger against that of the defendant they now had in custody.  But, the police and the District Attorney's office had a set of confessions and were satisfied that the defendants perpetrated the attack on the jogger.  They had no cause to search for links to other cases until DNA tests in November, 1989 indicated that the semen from the jogger did not match any of the defendants.  Today's case review methods would substantially increase the probability of identifying cases with seemingly very few similarities.

Another factor that may have interfered with a realization that the April 17th and April 19th rapes were connected was the fact that one of them was investigated as a homicide case and the other as a sex crimes case.  Under current procedures, information in cases like this is shared.

- Use of DNA
  In 1989, procedures were not in place to facilitate the comparison of DNA evidence in one case with that in another, particularly after the DNA test results were taken by the District Attorney's office to prepare for trial.  This problem is unlikely to recur due to the creation in 1994 of a DNA databank.  DNA is now routinely collected from defendants convicted of certain statutorily prescribed crimes and fed into a database to which both the Department and the District Attorney's office have access.  Unidentified DNA evidence recovered from a crime scene is entered into the databank and stored for future comparisons.

10

P-APP003229

**INTRODUCTION**

To determine whether police policy or procedures needed to be changed as a result of the Central Park Jogger case, the Police Commissioner asked our panel to review the events of April 19, 1989 and thereafter, that resulted in the convictions of Kharey Wise, Kevin Richardson, Antron McCray, Yusef Salaam and Raymond Santana (the "defendants"), for assault, robbery and riot in the course of attacks on various individuals, and for the rape and sexual abuse of a female jogger. Defendants moved to vacate and dismiss all of their convictions on the basis of a claim by an imprisoned serial rapist/killer named Matias Reyes that he raped the jogger that night, and that he committed the crime alone. New York County District Attorney Robert Morgenthau consented to the defendants' motions and, on December 19, 2002, the convictions were vacated and dismissed by Justice Charles Tejada.

Our task was to provide an overview for the investigation of these events, determine whether the new evidence indicated that police supervisors or officers acted improperly or incorrectly, identify any possible weaknesses in Police Department procedures and make recommendations to address any failures or weaknesses.

Included in this review was an examination of:

- Written statements of the defendants;
- Videotaped statements given by the defendants, and transcripts thereof;
- Notes of detectives' interviews with defendants;
- Notes, videotapes and transcripts of interviews of other witnesses;
- [LG1]People's opposition papers to Defendant's Motions to Suppress Evidence;
- Relevant portions of the transcript of the pre-trial hearing held by the trial judge, Justice Thomas B. Galligan, on defendants' Motions to Suppress;
- The trial court's decision on the Motions to Suppress, issued February 23, 1990 (Exhibit A);
- Defendants' recent Motions to Vacate the Judgments against them pursuant to Criminal Procedure Law § 440.10;
- Affirmation of Assistant District Attorney Nancy Ryan, dated December 5, 2002, submitted in response to Defendants' Motions to Vacate (Exhibit B);
- Justice Tejada's opinion granting defendants' motions (Exhibit C);
- 1989 crime scene photographs and a map of the area;
- The defendants' Parole Board Hearing transcripts; and
- Results of some of the recent forensic tests conducted by the FBI.

The following evidence was unavailable for us to review:

- results of additional forensic, DNA tests recently performed by the FBI and a private laboratory under the direction of the District Attorney's office;

- forensic evidence from defendants' trials; and

- notes and transcripts of interviews with Matias Reyes by the District Attorney's office and correction officers.

11

In addition, we have been unable to accomplish the following:

- a complete interview of Matias Reyes
- interviews of several of Reyes's inmate-acquaintances, some of whom have indicated that he had said things to them that contradicted the story he told the District Attorney.

The panel relied heavily upon police personnel assigned to assist in the review of this matter. Attached as Exhibit D is a list of those who were assigned and assisted the panel. These members also accompanied the panel to visit the crime scene several times.

## SUMMARY OF EVENTS OF APRIL 19, 1989

On the evening of April 19, 1989, shortly after 9:00 PM, approximately 40 African-American and Hispanic teenagers, mostly between the ages of 14 and 16, entered Central Park at 110th Street and 5th Avenue for the purpose, according to many of them, of assaulting and robbing people. Not all of the individuals in this group knew everyone else. Not every individual was present at each of the events that followed. They proceeded, at times together and at other times splitting up into smaller groups, to terrorize people through a large section of the park for almost an hour.

The hectic and violent activity of that evening is described, in large part, in Justice Galligan's pre-trial opinion (Exhibit A, pp. 3-9) and in the Ryan Affirmation (Exhibit B, pp. 3-5). The attacks by the group included:

- Accosting Michael Vigna, a racing biker, who escaped without physical injury;
- Assaulting and robbing Antonio Diaz, who was left on the side of a roadway unconscious;
- Menacing a couple on a tandem bicycle;
- Hurling rocks at and threatening a taxi driver;
- Threatening a male jogger, David Goode, who escaped without physical injury;
- Threatening a male jogger, Robert Garner, who escaped without physical injury;
- Assaulting a male jogger, David Lewis, who sustained physical injuries; and
- Assaulting a male jogger, John Loughlin, who sustained serious injuries from being knocked to the ground, kicked, punched, and beaten with a pipe and a stick.

The most significant event that occurred that evening was the brutal beating and rape of a 29 year old female jogger, whose bloody and almost lifeless body was found at about 1:30 AM on April 20, 1989. Later investigation showed that she had apparently been accosted and knocked down on a transverse road in the park at about 102nd Street, dragged into the woods where she was assaulted, and then dragged further into the

12