**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

| | | |
|---|---|---|
| LINDA FAIRSTEIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 20-cv-00180 |
| | ) | |
| NETFLIX, INC., AVA DUVERNAY, and | ) | |
| ATTICA LOCKE, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### DEFENDANT NETFLIX INC.'S REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

Kelley Geraghty Price (Florida Bar #889539)
DENTONS COHEN & GRIGSBY P.C.
Mercato - Suite 6200
9110 Strada Place
Naples, Florida  34108
Phone: (239) 390-1913
*kelley.price@dentons.com*

Kiran Patel (*pro hac vice*)
DENTONS US LLP
1221 Avenue of the Americas
New York, New York  10020
Phone: (212) 768-6700
*kiran.patel@dentons.com*

Natalie J. Spears (*pro hac vice*)
Gregory R. Naron (*pro hac vice*)
Jacqueline A. Giannini (*pro hac vice*)
DENTONS US LLP
233 South Wacker Drive, Suite 5900
Chicago, Illinois 60606
Phone: (312) 876-8000
*natalie.spears@dentons.com*
*gregory.naron@dentons.com*
*jacqui.giannini@dentons.com*

*Trial Counsel for Defendant Netflix, Inc.*

# **TABLE OF CONTENTS**

Page

ARGUMENT ................................................................................................................... 3

I.    Plaintiff Cannot Avoid The First Amendment's Protection For Defendants'
      Dramatization Of Controversial Historical Events—That Context Is Critical ................. 3

II.   The Records Defendants Submitted Are Properly Considered On This Motion To
      Establish The Dialogue At Issue Is Not Actionable And Otherwise Substantially
      True ............................................................................................................................ 8

      A.    The Public Records And Other Documents Submitted With Defendants'
            Motion May Be Considered By The Court ........................................................ 8

      B.    Plaintiff Has No Credible Response To The Substantial Truth Of The
            Dialogue At Issue Under The Concededly Applicable Standard .......................... 9

III.  Plaintiff Does Not Dispute That Certain Complained-Of Scenes Have No
      Defamatory Meaning And That Innuendo Alone Cannot Be The Basis For A
      Defamation Claim ...................................................................................................... 13

IV.   The Fairstein Character's Hyperbolic, Dramatized Dialogue Is Consistent With
      How Plaintiff Spoke About The Five And Is Not Actionable As A Matter of Law ........ 16

V.    Plaintiff Cannot Avoid Dismissal By Overwhelming The Court With Paper Or
      Establish A Defamation Case By An Anecdotal Poll of Social Media Users ................. 19

CONCLUSION ............................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>*

**Page(s)**

**Cases**

*Aboutaam v. Dow Jones & Co.*,
   180 A.D.3d 573 (1st Dep't 2020) ............................................................................19

*Aronson v. Wiersma*,
   65 N.Y.2d 592 (1985) ..............................................................................................14

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ...................................................................................................3

*Bryant v. Avado Brands, Inc.*,
   187 F.3d 1271 (11th Cir. 1999) .................................................................................9

*Chau v. Lewis*,
   771 F.3d 118 (2d Cir. 2014).............................................................................10, 20

*Deeb v. Saati*,
   778 F. App'x 683 (11th Cir. 2019) ............................................................................4

*Degirmenci v. Sapphire–Ft. Lauderdale*,
   693 F. Supp. 2d 1325 (S.D. Fla. 2010) ......................................................................3

*Dillon v. City of N.Y.*,
   261 A.D. 2d 34 (1st Dep't 1999) .............................................................................16

*El Meson Espanol v. NYM Corp.*,
   521 F. 2d 737 (2d Cir. 1975)....................................................................................16

*John E. Reid & Assocs., Inc. v. Netflix, Inc.*,
   2020 WL 1330657 (N.D. Ill. Mar. 23, 2020).................................................. *passim*

*Kimmerle v. N.Y. Evening Jour.*,
   262 N.Y. 99 (1933) ..................................................................................................14

*La Grasta v. First Union Sec., Inc.*,
   358 F.3d 840 (11th Cir. 2004) ...................................................................................8

*La Liberte v. Reid*,
   No. 19-3574, 2020 WL 3980223 (2d Cir. July 15, 2020)........................................18

*Lewis v. Gov. of Ala.*,
   944 F.3d 1287 (11th Cir. 2019) .................................................................................8

*Citations in the Table of Authorities are hyperlinked to Westlaw.

*Liberty Lobby v. Anderson,*
    1990 WL 605337 (D.D.C. July 30, 1990) ...............................................................13

*Lott v. Levitt,*
    556 F.3d 564 (7th Cir. 2009) ...................................................................................14

*Lovingood v. Discovery Comm'cns, Inc.,*
    275 F. Supp. 3d 1301 (N.D. Ala. 2017) ....................................................................5

*Lovingood v. Discovery Commc'ns, Inc.,*
    800 F. App'x 840 (11th Cir. 2020) ................................................................. *passim*

*Masson v. New Yorker Magazine,*
    501 U.S. 496 (1991) ..........................................................................................4, 6, 11

*Milkovich v. Lorain Jour.,*
    497 U.S. 1 (1990) ...................................................................................................4, 6

*Ollman v. Evans,*
    750 F.2d 970 (D.C. Cir. 1984) .................................................................................17

*Palin v. N.Y. Times Co.,*
    940 F.3d 804 (2d Cir. 2019) ..............................................................................19, 20

*Partington v. Bugliosi,*
    56 F.3d 1147 (9th Cir. 1995) ......................................................................... *passim*

*Rappaport v. VV Publ'g Corp.,*
    163 Misc.2d 1 (Sup.Ct. N.Y. Cty. 1994), *aff'd,* 223 A.D.2d 515 (1st Dep't
    1996) .....................................................................................................................18, 19

*Schiller v. Viacom, Inc.,*
    2016 WL 9280239 (S.D. Fla. Apr. 4, 2016) ...............................................................7

*Seymour v. Lakeville Jour. Co.,*
    150 F. App'x 103 (2d Cir. 2005) .........................................................................15, 16

*Tannerite Sports, LLC v. NBCUniversal News Group,*
    864 F.3d 236 (2d Cir. 2017) ...............................................................9, 10, 13, 15

*Thoroughbred Legends, LLC v. Walt Disney Co.,*
    2008 WL 616253 (N.D. Ga. Feb. 12, 2008) ...............................................................9

*Tracy v Newsday, Inc.,*
    5 N.Y.2d 134 (1959) .............................................................................................15, 16

**Statutes and Rules**

Federal Rules of Civil Procedure
    12(b)(6) ...........................................................................................................................8


Federal Rules of Evidence
    201...................................................................................................................................9
    801(d)(2)(A) ...................................................................................................................9

Plaintiff's tactic in opposing dismissal is clearly to overwhelm the Court with sheer volume and repetition. But neither her opposition brief (an extended rehash of her prolix, 119-page Complaint) nor her 3,000-plus page Appendix meaningfully address the governing constitutional and common law principles requiring dismissal of her claims against the award-winning dramatic series *When They See Us* (the "Series"). Plaintiff pronounces that "The First Amendment Affords No Protection to Defendants" but in fact, the Constitution's protections in analogous cases involving dramatizations of controversial historical events are intended precisely for cases like this, particularly where they involve criticism of public officials like Plaintiff. Defendants have never claimed "blanket" or "invincible" First Amendment protection. (ECF No. 45, Opp. to R. 12(b)(6) Motion ("Opp.") at 9.) That's Plaintiff's strawman. Defendants seek—and are entitled to—the specific protection afforded to the *actual* dialogue and scenes Plaintiff takes issue with in this film. That First Amendment protection exists not only for Defendants' benefit, but the public interest as well.

The facts, which Plaintiff does not, and could not, dispute, are that in 1989 five young teenagers—Kevin Richardson, Raymond Santana, Antron McCray, Yusef Salaam and Korey Wise (the "Five")—were arrested, prosecuted and convicted of a brutal rape that many years later a serial rapist confessed to *solely* committing, and his DNA alone matched. *None of the teens' DNA* matched. Plaintiff (i) was the head of the Manhattan D.A.'s Sex Crimes Unit that prosecuted the Five youths; (ii) hand-picked the lead prosecutor; (iii) was in her own words "the 800-pound gorilla" at the precincts for 30+ hours while they were investigated and interrogated; (iv) visited the crime scene with two of the teens and police; (v) testified at trial in support of their confessions; and (vi) to this day still believes they are guilty, a view she has championed for years. When the actual scenes and actual dialogue at issue are viewed against those facts, against Plaintiff's own words, and importantly in the context of a film dramatization based on a true story taken from the perspective of the Five and their families, there is simply no defamation claim as a matter of law.

Plaintiff professes that her "lawsuit in no way concerns" the "debate over the guilt or innocence of The Five" and she is not "questioning the vacatur of their convictions or attempting to 'silence' their narrative." (Opp. at 3.)  She suggests that the "scenes about which [she] complains" have nothing to do with "their account of what happened."  (*Id.* at 11-12.)  Plaintiff is wrong.  The "narrative" and "account" of the Five, reflected in their later civil rights lawsuit against Plaintiff and other New York City officials that was settled to the tune of $41 million, is that their prosecution and imprisonment was a colossal injustice.  The Series is not Plaintiff's story, nor solely about her.  It is an examination of the inequities and biases of the entire criminal justice system in New York and society in general, dramatically told through the lens of the Five and their parents' harrowing experience.  That narrative includes, of necessity, the antagonistic forces arrayed against them—New York City police, prosecutors, judges, the press.  And it certainly includes the conduct of the public official who oversaw and approved of the investigations (including the interrogations that led to the "confessions") and the prosecution (even after it was clear none of the Five was a DNA match).[1]

Given the undisputed history and her own admissions, Plaintiff cannot deny that as Head of the Sex Crimes Unit, she was the public official who oversaw and had critical responsibility for the prosecution of the Five; that she took credit for the prosecution in the press and her own writings; and that she continues to this day to vociferously defend the investigation and prosecution as not only appropriate but "brilliant," and castigate the Five as guilty.  It is nothing short of offensive for her to now claim she was only a bit player and attempt to dodge responsibility in order to bring a defamation suit that seeks not only damages but an order *removing the Series from circulation*.  If that is not "silencing" the Five's narrative, the word has no meaning.

---

[1]  Plaintiff argues, on the one hand, that this case is not about the "guilt or innocence" of the Five, but then, on the other hand, submits to this Court the "video confessions" of them when they were young teenagers from 1989.  That is the narrative she has championed and wants to perpetuate, while stamping out a film's artistic treatment that encompasses the Five's point of view.

2

Central to the First Amendment is the right to harshly criticize government, including in the context of artistic film dramatizations based on real stories and perspectives that include unflattering portrayals of public officials.  At its core, Plaintiff seeks to evade that criticism by ignoring the Series' essential context, the actual dialogue in the Series, and her own actual, documented words and actions.  The Complaint cannot stand as a matter of law.

## ARGUMENT

### I.   Plaintiff Cannot Avoid The First Amendment's Protection for Defendants' Dramatization of Controversial Historical Events—That Context Is Critical

Plaintiff's sweeping pronouncement that "The First Amendment Affords No Protection to Defendants" (Opp. at 9) is flat wrong.  Plaintiff argues that Defendants "attempt to cloak" the Series "as a 'docudrama,' in order to invoke First Amendment protections to which they are not entitled" and "conveniently relabel[] . . . WTSU as a docudrama after marketing and promoting it as a true story."  (Opp. at 12.)  Plaintiff is either unclear on the concept, or feigning confusion.  A docudrama or historical drama is, by definition, a dramatization of real, historical events.  There was no "relabeling"; on its face, the Series is plainly not a documentary.[2]  It was always a dramatization based on a true story—*the story of the Five from their point of view*—and any viewer would immediately recognize it as such.  *E.g., Lovingood v. Discovery Commc'ns, Inc.,* 800 F. App'x 840, 847-48 (11th Cir. 2020); *John E. Reid & Assocs., Inc. v. Netflix, Inc.,* 2020 WL 1330657, at *8 (N.D. Ill. Mar. 23, 2020).  Indeed, Plaintiff's Complaint admits the Series was marketed as "'*based on*' a true story." (Compl. ¶ 169.)

---

[2]  Plaintiff's only "cite" for the relabeling comment is her Complaint's speculation (¶ 168) "on information and belief" that Netflix changed the label of the Series from a documentary to a drama. Aside from being pure speculation, it is belied by the Series itself, which viewers would know in the first two minutes is not a "documentary."  *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (allegations must be plausible and rise "above the speculative level" to be considered on motion to dismiss); *Degirmenci v. Sapphire–Ft. Lauderdale,* 693 F. Supp. 2d 1325, 1341 (S.D. Fla. 2010) (allegations contradicted by matters referenced or incorporated in the Complaint "are nullified").

Plaintiff's argument also ignores controlling First Amendment law protecting this genre of film and storytelling.  Plaintiff cites *Milkovich v. Lorain Jour.*, 497 U.S. 1, 18 (1990) for the statement that there is no "wholesale defamation exemption for anything that might be labeled 'opinion'" (Opp. at 9), but does not address *Partington v. Bugliosi*, 56 F.3d 1147 (9th Cir. 1995) which applied both *Milkovich* and *Masson v. New Yorker Magazine*, 501 U.S. 496 (1991) in the specific context of dismissing claims like Plaintiff's based on a dramatization.  The Supreme Court in *Masson* emphasized that "statements made in 'a so-called docudrama or historical fiction' should not be accepted unquestioningly" as statements of fact, because "[d]ocudramas, as their names suggests, often rely heavily upon dramatic interpretations of events and dialogue filled with rhetorical flourishes in order to capture and maintain the interest of their audience." *Partington*, 56 F.3d at 1155 (quoting *Masson*, 501 U.S. at 512-13).  Plaintiff elides all that, and does not even cite *Masson*.[3]

Instead, Plaintiff's brief simply repeats the conclusion that "The viewing audience believed these scenes to be truthful as opposed to dramatization."  (Opp. at 7.)  That conclusion contradicts *Masson*.  As *Partington* explains:  "viewers" are "sufficiently familiar with this genre to avoid assuming that all statements within them represent assertions of verifiable facts. To the contrary, most of them are aware by now that parts of such programs are more fiction than fact."  56 F.3d at 1155; *accord John E. Reid,* 2020 WL 1330657, at *7; *Lovingood*, 800 F. App'x at 847-48.

*Masson* also "emphasized that the First Amendment guarantees authors 'the interpretive license that is necessary when relying upon ambiguous sources'" in describing controversial events, *Partington,* 56 F.3d at 1154 (quoting *Masson*, 501 U.S. at 519), "in order to criticize and interpret the actions and decisions of those involved in a public controversy." *Id.* at 1159.  Particularly where, as here, the actions at issue are those of a powerful public official, "the public dialogue that is so

---

[3] Plaintiff's cited cases outside the relevant context (Opp. at 10-11) are consistent with *Partington* as they too consider "the totality of the circumstances in which the statement was made, including the medium by which the statement was disseminated." *Deeb v. Saati*, 778 F. App'x 683, 688 (11th Cir. 2019).

important to the survival of our democracy will be stifled" if writers and filmmakers are forced "to confine themselves to dry, factual recitations or to abstract expressions of opinion." *Id.*

Glibly dismissing the First Amendment's protection, Plaintiff would confine the Defendants to a "dry, factual recitation" of the Central Park Jogger case and measure it by the standards applicable to a documentary or news report—disallowing, on pain of damages, any presentation that compresses events or places characters in different places or enhances dialogue for dramatic effect. That is definitively *not* what the law requires. The Eleventh Circuit's *Lovingood* decision makes this abundantly clear. 800 F. App'x at 847-49.[4] Indeed, in the context of a dramatization critical of government conduct, Plaintiff's take is profoundly at odds with the First Amendment's mandate. (*See* Open. Br. at 14, 16-17.) Hence, despite what she argues in her misleading presentation (Opp. at 9-12) the constitutional protection for artistic works dramatizing historical events is the essential, overarching backdrop to this case that cannot be disregarded in evaluating whether the complained-of scenes from the Series are actionable.

Plaintiff likewise misdirects in arguing that "Defendants waver between the position that the Series is pure fictionalization and that it is substantially true. The Series cannot be both" (Opp. at 3). Not so. When a film is "based on a true story" there are parts that are literally true and other parts that are dramatized and fictionalized, and compressed in time and/or with single characters, to tell the story. Indeed, the complained-of statements are all "dramatic passage[s] of dialogue designed to maintain the viewer's attention" and "'imaginative expression' that enlivens writers'

---

[4] With no answer to the Eleventh Circuit's decision in *Lovingood*, Plaintiff misrepresents the district court's decision as holding that "false reenactment *of events* which damages the reputation of the individual depicted" is not protected. (Opp. at 16 (emphasis added).) In fact, the court held only that "[u]nder certain circumstances, a jury question concerning actual malice could exist" where a defendant *falsified a plaintiff's sworn testimony*. There is nothing like that here. And even so, the claim still failed. What is apt is the court's holding that "[t]his case concerns a docudrama. The 'drama' aspect of the film *presupposes that aspects of the historical event are fictionalized in the film for entertainment purposes*." *Lovingood v. Discovery Comm'cns, Inc.*, 275 F. Supp. 3d 1301, 1313 (N.D. Ala. 2017) (emphasis added).

prose" that the constitution protects. *Partington*, 56 F.3d at 1157 (citing *Milkovich*).

Striving to avoid these core principles and obscure the nature of the Series, Plaintiff complains that the film's disclaimer was not prominent enough, and that Defendants "marketed and promoted" the Series as a true story, pointing to the tag line "The Story You Know" "Is The Lie They Told You" and various tweets and statements by the filmmakers and writers referring to their research for the Series.  (Opp. at 13.)  But these arguments also fail upon scrutiny.  The tag line and tweets simply reflect that the truth being told was that of the Five—namely their truth that they were not guilty of the crime for which they were wrongfully imprisoned ("the lie they told you"); *see also* Open. Br. at 17 n. 17.  Plaintiff cannot somehow turn that tag line into a claim that the Series purported to be a documentary examination, or the equivalent of an investigative news story documenting her literal "role" in every moment.  That simply was not the lens of this Series.

Further, and in any event, the genre of the Series is obvious and, as *Lovingood* teaches, the Court "looks to the film itself," not extrinsic statements, in assessing how a reasonable viewer would perceive it.  800 F. App'x at 847-48.  As in that case, given the "overall format, tone, and direction" of the Series, "[a] reasonable viewer would understand within the first two minutes that he is not watching a documentary film that consists mainly of historical footage and interviews with the historical figures" and "would understand the film as generally not purporting to present verbatim dialogue from the pages of history."  *Id.*[5]

---

[5]  Scrounging for some support for her position, Plaintiff attaches a Georgia district court order that "decline[d] to apply a more relaxed 'docudrama' standard" because Viacom's "Movie was billed as a 'true story . . . without using qualifying terms such as 'based on' or 'adapted from.'"  Gorycki Decl., ECF No. 45-1, Ex. 1 (*Reid v. Viacom Int'l Inc.*, No. 14-cv-01252, Order at 12 n. 7 (N.D. Ga. Sept. 14, 2016)).  *Viacom* is inconsistent with the law and distinguishable on the facts.  It defies the Supreme Court's admonition in *Masson*, and the Eleventh Circuit's recent holding in *Lovingood,* which involved a docudrama whose opening titles even included the statement "This is a true story."  800 F. App'x at 843.  Moreover, unlike *Viacom*, the Series, as Plaintiff concedes, is "billed" as being "*based on*" *a true story* (Compl. ¶ 169), and each Episode ends with a disclaimer that while "inspired by actual events and persons, certain characters, incidents, locations, dialogue and names are fictionalized for the purposes of dramatization" (*id.* ¶ 228).

Finally, while ignoring *Partington*'s holding, Plaintiff mentions the court's caveat that "[w]e do not intimate that the First Amendment shields from scrutiny . . . every statement made in a docudrama [and] . . . authors must attempt to avoid creating the impression they are asserting objective facts."  (Opp. at 12, citing *Partington*, 56 F.3d at 1155.)  But, again, Defendants are not claiming "blanket protection."  And Plaintiff disregards what the court actually meant, which is that "before reaching a final judgment, *we must look to the specific context* in which the statements were made *and to the content* of the statements themselves in order to determine whether they are protected by the First Amendment."  56 F.3d at 1155 (emphasis added).  That is precisely what Defendants did in their motion—meticulously explained why each purported defamatory Scene, in context, is not actionable.  (*See* Open. Br., Sections IV, V.)

Each of the statements, read in context and shorn of Plaintiff's innuendo, are nonactionable under the constitution and common law.[6]  The specific complained-of statements are either protected as hyperbolic or imaginative dramatic expression, or incapable of defamatory meaning, or substantially true as matter of law.  Repeating her litany of what she supposedly didn't do or say and her improper embellishments on what is actually said in the Scenes (*e.g.,* Opp. at 16-18) is no answer to Defendants' showing, *as to each alleged defamatory Scene*, why given the context of a dramatization and the actual dialogue it is nonactionable.[7]

---

[6]  While federal Constitutional law principles fundamentally doom Plaintiff's claim, either New York or California defamation law otherwise applies here (*see* Open. Br. at 13); for further discussion of choice of law, *see* Defs. Reply in Supp. of Lack of Jurisdiction, Improper Venue and Alternatively Transfer.

[7]  Unlike Plaintiff's conclusory pronouncements (Opp. at 34-37), Defendants support their argument with authority and analysis.  *See* Open. Br. at 18-35.  Plaintiff cites *Schiller v. Viacom, Inc.*, 2016 WL 9280239 (S.D. Fla. Apr. 4, 2016) (Opp. at 13); notably the court there *found merit* in defendants' argument that their portrayal of plaintiff in a film "as a 'deplorable, unlikeable, sleazy, rude, abrasive, braggart' who is disparaging 'towards homosexuals, women, foreigners and others'" was protected opinion, but found defendants failed to "identify any specific statements" that fell into this category.  *Id.* at *2.  Not so here.

**II.**    **The Records Defendants Submitted Are Properly Considered on This Motion to Establish The Dialogue at Issue Is Not Actionable And Otherwise Substantially True**

Plaintiff asserts that "[n]early every scene in the Series which depicts Ms. Fairstein is false." (Opp. at 4.)  But the "falsity" Plaintiff claims consists of the fact that the dialogue spoken is not a transcript of what she or the other characters depicted actually said, and she was depicted "at places she never was, and "making decisions" she allegedly "never made." (*Id.* at 2.)  Under the authority discussed in Section I above, literary tools that involve telescoping events, putting characters places they weren't, or speaking dramatized dialogue is not the kind of "falsity" that is actionable under the law of defamation in this context.  *See, e.g., Lovingood*, 800 F. App'x at 847-48.[8]  Moreover, much of the dialogue Plaintiff complains about is not at all "false" but rather substantially true given the undisputed record of Plaintiff's stated views and conduct.

**A.    The Public Records And Other Documents Submitted With Defendants' Motion May Be Considered by the Court**

On a Rule 12(b)(6) motion the Court may consider "the well-pleaded factual allegations, documents central to or referenced in the complaint, and matters judicially noticed." *La Grasta v. First Union Sec., Inc.,* 358 F.3d 840, 845 (11th Cir. 2004); *Lewis v. Gov. of Ala.,* 944 F.3d 1287, 1298 n. 7 (11th Cir. 2019) (when complaint "quotes part of a document" the "full text is 'incorporated into the amended complaint by reference'").  Plaintiff concedes, as she must, that the public records and other documents referenced in her Complaint (including the official New York City case website the Complaint extensively relies upon) are part of that Complaint and may be considered on this Motion.  (*See* Opp. at  27 (conceding that Defendants' Appendix ("Def. Appx.")

---

[8] Plaintiff contends she is "falsely portrayed" as "solely responsible for causing any injustices that may have occurred" (Opp. at 28).  Again that ignores the Series' actual dialogue and scenes.  It is the *entire* system—police, prosecutors, media and society as a whole—that are shown failing the Five young teens.  Portraying Plaintiff as an integral part of that system—the Head of the Unit that prosecuted and championed the guilt of the Five—is an appropriate and constitutionally protected expression, including the use of literary devices that set up the conflicting points of view, with Plaintiff representing the "true believer" in the "justness" of the prosecution's case.  (*See, e.g.,* Open. Br. 10-11, 24-27; *infra* II.B.)

Exs. 1-6, 9. 12, 20 and 21 may be considered as they are either referenced in the Complaint or her deposition testimony in the Five's civil suit that is a matter of public record).)[9]

These and the remaining documents Defendants submitted are also subject to judicial notice.  Plaintiff incorrectly asserts that Defendants are asking the Court "to consider each of their appendix exhibits . . . for the truth of their contents."  (Opp. at 26-27.)  To the contrary, the news articles (including those authored by Plaintiff) should be judicially noticed for "what statements the documents contain" (*i.e.,* plaintiff's use of certain language or expression of certain beliefs), not for the truth thereof (*i.e.,* that the Five are actually guilty).  *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999).[10]  Further, the fact that Plaintiff made those statements is "*not* subject to reasonable dispute" within the meaning of Rule 201 because Plaintiff *admits* she made the statements. They are *in fact not disputed*. *Id*.  Any suggestion otherwise (Opp. at 26) is frivolous.[11]

### B. Plaintiff Has No Credible Response to the Substantial Truth of The Dialogue at Issue Under the Concededly Applicable Standard

Plaintiff "must identify how the defendant's statement was false to survive a motion to dismiss." *Tannerite Sports, LLC v. NBCUniversal News Group,* 864 F.3d 236, 245 (2d Cir. 2017) (affirming dismissal).  Defamation law does not require "an overly technical or exacting

---

[9]  Plaintiff says earlier in her brief that "[a]s discussed below, Defs. Ex. 1 . . . is not properly before the Court" (Opp. at 21 n. 20) but the "discussion below" (Opp. at 30-31) articulates no reason for not considering the public record in question—Ms. Fairstein's 2003 Statement to the New York City Council.

[10]  The November 28, 2018 *N.Y. Times* article (Def. Appx. 10) is referenced in the Complaint (fn. 109) and need not be judicially noticed; that article quotes Plaintiff's statement that "the confessions were not coerced" from her own *N.Y. Law Jour.* article (Def. Appx. 7).  Those articles, Plaintiff's April 19, 1994 *Daily News* article (Def. Appx. 8) and her appearance on *Imus in the Morning* (Def. Appx. 11), along with other articles quoting her (Def. Appx. 12-15) are subject to judicial notice for what Plaintiff stated therein.

[11]  Plaintiff cites *Thoroughbred Legends, LLC v. Walt Disney Co*., 2008 WL 616253 (N.D. Ga. Feb. 12, 2008), but the court there acknowledged that "statements attributed to the Plaintiffs in the 'Ruffian' film may not be actionable if discovery shows that the challenged scenes contain the essence of truth, and that any falsity was incident to 'author's license' in creating a dramatization of the story." *Id.* at *13.  Here, without discovery, the public record and judicially noticeable facts demonstrate that the scenes have the "essence of truth" under the applicable standard.  Plaintiff also argues that the articles are "inadmissible hearsay" (Opp. at 26 n. 27, 34 n. 39).  Of course, a statement is "not hearsay" where, as here, it is "offered against an opposing party" and "was made by the party"—here, admittedly.  Fed. R. Evid. 801(d)(2)(A).

conception of truth in publication," and certainly not in a dramatization, "because fact and fiction may not be crisply delineated categories in defamation cases." *Id.* at 243. Hence, the applicable standard (which Plaintiff does not dispute) is one of *substantial* truth, *i.e.,* that an expression's "overall 'gist or substance'" is true. *Chau v. Lewis*, 771 F.3d 118, 129 (2d Cir. 2014).[12]

Fundamentally, Plaintiff's lawsuit depends on revising history to dodge responsibility for her role in the prosecution and continued defense of it. To that end, in arguing that the records Defendants submitted "do not contradict Ms. Fairstein's allegations that she was falsely depicted in the Series" (Opp. at 3) Plaintiff resorts to evasion and hairsplitting far beyond "overly technical."

She asserts (*id*. at 5) that she "was not at the Park at any time on April 20, 1989"—but does not dispute that she visited the crime scene twice the following morning, including a visit with two of the teens and detectives. She asserts that she "did not question any witnesses" and "was not in charge of any aspect" of the "investigations or interrogations"—but does not dispute that she spent over 30 hours at the precincts during the investigation and interrogations of the Five as the highest-ranking prosecutor and the admitted key liaison with D.A. Morgenthau. She asserts that she "did not come up with the theory of the case" or "create any timelines concerning the attacks"—but does not dispute that as the head of the prosecuting Unit, she not only approved and oversaw the theory of the prosecution, including the timeline used at trial, but agreed with the continuation of the prosecution even after DNA ruled out the Five, and to this day defends that theory and timeline she is invested in, even in the face of Reyes' confession and sole DNA match. (*See* Open. Br. 6-8.)

Plaintiff's fallacious mode of argument is to isolate every piece of testimony and evidence establishing her intimate involvement in the case and declare that each piece, alone, does not

---

[12] Plaintiff asserts that affirmative defenses "generally . . . will not support a motion to dismiss" (Opp. at 9, 25-26), but disregards (1) that truth is *both* an element of her claim and an affirmative defense, and (2) the many authorities deciding the issue of substantial truth on a motion to dismiss. (*See* Open. Br. at 3-4, 22.) Plaintiff also misleadingly attempts to confuse substantial truth with the "libel-proof plaintiff" and incremental harm doctrines (Opp. at 24-25), which Defendants did not raise on this Motion.

"contradict" or "nullify" her "litigation position" that she was "not responsible" and "not in charge of the case against the Five" (Opp. at 28-29).[13] Despite her desire, for purposes of this lawsuit, to minimize her "800-pound" role, Plaintiff cannot deny that the "buck stopped" with her. She does not and could not deny she had a critical role as head of the Unit that was responsible for the prosecution and could have stopped it at any point, including when the teens' DNA did not match.

What is more, Plaintiff does not and could not deny that even after Matias Reyes came forward she continued, unrepentantly, to espouse that the prosecution and the theory that was taken to trial was valid, the outcome just, and the Five guilty. Plaintiff's attempt to now evade her own very public, indisputable statements on this point is nothing but gaslighting and deception, and she goes to absurd lengths to airbrush her record for purposes of this lawsuit. For example, far from ever "agree[ing] with [the] decision" to vacate the convictions (Opp. at 33, citing Def. Appx. 6 (*Wall St. Jour.* Op-Ed))[14], Plaintiff strenuously argued against it in 2003 (Def. Appx. 1). And she has never retreated from ***her consistently expressed position*** that: "these five men were participants, not only in the other attacks that night but in the attack on the jogger" (Def. Appx. 12 (Nov. 2002)); "these men were participants in the attack on the jogger as charged" (Def. Appx. 11 (June 2014)); and "the confessions [to rape] were not coerced" (Def. Appx. 7, 10 (2018)).

Against this backdrop, and as demonstrated in Defendants' Motion (Section V.B.), several specific complained-of Scenes are not actionable in that: (a) the dramatized conversations are a

---

[13]  She argues, for example, that the 2002 *New Yorker* article (Def. Appx. 12) "does not say that Ms. Fairstein prosecuted the case" (Opp. at 28)—but *admits* that she boasted in that article that she was on the scene during the investigation and interrogations "to be the eight-hundred-pound gorilla" supporting the prosecution team and investigators and, consistent with her 2003 testimony to the City Council (Def. Appx. 1), that the investigation she supported "was one of the most brilliant police investigations I've ever seen."

[14]  Plaintiff's June 2019 *Wall Street Journal* Op-Ed attacking the Series represents the first time that Plaintiff has stated that Reyes' confession "required that the rape charges against the five be vacated"—and even that would-be concession is *wholly inconsistent the rest of the Op-Ed*, in which Plaintiff graphically asserts that evidence corroborated the Five's confessions and supported their conviction as accomplices in rape. *See* Def. Appx. 6 (pointing to evidence purportedly implicating Korey Wise and Yusef Salaam in the rape; that semen was found on the Five's clothing, "corroborating [the] confessions"; and asserting that Reyes' confession "changed none of this").

literary device and that they did "not take place" (Compl. ¶ 123) is beside the point in a claim based on a dramatization; (b) the heated and hyperbolic dialogue between the characters is not actionable, and (c) to the extent the portrayal reflects any statement of fact, it is consistent with views Plaintiff has publicly espoused for decades, which cannot be defamatory as a matter of law:

- *Scene 4: "Putting Together a Timeline" (Open. Br. at 25-26).*[15]  Plaintiff does not dispute that depicting her constructing a timeline "to connect the rape to the other assaults that happened in Central Park" (Compl. ¶ 79) could not be defamatory since she has consistently stated that the rape was "connected with" that other criminal activity.  She nevertheless argues these Scenes show her "forcing the timeline to fit her theory of the case in order to pursue a baseless case" (Opp. at 35).  Crucially, however, *Plaintiff is nowhere shown conceding that the case was "baseless"—in these Scenes or any other.*  To the contrary, she is consistently depicted as truly and zealously believing the validity of the case and timeline.  As to "discrepancies" in the timeline, the Scene shows Plaintiff and the detectives believed they had reason to question the accounts of the witnesses and suspects (Ep. 1, 36:00-09) since they "didn't know the Park" (50:41-46).  And Plaintiff does not dispute that this timeline was the basis for presentation to grand jury and trial—*under Plaintiff's watch.*[16]

  Moreover, Plaintiff has proclaimed the essential correctness of that theory and timeline.  Opposing vacatur in 2003, Plaintiff did not merely "discuss" whether "discrepancies in 'the timeline in the case' could be a basis for vacating the convictions" (Opp. at 31)—she specifically sought to refute "critics" that "have questioned the timeline in the case" (Def. Appx. 1).  At the end of the day, there is simply no way for her to found a defamation claim on distancing herself from the timeline by claiming she had no "responsib[ility] for" the timeline's "contents or any actual, or perceived, errors".  (Opp. at 31).

- *Scenes 8 and 10:  Interactions With ADA Lederer (Open. Br. at 26-28).*  First, staging a debate over the strengths and weaknesses of the prosecution's case, with the Fairstein character taking a more aggressive view of the evidence, is a literary device in a dramatization, not an actionable statement of defamatory fact.  *Partington,* 56 F.3d at 1157.[17]  Second, regardless of what ADA Lederer actually thought of the evidence (Opp. at 36), the indisputable fact is that *Plaintiff herself* never once doubted the theory of the case, and it cannot be defamatory of her "ethics and integrity" (Compl. ¶ 122) to show her saying

---

[15]  The numbers assigned to the Scenes are those in the Chart attached as Ex. B to Defendants' Motion.

[16]  Consistent with the Series, the prosecution rebutted the defense's attacks on the timeline by arguing the defendants did not know and were not paying attention to their exact location at any given time and there are "no street signs" in the park.  People's Summation (Aug. 8, 1990), NYCLD_014849-014852.

[17]  As for the Lederer character's reference to the Fairstein character as "delusional," Plaintiff does not address the cases holding such hyperbolic rhetoric is not actionable as a matter of law.  (Open. Br. at 27-28.)  Instead, she cites *Liberty Lobby v. Anderson,* 1990 WL 605337 (D.D.C. July 30, 1990), which did not involve the epithet "delusional" but a statement that plaintiff "attempted to emulate Hitler" in a speech and was actionable in that "emulat[ing] a genocidal madman" implied "insanity or delusion".  *Id.* at *2.

as much.  Plaintiff does not dispute that nothing in Scene 10 can be read as an admission by her that the confessions were "coerced"—just the opposite.  As in the "timeline" Scenes, the dialogue emphasizes her bedrock belief that the confessions were valid, which again the real Linda Fairstein has repeatedly affirmed to this day.  (*See, e.g.*, Def. Appx. 7, 10, 11.)

- ***Scenes 5 and 11:  Interactions With ADA Ryan (Open. Br. at 28-29).***  Like the Lederer Scenes,  the interactions with ADA Ryan reflect dueling opinions over a contested set of facts in a dramatic setting; even if "[t]he show casts . . . Ryan as [a] truth-telling protagonist[]," heated dialogue "during a fictionalized conversation," where both parties have "an ax to grind" cannot be the basis for liability.  *John E. Reid,* 2020 WL 1330657 at *8.  The Ryan character's angry outburst ("you knew you coerced those boys into saying what they did Linda, we pored over your confession tapes") is the hyperbolic expression of her opinion, not a factual statement that *Plaintiff herself* was responsible for the "alleged coercive tactics" (Compl. ¶ 129).  The Ryan character refers to "your" confessions, because Fairstein was the head of the Unit that relied on those confessions in prosecuting the Five—*confessions Plaintiff believes, to this day, were valid and uncoerced*.  That the Ryan character casts the Fairstein character as "responsible" for a prosecution that led to the Five's incarceration (Opp. at 37) when Plaintiff testified in support of the confessions, and has consistently defended that prosecution as just, simply cannot be defamatory.

In sum, if Plaintiff is not disputing in this lawsuit that "an injustice was committed" and the convictions were unsubstantiated and should have been vacated (*see* Opp. at 3, 27), she cannot complain of being portrayed as "pursuing a clearly unsubstantiated case against the Five."  (*Id.* at 33.)  Because pursue it she did.  Like the real Linda Fairstein, the Fairstein character is accurately depicted as a "true believer" in the prosecution's theory and the guilt of the Five.  That portrayal "could have produced no worse an effect on the mind of a reader than the truth pertinent to the allegation." *Tannerite Sports*, 864 F.3d at 241-42.[18]

## III.   Plaintiff Does Not Dispute That Certain Complained-of Scenes Have No Defamatory Meaning And That Innuendo Alone Cannot Be The Basis For a Defamation Claim

Many of the purported "false facts" (Opp. at 22) Plaintiff asserts simply have no plausible defamatory meaning, which is "a legal question to be resolved by the court in the first instance."

---

[18]  If Plaintiff's vigilant defense of the prosecution and insistence on the Five's guilt causes some to view her as "unrepentant" or "racist," those are protected opinions.  Notably, the June 11, 2019 tweet by Ms. Locke that Plaintiff repeatedly cites (Opp. at 2, 8, 15, 33), apparently for shock value, refers to Plaintiff as "unrepentant" in response to her June 10, 2019 *Wall St. Journal* Op-Ed, "Netflix's False Story of the Central Park Five," assailing the Series.  (Def. Appx. 6.)

*Aronson v. Wiersma*, 65 N.Y.2d 592, 593-94 (1985).  Critically, on a motion to dismiss, the Court is not obliged to "take the plaintiff's *interpretation* of the allegedly defamatory words at face value." *Lott v. Levitt*, 556 F.3d 564, 569 (7th Cir. 2009) (italics in original).

Plaintiff does not dispute that certain Scenes she identifies in her Complaint simply have no plausible defamatory meaning; they cannot be said to bring the "hatred, shame," or "contempt" necessary to sustain a defamation claim.  *Kimmerle v. N.Y. Evening Jour.*, 262 N.Y. 99, 102 (1933).

- *Scene 1:  Plaintiff "At the Crime Scene" (Open. Br. at 23).*  Plaintiff does not respond to Defendants' demonstration that this Scene is not defamatory because the comment ("[m]ake sure to get those drag marks. . . . Clear as day. *His footsteps*, her body" (Compl. ¶ 52 (emphasis Plaintiff's)) cannot be read as a definitive determination that there was "only one" perpetrator.  Nor does Plaintiff dispute that it is simply not defamatory to say that an initial theory changed based on additional evidence.[19]

- *Scene 2: "Drafting a Press Release" (Open. Br. at 23-24).*  Plaintiff does not dispute that showing her "drafting a press release" (Compl. ¶ 59) is not defamatory and that the scene cannot be spun to convey that her press release was the "source" or cause of "widely criticized" press coverage.

- *Scene 5: "Fighting With Nancy Ryan" (Open. Br. at 24).*  While Plaintiff makes other meritless arguments about this Scene (*see supra* II.B.) and cannot deny the admission in her own letter on the topic (Def. Appx. 3), she does not dispute that the suggestion she "fought with" Nancy Ryan over "who would prosecute the case" (Compl. ¶ 46d and p. 25)—that is, the unremarkable suggestion that she would want her Unit to be in charge of this high profile and significant case—is not defamatory.

Plaintiff claims that certain other Scenes impute that she "violated the law"; on their face, these Scenes are incapable of supporting that imputation, and instead require Plaintiff to improperly supplement the actual language with her own spin and innuendo.  As a matter of law, innuendo alone cannot be the basis for a defamation claim, and it cannot be used to "enlarge upon the meaning of words so as to convey a meaning that is not expressed."  *Tracy v Newsday, Inc.,* 5 N.Y.2d 134, 136 (1959).  (*See* Open. Br. at 22.)  *Plaintiff does not dispute that basic legal*

---

[19]  Even if this dialogue could be extrapolated into a statement that the theory "changed" from one to multiple attackers, Plaintiff approved of the prosecution based on that "changed" theory and championed it for decades thereafter; she cannot base a defamation claim on being aligned with that "changed" theory. *See supra* II.B.

*proposition*, and it dooms her claims based on these scenes.  Nor does Plaintiff dispute that, in

determining whether statements are "reasonably susceptible to a defamatory connotation . . . a

court does not construe the challenged statements 'with the close precision expected from lawyers

and judges'. . . ."  *Seymour v. Lakeville Jour. Co.*, 150 F. App'x 103, 104-105 (2d Cir. 2005).  That

too scuttles her claims based on these Scenes.

- *Scene 3: Purported Questioning of "Unaccompanied Minors" (Open. Br. at 30-32).*
  Plaintiff ignores the grounds for dismissal of her claim based on this Scene.  Instead she
  repeats her conclusion that "it portrays Ms. Fairstein breaking the law to coerce
  information out of unaccompanied minors" and arguing "[t]he average viewer would be
  familiar with the reading of *Miranda* rights to persons in custody, as this an act that is
  routinely depicted in television and film."  (Opp. at 35.)  The fact that people arrested on
  TV are read their *Miranda* rights does not support Plaintiff's speculative leap that if the
  *Miranda* reading is *not* depicted on screen, viewers will assume that the cops never
  Mirandized the suspect and "broke the law."  Certainly, there is no mention in the Scene
  of any State law (much less that Fairstein was violating it).  No reasonable viewer would
  understand Plaintiff's brief exchange with one of the witnesses to be a violation of New
  York statutory law.  *Seymour*, 150 F. App'x at 104-105.  On its face, the Scene cannot be
  read to state what Plaintiff says.  Even if it could, Plaintiff does not dispute that a technical
  failure to comply with *Miranda* or the New York statute is not defamatory; it is not itself a
  criminal act—or even a Constitutional violation.  (Open. Br. at 31-32.)[20]

- *Scene 7: "No Kid Gloves" (Open. Br. at 32-33).*  The complained-of dialogue ("This is
  not business as usual. The press is crawling all over this. No kid gloves here. These are not
  kids. They raped this woman. Our lady jogger deserves this") is the kind of typical heated
  rhetoric used for dramatic purposes when a novel or film depicts authorities under pressure
  to solve a particularly heinous crime (*e.g., John E. Reid*, 2020 WL 1330657 at *8*); whether
  or not "kid gloves" has a "readily discernible meaning" (Opp. at 21) is no answer to the fact
  that such colorful language and dramatic tropes cannot be the basis for a conclusion that the
  Fairstein character ordered detectives to "act unlawfully with respect to the interrogation of
  minors in a criminal case." (*Id.*)  Again, that is nothing but Plaintiff's own improper
  addition to the text.

- *Scene 8: Korey Wise is the "Glue" (Open. Br. at 33).*  The Fairstein character's
  statement that Mr. Wise is the "glue" that will hold the case together cannot be taken as
  "directing an NYPD detective to coerce, and beat, testimony from Korey Wise" (Opp. at

---

[20]  Plaintiff asserts that the incident in which Yusef Salaam's mother challenges Plaintiff about
interrogating her minor son without her present "does not contradict Ms. Fairstein's allegation that she
was falsely depicted as questioning unaccompanied minors" (Opp. at 28); of course it does.  As Judge
Titone stated in his scathing dissent, "there can have been no other reason" for Plaintiff "to prevent
defendant's aunt, 'Big Brother' and mother from speaking to him other than to capitalize on his youth and
isolation."  A false statement is not actionable if it could have produced no worse an effect on the mind of
the reader than the truth.  *See, e.g., Tannerite Sports,* 864 F.3d at 241-42.

35-36); that conclusion is simply Plaintiff's attempt to amend the dialogue through improper innuendo. The actions portrayed are those of the detectives alone, and the "glue" dialogue cannot be transformed into a directive by Plaintiff to beat Mr. Wise. "[T]he interpretation plaintiff attempts to establish by innuendo distorts the logical meaning of the text beyond the limits of its language." *El Meson Espanol v. NYM Corp.*, 521 F. 2d 737, 740 (2d Cir. 1975).

- ***Scene 9: Discussion of DNA Evidence (Open. Br. at 33-35).*** Plaintiff tries to spin the Scene where the prosecution team discusses the sock DNA into an accusation she "conceal[ed] potentially exculpatory evidence" to "spring it on defense counsel on the eve of trial," in violation of ethical duties. (Opp. at 36.) The Scene does not refer the prosecution's disclosure obligations under the rules of criminal procedure, and ordinary viewers would not assume that the Fairstein character's "surprise" comment was intended to allude to those obligations. *Seymour*, 150 F. App'x at 104-105. In any event, Plaintiff ignores that, read in context of the entire Episode, the sock DNA was definitively *not* helpful evidence the prosecution could have used to "surprise" defense counsel—*because after it was tested it came back negative as to the Five*. (*See* Compl. ¶ 120.)

In short, these Scenes, on their face, do not carry the defamatory imputation of illegality that Plaintiff alleges and a defamation claim cannot be constructed from her "strained or artificial construction," *Dillon v. City of N.Y.,* 261 A.D. 2d 34, 38 (1st Dep't 1999) and amendment by improper innuendo. *Tracy,* 5 N.Y.2d at 136.

## IV.   **The Fairstein Character's Hyperbolic, Dramatized Dialogue Is Consistent With How Plaintiff Spoke About The Five and Is Not Actionable As a Matter of Law**

Plaintiff complains of dialogue where the Fairstein character uses harsh language and "code" words—"wilding," "animals," "thug" (Opp. at 5, 19-20); she alleged in her Complaint that she would "never . . . use[]" such language (Compl. ¶ 165), but when confronted with the undeniable truth that *she repeatedly used* "wilding" and assorted "dehumanizing" verbiage in condemning the Five (and other criminal defendants) (*see* Open. Br. at 18-19), Plaintiff has no answer other than to weakly assert that "Ms. Fairstein places the term [wilding] in quotes, indicating that it is a defined term rather than her own." (Opp. at 19, 31-32.) Whether she put it in quotes or not, she admits she used and propagated the phrase "wilding" to describe the teenagers.[21]

---

[21] If anything, the quotes signaled that the word "wilding" was attributed the young teens—*i.e.,* it was the word they supposedly used to describe their activities in the Park. Certainly, the Series does not depict

Her argument about "when" she said the words is equally frivolous; if it was offensive to use the word "wilding" in 1989, it was as offensive to do so in 1994, and arguably even more so in 2003 when she told the N.Y.C. Council that the Five "participated in the wilding and attacks" (*without quotes*) after the real rapist confessed and she was pushing to maintain the guilty convictions. (Def. Appx. 1.)  She similarly (and bizarrely) points out that "[t]he truth or falsity of whether or not the persons at issue were thugs . . . is not at issue here."  (Opp. at 21 n. 18.)  No, the issue is whether the portrayal could defame Plaintiff in view of her own admitted statements and actions, and the answer is it could not.  For that reason alone, any claim based on this language cannot stand.

Even if use of these terms in the dialogue is not subject to dismissal on substantial truth grounds, it is still not actionable as a matter of law.  The use of fiery language or potentially "coded" words in dialogue in a dramatization as a way of exploring how language and phrases like "wiling," or "wilding" or "thug" can be interpreted, can evolve or can "dehumanize" others, is part of the art form.  Certainly, it is not a positive accusation that the Fairstein character is *ipso facto* a "racist".  It could not be.  Where, as here, statements may mean different things to different people they are not capable of being proven true or false because of their subjective, relative meanings.  (Open. Br. at 20-21.)  Where a word's "meaning is variable, unverifiable, controversial, a matter of opinion, whom you listen to, and whose side you are on, among other things" it "does not have a 'precise core of meaning.'"  *Ollman v. Evans*, 750 F.2d 970, 1015 (D.C. Cir. 1984) (MacKinnon, J., concurring).[22]  That basic principle, which Plaintiff ignores,

---

the Fairstein character as being responsible for "originating" use of the term "wilding" (Opp. at 35); it shows that the word was in the police report itself, not something that Fairstein came up with on her own; that she didn't understand what it was, and that *another* character—a female police officer—introduced the idea that it was "wilding" not "wiling".  (Ep. 1, 9:44-54.)

[22]  The recent decision in *La Liberte v. Reid,* No. 19-3574, 2020 WL 3980223 (2d Cir. July 15, 2020) is not to the contrary and does not help Plaintiff.  It involved a direct assertion of racist conduct; it did not involve dialogue in a dramatization, and did not depend on drawing a conclusion of "racist motivations" from contested, subjective meanings of words used in that dialogue.

forecloses her attempt to found a claim on this dialogue.

Plaintiff complains in particular about Scene 6, but "analyzing [that scene] in context" (Opp. at 21 n. 19) makes it even more clear that no defamation claim will lie.  The heated dramatic dialogue ("you stop every little thug you see")—spoken in reference to the "group" of youths that were reportedly committing crimes "in the park last night" and were persons of interest in the rape of the jogger—is consistent with any police procedural where a terrible crime has been committed and the desperate authorities launch a dragnet for suspects.  "Even a novice police-procedural viewer in Netflix's audience would pick up on that context and understand the character's aggressive word choice as a rhetorical device."  *John E. Reid*, 2020 WL 1330657 at *8. That rhetorical device cannot be transformed into a *factual* assertion that the Fairstein character "was pursuing a racist agenda."  (Opp. at 21.)

On its face, the Fairstein character's "agenda" or "motivation" in the Scene was the speedy apprehension of the perpetrators of a heinous rape that riveted New York.  But even if the Scene could be spun to suggest bias on the part of the Fairstein character, that criticism of a public official's conduct is classically protected speech.  "[B]ias or motivation is quintessentially subjective and therefore may not form the basis for an action for defamation;" no claim will lie based on Defendants expressing their opinion of her performance as a high ranking prosecutor, "no matter how unreasonable, extreme or erroneous these opinions might be."  *Rappaport v. VV Publ'g Corp.*, 163 Misc.2d 1, 9 (Sup.Ct. N.Y. Cty. 1994), *aff'd*, 223 A.D.2d 515 (1st Dep't 1996). "It is vital to our form of government that press and citizens alike be free to discuss *and, if they see fit, impugn the motives of public officials*." *Id.* at 11 (emphasis added).

Plaintiff's actions as a public official, and her continued support of their conviction as a "wilding" "pack" of "marauders" is fair game for criticism.  Contrary to what Plaintiff suggests (Opp. at 22) this critique is no less protected because it is in the form of a dramatization and not

an "abstract expression[] of opinion" or "dry, factual recitation[]." *Partington*, 56 F.3d at 1158.

## V.   Plaintiff Cannot Avoid Dismissal by Overwhelming The Court With Paper or Establish a Defamation Case by an Anecdotal Poll of Social Media Users

And then there's Plaintiff's Appendix.  Plaintiff tries to avoid dismissal by throwing in the

proverbial kitchen sink with a 3,000-plus page Appendix of transcripts, social media posts, news

stories and evidence from the original 1990 trials—including the controversial videotaped

"confessions" taken from the Five in 1989.  *See* Pl. Appx. (ECF No. 46).  That tactic does not work

here because, as Defendants have established, the bulk of what Plaintiff throws at the Court is

simply not relevant to *the issues on this Motion*, given the *actual* dialogue at issue, given the

context (a dramatization) and given Plaintiff's own *admitted* actions and prior statements.[23]

Plaintiff does not dispute that the issue of whether a statement has defamatory meaning is

one for the Court in the first instance.  (Open. Br. at 21-22.)  And, contrary to what Plaintiff

argues (Opp. at 13-15), in evaluating whether statements are actionable as a matter of law, the

Court does not rely on a poll of viewers (much less anecdotal social media comments).  *See, e.g.,*

*Aboutaam v. Dow Jones & Co.,* 180 A.D.3d 573, 575 (1st Dep't 2020) ("Whether a statement is

defamatory is a legal question to be determined by the court, not by survey participants").[24]

Plaintiff nevertheless attempts to improperly enlist the strong and emotional public reaction

to the Series to establish that it is defamatory.  (Opp. at 14.)  But there is no getting around the fact

---

[23]  In addition to a selective and one-sided sampling of testimony from the civil and criminal proceedings, Plaintiff's voluminous Appendix includes all of Ms. DuVernay's and Ms. Locke's tweets; she asserts that she "specified" those tweets she claims are defamatory (Opp. at p. 15 n. 14), but basically just lists all the Complaint paragraphs that allege tweets.  Plaintiff does not identify why or how any of the tweets are false or defamatory; they are not.  Aside from any defamation by tweet not being well-pleaded, Plaintiff ignores that there is no personal jurisdiction over these Defendants.

[24]  The *Palin* court's offhand comment about social media backlash does not establish such a rule either; the court held defendant's opinion argument "goes nowhere" because whether or not the motivations of Jared Loughner were "ultimately unknowable" the statement accusing Sarah Palin of "political incitement" in the case was factual.  *Palin v. N.Y. Times Co.*, 940 F.3d 804, 815-16 (2d Cir. 2019).

that Plaintiff played an important role in a "disastrous chapter of . . . history," and "a non-defamatory reflection" on that chapter "would not necessarily have an 'innocent meaning' for those depicted."  (Open. Br. at 17 n. 18, quoting *Chau v Lewis*, 771 F.3d at 132.)  Plaintiff cannot foreclose critical discussion of the Central Park Jogger prosecution because she does not come off well in the telling.  And here, the portrayal is entirely consistent with her words and deeds.

For example, Plaintiff concedes that the scene depicting the Fairstein character's confrontation with Yusef Salaam's mother—the subject of the excoriating Titone dissent—is not part of her defamation claim (Opp. at 3, 28), and that non-defamatory speech could alone be the basis of the viewing public's outrage.  The incident demonstrates not only how intimately involved Plaintiff was with the interrogation process, but vividly illustrates how the criminal justice system in this case capitalized on the vulnerability of these young teenagers.  As the *Chau* court held, in light of the history of these events, culminating in demonstrably wrongful convictions and imprisonment, no one involved in the investigation and prosecution would come off well—and certainly not Plaintiff, who had the power to stop, and continues to defend, the prosecution.

The truth is, the Series shone a light on Plaintiff as an important public official that was an integral part of the overall prosecution—who was feted for its initial success (even being considered by Bill Clinton for Attorney General) and who parlayed that fame into her successful career as a crime novelist, all the while maintaining the Five's guilt, even after Matias Reyes confessed.  In response, members of the public want to hold her—and others—accountable.  That does not mean that the Series defames her; it means history caught up with her.

## CONCLUSION

The Complaint should be dismissed with prejudice.

Dated: July 29, 2020                    Respectfully submitted,

                                        */s/ Natalie J. Spears*
                                        _____

                                        Natalie J. Spears (*pro hac vice*)
                                        Gregory R. Naron (*pro hac vice*)
                                        Jacqueline A. Giannini (*pro hac vice*)
                                        DENTONS US LLP
                                        233 South Wacker Drive, Suite 5900
                                        Chicago, Illinois 60606
                                        Phone: (312) 876-8000
                                        *natalie.spears@dentons.com*
                                        *gregory.naron@dentons.com*
                                        *jacqui.giannini@dentons.com*

                                        Kelley Geraghty Price (Florida Bar #889539)
                                        DENTONS COHEN & GRIGSBY P.C.
                                        Mercato - Suite 6200
                                        9110 Strada Place
                                        Naples, Florida  34108
                                        Phone: (239) 390-1913
                                        *kelley.price@dentons.com*

                                        Kiran Patel (*pro hac vice*)
                                        DENTONS US LLP
                                        1221 Avenue of the Americas
                                        New York, New York  10020
                                        Phone: (212) 768-6700
                                        *kiran.patel@dentons.com*

                                        *Attorneys for Defendant Netflix, Inc.*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on July 29, 2020, a true and correct copy of the foregoing was

served by CM/ECF on all counsel or parties of record on the service list.


*/s/ Natalie J. Spears*